**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**
―――――――――――――――――――――――――――――

PETER A. CRAWFORD,

        Plaintiff,

                                     Civil Action No.
v.                                     05-cv-10078 (DPW)

WOLVERINE, PROCTOR & SCHWARTZ, INC.,
STEVEN F. CHILINSKI, and
DEEPAK S. KULKARNI,

        Defendants.
―――――――――――――――――――――――――――――

**MEMORANDUM IN SUPPORT OF DEFENDANTS'**
**MOTION FOR PARTIAL DISMISSAL OF PLAINTIFF'S COMPLAINT**

Mark M. Whitney (BBO # 637054)
Jeffrey D. Kuhn
MORGAN, BROWN & JOY, LLP
*Attorneys for the Defendants*
200 State Street
Boston, Massachusetts  02109
(617) 523-6666

## PRELIMINARY STATEMENT

Defendants Wolverine, Proctor & Schwartz, Inc. ("Wolverine"), Steven F. Chilinski ("Chilinski") and Deepak S. Kulkarni ("Kulkarni") (collectively "Defendants") hereby submit the following memorandum in support of their Motion to Dismiss the second, fourth, fifth, sixth and seventh causes of action articulated in plaintiff's Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted.

Plaintiff *pro se*, Peter A. Crawford ("Crawford"), commenced the instant suit on January 12, 2005.  Crawford's Complaint, which seeks $1,792,710 in damages, asserts seven causes of action sounding in breach of contract, violations of the Massachusetts Payment of Wages Act and tortious interference with a contractual relationship. Crawford, the former Chief Operating Officer ("COO") of Wolverine, alleges that he is owed a bonus and certain unpaid wages arising out of his employment with Wolverine from December 1999 through January 2002.

Crawford has failed to state a claim upon which relief may be granted with respect to five of his seven causes of action for the following reasons:

- Crawford's claims for violations of the Payment of Wages Act must be dismissed because the statute is inapplicable to the type of bonus payment at issue here. (Second and Fourth counts of the Complaint)

- Crawford's claim for tortious interference against Kulkarni must be dismissed because Kulkarni cannot be held liable for interfering with a contract to which he is a party.  (Seventh count of the Complaint)

- Crawford's claims for breach of the parties' Transition Agreement and his related Wage Act claim must be dismissed because Crawford's allegations do not support a finding of breach by Wolverine.  (Fifth and Sixth counts of the Complaint)

Thus, as set forth more fully below, Defendants respectfully request an Order from this Court dismissing with prejudice the second, fourth, fifth, sixth and seventh causes of action of the Complaint.

## STATEMENT OF RELEVANT FACTS[1]

Crawford began his employment as Wolverine's COO on December 30, 1999. Complaint ¶ 9. On January 4, 2000, Crawford and Kulkarni, Wolverine's President and Chief Executive Officer ("CEO"), executed a written employment contract (the "Employment Contract"). Id. Crawford's Employment Contract provided for an annual base salary of $150,000, stock options and an annual bonus (the "Bonus"). Id. The Employment Contract contained a formula by which any potential Bonus due Crawford was to be calculated. Id. A copy of Crawford's Employment Agreement is attached as Exhibit 1 to the Affidavit of Mark Whitney ("Whitney Aff."), submitted in support of this Motion.[2]

In late 2001, Wolverine (with Kulkarni as its sole shareholder) and a group of investment entities which included Parthenon Investors II, L.P., PCIP Investors and J&R Founders' Fund, L.P. (collectively referred to as "Parthenon") entered into an acquisition agreement. Complaint ¶ 16. Under the acquisition agreement, Kulkarni's shares in Wolverine were transferred to a new entity, Wolverine, Proctor & Schwartz, LLC ("WPS LLC"). Id. Parthenon also lent funds to the old Wolverine entity for the purpose of

---

[1]    In accordance with Fed. R. Civ. P. 12(b)(6), Defendants draw upon the allegations of the Complaint as factual support of this Motion. See, Carreiro v. Rhodes Gill and Co., Ltd., 68 F.3d 1443, 1446 (1st Cir. 1995).

