UNITED STATES DISTRICT COURT
District of Massachusetts

Civil Action
No. 05-10078-DPW

|  |  |
|---|---|
| PETER A. CRAWFORD, Plaintiff | ) |
| | ) |
| | ) |
| v. | ) |
| | ) |
| WOLVERINE, PROCTOR & SCHWARTZ, INC., | ) |
| Steven F. Chilinski, Deepak S. Kulkarni, | ) |
| | ) |
| Defendants | ) |

## PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL DISMISSAL

### REQUEST FOR ORAL ARGUMENT

Defendants have requested oral argument and plaintiff joins in that request. The motion to dismiss affects five of seven counts of the Complaint and over two thirds of the damages sought of nearly $1.8 million.

### MEMORANDUM OF REASONS

### I. INTRODUCTION AND PROCEDURAL MATTERS

Defendants' motion seeks dismissal of all but the first and third causes of action of the plaintiff's Complaint. Defendant Wolverine, Proctor & Schwartz, Inc. ("Wolverine") joins this "Motion for Partial Dismissal," however, on the same day on

1

which that motion was filed on behalf of all three defendants, it also filed an Answer[1] to the plaintiff's Complaint. Fed. R. Civ. P. Rule 12(b) specifically requires that "[a] motion making any of these defenses shall be made before pleading..." See Wright & Miller, Federal Practice & Procedure Civil 3d ("Wright & Miller") §1357 (rule 12(b)(6) motion filed post answer is untimely); Brisk v. City of Miami Beach, 709 F.Supp. 1146, 1147 (S.D. Fla. 1989) (motion to dismiss served contemporaneously with answer is moot). The motion to dismiss should therefore be denied as to defendant Wolverine.

Even though defendants purport to move for "partial dismissal," they file with their motion the affidavits of Mark Brown and Mark Whitney, to which three documents are attached. While plaintiff does not dispute the authenticity of these three documents, he disputes several of the factual allegations made in the Affidavit of Mark Brown, in particular the conclusory allegation made therein that defendant Kulkarni was Chief Executive Officer ("CEO") of Wolverine on January 14, 2002.

The hurdle for dismissal of a complaint under Fed. R. Civ. P. Rule 12(b)(6) is a high one. "[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41 (1957). "[T]he material allegations of the complaint are taken as admitted" and it "is to be liberally construed in favor of the plaintiff." Jenkins v. McKeithen, 395 U.S. 411, 421 (1969). While a motion to dismiss may be converted into one for summary judgment under Fed. R. Civ. P. Rule 56, such conversion would need to be exercised with great caution and attention to the parties' procedural rights under Rule 56. Wright & Miller §1366.

---

[1] The Answer purports to be only on behalf of Wolverine, but is signed by its attorney on half of all three defendants. Plaintiff assumes that the notation preceding the signature is a typographical error.

While plaintiff, in this opposition, refers to the affidavits and attachments thereto submitted by defendants, he does not thereby assent to their motion to dismiss being treated as one for summary judgment or admit any facts. None of the documents that defendants attach to these affidavits casts doubt on the allegations of the Complaint, and the allegation that defendant Kulkarni was CEO of Wolverine is in any case not determinative. Thus, it is unnecessary and inappropriate for this Court to apply summary judgment standards. Nevertheless, if the Court desires to make such a conversion, plaintiff requests that he be provided the appropriate opportunity to conduct discovery and to submit opposing evidence.

## II. THE MASSACHUSETTS PAYMENT OF WAGES STATUTE IS CLEARLY APPLICABLE TO THE PLAINTIFF'S BONUS WAGES

### A. Defendants' arguments are largely based on lower court cases which are not binding on this Court

Defendants argue that the wages which the plaintiff seeks in Counts One and Three of his Complaint are not subject to Massachusetts General Law ("M.G.L.") c. 149 §148 (the "Wage Act"). However, none of the cases cited by defendants relate specifically to the type of bonus wages which are the subject of this case. Under the January 4, 2000 letter agreement (attached to the affidavit of Mark Whitney and hereinafter referred to as the "Employment Contract"), the plaintiff's bonus was "due upon completion of the audit of each year's results" and, in the event the plaintiff was terminated involuntarily (other than for cause), would be prorated based on the number of months worked during the year (Employment Contract, second page, last paragraph). Thus, the bonus wages were earned regularly each month, and became due and payable on a regular basis as part of each year's wages.

Furthermore, despite defendants' attempts to argue otherwise, there are no decisions of the Massachusetts Supreme Judicial Court which are even remotely on point[2], and the two Massachusetts Appeals Court decisions which it cites relate to unearned severance pay and a commission payable to a non-employee, independent real estate broker. Defendants largely rely upon citations to Massachusetts Superior Court opinions which, while instructive, are not binding on this court. King v. Order of United Commercial Travelers, 333 U.S. 153, 160-161 (1948). Although the Superior Court decisions cited by defendants are published in pamphlet form in the Mass. Law Reporter, these decisions are rarely, if ever, cited by the Massachusetts Supreme Judicial Court or the Massachusetts Appeals Court. "It would be incongruous indeed to hold [a] federal court bound by a decision which would not be binding on any state court." King at 161. Furthermore, none of these cases specifically relate to bonus wages, particularly not to the regularly earned bonus wages to which the plaintiff is entitled.

Defendants also cite two opinions of this court, one unpublished, to support their contentions. However, neither of those cases addressed bonus wages: one related to the vesting of stock options, and the other to a disputed commission payment. In any event, neither of these cases is binding upon this court, "a federal court adjudicating a matter of state law in a diversity suit is 'in effect, only another court of the State.'" King at 161. The practice of federal courts looking to their own decisions, rather than the statutes and rulings of the highest court of the state, was the very practice invalidated in Erie R. Co. v. Tompkins, 304 U.S. 64, 79 (1938) (the Legislature or the Supreme Court of the state

---

[2] An opinion in this district, Cumpata v. Blue Cross Blue Shield of Massachusetts, 113 F.Supp.2d 164, 167 (D.Mass. 2000) acknowledges that the "statute and case law" on the Massachusetts Wage Act is "sparse"

"should utter the last word" on the interpretation of state law). The District of Massachusetts cases cited by defendants are therefore merely instructive, and carry little weight.

