**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**
_____

PETER A. CRAWFORD,

        Plaintiff,

                                       Civil Action No.

v.                                     05-cv-10078 (DPW)

WOLVERINE, PROCTOR & SCHWARTZ, INC.;
STEVEN F. CHILINSKI, and
DEEPAK S. KULKARNI,

                Defendants.
_____

## DEFENDANTS' ASSENTED-TO MOTION FOR LEAVE TO FILE A REPLY TO PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL DISMISSAL

      Pursuant to Local Rule 7.1(b)(3), Defendants Wolverine, Proctor & Schwartz, Inc. ("Wolverine"), Steven F. Chilinski ("Chilinski") and Deepak S. Kulkarni ("Kulkarni") seek leave to file a Reply to plaintiff _pro se_ Peter Crawford's ("Crawford") Opposition to Defendants' Motion for Partial Dismissal.  The grounds for this Motion are as follows:

      1.    As recognized by Crawford in his recent motion for leave to file an opposition in excess of 20 pages, Defendants' motion for partial dismissal affects five of seven counts of his Complaint and over two-thirds of his alleged damages (in the $1.8 Million range).

      2.    Moreover, the issues raised in Defendants' motion for partial dismissal and Crawford's 30-page opposition are complex and involve an issue of Massachusetts law that has not been definitely decided by the Supreme Judicial Court.

3.     The additional points raised in the attached Reply Memorandum would assist this Court in rendering its decision on the matters at hand.

4.     Crawford has assented to the relief sought in this Motion, provided that the Defendants limited themselves to responding to the points raised in his Opposition brief without raising new legal issues.

5.     Attached hereto as Exhibit A is Defendants' Reply Memorandum which is the subject of this Motion.

<u>**LOCAL RULE 7.1 CERTIFICATION**</u>

I certify that on May 6, 2005, my colleague, Jeffrey D. Kuhn, discussed by telephone the bases of the foregoing Motion with Plaintiff *pro se*, Peter A. Crawford, in an effort to narrow or resolve the underlying issues.  Crawford assented to this Motion as set forth above in paragraph 4.

**WHEREFORE**, Defendants respectfully request that the Court grant the instant Motion and accept the Reply attached hereto as Exhibit A for filing, docketing and the Court's consideration.

Dated: May 6, 2005

Respectfully submitted,

WOLVERINE, PROCTOR &
SCHWARTZ, INC.,
STEVEN F. CHILINSKI, and
DEEPAK S. KULKARNI

By their attorneys,


/s/  Mark M. Whitney
Mark Whitney (BBO #637054)
Jeffrey D. Kuhn
MORGAN, BROWN & JOY LLP
200 State Street
Boston, Massachusetts  02109
(617) 523-6666


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on May 6, 2005, I filed the foregoing document with

the Clerk of the Court by using the ECF system.  I further certify that I mailed the

foregoing document and the notice of electronic filing to the pro se plaintiff, Peter A.

Crawford, 23 Newcastle Drive, #11, Nashua, NH  03060, by U.S. mail, on May 6, 2005.

/s/ Mark M. Whitney
Mark M. Whitney, Esq.

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**
_____

PETER A. CRAWFORD,

        Plaintiff,

                                          Civil Action No.
v.                                       05-cv-10078 (DPW)

WOLVERINE, PROCTOR & SCHWARTZ, INC.,
STEVEN F. CHILINSKI, and
DEEPAK S. KULKARNI,

        Defendants.
_____

**REPLY MEMORANDUM IN SUPPORT OF DEFENDANTS'**
**MOTION FOR PARTIAL DISMISSAL OF PLAINTIFF'S COMPLAINT**

Mark M. Whitney (BBO # 637054)
Jeffrey D. Kuhn
MORGAN, BROWN & JOY, LLP
*Attorneys for the Defendants*
200 State Street – 11th Floor
Boston, Massachusetts   02109
(617) 523-6666

## <u>PRELIMINARY STATEMENT</u>

Defendants Wolverine, Proctor & Schwartz, Inc. ("Wolverine"), Steven F. Chilinski ("Chilinski") and Deepak S. Kulkarni ("Kulkarni") (collectively "Defendants") hereby submit the following Reply to plaintiff *pro se* Peter Crawford's ("Crawford") Opposition to Defendants' Motion for Partial Dismissal ("Opposition Memo"). While Defendants continues to rely on the arguments set forth in their moving papers, this Reply is necessary to reveal several erroneous suppositions, misstatements of court holdings, flawed legal arguments and sophistry contained in plaintiff's Opposition Memo. Highlights of the defects in Crawford's Opposition Memo include:

