UNITED STATES DISTRICT COURT
District of Massachusetts

Civil Action
No. 05-10078-DPW

)
PETER A. CRAWFORD, Plaintiff )
)
v. )
)
WOLVERINE, PROCTOR & SCHWARTZ, INC., )
Steven F. Chilinski, Deepak S. Kulkarni, )
)
Defendants )
)

PLAINTIFF'S MEMORANDUM IN SUPPORT OF HIS MOTION TO COMPEL
RESPONSES TO HIS REQUEST FOR PRODUCTION OF DOCUMENTS, SET NO. 1

I.    DISCOVERY CONFERENCE

Plaintiff and attorneys for all defendants (Mark Whitney and Jeffrey Kuhn of

Morgan, Brown and Joy) conferred by telephone on October 11, 2005 from 1:30 p.m.

until approximately 3:00 p.m. The matters in dispute had been summarized by the

plaintiff in letters dated August 28, 2005 and October 3, 2005, and related to 19 separate

issues enumerated in these letters. With respect to a number of these issues, the wording

of responses to plaintiff's interrogatories and document requests was unclear, incomplete,

or contradictory. In others, the response failed to distinguish between documents that

exist, but were not being provided due to some objection, and documents that do not exist

at all. Oral assurances or responses with respect to most of these issues have been

provided to plaintiff, with a commitment to follow up by letter. An e-mail has been

received, together with 11 pages of scanned documents, the existence of which was not

1

even revealed prior to October 11, 2005. Nevertheless, plaintiff expects a document signed either by defendants' attorney, or in the case of supplemental interrogatory responses, by the defendant or an officer thereof, under penalty of perjury. Plaintiff reserves the right to make a further motion to compel should such written communications not be received.

In the case of Requests 3 and 6 of Plaintiff's Request for the Production of Documents to All Defendants, Set No. 1, defendants' attorneys have admitted that additional documents exist, but have not been produced due to objection. In the case of Request 3, defendants' attorneys indicated during the discovery conference that they would consult with their client early in the week of October 17th to see if he would agree to produce the documents, but it is now October 21, and no reply has been received.

In the case of Request 7 of Plaintiff's Request for the Production of Documents to All Defendants, Set No. 1 (bearing directly on the key issue of the case, calculation of plaintiff's bonus), defendants' attorneys had produced but a single page, but agreed to verify with their clients that no further documents existed within their custody or control. Such verification was to occur early during the week of October 17, 2005, but no supplemental response was received.

The issue of these three requests remains to be decided by the Court.

## II. NATURE OF THE CASE AND FACTS RELEVANT TO DISCOVERY MATTERS

This case seeks damages for breach of a written contract for a bonus payable to the plaintiff in the amount of $357,856.25, based upon his employment of Chief Operating Officer ("COO") of Wolverine, Proctor & Schwartz, Inc. ("Wolverine") during 2001. Additional amounts are sought under an oral agreement to increase the bonus

2

percentage, and treble damages are sought from defendants Wolverine and Chilinski (the CEO of Wolverine until early 2005) under the Massachusetts Payment of Wages statute. Additional amounts are sought from all defendants, including Kulkarni (Wolverine CEO during 2001), relating to the early termination of an agreement providing for 3 months of employment by the plaintiff after the sale of Wolverine.

The plaintiff assumed the position of COO of Wolverine in late 1999, successfully turning around the company and permitting its sale in late 2001. Under the terms of a letter agreement dated January 4, 2000 (the "Employment Contract") (attached hereto as pages PAC0001-PAC0005), the plaintiff became entitled to five percent of Wolverine's profits as a bonus, the profits being defined by a formula based upon earnings before interest, taxes or deductions for depreciation or amortization (EBITDA) less certain deductions for capital expenditures, interest, taxes or reserve adjustments. Based upon this formula, plaintiff maintains that Wolverine's 2001 profits were $7,157,125, an amount that includes an "extraordinary gain" of $10,169,839. Based upon their response to Plaintiff's Interrogatories, Set No. 1, Interrogatory 2, the inclusion of this gain is the sole dispute that defendant Wolverine has with the plaintiff's calculation. Nothing in the Employment Contract, however, indicates that the extraordinary gain was to be excluded, and the bonus provisions of the Employment Contract were reaffirmed and preserved on December 28, 2001 by agreement between Wolverine and the plaintiff (the "Transition Agreement") (attached hereto as pages PAC0043-PAC0047), paragraph 5.2. At the time of this agreement the fact and magnitude of the extraordinary gain were known.

3

Following the plaintiff's successful turnaround of Wolverine, the company was sold in late December, 2001 to an outside investor, Parthenon Capital, with defendant Kulkarni and the plaintiff retaining an interest in a new entity. A large number of documents, executed on or about December 28, 2001, including the Transition Agreement and a separate agreement relating to plaintiff's equity rights (the "Settlement Agreement") (attached hereto as pages PAC0048-PAC0051) were already in the plaintiff's possession or were produced by the defendants. As is often the case in these transactions, the various documents reference each other. Under the Settlement Agreement (paragraph 1(a)), the plaintiff exchanged his equity interest in Wolverine under the Employment Contract, for an interest in Wolverine Proctor LLC, a holding company formed to hold all Wolverine stock, and he agreed to share in an indemnity being committed to by Mr. Kulkarni as part of the transaction (paragraph 2).

Plaintiff learned for the first time through defendants' response to his first Request for Production that Wolverine was recapitalized on February 11, 2005, approximately a month after this suit was filed. The Wolverine 2004 financial statements (page W0367, attached hereto) specifically refer to the December 28, 2001 transaction and indicate that the agreement relating thereto must have been amended and/or superceded. They state that

> "On Feburary 11, 2005, the Company [i.e. Wolverine Proctor LLC, a holding company and the sole shareholder of defendant Wolverine] and the Class A and B shareholders entered into a series of transactions reorganizing and continuing the Company in which the Class A member [Kulkarni, with plaintiff retaining an interest through the Settlement Agreement] acquired new equity interests and the Class B member [Parthenon Capital and related investors] received approximately $2,000,000 in cash from the Company and certain preferred interests in newly-formed US and UK entities. Also as part of the transactions, the newly-formed US and UK entities acquired the operating net assets of the

4

Company, resulting in effective liquidation and dissolution of the
Company.

During the telephonic discovery conference, defendants' attorneys revealed for

the first time that amendments were made to certain of the December 28, 2001 contracts

on November 13, 2002, and after the call, e-mailed scanned copies to the plaintiff (one of

the documents is attached hereto as W0964-W0970). Paragraph 9.4 of that document

amends defendant Kullkarni's indemnification obligations, a percentage of which

plaintiff had assumed under the Settlement Agreement entered into by the plaintiff and

defendant Kulkarni, as well as Wolverine Proctor LLC.

## III.  PLAINTIFF IS ENTITLED TO AN ORDER COMPELLING PRODUCTION OF AMENDMENTS TO THE AGREEMENTS WHICH FORM THE BASIS FOR THIS ACTION (REQUEST 3)

Plaintiff's First Request for Production of Documents, Request 3, asks for:

"Copies of any and all agreements, contracts, undertakings,
understandings or other documents which amend, purport to amend,
rescind, replace, supercede, or otherwise modify, expand, reduce, or alter
in any way any of the four agreements referred to in paragraphs 1 and 2
above, or any of the exhibits thereto.

Defendants' response was:

"A copy of responsive documentation is attached."

The four "agreements referred to in paragraphs 1 and 2 above" are the Deepak

Kulkarni Representation and Warranty, Indemnity and Subscription Agreement, dated

December 28, 2001; the Consulting Agreement; the Transition and Release Agreement;

and the Wolverine Proctor, LLC, Limited Liability Company Agreement, dated as of

December 28, 2001 (see pages 3 and 4 of defendants' responses, attached hereto). The

5

first and fourth of these agreements are specifically referred to in the Settlement Agreement (page PAC0048 attached hereto).

Despite defendants' contention that documentation responsive to Request 3 had been provided in their response to the Request for Production, none was, until the October 14, 2005 e-mail. At that time, amendments to the first and second agreements listed above, dated November 13, 2002, were provided. Page W0964 of the e-mailed document, attached hereto, specifically refers to "that certain Omnibus Agreement of even date herewith...," indicating the existence of at least a third, previously undisclosed, agreement entered into on November 13, 2002. Furthermore, defendants' attorneys admitted during the discovery conference on October 11, 2005 that responsive documents relating to the February 11, 2005 recapitalization of Wolverine exist, but they object to providing them on grounds of relevance. They made no mention of the Omnibus Agreement, referring only to the other two agreements of the same date.

Fed. R. Civ. P. Rule 34(b) specifically provides that "[t]he response shall state, with respect to each item or category, that inspection and related activities will be permitted as requested, unless the request is objected to, in which event the reasons for the objection shall be stated." Objections must be specific on pain of waiver. Wright, Miller & Marcus, Federal Practice and Procedure (hereinafter "Wright") Civil 2d §2173. In this case, defendants made no objection at the time of response, as required by the rule, and the boilerplate "General Responses and Objections" at the beginning of their responses, does not specifically relate "to each item or category" and is thus by definition not specific enough to avoid waiver. It is axiomatic that an objection not made is deemed waived.

