UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
_____

PETER A. CRAWFORD,

        Plaintiff,

                                    Civil Action No.

v.                                05-cv-10078 (DPW)

WOLVERINE, PROCTOR & SCHWARTZ, INC.,      **Oral Argument Requested**
STEVEN F. CHILINSKI, and
DEEPAK S. KULKARNI,

        Defendants.
_____

## DEFENDANTS' CROSS-MOTION FOR A PROTECTIVE ORDER

Pursuant to F.R.C.P. 26(c), defendants Wolverine, Proctor & Schwartz, Inc. "WPS"), Steven F. Chilinski and Deepak S. Kulkarni (collectively, the "defendants") hereby move this Honorable Court for a protective order that would prohibit plaintiff *pro se* Peter Crawford from seeking disclosure from any party or non-party of any documents, materials or other information relating to either:

      1.      WPS LLC's February 2005 recapitalization; or

      2.      WPS LLC's current (fiscal year 2005) financial statements.

In support of this motion, defendants hereby submit Defendants' Memorandum of Law In Opposition to Plaintiff's Motion to Compel and In Support of Defendants' Cross-Motion for a Protective Order and the attached Affidavit of Jeffrey D. Kuhn.

**WHEREFORE** the defendants respectfully request that this Court issue a protective order which prohibits Crawford from seeking the disclosure of any documents, materials or other information from any party or non-party related to WPS LLC's

February 2005 recapitalization and WPS LLC's current (fiscal year 2005) financial statements.

## REQUEST FOR ORAL ARGUMENTS

Defendants hereby request, pursuant to Local Rule 7.1(d), that oral arguments be permitted on this motion.

## CERTIFICATE OF CONFERRAL

Counsel for the defendants hereby certify that they have complied with the provisions of Local Rules 7.1(a)(2), 26.2(c) and 37.1, as further detailed in the accompanying memorandum of law.  Defense counsel have made a reasonable and good faith effort to reach an agreement with opposing counsel on the matters set forth in this motion.

Dated: November 4, 2005

Respectfully submitted,

WOLVERINE, PROCTOR &
SCHWARTZ, INC.,
STEVEN F. CHILINSKI, and
DEEPAK S. KULKARNI

By their attorneys,


/s/ Mark M. Whitney
Mark Whitney (BBO #637054)
Jeffrey D. Kuhn (BBO #662326)
MORGAN, BROWN & JOY, LLP
200 State Street
Boston, Massachusetts   02109
(617) 523-6666

TO:    Peter A. Crawford, *pro se*
       23 Newcastle Drive #11
       Nashua, New Hampshire   03060
       (603) 888-4574

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that on November 4, 2005, I filed the foregoing document with the Clerk of the Court by using the ECF system.  I further certify that I mailed the foregoing document and the notice of electronic filing to plaintiff *pro se* Peter A. Crawford, 23 Newcastle Drive #11, Nashua, New Hampshire 03060 by U.S. mail, on this 4th day of November, 2005.

/s/ Mark M. Whitney
_____

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

PETER A. CRAWFORD,

        Plaintiff,

                                      Civil Action No.
v.                               05-cv-10078 (DPW)

WOLVERINE, PROCTOR & SCHWARTZ, INC.,
STEVEN F. CHILINSKI, and
DEEPAK S. KULKARNI,

        Defendants.

## AFFIDAVIT OF JEFFREY D. KUHN

I, Jeffrey D. Kuhn, on oath depose and say that:

1.    I am an attorney duly licensed to practice law in the Commonwealth of Massachusetts. I am an associate with the law firm of Morgan, Brown & Joy, counsel to the defendants in the above-captioned matter.

2.    I submit this Affidavit in support of the defendants' Motion for a Protective Order and in opposition to plaintiff *pro se* Peter A. Crawford's Motion to Compel.

3.    On September 28, 2005, the defendants forwarded their responses to plaintiff *pro se* Peter A. Crawford's First Request for the Production of Documents. A copy of the defendants' response to Crawford's First Request for the Production of Documents is attached to Crawford's Affidavit in support of his Motion to Compel.

4.    Following receipt of defendants' responses to Crawford's discovery requests, Crawford sent two letters to defense counsel, dated August 28, 2005 and

October 3, 2005. Crawford's letters outlined nineteen separate issues relating to defendants' discovery responses. Copies of Crawford's August 28, 2005 and October 3, 2005 letters to defendants' counsel are attached hereto as Exhibit "A".

5.    In an effort to resolve any discovery disputes, Crawford and defense counsel conducted a discovery conference on October 11, 2005. Participating in this telephone conference were Crawford, Mark Whitney (also of Morgan, Brown & Joy, LLP) and me. The telephonic discovery conference took place from 1:30 p.m. to approximately 3:00 p.m.

6.    As a result of the discovery conference, the parties reached agreement on the vast majority of the outstanding discovery issues.

7.    However, the parties were unable to reach an agreement with respect to at least two categories of discovery. Specifically, Crawford indicated that he demanded that the defendants produce documents relating to Wolverine, Proctor & Schwartz LLC's ("WPS LLC") February 2005 recapitalization and WPS LLC's 2005 financial statements. Crawford apparently became aware of WPS LLC's 2005 recapitalization during the discovery process. Defense counsel acknowledged to Crawford that documents related to the recapitalization most likely existed, but that the documents were not responsive to Crawford's requests and, more importantly, it was simply inconceivable that such documents were in any manner relevant to Crawford's claims.

8.    In response to Crawford's demands, defense counsel explained that, given the nature of the facts at dispute in this matter, documents relating to WPS LLC's actions or performance in 2005 could not possibly be relevant to this action.

2

9.    In response to defense counsel's arguments, Crawford argued that WPS LLC's 2005 recapitalization and WPS LLC's 2005 financial statements were relevant to the issue of the quantity of the defendants' assets and whether the defendants would be able to satisfy a judgment in the event Crawford prevailed in this matter. Crawford also expressed concern that the defendants' potential liability to him may have been assigned to another entity.

10.    Crawford also argued that the subject documents were relevant because those documents may shed light on other claims he was contemplating bringing against defendant Deepak S. Kulkarni at some future date. Crawford revealed that the primary reason he was demanding production of the subject documents was not because he felt they were potentially relevant to this matter, but, rather, because Crawford suspected that Kulkarni had committed other acts of dishonesty against him. Crawford made clear, however, that the suspected dishonest conduct by Kulkarni was *not* a subject of this litigation.

11.    Defense counsel rejected Crawford's line of reasoning as to the discoverability and relevance of WPS LLC's current financial statements or its 2005 recapitalization as fallacious and not supported by the Federal Rules. However, in an attempt to allay Crawford's concerns and with the hope of avoiding a motion to compel, defense counsel offered to somehow demonstrate to Crawford that his anxieties with respect to the defendants' assignment of liability were unfounded. Defense counsel offered to furnish Crawford either with those select portions of WPS LLC's recapitalization agreement pertinent to his concerns or with a sworn statement concerning the potentially liable entity. Crawford rejected each of these compromise proposals and

answered that the defendants' only options were to turn over the recapitalization documents or face a motion to compel.

12.    On October 14, 2005, I forwarded an email to Crawford which addressed the vast majority of the discovery issues which the parties had resolved during the October 11, 2005 discovery conference.  Attached to my October 14, 2005 email to Crawford were two separate documents responsive to Crawford's third numbered request in his First Request for the Production of Documents.  A copy of my October 14, 2005 email to Crawford (with attachments) is attached hereto as Exhibit "B".

13.    A true copy of Crawford's January 4, 2000 Employment Contract with Wolverine, Proctor & Schwartz, Inc. ("WPS") is attached hereto as Exhibit "C".

14.    A true copy of Crawford's December 28, 2001 Transition Agreement with WPS is attached hereto as Exhibit "D".

15.    A true copy of Crawford's December 2, 2004 letter to defendant Steven Chilinski is attached hereto as Exhibit "E".

16.    A true copy of Daniel J. Blake's December 8, 2004 letter to Crawford is attached hereto as Exhibit "F".

17.    A true copy of WPS LLC's 2001 Consolidated Financial Statements is attached hereto as Exhibit "G".

Signed under the penalties and pains of perjury the 4th day of November, 2005.


Jeffrey D. Kuhn

4

# EXHIBIT A

Peter A. Crawford
23 Newcastle Dr. #11
Nashua, NH  03060

October 3, 2005

Mr. Jeffrey Kuhn
Morgan, Brown & Joy, LLP
200 State St.
Boston, MA  02109

Re:  Crawford v. Wolverine, Proctor & Schwartz, Inc., C.A. 05-cv-10078 (DPW)

Dear Mr. Kuhn:

I have reviewed Defendants' Responses to Plaintiffs First Request for the Production of
Documents.  The responses are inadequate and fail to comply with the applicable Fed. R.
Civ. P. and Local Rules for the following reasons:

1.  The produced documents are not arranged in order "as they are kept in the
    usual course of business… or… organize[d] and label[ed]… to correspond
    with the categories in the request" as required by Fed. R. Civ. P. 34(b).
    Instead, there is no indication as to which documents are responsive to which
    requests.  By way of example, page W0019, the sole page apparently
    produced which relates to the central issue of calculation of the extraordinary
    gain, is inserted in the midst of the large volumes of documents relating to the
    compensation of Mr. Kulkarni.  The method of arrangement appears to be
    deliberately obfuscatory.  See Stiller v. Arnold, 167 F.R.D. 68 (N.D. Ind.
    1996), Wright, Miller & Marcus, Federal Practice and Procedure, Civil 2d
    §2213.
2.  There is no indication as to whether certain requested documents exist but are
    not being produced due to objection to the request.  Although the responses
    claim that documents have been produced in response to each request, there is
    no indication as to whether or not the produced documents encompass all
    documents that exist.  Furthermore, the generalized objections are insufficient.
    See Fed. R. Civ. P. 34(b) (response must be "with respect to each item or
    category." See also Wagner v. Dryquit Systems, Inc., 208 F.R.D. 605, 609-
    610 (D. Nebr. 2001), citing Dollar v. Long Manufacturing, 561 F. 2d 613, 616
    (5th Cir. 1977), "[t]he parties have a duty to provide true, explicit, responsive,
    complete and candid answers to discovery."
3.  Certain responses are evasive and incomplete, as further detailed below, and
    are thus deemed not to have been made pursuant to Fed. R. Civ. P. 37(a)(3).
4.  Despite defendants' claims to the contrary, not every request appears to have
    responsive documents produced.  The responses fall into a number of
    categories:

   a. W0001-W0018 Kulkarni compensation, apparently responsive to
      requests 9 and 10.
   b. W0019 Calculation of extraordinary gain, apparently responsive to
      request 7.
   c. W0020-W0025 Continuation of (a) above.
   d. W0026-W0028 Board meeting minutes, apparently responsive to
      request 4.
   e. W0029-W0034 Board authorization for December 2001 transaction,
      resignations of board members. Apparently responsive to request 4.
   f. W0035-W0042 Appointment of new Board of Directors and officers.
      Apparently responsive to request 4.
   g. W0043-W0049. Cellular telephone bill for 978-764-4679 (Mark
      Brown) covering January 2001. Apparently responsive to request 11.
   h. W0050-W0070. Announcement of appointment of Mr. Chilinski as
      CEO, and his employment contract. Apparently responsive to request
      5.
   i. W0071-W0106. Apparent personnel file of Peter Crawford.
      Apparently responsive to request 13.
   j. W0107-W0231 Continuation of (a) above.
   k. W0232-W0356 Sprint telephone bill covering January 2001.
      Apparently responsive to request 4.
   l. W0357-W0447 WPS financial statements. Apparently responsive to
      request 6.
   m. W0448-W0562 Tax returns. Apparently responsive to request 8.
   n. W0563-W0963 Contracts associated with December 2001 transaction.
      Apparently responsive to requests 1 and 2.

