UNITED STATES DISTRICT COURT
District of Massachusetts

Civil Action
No. 05-10078-DPW

)
PETER A. CRAWFORD, Plaintiff )
)
)
v. )
)
WOLVERINE, PROCTOR & SCHWARTZ, INC., )
  Steven F. Chilinski, Deepak S. Kulkarni, )
)
  Defendants )
)

### PLAINTIFF'S OPPOSTION TO DEFENDANTS' CROSS MOTION FOR A PROTECTIVE ORDER

### REQUEST FOR ORAL ARGUMENT

Oral argument has been scheduled for November 28, 2005 at 10:30 a.m.

### I. INTRODUCTION

This opposition and the related Plaintiff's Motion to Compel Responses to his Request for Production of Documents, Set No. 1 (hereinafter "Motion to Compel"), involve the discoverability of documents relating to the 2005 recapitalization and financials of Wolverine, Proctor & Schwartz, Inc. (hereinafter "WPS Inc."), the parent holding company, Wolverine Proctor LLC (hereinafter "WP LLC"), and an apparent third successor entity, Wolverine, Proctor & Schwartz, LLC (hereinafter "WPS LLC"). The recapitalization documents, by defendants' admission, amend or supercede the very contracts that form the basis for this action, namely the various contracts associated with an earlier December 28, 2001 recapitalization. The financial performance of WPS Inc. is

1

the fundamental basis for plaintiff's bonus claim, and financial statements for 2002-2004 already produced by defendants demonstrably shed further light upon plaintiff's basis for this claim.

After the piecemeal release of information, it now appears that a key witness in this case, Mark Brown, may well now report to defendant Kulkarni, clear evidence that may be used to impeach Brown for bias and partiality, assuming the requested documents confirm this highly likely inference.  In addition, this piecemeal release only last week revealed that Kulkarni extended into at least 2002 (after he ceased to be CEO of WPS, Inc.), a pattern of questionable cash transfers.  He apparently received, in 2002 or thereafter, at least $765,980 as settlement of a liability to him obscured from the new investors (Parthenon).  On December 28, 2001, Kulkarni had falsely denied to the plaintiff the existence of such liability.  These and other instances demonstrate a regular practice by Kulkarni of using intimidation, trickery and outright fraud to extract money from WPS Inc. and WP LLC, and investors therein, to support his lavish lifestyle.  A specific instance of such practice (i.e. the attempt by Kulkarni to intimidate the plaintiff into releasing $135,000) forms the basis for Count Seven of the Complaint.  The 2005 financial statements and recapitalization documents may well reveal additional incidents following this pattern, practice and plan.

Defendants' arguments are essentially twofold:  First, that the financial position of a defendant is not relevant under Fed. R. Civ. P. 26(b)(1), and second, that the discovery process may not be used to flesh out claims not made in the Complaint.  But, defendants' arguments are misplaced.  First of all, the Complaint seeks punitive damages, and the financial status of a defendant is relevant and discoverable when punitive damages are

2

sought. Second, it is the fact that the requested information is likely to constitute, or lead to the discovery of, clearly admissible evidence of bias, partiality, fraud (which is probative of truthfulness), habit, pattern, or practice that makes it discoverable, independent of whether such evidence might or might not form the basis for additional claims by the plaintiff against defendant Kulkarni.

## II. PLAINTIFF'S COUNTER STATEMENT OF THE FACTS

While much of section II (Nature of the Case and Factual Background) of Defendants' Memorandum of Law in Opposition to Plaintiff's Motion to Compel and in Support of Defendants' Cross-Motion for a Protective Order (hereinafter "Defendants Memorandum") is factual, there are a number of glaring omissions and misstatements.

