FILED
IN CLERK'S OFFICE

2005 DEC 12 P 1:21

U.S. DISTRICT COURT
DISTRICT OF MASS.

UNITED STATES DISTRICT COURT
District of Massachusetts

Civil Action
No. 05-10078-DPW

—————————————————————
                                          )
PETER A. CRAWFORD, Plaintiff              )
                                          )
        v.                                )
                                          )
WOLVERINE, PROCTOR & SCHWARTZ, INC.,      )
   Steven F. Chilinski, Deepak S. Kulkarni,  )
                                          )
        Defendants                        )
—————————————————————)

PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' SECOND
MOTION FOR A PROTECTIVE ORDER CONCERNING EVIDENCE OF
COMPENSATION AND OTHER PAYMENTS MADE TO DEEPAK KULKARNI

I. NATURE OF THE CASE AND FACTS RELEVANT TO DISCOVERY MATTERS

        This case seeks damages for breach of a written contract for a bonus payable to

the plaintiff in the amount of $357,856.25, based upon his employment of Chief

Operating Officer ("COO") of Wolverine, Proctor & Schwartz, Inc. ("Wolverine") during

2001. Additional amounts are sought under an oral agreement to increase the bonus

percentage, and treble damages are sought from defendants Wolverine and Chilinski (the

CEO of Wolverine until early 2005) under the Massachusetts Payment of Wages statute.

Additional amounts are sought from all defendants, including Kulkarni (Wolverine CEO

during 2001), relating to the early termination of an agreement providing for 3 months of

employment of the plaintiff after the sale of Wolverine.

        The plaintiff assumed the position of COO of Wolverine in late 1999,

successfully turning around the company and permitting its sale in late 2001. Between

1

December 28, 2001 and December 31, 2001, Wolverine was recapitalized and Parthenon

Capital took majority control of the company. Complaint ¶16. Prior to that, defendant

Kulkarni had been the sole shareholder. Complaint ¶15. On December 17, 2001,

defendant Kulkarni transferred $159,298.52 from the company's bank account to his own

account, and on December 27, 2001, a single day before the recapitalization transaction

closed, he transferred an additional $188,178.55. See Plaintiff's Affidavit in Support of

his Memorandum in Opposition to Defendants' Second Motion Motion for a Protective

Order (hereinafter "Plaintiff's Affidavit") ¶2, Exhibit A.

Parthenon was provided with balance sheets, as of November 30, 2001, for

Wolverine prior to the late December, 2001 transaction. In addition, Kulkarni had

represented, prior to the transaction, that there had not been "any change in the assets,

liabilities or financial condition of any of the Contributed Companies or any of their

respective Subsidiaries from that set forth in the unaudited balance sheet as at (sic) such

date included in Exhibit F hereto, other than changes in the Ordinary Course of Business

which have not been, either in any case or in the aggregate, materially adverse..."[1]

The November 30, 2001 balance sheets of the various Wolverine, Proctor &

Schwarz, Inc. subsidiaries were dated December 27, 2001, and included accrued

dividends of $624,263.00 apparently payable to Mr. Kulkarni. On December 28, 2001,

Mr. Kulkarni represented to the plaintiff that he had no right to any distributions or other

monies other than the $1 million per year under a Consulting Agreement of the same date

and sections 5.2 and 5.3 of the LLC Agreement, also of the same date. Kulkarni

---

[1] Deepak Kulkarni Representation and Warranty, Indemnity and Subscription Agreement dated
December 28, 2001 §3.8(a). The Contributed Companies included Wolverine and other
subsidiaries and related companies. Exhibit F was apparently the September 30, 2001 balance
sheet.

unequivocally denied that he had any such rights. Kulkarni also told the plaintiff that

"Special Distributions" under section 5.2 of the LLC Agreement were likely to be

deferred or forgiven. Plaintiff's Affidavit ¶4. Later that same day, the plaintiff executed

a Transition Agreement and a Settlement Agreement that exchanged the existing options

that he had in Wolverine, Proctor & Schwartz, Inc. for a right to receive 4 or 8 percent of

certain General Distributions under section 5.3 of the LLC Agreement, but 0 percent of

any Special Distributions under section 5.2 of that agreement. See Plaintiff's Affidavit

¶4, Exhibit D, ¶3, Exhibit B. On November 13, 2002, defendant Kulkarni entered into an

Omnibus Agreement with Parthenon whereby he gave up the right to the accrued

dividends in exchange for $765,980.00 in payments, much of which was pursuant to

section 5.2 of the LLC Agreement. The Omnibus Agreement made the Special

Distributions, as to Kulkarni only, mandatory, while Special Distributions under the pre-

amendment LLC Agreement were within the discretion of the Parthenon-controlled

Board of Managers (except as required to pay taxes), and paid 38.57% to Kulkarni and

61.43% to Parthenon. See Plaintiff's Affidavit ¶5, Exhibit E.

During June, July and August of 2001, seven checks for $25,000 each were issued

from the payroll account of Wolverine, Proctor & Schwartz, Inc. and sent to Wolverine's

branch office in Glasgow, Scotland. Plaintiff's Affidavit ¶6, Exhibit F. The aggregate of

these amounts, $175,000, was "grossed up" to provide for payment of the Medicare

portion of FICA tax, and was added to Mr. Kulkarni's W-2 for 2001. See Plaintiff's

Affidavit ¶7, Exhibit G. These amounts were in addition to $900,000 in annual

compensation permitted to Mr. Kulkarni under the existing loan agreement with Citizens

Bank. See Plaintiff's Affidavit ¶8, Exhibit H. Mr. Kulkarni informed the plaintiff that

3

checks, rather than wire transfers, were being used to transfer the funds to Glasgow in order to escape the notice of Citizens, which tended to monitor wire transfers with greater diligence than checks. Plaintiff's Affidavit ¶6.

From March 2001 through June 2001, Linda Green and others from Trimmingham Americas Inc., retained by Citizens Bank of Massachusetts, spent 47 days at the offices of Wolverine, Proctor & Schwartz, Inc. in Merrimac, Massachusetts. Ms. Green discovered evidence that Wolverine was "dissipating assets to its sole shareholder, Deepak S. Kulkarni, and to affiliated companies that Mr. Kulkarni controls and whose assets are not pledged as security for the loans Wolverine has received from" Citizens Bank. See Plaintiff's Affidavit ¶9, Exhibit I (the "Green Affidavit") ¶6. Citizens Bank subsequently sought the appointment of a receiver for Wolverine, but prior to that occurring, agreed to accept $10.2 million for $21.7 worth of debt to settle the matter.

Also on December 28, 2001, the plaintiff entered into a Transition Agreement whereby he agreed to remain with Wolverine through March 31, 2002 and to "perform such services to and for the Company as may be reasonably requested by the Chief Executive Officer of the Company or its Board of Directors to facilitate the transition of the Company's management."[2] Defendant Kulkarni on the same day entered into a Consulting Agreement whereby he agreed that he would "have no right, power or authority in any way to bind the Company to the fulfillment of any condition, contract or obligation or to create any liability binding on the Company."[3]

On January 14, 2002, defendant Kulkarni sought authorization from the plaintiff for a payment of $135,000 from Wolverine to him, above and beyond his stated

---

[2] Transition Agreement ¶1, attached to Plaintiff's Affidavit as Exhibit C.
[3] Paragraph 3(b) of the Consulting Agreement, produced by defendants as Bates number W0739.

4

compensation under the Consulting Agreement of $1 million per year (of which $.5 million was a bonus). After the plaintiff indicated that representatives of Parthenon should be contacted for approval, defendant Kulkarni angrily replied that he alone would deal with Parthenon, and that henceforth the Wolverine CFO and his U.K. counterpart alone would deal with disbursement decisions, and that the plaintiff remained employed by Wolverine only because of defendant Kulkarni's actions. Later that day, the plaintiff was informed that the Wolverine board of directors had voted to terminate his employment immediately. Complaint ¶¶22-23. Count Seven of the Complaint alleges that defendant Kulkarni thereby tortiously interfered with plaintiff's contract. Complaint ¶¶57-73.

Under the terms of a letter agreement dated January 4, 2000 (the "Employment Contract"), the plaintiff became entitled to five percent of Wolverine's profits as a bonus, the profits being defined by a formula based upon earnings before interest, taxes or deductions for depreciation or amortization (EBITDA) less certain deductions for capital expenditures, interest, taxes or reserve adjustments. Based upon this formula, plaintiff maintains that Wolverine's 2001 profits were $7,157,125, an amount that includes an "extraordinary gain" of $10,169,839. Based upon their response to Plaintiff's Interrogatories, Set No. 1, Interrogatory 2, the inclusion of this gain is the sole dispute that defendant Wolverine has with the plaintiff's calculation. Nothing in the Employment Contract, however, indicates that the extraordinary gain was to be excluded, and the bonus provisions of the Employment Contract were reaffirmed and preserved on December 28, 2001 by the Transition Agreement between Wolverine and the plaintiff.

5

At the time of this agreement the fact and magnitude of the extraordinary gain were known.

During the discovery process, disputes have arisen between the parties as to the discoverability of certain documents and facts related to a subsequent recapitalization of Wolverine Proctor LLC, the parent company of Wolverine, in early 2005. This recapitalization apparently created a new entity, Wolverine, Proctor & Schwartz, LLC, apparently now owned and controlled by defendant Kulkarni. The 2005 recapitalization and 2005 financial statements are the subject of a pending Motion to Compel by plaintiff, and a Cross Motion for a Protective Order by defendants. These motions were heard on November 28, 2005 and Magistrate Collings took the matter under advisement. On November 27, 2005, defendants filed a second protective order motion relating to compensation and other payments to defendant Kulkarni. It is this second motion that this memorandum responds to.

The depositions of Mark Brown, current President of Wolverine, Proctor & Schwartz, LLC, Steven Chilinski former CEO of Wolverine, Proctor & Schwartz, Inc., and Marian Lord, staff accountant with Wolverine, Proctor & Schwartz, LLC, and defendant Kulkarni have already occurred, as has the deposition of Richard Cummings, former partner of Arthur Anderson & Co., LLP, the auditor of the 2001 results of Wolverine. As the depositions of Mr. Brown, Mr. Chilinski and Ms. Lord progressed, it became apparent that defendants' counsel had some concerns regarding inquiry into payments to defendant Kulkarni, however, the witnesses were permitted to answer questions regarding those payments that occurred in 2001 and 2002, and defendants had produced 149 pages of documents relating to defendant Kulkarni's compensation and

6

payments to him, in response to plaintiff's first request for production of documents. See

defendants' response to these requests, Request No. 9, attached to Plaintiff's Affidavit in

Support of his Motion to Compel Responses to his Request for Production of Documents,

Set No. 1, filed on October 24, 2005. On November 28, 2005, this Court refused to delay

the deposition of Mr. Cummings, but prohibited inquiry during that deposition into the

"2005 recapitalization, the 2005 financial statements, or about any payments made to Mr.

Kulkarni after December 31, 2002..."

On Friday, November 18, 2005, just one business day prior to his scheduled

deposition, defendant Kulkarni's counsel notified plaintiff by e-mail that they objected to

any inquiry into payments to Mr. Kulkarni beyond the specific one alleged in the

Complaint, and that defendant Kulkarni would not be attending the deposition because of

the fact that questions relating to such other payments might be asked. Plaintiff

nevertheless appeared for that deposition, as scheduled, together with a court reporter.

Mr. Kulkarni did not appear. The parties subsequently agreed to proceed with the

Kulkarni deposition on December 7, 2005, with the proviso that no questions regarding

the 2005 recapitalization, the 2005 financial statements or payments to Mr. Kulkarni after

December 31, 2002 be asked, although Mr. Kulkarni agreed to return if this Court's

ruling on either of the two pending protective order motions made inquiry into any of

these areas permissible. In return for this agreement, the plaintiff agreed to withdraw

those parts of his Motion to Compel the Deposition of Defendant Kulkarni and for

Sanctions and Expenses, as sought to compel Mr. Kulkarni's attendance and payment of

expenses, but not for sanctions against defendant Kulkarni.

