UNITED STATES DISTRICT COURT
District of Massachusetts

Civil Action
No. 05-10078-DPW

PETER A. CRAWFORD, Plaintiff )
)
)
v. )
)
WOLVERINE, PROCTOR & SCHWARTZ, INC., )
   Steven F. Chilinski, Deepak S. Kulkarni, )
)
   Defendants )

## PLAINTIFF'S OBJECTION TO THE PARTIAL GRANTING OF DEFENDANTS' SECOND MOTION FOR A PROTECTIVE ORDER

Now comes the plaintiff in the above-captioned action and objects, pursuant to Fed. R. Civ. P. 72(a), to the partial granting of Defendants' Second Motion for a Protective Order Concerning Evidence of Compensation and Other Payments Made to Deepak Kulkarni (Docket No. 31) (hereinafter "Defendants' Second Protective Order Motion"). In support of his objection, plaintiff states that the partial granting of this motion is clearly erroneous and contrary to law in that the Magistrate, sua sponte granted relief that was not requested by defendants' motion by forbidding any inquiry into payments by "any entity other than WPS, Inc. and WPS, LLC" when defendants' motion had sought only protection as to payments by Wolverine, Proctor & Schwartz, Inc. ("WPS, Inc."). Furthermore, to the extent that the Magistrate's order prevents the discovery of evidence of payments that provide evidence of damages to the plaintiff, a necessary element to prove fraud in the making of the Transition Agreement, an

1

agreement underlying defendants' defenses to Counts 5 and 6 of the Complaint, it is clearly erroneous. Finally, plaintiff submits herewith Plaintiff's Motion for Leave to Amend his Complaint. The Amended Complaint undeniably causes the requested discovery to be relevant to the claims and defenses of this case.

I. THE SUA SPONTE EXTENSION OF DEFENDANTS' PROTECTIVE ORDER MOTION TO PAYMENTS BY ENTITIES OTHER THAN WOLVERINE, PROCTOR & SCHWARTZ, INC. IS CONTRARY TO LAW

On January 6, 2006, Magistrate Collings allowed in part Defendants' Second Protective Order Motion. He ruled that

> "[t]he motion is allowed as to any payment to defendant Kulkarni by any entity other than WPS, Inc. and WPS, LLC. The motion is allowed as to any payments to defendant Kulkarni by WPS, Inc. and WPS, LLC before January 1, 2001 and after December 31, 2002. The motion is otherwise denied.

However, Defendants' Second Protective Order Motion did not refer to any entities other than WPS, Inc. Paragraphs 1 and 2 of that motion refer only to payments by "WPS," which it defines as Wolverine, Proctor & Schwartz, Inc. Defendants will no doubt argue that paragraph 3 applies to payments from other entities, however, that paragraph refers only to "any evidence relating to Kulkarni's personal and private financial affairs, which has no bearing on this proceeding."

By its very language, paragraph 3 does not relate to payments at all, but only to financial affairs. Furthermore, paragraph 1 specifically excludes from the requested protective order the $135,000 payment alleged in plaintiff's Complaint. If paragraph 3 were to be construed to extend to payments, as opposed to financial affairs, it would appear to override the exception in paragraph 1, as paragraph 3 provides no exception for the $135,000 payment. A protective order incorporating all three paragraphs would in

2

that case prohibit <u>any</u> inquiry into payments to defendant Kulkarni. Language in legal documents must generally be interpreted so as to give meaning to every part, which indicates that paragraph 3 cannot reasonably be construed to apply to payments to Mr. Kulkarni but rather only to those parts of his "personal and private financial affairs" that have "no bearing on this proceeding." This language would make discovery relating to Mr. Kulkarni's real estate investments, for example, off limits. Any other interpretation of the motion would render superfluous the exception relating to the $135,000 payment. Magistrate Collings' order refers only to "payments," not "financial affairs," indicating that he denied paragraph 3.

Furthermore, any payments by entities related to WPS, Inc. would clearly have at least some "bearing on this proceeding" and thus would fall outside of the scope of paragraph 3. Elsewhere in the motion, defendants use the word "irrelevant," indicating that the words "no bearing" are intended to have a different meaning. In this context, bearing is synonymous with "relation" or "connection." Paragraph 3 must therefore be read to prohibit inquiry into only those matters having no relation or no connection with this proceeding. But, payments by entities related to WPS clearly have a connection with this case.

