UNITED STATES DISTRICT COURT
District of Massachusetts

Civil Action
No. 05-10078-DPW

PETER A. CRAWFORD, Plaintiff )
)
)
v. )
)
WOLVERINE, PROCTOR & SCHWARTZ, INC., )
Steven F. Chilinski, Deepak S. Kulkarni, )
)
Defendants )
)

## PLAINTIFF'S MOTION FOR LEAVE TO AMEND HIS COMPLAINT

### REQUEST FOR ORAL ARGUMENT

### MOTION

Now comes the plaintiff in the above captioned action, and moves, pursuant to

Fed. R. Civ. P. 15(a) that this Honorable Court grant him leave to amend his Complaint.

A copy of the proposed Amended Complaint is attached hereto, and plaintiff submits

herewith Plaintiff's Memorandum in Support of his Motion for Leave to Amend his

Complaint.

### CERTIFICATE OF CONFERRAL

Plaintiff hereby certifies that he has complied with the provisions of Local Rule

7.1(a)(2) and defendants have refused to assent to this amendment.

Respectfully submitted,

1

Peter A. Crawford, pro se
23 Newcastle Dr. #11
Nashua, NH  03060
(603)888-4574

Date: Jan 17, 2006

UNITED STATES DISTRICT COURT
District of Massachusetts

RECEIVED IN CLERKS OFFICE

2005 JUN 17 P 1:41

Civil Action
No. 05-10078-DPW MASS.
DISTRICT OF MASS.

|  |  |  |
|---|---|---|
| PETER A. CRAWFORD, Plaintiff | ) | |
| | ) | |
| v. | ) | AMENDED |
| | ) | COMPLAINT |
| WOLVERINE, PROCTOR & SCHWARTZ, INC., | ) | (Jury Trial |
| Steven F. Chilinski, Deepak S. Kulkarni, | ) | Demanded) |
| | ) | |
| Defendants | ) | |

## INTRODUCTION

This is a diversity action for, inter alia, breach of a written contract to pay nearly

$600,000 in bonus wages due to the plaintiff as a result of his service as Chief Operating

Officer of Wolverine, Proctor & Schwartz, Inc., a corporation headquartered in

Merrimac, Massachusetts. The plaintiff successfully turned around that company.

## JURISDICTION

1.     Plaintiff Peter A. Crawford is a citizen of the State of New Hampshire.

2.     Defendant Wolverine, Proctor & Schwartz, Inc. ("Wolverine Inc.") is

incorporated in the State of Delaware and has its principal place of business at Merrimac,

Massachusetts.

3.     Defendant Deepak S. Kulkarni is the former Chairman and Chief

Executive Officer of Wolverine, Inc., resides in Boston, Massachusetts and is a citizen of

the Commonwealth of Massachusetts.

1

4.    Defendant Steven F. Chilinski is the current President and Chief Executive Officer of Wolverine Inc., and assumed that position sometime between January 15, 2002 and January 31, 2002. He performs his duties relating to that position at the Wolverine Inc. headquarters in Merrimac, Massachusetts. His domicile is unknown.

5.    This complaint seeks in excess of $1,792,710 in damages, which amount is in controversy.

6.    Plaintiff invokes this Court's jurisdiction pursuant to its diversity jurisdiction under 28 U.S.C. §1332(a)(1) and its supplemental jurisdiction under 28 U.S.C. §1367(a).

## ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

7.    The allegations of paragraphs 1-6 above are incorporated herein by reference.

8.    Wolverine Inc. is primarily engaged in the business of producing large machines for the heating, cooking or drying of food and other products in continuous processes. During 2000 and 2001, it had major operations in Massachusetts, North Carolina, and the U.K. Portions of the company had been in existence since the mid-1800s.

