UNITED STATES DISTRICT COURT
District of Massachusetts

Civil Action
No. 05-10078-DPW

PETER A. CRAWFORD, Plaintiff )
)
v. )
)
WOLVERINE, PROCTOR & SCHWARTZ, INC., )
 Steven F. Chilinski, Deepak S. Kulkarni, )
)
 Defendants )

## PLAINTIFF'S MEMORADUM IN SUPPORT OF HIS MOTION TO AMEND AND DISSOLVE PROTECTIVE ORDERS IN LIGHT OF THE AMENDED COMPLAINT

### I. DISCOVERY CONFERENCE

On February 10, 2006 at 1:00 p.m., and again on February 14, 2006 at 2:00 p.m., plaintiff held telephonic discovery conferences with Jeffrey Kuhn of Morgan Brown & Joy, counsel for all defendants. The first conference lasted approximately 2 hours, the second approximately 1 hour. The subjects discussed included not only modification and dissolution of the protective orders, but also defendants' responses to other discovery requests. The discussion relating to these other requests is addressed in the accompanying Plaintiff Memorandum in Support of his Motion to Compel Responses to Plaintiff's Second Request for Production of Documents.

With respect to the protective orders, defendants were willing only to provide post-2002 information relating to payments under §5.3 of the Omnibus Agreement and were not willing to provide any documents relating to the 2005 recapitalization, which

1

the Amended Complaint ¶92 alleges may have further defrauded the plaintiff, or any information relating to payments to Mr. Kulkarni other than under §5.3 of the Omnibus Agreement.

II. NATURE OF THE CASE AND FACTS RELEVANT TO DISCOVERY MATTERS

A. PROCEDURAL HISTORY

On January 6, 2006, Magistrate Collings allowed Defendants' Cross Motion for a Protective Order (hereinafter "First Motion"), and allowed in part Defendants' Second Motion for a Protective Order Concerning Evidence of Compensation and Other Payments Made to Deepak Kulkarni (hereinafter "Second Motion").

The First Motion sought an order prohibiting the plaintiff from seeking "disclosure from any party or non-party of any documents, materials or other information relating to either:

1. WPS LLC's February 2005 recapitalization; or

2. WPS LLC's current (fiscal year 2005) financial statements.

The First Motion defined "WPS" as "Wolverine, Proctor & Schwartz, Inc."

The Second Motion broadly sought to prohibit the plaintiff from inquiring into any payments to defendant Kulkarni by "WPS" (again defined as Wolverine, Proctor & Schwartz, Inc.) other than the $135,000 payment alleged in plaintiff's Complaint ¶22 and Count VII. That motion was allowed in part, Magistrate Collings ruling that

> "[t]he motion is allowed as to any payment to defendant Kulkarni by any entity other than WPS Inc. and WPS, LLC. The motion is allowed as to any payments to defendant Kulkarni by WPS, Inc. and WPS, LLC before January 1, 2001 and after December 31, 2002. The motion is otherwise denied.

On January 17, 2006, plaintiff filed Objections to the allowance, or partial allowance, of the protective orders, and on the same date moved to amend his Complaint to add counts for fraud and for an accounting, which counts make the discovery prohibited by the two protective orders clearly relevant to the claims and defenses of the Amended Complaint. On January 31, 2006, defendants filed a Notice of Non-Opposition to the Motion to Amend, and the Motion to Amend was allowed on February 1, 2006. More than 10 business days have passed since the Motion to Amend was allowed, and no responsive pleading to the Amended Complaint has been filed by defendants, as required by Fed. R. Civ. P. 15(a).

B. FACTUAL BACKGROUND

This case seeks damages for breach of a written contract for a bonus payable to the plaintiff in the amount of $357,856.25, based upon his employment of Chief Operating Officer ("COO") of Wolverine, Proctor & Schwartz, Inc. ("WPS, Inc.") during 2001. Additional amounts are sought under an oral agreement to increase the bonus percentage, and treble damages are sought from defendants Wolverine and Chilinski (the CEO of Wolverine until early 2005) under the Massachusetts Payment of Wages statute. Additional amounts are sought from all defendants, including Kulkarni (Wolverine CEO during 2001), relating to the early termination of an agreement providing for 3 months of employment by the plaintiff after the sale of Wolverine.

