UNITED STATES DISTRICT COURT
District of Massachusetts

Civil Action
No. 05-10078-DPW

PETER A. CRAWFORD, Plaintiff )
)
)
v. )
)
WOLVERINE, PROCTOR & SCHWARTZ, INC., )
Steven F. Chilinski, Deepak S. Kulkarni, )
)
Defendants )
)

## PLAINTIFF'S MEMORADUM IN SUPPORT OF HIS MOTION TO COMPEL RESPONSES TO HIS REQUEST FOR PRODUCTION OF DOCUMENTS, SET NO. 2

### I. DISCOVERY CONFERENCE

On February 10, 2006 at 1:00 p.m., and again on February 14, 2006 at 2:00 p.m., plaintiff held telephonic discovery conferences with Jeffrey Kuhn of Morgan Brown & Joy, counsel for all defendants. The first conference lasted approximately 2 hours, the second approximately 1 hour. The subjects discussed included not only modification and dissolution of the protective orders, but also defendants' responses to other discovery requests, including those that are the subject of this motion. The discussion relating to the modification and dissolution of the protective orders is set forth in the accompanying Plaintiff's Memorandum in Support of his Motion to Amend and Dissolve Protective Orders in Light of the Amended Complaint.

With respect to the discovery, defendants agreed to provide some responsive documents that had not previously been produced, including additional documentation

1

relating to a payment of $59,931.85 made to Mr. Kulkarni in December 2001, a spreadsheet detailing payments under the Omnibus Agreement, and copies of checks constituting payments by Wolverine, Proctor & Schwartz, Inc.'s U.K. branch to Mr. Kulkarni in 2001. However, the parties were unable to agree to the relevance of transactions making up a $624,263 accrued dividend purportedly owing to Mr. Kulkarni as of November 30, 2001, or transactions making up the $787,325 in accrued expenses purportedly owing to Mr. Kulkarni as of December 31, 2001 (which amount apparently includes the aforementioned accrued dividend).

## II. FACTUAL BACKGROUND

This case seeks damages for breach of a written contract for a bonus payable to the plaintiff in the amount of $357,856.25, based upon his employment of Chief Operating Officer ("COO") of Wolverine, Proctor & Schwartz, Inc. ("WPS, Inc.") during 2001. Additional amounts are sought under an oral agreement to increase the bonus percentage, and treble damages are sought from defendants Wolverine and Chilinski (the CEO of Wolverine until early 2005) under the Massachusetts Payment of Wages statute. Additional amounts are sought from all defendants, including Kulkarni (Wolverine CEO during 2001), relating to the early termination of an agreement providing for 3 months of employment by the plaintiff after the sale of Wolverine.

The plaintiff assumed the position of COO of Wolverine in late 1999, successfully turning around the company and permitting its sale in late 2001. Under the terms of a letter agreement dated January 4, 2000 (the "Employment Agreement")[1], the plaintiff became entitled to five percent of Wolverine's profits as a bonus, the profits

---

[1] The Employment Agreement is attached to the Affidavit in support of Plaintiff's Motion to Compel (Docket entries 21 and 22) as pages PAC0001-PAC0005.

being defined by a formula based upon earnings before interest, taxes or deductions for depreciation or amortization (EBITDA) less certain deductions for capital expenditures, interest, taxes or reserve adjustments. Based upon this formula, plaintiff maintains that Wolverine's 2001 profits were $7,157,125, an amount that includes an "extraordinary gain" of $10,169,839. Based upon their response to Plaintiff's Interrogatories, Set No. 1, Interrogatory 2, the inclusion of this gain is the sole dispute that defendant Wolverine has with the plaintiff's calculation. Nothing in the Employment Agreement, however, indicates that the extraordinary gain was to be excluded, generally accepted accounting principles require the inclusion of extraordinary gains in earnings, and the bonus provisions of the Employment Agreement were reaffirmed and preserved on December 28, 2001 by agreement between Wolverine and the plaintiff (the "Transition Agreement")[2]. At the time of this agreement the fact and magnitude of the extraordinary gain were known.

