UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

---

PETER A. CRAWFORD,

    Plaintiff,

v.

WOLVERINE, PROCTOR & SCHWARTZ, INC.,
STEVEN F. CHILINSKI, and
DEEPAK S. KULKARNI,

    Defendants.

Civil Action No.
05-cv-10078 (DPW)

---

### DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION TO COMPEL [DOCKET # 54] RESPONSES TO PLAINTIFF'S REQUEST FOR PRODUCTION OF DOCUMENTS, SET NO. 2

**I.    INTRODUCTION**

Defendants Wolverine, Proctor & Schwartz, Inc. ("WPS"), Steven F. Chilinski, and Deepak S. Kulkarni hereby submit this memorandum of law in opposition to plaintiff *pro se* Peter A. Crawford's Motion to Compel Responses to his Request for Production of Documents, Set No. 2.

By this motion, Crawford seeks to compel production of documents relating to "each and every dividend that makes up the $624,263.00 in 'Accrued Dividends'" which appears on WPS's 2001 year-end financial statements. Furthermore, Crawford seeks to compel the production of all documents related to certain accrued expenses listed as owing to Kulkarni on WPS's financial statements as far back as 1999. Crawford's Motion to Compel should be denied for the following reasons:

- The manner in which WPS declared or calculated the various dividends making up the $624,263 in accrued dividends payable to Kulkarni is irrelevant to this litigation. On January 14, 2002, the day on which Kulkarni is alleged to have tortiously interfered with Crawford's Transition Agreement in purported retaliation for Crawford's refusal to assent to a $135,000 payment to Kulkarni, Kulkarni was contractually entitled to payment of the $624,263 accrued dividend from WPS's new owners, Parthenon Capital LLC. Because Parthenon contractually agreed to pay Kulkarni's accrued dividend, has never formally challenged Kulkarni's entitlement to the accrued dividend, and eventually paid Kulkarni a sum *greater* than the $624,263 accrued dividend, the manner in which any particular WPS dividend which composes a portion of the accrued dividend was calculated or declared is irrelevant to this litigation.

- Crawford's contention that the accrued dividend was illegal under Delaware corporation law is directly contradicted by Crawford's own November 7, 2000 letter to Arthur Andersen LLP wherein Crawford certified, in his capacity as the WPS senior executive in charge of finance and accounting functions, that the "[a]mounts accrued for dividends to the sole shareholder [in WPS's financial statements] are valid."

For the foregoing reasons, and those more fully articulated below, defendants request that this Court deny Crawford's Motion to Compel.

## II.   NATURE OF THE CASE AND RELEVANT FACTUAL BACKGROUND

Crawford began his employment as WPS's Chief Operating Officer on December 30, 1999. See, Complaint ¶ 9. On January 4, 2000, Crawford and Kulkarni, then WPS's

2

President and Chief Executive Officer, executed a written employment contract (the "Employment Contract"). Id.

In late 2001, Parthenon Capital LLC ("Parthenon") agreed to purchase WPS. See, Complaint ¶ 16. Parthenon's purchase of WPS closed between December 28, 2001 and December 31, 2001. Id. As part of Parthenon's purchase of WPS, Parthenon agreed to pay $624,263 in accrued WPS dividends that were owing to Kulkarni.

On December 28, 2001, ancillary to the sale of WPS to Parthenon, Crawford entered into a Transition Agreement with WPS (the "Transition Agreement"). See, Complaint ¶ 18. Under the Transition Agreement, Crawford's ongoing employment with WPS was limited to a maximum of three additional months, viz., until March 31, 2002 at the latest. Besides the three-month sunset provision, the Transition Agreement also allowed WPS to terminate Crawford's employment at an earlier point "for any reason or no reason." Id.

On January 14, 2002, Crawford was informed that the WPS Board of Directors had elected to terminate his employment. See, Complaint ¶ 23. On January 18, 2002, Crawford received formal written notice and confirmation of the Board's action terminating his employment with WPS. Id.

