**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**
———————————————————————

PETER A. CRAWFORD,

        Plaintiff,

                                       Civil Action No.
v.                                 05-cv-10078 (DPW)

WOLVERINE, PROCTOR & SCHWARTZ, INC.,      **Oral Argument Requested**
STEVEN F. CHILINSKI, and
DEEPAK S. KULKARNI,

        Defendants.

———————————————————————

**MEMORANDUM IN SUPPORT OF DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT**

Mark M. Whitney (BBO # 637054)
Jeffrey D. Kuhn
MORGAN, BROWN & JOY, LLP
*Attorneys for the Defendants*
200 State Street
Boston, Massachusetts  02109
(617) 523-6666

## PRELIMINARY STATEMENT

Defendants Wolverine, Proctor & Schwartz, Inc. ("WPS"), Steven F. Chilinski ("Chilinski") and Deepak S. Kulkarni ("Kulkarni") (collectively "Defendants") hereby submit the following memorandum in support of their Motion for Summary Judgment seeking dismissal of all counts in the original Complaint pursuant to Federal Rule of Civil Procedure 56.

Plaintiff *pro se*, Peter A. Crawford ("Crawford"), commenced the instant suit on January 12, 2005.  Crawford's Complaint, which seeks $1,792,710 in damages, asserts seven causes of action sounding in breach of contract, violations of the Massachusetts Payment of Wages Act, and tortious interference with a contractual relationship. Crawford, the former Chief Operating Officer ("COO") of Wolverine, alleges that he is owed a bonus and certain unpaid wages arising out of his employment with Wolverine from December 1999 through January 2002.

Summary judgment should enter in favor of the defendants for the following reasons:

1. Crawford's claims for violations of the Payment of Wages Act should be dismissed because the statute is inapplicable to the type of bonus payment at issue here. (Second and Fourth counts of the Complaint)

2. Crawford's claims for breach of the parties' Transition Agreement and his related Wage Act claim should be dismissed because the undisputed facts demonstrate that WPS did not breach the agreement.  Alternatively, Crawford's Wage Act claim relating to the Transition Agreement breach should be dismissed because he did not "earn" the wages that he now seeks to recover.  (Fifth and Sixth counts of the Complaint)

3. Crawford's claim for tortious interference against Kulkarni should be dismissed because Kulkarni, acting in his capacity as CEO of WPS, cannot be held personally liable for interfering with a contract to which WPS is a party.  (Seventh count of the Complaint)

4. Crawford's claims relating to his alleged unpaid bonus should be dismissed because there was no meeting of the minds between the parties as to how the bonus should be calculated.

5. Because Crawford failed to disclose material information in connection with a transaction that saved WPS from receivership and/or bankruptcy, and thus ensured the survival of Crawford's present claims, his claims should be dismissed under the equitable estoppel doctrine.

Thus, as set forth more fully below, defendants respectfully request an order from this Court dismissing with prejudice all causes of action in the original Complaint.[1]

## STATEMENT OF UNDISPUTED MATERIAL FACTS

Pursuant to Local Rule 56, the Defendants have set forth the undisputed material facts in support of this motion in a separate Statement of Undisputed Material Facts, filed contemporaneously with the instant Motion. In that separate document, Defendants have organized the undisputed material facts in separately-numbered paragraphs for ease of review and consideration. Defendants will not restate those facts here, and respectfully refer the Court to that separate Statement of Undisputed Material Facts.

## ARGUMENT

## SUMMARY JUDGMENT STANDARD

The moving party is entitled to summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is "material" if it has the "potential to affect the outcome of the suit under the applicable law." Santiago-Ramos v. Ventennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir.

---

[1]     It should be noted that Crawford recently sought leave to amend his complaint and filed his amended complaint on March 13, 2006. The defendants' deadline to answer or otherwise plead in response to the amended complaint is Friday, March 24, 2006. The new counts contained in the amended complaint are not addressed herein.

2000), and a "genuine" issue is one supported by such evidence that "a reasonable jury, drawing favorable inferences, could resolve it in favor of the nonmoving party." Triangle Trading Co., Inc. v. Robroy Indus., Inc., 200 F.3d 1, 2 (1st Cir. 1999) (internal quotations and citations omitted) ("SOF").

Once the movant makes the necessary showing, the non-movants "may not rest upon the mere allegations or denials" of their pleading, but "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); see Nat'l Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 735 (1st Cir. 1995), cert. denied, 515 U.S. 1103 (1995). "[C]onclusory allegations, improbable inferences, and unsupported speculation," are insufficient to establish a genuine dispute of fact. Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990). "When the nonmovant bears the ultimate burden of proof on a given issue, he must make a factual showing, by means of competent and specific evidence, sufficient to establish the essential elements of his claim." Johnson v. Gordon, 409 F.3d 12, 17 (1st Cir. 2005).

## POINT I

### THE SECOND AND FOURTH CAUSES OF ACTION, WHICH ALLEGE VIOLATIONS OF M.G.L. c. 149, §§ 148 AND 150, MUST BE DISMISSED BECAUSE THE WAGE ACT IS INAPPLICABLE TO CRAWFORD'S BONUS

Crawford alleges in his second cause of action that he is owed a Bonus in the amount of $357,856.25 in connection with his fiscal year 2001 employment at Wolverine. Crawford claims that Defendants' refusal to pay this Bonus violates the wage payment provisions of M.G.L. c. 149, §§ 148 and 150 (the "Wage Act") and, as a result of this statutory violation, Wolverine and Chilinski (in his capacity as Wolverine's CEO) are liable to Crawford for treble damages, costs and attorneys fees. Complaint ¶¶ 31-36.

3

Crawford's fourth cause of action alleges a further violation of the Wage Act in connection with a purported oral modification to the original bonus provision of Crawford's Employment Contract. Complaint ¶¶ 37-42. As a result of the purported oral modification, Crawford alleges that the total bonus he is due from Wolverine for FY 2001 is actually $572,570.00. Complaint ¶ 42. As a result of this further alleged Wage Act violation, Crawford claims that defendants are liable to him for three times his actual damages, costs and attorneys fees. <u>Id.</u> Both Crawford's second and fourth causes of action should be dismissed, however, because his alleged unpaid bonus is not covered by the Wage Act.

A.    **<u>Summary Of Key Facts Relevant To Crawford's Bonus.</u>**

At the commencement of Crawford's employment with WPS, he executed a written employment contract (the "Employment Contract"). SOF ¶ 2. Crawford's Employment Contract provided for an annual base salary of $150,000, stock options and an annual bonus. SOF ¶ 3. Crawford's annual Bonus was to be based on the performance of the company calculated using the following formula: BONUS = (EBITDA – CAPX – INT – TAXES) x .05. SOF ¶ 6. "EBITDA" is defined in Crawford's Employment contract to mean "earnings before any interest, taxes or deductions for depreciations or amortization." SOF ¶ 7. The Employment Contract goes on to state that the Bonus "will be due upon completion of the audit of each year's results, or if no such audit is performed, by April 15." SOF ¶ 17.

WPS terminated Crawford's employment on January 14, 2002, approximately two months before the Bonus calculation was due to be performed under the Employment Contract. SOF ¶¶ 17, 61-65. On December 4, 2004, nearly three years after Crawford's

termination, Crawford sent a letter to the then-current CEO of WPS and demanded that

he be paid a Bonus for FY 2001 in the amount of approximately $573,000. SOF ¶¶ 66-

68. By his own admission, Crawford elected on his own volition to wait three years to

request the bonus. SOF ¶¶ 66-68 (see demand letter). Crawford's December 2, 2004

demand letter was the first time that Crawford ever informed anyone at WPS that he

believed he was owed a $573,000 Bonus. SOF ¶¶ 39, 68.

**B.**      **Paradigm For Interpretation Of The Wage Act.**

When considering Crawford's Wage Act claim, the Court should interpret the

statute "according to the intent of the legislature ascertained from all its words construed

by the ordinary and approved usage of the language, considered in connection with the

cause of its enactment, the mischief or imperfection to be remedied and the main object

to be accomplished, to the end that the purpose of its framers may be effectuated."

Champagne v. Champagne, 429 Mass. 324, 326 (1999).

