UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

──────────────────────────────────────────

PETER A. CRAWFORD,

       Plaintiff,

                                     Civil Action No.
v.                                 05-cv-10078 (DPW)

WOLVERINE, PROCTOR & SCHWARTZ, INC.,     **Oral Argument Requested**
STEVEN F. CHILINSKI, and
DEEPAK S. KULKARNI,

       Defendants.

──────────────────────────────────────────

### DEFENDANTS' LOCAL RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Defendants Wolverine, Proctor & Schwartz, Inc. ("WPS"), Steven F. Chilinski ("Chilinski") and Deepak S. Kulkarni ("Kulkarni") hereby submit, pursuant to Local Rule 56.1, this statement of undisputed material facts in support of defendants' motion for summary judgment.

**I.    THE CRAWFORD/KULKARNI NEGOTIATIONS OF CRAWFORD'S EMPLOYMENT CONTRACT WITH WPS**

1.    Plaintiff pro se Peter A. Crawford ("Crawford") began his employment as WPS's Chief Operating Officer ("COO") on December 30, 1999.  [See, Plaintiff's Complaint ¶ 9, attached to accompanying Affidavit of Mark M. Whitney as Exhibit 1].

2.    On January 4, 2000, Crawford and defendant Kulkarni – in his capacity as WPS's President and Chief Executive Officer ("CEO") – executed a written employment contract (the "Employment Contract").  [See, January 4, 2000 Employment Contract, attached to accompanying Affidavit of Deepak S. Kulkarni as Exhibit 2].

3.     Crawford drafted the initial version of his Employment Contract and emailed it to Kulkarni on December 27, 1999.  [See, December 27, 1999 email from Crawford to Kulkarni, attached to Kulkarni Aff. as Exhibit 1].

4.     Crawford's Employment Contract provided for an annual base salary of $150,000, stock options and an annual bonus (the "Bonus").  [See, Kulkarni Aff., exh. 2].

5.     Provision 4 of the Employment Contract contained a formula by which any potential Bonus due Crawford was calculated.  [Id.]  Crawford drafted the final version of Provision 4 of his Employment Contract, including the terms of the Bonus entitlement.  [See, transcript of Crawford's deposition, pgs. 122-124, attached to Whitney Aff. as exh. 2; transcript of Crawford's deposition, pg. 8, attached to Whitney Aff. as exh. 3;  Kulkarni Aff., ¶ 6].  The language of the Bonus entitlement provision in Crawford's initial draft was materially identical to the version which appeared in Crawford's final Employment Contract.  [See, transcript of Crawford's deposition, pgs. 101-103, attached to Whitney Aff. as exh. 2].

6.     Crawford's annual Bonus was calculated using the following formula:

$$\text{BONUS} = (\text{EBITDA} - \text{CAPX} - \text{INT} - \text{TAXES}) \times .05$$

[See, Kulkarni Aff., exh. 2; Kulkarni Aff., ¶ 7].  The Employment Contract includes a detailed discussion of the manner by which each of the Bonus formula's capitalized terms are to be derived.  [Id.]  The Employment Contract states that "for purposes of [the Bonus] calculation, the [capitalized formula] terms will be calculated based upon the annual consolidated financial results of the Company, in accordance with generally accepted accounting principles."  [Id.]

7.      "EBITDA" is defined in Crawford's Employment contract to mean "earnings before any interest, taxes or deductions for depreciations or amortization." [See, Kulkarni Aff., exh. 2].

8.      "EBITDA" is not a term defined in the Generally Accepted Accounting Principles ("GAAP") promulgated by the Financial Accounting Standards Board ("FASB").   [See, accompanying Affidavit of Mark Brown, ¶ 4; transcript of Richard Cummings's deposition, pg. 103, attached to Whitney Aff. as exh. 5].  "Earnings" is also not a GAAP defined term.  [See, Brown Aff., ¶ 3; transcript of Cummings's deposition, pg. 46, attached to Whitney Aff. as exh. 5].

9.      Thus, the language of the Employment Contract notwithstanding, it is not possible to calculate "EBITDA" or "earnings" in "accordance with generally accepted accounting principles."  [See, Kulkarni Aff., ¶ 8].

10.      At the time Crawford and Kulkarni were negotiating the Employment Contract, Kulkarni was not aware that "EBITDA" and "earnings" were not GAAP defined terms.  [See, Kulkarni Aff., ¶¶ 8-11].

11.      As late his February 2006 deposition in this matter, Crawford was still proceeding from the mistaken assumption that "earnings" was a GAAP defined term. [See, Crawford deposition transcript, pg. 163 – attached as exh. 2 to Whitney Aff.]

