**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

---

PETER A. CRAWFORD,

        Plaintiff,

v.

WOLVERINE, PROCTOR & SCHWARTZ, INC.,
STEVEN F. CHILINSKI, and
DEEPAK S. KULKARNI,

        Defendants.

Civil Action No.
05-cv-10078 (DPW)

---

## AFFIDAVIT OF DEEPAK S. KULKARNI

DEEPAK S. KULKARNI, being duly sworn deposes and says:

1.      I was the sole stockholder, Chief Executive Officer ("CEO") and Chairman of the Board of defendant Wolverine, Proctor & Schwartz, Inc. ("WPS") throughout 1999, 2000 and most of 2001. I submit this Affidavit in support of Defendants' Motion for Summary Judgment.

2.      In or about December 1999, I asked plaintiff *pro se* Peter A. Crawford to join WPS as the company's Chief Operating Officer ("COO"). Soon thereafter, I entered into employment contract negotiations with Crawford.

3.      On December 27, 1999, Crawford emailed me an initial draft of a proposed employment contract. A copy of Crawford's December 27, 1999 email to me is attached hereto as Exhibit "1".

4.      On January 4, 2000, Crawford and I signed Crawford's Employment Contract (the "Employment Contract"), which provided the terms of Crawford's employment with WPS. A copy of Crawford's January 4, 2000 Employment Contract is attached hereto as Exhibit "2".

5.    Crawford's Employment Contract provided for an annual base salary of $150,000, stock options and an annual bonus (the "Bonus").

6.    Provision 4 of Crawford's Employment Contract, which was drafted completely by Crawford, contained a formula by which any potential Bonus due Crawford was to be calculated.

7.    Crawford's annual Bonus was calculated using the following formula:

$$BONUS = (EBITDA - CAPX - INT - TAXES) \times .05$$

The final version of the Employment Contract included a detailed discussion of the manner by which each of the Bonus formula's capitalized terms were to be derived. The Employment Contract states that "for purposes of [the Bonus] calculation, the [capitalized formula] terms will be calculated based upon the annual consolidated financial results of the Company, in accordance with generally accepted accounting principles."

8.    Notwithstanding the language of Provision 4 of Crawford's Employment Contract, however, at the time I negotiated and signed the Employment Contract I was unaware that it was literally impossible to calculate EBITDA "in accordance with generally accepted accounting principles" because EBITDA is *not* a GAAP defined term.

9.    Likewise, I was unaware at the time I negotiated and executed Crawford's Employment Agreement that "earnings" was not a GAAP defined term.

10.    I did not become aware that "earnings" and "EBITDA" were not GAAP defined terms until after Crawford brought the instant suit.

11.    During the discovery process of this litigation, I learned that Crawford was *still* proceeding from the mistaken assumption that "earnings" was a GAAP defined term.

12.    Despite the manifest absurdity of defining non-GAAP contractual terms "in accordance with generally accepted accounting principles," my intention in negotiating the

"EBITDA" portion of the Bonus calculation was to approximate WPS's annual *cash flow* – excluding changes in the company's working capital and any extraordinary gains.

13.    During the discovery process of this litigation, I have learned that it is Crawford's current position that during our negotiations of his Employment Contract he understood the EBITDA provision of his Bonus calculation was designed to approximate WPS's annual *net income,* which would include extraordinary results unrelated to the usual operations of the company. This was not my understanding. If I knew during our negotiations that Crawford was proceeding from the mistaken assumption that EBITDA was meant to equal WPS's net income (including extraordinary results from non-operating activities), I would never have agreed to sign Crawford's Employment Contract.

14.    In late December 2001 WPS (with myself as the sole shareholder) and a group of investment entities which included Parthenon Investors II, L.P., PCIP Investors and J&R Founders' Fund, L.P. (collectively referred to hereinafter as "Parthenon") entered into an acquisition agreement whereby Parthenon acquired a controlling ownership interest in WPS.

15.    Following Parthenon's acquisition transaction, which closed between December 28 and December 31, 2001, Parthenon controlled a majority of the Board of Directors of WPS. Subsequent to the transaction, I controlled 40% of WPS's Board of Directors.

16.    During the several months leading up to Parthenon's acquisition of WPS, Parthenon retained Pricewaterhouse Coopers ("PWC") to assist Parthenon in conducting due diligence into a purchase of WPS. A copy of PWC's July 30, 2001 final due diligence report on WPS to Parthenon is attached hereto as Exhibit "3".

17.    On December 28, 2001, in the midst of Parthenon's acquisition of WPS, Crawford signed a Transition Agreement with WPS (the "Transition Agreement"). I executed Crawford's

Transition Agreement on behalf of WPS in my capacity as the company's CEO. A copy of Crawford's December 28, 2001 Transition Agreement is attached hereto as Exhibit "4".

18.    On December 28, 2001, I entered into a Consulting Agreement with WPS (the "Consulting Agreement"). A copy of my December 28, 2001 Consulting Agreement is attached hereto as Exhibit "5".

19.    At no point in throughout December 2001 – while WPS was on the brink of either bankruptcy or receivership and in the process of negotiating a potential acquisition by Parthenon – did Crawford disclose to anyone at either WPS or Parthenon that he believed he would likely be due a sizable Bonus for 2001, much less the $573,000 Bonus that Crawford now claims he is due.

20.    Had Crawford disclosed his alleged Bonus entitlement to either WPS or Parthenon during December 2001, that fact would have very likely derailed Parthenon's acquisition of WPS or, at the very least, the parties to the Parthenon transaction would have taken steps to address Crawford's claim as part of the acquisition agreement.

21.    On December 31, 2001, subsequent to Parthenon's acquisition of WPS, the WPS Board of directors consisted of me, Mark Brown, Erik Scott, Ernest Jacquet and John Rutherford.

22.    On December 31, 2001, the other four members of the WPS Board of Directors and I each executed an "Action by Unanimous Written Consent of Directors in Lieu of a Meeting of Directors (the "Unanimous Written Consent"). A copy of the December 31, 2001 Unanimous Written Consent executed by each of the WPS Directors is attached hereto as Exhibit "6".

23.    On January 10, 2002, a meeting of the WPS Board of Directors was held at the offices of Parthenon. A copy of the minutes of WPS's Board of Directors meeting for January 10, 2002 is attached hereto as Exhibit "7".

24.    On January 29, 2002, Steven Chilinski became employed by WPS as the company's new CEO.    A copy of Chilinski's January 29, 2002 Employment Agreement is attached hereto as Exhibit "8".

25.    Upon being hired as WPS's new CEO on January 29, 2002, Chilinski took direction from the WPS Board of Directors, including me as Chairman of the Board.

26.    On February 28, 2002, a meeting of the WPS Board of Directors was held at the company's Merrimac, Massachusetts offices. A copy of the minutes of WPS's Board of Directors meeting for February 28, 2002 is attached hereto as Exhibit "9".

27.    On January 14, 2002, I was serving as WPS's CEO.

28.    On January 14, 2002, in a series of telephonic conferences, the WPS Board of Directors elected to terminate Crawford's employment as COO of WPS.

29.    Once the WPS Board's elected to terminate Crawford's employment, I, in my capacity as WPS's CEO, took steps to ensure that the Board's decision was executed. Thus, later in the day on January 14, 2002, I asked Mark Brown, WPS's Chief Financial Officer, to inform Crawford of the Board's decision.

30.    On December 2, 2004, Crawford forwarded a letter to Steven Chilinski, WPS's CEO, wherein Crawford demanded "approximately $573,000" in Bonus compensation as a result of his 2001 employment with WPS.  A copy of Crawford's December 2, 2004 letter to Chilinski is attached hereto as Exhibit "10".

Signed under the penalties and pains of perjury this 17th day of March 2006.


/s/ Deepak S. Kulkarni
DEEPAK S. KULKARNI

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on his 17th day of March 2006, I filed the foregoing document with the Clerk of the Court by using the ECF system.  I further certify that I mailed the foregoing document and the notice of electronic filing to the pro se plaintiff, Peter A. Crawford, 23 Newcastle Drive, #11, Nashua, NH  03060, by U.S. mail, on March 17, 2006.

/s/ Mark M. Whitney_____
Mark M. Whitney, Esq.

# EXHIBIT 1
# KULKARNI

mailbox://d:/Documents%20and%20Settings/Peter%20Crawford/ns...

**Subject:** Proposed offer letter
**From:** "Peter A. Crawford" <petercra@ix.netcom.com>
**Date:** Mon, 27 Dec 1999 23:20:50 -0500

**To:** Deepakkul@aol.com

Dear Deepak:

Per our conversation this afternoon, I have drafted an offer letter
which I believe encompasses what we discussed.  I'm looking forward to
starting work!

*********

Dear Peter:

We are pleased to offer you the position of Chief Operating Officer for
Wolverine (Massachusetts) Corporation and its wholly-owned subsidiaries,
including but not limited to Proctor and Schwartz Inc. and Wolverine,
Proctor and Schwartz (Glasgow) (collectively, "the Company")   The
following will be the terms of your employment.

   1.  You will report to the Company's Chief Executive Officer and be
based at the Company's Merrimac, Massachusetts headquarters.

   2.  Your employment will commence on December 30, 1999.

   3.  You will be paid a base salary of $150,000 per year, to be paid
ratably on each of the Company's regular paydays.

   4.  You will receive a bonus for each year, commencing 2000, which
will calculated as follows:

          BONUS = (EBITDA - DEPR - CAPX - INT - TAXES) x .05

   For purposes of this calculation, the above terms will be calculated
based upon the annual consolidated financial results of the Company, in
accordance with generally accepted accounting principles, and have the
following meanings:

          EBITDA means the earnings before any interest, taxes or
deductions for depreciation or amortization.  Excluded from EBITDA will
be any non-operating adjustments to reserves, to the extent that those
adjustments affect EBITDA.

          DEPR means depreciation and amortization

          CAPX means capital expenditures, except that the portion
of capital expenditures which the Company expenses for federal income
tax purposes in the year made will be excluded.

          INT means interest payments, net of interest income

          TAXES means imputed taxes (or tax benefit if the
calculation yields a negative number) on the income of the Company,
computed as follows:

             (EBITDA - DEPR - INT) x .45*

*insert actual DSK tax rate here.  Estimate 39.6% federal + 6% state x
.6 (fed benefit) + 2% medicare(?)

   The BONUS calculation will be performed annually, based upon the
consolidated audited financial results of the Company.  The bonus will
be due upon completion of the audit of each year's results, or if no

**PAC0342**

mailbox:///d|/Documents%20and%20Settings/Peter%20Crawford/ns...

such audit is performed, by April 15. In the event that you leave the Company involuntarily prior to the end of any calendar year, the bonus will be prorated for that fiscal year based upon the number of months, or portions of months, during which you were employed, divided by 12, multiplied by the calculated BONUS for that year. For any year in which you were employed by the Company on December 31 you will receive the full bonus without proration. In the event that any bonus calculation yields a negative number, no amount will be due back from you, and no negative calculation can be carried forward or backward from one year to another.

5. You will receive stock options representing 5 percent of the fully diluted number of common shares (prior to issuance of your options) of the Company as of January 1, 2000. The terms of these options will be as follows:

a. The options will fully vest upon the completion of your 24th month of employment with the Company, or upon a change in control, as defined below, whichever occurs first.

b. The striking price of the options will be the fair market value of the underlying stock as of January 1, 2000 as determined by an appraisal conducted by the Company prior to June 30, 2000.

c. Once vested, the options will exist in perpetuity for the benefit of you, your heirs and assigns. However, they may be exercised only upon a change in control of the Company, defined as any event which causes Deepak Kulkarni voluntarily to control less than 50 percent of the then-existing common shares of the Company.

6. In addition to the above, you will be eligible for the normal fringe benefits of the Company, including but not limited to medical benefits, 401(k), vacation, and similar benefits. You will also receive reimbursement of business and travel expenses incurred in connection with your employment in accordance with normal policies and procedures of the Company.

To indicate your acceptance of these terms, please countersign below.

PAC 0343

# EXHIBIT 2
# KULKARNI



EXHIBIT
Plf's # 1
Brou W
Dep 11-3-05

January 4, 2000


Mr. Peter A. Crawford
23 New Castle Drive, Apt. 11
Nashua, NH 03060

Dear Peter:

We are pleased to offer you the position of Chief Operating Officer for Wolverine, Proctor & Schwartz, Inc. (the "Company"). The following will be the terms of your employment.

1.  You will report to the Company's Chief Executive Officer and be based at the Company's Merrimac, Massachusetts headquarters.

2.  Your employment will commence on December 30, 1999.  You will be an employee at will.

3.  You will be paid a base salary of $150,000 per year, to be paid ratably on each of the Company's regular paydays.

4.  You will receive a bonus for each year, commencing 2000, which will calculated as follows:

$$BONUS = (EBITDA - CAPX - INT - TAXES) \times .05$$

For purposes of this calculation, the above terms will be calculated based upon the annual consolidated financial results of the Company, in accordance with generally accepted accounting principles, and have the following meanings:

EBITDA means the earnings before any interest, taxes or deductions for depreciation or amortization.   Excluded from EBITDA will be any non-operating adjustments to reserves, to the extent that those adjustments affect EBITDA, or any operating expenses charged against reserves.

CAPX means capital expenditures, except that portion which the Company has expensed in arriving at EBITDA.

PAC 0001

Wolverine Proctor & Schwartz, Inc.

INT means interest expense, whether or not paid, net of interest income.   TAXES means imputed taxes on the income of the Company, computed as follows:

$$(EBITDA + BOOKDIF - DEPR - INT) \times TAXRATE$$

If the calculation of TAXES yields a negative number, TAXES will be deemed to be zero. No amounts will be carried backward or forward for TAXES.

BOOKDIF means those adjustments, positive or negative, to make EBITDA equal to those earnings before interest, taxes, depreciation and amortization, which are taxable.

DEPR means depreciation, amortization and capital expenditures which are deductible for tax purposes and which have not previously been deducted in arriving at EBITDA.

TAXRATE means (for the year for which the computation is being performed) the maximum U.S. federal income tax rate  applicable to individuals with respect to income attributable to Sub-chapter S of the Internal Revenue Code, plus the maximum Massachusetts tax rate on such income net of the federal tax benefit received, if any, with respect to such Massachusetts tax rate (currently, 1 minus the above-mentioned federal tax rate), plus that portion of federal FICA tax which applies on a marginal basis at all income levels (i.e. Medicare tax or other similar FICA taxes not subject to an annual cap) plus any other taxes on income applicable on a marginal basis to all income levels, which may be later introduced or may apply from time to time.  If the calculation of TAXRATE requires clarification, Arthur Andersen & Company or such other accounting firm nominated to prepare the individual tax returns of the sole shareholder of the Company shall be the binding arbiter of the TAXRATE.

The BONUS calculation will be performed annually, based upon the consolidated audited financial results of the Company.  The bonus will be due upon completion of the audit of each year's results, or if no such audit is performed, by April 15.  In the event that you leave the Company involuntarily, other than for cause (defined as including only dishonesty, disloyalty, conviction for a felony, misappropriation of funds, habitual insobriety, substance abuse, willful misconduct or gross negligence in the performance of your duties), prior to the end of any calendar year, the bonus will be prorated for that fiscal year based upon the number of months, or portions of months, during which you were employed, divided by 12, and the result multiplied by the calculated BONUS for that year.  For any year in which you were employed by the Company on December 31 you will receive the full bonus without proration.  In the event that you leave the company for cause, as defined above, no BONUS will be paid for that year.  In the event that any bonus calculation yields a negative number, no amount will be due back from you, and no negative calculation can be carried forward or backward from one year to another.   If the calculation of BONUS requires clarification, Arthur Andersen & Company or such other accounting firm nominated to prepare the individual tax returns of the sole shareholder of the Company shall be the binding arbiter of the BONUS.

5.  You will receive non qualified stock options representing 5 percent of the fully diluted number of common shares (after issuance of your options) of the Company as of January 1, 2000 (the "Option"). The terms of the Option will be as follows:

   a.  The Option will fully vest upon the completion of your 24th month of employment with the Company, or upon a change in control, as defined below, whichever occurs first.

   b.  The amount per share which you would have to pay upon exercising the Option (the "Strike Price") will be the fair market value per share of the underlying stock as of January 1, 2000 as determined by an appraisal conducted by the Company prior to June 30, 2000, or as otherwise agreed.

   c.  Once vested, the Option shall remain in effect regardless of whether or not you remain employed by the Company. However, the Company shall have the right to call your Option by informing you in writing of its intent to exercise the call within ten days after your separation from the Company for any reason or under circumstances qualifying as a Change in Control (defined under d. below). This call shall be exercised by paying you (for each share underlying your Option), the difference, if any, between the value, as of the end of the fiscal quarter immediately prior to the separation date, of the underlying stock represented by your Option, less the Strike Price, computed in accordance with generally accepted principles of valuation (without considering any discount for the minority nature of the stock underlying the Option) (the "Call Payment"), using the procedure detailed in 6. below.

   d.  The Option may be exercised only upon or after a change in control of the Company, defined as any event which causes Deepak Kulkarni voluntarily to control less than 50 percent of the then-existing common shares of the Company (other than for estate planning purposes and other than in circumstances involving a restructuring of the Company's indebtedness), or an event whereby the Company sells substantially all of its assets other than cash and marketable securities (a "Change in Control"). The Company agrees to give you ten days prior written notice of any Change in Control so as to enable you to decide whether or not to exercise your Option and for you individually to secure financing to do so, if needed. Notwithstanding the foregoing, the Option may not be exercised under circumstances which could cause the Company to lose its status as a Sub-Chapter S corporation.

   e.  The Strike Price and the number of shares on which you have the Option will be subject to the customary proportional adjustments in the event of a stock split or stock dividend (defined as an event which causes additional shares to be issued, without new investment and without affecting the percentage ownership of any shareholder). No adjustment will be made for dividends

Wolverine Proctor & Schwartz, Inc.

paid in cash. The Option will be subject to dilution with respect to any shares, options, warrants or other similar instruments granted to other employees of the Company or to sources of capital in exchange for valuable consideration received.

f.  You will enter into a Stockholder Agreement (in the form attached) ceding control of the shares, other than after a public offering of the Company's shares, or other than in circumstances qualifying as a Change in Control.

6.  The following procedure will be utilized in the event your Option is called pursuant to 5c. above, and you and the Company are unable to agree on the fair market value of the underlying shares:

a.  Based upon the average of appraisals conducted by two independent appraisers qualified in business valuations; one appointed and paid for by the Company, and the other appointed and paid for by you. However, in the event that the ratio of the greater of the appraisals to the lesser exceeds 1.05, the two appraisers shall jointly appoint a third appraiser, the reasonable cost of whom will be equally borne by you and the Company. The valuation arrived at by the third appraiser shall be binding unless the ratio of the third appraisal to the average of the first two is greater than 1.15 or less than .87. Under such circumstances, the highest and lowest value shall be discarded, and the remaining value shall be deemed to be the appraised value.

b.  In the event that an appraisal is required, the Company shall provide such financial statements, financial projections, and other information as any appraiser may reasonably require in order to complete his appraisal; and any statements, projections or other information provided to one appraiser shall be provided to all. The Company may elect to require all appraisers appointed to sign a customary confidentiality agreement.

7.  In the event that the Company elects to call your Option, it may choose either to make the Call Payment in a lump sum, or to immediately issue you an unsecured promissory note. In such event, the promissory note shall provide for five equal principal repayments, paid annually over five years, commencing upon the first anniversary of its issuance. In addition, simple interest of 8 percent per annum of the average principal balance outstanding during the prior year shall be paid annually commencing upon the first anniversary of the note's issuance. Payments of interest or principal under such a note, and all of its terms, will be subordinated, in all respects, to the Company's then outstanding indebtedness, plus any refinancings thereof in any amounts, on terms acceptable to the Company and its then lenders or sources of capital. The Company may cancel and reissue its promissory note to you to comply with any restrictions or subordination arrangements during the life of the promissory note, and you agree to execute an intercreditor agreement so providing, or if you fail to do so within ten business

PAC 0004

Wolverine Proctor & Schwartz, Inc.

days of written request, the Company may execute such an agreement on your behalf.    In the event that the Company becomes insolvent or is the debtor in a bankruptcy case which is not dismissed, the remaining principal balance shall become immediately due and payable.

8.  In addition to the above-mentioned compensation, you will be eligible for the normal fringe benefits of the Company, including but not limited to medical benefits, 401(k), vacation, and similar benefits.    You will also receive reimbursement of business and travel  expenses incurred in connection with your employment in accordance with normal policies and procedures of the Company.

9.  You may elect to join the Company's Board of Directors at any time while you are employed by the Company.  If you do so, the Company will indemnify you in connection with your duties as a director and officer of the Company, on terms at least as favorable to you as the most favorable ones enjoyed by any other director or officer.

To indicate your acceptance of these terms, please countersign below.

Sincerely,

Deepak S. Kulkarni
President and CEO


Accepted by:

Peter A. Crawford


January 4, 2000
Date

PAC 0005

# EXHIBIT 3
# KULKARNI

W01103

PRICEWATERHOUSE COOPERS 🎇

Strictly Private & Confidential

# Project Wolverine

**Draft Report**
**July 30, 2001**

Transaction Services

W01104

# PRICEWATERHOUSE(COOPERS ⚋

PricewaterhouseCoopers LLP
One Post Office Square
Boston, Massachusetts 02109
Telephone (617) 478-5000
Facsimile (617) 478-5900

July 30, 2001

Mr. Erik Scott
Principal
Parthenon Capital
200 State Street, 8 floor
Boston, MA 02109

Dear Erik:

As you requested, we have performed analyses of certain historical financial information and various financial, operating and other data for Wolverine Proctor & Schwartz, Inc. ("the Company") solely to assist you in your evaluation of the Company. According to your instructions, our services have been limited to the work described in our report.

Information with respect to the Company's operations, account balances and accounting and operating procedures purported to be in effect and described in our report was obtained through discussions with certain officers and employees of the Company, discussions with the Company's independent accountants, and observations and analysis made by us during the course of our work.

Our work did not constitute an audit conducted in accordance with generally accepted auditing standards, an examination of internal controls or other attestation or review services in accordance with standards established by the American Institute of Certified Public Accountants ("AICPA"). Accordingly, we do not express an opinion or any other form of assurance on the financial statements of the Company or any financial or other information, or operating and internal controls of the Company.

With respect to prospective financial information relative to the Company referenced throughout this report, we did not examine, compile or apply agreed-upon procedures to such information in accordance with standards established by the AICPA, and we express no assurance of any kind on such information. There will usually be differences between estimated and actual results, because events and circumstances frequently do not occur as expected, and those differences may be material. We take no responsibility for the achievability of the expected results anticipated by the management of the Company.

We make no representation regarding the sufficiency of our work either for purposes for which this report has been requested or for any other purpose. The sufficiency of the work we performed is solely the responsibility of Parthenon Capital ("Parthenon"), as are any decisions with respect to the proposed transaction. Had we been requested to perform additional work, additional matters might have come to our attention that would have been reported to you.

It is understood that this report is solely for the information of Parthenon. This report, or portions thereof, should not be referred or distributed to any other persons or entity, other than Parthenon's legal counsel on this transaction. It is not to be referred to or quoted, in whole or in part, in any registration statement, prospectus, public filing, loan agreement, or other agreement or document without our prior written approval, which may require that we perform additional work.

We appreciate the opportunity to assist you in connection with your due diligence review of the Company. Should you require clarification of any of the matters contained in our report or any further information, we would be pleased to extend our work as you consider necessary.

Yours very truly,

*Draft*

*All dollar amounts are in '000s unless otherwise noted*

# Table Of Contents

| Section | | Page |
|---|---|---|
| 1 | Scope of Our Procedures | 1 - 2 |
| 2 | Quality of Earnings | 3 - 7 |
| 3 | Debt-Like Items | 8 - 11 |
| 4 | Business and Financial Review | 12 - 22 |
| 5 | Employee Benefits | 23 - 26 |
| 6 | Information Technology | 27 - 29 |
| 7 | Taxation | 30 - 33 |
| | Appendices | 34 - 37 |

PRICEWATERHOUSECOOPERS

W01105

W01106

# 1 - Scope of Our Procedures

PRICEWATERHOUSECOOPERS 🅚

Transaction Services

*All dollar amounts are in '000s unless otherwise noted*

# As directed by you, our work focused on financial and accounting, tax, employee benefits and information systems matters.

- **Financial Due Diligence**

  - We visited the Company's offices in Merrimac, MA and reviewed selected financial information provided to us by the Company in response to our information request list. In particular, we concentrated on revenue recognition, quality of earnings, significant balance sheet accounts and significant commitments.