[2]    In deciding a motion to dismiss, "a court may properly consider the relevant entirety of a document integral to or explicitly relied upon in the complaint, even though not attached to the complaint, without converting the motion into one for summary judgment." Howe v. Bank for Intern. Settlements, 194 F. Supp. 2d 6, 13 (D. Mass. 2002) (Lindsay, J.) (citing, Shaw v. Digital Equipment Corp., 82 F.3d 1194, 1220 (1st Cir. 1996)).

retiring Wolverine's remaining bank debt.  Id.  Following this transaction, which closed

between December 28 and December 31, 2001, Parthenon controlled a majority of the

board of directors of WPS LLC, which in turn owned all of the shares of Wolverine.  Id.

Crawford alleges that, in connection with the Wolverine/Parthenon transaction,

Kulkarni ceased acting as Wolverine's CEO and, instead, became a member of the WPS

LLC Board while continuing to serve as a consultant to Wolverine.  Complaint ¶ 17.

On December 28, 2001, Crawford entered into a Transition Agreement with

Wolverine (the "Transition Agreement").  Complaint ¶ 18.  Pursuant to the Transition

Agreement, Crawford agreed to "perform such services to and for [Wolverine] as may be

reasonably requested by the Chief Executive Officer of the Company or its Board of

Directors to facilitate the transition of [Wolverine's] management."  A copy of the

Transition Agreement is attached as Exhibit 2 to the Whitney Aff.  Under the Transition

Agreement with Wolverine, Crawford would be paid for his services at a rate identical to

his prorated salary for the previous year.  Kulkarni executed the Transition Agreement in

his capacity as Chairman of the Board of Wolverine.  Complaint ¶ 64.

Under Section 2 of Crawford's Transition Agreement with Wolverine, Crawford's

future employment with Wolverine was limited to a maximum of three months – *i.e.*,

until March 31, 2002, at the latest.  Whitney Aff., Ex. 2.  The Transition Agreement also

contained a provision whereby Crawford's future employment with Wolverine could be

terminated prior to March 31, 2002.  Id.  The Transition Agreement states that

Crawford's further employment with Wolverine could be terminated prior to March 31,

2002, "for any reason or no reason" provided that the CEO furnished Crawford with

written notice of termination.  Id.

On January 14, 2002, sixteen days following execution of the Transition

Agreement by Crawford and Kulkarni, Crawford was informed that the Wolverine Board

of Directors had elected to terminate his employment.  Complaint ¶ 23.  On January 18,

2002, Crawford received formal written notice and confirmation of the Board's action

terminating his employment with Wolverine.  Complaint ¶¶ 23, 59.

## ARGUMENT

Rule 12(b)(6) requires dismissal of a claim where it appears "beyond doubt that

the plaintiff can prove no set of facts in support of his claim which would entitle him to

relief."  Conley v. Gibson, 355 U.S. 41, 45-46 (1957); see also Rumford Pharmacy, Inc.

v. City of East Providence, 970 F.2d 996, 998 (1st Cir. 1992).  When reviewing a motion

to dismiss under Rule 12(b)(6), the Court must accept as true the allegations of the

Complaint.  Carreiro v. Rhodes Gill and Co., Ltd., 68 F.3d 1443, 1446 (1st Cir. 1995).  If

the allegations as set forth in the Complaint are still insufficient under any theory to state

a claim upon which relief can be granted, the defendant is entitled to an order of

dismissal.  Aulson v. Blanchard, 83 F.3d 1, 3 (1st Cir. 1996); Brown v. Hot, Sexy and

Safer Productions, Inc., 68 F.3d 525, 530 (1st Cir. 1995), cert. denied, 516 U.S. 1159

(1996).

## POINT I

**THE SECOND AND FOURTH CAUSES OF ACTION, WHICH
ALLEGE VIOLATIONS OF M.G.L. c. 149, §§ 148 AND 150, MUST
BE DISMISSED BECAUSE THE WAGE ACT IS INAPPLICABLE
TO CRAWFORD'S BONUS**

The second cause of action included in Crawford's Complaint is entitled

"Violation of Massachusetts Payment of Wages Statute."  Complaint ¶¶ 31-36.  Crawford

alleges that he is owed a Bonus in the amount of $357,856.25 in connection with his

4

fiscal year 2001 employment at Wolverine.  Crawford claims that Defendants' refusal to

pay this Bonus violates the wage payment provisions of M.G.L. c. 149, §§ 148 and 150

(the "Wage Act") and, as a result of this statutory violation, Wolverine and Chilinski (in

his capacity as Wolverine's CEO) are liable to Crawford for treble damages, costs and

attorneys fees.  Id.