Defendants make four basic arguments. First, they argue that the Wage Act does not protect wages which are "contingent," second that it does not protect wages which are "episodic," third that it does not apply to "professionals enforcing their asserted contract rights," and finally that it applies only to "ordinary wages." Incredibly, there is not the slightest support within either the text of the Wage Act or any of the decisions of the Massachusetts Supreme Judicial Court ("SJC") supporting these contentions. By its express terms, the statute applies to wages that increase or decrease, to all employees, specifically including executives and professionals, and to remuneration on an annual basis. While a number of the lower court cases cited by defendants make use of the terms "contingent," "episodic," "contractual rights" and "ordinary," a close reading of most of these cases reveals that, where the payments were not deemed to be subject to the statute, it was because the compensation had not been "earned," by an "employee" both of which are specifically required by the statute. Thus, severance pay and commissions of independent, non-employee, real estate brokers have been held not to be subject to the statute. Contrary to defendants' assertion, the plaintiff's claim for bonus wages does not fall under any of these exceptions. Plaintiff's efforts as Chief Operating Officer of Wolverine were directly responsible for the profits that formed the basis for his bonus, which accrued monthly and was in no sense "episodic." (see Complaint ¶¶10, 12). He thus clearly "earned" the wages to which he is entitled.

B. The text of the Wage Act and Supreme Judicial Court decisions clearly make the Wage Act applicable to plaintiff's bonus wages

As only the text of the statute itself and the opinions of the highest court in Massachusetts are binding upon this Court, we start with these authorities. The predecessor to the current Wage Act was enacted in the late 1800s and has been amended many times. While it may be true that at one time, its purpose was largely to ensure that wages were paid weekly, numerous provisions have since been added. Although the subchapter in which the statute appears remains entitled "Weekly Payment of Wages," the statute now permits all employees to be paid "weekly or bi-weekly," and numerous sections unrelated to payment frequency now appear in that subchapter. On May 23, 1960 the first paragraph of the Wage Act was completely rewritten by 1960 Mass. Acts c. 416 to permit "bona fide executive, administrative or professional" persons to be paid "bi-weekly or semi-monthly," or, if they "elect[] at [their] own option to be paid monthly. ." This act clearly puts salaries and wages on an equal footing, and brings executives and professionals within its protections. Furthermore, the 1960 act defines "salaried employee" to mean "any employee whose remuneration is on a weekly, bi-weekly, semi-monthly, monthly or annual basis, even though deductions or increases may be made in a particular pay period." (emphasis supplied) This text, which remains unchanged in the current Wage Act, clearly contemplates a variable component, such as bonuses or commissions, of salaries or wages, by permitting both deductions and increases from pay period to pay period. Furthermore, the statute clearly contemplates the calculation of remuneration on an annual basis, and makes such remuneration subject to its provisions. Both the plaintiff's base salary and his bonus, under the terms of the Employment Contract, are calculated on an annual basis and subject to the provisions of the Wage Act.

6

Furthermore, the Wage Act must be construed in light of M.G.L. c. 149 §148B which encompasses within the definition of "employee," for purposes of the Wage Act, all "individual[s] performing any service" unless the relationship passes a rigid, three-part test. The individual must be "free from control and direction," the service must be "outside the usual course of the business of the employer," and "the individual [must be] customarily engaged" in the same trade. This statute cannot be squared with the assertion that the Wage Act was primarily intended to benefit hourly laborers paid on a weekly basis. Rather, it is clear that the Massachusetts Legislature intends the Wage Act to be broadly applicable to all persons performing services with only a narrowly drawn exception.

Defendants cite American Mutual Liability Ins. Co. v. Commissioner of Labor & Industries, 340 Mass. 144 (1959), in arguing that the statute was primarily intended to apply to "wage earners," implying, to the extent that such term implicitly excludes executives, that it is not applicable to plaintiff, at least not in these circumstances. However, they ignore (as do all of their cases citing American Mutual), the fact that American Mutual was decided five months before the Legislature completely rewrote the first paragraph of the Wage Act, in part to make it clear that its provisions applied equally to executives and professionals. Nevertheless, American Mutual at 147, states that "[d]oubtless the legislation in its early form was enacted primarily to prevent unreasonable detention of wages." (emphasis in original) Thus, in 1959, dual purposes of the statute, namely ensuring regular payment, and preventing the unreasonable detentions of wages, were recognized. Therefore, even if defendants are correct that a bonus paid

7

each year (and earned each month) is not regular, the second part of the statute's purpose is clearly applicable to the plaintiff's case.

The statute provides that "[e]very person having employees in his service shall pay weekly or bi-weekly each such employee the wages earned by him…" Thus, in order for the Wage Act to apply, only three conditions must be met. First, the compensation must have been "earned."[3] Second, the person entitled to compensation must be an "employee." Third, the compensation must constitute "wages." Unfortunately, neither "wages" nor "earned" is defined in M.G.L. c. 149 §1 or elsewhere in that chapter. Employee is effectively defined, for purposes of §148, by M.G.L. c. 149 §148B.

The only Supreme Judicial Court case found which deals with the definition of "wages" in the context of the Wage Act is Boston Police Patrolmen's Association, Inc. v. City of Boston, 435 Mass. 718 (2002). In that case, it was held that deferred compensation contributions were not "wages" because the whole purpose of the scheme was that "funds are intended to be held, out of the employee's possession, for an extended period," and the purpose of the statute was "to prevent the unreasonable detention of wages." Boston Police Patrolmen's at 720. In so defining the Wage Act's purpose, the SJC minimizes the importance of regular payment, cited as a purpose in American Mutual 43 years earlier. Boston Police Patrolmen's is not applicable to the plaintiff's case, where the Employment Contract specifically provides for payment of bonus wages immediately after completion of the annual audit. Nevertheless, in that case, the SJC indicated the way in which the word "wages" was to be construed. "As always, we interpret the statutory language 'according to the intent of the Legislature

_____

[3] The Wage Act's references to vacation, holiday pay, and commissions use the word "due" rather than the word "earned."

8

ascertained from all its words construed by the ordinary and approved usage of the language, considered in connection with the cause of its enactment, the mischief or imperfection to be remedied and the main object to be accomplished, to the end that the purpose of its framers may be effectuated." Boston Police Patrolmen's at 719-720.