- This Court should immediately recognize Crawford's sprawling Wage Act[1] discussion for the diversion that it is: namely, it represents Crawford's attempt to avert the Court's attention away from the unambiguous definition of "wages" enacted by the Legislature which makes *no mention whatsoever of "bonuses."*

- Crawford's argument that this Court should look to Black's Law Dictionary and other sources to ascertain the meaning of the term "wages" in the Wage Act has already been raised and *specifically rejected* by the Massachusetts Appeals Court.

- In contradictory fashion, Crawford argues on the one hand that this Court must only consider SJC precedent when evaluating the Defendants' legal positions (and should not consider any of the state or federal trial court decisions cited by Defendants); while on the other hand, Crawford asserts that it is perfectly appropriate to consider the trial court decisions or foreign state court decisions and laws that he deems worthy of consideration by this Court.

- Where Defendants rely upon analogous cases with holdings adverse to Crawford's position, he simply concludes that the court's holding must be "wrong."

- Crawford erroneously concludes that he "earned" his bonus on a monthly basis, based on a contract provision which provided for a pro-rata bonus

---

[1] For convenience, Defendants will employ the same capitalized abbreviations as set forth in their moving papers.

1

payment in the event of his termination in the middle of the bonus calculation period.

Thus, for these reasons (detailed further below) and those more fully articulated in Defendants' moving papers, Defendants respectfully request that this Court issue an Order dismissing the second, fourth, fifth, sixth and seventh causes of action of the Complaint with prejudice.

## **REPLY ARGUMENT**

## **POINT I -- CRAWFORD'S WAGE ACT CLAIMS**

**A.**     **This Court May Give Full Weight And Consideration To All Authority Cited By Defendants In Their Memorandum Of Law.**

Crawford spends a significant portion of his memorandum instructing this Court as to which prior judicial opinions examining the Wage Act were correctly or erroneously decided and the relative weight this Court should assign to each of these prior decisions. Invariably, holdings which conflict with Crawford's preferred interpretation of the Wage Act were either wrongly decided or originate from tribunals this Court is free to ignore.[2] As a result, Defendants are compelled to address Crawford's arguments as to which prior authority this Court may rely on its analysis.

As Crawford correctly points out, "a federal court sitting in diversity jurisdiction and called upon in that role to apply state law is absolutely bound by a current interpretation of that law formulated by the state's highest tribunal."  Daigle v. Maine Medical Center, Inc., 14 F.3d 684, 689 (1st Cir. 1994); see, Largess v. Supreme Judicial Court for the State of Massachusetts, 373 F.3d 219, 225 (1st Cir. 2004) ("… federal

---

[2]     Curiously, after criticizing as either irrelevant or non-controlling several Massachusetts decisions interpreting the Wage Act, Crawford relies on opinions from *foreign* states interpreting *other* statutes in support of his argument for an alternative interpretation of the Wage Act.

courts should generally defer to a state's highest court on issues of state law."). However, "if Massachusetts has no controlling authority, the Court will predict how the Massachusetts Supreme Judicial Court would decide if presented with the question." Grabowski v. Bank of Boston, 997 F. Supp. 111, 119 (D. Mass. 1997) (Saris, J.); see, Garran v. SMS Fin. V, LLC (In re Garran), 338 F.3d 1, 6 (1st Cir. 2003) (recognizing that where Massachusetts courts have not yet addressed an issue, the court must predict how the SJC would interpret the statute).

In the "absence of a definitive ruling by the highest state court, a federal court may consider analogous decisions, considered dicta, scholarly works, and any other data tending to show how the highest court would decide the issue at hand, taking into account the broad policies and trends so evinced." Grabowski, 997 F. Supp. at 119 (quoting, Gibson v. City of Cranston, 37 F.3d 731, 736 (1st Cir. 1994)). In such a scenario, "the decisions of intermediate state appellate courts are trustworthy data for ascertaining state law." Losacco v. F.D. Rich Construction Co., Inc., 992 F.2d 382, 384 (1st Cir. 1993). The United States Supreme Court has stated that federal courts must follow intermediate appellate court opinions regarding state law when the intermediate court "is a court of statewide jurisdiction, the decisions of which are binding upon all trial courts in the absence of a conflicting decision of the [state supreme court]." Gooding v. Wilson, 405 U.S. 518, 525 n.3 (1972). "[I]n the absence of other telltales indicating that the state's highest tribunal would have ruled otherwise, [] it is prudent to accept the appeals court's interpretation as authoritative." Hamm v. Latessa, 72 F.3d 947, 955 (1st Cir. 1995).