Notwithstanding defendants' lack of any timely objection, it is clear that there can be no successful contention that provision of the requested documents is not "reasonably calculated to lead to the discovery of admissible evidence." See Fed. R. Civ. P. Rule 26(b)(1). Nor is it even arguably privileged. During the discovery conference, defendants' attorneys suggested that either Wolverine or a successor assuming its liabilities have sufficient assets to cover any judgment in this case. To the extent that the 2005 amendments may have transferred the liability to a successor entity, from which plaintiff might be entitled to recover on a successor liability or third party beneficiary theory, their content is certainly relevant. Plaintiff could possibly obtain a judgment against defendant Wolverine, only to discover that it has no assets, but that the liability has been assumed by a successor entity. Plaintiff might then have to proceed anew against such successor. Even if not admissible, such agreements would be discoverable on the same basis as insurance agreements. See Fed. R. Civ. P. Rule 26(a)(1)(D).

Furthermore, as the November 3, 2002 amendments reveal (inasmuch as the plaintiff has assumed certain indemnification obligations), the Settlement Agreement, the Transition Agreement and the Employment Contract, and all of the other agreements to which they refer, are all a part of the contract into which he entered. Basic rules of contract construction require that documents relating to the same matters and transaction be taken together. Several states have codified this principle, enacting statutes that provide that "several contracts relating to the same matters, between the same parties, and made as part of substantially one transaction, are to be taken together." See Calif. Civil Code §1642, Mont. Code Ann. §28-3-203, Okla. Stat. tit. 15 §15-158. In this case, the Settlement Agreement refers to, and incorporates the provisions of, at least one

7

agreement that was amended on November 13, 2002. It is difficult, indeed, to see how amendments to any of the December 28, 2001 agreements which, along with the two entered into by plaintiff, relate "to the same matters between the same parties" and are "part of substantially one transaction" are not relevant. The resolution of this matter hinges in large part upon the interpretation of those agreements, taken together.

Furthermore, defendants' reluctance to provide amendments relating to the 2005 recapitalization raises suspicions that the transaction may have been structured to deprive the plaintiff of other contractual rights to which he is entitled under the December 28, 2001 agreements upon which this case is based. In so doing, one or more of the defendants may have engaged in fraud, bad faith, unfair dealing, or downright dishonesty, matters which would surely be relevant to demonstrate the reputation for veracity of one or more of the defendants or probable witnesses in this case. Such evidence would be probative of truthfulness or untruthfulness and go directly the credibility of the witness and is potentially admissible under Fed. R. Evid. Rule 608(b).

## IV. PLAINTIFF IS ENTITLED TO AN ORDER COMPELLING DISCLOSURE OF WOLVERINE'S 2005 FINANCIAL STATEMENTS (REQUEST 6)

Plaintiff's First Request for Production of Documents, Request 6, asks for:

"Copies of any and all Wolverine Proctor & Schwartz, Inc. and Wolverine Proctor, LLC consolidated annual financial statements for the calendar or fiscal years from 2001 through present, or in the case of a year for which full financial results have not been reported, any available quarterly or monthly statements reflecting partial year results. For purposes of this request, the term "financial statements" shall mean statements in a format similar to those attached to Plaintiff's Rule 26 Disclosures, pages PAC0027 through PAC0042, if such format is available, but if not shall include a balance sheet, income statement, statement of cash flows, and all notes to the financial statements. If financial statements for both entities were prepared for any year, then each should be separately produced. Without limiting the generality of the foregoing, all documents for 2001 through present which have been provided, or should have been provided,

8

in compliance with section 9.3 of the Wolverine Proctor, LLC Limited Liability Company Agreement dated as of December 28, 2001 are included in this request, as are any and all WPS financial statements commencing with the year 2001, prepared by, or audited by, any auditing or accounting firm.

Defendants' response was:

"Defendants object to portions of this request as ambiguous and vague. The general applicability of the foregoing objection notwithstanding, a copy of responsive documentation is attached."

The format example provided in pages PAC0027-PAC0042 is that of the Wolverine Proctor, LLC 2001 financial statements. While defendants provided copies of the financial statements of Wolverine Proctor, LLC for the years 2001-2004, they provided no monthly or quarterly financial statements for 2005, as specifically requested. They have neither denied that such statements exist nor asserted in their response that the statements are irrelevant. They have thus waived any objection based upon relevance, and this Court's focus must be on whether or not the request is ambiguous or vague. Furthermore, defendants failed to indicate to which part of the request they objected, and to which part they responded. See Fed. R. Civ. P. Rule 34(b) (objection to part of a request must specify the part and permit inspection of the remaining parts), Wright §2213 (must specify the part to which objection is directed). Even if vague or ambiguous as to the precise statements to be produced, the request clearly encompasses the 2005 monthly and quarterly statements.

Even assuming that a relevance objection survives, it is difficult to see how the 2004 financial statements would be sufficiently relevant to produce, but the 2005 statements not. The disclosure of the recapitalization of Wolverine in the 2004 statements is an example of the type of disclosure that can lead to the discovery of

admissible evidence. In fact, inasmuch as the recapitalization occurred after the end of

2004, it is a subsequent event which is mentioned only in the notes to the financial

statements, but is not reflected in the balance sheet, income statement or statement of

cash flows, which reflect only transactions occurring prior to the end of 2004. Further

details of the restructuring are undoubtedly contained in the 2005 monthly and quarterly

statements.

## V. PLAINTIFF IS ENTITLED TO AN ORDER COMPELLING PRODUCTION OF DOCUMENTS RELATING TO THE CALCULATION OF HIS BONUS (REQUEST 7)

Plaintiff's First Request for Production of Documents, Request 7, asks for:

"With respect to the calculation of EBITDA or Extraordinary Gain of WPS[1] for 2001, as defined in Plaintiff's Interrogatories to Wolverine, Proctor & Schwartz, Inc., Set No. 1, Interrogatory 2(a), provide each and every communication with Arthur Anderson LLP, Vitale Caturano, or any of the current or former partners or employees of either, or with any other accountant or accounting firm, upon which defendant WPS relies, or which relates in any way to calculation of the WPS EBITDA or Extraordinary Gain for 2001. Without limiting the generality of the foregoing, this request includes but is not limited to, any and all documents relating in any way to the arithmetic calculation of the Extraordinary Gain of $10,169,839 which appears on the WPS 2001 financial statements (page PAC0030 attached to Plaintiff's Rule 26 Disclosure Statement), including documents showing the calculation of the Extraordinary Gain, listing the elements thereof, stating the accounting principles underlying the disclosure of, the accounting treatment of, or the way in which the Extraordinary Gain is presented in the WPS 2001 financial statements, specifically pages PAC0030 and PAC0033 (Note 2) attached to Plaintiff's Rule 26 Disclosure Statement.

Defendants' response was:

"Objection. This request is ambiguous, vague, overly broad, unduly burdensome and seeks the disclosure of irrelevant information that is not likely to lead to the discovery of admissible evidence. The general applicability of the foregoing objection notwithstanding, a copy responsive (sic) documentation is attached.

---

[1] The word "WPS" was defined in Request No. 4 to include Wolverine and related entities.

Plaintiff's Interrogatories, Set No. 1, Interrogatory 2(a) defined the calculation of

EBITDA, stating that:

> "[p]laintiff's position is that the WPS EBITDA for 2001 is $9,683,723.
> Such amount is calculated by subtracting the 'Loss before interest
> expense, taxes, depreciation and amortization and extraordinary gain' of
> $486,116 from the "Extraordinary Gain' of $10,169,839, both of which
> appear on page 3 of the WPS 2001 Financials..."

Defendants appear to have produced but a single page responsive to this request,

attached hereto as page W0019 (inserted in the middle 24 pages of unrelated documents

pertaining to the compensation of defendant Kulkarni). This document consists of six

figures, two of which are additions or subtractions of the others. The bulk of the damages

sought in this case turn upon the calculation of EBITDA and the extraordinary gain,

whether the term "EBITDA" excludes or includes the extraordinary gain, and the

accounting principles that might be applicable to such a determination.

It appears that Arthur Andersen & Co., which audited and published the

Wolverine 2001 financial statements, thought that the term "earnings before interest,

taxes, depreciation and amortization" (EBITDA) included any extraordinary gain, as it

was careful to use the words "Loss before interest expense, taxes, depreciation and

amortization and extraordinary gain." (emphasis supplied). Yet defendants have failed

to produce a single communication with any of their accountants that dispute or

otherwise shed light on plaintiff's contention as to the bonus that is due him. During the

discovery conference, defendants suggested that no such documents existed within the

custody or control of any of the defendants, but indicated that they would verify this with

defendant Wolverine. A response was promised early during the week of October 17,

2005, however, no such confirmation has been received. A parallel interrogatory sought

11

knowledge (within defendant Wolverine's organization) of accounting pronouncements or communications with accountants that related to the calculation of EBITDA for purposes of plaintiff's bonus. This interrogatory was answered without objection, and while stating Wolverine's belief that the extraordinary gain should be excluded from EBITDA, stated no basis for that belief.

The absence of documents or any other basis for Wolverine's position, within that organization, would virtually admit that defendants have no defense to this action, and that they have failed to exercise good faith or take any action to investigate the plaintiff's claim, which was made by written demand prior to the filing of this suit.

Defendants are also required to identify documents it does not possess. The instructions to the document request provided that "[i]f none of the defendants have control of any document, but any are aware that it may exist, state the name and address of the person or organization who may have information regarding that document."