5. None of the documents produced appears to be responsive to request 3,
   despite defendants' contrary assertion that responsive documents have been
   provided. The WPS 2004 financial statements, specifically page W0367, refer
   to a recapitalization in early 2005, which surely required amending or
   superceding documents relating to those referred to in 4(n) above, however no
   such documents were produced.
6. Request 4 refers to board meetings, and some responsive documents were
   produced, however, there is no indication that these are all of the documents
   which exist, or whether additional board meetings beyond those documented
   occurred. Specifically, and without limiting the generality of the foregoing,
   defendant WPS's response to Interrogatory Set 1, question 4(c) refers to
   Board of Directors action on January 14, 2002 relating to the termination of
   the plaintiff's employment, however no written documentation of such action
   has been provided. The response to Interrogatory Set 1, question 4(e), refers
   to minutes of a February 28, 2002 Board of Directors meeting as relating to
   the termination of the plaintiff's employment, however there is no mention in
   W0026-W0028 of the plaintiff. If no written documentation of board action
   terminating the plaintiff's employment exists, contrary to the suggestion in the
   response to question 4(e), then you are required to so state.
7. Request 6 refers to the production of monthly or quarterly financial statements
   for years for which "full financial results have not been reported" which

would apply to 2005.  Such statements surely exist but have not been produced.

8.  Request 11 refers to telephone bills.  Some such bills have been produced, see 4(g) and 4(k) above, however no cellular or home telephone bill was produced for Mr. Kulkarni, despite the fact that defendants' response purports to be for him as well as the other defendants, and no home telephone bill for Mr. Brown has been produced, despite the fact that he is an agent of defendant WPS and would presumably have custody or control of such a bill.  If copies of these bills no longer exist in the custody or control of any defendant or its agents, then the response should so state.  Furthermore, the request more broadly refers to additional telephone numbers for which bills may be in the custody or control of one or more of the defendants.

9.  Request 12 refers to notes and drafts of earlier versions of various agreements which may be in the possession of Mr. Kulkarni or in files at defendant WPS. Despite a claim that responsive documents were attached, no such documents were found.  If copies of these notes and drafts no longer exist in the custody or control of any defendant or its agents, then the response should so state.

10. Request 7 refers to the calculation of EBITDA and related documents, the key issue in the case.  Nevertheless, only page W0019 appears responsive to this request and there is no claim that no further documents exist that are responsive to this request.  Such an assertion, if made, would be difficult to believe.

11. In addition to the above, I incorporate the issues enumerated in my letter to Mr. Whitney of August 28, 2005 herein by reference.  Your e-mail of September 29 partially responds to the last two sentences of paragraph 5, however I am entitled to have a supplemental response, signed under oath by an agent of defendant WPS, so indicating.  Certain telephone records were provided in response to the Request for Production of Documents, Set 1, however, the interrogatory was broader than the document request, so paragraph 8 of the August 28 letter still applies and plaintiff requests a complete response to the related interrogatory.

Pursuant to Local Rule 37.1(a), plaintiff hereby requests a discovery conference to be held a maximum of seven days hence.  If, after such conference, we are unable to reach agreement on the matters raised herein, or you fail to respond to this request, I shall move promptly thereafter to compel discovery of the matters herein enumerated.

Sincerely,

Peter A. Crawford

Peter A. Crawford
23 Newcastle Dr. #11
Nashua, NH 03060

August 28, 2005

Mr. Mark Whitney
Morgan, Brown & Joy, LLP
200 State St.
Boston, MA 02109

Re: Crawford v. Wolverine, Proctor & Schwartz, Inc., C.A. 05-ev-10078 (DPW)

Dear Mr. Whitney:

I have reviewed the response of Wolverine, Procetor & Schwartz, Inc. to Plaintiff's
Interrogatories Set No. 1. The responses are wholly inadequate for the following reasons:

1. The responses begin with broad, boilerplate objections without any of those
   objections being restricted in scope to any particular Interrogatory. The
   Interrogatories specifically provide that "[i]f you refuse to answer on the basis
   of any privilege, specify the basis of the privilege asserted in sufficient detail
   so as to permit an adjudication of the validity of that claim." You have failed
   to provide such detail by incorporating blanket, boilerplate objections in your
   answers that are not limited in scope to any particular Interrogatory. Local
   Rule 33.1(c) clearly contemplates particularized objections. Furthermore, it is
   unclear from the responses which information is being withheld because it is
   unavailable and/or not in the possession of WPS (in which case you were to
   identify the person having the information), and which is being withheld due
   to its being "unduly burdensome" or otherwise allegedly not subject to
   disclosure. In order for the various objections to be evaluated it is necessary
   that you follow the instructions in the first paragraph of the Interrogatories. In
   addition, it is necessary that you provide home address and telephone
   numbers, if available, as this information may be needed for subpoenas to be
   served. Not all of the individuals listed are agents or employees of the
   defendants, and in any case Mr. Crawford is not subject to any ethical rules
   applicable to attorneys which might prohibit contact with employees or agents
   of an opposing party.

2. Your statement that 19 interrogatories have been propounded is without merit.
   Local Rule 26.1(c) specifically provides that subparts are not counted as
   separate interrogatories if they request "additional particularized information"
   as the subparts to these Interrogatories do.

3. You have failed to identify the persons assisting in the preparation of each
   response as requested in paragraph 2 of the Interrogatories.

4.  You have failed adequately to identify documents, including, but not limited to, the telephone and electronic mail records requested in Interrogatory 4. You have failed to provide any of the documents identified that you admit exist.

5.  Your response to Interrogatory 1 is inadequate in that it fails to provide dates in each instance in which a date was requested. The term "date" in the context used clearly means the month, day and year. Yet, in certain instances you have provided only a month and a year. With respect to Mr. Kulkarni, both Interrogatory 1 and Interrogatory 3 request specific dates, including dates "[f]or each and every position held by Mr. Kulkarni with WPS from December 1, 2001 through present, whether such position be Chairman, President, CEO, consultant, or any other title…" The dates during which Mr. Kulkarni served as Chairman and consultant to WPS are omitted. Nor is the request, in Interrogatory 3, to "state the basis for the contention by WPS that he held that position" answered, other than possibly a passing reference to minutes of a February 28, 2002 board meeting which purports only to respond to the first sentence of this Interrogatory. In addition, it is unclear from your responses whether positions in addition to those listed were held by any particular individual. For example, and without limiting the generality of the foregoing, you have failed to provide Mr. Chilinski's dates of employment with WPS, including whether he was employed in a position other than CEO of WPS prior to February 28, 2002. Finally, you state that certain individuals worked on the 2000, 2001 and 2002 WPS audits, but you do not state whether only the individuals listed under "2002 WPS Audit" currently work for Vitale Caturano or all do. If the response applies only to the 2002 audit, then you have failed to provide contact information for the persons working on the 2000 and 2001 audits.

6.  With respect to Interrogatory No. 2, your response with regard to TAXES and TAXRATE is less than definitive. You have not definitively stated whether or not your client's position differs from that of the plaintiff.

7.  No FASB Statements or similar documents as requested in Interrogatory No. 2 were identified, nor did you state that there were no such documents upon which your client relied, or which may be applicable to calculation of the Term.

8.  In a telephone conversation with Jeffrey Kuhn on August 3, 2005, Mr. Kuhn agreed that I was entitled to telephone records, however no such records have been provided or identified.

The very limited discovery period provided for in this case is passing quickly. Your Rule 26 disclosure was provided long after it was required, and I reluctantly agreed to a significant extension with regard to the Interrogatories, Set No. 1. The responses to the Request for Production of Documents to All Defendants, Set No. 1 is due in approximately a week. Thus far, it appears that your firm and/or your clients have

devoted only minimal effort to preparing responses, and the information provided to date is insufficient to move forward with depositions, if recalling of witnesses following the provision of the required more definitive information is to be avoided. It also appears that you may be using delaying tactics to hide unfavorable information in the possession of your clients and/or prevent its disclosure prior to the end of the discovery period. If that is indeed the case, these tactics will not be tolerated.

Please provide an updated response to the Interrogatories on or before the due date of the Request for Production of Documents to All Defendants, Set No. 1. In the event that we are unable to agree to resolve this discovery dispute in this time frame, it will be necessary for me at that time to proceed with a appropriate motions with the court, including an extension of the discovery deadline.

Sincerely,

Peter A. Crawford

# EXHIBIT B

## Kuhn, Jeff

| | |
|---|---|
| **From:** | Kuhn, Jeff |
| **Sent:** | Friday, October 14, 2005 4:49 PM |
| **To:** | 'Peter Crawford' |
| **Cc:** | Whitney, Mark |
| **Subject:** | Discovery Issues |

Dear Mr. Crawford:

As we agreed, I write to follow up on our discovery conference of October 10, 2005.

Please be advised that Mark Brown and Deepak S. Kulkarni assisted in the preparation of WPS's answers to your first set of interrogatories.

To answer your questions regarding the actual starting date of Mr. Chilinski's tenure as WPS's CEO: Mr. Chilinski's employment agreement was effective January 29, 2002, and that is the date on which his employment with WPS officially began. Due to the demands of Mr. Chilinski's schedule during his first month as WPS's CEO, a WPS Board meeting could not be scheduled until late February 2002. It was at that February 2002 Board meeting that Mr. Chilinski's hiring was confirmed by official Board action.

As promised during our call, I have also enclosed herewith two additional agreements – "Amendment No. 1 to Deepak Kulkarni Representation and Warranty, Indemnity and Subscription Agreement" and "Amendment No. 1 to Consulting Agreement." Both of these agreements are dated November 13, 2002. These documents are Bates numbered W0964-W0974.

With respect to your request for telephone bills, WPS, Mark Brown and Deepak Kulkarni have produced all the responsive telephone bills in their custody and control. Unsurprisingly, Mr. Kulkarni is no longer in possession of either his home or cellular telephone bills from January 2002. Likewise, WPS does not have any of Mr. Kulkarni's telephone bills from January 2002 in its custody or control.

We have produced board meeting minutes for all board meetings covered by your prior document request.

With respect to your eighth numbered paragraph, we have confirmed that no written communications between WPS and Vitale Caturano responsive to your earlier document request exist.

With respect to your ninth numbered paragraph, neither Deepak Kulkarni nor anyone at WPS are in possession of any earlier versions of the various agreements referenced in your twelfth document requests. Defendants regret if their earlier

11/4/2005

responses to your requests for the production of documents created any confusion on this topic.

Thank you for your courtesies.

Sincerely,

Jeffrey D. Kuhn
Morgan, Brown & Joy, LLP
200 State Street -- 11th Floor
Boston, Massachusetts   02109
(617) 788-5025
(617) 367-3125 (fax)

# AMENDMENT NO. 1 to DEEPAK KULKARNI REPRESENTATION AND WARRANTY, INDEMNITY AND SUBSCRIPTION AGREEMENT

**This Amendment No. 1 to Deepak Kulkarni Representation and Warranty, Indemnity and Subscription Agreement** is dated as of November 13, 2002 by and between **Wolverine Proctor, LLC,** a Delaware limited liability company (the **"Company"**); **Deepak S. Kulkarni ("Mr. Kulkarni")**; and **Parthenon Investors II, L.P., PCIP Investors** and **J&R Founders' Fund, L.P.** (the **"Parthenon Investors"**). Capitalized terms used but not defined herein shall have the meaning set forth in the Subscription Agreement (as defined below).