### A. Defendants' Memorandum misstates the Bonus and EBITDA issues

Defendants state that "[a]ccording to the WPS's (sic) 2001 Consolidated Financial Statements, WPS's EBITDA for fiscal year 2001 was a loss of $486,116." (Defendants' Memorandum at 6, emphasis in original). But turning to the accompanying Affidavit of Jeffrey D. Kuhn (hereinafter the "Kuhn Affidavit"), Exhibit G, page PAC0030, the falsity of defendants' statement becomes readily apparent. The $486,116 loss appears on the line entitled "loss before interest expense, taxes, depreciation and amortization and extraordinary gain." (emphasis supplied). As defendants admit (Defendants' Memorandum at 3), the Employment Contract defines EBITDA as "earnings before any interest, taxes or deductions for depreciation or amortization." Such definition is essentially identical to what appears on page PAC0030, except for the critical words "extraordinary gain." Nowhere does the Employment Contract state that an extraordinary gain should be excluded from the calculation of EBITDA. Simple logic requires that the

3

$10,169,839 "extraordinary gain," that appears on the same page PAC0030, be added to the negative $486,116 on that page to yield the EBITDA as defined in the Employment Contract.

Defendants further ignore the fact Arthur Andersen & Company is now defunct, and that WPS LLC from December 2001 through at least December 2004, was the sole shareholder of WPS Inc. and filed corporate, not individual, tax returns. There is thus no extant "binding arbiter" as to the BONUS, and any clause in the Employment Contract so implying fails for impossibility.

B. The long-hidden Omnibus Agreement reinforces evidence of recurring and repeated instances of fraud and other questionable cash transfers to Kulkarni

Defendants further suggest that the facts surrounding plaintiff's causes of action relate solely to the 2001 and 2002 time frames. However, they ignore the fact that there is a third agreement that, together with the Transition Agreement attached to the Kuhn Affidavit as Exhibit D, was executed on December 28, 2001. That Settlement Agreement is attached to the Plaintiff's Affidavit is Support of his Motion to Compel Responses to His Request for Production of Documents, Set No. 1 (hereinafter "Plaintiff's Support Affidavit"), previously filed with the court (see pages PAC0048-PAC0051). That third agreement provides for the plaintiff to receive, in addition to the Bonus, either 4 percent or 8 percent of certain distributions made to Kulkarni under another agreement executed on December 28, 2001 (the "LLC Agreement"). See pages PAC0048-PAC0049.

On November 9, 2005, defendants, after repeated attempts to hide its existence, belatedly produced a document entitled "Omnibus Agreement," dated November 13, 2002, between defendant Kulkarni and the investors involved in the December 2001

4

recapitalization of WPS Inc. (Parthenon Capital). See Plaintiff's Affidavit in Support of his Opposition to Defendants' Cross Motion for a Protective Order (hereinafter "Plaintiff's Opposition Affidavit"), Exhibit B. On December 28, 2001, prior to the plaintiff signing either the Settlement Agreement or the Transition Agreement, plaintiff specifically asked defendant Kulkarni whether he had any rights to any distributions other than the $1 million per year under a Consulting Agreement dated December 28, 2001 (hereinafter the "Consulting Agreement") and sections 5.2 and 5.3 of the LLC Agreement (attached to Plaintiff's Affidavit as Exhibit C). Kulkarni unequivocally said no. Kulkarni further stated that the interest payments (entitled "Special Distributions") that Kulkarni might be entitled to a portion of under section 5.2 of the LLC agreement were likely to be deferred or forgiven. Plaintiff's Opposition Affidavit ¶8. On November 5, 2002, the plaintiff met with Mark Brown, then the CFO of WPS Inc., and currently the President of WPS LLC. Brown told the plaintiff during that meeting that an amount of approximately $700,000 allegedly owed to defendant Kulkarni was disclosed in papers supplied to Parthenon Capital and their accountants (Price Waterhouse Coopers, or PWC) prior to the December 28, 2001 transaction, but that neither Parthenon nor PWC had noticed it[1]. See Plaintiff's Opposition Affidavit ¶9. As the Omnibus Agreement reveals, Kulkarni used his alleged entitlement to payment based on the November 2001 balance sheet (see Omnibus Agreement ¶2(b)) to obtain an even greater sum from WP LLC, much of which was as a "Special Distribution" under section 5.2 of the LLC agreement. Plaintiff is

---

[1] This failure is explainable by the manner in which this alleged liability was disclosed. It was buried in the middle of 153 pages of computer listings detailing the WPS Inc. assets and liabilities as of November 30, 2001. The listing is dated December 27, 2001, indicating that it was provided no earlier than one day before the December 28, 2001 transaction. These pages were produced as pages W0772-W0924 by the defendants' in this action.

entitled only to a percentage of the "General Distributions" under section 5.3 of the LLC agreement. See Plaintiff's Support Affidavit, pages PAC0048-PAC0049, Plaintiff's Opposition Affidavit, Exhibit C, pages W0574-W0575.