## II. ARGUMENT

7

Defendants make a number of arguments, none of which withstands scrutiny.
These are:

1. Evidence of payments, other than the one for $135,000 blocked on January
   14, 2002, is irrelevant.

2. Evidence of other improper transactions cannot be probative of Kulkarni's
   intent regarding the attempted January 14, 2002 transfer as his intent arose
   only that same day.

3. Evidence of other improper transactions constitutes inadmissible propensity
   evidence under Fed. R. Evid. 404(b).

4. Inquiry into other payments would be harassing, embarrassing and intrusive.

5. Inquiry into other payments would confuse the issues and result in fact finding
   detours.

6. The payment was in any case proper, lawful and approved by Parthenon.

First, in making these arguments, defendants confuse relevance with
admissibility. There can be no argument that evidence of other improper payments to
Kulkarni is <u>relevant</u>. The only argument is whether or not it is <u>admissible</u> or excludable
under Fed. R. Evid. 404(b) or Fed. R. Evid. 403. Second, defendants confuse Kulkarni's
intent to interfere with the plaintiff's contract with his intent improperly and
surreptitiously to extract money from Wolverine. The latter is certainly probative of
Kulkarni's intent on January 14, 2002. Third, as defendants admit, Kulkarni's intent on
that date is critical. Other instances of surreptitious extraction of funds from Wolverine
are certainly admissible under Fed. R. Evid. 404(b) to show that Kulkarni on January 14,
2002 intended again to accomplish such a transfer. Fourth, while it may be that the

8

evidence would be embarrassing and intrusive, it is not unreasonably so. All evidence of wrongdoing is embarrassing, but that doesn't prohibit its discovery. Fifth, confusion of the issues and the likelihood of fact finding detours are matters for the trial judge, not matters to be resolved at the discovery stage. Sixth, defendants' allegation that the payment was proper, legal and approved by Parthenon is unsupported and puts the cart before the horse by suggesting that, because defendants will somehow ultimately prove legitimacy, plaintiff's attempt to discover any contrary information should be prohibited.

## A.  EVIDENCE OF OTHER PAYMENTS IS UNDENIABLY PROBATIVE AND THUS RELEVANT

Defendants confuse the issues of relevance and admissibility in arguing that discovery of other evidence of payments to defendant Kulkarni should be prohibited. But they confuse relevance and admissibility. Fed. R. Evid. 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Under this standard, the fact that defendant Kulkarni received other questionable payments from Wolverine, particularly other payments that he attempted to hide from investors, such as Citizens Bank and Parthenon Capital, makes it more probable that he also improperly attempted to obtain the payment of $135,000 on January 14, 2002 as alleged in Count Seven of the Complaint.

The issue is one of admissibility, not of relevance. Fed. R. Evid. 402 makes relevant evidence generally admissible, but other rules of the Fed. R. Evid can override the general presumption of the admissibility of relevant evidence. Fed. R. Evid. 403 provides for the exclusion of relevant evidence on several grounds, among them unfair prejudice. Fed. R. Evid. 404(b) provides that "[e]vidence of other crimes, wrongs, or acts

9

is not admissible to prove the character of a person in order to show action in conformity

therewith. It may, however, be admissible for other purposes, such as proof of motive,

opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or

accident..." If defendants have any basis for excluding evidence of other payments to

defendant Kulkarni, it is under Fed. R. Evid 403 or 404, not because the other payments

are irrelevant, as defendants argue.

Judge Breyer, then of the First Circuit, described the applicable principle cogently

in U.S. v. Rubio-Estrada, 857 F.2d 845 (1st Cir. 1988).

> "The Federal Rules of Evidence recognize that a strong argument can be
> made for admitting, say, a prior crime as evidence when it shows 'bad
> character.' That argument consists of the well-accepted fact that 'bad
> character' has probative value. They also recognize the strong arguments
> against admitting such evidence. The result is a compromise. Where the
> past bad act is relevant only because it shows bad character (i.e., the
> proposed logical inference includes character as a necessary link), Rule
> 404 automatically excludes the evidence. But, if that evidence is also
> relevant in any way that does not involve character, the evidence is not
> automatically excluded... Indeed, it will be admitted unless the trial court
> determines that its probative value is 'substantially outweighed' by the
> risks of prejudice, confusion, or waste of time... Rubio-Estrada at 846-
> 847 (emphasis in original, citations omitted).

In so describing the principle, Judge Breyer clearly recognized that evidence of

prior bad acts is generally probative and thus relevant under Rule 401, but may not be

admissible, notwithstanding the provisions of Rule 402 that make relevant evidence

generally admissible.

## B. THE TWO WEEK DURATION OF THE TRANSITION AGREEMENT IS OF NO CONSEQUENCE AS OTHER PAYMENTS ARE PROBATIVE OF DEFENDANT KULKARNI'S INTENT SURREPTITIOUSLY TO EXTRACT MONEY, NOT HIS INTENT TO INTERFERE WITH THE TRANSITION AGREEMENT

Defendants' argument that Kulkarni's intent arose only on January 14, 2002 is

misplaced. It is not Kulkarni's intent to interfere with the plaintiff's contract that the

10

plaintiff is seeking to demonstrate through the evidence of other payments, but rather Kulkarni's intent on that date surreptitiously to extract money from Wolverine. The fact that the Transition Agreement was only in existence for approximately two weeks prior to January 14, 2002 is irrelevant for purposes of the inferences that the plaintiff seeks to prove. He is not arguing that defendant Kulkarni signed the Transition Agreement intending to interfere with it later, but rather that Kulkarni's intent in December, 2001 was to use trickery, surreptitious and hidden transfers, and intimidation to permit him to continue to extract money from Wolverine. It was only when he was thwarted in that plan by the plaintiff that Kulkarni improperly interfered with the Transition Agreement by causing the termination of the plaintiff's employment under that agreement. That interference was improper because the timing and the facts will generate the unavoidable inference that it was motivated by plaintiff's thwarting of the improper transfer.

## C. THE EVIDENCE OF OTHER PAYMENTS FALLS UNDER THE MOTIVE, INTENT, PREPARATION, PLAN AND KNOWLEDGE PRONGS OF RULE 404(b)

In this case, evidence of other payments to defendant Kulkarni is admissible under several of the exceptions of Fed. R. Evid. 404(b). In particular, the evidence of the December 2001 transfers and the last-minute provision of information to Parthenon demonstrates a plan and preparation by Kulkarni to extract the maximum possible amount of cash from Wolverine, both before and after the Parthenon transaction. First, Kulkarni used his positions as CEO and sole shareholder of Wolverine to cause accounting entries demonstrating that amounts were owed to him to be entered on the books and records of Wolverine. Next, Kulkarni hid the existence of these liabilities from Parthenon by burying the disclosure of those liabilities in the middle of 153 pages

11

of computer listings provided to Parthenon no earlier than the day before the transaction closed. Knowing that Parthenon was likely to object to payment once the hidden liability was unearthed, Kulkarni sought to drain as much cash as possible from Wolverine prior to the transaction, comfortable in the knowledge that the Parthenon transaction would replenish Wolverine's coffers. The last transfer, of $188,178.85 was done but a single day prior to the transaction. Finally, aware that Wolverine would soon have a new CEO, likely to protect the interests of Parthenon (the new majority shareholder), Kulkarni sought to transfer an additional $135,000 to himself on January 14, 2002, the attempt that led to the plaintiff's termination. The December, 2001 transfers are thus far more than simply evidence of other bad acts, they are evidence of the preparation and plan leading up to the January 14, 2002 transfer request.

Similarly, the $175,000 in transfers from the Wolverine payroll account to the U.K. are further evidence of Kulkarni's intent on January 14, 2002. These payroll account transfers were performed in the manner they were specifically to hide them from Wolverine's lender at the time, Citizens Bank. Under the terms of the loan agreement with that bank, Kulkarni was limited to $900,000 in wages, plus fringe benefits. See Plaintiff's Affidavit ¶8, Exhibit H, page PAC0197 §(s). At the time the payroll account transfers were made, Kulkarni was already withdrawing the maximum $900,000 annually in wages, thus any other payments to him were likely to be a major red flag to Citizens' consultants, Trimmingham Americas Inc. which was in the midst of a 47 day on-site review of Wolverine's finances focused on payments to Kulkarni. Kulkarni thus disguised the payments as transfers to Wolverine's U.K. branch. Although the payments had FICA Medicare tax paid on them, and were added to Kulkarni's W-2 for the year, the

12

checks were made payable to "Wolverine, Proctor & Schwartz, Inc." so as not to arouse suspicion. The reasonable inference is that the U.K. branch transferred the money back to Kulkarni.

In fact, Trimmingham failed to catch these transfers, although it caught other cash payments of at least $32,000 made to Kulkarni. Kulkarni had apparently had Wolverine make checks payable to Marian Lord, a staff accountant at Wolverine. Lord negotiated the checks and supplied the cash to Kulkarni. See Green Affidavit ¶6c. These transfers demonstrate Kulkarni's intent to hide transfers from investors, in this case Citizens Bank. The intent associated with these earlier transfers is probative of Kulkarni's intent with respect to the events of January 14, 2002, where the Complaint ¶¶22-23 alleges that the plaintiff sought to block a $135,000 transfer to Kulkarni until the approval of Parthenon had been obtained. Kulkarni angrily stated that he alone would deal with Parthenon.

Furthermore, the evidence sought relates to Kulkarni's knowledge on January 14, 2002. Evidence that he had previously, and subsequently, used surreptitious methods and questionable contract interpretations to extract payments from Wolverine is clear evidence that he knew how to use these methods, and clearly supports, without requiring an inference of bad character as a necessary link, an inference that he knew both how to extract payments in a surreptitious manner and that the actions that he took on January 14, 2002 were wrongful. See Rubio-Estrada at 847-848 (evidence of a prior conviction for cocaine possession supports the inference that the defendant knew how cocaine distribution operations were conducted); Huddleston v. United States, 485 U.S. 681, 684 (1988) (evidence of other instances where defendant may have sold stolen property is admissible to demonstrate knowledge under Fed. R. Evid. 404(b)).

13

Finally, evidence of other payments is probative as to Kulkarni's intent. The evidence clearly demonstrate that Kulkarni extracted well in excess of the $900,000 in annual wages permitted to him under the loan agreements with Citizens' Bank, and that Kulkarni's motive in extracting these larger amounts was supporting his lavish lifestyle, thus providing evidence of motive.

Independent of its relevance for proving the events of January 14, 2002, the payments to defendant Kulkarni may provide further evidence of fraud that goes directly to defendants' defenses in this case.

The Omnibus Agreement indicates, and Kulkarni admitted during his deposition, that he exchanged the alleged liability to him for accrued dividends (hidden from Parthenon[4] and the plaintiff) for the right to a number of payments of even greater value from Parthenon, primarily under section 5.2 of the LLC Agreement. Under the terms of the plaintiff's Settlement Agreement, he had the right to 4 or 8 percent of distributions under section 5.3 of the LLC Agreement, but 0 percent of distributions under section 5.2. Yet, on December 28, 2001, just prior to his signing of the Settlement Agreement, the plaintiff asked Kulkarni whether he had any right to "distributions or other monies" beyond those to which he was entitled under his $1 million per year Consulting Agreement and sections 5.2 and 5.3 of the LLC Agreement. Kulkarni unequivocally responded no. Plaintiff relied upon Kulkarni's representation, and suffered a loss when Kulkarni converted the hidden alleged right to $624,263.00 in dividends for the right to interest under section 5.2 of the LLC Agreement, which amount did not have to be shared

---

[4] Mr. Chilinski testified during his deposition (page 53) that Parthenon was surprised to discover the accrued dividends. Mr. Kulkarni during his deposition related a conversation with John Rutherford of Parthenon in which Rutherford expressed displeasure that Erik Scott of Parthenon had not been told about the accrued dividend.

14

with the plaintiff. This evidence goes directly to one of defendants' defenses in this case, namely that the Transition Agreement and the Settlement Agreement settled some of plaintiff's rights under the January 4, 2000 Employment Agreement. Since Kulkarni's statements on December 28, 2001, the plaintiff's reliance thereon, and losses resulting therefrom may combine to constitute fraud, evidence of the Omnibus Agreement and payments relating thereto are clearly admissible.