Sua sponte orders are prohibited under Fed. R. Civ. P. 72. See Moore's Federal Practice §72.06[3], <u>U.S. v. Bonanno Organized Crime Family</u>, 119 F.R.D. 625, 626 (E.D.N.Y. 1988) (setting aside Magistrate's <u>sua sponte</u> order prohibiting discovery of tax returns). Inasmuch as that portion of Magistrate Collings' January 6, 2006 ruling as extended to entities other than WPS, Inc. was without reference to any prior application by the parties, it was granted <u>sua sponte</u> and must be set aside.

3

## II. IT WAS CLEARLY ERRONEOUS TO PROHIBIT DISCOVERY OF PAYMENTS TO KULKARNI BY RELATED ENTITIES WHILE PERMITTING DISCOVERY OF PAYMENTS BY WPS, INC. FOR A TWO YEAR PERIOD

At the argument of this motion on January 6, 2006, plaintiff gave examples of the reason why he needed to be able to inquire into payments to defendant Kulkarni by entities related to WPS, Inc. First, he described the fact that, as a result of the 2001 recapitalization of WPS, Inc., Wolverine Proctor, LLC ("WP, LLC") came to be the holding company of WPS, Inc.[1] Then, he described how the Settlement Agreement, attached to Plaintiff's Affidavit in Support of his Memorandum in Opposition to Defendants' Second Motion for a Protective Order (hereinafter "Plaintiff's Affidavit") as Exhibit D provided for the plaintiff to share in distributions from WP, LLC. Then he described how the false statement by defendant Kulkarni on December 28, 2001 had induced him to sign the Settlement Agreement, that he relied upon that statement, and was thereby damaged when defendant Kulkarni received payments under the Omnibus Agreement in which plaintiff was not entitled to share. See Plaintiff's Memorandum in Opposition to Defendants' Second Motion for a Protective Order Concerning Evidence of Compensation and Other Payments Made to Deepak Kulkarni (hereinafter "Plaintiff's Memorandum") at 2-3, 14-15. Plaintiff further stated that the fraud permitted the plaintiff to void the Transition Agreement, a defense of defendants to Counts 5 and 6 of the Complaint. The Transition Agreement was entered into on the same day, December 28, 2001, as the Settlement Agreement. Magistrate Collings appears at least partially to

---

[1] Actually, there is an intermediate entity, Wolverine Proctor, Inc. Wolverine Proctor, LLC owns substantially all of the stock of Wolverine Proctor, Inc., which in turn owns substantially all of the stock of WPS, Inc.

4

have accepted this basis for discoverability as he agreed to include "WPS, LLC" in the entities from which discovery of payments would be permitted.

At a minimum the meaning of "WPS, LLC" in Magistrate Collings' order needs to be clarified. If he meant Wolverine, Proctor & Schwartz, LLC, then the inclusion of that entity was clearly erroneous as that was the entity apparently established for the purpose of the 2005 recapitalization in late 2005. Permitting discovery into payments from that entity only prior to December 31, 2002 would make no sense. Clearly, he meant Wolverine Proctor, LLC[2], the entity from which defendant Kulkarni was entitled to the payments under the Omnibus Agreement.

Plaintiff also argued at the hearing for the necessity of including Friel Engineering Limited ("Friel") and MawLaw 492 Ltd. ("MawLaw") among the entities from which payment information is needed in light of previous incidents of defendant Kulkarni funneling money through these entities. Friel and MawLaw were part of the December 2001 recapitalization, and became wholly owned subsidiaries of Wolverine Proctor, Inc. (which was in turn owned by Wolverine Proctor, LLC) at that time, along with Wolverine, Proctor & Schwartz, Inc. Prior to the December 2001 recapitalization, Friel was 49% owned by Wolverine, Proctor & Schwartz, Inc., and served as that company's U.K. manufacturing arm. The other 51% was owned by defendant Kulkarni. MawLaw 492 was 100% owned by Kulkarni, and served largely, if not exclusively, as the vehicle by which a $1 million investment was made in Wolverine, Proctor & Schwartz, Inc. in September, 2000, at the same time that up to $2 million in funds were made available to WPS, Inc. by its lender, Citizens Bank of Massachusetts ("Citizens").