9.    Mr. Crawford became employed by Wolverine Inc. as its Chief Operating Officer ("COO") on December 30, 1999. A written contract (the "Employment Contract") governing the terms of his employment was executed by him and Deepak Kulkarni, on behalf of Wolverine Inc., on January 4, 2000 within the Commonwealth of Massachusetts. Said Employment Contract provided for wages, including a base salary of $150,000 annually, a bonus (the "Bonus"), and stock options in Wolverine Inc.

2

10.     At the time that Mr. Crawford joined Wolverine Inc., Deepak Kulkarni
was Chairman and Chief Executive Officer of Wolverine Inc. and had been so since prior
to 1994. During Mr. Kulkarni's tenure, Wolverine Inc.'s fortunes had declined,
culminating in an EBITDA (earnings before interest, taxes, depreciation and
amortization) loss of $4.700 million during calendar 1999. After Mr. Crawford joined
and assumed day-to-day operating responsibility for the Wolverine Inc. operations,
Wolverine Inc.'s profits improved dramatically. Wolverine Inc.'s EBITDA for the 12
months commencing ending September 30, 2001 was $4.028 million on revenues of
$39.615 million.

11.     Nevertheless, Wolverine Inc. continued to be severely cash constrained
during 2000 and 2001 due to heavy bank debt and the continued withdrawal by Mr.
Kulkarni of approximately $2 million annually from Wolverine Inc. to finance a lavish
lifestyle and the renovation of a multi-million dollar townhouse in Boston's exclusive
Back Bay neighborhood. Distrustful of Mr. Kulkarni, becoming increasingly aware of
the magnitude of Mr. Kulkarni's cash withdrawals, and growing weary of his frequent
harangues and bombastic negotiating style, the company's lender forced the sale of
Wolverine Inc. in late 2001.

12.     But for the leadership exercised by Mr. Crawford, Wolverine Inc. would
not have survived in its current form, and its shares would have become worthless.

13.     At the time the Employment Contract was entered into, Mr. Crawford
knew that Wolverine Inc. was cash-constrained, but agreed to accept the position
anticipating that his primary financial reward would come from the Bonus and stock
options once the turnaround was complete. However, he never received any Bonus, and

3

his stock options have been converted into an unmarketable equity interest in Wolverine Inc.'s current parent company, although Mr. Crawford received a $150,000 "equity advance."

14.    Under the terms of the Employment Contract, Mr. Crawford was to receive an annual Bonus equal to 5 percent of Wolverine's adjusted profits for any calendar year in which he was an employee. The adjusted profit for purposes of the bonus calculation is equal to EBITDA less capital expenditures, interest, and taxes.

15.    From prior to 1994 through late December, 2001, Mr. Kulkarni was the sole shareholder of Wolverine Inc. His duties while Mr. Crawford was COO were largely limited to general oversight of Wolverine and its subsidiaries and affiliates, while Mr. Crawford managed and operated Wolverine Inc.

16.    In late 2001, an agreement was reached with a Boston-based investment firm, Parthenon Capital, and related entities, including Parthenon Investors II, L.P., PCIP Investors and J&R Founders' Fund, L.P. (collectively "Parthenon"). Mr. Kulkarni was previously acquainted with certain principals of that firm. Under the agreement, Mr. Kulkarni's shares in Wolverine Inc. and a related entity were transferred to a new entity, Wolverine, Proctor & Schwartz, LLC ("Wolverine LLC"), and Parthenon lent funds to Wolverine Inc. sufficient to retire all of its bank debt. This transaction was closed between December 28, 2001 and December 31, 2001. Following the transaction, Parthenon controlled a majority of the Board of Directors of Wolverine LLC, which in turn owned all of the shares of Wolverine Inc.

17.    In connection with this transaction, Mr. Kulkarni ceased to be CEO of Wolverine Inc. but became a consultant to Wolverine Inc. and continued as a member of

4

the Wolverine LLC Board of Directors. The successful turnaround and sale being completed, Mr. Crawford expressed little interest in remaining with Wolverine Inc., other than as CEO, but agreed to remain for a transition period. Parthenon made the securing of the services of Mr. Crawford after the sale a condition of closing the transaction.