The plaintiff assumed the position of COO of Wolverine in late 1999, successfully turning around the company and permitting its sale in late 2001. Under the terms of a letter agreement dated January 4, 2000 (the "Employment Agreement")[1], the

---

[1] The Employment Agreement is attached to the Affidavit in support of Plaintiff's Motion to Compel (Docket entries 21 and 22) as pages PAC0001-PAC0005.

plaintiff became entitled to five percent of Wolverine's profits as a bonus, the profits being defined by a formula based upon earnings before interest, taxes or deductions for depreciation or amortization (EBITDA) less certain deductions for capital expenditures, interest, taxes or reserve adjustments. Based upon this formula, plaintiff maintains that Wolverine's 2001 profits were $7,157,125, an amount that includes an "extraordinary gain" of $10,169,839. Based upon their response to Plaintiff's Interrogatories, Set No. 1, Interrogatory 2, the inclusion of this gain is the sole dispute that defendant Wolverine has with the plaintiff's calculation. Nothing in the Employment Agreement, however, indicates that the extraordinary gain was to be excluded, generally accepted accounting principles require the inclusion of extraordinary gains in earnings, and the bonus provisions of the Employment Agreement were reaffirmed and preserved on December 28, 2001 by agreement between Wolverine and the plaintiff (the "Transition Agreement")[2]. At the time of this agreement the fact and magnitude of the extraordinary gain were known.

Following the plaintiff's successful turnaround of Wolverine, the company was sold in late December, 2001 to an outside investor, Parthenon Capital, with defendant Kulkarni retaining a minority interest in a newly-created entity, Wolverine Proctor, LLC ("WP LLC"). WP LLC in turn owned substantially all of the shares of Wolverine, Proctor, Inc., which in turn owned substantially all of the shares of WPS, Inc., Friel Engineering Limited ("Friel"), and MawLaw 492 Ltd. "MawLaw."[3] Through a

---

[2] The Transition Agreement is attached to the Affidavit supporting Plaintiff's Motion to Compel (Docket entries 21 and 22) as pages PAC0043-PAC0047.
[3] Friel's sole business was providing labor to manufacture certain products utilizing material consigned by WPS, Inc.'s U.K. branch. MawLaw was purely an investment vehicle through which Friel reinvested money in WPS, Inc. prior to the 2001 recapitalization.

4

"Settlement Agreement,"[4] also executed on December 28, 2001, the plaintiff's options under the Employment Agreement were exchanged for 4 or 8 percent of the distributions to defendant Kulkarni under section 5.3 of an LLC Agreement[5] governing the relationships among the investors in WP LLC. However, plaintiff was not entitled to any portion of the distributions under section 5.2 of the LLC Agreement.

On December 28, 2001, just before signing the Transition Agreement and the Settlement Agreement, plaintiff asked defendant Kulkarni whether he was entitled to any "distributions or other monies" other than the $1 million per year to which he was entitled under a Consulting Agreement (also being executed that date), and under sections 5.2 and 5.3 of the LLC Agreement. Defendant Kulkarni unequivocally said no. He further stated that the interest payments (entitled "Special Distributions") that he might be entitled to a portion of under section 5.2 of the LLC Agreement were likely to be deferred or forgiven.

Unbeknownst to the plaintiff, and as it turns out, to Parthenon as well, defendant Kulkarni was retaining the hidden right to an accrued dividend of $624,263 that was apparently disclosed to Parthenon no earlier than the day before the transaction closed, as an item buried in the middle of a 153 page computer listing of all of the WPS, Inc. financial accounts. That listing was attached to a Termination and Release Agreement whereby Kulkarni released all claims against WPS, Inc. except those that might be found in the listing. The Termination and Release Agreement was not provided to the plaintiff until 2005, in connection with discovery in this case.

---

[4] The Settlement Agreement is attached to the Affidavit supporting Plaintiff's Motion to Compel (Docket entries 21 and 22) as pages PAC0048-PAC0051.
[5] The section of the LLC Agreement relating to distributions is attached to Plaintiff's Affidavit in Support of his Memorandum in Opposition to Defendants' Second Motion for a Protective Order as Exhibit C.

On November 13, 2002, defendant Kulkarni and Parthenon entered into an Omnibus Agreement[6] that exchanged Mr. Kulkarni's rights to the accrued dividend and certain other accrued amounts, for a right to $765,980 in payments, much of which was as Special Distributions in which the plaintiff was not entitled to share, pursuant to section 5.2 of the LLC Agreement.

Under the Settlement Agreement (¶1), the plaintiff exchanged his equity interest in Wolverine under the Employment Agreement, for an interest in WP LLC, a holding company formed to hold indirectly substantially all of the WPS, Inc. stock, and he agreed to share in an indemnity being committed to by Mr. Kulkarni as part of the transaction (¶2).