Following the plaintiff's successful turnaround of Wolverine, the company was sold in late December, 2001 to an outside investor, Parthenon Capital, with defendant Kulkarni retaining a minority interest in a newly-created entity, Wolverine Proctor, LLC ("WP LLC"). WP LLC in turn owned substantially all of the shares of Wolverine, Proctor, Inc., which in turn owned substantially all of the shares of WPS, Inc., Friel Engineering Limited ("Friel"), and MawLaw 492 Ltd. "MawLaw."[3] Through a

---

[2] The Transition Agreement is attached to the Affidavit supporting Plaintiff's Motion to Compel (Docket entries 21 and 22) as pages PAC0043-PAC0047.
[3] Friel's sole business was providing labor to manufacture certain products utilizing material consigned by WPS, Inc.'s U.K. branch. MawLaw was purely an investment vehicle through which Friel reinvested money in WPS, Inc. prior to the 2001 recapitalization.

"Settlement Agreement,"[4] also executed on December 28, 2001, the plaintiff's options under the Employment Agreement were exchanged for 4 or 8 percent of the distributions to defendant Kulkarni under section 5.3 of an LLC Agreement[5] governing the relationships among the investors in WP LLC. However, plaintiff was not entitled to any portion of the distributions under section 5.2 of the LLC Agreement.

On December 28, 2001, just before signing the Transition Agreement and the Settlement Agreement, plaintiff asked defendant Kulkarni whether he was entitled to any "distributions or other monies" other than the $1 million per year to which he was entitled under a Consulting Agreement (also being executed that date), and under sections 5.2 and 5.3 of the LLC Agreement. Defendant Kulkarni unequivocally said no. He further stated that the interest payments (entitled "Special Distributions") that he might be entitled to a portion of under section 5.2 of the LLC Agreement were likely to be deferred or forgiven.

Unbeknownst to the plaintiff, and as it turns out, to Parthenon as well, defendant Kulkarni was retaining the hidden right to an accrued dividend of $624,263 that was apparently disclosed to Parthenon no earlier than the day before the transaction closed, as an item buried in the middle of a 153 page computer listing of all of the WPS, Inc. financial accounts. That listing was attached to a Termination and Release Agreement whereby Kulkarni released all claims against WPS, Inc. except those that might be found in the listing. The Termination and Release Agreement was not provided to the plaintiff until 2005, in connection with discovery in this case.

---

[4] The Settlement Agreement is attached to the Affidavit supporting Plaintiff's Motion to Compel (Docket entries 21 and 22) as pages PAC0048-PAC0051.
[5] The section of the LLC Agreement relating to distributions is attached to Plaintiff's Affidavit in Support of his Memorandum in Opposition to Defendants' Second Motion for a Protective Order as Exhibit C.

4

On November 13, 2002, defendant Kulkarni and Parthenon entered into an Omnibus Agreement[6] that exchanged Mr. Kulkarni's rights to the accrued dividend and certain other accrued amounts, for a right to $765,980 in payments, much of which was as Special Distributions in which the plaintiff was not entitled to share, pursuant to section 5.2 of the LLC Agreement.

The Amended Complaint in this action asserts that defendant Kulkarni's statement that he had no right to "distributions or other monies" was patently false as to the accrued dividend, that plaintiff relied upon that false assertion, and was thereby damaged when Parthenon agreed to permit payments to defendant Kulkarni in which the plaintiff was not entitled to share. See Amended Complaint ¶¶76, 81, 89.

In addition, the Amended Complaint asserts a claim against defendant Kulkarni for tortious interference with contractual relations. In that count, the plaintiff alleges that, on January 14, 2002, he blocked a payment to defendant Kulkarni in the amount of $135,000 and that, the same day, defendant Kulkarni took actions to persuade, cause and induce the Board of Directors of WPS, Inc. to terminate the plaintiff's employment. Plaintiff alleges that the payment request "was wholly without any credible rationale whatsoever." See Amended Complaint ¶22, 59.