In his seventh cause of action, Crawford alleges that Kulkarni tortiously interfered with Crawford's Transition Agreement by causing WPS to terminate Crawford's employment on January 14, 2002. At the time Kulkarni is alleged to have tortiously interfered with Crawford's contract with WPS, Kulkarni was serving as WPS's CEO. The Complaint alleges that Kulkarni caused WPS to terminate Crawford because Crawford purportedly blocked a payment of $135,000 to Kulkarni. Defendants maintain

3

that Crawford's termination was the result of both a deficient management style and extremely poor interpersonal skills -- which resulted in Crawford's alienation from every WPS employee with whom he came in contact, including Deepak Kulkarni, Crawford's erstwhile friend who was responsible for bringing Crawford into WPS.

In Crawford's tortious interference claim against Kulkarni, Kulkarni's request for the aforementioned $135,000 payment is variously characterized by Crawford as a "fraudulent" and "criminal" effort to "unlawfully" "embezzle" or "convert" funds from the company. See, Complaint ¶¶ 59-60. During his deposition questioning by Crawford on December 7, 2005, Kulkarni responded to Crawford's unfounded embezzlement accusation by pointing out that WPS was contractually indebted to him for "substantially larger amounts of money" than the $135,000 cited in Crawford's Complaint. See, Plaintiff's Memorandum, pg. 6. In making this statement, Kulkarni was referring to, among other things, the $624,263 in accrued dividends owing to him under the provisions of Parthenon's written agreement to purchase WPS.

On November 13, 2002, Kulkarni and Parthenon entered into an Omnibus Agreement whereby Parthenon agreed to pay Kulkarni $765,980 to satisfy several Parthenon/WPS's debts to Kulkarni. Among the debts to Kulkarni extinguished by the Omnibus Agreement was the $624,263 in accrued WPS dividends.

III. **CRAWFORD IS NOT ENTITLED TO AN ORDER COMPELLING PRODUCTION OF DOCUMENTS RELATING TO THE EITHER THE $624,263 IN "ACCRUED DIVIDENDS" OR THE VARIOUS CATEGORIES OF ACCRUED EXPENSES BECAUSE THOSE DOCUMENTS ARE NOT RELEVANT TO THE EITHER PARTY'S CLAIMS OR DEFENSES IN THIS MATTER.**

A. <u>The $624,263 in "Accrued Dividends"</u>

Crawford's instant motion seeks to compel the defendants to produce all documents related to the $624,263 in "Accrued Dividends" which appeared on WPS's General Ledger Trial Balance as of November 30, 2001. Crawford's memorandum concedes that "[t]o determine how the accrued dividend came into existence it is necessary to go back in time and examine the transactions that make it up." See, plaintiff's memo, pg. 10. Thus, Crawford's instant motion seeks to compel the defendants to produce documentation relating to the manner in which WPS declared dividends in 1999, 2000 and earlier.

Crawford argues that, inasmuch as Kulkarni's alleged request for $135,000 on January 14, 2002 was partially predicated on an entitlement to the $624,263 accrued dividend, the ultimate validity of the accrued dividend – including the manner in which it was calculated and its consistency with Delaware corporation law – is a proper topic of discovery. Crawford's argument in this regard, however, is logically flawed.

Kulkarni's original entitlement to an accrued dividend from WPS is reflected in the company's end-of-the-year financial statements from both 2000 and 2001. On December 31, 2000, Kulkarni was owed $733,766 in accrued dividends; by December 31, 2001 the accrued dividend figure had dropped to $624,263. See, plaintiff's memo, pg. 7. The validity of these dividends was never challenged by WPS's auditors and

5

Crawford himself certified in writing that the accrued dividends were "valid" (see below).

Upon purchasing WPS in late December 2001, Parthenon contractually agreed to honor the $624,263 accrued dividend debt to Kulkarni. Thus, Crawford's statement that "[w]hether or not there was $135,000 owed to [] Kulkarni on January 14, 2002 depends entirely on the legitimacy of the $733,766.00 opening balance as of December 31, 2000" is factually incorrect. As of January 14, 2002, Kulkarni's entitlement to the $624,263 in accrued dividends (or the $135,000 fraction thereof) had crystallized as a contractual debt owed by Parthenon (as the then-owners of WPS) to Kulkarni. Thus, by endeavoring to conduct a forensic investigation into the propriety of Kulkarni's accrued dividend, Crawford seeks to establish a moot point. Even assuming, *arguendo*, the $624,263 in WPS dividends owing to Kulkarni in late 2001 were improperly declared by WPS (a hypothetical expressly rejected by the defendants), Kulkarni's entitlement to payment would remain unaffected because Parthenon (after completing a stringent due diligence process) had contractually agreed to honor Kulkarni's accrued dividends as part of Parthenon's purchase of WPS.