The Wage Act was intended to ensure what the Legislature deemed the important

practice of employers paying wages to employees regularly and promptly after they had

been earned. M.G.L. c. 149, §§148 and 150 "mandates the prompt, bi-weekly payment

of wages by employers to their employees." Baptista v. Abbey Healthcare Group, Inc.,

No. 95-10125, 1996 WL 33340740, *4 (D. Mass. Apr. 10, 1996) (Stearns, J.). The

Massachusetts Supreme Judicial Court, in its oft-cited decision American Mutual

Liability Ins. Co. v. Commission of Labor and Industries, 340 Mass. 144 (1959),

concluded that the Legislature enacted section 148 to limit "the interval between the

completion of a work week and the payday on which the wages earned in that week will

be paid." Id. at 145. This Court has similarly held that the "statute was intended and

designed to protect wage earners from the long-term detention of wages by unscrupulous employers as well as protect society from irresponsible employees who receive and spend lump sum wages." Cumpata v. Blue Cross Blue Shield of Massachusetts, 113 F. Supp. 2d 164, 167 (D. Mass. 2000) (Young, C.J.) (citing, American Mutual, 340 Mass. at 147). This Court has declared previously that, "the only impression that can possibly be derived from [the Wage Act], is that its intent is to protect laborers and casual wage earners who might otherwise be vulnerable to employer intimidation." Cumpata, 113 F. Supp. 2d at 167 (Young, C.J.) (citing Judge Stearns's Baptista decision).

The SJC informally describes section 148 as the "weekly wage law." Boston Police Patrolmen's Association, Inc. v. City of Boston, 435 Mass. 718, 718-719 (2002). Thus, the regular use of the term "weekly" in official descriptions of the act further emphasizes that the Wage Act was designed to protect regular and mundane forms of compensation.

Defendants respectfully submit that this Court should also remain mindful of the fact that the Wage Act is a criminal statute. See NaviSite, Inc. v. Cloonan, No. 02-1949, 2005 WL 1528903, at *13 (Mass. Super. Ct. May 11, 2005) (noting that a violation of the Wage Act carries criminal penalties). It is well-established that courts construing criminal statutes are required to interpret them narrowly. See, e.g., Commonwealth v. Richards, 426 Mass. 689, 690 (1998); Commonwealth v. O'Keefe, 48 Mass. App. Ct. 566, 567 (2000).

With this legislative intent in mind, courts in Massachusetts have consistently "construed the scope of the Wage [Act] narrowly." NaviSite, 2005 WL 1528903, at *13 (The Wage Act "has been construed 'narrowly,' the courts reluctant to extend its reach

beyond the wages, salary, 'holiday pay, vacation pay, and definitely determined commissions' which the statute expressly mentions."); <u>Okerman v. VA Software Corp.</u>, No. 0101825, 2003 WL 21960599, *8 (Mass. Super. Ct. July 9, 2003) (<u>citing</u>, <u>Commonwealth v. Savage</u>, 31 Mass. App. Ct. 714, 716 (1991)); <u>Prozinski v. Northeast Real Estate Services, LLC</u>, 59 Mass. App. Ct. 599 (2003) ("We have construed the wage act narrowly.").

In light of the above legislative intent, courts have held that many forms of income - including the one at issue here - do not fall within the Wage Act's coverage, noting the very clear-cut concept that "[n]ot everything that is earned is a wage." <u>Boston Police Patrolmen's Ass'n v. City of Boston</u>, 11 Mass. L. Rptr. 11, 1999 WL 1260164, at *7 (Mass. Super. Ct. 1999) (deferred compensation not a wage); <u>Prozinski</u>, 59 Mass. App. Ct. at 604 (severance pay not a wage); <u>NaviSite, Inc. v. Cloonan</u>, No. 02-1949, 2005 WL 1528903 (Mass. Super. Ct. May 11, 2005) ("retention bonus" and "performance bonus" were not wages); <u>Sterling Research, Inc. v. Pietrobono</u>, No. 02-40150, 2005 WL 3116758, at *14 (D. Mass. Nov. 12, 2005) (Saylor, J.) (stock was not a wage); <u>Baptista v. Abbey Healthcare Group, Inc.</u>, No. 95-10125, 1996 WL 33340740 (D. Mass. Apr. 10, 1996) (Stearns, J.) (stock options not a wage). While the courts in Massachusetts have "applied the statute to corporate executives as well as to lower level employees," the statute's applicability "is limited to the payment of ordinary wages and wage equivalents, specifically accrued vacation pay and sick leave." <u>Cumpata</u>, 113 F. Supp. 2d at 167.

C.      **Bonus Payments Are Not Covered Under The Wage Act.**

The Massachusetts Superior Court decision of <u>NaviSite, Inc. v. Cloonan</u>, No. 02-1949, 2005 WL 1528903 (Mass. Super. May 11, 2005), is directly on point with the instant case and should guide this Court's ruling.  In <u>NaviSite</u>, the plaintiff asserted claims for, among other things, payment of a performance bonus and retention bonus that he believed he was due under an agreement.  <u>Id.</u> at * 13-14.  Like Crawford's bonus, Cloonan's performance bonus was contingent on the reported results of the company's financial performance.  <u>Id.</u> at *1.  Similar to Crawford's bonus, Cloonan's bonus was not payable until after the financial close of the company's books (Crawford's was annual; Cloonan's was quarterly).  <u>Id.</u>  The performance bonus in <u>NaviSite</u> was allegedly based upon Cloonan's receipt of a percentage of the total money he was able to save the company through renegotiation of its contracts.  <u>Id.</u> at * 2.  Weighing the facts and the law, the Superior Court first noted the general reluctance of courts to extend the reach of the Wage Act beyond the forms of compensation which the statute expressly mentioned. *Citing* <u>Prozinski v. Northeast Real Estate Services, LLC</u>, 59 Mass. App. Ct. 599 (2003). The court next examined this Court's ruling in <u>Cumpata</u>, and held that <u>Cumpata</u> controlled the determination of the plaintiff's bonus claim:  "[The <u>Cumpata</u> holding seems in keeping with the statute's language, and with Massachusetts courts' strict construction of it.  …  the only forms of compensation to which Cloonan might be entitled that he has not received are the ***retention bonus and the performance bonus, both of which lie well outside the statute's reach***."  <u>Id.</u>  at *13-14 (emphasis added).

Decisions from other courts, including this Court, have indicated the general recognition that bonuses are not subject to the Wage Act.  This Court has held that the purpose of the Wage Act is "to assist employees who would ordinarily be paid on a

weekly basis, … there is **no reason to extend the protections of a wage earner's statute to cover [for example] bonuses potentially owing to highly paid executives**." Cumpata v. Blue Cross Blue Shield of Massachusetts, 113 F. Supp. 2d 164, 167 (D. Mass. 2000) (emphasis added). More recently, this Court, citing NaviSite, further emphasized the view that "[g]enerally, **bonuses are not 'wages earned' within the meaning of [the Wage Act]**." Sterling Research, Inc. v. Pietrobono, No. 02-40150, 2005 WL 3116758, at *12 (D. Mass. Nov. 12, 2005) (Saylor, J.) (holding that incentive compensation bonuses that were actually treated as commissions were not owed under the Wage Act because they were not definitely determined and due and payable) (emphasis added). In examining the potential scope of the Wage Act, the Massachusetts Superior Court cited with approval Judge Stearns's pronouncement that the Wage Act does not apply to "bonuses potentially owing to highly paid executives …." Dennis v. Jager, Smith & Stelter, P.C., No. 98497G, 2000 WL 782946, *1 (Mass. Super. Ct. Apr. 10, 2000); see also Wilkie v. Nets, Inc., No. 023480, 2005 WL 3105692 (Mass. Super. Ct. Oct. 16, 2005) (in this commissions case, the court emphasized that "courts have held that where the payment is erratic, **such as a yearly bonus**, the payment does not constitute a commission under the Act.") (emphasis added).

This Court's decision in Baptista v. Abbey Healthcare Group, Inc., No. 95-10125, 1996 WL 33340740 (D. Mass. Apr. 10, 1996) (Stearns, J.), is also instructive. The plaintiffs in Baptista were two executives who claimed that their former employer, Abbey Healthcare Group, promised that they would be entitled to exercise certain stock options in the event they were terminated. When the defendant terminated the plaintiffs and failed to grant their claimed stock options, plaintiffs filed suit alleging, *inter alia*,

9

violations of M.G.L. c. 149, §§ 148 and 150.  In discussing plaintiffs' Wage Act claims in

Baptista, this Court noted the well-established rule that the protections of sections 148

and 150 were applicable only "to the payment of ordinary wages and wage equivalents."