12.      Despite the impossibility of defining non-GAAP contractual terms "in accordance with generally accepted accounting principles," Kulkarni's intention in negotiating and executing the Employment Contract was that the EBITDA component of the Bonus calculation would approximate WPS's annual *cash flow* from operations –

excluding changes in the company's working capital and any extraordinary gains.  [See, Kulkarni Aff., ¶ 12].

13.    Crawford's intention in negotiating and executing the Employment Contract was that the EBITDA component of the Bonus calculation would approximate WPS's annual *net income*.  [See, Crawford deposition transcript, pgs. 168-169, 170-171 – attached as exh. 2 to Whitney Aff.]

14.    Crawford admitted during his deposition that his intent as to the meaning of the critical term "EBITDA" in the Bonus provision was different than Kulkarni's intent.  [See, Crawford deposition transcript, pgs. 170-171, attached as exh. 2 to Whitney Aff.]

15.    Had Kulkarni been aware during the negotiation of the Employment Contract that he and Crawford had such radically different understandings and intentions with respect to the EBITDA component of the Bonus calculation, Kulkarni would never have executed the Employment Contract.  [See, Kulkarni Aff., ¶ 13].

16.    At the time Crawford and Kulkarni were negotiating the Employment Contract, there were no discussions or negotiations regarding the potential inclusion of extraordinary gains or debt forgiveness in the EBITDA portion of the Bonus calculation. [See, Crawford deposition transcript, pgs. 165-166 – attached as exh. 2 to Whitney Aff.]

17.    The Employment Contract goes on to state that the Bonus "will be due upon completion of the audit of each year's results, or if no such audit is performed, by April 15."  [See, Kulkarni Aff., exh. 2].  Finally, the Employment Contract states that:

> If the calculation of BONUS requires clarification, Arthur Andersen & Company or such other accounting firm nominated to prepare the individual tax returns of the sole shareholder of the Company shall be the binding arbiter of the BONUS.

[Id.]

## II.    PARTHENON'S ACQUISITION OF A CONTROLLING INTEREST IN WPS

18.    In late December 2001, WPS (with Kulkarni as its sole shareholder) and a group of investment entities which included Parthenon Investors II, L.P., PCIP Investors and J&R Founders' Fund, L.P. (collectively referred to hereinafter as "Parthenon") entered into an acquisition agreement whereby Parthenon acquired a controlling ownership interest in WPS. [See, Complaint, ¶ 16 – attached to Whitney Aff. as exh. 1].

19.    Under Parthenon's acquisition agreement, Kulkarni's shares in WPS were transferred to a new entity, Wolverine, Proctor & Schwartz, LLC ("WPS LLC"). [See, Complaint, ¶ 16 – attached to Whitney Aff. as exh. 1]. Parthenon also lent funds to WPS for the purpose of retiring WPS's remaining bank debt. [Id.]

20.    Following Parthenon's acquisition transaction, which closed between December 28 and December 31, 2001, Parthenon controlled a majority of the board of directors of WPS LLC, which in turn owned all of the shares of WPS. [Id.] Kulkarni, on the other hand, retained a right to nominate 40% of the WPS Board. [See, Kulkarni Aff., ¶ 15].

21.    By June 2001, Crawford understood that loan forgiveness would be a substantial component of any potential acquisition of WPS by Parthenon. [See, Crawford deposition transcript, pgs. 137-138 – attached as exh. 3 to Whitney Aff.]

22.    At some point during the summer of 2001, Crawford came to believe that any debt forgiveness granted to WPS as part of Parthenon's acquisition of WPS could

have a positive impact on Crawford's Bonus. [See, Crawford deposition transcript, pg. 134 – attached as exh. 3 to Whitney Aff.]

23.    Parthenon began conducting due diligence into a potential purchase of WPS during the summer of 2001. [See, Crawford deposition transcript, pgs. 137-144 – attached as exh. 3 to Whitney Aff.]

24.    Parthenon retained PriceWaterhouse Coopers ("PWC") to assist Parthenon in conducting due diligence into a purchase of WPS. [See, Kulkarni Aff., ¶16; Kulkarni Aff., exh. C].

25.    PWC's due diligence investigation into WPS included meetings with Crawford wherein Crawford provided PWC's investigators information regarding WPS's financial status. [See, Kulkarni Aff., exh. 3, pg. 2].

26.    During 2000 and 2001, WPS was severely cash constrained and heavily in debt to its primary lender, Citizens Bank. [See, Complaint ¶ 11, attached to Whitney Aff. as exh. 1].