  - We met and held discussions with Deepak Kulkarni (CEO), Peter Crawford (COO), Mark Brown (CFO), Bill Crotty (Cost Accounting Manager), Marian Lord (Accountant), and Sheila Grennon (A/R Supervisor). We also had telephone conversations with Victor Garvie (Finance Director, UK).

  - We read the workpapers prepared by Arthur Andersen LLP (AA), the Company's independent accountants, in support of their audits of the financial statements of the Company for the years ended January 1, 2000 and December 31, 2000. We also held discussions with Bill Tarzia, Audit Manager. Our work did not encompass a review of the workpapers of the AA office in Glasgow, Scotland, which audits Wolverine UK and Friel Engineering.

- **Employee Benefits Due Diligence**

  - We telephonically interviewed Mark Brown, Carol O'Donoghue (HR Manager) and Victor Garvie, with respect to the Company's employee benefit plans.

  - We reviewed selected financial information provided to us by the Company related to its employee benefit plans.

- **Information Systems Due Diligence**

  - As part of our due diligence analysis, we conducted an Information Technology (IT) review of the application systems, development projects and IT organization of the business. Our findings were based on discussions with Mark Brown, Peter Crawford and Gordon Coulter (independent IT consultant for the UK facility). We also reviewed information available on the corporate web sites and documentation provided by management.

  - Our IT review was conducted on-site at the facility in Merrimac, MA and included discussions of the other Wolverine Proctor facilities in Horsham, PA, Fitchburg, MA, Lexington, NC and Chester, UK.

- **Tax Due Diligence**

  - The scope of the work performed is outlined in the respective section of this report, Section 7-Taxation.

*PRICEWATERHOUSECOOPERS* 🔷

W01108

# 2 - Quality of Earnings

PRICEWATERHOUSECOOPERS 🔘

Transaction Services

3

Draft

Section 2 - Quality of Earnings

*All dollar amounts are in '000s unless otherwise noted*

# As a result of our work, we have identified a number of matters that should be considered when evaluating the quality of the Company's earnings.

**Quality of Earnings**

| | Notes | 12m ended Dec, 00 | 5m ended May, 01 |
|---|---|---|---|
| Net income/(loss) | (a) | ($5,011.0) | $147.0 |
| Interest expense | (a) | 1,890.0 | 739.0 |
| Depreciation | (a) | 1,817.0 | 582.0 |
| Amortization | (a) | 1,520.0 | 195.0 |
| Income taxes | (a) | 46.0 | - |
| Minority interest | (a) | 92.0 | - |
| Reported EBITDA | (a) | 354.0 | 1,663.0 |
| | | | |
| Quality of earnings adjustments: | | | |
| Interest and other income | (b) | ($131.0) | ($83.0) |
| Pension income | (d) | (287.0) | (25.0) |
| OPEB income | (c) | (383.0) | - |
| Warranty reserve release | (e) | (502.0) | - |
| Constable reserve release | (f) | (322.0) | - |
| IBNR accrual | (g) | 160.0 | - |
| AA adjustments | (h) | - | [OPEN] |
| Bad debt expense | (i) | - | (25.0) |
| Intercompany profits | (j) | - | - |
| Revenue recognition | (k) | 143.0 | (250.0) |
| | | (1,322.0) | (383.0) |
| Adjusted EBITDA | | ($968.0) | $1,280.0 |
| | | | |
| Other considerations: | | | |
| FX transaction gains/losses | (l) | $37.0 | $4.0 |
| FX translation impact | (m) | - | 24.0 |
| Kulluml compensation | (n) | 2,336.0 | 1,008.0 |
| Minority interest | (o) | - | - |
| OPEB Cash costs | (p) | (72.0) | (72.0) |
| Pension Plan cash costs | (q) | $2,201.0 | $964.0 |

(a) **Reported EBITDA:** The amounts for fiscal year 2000 were derived from the Company's audited financial statements. The amounts for fiscal year 2001 are unaudited and were derived from the Company's internal financial statements.

(b) **Interest and other income:** In its calculation of EBITDA, management includes "interest and other income." Because these amounts represent interest and other non-recurring income amounts, we have excluded them from EBITDA.

(c) **Pension income:** As discussed in the Employee Benefits section, the Company recorded income from its pension plan during 2000. Given that this income is non-cash and is not likely sustainable, we have reversed the impact of this income from EBITDA. The Company has not recorded any income or expense associated with its pension plan during 2001.

(d) **Other Post Employment Benefit ("OPEB") Income:** As discussed in the Employee Benefits section, the Company recorded income from its OPEB plan. Given that this income is non-cash and is not likely to sustainable, we have reversed the impact of this income from EBITDA. Included in this amount in 2000 is approximately $60 that is related to the understatement of the Company's OPEB liability (the $25 in 2001 is the pro rata portion of this amount). The Company has not recorded any income or expense associated with its OPEB plan during 2001.

(e) **Warranty reserve release:** During 2000, the Company released excess warranty reserves into the income statement; reserves that were provided for in prior years. Accordingly, we have reversed the favorable impact of this reserve release from EBITDA.

(f) **Constable reserve release:** Prior to 2000, the Company had established a reserve to cover separation liabilities associated with its former CEO, Phil Constable. The original reserve established was in excess of what was actually paid to Constable and, during 2000, the Company released the excess reserves into the income statement. According, we have reversed the favorable impact of this reserve release from EBITDA.

PricewaterhouseCoopers

W01109

Draft

*All dollar amounts are in '000s unless otherwise noted*

Section 2 - Quality of Earnings

# As a result of our work we have identified a number of matters that should be considered when evaluating the quality of the Company's earnings (continued).

(g) **IBNR accrual:** The Company self-insures itself for medical coverage provided to employees. At both December 31, 2000 and May 31, 2001, it appears that the IBNR (incurred but not reported) reserve for medical claims is overstated by approximately $160 which is a result of over-provisioning during 2000. This adjustment reverses the EBITDA impact of this over-provisioning in the year that it occurred.

(h) **AA adjustments:** While they have been appropriately reflected in the 2000 audited financial statements, the audit adjustments made by AA have not yet been reflected in the Company's YTD May 2001 results. This adjustment reflects the net EBITDA impact of those adjustments. [open: need to have further discussions with the Company and AA. Preliminarily it appears that it will be an addback]

(i) **Bad debt expense:** As discussed in the Business and Financial Review section, we believe that the bad debt expense reported by the Company is likely understated. Based upon historical write-off experience, we have estimated that bad debt expense included in the Company's year-to-date 2001 income statement is understated by $25. Accordingly, we have adjusted EBITDA by this amount.

(j) **Intercompany profit:** As discussed in the Business and Financial Review section, the Company undertakes intercompany sales transactions at cost plus a small margin. In preparing its financial statements, both audited and internal, the Company has not appropriately eliminated the intercompany profit that remains in inventory at each period-end. This potentially could have the effect of overstating or understating reported EBITDA, however, the impact is not likely to be significant. [OPEN - ATTEMPTING TO CONFIRM PRELIMINARY CONCLUSION].

## Quality of Earnings

| | Notes | 12m ended Dec, 00 | 5m ended May, 01 |
|---|---|---|---|
| Net Income/(loss) | (a) | ($5,011.0) | $147.0 |
| Interest expense | (a) | 1,890.0 | 739.0 |
| Depreciation | (a) | 1,817.0 | 382.0 |
| Amortization | (a) | 1,520.0 | 193.0 |
| Income taxes | (a) | 46.0 | - |
| Minority interest | (a) | 92.0 | - |
| **Reported EBITDA** | (a) | **354.0** | **1,663.0** |
| | | | |
| Quality of earnings adjustments: | | | |
| Interest and other income | (b) | (131.0) | (383.0) |
| Pension income | (c) | (287.0) | (25.0) |
| OPEB income | (d) | (383.0) | |
| Warranty reserve release | (e) | (502.0) | |
| Contrade reserve release | (f) | (322.0) | |
| IBNR accrual | (g) | 160.0 | [OPEN] |
| Bad debt expense | (i) | - | (25.0) |
| Intercompany profits | (j) | - | |
| Revenue recognition | (k) | 143.0 | (230.0) |
| | | (1,322.0) | (383.0) |
| **Adjusted EBITDA** | | **($968.0)** | **$1,280.0** |
| | | | |
| Other considerations: | | | |
| FX transaction gains/losses | (l) | $37.0 | $4.0 |
| FX translation impact | (m) | | 24.0 |
| Kulami compensation | (n) | 2,336.0 | 1,008.0 |
| Minority interest | (o) | | |
| OPEB Cash costs | (p) | (172.0) | (72.0) |
| Pension Plan cash costs | (q) | | |
| | | **$2,201.0** | **$964.0** |

PricewaterhouseCoopers

W01110

W01111

Draft

Section 2 - Quality of Earnings

All dollar amounts are in '000s unless otherwise noted

# As a result of our work we have identified a number of matters that should be considered when evaluating the quality of the Company's earnings (continued).

**(k) Revenue recognition:** The Company's revenue recognition policy with respect to large orders is to recognize revenue on a percentage-of-completion basis. However, revenue recognition on that basis begins only once a particular contract is 50% complete. GAAP does not allow for arbitrary thresholds to be set as to when revenue recognition should begin. Therefore, this adjustment represents the EBITDA impact (i.e. the gross margin) of recognizing the appropriate amount of revenue on all contracts that are less than 50% complete, at both the beginning and end of the period. It is important to note that while not technically correct, the Company has consistently applied their revenue recognition policy across all the periods presented.

**(l) FX transaction gains/losses:** Management in the UK indicated that it had used FX hedging in the past but because of the working capital restrictions the Company has been unable to obtain hedging on sales at foreign currencies recently. The majority of the sales in the UK are in UK sterling, but several are in euros, some are in deutschemark, and one is in Danish krona. The Company has incurred foreign exchange transaction losses in the UK of $59, $37 and $4 in FY99, FY00, and the five months ended May 2001 respectively. The Company does not hedge against movements in the US dollar vs. UK sterling.

**(m) FX translation impact:** The Company does not hedge against movements in the US dollar versus the UK sterling. This adjustment represents the impact on EBITDA of the difference in exchange rates used to translate the UK entities' financial statements in 2000 and 2001. After giving effect to this adjustment, the income statements of the UK entities have effectively been translated into US dollars at a constant exchange rate over both periods presented.

## Quality of Earnings

| | Notes | 12m ended Dec, 00 | 5m ended May, 01 |
|---|---|---|---|
| Net Income/(loss) | (a) | ($5,011.0) | $147.0 |
| Interest expense | (a) | 1,890.0 | 739.0 |
| Depreciation | (a) | 1,817.0 | 582.0 |
| Amortization | (a) | 1,520.0 | 195.0 |
| Income taxes | (a) | - | - |
| Minority interest | (b) | 46.0 | - |
| Reported EBITDA | (a) | 354.0 | 1,663.0 |
| | | | |
| **Quality of earnings adjustments:** | | | |
| Interest and other income | (b) | ($131.0) | ($83.0) |
| Pension income | (c) | (287.0) | - |
| OPEB income | (d) | (383.0) | (25.0) |
| Warranty reserve release | (e) | (502.0) | - |
| Constable reserve release | (f) | (322.0) | - |
| IBNR accrual | (g) | 160.0 | - |
| AA adjustments | (h) | - | - |
| Bad debt expense | (i) | - | [OPEN] |
| Intercompany profits | (j) | - | (25.0) |
| Revenue recognition | (k) | 143.0 | (250.0) |
| | (l) | (1,322.0) | (383.0) |
| **Adjusted EBITDA** | | ($968.0) | $1,280.0 |
| | | | |
| **Other considerations:** | | | |
| FX transaction gains/losses | (l) | $37.0 | $4.0 |
| FX translation impact | (m) | - | 24.0 |
| Kulami compensation | (n) | 2,336.0 | 1,008.0 |
| Minority interest | (o) | - | - |
| OPEB Cash costs | (o) | (172.0) | (72.0) |
| Pension Plan cash costs | (o) | - | - |
| | | $2,201.0 | $964.0 |

PRICEWATERHOUSECOOPERS

Draft

All dollar amounts are in '000s unless otherwise noted

# As a result of our work we have identified a number of matters that should be considered when evaluating the quality of the Company's earnings (continued).

(n) **Kulkarni compensation:** As discussed further later in this report, the Company pays significant amounts of compensation to Mr. Kulkarni and pays for certain of his personal expenses as well. This adjustment reflects the net EBITDA impact of the amounts paid to, or on behalf of, Mr. Kulkarni. The adjustment for 2000 is based on actual amounts; the 2001 adjustment is an estimate based on actual amounts through April 2001 (ie. four months). Mr. Kulkarni. *Parthenon will need to offset this by the amounts expected to be paid to Mr. Kulkarni under the terms of his prospective employment arrangement.*

(o) **Minority interest:** Deepak Kulkarni owns 51% of Friel Engineering personally, while the other 49% is owned by the Company. The minority interest expense in the Company's income statement represents Mr. Kulkarni's 51% share of Friel's earnings. Based upon the current proposed structure for the transaction, the entity that Parthenon is investing in will own 100% of Friel; Kulkarni's personal ownership will be eliminated. Accordingly, we have made no adjustment to the Company's calculation of EBITDA. *To the extent that the transaction structure changes and Kulkarni retains his personal ownership interest, his personal share of Friel's earnings should be considered a quality of earnings adjustment.*

(p) **OPEB cash costs:** As discussed further in the Employee Benefits section, the cash costs of providing benefits under the OPEB plan amounted to $172 in 2000. We have estimated the cash costs of the plan in 2001 based upon the costs incurred in 2000 (i.e. 5/12 of $172).

(q) **Pension plan cash costs:** Note that the pension plan is currently on a contribution holiday that we estimate will last until September 2003. At that time, we expect required contributions to the pension plan to approximate $300.

## Quality of Earnings

| | Notes | 12m ended Dec, 00 | 5m ended May, 01 |
|---|---|---|---|
| Net income/(loss) | (a) | ($5,011.0) | $147.0 |
| Interest expense | (a) | 1,890.0 | 739.0 |
| Depreciation | (a) | 1,817.0 | 582.0 |
| Amortization | (a) | 1,520.0 | 195.0 |
| Income taxes | (a) | 46.0 | |
| Minority interest | (a) | 92.0 | |
| Reported EBITDA | (a) | 354.0 | 1,663.0 |
| | | | |
| Quality of earnings adjustments: | | | |
| Interest and other income | (b) | ($131.0) | ($83.0) |
| Pension income | (c) | (287.0) | |
| OPEB income | (c) | (383.0) | (25.0) |
| Warranty reserve release | (d) | (383.0) | |
| Constabo reserve release | (d) | (502.0) | |
| IBNR accrual | (e) | (322.0) | |
| AA adjustments | (f) | 160.0 | |
| Bad debt expense | (f) | | [OPEN] |
| Intercompany profits | (j) | | (25.0) |
| Revenue recognition | (a) | 143.0 | (250.0) |
| | | (1,322.0) | (383.0) |
| | | | |
| **Adjusted EBITDA** | | **($968.0)** | **$1,280.0** |
| | | | |
| Other considerations: | | | |
| FX transaction gains/losses | (l) | $37.0 | $4.0 |
| FX translation impact | (m) | | 24.0 |
| Kulkarni compensation | (n) | 2,336.0 | 1,008.0 |
| Minority interest | (o) | | |
| OPEB Cash costs | (p) | (172.0) | (72.0) |
| Pension Plan cash costs | (q) | | |
| | | $2,201.0 | $964.0 |

PricewaterhouseCoopers

W01112

W01113

# 3 - Debt-Like Items

PRICEWATERHOUSE COOPERS 🌐

8

Transaction Services

*Section 3 - Debt-Like Items*

*All dollar amounts are in '000s unless otherwise noted*

# In addition to the amounts recorded as debt on Wolverine's balance sheet, we have identified several other debt-like liabilities or potential future cash commitments that should be considered in an equity valuation of the Company.

**Debt-Like Items**

| | Notes | May 31,2001 |
|---|---|---|
| Peter Crawford option | (a) | ? |
| Pension plan termination liability | (b) | $1,500.0 |
| OPEB liability | (c) | 2,813.0 |
| Accrued interest | (e) | 368.0 |
| Past due accounts payable | (f) | 3,853.0 |
| UK taxes | (g) | 750.0 |
| Letters of credit | (h) | 1,565.0 |
| Warrants | (i) | ? |
| Multi-employer plan withdrawal liability | (j) | 1,000.0 |
| Restructuring costs | (k) | - |
| **Total debt-like items** | | **$11,849.0** |

(a) **Peter Crawford option:** As discussed in the Employee Benefits section, Peter Crawford was granted non-qualified stock options, representing 5% of the fully-diluted shares of the Company, as part of his employment agreement. It appears that the proposed transaction with Parthenon will trigger the change-in-control provisions of the options, causing them to fully-vest. The Company does have the ability to call the options, for fair value less the strike price (as defined), within 10 days of the change-in-control. The value of these options is unclear in that the strike price was supposed to have been established on the grant date based upon an independent appraisal that appears to never have been done. *Parthenon should ensure these options are appropriately considered in the context of the proposed transaction.*

(b) **Pension plan termination liability:** As discussed in the Employee Benefits section, the Company maintains a defined benefit plan for its employees. Benefits under the pension plan have been frozen, and therefore consideration should be given to terminating this plan. The pension assets are not sufficient to buy out the annuities with an insurance company, and therefore it would cost approximately $1.5 million to terminate the plan. See further discussion in the Employee Benefits section.

(c) **Other Post Employment Benefit ("OPEB") liability:** As discussed in the employee benefits section, the liability related to its retiree medical ("OPEB") plan is unfunded. See further discussion in the Employee Benefits section.

PRICEWATERHOUSECOOPERS

W01114

*Draft*

*All dollar amounts are in '000s unless otherwise noted*

# In addition to the amounts recorded as debt on Wolverine's balance sheet, we have identified several other debt-like liabilities or potential future cash commitments that should be considered in an equity valuation of the Company (continued).

## Debt-Like Items

| | Notes | May 31, 2001 |
|---|---|---|
| Peter Crawford option | (a) | ? |
| Pension plan termination liability | (b) | $1,500.0 |
| OPEB liability | (c) | 2,813.0 |
| Accrued interest | (e) | 368.0 |
| Past due accounts payable | (f) | 3,853.0 |
| UK taxes | (g) | 750.0 |
| Letters of credit | (h) | 1,565.0 |
| Warrants | (i) | ? |
| Multi-employer plan withdrawal liability | (j) | 1,000.0 |
| Restructuring costs | (k) | - |
| **Total debt-like items** | | **$11,849.0** |

(e) **Accrued interest**: The Company incurs interest on its debt with Citizens, as well as the MAWLAW 492 promissory note. This amount represents amounts accrued but unpaid as of May 31, 2001.

(f) **Past-due accounts payable**: Given the Company's cash constraints, for at least the last eighteen months it has actively "stretched" its vendors. This amount represents an estimate of that which the Company would be required to repay all accounts payable that were over 30 days past due as of the end May 2001. To the extent that all accounts in excess of 60 days were to be paid, approximately $3,000 would be required.

(g) **UK taxes**: As discussed in the Taxation section, the Company has a significant amount of exposure related to the failure to file UK tax returns in prior years. Based upon our conversations with AA in the UK, the amount of exposure is estimated at $750.

(h) **Letters of credit**: The Company has 4 letters of credit outstanding, including one taken out on behalf of The Cardwell Machine Company ("Cardwell") for $1.5 million. Cardwell is a company (not consolidated) that is 100% owned by Kulkarni personally.

PRICEWATERHOUSE COOPERS

10

W01115

W01116

Draft

*Section 3 - Debt-Like Items*

*All dollar amounts are in '000s unless otherwise noted*

# In addition to the amounts recorded as debt on Wolverine's balance sheet, we have identified several other debt-like liabilities or potential future cash commitments that should be considered in an equity valuation of the Company (continued).

(i) **Warrants:** [OPEN:Awaiting copies of the warrant agreements]

(j) **Multi-employer withdrawal liability:** As we understand it, the closing of the ATM division is currently being contemplated. The closure of this division will trigger a withdrawal from the union pension plan (IAM National Pension Fund). The liability associated with this withdrawal may be significant, potentially up to $1 million. See further discussion in the Employee Benefits section.

(k) **Restructuring costs:** During 1999 and 2000, the Company has taken a number of actions to restructure its business. The Company has represented that all restructuring costs were paid prior to May 2001.

### Debt-Like Items

| Debt-Like Items | Notes | May 31, 2001 |
|---|---|---|
| Peter Crawford option | (a) | ? |
| Pension plan termination liability | (b) | $1,500.0 |
| OPEB liability | (c) | 2,813.0 |
| Accrued interest | (e) | 368.0 |
| Past due accounts payable | (f) | 3,853.0 |
| UK taxes | (g) | 750.0 |
| Letters of credit | (h) | 1,565.0 |
| Warrants | (i) | ? |
| Multi-employer plan withdrawal liability | (j) | 1,000.0 |
| Restructuring costs | (k) | - |
| **Total debt-like items** | | **$11,849.0** |

PRICEWATERHOUSECOOPERS 🅻

11

W01117

# 4 - Business and Financial Review

PRICEWATERHOUSE COOPERS 🏢

Transaction Services

*12*

W01118

Draft

Section 4 - Business and Financial Review

All dollar amounts are in '000s unless otherwise noted

# Deepak Kulkarni withdraws a significant amount of cash from the Company in a variety of methods. Prospectively, Kulkarni's employment arrangement and the transaction documents should clearly articulate what he and his family is entitled to.

- **W-2 compensation:** In addition to salary and bonuses, the Company covers the costs of several of Deepak Kulkarni's personal expenses, including his maid, personal driver and chef, all of whom are on the Company's payroll. Management has represented that such costs are included in Mr. Kulkarni's W-2.

- **Estimated personal professional fees:** In addition to the expenses paid above, Management estimated that personal attorney, accounting, and other expenses paid for Mr. Kulkarni amounted to approximately $300 in FY00 and $120 for the 4 months ended April 2001. Such costs are not included in Mr. Kulkarni's W-2.

- **Mandakini Kulkarni:** Mandakini Kulkarni, Mr. Kulkarni's mother, is included on the payroll at approximately $6 per year plus benefits.

- **Health insurance:** Insurance charges for Mr. Kulkarni cover his immediate family as well as additional family members.

- **DSK management fee:** The Company has a management agreement with DSK Management Corp. (DSK), an entity wholly owned by Mr. Kulkarni, that requires the Company to pay DSK $200 per year in its first year, which was 1991, with an escalation of $50 per year throughout the term of the contract. The initial term was 5 years plus a 5 year renewal that was exercised. DSK waived its fee for each year of the contract. *Parthenon should ensure this contract is appropriately considered as part of the proposed transaction.*

- **Friel management fees:** In the UK, Friel pays a management fee to Mr. Kulkarni. *Parthenon should ensure this contract is appropriately considered as part of the proposed transaction.*

- **Cardwell letter of credit fees:** In 2000 the Company paid costs related to a $1.5 million standby letter of credit issued on behalf of Cardwell, a company wholly-owned by Mr. Kulkarni.

## Mr. Kulkarni's Expenses

| | 12m ended Dec, 00 | 4m ended April, 01 |
|---|---|---|
| Salary, bonuses and personal expenses on W-2 | $ 1,658.0 | $ 504.0 |
| Health Insurance | 80.0 | 47.0 |
| Payroll taxes, 401k | 40.0 | 17.0 |
| Mandakini Kulkarni | 6.0 | 2.0 |
| DSK Management Fee | – | – |
| Friel Management Fee | 252.0 ? | 116.0 ? |
| Cardwell letter of credit fees | [open] | [open] |
| Estimated personal professional fees | 300.0 | 120.0 |
| **Total** | $ 2,336.0 | $ 806.0 |

Source: Management prepared analysis

PRICEWATERHOUSECOOPERS 🏛

W01119

*Draft*

Section 4 - Business and Financial Review

*All dollar amounts are in '000s unless otherwise noted*

# The performance of the ATM division has declined significantly in 2000 and 2001 and is well behind budget for 2001. It is also a cash drain. Further consideration should be given as to whether this division is strategically important.

- **Overview:** The Company's ATM division is in the business of selling and repairing "rolls", primarily to the pulp & paper industry. The table at the right presents sales, gross margin and EBITDA for the Company's ATM division. The Company's performance in each of these metrics has deteriorated significantly from 1999. Management partially attributed the decline to the loss of the ATM CEO, who apparently was very well respected in the industry, in early 2000.