Crawford's fourth cause of action alleges a further violation of M.G.L. c. 149,

§§148 and 150 in connection with a purported oral modification to the original Bonus

provisions of Crawford's Employment Contract.  Complaint ¶¶ 37-42.  As a result of the

purported oral modification, Crawford alleges that the total Bonus he is due from

Wolverine for FY 2001 is actually $572,570.00 – an additional $214,713.75 beyond what

Crawford claims he is due under the written provisions of his Employment Contract.

Complaint ¶ 42.  As a result of this further alleged violation of M.G.L. c. 149, §§148 and

150, Crawford claims that defendants are liable to him for three times his actual damages,

costs and attorneys fees.  Id.

Both Crawford's second and fourth causes of action must be dismissed, however,

because of the well-established precept that the provisions of M.G.L. c. 149, §§ 148 and

150 are inapplicable to claims for bonus payments or other irregular forms of

compensation.

M.G.L. c. 149, §§148 and 150 "mandates the prompt, bi-weekly payment of

*wages* by employers to their employees."  Baptista v. Abbey Healthcare Group, Inc., No.

95-10125-RGS, 1996 WL 33340740, *4 (D. Mass. Apr. 10, 1996) (emphasis supplied)

(Stearns, J.); see also Massachusetts v. Morash, 490 U.S. 107, 109-110 (1989).  The

Massachusetts Supreme Judicial Court, in its oft-cited decision American Mutual

Liability Ins. Co. v. Commission of Labor and Industries, 340 Mass. 144 (1959),
concluded that the Legislature enacted section 148 to limit "the interval between the
completion of a work week and the payday on which the wages earned in that week will
be paid." Id. at 145. The "statute was intended and designed to protect wage earners
from the long-term detention of wages by unscrupulous employers as well as protect
society from irresponsible employees who receive and spend lump sum wages."
Cumpata v. Blue Cross Blue Shield of Massachusetts, 113 F. Supp. 2d 164, 167 (D.
Mass. 2000) (citing, American Mutual Ins., 340 Mass. at 147). Under section 148, "an
aggrieved party may sue for injunctive relief and any damages incurred, including treble
damages for any loss of wages or other benefits." Cumpata, 113 F. Supp. 2d at 166.

     Courts in Massachusetts have "construed the scope of the Wage [Act] narrowly."
Okerman v. VA Software Corp., No. 0101825, 2003 WL 21960599, *8 (Mass. Super. Ct.
July 9, 2003) (citing, Commonwealth v. Savage, 31 Mass. App. Ct. 714, 716 (1991)). It
is well-established that the intent of Wage Act was "to protect laborers and casual wage
earners who might otherwise be vulnerable to employer intimidation." Cumpata, 113 F.
Supp. 2d at 167. While the courts in Massachusetts have "applied the statute to corporate
executives as well as to lower level employees," the statute's applicability "is limited to
the payment of ordinary wages and wage equivalents, specifically accrued vacation pay
and sick leave." Id.; Morash, 490 U.S. at 117.

     "Wages," as the term is used in the Wage Act, is "money to which the employee
has an absolute right; it is 'his or her property … not subject to any limitations,
contingency, or delay' in payment." Huebsch v. Katahdin Industries, Inc., No. 4483,
2001 WL 716884, *2 (Mass. Super. Ct. Apr. 24, 2001). The Appeals Court has expressly

contrasted wages, which are "regular and insubstantial," with "bonuses or commissions

that are episodic and substantial." Id. (citing, Savage, 31 Mass. App. Ct. at 716).  Any

"irregular and substantial compensation," such as the Bonus claimed by Crawford in the

instant action, is "not afforded the protection of the Wage Act."  Cumpata, 113 F. Supp.