Just such a method of construction was applied in Jancey v. School Committee of Everett, 421 Mass. 482 (1995), where the SJC held, in interpreting the meaning of "wages," for purposes of another section of M.G.L. c. 149 (the same chapter in which Wage Act appears, causing it to share with the Wage Act the definitions of M.G.L. c. 149 §1), that "the Legislature should be supposed to have adopted the common meaning of the word, as assisted by a consideration of the historical origins of the enactment." Jancey at 490. The court went on to embrace the definition in Black's Law Dictionary (6th ed. 1990) which defines wages as "[e]very form of remuneration payable for a given period to an individual for personal services, including salaries ...bonuses... and any other similar advantage received from the individual's employer or directly with respect to work for him... Term should be broadly defined and includes not only periodic monetary earnings but all compensation for services rendered without regard to manner in which such compensation is computed." Jancey at 490-491 (emphasis supplied). The court further cited the text of M.G.L. c. 151A §1(s)(A) which mirrors the Black's definition.[4] Clearly the plaintiff's bonus is remuneration payable for a given period, is for personal services and is an advantage received with respect to his work for his

---

[4] Webster's Third New International Dictionary (1976) similarly defines "wage" as "a pledge or payment of usu. monetary remuneration by an employer esp. for labor or services usu. according to contract and on an hourly, daily or piecework basis and often including bonuses, commissions..."

employer. There can be no argument that plaintiff's bonus does not fall within the Black's definition.

Furthermore, prior SJC decisions and other statutes that are part of the same subchapter as the Wage Act, clearly indicate that wages may be computed on a basis other than time worked. In <u>Gallagher v. Hathaway Manuf. Corp.</u>, 172 Mass. 230 (1898), the Wage Act's applicability to piece work was not questioned. In that case, woven cloth of second quality was to be paid for at only half of the rate of that for first quality cloth. Although denominated as a fine which was deducted from the next week's wages, the effect of the practice was the same as if a bonus of 100% of the base rate applicable to second quality cloth had been paid for first quality cloth. In <u>Gallagher</u>, there was no question as to whether the Wage Act applied, only whether the practice of deducting for second quality work violated it. See also M.G.L. c. 149 §153 (referring to grading of work affecting the "wages" of the weavers), and M.G.L. c. 149 §155 (requiring written documentation of piece rate "wages" in cotton factories). Both of these sections are part of the "Weekly Payment of Wages" subchapter of M.G.L. c. 149 in which the Wage Act appears, thus it is clear that the term "wages" applies equally to compensation calculated based on criteria other than time worked. The difference between the bonus wages due to the plaintiff, which is a function of the quality and efficacy of his services as Chief Operating Officer of Wolverine, and the wages due a weaver or employee of a cotton factory based on the quality and quantity of production is one of degree only. Both are wages under both the definition in Black's and under the Wage Act.

C.  <u>Other jurisdictions overwhelmingly treat bonuses as wages under their Payment of Wages statutes.</u>

A broad definition of "wages" was adopted by Justice Souter in <u>Ives v. Manchester Subaru, Inc.</u>, 498 A.2d 297 (N.H. 1985). In a case that has very similar facts to this one, the plaintiff in <u>Ives</u> had been general manager of a car dealership and was entitled to a bonus of 15% of pre-tax profits. Justice Souter held that "[i]t is obvious that the parties' agreement for a share of profits was intended to provide compensation for the plaintiff's labor and services, and it clearly may fall within the statute's reference to compensation calculated on some 'other basis'" <u>Ives</u> at 300. To be sure, the New Hampshire statute contains a definition of "wages," but that definition, like the Massachusetts Wage Act, does not specifically refer to bonuses. Nevertheless, bonuses were held to constitute "wages." Although the New Hampshire statute refers to determination of compensation on a "time, task, piece, commission or other basis of calculation," factors not specifically enumerated in the Massachusetts statute, it is clear from the Massachusetts statutes and case law that, in Massachusetts, the determination of whether the compensation is "wages" does not hinge on the method of calculation.

Similarly in <u>Ware v. Merrill Lynch, Pierce, Fenner & Smith, Inc.</u>, 100 Cal. Rptr. 791 (Cal. App. 1972), 24 Cal.App.3d 35, affirmed 414 U.S. 117 (1973), the court applied a broad construction of the term "wages" under the section of the California Labor Code providing for collection of due and unpaid wages. <u>Ware</u> at 797. In <u>Suess v. Lee Sapp Leasing, Inc.</u>, 428 N.W.2d 899 (Neb. 1988), 229 Neb. 755, a manager entitled to receive 10 percent of profits as a bonus was permitted to avail himself to the benefits of the Nebraska Wage Payment and Collection Act. The Nebraska statute, like the New Hampshire one, did not specifically refer to bonuses, but had the same reference to "time, task, piece, commission or other basis of calculation." In <u>Rohr v. Ted Neiters Motor Co.</u>,

11

758 P.2d 186 (Colo.App. 1988), a general manager of another automobile dealership had an agreement to a monthly bonus, payable March 15 of the year after it was earned. The court held that the bonus constituted "wages" not a "profit sharing plan" which constituted a "complex contingent benefit" not subject to the penalty provisions of Colorado law. Rohr at 188.

In fact, nearly all of the state courts which have addressed the issue have found that bonuses constitute "wages" subject to the penalty provisions of state payment of wages laws[5].

D. The Massachusetts Appeals Court decisions on the issue are not on point, as they relate to compensation due non-employees or severance pay not earned.

While decisions of the SJC as to Massachusetts law are binding on this court, decisions of the Massachusetts Appeals Court are entitled to less deference. It is the duty of federal courts "to ascertain from all the available data what the state law is and apply it rather than to prescribe a different rule..." In so doing, intermediate appellate state court decisions are "dat[a] for ascertaining state law which [are] not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." West v. American Telephone & Telegraph Co., 311 U.S. 223, 237 (1940). However, an analogous or related decision of the highest court controls over a lower court decision which is more on point. Strubbe v. Sonnenschein, 299 F. 2d 185, 188-189 (2nd cir. 1962). See also 32 Am. Jur. 2d Federal Courts, §§465-468.