Among the more glaring false generalizations included in Crawford's brief is his contention that, with respect to the types of compensation governed by the Wage Act,

"there are no decisions of the Massachusetts Supreme Judicial court *which are even remotely on point*." Opposition Memo, at 4 (emphasis added). While the inaccuracy of this statement is addressed in detail below, Defendants do acknowledge that the *precise* question at issue on this Motion – *i.e.* whether remote, extraordinary bonus compensation that is contingent on a company's performance metrics is subject to the provisions of the Wage Act – is not yet the subject of a definitive SJC ruling. Therefore, in addition to being guided by the decisions of the Massachusetts Appeals Court, this Court's my take note of "analogous decisions, considered dicta, scholarly works, and any other data tending to show how" the SJC would decide the issue. Grabowski, 997 F. Supp. at 119.

Crawford's argument notwithstanding, this Court is also free to consider relevant decisions of the Massachusetts Superior Court as a persuasive indicator of how the SJC would interpret the Wage Act. See Commissioner v. Estate of Bosch, 387 U.S. 456, 465 (1967). Where a state's highest court has not issued a definitive ruling on a question of state law, federal courts are encouraged to consider pertinent opinions of non-controlling lower state courts, including trial courts, as "the best indicator of how the high court will resolve an issue." Eastern Mountain Platform Tennis, Inc. v. Sherwin-Williams Co., Inc., 40 F.3d 492, 499 (1st Cir. 1994).[3]

Crawford also belittles prior pertinent and analogous decisions of this Court "as merely instructive, and [carrying] little weight." Opposition Memo, at 5. In support of this argument, Crawford relies on no less than the Supreme Court's decision in Erie R. Co. v. Tompkins, 304 U.S. 64 (1938). While Defendants will reluctantly forebear from a lengthy dissertation on the actual Erie doctrine, suffice it to say that nothing in the

---

[3]  Crawford also argues that Superior Court decisions published in the Massachusetts Law Reporter are "rarely, if ever, cited by the Massachusetts Supreme Judicial Court the Massachusetts Appeals Court." Opposition Memo, at 4. Crawford fails, however, to cite any authority in support of this contention.

Supreme Court's Erie holding prevents this Court from considering its prior opinions in deriving how the SJC would interpret the relevant provisions of the Wage Act.[4]  Indeed, in the absence of a definitive SJC ruling on the topic, this Court has wide latitude in the jurisprudential sources it may consider in analyzing the statute – and this discretion clearly encompasses this Court's own prior decisions on the topic.  See Grabowski, 338 F.3d at 6.

**B.**     ***Prozinski v. Northeast Real Estate Serv.* Is The Law Of Massachusetts And It, Along With Other Persuasive Precedent Cited By Defendants, Should Govern This Court's Decision On The Instant Motion.**

In the face of considerable analogous authority clearly holding that Crawford's claim for his extraordinary, contingent bonus payment is not covered by the Wage Act, Crawford essentially argues that such authority is unpersuasive or wrongly decided.  Nevertheless, Prozinski v. Northeast Real Estate Serv., 59 Mass. App. Ct. 599, 797 N.E.2d 415 (2003), is the law of Massachusetts and requires judgment in favor of Defendants on Crawford's Wage Act claims for his alleged unpaid bonus.