As is typical of defendants' responses to the various requests for production, they have objected to the request, claimed to have provided responsive documentation, but not identified which of 963 pages produced are responsive to which requests. Certain categories of documents, for example those relating to Mr. Kulkarni's compensation, are interspersed throughout the provided documents. Defendants' attorneys have failed to indicate whether additional documents exist, but are not being produced due to an objection, or whether no additional documents exist. Fed. R. Civ. P. 34(b) requires produced documents to be arranged in order "as they are kept in the usual course of business... or... organize[d] and label[ed]... to correspond with the categories in the request." See Stiller v. Arnold, 167 F.R.D. 68 (N.D. Ind. 1996), Wright §2213. Fed. R.

12

Civ. P. 34(b) also provides that responses must be "with respect to each item or category." See also Wagner v. Dryquit Systems, Inc., 208 F.R.D. 605, 609-610 (D. Nebr. 2001), citing Dollar v. Long Manufacturing, 561 F. 2d 613, 616 (5th Cir. 1977), "[t]he parties have a duty to provide true, explicit, responsive, complete and candid answers to discovery."

Defendants' response to this request for production leaves the plaintiff open to unfair surprise at trial as defendants apparently are intending only at that point to reveal the mysterious basis for their refusal to pay plaintiff's bonus. Defendants' responses to the document requests are far from complete and candid. Instead, they have failed to preclude the existence of additional documents in their responses, and have stated that responsive documents were provided to each and every document request, when in fact they admitted during the discovery conference that no earlier versions of certain contracts existed, as requested by Request No. 12. They also initially failed to provide any documents responsive to Request No. 3, despite claiming to do so.

While defendants might argue that the phrase "relates in any way to the calculation of EBITDA…" encompasses a large number of calculations or communications aimed at arriving at the WPS EBITDA, the context makes it clear that plaintiff seeks only documents that shed light on the inclusion or exclusion of the extraordinary gain from EBITDA, and the amount and accounting treatment of the extraordinary gain. At the time plaintiff propounded this Request for Production, he had already received defendant Wolverine's response to his Interrogatories, indicating that treatment of the extraordinary gain was the sole area of dispute. During the discovery conference, plaintiff stated that he was not interested in documents supporting the

13

undisputed portion of EBITDA. In any event, defendants were required to answer non-objectionable portions of the request, and specifically to object to those portions they considered objectionable.

If no documents (beyond the single page produced) exist responding to Request No. 7, then defendants must so state in writing. See Wagner, supra, 208 F.R.D. at 610 (defendants may be required to verify under oath that no responsive documents exist or if they exist all have been disclosed). If, on the other hand, they exist, they must be produced. Defendants promised to verify the absence of additional documents by early during the week of October 17, 2005, but failed to do so.

## VI. CONCLUSION

In the cases of Requests 3 and 6, defendants admit that responsive documents exist that have not been produced. The December 28, 2001 transaction is key to this case, and all documents relating thereto impact the rights of the plaintiff under the contracts that are central to this case. The requested amendments are among these contracts, and plaintiff is entitled to them. Request 7 directly requests information central to the key determination of this case, and defendants have failed to state or verify that all responsive documents have been produced. The Motion to Compel should be allowed.

Respectfully submitted,

Peter A. Crawford, pro se
23 Newcastle Dr. #11
Nashua, NH 03060
(603)888-4574

Date: October 21, 2005

14

UNITED STATES DISTRICT COURT
District of Massachusetts

Civil Action
No. 05-10078-DPW

PETER A. CRAWFORD, Plaintiff    )
                                )
    v.                          )
                                )
WOLVERINE, PROCTOR & SCHWARTZ, INC.,    )
    Steven F. Chilinski, Deepak S. Kulkarni,    )
                                )
    Defendants                  )

### PLAINTIFF'S AFFIDAVIT IN SUPPORT OF HIS
### MOTION TO COMPEL RESPONSES TO
### HIS REQUEST FOR PRODUCTION OF DOCUMENTS, SET NO. 1

I, Peter A. Crawford, do hereby say and depose that the following documents are

true copies of those served by or upon plaintiff in this case: (1) Defendant's Responses to

Plaintiff's First Request for the Production of Documents; (2) all documents numbered

commencing with "PAC," produced by the plaintiff; and (3) all documents numbered

commencing with "W," produced by defendants.

Signed under pains and penalties of perjury.

Peter A. Crawford, pro se
23 Newcastle Dr. #11
Nashua, NH 03060
(603)888-4574

Date: October 21, 2005

1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

PETER A. CRAWFORD,

        Plaintiff,

v.

                                    Civil Action No.
                                    05-cv-10078 (DPW)

WOLVERINE, PROCTOR & SCHWARTZ, INC.,
STEVEN F. CHILINSKI, and
DEEPAK S. KULKARNI,

        Defendants.

_____

## DEFENDANTS' RESPONSES TO PLAINTIFF'S FIRST REQUEST FOR THE PRODUCTION OF DOCUMENTS

### GENERAL RESPONSES AND OBJECTIONS

The following General Responses and Objections are applicable to, and are hereby incorporated by reference into each of the defendants' specific responses to each request.

A.      Defendants Wolverine, Proctor & Schwartz, Inc. ("WPS"), Steven F. Chilinski and Deepak S. Kulkarni provide this response to plaintiff's first request for the production of documents, and are producing materials pursuant thereto, without waiver of or prejudice to their right, at any later time, to raise objections to: (1) the relevance, materiality, or admissibility of (a) the requests or any part thereof, (b) statements made in this response to the requests or any part thereof, or (c) any document produced pursuant to this response; or (2) any further demand for discovery involving or relating to the matters raised in the requests.

B.     The specific responses set forth below and the production defendants undertake to make pursuant thereto are based upon information now available to the defendants after having made a diligent search of the files in their possession, custody, or control that reasonably relate to one or more of the specific document requests contained in the request. Defendants may, in the future, obtain or locate additional documents responsive to the requests and may identify or determine additional information relevant to their Specific Responses to the document requests contained in the requests. Defendants object to the requests to the extent they purport to demand production of documents not in their possession, custody, or control, or require a search of files that do not reasonably relate to one or more of the specific document requests. Defendants reserve the right at any time to revise, correct, add to, supplement, modify, or clarify the Specific Responses set forth below or the production made pursuant thereto.

C.     Defendants object to the requests to the extent that they purport to impose duties and obligations beyond those set forth in Federal Rule of Civil Procedure ("F.R.C.P.") 34, attorney-client privilege, attorney work-product privilege, and any other applicable privilege or doctrine, including documents prepared in anticipation of litigation, or otherwise outside the scope of F.R.C.P. 34.

D.     In the event defendants produce any privileged document, its production is inadvertent and does not constitute a waiver of any privilege.

E.     Defendants object to the requests to the extent they seek production of any documents that are available from public records and thus, are equally available to plaintiff as to the defendants on the ground that any such request is unreasonable, unduly burdensome and unnecessarily expensive.

2

F.     Defendants object to plaintiff's requests to the extent that they seek private

information concerning WPS employees, including without limitation identity and

residential address, because such information is private and not relevant to this action.

Without waiving this objection, defendants agree to produce responsive documents

containing private information within the limits articulated in the Specific Responses.

G.     Defendants object to the requests to the extent they contain no reasonable,

temporal or geographic limitation as vague, overly broad, unduly burdensome, not related

to any claims or defenses in this action and not likely to lead to the discovery of

admissible evidence.

H.     Defendants object to the production of documents that are unrelated to the

allegations in the Complaint.

**SPECIFIC RESPONSES**
**TO REQUESTS FOR PRODUCTION OF DOCUMENTS**

**REQUEST NO. 1**:

A copy of the agreement, entitled Deepak Kulkarni Representation and Warranty,
Indemnity and Subscription Agreement, dated December 28, 2001 (including the pages
evidencing the signatures of the parties thereto), and including all Exhibits thereto,
including, but not limited to, the Consulting Agreement and the Transition and Release
Agreement referred to on page 3, third WHEREAS, of that agreement, which page is
attached to Plaintiff's Rule 266 Disclosure Statement as page PA 0059.

**RESPONSE:**

A copy of responsive documentation is attached.

**REQUEST NO. 2**:

A copy of the agreement, entitled Wolverine Proctor, LLC, Limited Liability
Company Agreement, dated as of December 28, 2001, including pages evidencing the
signatures of the parties thereto. The cover page of such agreement is attached to
Plaintiff's Rule 26 Disclosure as page PAC0060.

**RESPONSE:**

A copy of responsive documentation is attached.

**REQUEST NO. 3:**

Copies of any and all agreements, contracts, undertakings, understandings or other documents which amend, purport to amend, rescind, replace, supercede, or otherwise modify, expand, reduce, or alter in any way any of the four agreements referred to in paragraphs 1 and 2 above, or any of the exhibits thereto.

**RESPONSE:**

A copy of responsive documentation is attached.