**WHEREAS,** the Company, Mr. Kulkarni and the Parthenon Investors entered into the Deepak Kulkarni Representation and Warranty, Indemnity and Subscription Agreement on December 28, 2001 (the "Subscription Agreement");

**WHEREAS,** the Company, Mr. Kulkarni and the Parthenon Investors are party to that certain Omnibus Agreement of even date herewith (the **"Omnibus Agreement"**); and

**WHEREAS,** pursuant to the Omnibus Agreement, the Company, Mr. Kulkarni and the Parthenon Investors desire to amend certain provisions of the Subscription Agreement as set forth herein.

**NOW, THEREFORE,** in consideration of the mutual covenants and agreements contained herein, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.     Subsection (a) of Section 9.3 of the Subscription Agreement be and hereby is amended by deleting the phrase "until the earlier to occur of (x) March 31, 2002 or (y) the date of delivery to the Company of the audited financial statements of the Contributed Companies and their respective Subsidiaries for the fiscal year ending December 31, 2001 together with all footnotes thereto and the auditor's report of Arthur Andersen LLP (or such other nationally-recognized accounting firm as may be the Company's auditors at such time)" and substituting "until November 13, 2002" in lieu thereof.

2.     Subsection (b) of Section 9.3 of the Subscription Agreement be and hereby is deleted in its entirety and the following substituted in lieu thereof:

"     (b)     <u>Tax Reserves</u>. Any claim for indemnification hereunder with respect to any breach of the representations and warranties of Mr. Kulkarni contained in subsection (a) of Section 3.15 (Tax Returns and Payments) in respect to any income Taxes resulting from the failure of WP&S to be a valid and subsisting Subchapter S corporation for federal or state income tax purposes at all times before the Initial Closing may be brought at any time from and after the Closings until the latest to occur of (x) March 31, 2002, (y) the date of delivery to the Company of the audited financial statements of the Contributed Companies and their respective Subsidiaries for the fiscal year ending December 31, 2001 together with all footnotes thereto and the auditor's report of Arthur Andersen LLP (or such other nationally-recognized accounting firm

W0964

- 2 -

as may be the Company's auditors at such time), or (z) the expiration of the longest relevant statute of limitation (determined after giving effect to any waivers or extensions thereof) related to the matters underlying such claim."

3.    Subsection (c) of Section 9.3 of the Subscription Agreement be and hereby is amended by deleting the phrase "until the earlier of (i) the date of consummation of a Recapitalization or (ii) the date that is one year after the Subsequent Closing Date" and substituting "until November 13, 2002" in lieu thereof.

4.    Each of subsections (d) and (e) of Section 9.3 of the Subscription Agreement be and hereby is amended by deleting the phrase "until the date on which the matter is finally determined by order of a court of competent jurisdiction which is not subject to appeal" and substituting "until November 13, 2002" in lieu thereof.

5.    Subsection (h) of Section 9.3 of the Subscription Agreement be and hereby is amended by (1) inserting "and" before the phrase "subsection (a) of Section 3.10"; (2) deleting the phrase "and Section 3.29 (Brokers)" therefrom; and (3) inserting as the last sentence of such subsection "Any claim for indemnification hereunder with respect to any representations and warranties of Mr. Kulkarni contained in Section 3.29 (Brokers) may be brought any time from and after the Closings until November 13, 2002."

6.    Section 9.4 of the Subscription Agreement be and hereby is deleted in its entirety and the following substituted in lieu thereof:

"    9.4    Indemnification by Mr. Kulkarni.  Mr. Kulkarni hereby indemnifies and agrees to indemnify, defend and hold harmless the Company against and in respect of all liabilities, obligations, judgments, injunctions, orders, damages, Taxes, losses, fines, penalties, injuries, deficiencies, demands, expenses, fees, costs (including reasonable attorneys' and expert witness fees and disbursements in connection with investigating, defending or settling any action or action threatened in writing) and amounts paid in settlement (collectively, the "Losses") that arise out of or result from:

(a)    the breach of any representation or warranty made by Mr. Kulkarni in Sections 3.1, 3.6, subsection (a) of Section 3.10, subsection (a) of Section 3.15, subsections (a) and (b) of Section 3.16, subsection (a) of Section 3.18, Sections 3.23 or 3.29, including as a result of any misrepresentation in or omission from any schedule, document, certificate or other instrument required to be furnished by Mr. Kulkarni hereunder (in each case as such representation or warranty would read if all references to Material Adverse Change were deleted therefrom);

(b)    the Strayfield Indemnity; or

(c)    fraud or intentional misrepresentation by Mr. Kulkarni in the representations and warranties of Mr. Kulkarni in Section 3 or in the Closing Certificates;

9808/1.A799132-4

W0965

- 3 -

provided, however, Mr. Kulkarni shall not be liable under subsections (a) or (b) of this Section 9.4 unless and until the aggregate amount of all Losses under subsections (a) and (b) of this Section 9.4 exceeds $775,000, in which case Mr. Kulkarni shall be liable for only that portion of such Losses that exceeds such deductible threshold; and

provided, further that no amount in respect of any claim for indemnification based upon subsection (a) of this Section 9.4 (except for a claim based upon a breach of the representations and warranties in subsection (a) of Section 3.10 (Title to Contributed Shares)) shall be applied against the dollar threshold identified in the immediately preceding proviso of this Section 9.4 until all Reserves are depleted with respect to any such indemnification claim; and provided further that the dollar threshold identified in the first proviso of this Section 9.4 shall not apply to any claim for indemnification based upon any breach of any representation or warranty made by Mr. Kulkarni in subsection (a) of Section 3.10.

In the event that Mr. Kulkarni is obliged to indemnify the Company under this Section 9.4, the time limitations provided for in subsections (a) through (h) of Section 9.3 and the dollar limitation provided for in the first proviso above in this Section 9.4 shall not apply to any Loss arising out of or resulting from subsection (c) of this Section 9.4.

In the event that Mr. Kulkarni is obliged to indemnify the Company under this Section 9.4 as a result of a breach of the representation and warranty set forth in Section 3.15 (Tax Returns and Payments) arising from the failure of WP&S to be a valid and subsisting Subchapter S corporation for federal tax purposes at all times prior to the Initial Closing, and such indemnification results in a monetary benefit to the Company or results in a reduction of the amount of taxes owed by the Company as a result of losses recaptured by the Company, the Company shall pay to Mr. Kulkarni, in cash, an amount equal to the monetary benefit or reduction in taxes realized by the Company, which amount shall be paid upon earlier of the receipt of such monetary benefit or the filing of the applicable tax returns by the Company.

Notwithstanding anything to the contrary in this Section 9 (including the provisions of Section 9.3 and this Section 9.4), the indemnity set forth in this Section 9.4 (other than in respect of a claim for a breach of the representations and warranties in subsection (a) of Section 3.10 (Title to Contributed Shares)) shall terminate upon the sale of all or substantially all of the assets or equity interests of the Company or Holdco, directly or indirectly, to an unaffiliated third party (whether in a single transaction or series of related transactions) or the merger or consolidation of the Company or Holdco, directly or indirectly, where the Company or Holdco, as applicable, is not the surviving entity or the majority of the stockholders of such entity prior to such merger or consolidation are not the majority of the stockholders of such entity after such transaction."

    7.    The parties acknowledge and agree that any reference in the Subscription Agreement to the term "Reserves" (as defined in Section 8 of the Subscription Agreement) shall be and hereby is deemed to exclude any dividends that may be recorded as accrued in the trial balances accompanying the November 2001 Balance Sheet.

9808/1.A799132-4

W0966

- 4 -

8.    Except as expressly set forth in this Amendment, the Subscription Agreement is ratified and confirmed, shall remain in full force and effect and shall not be altered, amended or modified, except in accordance with its terms.

9.    This Amendment shall be governed by, and construed in accordance with, the laws of the Commonwealth of Massachusetts, without giving effect to the principles of conflicts of law thereof that would cause the application of the laws of any other jurisdiction. Neither this Amendment nor any term or provision hereof may be amended, modified, waived or supplemented except by a written instrument executed by all parties hereto. This Amendment, the Omnibus Agreement and the exhibits thereto constitute the complete agreement among the parties hereto and thereto with respect to the subject matter hereof and thereof. This Amendment supersedes all prior negotiations and documents reflecting such prior negotiations among the parties hereto with respect to the subject matter hereof. This Amendment is intended to bind and inure to the benefit of the parties hereto and their respective successors and permitted assigns, heirs, executors, administrators and representatives. The headings of the sections, paragraphs and subsections of this Amendment are inserted for convenience only and shall not affect the interpretation hereof. This Amendment may be executed in separate counterparts, each of which when so executed and delivered shall be an original but which together shall constitute on and the same instrument.

[Rest of page intentionally left blank]

9808/1.A799132-4

W0967

10/07/2005 15:17 IFAX                                    → B. Felder                    ☑005/011

11/13/2002 18:55 FAX 617 478 7010            PARTHENONCAPITAL                    ☑009

- 5 -

     **IN WITNESS WHEREOF,** the parties hereto have caused this Amendment No. 1 to Deepak Kulkarni Representation and Warranty, Indemnity and Subscription Agreement to be executed as of the date first above written.

                **WOLVERINE PROCTOR, LLC.:**

                By: _____
                Name: Grit A. Scott
                Title: Vice President

                **PARTHENON INVESTORS II, L.P.:**

                By: PCap Partners II, LLC, its General Partner
                By: PCap II, LLC, its Managing Member

                By: _____
                Name:
                Title:

                **PCIP INVESTORS,** by its General Partners:

                Parthenon Capital, Inc.:

                By: _____
                Name:
                Title:

                _____
                Ernest K. Jacquet

                _____
                John C. Rutherford

*SIGNATURE PAGE TO AMENDMENT NO. 1 TO DEEPAK KULKARNI REPRESENTATION AND WARRANTY, INDEMNITY AND SUBSCRIPTION AGREEMENT*

9808/1.A799132-4

10/07/2005 15:17 1FAX                                           → B. Felder          ☒006/011
      11/13/2002 16:55 FAX 617 478 7010        PARTHENONCAPITAL                              ☒010

- 6 -

**J&R FOUNDERS' FUND, L.P.:**

By: J&R Advisors F.F., Inc., its General Partner:

By: *John Rutherford*
Name:
Title:

_____
Deepak S. Kulkarni

*SIGNATURE PAGE TO AMENDMENT NO. 1 TO DEEPAK KULKARNI REPRESENTATION AND WARRANTY, INDEMNITY AND SUBSCRIPTION AGREEMENT*

9808/1.A799132-4

W0969

10/07/2005 15:17 IFAX                                          → B. Felder          ☑007/011
SENT BY: WMC;                        617;              NOV-12-02 5:50PM;          PAGE 2

- 6 -

J&R FOUNDERS' FUND, L.P.:

By: J&R Advisors F.F., Inc., its General Partner:


By: _____
Name:
Title:

Deepak S. Kulkarni


*SIGNATURE PAGE TO AMENDMENT NO. 1 TO DEEPAK KULKARNI REPRESENTATION
AND WARRANTY, INDEMNITY AND SUBSCRIPTION AGREEMENT*

9808/1.A799132-4

W0970

## AMENDMENT NO. 1 to CONSULTING AGREEMENT

**This Amendment No. 1 to Consulting Agreement** is dated as of November 13, 2002 by and between **Wolverine, Proctor & Schwartz, Inc.**, a Delaware corporation (the **"Company"**) **Deepak S. Kulkarni** (the **"Consulting Employee"**). Terms used but not defined herein shall have the meaning set forth in the Consulting Agreement (as defined below).