C. <u>Defendants' attorneys have engaged in repeated attempts to obfuscate the facts</u>

Defendants' steps leading to revelation of the Omnibus Agreement were as follows. Defendants' filed a Motion to Dismiss in this matter, in support of which they attached the Affidavit of Mark Brown. See Plaintiff's Opposition Affidavit, Exhibit D. In that affidavit, Brown stated that he had been CFO of WPS Inc. through September 25, 2003, but made no mention of his having returned to WPS Inc., WP LLC, or WPS LLC. The affidavit was signed on April 6, 2005. In fact, Brown had already rejoined WPS LLC as President on February 14, 2005, nearly two months earlier. On May 6, 2005, defendants filed their Reply Memorandum in Support of Defendant's Motion for Partial Dismissal of Plaintiff's Complaint (hereinafter "Reply Memorandum"), revealing for the first time to the plaintiff and this Court, that Brown, contrary to the suggestion in his affidavit, had in fact returned to "Wolverine." See Reply Memorandum at 12, n. 7. "Wolverine" is defined in the Reply Memorandum at 1 as Wolverine, Proctor & Schwartz, Inc. (i.e. WPS Inc.). But, in his deposition, Brown stated that he had rejoined WPS LLC as President[2]. Contrary to the defendants' representation in the Reply

---

[2] 3 From Brown deposition, taken November 3, 2005, page 7:
Q. Did you subsequently rejoin Wolverine?
A. (Brown) Wolverine, Proctor & Schwartz, Inc.?
Q. Yes.
A. No.
Q. Where are you employed now?
A. Wolverine, Proctor & Schwartz, LLC.
Q. When did you join that organization?
A. February 14th, 2005.
From Brown deposition, taken November 3, 2005, page 15:

6

Memorandum, Brown was not in fact CEO and did not rejoin WPS Inc. at all. Brown further obfuscated his status by responding using a different company name than plaintiff used in his questions, without correcting plaintiff's misconception as to the name.

In response to Plaintiff's Request for Production of Documents to All Defendants, Set No. 1, defendants responded to Request No. 3 (requesting amendments to any of the four December 28, 2001 agreements) that "[a] copy of responsive documentation is provided"[3] They neither objected to the request, nor indicated that any documents existed beyond those being provided therewith. During the discovery conference on October 11, 2005, defendants revealed for the first time the existence of two amendments responsive to Request No. 3, but did not mention the third Omnibus Agreement. The two documents were provided by e-mail to the plaintiff on October 14, 2005. See Kuhn Affidavit ¶12. After receiving the two documents and seeing that they referenced the Omnibus Agreement, the plaintiff requested a copy of that third agreement, which was finally e-mailed to him on November 9, 2005, over two weeks after the plaintiff had moved to compel production of that and other documents. See Plaintiff's Opposition Affidavit ¶5.

---

Q. And, excuse me, did you tell me when you joined Wolverine, Proctor, LLC, what position you joined in?
A. (Brown) No, I didn't tell you.
Q. Would you tell me now?
A. Sure. I am the president of Wolverine, Proctor & Schwartz, LLC.
Q. Are you chief executive officer or not?
A. No.
Q. Who is chief executive officer?
A. That title is not used.

[3] The full text of the request and the titles of the four documents may be found on pages 5 and 6 of Plaintiff's Memorandum in Support of his Motion to Compel Responses to his Request for Production of Documents, Set No. 1.