Although the Omnibus Agreement called for the payments to Kulkarni to be paid before the end of 2002, not all of the payments apparently were made in this time frame[5]. Thus, evidence of payments after the end of 2002 is directly relevant to one of defendants' key defenses in this case, namely the existence of valid Transition and Settlement Agreements. If plaintiff demonstrates fraud in the negotiation of these agreements, which fraud in part is based upon payments under the Omnibus Agreement, certain of defendants' defenses, at plaintiff's option, may be vitiated by the fraud. Furthermore, as yet undiscovered agreements or payments may provide further evidence of fraud.

## D. INQUIRY INTO OTHER PAYMENTS IS NOT UNDULY HARRASSING, EMBARASSING OR INTRUSIVE

---

[5] From November 14, 2005 deposition of Steven Chilinski, CEO of Wolverine, Proctor & Schwartz, Inc. from early 2002 through early 2005, pages 63-64:

Q. ...In 2002, there was a payment under the omnibus agreement, correct, Mr. Chilinski?
A. I'm trying to – payments -- I believe payments were paid in 2002 and 2003 related to the omnibus agreement. But I do not recall the amounts in each year.
.....
Q. So was everything that was called for to be paid in the omnibus agreement paid in either 2002 or 2003?
A. I recall that not all of it was paid.
Q. So there was still some owing at the end of 2003. Is that correct?
A. I believe so.

Defendants show little in the way of cause to support for their protective order motion. Fed. R. Civ. P. 26(c) permits a protective order to be granted "for good cause shown" to protect a "person from annoyance, embarrassment, oppression, or undue burden or expense." However, defendants have failed to demonstrate a single good cause, other than to repeat the mantra that "[e]xposing this private and confidential information to the public record from such a vast range of time is unduly burdensome, annoying, embarrassing, and intrusive to WPS and Kulkarni." Defendants' Memorandum at 12. They do not argue that there would be any expense whatsoever in connection with providing the requested information. They fail to enumerate a single burden associated with the provision of the information, let alone one that is undue. While the provision of financial information could possibly be annoying or embarrassing, defendants fail to demonstrate a single specific injury that might result from the disclosure. Their sole argument is that defendant Kulkarni does not want his compensation information disclosed to the public. Yet, plaintiff has explored with defendants ways in which the information could be protected from public view by certain stipulations. These discussions have made it abundantly clear that it is not the public that defendants are concerned about, but the plaintiff himself.

Good cause under Fed. R. Civ. P. Rule 26 is not established by inconvenience or expense, but rather it must be specifically demonstrated that disclosure will cause a clearly defined and serious injury. See Moore's Federal Practice (hereinafter "Moore") §26.104[1], Public Citizen v. Liggett Group, 858 F.2d 775, 789 (1st Cir. 1988), cert. den 488 U.S. 1030 (1989), Moore §26.101[1][c] (hardship to party against whom discovery sought must be weighed against value of information to the other party).

16

Furthermore, defendants allege that plaintiff is seeking information on payments from 1999 through 2005. That is misleading. While plaintiff has outstanding interrogatories and requests for production of documents for which responses are due later this week, these are narrowly tailored to focus on specific time periods and types of payments. Most requests are limited to periods ending March 31, 2003 or earlier. The only request relating to 1999 is for documentation relating to accrued expenses payable to defendant Kulkarni at the end of 1998 and 1999. The only documentation sought for which the time frame is not limited (and thus might extend to 2005) are payments and amounts due under the LLC Agreement and the Omnibus Agreement, entered into in 2001 and 2002 respectively. There are unlikely to be more than a handful of payments under either agreement, and these agreements and the payments made under them specifically relate to the issue of fraud discussed earlier.

E. THERE IS NO BASIS FOR PROHIBITING DISCOVERY BASED ON CONFUSION OF THE ISSUES OR THE POSSIBILITY OF FACT FINDING DETOURS

Defendants' next argument is that the discovery sought is likely to result in confusion of the issues or fact finding detours. However, neither of these issues appears anywhere in the Fed. R. Civ. P. relating to discovery. Fed. R. Civ. P. 26 refers to burden, expense, duplication, annoyance, embarrassment and oppression, but never mentions confusion of the issues or fact finding detours. These criteria appear in Fed. R. Evid. 403 which permits relevant evidence to be excluded based upon "confusion of the issues... or by considerations of undue delay..." but only if these bases outweigh the probative value of the evidence. It is apparent, therefore, that discovery of material that might ultimately be excluded following a balancing test at trial, is permitted, and that the weighing is to be

17

postponed until trial.  All that is required at the discovery stage is that the evidence

sought be "reasonably calculated to lead to the discovery of admissible evidence," a low

standard.  No weighing of probative value vs. these other factors is contemplated by the

Fed. R. Civ. P. at the discovery stage.

### F.  DEFENDANTS' CONTENTION THAT THE JANUARY 14, 2002 PAYMENT WAS PROPER AND APPROVED IS UNSUBSTANTIATED AND IN ANY CASE IS NO BASIS FOR PROHIBITING DISCOVERY

Defendants' final argument is that the payment that the plaintiff sought to halt on

January 14, 2002 was in any case approved by Parthenon.  Yet, they ignore the

Complaint ¶22, which states that the plaintiff "suggested that representatives of

Parthenon be contacted for approval," and that defendant Kulkarni angrily replied that

"he alone would deal with Parthenon."  This evidence is inconsistent with prior approval

of the payment by Parthenon.  Furthermore, despite the depositions of five persons,

including Mr. Kulkarni, having been conducted, no evidence of prior approval by

Parthenon has come to light, nor has any evidence of a payment of this magnitude to Mr.

Kulkarni prior to April 30, 2002 been provided by defendants, despite the fact that

evidence of all payments to Mr. Kulkarni from December 1, 2001 through April 30, 2002

were supposedly provided in response to one of plaintiff's earlier discovery requests.

It appears that defendants are referring to the Omnibus Agreement of November,

2002, executed ten months later, to support their contention that the payment was proper

and approved.  However, the fact that defendant Kulkarni and Parthenon ultimately

agreed to settle certain differences, and Kulkarni was permitted to receive certain

payments, does not change the issue of whether the payment would have been proper on

January 14, 2002.  Furthermore, even if Kulkarni were able to demonstrate that

18

Wolverine had a liability to him of more than $135,000 on January 14, 2002, that still would not demonstrate that he had the authority to cause immediate payment to be made to him, particularly in light of his Consulting Agreement, then in effect, which stripped him of any authority to "bind the company to the fulfillment of any… obligation…"

Defendants' argument is illogical. It is essentially that, since the evidence will ultimately show that the payment was proper, there is no need to permit discovery of facts that might demonstrate the opposite. In essence, they are arguing that this Court ought to prejudge the facts based on their one-sided and unsupported arguments, and prohibit discovery of facts that might demonstrate the falsity of their version of events. Such an argument has no merit whatsoever.

### III.  CONCLUSION

Plaintiff has amply demonstrated that the payments to defendant Kulkarni revealed to date are both relevant and admissible. Further discovery relating to both these and other, as yet undisclosed, payments is thus highly likely to lead to the discovery of admissible evidence, of motive, knowledge, preparation or plan, or of fraud in the negotiation of the Transition Agreement and the Settlement Agreement, which agreements defendants put forth as defenses in this case. Defendants' protective order motion should therefore be denied.

Respectfully submitted,

Peter A. Crawford, pro se
23 Newcastle Dr. #11
Nashua, NH  03060
(603)888-4574

Date: Dec 12, 2005

19

<u>Affidavit of Service</u>

I, Peter A. Crawford, plaintiff, hereby say and depose, under pains and penalties of perjury, that I this day served the within papers upon defendants' attorney, by causing copies thereof to be mailed, first class postage prepaid, to Mark Whitney, Morgan Brown & Joy, 200 State St., Boston, MA  02109.

Date: _Dec 12, 2005_

UNITED STATES DISTRICT COURT
District of Massachusetts

Civil Action
No. 05-10078-DPW

PETER A. CRAWFORD, Plaintiff   )
               )
   v.          )
               )
WOLVERINE, PROCTOR & SCHWARTZ, INC., )
Steven F. Chilinski, Deepak S. Kulkarni,  )
               )
   Defendants      )

## PLAINTIFF'S AFFIDAVIT IN SUPPORT OF HIS MEMORANDUM IN OPPOSITION TO DEFENDANTS' SECOND MOTION FOR A PROTECTIVE ORDER

I, Peter A. Crawford, do hereby say and depose that:

1. I am the plaintiff in the above captioned action

2. I attach hereto as Exhibit A, pages W0129 and W0133 previously produced by defendants during discovery in this matter.

3. I attach hereto as Exhibit B, pages W0574 and W0575, portions of the LLC Agreement entered into between Deepak Kulkarni and investors associated with Parthenon Capital on December 28, 2001. These documents were previously produced by defendants during discovery in this matter.

4. On December 28, 2001, I met with Deepak Kulkarni at the offices of Ropes and Gray in Boston, MA, just prior to signing the Transition Agreement and the Settlement Agreement, which I entered into on that date and which are attached hereto as

1

Exhibits C and D respectively. Prior to signing those documents, I specifically asked Mr. Kulkarni whether he had any rights to distributions or other monies other than those under the $1 million per year consulting agreement and sections 5.2 and 5.3 of the LLC Agreement, both being executed that day. He specifically and unequivocally said no. He further stated that the interest payments under section 5.2 of the LLC Agreement were being "carved out" from the distributions, a portion of which I would be entitled to under the Settlement Agreement, as these payments were likely to be deferred or forgiven and that he would otherwise want me to pay taxes on the imputed income.

5. I attach hereto as Exhibit E the Omnibus Agreement, pages W0975-W0988, previously produced by defendants during discovery in this matter.

6. I attach hereto as Exhibit F page W0137, previously produced by defendants during discovery in this matter. Deepak Kulkarni informed me during 2001 that money was transferred to the U.K. by these checks to escape the notice of Citizens Bank, that monitored wire transfers with greater scrutiny.

7. I attach hereto as Exhibit G, pages W0136 and W0138, previously produced by defendants during discovery in this matter.

8. I attach hereto as exhibit H, pages PAC0182, PAC0197, PAC0215 and PAC0216, selected pages of a Loan and Funding Agreement entered into on September 29, 2000 between Wolverine, Proctor & Schwartz, Inc. and Citizens Bank of Massachusetts. Such agreement was in effect until the Parthenon transaction on December 28, 2001.

9.  I attach hereto as Exhibit I, pages PAC0237-PAC0241, the Affidavit of Linda
Green, that I understand was filed in Suffolk Superior Court during November, 2001, in
support of an action to appoint a receiver for Wolverine, Proctor & Schwartz, Inc.

Signed under pains and penalties of perjury

Peter A. Crawford

Date: December 12, 2005

3

# EXHIBIT A



December 17, 2001

Brown Brothers Harriman & Company
Bernie Ward


Dear Bernie,

I would like to request that you initiate a funds transfer on behalf of Wolverine Proctor &
Schwartz in the amount of $159,298.52. This transfer should be from Wolverine's
account as noted below:

> Wolverine Proctor & Schwartz Ordinary Account
> Account# 612319-4

Please transfer to Deepak S Kulkarni's account as noted below:

> Account# 612071-1

Please contact me with any questions regarding this request.

Sincerely,

Deepak S Kulkarni
Chief Executive Officer
Phone (978) 346-4541
Fax (978) 346-8753

**Wolverine Proctor & Schwartz, Inc.**
51 East Main Street, Merrimac, MA 01860 USA  Tel 978.346.4541  Fax 978.346.4213
www.wolverineproctor.com

W0129



December 27, 2001

Brown Brothers Harriman & Company
Bernie Ward

Dear Bernie,

I would like to request that you initiate a funds transfer on behalf of Wolverine Proctor &
Schwartz in the amount of $188,178.85. This transfer should be from Wolverine's
account as noted below:

     Wolverine Proctor & Schwartz Ordinary Account
     Account# 612319-4

Please transfer to Deepak S Kulkarni's account as noted below:

     Account# 612071-1

Please contact me with any questions regarding this request.