---

[2] The Omnibus Agreement, attached to Plaintiff's Affidavit as Exhibit E, refers to Wolverine Proctor, LLC.

5

Plaintiff is not aware that either entity had any business or source of funds other than from WPS, Inc. Friel's only revenues came from supplying the labor portion of manufacturing services to WPS, Inc. (WPS, Inc. purchased the material and consigned it to Friel), and Friel's financial affairs were handled by WPS, Inc. employees in the U.K.[3] Thus, it was a simple matter for WPS, Inc. in the U.K. to transfer funds to Friel, for the ostensibly legitimate purpose of paying for Friel's manufacturing services, but with the intent that the funds so transferred be earmarked for, and later transferred to, defendant Kulkarni. Similarly, MawLaw 492 was purely an investment vehicle without any revenues. The only cash transfers to MawLaw 492 that were made, of which plaintiff is aware, came from Friel.

The following provides an example of the type of surreptitious transfer that occurred. Plaintiff believes that Citizens was misled into believing that the $1 million invested by MawLaw was new money being invested in the business by Kulkarni, thus inducing it to provide up to $2 million in capital to WPS, Inc. at the same time. In fact, through a series of transactions, the money was extracted from WPS, Inc. itself prior to being reinvested. In the last such transaction, approximately $500,000 was transferred from WPS, Inc. in the U.S. to WPS, Inc. in the U.K. From there it was transferred to Friel and was used to settle an amount that Kulkarni had caused to be created as a liability from WPS, Inc. in the U.K. to Friel. Friel then advanced the money to MawLaw, which reinvested the money back in WPS, Inc. in the U.S. This four step process occurred in a matter of a few days in late September 2000. Citizens had no right of

---

[3] For tax reasons, the WPS, Inc. operations in the U.K. were conducted as a branch of the U.S. corporation, rather than as a separately incorporated foreign subsidiary, as is typical.

6

access to the books and records of either Friel or MawLaw, and thus was unable to discover the ruse.

Additional evidence of the use of U.K. transfers to provide money to Kulkarni was provided in Plaintiff's Opposition. See in particular Plaintiff's Memorandum at 12-13, Plaintiff's Affidavit ¶6, Plaintiff's Affidavit, Exhibits F and G (providing evidence of transfers to the U.K. branch of WPS, Inc. for the benefit of Kulkarni). This evidence indicates that the $175,000 in transfers made to the U.K. were added to Kulkarni's W-2, however, it is unclear how this money was returned to Kulkarni, if in fact it was. It seems likely that it was funneled through Friel and/or MawLaw, thus underscoring the necessity of including these entities among those to which the protective order does not apply.

Citizens was also concerned over the use of transfers to Friel. The affidavit of Linda Green maintains that Trimmingham Americas Inc., retained by Citizens to review and analyze the financial condition of WPS, Inc., "discovered evidence that Wolverine is dissipating assets to its sole shareholder, Deepak S. Kularni, and to affiliated companies that Mr. Kulkarni controls and whose assets are not pledged as security for the loans Wolverine has received from the Bank." The affidavit went on to state that "Wolverine International's bank statements show that, between October 4, 2000, and March 28, 2001, it made transfers to Friel totaling £602,902.38 (or approximately $902,208.45, assuming an average exchange rate of 1.45 dollars per pound)." From this, it appears that the time frame for which information was provided may have been intentionally limited so as to prevent Trimmingham from discovering the large transfer to Friel that occurred at the end

of September, 2000[4]. See Green Affidavit ¶6, attached as Exhibit I to Plaintiff's Affidavit.

At the hearing on this motion, defendants did not dispute plaintiff's contentions regarding the use of Friel and MawLaw in 2000, nor did they ever dispute the facts in the Green Affidavit that was attached to Plaintiff's Affidavit. Magistrate Collings' decision to include only WPS, Inc. and "WPS, LLC" within the scope of permissible discovery, but exclude Friel and MawLaw, which plaintiff specifically sought in orally arguing the motion, was without any support in the record before him.