18.     In connection with this transaction, Mr. Crawford on December 28, 2001 executed a Transition Agreement that specifically preserved his rights to the Bonus, and continued his base salary at the prior rate. The Transition Agreement was executed within the Commonwealth of Massachusetts.

19.     The Wolverine Inc. consolidated financial statements for 2001, audited by Arthur Anderson LLP, set forth EBITDA for 2001 of $9,683,723. Subtracting capital expenditures, interest, and taxes set forth in these financial statements of $2,526,598 leaves $7,157,125 as a base for the bonus calculation, of which Mr. Crawford is entitled to five percent, or $357,856.25, under the written Employment Contract.

20.     Under the terms of the Transition Agreement, Mr. Crawford committed to not knowingly taking any action contrary to the best interests of Wolverine Inc.

21.     During early 2001, prior to January 14, Mr. Crawford met with Erik Scott, an employee of Parthenon and one of its representatives on the Board of Directors of Wolverine LLC. Mr. Scott informed Mr. Crawford that he had been doing a fantastic job holding Wolverine Inc. together and suggested that Mr. Crawford should remain with Wolverine Inc. until Mr. Crawford and Parthenon were both comfortable that the transition was complete. The two also discussed the large sums that Mr. Kulkarni had extracted from Wolverine Inc. prior to its sale, and Mr. Scott assured Mr. Crawford that

5

he could call Mr. Scott directly at any time, particularly regarding any issue of payments to Mr. Kulkarni.

22.    During the afternoon of January 14, 2002, Mr. Kulkarni summoned Mr. Crawford to a meeting to discuss the payment of $135,000 to Mr. Kulkarni, which he alleged was due him as fringe benefit compensation above and beyond his normal salary for the month of December, 2001. Mr. Kulkarni stated that the Wolverine Inc. Chief Financial Officer ("CFO") had declined to make such payment in accordance with Mr. Crawford's instructions. Inasmuch as such payment request was wholly without any credible rationale whatsoever, such that payment would constitute embezzlement under Massachusetts law (M.G.L. c. 266 §30), Mr. Crawford suggested that representatives of Parthenon be contacted for approval. To this, Mr. Kulkarni angrily replied that he alone would deal with Parthenon, that henceforth the CFO and his U.K. counterpart alone would deal with any cash disbursement decisions, and that Mr. Crawford remained employed by Wolverine Inc. only because of his actions.

23.    Mr. Crawford attempted unsuccessfully to contact Mr. Scott, and later on January 14, 2002, Mr. Crawford was informed that the Board of Directors had voted to terminate his employment immediately. A letter dated January 18, 2002 from the Wolverine Inc. Human Resources Manager confirmed this action, however, no written notice of termination from Wolverine's Chief Executive Officer was ever received.

## AS AND FOR A FIRST CAUSE OF ACTION
### (Breach of the written contract to pay Bonus)

24.    The allegations of paragraphs 1-23 above are incorporated herein by reference.

25.    The Employment Contract is valid, binding and enforceable.

6

26.     The Employment Contract makes the Bonus due upon "completion of the audit of each year's results," or April 15, if no audit is performed. The audit report of the Wolverine 2001 consolidated financials prepared by Arthur Anderson LLP is dated March 26, 2002. The 2001 bonus was thus due no later than March 26, 2002.

27.     In a letter to Steven F. Chilinski, Chief Executive Officer of Wolverine, Inc., dated December 2, 2004, Mr. Crawford detailed the calculations, derived directly from the Employment Contract and the audited 2001 financial statements of Wolverine, leading to a bonus payment for 2001 of $357,856.25 (rounded off in the letter). The only reply Mr. Crawford received to that letter was a letter dated December 22, 2004 from Daniel Blake of Epstein Becker & Green, counsel for Wolverine Inc., to which was attached a letter dated December 8, 2004 which merely states that "[t]he Company does not believe that it owes you a bonus for 2001 and disagrees with the various calculations set forth in your letter," but provides no support for its belief. The letter indicates that the matter is being forwarded to Mr. Kulkarni's accountants for "clarification."