Plaintiff learned for the first time through defendants' response to his first Request for Production that Wolverine was recapitalized on February 11, 2005, approximately a month after this suit was filed. The Wolverine 2004 financial statements[7] specifically refer to the December 28, 2001 transaction and indicate that the agreement relating thereto must have been amended and/or superceded. They state that:

> "On February 11, 2005, the Company [i.e. Wolverine Proctor LLC] and the Class A and B shareholders entered into a series of transactions reorganizing and continuing the Company in which the Class A member [Kulkarni, with plaintiff retaining an interest through the Settlement Agreement] acquired new equity interests and the Class B member [Parthenon Capital and related investors] received approximately $2,000,000 in cash from the Company and certain preferred interests in newly-formed US and UK entities. Also as part of the transactions, the newly-formed US and UK entities acquired the operating net assets of the Company, resulting in effective liquidation and dissolution of the Company. The outstanding debt of the Company was refinanced.

---

[6] The Omnibus Agreement is attached to Plaintiff's Affidavit in Support of his Memorandum in Opposition to Defendants' Second Motion for a Protective Order as Exhibit E.

[7] Page W0367 previously filed in this case as an attachment to the Affidavit supporting Plaintiff's Motion to Compel (docket entries 21 and 22).

### III. PLAINTIFF"S AMENDED COMPLAINT MAKES THE REQUESTED DISCOVERY CENTRAL TO THE CLAIMS AND DEFENSES OF THIS CASE

The Amended Complaint adds Count Eight for fraud and Count Nine for an accounting. These counts arise out of the misrepresentation made by defendant Kulkarni to the plaintiff on December 28, 2001, and the recapitalization that occurred on February 11, 2005. Count Eight alleges that plaintiff was damaged when defendant Kulkarni exchanged an alleged right to $624,263 in accrued dividends (the existence of which he denied to the plaintiff) for $765,980 in payments under the Omnibus Agreement (see Amended Complaint ¶¶80-81, 87), which payments were purportedly pursuant to §5.2 of the LLC Agreement, in which the plaintiff was not entitled to share. The Amended Complaint alleges that the plaintiff was thereby defrauded (Amended Complaint ¶89).

The protective order permits inquiry into payments to defendant Kulkarni through the end of 2002, and defendant Kulkarni's response to interrogatories reveals that he was apparently paid only $359,967.00 pursuant to the Omnibus Agreement in 2002[8]. In addition, it appears that $135,500 was paid to defendant Kulkarni on April 16, 2003 pursuant to the Omnibus Agreement. However, that leaves $270,513 apparently remaining payable to Mr. Kulkarni under the Omnibus Agreement after that[9]. Discovery of whether or not that balance was ever paid is prohibited by the current protective order.

---

[8] The Interrogatory response also indicates that $1,000,000.00 in wages and salary and $6246.58 in expense reimbursements were paid to Mr. Kulkarni. Plaintiff is not alleging that these payments were fraudulent as to him, inasmuch as the Consulting Agreement and its $1 million annual payment had been disclosed to him prior to the 2001 recapitalization.

[9] Defendants continue to obfuscate the facts and mislead the plaintiff. On December 20, 2005, defendants produced redacted documents evidencing Omnibus Agreement payments to Mr. Kulkarni of $130,967 on November 19, 2002, and $135,500 on April 15, 2003. However, they hid, until January 13, 2006, the existence of a $229,000 payment to Kulkarni under that agreement, made on December 20, 2002.

7

Furthermore, by its terms, the Omnibus Agreement, ¶4(iv), makes Special Distributions to Mr. Kulkarni mandatory for 2003 and future years, unless prohibited by an agreement with the company's lenders. Under the LLC Agreement, these Special Distributions were subject to the discretion of the Parthenon-controlled board of managers, other than for that portion required to pay taxes thereon. It is therefore possible that additional payments were made to Mr. Kulkarni arising out of the Omnibus Agreement, entered into by Parthenon only because of the hidden (and fraudulently concealed from the plaintiff) accrued dividend. It may well be also that there were other agreements entered into between Mr. Kulkarni and Parthenon, WP LLC, or WPS, Inc. providing for further payments to him. Discovery of the amount of all payments to Mr. Kulkarni by WP LLC, WPS, Inc., or any direct or indirect subsidiary of either, is needed to determine the amount by which plaintiff was damaged by the fraud. See Amended Complaint ¶89. Only a complete set of records will permit the payments to defendant Kulkarni to be separated and compared to the contractual provisions disclosed to the plaintiff on December 28, 2001.