In defense, defendant Kulkarni appears to assert that, since the Omnibus Agreement of November 13, 2002 permitted him to receive payments late in 2002, that the payment request on January 14, 2002 was legitimate. He appears further to argue that, in any event, he was owed more than $135,000 as of January 14, 2002. In his

---

[6] The Omnibus Agreement is attached to Plaintiff's Affidavit in Support of his Memorandum in Opposition to Defendants' Second Motion for a Protective Order as Exhibit E.

5

deposition of December 7, 2005, at 131-132, defendant Kulkarni (while reading the Omnibus Agreement) testified as follows:

> A. Okay.
>    (Document Perusal.)
> A. I read this thing, at least the first page, it just reminded me of something.
>    (Document Perusal.)
> A. Okay, what's your question?
> Q. Are you done?
> A. I speed read it. One of the things that strikes me -- I just want to make a small observation. Do you see the amounts of money being mentioned here? I mean are they, are they larger, with the exception of the 56, right, everything appears to be larger than 130,000, is that correct?
> Q. I think that's correct.
> A. Right?
> Q. Yes.
> A. So there's 56,000. That's the only amount that's smaller than 130,000. And then we have other amounts here. There's 170,000. There is 539,000. There's 404,000.
> Q. Right.
> A. These are all larger than 130,000, would you say?
> Q. What is your point?
> A. So my point is I want to make it very clear to you, so when you ask me a question like do you remember the 140,000, you'll forgive me for not remembering it because I try to keep my eyes on the donut not the hole. So there were larger amounts of money that were owed to me by the Company. So when you say to me do you remember coming and talking to me about 135,000 or 130,000, why these are all large amounts of money. The Company actually owed me substantially more, substantially larger amounts of money, and I couldn't tell you offhand, you know, what the composition of that money was without diving into it. We have to go and look at each one and see what it was for, and the point is so what, who cares, what does that have to do with you?

### III. PLAINTIFF IS ENTITLED TO AN ORDER COMPELLING PRODUCTION OF DOCUMENTS RELATING TO THE ACCRUED DIVIDEND

Plaintiff's Second Request for Production of Documents, Request 6, asks:

> "[f]or each and every dividend that makes up the $624,263.00 in "Accrued Dividends" which appears on the General Ledger Trial Balance of WPS as of November 30, 2001 (page W0828 previously produced by defendants),

>provide all documents that refer, relate to, otherwise reference such dividend, including but not limited to, board of directors resolutions or minutes authorizing such dividend or dividends and any accounting journal entries, regardless of when made, relating to such dividend or dividends.

Defendants' response was:

>"Defendants object to this document request. This document request is overly broad, unduly burdensome, oppressive and not reasonably calculated to lead to discovery of evidence which is material or necessary to the prosecution or defense of this case. This document request seeks information which is not relevant or pertinent to a determination of the factual or legal issues present in this litigation and is otherwise objectionable for all the reasons specified in Wolverine's pending second motion for a protective order.

The second motion for a protective order was allowed only in part on January 6, 2006. It appears that defendants may have supplied some information responsive to this request, however, this information relates only to <u>changes</u> in the amount of the accrued dividend during 2001 and 2002. Other than two transactions that cancelled each other out during 2001, there were only two changes, both reductions, to the accrued dividend during 2001. The information provided[7] reveals the following:

>Opening balance of accrued dividend as of 12/31/2000    $733,766.00
>4/13/2001 debit (reclass IRS check)                      ($ 85,000.00)
>10/31/2001 debit (reclass)                               ($ 24,503.00)
>Ending balance as of 12/31/2001                          $624,263.00

As can be seen, this information provides no evidence that would support or contradict defendant Kulkarni's assertion in his deposition that "there were larger amounts [than the $135,000 payment blocked by the plaintiff] of money that were owed to me by the Company," Whether or not there was $135,000 owed to defendant Kulkarni on January 14, 2002 depends entirely on the legitimacy of the $733,766.00 opening

---

[7] Pages W01037 to W01041 produced by defendants on January 13, 2006.

balance as of December 31, 2000. Yet, defendants are willing to provide no evidence to substantiate this opening balance.