It must be noted that Parthenon – which would have had both standing and motivation to dispute the validity of the accrued dividend in the presence of any actual evidence of impropriety – never challenged Kulkarni's right to the payment. In fact, Parthenon agreed in November 2002 to pay Kulkarni $765,980 to satisfy and extinguish, among other things, Kulkarni's accrued dividend rights. That Parthenon paid $765,980 to Kularni to satisfy, *inter alia*, Kulkarni's accrued dividend claim is dispositive evidence

6

that Kulkarni's claim was valid and, as a result, Crawford's embezzlement allegation against Kulkarni is totally unfounded.

Crawford argues at length in his memorandum that WPS's declaration of a dividend in 1999 and 2000 was violative of certain provisions of Delaware corporation law. The inclusion of this argument demonstrates the hazards of permitting Crawford to conduct further discovery into such a manifestly peripheral issue. If this Court compels discovery on the issue of the legality of WPS's dividends from 1999, 2000 and earlier, this litigation will become further complicated by the insertion of a corporate finance and governance debate which is otherwise unrelated to the merits of this case.

Furthermore, the meritless nature of Crawford's current contention that WPS's declaration of a dividend for 1999 or 2000 was somehow illegal under the Delaware corporation laws is demonstrated by a November 7, 2000 letter <u>from Crawford</u> to Arthur Andersen LLP (WPS's auditors) wherein Crawford, in his capacity as WPS's COO, provided written certification that WPS was not in violation of any applicable laws or regulations. Crawford made these representations to Arthur Andersen as the WPS senior executive who supervised all finance and accounting functions at the company.[1] More importantly, however, Crawford's November 7, 2000 letter to Arthur Andersen LLP includes a certification that:

> 17. Amounts accrued for dividends to the sole shareholder are valid and expect to be paid in 2000.

A copy of Crawford's November 7, 2000 letter to Arthur Andersen LLP is attached to this memorandum as <u>Exhibit 1</u>. Thus, Crawford now attacks the legitimacy of an accrued dividend which he earlier certified in writing as "valid."

---

[1] During the first day of his deposition, Crawford testified that no one at WPS had a better understanding of the company's cash flow or profitability than he did. See, Crawford deposition, pgs. 98-99.

7

It bears noting that the legality of Kulkarni's accrued dividend is not the subject of any of Crawford's actual claims in this matter. Crawford has never owned WPS stock and Crawford has no standing to challenge the legality of any dividend either declared by WPS or paid to Kulkarni while Kulkarni was the company's sole shareholder.

### B.    Kulkarni's Accrued Expenses

Crawford's Second Request for the Production of Documents, Request 13, demanded production of:

> … all documents reflecting, relating to, or referring to any Kulkarni Accrued Expenses, or any portion thereof, as defined below. This request includes, but is not limited to itemizations, detailed statements, authorizing board resolutions, authorizing memoranda, journal entries or similar documents of any type. Also included in this request are any documents depicting journal entries or other transactions of any type that alter the amount of the Kulkarni Accrued Expenses from the end of any year for which financial statements were prepared for Wolverine, Proctor & Schwartz, Inc. or Wolverine Proctor LLC to the end of the next year for which accounting statements were prepared, including all documents necessary to enable understanding and reconciliation of the change in the amount of the Kulkarni Accrued Expenses from year to year. The term "Kulkarni Accrued Expenses" means the "$35,000 and $97,000, respectively, payable to the sole stockholder of the Company," listed on page 16 of the 1999 financial statement of Wolverine, Proctor & Schwartz, Inc. (page PAC0077) attached to Plaintiff's Request for Admission to All Defendants, Set No. 1; the $11,000, $35,000, $694,000 and #1,374,000 listed in section 9(d) of the 2000 financial statements of Wolverine, Proctor & Schwartz, Inc. (PAC0097) attached to Plaintiff's Request for Admission to All Defendants, Set No. 1; the $787,325 listed on page 13 of the 2001 financial statements of Wolverine Proctor LLC (page PAC0040) attached to Plaintiff's Request for Admissions to All Defendants, Set No. 1, the $402,379 and $787,325 listed on page 20 of the Wolverine Proctor LLC financial statements for 2002 (page W0431 previously produced by defendants); and any amounts that would have been listed on the Wolverine Proctor LLC financial statements for 2003 (pages W03840W0408 previously produced by defendants) had such statement set forth any amounts payable to the previous sole shareholder of the Company.