1999 WL 33340740, at *4.  In granting the defendant's motion to dismiss plaintiff's

claims under sections 148 and 150, this Court held that:

> *there is no reason to extend the protections of a wage earner's statute to cover bonuses potentially owing to highly paid executives*… There is even less reason to extend the opportunity to collect 'treble damages for any loss of wage and other benefits and an award of the costs of the litigation and reasonable attorney fees."

Id. (emphasis supplied).  Accordingly, the weight of authority demonstrates that yearly

bonuses are not covered under the Wage Act.

### D.    The Plain Language of the Wage Act Excludes Plaintiff's Claims.

The plain language of the Wage Act expressly refers to holiday pay, vacation pay,

and definitely determined commissions.  M.G.L. c. 149, §§ 148 and 150.  However, it

does *not* refer to executive bonuses or similar terms.  Id.  In Prozinski v. Northeast Real

Estate Services, LLC, 59 Mass. App. Ct. 599 (2003), the Appeals Court interpreted the

Wage Act narrowly and rejected a former employee's claim for severance pay under the

Wage Act in part because "severance pay" and words similar to it were not expressly

mentioned in the Wage Act.  Id. at 604.  Similar logic applied here compels the same

result.  Prozinski is the law of Massachusetts and requires judgment in favor of

defendants on Crawford's Wage Act claims for his alleged unpaid bonus.

In Prozinski, the Appeals Court definitively established state law regarding

whether severance payments are encompassed within the definition of "wages" in the

Wage Act.  The primary basis for the holding in Prozinski was the court's analysis of the

definition of "wages" in the Wage Act. The Court noted that the statute makes express reference to compensation that is paid on a regular - weekly, bi-weekly, or monthly - basis. The Appeals Court further recognized that the statute makes express reference to holiday pay and vacation pay and, pursuant to the most recent amendment, definitely determined commissions that are due and payable to the employee. Id. at 603. In rejecting Prozinski's claim for severance pay under the Wage Act, the Appeals Court held that:

> Although the statute expressly refers to holiday pay, vacation pay, and definitely determined commissions, *it does not refer to "severance pay" or similar terms*. Prozinski argues that severance pay falls within the statute because his severance pay was "definitely determined" and therefore had "become due and payable." A plain reading of the statute reveals that the quoted statutory terms refer solely to commissions.

Id.

It is significant to note that the Prozinski decision considered the same arguments that Crawford made in his opposition to defendants' prior motion to dismiss under Jancey v. School Comm. of Everett, 421 Mass. 482 (1995), and *specifically rejected them*. In Jancey, the SJC considered what types of compensation and benefits should be included in the term "wages" as used by the Massachusetts Equal Pay Act, M.G.L. c. 149 § 105A. 421 Mass. at 490-493. As noted in Jancey, the Equal Pay Act does not define the term "wages" or provide any guidance whatsoever as to the scope of that term. Id. In order to resolve the issue, therefore, the court resorted to Black's Law Dictionary and to other statutes for assistance in defining wages. Id.

Prozinski argued that the Appeals Court should embrace the broad definition of "wages" that the SJC in Jancey embraced in construing the meaning of "wages" under the equal pay act (M.G.L. c. 149, § 105A). The Jancey Court relied in part on Black's Law

Dictionary, which Crawford emphasized contains a reference to "bonuses." However, the Appeals Court in <u>Prozinski</u> recognized that while the equal pay act "did not define the term 'wages' or provide any guidance as to its scope," (<u>Id</u>. at 604) the Wage Act contains a specific definition. The <u>Prozinski</u> Court found:

> In contrast, G.L. c. 149, § 148, refers to "weekly" or "biweekly" wages having been earned during a particular pay period and specifically includes in its definition "holiday or vacation pay" as well as definitely determined commissions. ***There is, therefore, no need to resort to the popular meaning of the term "wages," to Black's Law Dictionary, or to other statutes using the term "wage."***

<u>Id</u>. at 604.

This Court recently considered the argument defendants make herein. <u>Sterling Research, Inc. v. Pietrobono</u>, No. 02-40150, 2005 WL 3116758, at *12 (D. Mass. Nov. 12, 2005) (Saylor, J.). In <u>Sterling</u>, Judge Saylor examined whether stock fell under the definition of "wages earned" under the Wage Act. Relying on <u>Prozinski</u>, <u>Cumpata</u>, <u>Boston Police</u>, <u>NaviSite</u>, Judge Saylor held that, "[t]he statute lists several specific types of compensation; stock is not one of them." <u>Id.</u> at * 14.

Thus, <u>Prozinski</u> stands for the proposition that courts evaluating whether a particular form of compensation should be covered under the Wage Act must determine whether such form of compensation is encompassed in the express definition that the Legislature enacted. The Appeals Court held that because "severance pay" was not enumerated in the definition, it was not covered. The same logic applies to "bonuses," which are likewise ***not*** enumerated in the Wage Act's definition of "wages."

**E.**    **Courts Have Consistently Held That The Wage Act Does Not Cover Irregular Forms of Compensation Or Compensation Triggered by Contingencies**

The law is well-settled that sections 148 and 150 apply only "the payment of ordinary wages and wage equivalents." Cumpata, 113 F. Supp. 2d at 167-68. Crawford is not the type of low-wage, weekly laborer that the Wage Act is designed to protect. Id. at 168; Savage, 31 Mass. App. Ct. at 716.

"Wages," as the term is used in the Wage Act, is "money to which the employee has an absolute right; it is 'his or her property … not subject to any limitations, contingency, or delay' in payment." Huebsch v. Katahdin Industries, Inc., No. 4483, 2001 WL 716884, *2 (Mass. Super. Ct. Apr. 24, 2001). The Appeals Court has expressly contrasted wages, which are "regular and insubstantial," with "***bonuses*** or commissions that are episodic and substantial." Id. (citing, Savage, 31 Mass. App. Ct. at 716) (emphasis added). Any "irregular and substantial compensation," such as the bonus claimed by Crawford in the instant action, is "not afforded the protection of the Wage Act." Cumpata, 113 F. Supp. 2d at 167 (citing, Dennis v. Jager, Smith & Stelter, P.C., No. 98497G, 2000 WL 782946, *1 (Mass. Super. Ct. Apr. 10, 2000) (compensation "triggered by contingencies" is outside the scope of the Wage Act)). Likewise, other forms of contingent compensation, such as conditional bonuses or high-end commissions, are also outside the scope of sections 148 and 150. See Savage, 31 Mass. App. Ct. at 716; Okerman, 2003 WL 21960599, at *8; Locke v. Sales Consultants of Boston, Inc., No. 984081, 2001 WL 716911, *2 (Mass. Super. Ct. Apr. 13, 2001) (payment of commissions that were paid on a quarterly rather than weekly basis and were subject to contingencies not covered by Wage Act); Cumpata, 113 F. Supp. 2d at 167 (sales

commissions that were contingent on employee's ability to meet certain quotas not covered under the Wage Act).

As recently as two weeks prior to the submission of this brief, this Court acknowledged the general proposition established by <u>Cumpata</u> that: "the Wage Act only ensures 'the payment of ordinary wages and wage equivalents, like specifically accrued vacation pay and sick leave' as opposed to 'compensation 'triggered by contingencies','…." <u>See</u> <u>Scalli v. Citizens Financial Group, Inc.</u>, No. 03-12413-DPW, slip op., Memorandum and Order, Feb. 28, 2006 (denied plaintiff's claims for unpaid commissions because they were not definitely determined or due and payable) (Woodlock, J.).