27.    In or about November 2001, as a resulted of WPS's inability to service its debt, Citizens Bank instituted a judicial action to have a receiver appointed to manage WPS's affairs. [See, Crawford deposition transcript, pg. 165 – attached as exh. 3 to Whitney Aff.]

28.    In or about early December 2001, Parthenon and Citizens Bank reached an agreement "on the courthouse steps" whereby Citizens Bank agreed to withdraw its petition to have a receiver appointed in exchange for repayment of a portion of WPS's debt by Parthenon. [See, Crawford deposition transcript, pgs. 139-140, 167-169 – attached as exh. 3 to Whitney Aff.]

29.     As part of the Parthenon/Citizens Bank agreement, Citizens Bank agreed to forgive approximately $10 million of WPS's debt.   [See, Crawford deposition transcript, pgs. 8-12 – attached as exh. 3 to Whitney Aff.]

30.     In late November or early December 2001, Crawford became aware of both the $10 million level of WPS debt forgiveness that would be incorporated into Parthenon's acquisition of WPS and the overall structure of the transaction.   [See, Crawford deposition transcript, pgs. 139-140, 149 – attached as exh. 3 to Whitney Aff.]

31.     As the closing of Parthenon's acquisition of WPS approached during the final quarter of 2001, Crawford personally provided data regarding WPS's financial condition to Parthenon's representatives.  [See, Crawford deposition transcript, pgs. 150-151 – attached as exh. 3 to Whitney Aff.]

32.     As WPS's COO, Crawford was the senior corporate executive most involved in the day to day operations of the company.  Furthermore, Crawford was the senior WPS executive in charge of corporate finance and accounting and no single WPS employee had a better understanding of the company's cash flow or profitability than Crawford in his capacity as COO.  [See, Crawford deposition transcript, pgs. 98-99 – attached as exh. 3 to Whitney Aff.]

33.     Several WPS employees under Crawford's supervision also provided information regarding WPS's financial condition to Parthenon in late 2001.  [See, Crawford deposition transcript, pgs. 155-158, 161-163, 196-198 – attached as exh. 3 to Whitney Aff.]  These WPS employees included William Crotty and Mark Brown, WPS's Chief Financial Officer.  [Id.]

34.    On December 21, 2001, Crawford obtained a WPS financial statement from WPS employee William Crotty.  [See, Crawford deposition transcript, pgs. 196-198 – attached as exh. 3 to Whitney Aff.; Brown Aff., ¶13; Brown Aff., exh. 2].

35.    An accrual for Crawford's 2001 Bonus is not included on the WPS financial statement Crawford obtained from Crotty on December 21, 2001.  [See, Crawford deposition transcript, pg. 198 – attached as exh. 3 to Whitney Aff.]  Crawford never spoke to Crotty or anyone else at either WPS or Parthenon about the fact that an accrual for his 2001 Bonus was not included in WPS's financial statements as of December 21, 2001.  [See, Crawford deposition transcript, pgs. 200-201 – attached as exh. 3 to Whitney Aff.]

36.    Parthenon's acquisition of WPS closed between December 28 and December 31, 2001.  [See, Complaint, ¶ 16 – attached to Whitney Aff. as exh.1].

37.    By December 28, 2001, the first day of the two-part closing of Parthenon's acquisition of WPS, Crawford fully believed that the terms of Parthenon's acquisition of WPS – specifically, the $10 million in WPS debt forgiveness from Citizens Bank – would result in WPS owing Crawford approximately $573,000 in Bonus compensation for 2001.  [See, Crawford deposition transcript, pgs. 202-203 – attached as exh. 3 to Whitney Aff.]

38.    No accrual for Crawford's 2001 Bonus was included in the accrued payroll portion of the trial balance which was incorporated into the documents governing Parthenon's acquisition of WPS.  [See, Crawford deposition transcript, pgs. 200-201 – attached as exh. 3 to Whitney Aff.]

39.     Neither at any time before nor immediately after the December 31, 2001 final closing of Parthenon's acquisition of WPS did Crawford disclose to anyone at Parthenon or WPS his belief that he was owed approximately $573,000 in Bonus compensation for 2001.  [See, Crawford deposition transcript, pg. 205 – attached as exh. 3 to Whitney Aff.; Kulkarni Aff., ¶ 19].

40.     If, during December 2001, Crawford had disclosed to either WPS or Parthenon his belief that he was owed a $573,000 Bonus for 2001, that fact would have very likely prevented Parthenon from consummating its acquisition of WPS.  [See, Kulkarni Aff., ¶ 20].