- **Current year trend:** As indicated, the Company's current year performance is well under budget, and management is not forecasting improvement for the remainder of the year. Management indicated that the ATM division has a negative cash flow of approximately $35 per month.

- **Strategic view:** As we understand it, management has begun considering whether the ATM division should be shut down. We believe that such an assessment is appropriate.

- **Potential closure costs:** The Company's assessment as to the costs and benefits of closing the ATM business should obviously include all costs of doing so, and should consider specifically those that may arise from the employment of union individuals. In addition to potential costs to terminate union and other employee contracts, the closure of the division will trigger a withdrawal from the union pension plan (IAM National Pension Fund). *The liability associated with this withdrawal may be significant, potentially up to $1 million.* See further discussion in the Employee Benefits section.

## ATM Results

| ACTUAL | 12m ended Dec. 99 | 12m ended Dec. 00 | 5 m ended 37,012.0 |
|---|---|---|---|
| Sales | 3,131.0 | 1,710.0 | 500.0 |
| COGS | 2,415.0 | 1,606.0 | 446.0 |
| Gross Margin | 716.0 | 104.0 | 54.0 |
| Gross Margin % | 23% | 6% | 11% |
| EBITDA | 236.0 | (265.0) | (102.0) |
| EBITDA plus depreciation in COGS | 356.0 | (158.0) | (62.0) |
| | | | |
| **BUDGET** | | | |
| Sales | 3,620.0 | [open] | 780.0 |
| COGS | 2,638.0 | [open] | 576.0 |
| Gross Margin | 982.0 | [open] | 204.0 |
| Gross Margin % | 27% | [open] | 26% |
| EBITDA | 471.0 | [open] | (13.0) |
| EBITDA plus depreciation in COGS | 607.0 | [open] | 29.0 |

*Source: System-generated income statement by division.*

14

PRICEWATERHOUSECOOPERS

W01120

Draft

*All dollar amounts are in '000s unless otherwise noted*

*Section 4 - Business and Financial Review*

# Accounting related to revenue recognition appears to be consistently applied in the US and UK and across periods, but is not strictly in line with GAAP.

## Revenue Analysis

|  | 12m ended Dec,99 | 12m ended Dec,00 | 5m ended May,01 |
|---|---|---|---|
| Wolverine MA | $10,779.0 | $20,244.0 | $6,542.0 |
| ATM | 3,131.0 | 1,710.0 | 500.0 |
| Proctor | 28,114.0 | 13,068.0 | 5,272.0 |
| Pollution Control | 6,444.0 | 0.0 | 0.0 |
| Friel | 2,288.0 | 2,324.0 | 968.0 |
| Wolverine UK | $17,406.0 | $10,526.0 | $5,823.0 |
|  | $68,162.0 | $47,872.0 | $19,105.0 |
| Less interco sales | -$4,133.0 | -$4,005.0 | -$2,057.0 |
| Total sales | $64,029.0 | $43,867.0 | $17,048.0 |
|  |  |  |  |
| **Wolverine MA breakdown:** |  |  |  |
| Conveyors and other LO | $0.0 | $13,915.0 | $2,109.0 |
| Jetzone | 9,138.0 | 5,192.0 | 4,380.0 |
| Miscellaneous | 0.0 | 0.0 | 53.0 |
| Dust collection | 1,491.0 | 1,002.0 | 0.0 |
| Royalty Income | $150.0 | $135.0 | $0.0 |
|  | $10,779.0 | $20,244.0 | $6,542.0 |
|  |  |  |  |
| **Wolverine UK breakdown:** |  |  |  |
| Large orders | $15,718.0 | $8,732.0 | $5,186.0 |
| Spare parts | $1,688.0 | $1,794.0 | $637.0 |
|  | $17,406.0 | $10,526.0 | $5,823.0 |

*Source: Adjusted consolidating FS in AA w/ps and system-generated statements by division.*

- **Revenue recognition:** The Company uses the percentage of completion method of accounting for its large order sales, while small orders and repairs are recognized when shipped or performed. The methodology followed in the percentage of completion accounting appears in accordance with GAAP, except that the Company does not recognize any revenue on contracts until they are at least 50% complete. GAAP requires a determination of completeness and recognition of that portion of revenues and costs at each balance sheet date regardless of the percentage complete. The net effect on gross margin of such lag for contracts outstanding at the beginning and end of each period for both the US and UK operations is included in the quality of earnings analysis in this report. In addition, using full percentage of completion would result in a net increase in revenue in FY00 of $180, and a net decrease in revenue for the 5 months ended May 2001 of $594.

- **Year to date Jetzone sales trends:** Year-to-date June 2000, Wolverine MA had taken orders for 10 Jetzones, totaling $6.6 million in contract value, while June 2001 Wolverine MA has not taken any Jetzone orders. Management attributed this to timing and cycles in the market, and notes that a few orders are in negotiations now, including one for $1.6 million with US Tobacco. However there is no assurance that such orders will be finalized, or that Jetzone orders in the US in 2001 will reach 2000 levels. In the UK  3 orders have already been received in FY00 versus 2 orders received in all FY00. *Parthenon should further consider these Jetzone sales trends as part of its business due diligence.*

- **Maintenance agreements:** Management has represented that there are no maintenance agreements. This may be a source of revenue and cash flow to consider in the future.

PRICEWATERHOUSECOOPERS

*Draft*

*All dollar amounts are in '000s unless otherwise noted*

# During the later part of 2000, Kraft cancelled two orders previously placed. Consideration should be given to discussing with Kraft the reasons therefor.

- **Cancelled Orders:** During the course of our work, we noted that certain jobs have been cancelled after a job number has been assigned. The reasons for the cancellations should be determined to ensure that the relationship with such customers remains strong for future orders. For example, Kraft Foods, which had accounted for approximately $600 in sales for each of 1998 through 2000 at an average 35.7% margin, cancelled two orders placed in late 2000 and had not placed another order through June 2001. The Company's list of orders turned down in 2000 includes two large from Kraft, which management represents are in addition to the cancelled orders. Given the size and reputation of Kraft, the margins on the work done with them in the past, and their consistent purchases from the Company over the last three years, an ongoing relationship is important to the Company. *Parthenon should consider interviewing Kraft as part of its business diligence and, in particular, discussing with them the aforementioned orders.*

- **Warranty period:** The warranty period is typically one year from acceptance of the equipment, however each contract is negotiated separately so the terms may vary. In the UK there is at least one contract that has a two year warranty period. The Company maintains reserves for warranty and such reserves appear to be adequate based on the Company's historical experience (see quality of earnings analysis).

## Revenue Composition

| | 12m ended Dec, 99 | 12m ended Dec, 00 | 5 m ended May, 01 |
|---|---|---|---|
| **Entire Company:** | | | |
| Large Orders | $32,791.0 | $27,274.0 | $11,675.0 |
| Small Orders/Other | 31,238 | 16,593 | 5,373 |
| | $64,029.0 | $43,867.0 | $17,048.0 |
| Large Orders | 51.2% | 62.2% | 68.5% |
| Small Orders/Other | 48.8% | 37.8% | 31.5% |
| | 100.0% | 100.0% | 100.0% |
| **Wolverine MA only:** | | | |
| Large Orders | | $20,109.0 | $6,499.0 |
| Small Orders/Other | | 135 | 53 |
| | | $20,244.0 | $6,542.0 |
| Large Orders | | 91.6% | 99.2% |
| Small Orders/Other | | 8.4% | 0.8% |
| | | 100.0% | 100.0% |
| **Wolverine UK only:** | | | |
| Large Orders | $15,718.0 | $8,732.0 | $5,186.0 |
| Small Orders/Other | 1,688 | 1,794 | 637 |
| | $17,406.0 | $10,526.0 | $5,823.0 |
| Large Orders | 90.3% | 83.0% | 89.1% |
| Small Orders/Other | 9.7% | 17.0% | 10.9% |
| | 100.0% | 100.0% | 100.0% |

*Source: Adjusted consolidating FS in AA w/ps and system-generated statements by division.*

16

PRICEWATERHOUSECOOPERS ▣

W01121

W01122

*Draft*

Section 4 - Business and Financial Review

All dollar amounts are in '000s unless otherwise noted

# Accounts receivable levels are down from prior years, reflecting the decline in sales. At May, 2001 the aging has improved in relation to December, 2000.

- **Overall movement:** The Company's accounts receivable balance has decreased by $4.8 million, or 48%, from December 1999 to May 2001. The decrease is consistent with the decrease in sales over this period, as well as what management has described as improved controls in collecting amounts outstanding.

- **Aging profile:** As the aging indicates, at May 2001 there has been improvement from prior years. This improvement is driven by the collection of small order receivables that are typically more difficult to collect. Management has attributed that to the improved collection controls around small orders that were implemented in late 2000. At May 2001 the aging for Proctor has improved with only 25% of P&S receivables over 90 days at May,2001, versus 54% as of December, 2000. The most significant balance outstanding is for $132 for Universal Blanchers.

- **Days Sales Outstanding (DSO):** The collection days has improved from FY99 to YTD01 with 57.2, 54 and 46.5 DSO for December 99, December 00 and May 01, respectively.

- **Credit terms:** For small orders a base line credit limit of $25 is given to all accounts. Credit references are requested for all small order customers with an order in excess of $5. Credit terms on large orders are negotiated on a contract-by-contract basis.

## Accounts Receivable Aging

| $ in millions | Current | >30 | >60 | >90 | Total |
|---|---|---|---|---|---|
| **December, 99** | | | | | |
| Receivables | 7.0 | 0.9 | 0.6 | 1.3 | 9.8 |
| % | 71.4 | 9.2 | 6.1 | 13.3 | 100.0 |
| **December, 00** | | | | | |
| Receivables | 3.9 | 0.8 | 0.2 | 1.4 | 6.3 |
| % | 61.9 | 12.7 | 3.2 | 22.2 | 100.0 |
| **May, 01** | | | | | |
| Receivables | 2.8 | 1.6 | 0.1 | 0.7 | 5.2 |
| % | 53.8 | 30.8 | 1.9 | 13.5 | 100.0 |

Note: The Company's aging reports do not agree directly to the reported amount in the Company's financial statements as it does not include reserve or other receivables.

*Source: Management provided aging reports*

*Draft*

*All dollar amounts are in '000s unless otherwise noted*

# Management believes that the total reserve against receivables is adequate to cover its exposure to bad debts. This assertion does not appear unreasonable.

- **Reserve methodology:** The Company's method for reserving for bad debts is subjective. At each period-end, management reviews the receivable agings with a view towards ensuring that the reserves maintained are adequate.

- **Write-off policies:** Management represented that accounts are not written-off until determination is made that either the customer account is not collectible, or collection costs exceed the value of the outstanding liability.

- **Reserve movements:** The large bad debt provision in 1999 is largely related to charges taken in connection with the 1999 restructuring. The write-offs in 2001 relate primarily to Cardwell ($204), a related party, Tingyi International Company ($165), and Seven Management ($60) and represent primarily pre-1999 sales.

- **Bad debt expense:** As the table on the right indicates, the bad debt expense recorded by the Company in 2001 appears to be somewhat lower than amounts recorded in the prior years. As a result, we believe that the bad debt expense is likely understated. Excluding the impact of the restructuring related provision in 1999, we estimate that the understatement approximates $25. We have included this adjustment in our quality of earnings analysis.

- **Balances in dispute:** Management indicated that approximately $30 of receivables are with the collection agency and an additional $273 are in dispute. The main balances in dispute are Universal Blanchers of $132, Basic American Foods of $57 and Domco Tarquet of $40.

- **Adequacy of bad debt reserve:** At May, 2001 receivables over 90 days amount to approximately $700 while the bad debt reserve is approximately $500. Included in receivables over 90 days is $134 for Universal Foods, which was collected in June, 2000. Management believes that the total reserve against receivables is adequate to cover its exposure to bad debts. This assertion does not appear unreasonable.

## Roll-Forward of A/R Reserve

| | 12m ended Dec, 99 | 12m ended Dec, 00 | 5m ended May,01 |
|---|---|---|---|
| Opening Balance reserve | 391.0 | 955.0 | 983.0 |
| Provision | 593.0 | 112.0 | 25.0 |
| Write Offs | (29.0) | (84.0) | (540.0) |
| Closing Balance reserve | 955.0 | 983.0 | 468.0 |
| | | | |
| Write-off directly to P&L * | 75.0 | 87.0 | 0.0 |

\* These amounts represent balances due from Cardwell, a related company owned 100% by Kulkarni.

*Source: Management provided schedule*

PRICEWATERHOUSECOOPERS

18

W01123

All dollar amounts are in '000s unless otherwise noted

# Inventory reserve levels have remained consistent over time, and they appear adequate.

- **Inventory Costing:** WIP inventory is composed of labor, materials and overhead. Both labor and materials are valued at standard rates. The labor rate reflects labor hours and overhead (240% of labor costs), and different rate are used for the engineering and manufacturing processes. The rates in Wolverine have not changed since pre 1998, however, management prepared analysis to support these rates. Proctor rates increased in October, 2000 to bring them in line with Wolverine, and with actual costs.

- **Pre-sales costs in inventory:** No costs are charged to a job until there is a job number, which is generated upon the receipt of a signed purchase order or contract. While under GAAP these costs related to successful sales may be accumulated and charged to the job (or else accumulated and collected in the overhead bucket), the Company includes all costs of the engineering department in the overhead bucket. Thus gross margin is understated to the extent that costs related to unsuccessful efforts have been included. Also, as the costs are spread to all jobs through the overhead load, the gross margin on a job that required an exceptionally large amount of pre-sales engineering costs would be charged with less costs using an overhead load than it might have if all its costs were charged directly to the job.

- **Reserve Methodology:** Throughout the year, management provides $5 a month for inventory reserve. In addition, at year end management take the previous 12 months of usage and determines the "annual usage" for each item. Based on the number of years-on-hand usage a reserve is calculated as follows: 33%, 67% and 100% for 1 to 2 years, 2 to 3 years and over 3 years, respectively. Management believes that this is a very conservative approach. Their assertion does not appear unreasonable.

- **Write-offs:** In 2000, approximately 475 in obsolete inventory was written off against the reserve. Most of the inventory was greater than 3 years old.

- **Inventory counts:** Inventory counts of finished goods are completed in the US at year end with no significant issues noted by AA. In the UK there is no inventory system due to the small amount of raw material on hand.

## Inventory Composition

|                      | Dec,99    | Dec,00    | May,01    |
|----------------------|-----------|-----------|-----------|
| Raw materials        | $2,211.0  | $2,171.0  | $2,057.0  |
| Work in progress     | 2,747.0   | 2,186.0   | 1,832.0   |
| Finished Goods       | 391.0     | 16.0      | 201.0     |
| Total before reserve | 5,349.0   | 4,373.0   | 4,090.0   |
| Reserve              | (949.0)   | (996.0)   | (509.0)   |
| Total Inventory      | $4,400.0  | $3,377.0  | $3,581.0  |

Note: May,01 does not include the AA audit adjustment for $522 which would increase the reserve to $1 million

## Aging of Inventory used in Reserve calculation in FY00

| FY00              |         |        |       |        |          |
|-------------------|---------|--------|-------|--------|----------|
| Proctor Inventory | $821.9  | $96.5  | $40.1 | $963.5 | $1,922.0 |
| %                 | 43%     | 5%     | 2%    | 50%    |          |
| Wolverine         |         |        |       |        | 131.0    |
| Wolverine(UK)     |         |        |       |        | 118.0    |
| Total             |         |        |       |        | $2,171.0 |

Note: Management only prepares inventory aging at year end

Source: Management prepared schedules

PRICEWATERHOUSECOOPERS ▪

19

W01124

*Draft*

*All dollar amounts are in '000s unless otherwise noted*

# As evidenced by the aging, the Company has stretched payables as a result of its cash constraints. A significant portion of the proceeds from this transaction will need to be used to bring the balances current.

- **Payables management:** The Company's cash flow difficulties have required it to manage its payables very aggressively, and "stretch" its vendors. Generally, the Company pays its vendors in the following order: (1) ensure that payroll can be and is fully-funded; (2) other vendors that can "shut the business" down should be paid next, e.g. electricity, taxes, etc; (3) material and other production-related vendors are paid next, depending on the specifics of the contracts and customers for which they are needed; and (4) others. Management indicated that certain vendors were clearly unhappy with the Company's practices. However, they represented that there has been no irreparable harm done to its vendor relationships in either the US or UK and expect those relationships to return to normal once they are paying on terms.

- **General terms:** Management indicated that, historically, standard payment terms with its vendors were net 30 days.

- **UK Aging:** Management represented that the working capital restriction has resulted in payables being extended. Management represented that, at July 13, 2001, approximately 47% of total payables are greater than 60 days. Credit terms are now generally 60 days for the UK company.

## Aging of Trade Payables

| $ in Millions | Current | 1-30 | 31-60 | 60+ | Total |
|---|---|---|---|---|---|
| **December, 99** | | | | | |
| Trade Payables | 0.8 | 1.3 | 1.3 | 1.1 | 4.5 |
| % | 16.3% | 26.5% | 26.5% | 22.4% | 91.8% |
| **December, 00** | | | | | |
| Trade Payables | 0.9 | 1.1 | 0.8 | 2.1 | 4.9 |
| % | 18.4% | 22.4% | 16.3% | 42.9% | 100.0% |
| **May, 01** | | | | | |
| Trade Payables | 0.4 | 0.6 | 0.7 | 2.2 | 3.9 |
| % | 10.3% | 15.4% | 17.9% | 56.4% | 100.0% |

Note: This aging excludes Friel and Wolverine (UK) due to limitations on the UK system

Source: Management's aging reports

20

PRICEWATERHOUSECOOPERS

W01125

All dollar amounts are in '000s unless otherwise noted

Draft

W01126

# Transactions between the Company's divisions are undertaken primarily at costs plus a small margin. This pricing policy "transfers" margin to the entities making the final sale.

## Intercompany sales

| $ In Millions | 12m ended Dec, 00 | 5m ended May,01 |
|---|---|---|
| Proctor to Wolverine (UK) | 0.4 | 0.5 |
| Proctor to Wolverine | 1.3 | 0.5 |
| Friel to UK | 2.3 | 1.0 |

*Source: Management prepared schedule*

- **Proctor to Wolverine (UK):** These sales relate to parts sent to the Wolverine (UK). These sales are made and eliminated at cost, thus there is no effect on gross margin.

- **Proctor to Wolverine MA:** These sales relate to sub-assembly parts that are then assembled at Wolverine MA. It also relates to field services carried out by Proctor for large order products. The parts sales are charged at cost plus freight, which is intended to be approximately 6%.

- **Friel to Wolverine (UK):** These sales relate to a charge to Wolverine in order to covers costs of manufacturing and assembly for products that are sold through Wolverine (UK). These costs are charged at cost plus a margin that is intended to be approximately 10%.

- **UK product flow:** Proctor sells parts to Wolverine (UK). These parts are sent to Friel for manufacturing and assembly and are then shipped on to customers. Friel is considered a cost center by management and the sales recognized on Friel's books relate to the labor hours and costs incurred by Friel. The raw material shipped from Proctor and work in progress remain on the Wolverine (UK) books.

- **Intercompany profit in inventory:** As indicated in the discussion above, the Company undertakes intercompany sales transactions at cost plus a small margin. In preparing its financial statements, both audited and internal, the Company has not appropriately eliminated the intercompany profit that remains in inventory at each period end. This potentially could have the impact of overstating or understating reported EBITDA, however, the impact is not likely to be significant. [OPEN - ATTEMPTING TO CONFIRM PRELIMINARY CONCLUSION].

PRICEWATERHOUSECOOPERS

*Draft*

*All dollar amounts are in '000s unless otherwise noted*

# Other miscellaneous observations

- **Capital expenditures:** Total capital expenditures have decreased significantly over time, from $1,670 in 1999 to $214 in 2000, and that trend appears to have continued through May 2001 ($62). Based on analyses provided to us by management, it appears that most of the expenditures during this time have not been related to production. Further, management in the UK has indicated that the production equipment in the UK is very old. *These observations could suggest that the Company has, over-time, under-invested in its production capacity.* Budgeted capex for 2001 is $370.

- **Leases:** The Company leases only its Horsham facility under a long-term lease, for which the rent will be approximately $240 per year through 2007. The leases in the UK are at will. The Company owns its other locations.

- **Sale of Pollution Control business in 1999:** We were not provided with the Purchase and Sale agreement related to the sale of the PC business. *Legal diligence should include a review of the transaction document to ensure there are no contingencies outstanding.* In addition we noted four contracts initiated subsequent to the sale of the PC business that seem to be for pollution control equipment. *Legal diligence should ensure there are no non-compete issues relative to these contracts.*

- **Promissory note to MAWLAW 492:** The Company has an outstanding note payable in the amount of $1 million to MAWLAW 492, a company that is 100% owned by Kulkarni. This note was issued by the Company in connection with a $1million loan to the Company from MAWLAW 492. The loan discussed above was financed by MAWLAW 492 via a $1 million loan that Friel Engineering (49% owned by Company; 51% owned by Kulkarni) made to MAWLAW 492. This promissory note receivable is recorded as a prepaid assets on the Friel Engineering financial statements. From a consolidated balance sheet perspective these amounts eliminate. *However, Parthenon should ensure that these loans are forgiven and cancelled as part of the proposed transaction.*

- **Royalty agreement:** A licensing agreement between the Company and Arakawa Engineering Works Co., Ltd. of Nagoya, Japan dated June 2, 1998 grants an exclusive license to Itochu Corporation to manufacture and sell the Company products in Japan and allows Itochu to export the Company products to certain countries in southeast Asia. In return the Company is entitled to a royalty of 5% of the net sales price of all products sold and delivered, or a minimum of $150 per year. The agreement is in effect from January 1, 1998 through December 31, 2002, with automatic extensions through 2007 unless either party notifies the other in writing. Arakawa has paid the minimum $150 for each the first three years of the contract, but no additional amounts, suggesting that net sales have been less than $3 million per year. The Company has not been able to obtain the annual report of sales as required by the contract to determine the actual level of sales. Post transaction, consideration should be given to:

  – (i) auditing the sales levels to ensure that the appropriate amount of royalties are being paid; and

  – (ii) evaluating whether this arrangement maximizes the Company's penetration in these markets.

- **FX translation:** The UK reports its monthly results in US dollars, having first remeasured any transactions denominated in a currency other than the UK sterling before finalizing the UK books. Before entering the monthly UK results into the Macola accounting system in Merrimac, the staff accountant translates the UK P&L results into US dollars using the exchange rate on the last day of the month. This method is acceptable under GAAP. Accounts other than fixed assets, intercompany, and equity are translated at the ending rate as well, with the net going to the cumulative translation adjustment account in equity. Such adjustments were $27 and $38 for FY99 and FY00 respectively.

22

PRICEWATERHOUSECOOPERS

W01127

W01128

# 5 - Employee Benefits

PRICEWATERHOUSECOOPERS

Transaction Services

23

W01129

Draft

*All dollar amounts are in '000s unless otherwise noted*

Section 5 - Employee Benefits

# Employee benefit plans

- **Benefit plans:** A summary of benefit plans is set out in Appendix A

- **Employees:** Wolverine, Proctor & Schwartz has approximately 80 in North Carolina, 80 in Massachusetts, 30 in Pennsylvania, 33 at WPS UK and 36 at Friel, UK.

- **Collective Bargaining Agreements:** In the US, the workforce at American Tool & Machine ('ATM') Division in Fitchburg, MA (approximately 11 employees) is represented by the International Association of Machinists and Aerospace Workers AFL–CIO, Local Lodge 1376, District Lodge No. 38. Management represented that relations with unions were good, with no labor disputes in recent history.

    – The Company makes contribution to the I.A.M. National Pension Fund (a multiemployer plan) on behalf of employees in the bargaining unit. The contributions were $37 and $51 for fiscal 2000 and 1999, respectively.

    – We understand that the Company is contemplating the shut down of 'ATM' Division. This shutdown will result in withdrawal from the multiemployer plan. If the multiemployer plan is underfunded, a withdrawal liability will be assessed. The multiemployer plan was not underfunded as at January 1, 2000. However, due to poor market performance, it is is not clear whether or not the plan has any underfunding as of July 2001. The liability associated with this withdrawal may be significant, potentially up to $1 million.

- **Group Insurance - US:** The company provides group insurance benefits that are typical of most US companies including medical, dental, and life insurance benefits. The medical and dental benefits for employees in North Carolina. and Massachusetts are self-insured. All other plans are fully insured. Program design and company cost sharing varies by division.

    – The US medical plan costs are quite high. The expected self-insured average costs for 2001 are $4 for single coverage and $11 for family. US medical trend rates have been high (10% to 15% nationally for similar plans).