2d at 167 (citing, Dennis v. Jager, Smith & Stelter, P.C., No. 98497G, 2000 WL 782946,

*1 (Mass. Super. Ct. Apr. 10, 2000) (compensation "triggered by contingencies" is

outside the scope of the Wage Act)).  Likewise, other forms of contingent compensation,

such as conditional bonuses or high-end commissions, are also outside the scope of

sections 148 and 150.  See Savage, 31 Mass. App. Ct. at 716; Okerman, 2003 WL

21960599, at *8; Locke v. Sales Consultants of Boston, Inc., No. 984081, 2001 WL

716911, *2 (Mass. Super. Ct. Apr. 13, 2001) (payment of commissions that were paid on

a quarterly rather than weekly basis and were subject to contingencies not covered by

Wage Act); Cumpata, 113 F. Supp. 2d at 167 (sales commissions that were contingent on

employee's ability to meet certain quotas not covered under the Wage Act).

    This Court's decision in Baptista v. Abbey Healthcare Group, Inc., No. 95-10125-

RGS, 1996 WL 33340740 (D. Mass. Apr. 10, 1996) (Stearns, J.), is instructive and

directly on point.  The plaintiffs in Baptista were two executives who claimed that their

former employer, Abbey Healthcare Group, promised that they would be entitled to

exercise certain stock options in the event they were terminated.  When the defendant

terminated the plaintiffs and failed to grant their claimed stock options, plaintiffs filed

suit alleging, inter alia, violations of M.G.L. c. 149, §§ 148 and 150.  In discussing

plaintiffs' Wage Act claims in Baptista, this Court noted the well-established rule that the

protections of sections 148 and 150 were applicable only "to the payment of ordinary

wages and wage equivalents."  1999 WL 33340740, at *4.  In granting the defendant's motion to dismiss plaintiff's claims under sections 148 and 150, this Court held that "there is no reason to extend the protections of a wage earner's statute to cover *bonuses* potentially owing to highly paid executives… There is even less reason to extend the opportunity to collect 'treble damages for any loss of wage and other benefits and an award of the costs of the litigation and reasonable attorney fees."  Id. (emphasis supplied).

Moreover, the plain language of the Wage Act the statute expressly refers to holiday pay, vacation pay, and definitely determined commissions.  M.G.L. c. 149, §§ 148 and 150.  However, it does not refer to executive bonuses or similar terms.  Id.  In Prozinski v. Northeast Real Estate Services, LLC, 59 Mass. App. Ct. 599 (2003), the Appeals Court interpreted the Wage Act narrowly and rejected a former employee's claim for severance pay under the Wage Act in part because "severance pay" and words similar to it were not expressly mentioned in the Wage Act.  Id. at 604.  Similar logic applied here compels the same result.

Here, in the Complaint's second and fourth causes of action, Crawford is attempting to extend the protections of the Wage Act to his unpaid Bonus claims.  The law is well-settled that sections 148 and 150 apply only "the payment of ordinary wages and wage equivalents."  Cumpata, 113 F. Supp. 2d at 167-68 (this Court emphasized that "there is no evidence that the Legislature intended to provide treble damages and attorney's fees and costs to professionals enforcing their asserted contract rights.") Crawford is not the type of low-wage, weekly laborer that the Wage Act is designed to protect.  Id. at 168; Savage, 31 Mass. App. Ct. at 716.  Crawford's Bonus was not only

"episodic," "irregular and substantial," but was clearly subject to the significant contingency of Wolverine's annual EBITDA performance.  Huebsch, 2001 WL 716884, at *2; Cumpata, 113 F. Supp. 2d at 167.  Thus, Crawford's Bonus fails nearly every criteria articulated by the courts for compensation covered by the Wage Act.  Id.

Judging by these standards, Crawford's allegations in support of his Wage Act claims cannot survive legal scrutiny.  Id.; see, Baptista, 1996 WL 33340740, at *4. Because Crawford's second and fourth causes of action do not allege the deprivation of "ordinary wages" as that term is legally defined, those portions of his Complaint fail to state a claim upon which relief may be granted and, therefore, must be dismissed.