---

[5] See Validity, Construction and Effect of State Laws Requiring Payment of Wages on Discharge of Employee Immediately or Within Specified Period, 18 A.L.R. 5th 577 §25 (1994) (bonuses are wages under California, Colorado, Delaware, Idaho, South Carolina, but not Louisiana law), Validity, Construction, and Effect of State Laws Requiring Payment of Wages on Resignation of Employee Immediately or Within Specified Period, 11 A.L.R. 5th 715 §21 (1993) (bonuses are wages under Colorado and Nebraska, but not Louisiana, law).

Defendants cite two Massachusetts Appeals Court cases and argue that they apply to this case. However, these cases are not on point. Thus, the analogous decision of the SJC in Jancey, which clearly construes the term "wages," under another section of M.G.L. c. 149, to include bonuses, is persuasive data that the SJC would apply this same meaning to the references to "wages" in the Wage Act, particularly since the "ordinary and approved usage" of the word "wages" encompasses bonuses.

The first appellate case cited by defendants is Commonwealth v. Savage, 31 Mass. App. Ct. 714 (1991). In that case, a real estate broker, who was paid on a commission only basis, was deemed an independent contractor to whom the Wage Act did not apply. Clearly as the statute refers to paying "each such employee," the court was correct. However, the subsequent enactment of 1993 Mass Acts c. 110 §165, which amended M.G.L. c. 149 §148B to make its definition of "employee" applicable to the entire c. 149, overrules Savage.

Savage needed to go no further than to conclude that the broker was not an employee for purposes of the Wage Act. Nevertheless, Savage, in dicta, cites the caption of 1943 Mass Acts c. 467, which refers to weekly payment of commissions, and concludes that the intent of the Legislature was "to assist employees who would ordinarily be paid on a weekly basis." It further refers to commissions of real estate brokers as resulting from "transactions [that] are not regular, but episodic..." Savage at 716. These dicta have been cited by other courts to support the proposition that only this weekly type of commission is subject to the Wage Act. However, they are wrong, and Savage was severely criticized as being "contrary to the clear language of the statute" in Lohnes v. Darwin Partners, 15 Mass. L. Rptr. 157, 159 n. 1 (July 22, 2002). The SJC

13

subsequently clarified the intent of the Legislature in <u>Boston Police Patrolmen's</u>, 435

Mass. at 720, when it held simply that the purpose of the act was "to prevent the

unreasonable detention of wages." This subsequent determination by the higher court is

controlling. Furthermore, the Appeals Court fails to recognize that the commission

provision was added in 1943, long before the 1960 amendment which provided for

payment of salaried employees other than on a weekly basis. The caption of the 1943 act

must be viewed in that light.   1960 Mass. Acts c. 416 further provided for payment of

professionals on other than a weekly basis and provides for "deductions or increases" in

pay between pay periods, clearly contemplating a variable element to wages resulting

from commissions or bonuses for non-weekly workers. Furthermore, "[t]here is no

logical reason why the Legislature would seek to protect small commissions involving

multiple sales but not protect larger commissions based on fewer sales." <u>Lohnes</u> at 159

n. 1. Certainly, many professionals perform services on a contract basis and would be

considered employees under M.G.L. c. 149 §148B, despite the fact that their

compensation is arguably "episodic." Yet, the Legislature clearly intended to make the

Wage Act applicable to their compensation.

Dicta is given little weight in Massachusetts. Even the Supreme Judicial Court is

"not bound by 'language which was not necessary' in an earlier decision 'and which

passed upon an issue not really presented.'" <u>Commonwealth v. Rahim</u>, 441 Mass. 273,

284 (2004), citing <u>Old Colony Trust Co. v. Commissioner of Corps. & Taxation</u>, 346

Mass. 667, 676 (1964).

In <u>Prozinski v. Northeast Real Estate Services, L.L.C.</u>, 59 Mass. App. Ct. 599

(2003), the Massachusetts Appeals Court construed the Wage Act not to apply to

severance payments.  In so doing, it concluded that the "severance pay was not earned but contingent upon severance." Prozinski at 603.  By using to the word "contingent" in this context, the court underscored an appropriate relationship between the words "contingent" and "earned."  Unearned compensation is contingent because it does not become due after it is earned but only after a contingency beyond the control of the employee, in this case termination, occurs.  As will be discussed later, other courts have not necessarily recognized this relationship.  On this basis, the fact that the severance was unearned would be sufficient to deny coverage under the Wage Act, as was concluded in Kittredge v. McNerney, 17 Mass. L. Rptr. 652 (May 11, 2004), 2004 Mass. Super LEXIS 185.

However, the Prozinski court goes on to state, in dicta, that the Black's definition of "wages" should not apply.  As a rationale for this, the court appears to conclude that the Wage Act itself defines the term "wages," and that "[t]here is, therefore, no need to resort to the popular meaning of the term 'wages' ..." Prozinski at 604.  Nevertheless, this assertion is directly contrary to the ruling of the Supreme Judicial Court in Boston Police Patrolmen's, 435 Mass. at 719-720, decided 21 months earlier, where the SJC held, in construing that same word, in that same statute, that it must be "construed by the ordinary and approved usage of the language..."  If the SJC had concluded that "wages" was defined in the Wage Act itself, it would have so stated.  The dicta in Prozinski must therefore be ignored by this court as it is inconsistent a holding by the SJC on the same issue.

Furthermore, the assertion that the Wage Act itself defines "wages" is without merit.  If such were the case, then the Wage Act would have had no applicability

15

whatsoever prior to 1943. In that year, 1943 Mass. Acts c. 467 added language relating to commissions. 1966 Mass Acts c. 319, entitled "An act clarifying the word 'wages' as used in the weekly payment of wages law" added a sentence relating to holiday and vacation payments[6]. Prior to the 1943 amendment, there were no categories of wages enumerated in the statute, and by the logic of Prozinski, no compensation could be considered wages. To the contrary, any reasonable reading of the statute indicates that "wages," includes, but is not limited to, holiday and vacation pay, and definitely determined commissions. Other compensation, obviously including pay of hourly laborers, is clearly included, but the extent of what is included must rest, as the Supreme Judicial Court determined in Boston Police Patrolmen's, on the meaning of the word "wages." In any case, Prozinski has little or no applicability to the plaintiff's case, at least as to Counts Two and Four[7] (which relate to the bonus), inasmuch as the bonus wages were clearly earned by the plaintiff in direct return for his services. To the extent that this Court believes that Massachusetts law, as applied to the facts of this case, is uncertain, it may certify the question to the SJC under its Rule 1:03.