In Prozinski, the Appeals Court definitively established state law regarding whether severance payments are encompassed within the definition of "wages" in the Wage Act.  The primary basis for the holding in Prozinski was the court's analysis of the definition of "wages" in the Wage Act.  The Court noted that the statute makes express reference to compensation that is paid on a regular - weekly, bi-weekly, or monthly - basis.  The Appeals Court further recognized that the statute makes express reference to holiday pay and vacation pay, and pursuant to the most recent amendment, definitely determined commissions that are due and payable to the employee.  Id. at 603.  In

---

[4]  In Erie, the Supreme Court held that Federal District Courts sitting in diversity must adhere to principles of state statutory and common law as opposed to the nonexistent "general common law."  304 U.S. at 64.

rejecting Prozinski's claim for severance pay under the Wage Act, the Appeals Court held that:

> Although the statute expressly refers to holiday pay, vacation pay, and definitely determined commissions, *it does not refer to "severance pay" or similar terms*. Prozinski argues that severance pay falls within the statute because his severance pay was "definitely determined" and therefore had "become due and payable."  A plain reading of the statute reveals that the quoted statutory terms refer solely to commissions.

Id.

It is significant to note that the Prozinski decision considered the same arguments that Crawford now makes under Jancey v. School Comm. of Everett, 421 Mass. 482, 658 N.E.2d 162 (1995), and *specifically rejected them*.  In Jancey, the SJC considered what types of compensation and benefits should be included in the term "wages" as used by the Massachusetts Equal Pay Act, M.G.L. c. 149 § 105A.  421 Mass. at 490-493.  As noted in Jancey, the Equal Pay Act does not define the term "wages" or provide any guidance whatsoever as to the scope of that term.  Id.  In order to resolve the issue, therefore, the court resorted to Black's Law Dictionary and to other statutes for assistance in defining wages.  Id.

Prozinski argued that the Appeals Court should embrace the broad definition of "wages" that the SJC in Jancey embraced in construing the meaning of "wages" under the equal pay act (M.G.L. c. 149, § 105A).  The Jancey Court relied in part on Black's Law Dictionary, which Crawford emphasized contains a reference to "bonuses."   However, the Appeals Court in Prozinski recognized that while the equal pay act "did not define the term 'wages' or provide any guidance as to its scope," (Id. at 604) the Wage Act contains a specific definition.  The Prozinski Court found:

> In contrast, G.L. c. 149, §  148, refers to "weekly" or "biweekly" wages having been earned during a particular pay period and specifically includes in its

6

definition "holiday or vacation pay" as well as definitely determined commissions. ***There is, therefore, no need to resort to the popular meaning of the term "wages," to Black's Law Dictionary, or to other statutes using the term "wage."***

Id. at 604.

Thus, Prozinski stands for the proposition that courts evaluating whether a particular form of compensation should be covered under the Wage Act must determine whether such form of compensation is encompassed in the express definition that the Legislature enacted.  The Appeals Court held that because "severance pay" was not enumerated in the definition, it was not covered.  The same logic applies to "bonuses," which are likewise ***not*** enumerated in the Wage Act's definition of "wages."[5]

### C.    Other Persuasive Precedent Compels A Finding That The Wage Act Is Clearly Inapplicable To Crawford's Bonus Claims.

Although defendants have cited several analogous decisions of various Massachusetts and federal courts to assist this Court in its analysis, Crawford's contention that there is no relevant SJC decision "even remotely on point" is simply erroneous.  Opposition Memo, at 4.

For example, the SJC informally describes section 148 as the "weekly wage law." Boston Police Patrolmen's Association, Inc. v. City of Boston, 435 Mass. 718, 718-719 (2002).  Thus, the regular use of the term "weekly" in official descriptions of the act emphasizes that the Wage Statute was designed to protect regular and mundane forms of compensation.  In addition, in its oft-cited opinion in American Mutual Liability Ins. Co. v. Commissioner of Labor & Indus., 340 Mass. 144, 145 (1959), the SJC concluded that

---

[5]  It is also interesting to note that the Appeals Court in Prozinski relied heavily on this Court's Cumpata v. Blue Cross Blue Shield of Mass. Inc., 113 F. Supp. 2d 164, 168 (D. Mass. 2000) decision, for the proposition that compensation triggered by a contingency are not covered under the Wage Act.

the Legislature enacted section 148 to limit "the interval between the completion of a work week and the payday on which the wages earned in that week will be paid." Thus, the SJC has clearly interpreted the Wage Act to apply only to regular wages or commissions which are paid on a weekly, bi-weekly or monthly basis.[6] Id.