**REQUEST NO. 4:**

The minutes of any and all Board of Directors meetings held by Wolverine Proctor & Schwartz, Inc. or any of its subsidiaries, or any related entities, including but not limited to Friel Engineering Ltd.; Wolverine, Proctor & Schwartz, Ltd.; Wolverine Proctor LLC; Wolverine Proctor Holdings, Inc., or Maw Law 492 (all of which are hereinafter collectively referred to as "WPS") held between December 1, 2001 and April 30, 2002, including but not limited to the Minutes of the WPS Board of Directors meeting held on February 28, 2002 and identified in Defendant Wolverine Proctor & Schwartz, Inc.'s Response to Plaintiff's First Set of Interrogatories, Interrogatory 4(e).

**RESPONSE:**

Objection. This request is overly broad, unduly burdensome and seeks the disclosure of irrelevant information that is not likely to lead to the discovery of admissible evidence. The general applicability of the foregoing objection notwithstanding, a copy of responsive documentation is attached.

**REQUEST NO. 5:**

A copy of any and all offer letters, employment agreements, press releases, or similar documents executed by, sent by, or released by Steven F. Chilinski, WPS or Parthenon Capital on or before April 30, 2002, which refer to Mr. Chilinski's title with WPS, his responsibilities with WPS or the effective date on which his employment with WPS commenced.

4

**RESPONSE:**

A copy of responsive documentation is attached.

**REQUEST NO. 6:**

Copies of any and all Wolverine Proctor & Schwartz, Inc. and Wolverine Proctor, LLC consolidated annual financial statements for the calendar or fiscal years from 2001 through present, or in the case of a year for which full financial results have not been reported, any available quarterly or monthly statements reflecting partial year results. For purposes of this request, the term "financial statements" shall mean statements in a format similar to those attached to Plaintiff's Rule 26 Disclosures, page PAC0027 through PAC0042, if such format is available, but if not shall include a balance sheet, income statement, statement of cash flows, and all notes to the financial statements. If financial statements for both entities were prepared for any year, then each should be separately produced. Without limiting the generality of the foregoing, all documents for 2001 through present which have been provided, or should have been provided, in compliance with section 9.3 of the Wolverine Proctor, LLC Limited Liability Company Agreement dated as of December 28, 2001 are included in this request, as are any and all WPS financial statements commencing with the year 2001, prepared by or audited by, any auditing or accounting firm.

**RESPONSE:**

Defendants object to portions of this request as ambiguous and vague. The

general applicability of the foregoing objection notwithstanding, a copy of responsive

documentation is attached.

**REQUEST NO. 7:**

With respect to the calculation of EBITDA or Extraordinary Gain of WPS for 2001, as defined in Plaintiff's Interrogatories to Wolverine, Proctor & Schwartz, Inc., Set No. 1, Interrogatory 2(a), provide each and every communication with Arthur Andersen LLP, Vitale Caturano, or any of the current or former partners or employees of either, or with any other accountant or accounting firm, upon which defendant WPS relies, or which relates in any way to calculation of the WPS EBITDA or Extraordinary Gain for 2001. Without limiting the generality of the foregoing, this request includes but is not limited to, any and all documents relating in any way to the arithmetic calculation of the Extraordinary Gain of $10,169,839 which appears on the WPS 2001 financial statement (page PAC0030 attached to Plaintiff's Rule 26 Disclosure Statement), including documents showing the calculation of the Extraordinary Gain, listing the elements thereof, stating the accounting principles underlying the disclosure of, the accounting treatment of, or the way in which Extraordinary Gain is presented in the WPS 2001

financial statements, specifically pages PAC 0030 and PAC0033 (Note 2) attached to Plaintiff's Rule 26 Disclosure Statement.

## RESPONSE:

Objection. This request is ambiguous, vague, overly broad, unduly burdensome

and seeks the disclosure of irrelevant information that is not likely to lead to the

discovery of admissible evidence. The general applicability of the foregoing objection

notwithstanding, a copy responsive documentation is attached.

## REQUEST NO. 8:

Each and every income tax return, for 2001 or any other fiscal year, filed with the United States Internal Revenue Service, the Massachusetts Department of Revenue, U.K. Inland Revenue, or any other national or state taxing authority, by Wolverine, Proctor & Schwartz, Inc., Wolverine Proctor, LLC, Deepak S. Kulkarni or any entity related to any of these, which includes as income, lists, or in any way discloses the gain on the retirement of the debt of Wolverine, Proctor & Schwartz, Inc. which is discussed in Note 2, page PAC0033, attached to Plaintiff's Rule 26 Disclosure Statement.

## RESPONSE:

Objection. This request is ambiguous, vague, overly broad, unduly burdensome

and seeks the disclosure of irrelevant information that is not likely to lead to the

discovery of admissible evidence. The general applicability of the foregoing objection

notwithstanding, a copy of relevant documentation is attached.

## REQUEST NO. 9:

Each and every pay stub, remittance advice, check register entry, expense report, reimbursement request, IRS form W-2 or Form 1099, or other document of any type, which relates in any way, or includes, any payments made by WPS, or any entity related thereto, to Deepak S. Kulkarni, or to any other person or entity for his direct or indirect benefit, for the period from December 1, 2001 through April 30, 2002, whether such payments be for salary, consulting fees, expense reimbursement, fringe benefits, or any other purpose. Specifically, and without limiting the generality of the foregoing, this request includes any and all documents for this time period which would disclose, or shed light upon, whether Mr. Kulkarni was paid as an employee of, or as a consultant to, WPS, and the time period during which the services relating to the payment were performed. Furthermore, provide any and all documents which relate in any way to the fringe benefit

compensation referred to in paragraph 22 of the Complaint in this matter, whether or not such fringe benefit compensation was ultimately paid.

## RESPONSE:

Objection. This request is ambiguous, vague, overly broad, unduly burdensome

and seeks the disclosure of irrelevant information that is not likely to lead to the

discovery of admissible evidence. The general applicability of the foregoing objection

notwithstanding, a copy of relevant non-privileged documentation is attached.

## REQUEST NO. 10:

Any and all documents which set forth the amount of salary, bonuses, commissions, consulting fees, expense reimbursements, fringe benefits (whether paid directly to him or indirectly for his benefit), or any other capital payment or compensation of any type made by WPS, Parthenon Capital, or any related entity, to Deepak Kulkarni during the calendar years 2001 and 2002.

## RESPONSE:

Objection. This request is ambiguous, vague, overly broad, unduly burdensome

and seeks the disclosure of irrelevant information that is not likely to lead to the

discovery of admissible evidence. The general applicability of the foregoing objection

notwithstanding, a copy of responsive documentation is attached.

## REQUEST NO. 11:

Any and all documents, including, but not limited to, telephone bills, cellular telephone bills, lists of telephone calls in printed or electronic form, and electronic mails, which provides evidence of any Board Communication occurring on January 14, 2002, as the term "Board Communication" is defined in Plaintiff's Interrogatories to Defendant Wolverine, Proctor & Schwartz, Inc., Set No. 1, Interrogatory 4(d). Without limiting the generality of the foregoing, this request includes copies of those portions of all telephone bills in which incoming or outgoing telephone numbers of call made on January 14, 2002 are listed, for telephone numbers at the Wolverine, Proctor & Schwartz, Inc. facility at 51 East Main St., Merrimac, MA, and any home or cellular telephone number customarily utilized by Mr. Kulkarni or Mr. Brown, or any telephone bills of any of the following numbers: 617-478-7064, 617-236-8135, 617-306-4000, 617-478-7091, 617-710-5443, 617-262-7960, 617-262-7961, 617-460-5445, 603-433-4745 and 978-764-4679. Furthermore, and again without limiting the generality of the foregoing, this request includes any and all documents which were identified, or which should have been

7

**REQUEST NO. 13**:

A copy of any and all documents included in Plaintiff's personnel records (referred to in Defendants' Rule 26 Disclosure Statement, paragraph B), which are not attached to Plaintiff's Rule 26 Disclosure Statement.

**RESPONSE:**

A copy of responsive documentation is attached.

Dated: September 28, 2005

Respectfully submitted,

WOLVERINE, PROCTOR & SCHWARTZ, INC., STEVEN F. CHILINSKI, and DEEPAK S. KULKARNI

By their attorneys,

Mark Whitney (BBO # 637054)
Jeffrey D. Kuhn (BBO # 662326)
MORGAN, BROWN & JOY, LLP
200 State Street
Boston, Massachusetts 02109
(617) 523-6666

TO:   Peter A. Crawford, *pro se*
      23 Newcastle Drive #11
      Nashua, New Hampshire 03060
      (603) 888-4574



January 4, 2000

Mr. Peter A. Crawford
23 New Castle Drive, Apt. 11
Nashua, NH 03060

Dear Peter:

We are pleased to offer you the position of Chief Operating Officer for Wolverine, Proctor & Schwartz, Inc. (the "Company"). The following will be the terms of your employment.

1. You will report to the Company's Chief Executive Officer and be based at the Company's Merrimac, Massachusetts headquarters.

2. Your employment will commence on December 30, 1999.  You will be an employee at will.

3. You will be paid a base salary of $150,000 per year, to be paid ratably on each of the Company's regular paydays.

4. You will receive a bonus for each year, commencing 2000, which will calculated as follows:

$$BONUS = (EBITDA - CAPX - INT - TAXES) \times .05$$

For purposes of this calculation, the above terms will be calculated based upon the annual consolidated financial results of the Company, in accordance with generally accepted accounting principles, and have the following meanings:

EBITDA means the earnings before any interest, taxes or deductions for depreciation or amortization.   Excluded from EBITDA will be any non-operating adjustments to reserves, to the extent that those adjustments affect EBITDA, or any operating expenses charged against reserves.