**WHEREAS,** the Company and Mr. Kulkarni entered into a Consulting Agreement on December 28, 2001 (the "Consulting Agreement");

**WHEREAS,** the Company, Mr. Kulkarni and the Parthenon Investors are parties to that certain Omnibus Agreement of even date herewith (the "Omnibus Agreement");

**WHEREAS,** pursuant to the Omnibus Agreement, the Company and Mr. Kulkarni desire to amend certain provisions of the Consulting Agreement as set forth herein.

**NOW, THEREFORE,** in consideration of the mutual covenants and agreements contained herein, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.    Section 4(c) of the Consulting Agreement be and hereby is deleted in its entirety and the following substituted in lieu thereof:

"    (c)    <u>Medical Plans</u>.  During the term hereof, the Company shall pay the entire premium cost of coverage of the Consulting Employee and his Immediate Family under all health insurance plans in which the Consulting Employee and/or his Immediate Family participate as of the date of this Agreement or under one or more substitute plans providing substantially equivalent coverage in the event the Company elects to change insurance carriers.  In addition to the payment of health insurance premiums as provided in the immediately preceding sentence, from and after January 1, 2002 and during the term hereof, the Company shall reimburse the Consulting Employee for any and all medical expenses (including all applicable deductibles, dental expenses, orthodontics expenses, any charges for private rooms and expenses for the use of a doctor of choice outside of the coverage of such health insurance plan) incurred by the Consulting Employee (on his behalf or on behalf of his Immediate Family) which are not otherwise reimbursed or paid to the Consulting Employee or his Immediate Family, as applicable, pursuant to any health insurance plan or arrangement; provided, however, that in no event shall the Company be obligated to reimburse any expenses for any medical care which is not based on recognized medical practices and standards in the United States (expenses subject to reimbursement under the terms of this sentence are hereinafter referred to collectively, "Reimbursable Expenses").  Notwithstanding the foregoing, the Company shall not be obligated to pay more than $75,000 in the aggregate during any calendar year (the "Annual Reimbursement Cap") for any Reimbursable Expenses, and no portion of the Annual Reimbursement Cap for any one year shall be applied to or available for use in any other year.  For purposes of this Section 4(c), "Immediate Family" shall mean Alison J. Kulkarni, Isabella P. Kulkarni, Sebastian S. Kulkarni, Elizabeth A. Taylor, Mandakini S. Kulkarni and any future children of Mr. Kulkarni."

W0971

2.      Except as expressly set forth in this Amendment, the Consulting Agreement is ratified and confirmed, shall remain in full force and effect and shall not be altered, amended or modified, except in accordance with its terms.

3.      This Amendment shall be governed by, and construed in accordance with, the laws of the Commonwealth of Massachusetts, without giving effect to the principles of conflicts of law thereof that would cause the application of the laws of any other jurisdiction. Neither this Amendment nor any term or provision hereof may be amended, modified, waived or supplemented except by a written instrument executed by all parties hereto. This Amendment, the Omnibus Agreement and the exhibits thereto constitute the complete agreement among the parties hereto and thereto with respect to the subject matter hereof and thereof. This Amendment supersedes all prior negotiations and documents reflecting such prior negotiations among the parties hereto with respect to the subject matter hereof. This Amendment is intended to bind and inure to the benefit of the parties hereto and their respective successors and permitted assigns, heirs, executors, administrators and representatives. The headings of the sections, paragraphs and subsections of this Amendment are inserted for convenience only and shall not affect the interpretation hereof. This Amendment may be executed in separate counterparts, each of which when so executed and delivered shall be an original but which together shall constitute on and the same instrument.

[Remainder of the page intentionally left blank]

10/07/2005 15:17 IFAX                                    → B. Felder          ☑010/011

11/13/2002 16:52 FAX 617 478 7010          PARTHENONCAPITAL                        ☑004

- 3 -

**IN WITNESS WHEREOF,** the parties hereto have caused this Amendment No. 1 to Consulting Agreement to be executed as of the date first above written.

WOLVERINE, PROCTOR &SCHWARTZ, INC.:

By: _____

Name: Erik Scott

Title: Vice President

_____

Deepak S. Kulkarni

W0973

10/07/2005 15:17 IFAX                                      → B. Felder          ☒011/011

SENT BY: WMC;                    617;              NOV-12-02 5:50PM;      PAGE 4/4

- 3 -

**IN WITNESS WHEREOF,** the parties hereto have caused this Amendment No. 1 to Consulting Agreement to be executed as of the date first above written.

WOLVERINE, PROCTOR &SCHWARTZ, INC.:

By: _____
Name:
Title:

_____
Deepak S. Kulkarni

9808/1.A799132-4

W0974

# EXHIBIT C

# Wolverine
# Proctor

January 4, 2000


Mr. Peter A. Crawford
23 New Castle Drive, Apt. 11
Nashua, NH 03060

Dear Peter:

We are pleased to offer you the position of Chief Operating Officer for Wolverine, Proctor & Schwartz, Inc. (the "Company"). The following will be the terms of your employment.

1. You will report to the Company's Chief Executive Officer and be based at the Company's Merrimac, Massachusetts headquarters.

2. Your employment will commence on December 30, 1999. You will be an employee at will.

3. You will be paid a base salary of $150,000 per year, to be paid ratably on each of the Company's regular paydays.

4. You will receive a bonus for each year, commencing 2000, which will calculated as follows:

$$BONUS = (EBITDA - CAPX - INT - TAXES) \times .05$$

For purposes of this calculation, the above terms will be calculated based upon the annual consolidated financial results of the Company, in accordance with generally accepted accounting principles, and have the following meanings:

EBITDA means the earnings before any interest, taxes or deductions for depreciation or amortization. Excluded from EBITDA will be any non-operating adjustments to reserves, to the extent that those adjustments affect EBITDA, or any operating expenses charged against reserves.

CAPX means capital expenditures, except that portion which the Company has expensed in arriving at EBITDA.

**PAC 0001**

INT means interest expense, whether or not paid, net of interest income.    TAXES means imputed taxes on the income of the Company, computed as follows:

$$(EBITDA + BOOKDIF - DEPR - INT) \times TAXRATE$$

If the calculation of TAXES yields a negative number, TAXES will be deemed to be zero. No amounts will be carried backward or forward for TAXES.

BOOKDIF means those adjustments, positive or negative, to make EBITDA equal to those earnings before interest, taxes, depreciation and amortization, which are taxable.

DEPR means depreciation, amortization and capital expenditures which are deductible for tax purposes and which have not previously been deducted in arriving at EBITDA.

TAXRATE means (for the year for which the computation is being performed) the maximum U.S. federal income tax rate  applicable to individuals with respect to income attributable to Sub-chapter S of the Internal Revenue Code, plus the maximum Massachusetts tax rate on such income net of the federal tax benefit received, if any, with respect to such Massachusetts tax rate (currently, 1 minus the above-mentioned federal tax rate), plus that portion of federal FICA tax which applies on a marginal basis at all income levels (i.e. Medicare tax or other similar FICA taxes not subject to an annual cap) plus any other taxes on income applicable on a marginal basis to all income levels, which may be later introduced or may apply from time to time.  If the calculation of TAXRATE requires clarification, Arthur Andersen & Company or such other accounting firm nominated to prepare the individual tax returns of the sole shareholder of the Company shall be the binding arbiter of the TAXRATE.

The BONUS calculation will be performed annually, based upon the consolidated audited financial results of the Company.  The bonus will be due upon completion of the audit of each year's results, or if no such audit is performed, by April 15.  In the event that you leave the Company involuntarily, other than for cause (defined as including only dishonesty, disloyalty, conviction for a felony, misappropriation of funds, habitual insobriety, substance abuse, willful misconduct or gross negligence in the performance of your duties), prior to the end of any calendar year, the bonus will be prorated for that fiscal year based upon the number of months, or portions of months, during which you were employed, divided by 12, and the result multiplied by the calculated BONUS for that year.  For any year in which you were employed by the Company on December 31 you will receive the full bonus without proration.  In the event that you leave the company for cause, as defined above, no BONUS will be paid for that year.  In the event that any bonus calculation yields a negative number, no amount will be due back from you, and no negative calculation can be carried forward or backward from one year to another.  If the calculation of BONUS requires clarification, Arthur Andersen & Company or such other accounting firm nominated to prepare the individual tax returns of the sole shareholder of the Company shall be the binding arbiter of the BONUS.

Wolverine Proctor & Schwartz, Inc.

5. You will receive non qualified stock options representing 5 percent of the fully diluted number of common shares (after issuance of your options) of the Company as of January 1, 2000 (the "Option"). The terms of the Option will be as follows:

    a. The Option will fully vest upon the completion of your 24th month of employment with the Company, or upon a change in control, as defined below, whichever occurs first.

    b. The amount per share which you would have to pay upon exercising the Option (the "Strike Price") will be the fair market value per share of the underlying stock as of January 1, 2000 as determined by an appraisal conducted by the Company prior to June 30, 2000, or as otherwise agreed.

    c. Once vested, the Option shall remain in effect regardless of whether or not you remain employed by the Company. However, the Company shall have the right to call your Option by informing you in writing of its intent to exercise the call within ten days after your separation from the Company for any reason or under circumstances qualifying as a Change in Control (defined under d. below). This call shall be exercised by paying you (for each share underlying your Option), the difference, if any, between the value, as of the end of the fiscal quarter immediately prior to the separation date, of the underlying stock represented by your Option, less the Strike Price, computed in accordance with generally accepted principles of valuation (without considering any discount for the minority nature of the stock underlying the Option) (the "Call Payment"), using the procedure detailed in 6. below.

    d. The Option may be exercised only upon or after a change in control of the Company, defined as any event which causes Deepak Kulkarni voluntarily to control less than 50 percent of the then-existing common shares of the Company (other than for estate planning purposes and other than in circumstances involving a restructuring of the Company's indebtedness), or an event whereby the Company sells substantially all of its assets other than cash and marketable securities (a "Change in Control"). The Company agrees to give you ten days prior written notice of any Change in Control so as to enable you to decide whether or not to exercise your Option and for you individually to secure financing to do so, if needed. Notwithstanding the foregoing, the Option may not be exercised under circumstances which could cause the Company to lose its status as a Sub-Chapter S corporation.

    e. The Strike Price and the number of shares on which you have the Option will be subject to the customary proportional adjustments in the event of a stock split or stock dividend (defined as an event which causes additional shares to be issued, without new investment and without affecting the percentage ownership of any shareholder). No adjustment will be made for dividends

**PAC 0003**

paid in cash. The Option will be subject to dilution with respect to any shares, options, warrants or other similar instruments granted to other employees of the Company or to sources of capital in exchange for valuable consideration received.

    f.    You will enter into a Stockholder Agreement (in the form attached) ceding control of the shares, other than after a public offering of the Company's shares, or other than in circumstances qualifying as a Change in Control.

6. The following procedure will be utilized in the event your Option is called pursuant to 5c. above, and you and the Company are unable to agree on the fair market value of the underlying shares:

    a.    Based upon the average of appraisals conducted by two independent appraisers qualified in business valuations; one appointed and paid for by the Company, and the other appointed and paid for by you. However, in the event that the ratio of the greater of the appraisals to the lesser exceeds 1.05, the two appraisers shall jointly appoint a third appraiser, the reasonable cost of whom will be equally borne by you and the Company. The valuation arrived at by the third appraiser shall be binding unless the ratio of the third appraisal to the average of the first two is greater than 1.15 or less than .87. Under such circumstances, the highest and lowest value shall be discarded, and the remaining value shall be deemed to be the appraised value.

    b.    In the event that an appraisal is required, the Company shall provide such financial statements, financial projections, and other information as any appraiser may reasonably require in order to complete his appraisal; and any statements, projections or other information provided to one appraiser shall be provided to all. The Company may elect to require all appraisers appointed to sign a customary confidentiality agreement.