7

The fact of the 2005 recapitalization was discovered by the plaintiff only after reviewing defendants' response to his first request for production of documents. The paragraph referencing that transaction is reproduced in full in Plaintiff's Memorandum in Support of his Motion to Compel Responses to his Request for Production of Documents, Set No. 1 (hereinafter "Plaintiff's Memorandum") at 4-5. That characterization indicates that WP LLC has been liquidated. "Also as part of the transactions, the newly-formed US and UK entities acquired the operating net assets of the Company, resulting in effective liquidation and dissolution of the Company." Defendants' Memorandum at 1 n. 1, reveals that "[t]he enterprise that was WPS Inc., however, has now been entirely transferred to WPS LLC." Thus it appears that there is a third entity, which apparently holds the previous assets and liabilities of defendant WPS Inc., that defendants managed to hide until only recently

### III. ARGUMENT

The purpose of defendants' obfuscations, misrepresentations, stonewalling and delays is apparent. Since at least April 2005, they have misled the plaintiff and this Court with half truths, outright misrepresentations, and contradictory assertions, all aimed at avoiding discovery of the fact that the assets of defendant WPS Inc. have been transferred to WP LLC, with Brown as President, and defendant Kulkarni the apparent new owner. See Plaintiff's Support Affidavit, page W0367, "...the Class A member [Kulkarni] acquired new equity interests..." The Kuhn Affidavit ¶11 further suggests that WPS LLC apparently assumed the liabilities of WPS Inc. This much is known, but the exact extent of defendant Kulkarni's involvement is not. Brown's denial that WPS LLC has a CEO suggests that Kulkarni may be playing that role (see Brown testimony, reproduced in an

8

earlier footnote). Such a fact would be highly relevant as to the motives and bias of Brown, a key witness in this matter, particularly if Kulkarni had the power to terminate Brown. Such concern on the part of Brown would be well-founded given the circumstances of the plaintiff's dismissal. See Complaint ¶22 (Kulkarni browbeat the plaintiff over $135,000 allegedly owed to Kulkarni, and caused his termination later that day after the plaintiff refused to permit the embezzlement of such funds).

A. Discovery limits are very broad

Defendants cite no Supreme Court cases relating to discovery. But these cases make it very clear that the discovery limits are very broad. In Oppenheimer v. Sanders, 437 U.S. 340 (1978), the Supreme Court held that "discovery is not limited to issues raised by the pleadings, for discovery itself is designed to help define and clarify the issues. Nor is discovery limited to the merits of a case, for a variety of fact-oriented issues may arise during litigation that are not related to the merits." Oppenheimer at 351 (citation omitted). To be sure, Oppenheimer was decided before Fed. R. Civ. P. Rule 26(b)(1) was amended to replace the words "relevant to the subject matter involved in the pending action" with "relevant to the claim or defense of any party," but still permitting inquiry into matters relevant only to the subject matter for good cause. See Moore's Federal Practice (hereinafter "Moore") §26.41[6][c] (2000 amendments to Rule 26 unlikely to diminish discovery rights substantially; there is no bright or distinct line).

Defendants do not assert that provision of the requested information would be unduly burdensome. Nor do they assert any privilege. Instead, they merely allege that the information is irrelevant and that the plaintiff is engaged in a "fishing expedition." But, the Supreme Court long ago rejected just such an argument.

9

> "We agree, of course that the deposition-discovery rules are to be accorded a broad and liberal treatment. No longer can the time-honored cry of 'fishing expedition' serve to preclude a party from inquiring into the facts underlying his opponent's case. Mutual knowledge of all the relevant facts gathered by both parties is essential to proper litigation. To that end, either party may compel the other to disgorge whatever facts he has in his possession. Hickman v. Taylor, 329 U.S. 495, 507 (1947).

B.  The requested information is reasonably calculated to lead to the discovery of evidence of bias or other impeachment evidence

Defendants cite Renshaw v. Ravert, 82 F.R.D. 361 (E.D. Penn. 1979) to support their position, asserting that it provides that "inquiry into a defendant's personal financial status is not ordinarily permitted." Defendants' Memorandum at 12. While Renshaw indeed contains such a statement, it also provides that "'[m]atters that affect the credibility of a deponent, or might be used in impeaching or cross-examining a witness at the trial, may be inquired into." Renshaw at 363. Such is precisely the case here. Not only is it possible that the requested documents might reveal such impeachment material, it seems likely that they will, given the many contradictions in the defendants' versions that have already been provided to the plaintiff and this Court. See also Wright, Miller & Marcus, Federal Practice and Procedure (hereinafter "Wright") Civil 2d §2008, "[s]imilarly information that could be used to impeach a likely witness, although not otherwise relevant to the claims and defenses might be properly discoverable... information that might provide a basis for impeachment should still be available regularly." See also Moore §26.41[9][a] ("impeachment evidence is almost always relevant, for discovery purposes, to the claims and defenses of a party...").