Sincerely,

Deepak S Kulkarni
Chief Executive Officer
Phone (978) 346-4541
Fax (978) 346-8753

**Wolverine Proctor & Schwartz, Inc.**
51 East Main Street, Merrimac, MA 01860 USA  Tel 978.346.4541  Fax 978.346.4213
www.wolverineproctor.com

W0133

# EXHIBIT B

ARTICLE 5

DISTRIBUTIONS AND ALLOCATIONS OF PROFIT AND LOSS

5.1.    Board of Managers Determination. The Board of Managers shall determine in its sole discretion the timing and the aggregate amount of any Distributions to Members; provided, however, (i) that in the event of a Recapitalization or a Sale, the proceeds of such Recapitalization or Sale, as the case may be, after deducting reasonable expenses incurred by the Company in connection therewith, shall be distributed, as soon as reasonably practicable and (ii) in the event the Company receives income taxable to its Members, the Board of Managers shall make Distributions to all Members under Sections 5.2 or 5.3 as applicable in amounts calculated to be sufficient to enable the Members in the highest marginal tax bracket to pay income tax on such income at a combined federal and state tax rate determined in good faith by the Board of Managers, unless the Board of Managers determines in good faith that the making of such Distribution would be against the best interests of the Company. Distributions shall be charged to the Capital Accounts of the Members and made in the order set forth in Sections 5.2 and 5.3, as applicable (including Distributions described in clause (ii) of the immediately preceding sentence). Distributions made to a particular class of Units shall be made to the holders of such class of Units pro rata in accordance with the number of Units of such class held by the holder in question. Distributions to holders of Class A Units are subject to offset as provided in the Kulkarni Subscription Agreement.

5.2.    Special Distributions. After deducting any amounts of interest on the WP&S Notes which are used to pay expenses of the Company, amounts equal to interest on the WP&S Notes shall be distributed 38.57% to the holders of Class A Units and 61.43% to the holders of Class B Units.

5.3.    General Distributions. Except for amounts distributed pursuant to Section 5.2:

5.3.1. First, 50% of any Distributions shall be made to the holders of the Class A Units and 50% of such Distributions shall be made to the holders of Class B Units until the aggregate amount of Distributions made pursuant to this Section 5.3.1 equals $10,000,000;

5.3.2. Second, after the aggregate amount of Distributions made pursuant to Section 5.3.1 equals $10,000,000, 10% of any Distributions shall be made to the holders of the Class A Units and 90% of any Distributions shall be made to the holders of the Class B Units until the aggregate amount of Distributions made pursuant to this Section 5.3.2 equals $37,778,000;

5.3.3. Third, after the aggregate amount of Distributions made pursuant to Section 5.3.2 equals $37,778,000, 90% of any Distributions shall be made to the holders of Class A Units and 10% of any Distributions shall be made to the holders of Class B Units until the aggregate amount of Distributions made pursuant to this Section 5.3.3 equals $20,665,000;

5.3.4.  Thereafter, 40% of any Distributions shall be made to the holders of Class A Units and 60% of any Distributions shall be made to the holders of Class B Units.

5.3.5.  Notwithstanding the foregoing, the proceeds distributed after the occurrence of a Liquidation Event shall be distributed solely to the holders of Class B Units until the holders of Class B Units have received $14,000,000 in the aggregate pursuant to this Section 5.3.5 and the other provisions of this Section 5.3 including all Distributions to holders of Class B Units made prior to the occurrence of Liquidation Event (it being understood and agreed that (i) any Distributions made after a Liquidation Event shall in no way require any repayment of any Distributions made prior to such Liquidation Event and (ii) Distributions pursuant to this Section 5.3.5 shall be credited against amounts payable to the holders of Class B Units pursuant to Section 5.3.1, 5.3.2, 5.3.3 and 5.3.4).

5.4.    No Violation.  Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not make a Distribution to any Member on account of such Member's Interest in the Company if such Distribution would violate section 18-607 of the Act or other applicable law.

5.5.    Withholdings.  All amounts withheld pursuant to the Code or any federal, state, local or foreign tax law with respect to any payment, distribution or allocation to the Company shall be treated as amounts paid to the Company.  The Board of Managers is authorized to withhold from Distributions, or with respect to allocations, to the Members and to pay over to the appropriate federal, state, local or foreign government any amounts required to be so withheld. The Board of Managers shall allocate any such amounts to the Members in respect of whose Distribution or allocation the tax was withheld and shall treat such amounts as actually distributed to such Members.

5.6.    Property Distributions and Installment Sales.  If any assets of the Company shall be distributed in kind pursuant to this Article 5, such assets shall be distributed to the Members entitled thereto in the same proportions as the Members would have been entitled to cash Distributions.  The amount by which the fair market value of any property to be distributed in kind to the Members exceeds or is less than the then prevailing Asset Value of such property shall, to the extent not otherwise recognized by the Company, be taken into account in determining Net Profit and Net Loss and determining the Capital Accounts of the Members as if such property had been sold at its fair market value immediately prior to such Distribution.  If any assets are sold in transactions in which, by reason of section 453 of the Code, gain is realized but not recognized, such gain shall be taken into account when realized in computing gain or loss of the Company for purposes of allocation of Net Profit or Net Loss under this Article 5 and, if such sales shall involve substantially all the assets of the Company, the Company shall be deemed to have been dissolved and terminated notwithstanding any election by the Members to continue the Company for purposes of collecting the proceeds of such sales.

5.7.    Net Profit or Net Loss.  The "Net Profit" or "Net Loss" of the Company for each Fiscal Year or relevant part thereof shall mean the Company's taxable income or loss for federal income tax purposes for such period (including all items of income, gain, loss or deduction

# EXHIBIT C

## WOLVERINE PROCTOR & SCHWARTZ, INC.

### Transition Agreement

THIS IS AN AGREEMENT made as of December 28, 2001 by and between Wolverine Proctor & Schwartz, Inc., a Delaware corporation (the "Company"), and Peter Crawford (the "Employee").

WHEREAS, the Company desires to obtain the services of the Employee and the Employee desires to provide such services to the Company to facilitate transitional needs arising from a change of control of the Company. .

NOW, THEREFORE, in consideration of the mutual covenants contained in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which consideration are hereby acknowledged, the parties agree as follows:

1.    Services

During the Transition Period, the Employee agrees to perform such services to and for the Company as may be reasonably requested by the Chief Executive Officer of the Company or its Board of Directors to facilitate the transition of the Company's management.    The Employee's commitment to the Company during the Transition Period will be full-time and shall take into account the Employee's expertise in managing and operating the Company.

2.    Term

Unless sooner terminated as provided below, the term of the Employee's engagement under this Agreement will be from the date hereof until the earlier of (i) March 31, 2002, (ii) the consummation by the Company of a working capital facility with an institutional lender, or (iii) two weeks after the date on which the Chief Executive Officer provides written notice of termination, for any reason or no reason, to the Employee (the "Transition Period").

3.    Extent of Services

During the Transition Period, the Employee will devote his best efforts to the performance of his duties under this Agreement.    Under no circumstances will the Employee knowingly take any action contrary to the best interests of the Company.

4.    Compensation

4.1    Base Salary Fee.    During the Transition Period, the Company will pay the Employee compensation at the rate of $150,000 per annum, which shall be payable in accordance with the Company's normal payroll practices (the "Base Salary Fee").

8698745.2

**PAC 0043**

4.2    Expenses.  The Company will, upon substantiation thereof, reimburse the Employee for all reasonable expenses of types authorized by the Chief Executive Officer of the Company in the ordinary course of business and incurred by the Employee in connection with the Company's business affairs.  The Employee must comply with such accounting and reporting requirements as the Company may from time to time establish in order to obtain such reimbursement.

4.3    Benefits.  During the Transition Period, the Employee shall be entitled to participate in the Company's life, disability, medical, dental and other insurance programs available to key executives on the same terms as such are available generally to other key executives of the Company.

4.4    Equity Advance.  Within three months after the expiration of the Transition Period, the Company shall pay to the Employee the amount of $150,000, subject to appropriate deductions for withholding and similar taxes.

5.    Release.

5.1    The Employee agrees, promises and covenants that he will not file, charge, claim, sue or cause to permit to be filed, charged, claimed or sued, any action for damages or other relief (including injunctive, declaratory or other equitable relief) against the Company or any of its affiliates involving any matter occurring in the past up to the date hereof.  The Employee agrees that he has not, and will not, assign any claims which he has or may have against the Company or any of its affiliates to any third party.  The preceding sentence shall not apply to any matter arising out of the performance or nonperformance of the obligations of the Company under this Agreement or the Employee's right to a bonus payment (the "Bonus Payment") provided by paragraph 4 of the Employment Letter dated January 2001, a copy of which is attached hereto as Exhibit A (the "Employment Letter").

5.2    In consideration of the covenants set forth herein, and more particularly the payments to the Employee hereunder, and other good and valuable consideration, the Employee, his agents, heirs, legatees, successors and assigns (collectively hereinafter the "Employee-Releasors"), hereby irrevocably and unconditionally releases, remises, and forever discharges the Company, Deepak Kulkarni, their respective affiliates, any entity owned or controlled by the Company or Deepak Kulkarni, their officers or directors and their respective present and former directors, officers, employees, agents, attorneys, subsidiaries, successors, insurance carriers and assigns, and each of them (collectively hereinafter the "Company-Releasees"), of and from any and all actions, causes of action, suits, debts, charges, complaints, claims, liabilities, obligations, injuries, promises, agreements, controversies, damages, and expenses (including attorneys' fees and costs actually incurred), of any form whatsoever, whether known or unknown, foreseen or unforeseen, anticipated or unanticipated, suspected or unsuspected, manifest or latent, intentional or negligent (collectively, "Claims") which the Employee or the Employee's successors in interest now own or hold, have at any time heretofore owned or held or may at any time own or hold by reason of any matter or thing based upon, relating to or arising out of the Employee's employment relationship with the Company or any of its affiliates or the termination of that relationship, including but not limited to, claims arising out of any right to an equity interest in the Company (including, without limitation, under

8698745.2

-2-

PAC 0044

that certain letter agreement between the Employee and the Company dated January 4, 2000 or that certain letter agreement between the Employee and the Company dated December 4, 2001), expressly excluding any rights to the Bonus Payment, or claims arising under the Age Discrimination in Employment Act of 1967, Title VII of the civil Rights Act of 1963 and any other federal, state or local laws prohibiting age, sex, disability or any other forms of discrimination, which existed or may have existed prior to or contemporaneously with the execution of this Agreement. Notwithstanding the foregoing, this Section 5.2 shall not release the Company from any obligation set forth in this Agreement or in the Settlement Agreement of even date herewith between the Employee and Deepak Kulkarni.

6.      Confidentiality of Agreement. The parties agree that all information relating in any way to the terms of and amounts payable under this Agreement shall be held confidential by the parties and shall not be publicized or disclosed to any person (other than an immediate family member (including, without limitation, any spouse, parent, child, and/or sibling), physician, psychologist, legal counsel or financial advisor, provided that any such individual to whom disclosure is made agrees to be bound by these confidentiality obligations), business entity or government agency, except as mandated by state or federal law, upon lawful subpoena by a court or agency of competent jurisdiction or pursuant to the mutual consent of the parties. If such subpoena is received by any party to this Agreement, a copy thereof shall be promptly provided to all other parties.

7.      Notices

All notices under this Agreement must be in writing and must be delivered by hand or mailed by certified or registered mail, postage prepaid, return receipt requested, to the parties as follows:

| | |
|---|---|
| If to the Company: | Wolverine Proctor & Schwartz, Inc.<br>51 E. Main Street<br>Merrimac, MA 01850<br>Attention: Chief Executive Officer |
| with a copy to: | Deepak Kulkarni<br>124 Commonwealth Ave.<br>Boston, MA 02116 |
| If to the Employee: | To the address set forth below the signature of the Employee; |

or to such other address as is specified in a notice complying with this Section 8. Any such notice is deemed given on the date delivered by hand or three days after the date of mailing.

8698745.2

-3-

PAC 0045

8.    <u>Miscellaneous</u>

      8.1    <u>Modification</u>.  This Agreement constitutes the entire Agreement between the parties with regard to the subject matter hereof, superseding all prior understandings and agreements, whether written or oral.  This Agreement may not be amended or revised except by a writing signed by the parties.

      8.2    <u>Successors and Assigns</u>.  This Agreement is binding upon and inures to the benefit of both parties and their respective successors and assigns, including any corporation with which or into which the Company may be merged or which may succeed to its assets or business, although the obligations of the Employee are personal and may be performed only by him.