Furthermore, the relevance of the payments to Kulkarni, which Magistrate Collings necessarily accepted in permitting the discovery of two years worth of payments by WPS, Inc. and "WPS, LLC" is based upon the fact that it provides evidence to support plaintiff's allegation that Kulkarni <u>knew</u> that the payment that he sought to obtain from WPS, Inc. on January 14, 2002 was improper, and that the plaintiff was terminated after suggesting that Parthenon approve such payment. The existence of other improper payments is strong evidence of this knowledge and intent. See Plaintiff's Memorandum at 11-15. If anything, evidence that a payment was funneled to Kulkarni through Friel and/or MawLaw, as opposed to being paid directly out of WPS, Inc., is strong evidence of the surreptitious and knowingly improper nature of these payments. A reasonable jury could certainly find, and indeed probably would find, that a payment so funneled was knowingly improper. Given evidence that money was transferred from the U.S. to the

---

[4] In fairness to defendants, Ms. Green's affidavit failed to recognize that Friel invoiced WPS, Inc. in the U.K. for the labor it expended in manufacturing for WPS, Inc., and that the bulk of the transfers to Friel from October 2000 through March 2001 (but not in September 2000) were likely related to these legitimate costs to enable Friel to meet payroll rather than consisting of money being funneled to Kulkarni. Nevertheless, Ms. Green correctly ascertained that this funneling was occurring and the large total amount of the transfers easily would have permitted Kulkarni to siphon off a portion.

U.K., and then back to the U.S., there really can be no other conclusion than that Kulkarni sought to hide what was occurring from Citizens or others. In order to have a complete picture, the plaintiff needs to discover payments from Friel and MawLaw to Kulkarni as well as payments from WPS, Inc. and WP, LLC.

With respect to the time frame permitted by the protective order, it arbitrarily sets December 31, 2002 as the end date. However, by including "WPS, LLC" (presumably meant to refer to Wolverine Proctor, LLC) among the entities from which discovery is permitted, Magistrate Collings acknowledged that payments under the LLC Agreement and the Omnibus Agreement are relevant. The Omnibus Agreement, attached to Plaintiff's Affidavit as Exhibit E, provided for $765,980 in payments to Kulkarni, all to have been made prior to December 31, 2002. Thus far, defendants have produced evidence of three payments under this agreement: $130,967 on November 19, 2002, $229,000 on December 20, 2002, and $135,500 on April 15, 2003, a total of only $495,467. Steven Chilinski, former CEO of WPS, Inc. testified at his deposition that some money was still owing at the end of 2003. See Plaintiff's Memorandum at 15 FN5. These payments provide evidence of the damages to the plaintiff arising out of Kulkarni's fraudulent December 28, 2001 representations. As of December 31, 2001, defendant Kulkarni was only a minority shareholder of WP, LLC, and plaintiff, by way of the Settlement Agreement, was to share in certain payments or distributions to defendant Kulkarni. <u>Any</u> payment to defendant Kulkarni after that date, unless specifically permitted by agreements of which plaintiff was made aware on or before December 28, 2001, is suspicious and thus relevant. Plaintiff alleges that he was defrauded in that payments to defendant Kulkarni were purposely denominated as payments in which

9

plaintiff would not share. Thus, all payments to defendant Kulkarni after the December 2001 recapitalization become relevant for assessing the damages to the plaintiff from fraud, and permitting plaintiff to ascertain whether or not he should rescind the December 28, 2001 Transition Agreement that is central to Counts 5 and 6 of the Complaint.

## III. CONCLUSION

For the reasons stated above, plaintiff is entitled to an order overruling Magistrate Collings' decision on defendants second protective order motion. Plaintiff is entitled to information on payments to defendant Kulkarni from Friel and MawLaw, as well as from WPS, Inc. and WP, Inc. Furthermore, the limited period needs to be extended to include dates from December 31, 2002 to present.

Respectfully submitted,

Peter A. Crawford, pro se
23 Newcastle Dr. #11
Nashua, NH 03060
(603)888-4574

Date: Jan. 17, 2006