28.     Mr. Crawford's December 2, 2004 letter states that if no payment is received by December 17, 2004, further action may be taken without further notice or demand.

29.     No payment of the Bonus for 2001 has been received by Mr. Crawford, nor has there been any explanation as to the reason, beyond that noted above.

30.     Defendant Wolverine Inc. has therefore breached the Employment Agreement, plaintiff has been damaged by that breach, and plaintiff is entitled to recover the amount of $357,856.25 in damages.

### AS AND FOR A SECOND CAUSE OF ACTION
(Violation of Massachusetts Payment of Wages Statute)

7

31.     The allegations of paragraphs 1-30 above are incorporated herein by reference.

32.     Defendant Chilinski is a an "officer[] or agent[] having the management of" Wolverine Inc. within the meaning of Massachusetts General Laws ("M.G.L.") c. 149 §148.

33.     Defendant Chilinski took actions within the Commonwealth of Massachusetts that caused the Bonus and other wages not to be paid to Mr. Crawford.

34.     The Bonus wages were earned in connection with Mr. Crawford's employment within the Commonwealth of Massachusetts and are thus subject to the provisions of M.G.L. c. 149 §§148 and 150 (the "Massachusetts Payment of Wages Statute").

35.     The office of the Attorney General of Massachusetts has assented in writing to the filing of this suit. The plaintiff is therefore authorized to bring this action pursuant to M.G.L. c. 149 §150.

36.     The Bonus has remained due for more than six days of the "termination of the pay period when earned" and has not been paid. Defendants Wolverine and Chilinski are therefore jointly and severally liable to the plaintiff under the Massachusetts Payment of Wages Statute for damages of treble the amount in the First Cause of Action, $1,073,568.75, an additional $715,712.50 in the case of defendant Wolverine Inc. Defendants Wolverine Inc. and Chilinski are furthermore liable for costs and attorney fees pursuant to M.G.L. c. 149 §150.

AS AND FOR A THIRD CAUSE OF ACTION
(Breach of the oral contract to pay additional Bonus)

8

37.     The allegations of paragraphs 1-36 above are incorporated herein by reference.

38.     During February 2001, Mr. Crawford and Mr. Kulkarni, in his capacity as Chairman and Chief Executive Officer of Wolverine Inc., reached an oral agreement to increase the bonus percentage for calculation, pursuant to the formula in the Employment Contract, from five percent to eight percent. This agreement was reached within the Commonwealth of Massachusetts.

39.     As consideration for this increase, Mr. Crawford continued to perform his duties as Chief Operating Officer of Wolverine Inc.

40.     The oral agreement reached was capable of being fully executed within one year of the date made, inasmuch as the underlying Employment Agreement makes the Bonus due upon completion of the audit, which completion, in the case of the 2001 Bonus, could have occurred any time after December 31, 2001.

41.     Wolverine Inc. has failed to pay the additional Bonus resulting from the above-detailed oral agreement when due.

42.     Defendant Wolverine Inc. has therefore breached the Employment Contract, as orally modified, plaintiff has been damaged by that breach, and plaintiff is entitled to recover an additional amount of $214,713.75 in damages from defendant Wolverine Inc., said amount representing the increase in the bonus due as a result of the oral contract.

### AS AND FOR A FOURTH CAUSE OF ACTION
(Violation of Massachusetts Payment of Wages Statute on additional Bonus)

43.     The allegations of paragraphs 1-42 above are incorporated herein by reference.

44. The additional bonus amount set forth in the Third Cause of Action has remained unpaid for more than six days after the termination of the pay period when earned. Defendants Wolverine Inc. and Chilinski are therefore jointly and severally liable to the plaintiff under the Massachusetts Payment of Wages Statute for damages of treble the amount in the Third Cause of Action, $644,141.25, an additional $429,427.50 in the case of defendant Wolverine Inc.