Furthermore, it appears that the 2005 recapitalization must either have resulted in distributions under §5.3 to Mr. Kulkarni, in which the plaintiff would be entitled to a 4 or 8 percent share under the Settlement Agreement, or the recapitalization itself may have caused defendant Kulkarni to breach his fiduciary duties to the plaintiff. Although the exact terms of the recapitalization are unclear, it appears that defendant Kulkarni thereby obtained majority control of the equity of Wolverine, Proctor & Schwartz, LLC ("WPS, LLC"), a new entity that acquired substantially all of the assets of Wolverine, Proctor & Schwartz, Inc. The 2004 financial statements also reveal that Wolverine Proctor, LLC

has been effectively liquidated. Wolverine, Proctor & Schwartz, LLC should not be confused with Wolverine Proctor LLC; the two are two separate entities.

Under the Settlement Agreement, plaintiff is entitled to share in distributions from the latter entity (WP LLC), including distributions in kind. It is difficult to see how WP LLC could have been liquidated without making any distributions for the benefit of defendant Kulkarni, inasmuch as the consolidated debt of WP LLC at the end of 2004 amounted to only $3.5 million and in any event, according to the 2004 financial statements, that debt was refinanced. Under the LLC Agreement, defendant Kulkarni and Parthenon held similar equity interests in WP LLC, thus it would be unlikely that Parthenon could force a liquidation without providing defendant Kulkarni with his fair share.

To the extent that defendant Kulkarni negotiated an arrangement whereby the liquidation was accomplished in a way that prevented the plaintiff from receiving a share of the distributions under §5.3 of the LLC Agreement, he may have breached his fiduciary responsibility to the plaintiff[10].

Furthermore, the Settlement Agreement at 4 specifically states that it operates as an "irrevocable assign[ment] of [a] portion of Kulkarni's interest in the Class A Units." In addition to defendant Kulkarni's duties to the plaintiff under the constructive trust theory set forth in the Amended Complaint, general principles imposing implied

---

[10] While it is true that under §1(a) of the Settlement Agreement and §4.4 of the Transition Agreement, the plaintiff is entitled to share in distributions only to the extent that his 4% share of Kulkarni's distributions exceeds $150,000, that level would be surpassed if the total value of Wolverine Proctor, LLC exceeded $7.5 million (at that value, Kulkarni would be entitled to 50%, and the plaintiff to 4% of that, or 2% of the total). For comparison, at the time of the 2001 recapitalization, Parthenon paid $14 million for an approximately 60% stake in Wolverine Proctor, LLC, implying a total value of the company of $23.3 million.

warranties in connection with the assignment of contracts apply. Restatement (2d) of Contracts §333(1) states that:

> "Unless a contrary intention is manifested, one who assigns or purports to assign a right by assignment under seal or for value warrants to the assignee (a) that he will do nothing to defeat or impair the value of the assignment and has no knowledge of any fact which would do so…

Massachusetts law accepts this principle. See Abbott v. Bean, 295 Mass. 268, 278 (1936) (citing with approval the substantially identical language of Am. Law Inst. Restatement: Contracts §175). See also Easton v. Mellus, 73 Mass. (7 Gray) 566, 573 (1856) (assignee of the right to collect payment for the gunpowder used in the conquest of California was not required to incur the risk that the assignor had done anything to defeat collection).

The assignment in this case was for value (as required by the Restatement) in that plaintiff surrendered his equity rights represented by the options he held in exchange for the Settlement Agreement. Furthermore, the Restatement (2d) of Contracts §326(1) makes the partial assignment represented by the Settlement Agreement "operative as to that part to the same extent and in the same manner as if the part had been a separate right."

There can thus be no doubt that the plaintiff was owed a duty by defendant Kulkarni. He was permitted to do nothing to prevent the plaintiff from receiving what was due him under the Settlement Agreement, and the facts strongly suggest that that duty was breached. The Amended Complaint seeks damages for the breach of that duty, both in misrepresenting to the plaintiff the facts relating to the accrued dividend, and potentially in further breaching that duty in the 2005 recapitalization. The Amended Complaint further seeks an accounting. As a result of the amendment, therefore, the

discovery sought relates directly to the claims and defenses of the Amended Complaint and discovery must be allowed.

The law in the First Circuit specifically permits protective orders to be modified or dissolved based upon changed circumstances. In Public Citizen v. Liggett Group, Inc., 858 F.2d 775, 782 (1st Cir. 1988), cert den, 488 U.S. 1030 (1989), it was held that a protective order could be modified for the benefit of non parties even after judgment. See U.S. v. Swift, 286 U.S. 106, 114-115 (1932) (injunctions are adaptable to changing circumstances). See also Moore's Federal Practice 3d, §26.106 (court may modify or dissolve protective order), Wright, Miller & Marcus, Federal Practice and Procedure Civil 2d §2044.1 (protective orders are not immutable and may be modified). The amendment of the Complaint in this action is the sort of changed circumstance contemplated by the case law.