While it appears that the books and records of WPS, Inc. may have supported such a larger amount owed by the Company, it is also apparent that defendant Kulkarni, as sole shareholder and CEO of WPS, Inc. prior to the December 28, 2001 transaction, had the power to cause the WPS, Inc. accounting staff to make whatever adjustment to the books and records of WPS, Inc. that he saw fit. Whether those adjustments were lawful and legitimate is a different issue.

The normal use of an accrued dividend account would be to reflect a dividend that a corporation had declared, but not yet paid, to its shareholders. Normally, a dividend would be declared out of the "surplus" of the corporation's capital, or the amount by which the "net assets" of the corporation exceed the stated capital of the corporation as voted by its board of directors. As WPS, Inc. had been a Delaware corporation since at least 1991,[8] Delaware law applies. See Del. Code Ann. tit. 8, §154 for the definition of "surplus" under Delaware law. That statute also defines "net assets" as "the amount by which total assets exceed total liabilities." As of December 31, 2000, WPS, Inc. had total assets of $31,624,327 and liabilities of $43,925,763[9], leaving "net assets," as defined by Delaware Law, of a negative $12,301,436. Manifestly, there was no "surplus" out of which to declare any dividend, as of December 31, 2000. Del. Code Ann. tit. 8, §170(a) provides that:

---

[8] It was renamed from Wolverine Acquisition Corporation to Wolverine (Massachusetts) Corporation in 1991, and from Wolverine (Massachusetts) Corporation to Wolverine, Proctor & Schwartz, Inc. in 1999.

[9] Based on the WPS, Inc. 2000 financial statements, previously produced by plaintiff as page PAC0083. The minority interest of $158,509 is not included in the liabilities, thus net assets differ from the total shareholders deficit of $12,459,945 by this amount.

> "[t]he directors of every corporation, subject to any restrictions contained in its certificate of incorporation, may declare and pay dividends upon the shares of its capital stock, or to its members if the corporation is a nonstock corporation, either (1) out of its surplus, as defined in and computed in accordance with §§ 154 and 244 of this title, or (2) in case there shall be no such surplus, out of its net profits for the fiscal year in which the dividend is declared and/or the preceding fiscal year. If the capital of the corporation, computed in accordance with §§ 154 and 244 of this title, shall have been diminished by depreciation in the value of its property, or by losses, or otherwise, to an amount less than the aggregate amount of the capital represented by the issued and outstanding stock of all classes having a preference upon the distribution of assets, the directors of such corporation shall not declare and pay out of such net profits any dividends upon any shares of any classes of its capital stock until the deficiency in the amount of capital represented by the issued and outstanding stock of all classes having a preference upon the distribution of assets shall have been repaired. Nothing in this subsection shall invalidate or otherwise affect a note, debenture or other obligation of the corporation paid by it as a dividend on shares of its stock, or any payment made thereon, if at the time such note, debenture or obligation was delivered by the corporation, the corporation had either surplus or net profits as provided in clause (1) or (2) of this subsection from which the dividend could lawfully have been paid.

WPS, Inc. lost money in both 1999 and 2000, so there were no net profits out of which any dividend could be declared by the WPS, Inc. board of directors pursuant to Del. Code Ann. tit. 8, §170(a)(2) at any time during 2000. In addition, it had negative net assets at the end of both 1999 and 2000, so there was no surplus out of which the WPS, Inc. board of directors could declare a dividend pursuant to Del. Code Ann. tit. 8, §170(a)(1) at any time during 2000. However, WPS, Inc. might be able to demonstrate that the accrued dividend was valid under the last sentence of Del. Code Ann. tit. 8, §170(a), by virtue of its having been declared by the board of directors at a time when WPS, Inc. had either a surplus or net profits.