Defendants' objected to this Byzantine document request as "duplicative, vague, oppressive, overly broad and unduly burdensome and not reasonable calculated to lead to the discovery of evidence which is material or necessary to the prosecution or defense of this case." These objections notwithstanding, however, defendants, in an effort to avoid unnecessary discovery motion practice, have produced documents relevant to Kulkarni's accrued expenses. After several discovery conferences with the plaintiff, on Friday, March 3, 2006, defendants produced additional responsive documents W01143 through W01161 – all of which pertain directly to Kulkarni's accrued expenses. These documents included various pages of the WPS general ledger trial balance which reflected payments owed to Kulkarni as expenses.

It is unclear at this point what, if any, additional documentation Crawford is attempting to compel defendants to produce. In several telephonic discovery conferences with defense counsel, Crawford has demanded production of the various receipts which substantiate Kulkarni's expenses. As defense counsel has explained, however, the defendants do not have any receipts in their custody or control which relate to Kulkarni's business expenses from 1999-2003. Even if one credits Crawford's arguments as to the general relevancy of documents pertaining only to Kulkarni's expense accounts, it is difficult to see how expenses charged after January 14, 2002 could have any possible bearing on this litigation.

In his memorandum, Crawford maintains that information relevant to Kulkarni's accrued expenses are discoverable "for the same reason that the accrued dividend information is discoverable." See, plaintiff's memorandum, pg. 14. Likewise,

9

defendants raise the same arguments and objections to the relevance of the accrued expenses that were raised above with respect to the accrued dividends.

In purchasing WPS in late December 2001, Parthenon agreed to honor the accrued expenses owing to Kulkarni. All of Kulkarni's claims, for both accrued expenses and accrued dividends, were eventually satisfied by Kulkarni's Omnibus Agreement with Parthenon. That Parthenon ultimately paid Kulkarni $765,980 to satisfy and extinguish his accrued dividends and expenses is dispositive evidence of the validity of those debts. Furthermore, that Kulkarni's accrued expenses and dividends were valid debts eventually paid by Parthenon demonstrates that the attempted $135,000 embezzlement allegation lodged by Crawford against Kulkarni as the predicate for Kulkarni's tortious interference claim is wholly devoid of merit.

## IV. CONCLUSION

Based on the foregoing, Crawford's Instant Motion to Compel should be denied in full.

Dated: March 10, 2006

                                          Respectfully submitted,

                                          WOLVERINE, PROCTOR &
                                          SCHWARTZ, INC.,
                                          STEVEN F. CHILINSKI, and
                                          DEEPAK S. KULKARNI

                                          By their attorneys,

                                          /s/ Jeffrey D. Kuhn
                                          Mark Whitney (BBO #637054)
                                          Jeffrey D. Kuhn (BBO #662326)
                                          MORGAN, BROWN & JOY, LLP
                                          200 State Street
                                          Boston, Massachusetts   02109
                                          (617) 523-6666

TO:    Peter A. Crawford, *pro se*
           23 Newcastle Drive #11
           Nashua, New Hampshire   03060
           (603) 888-4574

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on March 10, 2006, I filed the foregoing document with the Clerk of the Court by using the ECF system. Because the plaintiff is not a registered user of the ECF system, I further certify that I mailed the foregoing document and the notice of electronic filing to plaintiff *pro se* Peter A. Crawford at 23 Newcastle Drive #11, Nashua, New Hampshire 03060 by U.S. mail, on this 10th day of March, 2006.

                                                                  /s/ Jeffrey D. Kuhn

# Exhibit 1

# Wolverine Proctor

November 7, 2000

Arthur Andersen LLP
225 Franklin Street
Boston, MA 02110

We are providing this letter in connection with your audit of the consolidated financial statements of Wolverine Proctor & Schwartz as of January 1, 2000 and December 26, 1998 and for the two years ending January 1, 2000 for the purpose of expressing an opinion as to whether those financial statements present fairly, in all material respects, the financial position, results of operations, and cash flows of the company in conformity with generally accepted accounting principles. We confirm that we are responsible for such fair presentation in those financial statements.