Crawford's Bonus was not only "episodic," "irregular and substantial," but was clearly subject to the significant contingency of Wolverine's annual performance measured by "EBITDA," including the components that comprise that measure, as well all of the other measures set forth in the Employment Contract. <u>Huebsch</u>, 2001 WL 716884, at *2; <u>Cumpata</u>, 113 F. Supp. 2d at 167. Thus, Crawford's Bonus fails nearly every criteria articulated by the courts for compensation covered by the Wage Act. <u>Id.</u>

Indeed, Crawford's fundamental argument illustrates that his bonus was triggered by and subject to considerable contingencies over which he had no control. Crawford's primary allegation with respect to his bonus is that the $10 million extraordinary gain (that had nothing whatsoever to do with the company's earnings from its operations or anything that Crawford had control over) WPS experienced effectively increased his bonus from $0 to $573,000. Viewing Crawford's position from a contrary angle, it was also possible for a comparable extraordinary loss over which Crawford had no control in

a given year to completely wipe out a bonus to which he would have been otherwise entitled to receive. By Crawford's own allegations, his bonus could be impacted by potentially huge contingencies over which he had no control. Accordingly, Crawford's bonus is not covered by the Wage Act.

**F.    Crawford Elected to Treat His Bonus As A Form Of Deferred Compensation, Which Is Not Covered Under The Wage Act.**

It is undisputed that Crawford did not immediately seek payment of his bonus in April 2002. Rather, he elected on his own accord to wait **nearly three years** after the bonus was ostensibly due to seek payment. These facts alone require dismissal of Crawford's Wage Act claims.

In Boston Police Patrolmen's Association, Inc. v. City of Boston, 435 Mass. 718 (2002), the SJC was presented with the question of "whether deferred compensation contributions are 'wages' under" the Wage Act. Id. at 719. Thus, although the specific form of compensation differs from that claimed by Crawford, the SJC's BPPA analysis of how *wages* are defined under the Wage Act is highly instructive to this Court given that the instant case raises that *precise* question in a somewhat different context.

The plaintiffs in BPPA, more than 1,300 police patrol officers and detectives, brought suit under the Wage Act. 435 Mass. at 718. The plaintiffs argued that their employee contributions to a tax-exempt deferred compensation plan were "wages" under the Wage Act and, therefore, subject to the statutory requirement that they be paid into the fund within seven days of the end of each pay period. Id.

In attempting to reconcile the plaintiffs' claims with the legislative intent of the Wage Act, the SJC observed that payments under the plaintiffs' deferred compensation plan in BPPA were, by the fundamental nature of the plan, *intended* to be deferred (*i.e.*

delayed). <u>Id.</u> at 720.  As a result, the SJC held that the Wage Act, which was ratified by the Legislature to remedy "the evil of unreasonable detention of wages," was simply inapplicable to a form of compensation where "funds were intended to be held out of the employee's possession" for some pre-ordained period of time beyond the ordinary weekly or bi-weekly pay day.  <u>Id.</u>  The SJC ultimately held that "deferred compensation contributions are not 'wages' under the weekly wage law."  <u>Id.</u> at 721.

Here, applying the logic of the SJC's <u>BPPA</u> holding to Crawford's Bonus claims yields identical results.  Besides being episodic, irregular and contingent in nature, neither Crawford nor Wolverine intended that Crawford's Bonus (in the event he was so entitled), would be paid in the manner of ordinary wages, <u>viz.</u>, on a weekly, bi-weekly or monthly basis.  Rather, like the deferred compensation at issue in <u>BPPA</u>, Crawford's bonus was "intended to be held out of [Crawford's] possession" and would only be paid far in the future after his ordinary salary for the corresponding month.  435 Mass. at 721. Beyond that mutual intent to delay payment contained in the Employment Contract, it is also undisputed that Crawford decided unilaterally to delay his efforts to seek payment of his bonus for nearly three more years after it was due.  Thus, Crawford's bonus cannot be considered wages under the weekly wage law pursuant to the SJC's rationale in <u>BPPA</u>. 435 Mass. at 721.

**G.     <u>The Wage Act Is Not The Appropriate Vehicle For Highly Paid Executives To Enforce Their Contract Rights.</u>**

Numerous courts in this District and in Massachusetts have acknowledged the proposition that the Wage Act is not the proper avenue for highly paid executives to assert rights to compensation payments that actually arise under contract.  The Wage Act is simply is not applicable under such circumstances.  <u>See</u> <u>Prozinski</u>, 59 Mass. App. Ct. at

604 (quoting <u>Cumpata</u>); <u>Dennis v. Jager, Smith & Stelter, P.C.</u>, No. 98497G, 2000 WL

782946, *1 (Mass. Super. Ct. Apr. 10, 2000) ("There is no reason to extend to highly paid

professionals the opportunity to collect treble damages and attorneys fees and costs

incurred in enforcing their asserted contract rights.") (quoting <u>Baptista</u>). <u>Cumpata</u>, 113 F.

Supp. 2d at 167-68 (this Court emphasized that "there is no evidence that the Legislature

intended to provide treble damages and attorney's fees and costs to professionals

enforcing their asserted contract rights.")

Crawford may, as he in fact has done here, pursue his claim for his alleged unpaid

bonus is under other legal theories.  His Wage Act claims, however, are therefore

improper.

*   *   *

Judging by standards addressed above, Crawford's allegations in support of his

Wage Act claims for non-payment of his FY 2001 bonus cannot survive legal scrutiny.

Because Crawford's second and fourth causes of action do not allege the deprivation of

"ordinary wages" as that term is legally defined, summary judgment should enter in favor

of defendants on those portions of his Complaint.

### POINT II

**CRAWFORD'S FIFTH AND SIXTH CAUSES OF ACTION, FOR BREACH OF THE TRANSITION AGREEMENT AND A RELATED WAGE ACT CLAIM, MUST BE DISMISSED BECAUSE DEFENDANTS HAVE NOT BREACHED THE TRANSITION AGREEMENT AND THE WAGE ACT DOES NOT APPLY**

Crawford's fifth cause of action alleges a breach of the parties' December 28,

2001 Transition Agreement.  [Complaint ¶¶ 46-53].  Crawford alleges that, pursuant to

the Transition Agreement, he is owed unpaid wages of $25,000.00 for the period of

February 1, 2002, through March 31, 2002. [Complaint ¶¶ 52-53]. Crawford's sixth cause of action alleges violations of the Wage Act in connection with Defendants' failure to pay those wages purportedly due Crawford under the Transition Agreement. [Complaint ¶¶ 54-56].

### A.    The Undisputed Facts Demonstrate That Defendants Did Not Breach The Transition Agreement.

Section 2 of the Transition Agreement, entitled "Term," provides that Crawford's employment under the Agreement would terminate at

> …the earlier of (i) March 31, 2002 … or (iii) two weeks after the date on which the Chief Executive Officer provides written notice of termination, for any reason or no reason, to the Employee [*i.e.*, Crawford].[2]

[SOF, ¶ 39].

On January 14, 2002, the WPS Board of Directors elected to terminate Crawford's employment as WPS's COO. [SOF, ¶ 54]. Crawford's Complaint concedes the fact that the WPS Board of Directors "voted to terminate his employment" on January 14, 2002. [Complaint ¶ 23]. The Complaint further concedes that, on January 18, 2002, Crawford received written notice from WPS's Human Resources Manager which confirmed the Board's decision to terminate Crawford's employment. [Id.] Crawford contends, however, that he is entitled to a $25,000 salary for February and March 2002 – a period in which he rendered no services to the company – because the format of the January 18 written notice of termination was not in technical compliance with the requirements of section 2-(iii) of the Transition Agreement, inasmuch as that notice was not *signed by* the CEO of WPS. [Complaint ¶¶ 47-50].

---

[2]    Section 2-(ii) of the Transition Agreement also provided that plaintiff's employment could terminate upon "the consummation by the Company of a working capital facility with an institutional lender." Both parties concede that this contingency never occurred.

Crawford's contention that WPS somehow breached the provisions of the Transition Agreement by failing to pay him a $25,000 salary for February and March 2002 – Crawford's January 14, 2002 termination notwithstanding – is devoid of merit.

Under Massachusetts law, "interpretation of a contract is a matter of law for the court, which must determine the meaning of the terms thereof." Albertini v. Summit Technical Services, Inc., 287 F. Supp. 2d 92, 97-98 (D. Mass. 2003); see, Coll v. PB Diagnostics Sys., Inc., 50 F.3d 1115, 1122 (1st Cir. 1995) ("[I]nterpretation of a contract is ordinarily a question of law for the court.")  "Contract law," therefore, "favors judicial resolution of disputes." Nadherny v. Roseland Property Co., Inc., 390 F.3d 44, 48 (1st Cir. 2004).