41.     In the event Parthenon's acquisition of WPS was not consummated in late December 2001, either Citizens Bank would have continued its action to have a receiver appointed or WPS would have declared bankruptcy.  [See, Crawford deposition transcript, pgs. 168-169 – attached as exh. 3 to Whitney Aff.]  In either event, WPS would not have received the "extraordinary gain" of $10 million in loan forgiveness from Citizens Banks (the basis of Crawford's current Bonus claim) and Crawford would not have executed either his Transition Agreement or his Settlement Agreement.  [See, Crawford deposition transcript, pgs. 203-204 – attached as exh. 3 to Whitney Aff.]

42.     If the Parthenon/Citizens Bank/WPS transaction had not been consummated in late December 2001, Crawford would not have been able to assert his instant 2001 Bonus claims against WPS.  [See, Crawford deposition transcript, pg. 204 – attached as exh. 3 to Whitney Aff.]

### III.    CRAWFORD'S TRANSITION AGREEMENT WITH WPS

43.    On December 28, 2001, in the midst of Parthenon's acquisition of WPS, Crawford signed a Transition Agreement with WPS (the "Transition Agreement"). [See, Transition Agreement – attached as exh. 4 to Kulkarni Aff.]  Kulkarni signed the Transition Agreement on behalf of WPS. [Id.]

44.    The stated purpose of the Transition Agreement was to retain Crawford's services as WPS's COO "to facilitate transitional needs arising from a change of control of the Company." [Id.]

45.    Pursuant to the Transition Agreement, Crawford agreed to "perform such services as may be reasonably requested by the Chief Executive Officer of the Company or its Board of Directors to facilitate the transition of [WPS's] management." [Id.]

46.    Under Section 2 of the Transition Agreement, Crawford's future employment with WPS was limited to a maximum of three months – *i.e.*, until March 31, 2002 at the latest. [Id.]

47.    Section 2 of the Transition Agreement also contained a provision whereby Crawford's future employment with WPS could be terminated prior to March 31, 2002. [Id.] Section 2 states that Crawford's employment with WPS could be terminated prior to March 31, 2002 "for any reason or no reason," which would be effective two weeks after the company's CEO "provides written notice of termination." [Id.]

### IV.    KULKARNI'S JANUARY 2002 STATUS AS CHAIRMAN AND CEO OF WPS

48.    On December 28, 2001, Kulkarni signed a Consulting Agreement with WPS (the "Consulting Agreement). [See, Consulting Agreement – attached as exh. 5 to Kulkarni Aff.]

49.     By virtue of the Consulting Agreement, Kulkarni agreed to assist WPS "in the recruitment and orientation of the new Chief Executive Officer."  [Id]

50.     On December 31, 2001, in connection with Parthenon's acquisition of WPS, each of the five members of the WPS Board of Directors executed an "Action by Unanimous Written Consent of Directors in Lieu of a Meeting of Directors" (the "Unanimous Written Consent").  [See, December 31, 2001 Unanimous Written Consent – attached as exh. 6 to Kulkarni Aff.; Kulkarni Aff., ¶¶ 21-22; accompanying Affidavit of Erik Scott, ¶ 5].

51.     Under the December 31, 2001 Unanimous Written Consent, the entire WPS Board of Directors resolved that "all officers of this Corporation shall be and are hereby removed from office without cause, effective immediately."  [Id.]

52.     Also under the December 31, 2001 Unanimous Written Consent, the entire WPS Board of Directors elected Deepak Kulkarni as WPS's CEO.  [Id.]

53.     On January 10, 2002, a meeting of the WPS Board of Directors was held at the offices of Parthenon Capital.  [See, Kulkarni Aff., ¶ 23].

54.     The minutes from the January 10, 2002 meeting of WPS's Board of Directors contain the following action item:

> The next item of business was to discuss progress on the CEO search.  The directors asked questions related to the potential candidates.  Particular attention was paid to timing and the ability of the different candidates to run Wolverine Proctor & Schwartz.  The directors exchanged their opinions of their interviews with the different candidates.  The directors discussed potential compensation for the CEO.

[See, minutes of January 10, 2002 WPS Board of Directors meeting – attached as exh. 7 to Kulkarni Aff.]

55.    On January 14, 2002, Kulkarni was serving as the CEO of WPS.  [See, Kulkarni Aff., ¶ 27; Scott Aff., ¶ 6].

56.    On January 29, 2002, Steven Chilinski became employed by WPS as the company's new CEO.  [See, Kulkarni Aff., ¶ 24; transcript of Chilinski deposition, pgs. 8-12, attached to Whitney Aff. as exh. 4].