    – In the US, the company pays roughly 90% of the cost of medical at the Massachusetts and North Carolina locations which is above competitive levels. If these locations were to reduce its cost sharing to 80%, we estimate that the company could reduce its annual medical expense by roughly $100.

PRICEWATERHOUSECOOPERS

Draft

PRICEWATERHOUSECOOPERS ⊕

Section 5 - Employee Benefits                                                                                                      *All dollar amounts are in '000s unless otherwise noted*

# Pension Plan

- **Proctor & Schwartz Pension Plan(US):** The Proctor & Schwartz Pension Plan is a defined benefit plan that was frozen effective December 31, 1997. The Pension plan had a $2.4 million surplus on a US GAAP basis as at January 1, 2000. The surplus reduced to $1.1 million as at December 31, 2000. Due to poor asset returns in the first half of 2001, we expect the surplus to be further reduced to $0.4 million as at July 1, 2001.

- **P&L:** The pension (income)/charge recorded in the Company's income statements for 2000, 1999 and 1998 was ($287), $211, and $290, respectively. The credit in 2000 included a $212 credit that should have been recorded in prior years. Under purchase accounting, the pension income for 2001 would increase approximately $25.

- **Balance Sheet:** The accrued pension cost recorded on the December 31, 2000 balance sheet is ($286). This compares with the funded status of $1,117. The difference of $1,403 million is unrecognized net gain. The unrecognized net gain will either be offset by future actuarial losses or be amortized through future income statements. If the deal is structured under purchase accounting, the unrecognized gain will be eliminated.

- **Plan termination liabilities:** The pension assets are not sufficient to buy out the annuities with an insurance company. (The actuarial basis that would be used by an insurance company is more conservative than the US GAAP assumptions adopted by 'WPS') We estimate that the underfunding on a plan termination basis is $1.5 million as at July 1, 2001. *We recommend that the underfunding on a plan termination basis be treated as additional debt in the valuation of this business.*

- **Cash costs:** The Proctor & Schwartz Pension Plan is on a contribution holiday. We expect the contribution holiday to last through 2001. Starting in the 2002 plan year, we expect cash contributions to be required. For financial modeling purposes, it is reasonable to expect cash contributions of $300 per annum beginning in fiscal 2003 (Plan year contribution for 2002 is not due until September 2003). Please note, the cash contribution requirement are dependent on the relationship between pension assets and plan liabilities. Relatively small fluctuations in assets or liabilities can lead to large fluctuations in cash contribution requirements from year to year.

- **Wolverine (UK)** Employees at WPS, UK are eligible to set up a personal pension with AXA Equity and Law (a major UK insurance company). The company contributes 5% for staff and 7-10% for management employees. The total employer contribution for 2000 was $90 (£60).

- **No Pension plan at Friel:** There is no pension plan currently at the Friel division. Under UK Stakeholder Pension Legislation, all companies in the UK will be required to offer access to a pension plan by October 2001. The Company has not made a decision on the pension to offer employees. However, management's current thinking is to set up a contracted-out defined contribution scheme. The scheme will be designed to be cost neutral. The contracting-out refund of NI contributions will be used to cover the entire cost of the pension scheme. However, if a group personal pension is set-up (what PwC considers likely) the employer cost will go up a minimum of 3% of pay up to social security limits (2.5% of total pay or approximately $26)

W01131

*Draft*

All dollar amounts are in '000s unless otherwise noted

Section 5 - Employee Benefits

# Post-retirement health and life insurance plan

- **Proctor & Schwartz Post-retirement plan:** The company provides retiree health and life insurance coverage. Benefits are provided under the base plus major medical plan. Retirees can also elect coverage under an HMO. Individuals retiring prior to January 1, 1999 pay 50% of the premium amount and individuals retiring after January 1, 1999 pay 100% of the premium amount. There are no segregated assets to provide for these benefits. Claims and premiums are paid by the Company on a pay-as-you-go basis.

- **P&L:** According to the audit work papers, the postretirement benefit (income)/charge recorded in the Company books for 2000, 1999 and 1998 was ($322), ($170), and ($173), respectively. The credit in 2000 included a $117 credit that should have been recorded in prior years. Under purchase accounting, the post-retirement benefit cost for 2001 would increase approximately $325.

- **Balance Sheet:** The accrued post-retirement benefit cost recorded on the December 31, 2000 balance sheet is ($4,564). This compares with the plan obligation measured by the actuary of ($1,413). The difference of $3,151 is unrecognized net gain and unrecognized negative prior service cost. The unrecognized net gain and unrecognized negative prior service cost are amortized through the P&L. If the deal is structured under purchase accounting, the unrecognized items will be eliminated.

- **Plan obligations:** The post-retirement benefit obligation is understated by approximately $1.4 million. The company charges retirees 100% of the average medical costs for the entire covered group (both actives and retirees). This understates the true costs of retiree coverage. In essence, the active population is subsidizing the retiree population. (Average retiree costs are typically 2-3 times average active medical costs) Under FAS 106, the Company must record a liability for this subsidy. We recommend that the total under funding ($1.4 + $1.4 = $2.8) be treated as additional debt in the valuation of this business. [open:confirm Company charges retirees COBRA rates]

- **Cash costs:** The cash costs for 2000 and 1999 were $172 and $173, respectively.

PRICEWATERHOUSE COOPERS

W01132

# 6 - Information Technology

_PRICEWATERHOUSE(COOPERS_ 🔲

Transaction Services

27

Draft

Section 6 - Information Technology

*All dollar amounts are in '000s unless otherwise noted*

# Wolverine's Information Technology platform is comprised of custom developed database applications, two software application packages and many manual transaction processes.

- **Scope of Review**
  - Assessing the adequacy of the current software and hardware platforms to meet the business requirements and future growth expectations.
  - Assessing the adequacy of plans, budgets and staffing to meet current and future system needs.
  - Evaluating information system projects in progress and planned.

**Key Findings**

- **Multiple systems:** Across the Company's five locations, there are five different business systems in place that support the bare minimum requirements of the business. The existence of multiple systems that are not interfaced requires additional manual entry of data for consolidating financials and handling inter-company material transfers.

- **Minimal IT support:** The IT systems at each facility are supported with minimal staffing with limited depth of IT skills. According to management, IT staffing (in FTE's) consists of Lexington (1), Fitchburg (0), Chester ($\frac{1}{2}$ external consultant), Horsham (0) and Merrimac (1 $\frac{1}{2}$). Other IT functions are supported through employees in the engineering department.

- **Lack of integration with shop floor:** The systems used at Merrimac and Chester for large orders do not have an integrated shop floor control module to track materials and labor through the fabrication process. Material and labor costs are posted directly to the general ledger against a job number and cost tracking is performed on manual spreadsheets. This manual system supports the current level of business. However, increased growth resulting in additional in-house and contract manufacturing volume could impact these manual processes.

- **IT spending:** According to management, IT spending for the Company is approximately $250 per year and includes staffing, consultants, licensing, application maintenance and hardware support. *The current IT spending is well below industry standards and is indicative of the quality of the systems.* The average IT spending for similar manufacturing companies is 1.0 - 1.5% of annual revenue. Based on a revenue of $44 million, Wolverine Proctor's IT spending should be in the range of $440 -$660 annually.

- **Future IT projects:** According to management, no significant IT projects or capital spending is planned for the foreseeable future.

- **Merrimac:** Our initial assessment of the Merrimac facility is that the building is not used efficiently and that space is available in the office and manufacturing areas. Further facility consolidation may be feasible after improvements are made.

28

PRICEWATERHOUSECOOPERS

W01133

*All dollar amounts are in '000s unless otherwise noted*

*Draft*

# Across the five Wolverine Proctor locations, there are five different business systems in place that support the bare minimum requirements of the business.

- **Lexington, NC Facility (Small Orders)**

  - **IT system:** Epicor Avante is used for general ledger, accounts payable, accounts receivable, order entry, bill of materials, inventory, purchasing, materials requirements planning (MRP) and shop floor control (e.g., work orders, material and labor tracking). The system was installed in 1999 and is currently under a maintenance contract.

  - **Users and IT Support:** Management estimates there are 25-35 users of Avante in Lexington and approximately 25 users in Merrimac with access to the Avante system. There is one systems analyst on-site to support the IT system.

  - **Pro Engineering:** In 1998-1999, the installation of Pro Engineering, a sophisticated 3-D design package was started. After only one machine design was installed, management ceased all implementation of this project. Preliminary indications are a lack of training and understanding of the application were responsible for the majority of the concerns.

- **Fitchburg, MA Facility (ATM):** Materials and labor are tracked in a manual spreadsheet program. Accounts payable, accounts receivable, order entry and purchase orders are processed through the Merrimac facility.

- **Chester, UK Facility**

  - **System:** A custom-developed database application written in Microsoft Access and Visual Basic is used for order entry, contact management, proposal management, sales inquiry management and purchase orders. Systems Union is used for accounting including general ledger, accounts payable and accounts receivable. The systems are run on two Windows NT Pentium Pro servers. A part numbering system is not used. Materials are purchased for a particular customer order and manufacturing and engineering labor are tracked against the order. Inventory is tracked in various spreadsheets.

  - **Users and IT support:** Approximately 35 users are on the local area network. The IT systems are supported by a third party consultant, Gordon Coulter, who developed the custom package. Mr. Coulter is supported by another consultant in his practice and estimates the current IT staffing to be 10-15 days per month. According to Mr. Coulter, some documentation is in place to support the system, but further documentation work is required.

- **Horsham, PA Facility:** Sales order entry and tracking is performed with access to the Avante system.

- **Merrimac, NH Facility (Large Orders)**

  - **IT Accounting System:** Installed in the late 1990's, Macola is used for order entry, general ledger, accounts payable (disbursements only) and accounts receivable. Consolidated financials for Wolverine Proctor are prepared in Macola and include detail levels for Merrimac and Fitchburg, while only high level information is entered for the UK and Lexington financials. In the past few months, the application was upgraded to the latest version and converted to SQL.

  - **IT production system:** BOS, a custom-developed business operating system is used for inventory, bill of materials, costing, project management and purchasing. Written in Visual Basic and installed in 1998-1999, the application is maintained by one employee. An additional employee is currently in training.

  - **Shop floor:** Shop floor control is not managed in either system. Customer orders are assigned a job number and purchased materials, manufacturing labor and engineering labor are tracked against the customer job number.

  - **Payroll:** Payroll for all US facilities is processed through the Merrimac facility using ADP services. The BOS application in Merrimac is interfaced to ADP. All other payroll systems require manual data entry processes. Fixed assets are maintained in spreadsheets.

  - **Disaster recovery procedures:** A complete system back-up is performed on a weekly basis with external storage of the data tapes. A disaster recovery procedure has not been developed.

  - **Websites:** Four separate websites for the company are externally hosted and include Wolverine (US), Proctor (US), Wolverine Proctor (UK) and American Tool and Machine Company (ATM). Management reports that future plans include integration of the websites and to internally host them from the Merrimac facility.

PRICEWATERHOUSECOOPERS

W/01134

W01135

# 7 - Taxation

PRICEWATERHOUSECOOPERS 🅡

Transaction Services

30

Draft

All dollar amounts are in '000s unless otherwise noted

# Scope of work and Overview

- **Scope of work**

  – Read Wolverine (Massachusetts) Corporation's ("Wolverine" or the "Company") federal and state income tax returns for the tax years ended December 31, 1997, 1998 and 1999 as filed. **Read the Company's audited financial statements for the years ended December 26, 1998, January 1, 2000, and December 31, 2000.**

  – Read a copy of the Internal Revenue Service ("IRS") S Corporation election acceptance letter dated May 17, 1993. **OPEN: We have requested a copy of the Company's IRS Form 2553 - S Corporation status election.**

  – Read the Friel Engineering Limited ("Friel") U.S. federal partnership income tax return for the tax years ended December 31, 1997, 1998, and 1999.

  – Held discussions with Mark Brown and Stephen Marra, Tax Manager of Arthur Andersen LLP, the Company's independent accounting firm and tax return preparer, regarding various tax related matters.

  – Held discussions with Victor Garvie and Stewart Gray, Tax Manager, of Arthur Andersen (Glasgow, Scotland), the Company's UK tax return preparer.

  – We did not read the Company's U.S. income tax filings for the period ended December 31, 2000, as those tax returns have not been filed. We also did not read the Company's UK branch tax filings for the periods ended December 31, 1998, 1999 and 2000, or Friel's UK tax filings for the periods ended December 31, 1999 and 2000, as those tax returns have not been filed. **[OPEN: We have requested a copy of Friel's UK tax return for the period ended December 31, 1998, which was filed recently.]**

- **Legal/Tax Structure -** The Company was incorporated in the state of Massachusetts on December 28, 1991 and was taxed as a Subchapter C corporation for federal income tax purposes until its election to be treated as a Subchapter S corporation on January 1, 1993. All of the company's outstanding stock is owned by one individual. As a result of the S corporation election, all items of income, expense, gain and loss of the corporation since the effective date of the election have flowed directly through to the tax return of the company's sole shareholder. The Company owns 49% of Friel, which is taxed as a partnership for U.S. tax purposes and as a corporation for U.K. tax purposes. The remaining 51% of Friel is owned directly by the Company's sole shareholder.

- **Transaction -** It is currently proposed that the Company's sole shareholder will contribute the assets of the Company and all of the stock of Friel to a new LLC, to which Parthenon Capital ("Parthenon") will contribute approximately $15.5 million as an equity investment through a "Blocker C" Corporation. Parthenon and the Company's sole shareholder will own 51% and 49%, respectively, of the new LLC.

PRICEWATERHOUSECOOPERS 🏛

W01136

Section 7 - Taxation

*Draft*

*All dollar amounts are in '000s unless otherwise noted*

# Key Tax Issues

- **Delinquent UK income tax returns** - The Company has not filed UK income tax returns for its UK branch for the years ended December 31, 1998, 1999 and 2000. In addition, Friel has not filed UK income tax returns for the years ended December 31, 1999 and 2000, and just recently filed its UK income tax return for the year ended December 31, 1998. According to Stewart Gray, the Company and Friel filed all required UK returns up to and including the tax year ended December 31, 1997. According to the Company's UK tax advisor, aggregate tax exposure, including interest and penalties could be approximately $750. According to Victor Garvie, the Company is planning to charge management fees to Friel and its UK branch on the overdue UK tax returns when they are filed. Victor Garvie has indicated that the contemplated management fees would significantly reduce the potential UK tax liability for Friel and the UK branch. To date, no estimate of the management fees or the Company's branch profit and loss statement has been made available to the Company's tax advisor (Arthur Andersen LLP). [OPEN: We have requested copies of Friel's and the Company's UK estimated tax liabilities for the periods since December 31, 1997.] It appears that the UK tax liabilities of both Friel and the Company's UK branch will be assumed by the new LLC by operation of law. We recommend that Parthenon obtain specific indemnification for any tax exposure related to the delinquent UK tax returns and include such amounts as part of any escrow agreement.

- **Tax Reserves** - According to Stephen Marra, at December 31, 2000, the Company had a tax reserve (cushion) of approximately $105 for unidentified tax exposure items on its U.S. books. According to Victor Garvie, at December 31, 2000, the Company had a tax reserve of approximately $297 recorded at its UK branch and $134 recorded at Friel. To the extent that resulting tax exposure items are in excess of the tax reserve amounts, the Company and/or Friel would record a corresponding charge to earnings.

- **Transfer Pricing** - The Company conducts intercompany sales of various items (ovens, spare parts, etc.) to Friel and its UK branch on a regular basis (less than $500 total intercompany sales for fiscal year 2000). According to Mark Brown, some items (e.g., ovens) are sold at cost and other sales (e.g., spare parts) are made on a cost plus 6% basis(approximately). According to Stephen Marra, Friel operates as a contract manufacturer on behalf of the Company's UK branch and is reimbursed by the Company on a cost plus 10% basis(approximately). Both US and UK tax rules require taxpayer's to prepare and maintain contemporaneous documentation with respect to related party transactions, in order to substantiate that the terms of the transactions are arm's length. Company representatives indicated that no transfer pricing analysis has been performed for US or UK tax purposes. **We recommend that a transfer pricing analysis be performed after the close of the contemplated transaction in order to properly comply with the applicable US and UK tax regulations.**

- **Nexus for Foreign Tax Purposes** - According to Victor Garvie, more than 50% of the sales of the Company's UK branch are made to customers located outside the UK (i.e., continental Europe, the Middle East). The services that are provided to customers by employees of the Company's UK branch include on site engineering and installation services. Such services could create a taxable presence and subject the Company to tax filing requirements in the applicable foreign countries. According to Stewart Gray, neither the Company nor its tax advisors have performed any analysis to determine whether the Company has any tax filing requirements outside the UK. To date, the Company has not received any notices from foreign tax authorities regarding this issue. **Nonetheless, we recommend that the Company perform an analysis to determine whether it should be filing foreign tax returns after the close of the transaction.**

- **Tax Exams** - According to Stephen Marra, the Company was last audited by the IRS for its tax years ended December 31, 1993 to December 31, 1995. The examination resulted in additional assessment to the Company's sole shareholder of approximately $1 million (including interest) related to nondeductible acquisition expenses recorded by the Company.

PRICEWATERHOUSE COOPERS

*Draft*

*All dollar amounts are in '000s unless otherwise noted*

# State and Local Tax Observations

- **State Tax Overview** - The Company maintains offices in Massachusetts, North Carolina and Pennsylvania, where the Company's business activities are primarily conducted. In addition, an employee performing research and development activities is located in Wisconsin. Based upon a review of the Company's state tax procedures and discussions with Company representatives and its tax advisor, it does not appear that material state tax exposure exists. Specific items are identified below.

- **Income/Franchise Taxes** - Based upon discussions with Stephen Marra of AA, Wolverine has filed income/franchise returns in Massachusetts, North Carolina, Pennsylvania and Wisconsin for the years under review. In addition, the Company may have additional filing responsibilities in states where its engineers perform services. The Company has conducted business in California, Illinois, New York, Rhode Island, Tennessee and Texas, which states impose an entity level tax on S Corporations. Thus, the Company may have potential exposure in these states. Furthermore, the Company and its shareholders may have a filing responsibility in all states where the engineers perform services. However, the potential exposure should not be substantial. **We recommend a state nexus study be undertaken in connection with the formation of the new LLC by the Company and Parthenon in order to determine where the new LLC will have state filing requirements based on the business activities of the Company.**

- **State Tax Examinations** - The Company was subject to a state tax examination by Massachusetts in 1998 with respect to income tax. There was no adjustment as a result of the audit. There have been no other state examinations.

- **Sales and Use Taxes** - Based upon discussions with Dino Orfanos of Wolverine MA, it appears that appropriate procedures are in place to collect sales tax and self-assess use tax on purchases. The Company files sales and use tax returns in California, Connecticut, Georgia, Illinois, Iowa, Massachusetts, Mississippi, New York, North Carolina, Pennsylvania, Rhode Island, Tennessee and Texas.

- **Payroll Taxes** - According to Mark Brown, the Company utilizes a third party service provider (ADP) for the processing of its payroll. The Company has never been subject to a federal or state payroll tax examination.

PRICEWATERHOUSECOOPERS ■

W01138

W01139

# Appendices

_PRICEWATERHOUSECOPERS_ 🖳

34

Transaction Services

*Draft*

*All dollar amounts are in '000s unless otherwise noted*

*APPENDIX A*

# Employee Benefit Plan Summary

| Benefit | Plan |
|---|---|
| Defined Benefit Pension Plan | **Proctor & Schwartz Pension Plan**<br>Benefits frozen 12/31/1997. Covers Hourly and Salaried employees |
| Defined Contribution Pension Plans | **Proctor & Schwartz 401(k) Savings Plan**<br>Up to 17% Employee contribution with Employer match of 60% of first 6% of employee contributions.<br>**Wolverine Corp. 401(k) Deferred Savings Plan**<br>Up to 15% Employee contribution with Employer match of 60% of first 6% of employee contributions. (Prior to [ OPEN ], the employer match was 10%) |

PRICEWATERHOUSECOOPERS

W01140

W01141

*Draft*

*All dollar amounts are in '000s unless otherwise noted*

APPENDIX A

*Appendices*

# Employee Benefit Plan Summary

| Health Plans | Description |
|---|---|
| Wolverine, Proctor & Schwartz, Inc. Health Care Plan (Self-insured) | **Medical**<br>  Company cost sharing: approximately 90% costs in aggregate<br>  2001 Monthly employee contributions: $35.5 single; $86.20 family<br>**Dental**<br>  80% Basic coverage, 50% Major coverage with $1,000 maximum<br>  Company cost sharing: approximately 85% of costs. 2001 Monthly employee contributions: $4.5 single; $13.8 family |
| Keystone Health Plan East, Inc. (Health Maintenance Organization 'HMO') | **Medical**<br>  Company cost sharing: [ OPEN ] costs in aggregate<br>  2001 Monthly premiums:<br>  PPO: $217.30 single; $499.8 for double; $637.20 family<br>  2001 Monthly employee contributions:<br>  HMO: [ OPEN ] single: [ OPEN ] for double: [ OPEN ] family<br>**Dental**<br>  [ OPEN ] |

PRICEWATERHOUSE COOPERS ⬛

36

W01142

*Draft*

All dollar amounts are in '000s unless otherwise noted

APPENDIX A

# Employee Benefit Plan Summary

| Other Plans | Description |
|---|---|
| Basic Life | **Sun Life (SAL)**<br>Basic: $10,000; 100% company paid<br>Optional: 1x or 2x pay ($240K maximum); 100% company paid |
| Accidental Death & Dismemberment (AD&D) | **Sun Life (SAL)**<br>Basic: $10,000; 100% company paid<br>Optional: 1x or 2x pay ($240K maximum); 100% company paid |
| Short-Term Disability Insurance | [ OPEN ] |
| Long-Term Disability | **UNUM (Wolverine Massachusetts)**<br>180 day elimination period; 60% of pay; $6,000 maximum/month; 100% company paid<br>**Sun Life (Pennsylvania and North Carolina)**<br>90 day elimination period; 60% of pay; $5,000 maximum/month; 100% company paid |

PRICEWATERHOUSECOOPERS

# EXHIBIT 4
# KULKARNI

# WOLVERINE PROCTOR & SCHWARTZ, INC.

## Transition Agreement

THIS IS AN AGREEMENT made as of December 28, 2001 by and between Wolverine Proctor & Schwartz, Inc., a Delaware corporation (the "Company"), and Peter Crawford (the "Employee").

WHEREAS, the Company desires to obtain the services of the Employee and the Employee desires to provide such services to the Company to facilitate transitional needs arising from a change of control of the Company.

NOW, THEREFORE, in consideration of the mutual covenants contained in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which consideration are hereby acknowledged, the parties agree as follows:

1. **Services**

   During the Transition Period, the Employee agrees to perform such services to and for the Company as may be reasonably requested by the Chief Executive Officer of the Company or its Board of Directors to facilitate the transition of the Company's management.   The Employee's commitment to the Company during the Transition Period will be full-time and shall take into account the Employee's expertise in managing and operating the Company.

2. **Term**

   Unless sooner terminated as provided below, the term of the Employee's engagement under this Agreement will be from the date hereof until the earlier of (i) March 31, 2002, (ii) the consummation by the Company of a working capital facility with an institutional lender, or (iii) two weeks after the date on which the Chief Executive Officer provides written notice of termination, for any reason or no reason, to the Employee (the "Transition Period").

3. **Extent of Services**

   During the Transition Period, the Employee will devote his best efforts to the performance of his duties under this Agreement.   Under no circumstances will the Employee knowingly take any action contrary to the best interests of the Company.

4. **Compensation**

   4.1   **Base Salary Fee.**  During the Transition Period, the Company will pay the Employee compensation at the rate of $150,000 per annum, which shall be payable in accordance with the Company's normal payroll practices (the "Base Salary Fee").

8698745.2

EXHIBIT
PLF'S 19
BROWN
KLN 11-3-05

**PAC 0043**

4.2  Expenses.  The Company will, upon substantiation thereof, reimburse the Employee for all reasonable expenses of types authorized by the Chief Executive Officer of the Company in the ordinary course of business and incurred by the Employee in connection with the Company's business affairs.  The Employee must comply with such accounting and reporting requirements as the Company may from time to time establish in order to obtain such reimbursement.

4.3  Benefits.  During the Transition Period, the Employee shall be entitled to participate in the Company's life, disability, medical, dental and other insurance programs available to key executives on the same terms as such are available generally to other key executives of the Company.