## POINT II

### CRAWFORD'S CLAIM AGAINST DEFENDANT KULKARNI FOR TORTIOUS INTERFERENCE MUST BE DISMISSED BECAUSE A PARTY CANNOT TORTIOUSLY INTERFERE WITH ITS OWN CONTRACT

The Complaint's seventh cause of action alleges that defendant Kulkarni tortiously interfered with Crawford's contractual rights under the Transition Agreement. Complaint ¶¶ 57-73.  Crawford and Kulkarni executed the Transition Agreement on December 28, 2001.  Complaint ¶¶ 18, 64.  The Complaint alleges that, on January 14, 2002, as a result of a disagreement between Crawford and Kulkarni regarding Kulkarni's entitlement to $135,000 in "fringe benefit compensation," Kulkarni "took actions to persuade, cause and induce the Board of Directors of Wolverine to terminate the plaintiff's employment" under the Transition Agreement.  Complaint ¶¶ 22, 59. Crawford alleges that Kulkarni's actions in persuading the Wolverine Board to terminate the Crawford's employment were undertaken in response to "the plaintiff's refusal to permit embezzlement and conversion of $135,000" from Wolverine.  Complaint ¶ 61.

Crawford alleges that on some undefined date subsequent to executing the Transition Agreement on December 28, 2001, but before Crawford's termination on January 14, 2002, Kulkarni "ceased to be Chairman or CEO of Wolverine." Complaint ¶ 65. Crawford concedes that at the time of his termination, however, Kulkarni was still acting as a "consultant" to Wolverine. Complaint ¶ 66.

Under Massachusetts law, in order to succeed on a claim of tortious interference with contractual relations, a plaintiff must prove that he had a contract with a third party, that the defendant knowingly and improperly induced the third party to breach that contract and that the plaintiff was harmed by the defendant's action. G.S. Enterprises, Inc. v. Falmouth Marine, Inc., 410 Mass. 262, 272 (1991); United Truck Leasing Corp. v. Geltman, 406 Mass. 811 (1990). Because of the *third party* element of a tortious interference claim, basic hornbook law dictates that a party "cannot be liable for tortious interference with its own contract." Powderly v. Metrabyte Corp., 866 F. Supp. 39, 43 (D. Mass. 1994); see also Brown v. Armstrong, 957 F. Supp. 1293, 1305 (D. Mass. 1997); Appley v. Locke, 396 Mass. 540, 543 (1986).

Crawford alleges that Kulkarni's actions of January 14, 2002 disrupted Crawford's contractual rights under the Transition Agreement – an Agreement which Kulkarni himself executed only 16 days earlier. In effect, Crawford argues that Kulkarni interfered with his own contract. The law in Massachusetts is clear, however, that such allegations cannot serve as the basis for a viable tortious interference claim. See Riseman v. Orion Research, Inc., 394 Mass. 311, 314 (1985); W. Page Keeton, *Prosser and Keeton on the Law of Torts*, § 129, at 990 (5th ed. 1984) (stating that "defendant's breach of his own contract with the plaintiff is of course not a basis for the tort" of intentional

interference with contractual relations). Kulkarni cannot be held liable for "interference" in his own contractual affairs "any more than an employer is liable for tortious interference between itself and an employee." Saint Louis v. Baystate Medical Center, Inc., 30 Mass. App. Ct. 393, 404 (1991).

Furthermore, as both "the highest ranking corporate official" and the sole shareholder of Wolverine at the time he executed Crawford's Transition Agreement, Kulkarni is afforded the additional protection of being "viewed as indistinguishable from the corporation for purposes of any claim of intentional interference." Schutz v. Go Ahead Vacations, Inc., No. 97-4409, 1999 WL 959681, *4 (Mass. Super. Ct. Sept. 1, 1999); see also Harrison v. Netcentric Corp., 433 Mass. 465, 478 (2001) (observing that courts frown upon a "tortious interference claims against an individual decision maker who is indistinguishable from the corporation itself"); Restuccia v. Burk Technology, Inc., No. 952125, 1996 WL 1329386, *3 (Mass. Super. Ct. Aug. 13, 1996); Schinkel v. Maxi Holding, Inc., 30 Mass. App. Ct. 41, 50 (1991) (recognizing that a corporate officer may "be so closely identified with the corporation itself, and with its policies, that he should not be treated as a third person in relation to corporate contracts, susceptible to charges of tortious interference when he causes the corporation to breach its contractual obligations.")

Crawford has attempted to bypass the obvious infirmity of his tortious interference claim by alleging that in the interim between Kulkarni's execution of the Transition Agreement and the termination of Crawford's employment with Wolverine – an interim of a grand total of 16 days – Kulkarni "ceased to be Chairman and CEO of Wolverine" and, instead, was demoted to a "consultant" position with the company.