E.  Contingent compensation is not subject to the Wage Act only when it has not been earned

The focus on whether or not compensation is contingent appears to have entered the case law with the decision of the Supreme Court in Massachusetts v. Morash, 490

---

[6] The word "clarify," according to Webster's New Collegiate Dictionary (1977), means "to free of confusion," indicating that the Legislature felt that the Wage Act already applied to these payments, but amended the statute to eliminate any confusion on the issue
[7] The Sixth Count of the Complaint also arises under the Wage Act, however defendants seek dismissal of that count only on the same basis as is seeks dismissal of the underlying Fifth Count (i.e. that there was no breach of the underlying contract). It is thus unnecessary for plaintiff to counter an argument that Prozinski, or any other case, would provide an independent basis to dismiss the Sixth Count. In not addressing such a hypothetical contention, plaintiff does not abandon this Count or waive the right to argue this issue at a later date.

U.S. 107 (1989). That case specifically dealt with the Wage Act, but contrary to the impression given by a number of the cases citing it, did not construe the statute itself, but simply addressed the issue of whether the protection accorded by the statute to vacation payments upon discharge was preempted by federal ERISA law. In <u>Morash</u>, two bank vice presidents had been discharged, and criminal complaints[8] were issued under the Wage Act for failure to pay accrued, but unused, vacation pay. The Massachusetts SJC held that the statute was preempted by ERISA and an appeal was taken to the Supreme Court. The Supreme Court reversed, holding that a careful reading of the ERISA statute in question indicated that it was intended to apply to benefits which "accumulate[d] over a period of time and [were] payable only upon the occurrence of a contingency <u>outside</u> of the control of the employee." <u>Morash</u> at 116 (emphasis supplied). These included medical, accident and unemployment benefits. <u>Morash</u> at 113. The Supreme Court held ERISA did not preempt the Wage Act, ruling that Congress did not intend ERISA to apply to 'vacation benefits which by their nature are payable on a regular basis from the general assets of the employer..." <u>Morash</u> at 116.

A few years later in <u>Baptista v. Abbey Healthcare Group, Inc.</u> 1996 WL 3334074) (D. Mass. 1996), the court relied in part upon <u>Morash</u> in deciding that stock options were not subject to the Wage Act. However, the opinion erroneously stated that <u>Morash</u> ' has construed the statute to apply to corporate executives as well as to lower level employees, but its holding is limited to the payment of ordinary wages and wage equivalents..." <u>Baptista</u> at *4. In fact, the U.S. Supreme Court never construed the Wage Act. This error was noted <u>in Cumpata v. Blue Cross Blue Shield of Massachusetts</u>,

---

[8] In addition to the private right of action provided by M.G.L. c. 149 §150, M.G.L. c. 149 §27C(a)(1) provides criminal penalties for violation of M.G.L. c. 149 §148.

113 F.Supp.2d 164, 167 n. 5 (D. Mass. 2000). To the extent that the Supreme Court may have referred to "ordinary wages" in Morash, it was in the context of ERISA preemption, not in construing the Massachusetts statute, which of course was for the SJC, not itself, under Erie R. Co. v. Tompkins, supra. Furthermore, even if the Supreme Court's distinction were applicable to the construction of the statute, the court in Baptista failed to acknowledge that the contingencies to which the Supreme Court referred were those outside of the control of the employee, such as termination or sickness, not those within the control of the employee. This distinction is similar to that of whether the compensation is earned or not. Thus, hospitalization, unemployment, and severance benefits are not "earned" in the traditional sense. Although the entitlement may arise out of the same contract of employment that creates an obligation to pay wages, the employee receives the benefit only after contingencies outside of his control have occurred. Webster[9] defines "earned" as "to receive as return for effort and esp. for work done or services rendered." In the case of these types of benefits the direct relationship between the effort and the payment is lacking. This is the context in which the Morash and Baptista decisions must be understood. In Baptista, the plaintiff had been terminated, and his attempt to exercise his vested options had then been denied. Baptista at *3. However, the right to exercise the options arose only "[i]f their employment was terminated..." Baptista at *1. Therefore, the court in Baptista may have arrived at the correct decision, but its reasoning was not expressed as well as it could have been.

To be sure, Baptista refers to "bonuses," but the surrounding words indicate that the court was using the term to refer to the stock options, finding no reason to apply the Massachusetts Payment of Wages Statute to "bonuses potentially owing to highly paid

---

[9] Webster's New Collegiate Dictionary, 1977

18

executives, who were confident enough to resign their employment if their demands for accelerated (and contingent) stock options were not met." Baptista at *4. This text is clearly referring to Baptista himself, who had threatened to resign and had negotiated accelerated vesting in the event of termination. Baptista at *2. Of course, there is a big difference between a stock option, which is simply a contractual right to purchase a security, and a bonus, which is generally paid in cash. The use of the word "pay" in the Wage Act implies the transfer of cash or at least some tangible good, rather than a contractual right. Furthermore, stock options typically vest according to time of service, and once granted, do not vary in magnitude according to the individual employee's performance, unlike bonuses which typically do[10].

The recent decision in Sword v. Biofertec, 15 Mass. L. Rptr. 489 (December 2, 2002) is in accord with the principle that the Wage Act applies to earned compensation, even when it is contingent. In that case, compensation which was earned, but contingent upon sufficient funds being available, was nevertheless subject to the Wage Act, there being no exception for highly paid individuals in the Wage Act. Sword at 490.