Crawford attempts to escape the ramifications of the SJC's holding in American Mutual by arguing that Defendants – and the subsequent opinions citing the SJC's decision – "ignore the fact that American Mutual was decided five months before the Legislature completely rewrote the Wage Act, in part to make it clear that the provision applied equally to executives and professionals." Opposition Memo, at 7. Crawford confuses, however, which aspect of the American Mutual holding is germane to Defendants' argument and the decisions cited in support of it. Defendants brief expressly acknowledges that the Wage Act is applicable "to corporate executives as well as to lower level employees." Defendants' Memo, at 6 (quoting, Cumpata v. Blue Cross Blue Shield of Massachusetts, 113 F. Supp. 2d 164, 167 (D. Mass. 2000)). Crawford's argument notwithstanding, the Legislature's subsequent revisions to the Wage Act were entirely unrelated to that portion of the American Mutual holding on which Defendants rely – i.e., the SJC's determination that the Wage Act applies only to regular weekly or bi-weekly wages, as opposed to the irregular, episodic and contingent forms of compensation such as the Bonus Crawford alleges he is due.

---

[6]  Citing absolutely no authority in support of his proposition, Crawford argues that "it is clear that the Massachusetts Legislature intends the Wage Act to be broadly applicable to all persons performing services with only a narrowly drawn exception." (Opposition Memo, at 6). Crawford's opinion on the subject notwithstanding, courts in Massachusetts have, in reality, "construed the scope of the Wage [Act] narrowly." Okerman v. VA Software Corp., No. 0101825, 2003 WL 21960599, *8 (Mass. Super. Ct. Jul. 9, 2003) (citing, Commonwealth v. Savage, 31 Mass. App. Ct. 714, 716 (1991)); Prozinski v. Northeast Real Estate Services, LLC, 59 Mass. App. Ct. 599 (2003) ("We have construed the wage act narrowly.")

Furthermore, an examination of the 1960 amendments to the Wage Act only serves to bolster the critical components of the <u>American Mutual</u> holding.  As Crawford notes in his brief, on May 23, 1960, the first paragraph of the Wage Act was rewritten by 1960 Mass. Acts c. 416 to permit executive and professional personnel to be paid "bi-weekly or semi-monthly," or, if they "elect[] at [their] own option to be paid monthly…."  Thus, the Legislature *confirmed* the SJC's <u>American Mutual</u> holding inasmuch as the 1960 amendment removed any doubt that the Wage Act applied only to those regular wages paid on a weekly, bi-weekly or monthly basis.

Moreover, that employees paid on an annual basis were included in the 1960 act's definition of a "salaried employee" has no bearing whatsoever on Defendants' motion.  Clearly, by broadening the definition of "salaried employees," the Legislature was signaling its intention that *all* employees, regardless of how their total compensation was calculated, should be protected by the Wage Act's payment frequency requirements – *i.e.*, that employees' wages must be paid on at least a weekly, bi-weekly or monthly basis.  There is simply no statutory basis for Crawford's contention that irregular and episodic remuneration, which was *never* intended to be paid on a weekly, bi-weekly or monthly basis, finds any protection in the provisions of the Wage Act.

It is worth noting here the critical fallacy in Crawford's assertion that he earned his bonus on a monthly basis.  Opposition Memo at 3.  As a support for his contention that his "bonus wages were earned regularly each month" Crawford relies on a provision of the Employment Contract which provided for proration of the annual bonus payment (if any) in the event that Crawford was terminated during the bonus calculation period.  <u>Id</u>.  That language obviously means that if Crawford were terminated six months into the

bonus calculation period, Wolverine would still need to wait for its audited financial statements after the end of the fiscal year to ascertain EBITDA for the prior year, and then Crawford's bonus figure if any would be divided by two. Simply put, the contract language does not support Crawford's conclusion that he therefore can be deemed to "earn" his bonus on a monthly basis.

Subsequent to its decision in <u>American Mutual</u>, the SJC provided further guidance on the methods of compensation governed by the Wage Act.

In <u>Boston Police Patrolmen's Association, Inc. v. City of Boston</u>, 435 Mass. 718 (2002), the SJC was presented with the question of "whether deferred compensation contributions are 'wages' under" the Wage Act. <u>Id.</u> at 719. Thus, although the specific form of compensation differs from that claimed by Crawford, the SJC's <u>BPPA</u> analysis of how *wages* are defined under the Wage Act is highly instructive to this Court given that the instant case raises that *precise* question in a somewhat different context.