CAPX means capital expenditures, except that portion which the Company has expensed in arriving at EBITDA.

**PAC 0001**

INT means interest expense, whether or not paid, net of interest income.   TAXES means imputed taxes on the income of the Company, computed as follows:

$$(EBITDA + BOOKDIF - DEPR - INT) \times TAXRATE$$

If the calculation of TAXES yields a negative number, TAXES will be deemed to be zero. No amounts will be carried backward or forward for TAXES.

BOOKDIF means those adjustments, positive or negative, to make EBITDA equal to those earnings before interest, taxes, depreciation and amortization, which are taxable.

DEPR means depreciation, amortization and capital expenditures which are deductible for tax purposes and which have not previously been deducted in arriving at EBITDA.

TAXRATE means (for the year for which the computation is being performed) the maximum U.S. federal income tax rate  applicable to individuals with respect to income attributable to Sub-chapter S of the Internal Revenue Code, plus the maximum Massachusetts tax rate on such income net of the federal tax benefit received, if any, with respect to such Massachusetts tax rate (currently, 1 minus the above-mentioned federal tax rate), plus that portion of federal FICA tax which applies on a marginal basis at all income levels (i.e. Medicare tax or other similar FICA taxes not subject to an annual cap) plus any other taxes on income applicable on a marginal basis to all income levels, which may be later introduced or may apply from time to time. If the calculation of TAXRATE requires clarification, Arthur Andersen & Company or such other accounting firm nominated to prepare the individual tax returns of the sole shareholder of the Company shall be the binding arbiter of the TAXRATE.

The BONUS calculation will be performed annually, based upon the consolidated audited financial results of the Company.  The bonus will be due upon completion of the audit of each year's results, or if no such audit is performed, by April 15. In the event that you leave the Company involuntarily, other than for cause (defined as including only dishonesty, disloyalty, conviction for a felony, misappropriation of funds, habitual insobriety, substance abuse, willful misconduct or gross negligence in the performance of your duties), prior to the end of any calendar year, the bonus will be prorated for that fiscal year based upon the number of months, or portions of months, during which you were employed, divided by 12, and the result multiplied by the calculated BONUS for that year. For any year in which you were employed by the Company on December 31 you will receive the full bonus without proration.   In the event that you leave the company for cause, as defined above, no BONUS will be paid for that year.  In the event that any bonus calculation yields a negative number, no amount will be due back from you, and no negative calculation can be carried forward or backward from one year to another.    If the calculation of BONUS requires clarification, Arthur Andersen & Company or such other accounting firm nominated to prepare the individual tax returns of the sole shareholder of the Company shall be the binding arbiter of the BONUS.

PAC 0002

5.  You will receive non qualified stock options representing 5 percent of the fully diluted number of common shares (after issuance of your options) of the Company as of January 1, 2000 (the "Option"). The terms of the Option will be as follows:

   a.  The Option will fully vest upon the completion of your 24th month of employment with the Company, or upon a change in control, as defined below, whichever occurs first.

   b.  The amount per share which you would have to pay upon exercising the Option (the "Strike Price") will be the fair market value per share of the underlying stock as of January 1, 2000 as determined by an appraisal conducted by the Company prior to June 30, 2000, or as otherwise agreed.

   c.  Once vested, the Option shall remain in effect regardless of whether or not you remain employed by the Company. However, the Company shall have the right to call your Option by informing you in writing of its intent to exercise the call within ten days after your separation from the Company for any reason or under circumstances qualifying as a Change in Control (defined under d. below). This call shall be exercised by paying you (for each share underlying your Option), the difference, if any, between the value, as of the end of the fiscal quarter immediately prior to the separation date, of the underlying stock represented by your Option, less the Strike Price, computed in accordance with generally accepted principles of valuation (without considering any discount for the minority nature of the stock underlying the Option) (the "Call Payment"), using the procedure detailed in 6. below.

   d.  The Option may be exercised only upon or after a change in control of the Company, defined as any event which causes Deepak Kulkarni voluntarily to control less than 50 percent of the then-existing common shares of the Company (other than for estate planning purposes and other than in circumstances involving a restructuring of the Company's indebtedness), or an event whereby the Company sells substantially all of its assets other than cash and marketable securities (a "Change in Control"). The Company agrees to give you ten days prior written notice of any Change in Control so as to enable you to decide whether or not to exercise your Option and for you individually to secure financing to do so, if needed. Notwithstanding the foregoing, the Option may not be exercised under circumstances which could cause the Company to lose its status as a Sub-Chapter S corporation.

   e.  The Strike Price and the number of shares on which you have the Option will be subject to the customary proportional adjustments in the event of a stock split or stock dividend (defined as an event which causes additional shares to be issued, without new investment and without affecting the percentage ownership of any shareholder). No adjustment will be made for dividends

Wolverine Proctor & Schwartz, Inc.

paid in cash. The Option will be subject to dilution with respect to any shares, options, warrants or other similar instruments granted to other employees of the Company or to sources of capital in exchange for valuable consideration received.

f.    You will enter into a Stockholder Agreement (in the form attached) ceding control of the shares, other than after a public offering of the Company's shares, or other than in circumstances qualifying as a Change in Control.

6.  The following procedure will be utilized in the event your Option is called pursuant to 5c. above, and you and the Company are unable to agree on the fair market value of the underlying shares:

a.    Based upon the average of appraisals conducted by two independent appraisers qualified in business valuations; one appointed and paid for by the Company, and the other appointed and paid for by you. However, in the event that the ratio of the greater of the appraisals to the lesser exceeds 1.05, the two appraisers shall jointly appoint a third appraiser, the reasonable cost of whom will be equally borne by you and the Company. The valuation arrived at by the third appraiser shall be binding unless the ratio of the third appraisal to the average of the first two is greater than 1.15 or less than .87. Under such circumstances, the highest and lowest value shall be discarded, and the remaining value shall be deemed to be the appraised value.

b.    In the event that an appraisal is required, the Company shall provide such financial statements, financial projections, and other information as any appraiser may reasonably require in order to complete his appraisal; and any statements, projections or other information provided to one appraiser shall be provided to all. The Company may elect to require all appraisers appointed to sign a customary confidentiality agreement.

7.  In the event that the Company elects to call your Option, it may choose either to make the Call Payment in a lump sum, or to immediately issue you an unsecured promissory note. In such event, the promissory note shall provide for five equal principal repayments, paid annually over five years, commencing upon the first anniversary of its issuance. In addition, simple interest of 8 percent per annum of the average principal balance outstanding during the prior year shall be paid annually commencing upon the first anniversary of the note's issuance. Payments of interest or principal under such a note, and all of its terms, will be subordinated, in all respects, to the Company's then outstanding indebtedness, plus any refinancings thereof in any amounts, on terms acceptable to the Company and its then lenders or sources of capital. The Company may cancel and reissue its promissory note to you to comply with any restrictions or subordination arrangements during the life of the promissory note, and you agree to execute an intercreditor agreement so providing, or if you fail to do so within ten business

Wolverine Proctor & Schwartz, Inc.

days of written request, the Company may execute such an agreement on your behalf.    In the event that the Company becomes insolvent or is the debtor in a bankruptcy case which is not dismissed, the remaining principal balance shall become immediately due and payable.

8.  In addition to the above-mentioned compensation, you will be eligible for the normal fringe benefits of the Company, including but not limited to medical benefits, 401(k), vacation, and similar benefits.    You will also receive reimbursement of business and travel  expenses incurred in connection with your employment in accordance with normal policies and procedures of the Company.

9.  You may elect to join the Company's Board of Directors at any time while you are employed by the Company.  If you do so, the Company will indemnify you in connection with your duties as a director and officer of the Company, on terms at least as favorable to you as the most favorable ones enjoyed by any other director or officer.

To indicate your acceptance of these terms, please countersign below.

Sincerely,

Deepak S. Kulkarni
President and CEO

Accepted by:

Peter A. Crawford

January 4, 2000
Date

**PAC 0005**

## WOLVERINE PROCTOR & SCHWARTZ, INC.

### Transition Agreement

THIS IS AN AGREEMENT made as of December 28, 2001 by and between Wolverine Proctor & Schwartz, Inc., a Delaware corporation (the "Company"), and Peter Crawford (the "Employee").

WHEREAS, the Company desires to obtain the services of the Employee and the Employee desires to provide such services to the Company to facilitate transitional needs arising from a change of control of the Company.

NOW, THEREFORE, in consideration of the mutual covenants contained in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which consideration are hereby acknowledged, the parties agree as follows:

1.    Services

During the Transition Period, the Employee agrees to perform such services to and for the Company as may be reasonably requested by the Chief Executive Officer of the Company or its Board of Directors to facilitate the transition of the Company's management.    The Employee's commitment to the Company during the Transition Period will be full-time and shall take into account the Employee's expertise in managing and operating the Company.

2.    Term

Unless sooner terminated as provided below, the term of the Employee's engagement under this Agreement will be from the date hereof until the earlier of (i) March 31, 2002, (ii) the consummation by the Company of a working capital facility with an institutional lender, or (iii) two weeks after the date on which the Chief Executive Officer provides written notice of termination, for any reason or no reason, to the Employee (the "Transition Period").