7. In the event that the Company elects to call your Option, it may choose either to make the Call Payment in a lump sum, or to immediately issue you an unsecured promissory note. In such event, the promissory note shall provide for five equal principal repayments, paid annually over five years, commencing upon the first anniversary of its issuance. In addition, simple interest of 8 percent per annum of the average principal balance outstanding during the prior year shall be paid annually commencing upon the first anniversary of the note's issuance. Payments of interest or principal under such a note, and all of its terms, will be subordinated, in all respects, to the Company's then outstanding indebtedness, plus any refinancings thereof in any amounts, on terms acceptable to the Company and its then lenders or sources of capital. The Company may cancel and reissue its promissory note to you to comply with any restrictions or subordination arrangements during the life of the promissory note, and you agree to execute an intercreditor agreement so providing, or if you fail to do so within ten business

Wolverine Proctor & Schwartz, Inc.

days of written request, the Company may execute such an agreement on your behalf.    In the event that the Company becomes insolvent or is the debtor in a bankruptcy case which is not dismissed, the remaining principal balance shall become immediately due and payable.

8.  In addition to the above-mentioned compensation, you will be eligible for the normal fringe benefits of the Company, including but not limited to medical benefits, 401(k), vacation, and similar benefits.    You will also receive reimbursement of business and travel  expenses incurred in connection with your employment in accordance with normal policies and procedures of the Company.

9.  You may elect to join the Company's Board of Directors at any time while you are employed by the Company.  If you do so, the Company will indemnify you in connection with your duties as a director and officer of the Company, on terms at least as favorable to you as the most favorable ones enjoyed by any other director or officer.

To indicate your acceptance of these terms, please countersign below.

Sincerely,

Deepak S. Kulkarni
President and CEO

Accepted by:

Peter A. Crawford

January 4, 2000
Date

PAC 0005

# EXHIBIT D

# WOLVERINE PROCTOR & SCHWARTZ, INC.

## Transition Agreement

THIS IS AN AGREEMENT made as of December 28, 2001 by and between Wolverine Proctor & Schwartz, Inc., a Delaware corporation (the "Company"), and Peter Crawford (the "Employee").

WHEREAS, the Company desires to obtain the services of the Employee and the Employee desires to provide such services to the Company to facilitate transitional needs arising from a change of control of the Company.

NOW, THEREFORE, in consideration of the mutual covenants contained in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which consideration are hereby acknowledged, the parties agree as follows:

1.    Services

During the Transition Period, the Employee agrees to perform such services to and for the Company as may be reasonably requested by the Chief Executive Officer of the Company or its Board of Directors to facilitate the transition of the Company's management. The Employee's commitment to the Company during the Transition Period will be full-time and shall take into account the Employee's expertise in managing and operating the Company.

2.    Term

Unless sooner terminated as provided below, the term of the Employee's engagement under this Agreement will be from the date hereof until the earlier of (i) March 31, 2002, (ii) the consummation by the Company of a working capital facility with an institutional lender, or (iii) two weeks after the date on which the Chief Executive Officer provides written notice of termination, for any reason or no reason, to the Employee (the "Transition Period").

3.    Extent of Services

During the Transition Period, the Employee will devote his best efforts to the performance of his duties under this Agreement. Under no circumstances will the Employee knowingly take any action contrary to the best interests of the Company.

4.    Compensation

4.1    Base Salary Fee. During the Transition Period, the Company will pay the Employee compensation at the rate of $150,000 per annum, which shall be payable in accordance with the Company's normal payroll practices (the "Base Salary Fee").

8698745.2

PAC 0043

4.2    Expenses.    The Company will, upon substantiation thereof, reimburse the Employee for all reasonable expenses of types authorized by the Chief Executive Officer of the Company in the ordinary course of business and incurred by the Employee in connection with the Company's business affairs.    The Employee must comply with such accounting and reporting requirements as the Company may from time to time establish in order to obtain such reimbursement.

4.3    Benefits.    During the Transition Period, the Employee shall be entitled to participate in the Company's life, disability, medical, dental and other insurance programs available to key executives on the same terms as such are available generally to other key executives of the Company.

4.4    Equity Advance.    Within three months after the expiration of the Transition Period, the Company shall pay to the Employee the amount of $150,000, subject to appropriate deductions for withholding and similar taxes.

5.    Release.

5.1    The Employee agrees, promises and covenants that he will not file, charge, claim, sue or cause to permit to be filed, charged, claimed or sued, any action for damages or other relief (including injunctive, declaratory or other equitable relief) against the Company or any of its affiliates involving any matter occurring in the past up to the date hereof.    The Employee agrees that he has not, and will not, assign any claims which he has or may have against the Company or any of its affiliates to any third party.    The preceding sentence shall not apply to any matter arising out of the performance or nonperformance of the obligations of the Company under this Agreement or the Employee's right to a bonus payment (the "Bonus Payment") provided by paragraph 4 of the Employment Letter dated January 2001, a copy of which is attached hereto as Exhibit A (the "Employment Letter").

5.2    In consideration of the covenants set forth herein, and more particularly the payments to the Employee hereunder, and other good and valuable consideration, the Employee, his agents, heirs, legatees, successors and assigns (collectively hereinafter the "Employee-Releasors"), hereby irrevocably and unconditionally releases, remises, and forever discharges the Company, Deepak Kulkarni, their respective affiliates, any entity owned or controlled by the Company or Deepak Kulkarni, their officers or directors and their respective present and former directors, officers, employees, agents, attorneys, subsidiaries, successors, insurance carriers and assigns, and each of them (collectively hereinafter the "Company-Releasees"), of and from any and all actions, causes of action, suits, debts, charges, complaints, claims, liabilities, obligations, injuries, promises, agreements, controversies, damages, and expenses (including attorneys' fees and costs actually incurred), of any form whatsoever, whether known or unknown, foreseen or unforeseen, anticipated or unanticipated, suspected or unsuspected, manifest or latent, intentional or negligent (collectively, "Claims") which the Employee or the Employee's successors in interest now own or hold, have at any time heretofore owned or held or may at any time own or hold by reason of any matter or thing based upon, relating to or arising out of the Employee's employment relationship with the Company or any of its affiliates or the termination of that relationship, including but not limited to, claims arising out of any right to an equity interest in the Company (including, without limitation, under

8698745.2

-2-

= PAC 0044

that certain letter agreement between the Employee and the Company dated January 4, 2000 or that certain letter agreement between the Employee and the Company dated December 4, 2001), expressly excluding any rights to the Bonus Payment, or claims arising under the Age Discrimination in Employment Act of 1967, Title VII of the civil Rights Act of 1963 and any other federal, state or local laws prohibiting age, sex, disability or any other forms of discrimination, which existed or may have existed prior to or contemporaneously with the execution of this Agreement. Notwithstanding the foregoing, this Section 5.2 shall not release the Company from any obligation set forth in this Agreement or in the Settlement Agreement of even date herewith between the Employee and Deepak Kulkarni.

   6.      Confidentiality of Agreement. The parties agree that all information relating in any way to the terms of and amounts payable under this Agreement shall be held confidential by the parties and shall not be publicized or disclosed to any person (other than an immediate family member (including, without limitation, any spouse, parent, child, and/or sibling), physician, psychologist, legal counsel or financial advisor, provided that any such individual to whom disclosure is made agrees to be bound by these confidentiality obligations), business entity or government agency, except as mandated by state or federal law, upon lawful subpoena by a court or agency of competent jurisdiction or pursuant to the mutual consent of the parties. If such subpoena is received by any party to this Agreement, a copy thereof shall be promptly provided to all other parties.

   7.   Notices

   All notices under this Agreement must be in writing and must be delivered by hand or mailed by certified or registered mail, postage prepaid, return receipt requested, to the parties as follows:

| | |
|---|---|
| If to the Company: | Wolverine Proctor & Schwartz, Inc.<br>51 E. Main Street<br>Merrimac, MA 01850<br>Attention: Chief Executive Officer |
| with a copy to: | Deepak Kulkarni<br>124 Commonwealth Ave.<br>Boston, MA 02116 |
| If to the Employee: | To the address set forth below the signature of the Employee; |

or to such other address as is specified in a notice complying with this Section 8. Any such notice is deemed given on the date delivered by hand or three days after the date of mailing.

8698745.2

-3-

8.     Miscellaneous

8.1     Modification.  This Agreement constitutes the entire Agreement between the parties with regard to the subject matter hereof, superseding all prior understandings and agreements, whether written or oral.  This Agreement may not be amended or revised except by a writing signed by the parties.

8.2     Successors and Assigns.  This Agreement is binding upon and inures to the benefit of both parties and their respective successors and assigns, including any corporation with which or into which the Company may be merged or which may succeed to its assets or business, although the obligations of the Employee are personal and may be performed only by him.

8.3     Severability.  The provisions of this Agreement are severable, and invalidity of any provision does not affect the validity of any other provision.  In the event that any court of competent jurisdiction determines that any provision of this Agreement or the application thereof is unenforceable because of its duration or scope, the parties agree that the court in making such determination will have the power to reduce the duration and scope of such provision to the extent necessary to make it enforceable, and that the Agreement in its reduced form is valid and enforceable to the full extent permitted by law.

8.4     Governing Law.  This Agreement is to be construed under and governed by the laws of The Commonwealth of Massachusetts.

8698745.2

PAC 0046

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date and year first above written.

WOLVERINE PROCTOR & SCHWARTZ, INC.

By: _____

Name:

Title: Chairman

_____

Peter Crawford

Address:       23 New Castle Drive #11
               Nashua, New Hampshire 03060

8698745.2

-5-

PAC 0047

# EXHIBIT E

# PETER A. CRAWFORD
## 23 Newcastle Dr. #11
## Nashua, NH 03060
## (603) 888-4574
### petercra@ix.netcom.com

December 2, 2004

Mr. Steven F. Chilinski
Chief Executive Officer
Wolverine, Proctor & Schwartz, Inc.
51 East Main St.
Merrimac, MA  01860

By certified mail, return receipt requested

Dear Mr. Chilinski:

I am writing to you regarding the bonus payment which is due to me under the terms of the letter agreement dated January 4, 2000 (the "Agreement"), pursuant to which I served as Chief Operating Officer of Wolverine, Proctor & Schwartz, Inc. (the "Company") between December 30, 1999 and January 14, 2002.  Inasmuch as the Company's capital had been seriously eroded by actions occurring prior to my tenure, and I continue to hold a financial interest in the Company, I benefited from rebuilding of the Company's working capital and thus have deferred my request for payment.  However, certain deadlines are now approaching which require me to pursue this payment, or potentially waive certain rights to it.  I hope that my forbearance has benefited the company and that it is now in a position to pay these funds to me.

While the fact of a bonus being due is a matter governed by the Agreement, it was also well earned.  From the fourth quarter of 2000 through the third quarter of 2001, the Company's EBITDA was approximately $4 million, to which approximately $2 million in shareholder payments should be added to reflect operating results over which I had control.  This represents strong operating performance for a company with approximately $40 million in annual revenues, and should be compared to a loss, from an operating EBITDA standpoint, of approximately $1.5 million (before subtracting shareholder payments) in 1999, the year before I joined.  Reserve adjustments for 1999 made the results even worse:  an EBITDA loss of $4.7 million.  The dramatic turnaround was accomplished in the face of a severe working capital shortage and, as accepted by most employees, could not have been accomplished without my leadership, the shareholder being largely absent and not involved in day-to-day operations, particularly during the critical summer of 2000.  Without this leadership, the company would likely not have survived, destroying the approximately $20 million in value ultimately demonstrated by the 2001 recapitalization.