Not only might the requested information provide a basis to impeach witnesses based upon inconsistencies between the documents and their testimony, but the documents may well provide evidence of bias, particularly, if, as anticipated, they reveal

10

defendant Kulkarni's continuing control over Brown. See Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence (hereinafter "Weinstein") §607.04[1] (bias is always significant in assessing credibility), U.S. v. Hudson, 970 F.2d 948, 954-955 (1st Cir. 1992) (reversing conviction because collateral hearsay evidence of bias was excluded). In United States v. Abel, 469 U.S. 45 (1984), the Supreme Court discussed the interaction between the Federal Rules of Evidence and impeachment for bias, prejudice, or corruption. Notwithstanding a lack of the mention of bias in the rules, Fed. R. Evid. 611(b) permits cross examination on issues of credibility, and "the Courts of Appeals have upheld use of extrinsic evidence to show bias both before and after the adoption of the Federal Rules of Evidence." Abel at 51. Thus, documents supporting bias by Brown or other witnesses would be both relevant and admissible. See also Salgado v. United States, 278 F.2d 830, 831 (1st Cir. 1960) (bias provable by extrinsic evidence even after witnesses' disavowal), Weinstein §607.04[5] (relationship, including business or employment relationship always relevant to show bias).

C. Financial information is discoverable because punitive damages are sought and because calculation of the plaintiff's bonus is based upon the financial statements

Furthermore, Renshaw underscores a second, independent, reason why the financial status of WPS Inc. and WPS LLC is indeed relevant and discoverable. The Complaint in this matter (Counts 2, 4 and 6) seeks treble damages pursuant to the Massachusetts Payment of Wages statute, M.G.L. c. 149 §148. In Wiedmann v. The Bradford Group, Inc., 444 Mass. 698 (July 21, 2005), the Supreme Judicial Court indicated for the first time that the award of treble damages under that statute might be

discretionary rather than mandatory as the text of the statute would appear to indicate[4]. Wiedmann also states that "...treble damages [under the Wage Act] are punitive in nature..." Wiedmann at 710. Wiedmann does not define the criteria to be used by a finder of fact in assessing punitive damages, but presumably traditionally used criteria, including ability to pay, would be relevant. See Newport v. Fact Concerts, Inc., 453 U.S. 247, 270 (1981) ("evidence of tortfeasor's wealth is traditionally admissible as a measure of the amount of punitive damages.")

Rather than prohibiting inquiry into a defendant's financials in all cases, Renshaw states that "[a]lthough this line of inquiry [into personal financial status] is not ordinarily permitted, when a plaintiff seeks punitive damages, the defendant's financial status becomes a relevant consideration." Renshaw at 363 (citations omitted). While some courts require a prima facie showing before allowing discovery of financial information in a punitive damages case, the majority of cases, including all known First Circuit cases on this issue, indicate that no such showing is required. See CEH, Inc. v. FV Seafarer, 153 F.R.D. 491, 498 (D.R.I. 1994) (permitting discovery of financial information in punitive damages case, rejecting need for prima facie showing, and listing cases), St. Joseph Hosp. v. INA Underwriters Ins. Co., 117 F.R.D. 24, 25-26 (D. Me. 1987) (permitting discovery of financial statements in punitive damages case). In any case, defendants' motion to dismiss plaintiff's treble damages claims was denied, indicating that the claim is meritorious[5].

---

[4] Plaintiff preserves for another day any arguments that he might make as to the retroactive effect of Wiedmann on this case, or whether the SJC, by adopting a construction ignoring the plain text of the statute (which uses the word "may" only in the context of making the bringing of an action permissive) might have deprived him of certain federal constitutional rights.
[5] Although this action is against WPS Inc., the Kuhn Affidavit ¶11 indicates that WPS LLC has in all likelihood assumed the liability, making its financial status relevant.