      8.3    <u>Severability</u>.  The provisions of this Agreement are severable, and invalidity of any provision does not affect the validity of any other provision.  In the event that any court of competent jurisdiction determines that any provision of this Agreement or the application thereof is unenforceable because of its duration or scope, the parties agree that the court in making such determination will have the power to reduce the duration and scope of such provision to the extent necessary to make it enforceable, and that the Agreement in its reduced form is valid and enforceable to the full extent permitted by law.

      8.4    <u>Governing Law</u>.  This Agreement is to be construed under and governed by the laws of The Commonwealth of Massachusetts.

8698745.2

-4-

PAC 0046

**IN WITNESS WHEREOF**, the parties have executed this Agreement as of the date and year first above written.

WOLVERINE PROCTOR & SCHWARTZ, INC.

By: _____

Name:

Title: Chairman

_____

Peter Crawford

Address:     23 New Castle Drive #11
             Nashua, New Hampshire 03060

8698745.2

-5-

PAC 0047

# EXHIBIT D

## SETTLEMENT AGREEMENT

SETTLEMENT AGREEMENT made and entered into in Boston, Massachusetts, by and among Wolverine Proctor, LLC, a Delaware limited liability company (the "Company"), Deepak Kulkarni of 124 Commonwealth Avenue, Boston, Massachusetts and Peter Crawford of 23 New Castle Drive #11, Nashua, NH 03060 ("Crawford"), as of this 28th day of December, 2001.

WHEREAS, Crawford and Wolverine Proctor & Schwartz, Inc. ("WP&S") are parties to that certain letter agreement, dated January 4, 2000, as the same may have been amended or modified (the "Crawford Employment Letter");

WHEREAS, Deepak Kulkarni ("Kulkarni"), Parthenon Investors II, L.P., PCIP Investors, J&R Founders' Fund, L.P. and Wolverine Proctor, LLC (the "LLC") have entered into the Deepak Kulkarni Representation and Warranty, Indemnity and Subscription Agreement (the "Kulkarni Subscription Agreement") and the documents contemplated thereby (the "Transaction Documents");

WHEREAS, pursuant to the Transaction Documents, among other things, WP&S will be recapitalized and refinanced;

WHEREAS, in connection with the consummation of the recapitalization and refinancing of WP&S contemplated by the Transaction Documents, it is desired that all of Crawford's rights with respect to any and all options or other rights to acquire capital stock of WP&S granted pursuant to Crawford Employment Letter or otherwise ("Crawford's Equity Rights") be purchased by the LLC or otherwise terminated and extinguished;

WHEREAS, in connection with the execution of this Agreement, Crawford and WP&S are entering into a Transition Agreement dated as of even date herewith (the "Transition Agreement");

NOW, THEREFORE, in consideration of the foregoing premises (including, without limitation, the termination of Crawford's Equity Rights, which are hereby terminated) and the mutual promises, terms, provisions and conditions set forth in this Agreement, the parties hereby agree

1.    Crawford shall be entitled to the following payments, which are to be made solely in the event that a Distribution is made to the holders of the Class A Units under the Wolverine Proctor, LLC Limited Liability Company Agreement dated as of December 28, 2001 (the "LLC Agreement"):

(a)    In the event that the holders of the Class A Units receive a Distribution pursuant to Section 5.3.1. of the LLC Agreement, Crawford shall be entitled to a payment in an amount equal to four percent (4%) of the aggregate Distributions actually received by the holders of Class A Units thereunder; provided, that Crawford shall not be entitled to any payment under this clause (a) until the foregoing amount exceeds the Equity Advance (as that term is defined in the

8698873.2

PAC 0048

Transition Agreement) in which case he shall only be entitled to the amount in excess of the Equity Advance.

(b)    In the event that the holders of the Class A Units receive a Distribution pursuant to Section 5.3.2. of the LLC Agreement, Crawford shall be entitled to a payment in an amount equal to four percent (4%) of the aggregate Distributions actually received by the holders of Class A Units thereunder.

(c)    In the event that the holders of the Class A Units receive a Distribution pursuant to Section 5.3.3. of the LLC Agreement, Crawford shall be entitled to a payment in an amount equal to eight percent (8%) of the aggregate Distributions actually received by the holders of Class A Units thereunder.

(d)    In the event that the holders of the Class A Units receive a Distribution pursuant to Section 5.3.4. of the LLC Agreement, Crawford shall be entitled to a payment in an amount equal to eight percent (8%) of the aggregate Distributions actually received by the holders of Class A Units thereunder.

For the purposes hereof, the term "Distributions" shall include cash, assets in kind or other property actually distributed to the holders of the Class A Units, provided that, (i) in the case of cash Distributions, the value thereof shall be calculated prior to giving effect to any withholding pursuant to Section 5.5 of the LLC Agreement and (ii) all Distributions shall be net of any applicable withholding or similar taxes.

2.    In the event that the holders of the Class A Units are obligated to indemnify the Company, the Parthenon Investors (as defined in the Kulkarni Subscription Agreement) or any of their respective Affiliates (as defined in the Kulkarni Subscription Agreement) under the Kulkarni Subscription Agreement and such indemnity obligation is satisfied by Kulkarni (whether through the return of the proceeds of a Distribution, offset of compensation payments, direct payments or otherwise) Crawford shall pay Kulkarni in cash that percentage of such indemnity payment which is equal to the percentage of Distributions to which Crawford would be entitled under paragraph 1 hereof in each case calculated at the date of the making of such indemnity payment. By way of example only, if Kulkarni were to make an indemnity payment on a date on which Crawford was entitled to receive four percent (4%) of Distributions under paragraph 1 hereof, Crawford would be required to pay Kulkarni four percent (4%) of such indemnity payment. If Kulkarni were to make an indemnity payment on a date on which Crawford was entitled to receive eight percent (8%) of Distributions under paragraph 1 hereof, Crawford would be required to pay Kulkarni eight percent (8%) of such indemnity payment. Notwithstanding the forgoing, Crawford's percentage of indemnity payments arising under paragraphs 9.3 (d), (h) or (i) of the Kulkarni Subscription Agreement shall be fixed at four percent (4%). Any such payments due to Kulkarni shall be made within ten (10) business days of receipt by Crawford of a written notice delivered by Kulkarni to Crawford, which notice shall set forth in reasonable detail the nature of the indemnified loss and the amount of Kulkarni's indemnity obligation with respect thereto.

3.    All payments made to Crawford pursuant to paragraph 1 above shall be made by the Company in the same form as the Distribution was paid to the holders of the Class A Units and shall be made as soon as reasonably practicable after payment of such Distribution is made to the holders of the Class A Units.

4.    Crawford acknowledges and agrees that nothing herein shall be construed as granting him (i) any rights as a member of the Company (including, without limitation, any approval or voting rights granted to any members of the Company) or (ii) any right to acquire or otherwise exercise ownership of any Units of the Company or (iii) any right of employment by the Company.

5.    This Agreement may not be amended or modified without the written consent of all parties hereto.

IN WITNESS WHEREOF, the parties hereto, intending to be legally bound by the terms hereof, have executed this Agreement, under seal, as of the date first above written.

_Peter C. Crawford_
Peter Crawford

_Deepak Kulkarni (signature)_
Deepak Kulkarni

Wolverine Proctor, LLC hereby joins in the foregoing Agreement solely for the purpose of agreeing to make the payments in paragraphs (a) through (d) of paragraph 1 directly to Crawford as an irrevocable assignee of that portion of Kulkarni's interest in the Class A Units. Crawford's rights to receive these assigned payments from the LLC shall be enforceable notwithstanding the provisions of Section 15.8 of the LLC Agreement.

WOLVERINE PROCTOR, LLC

By: _signature_
Name:
Title:

8698873.2

-4-

PAC 0051

# EXHIBIT E

# OMNIBUS AGREEMENT

This Omnibus Agreement is made this 13th day of November, 2002 by and between Wolverine Proctor, LLC., a Delaware limited liability company (the "Company"); Wolverine Proctor & Schwartz, Inc., a Delaware corporation ("WP&S"); Deepak S. Kulkarni ("Kulkarni"); and Parthenon Investors II, L.P., PCIP Investors and J&R Founders' Fund, L.P. (the "Parthenon Investors"). Capitalized terms used but not defined herein shall have the meaning set forth in the Subscription Agreement (as defined below).

WHEREAS, Kulkarni and the Parthenon Investors are the sole holders of equity interests in the Company;

WHEREAS, the Company is the sole stockholder of Wolverine Holdings, Inc., a Delaware corporation, which is the sole stockholder of WP&S;

WHEREAS, the Company, Kulkarni and the Parthenon Investors are parties to the Deepak Kulkarni Representation and Warranty, Indemnity and Subscription Agreement on December 28, 2001 (the "Subscription Agreement") pursuant to which Kulkarni has certain indemnity obligations to the Company;

WHEREAS, WP&S and Kulkarni previously entered into a Consulting Agreement dated December 28, 2001 (the "Consulting Agreement") pursuant to which Kulkarni is entitled to certain health benefits;

WHEREAS, WP&S previously issued a note dated December 28, 2001 in the principal amount of $11,229,685 to Parthenon Investors II, L.P., a note dated December 31, 2001 in the principal amount of $2,441,236 to Parthenon Investors II, L.P., a note dated December 28, 2001 in the principal amount of $95,227 to PCIP Investors, a note dated December 28, 2001 in the principal amount of $175,088 to J&R Founders' Fund, a note dated December 31, 2001 in the principal amount of $20,702 to PCIP Investors and a note dated December 31, 2001 in the principal amount of $38,063 to J&R Founders' Fund (the "WP&S Notes"), and each of the WP&S Notes was subsequently assigned by the holder thereof to the Company;

WHEREAS, the unpaid interest and principal amounts due under the WP&S Notes are currently payable to the Company; and

WHEREAS, the parties hereto desire to amend and clarify certain obligations and benefits of the parties as set forth herein.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

1.     Indemnification Obligations.  Contemporaneously with the execution and delivery of this Omnibus Agreement, each of the Company, the Parthenon Investors and Kulkarni shall execute and deliver to each other an Amendment No. 1 to the Subscription Agreement in the form attached hereto as Exhibit A (the "Subscription Amendment").  With the execution of the

BO:86809.3

W0975

Subscription Amendment and in addition to the terms and conditions set forth therein, Kulkarni hereby forgives any accrued dividend contained in the November 2001 Balance Sheet referenced in the definition of Reserves of the Subscription Agreement.

      2.    Accrued Dividends; Deferred Compensation; Tax Liability.

      (a)    Subject to the execution and delivery of the Consulting Amendment (as defined below) by WP&S and Kulkarni, the parties hereto agree that WP&S shall pay to Kulkarni (1) $56,000 in respect of certain state tax liabilities (including accrued interest) purported by the Commonwealth of Massachusetts to be owed by Kulkarni to the Commonwealth of Massachusetts for the 1993, 1994 and 1995 taxable years in connection with his prior equity holdings in WP&S, which amount shall be paid contemporaneously with the execution and delivery of this Agreement, and (2) $170,000 in deferred compensation (the "Agreed Deferred Compensation"), which amount shall be paid in two equal installments on November 15, 2001 and December 15, 2002.

      (b)    Effective upon the execution and delivery of the Subscription Amendment by the parties thereto, Kulkarni hereby irrevocably forgives, waives and forfeits (on his own behalf, on behalf of his Immediate Family (as defined in the Consulting Agreement) and on behalf of each of his Affiliates) any right or interest he may have in any accrued dividend (including, without limitation, any accrued dividends as may be contained in the trial balances accompanying the November 2001 Balance Sheet), any deferred compensation (other than the Agreed Deferred Compensation) and any other compensation, amounts, claims or obligations arising prior to the Initial Closing as may be owed or owing by WP&S or any of its subsidiaries or Affiliates to any of Kulkarni, his Immediate Family or any of his Affiliates.