45. Defendants Wolverine and Chilinski are furthermore liable for costs and attorney fees pursuant to M.G.L. c. 149 §150.

## AS AND FOR A FIFTH CAUSE OF ACTION
### (Breach of Transition Agreement)

46. The allegations of paragraphs 1-45 above are incorporated herein by reference.

47. The Transition Agreement provides for employment of the plaintiff until March 31, 2002 unless terminated earlier by virtue of either the consummation of a working capital facility or written notice of termination by the Chief Executive Officer of Wolverine Inc.

48. No working capital facility was consummated by Wolverine Inc. prior to March 31, 2002.

49. No written notice of termination by the Chief Executive Officer of Wolverine Inc. was received by the plaintiff.

50. Defendant Wolverine Inc. was notified of its breach of the Transition Agreement by way of the letter to Mr. Chilinski of December 2, 2004. Defendant Wolverine Inc. responded to that letter by way of the December 8, 2004 letter from Daniel Blake, which merely alleges that no compensation was due because the plaintiff

10

"did not perform services for the Company during that time" and "[y]ou were given effective notice." Such interpretation of the Transition Agreement is wholly unreasonable as it would render void and superfluous the provision requiring written notice of termination by the Chief Executive Officer of Wolverine.

51.    The December 2, 2004 letter from the plaintiff constituted a final notice and demand.

52.    As a result of its breach of the Transition Agreement, the plaintiff received no wages from Wolverine Inc. for the period from February 1, 2002 through March 31, 2002.

53.    Defendant Wolverine Inc. therefore breached the Transition Agreement and is liable to the plaintiff in the amount of $25,000, the amount of unpaid wages for February and March 2002.

### AS AND FOR A SIXTH CAUSE OF ACTION
(Violation of Massachusetts Payment of Wages Statute on Transition Payments)

54.    The allegations of paragraphs 1-53 above are incorporated herein by reference.

55.    The payments set forth in the Fifth Cause of Action has remained unpaid for more than six days after the termination of the pay period when earned. Defendants Wolverine Inc. and Chilinski are therefore jointly and severally liable to the plaintiff under the Massachusetts Payment of Wages Statute for damages of treble the amount in the Third Cause of Action, $75,000.00, an additional $50,000.00 in the case of defendant Wolverine Inc.

56.    Defendants Wolverine Inc. and Chilinski are furthermore liable for costs and attorney fees pursuant to M.G.L. c. 149 §150.

## AS AND FOR A SEVENTH CAUSE OF ACTION
(Tortious interference with contractual and business relations)

57.     The allegations of paragraphs 1-56 above are incorporated herein by reference.

58.     Defendant Kulkarni knew that the $135,000 that he sought to have paid to him by Wolverine Inc. was not owed to him and that the receipt thereof would have constituted a fraudulent misappropriation of Wolverine Inc. funds. The terms of his relationship to Wolverine Inc., as consultant to, and former CEO of, the company enabled him to attempt to receive disbursement of these funds.

59.     Following the plaintiff's refusal to permit defendant Kulkarni to embezzle and unlawfully convert $135,000 from Wolverine Inc., defendant Kulkarni took actions to persuade, cause and induce the Board of Directors of Wolverine to terminate the plaintiff's employment.

60.     Fraudulent and criminal intent by Mr. Kulkarni to convert the $135,000 to his own use was demonstrated by his vehement unwillingness to have the plaintiff disclose the attempt to representatives of Parthenon, and by his actions resulting in the termination of the plaintiff's employment to cover up his fraudulent and criminal attempt.

61.     But for the plaintiff's refusal to permit embezzlement and conversion of $135,000 from Wolverine Inc., the plaintiff's employment would not have been terminated.