Inasmuch as the 2005 recapitalization documents are likely to provide evidence that defendant Kulkarni negotiated an arrangement whereby the liquidation of Wolverine Proctor, LLC was accomplished in a way that purports to extinguish the plaintiff's rights, and the extent that such purported extinguishment violates duties owed by defendant Kulkarni to the plaintiff, those documents are now clearly discoverable. In addition, any other documents responsive to Request Three of Plaintiff's First Request for Production of Documents that were not provided because Magistrate Collings' January 6, 2006 order required only the production of documents "generated before December 31, 2002" should be produced as these documents may provide evidence of other agreements, similar to the Omnibus Agreement, through which defendant Kulkarni obtained other payments in which the plaintiff is not entitled to share. Furthermore, the 2005 financial statements, as

the first such statements issued after the 2005 recapitalization, are also very likely to shed additional light upon that recapitalization and the extent to which the plaintiff may have been injured. Thus the protective order resulting from the First Motion should be dissolved in its entirety.

With respect to amounts paid to Mr. Kulkarni, it is clear that any amount paid by Wolverine Proctor LLC, Wolverine, Proctor & Schwartz, Inc., or any other entity that was at any time majority owned by either, could have been the result (as the Omnibus Agreement apparently was) of an attempt by defendant Kulkarni to shift payments into categories not subject to sharing with the plaintiff under §5.3 of the LLC Agreement. Any payment made to defendant Kulkarni after December 28, 2001 (the date of the 2001 recapitalization) is therefore relevant to determine the extent of the fraud on the plaintiff. The only legitimate payments are likely to be those resulting from contractual provisions that Mr. Kulkarni disclosed to the plaintiff on December 28, 2001. Any increase in the $1 million per year Consulting Agreement, or any attempt to move payments from §5.3 of the LLC Agreement to some other category would create a strong inference that defendant Kulkarni thereby breached his duties to the plaintiff.

Particularly inasmuch as it appears that $270,513 remained owing to defendant Kulkarni under the Omnibus Agreement after April 16, 2003, the amount and timing of any other Omnibus Agreement payments is clearly relevant to determine the extent to which the plaintiff was damaged by defendant Kulkarni's fraud. Furthermore, as a result of the duties owed by defendant Kulkarni to the plaintiff, it may well be that additional arrangements, beyond the Omnibus Agreement, were made by defendant Kulkarni to extract additional funds that he would not be required to share with the plaintiff.

Therefore, plaintiff requests that the protective order relating to the Second Motion be amended to permit inquiry into any payments to Mr. Kulkarni from the Wolverine Entities after the 2001 recapitalization. A proposed revised wording is as follows:

> "The motion is allowed as to any payment to defendant Kulkarni by any entity other than Wolverine, Proctor & Schwartz, Inc. and Wolverine Proctor, LLC[11] prior to December 28, 2001. The motion is allowed as to any payments to defendant Kulkarni by any entity other than Wolverine, Proctor & Schwartz, Inc., Wolverine Proctor, LLC, Wolverine Proctor, Inc., Wolverine, Proctor & Schwartz, LLC (the "Wolverine Entities") or any entity that was at any time majority-owned, either directly or indirectly, by any of the Wolverine Entities. The motion is allowed as to any payments to defendant Kulkarni by Wolverine, Proctor & Schwartz, Inc. and Wolverine Proctor LLC before January 1, 2001. The motion is otherwise denied.

## IV. CONCLUSION

For the reasons stated above, plaintiff is entitled to dissolution of the protective order resulting from the First Motion (relating to the 2005 recapitalization and 2005 financial statements), and modification of the protective order resulting from the Second Motion (relating to payments to Mr. Kulkarni). He is further entitled to modification of the Court's January 6, 2006 order, compelling compliance with Request 3, with any time restriction thereon removed.

Respectfully submitted,

/s/ Peter A. Crawford

Peter A. Crawford, pro se
23 Newcastle Dr. #11
Nashua, NH  03060
(603)888-4574

Date: 21 Feb. 2006

---

[11] The current protective order refers to WPS, LLC, which presumably could be construed to mean Wolverine, Proctor & Schwartz, LLC. That entity was not created until late 2004. It appears that Wolverine Proctor, LLC was meant. That entity was created in late 2001.

13