It is possible, however, that defendant Kulkarni had instructed the WPS, Inc. accounting department to alter the books and records of WPS, Inc. during 2000 to reflect

9

a dividend payable to him. Such a transaction would have increased the liabilities of WPS, Inc., and driven the "net assets," defined by Delaware law as the total assets less the total liabilities, even more deeply negative. But, regardless of whether or not the board of directors voted to declare such a dividend, it would clearly violate Delaware law, which prohibits dividends from being declared when there is no current surplus, and no net profits in that year or the prior year.

If the accrued dividend was not lawfully declared and voted by the WPS, Inc. board of directors, then defendant Kulkarni's assertion that the company owed him even more money than the $135,000 payment that plaintiff blocked may be without merit. Thus, the discovery sought by the plaintiff goes directly to the heart of the claims and defenses relating to count seven of his Amended Complaint (tortious interference).

Unlike the issue with actual payments to defendant Kulkarni, where this Court's January 6, 2006 protective order permits inquiry only into payments made in 2001 and 2002, what the plaintiff seeks is an explanation of how the $624,263.00 accrued dividend that appeared on the books and records of WPS, Inc. as of November 30, 2001 (and again as of December 31, 2001) came to exist. As has been demonstrated, restricting inquiry into what happened during 2001 prevents discovery of sufficient evidence to resolve the issue, as there was no net increase to the accrued dividend during 2001. To determine how the accrued dividend came into existence it is necessary to go back in time and examine the transactions that make it up.

Unlike the situation with defendants' second motion for a protective order, where defendants argued (albeit unsuccessfully with respect to the period 2001-2002) that other payments to defendant Kulkarni were nothing but other bad acts excludable pursuant to

Fed. R. Evid. 404(b), what is sought here is substantiation for the balance of the accrued dividend in late 2001,[10] an amount that, by definition, had not yet been paid to defendant Kulkarni.

An analogous situation would be a prosecution for the theft of property. If the police had discovered a cache of such property in the possession of a defendant, then if he were being prosecuted for the theft of each such item, then the source and ownership of each item would be relevant. Information relating to other goods that might have been stolen and already resold, but were not the subject of the current prosecution, might be excludable under Fed. R. Evid. 404(b) as being merely evidence of other bad acts, but the source and ownership of the actual items, the theft of which was being prosecuted, would go to the very heart of the claims and defenses of that case. Such is also the case here, where defendant Kulkarni has himself put forth the accrued dividend and other accrued expenses as a defense. The legitimacy of the dividend and other accrued expenses, therefore, goes to the heart of the claims and defenses of this case.

Defendants will no doubt cite the Termination and Release Agreement, by which defendant Kulkarni waived the right to seek payment of any liabilities of WPS, Inc. to him that were not listed somewhere in the attached 153 page listing of all WPS, Inc. accounts. They will likely maintain that that agreement obligated WPS, Inc. to pay the accrued dividend. However, nowhere in that agreement is it stated that either WPS, Inc. or Parthenon agree to pay any of these liabilities to defendant Kulkarni only that <u>he</u> waives any right to payment for liabilities that are not listed.

---

[10] and by implication as of January 14, 2002 as plaintiff is aware of no changes to such balance, and defendants have produced no evidence of such, between November 30, 2001 and January 14, 2002.

11

As the 2000 data indicate, it does not appear that there are large numbers of transactions each year that affect the balance of the accrued dividend. Rather there are likely to be a handful, perhaps 2-5, of such transactions each year. Furthermore, it would be necessary only to go back in time far enough so that the total increases to the accrued dividend amounted to $624,263.00 or more, applying a first in, first out assumption. Any decreases during that period would be assumed to reduce the opening balance, if any, of the accrued dividend at the beginning of the time period.