We confirm, to the best of our knowledge and belief, as of the date of this letter, the following representations made to you during your audit.

1. The financial statements referred to above are fairly presented in conformity with generally accepted accounting principles.

2. We have made available to you all financial records and related data.

3. There have been no communications from regulatory agencies or lenders concerning noncompliance with or deficiencies in financial reporting practices.

4. There are no material transactions that have not been properly recorded in the accounting records underlying the financial statements.

5. You have brought to our attention misstatements which remain uncorrected at January 1, 2000 and which are summarized in the accompanying schedule. The effects of those misstatements are not material, both individually and in the aggregate, to the financial statements taken as a whole.

6. There has been no—

    a) Fraud involving management or employees who have significant roles in internal control.

Wolverine Proctor & Schwartz, Inc.

    b)     Fraud involving others that could have a material effect on the financial statements.

7.     The company has no plans or intentions that may materially affect the carrying value or classification of assets and liabilities.

8.     The following have been properly recorded or disclosed in the financial statements:

    a)     Related-party transactions, including sales, purchases, loans, transfers, leasing arrangements and guarantees (written or oral), and amounts receivable from or payable to related parties.

    b)     Guarantees, whether written or oral, under which the company is contingently liable.

    c)     Significant estimates and material concentrations known to management that are required to be disclosed in accordance with the AICPA's Statement of Position 94-6, Disclosure of Certain Significant Risks and Uncertainties. [Significant estimates are estimates at the balance sheet date that could change materially within the next year. Concentrations refer to volumes of business, revenues, available sources of supply, or markets or geographic areas for which events could occur that would significantly disrupt normal finances within the next year.]

9.     There are no—

    a)     Violations or possible violations of laws or regulations whose effects should be considered for disclosure in the financial statements or as a basis for recording a loss contingency.

    b)     Unasserted claims or assessments that our lawyer has advised us are probable of assertion and must be disclosed in accordance with Financial Accounting Standards Board (FASB) Statement No. 5, *Accounting for Contingencies*.

    c)     Other liabilities or gain or loss contingencies (including those relating to oral guarantees) that are required to be accrued or disclosed by FASB Statement No. 5.

10.     The company has satisfactory title to all owned assets, and there are no liens or encumbrances on such assets nor has any asset been pledged as collateral except as disclosed to you.

11.     The company has complied with all aspects of contractual agreements that would have a material effect on the financial statements in the event of noncompliance except as disclosed to you.

12.     The accounting records underlying the financial statements accurately and fairly reflect, in reasonable detail, the transactions of the company (and its subsidiaries).

13.     No events have occurred subsequent to the balance-sheet date and through the date of this letter that would require adjustment to or disclosure in the financial statements.

Wolverine Proctor & Schwartz, Inc.

14. All bonus/commission accruals as of January 1, 2000 are adequate but not excessive to cover all contractual and discretionary incentive/bonus payments related to fiscal 1999 and prior years.

15. An actuary has been used to measure pension liabilities and costs.

16. All intercompany transactions, including any profit on sales between subsidiaries and profit in ending inventory, have been identified and properly eliminated from the consolidated financial statements of the Company as of January 1, 2000.

17. Amounts accrued for dividends to the sole shareholder are valid and expect to be paid in 2000

18. DSK Management Corporation a company owned by the sole stockholder of the Company has forgiven all amounts owed under the agreement for the years ending January 1, 2000 and December 26, 1998. Accordingly, no amounts have been accrued by the Company in the 1999 or 1998 statements of operations.

19. Payments of salary, bonuses, and other similar compensation to all Affiliates (as defined in the credit agreement by and between the company and Merita bank limited) who are full time employees of the Company were customary and reasonable and in the ordinary course of business. were not considered dividends, distributions or any other payment in respect of any of the share of its capital stock and did not represent payments under the Management Agreement between the Company any DSK Management Corporation.

20. Value attributed to put warrants is a reasonable approximation of the value of the company within a reasonable range.

21. Management has provided support for the warrant valuation and stock distribution, which it considers reasonable at January 1, 2000.

_____
Deepak Kulkarni, President

_____  1/7/00
Peter Crawford, Chief Operating Officer

3