In interpreting the provisions of a contract, "it is the actual agreement and intent of the parties that is dispositive" and the court should examine "the substance of the transaction, and not the form of the agreement to determine the legal rights of the parties." Insurance Marketing Agencies, Inc. v. Tudor Enterprises, Inc., 1999 WL 788691, *2, 1999 Mass. App. Div. 60 (March 5, 1999); see also, Heller v. Insurance Co. of North America, 410 Mass. 400, 404 (1991) ("In determining the intent of the parties, we look at the substance of the transaction, including the relationship between the parties, and not at the form."); Kerrigan v. City of Boston, 361 Mass. 24, 33 (1972) (a contract must be interpreted "'in a manner to give effect to the chief design to be accomplished by the instrument,' and we are to look 'through the form to the substance and purpose of the agreement' and to mould the decree 'in accordance with what the parties may fairly be presumed to have intended.'")

In deriving the parties' intentions as reflected in their written agreement, "a contract should be construed to give it effect as a rational business instrument." Shane v. Winter Hill Federal Savings and Loan Association, 397 Mass. 479, 483 (1986); see also, Warner Ins. Co. v. Commissioner of Ins., 406 Mass. 354, 362 (1990) ("The [] Court's function is to give the contract a construction that is reasonable, equitable, and expresses the intent of the parties.); Albertini, 287 F. Supp. 2d at 98 (citing, Starr v. Fordham, 420 Mass. 178, 190 (1995)) (when interpreting a contract, "the Court is required to 'construe the contract with reference to the situation of the parties when they made it and to the objects sought to be accomplished.'")

Here, Crawford's claim for breach of the Transition Agreement is predicated on an unreasonable interpretation of the contract which is wholly inconsistent with the clear intention of the parties and, as a result, should be rejected by this Court. See, Nadherny, 390 F.3d at 48-49 (summary judgment is appropriate where a claim is rooted in an unreasonable contract interpretation).

Both Crawford and Wolverine recognized when executing the December 28, 2001 Transition Agreement that Crawford's tenure with the company was drawing to a close. This fact is demonstrated by the language of the Agreement itself which states that Crawford's employment would cease on March 31, 2002 "unless sooner terminated." [SOF, ¶ 39]. Furthermore, Wolverine was granted the widest possible discretion in determining the future length of Crawford's tenure with the company; viz., the company was empowered to terminate Crawford's employment "for any reason or no reason." [SOF, ¶ 40]. Thus, Crawford cannot argue that Wolverine breached the Transition Agreement in its *decision* to terminate him; rather, Crawford argues that his termination

was ineffective and, as a result, he is owed salary for a period of two months after his employment ceased, because the manner in which Crawford was *informed* of his termination was technically improper.

The Transition Agreement states that Crawford's termination would be effective "two weeks after the date on which the Chief Executive Officer provides written notice of termination, for any reason or no reason, to [Crawford]." [SOF, ¶ 40]. Crawford was informed of the WPS Board's decision to terminate him on January 14, 2002. [Complaint ¶ 23]. Crawford does not allege that Wolverine failed to inform him of his termination in a timely manner. [Id.] Nor does Crawford allege that Wolverine failed to furnish him with "written notice of termination" – Crawford concedes that he received formal written notice and confirmation of his termination on January 18, 2002. [Id.] Instead, it is Crawford's position that because his written notice of termination was not *signed* by the CEO, Crawford was never effectively terminated and, as a result, is owed two months salary for nothing. Crawford's strained interpretation of the parties' obligations under the Transition Agreement not only seeks to elevate form over substance, but it is also at odds with Massachusetts law inasmuch as it ignored the intent of the parties in entering into the Transition Agreement.

Written notice of termination provisions are commonplace in employment contracts. These provisions are generally included to ensure proper documentation of personnel decisions in order to protect the rights of both employers and employers. Such was the intention of the parties with regard to the Transition Agreement in the instant case. Obviously, it was not the intention of the parties, as Crawford now argues, that any minute or hyper-technical violation of the written notice provision of the Transition

Agreement would entitle Crawford to two months of salary notwithstanding his termination. Such an unreasonable interpretation of the Transition Agreement is inconsistent with the requirement that a contract must be "construed to give it effect as a rational business instrument."[3] Shane, 397 Mass. at 483.

As an alternative argument, defendants note that even utilizing Crawford's unreasonable interpretation of the language of the Transition Agreement, the manner in which WPS furnished Crawford with written notice of his termination conforms with the provisions of the Agreement. As was noted above, under the Transition Agreement Crawford's termination was effective "two weeks after the date on which the Chief Executive Officer provides written notice of termination, for any reason or no reason, to [the plaintiff]." [SOF, ¶ 40]. Although Crawford contends that his termination was ineffective because his January 18, 2002 written notice of termination was not *signed* by the CEO, the Transition Agreement requires only that the CEO "*provides*" Crawford with written notice of termination. Merriam Webster's Collegiate Dictionary (10th ed. 1993) defines "provide" as a verb meaning "to make preparation to meet a need."

After making the decision to terminate Crawford on January 14, 2002, Kulkarni, then WPS's CEO, instructed Mark Brown, the company's Chief Financial Officer, to inform Crawford of his termination. [SOF, ¶ 55]. Brown then verbally informed Crawford of his termination. [SOF, ¶ 56]. Later in the day on January 14, after escorting Crawford out of the building, Brown instructed WPS's Human Resources Manager,

---

[3]    Crawford's contention also ignores the general rule, well established in this and numerous other jurisdictions, that mere nominal, trifling, or technical departures from the written provisions of a contract are insufficient to support a claim for breach. See e.g., Patel v. Ambassador Drycleaning Co., Inc., No. 11-01-00175, 2002 WL 1880179 (Tex. App. Aug. 15, 2002); Hansel v. Creative Concrete & Masonry Constr. Co., 772 N.E.2d 138 (Ohio App. 10th Dist. 2002); Burlington Resources Oil & Gas Co. v. Cox, 729 N.E.2d 398 (Ohio App. 4th Dist. 1999); Fort Washington Resources, Inc. v. Tannen, 901 F. Supp. 932 (E.D. Pa. 1995); Miller v. Gray, 217 N.W. 228 (Iowa 1928).

Carol O'Donohue, to draft a letter to Crawford confirming WPS's decision to terminate his employment.  [SOF, ¶ 57].

While conceding that Kulkarni, as WPS's CEO, did not personally write and sign the January 18, 2002 letter to Crawford which confirmed his termination, Kulkarni made arrangements for written notice to be "provided" to Crawford by delegating that task to Brown who, in turn, delegated to O'Donohue in her capacity as WPS's Human Resources Manager.  Thus, pursuant to the provisions of the Transition Agreement, O'Donohue's January 18, 2002 letter to Crawford effectively terminated Crawford, inasmuch as his receipt of that "written notice of termination" was the culmination of a process initiated by Wolverine's CEO.  Kulkarni's actions *provided* the "written notice of termination" to Crawford and, as a result, Kulkarni's actions were consistent with WPS's obligations under the Transition Agreement.  Crawford's contention that only a written notice of termination signed by WPS's CEO could effectively terminate Crawford's employment is contradicted by the plain language of the Transition Agreement, which contains no such requirement.

**B.    Crawford's Wage Act Claim Based On The Alleged Breach of the Transition Agreement Is Without Legal Basis.**

Crawford's Wage Act claim asserted in count seven of the Complaint essentially seeks the pay he never received due to the alleged premature termination of his Transition Agreement.  Crawford does not dispute that he did not work for WPS after the termination of his Transition Agreement.  Even if Crawford prevails on his breach argument, it is impossible for him to "earn" the unpaid money by working.  This type of argument has been examined and soundly rejected under the Wage Act.  See Kittredge v. McKerney, No. 03-2146, 2004 WL 1147449, at *14 (Mass. Super. Ct. May 11, 2004)

(lost salary due as damages for prematurely cancelled employment agreement not wages within the meaning of § 148); <u>Fitzgerald v. Chipwrights Design, Inc.</u>, No. 051050, 2005 WL 1869151, at * 2 (Mass. Super. Ct. July 1, 2005) (unpaid salary and benefits due as part of three-month notice period pursuant to employment agreement was not "earned" under the Wage Act, and plaintiff's remedy was in action to enforce contract only); <u>Huebsch v. Katahdin Industries, Inc.</u>, No. 4483, 2001 WL 716884, *3 (Mass. Super. Ct. Apr. 24, 2001) (any right to salary owed was not available under the Wage Act because the plaintiff did not work during period in question and, therefore, did not "earn" it; any right to such salary is based on contract). Thus, Crawford cannot sustain a Wage Act claim in connection with his claim for unpaid salary in connection with the alleged breach of the Transition Agreement.