57.    Upon being hired as WPS's new CEO on January 29, 2002, Chilinski took direction from the WPS Board of Directors, including Kulkarni as Chairman of the Board.  [See, transcript of Chilinski deposition, pgs. 8-12, attached to Whitney Aff. as exh. 4].

58.    On February 28, 2002, a meeting of the WPS Board of Directors was held at the company's Merrimac, Massachusetts offices.  [See, Kulkarni Aff., ¶ 26].

59.    According to the meeting minutes, the following official action was taken by the WPS Board of Directors at the February 28, 2002 meeting:

> The next item of business was to remove Deepak Kulkarni as Chief Executive Officer of Wolverine Proctor & Schwartz and install Steven Chilinski as the new Chief Executive Officer.  A motion duly made and seconded, it was:
>
> **VOTED**:    To remove Deepak Kulkarni as Chief Executive Officer and install Steven Chilinski as the new Chief Executive Officer of the company.

[See, minutes of February 28, 2002 WPS Board of Directors meeting – attached as exh. 9 to Kulkarni Aff.]

60.    Subsequent to his official installation as WPS's CEO by the company's Board on February 28, 2002, Chilinski executed his Employment Agreement on March 8, 2002.  [See, transcript of Chilinski deposition, pgs. 8-12, attached to Whitney Aff. as exh. 4].

## V.    CRAWFORD'S JANUARY 14, 2002 TERMINATION FROM WPS

61.    On January 14, 2002, in a series of telephonic conferences, the WPS Board of Directors elected to terminate Crawford's employment as COO of WPS.  [See, Kulkarni Aff., ¶ 28; Brown Aff., ¶¶ 5-12; Scott Aff., ¶ 8].

62.    Later in the day on January 14, 2002, following the WPS Board of Directors' decision to terminate Crawford's employment, Kulkarni, WPS's CEO at the time, asked Mark Brown, then WPS's CFO, to notify Crawford of the Board's decision. [See, Brown Aff., ¶ 11; Kulkarni Aff., ¶ 29].

63.    Brown then verbally informed Crawford that WPS Board and CEO had elected to terminate Crawford's employment.  [See, Brown Aff., ¶¶ 11-12].

64.    After escorting Crawford out of WPS's headquarters, Brown asked WPS Human Resources Manager Carol O'Donohue to draft a letter to Crawford confirming WPS's decision to terminate his employment.  [See, Brown Aff., ¶ 12].

65.    On January 18, 2002, O'Donohue forwarded a letter to Crawford which memorialized and confirmed Crawford's January 14 termination.  [See, Brown Aff., ¶ 12; Brown Aff., exh. 1].

## VI.    CRAWFORD'S DECEMBER 2004 BONUS DEMANDS

66.    On December 2, 2004, Crawford forwarded a letter to Steven F. Chilinski, WPS's CEO, wherein Crawford demanded "approximately $573,000" in Bonus compensation as a result of his 2001 employment with WPS.  [See, Kulkarni Aff., ¶ 30; Kulkarni Aff., exh. 10].

67.    Crawford's December 2, 2004 letter to Chilinski also included a demand for approximately $25,000 that Crawford alleged he was owed in unpaid wages under the Transition Agreement.  [See, Kulkarni Aff., exh. 10].

68.    Crawford's December 2, 2004 letter to Chilinksi represented the first time Crawford asserted to anyone at WPS or Parthenon that he was entitled to a Bonus as a result of his 2001 employment with WPS.  [See, Crawford deposition transcript, pgs. 128 – attached as exh. 3 to Whitney Aff.]

Dated: March 17, 2006

Respectfully submitted,

WOLVERINE, PROCTOR &
SCHWARTZ, INC.,
STEVEN F. CHILINSKI, and
DEEPAK S. KULKARNI

By their attorneys,


/s/ Mark M. Whitney
Mark Whitney (BBO #637054)
Jeffrey D. Kuhn (BBO #662326)
MORGAN, BROWN & JOY, LLP
200 State Street
Boston, Massachusetts   02109
(617) 523-6666

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on March 17, 2006, I filed the foregoing document with the Clerk of the Court by using the ECF system and served an electronic copy upon the plaintiff. I further certify that I mailed the foregoing document and the notice of electronic filing to the pro se plaintiff, Peter A. Crawford, 23 Newcastle Drive, #11, Nashua, NH 03060, by U.S. mail, on March 20, 2006.

/s/ Mark M. Whitney

_____