4.4  Equity Advance.  Within three months after the expiration of the Transition Period, the Company shall pay to the Employee the amount of $150,000, subject to appropriate deductions for withholding and similar taxes.

5.  Release.

5.1  The Employee agrees, promises and covenants that he will not file, charge, claim, sue or cause to permit to be filed, charged, claimed or sued, any action for damages or other relief (including injunctive, declaratory or other equitable relief) against the Company or any of its affiliates involving any matter occurring in the past up to the date hereof.  The Employee agrees that he has not, and will not, assign any claims which he has or may have against the Company or any of its affiliates to any third party.  The preceding sentence shall not apply to any matter arising out of the performance or nonperformance of the obligations of the Company under this Agreement or the Employee's right to a bonus payment (the "Bonus Payment") provided by paragraph 4 of the Employment Letter dated January 2001, a copy of which is attached hereto as Exhibit A (the "Employment Letter").

5.2  In consideration of the covenants set forth herein, and more particularly the payments to the Employee hereunder, and other good and valuable consideration, the Employee, his agents, heirs, legatees, successors and assigns (collectively hereinafter the "Employee-Releasors"), hereby irrevocably and unconditionally releases, remises, and forever discharges the Company, Deepak Kulkarni, their respective affiliates, any entity owned or controlled by the Company or Deepak Kulkarni, their officers or directors and their respective present and former directors, officers, employees, agents, attorneys, subsidiaries, successors, insurance carriers and assigns, and each of them (collectively hereinafter the "Company-Releasees"), of and from any and all actions, causes of action, suits, debts, charges, complaints, claims, liabilities, obligations, injuries, promises, agreements, controversies, damages, and expenses (including attorneys' fees and costs actually incurred), of any form whatsoever, whether known or unknown, foreseen or unforeseen, anticipated or unanticipated, suspected or unsuspected, manifest or latent, intentional or negligent (collectively, "Claims") which the Employee or the Employee's successors in interest now own or hold, have at any time heretofore owned or held or may at any time own or hold by reason of any matter or thing based upon, relating to or arising out of the Employee's employment relationship with the Company or any of its affiliates or the termination of that relationship, including but not limited to, claims arising out of any right to an equity interest in the Company (including, without limitation, under

8698745.2

-2-

PAC 0044

that certain letter agreement between the Employee and the Company dated January 4, 2000 or that certain letter agreement between the Employee and the Company dated December 4, 2001), expressly excluding any rights to the Bonus Payment, or claims arising under the Age Discrimination in Employment Act of 1967, Title VII of the civil Rights Act of 1963 and any other federal, state or local laws prohibiting age, sex, disability or any other forms of discrimination, which existed or may have existed prior to or contemporaneously with the execution of this Agreement. Notwithstanding the foregoing, this Section 5.2 shall not release the Company from any obligation set forth in this Agreement or in the Settlement Agreement of even date herewith between the Employee and Deepak Kulkarni.

6.    Confidentiality of Agreement. The parties agree that all information relating in any way to the terms of and amounts payable under this Agreement shall be held confidential by the parties and shall not be publicized or disclosed to any person (other than an immediate family member (including, without limitation, any spouse, parent, child, and/or sibling), physician, psychologist, legal counsel or financial advisor, provided that any such individual to whom disclosure is made agrees to be bound by these confidentiality obligations), business entity or government agency, except as mandated by state or federal law, upon lawful subpoena by a court or agency of competent jurisdiction or pursuant to the mutual consent of the parties. If such subpoena is received by any party to this Agreement, a copy thereof shall be promptly provided to all other parties.

7.    Notices

All notices under this Agreement must be in writing and must be delivered by hand or mailed by certified or registered mail, postage prepaid, return receipt requested, to the parties as follows:

If to the Company:          Wolverine Proctor & Schwartz, Inc.
                            51 E. Main Street
                            Merrimac, MA 01850
                            Attention: Chief Executive Officer

with a copy to:             Deepak Kulkarni
                            124 Commonwealth Ave.
                            Boston, MA 02116

If to the Employee:         To the address set forth below the signature of the Employee;

or to such other address as is specified in a notice complying with this Section 8. Any such notice is deemed given on the date delivered by hand or three days after the date of mailing.

8698745.2

-3-

PAC 0045

8.    Miscellaneous

8.1    Modification.  This Agreement constitutes the entire Agreement between the parties with regard to the subject matter hereof, superseding all prior understandings and agreements, whether written or oral.  This Agreement may not be amended or revised except by a writing signed by the parties.

8.2    Successors and Assigns.  This Agreement is binding upon and inures to the benefit of both parties and their respective successors and assigns, including any corporation with which or into which the Company may be merged or which may succeed to its assets or business, although the obligations of the Employee are personal and may be performed only by him.

8.3    Severability.  The provisions of this Agreement are severable, and invalidity of any provision does not affect the validity of any other provision.  In the event that any court of competent jurisdiction determines that any provision of this Agreement or the application thereof is unenforceable because of its duration or scope, the parties agree that the court in making such determination will have the power to reduce the duration and scope of such provision to the extent necessary to make it enforceable, and that the Agreement in its reduced form is valid and enforceable to the full extent permitted by law.

8.4    Governing Law.  This Agreement is to be construed under and governed by the laws of The Commonwealth of Massachusetts.

8698745.2

-4-

PAC 0046

**IN WITNESS WHEREOF,** the parties have executed this Agreement as of the date and year first above written.

WOLVERINE PROCTOR & SCHWARTZ, INC.

By: _____

Name:

Title: Chairman

_____

Peter Crawford

Address:     23 New Castle Drive #11
             Nashua, New Hampshire 03060

8698745.2

-5-

PAC 0047

# EXHIBIT 5
# KULKARNI

*Execution Copy*

## CONSULTING AGREEMENT

AGREEMENT made and entered into in Boston, Massachusetts, by and between Wolverine, Proctor & Schwartz, Inc. (the "Company"), a Delaware corporation with its principal place of business at 51 East Main Street, Merrimac Massachusetts, and Deepak Kulkarni of 124 Commonwealth Avenue, Boston, Massachusetts 02116 (the "Consulting Employee"), as of this 28th day of December, 2001.

WHEREAS, subject to the terms and conditions hereinafter set forth, the Company therefore wishes to employ the Consulting Employee as a consultant and the Consulting Employee wishes to accept such employment;

NOW, THEREFORE, in consideration of the foregoing premises and the mutual promises, terms, provisions and conditions set forth in this Agreement, the parties hereby agree:

1.    Employment.  Subject to the terms and conditions set forth in this Agreement, the Company hereby offers and the Consulting Employee hereby accepts employment.

2.    Term.  Subject to earlier termination as hereafter provided, the Consulting Employee's employment hereunder shall commence on the date of the Subsequent Closing under (and as defined in) the Deepak Kulkarni Representation and Warranty, Indemnity and Subscription Agreement (the "Kulkarni Subscription Agreement") dated as of December 28, 2001 among Mr. Deepak Kulkarni, Wolverine Proctor, LLC, a Delaware limited liability company, and the other parties thereto (such date, the "Effective Date"), and continue in effect until terminated in accordance with Section 5 hereof.  The term of this Agreement, as from time to time extended or renewed, is hereafter referred to as "the term of this Agreement" or "the term hereof".

3.    Capacity and Performance.

(a)    From the effective date of this Agreement until the earlier of (i) one month after such time as a new Chief Executive Officer has been hired by the Company and (ii) the time at which such new Chief Executive Officer has been oriented to the business of the Company (the "Transition Period"), as determined by the Board of Directors of the Company (the "Board") in its reasonable discretion, the Consulting Employee shall provide advice and consulting services to the Company by telephone or electronically or; at the reasonable convenience of the Consulting Employee, in person.  Consulting services during the Transition Period shall include, without limitation, assistance in the recruitment and orientation of the new Chief Executive Officer.  During the remainder of the term hereof, the Consulting Employee shall hold himself available to provide such advice and other consulting services as the Company may from time to time request, upon reasonable notice to the Consulting Employee, orally or in writing, with such services generally being provided by telephone or electronically unless

8696699.4

-1-

W0738

otherwise specified by the Company on at least seven business days' notice. The Consulting Employee shall devote such business time as is reasonably necessary to fully perform hereunder.

(b)      The Consulting Employee shall have no right, power or authority in any way to bind the Company to the fulfillment of any condition, contract or obligation or to create any liability binding on the Company. The Company is not responsible for any expenses or liabilities incurred by the Consulting Employee, except as expressly provided in Section 4(e).

4.      Compensation and Benefits. As compensation for all services performed by the Consulting Employee under and during the term hereof and subject to performance of the Consulting Employee's duties and of the obligations of the Consulting Employee to the Company and its Affiliates, pursuant to this Agreement or otherwise:

(a)      Base Salary. During the term hereof, the Company shall pay the Consulting Employee a base salary at the rate of Five Hundred Thousand Dollars ($    ,000) per annum, payable in accordance with the payroll practices of the Company for its executives, as in effect from time to time, but in no event less than on a monthly basis. Such base salary is hereafter referred to as the "Base Salary".

(b)      Performance Bonus. During the term hereof, the Consulting Employee shall be eligible to earn a bonus (the "Performance Bonus") of up to Five Hundred Thousand Dollars ($500,000) per fiscal year, pro-rated for any period of service less than a full twelve months. The amount and timing of any Performance Bonus shall be based on the achievement of goals set by the Consulting Employee in consultation with the board of directors of the Company prior to the commencement of each fiscal year (or as promptly thereafter as is practicable). The Company and the Consulting Employee shall reasonably determine whether such goals have been achieved. The Company shall advance the Consulting Employee the maximum amount of the Performance Bonus for which he is eligible in twelve equal monthly payments, during each fiscal year of the term hereof.

(c)      Medical Plans. During the term hereof, the Company shall pay the entire premium cost of coverage of the Consulting Employee and his Immediate Family under all health insurance plans in which the Consulting Employee and/or his Immediate Family participate as of the date of this Agreement or under one or more substitute plans providing substantially equivalent coverage in the event the Company elects to change insurance carriers. For purposes of this Section 4(c), "Immediate Family" shall mean Alison J. Kulkarni, Isabella P. Kulkarni, Sebastian S. Kulkarni, Elizabeth A. Taylor and Mandakini S. Kulkarni.

(d)      Other Benefits. During the term hereof, the Consulting Employee may participate in those employee benefit plans in which he participates as of the date of this Agreement in effect from time to time for employees of the Company generally, provided that the Consulting Employee is eligible to participate in such plans under the terms thereof and applicable law (including without limitation any requirements with respect to the minimum number of hours of service ) and provided further that such plans are not in a category of benefit otherwise provided the Consulting Employee hereunder (e.g., medical plan coverage and

8696699.4

W0739

severance benefits).  To the extent permitted by any such plan, the Consulting Employee shall receive credit for the Consulting Employee's period of employment by the Company (and its predecessors) prior to the date hereof under such plan (e.g., for purposes of vesting his right to receive any such benefits or  computing the amount or timing of any such benefits).

(e)    Business Expenses.  The Company shall pay or reimburse the Consulting Employee for all reasonable and necessary business expenses incurred or paid by the Consulting Employee in the performance of his duties and responsibilities hereunder, subject to any maximum annual limit and other restrictions or approvals on such expenses set by the Board or the chief executive officer and to such reasonable substantiation and documentation as may be specified by the Company from time to time.

5.    Termination of Employment and Severance Benefits.  Notwithstanding the provisions of Section 2 hereof, the Consulting Employee's employment hereunder shall terminate prior to the expiration of the term under the following circumstances:

(a)    Death.  In the event of the Consulting Employee's death during the term hereof, the Consulting Employee's employment hereunder shall immediately and automatically terminate and the Company shall pay to the beneficiary expressly designated by the Consulting Employee in writing or, if none, to his estate, an amount equal to the sum of the Base Salary and the maximum Performance Bonus to which the Consulting Employee would have been entitled, had he continued to be employed by the Company until the later of (i) the third anniversary of the Effective Date or (ii) the first anniversary of the Consulting Employee's death.  The Company may elect to pay such sum in equal monthly installments (without interest) over that period of time equal to the remainder of the term hereof as determined on the date of the Consulting Employee's death.

(b)    By the Company for Cause.  The Company may terminate the Consulting Employee's employment hereunder for Cause at any time upon notice to the Consulting Employee setting forth in reasonable detail the nature of such Cause.  The following, as determined by the Board in its reasonable judgment, shall constitute "Cause" for termination:

(i)    the Consulting Employee is required to satisfy his indemnification obligations under the Kulkarni Subscription Agreement in respect of fraud or intentional misrepresentation in the representations and warranties of the Consulting Employee in such agreement, embezzlement or other material dishonesty with respect to the Company or any of its Affiliates; or

(ii)    commission of a felony, or conviction of a crime as a result of which the Company's reputation could be materially damaged if the Consulting Employee remains in the employment of the Company hereunder after the conviction; or

(iii)    material breach of any of the restrictive covenants set forth in Sections 7, 8 and 9 hereunder, which remains uncured or continues or recurs after fifteen

8696699.4

-3-

W0740

(15) business days' notice from the Company specifying in reasonable detail the nature of such material breach.

Upon the giving of notice of termination of the Consulting Employee's employment hereunder for Cause, the Company shall have no further obligation or liability to the Consulting Employee, other than for Base Salary earned and unpaid through the date of termination and Performance Bonus for the year in which termination occurs, pro-rated to the date of termination.

    (c)    Upon a Change of Control.  In the event of a Change of Control, the Consulting Employee's employment hereunder shall immediately and automatically terminate. In that event, the Consulting Employee shall be entitled to the foregoing:

    (i)    If a Change of Control occurs with the Consulting Employee's consent, the Company shall have no further obligation or liability to the Consulting Employee, other than for Base Salary earned and unpaid through the date of termination and Performance Bonus for the year in which termination occurs, pro-rated through the date of termination.

    (ii)    If a Change of Control occurs without the Consulting Employee's consent during the first three years of the initial term hereof, then, provided that the Consulting Employee signs a release of claims arising under this Agreement or otherwise (but not arising with respect to Mr. Kulkarni's ownership interest in Wolverine Proctor, LLC (or indirect ownership of any Subsidiary thereof) or status as a member of the board of managers thereof) in favor of the Company and its Affiliates and Subsidiaries in the form provided by the Company (the "Consulting Employee Release") within twenty-one days (or such greater period as the Company may specify) following the later of the date on which the Consulting Employee receives notice of termination of employment or the date he receives a copy of the Consulting Employee Release and upon the Consulting Employee not revoking the Consulting Employee Release in a timely manner, the Company (A) shall pay the Consulting Employee monthly severance payments, each in an amount equal to the sum of (i) the Consulting Employee's monthly base compensation in effect at the time of such termination (i.e. 1/12th of the Base Salary) and (ii) 1/12th of the Performance Bonus for which the Consulting Employee is eligible (the "Severance Payments"), until the date that is three years from the Effective Date (the "Severance Pay Period") and (B) shall reimburse the Consulting Employee at a maximum rate of no more than $50,000 per annum toward the premium cost of the medical plan described in Section 4(c) hereof to the extent such coverage is available under the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA") until the earlier of (i) the end of the Severance Pay Period and (ii) the maximum period during which such coverage is available under COBRA.

"Change of Control" shall mean the occurrence hereafter of any of the following:  (i) any Person other than the Company and its Affiliates (other than the Consulting Employee), becomes a beneficial owner (within the meaning of Rule 13d-3, as amended, as promulgated under the Exchange Act), directly or indirectly, in one or a series of transactions, of securities representing

8696699.4

-4-

W0741

more than fifty percent of the combined voting power of the then outstanding securities of Wolverine Proctor, Inc., a Delaware corporation ("Holdings"); (ii) the consummation of a merger, reorganization, recapitalization, consolidation or similar transaction involving Holdings and/or all or substantially all of its Subsidiaries, other than a merger, reorganization, recapitalization, consolidation or similar transaction which would result in the voting securities of Holdings and/or all or substantially all of its Subsidiaries, as appropriate, outstanding immediately prior thereto continuing to represent (either by remaining outstanding or by being converted into voting securities of the surviving entity) more than fifty percent (50%) of the combined voting power of the voting securities of Holdings and/or all or substantially all of its Subsidiaries, as appropriate, or such surviving entity outstanding immediately after such merger, reorganization, recapitalization, consolidation or similar transaction; or (iii) there occurs a sale or other disposition of Holdings or of all or substantially all of the assets of Holdings and/or all or substantially all of its Subsidiaries.

(d) Post Agreement Employment. In the event the Consulting Employee remains in the employ of the Company or any of its Affiliates following termination of this Agreement, by the expiration of the term or otherwise, then such employment shall be at will.

6. Effect of Termination. The provisions of this Section 6 shall apply to termination pursuant to Section 5.

(a) Payment by the Company of any payments due under the applicable termination provision of Section 5 shall constitute the entire obligation of the Company to the Consulting Employee hereunder.

(b) All advances of all or any portion of the Performance Bonus shall be retained by the Consulting Employee.

(c) Consulting Employee's participation in any employee benefit plans of the Company shall terminate pursuant to the terms of the applicable benefit plans based on the date of termination of the Consulting Employee's employment without regard to any continuation of Base Salary, Performance Bonus, Severance Payments or other payment to the Consulting Employee following such date of termination.

(d) Provisions of this Agreement shall survive any termination if so provided herein or if necessary or desirable to accomplish the purposes of other surviving provisions, including without limitation the obligations of the Consulting Employee under Sections 7 ,8 and 9 hereof. The obligation of the Company to make payments to or on behalf of the Consulting Employee under Sections 5(a) or 5(c) hereof are expressly conditioned upon the Consulting Employee's continued full performance of obligations under Sections 7, 8 and 9 hereof. The Consulting Employee recognizes that, except as expressly provided in Sections 5(a) or 5(c) hereof, no compensation is earned after termination of employment.

7. Confidential Information.

8696699.4

-5-

W0742

(a)    The Consulting Employee acknowledges that the Company and its Affiliates continually develop Confidential Information, that the Consulting Employee may develop Confidential Information for the Contributed Companies and that the Consulting Employee may learn of Confidential Information during the course of employment. The Consulting Employee will comply with the policies and procedures of the Contributed Companies for protecting Confidential Information and shall not disclose to any Person or use, other than as required by applicable law or for the proper performance of his duties and responsibilities to the Contributed Companies, any Confidential Information obtained by the Consulting Employee incident to his employment or other associations with the Contributed Companies. The Consulting Employee understands that this restriction shall continue to apply after his employment terminates, regardless of the reason for such termination.

(b)    All documents, records, tapes and other media of every kind and description relating to the business, present or otherwise, of the Company or its Affiliates and any copies, in whole or in part, thereof (the "Documents"), whether or not prepared by the Consulting Employee, shall be the sole and exclusive property of the Company and its Affiliates, subject to the Consulting Employee's rights of access to Documents pursuant to the Limited Liability Company Agreement of Wolverine Proctor, LLC. The Consulting Employee shall safeguard all Documents and shall surrender to the Company at the time his employment terminates, or at such earlier time or times as the Board or its designee may specify, all Documents then in the Consulting Employee's possession or control.

8.    Assignment of Rights to Intellectual Property. The Consulting Employee shall promptly and fully disclose all Intellectual Property to the Company. The Consulting Employee hereby assigns and agrees to assign to the Company (or as otherwise directed by the Company) the Consulting Employee's full right, title and interest in and to all Intellectual Property. The Consulting Employee agrees to execute any and all applications for domestic and foreign patents, copyrights or other registrable proprietary rights and to do such other acts (including without limitation the execution and delivery of instruments of further assurance or confirmation) requested by the Company to assign the Intellectual Property to the Company and to permit the Company to enforce any patents, copyrights or other proprietary rights to the Intellectual Property. The Consulting Employee will not charge the Company for time spent in complying with these obligations. All copyrightable works that the Consulting Employee creates shall be considered "work made for hire".

9.    Restricted Activities. The Consulting Employee agrees that some restrictions on his activities during and after his employment are necessary to protect the goodwill, Confidential Information and other legitimate interests of the Company and its Affiliates:

(a)    For the period of the Consulting Employee's employment hereunder plus eighteen (18) months following the date his employment hereunder terminates (the "Non-Competition Period"), the Consulting Employee shall not, directly or indirectly, whether as owner, partner, investor, consultant, agent, employee, co-venturer or otherwise, compete with the Contributed Companies within Massachusetts, Pennsylvania, North Carolina, the United Kingdom or any other geographic area where any of the Contributed Companies is conducting

8696699.4

-6-

W0743

business at the time the Consulting Employee's employment terminates; specifically, but without limiting the foregoing, the Consulting Employee agrees not to engage in any manner in any activity that is competitive with the business of the Contributed Companies; provided that the ownership of publicly-traded securities of any Person representing less than two percent (2%) of the outstanding voting securities of such Person shall be permitted hereunder. Restricted activity includes without limitation accepting employment or a consulting position with any Person who is, or at any time within twelve (12) months prior to termination of the Consulting Employee's employment has been, a customer of the Contributed Companies. For the purposes of this Section 9, the business of the Contributed Companies shall be limited to all Products and the Consulting Employee's undertaking shall encompass all items, products and services that may be used in substitution for Products.

(b)    The Consulting Employee further agrees that while he is employed by the Company and during the Non-Competition Period, the Consulting Employee will not hire or attempt to hire any executive of the Company or any of its Affiliates, assist in such hiring by any Person, encourage any such executive to terminate his or her relationship with the Company or any of its Affiliates, or solicit or encourage any customer or vendor of the Contributed Companies to terminate or diminish its relationship with them, or, in the case of a customer, to conduct with any Person any business or activity which such customer conducts or could conduct with the Contributed Companies.

10.    _Information Requirement_. The Consulting Employee shall provide the Company with such information concerning his business activities that may be competitive with those of the Contributed Companies, as the Company may reasonably request on no more than two (2) occasions, solely in order to determine the Consulting Employee's continued compliance with his obligations under Sections 7, 8 and 9 hereof.

11.    _Enforcement of Covenants_. The Consulting Employee acknowledges that he has carefully read and considered all the terms and conditions of this Agreement, including the restraints imposed upon him pursuant to Sections 7 ,8 and 9 hereof. The Consulting Employee agrees that said restraints are necessary for the reasonable and proper protection of the Company and its Affiliates and that each and every one of the restraints is reasonable in respect to subject matter, length of time and geographic area. The Consulting Employee further acknowledges that, were he to breach any of the covenants contained in Sections 7, 8 or 9 hereof, the damage to the Company would be irreparable. The Consulting Employee therefore agrees that the Company, in addition to any other remedies available to it, shall be entitled to preliminary and permanent injunctive relief against any breach or threatened breach by the Consulting Employee of any of said covenants, without having to post bond. The parties further agree that, in the event that any provision of Section 7, 8 or 9 hereof shall be determined by any court of competent jurisdiction to be unenforceable by reason of its being extended over too great a time, too large a geographic area or too great a range of activities, such provision shall be deemed to be modified to permit its enforcement to the maximum extent permitted by law.

12.    _Conflicting Agreements_. The Consulting Employee hereby represents and warrants that the execution of this Agreement and the performance of his obligations hereunder

8696699.4

-7-

W0744

will not breach or be in conflict with any other agreement to which the Consulting Employee is a party or is bound and that the Consulting Employee is not now subject to any covenants against competition or similar covenants or any court order or other legal obligation that would affect the performance of his obligations hereunder. The Consulting Employee will not disclose to or use on behalf of the Company or any of its Affiliates any proprietary information of a third party without such party's consent.

13.    Definitions. Words or phrases which are initially capitalized or are within quotation marks shall have the meanings provided in this Section 13 and as provided elsewhere herein. For purposes of this Agreement, the following definitions apply:

(a)    "Affiliates" means all persons and entities directly or indirectly controlling, controlled by or under common control with the Company, where control may be by either management authority or equity interest.

(b)    "Confidential Information" means any and all information of Holdings and its Subsidiaries that is not generally known by others with whom they compete or do business, or with whom they plan to compete or do business and any and all information, publicly known in whole or in part or not, which, if disclosed by Holdings and its Subsidiaries would assist in competition against them. Confidential Information includes without limitation such information relating to (i) the development, research, testing, manufacturing, marketing and financial activities of Holdings and its Subsidiaries, (ii) the Products, (iii) the costs, sources of supply, financial performance and strategic plans of Holdings and its Subsidiaries, (iv) the identity and special needs of the customers of Holdings and its Subsidiaries and (v) the people and organizations with whom Holdings and its Subsidiaries have business relationships and those relationships. Confidential Information also includes any information that Holdings and its Subsidiaries have received, or may receive hereafter, belonging to customers or others with any understanding, express or implied, that the information would not be disclosed.