Complaint ¶¶ 65-66.  Even assuming, however, that Kulkarni was a mere employee of Wolverine and not the CEO at the time he allegedly interfered with the Transition Agreement (and putting aside, for the sake of discussion, the glaring fact that it was Kulkarni himself who signed the Agreement), Kulkarni was, in all events, acting as Wolverine's corporate agent at the time he allegedly interfered with the contract between Wolverine and Crawford.  Courts in Massachusetts have repeatedly voiced their displeasure with the conversion of a run-of-the-mill breach of employment contract matter into a claim for tortious interference.  See e.g., Schutz, 1999 WL 959681, at *4 ("Converting every corporation's breach or termination of contract into a claim for intentional interference on the part of the individual that actually made the decision to breach or terminate the contract would create widespread individual liability for what are corporate acts."); Gram v. Liberty Mutual Ins. Co., 384 Mass. 659, 663 (1981) (employees not be liable for tortious interference "when acting within the scope of their employment responsibilities").

Because Kulkarni could not tortiously interfere with Crawford's alleged rights arising from a contract which Kulkarni himself signed, Crawford's seventh cause of action fails to state a claim upon which relief may be granted and, therefore, must be dismissed.

## POINT III

### CRAWFORD'S FIFTH AND SIXTH CAUSES OF ACTION, FOR BREACH OF THE TRANSITION AGREEMENT AND A RELATED WAGE STATUTE CLAIM, MUST BE DISMISSED BECAUSE DEFENDANTS HAVE NOT BREACHED THE TRANSITION AGREEMENT

Crawford's fifth cause of action alleges a breach of the parties' December 28, 2001 Transition Agreement.  Complaint ¶¶ 46-53.  Crawford alleges that, pursuant to the

Transition Agreement, he is owed unpaid wages of $25,000.00 for the period of February 1, 2002, through March 31, 2002.  Complaint ¶¶ 52-53.  Crawford's sixth cause of action alleges violations of the Wage Act in connection with Defendants' failure to pay those wages purportedly due Crawford under the Transition Agreement.  Complaint ¶¶ 54-56.

Section 2 of the Transition Agreement, entitled "Term," provides that Crawford's employment under the Agreement would terminate at

> …the earlier of (i) March 31, 2002 … or (iii) two weeks after the date on which the Chief Executive Officer provides written notice of termination, for any reason or no reason, to the Employee [*i.e.* the plaintiff].[3]

Crawford concedes that the Wolverine Board of Directors "voted to terminate his employment" on January 14, 2002.  Complaint ¶ 23.  Crawford's Complaint also concedes that, on January 18, 2002, he received a written letter from the Wolverine Human Resources Manager which confirmed the Board's decision to terminate Crawford's employment.  Id.  Crawford contends, however, that he is entitled to a $25,000 salary for February and March 2002 – a period in which he rendered no services to the company – because the format of the written notice he received from Wolverine was not in technical compliance with the requirements of section 2-(iii) of the Transition Agreement, inasmuch as that notice was not *signed by* the CEO of Wolverine.  Complaint ¶¶ 47-50.

Crawford's contention that Wolverine somehow breached the provisions of the Transition Agreement by failing to pay him a $25,000 salary for February and March 2002 – Crawford's January 14, 2002 termination notwithstanding – is utterly without merit.

---

[3]     Section 2-(ii) of the Transition Agreement also provided that plaintiff's employment could terminate upon "the consummation by the Company of a working capital facility with an institutional lender."  Both parties concede that this contingency never occurred.

Under Massachusetts law, "interpretation of a contract is a matter of law for the court, which must determine the meaning of the terms thereof." Albertini v. Summit Technical Services, Inc., 287 F. Supp. 2d 92, 97-98 (D. Mass. 2003); see Coll v. PB Diagnostics Sys., Inc., 50 F.3d 1115, 1122 (1st Cir. 1995) ("[I]nterpretation of a contract is ordinarily a question of law for the court.") In so doing, "the Court is required to 'construe the contract with reference to the situation of the parties when they made it and to the objects sought to be accomplished.'" Albertini, 287 F. Supp. 2d at 98 (citing, Starr v. Fordham, 420 Mass. 178, 190 (1995)).