In Cumpata, the issue of the applicability of the Wage Act to commissions arose. There, the real question was whether the employer would be bound by a side agreement between two sales representatives to split commissions 60/40 (40% to Cumpata) when there was an issue as to whether the side agreement had been approved by management as required. Cumpata at 166. After Cumpata was paid only 20% of the commission, he

---

[10] However, the issue of whether stock options are "wages" was not settled by Baptista. In refusing a motion to dismiss, the court in Brown v. Nortel Networks, Inc., 14 Mass. L. Rptr. 544, 545 (April 26, 2002), noted that "[t]he issue of stock options as a wage is clearly an emerging issue, and subject to ongoing litigation in many jurisdictions. The appellant (sic) courts of Massachusetts have not yet weighed in on this issue…"

sued. While the court discussed applying the requirement in the statute that commissions be "definitively determined" to support its decision, it was reluctant to do so, as it feared that employers seeking to avoid the treble damages imposed by the Wage Act might raise "contractual question[s] to remove themselves from [the] sweep" of the statute. Cumpata at 168. Thus, it relied upon the "triggered by contingencies" exception espoused in Baptista. Cumpata at 167.

However, there is serious doubt that Cumpata was correctly decided, because it appears that in fact the commissions were indeed, at least allegedly, "earned." This fact was recognized in Barthel v. One Community, Inc., 233 F. Supp.2d 125 (D.Mass. 2002), a third (and the most recent) case in this district dealing with Wage Act. In that case, also dealing with the issue of unpaid commissions, the court denied a motion to dismiss, defendants having argued that "[c]ommisions were not guaranteed, but instead were contingent upon the Sales Executive selling One's products and services..." In rejecting this argument, the court noted that "all commissions are contingent to some extent, but once they are due and payable the commissions are covered by the Act." Berthel at 126. Similar logic was applied in Lohnes v. Darwin Partners, 15 Mass. L. Rptr. 157 (July 22, 2002), the court concluding that "[i]f commissions were not protected by G.L. c. 149, §148 because they became payable only when something happened, then the Legislature would be engaged in a sham to have amended the statute to include commissions, because all (or virtually all) commissions would fall outside the protection of the statute." Lohnes at 159. Lohnes further criticizes Savage and expresses doubt that the appellate courts would "persist in its holding." Lohnes at 159 n. 1.

For the same reason that commissions are not immune from the Wage Act's provisions merely because they are "contingent," plaintiff's bonus is subject to the Wage Act. That is true, even though "commissions" are mentioned in the Wage Act and "bonuses" are not, because bonuses that are earned, as plaintiff's clearly was, constitute wages, whether the statute enumerates bonuses or not. Commissions, on the other hand, under the terms of the Wage Act, need only be "due and payable" to be subject its provisions. The legislation thus provided protection in the typical situation, as many (if not most) companies set up commission plans to give salespersons a commission on everything sold within their territory, whether or not they made the slightest effort to close the sale. This policy avoids disputes, simplifies bookkeeping and provides an incentive for salespersons to call on accounts that place small orders directly with the home office. Without a specific provision in the Wage Act applicable to commissions when they are "due and payable" rather than when they are "earned," commissions for which no effort was expended might not be subject to the Wage Act. This problem does not arise in the case of most bonuses (including the plaintiff's), thus it was unnecessary for the Legislature specifically to enumerate this category of wages.

Defendants cite a number of other Superior Court decisions, none of which specifically relate to the issue of bonuses and are in any case not binding on this court and need not be given significant weight. In Ockerman v. VA Software, 16 Mass. L. Rptr. 513 (July 9, 2003), 2003 WL 21960599, the plaintiff sued for unpaid commissions, but summary judgment (or judgment on the pleadings) was granted on both the breach of contract claim and the related Wage Act claim. Locke v. Sales Consultants of Boston, 13 Mass. L. Rptr. 164 (April 13, 2001), 2001 WL 716911, also related to commissions (for

21

an employment recruiter), but these were deemed contingent in part because they were subject to disgorgement in the event a recruited employee did not remain with the client. Furthermore, it relies upon Cumpata, supra, and was wrongly decided for the reasons stated above. In Huebsch v. Katahdin Industries, 13 Mass. L. Rptr. 180 (April 24, 2001), 2001 WL 716884, the importance of wages being "earned" was underscored. The employee in that case did not work the required 100 days during the first year which were required for payment of a contingent salary of a matching amount, and he was terminated before the end of the first year. While his contract provided for payment of both the first and second year's non-contingent salary despite the termination, "Huebsch did not work during the second year and therefore did not earn any part of the second-year salary. Any right Huebsch had to the guaranteed second year salary is based on contract." Huebsch at 182. In Dennis v. Jager, Smith & Stetler, P.C., 11 Mass. L. Rptr. 567 (April 10, 2000), 2000 WL 782946, a contract attorney sued for compensation, yet it was unclear from the opinion exactly how that compensation was computed, thus this opinion is of little assistance, was probably wrongly decided and is in any event not binding on this court.

Some of these lower court cases are little more than misguided attempts to avoid the mandate of the Wage Act and its requirement of treble damages. These effects can sometimes be harsh. However, courts must follow statutory imperatives and cannot construe validly enacted legislation to avoid the plain meaning of statutes. In Griffin v. Oceanic Contractors, 458 U.S. 564, 574-575 (1982), over $300,000 in damages was awarded for $412.50 in improperly withheld wages under a federal wage statute applicable to seamen after the Supreme Court refused to ignore the plain meaning of the statute.

22

## III. COUNT SEVEN CANNOT BE DISMISSED AS KULKARNI WAS NEITHER THE ALTER EGO OF WOLVERINE NOR ITS CEO AT THE TIME THE INTERFERENCE OCCURRED.

On this motion to dismiss, the Court must accept as true the facts alleged in the plaintiff's Complaint and the reasonable inferences therefrom. In paragraphs 17 and 65 of his Complaint, plaintiff clearly alleges that Mr. Kulkarni was no longer CEO, or even an officer or employee of Wolverine, as of January 14, 2002, the date on which the interference occurred. Yet, defendants submit the Affidavit of Mark Brown, which alleges in ¶2 that on January 14, 2002, Mr. Kulkarni was CEO of Wolverine, but does not provide any support for that contention. Ignoring this factual dispute, defendants in their Memorandum supporting their Motion for Partial Dismissal assume that Mr. Kulkarni was in fact CEO on January 14, 2002. This court is required to assume the contrary[11]. Furthermore, even were defendants somehow able to demonstrate that Mr. Kulkarni was CEO on January 14, 2002, they would still not prevail on their motion to dismiss unless they are also able to demonstrate that Wolverine and Mr. Kulkarni are effectively one and the same. Furthermore, a review of the Transition Agreement clearly demonstrates that it is between the plaintiff and Wolverine, and that Mr. Kulkarni signed it on behalf of Wolverine, not on his own behalf[12].