The plaintiffs in <u>BPPA</u>, more than 1,300 police patrol officers and detectives, brought suit under the Wage Act. 435 Mass. at 718. The plaintiffs argued that their employee contributions to a tax-exempt deferred compensation plan were "wages" under the Wage Act and, therefore, subject to the statutory requirement that they be paid into the fund within seven days of the end of each pay period. <u>Id.</u> As an initial matter, the SJC noted that its Wage Act jurisprudence was governed by "the intent of the Legislature ascertained from [the statutory language], considered in connection with the cause of [the Wage Act's] enactment, the mischief or imperfection to be remedied and the main object to be accomplished, to the end that the purpose of the framers may be effectuated." <u>Id.</u> at 719-720. The SJC found that "the purpose of the weekly wage law is clear: to prevent

the unreasonable detention of wages." Id. at 720 (citing, American Mutual, 340 Mass. at 147).

In attempting to reconcile the plaintiffs' claims with the legislative intent of the Wage Act, the SJC observed that payments under the plaintiffs' deferred compensation plan in BPPA were, by the fundamental nature of the plan, *intended* to be deferred (*i.e.* delayed). Id. at 720. As a result, the SJC held that the Wage Act, which was ratified by the Legislature to remedy "the evil of unreasonable detention of wages," was simply inapplicable to a form of compensation where "funds were intended to be held out of the employee's possession" for some pre-ordained period of time beyond the ordinary weekly or bi-weekly pay day. Id. The SJC ultimately held that "deferred compensation contributions are not 'wages' under the weekly wage law." Id. at 721.

Here, applying the logic of the SJC's BPPA holding to Crawford's Bonus claims yields identical results. Besides being episodic, irregular and contingent in nature, neither Crawford nor Wolverine intended that Crawford's Bonus (in the event he was so entitled), would be paid in the manner of ordinary wages, viz., on a weekly, bi-weekly or monthly basis. Rather, like the deferred compensation at issue in BPPA, Crawford's bonus was "intended to be held out of [Crawford's] possession" and would only be paid far in the future after his ordinary salary for the corresponding month. 435 Mass. at 721. Thus, Crawford's bonus cannot be considered wages under the weekly wage law pursuant to the SJC's rationale in BPPA. 435 Mass. at 721.

## POINT II -- CRAWFORD'S INTENTIONAL INTERFERENCE CLAIM

Crawford's arguments in support of his tortious interference claim rely on his assertion that Kulkarni was no longer the CEO of Wolverine on January 14, 2002, the

11

date of Crawford's termination.  Crawford contends that because Kulkarni was no longer the CEO on January 14, Kulkarni was, in effect, a stranger to the Transition Agreement between Crawford and Wolverine and, therefore, capable of tortiously interfering with Crawford's contractual rights under that Agreement.  Crawford contends that by January 14, 2002, Kulkarni was a third-party to the Transition Agreement notwithstanding the fact that it was Kulkarni who personally executed the Agreement on December 28, 2001 – just 16 days earlier.

Even assuming, for the sake of this discussion only, that Kulkarni was *not* Wolverine's CEO on January 14, 2002, while the analysis of Crawford's claim changes slightly, the ultimate outcome remains the same.  In his brief, beyond alleging the Kulkarni was not Wolverine's CEO on the date of his termination, Crawford now alleges that Kulkarni was neither an officer nor even an employee of Wolverine as of January 14, 2002.  This contention, however, appears to conflict with the admission in Crawford's Complaint that Kulkarni was, at the very least, acting as a "consultant" to Wolverine on January 14.  Complaint ¶ 66.  Regardless of Crawford's current theory as to Kulkarni's position with Wolverine on the date he was terminated, Crawford does acknowledge that Kulkarni was acting in some type of official capacity on the date Crawford was terminated.  Crawford admits, therefore, that Kulkarni was acting as a corporate agent at the time he allegedly interfered with Crawford's Transition Agreement by urging the Wolverine Board to make a personnel decision adverse to Crawford.[7]

---

[7]  Crawford's assertion that Kulkarni was not the CEO of Wolverine on January 14, 2002 is simply erroneous.  In response to the testimony of Mark Brown, the current CEO of Wolverine, that Kulkarni was the company's CEO on the date of Crawford's termination, Crawford contends that Brown "does not provide any support for [his] contention.  Opposition Memo, at 23.  In terms of corporate history, it is difficult to imagine what evidence could be more compelling than the testimony of Wolverine's current CEO – who was also, incidentally, at the pertinent time the company's CFO and the man tasked with terminating Crawford in January 2002 by then-CEO Kulkarni.  It would indeed be difficult to fathom a