3.    Extent of Services

During the Transition Period, the Employee will devote his best efforts to the performance of his duties under this Agreement.    Under no circumstances will the Employee knowingly take any action contrary to the best interests of the Company.

4.    Compensation

4.1    Base Salary Fee.  During the Transition Period, the Company will pay the Employee compensation at the rate of $150,000 per annum, which shall be payable in accordance with the Company's normal payroll practices (the "Base Salary Fee").

8698745.2

4.2    Expenses. The Company will, upon substantiation thereof, reimburse the Employee for all reasonable expenses of types authorized by the Chief Executive Officer of the Company in the ordinary course of business and incurred by the Employee in connection with the Company's business affairs. The Employee must comply with such accounting and reporting requirements as the Company may from time to time establish in order to obtain such reimbursement.

4.3    Benefits. During the Transition Period, the Employee shall be entitled to participate in the Company's life, disability, medical, dental and other insurance programs available to key executives on the same terms as such are available generally to other key executives of the Company.

4.4    Equity Advance. Within three months after the expiration of the Transition Period, the Company shall pay to the Employee the amount of $150,000, subject to appropriate deductions for withholding and similar taxes.

5.    Release.

5.1    The Employee agrees, promises and covenants that he will not file, charge, claim, sue or cause to permit to be filed, charged, claimed or sued, any action for damages or other relief (including injunctive, declaratory or other equitable relief) against the Company or any of its affiliates involving any matter occurring in the past up to the date hereof. The Employee agrees that he has not, and will not, assign any claims which he has or may have against the Company or any of its affiliates to any third party. The preceding sentence shall not apply to any matter arising out of the performance or nonperformance of the obligations of the Company under this Agreement or the Employee's right to a bonus payment (the "Bonus Payment") provided by paragraph 4 of the Employment Letter dated January 2001, a copy of which is attached hereto as Exhibit A (the "Employment Letter").

5.2    In consideration of the covenants set forth herein, and more particularly the payments to the Employee hereunder, and other good and valuable consideration, the Employee, his agents, heirs, legatees, successors and assigns (collectively hereinafter the "Employee-Releasors"), hereby irrevocably and unconditionally releases, remises, and forever discharges the Company, Deepak Kulkarni, their respective affiliates, any entity owned or controlled by the Company or Deepak Kulkarni, their officers or directors and their respective present and former directors, officers, employees, agents, attorneys, subsidiaries, successors, insurance carriers and assigns, and each of them (collectively hereinafter the "Company-Releasees"), of and from any and all actions, causes of action, suits, debts, charges, complaints, claims, liabilities, obligations, injuries, promises, agreements, controversies, damages, and expenses (including attorneys' fees and costs actually incurred), of any form whatsoever, whether known or unknown, foreseen or unforeseen, anticipated or unanticipated, suspected or unsuspected, manifest or latent, intentional or negligent (collectively, "Claims") which the Employee or the Employee's successors in interest now own or hold, have at any time heretofore owned or held or may at any time own or hold by reason of any matter or thing based upon, relating to or arising out of the Employee's employment relationship with the Company or any of its affiliates or the termination of that relationship, including but not limited to, claims arising out of any right to an equity interest in the Company (including, without limitation, under

8698745.2

-2-

PAC 0044

that certain letter agreement between the Employee and the Company dated January 4, 2000 or that certain letter agreement between the Employee and the Company dated December 4, 2001), expressly excluding any rights to the Bonus Payment, or claims arising under the Age Discrimination in Employment Act of 1967, Title VII of the civil Rights Act of 1963 and any other federal, state or local laws prohibiting age, sex, disability or any other forms of discrimination, which existed or may have existed prior to or contemporaneously with the execution of this Agreement. Notwithstanding the foregoing, this Section 5.2 shall not release the Company from any obligation set forth in this Agreement or in the Settlement Agreement of even date herewith between the Employee and Deepak Kulkarni.

6.    Confidentiality of Agreement. The parties agree that all information relating in any way to the terms of and amounts payable under this Agreement shall be held confidential by the parties and shall not be publicized or disclosed to any person (other than an immediate family member (including, without limitation, any spouse, parent, child, and/or sibling), physician, psychologist, legal counsel or financial advisor, provided that any such individual to whom disclosure is made agrees to be bound by these confidentiality obligations), business entity or government agency, except as mandated by state or federal law, upon lawful subpoena by a court or agency of competent jurisdiction or pursuant to the mutual consent of the parties. If such subpoena is received by any party to this Agreement, a copy thereof shall be promptly provided to all other parties.

7.    Notices

All notices under this Agreement must be in writing and must be delivered by hand or mailed by certified or registered mail, postage prepaid, return receipt requested, to the parties as follows:

| If to the Company: | Wolverine Proctor & Schwartz, Inc. |
| | 51 E. Main Street |
| | Merrimac, MA 01850 |
| | Attention:  Chief Executive Officer |
| | |
| with a copy to: | Deepak Kulkarni |
| | 124 Commonwealth Ave. |
| | Boston, MA 02116 |
| | |
| If to the Employee: | To the address set forth below the signature of the Employee; |

or to such other address as is specified in a notice complying with this Section 8. Any such notice is deemed given on the date delivered by hand or three days after the date of mailing.

8698745.2

-3-

PAC 0045

8.    Miscellaneous

8.1    Modification.  This Agreement constitutes the entire Agreement between the parties with regard to the subject matter hereof, superseding all prior understandings and agreements, whether written or oral.  This Agreement may not be amended or revised except by a writing signed by the parties.

8.2    Successors and Assigns.  This Agreement is binding upon and inures to the benefit of both parties and their respective successors and assigns, including any corporation with which or into which the Company may be merged or which may succeed to its assets or business, although the obligations of the Employee are personal and may be performed only by him.

8.3    Severability.  The provisions of this Agreement are severable, and invalidity of any provision does not affect the validity of any other provision.  In the event that any court of competent jurisdiction determines that any provision of this Agreement or the application thereof is unenforceable because of its duration or scope, the parties agree that the court in making such determination will have the power to reduce the duration and scope of such provision to the extent necessary to make it enforceable, and that the Agreement in its reduced form is valid and enforceable to the full extent permitted by law.

8.4    Governing Law.  This Agreement is to be construed under and governed by the laws of The Commonwealth of Massachusetts.

PAC 0046

**IN WITNESS WHEREOF**, the parties have executed this Agreement as of the date and year first above written.

WOLVERINE PROCTOR & SCHWARTZ, INC.

By: _____
Name:
Title: *Chairman*

_____
Peter Crawford

Address:        23 New Castle Drive #11
                Nashua, New Hampshire 03060

8698745.2

-5-

PAC 0047

## SETTLEMENT AGREEMENT

SETTLEMENT AGREEMENT made and entered into in Boston, Massachusetts, by and among Wolverine Proctor, LLC, a Delaware limited liability company (the "Company"), Deepak Kulkarni of 124 Commonwealth Avenue, Boston, Massachusetts and Peter Crawford of 23 New Castle Drive #11, Nashua, NH 03060 ("Crawford"), as of this 28th day of December, 2001.

WHEREAS, Crawford and Wolverine Proctor & Schwartz, Inc. ("WP&S") are parties to that certain letter agreement, dated January 4, 2000, as the same may have been amended or modified (the "Crawford Employment Letter");

WHEREAS, Deepak Kulkarni ("Kulkarni"), Parthenon Investors II, L.P., PCIP Investors, J&R Founders' Fund, L.P. and Wolverine Proctor, LLC (the "LLC") have entered into the Deepak Kulkarni Representation and Warranty, Indemnity and Subscription Agreement (the "Kulkarni Subscription Agreement") and the documents contemplated thereby (the "Transaction Documents");

WHEREAS, pursuant to the Transaction Documents, among other things, WP&S will be recapitalized and refinanced;

WHEREAS, in connection with the consummation of the recapitalization and refinancing of WP&S contemplated by the Transaction Documents, it is desired that all of Crawford's rights with respect to any and all options or other rights to acquire capital stock of WP&S granted pursuant to Crawford Employment Letter or otherwise ("Crawford's Equity Rights") be purchased by the LLC or otherwise terminated and extinguished;

WHEREAS, in connection with the execution of this Agreement, Crawford and WP&S are entering into a Transition Agreement dated as of even date herewith (the "Transition Agreement");

NOW, THEREFORE, in consideration of the foregoing premises (including, without limitation, the termination of Crawford's Equity Rights, which are hereby terminated) and the mutual promises, terms, provisions and conditions set forth in this Agreement, the parties hereby agree

1.    Crawford shall be entitled to the following payments, which are to be made solely in the event that a Distribution is made to the holders of the Class A Units under the Wolverine Proctor, LLC Limited Liability Company Agreement dated as of December 28, 2001 (the "LLC Agreement"):

(a)    In the event that the holders of the Class A Units receive a Distribution pursuant to Section 5.3.1. of the LLC Agreement, Crawford shall be entitled to a payment in an amount equal to four percent (4%) of the aggregate Distributions actually received by the holders of Class A Units thereunder; provided, that Crawford shall not be entitled to any payment under this clause (a) until the foregoing amount exceeds the Equity Advance (as that term is defined in the

PAC 0048

Transition Agreement) in which case he shall only be entitled to the amount in excess of the Equity Advance.