PAC 0023

The results for the calendar year 2001 (before the extraordinary gain) would have reflected this improved operating performance, were it not for the shutdown of Cardwell, an operation with which I had substantially no involvement. This resulted in the drawing down of a $1.5 million letter of credit (issued by the Company) guaranteeing the Cardwell debt, and the writeoff of this and other Cardwell receivables by the Company. This was partially responsible for poor performance during the fourth quarter of 2001 which reduced full year results. In addition, the relationship between the shareholder and the Company's lender deteriorated, in part as it was forced to pay $1.5 million against the Cardwell LC, leading to a working capital squeeze and inability to make shipments in the fourth quarter of 2001. Furthermore, no bonus was paid for 2000, as it took one or two quarters after I joined to turn the results around, and these early quarters detracted from the results for the entire year.

According to the Agreement, a copy of which is attached hereto, I was to receive the full bonus for any year in which I was employed by the Company on December 31, which was in fact the case for 2001. This bonus is to be calculated as follows:

$$BONUS = (EBITDA - CAPX - INT - TAXES) \times .05$$

$$Where\ TAXES = (EBITDA + BOOKDIF - DEPR - INT) \times TAXRATE$$

The capitalized terms are further defined in the Agreement. While certain amounts, such as adjustments to reserves and the BOOKDIF adjustment to the taxes calculation are not calculable with precision from the audited financial statements, the following summarizes my calculation of the BONUS in accordance with the terms of the Agreement. All terms in which every letter is capitalized have the same meaning as in the Agreement and the page numbers refer to the audited financial statements.

(Figures in $000s for 2001)

| | |
|---|---:|
| Loss before interest, taxes, depreciation, amortization and extraordinary gain (p. 3) | (486) |
| Plus: Extraordinary gain (p. 3) | 10,170 |
| EBITDA | 9,684 |
| Less: CAPX (p. 5) | (412) |
| Less: INT (net of income of 82) (p. 3) | (2,070) |
| Less: TAXES | (44) |
| Equals: base for bonus calculation | 7,158 |
| Times .05 equals BONUS due under written agreement | 358 |

PAC 0024

I reserve the right to amend this calculation to reflect a higher or lower base amount for the bonus calculation in the event that I receive subsequent information that reflects a different amount. I have used the amount stated in the audited financial statements for TAXES, rather than the formula in the Agreement, as the difference is due to BOOKDIF. However, even if one were to assume that BOOKDIF is zero, the TAXES would be calculated as follows:

(Figures in $000s for 2001)

| | |
|---|---|
| Maximum federal personal tax rate for 2001 | 39.10% |
| Maximum Massachusetts tax rate for 2001 | 5.60% |
| Federal benefit on Massachusetts taxes | (2.19%) |
| FICA Medicare portion (applicable at all income levels) | 1.45% |
| TAXRATE | 43.96% |
| EBITDA (from prior page) | 9,684 |
| Less: INT | (2,070) |
| Less: Depreciation (DEPR together with line below) (p. 3) | (1,268) |
| Less: Amortization (p. 3) | (1,462) |
| Taxable income for calculation | 4,884 |
| Times .4396 equals TAXES | 2,147 |

Even if one were to apply the above calculation of TAXES the base for the bonus calculation would be 7,158 − (2,147 − 44) = 5,055, and the BONUS $253,000. However, I believe that utilizing the actual TAXES figure for 2001 is correct, and the BONUS due under the written agreement is thus approximately $358,000. Furthermore, Mr. Kulkarni and I entered into an oral agreement, by which the bonus amount was increased to 8%, making the bonus due approximately $573,000.

I entered into a Transition Agreement and Settlement Agreement dated December 28, 2001. Under the terms of the Settlement Agreement, paragraph 5.2, the Bonus Payment was specifically excluded from the amounts due to me that were being settled by that Agreement. Mr. Kulkarni and I had specifically discussed the fact that the Company's 2001 EBITDA would be increased by the transaction of December, 2001, and it is in light of that understanding and knowledge that we entered into the Transition and Settlement Agreements. I would not have accepted a substitute financial interest in the Company of less than that which I was entitled to under the Option provided in the Agreement, as

amended, while also agreeing to forego the BONUS. Furthermore, the extraordinary gain is due to the Company's lender accepting less than book value for the repayment of the Company's debt and is neither a non-operating adjustment to reserves, interest, taxes, or capital expenditures, which would cause the amount to be excluded from the calculation of BONUS under the terms of the Agreement. The BONUS is thus due.

In addition, reviewing the Transition Agreement, paragraph 2, I note that that Agreement was to remain in force until March 31, 2002, and I was to be paid through that date unless two weeks written notice of termination by the Chief Executive Officer was provided. No such written notice by the Chief Executive Officer was provided; I am thus due wages for February and March 2002, an additional amount of approximately $25,000.

If you would like to discuss this matter further, please call me at (603)888-4574. While I hope that we may proceed in the spirit of cooperation, certain deadlines are fast approaching and I unfortunately feel compelled to mention that, in the absence of a positive response from you by December 9, 2004, I shall be forced to commence the statutory notification process with the Massachusetts Attorney General under M.G.L. c. 149 §150, and, if the BONUS and other wages of $598,000 are not paid by December 17, 2004, I may proceed on my own behalf without further notice or demand. I make these statements with some reluctance, as I know that you personally may not have been aware of the terms of the agreements entered into prior to your tenure, and I certainly hope that we are able to proceed in a professional and non-adversarial manner.

I look forward to talking with you.

Sincerely,

Peter A. Crawford

Enclosures: January 4, 2000 Agreement
            December 28, 2001 Transition and Settlement Agreements
            Pages 3 and 5 of Wolverine, Proctor & Schwartz, Inc. consolidated audited
            financial statements for 2001

# EXHIBIT F

# EPSTEIN BECKER & GREEN, P.C.

ATTORNEYS AT LAW

111 HUNTINGTON AVENUE
26TH FLOOR
BOSTON, MA 02199-7610
617.342.4000
FAX: 617.342.4001
EBGLAW.COM

December 8, 2004

*Via Overnight Mail*

Peter A. Crawford
23 Newcastle Drive, #11
Nashua, NH 03060

     Re:    Your Correspondence of December 2, 2004

Dear Mr. Crawford:

    We represent Wolverine, Procter and Schwartz, Inc. (the "Company.") Your December 2, 2004 letter to CEO Stephen F. Chilinski has been forwarded to us for reply.

    The Company does not believe that it owes you a bonus for 2001 and disagrees with the various calculations set forth in your letter.

    You will recall that your January 4, 2000 agreement calls for any clarification of the bonus calculation to be submitted to Arthur Andersen, or the firm nominated to prepare the individual tax returns of Mr. Kulkarni. As you know, such firm shall be the "binding arbiter" of the bonus. Accordingly, we will submit a copy of your January 4, 2000 agreement and the Company's 2001 financials to the firm of Vitale Caturano & Co., Ltd.

    Responding to the other assertions in your letter, the Company denies that Mr. Kulkarni made a verbal agreement to increase the bonus amount to 8%, or that he made any other representations or misrepresentations that would affect the bonus calculation. Finally, with regard to February and March 2002, you did not perform services for the Company during that time which would entitle you to additional compensation. You were given effective notice by the Company at the time your employment ended.

**PAC 0055**

ATLANTA • BOSTON • CHICAGO • DALLAS • HOUSTON • LOS ANGELES
NEWARK • NEW YORK • SAN FRANCISCO • STAMFORD • WASHINGTON, D.C.

EPSTEIN BECKER GREEN WICKLIFF & HALL, P.C. IN TEXAS ONLY

Peter A. Crawford
December 8, 2004
Page 2

The Company reserves all of its rights and defenses. Please direct any further communications regarding this matter to me.

Very truly yours,

Daniel J. Blake

PAC 0056

# EXHIBIT G

ANDERSEN

**WOLVERINE PROCTOR LLC**

Consolidated Financial Statements
as of December 31, 2001
Together with Auditors' Report

PAC 0027

**ANDERSEN**

### Report of Independent Public Accountants

To the Board of Directors of
Wolverine Proctor LLC:

We have audited the accompanying consolidated balance sheet of Wolverine Proctor LLC (a Delaware limited liability company) and subsidiaries as of December 31, 2001 and the related consolidated statements of operations and comprehensive income, members' equity and cash flows for the year then ended. These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audit.

We conducted our audit in accordance with auditing standards generally accepted in the United States. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Wolverine Proctor LLC and subsidiaries as of December 31, 2001, and the results of their operations and their cash flows for the year then ended, in conformity with accounting principles generally accepted in the United States.

*Arthur Andersen LLP*

Boston, Massachusetts
March 26, 2002

1
31908.doc

PAC 0028

WOLVERINE PROCTOR LLC
Consolidated Balance Sheet
December 31, 2001

| | 2001 |
|---|---|
| **ASSETS** | |
| | |
| Current Assets: | |
| Cash and cash equivalents | $ 1,432,726 |
| Accounts receivable, net of allowance for doubtful accounts of $556,228 | 3,284,040 |
| Costs and estimated earnings in excess of billings on uncompleted contracts | 2,833,523 |
| Inventories | 1,658,431 |
| Prepaid expenses and other | 416,968 |
| | |
| Total current assets | 9,625,688 |
| | |
| Property and Equipment, at cost, less accumulated depreciation | 5,598,811 |
| | |
| Goodwill, net | 10,340,099 |
| | |
| | $ 25,564,598 |
| | |
| **LIABILITIES AND MEMBERS' EQUITY** | |
| | |
| Current Liabilities: | |
| Accounts payable | $ 5,549,697 |
| Billings in excess of costs and estimated earnings on uncompleted contracts | 55,969 |
| Accrued expenses and other | 6,024,705 |
| Customer deposits | 4,163,814 |
| | |
| Total current liabilities | 15,794,185 |
| | |
| Other Long-term Liabilities | 5,708,951 |
| | |
| Total liabilities | 21,503,136 |
| | |
| Members' Equity: | |
| Class A Units, $0.01 par value | |
| Authorized—1,000 shares | |
| Issued and outstanding—1,000 shares | 10 |
| Class B Units, $0.01 par value | |
| Authorized—1,000 shares | |
| Issued and outstanding—1,000 shares | 10 |
| Additional paid-in capital | 13,139,058 |
| Accumulated other comprehensive loss | (908,581) |
| Retained deficit | (8,169,035) |
| | |
| Total members' equity | 4,061,462 |
| | |
| | $ 25,564,598 |

*The accompanying notes are an integral part of these consolidated financial statements.*

2
31908.doc

PAC 0029

Consolidated Statement of Operations and Comprehensive Income
for the Year Ended December 31, 2001

|  | 2001 |
|---|---|
| Sales | $ 34,357,906 |
| Cost of Sales | (23,030,351) |
| Gross profit, excluding depreciation expense | 11,327,555 |
| Selling, General and Administrative Expenses | (11,895,187) |
| Interest and Other Income | 81,516 |
| Loss before interest expense, taxes, depreciation and amortization and extraordinary gain | (486,116) |
| Other Expenses: | |
| Interest expense | (2,152,470) |
| Depreciation | (1,267,769) |
| Amortization | (1,461,939) |
| Minority interest expense | (61,814) |
| Loss before provision for income taxes and extraordinary gain | (5,430,108) |
| Provision for Income Taxes | (43,894) |
| Loss before extraordinary gain | (5,474,002) |
| Extraordinary Gain | 10,169,839 |
| Net income | 4,695,837 |
| Other Comprehensive Income, net of tax: | |
| Minimum pension liability expense | (1,150,406) |
| Foreign currency translation adjustments | 21,593 |
| Comprehensive income | $ 3,567,024 |