12

Defendants cite U.S. v. General Electric Co., 158 F.R.D. 161 (D. Oregon 1994). In that case, a contractor sought compensation for work done outside of an original contract. The plaintiff's financial records were irrelevant to that determination and the court noted that these records were "not a proper subject for discovery because its current or past financial condition is not relevant to the issues in this case." General Electric at 162. In contrast, the past financial condition of WPS Inc., namely its 2001 results, specifically underlies this case, and more recent financial statements demonstrably shed light on the 2001 results[6]. Companies can restate prior years' results at almost any time; General Motors last week indicated that it was restating its 2001 results due to an accounting error[7]. See also Buntzman v. Springfield Redevel. Auth., 146 F.R.D. 30, 32-33 (D. Mass. 1993) (financial information discoverable if relevant to claim or defense).

Similarly, defendants cite Sanderson v. Winner, 507 F.2d 477 (10th Cir. 1974), however in that antitrust case the defendants in a class action sought information regarding the plaintiff's ability to finance the litigation and disclosure of how the costs of litigation would be financed. Such information was manifestly irrelevant to the issues involved in the case. But the court noted that "tax returns are not generally discoverable. It is only when the plaintiff's income is directly in issue." Sanderson at 480. Unlike the case in Sanderson, defendant WPS Inc.'s income is directly in issue in this case because it drives the calculation of the plaintiff's bonus. WPS LLC merely continues the WPS Inc. business, thus its financial statements are clearly relevant.

D. Defendants have waived any objections by responding late and by failing specifically to state any in their response to the request for production

---

[6] For example, in the 2002 statements, the gain in 2001 is no longer termed "extraordinary"
[7] See General Motors 8-K statement filed with U.S. SEC on November 9, 2005, indicating an impact to 2001 profits of $300-400 million. Available at http://www.sec.gov.

13

Magistrate Collings' decision in this district in <u>Krewson v. City of Quincy</u>, 120 F.R.D. 6 (D. Mass. 1988) is directly on point. In that case, there was no response to a request for production until the day after the motion to compel had been filed. Yet, the court "rule[d] that all of the objections have been waived. If a party fails to file <u>timely</u> objections to document requests, such a failure constitutes a waiver of any objections which a party might have to the requests." In this case the response to the request for production both failed to object with sufficient specificity and was late[8]. Local Rule 34.1(c)(1) is in accord, providing that "[a]ny ground not stated in an objection within the time provided by the Federal Rules of Civil Procedure, or any extension thereof, shall be deemed waived."

In this case, defendants failed to object to Request No. 3 (relating to the amendments) at all, and objected to Request No. 6 (relating to the financial statements) only on the grounds of vagueness and ambiguity. They confine their defense on this issue to a footnote. See Defendants' Memorandum at 9 n. 2. Essentially, their argument is that the blanket general objections prefacing their responses are sufficient. But, they are not. Fed. R. Civ. P. Rule 34(b) specifically requires that

> "[t]he response shall state, <u>with respect to each item or category</u>, that inspection and related activities will be permitted as requested, unless the request is objected to, in which event the reasons for the objection shall be stated. If objection is made to part of an item or category, the part shall be specified and inspection permitted of the remaining parts. (emphasis supplied)

---

[8] The request was mailed to defendants' attorneys on August 8, 2005, the response is dated September 28, 2005. A last minute telephonic request for a two week extension due to an upcoming vacation was denied by the plaintiff as necessitated only due to an egregious lack of planning, and unnecessary given the continued availability of at least one other attorney on the case. Defendants exceeded even their own requested extension. See Plaintiff's Affidavit ¶3. In addition Fed. R. Civ. P. 29 requires any agreed extensions to be in writing.

Defendants' blanket objection is neither with respect to an item or category, nor does it specify the part objected to, both as specifically required by this rule. This fact alone compels this court to allow plaintiff's Motion to Compel[9]. See Moore §34.13[2][b] (objection must clearly set forth specifics of objection and how that relates to documents being demanded; generic objections are improper).

Similarly, Renshaw addresses the issue of waiver. "Because Ravert has neither answered nor objected to interrogatories 9 and 50 he will be compelled to answer those interrogatories. Ravert's silence... can only be interpreted as a waiver of any objection he may have had." Renshaw at 362.