      (c)    Kulkarni hereby represents and warrants to the Company and the Parthenon Investors that he has not assigned, transferred, pledged or otherwise encumbered or disposed of any right or interest he, his Immediate Family or any of his Affiliates may have in or to in any accrued dividend (including, without limitation, any accrued dividend as may be disclosed in the trial balances accompanying the November 2001 Balance Sheet), any deferred compensation (including, without limitation, the Agreed Deferred Compensation) or any other compensation, amounts, claims or obligations arising prior to the Initial Closing as may be owed or owing by WP&S or any of its subsidiaries or Affiliates to any of Kulkarni, his Immediate Family or any of his Affiliates.

      3.    Health Benefits and Additional Compensation. Contemporaneously with the execution and delivery of this Omnibus Agreement, Kulkarni and WP&S shall execute and deliver to each other an Amendment No. 1 to the Consulting Agreement in the form attached hereto as Exhibit B (the "Consulting Amendment").

      4.    WP&S Notes. The parties hereby acknowledge and agree that the WP&S Notes bear an interest rate of 10% per annum, which rate of interest is set forth in each such note and has not been amended or modified since the date of issuance of such note. In the event that the

BO:86809.3

W0976

rate of interest applicable to the WP&S Notes, or any one of them, is decreased such rate shall not be decreased, in any instance, to a rate of interest less than the imputed rate of interest that would be charged by the Internal Revenue Service for federal tax purposes; provided, however, that Kulkarni shall receive from the Company distributions in cash in respect of the tax liability paid or payable by Kulkarni in connection with the WP&S Notes, which distributions shall be made quarterly in arrears together with the payment of interest on the WP&S Notes in accordance with clause (iv) below. The parties hereto further acknowledge and agree that (i) the portion of interest on the WP&S Notes that is payable to Kulkarni for the year ending December 31, 2002 is $539,980 (the "2002 Interest"), (ii) the Company shall pay to Kulkarni $404,985 contemporaneously with the execution and delivery of this Agreement, which amount represents 75% of the 2002 Interest, (iii) the Company shall pay to Kulkarni the balance of the 2002 Interest on or prior to December 31, 2002, and (iv) interest payments in connection with the WP&S Notes shall be paid by WP&S to the Company, and distributed by the Company, in accordance with percentages set forth in Section 5.2 of the Company's Limited Liability Company Agreement dated December 28, 2001 (as amended from time to time in accordance with its terms, the "LLC Agreement"), to Kulkarni and (if they so elect) the Parthenon Entities quarterly, in arrears, commencing with January 1, 2003, subject to any restrictions on such payments set forth in that certain Loan and Security Agreement dated as of September 13, 2002, by and among Borrower, General Electric Capital Corporation, a New York corporation ("Lender"), and the other signatories thereto (including all annexes, exhibits and schedules thereto or contemplated therein, and as from time to time amended, restated, supplemented or otherwise modified).

5.      This Omnibus Agreement shall be governed by, and construed in accordance with, the laws of the Commonwealth of Massachusetts, without giving effect to the principles of conflicts of law thereof that would cause the application of the laws of any other jurisdiction. Neither this Omnibus Agreement nor any term or provision hereof may be amended, modified, waived or supplemented except by a written instrument executed by all parties hereto. This Agreement and the exhibits hereto constitute the complete agreement among the parties with respect to the subject matter hereof and thereof. This Agreement supersedes all prior negotiations and documents reflecting such prior negotiations among the parties hereto with respect to the subject matter hereof. This Agreement is intended to bind and inure to the benefit of the parties hereto and their respective successors and permitted assigns, heirs, executors, administrators and representatives. The headings of the sections, paragraphs and subsections of this Agreement are inserted for convenience only and shall not affect the interpretation hereof. Without prejudice to any rights or remedies otherwise available to any party hereunder, each party acknowledges and agrees that damages would be an inadequate remedy for any breach of the provisions of this Omnibus Agreement and agrees that the obligations of the parties hereunder shall be specifically enforceable. This Omnibus Agreement may be executed in separate counterparts, each of which when so executed and delivered shall be an original but which together shall constitute on and the same instrument.

BO:86809.3

W0977

IN WITNESS WHERBOF, this Omnibus Agreement is executed as of the first date written above.

WOLVERINE PROCTOR & SCHWARTZ, INC.:

By: _____
Name: Erik A Scot
Title: Vice President

WOLVERINE PROCTOR, LLC:

By: _____
Name: Erik A Scot
Title: Vice President

PARTHENON INVESTORS II, L.P.:

By: PCap Partners II, LLC, its General Partner
By: PCap II, LLC, its Managing Member

By: _____
Name:
Title:

PCIP INVESTORS, by its General Partners:

Parthenon Capital, Inc.:

By: _____
Name:
Title:

_____
Ernest K Jacquet

_____
John C. Rutherford

*SIGNATURE PAGE TO OMNIBUS AGREEMENT*

BO:86809.3                                          W0978

J&R FOUNDERS' FUND, L.P.:

By: J&R Advisors F.F., Inc., its General Partner:

By: _____

Name:

Title:

_____

Deepak S. Kulkarni


*SIGNATURE PAGE TO OMNIBUS AGREEMENT*


BO:86809.3

W0979

SENT BY: WMC;                          617;              NOV-12-02  5:50PM;              PAGE 3/4

J&R FOUNDERS' FUND, L.P.:

By:  J&R Advisors F.F., Inc., its General Partner:

By: _____
Name:
Title:

Deepak S. Kulkarni

*SIGNATURE PAGE TO OMNIBUS AGREEMENT*

BO:26809.3

W0980

Exhibit A

## AMENDMENT NO. 1 to DEEPAK KULKARNI REPRESENTATION AND WARRANTY, INDEMNITY AND SUBSCRIPTION AGREEMENT

This Amendment No. 1 to Deepak Kulkarni Representation and Warranty, Indemnity and Subscription Agreement is dated as of November 13, 2002 by and between Wolverine Proctor, LLC, a Delaware limited liability company (the "**Company**"); Deepak S. Kulkarni ("**Mr. Kulkarni**"); and Parthenon Investors II, L.P., PCIP Investors and J&R Founders' Fund, L.P. (the "**Parthenon Investors**"). Capitalized terms used but not defined herein shall have the meaning set forth in the Subscription Agreement (as defined below).

WHEREAS, the Company, Mr. Kulkarni and the Parthenon Investors entered into the Deepak Kulkarni Representation and Warranty, Indemnity and Subscription Agreement on December 28, 2001 (the "Subscription Agreement");

WHEREAS, the Company, Mr. Kulkarni and the Parthenon Investors are party to that certain Omnibus Agreement of even date herewith (the "**Omnibus Agreement**"); and

WHEREAS, pursuant to the Omnibus Agreement, the Company, Mr. Kulkarni and the Parthenon Investors desire to amend certain provisions of the Subscription Agreement as set forth herein.

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained herein, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1. Subsection (a) of Section 9.3 of the Subscription Agreement be and hereby is amended by deleting the phrase "until the earlier to occur of (x) March 31, 2002 or (y) the date of delivery to the Company of the audited financial statements of the Contributed Companies and their respective Subsidiaries for the fiscal year ending December 31, 2001 together with all footnotes thereto and the auditor's report of Arthur Andersen LLP (or such other nationally-recognized accounting firm as may be the Company's auditors at such time)" and substituting "until November 13, 2002" in lieu thereof.

2. Subsection (b) of Section 9.3 of the Subscription Agreement be and hereby is deleted in its entirety and the following substituted in lieu thereof:

" (b) Tax Reserves. Any claim for indemnification hereunder with respect to any breach of the representations and warranties of Mr. Kulkarni contained in subsection (a) of Section 3.15 (Tax Returns and Payments) in respect to any income Taxes resulting from the failure of WP&S to be a valid and subsisting Subchapter S corporation for federal or state income tax purposes at all times before the Initial Closing may be brought at any time from and after the Closings until the latest to occur of (x) March 31, 2002, (y) the date of delivery to the Company of the audited financial statements of the Contributed Companies and their respective Subsidiaries for the fiscal year ending December 31, 2001 together with all footnotes thereto and the auditor's report of Arthur Andersen LLP (or such other nationally-recognized accounting

W0981

-2-

firm as may be the Company's auditors at such time), or (z) the expiration of the longest relevant statute of limitation (determined after giving effect to any waivers or extensions thereof) related to the matters underlying such claim.".

3.     Subsection (c) of Section 9.3 of the Subscription Agreement be and hereby is amended by deleting the phrase "until the earlier of (i) the date of consummation of a Recapitalization or (ii) the date that is one year after the Subsequent Closing Date" and substituting "until November 13, 2002" in lieu thereof.

4.     Each of subsections (d) and (e) of Section 9.3 of the Subscription Agreement be and hereby is amended by deleting the phrase "until the date on which the matter is finally determined by order of a court of competent jurisdiction which is not subject to appeal" and substituting "until November 13, 2002" in lieu thereof.

5.     Subsection (h) of Section 9.3 of the Subscription Agreement be and hereby is amended by (1) inserting "and" before the phrase "subsection (a) of Section 3.1 0"; (2) deleting the phrase "and Section 3.29 (Brokers)" therefrom; and (3) inserting as the last sentence of such subsection "Any claim for indemnification hereunder with respect to any representations and warranties of Mr. Kulkarni contained in Section 3.29 (Brokers) may be brought any time from and after the Closings until November 13, 2002."

6.     Section 9.4 of the Subscription Agreement be and hereby is deleted in its entirety and the following substituted in lieu thereof:

"     9.4     Indemnification by Mr. Kulkarni. Mr. Kulkarni hereby indemnifies and agrees to indemnify, defend and hold harmless the Company against and in respect of all liabilities, obligations, judgments, injunctions, orders, damages, Taxes, losses, fines, penalties, injuries, deficiencies, demands, expenses, fees, costs (including reasonable attorneys' and expert witness fees and disbursements in connection with investigating, defending or settling any action or action threatened in writing) and amounts paid in settlement (collectively, the "Losses") that arise out of or result from:

            (a)     the breach of any representation or warranty made by Mr. Kulkarni in Sections 3.1, 3.6, subsection (a) of Section 3.10, subsection (a) of Section 3.15, subsections (a) and (b) of Section 3.16, subsection (a) of Section 3.18, Sections 3.23 or 3.29, including as a result of any misrepresentation in or omission from any schedule, document, certificate or other instrument required to be furnished by Mr. Kulkarni hereunder (in each case as such representation or warranty would read if all references to Material Adverse Change were deleted therefrom);

            (b)     the Strayfield Indemnity; or

            (c)     fraud or intentional misrepresentation by Mr. Kulkarni in the representations and warranties of Mr. Kulkarni in Section 3 or in the Closing Certificates;

W0982

- 3 -

provided, however, Mr. Kulkarni shall not be liable under subsections (a) or (b) of this Section 9.4 unless and until the aggregate amount of all Losses under subsections (a) and (b) of this Section 9.4 exceeds $775,000, in which case Mr. Kulkarni shall be liable for only that portion of such Losses that exceeds such deductible threshold; and

provided, further that no amount in respect of any claim for indemnification based upon subsection (a) of this Section 9.4 (except for a claim based upon a breach of the representations and warranties in subsection (a) of Section 3.10 (Title to Contributed Shares)) shall be applied against the dollar threshold identified in the immediately preceding proviso of this Section 9.4 until all Reserves are depleted with respect to any such indemnification claim; and provided further that the dollar threshold identified in the first proviso of this Section 9.4 shall not apply to any claim for indemnification based upon any breach of any representation or warranty made by Mr. Kulkarni in subsection (a) of Section 3.10.

In the event that Mr. Kulkarni is obliged to indemnify the Company under this Section 9.4, the time limitations provided for in subsections (a) through (h) of Section 9.3 and the dollar limitation provided for in the first proviso above in this Section 9.4 shall not apply to any Loss arising out of or resulting from subsection (c) of this Section 9.4.

In the event that Mr. Kulkarni is obliged to indemnify the Company under this Section 9.4 as a result of a breach of the representation and warranty set forth in Section 3.15 (Tax Returns and Payments) arising from the failure of WP&S to be a valid and subsisting Subchapter S corporation for federal tax purposes at all times prior to the Initial Closing, and such indemnification results in a monetary benefit to the Company or results in a reduction of the amount of taxes owed by the Company as a result of losses recaptured by the Company, the Company shall pay to Mr. Kulkarni, in cash, an amount equal to the monetary benefit or reduction in taxes realized by the Company, which amount shall be paid upon earlier of the receipt of such monetary benefit or the filing of the applicable tax returns by the Company.