62.     Plaintiff Crawford was ready, willing and able to perform his duties under the Transition Agreement. But for defendant Kulkarni's actions, Mr. Crawford would have remained employed with Wolverine Inc. through March 31, 2002 or later.

12

63.     Defendant Kulkarni took such actions to terminate the plaintiff's employment knowing that the plaintiff would be economically damaged thereby, and with malice, fraud and misrepresentation wrongfully attempted to intimidate the plaintiff into permitting the embezzlement and unlawful conversion of funds by Mr. Kulkarni.

64.     Defendant Kulkarni was aware of the Transition Agreement as he signed it on December 28, 2001 in his then-current capacity as CEO of Wolverine Inc.

65.     As of a date prior to January 14, 2002, Mr. Kulkarni had ceased to be Chairman or CEO of Wolverine Inc., and was neither an officer nor an employee of that corporation.

66.     The actions taken by Mr. Kulkarni to terminate the plaintiff's employment were beyond the scope of his authority as a consultant to Wolverine Inc., not related to a legitimate business purpose of Wolverine Inc., and in furtherance of his own greed and his personal objective of extracting funds from Wolverine Inc.

67.     The actions of Mr. Kulkarni to terminate the plaintiff's employment were taken with actual malice and in retaliation for Mr. Crawford's refusal to permit disbursement of Wolverine Inc. funds to Mr. Kulkarni.

68.     The actions taken by Mr. Kulkarni to terminate the plaintiff's employment took place within the Commonwealth of Massachusetts.

69.     If plaintiff had permitted the payment of $135,000 to Mr. Kulkarni, the plaintiff would have both have violated the Transition Agreement that prohibited actions adverse to those of Wolverine Inc., would have breached his fiduciary duties to Wolverine Inc., and would have committed an unlawful and criminal act as well.

70.   Plaintiff Crawford had a legally protected interest in the Transition Agreement and in other prospective business relations.

71.   Defendant Kulkarni interfered these those interests without justifiable cause and for the unlawful purpose of permitting him to convert and embezzle funds from Wolverine Inc.

72.   Plaintiff Crawford was damaged by defendant Kulkarni's actions in that he did not receive the full benefits of the Transition Agreement, his reputation was damaged, any prospect of his being selected as CEO of Wolverine Inc. was eliminated, and other prospective business relations were interfered with.

73.   Defendant Kulkarni therefore did tortiously interfere with the Transition Agreement between the plaintiff and Wolverine Inc., and with other prospective business relationships, the plaintiff was damaged thereby, and Mr. Kulkarni is liable to the plaintiff for damages.

AS AND FOR AN EIGHTH CAUSE OF ACTION
(Fraud)

74.   The allegations of paragraphs 1-73 above are incorporated herein by reference.

75.   On December 28, 2001, plaintiff met with defendant Kulkarni prior to signing the Transition Agreement and a separate Settlement Agreement, both executed later that day.

76.   At that meeting, defendant Kulkarni represented to the plaintiff that defendant Kulkarni had no right to any distributions or other monies from Wolverine Inc. or Wolverine Proctor, LLC, other than a $1 million per year Consulting Agreement, and under sections 5.2 and 5.3 of the LLC Agreement (governing the respective rights of

14

Kulkarni and Parthenon in Wolverine Proctor, LLC), both being executed on December 28, 2001. Defendant Kulkarni further represented to the plaintiff that the optional Special Distributions allowed pursuant to section 5.2 of the LLC Agreement were likely to be deferred or forgiven.

77.     Under the terms of the LLC Agreement, the Special Distributions were, except as to the portion necessary to meet tax liabilities, optional and subject to the sole discretion of the Board of Managers of Wolverine Proctor, LLC, a majority of which was controlled by Parthenon.

78.     Under the terms of the Settlement Agreement, plaintiff exchanged his right to options in Wolverine Inc. under the Employment Contract for a right to 4-8 percent of the distributions to Kulkarni under section 5.3, but not section 5.2, of the LLC Agreement.