Given the small number of transactions making up the accrued dividend, it is unlikely that defendants can demonstrate any undue burden associated with compiling this information. Nor is the request overly broad, as there are likely to be only a few board of directors resolutions (if any exist) referencing increases to the amount of the accrued dividend, and a few accounting entries referring to it. As the request is undeniably reasonably calculated to lead to the discovery of admissible evidence, in that it seeks information that will either support or undermine defendant Kulkarni's assertion as to the legitimacy of his request for the payment of $135,000, defendants' objections should be overruled and they should be compelled to respond to this request.

### IV. PLAINTIFF IS ENTITLED TO AN ORDER COMPELLING PRODUCTION OF DOCUMENTS RELATING TO THE ACCRUED EXPENSES

Plaintiff's Second Request for Production of Documents, Request 13, requests that defendants:

> "[p]rovide a copy of all documents reflecting, relating to, or referring to any Kulkarni Accrued Expenses, or any portion thereof, as defined below. This request includes, but is not limited to itemizations, detailed statements, authorizing board resolutions, authorizing memoranda, journal entries or similar documents of any type. Also included in this request are any documents depicting journal entries or other transactions of any type that alter the amount of the Kulkarni Accrued Expenses from the end of any year for which financial statements were prepared for Wolverine,

Proctor & Schwartz, Inc. or Wolverine Proctor LLC to the end of the next year for which accounting statements were prepared, including all documents necessary to enable understanding and reconciliation of the change in the amount of the Kulkarni Accrued Expenses from year to year. The term "Kulkarni Accrued Expenses" means the "$35,000 and $97,000, respectively, payable to the sole stockholder of the Company," listed on page 16 of the 1999 financial statements of Wolverine, Proctor & Schwartz, Inc. (page PAC0077) attached to Plaintiff's Request for Admission to All Defendants, Set No. 1; the $11,000, $35,000, $694,000 and $1,374,000 listed in section 9(d) of the 2000 financial statements of Wolverine, Proctor & Schwartz, Inc. (page PAC0097) attached to Plaintiff's Request for Admission to All Defendants, Set No. 1; the $787,325 listed on page 13 of the 2001 financial statements of Wolverine Proctor LLC (page PAC0040) attached to Plaintiff's Request for Admissions to All Defendants, Set No. 1; the $402,379 and $787,325 listed on page 20 of the Wolverine Proctor LLC financial statements for 2002 (page W0431 previously produced by defendants); and any amounts that would have been listed on the Wolverine Proctor LLC financial statements for 2003 (pages W0384-W0408 previously produced by defendants) had such statements set forth any amounts payable to the previous sole shareholder of the Company.

Defendants' response was:

"Defendants object to this document request. Plaintiff's document request is duplicative, vague, oppressive, overly broad and unduly burdensome and not reasonably calculated to lead to the discovery of evidence which is material or necessary to the prosecution or defense of this case. This document request also seeks information which is not relevant or pertinent to a determination of the factual or legal issues present in this litigation and is otherwise objectionable for all the reasons specified in Wolverine's pending second motion for a protective order. Subject to and without waiving defendants' foregoing objections, defendants state that, pursuant to plaintiff's second request for production, relevant documents responsive to this request (besides those which have already been produced, e.g. W0445) are currently available for copying and inspection at the offices of defendants' attorneys, Morgan, Brown & Joy, LLP.