Thus, because Defendants have not breached the Transition Agreement and because the Wage Act does not apply to the premature alleged breach of the Transition Agreement, both Crawford's fifth and sixth causes of action, for breach of contract and related Wage Act claim, should be dismissed.

## POINT III

**CRAWFORD'S CLAIM AGAINST DEFENDANT KULKARNI FOR TORTIOUS INTERFERENCE MUST BE DISMISSED BECAUSE THERE WAS NO UNDERLYING BREACH OF THE TRANSITION AGREEMENT <u>AND</u> KULKARNI COULD NOT TORTIOUSLY INTERFERE IN A WPS CONTRACT WHEN ACTING IN A CORPORATE CAPACITY ON BEHALF OF WPS.**

The Complaint's seventh cause of action alleges that defendant Kulkarni tortiously interfered with Crawford's contractual rights under the Transition Agreement by causing WPS to terminate Crawford's employment. [Complaint ¶¶ 57-73].

Crawford and Kulkarni executed the Transition Agreement on December 28, 2001.  [SOF, ¶ 36].  Crawford's tortious interference claim alleges that, on January 14, 2002, as a result of a disagreement between Crawford and Kulkarni regarding Kulkarni's entitlement to $135,000 in "fringe benefit compensation," Kulkarni "took actions to persuade, cause and induce the Board of Directors of [WPS] to terminate the plaintiff's employment" under the Transition Agreement.  [Complaint ¶¶ 22, 59].  Crawford alleges that Kulkarni's actions in persuading the WPS Board to terminate Crawford's employment were undertaken in response to "the plaintiff's refusal to permit embezzlement and conversion of $135,000" from Wolverine.  [Complaint ¶ 61].

Crawford alleges that on some undefined date subsequent to executing the Transition Agreement on December 28, 2001, but before Crawford's termination on January 14, 2002, Kulkarni "ceased to be Chairman or CEO of Wolverine."  [Complaint ¶ 65].  Crawford's contention is factually incorrect.

Although Kulkarni signed a Consulting Agreement with WPS on December 28, 2001, three days later, on December 31, 2001, Kulkarni was installed as WPS's CEO by an "Action by Unanimous Written Consent of Directors in Lieu of a Meeting of Directors" (the "Unanimous Written Consent").  [SOF, ¶¶ 43, 45].  Kulkarni's replacement as CEO, Steven Chilinski, did not become employed by WPS until January 29, 2002 and was not formally installed as CEO by the WPS Board until February 28, 2002.  [SOF, ¶ 49, 51-52].  Thus, on January 14, 2002 (the date on which Kulkarni is alleged to have tortiously interfered with Crawford's Transition Agreement), Kulkarni was WPS's CEO.  [SOF, ¶ 48].

Furthermore, on January 14, 2002, Kulkarni retained the right to nominate 40% of WPS's Board of Directors. [SOF, ¶ 20].

Under Massachusetts law, in order to succeed on a claim of tortious interference with contractual relations, a plaintiff must prove that he had a contract with a third party, that the defendant knowingly and improperly induced the third party to breach that contract, and that the plaintiff was harmed by the defendant's action. G.S. Enterprises, Inc. v. Falmouth Marine, Inc., 410 Mass. 262, 272 (1991); see, Rogers v. NSTAR Electric, 389 F. Supp. 2d 100, 108-109 (D. Mass. 2005).

As an initial matter, Crawford's claim that Kulkarni tortiously interfered in Crawford's Transition Agreement must fail because WPS did not breach the Transition Agreement (see, Point II, *supra*). In the absence of a breach of the underlying Transition Agreement by WPS, an essential element of a viable tortious interference claim is missing in this case. See, G.S. Enterprises, 410 Mass. at 272; Rogers, 389 F. Supp. 2d at 108-109.

Furthermore, inasmuch as Kulkarni was acting in his capacity as the 40% owner, Chairman and CEO of WPS at the time he is alleged to have caused Crawford's termination, Kulkarni cannot be held liable for tortiously interfering in the Transition Agreement between Crawford and WPS.

Because of the *third party* element of a tortious interference claim, basic hornbook law dictates that a party "cannot be liable for tortious interference with its own contract." Powderly v. Metrabyte Corp., 866 F. Supp. 39, 43 (D. Mass. 1994); see also, Brown v. Armstrong, 957 F. Supp. 1293, 1305 (D. Mass. 1997); Appley v. Locke, 396 Mass. 540, 543 (1986); W. Page Keeton, *Prosser and Keeton on the Law of Torts*, § 129,

at 990 (5th ed. 1984) (stating that "defendant's breach of his own contract with the plaintiff is of course not a basis for the tort" of intentional interference with contractual relations).

A Massachusetts law corollary to this rule holds that when evaluating a tortious interference claim in the corporate actor context, "the acts and intent of natural persons, be they officers, directors or employees" are "treated as the acts and intent of the corporation itself" where the "natural person" has "been vested with the authority to act on behalf of the corporation in the sphere of corporate business in which he commits the alleged wrongful act." Platten v. HG Bermuda Exempted Ltd., 437 F.3d 118, 130 (1st Cir. 2006). Said differently, an individual vested and acting with corporate authority cannot be held liable for tortious interference with the corporation's contracts because, in such a situation, the law treats the individual's actions as the actions of the corporation itself. Id.; see also, Harrison v. Netcentric Corp., 433 Mass. 465, 478 (2001) (observing that courts frown upon a "tortious interference claims against an individual decision maker who is indistinguishable from the corporation itself"); Schutz v. Go Ahead Vacations, Inc., No. 97-4409, 1999 WL 959681, *4 (Mass. Super. Ct. Sept. 1, 1999) ("the highest ranking corporate official" is regarded "as indistinguishable from the corporation for purposes of any claim of intentional interference.")

Here, Crawford alleges that in persuading the WPS Board to terminate his employment, Kulkarni tortiously interfered in Crawford's contractual relationship with WPS. In discussing Crawford's potential termination with the other members of the WPS Board and then effectuating the Board's decision to terminate Crawford, Kulkarni was always acting within the scope of his duties as both Chairman and CEO of WPS.

[SOF, ¶¶ 45, 48, 50, 54-58].  Because Kulkarni was acting within the scope of his responsibilities as a WPS director and corporate officer when he terminated Crawford's employment, Kulkarni's actions are treated as the actions of the corporation itself and cannot form the basis of a viable tortious interference claim.  See, Platten, 437 F.3d at 130; Schutz, 1999 WL 959681, at *4 ("Converting every corporation's breach or termination of contract into a claim for intentional interference on the part of the individual that actually made the decision to breach or terminate the contract would create widespread individual liability for what are corporate acts."); Gram v. Liberty Mutual Ins. Co., 384 Mass. 659, 663 (1981) (employees may not be liable for tortious interference "when acting within the scope of their employment responsibilities").

Crawford has attempted to bypass the obvious infirmity of his tortious interference claim by alleging that in the interim between Kulkarni's execution of the Transition Agreement on December 28, 2001 and the termination of Crawford's employment with WPS on January 14, 2002 – an interim of a grand total of 16 days – Kulkarni "ceased to be Chairman and CEO of Wolverine" and, instead, was demoted to a "consultant" position with the company.  [Complaint ¶¶ 65-66].  Crawford's allegations in this regard, however, are factually incorrect.  [SOF, ¶¶ 45, 48, 50].  Given that Kulkarni was installed as WPS's CEO by unanimous written consent of the WPS Board on December 31, 2001, and Kulkarni's replacement as CEO, Steven Chilinski, was not hired until January 29, 2002, it is beyond dispute that Kulkarni was WPS's CEO on January 14, 2002.  [SOF, ¶¶ 45, 49].