(c)    "Contributed Companies" means Wolverine Proctor & Schwartz, Inc., a Delaware corporation, MawLaw 492 Limited, an entity organized under the laws of the United Kingdom, and Friel Engineering Limited, an entity organized under the laws of the United Kingdom.

(d)    "Intellectual Property" means inventions, discoveries, developments, methods, processes, compositions, works, concepts and ideas (whether or not patentable or copyrightable or constituting trade secrets) conceived, made, created, developed or reduced to practice by the Consulting Employee (whether alone or with others, whether or not during normal business hours or on or off Company premises) during the Consulting Employee's employment and during the Non-Competition Period that relate to the manufacture or design of Products or that make use of Confidential Information of Holdings and its Subsidiaries.

(e)    "Person" means an individual, a corporation, a limited liability company, an association, a partnership, an estate, a trust and any other entity or organization, other than the Company or any of its Affiliates.

8696699.4

-8-

(f)    "Products" mean all products planned, researched, developed, tested, manufactured, sold, licensed, leased or otherwise distributed or put into use by Holdings and its Subsidiaries, together with all services provided or planned by Holdings and its Subsidiaries, as of the Effective Date of this Agreement.

(g)    "Subsidiary" means (i) any corporation with respect to which a specified Person (or a Subsidiary thereof), directly or indirectly, owns a majority of the common stock or has the power to vote or direct the voting of sufficient securities to elect a majority of the directors, (ii) any general partnership, limited liability company, joint venture or similar Person, at least a majority of whose outstanding partnership or similar interests shall at the time be owned, directly or indirectly, by such Person, or by one or more of its Subsidiaries, or by such Person and one or more of its Subsidiaries and (iii) any limited partnership of which such Person or any of its Subsidiaries is a general partner.

15.    Withholding and Off-Set. All payments made by the Company under this Agreement shall be (a) reduced by any tax or other amounts required to be withheld by the Company under applicable law, and (b) subject to off-set and reduction as set forth in, and pursuant to the terms of, the Kulkarni Subscription Agreement.

16.    Assignment.  Neither the Company nor the Consulting Employee may make any assignment of this Agreement or any interest herein, by operation of law or otherwise, without the prior written consent of the other; provided, however, that (i) the Company may assign its rights and obligations under this Agreement without the consent of the Consulting Employee in the event that the Consulting Employee is transferred to a position with any of the Affiliates or in the event that the Company shall hereafter affect a reorganization, consolidate with, or merge into, any other Person or transfer all or substantially all of its properties or assets to any other Person and (ii) the obligations of the Company hereunder may be assigned to the Consulting Employee's estate in the event of his death.  This Agreement shall inure to the benefit of and be binding upon the Company and the Consulting Employee, their respective successors, executors, administrators, heirs and permitted assigns.

17.    Indemnification. The Company agrees to indemnify Mr. Kulkarni hereunder to the same extent to which Wolverine Proctor, LLC indemnifies its board of managers, its members, and its officers and directors, pursuant to and as provided in its Limited Liability Company Agreement.

18.    Severability.  If any portion or provision of this Agreement shall to any extent be declared illegal or unenforceable by a court of competent jurisdiction, then the remainder of this Agreement, or the application of such portion or provision in circumstances other than those as to which it is so declared illegal or unenforceable, shall not be affected thereby, and each portion and provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

19.    Waiver.  No waiver of any provision hereof shall be effective unless made in writing and signed by the waiving party.  The failure of either party to require the performance of

8696699.4

-9-

W0746

any term or obligation of this Agreement, or the waiver by either party of any breach of this Agreement, shall not prevent any subsequent enforcement of such term or obligation or be deemed a waiver of any subsequent breach.

20.   Notices.  Any and all notices, requests, demands and other communications provided for by this Agreement shall be in writing and shall be effective when delivered in person or deposited in the United States mail, postage prepaid, registered or certified, and addressed to the Consulting Employee at his last known address on the books of the Company or, in the case of the Company, at its principal place of business, attention of Chief Executive Officer, or to such other address as either party may specify by notice to the other actually received.

21.   Entire Agreement.  This Agreement constitutes the entire agreement between the parties and supersedes all prior communications, agreements and understandings, written or oral, with respect to the terms and conditions of the Consulting Employees employment; provided however, that this Agreement shall not supersede any other obligations of the Consulting Employee with respect to confidentiality, non-competition, non-solicitation, assignment of rights to intellectual property or the like, which obligations shall remain in full force and effect in accordance with their terms.

22.   Amendment.  This Agreement may be amended or modified only by a written instrument signed by the Consulting Employee and representative of the Company (other than the Consulting Employee) duly authorized by a majority of the Board of Directors of the Company.

23.   Headings.  The headings and captions in this Agreement are for convenience only and in no way define or describe the scope or content of any provision of this Agreement.

24.   Counterparts.  This Agreement may be executed in two or more counterparts, each of which shall be an original and all of which together shall constitute one and the same instrument.

25.   Governing Law.  This is a Massachusetts contract and shall be construed and enforced under and be governed in all respects by the laws of the Commonwealth of Massachusetts, without regard to the conflict of laws principles thereof.

26.   Guaranty.  The Contributed Companies (other than the Company) shall, jointly and severally, guaranty the obligations of the Company hereunder.

[Remainder of page intentionally left blank]

8696699.4

W0747

IN WITNESS WHEREOF, this Agreement has been executed as a sealed instrument by the Company, by its duly authorized representative, and by the Consulting Employee, as of the date first above written.

WOLVERINE, PROCTOR & SCHWARTZ, INC.

By:
Name:
Title:                                    MARK    BROWN
                                          CEO

Mr. Deepak Kulkarni

*Agreed, as to Section 26 hereof only*:

MAWLAW 492 LIMITED

By:
Name:
Title:

FRIEL ENGINEERING LIMITED

By:
Name:
Title:

0696699.4                    -2-

TOTAL P.02

W0748

**<u>EXHIBIT 6</u>**
**KULKARNI**

## WOLVERINE PROCTOR & SCHWARTZ, INC.

Action by Unanimous Written Consent of Directors
In Lieu of a Meeting of Directors

The undersigned, being all of the directors of Wolverine Proctor & Schwartz, Inc., a Massachusetts corporation (the "Corporation"), hereby consent to and adopt the resolutions attached hereto as Exhibit 1 and consent to the actions described therein in the same manner as if duly presented to and approved at a meeting of the Board of Directors of the Corporation duly called for such purpose.

This consent may be executed in one or more counterparts and shall be filed with minutes of meetings of the Board of Directors of the Corporation.

IN WITNESS WHEREOF, the undersigned have caused this unanimous written consent to be executed as of the date first written below.

_____
Ernest K. Jacquet

_____
Erik Scott

_____
John C. Rutherford

_____
Deepak Kulkarni

_____
Mark Brown

Dated: December 31, 2001

8690684.1

W0037

## WOLVERINE PROCTOR & SCHWARTZ, INC.

Action by Unanimous Written Consent of Directors
<u>In Lieu of a Meeting of Directors</u>

The undersigned, being all of the directors of Wolverine Proctor & Schwartz, Inc., a Massachusetts corporation (the "<u>Corporation</u>"), hereby consent to and adopt the resolutions attached hereto as <u>Exhibit 1</u> and consent to the actions described therein in the same manner as if duly presented to and approved at a meeting of the Board of Directors of the Corporation duly called for such purpose.

This consent may be executed in one or more counterparts and shall be filed with minutes of meetings of the Board of Directors of the Corporation.

**IN WITNESS WHEREOF,** the undersigned have caused this unanimous written consent to be executed as of the date first written below.

_____
Ernest K. Jacques

_____
Erik Scott

_____
John C. Rutherford

_____
Deepak Kulkarni

_____
Mark Brown

Dated: December 31, 2001

# WOLVERINE PROCTOR & SCHWARTZ, INC.

## Action by Unanimous Written Consent of Directors
### In Lieu of a Meeting of Directors

The undersigned, being all of the directors of Wolverine Proctor & Schwartz, Inc., a Massachusetts corporation (the "Corporation"), hereby consent to and adopt the resolutions attached hereto as Exhibit 1 and consent to the actions described therein in the same manner as if duly presented to and approved at a meeting of the Board of Directors of the Corporation duly called for such purpose.

This consent may be executed in one or more counterparts and shall be filed with minutes of meetings of the Board of Directors of the Corporation.

IN WITNESS WHEREOF, the undersigned have caused this unanimous written consent to be executed as of the date first written below.

_____
Ernest K. Jacquet


_____
Erik Scott

_____
John C. Rutherford


_____
Deepak Kulkarni


_____
Mark Brown


Dated: December 31, 2001


8690684.1

## WOLVERINE PROCTOR & SCHWARTZ, INC.

Action by Unanimous Written Consent of Directors
In Lieu of a Meeting of Directors

The undersigned, being all of the directors of Wolverine Proctor & Schwartz, Inc., a Massachusetts corporation (the "Corporation"), hereby consent to and adopt the resolutions attached hereto as Exhibit 1 and consent to the actions described therein in the same manner as if duly presented to and approved at a meeting of the Board of Directors of the Corporation duly called for such purpose.

This consent may be executed in one or more counterparts and shall be filed with minutes of meetings of the Board of Directors of the Corporation.

IN WITNESS WHEREOF, the undersigned have caused this unanimous written consent to be executed as of the date first written below.

_____
Ernest K. Jacquet

_____
Erik Scott

_____
John C. Rutherford

_____
Deepak Kulkarni

_____
Mark Brown

Dated: December 31, 2001

8690684.1

# WOLVERINE PROCTOR & SCHWARTZ, INC.

## Action by Unanimous Written Consent of Directors
### In Lieu of a Meeting of Directors

The undersigned, being all of the directors of Wolverine Proctor & Schwartz, Inc., a Massachusetts corporation (the "Corporation"), hereby consent to and adopt the resolutions attached hereto as Exhibit 1 and consent to the actions described therein in the same manner as if duly presented to and approved at a meeting of the Board of Directors of the Corporation duly called for such purpose.

This consent may be executed in one or more counterparts and shall be filed with minutes of meetings of the Board of Directors of the Corporation.

**IN WITNESS WHEREOF,** the undersigned have caused this unanimous written consent to be executed as of the date first written below.

_____
Ernest K. Jacquet

_____
Erik Scott

_____
John C. Rutherford

_____
Deepak Kulkarni

_____
Mark Brown

Dated: December 31, 2001

8690684.1

W0041

<u>Exhibit 1</u>

## WOLVERINE PROCTOR & SCHWARTZ, INC.

<u>RESOLUTIONS</u>

<u>Removal and Appointment of Officers</u>

RESOLVED:  That all officers of this Corporation shall be and are hereby removed from office without cause, effective immediately.

RESOLVED:  That each of the following individuals shall be and are hereby elected to the office or offices set forth opposite his/her name, to serve in accordance with the Bylaws of the Corporation:

| | |
|---|---|
| Deepak Kulkarni | Chief Executive Officer |
| Erik Scott | Vice President |
| Mark Brown | Secretary & Treasurer |

[The remainder of this page has been intentionally left blank.]

# EXHIBIT 7
# KULKARNI

## Wolverine Proctor & Schwartz, Inc.
### Minutes of Board of Directors Meeting
*January 10, 2002*

Pursuant to notice duly given, a special meeting of the Board of Directors of Wolverine Proctor & Schwartz was held at 10:00 a.m. on Thursday, January 10, 2002 at the offices of Parthenon Capital, 200 State Street, Boston, MA. Present and acting throughout the meeting were Deepak Kulkarni, Gideon Argov, and Erik Scott. Also present by invitation Thomas Scriven, Associate at Parthenon Capital. Mr. Thomas Scriven, as secretary pro tempore, kept the minutes of the meeting.

The first item of business was to discuss the plan of putting a working capital line in place. The directors listed a number of banks that might be approached as well as banks that in the past have had interaction with Wolverine Proctor & Schwartz. A general discussion with regards to how best implement the financing and timing followed.

The next items of business were to discuss the press release announcing the completed transaction between Parthenon Capital and Wolverine Proctor & Schwartz, the business opportunities for the ATM business division, the current status of the customer and potential customer list, vendors as well as the state of employee morale.

The next item of business was to discuss reporting within the business. Thomas Scriven presented to the directors a first draft of some of the necessary reporting templates. The directors then discussed financial controls policies. Further, the timing of the audit was discussed.

The next item of business was to discuss progress on the CEO search. The directors asked questions related to the potential candidates. Particular attention was paid to timing and the ability of the different candidates to run Wolverine Proctor & Schwartz. The directors exchanged their opinions of their interviews with the different candidates. The directors discussed potential compensation for the CEO.

The next item of business was to set a date for the next Board meeting. Following brief discussion, a motion duly made and seconded, it was:

**VOTED:**    To meet in Boston at 200 State Street on February 15th at 1:00pm and in Merrimac at 51 East Main Street on March 22nd at 10:00am.

There being no further business to come before the meeting, upon motion duly made and seconded, it was:

**VOTED:**    To adjourn.
Adjourned.
A true record.
ATTEST:

_____

# EXHIBIT 8
# KULKARNI

*Execution Copy*

# EMPLOYMENT AGREEMENT

AGREEMENT made and entered into in Boston, Massachusetts, by and between Wolverine Proctor & Schwartz, Inc. (the "Company"), a Delaware corporation with its principal place of business at 51 East Main Street, Merrimac, Massachusetts, and Steven Chilinski, an individual currently residing at 18 Cedar Farms Road, Medway, Massachusetts (the "Executive"), effective as of the 29th day of January, 2002.

WHEREAS, the operations of the Company and its Affiliates are a complex matter requiring direction and leadership;

WHEREAS, the Executive is possessed of certain experience and expertise that qualify him to provide the direction and leadership required by the Company and its Affiliates; and

WHEREAS, subject to the terms and conditions hereinafter set forth, the Company therefore wishes to employ the Executive as its Chief Executive Officer and the Executive wishes to accept such employment;

NOW, THEREFORE, in consideration of the foregoing premises and the mutual promises, terms, provisions and conditions set forth in this Agreement, the parties hereby agree:

1.    <u>Employment</u>.  Subject to the terms and conditions set forth in this Agreement, the Company hereby offers and the Executive hereby accepts employment.

2.    <u>Term</u>.  Subject to earlier termination as hereafter provided, this Agreement shall have an original term of three (3) years commencing on the effective date hereof and shall be automatically extended for successive terms of one (1) year each, unless the Executive or an expressly authorized representative of the Company (other than the Executive) provides notice to the other party at least sixty (60) days prior to the expiration of the original or any extension term that the Agreement is not to be extended.  The term of this Agreement, as from time to time extended or renewed, is hereafter referred to as "the term of this Agreement" or "the term hereof".

3.    <u>Capacity and Performance</u>.

(a)    During the term hereof, the Executive shall serve the Company as its Chief Executive Officer.  In addition, and without further compensation, the Executive shall serve during the term hereof as a member of the Board of Managers of the LLC, as defined below, provided Deepak Kulkarni nominates the Executive to fill one of the two seats on such board of managers controlled by Mr. Kulkarni, and shall continue to so serve until removed.

(b)    During the term hereof, the Executive shall be employed by the Company on a full-time basis and shall perform such duties and responsibilities on behalf of the Company

W0051

and its Affiliates (including without limitation, in the case of such Affiliates, serving as an executive officer and/or director of one or more of them) as may be designated from time to time by the Company's Board of Directors (the "Board") or by its designees.

(c)    During the term hereof, the Executive shall devote his full business time and his best efforts, business judgment, skill and knowledge exclusively to the advancement of the business and interests of the Company and its Affiliates and to the discharge of his duties and responsibilities hereunder. The Executive shall not engage in any other business activity or serve in any industry, trade, professional, governmental or academic position during the term of this Agreement, except as may be expressly approved in advance by the Board in writing, which approval shall not be unreasonably withheld so long as the activity will not interfere with the Executive's performance of his duties and responsibilities hereunder in any material way.

4.    Compensation and Benefits.  As compensation for all services performed by the Executive under and during the term hereof and subject to performance of the Executive's duties and of the obligations of the Executive to the Company and its Affiliates, pursuant to this Agreement or otherwise:

(a)    Base Salary.  During the term hereof, the Company shall pay the Executive a base salary at the rate of Two Hundred Thirty Five Thousand Dollars ($235,000) per annum, payable in accordance with the payroll practices of the Company for its executives and subject to adjustment from time to time by the Board, in its sole discretion. Such base salary, as from time to time adjusted, is hereafter referred to as the "Base Salary".

(b)    Performance Bonus Compensation.  During the Executive's employment hereunder, the Executive will be eligible each year for a bonus (the "Performance Bonus"), ranging in amount from zero to 100% of the Base Salary, as determined by the Board. The Executive will be eligible to receive the Performance Bonus each fiscal year if the EBITDA or other performance targets identified as the targets for the Performance Bonus and set forth as such in the Company's annual budget, as approved by the Board, are met or exceeded in such fiscal year. Any Performance Bonus for which the Executive would be eligible for fiscal year 2002 will be prorated by multiplying (x) the amount of the Performance Bonus otherwise payable in accordance with this Section 4(b) by (y) a fraction, the denominator of which shall be 365 and the numerator of which shall be the number of days during fiscal year 2002 for which the Executive was employed by the Company hereunder. The Executive will not be eligible for any Performance Bonus in respect of any fiscal year in which he is not employed by the Company through December 31st of such year; provided that, if the Executive's employment hereunder is terminated by the Company in accordance with Section 7(d)(ii) below and the EBITDA or other performance targets for the fiscal year through and including the quarter of such termination have been met or exceeded, any Performance Bonus for which the Executive would be eligible for that year, if any, will be prorated by multiplying (I) the amount of the Performance Bonus otherwise payable in accordance with this Section 4(b) by (II) a fraction, the denominator of which shall be 365 and the numerator of which shall be the number of days during the applicable fiscal year for which the Executive was employed by the Company

Chalinsky agreement.DOC

W0052

hereunder, and will be payable at the time such bonuses in respect of such year are payable to Company executives generally.

      (c)    <u>Stock Options</u>.

      (i)    On, or promptly following, the date that is ninety (90) days after the date the Executive commences employment hereunder, Holdings (as defined below) shall grant to the Executive a non-qualified stock option (the "Incentive Option") to purchase 3.19737 shares (subject to adjustment from time to time for stock splits, stock dividends and the like) of the common stock of Holdings, provided that, in no event shall the Executive be entitled to any portion of the Incentive Option if he is not employed by the Company pursuant to this Agreement on that date that is ninety (90) days after the date the Executive commences employment hereunder. The Incentive Option shall be exercisable at a price per share equal to the Applicable Exercise Price (as defined below). The Incentive Option shall vest in thirty-six (36) equal monthly installments as follows: on the date of grant, a portion of the Incentive Option representing three (3) monthly installments shall immediately vest and become exercisable and the remaining thirty-three (33) installments shall vest and become exercisable monthly thereafter during the Executive's employment hereunder, treating (for vesting purposes) the date that is ninety (90) days after the date the Executive commences employment hereunder as the grant date. No portion of any Incentive Option shall vest and become exercisable in any respect from and after the date of termination of the Executive's employment hereunder. Notwithstanding any other provision hereof: (x) if a Recapitalization, as defined below, is consummated within one year after the date the Executive commences employment hereunder (the "First Year"), the portion of the Incentive Option which would have vested and become exercisable during the remainder of the First Year shall vest and become immediately exercisable by the Executive as of the date of such Recapitalization, and the remaining portion of the Incentive Option will continue to vest and become exercisable on a monthly basis beginning with the thirteenth month after the Executive commences employment hereunder; and (y) if a Change of Control, as defined below, is consummated at any time during the term hereof, any portion of the Incentive Option that has not yet vested and become exercisable shall immediately vest and become exercisable by the Executive as of the date of consummation of such Change of Control. Any portion of the Incentive Option that is (A) not vested and exercisable on the date of termination of the Executive's employment hereunder shall be cancelled as of that date; (B) vested and exercisable as of such date of termination (in the case of termination by the Company other than for Cause, or termination pursuant to Sections 7(a) (Death) or 7(b) (Disability) hereof) shall remain vested and exercisable following such date of termination for a period of two (2) years, after which it shall be cancelled to the extent not exercised prior to the second anniversary of such date of termination; (C) vested and exercisable as of such date of termination (in the case of termination by the Executive) shall be cancelled as of that date; and (D) vested and exercisable as of such date of termination (in the case of termination by the Company for Cause) shall be cancelled as such date. Notwithstanding the foregoing, any portion of the Incentive Option that is not exercised

W0053

by the Executive prior to or on the date of consummation of a Change of Control shall be cancelled.

(ii)    Upon consummation of a Qualified Sale, at any time after the date that is ninety (90) days after the date the Executive commences employment hereunder, that results in Distributions to the Members of the LLC (each such term as defined below), equal to: (A) an aggregate of at least Thirty-Five Million Dollars ($35,000,000) but less than Forty-Eight Million Dollars ($48,000,000) (in each case, net of Transaction Expenses, as defined below), the Executive shall be granted a non-qualified stock option (a "Sale Option"), which shall be immediately vested and exercisable by the Executive, to purchase 1.06579 shares (subject to adjustment from time to time for stock splits, stock dividends and the like) of the common stock of Holdings, or (B) an aggregate of Forty-Eight Million Dollars ($48,000,000) or more (net of Transaction Expenses), the Executive shall be granted a Sale Option, which shall be immediately vested and exercisable by the Executive, to purchase 2.13158 shares (subject to adjustment from time to time for stock splits, stock dividends and the like) of the common stock of Holdings, provided, in the case of either clause (A) or (B) above, either (x) the Executive is employed by the Company hereunder on the date of consummation of such Qualified Sale or (y) such Qualified Sale is consummated within thirty (30) days from and after the date of termination of the Executive's employment hereunder other than for Cause pursuant to Section 7(d)(ii). Any Sale Option granted hereunder shall be exercisable at a price per share equal to the Applicable Exercise Price. If such Qualified Sale is consummated more than thirty (30) days from and after the date that the Executive's employment hereunder is terminated other than for Cause pursuant to Section 7(d)(ii) below, and the Executive had been employed by the Company hereunder prior to such termination: (C) for less than one (1) year after the date the Executive commences employment hereunder, the Executive shall not be entitled to or receive any Sale Option; (D) for more than one (1) year, but less than two (2) years, after the date the Executive commences employment hereunder, the Executive shall be granted a Sale Option, representing one third (1/3) of the amount that would be granted in accordance with the applicable provision of (ii)(A) or (ii)(B) above if the Executive were employed by the Company hereunder on the date of consummation of such Qualified Sale; (E) for more than two (2) years, but less than three (3) years, after the date the Executive commences employment hereunder, the Executive shall be granted a Sale Option, representing two thirds (2/3) of the amount that would be granted in accordance with the applicable provision of (ii)(A) or (ii)(B) above if the Executive were employed by the Company hereunder on the date of consummation of such Qualified Sale; or (F) for at least three (3) years after the date the Executive commences employment hereunder, the Executive shall be granted a Sale Option, representing the entire amount that would be granted in accordance with the applicable provision of (ii)(A) or (ii)(B) above if the Executive were employed by the Company hereunder on the date of consummation of such Qualified Sale. Any Sale Option granted to the Executive hereunder shall be immediately vested and exercisable. Any portion of any Sale Option that is not exercised by the Executive

Chalinsky agreement.DOC                    -4-

on the date of consummation of a Qualified Sale that is a Change of Control shall be cancelled.

        (iii)    Any stock options granted the Executive under this Agreement shall be granted pursuant and subject to a stock option agreement and a stock option plan and such other documentation as are required and approved by the board of directors of Holdings, as each may be amended from time to time pursuant to their respective terms. Any grant of stock options to the Executive under this Agreement is subject to the Executive signing the applicable stock option agreement, which shall contain terms regarding the Options consistent with those set forth in this Agreement and providing for exercise of such Options on a cash and cashless basis, restrictions on transfer of the Options by the Executive (except for estate planning purposes and upon his death to his lawful beneficiaries) and drag-along rights in favor of the LLC with respect to the Options, and such other documentation as the board of directors of Holdings shall require. Any options granted pursuant to this Section 4(c) are not intended to qualify as incentive stock options under Section 422 of the Internal Revenue Code of 1986.

The term "Applicable Exercise Price" shall mean, as of the date of determination thereof, two hundred thousand dollars ($200,000) multiplied by a fraction (a) the numerator of which is the difference between (i) the sum of twenty million dollars ($20,000,000) plus the aggregate amount of the Investment and (ii) the sum of the aggregate amount of the principal of the WP&S Notes paid with the proceeds of a Recapitalization through and including such date plus the amount of the proceeds of a Recapitalization paid to the Executive through and including such date and (b) the denominator of which is the sum of twenty million dollars ($20,000,000) plus the aggregate amount of the Investment.