In interpreting the provisions of a contract, "it is the actual agreement and intent of the parties that is dispositive" and the court should examine "the substance of the transaction, and not the form of the agreement to determine the legal rights of the parties." Insurance Marketing Agencies, Inc. v. Tudor Enterprises, Inc., 1999 WL 788691, *2, 1999 Mass. App. Div. 60 (March 5, 1999); see also, Heller v. Insurance Co. of North America, 410 Mass. 400, 404 (1991) ("In determining the intent of the parties, we look at the substance of the transaction, including the relationship between the parties, and not at the form.") In deriving the parties' intentions as reflected in their written agreement, "a contract should be construed to give it effect as a rational business instrument." Shane v. Winter Hill Federal Savings and Loan Association, 397 Mass. 479, 483 (1986).

Here, both Crawford and Wolverine recognized when executing the December 28, 2001 Transition Agreement that Crawford's tenure with the company was drawing to a close. This fact is demonstrated by the language of the Agreement itself which states that Crawford's employment would cease on March 31, 2002 "unless sooner terminated."

Whitney Aff. Ex. 2. Furthermore, Wolverine was granted the widest possible discretion in determining the future length of Crawford's tenure with the company; viz., the company was empowered to terminate Crawford's employment "for any reason or no reason." Id. Thus, Crawford cannot argue that Wolverine breached the Transition Agreement in its decision to terminate him; rather, Crawford argues that his termination was ineffective and, as a result, he is owed salary for a period of two months after his employment ceased, because the manner in which Crawford was *informed* of his termination was technically improper.

The Transition Agreement states that Crawford's termination would be effective "two weeks after the date on which the Chief Executive Officer provides written notice of termination, for any reason or no reason, to [Crawford]." Whitney Aff. Ex. 2. Crawford was informed of the Wolverine Board of Director's decision to terminate him on January 14, 2002. Complaint ¶ 23. Crawford does not allege that Wolverine failed to inform him of his termination in a timely manner. Id. Nor does Crawford allege that Wolverine failed to furnish him with "written notice of termination" – Crawford concedes that he received formal written notice and confirmation of his termination on January 18, 2002. Instead, it is Crawford's apparent position that because his written notice of termination was not *signed by* Wolverine's CEO, Crawford was never effectively terminated and, as a result, is owed two months of additional salary for services not rendered. Clearly, Crawford's strained interpretation of the parties' obligations under the Transition Agreement seeks to elevate form over substance.

Written notice of termination provisions such as the one present in the parties' Transition Agreement are commonplace in employment contracts. These provisions are

generally included to assure proper documentation of personnel decisions in order to

protect the rights of both employees and employers.  Such was the intention of the parties

with regard to the Transition Agreement in the instant case.  Obviously, it was not the

intention of the parties, as Crawford must now contend, that any minute or hyper-

technical violation of the written notice provisions of the Transition Agreement would

entitle Crawford to two months of salary notwithstanding his termination.  Such an

illogical interpretation of the provisions of the Agreement cannot be reconciled with the

requirement that a contract must be "construed to give it effect as a rational business

instrument."[4]  Shane, 397 Mass. at 483.

As an alternative argument, defendants note that even utilizing Crawford's

strained and hyper-technical reading of the language of the Transition Agreement, the

manner in which Wolverine furnished Crawford with written notice of his termination

conforms with the provisions of the Agreement.[5]  As was noted above, under the

Transition Agreement Crawford's termination was effective "two weeks after the date on

which the Chief Executive Officer provides written notice of termination, for any reason

or no reason, to [the plaintiff]."  Whitney Aff. Ex. 2.  Although Crawford contends that

---

[4]        Crawford's contention also ignores the general rule, well established in this and numerous other
jurisdictions, that mere nominal, trifling, or technical departures from the written provisions of a contract
are insufficient to support a claim for breach.  See e.g., Patel v. Ambassador Drycleaning Co., Inc., No. 11-
01-00175, 2002 WL 1880179 (Tex. App. Aug. 15, 2002); Hansel v. Creative Concrete & Masonry Constr.
Co., 772 N.E.2d 138 (Ohio App. 10th Dist. 2002); Burlington Resources Oil & Gas Co. v. Cox, 729 N.E.2d
398 (Ohio App. 4th Dist. 1999); Fort Washington Resources, Inc. v. Tannen, 901 F. Supp. 932 (E.D. Pa.
1995); Miller v. Gray, 217 N.W. 228 (Iowa 1928).