---

[11] While Fed. R. Civ. P. Rule 12(b) permits a motion to dismiss to be treated as one for summary judgment, after informing the plaintiff and giving him an option to submit contrary evidence, defendants' assertion is little more than optimistic surmise which is all but contradicted by the Transition Agreement which Mr. Whitney attaches to his Affidavit. That agreement was signed by Mr. Kulkarni on December 28, 2001 as "Chairman," not CEO, and the agreement itself ¶1 refers to "transition of the Company's management" and ¶7 provides separate notice addresses for Mr. Kulkarni and the Wolverine CEO.

[12] The signing occurred at the offices of Ropes & Gray, attorneys for Parthenon Capital, in Boston, on a day when large numbers of documents were being signed and exchanged in connection with the closing of the transaction referred to in ¶16 of the Complaint. Mr. Crawford was informed that it had been reviewed by Parthenon's attorneys. Mr. Kulkarni signed the agreement as representatives of Parthenon had already left for the day.

Defendants state that "Crawford argues that Kulkarni interfered with his own contract." Of course a party to a contract cannot interfere with its own contract, but this is not what the plaintiff is arguing as Wolverine and Mr. Kulkarni were legally two separate and distinct legal persons, particularly after the transaction closed on December 28, 2001 and December 31, 2001. In fact, it was the conflict between Mr. Kulkarni's interest and that of Wolverine that the Complaint alleges led to Mr. Kulkarni's interference. See Complaint ¶22, 58-73.

Recognizing this, defendants further allege that Mr. Kulkarni was the sole shareholder of Wolverine at the time he executed the Transition Agreement on December 28, 2001[13]. But the applicable question is what Mr. Kulkarni's position was on the date of the interference. Defendants make much of the 16 day gap between Kulkarni's execution of the Transition Agreement and his interference with it. However, even a single day is determinative, as was recognized in Appley v. Locke, 396 Mass. 540 (1986). In that case Mr. Foster resigned as CEO of the MBTA, a "body politic and corporate," Appley at 541, on June 9, 1980. On June 10, 1980, then-governor King appointed Mr. Locke interim chairman with the CEO's powers, and Mr. Locke on that same day terminated the plaintiffs. Appley at 542. The court held that "on June 10, 1980, one day after the office of chief executive officer had become vacant, the defendant Locke had the authority to exercise the powers of that office…" Appley at 548. Thus, Locke could not be liable to the plaintiffs for interference. If on the other hand "Locke

---

[13]Even this allegation is highly questionable, as the agreements relating to the transaction provided for Mr. Kulkarni to transfer all of his Wolverine shares, to a company of which Parthenon owned a majority, on that very date, and the wire transfer by Parthenon fulfilling its part of the transaction occurred prior to the signature by Mr. Kulkarni of the Transition Agreement.

lacked authority to fire the plaintiffs, they [would have been] entitled to partial summary judgment against him as to liability" on the tortious interference claim." Appley at 543.

Defendants cite Harrison v. NetCentric Corp., 433 Mass. 465, 478 (2001) in support of their assertion that "courts frown upon 'tortious interference claims against an individual decision maker who is indistinguishable from the corporation itself.'" However, in Harrison, even though O'Sullivan was a founder, chairman, CEO, and a large shareholder of a closely held corporation, there was insufficient evidence to determine, as a matter of law, that O'Sullivan controlled the "corporation to the degree that he should be viewed as its alter ego," which the court established as the standard for a corporate officer to avoid liability for interference. Harrison at 478. On January 14, 2002, accepting the allegations of the Complaint as true, as this Court must, Mr. Kulkarni was far from being the alter ego of Wolverine.

Defendants further cite Schinkel v. Maxi-Holding, Inc., 30 Mass. App. Ct. 41, 50 (1991), but that case only briefly suggests that the principle might apply to a CEO, which of course, Mr. Kulkarni must be assumed not to have been for purposes of this motion. Nor does Schutz v. Go Ahead Vacations, Inc., 10 Mass. L. Rptr 573 (Sept. 1, 1999), 1999 WL 959681, assist defendants. In that case, the CEO was "not someone who maliciously set out to influence some other decision-maker to fire plaintiff. He was the decision-maker acting on behalf of the corporation." Schutz at 575. In this case, the Complaint specifically alleges malice and influence of the board of Wolverine as a separate decision maker. Complaint ¶¶22-23, 59, 66, 67. In Restuccia v. Burk Technology, Inc., 5 Mass. L. Rptr. 712 (August 13, 1996), 1996 WL 1329386, Burk apparently owned 100% of the company, it bore his name and he was its president. The court thus apparently found it to

be his alter ego, insulating Burk himself from liability for interference. In the plaintiff's case, as of the date of the interference, Kulkarni no longer owned any Wolverine shares, and he was no longer a Wolverine officer or employee. Complaint ¶¶16-17, 65.

Defendants further cite <u>Gram v. Liberty Mutual Ins. Co.</u>, 384 Mass. 659, 663 (1981) in support of the proposition that employees may not be liable for tortious interference when acting within the scope of their employment responsibilities. However, <u>Gram</u> recognizes that the privilege is unavailable to those acting with malevolence or outside the scope of their authority. <u>Gram</u> at 663. The Complaint alleges that Kulkarni was not CEO at the time, and further that he acted wrongfully, outside the scope of his responsibilities, and for a purpose outside of the legitimate business purposes of Wolverine. Complaint ¶¶63-67. Since these facts must be taken as true, <u>Gram</u> does not help the defendants.

Furthermore, the SJC has on a number of occasions held supervisors liable for intentional interference with the employment contracts of those who report to them. In <u>Abramian v. President & Fellows of Harvard College</u>, 432 Mass. 107 (2000), the well-publicized case of a Russian security guard at Harvard, jury verdicts for intentional interference were returned against the guard's supervisor, the manager of operations for the security department, and the chief of police and security. <u>Abramian</u> at 109. While the court set aside the verdict and ordered a new trial on this count, there was no contention that these individuals could not be liable, despite the fact that the supervisor was arguably acting within the scope of his responsibilities. Similarly, in <u>Owen v. Williams</u>, 322 Mass. 356 (1948), a jury verdict against a doctor for interference with a

nurse's employment at a hospital was upheld, the court holding that the burden was on the doctor to establish that his action was privileged. Owen at 360.