Thus, giving Crawford's allegations the benefit of every doubt, his claim against Kulkarni ultimately boils down to a tort claim brought against a corporate employee for a personnel action. As Defendants stated in their initial memorandum, Massachusetts courts have repeatedly voiced their displeasure with the conversion of a run-of-the-mill breach of employment contract matter into a claim for tortious interference. See e.g., Schutz v. Go Ahead Vacations, Inc., No. 97-4409, 1999 WL 959681, *4 (Mass. Super. Ct. Sep. 1, 1999) ("Converting every corporation's breach or termination of contract into a claim for intentional interference on the part of the individual that actually made the decision to breach or terminate the contract would create widespread individual liability for what are corporate acts.")

The alleged breach of Crawford's Transition Agreement was a contractual act, the ramifications and remedies for which should be limited to contract law. Crawford has brought several separate causes of action whereby he asserts traditional contract claims sounding in breach. To allow Crawford to sustain a tortious interference claim against the individual corporate actor who he blames for his termination and the alleged breach of his Transition Agreement, however, needlessly converts what should otherwise remain a straightforward contract matter into a tort claim, with the resultant possibility of punitive damages.

## POINT III - BREACH OF THE TRANSITION AGREEMENT

Crawford's fifth cause of action alleges that Wolverine has failed to pay Crawford $25,000.00 in wages he is due under the terms of parties' December 28, 2001 Transition

---

situation where an employee or someone acting in a lesser capacity than the CFO in a corporate hierarchy could have the power or ability to instruct the CFO to terminate someone in Crawford's position (the COO). Crawford's contention simply belies logic and the undisputable evidence provided by Brown.

Agreement.     Despite the fact that Crawford's employment with Wolverine was terminated on January 14, 2002, Crawford argues that Wolverine breached the Transition Agreement by failing to pay his salary for February and March 2002.  Crawford's sixth cause of action alleges a violation of the Wage Act in connection with Wolverine's failure to pay Crawford's February and March 2002 salary under the Transition Agreement.  Complaint ¶¶ 54-56.

Crawford's Complaint acknowledges that his employment with Wolverine was terminated by the company's Board of Directors on January 14, 2002.  Complaint ¶ 23. Crawford's Complaint also concedes that on January 18, 2002 he received a written letter from the Wolverine Human Resources Manager which confirmed the Board's decision to terminate Crawford's employment with the company.  Id.  His undisputed termination notwithstanding, Crawford claims that, under the provisions of the Transition Agreement, he is owed unpaid wages of $25,000.00 for the months of February and March 2002. Complaint ¶¶ 52-53.  As the basis for this claim, Crawford argues that his January 14 termination was ineffective because the subsequent written notice of termination did not conform to the terms of the Transition Agreement.  Crawford's claims, however, are entirely devoid of merit.

Section 2 of the Transition Agreement, entitled "Term," provides that Crawford's employment under the Agreement would terminate at

> … the earlier of (i) March 31, 2002 … or (iii) two weeks after the date on which the Chief Executive Officer provides written notice of termination, for any reason or no reason, to the Employee [*i.e.*, Crawford].

In his Complaint, Crawford contends that because the January 18 written notice of termination he received from Wolverine's Human Resources Manager was not signed by

the company's CEO, his termination was ineffective and, thus, he is due his normal salary for February and March 2002.  In response to the arguments raised by defendants in their initial memorandum, Crawford now argues that the January 18 notice of termination was ineffective for a host of *additional* reasons.  None of Crawford's new arguments attacking the effectiveness of the January 18 notice, however, are supported by the actual language of the Transition Agreement itself.

Crawford contends that Carol O'Donohue's January 18 letter supplying written notice of termination was ineffective because:

- the "letter contains no reference to the Transition Agreement;"

- the letter "does not purport that it provide notice pursuant to any agreement;"

- the letter "does not refer to [] having been issued at the behest of any individual;" and

- the letter "purports to effect the termination without the two weeks notice required by the Transition Agreement."  (Opposition Memo, at 28).

There is simply nothing in section 2 of the Transition Agreement, however, that necessitates that any of the above-listed information be included in an efficacious written notice of termination.  For instance, nothing in section 2 of the Transition Agreement can be read as requiring that a written notice of termination must reference the Transition Agreement in order to be effective.  Crawford's arguments to the contrary appear to be inventing new contractual requirements out of thin air.