(b)    In the event that the holders of the Class A Units receive a Distribution pursuant to Section 5.3.2. of the LLC Agreement, Crawford shall be entitled to a payment in an amount equal to four percent (4%) of the aggregate Distributions actually received by the holders of Class A Units thereunder.

(c)    In the event that the holders of the Class A Units receive a Distribution pursuant to Section 5.3.3. of the LLC Agreement, Crawford shall be entitled to a payment in an amount equal to eight percent (8%) of the aggregate Distributions actually received by the holders of Class A Units thereunder.

(d)    In the event that the holders of the Class A Units receive a Distribution pursuant to Section 5.3.4. of the LLC Agreement, Crawford shall be entitled to a payment in an amount equal to eight percent (8%) of the aggregate Distributions actually received by the holders of Class A Units thereunder.

For the purposes hereof, the term "Distributions" shall include cash, assets in kind or other property actually distributed to the holders of the Class A Units, provided that, (i) in the case of cash Distributions, the value thereof shall be calculated prior to giving effect to any withholding pursuant to Section 5.5 of the LLC Agreement and (ii) all Distributions shall be net of any applicable withholding or similar taxes.

2.    In the event that the holders of the Class A Units are obligated to indemnify the Company, the Parthenon Investors (as defined in the Kulkarni Subscription Agreement) or any of their respective Affiliates (as defined in the Kulkarni Subscription Agreement) under the Kulkarni Subscription Agreement and such indemnity obligation is satisfied by Kulkarni (whether through the return of the proceeds of a Distribution, offset of compensation payments, direct payments or otherwise) Crawford shall pay Kulkarni in cash that percentage of such indemnity payment which is equal to the percentage of Distributions to which Crawford would be entitled under paragraph 1 hereof in each case calculated at the date of the making of such indemnity payment. By way of example only, if Kulkarni were to make an indemnity payment on a date on which Crawford was entitled to receive four percent (4%) of Distributions under paragraph 1 hereof, Crawford would be required to pay Kulkarni four percent (4%) of such indemnity payment. If Kulkarni were to make an indemnity payment on a date on which Crawford was entitled to receive eight percent (8%) of Distributions under paragraph 1 hereof, Crawford would be required to pay Kulkarni eight percent (8%) of such indemnity payment. Notwithstanding the forgoing, Crawford's percentage of indemnity payments arising under paragraphs 9.3 (d), (h) or (i) of the Kulkarni Subscription Agreement shall be fixed at four percent (4%). Any such payments due to Kulkarni shall be made within ten (10) business days of receipt by Crawford of a written notice delivered by Kulkarni to Crawford, which notice shall set forth in reasonable detail the nature of the indemnified loss and the amount of Kulkarni's indemnity obligation with respect thereto.

PAC 0049

3.    All payments made to Crawford pursuant to paragraph 1 above shall be made by the Company in the same form as the Distribution was paid to the holders of the Class A Units and shall be made as soon as reasonably practicable after payment of such Distribution is made to the holders of the Class A Units.

4.    Crawford acknowledges and agrees that nothing herein shall be construed as granting him (i) any rights as a member of the Company (including, without limitation, any approval or voting rights granted to any members of the Company) or (ii) any right to acquire or otherwise exercise ownership of any Units of the Company or (iii) any right of employment by the Company.

5.    This Agreement may not be amended or modified without the written consent of all parties hereto.

**PAC 0050**

IN WITNESS WHEREOF, the parties hereto, intending to be legally bound by the terms hereof, have executed this Agreement, under seal, as of the date first above written.

_____
Peter Crawford

_____
Deepak Kulkarni

Wolverine Proctor, LLC hereby joins in the foregoing Agreement solely for the purpose of agreeing to make the payments in paragraphs (a) through (d) of paragraph 1 directly to Crawford as an irrevocable assignee of that portion of Kulkarni's interest in the Class A Units. Crawford's rights to receive these assigned payments from the LLC shall be enforceable notwithstanding the provisions of Section 15.8 of the LLC Agreement.

WOLVERINE PROCTOR, LLC

By: _____
Name:
Title:

**Wolverine Proctor LLC**
**Extraordinary Gain**
**Year ended 12/31/01**

| | |
|---|---:|
| Note Payable - Citizens Bank | 14,000,000 |
| Revolving Credit Facility - Citizens Bank | 6,967,514 |
| Accrued Interest - Citizens Bank | 702,325 |
| | |
| Total Monies Due Citizens Bank | 21,669,839 |
| | |
| Cash Paid to Citizens Bank to settle debt | 11,500,000 |
| | |
| Extraordinary Gain - reported on Audited Financial Statements | 10,169,839 |

## *WOLVERINE PROCTOR LLC AND SUBSIDIARIES*
Notes to Consolidated Financial Statements
Years Ended December 31, 2004 and 2003

### 1.    THE COMPANY

Wolverine Proctor LLC (the Company), a limited liability company, was formed on December 28, 2001 for the purpose of holding the securities of Wolverine Proctor, Inc. (WPI), a Delaware corporation, and its Subsidiaries. The purpose of WPI is to hold the securities of all of the operating entities of the Company. These operating entities include Wolverine Proctor & Schwartz, Inc. (WP&S), Wolverine Proctor & Schwartz Limited (Limited) and Mawlaw 492 Ltd. (Mawlaw).

The Company designs and manufactures thermal processing and converting equipment used for a variety of industry applications. WP&S was formed from the 1994 acquisition of Proctor & Schwartz by Wolverine (Massachusetts) Corporation and their subsequent merger. The Company has manufacturing operations located in Merrimac, Massachusetts; Lexington, North Carolina; and Deeside, Wales. The Company also maintains sales offices in Horsham, Pennsylvania and Glasgow, Scotland.

### 2.    RECAPITALIZATIONS

Pursuant to a recapitalization plan (Recapitalization), on December 28, 2001, an investor group assigned a series of promissory notes (Notes) to the Company amounting to $14 million in exchange for 1,000 Class B member units. The Notes had been issued by WP&S to the investor group to fund the retirement of WP&S bank debt on December 28, 2001 and provide funds for working capital. On or about December 31, 2001, the previous sole shareholder contributed 100% of the outstanding shares of WP&S, Mawlaw and Limited in exchange for 1,000 Class A member units.

On February 11, 2005, the Company and the Class A and B shareholders entered into a series of transactions reorganizing and continuing the Company in which the Class A member acquired new equity interests and the Class B member received approximately $2,000,000 in cash from the Company and certain preferred interests in newly-formed US and UK entities. Also as part of the transactions, the newly-formed US and UK entities acquired the operating net assets of the Company, resulting in effective liquidation and dissolution of the Company. The outstanding debt of the Company was refinanced.

### 3.    SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

Principles of Consolidation

The accompanying consolidated financial statements include the accounts of the Company and its subsidiaries. All material intercompany accounts and transactions have been eliminated in consolidation.



### AMENDMENT NO. 1 to DEEPAK KULKARNI REPRESENTATION AND WARRANTY, INDEMNITY AND SUBSCRIPTION AGREEMENT

**This Amendment No. 1 to Deepak Kulkarni Representation and Warranty, Indemnity and Subscription Agreement** is dated as of November 13, 2002 by and between **Wolverine Proctor, LLC**, a Delaware limited liability company (the **"Company"**); **Deepak S. Kulkarni ("Mr. Kulkarni"**); and **Parthenon Investors II, L.P., PCIP Investors** and **J&R Founders' Fund, L.P.** (the **"Parthenon Investors"**). Capitalized terms used but not defined herein shall have the meaning set forth in the Subscription Agreement (as defined below).

**WHEREAS,** the Company, Mr. Kulkarni and the Parthenon Investors entered into the Deepak Kulkarni Representation and Warranty, Indemnity and Subscription Agreement on December 28, 2001 (the "Subscription Agreement");

**WHEREAS,** the Company, Mr. Kulkarni and the Parthenon Investors are party to that certain Omnibus Agreement of even date herewith (the **"Omnibus Agreement"**); and

**WHEREAS,** pursuant to the Omnibus Agreement, the Company, Mr. Kulkarni and the Parthenon Investors desire to amend certain provisions of the Subscription Agreement as set forth herein.

**NOW, THEREFORE,** in consideration of the mutual covenants and agreements contained herein, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.     Subsection (a) of Section 9.3 of the Subscription Agreement be and hereby is amended by deleting the phrase "until the earlier to occur of (x) March 31, 2002 or (y) the date of delivery to the Company of the audited financial statements of the Contributed Companies and their respective Subsidiaries for the fiscal year ending December 31, 2001 together with all footnotes thereto and the auditor's report of Arthur Andersen LLP (or such other nationally-recognized accounting firm as may be the Company's auditors at such time)" and substituting "until November 13, 2002" in lieu thereof.

2.     Subsection (b) of Section 9.3 of the Subscription Agreement be and hereby is deleted in its entirety and the following substituted in lieu thereof:

"     (b)     <u>Tax Reserves</u>. Any claim for indemnification hereunder with respect to any breach of the representations and warranties of Mr. Kulkarni contained in subsection (a) of Section 3.15 (Tax Returns and Payments) in respect to any income Taxes resulting from the failure of WP&S to be a valid and subsisting Subchapter S corporation for federal or state income tax purposes at all times before the Initial Closing may be brought at any time from and after the Closings until the latest to occur of (x) March 31, 2002, (y) the date of delivery to the Company of the audited financial statements of the Contributed Companies and their respective Subsidiaries for the fiscal year ending December 31, 2001 together with all footnotes thereto and the auditor's report of Arthur Andersen LLP (or such other nationally-recognized accounting firm

W0964

- 2 -

as may be the Company's auditors at such time), or (z) the expiration of the longest relevant statute of limitation (determined after giving effect to any waivers or extensions thereof) related to the matters underlying such claim."