*The accompanying notes are an integral part of these consolidated financial statements.*

**PAC** 0030

3
31908.doc

**WOLVERINE PROCTOR LLC**

Consolidated Statement of Members' Equity
for the Year Ended December 31, 2001

| | Number of Shares/Units | Par Value | Additional Paid-In Capital | Put Warrants | Retained Deficit | Accumulated Other Comprehensive Loss | Total |
|---|---|---|---|---|---|---|---|
| Balance, December 31, 2000 | 655 | $ 7 | $ 1,493 | $ 183,195 | $ (12,864,872) | $ 220,232 | $ (12,459,945) |
| Net Income | - | - | - | - | 4,695,837 | - | 4,695,837 |
| Minimum pension liability | - | - | - | - | - | (1,150,406) | (1,150,406) |
| Retirement of warrants | - | - | 183,195 | (183,195) | - | - | - |
| Redemption of common stock | (655) | (7) | (1,493) | - | - | - | (1,500) |
| Issuance of LLC Units—Class A | 1,000 | 10 | 290,892 | - | - | - | 290,902 |
| Issuance of LLC Units—Class B | 1,000 | 10 | 13,999,990 | - | - | - | 14,000,000 |
| Recapitalization transaction costs | - | - | (1,335,019) | - | - | - | (1,335,019) |
| Effect of cumulative translation adjustment | - | - | - | - | - | 21,593 | 21,593 |
| Balance, December 31, 2001 | 2,000 | $ 20 | $ 13,139,058 | $ - | $ (8,169,035) | $ (908,581) | $ 4,061,462 |

*The accompanying notes are an integral part of these consolidated financial statements.*

PAC 0031

4

WOLVERINE PROTON LLC

Consolidated Statement of Cash Flows
for the Year Ended December 31, 2001

|  | 2001 |
|---|---|
| **Cash Flows from Operating Activities:** |  |
| Net income | $   4,695,837 |
| Adjustments to reconcile net income to net cash used in operating activities, net of acquisitions– |  |
| Depreciation and amortization | 2,729,708 |
| Extraordinary gain | (10,169,839) |
| Interest income—Friel | (81,516) |
| Minority interest | 61,814 |
| Changes in assets and liabilities– |  |
| Accounts receivable | 2,130,735 |
| Costs and estimated earnings in excess of billings on uncompleted contracts | 82,466 |
| Inventories | 1,718,902 |
| Prepaid expenses and other | 932,081 |
| Accounts payable | (1,734,074) |
| Billings in excess of costs and estimated earnings on uncompleted contracts | (1,992,877) |
| Accrued expenses and other | (373,145) |
| Customer deposits | 752,165 |
| Net cash used in by operating activities | (1,247,743) |
| **Cash Flows from Investing Activities:** |  |
| Purchases of property and equipment | (411,750) |
| Net cash used in investing activities | (411,750) |
| **Cash Flows from financing Activities:** |  |
| Issuance of Class B units | 14,000,000 |
| Payment of long-term debt during the year | (12,000,000) |
| Recapitalization transactions costs | (1,335,019) |
| Proceeds from revolving loan payable | 2,151,314 |
| Net cash provided by financing activities | 2,816,295 |
| Effect of Exchange Rates on Cash and Cash Equivalents | 21,593 |
| Net Increase in Cash and Cash Equivalents | 1,178,395 |
| Cash and Cash Equivalents, beginning of year | 254,331 |
| Cash and Cash Equivalents, end of year | $   1,432,726 |
| **Supplemental Disclosure of Cash Flow Information:** |  |
| Cash paid during the period for– |  |
| Interest | $   1,503,054 |
| **Supplemental Disclosure of Noncash Information:** |  |
| Minimum pension liability | $   1,150,406 |
| Issuance of Class A units | $   290,902 |
| Retirement of warrants | $   183,195 |

*The accompanying notes are an integral part of these consolidated financial statements.*

PAC 0032

WOLVERINE PROCTOR LLC

Notes to Consolidated Financial Statements

December 31, 2001

(1)    **THE COMPANY**

Wolverine Proctor LLC (the Company) was formed on December 28, 2001 for the purpose of holding the securities of Wolverine Proctor, Inc. (WPI), a Delaware corporation, and its Subsidiaries. The purpose of WPI is to hold the securities of all of the operating entities of the Company. These operating entities include Wolverine Proctor & Schwartz, Inc. (WP&S), Friel Engineering Limited (Friel) and Mawlaw 492 Ltd. (Mawlaw).

WP&S designs and manufactures thermal processing and converting equipment use for a variety of industry applications. WP&S was formed from the 1994 acquisition of Proctor & Schwartz by Wolverine (Massachusetts) Corporation and their subsequent merger. The Company has manufacturing operations located in Merrimac, Massachusetts' Lexington, North Carolina; Fitchburg, Massachusetts and Glasgow, Scotland.

(2)    **RECAPITALIZATION**

Pursuant to a recapitalization plan, on December 31, 2001, an investor group assigned a series of promissory notes (Notes) to the Company amounting to $14 million in exchange for 1,000 Class B member units. The Notes had been issued by WP&S to the investor group to fund the retirement of WP&S bank debt on December 28, 2001 and provide funds for working capital. As a result of the debt retirement, the Company has recognized an extraordinary gain of $10,169,839 in the consolidated statement of operations.

On or about December 31, 2001, a sole shareholder contributed 100% of the outstanding shares of WP&S, Mawlaw and Friel in exchange for 1,000 Class A member units.

Costs associated with the recapitalization amounting to $1,335,019 were netted against the equity proceeds.

The accompanying consolidated statement of operations for the year ended December 31, 2001 include the operating results of Mawlaw and the 51% of Friel Engineering Limited not previously owned by the Company from the date of their contribution to the Company. The assets and liabilities of Mawlaw and Friel are reflected in the accompanying balance sheet as of December 31, 2001 at their historical cost basis.

(3)    **SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES**

The accompanying consolidated financial statements include the accounts of the Company and its divisions. All material intercompany transactions have been eliminated in consolidation. Other significant accounting policies are described below and elsewhere in the footnotes.

(a)    **Use of Estimates**

The preparation of financial statements requires management to make estimates and assumptions that affect the reported amounts of assets and

6

31908.doc

Notes to Consolidated Financial Statements
December 31, 2001

liabilities and disclosure of contingent assets and liabilities as of the date of the financial statements and the reported amounts of revenues and expenses during the reporting periods. Actual results could differ from those estimates.

(b)     **Cash and Cash Equivalents**

Cash and cash equivalents consist primarily of overnight cash investments, which are swept daily by the Company's bank. The Company values these temporary cash investments at cost, which approximates market.

(c)     **Inventories**

Inventories at December 31, 2001 consisted of the following:

|  | | 2001 |
|---|---|---|
| Raw material | $ | 876,478 |
| Work-in-process | | 777,690 |
| Finished goods | | 4,263 |
|  | $ | 1,658,431 |

Raw materials, work-in-process and finished goods inventories are stated at the lower of cost (first-in, first-out method) or market. Raw materials inventory consists of sheet steel, piping, wire, fasteners and other items used in the manufacturing process. Work-in-process inventory represents materials released into production and labor and overhead applied on a job-order cost basis. Finished goods inventory includes goods awaiting shipment to fulfill open sales orders and component parts available for sale to customers for repairs or modifications to existing equipment.

(d)     **Property and Equipment**

Property and equipment are recorded at cost. Additions and improvements are capitalized, and ordinary repairs and maintenance are charged to expense as incurred.

The Company provides for depreciation on property and equipment on the straight-line basis over their estimated useful lives, ranging from three to 50 years.

(e)     **Goodwill**

The unallocated excess of purchase cost over net assets acquired in acquisitions has been amortized on the straight-line basis over 10 years. Accumulated amortization of goodwill at December 31, 2001 amounted to $8,065,901. The Company regularly assesses the realizability of goodwill in accordance with Statement of Financial Accounting Standards (SFAS) No. 121, *Accounting for the Impairment of Long-Lived Assets and for Long-Lived Assets to Be Disposed Of*, and has concluded that no impairment has occurred.

7

31908.doc

PAC 0034

**(f)**    **Income Taxes**

The Company (prior to the Recapitalization) has elected to be treated as a small business corporation (a Subchapter S corporation) under the Internal Revenue Code and state tax law. Accordingly, no provision for federal income taxes is reflected in the Company's accompanying consolidated financial statements, since the stockholder, not the Company, is liable for federal income taxes on corporate income. The Company's WP&S branch is subject to corporate income taxes in the United Kingdom.

As a result of the Recapitalization, the Company's Subchapter S corporation status has been revoked. Beginning January 1, 2002, the Company will be subject to Subchapter C corporation federal and state income tax requirements.

The Company records income taxes in accordance with SFAS No. 109, *Accounting for Income Taxes.* Under SFAS No. 109, deferred tax assets and liabilities are recognized for the expected future tax consequences of events that have been included in the consolidated financial statements or tax returns. The amount of deferred tax assets and liabilities is based on the differences between the financial statement and tax bases of assets and liabilities using currently enacted tax rates.

**(g)**    **Revenue Recognition**

Revenue from sales contracts for machinery is recognized under the percentage-of-completion method, measured by the percentage ratio of either costs incurred to date to the estimated total costs of the contract or labor hours incurred to date to the estimated total labor hours of the contract. When an ultimate loss is indicated on a contract, the entire estimated loss is recorded. Revenue from sales of machine parts and repair services is recognized when the parts are shipped or the services are rendered. The Company provides for a reserve for its estimate of warranty costs at the time of shipment.

**(h)**    **Comprehensive Income**

The Company follows SFAS No. 130, *Reporting Comprehensive Income,* which established standards for the reporting and display of comprehensive income and other comprehensive income items. In general, comprehensive income combines net income and other changes in equity from nonowner sources during the year. At year-end, the balance of accumulated other comprehensive income represents the Company's cumulative translation adjustment and the minimum pension liability.

**(i)**    **Foreign Currency Translation**

Assets and liabilities of the Company's foreign subsidiaries are translated using the exchange rate in effect at the balance sheet date. Revenue and expense accounts are translated using a weighted average of exchange rates in effect during the period cumulative translation gains and losses are shown in the accompanying consolidated balance sheet as a separate component of

**8**
31908.doc

Notes to Consolidated Financial Statements
December 31, 2001

members' equity.  Exchange gains and losses arising from transactions denominated in foreign currencies are included in current operations.

(j)   **New Accounting Standards**

In June 2001, the Financial Accounting Standards Board (FASB) issued SFAS No. 141, *Business Combinations*. SFAS No. 141 addresses changes in the financial accounting and reporting for business combinations and supersedes Accounting Principles Board (APB) Opinion No. 16, *Business Combinations*, and SFAS No. 38, *Accounting for Pre-acquisition Contingencies of Purchased Enterprises*. Effective July 1, 2001, all business combinations should be accounted for using only the purchase method of accounting. The adoption of this statement did not have a material effect on its financial position, results of operations of cash flows.

In June 2001, the FASB issued SFAS No. 142, *Goodwill and Other Intangible Assets*, which requires use of a nonamortization approach to account for purchased goodwill and certain intangibles, effective January 1, 2002. Under the nonamortization approach, goodwill and certain intangibles will not be amortized into the results of operations, but instead will be reviewed for impairment and written down and charged to results of operations only in the periods in which the recorded value of goodwill and certain intangibles is more than its fair value. Management is currently evaluating the impact that this statement will have on the Company's financial statements.