E. The requested discovery is reasonably calculated to lead to the discovery of further admissible evidence of a pattern of improper transfers from WPS Inc. to Kulkarni similar to the attempt alleged in Count Seven of the Complaint

In this case, the Complaint alleges that defendant Kulkarni attempted to embezzle $135,000 from WPS Inc. The plaintiff has demonstrated that in fact, Kulkarni received $765,980 later that same year, by taking advantage of a fraudulent concealment in late 2001. The 153 page computer printout in which the alleged liability to Kulkarni appears is dated December 27, 2001, indicating that it could have been provided to Parthenon no earlier than one day prior to the closing of the transaction on December 28, 2001.

Documents produced by defendants show transfers of $159,298.52 made to Mr. Kulkarni on December 17, 2001 and $188,178.85 made on December 27, 2001. See

---

[9] It is theoretically possible that if the lack of objection were the sole basis by which the plaintiff is entitled to information regarding the 2005 recapitalization and the 2005 financial statements, that this Court might allow both plaintiff's motion to compel and defendants protective motion as it relates to future document requests, interrogatories, or deposition questions. However, that would unfairly deprive the plaintiff of the opportunity to view the compelled documents before responding to the motion for a protective order. If the Court is inclined to so rule, the plaintiff requests that he be given time to supplement this Opposition Memorandum based upon the new information.

Plaintiff's Opposition Affidavit ¶10, Exhibit E, pages W0129 and W0133. Such transfers occurred after the November 30, 2001 balance sheet (the last provided to Parthenon) but before the December 28, 2001 transaction, manifestly in order to enable Kulkarni to extract such cash unnoticed by Parthenon. Such instances of withdrawal of cash by defendant Kulkarni from WPS Inc. demonstrate a clear pattern and habit, and evidence of such occurrences would be admissible under Fed. R. Evid. 404(b) and 406, and is highly relevant to plaintiff's claim that he was terminated after refusing to permit defendant Kulkarni (without approval by Parthenon) to extract an additional $135,000 from WPS Inc. just two weeks later. Given this pattern, it is much more than mere speculation that defendant Kulkarni may have engaged in more recent similar acts in connection with the 2005 recapitalization, further reinforcing the pattern and providing admissible evidence of habit, practice, plan and motive.

Inasmuch as plaintiff would have been entitled to 4 or 8 percent of any "General Distributions" under section 5.3, but 0 percent of any "Special Distributions," Kulkarni took advantage of his misrepresentation to the plaintiff, upon which the plaintiff relied, to defraud him. This of course goes to the heart of this case, as fraud vitiates every contract at the option of the injured party. The plaintiff may therefore, but does not hereby, elect to render the Transition Agreement and Settlement Agreement (which form the basis for defendants' defenses) null and void. Given the past pattern, it appears likely that the 2005 recapitalization will provide further evidence of fraud against the plaintiff, inasmuch as plaintiff received no notice of such recapitalization, it appears that WP LLC was liquidated, and the plaintiff is entitled to 4 or 8 percent of any distributions, including of assets in kind. See Settlement Agreement, attached to Plaintiff's Support Affidavit,

pages PAC0048-PAC0049. Such fraud would go directly to the validity of the Transition and Settlement Agreements, defenses in this case. Independent of that, of course, Kulkarni's fraudulent and dishonest behavior is likely admissible against him for purposes of impeachment as well as to establish habit, plan, pattern and practice. See Fed. R. Evid. 608(b) (may inquire into specific instances of untruthfulness on cross examination at discretion of court)

To be sure, evidence of prior bad acts is not admissible to prove that a person acted in conformity therewith. Fed. R. Evid. 404(b). However, it is admissible for other purposes, including to prove an actor's state of mind, motive or plan. Here, there is already ample evidence of defendant Kulkarni's repeated cash withdrawals from WPS Inc. with a demonstrated motive of supporting his lavish lifestyle[10]. The repeated instances of questionable contract interpretations, misrepresentations and outright fraud, as evidenced by the Omnibus Agreement, point towards a substantial likelihood that the 2005 recapitalization continued that pattern, repeating the actions that he took during the 2001 recapitalization, and further demonstrating Kulkarni's motive and state of mind, namely a sense of entitlement to whatever cash WPS Inc. held, with rationales of varying validity invented to justify withdrawal. Such evidence would thus be admissible under Fed. R. Evid. 404(b). See Huddleston v. United States, 485 U.S. 681, 685 (1988) (Rule 404(b) is applicable in both civil and criminal cases and extrinsic acts evidence may be critical to establishing a disputed issue). See also U.S. v. Frankhauser, 80 F.3d 641 (1st Cir. 1996) (two prong test in the First Circuit for introduction of bad act evidence). In