Notwithstanding anything to the contrary in this Section 9 (including the provisions of Section 9.3 and this Section 9.4), the indemnity set forth in this Section 9.4 (other than in respect of a claim for a breach of the representations and warranties in subsection (a) of Section 3.10 (Title to Contributed Shares)) shall terminate upon the sale of all or substantially all of the assets or equity interests of the Company or Holdco, directly or indirectly, to an unaffiliated third party (whether in a single transaction or series of related transactions) or the merger or consolidation of the Company or Holdco, directly or indirectly, where the Company or Holdco, as applicable, is not the surviving entity or the majority of the stockholders of such entity prior to such merger or consolidation are not the majority of the stockholders of such entity after such transaction."

7.     The parties acknowledge and agree that any reference in the Subscription Agreement to the term "Reserves" (as defined in Section 8 of the Subscription Agreement) shall be and hereby is deemed to exclude any dividends that may be recorded as accrued in the trial balances accompanying the November 2001 Balance Sheet.

9808/1.A799132-4

W0983

- 4 -

8.     Except as expressly set forth in this Amendment, the Subscription Agreement is ratified and confirmed, shall remain in full force and effect and shall not be altered, amended or modified, except in accordance with its terms.

9.     This Amendment shall be governed by, and construed in accordance with, the laws of the Commonwealth of Massachusetts, without giving effect to the principles of conflicts of law thereof that would cause the application of the laws of any other jurisdiction. Neither this Amendment nor any term or provision hereof may be amended, modified, waived or supplemented except by a written instrument executed by all parties hereto. This Amendment, the Omnibus Agreement and the exhibits thereto constitute the complete agreement among the parties hereto and thereto with respect to the subject matter hereof and thereof. This Amendment supersedes all prior negotiations and documents reflecting such prior negotiations among the parties hereto with respect to the subject matter hereof. This Amendment is intended to bind and inure to the benefit of the parties hereto and their respective successors and permitted assigns, heirs, executors, administrators and representatives. The headings of the sections, paragraphs and subsections of this Amendment are inserted for convenience only and shall not affect the interpretation hereof. This Amendment may be executed in separate counterparts, each of which when so executed and delivered shall be an original but which together shall constitute on and the same instrument.

[Rest of page intentionally left blank]

9808/1.A799132-4

W0984

- 5 -

IN WITNESS WHEREOF, the parties hereto have caused this Amendment No. 1 to Deepak Kulkarni Representation and Warranty, Indemnity and Subscription Agreement to be executed as of the date first above written.

WOLVERINE PROCTOR, LLC.:

By: _____
Name:
Title:

PARTHENON INVESTORS II, L.P.:

By:  PCap Partners II, LLC, its General Partner
By:  PCap II, LLC, its Managing Member

By: _____
Name:
Title:

PCIP INVESTORS, by its General Partners:

Parthenon Capital, Inc.:

By: _____
Name:
Title:

_____
Ernest K. Jacquet

_____
John C. Rutherford

*SIGNATURE PAGE TO AMENDMENT NO. 1 TO DEEPAK KULKARNI REPRESENTATION AND WARRANTY, INDEMNITY AND SUBSCRIPTION AGREEMENT*

9808/1.A799132-4

W0985

- 6 -

**J&R FOUNDERS' FUND, L.P.:**

By:  J&R Advisors F.F., Inc., its General Partner:


By: _____
Name:
Title:



_____
Deepak S. Kulkarni




*SIGNATURE PAGE TO AMENDMENT NO. 1 TO DEEPAK KULKARNI REPRESENTATION
AND WARRANTY, INDEMNITY AND SUBSCRIPTION AGREEMENT*

9808/1.A799132-4

W0986

Exhibit B

## AMENDMENT NO. 1 to CONSULTING AGREEMENT

This Amendment No. 1 to Consulting Agreement is dated as of November 13, 2002 by and between Wolverine, Proctor & Schwartz, Inc., a Delaware corporation (the "Company") Deepak S. Kulkarni (the "Consulting Employee"). Terms used but not defined herein shall have the meaning set forth in the Consulting Agreement (as defined below).

WHEREAS, the Company and Mr. Kulkarni entered into a Consulting Agreement on December 28, 2001 (the "Consulting Agreement");

WHEREAS, the Company, Mr. Kulkarni and the Parthenon Investors are parties to that certain Omnibus Agreement of even date herewith (the "Omnibus Agreement");

WHEREAS, pursuant to the Omnibus Agreement, the Company and Mr. Kulkarni desire to amend certain provisions of the Consulting Agreement as set forth herein.

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained herein, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.      Section 4(c) of the Consulting Agreement be and hereby is deleted in its entirety and the following substituted in lieu thereof:

"      (c)      Medical Plans. During the term hereof, the Company shall pay the entire premium cost of coverage of the Consulting Employee and his Immediate Family under all health insurance plans in which the Consulting Employee and/or his Immediate Family participate as of the date of this Agreement or under one or more substitute plans providing substantially equivalent coverage in the event the Company elects to change insurance carriers. In addition to the payment of health insurance premiums as provided in the immediately preceding sentence, from and after January 1, 2002 and during the term hereof, the Company shall reimburse the Consulting Employee for any and all medical expenses (including all applicable deductibles, dental expenses, orthodontics expenses, any charges for private rooms and expenses for the use of a doctor of choice outside of the coverage of such health insurance plan) incurred by the Consulting Employee (on his behalf or on behalf of his Immediate Family) which are not otherwise reimbursed or paid to the Consulting Employee or his Immediate Family, as applicable, pursuant to any health insurance plan or arrangement; provided, however, that in no event shall the Company be obligated to reimburse any expenses for any medical care which is not based on recognized medical practices and standards in the United States (expenses subject to reimbursement under the terms of this sentence are hereinafter referred to collectively, "Reimbursable Expenses"). Notwithstanding the foregoing, the Company shall not be obligated to pay more than $75,000 in the aggregate during any calendar year (the "Annual Reimbursement Cap") for any Reimbursable Expenses, and no portion of the Annual Reimbursement Cap for any one year shall be applied to or available for use in any other year. For purposes of this Section 4(c), "Immediate Family" shall mean Alison J. Kulkarni, Isabella P. Kulkarni, Sebastian S. Kulkarni, Elizabeth A. Taylor, Mandakini S. Kulkarni and any future children of Mr. Kulkarni."

W0987

- 2 -

2.    Except as expressly set forth in this Amendment, the Consulting Agreement is ratified and confirmed, shall remain in full force and effect and shall not be altered, amended or modified, except in accordance with its terms.

3.    This Amendment shall be governed by, and construed in accordance with, the laws of the Commonwealth of Massachusetts, without giving effect to the principles of conflicts of law thereof that would cause the application of the laws of any other jurisdiction. Neither this Amendment nor any term or provision hereof may be amended, modified, waived or supplemented except by a written instrument executed by all parties hereto. This Amendment, the Omnibus Agreement and the exhibits thereto constitute the complete agreement among the parties hereto and thereto with respect to the subject matter hereof and thereof. This Amendment supersedes all prior negotiations and documents reflecting such prior negotiations among the parties hereto with respect to the subject matter hereof. This Amendment is intended to bind and inure to the benefit of the parties hereto and their respective successors and permitted assigns, heirs, executors, administrators and representatives. The headings of the sections, paragraphs and subsections of this Amendment are inserted for convenience only and shall not affect the interpretation hereof. This Amendment may be executed in separate counterparts, each of which when so executed and delivered shall be an original but which together shall constitute on and the same instrument.

[Remainder of the page intentionally left blank]

9808/1.A799132-4

W0988

# EXHIBIT F

Payroll Account
10201-100-00
Checks issued

© WILSON JONES     G7206 GREEN     7206 BUFF

| | Initials | c |
|---|---|---|
| Prepared By | | |
| Approved By | | |

| | date 2001 | check # | Payable to | Cleared bank | Amount |
|---|---|---|---|---|---|
| 1 | 5/29 | 001  Void | Deepak S Kulkarni | | Void |
| 2 | 5/3 | 002  Void | Deepak S Kulkarni | | Void |
| 3 | 6/1 | 003 | Wolverine Procter & Schwartz Inc | 6/18 | 25000 |
| 4 | 6/4 | 004 | Wolverine Procter & Schwartz Inc | 6/18 | 25000 |
| 5 | 6/14 | 005 | Wolverine Procter & Schwartz Inc | 7/2 | 25000 |
| 6 | 6/26 | 1001 | Wolverine Procter & Schwartz Inc | 7/9 | 25000 |
| 7 | 7/10 | 1002 | Void | | |
| 8 | 7/10 | 1003 | Wolverine Procter & Schwartz Inc | 7/30 | 25000 |
| 9 | 7/25 | 1004 | Wolverine Procter & Schwartz Inc | 8/6 | 25000 |
| 10 | 8/9 | 1005 | Wolverine Procter & Schwartz Inc | 8/23 | 25000 |
| 11 | 8/27 | 1006 | Wolverine Procter & Schwartz Inc | Not Sent | 25000 |
| 12 | | | | | |
| 13 | | | | | |
| 14 | | | | | |
| 15 | | | | | |
| 16 | | | | | |
| 17 | | | | | |
| 18 | 177,574.84 | | | | |
| 19 | | | | | |
| 20 | 175,000 | | | | |
| 21 | | | | | |
| 22 | $2,574.84  Medicare ) | | | | |
| 23 | | | | | |
| 24 | | | | | |
| 25 | | | | | |
| 26 | | | | | |
| 27 | | | | | |
| 28 | | | | | |
| 29 | 175,000  Net | | | | |
| 30 | | | | | |
| 31 | | | | | |
| 32 | | | | | |
| 33 | | | | | |
| 34 | | | | | |
| 35 | | | | | |
| 36 | | | | | |
| 37 | | | | | |
| 38 | | | | | |
| 39 | | | | | |
| 40 | | | | | |

W0137

# EXHIBIT G

## Jean McCoole

| | |
|---|---|
| **From:** | Mark Brown |
| **Sent:** | Monday, October 15, 2001 1:23 PM |
| **To:** | Carol O'Donohue; Jean McCoole |
| **Cc:** | Deepak Kulkarni; Peter A. Crawford |
| **Subject:** | Gross up of UK transfers |

Please add to Deepak's W-2 the amount of the $25,000 transfers we have made to the UK on his behalf.

Thanks

Mark A. Brown
Wolverine, Proctor & Schwartz, Inc
51 E Main Street
Merrimac, MA 01860
978.346.4541 x 739
Fax 346.8753
mbrown@jetzone.com



1

W0136

| File #: | 41797 | | Transaction Type: | Manual check |
|---------|-------|--|-------------------|--------------|
| Name: | Kulkarni, Deepak S | | Tax Frequency: | |
| Pay #: | C | | Temp Dept: | |
| Check #: | | | | |

Hours Information:
Regular Hours:                    0.00
Overtime Hours:                   0.00

Earnings Information:
Regular Earnings:           177,574.84
Overtime Earnings:                0.00

Statutory Deductions Information:

|  | Medicare | Amount: | 2574.84 |
|--|----------|---------|---------|
|  |  | Total Statutory Deductions: | 2,574.84 |

| Gross Pay: | 177,574.84 |
|------------|------------|
| - Taxes: | 2,574.84 |
| - Deductions: | 0.00 |
| Net Pay: | 175,000.00 |

Manual Checks - Full Report( 10-15-2001 )                                    3

W0138

# EXHIBIT H

### LOAN AMENDMENT AND FUNDING AGREEMENT

THIS LOAN AMENDMENT AND FUNDING AGREEMENT (this "Agreement"), dated as of September 29, 2000 (the "Funding Date"), is by and between Wolverine Proctor & Schwartz, Inc. f/k/a Wolverine (Massachusetts) Corporation ("Wolverine" or the "Borrower"), a Delaware corporation with its chief executive office and principal place of business at 51 East Main Street, Merrimac, Massachusetts 01860, and Citizens Bank of Massachusetts (the "Lender"), a Massachusetts bank with offices at 28 State Street, Boston, Massachusetts 02109.