79.     The Settlement Agreement created a resulting trust whereby plaintiff's right to share in distributions under that agreement were nominally held in defendant Kulkarni's name for the benefit of the plaintiff. Kulkarni therefore had a fiduciary obligation to the plaintiff arising out of that trust.

80.     Plaintiff was concerned that defendant Kulkarni would be able to receive payments from Wolverine Inc. or Wolverine Proctor, LLC in which plaintiff would not be entitled to share under the Settlement Agreement, and which would reduce the value of distributions in which he was entitled to share. Defendant Kulkarni's representations assured him that unshared payments would be limited in scope. Plaintiff relied upon these representations in entering into the Settlement Agreement and the Transition Agreement.

15

81.     Contrary to his assertion on December 28, 2001, defendant Kulkarni retained an alleged right to $624,263 in accrued dividends and certain other payments from Wolverine Inc., neither of which was under the Consulting or LLC Agreement.

82.     Defendant Kulkarni had exclusive knowledge of the fact that he retained an alleged right to the accrued dividend and certain other payments and information by which plaintiff might have discovered that right was not available to him.

83.     Defendant Kulkarni actively concealed the existence of his alleged right to the accrued dividend from the plaintiff.

84.     Defendant Kulkarni had a duty to the plaintiff to disclose the existence of his alleged right to the accrued dividend, but failed to disclose it.

85.     Defendant Kulkarni failed fully and completely to disclose the existence of his alleged rights to these payments to representatives of Parthenon.

86.     Parthenon entered into the transaction that closed between December 28, 2001 and December 31, 2001 without knowing that defendant Kulkarni could and would later allege that he was entitled to the accrued dividend and other payments.

87.     On November 13, 2002, defendant Kulkarni, Parthenon and Wolverine Proctor, LLC entered into an Omnibus Agreement whereby Kulkarni's alleged right to the accrued dividend and certain other payments was extinguished, in exchange for $765,980 in payments, largely as Special Distributions for 2002 pursuant to section 5.2 of the LLC Agreement. The Omnibus Agreement further made the Special Distributions mandatory as to defendant Kulkarni for 2003 and subsequent years, removed the discretion of the Board of Managers as to the Special Distributions, and permitted Special

Distributions to be made only to defendant Kulkarni rather than requiring that Special

Distributions be made 61.43% to Parthenon and 38.57% to Kulkarni.

88.    But for Kulkarni's alleged right to the accrued dividend, Parthenon would

not have entered into the Omnibus Agreement and the funds paid out thereunder would

have been retained for the benefit of Wolverine Proctor, LLC and Wolverine Inc.,

immediately or subsequently increasing the value of General Distributions under section

5.3 of the LLC Agreement, and benefiting the plaintiff through his share of such

distributions under the Settlement Agreement.

89.    Plaintiff relied upon the representations made by defendant Kulkarni on

December 28, 2001, such representations were false, plaintiff relied upon such

representations and was damaged, and thereby defrauded.

90.    Defendant Kulkarni fraudulently concealed from the plaintiff the fact that

defendant Kulkarni utilized his alleged right to the accrued dividend to obtain payments

in which plaintiff was not entitled to share until defendants produced the Omnibus

Agreement during discovery in this case on November 9, 2005. Any statute of

limitations applying to this cause of action was therefore tolled until such date.

91.    On February 11, 2005, approximately one month after the filing of this

suit, the assets of Wolverine LLC were transferred to a new entity, owned and controlled

by defendant Kulkarni, which fact was actively hidden by defendants and was not

disclosed to the plaintiff until defendants produced documents in this case on September

28, 2005. Defendants have steadfastly refused to reveal the details of such

recapitalization.

17

92.     Plaintiff believes that the February 11, 2005 recapitalization may further have defrauded him of the benefits to which he is entitled under the Settlement Agreement, or may have constituted a breach of fiduciary duty by Kulkarni to the plaintiff, or both.