The second motion for a protective order was denied in part. The page referred to, W0445, merely sets forth the total amount of the accrued expenses payable to defendant Kulkarni as of December 31, 2001, i.e. $787,325. Documents produced by

defendants[11] indicate that this is made up largely of the accrued dividend discussed in the previous section:

| | |
|---|---|
| Accrued dividend | $624,263.00 |
| Accrued payroll | $ 79,116.00 |
| Management fee on books of Friel | $ 53,400.00 |
| Unexplained | $ 30,546.00 |
| Total accrued expenses | $787,325.00 |

Defendants have not produced documents sufficient to explain even the change in the amount of the accrued expenses between December 31, 2000 and December 31, 2002, the period for which inquiry into payments to defendant Kulkarni is not prohibited by the current protective order. Inasmuch as the accrued expenses apparently are largely made up of the accrued dividend, some aspects of this request will be satisfied by the provision of the information sought in Request 6 (spelled out in the section above). Other aspects of this request require that additional information be provided.

This additional information is important because defendant Kulkarni's deposition testimony indicates that he intends to assert that WPS, Inc. owed him significantly more than the $135,000 that he sought to have paid to him on January 14, 2002, and that such liability falls into multiple categories. For the same reason that the accrued dividend information is discoverable, as argued in the section above, information on the accrued expenses is as well.

In addition, the 1999 and 2000 financial statements are inconsistent in that they show vastly different amounts owing to defendant Kulkarni as of the end of fiscal 1999 (January 1, 2000). Furthermore, the changes in the liabilities to defendant Kulkarni reflected on the books and records of WPS, Inc. will permit an understanding of the various amounts that were paid to him under the LLC Agreement, the Omnibus

---

[11] Pages W01049-W01054 produced by defendants on January 13, 2006

14

Agreement, and any other agreements that he might have negotiated. These amounts relate directly to counts eight and nine of the Amended Complaint for the reasons stated in the accompanying Plaintiff's Memorandum in Support of his Motion to Amend and Dissolve Protective Orders in Light of the Amended Complaint.

The information provided by defendants thus far indicates that there are fewer than ten transactions annually involving the accrued expenses. There can thus be no argument that this request is unduly burdensome, nor is it overly broad, as the information sought relates directly to the claims and defenses of this case. Specifically, it relates to the legitimacy of what was purportedly owed to defendant Kulkarni on January 14, 2002, and it relates to payments that may have been made prior to December 31, 2002, which payments have been determined by this Court to be both discoverable and relevant under the existing protective orders.

This document request was served on defendants on November 16, 2005, prior to the entry of the protective orders on January 6, 2006. To the extent that this request seeks information relating to amounts owed to defendant Kulkarni after December 31, 2002, and by implication to payments to him after that date, it must be pointed out that this information is clearly relevant as to counts eight and nine of the Amended Complaint, and is discoverable for the reasons stated in the accompanying memorandum which seeks to amend the protective order to permit inquiry into any payments to defendant Kulkarni by the Wolverine Entities at any time after December 28, 2001, the date of the recapitalization transaction.

V. CONCLUSION

Because defendant Kulkarni has asserted that his attempt to obtain a $135,000 payment on January 14, 2002 reflected a request for only a portion of the amount that was purportedly legitimately owed to him, discovery of the way in which all amounts allegedly owed to him as of that date came about is clearly relevant to the claims and defenses associated with count seven of the Amended Complaint. With respect to changes to these amounts after January 14, 2002, the discovery is relevant for the reason that it relates to counts eight and nine of the Amended Complaint which assert that defendant Kulkarni defrauded the plaintiff by shifting payment of monies into categories that he was not required to share with the plaintiff under §5.3 of the Settlement Agreement.

Respectfully submitted,

/s/ Peter A. Crawford
Peter A. Crawford, pro se
23 Newcastle Dr. #11
Nashua, NH 03060
(603)888-4574

Date: 21 Feb. 2006

## Affidavit of Service

I, Peter A. Crawford, plaintiff, hereby say and depose, under pains and penalties of perjury, that I this day served the within papers upon defendants' attorney, by causing copies thereof to be mailed, first class postage prepaid, to Mark Whitney, Morgan Brown & Joy, 200 State St., Boston, MA 02109.

/s/ Peter A. Crawford

Date: 21 Feb. 2006