Crawford's tortious interference claim against Kulkarni with respect to the Transition Agreement must fail because Kulkarni was clearly acting on behalf of WPS when he terminated Crawford's employment.

## POINT IV

### THE BONUS PROVISION OF THE EMPLOYMENT CONTRACT SHOULD BE RESCINDED BECAUSE THERE WAS NO MEETING OF THE MINDS BETWEEN CRAWFORD AND KULKARNI[4]

Crawford's First cause of action alleges that Defendants breached the Employment Contract by Defendants' failure to pay him a Bonus that he claims is due to him pursuant to the Employment Contract. [Complaint ¶¶ 24-30]. Specifically, Crawford alleges that he is owed a Bonus of $573,000.00 for 2001. Crawford's Second cause of action alleges violations of the Wage Act in connection with Defendants' failure to pay this same Bonus. [Complaint ¶¶ 31-36].

Crawford and defendant Deepak S. Kulkarni – in his capacity as WPS's President and CEO – executed a written employment contract, the Employment Contract, on January 4, 2000. [SOF, ¶ 2]. Crawford's Employment Contract provided for an annual base salary of $150,000, stock options and an annual bonus (the "Bonus"). [SOF, ¶ 4]. Provision 4 of the Employment Contract specifically governed how any potential Bonus due Crawford was to be calculated. [SOF, ¶ 5]. Crawford's annual Bonus was calculated according to the following formula:

$$BONUS = (EBITDA - CAPX - INT - TAXES) \times .05$$

---

[4]    Crawford's Third and Fourth causes of action are based on an alleged oral modification to the Bonus provision in the Employment Contract. [Complaint, ¶¶ 37-45]. In this section, Defendants argue that Crawford's claims relative to the Bonus provision in the Employment Contract, the First and Second causes of action should be dismissed. Accordingly, if the Court disposes of the First and Second causes of action, the Third and Fourth should also be dismissed, as any oral modification to the Bonus provision cannot stand if the Bonus provision itself is held to be a nullity because there was no meeting of the minds.

[SOF, ¶ 6].

The Employment Contract also includes the manner by which each of the Bonus formula's capitalized terms are to be derived. [SOF, ¶ 6]. The Employment Contract states that, "for purposes of [the Bonus] calculation, the [capitalized formula] terms will be calculated based upon the annual consolidated financial results of the Company, in accordance with generally accepted accounting principles." [SOF, ¶ 6]. However, the term "EBITDA," defined in the Employment Contract to mean "earnings before any interest, taxes or deductions for depreciations or amortization," is not a term defined in the Generally Accepted Accounting Principles ("GAAP") promulgated by the Financial Accounting Standards Board ("FASB"). [SOF, ¶¶ 7-8]. Likewise, the "E" in EBITDA, ("Earnings") is also not a GAAP defined term. [SOF, ¶ 8].

When Crawford and Kulkarni negotiated the Employment Contract, neither of them was aware that "EBITDA" and "earnings" were not GAAP defined terms. [SOF, ¶ 10]. Notwithstanding the fact that these terms could not be defined "in accordance with generally accepted accounting principles," the parties have subsequently learned both Crawford and Kulkarni had vastly different understandings of what the EBITDA component of the Bonus calculation represented at the time the Employment Contract was executed. [SOF, ¶¶ 12-13]. Kulkarni understood that the EBITDA component of the Bonus calculation would approximate WPS's annual *cash flow* from operations – excluding changes in the company's working capital and any extraordinary gains. [SOF, ¶ 12]. Crawford, however, claims that he understood that the EBITDA component of the Bonus calculation would approximate WPS's *net income*. [SOF, ¶ 13].

It is a basic principle of contract law that a "party cannot be bound to essential and material terms of a contract to which he has not agreed." See Walsh v. Telesector Resources Group, Inc., 40 Mass. App. Ct. 227, 233 (1996). "The unexpressed intention of one party is not binding on the other party to a contract." See Nadherny v. Roseland Property Company, 390 F.3d 44, 51 (1st Cir. 2004); citing Lohnqvist v. Lammi, 240 Mass. 371, 373-374 (1922) (intention or understanding must be mutual to create a contract"). Indeed, an essential element to contract formation is mutual assent, often referred to as a "meeting of the minds." See I & R Mechanical, Inc. v. Hazelton Manufacturing Co., 62 Mass. App. Ct. 452, 455 (2004)("parties must give mutual assent by having 'a meeting of the minds' on the same proposition on the same terms at the same time"), citing Restatement (Second) of Contracts, § 17 comment c (1981). If the parties give materially different meaning to contract language, there is ordinarily no meeting of the minds and no contract. See Kyle v. Kavanagh, 103 Mass. 356 (1869).

Here, it is undisputed that both Crawford and Kulkarni intended that the Bonus calculation be governed by two very different and irreconcilable precepts. While Crawford and Kulkarni negotiated a formula by which a Bonus was to be calculated, the materially different understanding they each possessed of the essential component to the calculation, EBITDA, demonstrates that they failed to have the meeting of the minds requisite to the forming of a contract on the Bonus issue.

Crawford's deposition testimony reveals that his understanding of the EBITDA component of the Bonus Calculation was that it would approximate the company's annual net income. [SOF, ¶ 13]. However, the record reflects that Kulkarni understood that the EBITDA component would approximate WPS's annual *cash flow* from

operations – excluding changes in the company's working capital and any extraordinary gains.  [SOF, ¶ 12].  Accordingly, there is no dispute that there is a substantial difference between the two parties' understandings of what EBITDA represented  -- and that this difference creates a substantive change in the Bonus provision of the contract such that there was no mutual assent or meeting of the minds "on the same proposition on the same terms at the same time."  See I & R Mechanical at 455.  Indeed, Crawford admitted that he had a different intent than Kulkarni with respect to the Bonus at his deposition:  "Q: . . . You have heard what Mr. Kulkarni testified his intent was with regard to the bonus.  It's obviously, not the same as you're saying today your intent was, right?"  A: I think that his deposition testimony, yes, is different from what I'm testifying today.  I think that's accurate."  [SOF, ¶¶ 12-13].

Moreover, Kulkarni would simply have not executed the Employment Contract had he understood at the time that Crawford believed the EBITDA provision of his Bonus calculation approximated WPS's *net income*.  [SOF, ¶ 14].   It would therefore contradict elementary contract principles should the Court allow Crawford to hold Kulkarni to a material and essential term to which he had not agreed.  See Walsh, 40 Mass. App. Ct. at 233.

For these reasons, Crawford's First, Second, Third and Fourth Causes of Action should be dismissed as there was no meeting of minds as to the Bonus provision of the Employment Contract.

## POINT V

### CRAWFORD'S COMPLAINT IS BARRED IN ITS ENTIRETY BY THE DOCTRINE OF EQUITABLE ESTOPPEL

The doctrine of equitable estoppel is well-established under Massachusetts law, and its fundamental principles have been endorsed by the Supreme Judicial Court: "it is in the main to accomplish the prevention of results contrary to good conscience and fair dealing that the doctrine of estoppel has been formulated and taken its place as part of the law." See Turnpike Motors, Inc., v. Newbury Group, Inc., 413 Mass. 119 (1992)(internal quotations omitted) (plaintiff sellers estopped from claiming defendant broker was not entitled to commissions because broker was unlicensed, where broker reasonably relied upon sellers' representation that license was not necessary).

Simply put, the doctrine of equitable estoppel means that the law will not allow a party to benefit by acting badly. See Harrington v. Fall River Housing Auth., 27 Mass. App. Ct. 301, 307 (1989) ("[e]stoppel is an equitable doctrine created to prevent one from benefiting from his own wrongdoing and to avoid injustice"). The essential factors giving rise to an estoppel are: (1) a representation or conduct amounting to a representation intended to induce a course of conduct on the part of a person to whom the representation was made; (2) an act or omission resulting from the representation by the person to whom the representation is made; and (3) detriment as a consequence of an act or omission. See Turnpike Motors, 413 Mass. at 123.

Here, the elements of equitable estoppel are clearly met. In the summer of 2001, a group of investment entities, referred to here as Parthenon, began conducting due diligence into a potential purchase of WPS. [SOF, ¶ 21]. Parthenon retained PriceWaterhouse Coopers ("PWC") to assist Parthenon in conducting the due diligence.