        (d)    <u>Vacations and Holidays</u>. During the term hereof, the Executive shall be entitled to four (4) weeks of vacation per annum, to be taken at such times and intervals as shall be determined by the Executive, subject to the reasonable business needs of the Company. In addition, the Executive will receive one day of vacation with pay on each holiday recognized by the Company.

        (e)    <u>Car Allowance</u>. During the term hereof, the Company shall pay the Executive Seven Hundred Fifty Dollars ($750.00) per month to be used by the Executive for automobile expenses, including lease or purchase cost, gasoline, maintenance, repairs, and insurance expenses in connection with the Executive's ownership and operation of the automobile. Any resulting income taxes shall be the sole responsibility of the Executive.

        (f)    <u>Other Benefits</u>. During the term hereof and subject to any contribution therefor generally required of employees of the Company, the Executive shall be entitled to participate in any and all employee benefit plans from time to time in effect for employees of the Company generally, including the generally applicable 401(k) plan, group health plan, life insurance plan, and disability income plan, except to the extent such plans are in a category of benefit otherwise provided to the Executive. Such participation shall be subject to the terms of

W0055

the applicable plan documents and generally applicable Company policies. The Company may alter, modify, add to or delete its employee benefit plans at any time as it, in its sole judgment, determines to be appropriate, without recourse by the Executive.

(g)    Business Expenses. The Company shall pay or reimburse the Executive for all reasonable business expenses (other than automobile expenses provided for separately in Section 4(e) hereof) incurred or paid by the Executive in the performance of his duties and responsibilities hereunder, subject to any maximum annual limit and other restrictions on such expenses set by the Board and to such reasonable substantiation and documentation as may be specified by the Company from time to time.

5.    Equity Investment. The Executive shall purchase at least 1.25000 shares (subject to adjustment from time to time for stock splits, stock dividends and the like) of common stock of Holdings at a price per share equal to two hundred thousand dollars ($200,000), (such purchase, the "Investment") pursuant to a subscription agreement containing the foregoing price terms and such other terms (including without limitation (i) representations by the Executive as to his investment intent and ability to bear the loss of the funds invested, and (ii) provisions restricting the transfer of Shares by the Executive except for estate planning purposes and upon his death to his lawful beneficiaries and (iii) drag-along rights in favor of the LLC over Shares and Options) as the board of Holdings shall require. The Executive acknowledges that the consummation of the Investment as provided herein is a material obligation of the Executive hereunder and that the failure to consummate the Investment as and when provided herein shall constitute a material breach of the Agreement. The Executive agrees that the Investment shall be completed as soon as practicable after the ninetieth (90th) day following the date that the Executive commences employment hereunder, and in no event later than the tenth business day after the ninetieth (90th) day following the date that the Executive commences employment hereunder. Holdings shall lend to the Executive on a full recourse basis an amount equal to up to 50% of the aggregate subscription price for the Investment, subject to the Executive's execution and delivery of a promissory note (the "Executive Note") to Holdings in the form provided by Holdings, which loaned amount shall be used in its entirety by the Executive to pay a portion of the subscription price for the Investment. The Executive shall pay the remainder of the subscription price for the Investment in cash. The Executive Note shall be full recourse to the Executive and shall accrue simple interest at the "applicable federal rate" as defined in Section 1274(d) of the Internal Revenue Code, payable at maturity of the Executive Note. The principal of the Executive Note, together with any accrued and unpaid interest thereon, shall be due and payable in full on the earlier of (i) the fifth anniversary of its date of issue or (ii) the date of consummation of a Qualified Sale; provided, that the Executive shall be required to prepay the principal of the Executive Note, together with any accrued and unpaid interest thereon, with fifty percent (50%) of any cash proceeds of a Recapitalization received by the Executive, determined on an after-tax basis assuming a rate of tax for all taxes (including without limitation federal, state and local) applicable to such proceeds of forty percent (40%) in the aggregate.

6.    Call Right. Upon any termination of the employment of the Executive with the Company or any of its Affiliates and at any time thereafter, Holdings shall have the right to

Chalinsky agreement.DOC

-6-

purchase for cash all or any portion of the Shares, including without limitation any Options, (collectively, the "Call Shares") held by the Executive or originally issued to the Executive but held by one or more Permitted Transferees (collectively, the "Stockholder Call Group") on the following terms (the "Call Option"):

   (a) Termination due to Death or Disability or by Company other than for Cause. If such termination is the result of (i) the death or disability of the Executive or (ii) termination of the Executive's employment by the Company or any its Affiliates other than for Cause, then, in any such event, Holdings may purchase all or any portion of the Call Shares held by the Executive (or Permitted Transferee, if applicable) at a per Share price (determined as provided in Section 6(c) in the case of Call Shares that are Options) equal to the Fair Market Value of such Call Shares. In each case Call Shares are purchased pursuant to this clause (a), Holdings will pay for such Call Shares by paying the holder the applicable purchase price in cash.

   (b) Termination by Company for Cause or by the Executive. If such termination is the result of (i) termination of the Executive's employment by the Company or any its Affiliates for Cause or (ii) termination of the Executive's employment by the Executive, then Holdings may purchase all or any portion of the Call Shares held by such holder (or Permitted Transferee, if applicable) at a per Share price (determined as provided in Section 6(c) in the case of Call Shares that are Options) equal to the lesser of the Cost or the Fair Market Value of such Call Shares. In each case Call Shares are purchased pursuant to this clause (b), Holdings will pay for such Call Shares by paying the holder the applicable purchase price in cash.

   (c) Treatment of Options. Any Options that by their terms are terminated (in whole or in part) effective upon termination of employment will be so terminated. If any Call Shares to be sold to Holdings pursuant to this Section 6 are Options, for purposes of determining the applicable price per share, the Fair Market Value per share of such Call Shares shall be determined after taking into account a reduction for an amount equal to the exercise price per share of such Options and the Cost per share of such Options shall be zero.

   (d) Notices, Etc. Any Call Option may be exercised by delivery of written notice thereof (the "Call Notice") to all members of the applicable Stockholder Call Group stating that Holdings has elected to exercise the Call Option, and the number and price of the Call Shares with respect to which the Call Option is being exercised.

   (e) Closing.

    (i) The closing of any purchase and sale of Call Shares pursuant to this Section 6 shall take place as soon as reasonably practicable (and in no event later than 30 days after the date of the Call Notice) at the principal office of Holdings, or at such other time and location as the parties to such purchase may mutually determine; provided that such 30-day period or other mutually-agreed period shall be extended for

Chalinsky agreement.DOC

-7-

W0057

any period needed to determine the Fair Market Value of the Call Shares being purchased.

(ii)    At the closing of any purchase and sale of Call Shares following the exercise of any Call Option, the holders of Call Shares to be sold shall deliver to Holdings a certificate or certificates representing the Call Shares to be purchased by Holdings duly endorsed, or with stock (or equivalent) powers duly endorsed, for transfer with signature guaranteed, free and clear of any lien or encumbrance, with any necessary stock (or equivalent) transfer tax stamps affixed, and Holdings shall pay to such holder by certified or bank check or wire transfer of immediately available federal funds the purchase price of the Call Shares being purchased by Holdings. If any holder of Call Shares to be so sold to Holdings fails or refuses to execute such documents or instruments of transfer referred to in the preceding sentence, Holdings is hereby appointed as attorney-in-fact for such Person in order to execute such documents or instruments of transfer and, upon such execution by Holdings, the Company may cancel on its books the certificate or certificates representing such Call Shares and, thereupon, all of such holder's rights in and to such Call Shares shall terminate. Until such documents or instruments of transfer become effective, Holdings may hold the purchase price in respect of such Call Shares. The delivery of a certificate or certificates for Call Shares by any Person selling Call Shares pursuant to any Call Option shall be deemed a representation and warranty by such Person that: (i) such Person has full right, title and interest in and to such Call Shares; (ii) such Person has all necessary power and authority and has taken all necessary action to sell such Call Shares as contemplated; (iii) such Call Shares are free and clear of any and all liens or encumbrances and (iv) there is no "adverse claim" with respect to such Call Shares as defined in Section 8-302 of the applicable Uniform Commercial Code.

(f)    Acknowledgment.  The Executive acknowledges and agrees that neither the Company nor any Person directly or indirectly affiliated with the Company (in each case whether as a director, officer, manager, employee, agent or otherwise) shall have any duty or obligation to affirmatively disclose to him, and he shall not have any right to be advised of, any material information regarding the Company or otherwise at any time prior to, upon, or in connection with any termination of his employment by the Company or any its Affiliates upon the exercise of any Call Option or any purchase of the Call Shares in accordance with the terms hereof.

7.    Termination of Employment and Severance Benefits.  In the event that the Company elects not to extend this Agreement pursuant to Section 2 above, the Company will continue to pay the Executive the Base Salary at the rate in effect on the date of expiration of this Agreement pursuant to Section 2 above for the period of twelve (12) months from the date of such expiration (the "Severance Payments"). If benefits are payable to the Executive by the Company under a separate severance agreement or severance plan, and the aggregate amount of all such benefits is less than the Severance Payments, the Severance Payments will be reduced by the aggregate amount of all such benefits; if the aggregate amount of all benefits payable to the

Chalinsky agreement.DOC

-8-

W0058

Executive by the Company under a separate severance agreement or severance plan is greater than the Severance Payments, the Executive shall receive either benefits under one such severance agreement or severance plan or the Severance Payments, whichever is greater. Any obligation of the Company to the Executive hereunder is conditioned, however, upon the Executive signing a release of claims in the form provided by the Company (the "Employee Release") within twenty-one days (or such greater period as the Company may specify) following the later of the date on which the Executive receives notice of termination of employment or the date he receives a copy of the Employee Release and upon the Executive not revoking the Employee Release in a timely manner thereafter. All Severance Payments will be in the form of salary continuation, payable in accordance with the normal payroll practices of the Company, and will begin at the Company's next regular payroll period which is at least 5 business days following the effective date of the Employee Release, but shall be retroactive to the day following the date of termination.

Notwithstanding the provisions of Section 2 hereof, the Executive's employment hereunder shall terminate prior to the expiration of the term under the following circumstances:

(a)    Death. In the event of the Executive's death during the term hereof, the Executive's employment hereunder shall immediately and automatically terminate and the Company shall pay to the Executive's designated beneficiary or, if no beneficiary has been designated by the Executive, to his estate: any earned and unpaid Base Salary, pro-rated through the date of his death; pay for any vacation time accrued but not used to that date; and reimbursement for any outstanding business expenses incurred by the Executive in accordance with Section 4(g) above, subject to the Company's substantiation and documentation requirements.

(b)    Disability.

(i)    The Company may terminate the Executive's employment hereunder, upon notice to the Executive, in the event that the Executive becomes disabled during his employment hereunder through any illness, injury, accident or condition of either a physical or psychological nature and, as a result, is unable to perform substantially all of his duties and responsibilities hereunder for either ninety (90) consecutive days or 180 cumulative days during any period of three hundred and sixty-five (365) consecutive calendar days.

(ii)    The Board may designate another employee to act in the Executive's place during any period of the Executive's disability. Notwithstanding any such designation, the Executive shall continue to receive the Base Salary in accordance with Section 4(a) and benefits in accordance with Section 4(f), to the extent permitted by the then-current terms of the applicable benefit plans, until the Executive becomes eligible for disability income benefits under any disability policy or plan covering the Executive or until the termination of his employment, whichever shall first occur.

Chalinsky agreement.DOC

-9-

W0059

(iii)    If any question shall arise as to whether during any period the Executive is disabled through any illness, injury, accident or condition of either a physical or psychological nature so as to be unable to perform substantially all of his duties and responsibilities hereunder, the Executive may, and at the request of the Company shall, submit to a medical examination by a physician selected by the Company to whom the Executive or his duly appointed guardian, if any, has no reasonable objection to determine whether the Executive is so disabled and such determination shall for the purposes of this Agreement be conclusive of the issue. If such question shall arise and the Executive shall fail to submit to such medical examination, the Company's determination of the issue shall be binding on the Executive.

(c)    <u>By the Company for Cause</u>. The Company may terminate the Executive's employment hereunder for Cause at any time upon notice to the Executive setting forth in reasonable detail the nature of such Cause. The following, as determined by the Board in its reasonable judgment, shall constitute Cause for termination:

(i)    The Executive's material failure to perform (other than by reason of disability), or material negligence in the performance of, his duties and responsibilities to the Company or any of its Affiliates, which such failure or negligence remains uncured or continues or recurs after ten (10) business days' notice thereof from the Company specifying in reasonable detail the nature of the failure or the negligence;

(ii)    Material breach by the Executive of any provision of this Agreement or any other agreement between the Executive and the Company or any of its Affiliates, which breach remains uncured or continues or recurs after ten (10) business days' notice thereof from the Company specifying in reasonable detail the nature of the breach;

(iii)    Commission of fraud, embezzlement or other material dishonesty with respect to the Company or any of its Affiliates; or

(iv)    Commission of a felony or other crime involving moral turpitude.

Upon the giving of notice of termination of the Executive's employment hereunder for Cause, the Company and its Affiliates shall have no further obligation or liability to the Executive, other than for Base Salary earned and unpaid at the date of termination, pay for any vacation time accrued but not used prior to the date of termination, and reimbursement for any outstanding business expenses incurred in accordance with Section 4(g) hereof, subject to the Company's substantiation and documentation requirements.

(d)    <u>By the Company Other than for Cause</u>. The Company may terminate the Executive's employment hereunder other than for Cause at any time upon notice to the Executive.

(i) In the event of such termination during the first ninety (90) days of the

Chalinsky agreement.DOC

-10-

W0060

Executive's employment hereunder, the Company and its Affiliates shall have no further obligation or liability to the Executive, other than for Base Salary earned and unpaid at the date of termination, pay for any vacation time accrued but not used prior to the date of termination, and reimbursement for any outstanding business expenses incurred in accordance with Section 4(g) hereof, subject to the Company's substantiation and documentation requirements.

(ii) In the event of such termination subsequent to the first ninety (90) days of the Executive's employment hereunder, and provided that no benefits are payable to the Executive by the Company under a separate severance agreement or severance plan as a result of such termination, then the Company will continue to pay the Executive the Base Salary at the rate in effect on the date of termination for the period of twelve (12) months from the date of termination (the "Severance Payments"). If benefits are payable to the Executive by the Company under a separate severance agreement or severance plan, and the aggregate amount of all such benefits is less than the Severance Payments, the Severance Payments will be reduced by the aggregate amount of all such benefits; if the aggregate amount of all benefits payable to the Executive by the Company under a separate severance agreement or severance plan is greater than the Severance Payments, the Executive shall receive either benefits under one such severance agreement or severance plan or the Severance Payments, whichever is greater. In addition, the Company shall pay the Executive any Performance Bonus to which he may be entitled pursuant to the provisions of the proviso to Section 4(b) above, at the time such bonuses are payable to Company executives generally. In addition, subject to any employee contribution applicable to the Executive on the date of termination, the Company shall continue to contribute to the cost of participation in the Company's group medical and dental plans for the Executive and his eligible dependents, provided that the Executive and his dependents are entitled to continue such participation under applicable law and plan terms, until the earlier of (i) twelve months following the date of termination of the Executive's employment hereunder and (ii) the date the Executive obtains new employment. The Executive shall provide the Company prompt notice in accordance with Section 20 hereof of his acceptance of any such new employment and in any event no later than five (5) business days after such acceptance. Any obligation of the Company to the Executive hereunder is conditioned, however, upon the Executive signing an Employee Release within twenty-one days (or such greater period as the Company may specify) following the later of the date on which the Executive receives notice of termination of employment or the date he receives a copy of the Employee Release and upon the Executive not revoking the Employee Release in a timely manner thereafter. All Severance Payments will be in the form of salary continuation, payable in accordance with the normal payroll practices of the Company, and will begin at the Company's next regular payroll period which is at least 5 business days following the effective date of the Employee Release, but shall be retroactive to the day following the date of termination.

(e)    By the Executive. The Executive may terminate his employment

W0061

hereunder at any time upon sixty (60) days' notice to the Company. In the event of such termination, the Company shall pay to the Executive: any earned and unpaid Base Salary, pro-rated through the date of termination; pay for any vacation time accrued but not used to that date; and reimbursement for any outstanding business expenses incurred by the Executive in accordance with Section 4(g) above, subject to the Company's substantiation and documentation requirements.

(f) <u>Post-Agreement Employment</u>. In the event the Executive remains in the employ of the Company or any of its Affiliates following termination of this Agreement, by the expiration of the term or otherwise, then such employment shall be at will.

8. <u>Effect of Termination</u>. The provisions of this Section 8 shall apply to termination due to the expiration of the term, pursuant to Section 7 or otherwise.

(a) Payment by the Company of any Base Salary, payment for any vacation time accrued but not used prior to the date of termination, reimbursement for any outstanding business expenses incurred in accordance with Section 4(g) hereof, and contributions to the cost of the Executive's continued participation in the Company's group health and dental plans, in each case that are due the Executive under the applicable termination provision of Section 7, and, in the case of termination pursuant to Section 7(d)(ii), payment for any pro-rata Performance Bonus pursuant to Section 4(b) hereof, shall constitute the entire obligation of the Company and its Affiliates to the Executive.

(b) Except for medical and dental plan coverage continued pursuant to Section 7(d)(ii) hereof, benefits shall terminate pursuant to the terms of the applicable benefit plans based on the date of termination of the Executive's employment without regard to any continuation of Base Salary or other payment to the Executive following such date of termination.

(c) Provisions of this Agreement shall survive any termination if so provided herein or if necessary or desirable to accomplish the purposes of other surviving provisions, including without limitation the obligations of the Executive under Sections 9, 10 and 11 hereof. The obligation of the Company to make payments to or on behalf of the Executive under Section 7(d)(ii) hereof shall survive termination, provided, however, that such obligation of the Company is expressly conditioned upon the Executive's continued full performance of obligations under Sections 9, 10 and 11 hereof. The Executive recognizes that, except as expressly provided in Section 7(d)(ii), no compensation is earned after termination of employment.

9. <u>Confidential Information</u>.

(a) The Executive acknowledges that the Company and its Affiliates continually develop Confidential Information, that the Executive may develop Confidential Information for the Company or its Affiliates and that the Executive may learn of Confidential Information during the course of employment. The Executive will comply with the policies and procedures of the Company and its Affiliates for protecting Confidential Information and shall

Chalinsky agreement.DOC

-12-

W0062

not use or disclose to any Person (other than the LLC and its Affiliates), other than as required by applicable law (after prior notice to the Company and a reasonable opportunity for it to seek protection of the Confidential Information) or for the proper performance of his duties and responsibilities to the Company and its Affiliates, any Confidential Information obtained by the Executive incident to his employment or other associations with the Company or any of its Affiliates. The Executive understands that this restriction shall continue to apply after his employment terminates, regardless of the reason for such termination.

(b)     All documents, records, tapes and other media of every kind and description relating to the business, present or otherwise, of the Company or its Affiliates and any copies, in whole or in part, thereof (the "Documents"), whether or not prepared by the Executive, shall be the sole and exclusive property of the Company and its Affiliates. The Executive shall safeguard all Documents and shall surrender to the Company at the time his employment terminates, or at such earlier time or times as the Board or its designee may specify, all Documents then in the Executive's possession or control.

10.    Assignment of Rights to Intellectual Property. The Executive shall promptly and fully disclose all Intellectual Property to the Company. The Executive hereby assigns and agrees to assign to the Company (or as otherwise directed by the Company) the Executive's full right, title and interest in and to all Intellectual Property. The Executive agrees to execute any and all applications for domestic and foreign patents, copyrights or other proprietary rights and to do such other acts (including without limitation the execution and delivery of instruments of further assurance or confirmation) requested by the Company to assign the Intellectual Property to the Company and to permit the Company to enforce any patents, copyrights or other proprietary rights to the Intellectual Property. The Executive will not charge the Company for time spent in complying with these obligations. All copyrightable works that the Executive creates shall be considered "work made for hire".

11.    Restricted Activities. The Executive agrees that some restrictions on his activities during and after his employment are necessary to protect the goodwill, Confidential Information and other legitimate interests of the Company and its Affiliates:

(a)     While the Executive is employed by the Company and for twelve (12) months after his employment terminates (in the aggregate, the "Non-Competition Period"), the Executive shall not, directly or indirectly, whether as owner, partner, investor, consultant, agent, employee, co-venturer or otherwise, compete with the Company or any of its Affiliates within the United States or any other geographic area where such business is being conducted or actively planned to be conducted by the Company or any of its Affiliates for whom the Executive has provided services during his employment hereunder (a "Served Affiliate") at or prior to the date of termination, nor shall the Executive undertake any planning for any business competitive with the Company or any Served Affiliate during the Non-Competition Period. Specifically, but without limiting the foregoing, the Executive agrees not to engage in any manner in any activity that is directly or indirectly competitive or potentially competitive with the business of the Company or any of its Affiliates as conducted or under consideration at any time during the

Chalinsky agreement.DOC

-13-

Executive's employment. For the purposes of this Section 11, the business of the Company and its Affiliates shall include all Products and the Executive's undertaking shall encompass all items, products and services that may be used in substitution for Products.

   (b) The Executive agrees that, during his employment with the Company, he will not undertake any outside activity, whether or not competitive with the business of the Company or its Affiliates, that could reasonably give rise to a conflict of interest or otherwise interfere with his duties and obligations to the Company or any of its Affiliates.

   (c) The Executive further agrees that while he is employed by the Company and during the Non-Competition Period, the Executive will not hire or attempt to hire any employee of the Company or any of its Affiliates, assist in such hiring by any Person (other than the LLC and its Affiliates), encourage any such employee to terminate his or her relationship with the Company or any of its Affiliates, or solicit or encourage any customer or vendor of the Company or any of its Affiliates to terminate or diminish its relationship with them, or, in the case of a customer, to conduct with any Person any business or activity which such customer conducts or could conduct with the Company or any of its Affiliates.

  12. Notification Requirement. Until the conclusion of the Non-Competition Period, the Executive shall give notice to the Company of each new business activity he plans to undertake, at least ten (10) business days prior to beginning any such activity. Such notice shall state the name and address of the Person for whom such activity is undertaken and the nature of the Executive's business relationship(s) and position(s) with such Person. The Executive shall provide the Company with such other pertinent information concerning such business activity as the Company may reasonably request in order to determine the Executive's continued compliance with his obligations under Sections 9, 10 and 11 hereof.

  13. Enforcement of Covenants. The Executive acknowledges that he has carefully read and considered all the terms and conditions of this Agreement, including the restraints imposed upon him pursuant to Sections 9, 10 and 11 hereof. The Executive agrees that said restraints are necessary for the reasonable and proper protection of the Company and its Affiliates and that each and every one of the restraints is reasonable in respect to subject matter, length of time and geographic area. The Executive further acknowledges that, were he to breach any of the covenants contained in Sections 9, 10 or 11 hereof, the damage to the Company would be irreparable. The Executive therefore agrees that the Company and its Affiliates, in addition to any other remedies available to them, shall be entitled to preliminary and permanent injunctive relief against any breach or threatened breach by the Executive of any of said covenants, without having to post bond. The parties further agree that, in the event that any provision of Section 9, 10 or 11 hereof shall be determined by any court of competent jurisdiction to be unenforceable by reason of its being extended over too great a time, too large a geographic area or too great a range of activities, such provision shall be deemed to be modified to permit its enforcement to the maximum extent permitted by law.

  14. Conflicting Agreements. The Executive hereby represents and warrants that the

Chalinsky agreement.DOC

-14-

W0064

execution of this Agreement and the performance of his obligations hereunder will not breach or be in conflict with any other agreement to which the Executive is a party or is bound and that the Executive is not now subject to any covenants against competition or similar covenants or any court order or other legal obligation that would affect the performance of his obligations hereunder. The Executive will not disclose to or use on behalf of the Company any proprietary information of a third party without such party's consent.

15.    Definitions. Words or phrases which are initially capitalized or are within quotation marks shall have the meanings provided in this Section 15 and as provided elsewhere herein. For purposes of this Agreement, the following definitions apply:

(a)    "Affiliate" means any Person directly or indirectly controlling, controlled by or under common control with a specified Person, where control may be by management authority, equity interest or contract; provided, however, that for purposes of Section 11 hereof, the term "Affiliate" shall be deemed to exclude Parthenon Capital, LLC and its affiliated investment funds, the equityholders of the LLC from time to time, and Persons who are not directly or indirectly controlled by the LLC or its successors but who are controlled by Parthenon Capital, LLC, its affiliated investment funds, or the equityholders of the LLC from time to time.