[5]        This argument, which is offered only in the alternative, references the attached Affidavit of Mark
Brown.  Rule 12(b) provides that a court may convert a "motion to dismiss for failure to state a claim into
one for summary judgment if 'matters outside the pleadings are presented to and not excluded by the
court.'"  C.B. Trucking, Inc. v. Waste Management, Inc., 137 F.3d 41, 43 (1st Cir. 1998).  The courts
employ a "functional approach" to this conversion process.  Id.  Thus, in the event the Court finds it
necessary to consider defendants' alternative argument for the dismissal of plaintiff's fifth and sixth causes
of action, the Court may, at its discretion, convert this portion of defendant's motion into one for summary
judgment.

his termination was ineffective because his January 18, 2002 written notice of termination was not *signed by* the CEO, the Transition Agreement only requires that the CEO "*provides*" Crawford with written notice of termination. Merriam Webster's Collegiate Dictionary (10th ed. 1993) defines "provide" as a verb meaning "to make preparation to meet a need."

After making the decision to terminate Crawford on January 14, 2002, Kulkarni, then the CEO of Wolverine, instructed Mark Brown, the company's Chief Financial Officer, to inform Crawford of his termination. See Affidavit of Mark Brown ¶¶ 3, 5 filed herewith ("Brown Aff."). Brown then verbally informed Crawford of his termination. Id. Later in the day on January 14, after escorting Crawford out of the building, Brown instructed Wolverine's Human Resources Manager, Carol O'Donohue, to draft a letter to Crawford confirming Wolverine's decision to terminate his employment. See Brown Aff. ¶ 6. Brown's instruction to O'Donohue to issue the termination letter was consistent with Wolverine's standard operating procedure, which Crawford, as the former COO, was presumably aware of. Id.

While conceding that Kulkarni, as Wolverine's CEO, did not personally write and sign the January 18, 2002 letter to Crawford which confirmed his termination, Kulkarni made arrangements for written notice to be "provided" to Crawford by delegating that task to Brown who, in turn, delegated to O'Donohue in her capacity as Wolverine's Human Resources Manager. Thus, pursuant to the provisions of the Transition Agreement, O'Donohue's January 18, 2002 letter to Crawford effectively terminated Crawford, inasmuch as his receipt of that "written notice of termination" was the culmination of a process compelled by Wolverine's CEO. Kulkarni's actions *provided*

that "written notice of termination" to Crawford and, therefore, Kulkarni's actions were consistent with Wolverine's obligations under the Transition Agreement. Crawford's contention that only a written notice of termination signed by Wolverine's CEO could effectively terminate Crawford's employment is contradicted by the plain language of the Transition Agreement, which contains no such requirement.

Therefore, because Defendants have not breached the Transition Agreement, both Crawford's fifth and sixth causes of action, for breach of contract and related Wage Statute claim, must be dismissed.

## <u>CONCLUSION</u>

For the foregoing reasons, Defendants' Motion to Dismiss the second, fourth, fifth, sixth and seventh causes of action articulated in Crawford's Complaint for failure to state a claim upon which relief can be granted should be allowed.

Dated: April 8, 2005

Respectfully submitted,

WOLVERINE, PROCTOR & SCHWARTZ, INC.,
STEVEN F. CHILINSKI, and
DEEPAK S. KULKARNI

By their attorneys,

/s/ Mark M. Whitney
Mark Whitney (BBO #637054)
Jeffrey D. Kuhn
MORGAN, BROWN & JOY, LLP
200 State Street
Boston, Massachusetts  02109
(617) 523-6666

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on April 8, 2005, I filed the foregoing document with the Clerk of the Court by using the ECF system. I further certify that I mailed the foregoing document and the notice of electronic filing to the pro se plaintiff, Peter A. Crawford, 23 Newcastle Drive, #11, Nashua, NH 03060, by U.S. mail, on April 8, 2005.

/s/ Mark M. Whitney
Mark M. Whitney, Esq.