## IV. THE CAUSES OF ACTION RELATING TO BREACH OF THE TRANSITION AGREEMENT CANNOT BE DISMISSED AS MASSACHUSETTS LAW REQUIRES CONTRACT NOTICE PROVISIONS TO BE STRICTLY OBSERVED

Defendants' final argument is that the Fifth and Sixth Causes of Action must be dismissed as the January 18, 2002 letter from Wolverine's Human Resources Manager constituted sufficient notice, despite the fact that the Transition Agreement itself specifically provides that "the Chief Executive Officer [must] provide[] written notice of termination."[14] As discussed in the previous section, plaintiff alleges in his Complaint that Mr. Kulkarni was no longer CEO of Wolverine on January 14, 2002. Yet, defendants maintain that he was. See Affidavit of Mark Brown, ¶2. Defendants ignore the requirement that, for purposes of a motion to dismiss, the allegations of the Complaint must be accepted as true.

The fact that Mr. Kulkarni ceased to be CEO after the transaction (Complaint ¶17) and only the new CEO had the authority to terminate the Transition Agreement provided an important protection to the plaintiff. The new CEO[15] would doubtless require the plaintiff's assistance in the "transition of the Company's management" and the benefit of his "expertise in managing and operating the Company," assistance of lesser importance to Mr. Kulkarni, the former CEO. Transition Agreement ¶1. Failure to follow the notice requirement was thus much more than minute or hypertechnical failure under the contract.

---

[14] The dictionary definition of "provide" as "to make preparation to meet a need," cited by defendants (Defendants' Memorandum at 17), is wholly unreasonable given the context in which the word appears.

[15] See Complaint ¶4 (new CEO assumed position sometime between January 15 and 31, 2002, after the termination of the plaintiff).

Defendants assert that the January 18, 2002 letter (attached to the Affidavit of Mark Brown) constituted the required notice. However, that letter contains no reference to the Transition Agreement, does not purport that it provide notice pursuant to any agreement, does not refer to the letter having been issued at behest of any individual, and purports to effect the termination without the two weeks notice required by the Transition Agreement ¶2. Furthermore, the argument that the plaintiff received effective notice would render superfluous the requirement in the Transition Agreement that the CEO provide written notice. Contracts must be interpreted, whenever possible, to give meaning to every part. 17A Am Jur 2d Contracts §377.

Despite these obvious deficiencies, defendants attempt to massage the facts, incredibly maintaining that the "manner in which Wolverine furnished Crawford with written notice of his termination conforms with the provisions of the Agreement." [16] Contrary to defendants' assertion, plaintiff does not allege that the CEO merely failed to sign the notice. Complaint ¶49. Defendants maintain that "Kulkarni made arrangement for written notice to be 'provided' to Crawford," but a review of the Affidavit of Mark Brown reveals that it was at Brown's sole request, not Kulkarni's, that the letter was sent. Thus, even if Kulkarni remained CEO, and the Complaint alleges he did not, the notice was not "provided" by the CEO as required by the Transition Agreement, as even by defendants' facts he did not request that it be sent. Furthermore, there is nothing in the January 18 letter that would indicate to the plaintiff that it constituted notice under the Transition Agreement. Defendants' argument requires clairvoyance by the plaintiff as to happenings outside of his purview in order for him to ascertain whether or not the required notice under the Transition Agreement had been provided.

[16] Memorandum in Support of Partial Motion to Dismiss at 16.

28

Defendants then argue that any failure to follow the notice provisions of the Transition Agreement is excused because it constitutes an immaterial breach of that Agreement. However, the plaintiff does not maintain that the agreement was breached by the failure to provide notice in the manner specified, but rather that any notice of termination was without force or effect as it was not provided in the matter clearly spelled out by the agreement. It was the failure to pay the amounts due under the still effective agreement that constituted the breach.

Contract notice requirements, particularly those of contract termination, must be strictly observed, and notices of termination which do not comply with the requirements of the contract are without effect. See 17A Am Jur 2d Contracts §544. In Cities Service Oil Co. v National Shawmut Bank, 342 Mass. 108 (1961), a lessee exercised its option to purchase a property by mailing notice of such exercise on the day the option expired. Even though the notice was received the very next day, it was deemed ineffective as the contract required that notice be "given," and, even though the contract provided for notice by forwarding, notice was not effective until received.[17]  Similarly, in McCord v. Masonic Casualty Company, 201 Mass. 473 (1909), notice of an accident to an insurance company was deemed ineffective and the claim correctly denied, when notice was mailed before a two week deadline, but not received until after it. In Old Colony Railroad v. Assessors of Quincy, 305 Mass. 509 (1940) a messenger delivering a petition of abatement found the assessor's office closed early (by the messenger's watch set to standard time) following the Governor's extension of daylight saving time after the

---

[17] Mr. Kulkarni was surely aware of the strict notice requirements relating to options as he personally litigated that very issue with a tenant of one of his Boston properties.

Hurricane of 1938. Even though notice was immediately mailed, it arrived after the statutory deadline and was ruled ineffective.

Furthermore, the January 18, 2002 letter did not constitute effective notice because it purported to effect termination earlier than the contract permitted. In Oldfield v. Chevrolet Motor Co., 199 N.W. 161 (Iowa 1924), a notice of termination which purported to cancel an agreement five days after the date of the letter was without force or effect when the contract provided merely for five days' written notice, which period was not deemed to commence until the notice was received. The notice was deemed not to have terminated the contract at all, even commencing five days after receipt, as it did not comply with the terms of the agreement, even though it specifically referred to the termination clause of the agreement.

## V. CONCLUSION

For the above stated reasons, defendants' partial motion to dismiss should be denied in all respects.

Respectfully submitted,

Peter A. Crawford, pro se
23 Newcastle Dr. #11
Nashua, NH 03060
(603)888-4574

Date: April 22, 2005