Finally, Crawford contends that "the January 18, 2002 letter did not constitute effective notice because it purported to effect termination earlier than the contract permitted."  Opposition Memo at 30.  Although it is not entirely clear, presumably this

argument is related to Crawford's assertion that Ms. Donohue's January 18 notice was ineffective because it "purports to effect the termination without the two weeks notice required by the Transition Agreement." Opposition Memo at 28. Crawford neglects to mention, however, that Wolverine did, in fact, pay Crawford's salary for *seventeen days* following his termination. Complaint ¶ 52. Thus, the implication that Wolverine removed Crawford from the company payroll earlier than permitted by the terms of the Transition Agreement is incorrect.

Therefore, because defendants have not breached the Transition Agreement, both Crawford's fifth and sixth causes of action, for breach of contract and the related Wage Act claim, must be dismissed.

## POINT IV -- IT WAS PROCEDURALLY PROPER FOR DEFENDANTS TO FILE AN ANSWER AND A MOTION FOR PARTIAL DISMISSAL

Plaintiff's contention that defendants may not file a motion for partial dismissal pursuant to F.R.C.P. 12(b)(6) while contemporaneously filing an Answer to the Complaint's remaining claims is simply incorrect and merits little discussion.

Crawford's Complaint includes seven causes of action asserted against various subsets of the three defendants. The first and third causes of action are alleged against Wolverine only, and are not addressed in Defendants' Motion for Partial Dismissal. Thus, Wolverine has answered Crawford's first and third causes of action and, in lieu of answering, has moved to dismiss Crawford's remaining claims.

Where a plaintiff's Complaint asserts several discrete causes of action, it is both unremarkable and procedurally proper for a defendant to move to dismiss certain claims under 12(b) while at that same time filing an answer to the unchallenged portions of the complaint. See e.g., Matney v. The Hartford Life Ins. Co., No. 3:02-cv-2287L, 2004 WL

2997488, *1 (N.D. Tex. Dec. 27, 2004) (granting both defendant's partial motion to dismiss and motion to file an amended answer); El-Hajj v. Fortis Benefits Ins. Co., 156 F. Supp. 2d 27, 28 (D. Me. 2001) (granting both defendant's partial motion to dismiss and motion to file an amended answer).

The case cited by Crawford in support of his procedural argument, Brisk v. City of Miami Beach, Florida, 709 F. Supp. 1146 (S.D. Fla. 1989), is inapposite inasmuch as the defendants in that case apparently filed a motion for partial dismissal under 12(b)(6) five days *after* filing an answer to the entire complaint. Thus, the defendants had, in violation of Rule 12(b), sought to dismiss claims to which they had already filed an answer. Brisk, 709 F. Supp. at 1147.

In this case, Wolverine has only answered those discrete claims which are not addressed by its 12(b)(6) motion. Therefore, Wolverine has adhered to the dictates of 12(b) inasmuch as its motion to dismiss Crawford's second, fourth, sixth and seventh claims was made "before" Wolverine filed a "further pleading," viz., an answer addressing those four claims. F.R.C.P. 12(b).

## CONCLUSION

For the foregoing reasons and those reasons addressed in their moving papers, Defendants respectfully request that this Court grant the instant Motion and dismiss with prejudice Crawford's second, fourth, fifth, sixth and seventh causes of action.

Dated: May 6, 2005

Respectfully submitted,

WOLVERINE, PROCTOR & SCHWARTZ, INC.,
STEVEN F. CHILINSKI, and
DEEPAK S. KULKARNI

By their attorneys,

/s/ Mark M. Whitney
Mark Whitney (BBO #637054)
Jeffrey D. Kuhn
MORGAN, BROWN & JOY, LLP
200 State Street
Boston, Massachusetts  02109
(617) 523-6666

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on May 6, 2005, I filed the foregoing document with

the Clerk of the Court by using the ECF system.  I further certify that I mailed the

foregoing document and the notice of electronic filing to the pro se plaintiff, Peter A.

Crawford, 23 Newcastle Drive, #11, Nashua, NH  03060, by U.S. mail, on May 6, 2005.

/s/ Mark M. Whitney
Mark M. Whitney, Esq.