3.      Subsection (c) of Section 9.3 of the Subscription Agreement be and hereby is amended by deleting the phrase "until the earlier of (i) the date of consummation of a Recapitalization or (ii) the date that is one year after the Subsequent Closing Date" and substituting "until November 13, 2002" in lieu thereof.

4.      Each of subsections (d) and (e) of Section 9.3 of the Subscription Agreement be and hereby is amended by deleting the phrase "until the date on which the matter is finally determined by order of a court of competent jurisdiction which is not subject to appeal" and substituting "until November 13, 2002" in lieu thereof.

5.      Subsection (h) of Section 9.3 of the Subscription Agreement be and hereby is amended by (1) inserting "and" before the phrase "subsection (a) of Section 3.10"; (2) deleting the phrase "and Section 3.29 (Brokers)" therefrom; and (3) inserting as the last sentence of such subsection "Any claim for indemnification hereunder with respect to any representations and warranties of Mr. Kulkarni contained in Section 3.29 (Brokers) may be brought any time from and after the Closings until November 13, 2002."

6.      Section 9.4 of the Subscription Agreement be and hereby is deleted in its entirety and the following substituted in lieu thereof:

"      9.4      Indemnification by Mr. Kulkarni.  Mr. Kulkarni hereby indemnifies and agrees to indemnify, defend and hold harmless the Company against and in respect of all liabilities, obligations, judgments, injunctions, orders, damages, Taxes, losses, fines, penalties, injuries, deficiencies, demands, expenses, fees, costs (including reasonable attorneys' and expert witness fees and disbursements in connection with investigating, defending or settling any action or action threatened in writing) and amounts paid in settlement (collectively, the "Losses") that arise out of or result from:

      (a)      the breach of any representation or warranty made by Mr. Kulkarni in Sections 3.1, 3.6, subsection (a) of Section 3.10, subsection (a) of Section 3.15, subsections (a) and (b) of Section 3.16, subsection (a) of Section 3.18, Sections 3.23 or 3.29, including as a result of any misrepresentation in or omission from any schedule, document, certificate or other instrument required to be furnished by Mr. Kulkarni hereunder (in each case as such representation or warranty would read if all references to Material Adverse Change were deleted therefrom);

            (b)      the Strayfield Indemnity; or

      (c)      fraud or intentional misrepresentation by Mr. Kulkarni in the representations and warranties of Mr. Kulkarni in Section 3 or in the Closing Certificates;

9808/1.A799132-4

W0965

- 3 -

provided, however, Mr. Kulkarni shall not be liable under subsections (a) or (b) of this Section 9.4 unless and until the aggregate amount of all Losses under subsections (a) and (b) of this Section 9.4 exceeds $775,000, in which case Mr. Kulkarni shall be liable for only that portion of such Losses that exceeds such deductible threshold; and

provided, further that no amount in respect of any claim for indemnification based upon subsection (a) of this Section 9.4 (except for a claim based upon a breach of the representations and warranties in subsection (a) of Section 3.10 (Title to Contributed Shares)) shall be applied against the dollar threshold identified in the immediately preceding proviso of this Section 9.4 until all Reserves are depleted with respect to any such indemnification claim; and provided further that the dollar threshold identified in the first proviso of this Section 9.4 shall not apply to any claim for indemnification based upon any breach of any representation or warranty made by Mr. Kulkarni in subsection (a) of Section 3.10.

In the event that Mr. Kulkarni is obliged to indemnify the Company under this Section 9.4, the time limitations provided for in subsections (a) through (h) of Section 9.3 and the dollar limitation provided for in the first proviso above in this Section 9.4 shall not apply to any Loss arising out of or resulting from subsection (c) of this Section 9.4.

In the event that Mr. Kulkarni is obliged to indemnify the Company under this Section 9.4 as a result of a breach of the representation and warranty set forth in Section 3.15 (Tax Returns and Payments) arising from the failure of WP&S to be a valid and subsisting Subchapter S corporation for federal tax purposes at all times prior to the Initial Closing, and such indemnification results in a monetary benefit to the Company or results in a reduction of the amount of taxes owed by the Company as a result of losses recaptured by the Company, the Company shall pay to Mr. Kulkarni, in cash, an amount equal to the monetary benefit or reduction in taxes realized by the Company, which amount shall be paid upon earlier of the receipt of such monetary benefit or the filing of the applicable tax returns by the Company.

Notwithstanding anything to the contrary in this Section 9 (including the provisions of Section 9.3 and this Section 9.4), the indemnity set forth in this Section 9.4 (other than in respect of a claim for a breach of the representations and warranties in subsection (a) of Section 3.10 (Title to Contributed Shares)) shall terminate upon the sale of all or substantially all of the assets or equity interests of the Company or Holdco, directly or indirectly, to an unaffiliated third party (whether in a single transaction or series of related transactions) or the merger or consolidation of the Company or Holdco, directly or indirectly, where the Company or Holdco, as applicable, is not the surviving entity or the majority of the stockholders of such entity prior to such merger or consolidation are not the majority of the stockholders of such entity after such transaction."

7.      The parties acknowledge and agree that any reference in the Subscription Agreement to the term "Reserves" (as defined in Section 8 of the Subscription Agreement) shall be and hereby is deemed to exclude any dividends that may be recorded as accrued in the trial balances accompanying the November 2001 Balance Sheet.

9808/1 A799132-4

W0966

- 4 -

8.      Except as expressly set forth in this Amendment, the Subscription Agreement is ratified and confirmed, shall remain in full force and effect and shall not be altered, amended or modified, except in accordance with its terms.

9.      This Amendment shall be governed by, and construed in accordance with, the laws of the Commonwealth of Massachusetts, without giving effect to the principles of conflicts of law thereof that would cause the application of the laws of any other jurisdiction. Neither this Amendment nor any term or provision hereof may be amended, modified, waived or supplemented except by a written instrument executed by all parties hereto. This Amendment, the Omnibus Agreement and the exhibits thereto constitute the complete agreement among the parties hereto and thereto with respect to the subject matter hereof and thereof. This Amendment supersedes all prior negotiations and documents reflecting such prior negotiations among the parties hereto with respect to the subject matter hereof. This Amendment is intended to bind and inure to the benefit of the parties hereto and their respective successors and permitted assigns, heirs, executors, administrators and representatives. The headings of the sections, paragraphs and subsections of this Amendment are inserted for convenience only and shall not affect the interpretation hereof. This Amendment may be executed in separate counterparts, each of which when so executed and delivered shall be an original but which together shall constitute on and the same instrument.

[Rest of page intentionally left blank]

W0967

- 5 -

IN WITNESS WHEREOF, the parties hereto have caused this Amendment No. 1 to Deepak Kulkarni Representation and Warranty, Indemnity and Subscription Agreement to be executed as of the date first above written.

WOLVERINE PROCTOR, LLC.:

By: _____
Name: Cris A. Scott
Title: Vice President

PARTHENON INVESTORS II, L.P.:

By: PCap Partners II, LLC, its General Partner
By: PCap II, LLC, its Managing Member

By: _____
Name:
Title:

PCIP INVESTORS, by its General Partners:

Parthenon Capital, Inc.:

By: _____
Name:
Title:

_____
Ernest K. Jacquet

_____
John C. Rutherford

*SIGNATURE PAGE TO AMENDMENT NO. 1 TO DEEPAK KULKARNI REPRESENTATION AND WARRANTY, INDEMNITY AND SUBSCRIPTION AGREEMENT*

9808/1.A799132-4

- 6 -

**J&R FOUNDERS' FUND, L.P.:**

By: J&R Advisors F.F., Inc., its General Partner:

By: _John Rutherford_____
Name:
Title:

_____
Deepak S. Kulkarni

_SIGNATURE PAGE TO AMENDMENT NO. 1 TO DEEPAK KULKARNI REPRESENTATION
AND WARRANTY, INDEMNITY AND SUBSCRIPTION AGREEMENT_

9808/1.A799132-4

10/07/2005 15:17 1FAX
SENT BY: WMC;                          617;              NOV-12-02 5:50PM;      PAGE 2
                                                  → B. Felder        ☐ 007/011

- 6 -

J&R FOUNDERS' FUND, L.P.:

By: J&R Advisors F.F., Inc., its General Partner:


By: _____
Name:
Title:

Deepak S. Kulkarni

*SIGNATURE PAGE TO AMENDMENT NO. 1 TO DEEPAK KULKARNI REPRESENTATION*
*AND WARRANTY, INDEMNITY AND SUBSCRIPTION AGREEMENT*

9808/1.A799132-4

W0970

### Affidavit of Service

I, Peter A. Crawford, plaintiff, hereby say and depose, under pains and penalties
of perjury, that I this day served the within papers upon defendants' attorney, by causing
copies thereof to be mailed, first class postage prepaid, to Mark Whitney, Morgan Brown
& Joy, 200 State St., Boston, MA  02109.

Date:  _October 21, 2005_