In October 2001, the FASB issued SFAS No. 144, *Accounting for the Impairment of Disposal of Long-Lived Assets*, which replaces SFAS No. 121. This statement addresses financial accounting and reporting for the impairment or disposal of long-lived assets. Under SFAS No. 144, asset write-downs from discontinuing a business segment will be treated the same as other assets held for sale. The new standard also broadens the financial statement presentation of discontinued operations to include the disposal of an asset group (rather than a segment of a business). SFAS No. 144 is effective beginning January 1, 2002 and, generally is to be applied prospectively. Management is currently evaluating the impact that this statement will have on the Company's financial statements.

(k)   **Disclosures about the Fair Value of Financial Instruments**

As of December 31, 2001, the Company's financial instruments, which consist of cash equivalents and accounts receivable, are carried at amounts that approximate fair value, due to their short-term maturity.

(4)   **PARTNERSHIP AGREEMENT**

(a)   **Advisory Agreement**

On December 28, 2001, WPI entered into a five-year advisory agreement with its investor group.  The agreement requires the investor group to render advisory services to the Company in return for an annual fee of $500,000, payable in quarterly installments.

9

31908.doc

PAC 0036

Notes to Consolidated Financial Statements
December 31, 2001

(b)    **Distributions**

The distributions to the LLC partners will be allocated based upon the specific provisions of the LLC agreement up to a total amount of distributions of approximately $68 million.

Thereafter, 40% of any distribution will be made to the holders of Class A units and 60% of any distributions will be made to the holders of Class B units.

Notwithstanding the foregoing, the proceeds distributed after the occurrence of a liquidation event shall be distributed solely to the holders of Class B units until the holders of Class B units have received $14,000,000 in the aggregate pursuant to the agreement.

(5)    **PUT OPTION**

The Company has issued a put option to its minority shareholder to put the Class A units back to the Company at any time after December 31, 2006. The Class A units will be repurchased at the fair market value thereof, determined with no discount for the fact that Class A units may represent a minority interest or that the Class B units may represent a controlling interest.

(6)    **CONTRACTS**

Costs, estimated earnings and related billings on uncompleted contracts at December 31, 2001 are as follows:

| | | |
|---|---|---:|
| Cost incurred to date | $ | 6,257,533 |
| Estimated earnings | | 1,725,507 |
| | | 7,983,040 |
| Less—Billings to date | | 5,205,486 |
| | $ | 2,777,554 |

Included in the accompanying consolidated balance sheet are the following at December 31, 2001:

| | | |
|---|---|---:|
| Costs and estimated earnings in excess of billings on uncompleted contracts | $ | 2,833,523 |
| Billings in excess of costs and estimated earnings on uncompleted contracts | | (55,969) |
| | $ | 2,777,554 |

(7)    **INCOME TAXES**

The Company's state income tax provision consists of corporate-level state income taxes that are levied against the Company as a Subchapter S corporation. As a

**10**

31908.doc

**PAC 0037**

Notes to Consolidated Financial Statements
December 31, 2001

result of the recapitalization, the Company's Subchapter S corporation status has been revoked. Beginning January 1, 2002 the Company will be subject to Subchapter C corporation federal and state income tax requirements.

Deferred income taxes are based on differences between financial reporting and income tax bases due to purchase accounting. These differences result from using accelerated depreciation methods on property and equipment for income tax reporting purposes, and from recognizing certain expenses for financial reporting purposes in advance of income tax reporting recognition.

(8)    **PROPERTY AND EQUIPMENT**

Property and equipment consists of the following at December 31, 2001:

|  | Useful Life |  |
|---|---|---|
| Buildings and improvements | 31–50 years | $ 4,093,651 |
| Office equipment and motor vehicles | 3–10 years | 2,105,380 |
| Machinery and equipment | 7–10 years | 6,357,603 |
| Laboratory and computer equipment | 7–10 years | 3,142,058 |
| Leasehold interest | Life of lease | 170,300 |
|  |  | 15,868,992 |
| Less—Accumulated depreciation |  | 11,618,538 |
|  |  | 4,250,454 |
| Land |  | 1,348,357 |
|  |  | $ 5,598,811 |

(9)    **LONG-TERM OBLIGATIONS**

WP&S had a loan and security agreement with a bank throughout the majority of 2001. The Company had outstanding debt with a bank amounting to $20,967,514 as well as accrued interest of $702,325 as of December 28, 2001. As a part of the recapitalization, the Company extinguished the debt with the bank by settling all facilities for $11,500,000. This has resulted in an extraordinary gain of $10,169,839, which is reflected in the consolidated statement of operations as of December 31, 2001.

(10)    **EMPLOYEE BENEFIT PLANS**

The Company has 401(k) contribution plans, covering substantially all of their employees, in which participants may invest up to 6% of their gross compensation. Under the terms of the plans, the Company provides a 60% matching contribution and pays all fees and expenses related to the plans. During 2001 the contribution to the plans, including fees and expenses, totaled $166,682.

11
31908.doc

PAC 0038

Notes to Consolidated Financial Statements
December 31, 2001

The Company also has a noncontributory, collectively bargained, multi-employer defined benefit pension plan covering substantially all nonmanagement employees at a manufacturing facility in Fitchburg, Massachusetts. The Company contributed $30,269 in 2001. The pension fund has advised the Company that there were no unfunded vested benefits for withdrawal liability purposes during the plan year ended December 31, 2001.

WP&S maintains a noncontributory defined benefit pension plan covering certain qualified salaried and hourly employees, previously employed by Proctor & Schwartz. All Plan benefits were frozen as of December 31, 1997. WP&S's policy is to fund amounts as are necessary, on the actuarial basis, to provide assets sufficient to meet the benefits to be paid to plan members in accordance with the requirements of the Employee Retirement Income Security Act of 1974. Pension income related to this plan was $121,343 in 2001. Unrecognized prior-service costs are being amortized over 15 years.

The following table sets forth the reconciliation of the plan's funded status as of December 31, 2001:

|  | Pension | Life and Medical |
| --- | --- | --- |
| Benefit cost | $ (121,343) | $ 16,682 |
| Employer contribution | $ - | $ 186,108 |
| Benefits paid | $ (1,463,956) | $ (186,108) |
| Benefit obligation at December 31 | $ (14,135,360) | $ (2,536,324) |
| Fair value of plan assets at December 31 | 12,820,574 | - |
| Funded status | $ (1,314,786) | $ (2,536,324) |
| Accrued benefit cost recorded in the statement of financial position | $ (1,314,786) | $ (4,394,165) |
| Weighted average assumptions as of December 31, 2001— | | |
| Discount rate | 7.50% | 7.50% |
| Expected return on plan assets | 9.00% | N/A |
| Rate of compensation increase | N/A | N/A |

All benefit costs above are shown net of any plan participant contributions. Included in the pension accrued benefit cost above is $1,150,406 of minimum pension liability, which was included as a 2001 charge to comprehensive income.

During 1998, the Company changed the method of coverage from self-insured to managed care programs for the majority of their retirees. This change results in a reduction of the plan's liabilities of approximately $898,000 that is currently being amortized over 12 years.

WP&S's postretirement health care plans currently are not funded. Under the terms of the plan, retirees will pay up to 50% of the premiums, but all currently employed

**12**
31908.doc

WOLVERINE PROCTOR LLC

Case 1:05-cv-10078-DPW   Document 24-3   Filed 11/04/2005   Page 60 of 62
Notes to Consolidated Financial Statements
December 31, 2001

personnel will pay 100% of their premiums upon retirement. The expenses included in the consolidated statement of operations and comprehensive income relating to the postretirement plan amounted to $65,638 in 2001.

The assumed health care cost trend rates used in measuring the accumulated postretirement benefit obligations as of December 31, 2001 were 9.0% for pre-65 coverage and 7.0% for post-65 coverage, decreasing linearly each successive year until it reaches 5.0% in the year 2009 for pre-65 coverage and 2005 for post 65 coverage, after which it remains constant. A 1% increase or (decrease) in the assumed health care cost trend rate for each year would change the accumulated postretirement benefit obligations as of December 31, 2001 by approximately $148,144 and $(133,341), respectively. The assumed discount rate used in determining the accumulated postretirement benefit obligation was 7.50%.

(11)   **RELATED PARTY TRANSACTIONS**

(a)   **Management Agreement**

The Company's subsidiaries had a management agreement (the Agreement) with DSK Management Corporation (the Management Company), a company owned by the previous sole stockholder of the Company. The Management Company has forgiven the amount owed each year under the Agreement for all periods through December 28, 2001. In conjunction with the recapitalization, the management agreement was cancelled.

In addition, management fees of approximately $342,000 payable to the sole previous stockholder of the Company were charged to expense of Friel in 2001. Approximately $53,400 is included in the amount payable described in Note 11(c) below.

(b)   **Cardwell Write-Off**

The Company had issued an irrevocable standby letter of credit of $1,500,000 to support certain obligations of The Cardwell Machine Company (Cardwell), a wholly owned company of the previous sole stockholder. During 2001, Wolverine was required to repay the letter of credit, and subsequently wrote off the related receivable from Cardwell.

(c)   **Accrued Expenses**

Included in accrued expenses at December 31, 2001 is approximately $787,325 payable to the previous sole stockholder of the Company.

(d)   **Consulting Agreement**

As of December 28, 2001, WP&S has entered into a consulting agreement with the Class A unitholder. The agreement calls for the unitholder to provide advice and consulting services to the Company in return for an annual salary of $500,000 and a potential performance bonus.

13
31908.doc

PAC 0040

Notes to Consolidated Financial Statements
December 31, 2001

    (e)    **Severance Agreement**

        WP&S and a former executive officer of the Company agreed to a $150,000 termination and separation payment effective December 28, 2001.

(12)   **PUT WARRANTS**

    In connection with a prior revolving credit agreement, WP&S issued a warrant to a bank to purchase 7.5% of the prior outstanding common stock of WP&S.

    Also, in connection with the acquisition of Proctor & Schwartz as of September 23, 1994, WP&S additionally issued warrants to purchase 15% of the prior outstanding common stock of WP&S.

    During 1999 and 2000, the put warrants were purchased by the previous sole shareholder of WP&S. These warrants were retired as a part of the recapitalization.

(13)   **COMMITMENTS AND CONTINGENCIES**

    (a)    **Lease Commitments**

        The Company leases office space and equipment under noncancelable operating leases. The following is a schedule, by year, of minimum future lease commitments under such leases as of December 31, 2001:

| | |
|---|---:|
| 2002 | $    494,794 |
| 2003 | 415,306 |
| 2004 | 421,306 |
| 2005 | 427,306 |
| Thereafter | 433,306 |
| Total future minimum rentals | $  2,192,018 |

        Rent expense incurred under operating leases was approximately $610,886 in 2001. Renewal options ranging from one to 10 years exist for several of these leases.

    (b)    **Other Contingencies**

        At December 31, 2001, there were lawsuits pending that arose in the ordinary course of business. Management has reviewed these actions with legal counsel and has taken into consideration the view of counsel concerning the outcome of the litigation. In the opinion of management, final disposition of these lawsuits is not expected to have a material adverse effect on the Company's financial position or results of operations. In addition, the Company has been indemnified against unfavorable outcomes in certain legal matters of Proctor & Schwartz assumed as part of the acquisition of Proctor & Schwartz.

14

31908.doc

**PAC 0041**

WOLVERINE PROCTOR LLC

Notes to Consolidated Financial Statements

December 31, 2001

(14)    **SUBSEQUENT EVENTS**

Effective March 15, 2002, the Company closed its manufacturing facility in Fitchburg, Massachusetts. The Company is currently in negotiation with various parties to discuss a sale of the building and the property.

(15)    **BRIDGE LOAN**

Also, in March 2002, the Company entered into an agreement with a bank pursuant to which the Corporation may borrow up to $2,000,000 in a revolving credit facility.

PAC 0042