---

[10] Plaintiff will testify to this, as did Mark Brown in his deposition (Nov. 3 deposition at 166):
Q. ...Would you say that with respect to 11, to your knowledge, does Mr. Kulkarni have a lavish lifestyle?
A. (Brown) Compared to Donald Trump, no.

addition, it may well be that the repeated withdrawals rise to the level of habit and are also admissible under Fed. R. Evid. 406, See U.S. v. Newman, 982 F.2d 665 (1st Cir. 1992), cert den 114 S.Ct. 59 (1993).

F. **Balancing of interests weighs heavily in favor of disclosure as producing the requested documents would constitute but a minor inconvenience to defendants**

Courts must apply a balancing test when considering whether or not to allow a motion for a protective order. See Moore §26.101[1][c] (hardship to party against whom discovery is sought is weighed against the value of the information to the other party). In this case, defendants have not demonstrated a single hardship associated with providing the information sought. Plaintiff seeks specific information relating to the 2005 recapitalization and 2005 financial statements that is retained in the normal course of business. The 2001 recapitalization documents produced by defendants consisted of 401 pages (W0563-W0963) and the financial statements for 2001-2004 91 pages (W0357-W0447) (see Kuhn Affidavit, Exhibit A, second page). Defendants have completely failed to demonstrate any inconvenience or hardship whatsoever, let alone one that would weigh against the likely value of the information to the plaintiff. See Moore §26.104[1] (good cause for a protective order established only when it is specifically demonstrated that disclosure will cause a clearly defined and serious injury; but not by inconvenience or expense).

The cases cited by defendants are unavailing. In Ameristar v. Signal Composites, 244 F.3d 189 (1st Cir. 2001), cited by defendants, the Ameristar defendants sought to depose third party witnesses employed by GE. However, two GE employees involved with the very same issue had already testified about it, the magistrate had already issued findings of fact, and the judge had specifically prohibited further discovery.

Nevertheless, the defendants sought to depose two other GE employees in the apparent hope that they would contradict their colleagues. Understandably, the first circuit upheld the district court ruling against the defendants.

Similarly, in Mack v. Great Atlantic and Pacific Tea Co., Inc., 871 F.2d 179 (1st Cir. 1989), summary judgment had been granted against a plaintiff. The first circuit upheld the district court's refusal to order the compilation of data from 62 separately managed A&P stores. In upholding the district court, the First Circuit noted that "parties have a correlative obligation to tailor interrogatories to suit the particular exigencies of the litigation. They ought not to be permitted to use broadswords where scalpels will suffice, nor to undertake wholly exploratory operations in the vague hope that something helpful will turn up." Mack at 187. The production of a few hundred pages of documents that have in all likelihood already been assembled is indeed a scalpel, not a broadsword, and as demonstrated, the hope is far from vague.

## IV. CONCLUSION

For the above stated reasons, the requested 2005 transaction documents and 2005 financial statements are likely either to constitute, in and of themselves, admissible evidence, or are at a minimum, reasonably calculated to lead to the discovery of such evidence. Plaintiff's request can easily be satisfied by defendants, defendants have in any event waived any objection, financial statements are clearly discoverable in a punitive damages case, and the document request is reasonably likely to provide evidence for impeachment, of bias, or of a pattern of similar acts to those alleged in Count Seven of the Complaint. Plaintiff's motion to compel should therefore be allowed, and defendants motion for a protective order denied.

Respectfully submitted,

/s/ Peter A. Crawford
Peter A. Crawford, pro se
23 Newcastle Dr. #11
Nashua, NH 03060
(603)888-4574

Date: Nov 18, 2005