### Preliminary Statements

A.    The Lender and Wolverine are parties to a Loan and Security Agreement dated February 24, 1999 (as amended heretofore and by this Agreement and as further amended, modified, supplemented or restated from time to time, the "Loan Agreement"; capitalized terms used but not defined herein shall have the meanings ascribed to them in the Loan Agreement) pursuant to which the Lender, subject to the terms and conditions thereof, agreed to make certain Revolving Credit Loans and Term Loans to Wolverine.  Wolverine's obligations under the Loan Agreement with respect to the Revolving Credit Loans and the Term Loans are evidenced by: (i) a Revolving Credit Note dated February 24, 1999 (as amended and/or restated from time to time, the "Revolving Credit Note") executed and delivered by the Borrower to the Lender;  (ii) a Term Note (Term Loan A) dated February 24, 1999 in the original principal amount of $10,000,000 (as amended and/or restated from time to time, "Term Note A");  and (iii) a Term Note (Term Loan B) dated February 24, 1999 in the original principal amount of $6,000,000 (as amended and/or restated from time to time, "Term Note B"; the Revolving Credit Note, Term Note A and Term Note B are collectively referred to herein as the "Notes").

B.    Pursuant to the Loan Agreement, the Lender has issued letters of credit for Wolverine's account, including that certain Irrevocable Standby Letter of Credit number 101-LC-01158 (the "Cardwell L/C") issued for the benefit of Fleet National Bank (together with its successors and assigns, "Fleet") to support certain obligations of Wolverine's affiliate, The Cardwell Machine Company, a Delaware corporation ("Cardwell") to Fleet.

**PAC 0182**

immediately after the word "Borrower" in the last line of such Subsection:

> "provided that the aggregate amount of such Advances shall at no time exceed $100,000."

(q)  <u>Subsection 5-22</u>.  Subsection 5-22 of the Loan Agreement is hereby further amended by deleting Subsection 5-22(d) in its entirety, deleting the word "and" at the end of Subsection 5-22(c) and inserting a period in lieu thereof and inserting the word "and" at the end of Subsection 5-22(b).

(r)  <u>Section 5-25</u>.  Section 5-25 of the Loan Agreement is hereby amended by striking the period at the end of clause (b), inserting therein the word "and" and adding to such Section as new clauses (c) and (d) the following:

> "(c) to the extent that any such transaction (excluding reasonable transactions between the Borrower and Friel) requires the payment of $50,000 by the Borrower or would cause the Borrower to have paid more than $100,000 in the aggregate on and after the Funding Date, have been consented to in writing by the Lender.
>
> (d)  The Borrower shall provide to the Lender within thirty (30) days of each calendar month end a schedule detailing any transaction entered into by the Borrower pursuant to this Section 5-25 during such calendar month, other than transactions between the Borrower and Friel that otherwise comply with the requirements of this Section."

(s)  <u>Section 5-26</u>.  Section 5-26 of the Loan Agreement is amended by adding thereto as a new clause (d) the following:

> "(d) Notwithstanding anything to the contrary herein or in any Executive Agreement, the total compensation paid by the Borrower to Deepak S. Kulkarni shall not exceed $900,000 per annum plus the fringe benefits provided to him as of the Funding Date."

(t)  <u>Article 5</u>.  Article 5 of the Loan Agreement is hereby amended by adding the following provision thereto as a new Section 5-30:

PAC 0197

(j) <u>Negotiations/Counsel</u>. Wolverine stipulates and agrees that this Agreement is the product of and results from lengthy arms-length negotiations among the parties and that neither the Lender nor any other party has exerted or attempted to exert improper or unlawful pressure or has in any way attempted to induce, through threats or otherwise, the execution or delivery of this Agreement. Without in any way limiting the foregoing, each of the parties hereto stipulates and agrees that at all times during the course of the negotiations surrounding the execution and delivery of this Agreement, they have, to the extent deemed necessary or advisable in their sole discretion, been advised and assisted by competent counsel of their own choosing, that such counsel has been present and participated in the negotiations surrounding this Agreement and that they have been fully advised by such counsel of the effect of each term, condition, provision and stipulation contained herein.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as a sealed instrument as of the date first above written.

WOLVERINE PROCTOR & SCHWARTZ, INC.

By:_____
                                                    (Title)

CITIZENS BANK OF MASSACHUSETTS

By_____
                    Kenneth J. Mooney

Senior Vice President

3177339_1.DOC

Subordination Agreement                                   J1429959v3

34

PAC0215

(j) <u>Negotiations/Counsel</u>. Wolverine stipulates and agrees that this Agreement is the product of and results from lengthy arms-length negotiations among the parties and that neither the Lender nor any other party has exerted or attempted to exert improper or unlawful pressure or has in any way attempted to induce, through threats or otherwise, the execution or delivery of this Agreement.  Without in any way limiting the foregoing, each of the parties hereto stipulates and agrees that at all times during the course of the negotiations surrounding the execution and delivery of this Agreement, they have, to the extent deemed necessary or advisable in their sole discretion, been advised and assisted by competent counsel of their own choosing, that such counsel has been present and participated in the negotiations surrounding this Agreement and that they have been fully advised by such counsel of the effect of each term, condition, provision and stipulation contained herein.


    IN WITNESS WHEREOF, the parties hereto have executed this Agreement as a sealed instrument as of the date first above written.



                        WOLVERINE PROCTOR & SCHWARTZ, INC.


                        By:_____
                                                (Title)



                        CITIZENS BANK OF MASSACHUSETTS

                        By _____
                            Kenneth J. Mooney
                            Senior Vice President



Funding Agreement                    34                    3083324v8

                                          **PAC** 0216

# EXHIBIT I

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.                                      SUPERIOR COURT DEPARTMENT
                                                  OF THE TRIAL COURT

---

)
CITIZENS BANK OF MASSACHUSETTS,   )
                                  )
         Plaintiff,               )
                                  )
         v.                       )   CIVIL ACTION NO.
                                  )
WOLVERINE PROCTOR & SCHWARTZ, INC., )
                                  )
         Defendant.               )

---

## AFFIDAVIT OF LINDA GREEN

Linda Green, being duly sworn, hereby deposes and states as follows:

1.      I am a Certified Public Accountant in the United States and a Chartered
Accountant in Canada.  In 1976, I received a Bachelor of Commerce degree, with a major in
accounting, from Concordia University in Montreal.  From 1976 to 1980, I was an auditor with
Clarkson & Gordon, a Canadian accounting firm that now operates as Ernst & Young.  From
1980 to 1999, I was employed by Canadian International Paper and its successors in various
financial and accounting positions, including manager of budgets and administration, manager of
corporate accounting, and manager of financial reporting and internal control.  Since 1999, I
have worked as an independent consultant, and, since July 2000, I have worked on a contract
basis for Trimingham Americas Inc. ("Trimingham").

2.      I make this Affidavit in support of the motion of Citizens Bank of Massachusetts
(the "Bank") for appointment of a receiver over Wolverine Proctor & Schwartz, Inc.
("Wolverine").  This Affidavit is based upon my personal knowledge of the facts or upon
information and belief as reported to me by others in the employ of Wolverine or Trimingham.

**PAC 0237**

To the extent the Affidavit is based upon information and belief, I believe the facts contained herein to be true.

3.    In connection with loans that the Bank has made to Wolverine, Trimingham has been retained to review and to analyze Wolverine's financial condition. I have participated in Trimingham's work involving Wolverine.

4.    From March until June 2001, I and others from Trimingham spent a total of 47 business days at Wolverine's headquarters in Merrimac, Massachusetts. During this period, I reviewed financial information of Wolverine and had meetings and conversations with a number of Wolverine personnel who have financial and accounting responsibilities.

5.    Wolverine's financial records show that it had net income of $1.2 million in 1998, and net losses of $11.8 million and $3.9 million in 1999 and 2000, respectively. Wolverine's revenues in 1998, 1999, and 2000 were $77.7 million, $64.0 million, and $43.9 million, respectively. (The figures for 1998 and 1999 are based on audited financial statements; the figures for 2000 have not been audited.)

6.    During the course of my work at Wolverine, I discovered evidence that Wolverine is dissipating assets to its sole shareholder, Deepak S. Kulkarni, and to affiliated companies that Mr. Kulkarni controls and whose assets are not pledged as security for the loans Wolverine has received from the Bank. This evidence includes the following:

    a.    <u>Cash transfers to a company controlled by Mr. Kulkarni.</u> Since at least as early as October 2000 and continuing through at least March 2001, Wolverine transferred approximately $150,000 per month to Friel Engineering Limited ("Friel"), a United Kingdom corporation that Mr. Kulkarni controls. Wolverine made these transfers through payments from the bank account of its international division, Wolverine International, in Glasgow, Scotland.

2

PAC 0238

These transfers do not correspond to specific invoices from Friel. During the second week of April, 2001, I spoke by telephone with a Wolverine International employee who told me that there is a "standing order" to make transfers to Friel. Wolverine International's bank statements show that, between October 4, 2000, and March 28, 2001, it made transfers to Friel totaling £622,902.38 (or approximately $903,208.45, assuming an average exchange rate of 1.45 dollars per pound). Attached hereto as **Exhibit 1** is a table summarizing these transfers.

  b. <u>Write-offs of accounts receivables from companies controlled by Mr. Kulkarni</u>. In March 2001, Wolverine wrote off an account receivable of $211,966 from Cardwell Machine Company ("Cardwell") and an account receivable of $22,616 from Freezing Systems, Inc. ("FSI"). Copies of the Wolverine Adjustments Transaction Report pages containing these write-off entries are attached hereto as **Exhibit 2**. According to Mark Brown, Wolverine's chief financial officer, Mr. Kulkarni is the sole shareholder of both Cardwell and FSI.

  c. <u>Mr. Kulkarni's Compensation</u>. Wolverine's payroll records show that it pays Mr. Kulkarni a salary of $900,000 per year. Mr. Kulkarni also has received at least $32,000 in additional cash compensation from Wolverine since October 2000. I became aware of this additional cash compensation after I noticed in a Wolverine disbursements register that Marian Lord, a Wolverine accounting employee, was receiving checks from Wolverine in even dollar amounts. When I asked Ms. Lord about these checks, she told me that Mr. Kulkarni had requested cash advances and that Wolverine processed such requests by issuing checks to her and having her then cash the checks and give the cash to Mr. Kulkarni. Separately, Mr. Brown told me that Mr. Kulkarni does not like to fill out travel expense reports and so has directed that these cash advances be reported as income on his IRS Form W-2. This income is in addition to

3

PAC0239

Mr. Kulkarni's regular $900,000 per annum compensation. A Wolverine payroll clerk at one point implied to me that other items were added in a similar manner to Mr. Kulkarni's W-2, but she later refused to provide me with any information on these items. Attached hereto as **Exhibit 3** are copies of check requests that Mr. Kulkarni submitted to Wolverine and copies of the checks that were issued as a result of those requests.

        d.    <u>Luxury automobiles for Mr. Kulkarni's personal use</u>. Wolverine's fixed asset list, a copy of which is attached hereto as **Exhibit 4**, shows that Wolverine owns three luxury automobiles: (1) a Mercedes-Benz acquired in December 1998 for $57,851; (2) a Land Rover acquired in April 1999 for $32,650; and (3) a Mercedes-Benz acquired in June 1999 for $95,626. During my visits to Wolverine, I saw an insurance policy issued to Wolverine for these automobiles. Either Mr. Brown or Mr. Crawford told me that Mr. Kulkarni has possession of these automobiles and indicated that Wolverine does not use them.

        7.    The financial records of Wolverine International show additional reason for concern about the potential dissipation of Wolverine's assets. As of January 31, 2001, the Wolverine International general ledger trial balance showed a $444,315 balance for an account labeled "Employee Advances." A copy of the trial balance page containing this balance is attached hereto as **Exhibit 5**. In April 2001, I inquired about these "Employee Advances" to Victor Garvie, a Wolverine International employee with responsibility for financial matters. Mr. Garvie told me that the $444,315 did not reflect actual employee advances, but instead

4

**PAC 0240**

included travelers checks that Wolverine International had on hand.  I did not receive an

explanation from Wolverine as to why its international division purchased such a large amount

of travelers checks.

Signed under pains and penalties of perjury on October _11_, 2001.

_____  _____

LINDA GREEN

3276611

5