93.     Because of defendant Kulkarni's fraud, plaintiff may elect between the remedy of rescission of the Settlement Agreement and/or the Transition Agreement, or the remedy of damages, but has insufficient information at this time to make such election and does hereby expressly choose to pursue both remedies until he makes such election.

94.     Defendant Kulkarni is liable to the plaintiff for damages for fraud arising out of the facts stated in this cause of action.

95.     In the event that plaintiff elects to rescind the Settlement Agreement, defendant Wolverine Inc. is subject to equitable relief in the nature of an order returning to the plaintiff options on eight percent of the shares of Wolverine Inc., to be exercised, or not, by the plaintiff, as of any date between December 28, 2001 and the date upon which such order granting him such equitable relief issues.

### AS AND FOR AN NINTH CAUSE OF ACTION
(Accounting)

96.     The allegations of paragraphs 1-95 above are incorporated herein by reference.

97.     The amounts due to the plaintiff resulting from defendant Kulkarni's fraud and/or breach of fiduciary duty arising out of the 2005 recapitalization are not readily ascertainable.

98.     Adequate relief may not be obtained at law.

18

99. Plaintiff is entitled to an election of remedies for defendant Kulkarni's fraud, but has insufficient information to make such election without the accounting requested in this cause of action.

100. Defendant Kulkarni, as a result of the fiduciary relationship between him and the plaintiff arising out of the Settlement Agreement, and also because of the fraudulent actions taken by defendant Kulkarni, has a duty to the plaintiff to render to him an account as to (a) all distributions by Wolverine LLC or any related entity, of cash, assets in kind, securities, contract rights or other assets of any nature or type whatsoever made to himself, his family or entities that he controls, or to Parthenon or related entities, (b) copies of any and all agreements, contracts, undertakings, understanding or other documents which amend, purport to amend, rescind, replace, supercede, or otherwise modify, expand, reduce or alter in any way the LLC Agreement, or any of the exhibits thereto, and (c) copies of all financial statements of Wolverine LLC and any subsidiaries thereof through the present.

WHEREFORE, Plaintiff seeks damages for breach of contract from defendant Wolverine Inc. in the total amount of $597,570.

WHEREFORE, Plaintiff seeks treble damages for violation of the Massachusetts Payment of Wages Statute in the amount of $1,792,710 from defendants Wolverine Inc. and Chilinski, of which $597,570 of these damages are duplicative of those in the above paragraph with respect to defendant Wolverine Inc. only.

WHEREFORE, Plaintiff seeks damages from Mr. Kulkarni for tortious interference with contractual relations.

WHEREFORE, Plaintiff seeks attorney fees and costs.

WHEREFORE, Plaintiff seeks interest of 18 percent per annum, commencing from the date of breach, pursuant to M.G.L. c. 231 §§6C and 6F.

WHEREFORE, Plaintiff seeks an accounting of the financial results of Wolverine Inc. for 2001.

WHEREFORE, Plaintiff seeks a declaratory judgment that Mr. Kulkarni tortiously interfered with his contractual and business relations.

WHEREFORE, Plaintiff seeks damages from defendants Kulkarni and Wolverine Inc. for fraud.

WHEREFORE, Plaintiff seeks equitable relief in the nature of an order reforming, rescinding, or otherwise modifying the Settlement Agreement and the Transition Agreement, and/or distributing options in Wolverine Inc. to him, the exact nature, and the necessity, of such relief to be determined at plaintiff's option following discovery in this matter.

WHEREFORE, Plaintiff seeks equitable relief in the nature of an accounting from defendants Kulkarni and Wolverine Inc.

WHEREFORE, Plaintiff seeks such other relief as the Court finds just and meet.

Respectfully submitted,

Peter A. Crawford, pro se
23 Newcastle Dr. #11
Nashua, NH 03060
(603)888-4574

Date: Jan. 17, 2006