33

[SOF, ¶ 24]. As Chief Operating Officer, and the senior executive in the company in charge of the finance and accounting functions, Crawford was involved in the due diligence that took place in advance of the acquisition and in the actual acquisition itself. [SOF, ¶¶ 25, 28-31]. Meanwhile, during the summer of 2001, Crawford came to understand that loan forgiveness would be a substantial component of any potential acquisition of WPS by Parthenon. Around that time Crawford formed the belief that any debt forgiveness granted to WPS as part of Parthenon's acquisition of WPS could impact Crawford's bonus significantly. [SOF, ¶¶ 22-23].

By early December 2001, Crawford had become aware that as part of Parthenon's acquisition of WPS, WPS's primary lender, Citizens Bank, had agreed to forgive approximately $10 million of WPS's debt. [SOF, ¶¶26-27]. Crawford continued to provide information to facilitate the acquisition and, as the closing of the deal grew closer in the last quarter of 2001, personally provided data regarding WPS's financial condition to Parthenon's representatives. [SOF, ¶ 28]. Despite Crawford's knowledge of the $10 million in debt forgiveness that was an integral part of the Parthenon acquisition, and Crawford's belief that the debt forgiveness would result in WPS's owing him a $573,000.00 bonus under the Employment Contract, Crawford never spoke to anyone at WPS or Parthenon about the bonus. [SOF, ¶ 31]. Crawford did not include any information regarding an accrual for his 2001 bonus on the financial statements he provided as part of the closing of the acquisition, nor did he speak to WPS's accountant, William Crotty, about the fact that such an accrual was not included in the financial statements as of December 21, 2001. [SOF, ¶ 31]. In addition, no accrual for Crawford's 2001 bonus was included in the accrued payroll portion of the trial balance incorporated

34

into the documents governing Parthenon's acquisition of WPS.  [SOF, ¶ 34].  Parthenon's

acquisition of WPS was closed on December 31, 2001.  [SOF, ¶ 35].

Moreover, at the actual two-day closing of the acquisition, December 28, 2001,

and December 31, 2001, Crawford fully believed that the $10 million in WPS debt

forgiveness from Citizens Bank would result in WPS owing Crawford approximately

$573,000 in bonus compensation for 2001.  Crawford, however, failed to disclose this

information to anyone at Parthenon or WPS.  [SOF, ¶¶ 33, 35].

Close to three years later, on December 2, 2004, Crawford sent a letter to WPS's

CEO, Steven F. Chilinski, and demanded "approximately $573,000" in bonus

compensation as a result of his 2001 employment with WPS.  [SOF, ¶ 59].  Crawford's

December 2, 2004 letter represented the <u>first</u> time Crawford asserted to anyone at WPS or

Parthenon that he was entitled to a bonus as a result of his 2001 employment with WPS.

[SOF, ¶ 61].  On January 12, 2005, Crawford filed his Complaint and this litigation

ensued.

Given Crawford's fundamental role in Parthenon's acquisition of WPS in 2001, in

which he represented WPS's financials throughout the due diligence process and the

acquisition closing without disclosing the accrual of his 2001 bonus, and that Parthenon

clearly relied on these financial statements in its decision to acquire WPS, Crawford may

not now assert that he is entitled to the bonus.  Simply stated, Crawford, while he

believed that the acquisition was going to result in the payment to him of a bonus of over

half a million dollars, deliberately withheld this expense from the financial statements

provided to Parthenon in order to ensure that the acquisition took place, and failed to tell

anyone at WPS or Parthenon about his belief that he was owed the bonus until December

of 2004.  Accordingly, to allow Crawford to collect the bonus he claims he is owed pursuant to the Employment Contract would be contradictory to the equitable principles that have been endorsed by Massachusetts law; it would, in essence, allow Crawford to benefit by "his own wrongdoing."  <u>Harrington v. Fall River Housing Auth</u>, 27 Mass. App. Ct. at 307.

Conduct such as Crawford's here has moved courts to bar such claims as a matter of law under the equitable estoppel doctrine.  For example, in <u>Moran v. Gala</u>, No. 266795, 2005 WL 22859, *5 (Mass. Land Ct. Jan. 6, 2005), the court allowed summary judgment for the defendants and held that the plaintiffs were equitably estopped from bringing an adverse possession claim against defendants, where plaintiff's failure to communicate facts to defendants which resulted in the defendants "blindly placing themselves in a position to be sued by the [plaintiffs]."  In circumstances similar to the ones in the instant case, the plaintiff, Robert Moran, acted as an attorney for his next door neighbors in the sale of their home.  In doing so, he signed off on the lien certificate on behalf of the sellers, and which was relied upon by the purchasers of the property, which stated that "there are no tenants, lessees, or parties in possession of said premises other than" his clients.  <u>Id</u>. at *6.

Over three years after the closing, the new owners hired someone to construct a driveway on their property.  <u>Id</u>. at *5.  Moran and his wife sued the new owners for adverse possession, claiming that they in fact owned a portion of the property.  <u>Id</u>.  The court found that the elements of equitable estoppel were satisfied and that the Morans' claim was barred as a matter of law.  <u>Id</u>. at *5.  The court pointed to the fact that Robert Moran dealt with the defendants repeatedly throughout the sale of the property, and while

he was fully aware of the facts asserted in the lawsuit, never raised these facts with defendants throughout the course of the transaction.[5]  Id.  The court further found that a detriment was caused to the defendants, that "[t]hey have purchased a parcel of land over which a neighbor has asserted a claim of adverse possession, they have been forced to defend their title in this litigation, by virtue of which they stood to lose a sizeable area of their property . . ."

Likewise, Crawford misled Defendants when, in his capacity as WPS's Chief Operating Officer, he misrepresented the actual financial situation of WPS by standing by and saying nothing to advise anyone that the accrual of his 2001 bonus was not reflected on any records or statements.  Then, only after the acquisition was completed, he commenced this litigation, seeking to collect the bonus he contends he was owed. Parthenon reasonably relied upon the representations made by Crawford and others at WPS (from whom Crawford kept his belief about the bonus) and made the decision to acquire the company.  As a result, WPS now faces the detriment of defending itself against this lawsuit, and should Crawford succeed on his wage act claim, blindly placed itself in the position of potentially paying out three times what Crawford claims he is owed as a bonus.

The gross inequity of this situation calls for this Court to bar Crawford's causes of action seeking payment of the bonus he is purportedly owed under the Employment Contract.  The doctrine of equitable estoppel is properly invoked here, where to grant

---

[5] The court rejected Moran's argument that his silence could not form the basis for estoppel as he owed no duty to the defendants.  Id. at *6.  The court reasoned that if Moran had been no more than a neighbor, he might be able to assert such a defense, but that his active involvement as the attorney and spokesperson for the sellers placed him in a position of one on whom the defendants reasonably relied.  Similarly, in this case, Crawford cannot assert that he was simply an innocent bystander who had no duty to make truthful representations about the financial status of WPS; as Chief Operating Officer, Crawford represented WPS in the due diligence phase and in the course of the acquisition to the extent that Parthenon justifiably relied on him and his representations.

Crawford the relief he seeks, a bonus payment in the amount of $573,000, would be to reward him for his misdeeds relative to the acquisition of WPS by Parthenon. Accordingly, this Court should dismiss Crawford's Complaint.

## CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment should be granted and the first seven counts of the Complaint dismissed with prejudice.

Dated: March 17, 2006

Respectfully submitted,

WOLVERINE, PROCTOR & SCHWARTZ, INC.,
STEVEN F. CHILINSKI, and
DEEPAK S. KULKARNI

By their attorneys,

/s/ Mark M. Whitney
Mark Whitney (BBO #637054)
Jeffrey D. Kuhn
MORGAN, BROWN & JOY, LLP
200 State Street
Boston, Massachusetts  02109
(617) 523-6666

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on March 17, 2006, I filed the foregoing document with the Clerk of the Court by using the ECF system and served an electronic copy upon the plaintiff.  I further certify that I mailed the foregoing document and the notice of electronic filing to the pro se plaintiff, Peter A. Crawford, 23 Newcastle Drive, #11, Nashua, NH  03060, by U.S. mail, on March 20, 2006.

<u>/s/ Mark M. Whitney</u>
Mark M. Whitney, Esq.