(b)    "Change of Control" means the occurrence hereafter of any of the following:  (i) any Person other than the LLC and its Affiliates becomes a beneficial owner (within the meaning of Rule 13d-3, as amended, as promulgated under the Securities Exchange Act of 1934), directly or indirectly, in one or a series of transactions, of securities representing more than fifty percent (50%) of the combined voting power of the then outstanding securities of Holdings; (B) the consummation of a merger, reorganization, recapitalization, consolidation or similar transaction involving Holdings and/or all or substantially all of its Subsidiaries, other than a merger, reorganization, recapitalization, consolidation or similar transaction which would result in the voting securities of Holdings and/or all or substantially all of its Subsidiaries, as appropriate, outstanding immediately prior thereto continuing to represent (either by remaining outstanding or by being converted into voting securities of the surviving entity) more than fifty percent (50%) of the combined voting power of the voting securities of Holdings and/or all or substantially all of its Subsidiaries, as appropriate, or such surviving entity outstanding immediately after such merger, reorganization, recapitalization, consolidation or similar transaction; or (iii) there occurs a sale or other disposition of Holdings or of all or substantially all of the assets of Holdings and/or all or substantially all of its Subsidiaries.

(c)    "Confidential Information" means any and all information of the Company and its Affiliates that is not generally known by others with whom they compete or do business, or with whom they plan to compete or do business, and any and all information, publicly known in whole or in part or not, which, if disclosed by the Company or its Affiliates would assist in competition against them. Confidential Information includes without limitation such information relating to (i) the development, research, testing, manufacturing, marketing and financial activities of the Company and its Affiliates, (ii) the Products, (iii) the costs, sources of supply, financial performance and strategic plans of the Company and its Affiliates, (iv) the identity and

Chalinsky agreement.DOC

-15-

special needs of the customers of the Company and its Affiliates and (v) the people and organizations with whom the Company and its Affiliates have business relationships and those relationships. Confidential Information also includes any information that the Company or any of its Affiliates have received, or may receive hereafter, belonging to customers or others with any understanding, express or implied, that the information would not be disclosed.

(d)     "Cost" shall mean, for any security, the price paid to the issuer for such security.

(e)     "Distributions" has the meaning assigned to such term in the LLC Agreement.

(f)     "Fair Market Value" shall mean, as of any date, as to any share of common stock, the Board's good faith determination of the fair value of such share as of the applicable reference date; provided, that the Executive may object to such valuation by the Board by giving written notice thereof to the Board setting forth the valuation which the Executive proposes. If the Board and the Executive do not reach agreement within 30 days after such notice, the Board and the Executive will each choose an appraiser, and the two appraisers will jointly choose a third appraiser. Thereafter, all three appraisers will independently determine the fair market value for the shares. Of these valuations, the one that differs most from the other two will be discarded and the remaining two will be averaged, which such average will be binding upon the Company and such the Executive. The fees and expenses of all three appraisers shall be born by the party whose initial proposed valuation differs most from such average.

(g)     "Fully-Diluted Basis" shall mean the determination of the applicable percentage prior to the grant of the subject option or issuance of the subject common stock (as appropriate) and after taking into account full exercise and conversion of all securities of Holdings to the extent then exercisable for or convertible into common stock of Holdings.

(h)     "Holdings" means Wolverine Proctor, Inc., a Delaware corporation.

(i)     "Initial Public Offering" means a registered initial public offering and sale of the common stock of Holdings for cash pursuant to an effective registration statement on Form S-1 (or successor form under the Securities Act) under the Securities Act,

(j)     "Intellectual Property" means inventions, discoveries, developments, methods, processes, compositions, works, concepts and ideas (whether or not patentable or copyrightable or constituting trade secrets) conceived, made, created, developed or reduced to practice by the Executive (whether alone or with others, whether or not during normal business hours or on or off Company premises) during the Executive's employment that relate to either the Products or any prospective activity of the Company or any of its Affiliates or that make use of Confidential Information or any of the equipment or facilities of the Company or any of its Affiliates.

Chalinsky agreement.DOC

-16-

W0066

(k)    "LLC" means Wolverine Proctor, LLC, a Delaware limited liability company.

(l)    "LLC Agreement" means the Limited Liability Company Agreement, dated December 28, 2001, of the LLC, as in effect from time to time.

(m)    "Member" has the meaning assigned to such term in the LLC Agreement.

(n)    "Options" means all Incentive Options and Sale Options and any other options to subscribe for, purchase or otherwise directly acquire common stock of Holdings.

(o)    "Permitted Transferee" means (i) upon the death of the Executive, transfer by the will or other instrument taking effect at death or by applicable laws of descent and distribution to the Executive's estate, executors, administrators and personal representatives, and then to the Executive's heirs, legatees or distributees and (ii) for bona fide estate planning purposes, any Member of the Immediate Family of the Executive or to any trust all of whose beneficiaries are Members of the Immediate Family of the Executive; provided that, the person controlling such trust is reasonably satisfactory to the Board; provided, further, that, in each case, all conditions to such transfer as may be applicable thereto under law or contract binding the Executive are satisfied prior to such transfer.

(p)    "Person" means an individual, a corporation, a limited liability company, an association, a partnership, an estate, a trust and any other entity or organization.

(q)    "Products" mean all products planned, researched, developed, tested, manufactured, sold, licensed, leased or otherwise distributed or put into use by the Company or any of its Affiliates, together with all services provided or planned by the Company or any of its Affiliates, during the Executive's employment.

(r)    "Qualified Sale" means either (i) a Change in Control; or (ii) an Initial Public Offering.

(s)    "Recapitalization" means the re-payment of all or a portion of the WP&S Notes with the proceeds of a financing entered into by Holdings or its Subsidiaries.

(t)    "Securities Act" means the Securities Act of 1933, and the rules and regulations promulgated thereunder, as in effect from time to time.

(u)    "Shares" shall mean (a) all shares of common stock of Holdings originally issued to, or issued with respect to shares originally issued to, or held by, the Executive, whenever issued, including without limitation all shares of common stock of Holdings issued upon the exercise, conversion or exchange of any Options, warrants or other convertible securities and (b) all Options, warrants and other convertible securities originally granted or issued to the Executive.

Chalinsky agreement.DOC

-17-

(v)    "Subsidiary" means (i) any corporation with respect to which a specified Person (or a Subsidiary thereof), directly or indirectly, owns a majority of the common stock or has the power to vote or direct the voting of sufficient securities to elect a majority of the directors, (ii) any general partnership, limited liability company, joint venture or similar Person, at least a majority of whose outstanding partnership or similar interests shall at the time be owned, directly or indirectly, by such Person, or by one or more of its Subsidiaries, or by such Person and one or more of its Subsidiaries and (iii) any limited partnership of which such Person or any of its Subsidiaries is a general partner.

(w)    "Transaction Expenses" means the fees and expenses of the financial, legal and other advisers of Holdings and its Subsidiaries (other than fees payable to Parthenon Capital, LLC, its affiliated investment funds, and the equityholders of the LLC as may be payable in respect of the subject Qualified Sale) plus, in the case of a Qualified Sale that is an Initial Public Offering, underwriting discounts and commissions.

(x)    "WP&S Notes" means the $11,229,685 note of the Company dated December 28, 2001, the $95,227 of the Company dated December 28, 2001, the $175,088 note of the Company dated December 28, 2001, the $2,441,236 note of the Company dated December 31, 2001, the $20,702 note of the Company dated December 31, 2001 and the $38,063 note of the Company dated December 31, 2001.

16.    Withholding. All payments made by the Company under this Agreement shall be reduced by any tax or other amounts required to be withheld by the Company under applicable law.

17.    Assignment. Neither the Company nor the Executive may make any assignment of this Agreement or any interest herein, by operation of law or otherwise, without the prior written consent of the other; provided, however, that the Company may assign its rights and obligations under this Agreement without the consent of the Executive (a) to a secured lender as collateral security and (b) in the event that the Executive is transferred to a position with any of the Company's Affiliates or in the event that the Company shall hereafter affect a reorganization, consolidate with, or merge into, any Person or transfer all or substantially all of its properties or assets to any Person. This Agreement shall inure to the benefit of and be binding upon the Company and the Executive, their respective successors, executors, administrators, heirs and permitted assigns.

18.    Severability. If any portion or provision of this Agreement shall to any extent be declared illegal or unenforceable by a court of competent jurisdiction, then the remainder of this Agreement, or the application of such portion or provision in circumstances other than those as to which it is so declared illegal or unenforceable, shall not be affected thereby, and each portion and provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

Chalinsky agreement.DOC

-18-

W0068

19.  <u>Waiver</u>. No waiver of any provision hereof shall be effective unless made in writing and signed by the waiving party. The failure of either party to require the performance of any term or obligation of this Agreement, or the waiver by either party of any breach of this Agreement, shall not prevent any subsequent enforcement of such term or obligation or be deemed a waiver of any subsequent breach.

20.  <u>Notices</u>. Any and all notices, requests, demands and other communications provided for by this Agreement shall be in writing and shall be effective when delivered in person or deposited in the United States mail, postage prepaid, registered or certified, and addressed to the Executive at his last known address on the books of the Company, with a copy to Westerman Ball Ederer Miller & Sharfstein, LLP, 170 Old Country Road, Mineola, NY 11501, attention of Alan C. Ederer, or, in the case of the Company, at its principal place of business, attention of Erik Scott, Vice President, with a copy to each of Parthenon Capital, 200 State Street, Boston, MA 02109, attention of Samantha Trotman Burman and Erik Scott, and Ropes & Gray, One International Place, Boston, MA 02110, attention of Philip J. Smith, Esq., or to such other address or addresses as either party may specify by notice to the other actually received.

21.  <u>Entire Agreement</u>. This Agreement constitutes the entire agreement between the parties and supersedes all prior communications, agreements and understandings, written or oral, with respect to the terms and conditions of the Executive's employment, excluding only any other obligations the Executive has with respect to confidentiality, non-competition, non-solicitation, assignment of rights to intellectual property or the like, and any obligations the Executive may have with respect to the securities of the Company, all of which are incorporated by reference herein and shall remain in full force and effect in accordance with their terms.

22.  <u>Amendment</u>. This Agreement may be amended or modified only by a written instrument signed by the Executive and by a expressly authorized representative of the Company (other than the Executive).

23.  <u>Headings</u>. The headings and captions in this Agreement are for convenience only and in no way define or describe the scope or content of any provision of this Agreement.

24.  <u>Counterparts</u>. This Agreement may be executed in two or more counterparts, each of which shall be an original and all of which together shall constitute one and the same instrument.

[Remainder of page intentionally left blank]

Chalinsky agreement.DOC

-19-

W0069

WOLVERINE    Fax:9783464213    Mar 11 '02    9:39    P.05/05

25.    <u>Governing Law</u>.  This is a Massachusetts contract and shall be construed and enforced under and be governed in all respects by the laws of the Commonwealth of Massachusetts, without regard to the conflict of laws principles thereof.

IN WITNESS WHEREOF, this Agreement has been executed as a sealed instrument by the Company, by its duly authorized representative, and by the Executive, as of the date first above written.

THE EXECUTIVE:                          WOLVERINE PROCTOR & SCHWARTZ, INC.

_____                 By: _____
Steven Chilinski                        Name: _____Erik A Scott____
        3-8-02                          Title: ____Vice President___

_____

<u>Accepted and agreed for purposes of Section 4(c),
Section 5 and Section 6 hereof only:</u>

WOLVERINE PROCTOR, INC.

By: _____
Name: _____Erik A Scott____
Title: ____Vice President___

Chalinsky agreement.DOC

W0070

**<u>EXHIBIT 9</u>**
**KULKARNI**

## Wolverine Proctor & Schwartz, Inc.
### Minutes of Board of Directors Meeting
#### *February 28, 2002*

Pursuant to notice duly given, a special meeting of the Board of Directors of Wolverine Proctor & Schwartz was held at 10:00 a.m. on Thursday, February 28, 2002 at the offices of Wolverine Proctor & Schwartz, 51 East Main Street, Merrimac, MA. Present and acting throughout the meeting were Deepak Kulkarni, Gideon Argov, Steven Chilinski, and Mark Brown. Also present by invitation were Marshall Bartlett, Senior Associate at Parthenon Capital, and Thomas Scriven, Associate at Parthenon Capital. Mr. Thomas Scriven, as secretary pro tempore, kept the minutes of the meeting.

Steven Chilinski introduces the first item of business, which was to discuss the highlights of the budget, sales & marketing strategy, organizational structure of business, and the strategic direction of the company.

The next item of business was to discuss the market and competitive environment. A general discussion among the directors ensues with regards to customer relationships, competitors, business procedures, cost structure of projects, and the competitive advantages and disadvantages of the competition.

The next item of business to discuss was the strategic outlook for Wolverine Proctor & Schwartz. Steven Chilinski discusses growth initiatives, business development, ATM property and business strategy, as well as operational and organizational initiatives. A general discussion with regards to what should the top priorities be followed.

The next item of business was to discuss the January financial results as well as the budget. Mark Brown walks the board through the January numbers and the budget division by division. A general discussion with regards to the attainability of the budget ensued.

The next item of business was to discuss litigation and claims. The directors asked questions related to outstanding litigation and claims.

The next item of business was to appoint directors of the board. Following brief discussion, a motion duly made and seconded, it was:

**VOTED:**     To add Gideon Argov and Jack Cooney as new members of the board.

The next item of business was to remove Deepak Kulkarni as Chief Executive Officer of Wolverine Proctor & Schwartz and install Steven Chilinski as the new Chief Executive Officer. A motion duly made and seconded, it was:

**VOTED:**     To remove Deepak Kulkarni as Chief Executive Officer and install Steven Chilinski as the new Chief Executive Officer of the company.

The next item of business was to appoint Steven Chilinski as a director of the board of Wolverine Proctor & Schwartz. A motion duly made and seconded, it was:

**VOTED:**     To appoint Steven Chilinski as a director of the board of Wolverine Proctor & Schwartz.

The next item of business was to remove Mark Brown as a director of the board of Wolverine Proctor & Schwartz. A motion duly made and seconded, it was:

**VOTED:**     To remove Mark Brown as a director of the board of Wolverine Proctor & Schwartz.

The next item of business was to approve and accept the board minutes of the prior board meeting held on January 10th, 2002. A motion duly made and seconded, it was:

**VOTED:**     To approve and accept the board minutes of the prior board meeting held on January 10th, 2002.

The next item of business was to grant Steven Chilinski signature authority according to the guidelines set forth in the company rules. A brief discussion followed outlining the guidelines set forth in the company rules. No limitations on payments for payroll. Payments to vendors under $250,000 require a signature from Steven Chilinski or Mark Brown. Payments to vendors above $250,000 but under $500,000 require a signature from both Steven

Chilinski and Mark Brown. Payments to vendors above $500,000 require board approval. Payments for capital expenditures above $50,000 require board approval. Following this conversation a motion duly made and seconded, it was:

**VOTED:**      To grant Steven Chilinski signature authority according to the guidelines set forth in the company rules.

The next item of business was to discuss a potential bonus plans for management and the possibility of management being able to buy company stock. A general discussion among the directors with regards to how that could be structured followed.

The next item of business was to approve and adopt a two million dollar bridge loan from Parthenon Capital, based on terms as described. Following brief discussion, a motion duly made and seconded, it was:

**VOTED:**      To approve and adopt a two million dollar bridge loan from Parthenon Capital.

The next item of business was to create a compensation committee and determine which directors of the board would be sitting on the committee. Following brief discussion, a motion duly made and seconded, it was:

**VOTED:**      To form a compensation committee consisting of Gideon Argov and Deepak Kulkarni.

The next item of business was to discuss the creation an audit committee and determine which directors of the board would be sitting on the committee. Following brief discussion, a motion duly made and seconded, it was:

**VOTED:**      To form an audit committee consisting of Jack Cooney and Erik Scott.

The next item of business was to appoint Arthur Andersen as the auditors for Wolverine Proctor & Schwartz for the year. A motion duly made and seconded, it was:

**VOTED:**      To appoint Arthur Andersen as the auditors for Wolverine Proctor & Schwartz for the year.

The next item of business was to approve the 2002 financial budget for Wolverine Proctor & Schwartz. (The total sales being 39.1 million dollars and the total EBITDA prior to bonuses being 4.5 million dollars.) Following brief discussion, a motion duly made and seconded, it was:

**VOTED:**      To approve the 2002 financial budget for Wolverine Proctor & Schwartz.

The next item of business was to set a date for the next board meeting. Following brief discussion, a motion duly made and seconded, it was:

**VOTED:**      To meet in Merrimac, MA, at 51 East Main Street on May 2nd at 11:00am.

There being no further business to come before the meeting, upon motion duly made and seconded, it was:

**VOTED:**      To adjourn.
              Adjourned.
                        A true record.
                              ATTEST:

_____

**<u>EXHIBIT 10</u>**
**KULKARNI**

**PETER A. CRAWFORD**
23 Newcastle Dr. #11
Nashua, NH 03060
(603) 888-4574
petercra@ix.netcom.com

EXHIBIT
CHILINSKI
PLF's 3
len 11-14-05

December 2, 2004

Mr. Steven F. Chilinski
Chief Executive Officer
Wolverine, Proctor & Schwartz, Inc.
51 East Main St.
Merrimac, MA  01860

By certified mail, return receipt requested

Dear Mr. Chilinski:

I am writing to you regarding the bonus payment which is due to me under the terms of the letter agreement dated January 4, 2000 (the "Agreement"), pursuant to which I served as Chief Operating Officer of Wolverine, Proctor & Schwartz, Inc. (the "Company") between December 30, 1999 and January 14, 2002.  Inasmuch as the Company's capital had been seriously eroded by actions occurring prior to my tenure, and I continue to hold a financial interest in the Company, I benefited from rebuilding of the Company's working capital and thus have deferred my request for payment.  However, certain deadlines are now approaching which require me to pursue this payment, or potentially waive certain rights to it.  I hope that my forbearance has benefited the company and that it is now in a position to pay these funds to me.

While the fact of a bonus being due is a matter governed by the Agreement, it was also well earned.  From the fourth quarter of 2000 through the third quarter of 2001, the Company's EBITDA was approximately $4 million, to which approximately $2 million in shareholder payments should be added to reflect operating results over which I had control.  This represents strong operating performance for a company with approximately $40 million in annual revenues, and should be compared to a loss, from an operating EBITDA standpoint, of approximately $1.5 million (before subtracting shareholder payments) in 1999, the year before I joined.  Reserve adjustments for 1999 made the results even worse:  an EBITDA loss of $4.7 million.  The dramatic turnaround was accomplished in the face of a severe working capital shortage and, as accepted by most employees, could not have been accomplished without my leadership, the shareholder being largely absent and not involved in day-to-day operations, particularly during the critical summer of 2000.  Without this leadership, the company would likely not have survived, destroying the approximately $20 million in value ultimately demonstrated by the 2001 recapitalization.

The results for the calendar year 2001 (before the extraordinary gain) would have reflected this improved operating performance, were it not for the shutdown of Cardwell, an operation with which I had substantially no involvement. This resulted in the drawing down of a $1.5 million letter of credit (issued by the Company) guaranteeing the Cardwell debt, and the writeoff of this and other Cardwell receivables by the Company. This was partially responsible for poor performance during the fourth quarter of 2001 which reduced full year results. In addition, the relationship between the shareholder and the Company's lender deteriorated, in part as it was forced to pay $1.5 million against the Cardwell LC, leading to a working capital squeeze and inability to make shipments in the fourth quarter of 2001. Furthermore, no bonus was paid for 2000, as it took one or two quarters after I joined to turn the results around, and these early quarters detracted from the results for the entire year.

According to the Agreement, a copy of which is attached hereto, I was to receive the full bonus for any year in which I was employed by the Company on December 31, which was in fact the case for 2001. This bonus is to be calculated as follows:

$$BONUS = (EBITDA - CAPX - INT - TAXES) \times .05$$

$$Where\ TAXES = (EBITDA + BOOKDIF - DEPR - INT) \times TAXRATE$$

The capitalized terms are further defined in the Agreement. While certain amounts, such as adjustments to reserves and the BOOKDIF adjustment to the taxes calculation are not calculable with precision from the audited financial statements, the following summarizes my calculation of the BONUS in accordance with the terms of the Agreement. All terms in which every letter is capitalized have the same meaning as in the Agreement and the page numbers refer to the audited financial statements.

(Figures in $000s for 2001)

Loss before interest, taxes, depreciation, amortization and extraordinary gain (p. 3)  (486)

Plus: Extraordinary gain (p. 3)          10,170

EBITDA                                    9,684

Less: CAPX (p. 5)                          (412)

Less: INT (net of income of 82) (p. 3)   (2,070)

Less: TAXES                                 (44)

Equals: base for bonus calculation        7,158

Times .05 equals BONUS due under written agreement     358

PAC 0024

I reserve the right to amend this calculation to reflect a higher or lower base amount for the bonus calculation in the event that I receive subsequent information that reflects a different amount. I have used the amount stated in the audited financial statements for TAXES, rather than the formula in the Agreement, as the difference is due to BOOKDIF. However, even if one were to assume that BOOKDIF is zero, the TAXES would be calculated as follows:

(Figures in $000s for 2001)

| | |
|---|---|
| Maximum federal personal tax rate for 2001 | 39.10% |
| Maximum Massachusetts tax rate for 2001 | 5.60% |
| Federal benefit on Massachusetts taxes | (2.19%) |
| FICA Medicare portion (applicable at all income levels) | <u>1.45%</u> |
| TAXRATE | 43.96% |
| EBITDA (from prior page) | 9,684 |
| Less: INT | (2,070) |
| Less: Depreciation (DEPR together with line below) (p. 3) | (1,268) |
| Less: Amortization (p. 3) | <u>(1,462)</u> |
| Taxable income for calculation | 4,884 |
| Times .4396 equals TAXES | 2,147 |

Even if one were to apply the above calculation of TAXES the base for the bonus calculation would be 7,158 – (2,147 – 44) = 5,055, and the BONUS $253,000. However, I believe that utilizing the actual TAXES figure for 2001 is correct, and the BONUS due under the written agreement is thus approximately $358,000. Furthermore, Mr. Kulkarni and I entered into an oral agreement, by which the bonus amount was increased to 8%, making the bonus due approximately $573,000.

I entered into a Transition Agreement and Settlement Agreement dated December 28, 2001. Under the terms of the Settlement Agreement, paragraph 5.2, the Bonus Payment was specifically excluded from the amounts due to me that were being settled by that Agreement. Mr. Kulkarni and I had specifically discussed the fact that the Company's 2001 EBITDA would be increased by the transaction of December, 2001, and it is in light of that understanding and knowledge that we entered into the Transition and Settlement Agreements. I would not have accepted a substitute financial interest in the Company of less than that which I was entitled to under the Option provided in the Agreement, as

PAC 0025

amended, while also agreeing to forego the BONUS. Furthermore, the extraordinary gain is due to the Company's lender accepting less than book value for the repayment of the Company's debt and is neither a non-operating adjustment to reserves, interest, taxes, or capital expenditures, which would cause the amount to be excluded from the calculation of BONUS under the terms of the Agreement. The BONUS is thus due.

In addition, reviewing the Transition Agreement, paragraph 2, I note that that Agreement was to remain in force until March 31, 2002, and I was to be paid through that date unless two weeks written notice of termination by the Chief Executive Officer was provided. No such written notice by the Chief Executive Officer was provided; I am thus due wages for February and March 2002, an additional amount of approximately $25,000.

If you would like to discuss this matter further, please call me at (603)888-4574. While I hope that we may proceed in the spirit of cooperation, certain deadlines are fast approaching and I unfortunately feel compelled to mention that, in the absence of a positive response from you by December 9, 2004, I shall be forced to commence the statutory notification process with the Massachusetts Attorney General under M.G.L. c. 149 §150, and, if the BONUS and other wages of $598,000 are not paid by December 17, 2004, I may proceed on my own behalf without further notice or demand. I make these statements with some reluctance, as I know that you personally may not have been aware of the terms of the agreements entered into prior to your tenure, and I certainly hope that we are able to proceed in a professional and non-adversarial manner.

I look forward to talking with you.

Sincerely,

Peter A. Crawford

Peter A. Crawford

Enclosures: January 4, 2000 Agreement
December 28, 2001 Transition and Settlement Agreements
Pages 3 and 5 of Wolverine, Proctor & Schwartz, Inc. consolidated audited
financial statements for 2001

PAC 0026