UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

---

PETER A. CRAWFORD,

       Plaintiff,

                                        Civil Action No.
v.                                      05-cv-10078 (DPW)

WOLVERINE, PROCTOR & SCHWARTZ, INC.,
STEVEN F. CHILINSKI, and
DEEPAK S. KULKARNI,

       Defendants.

---

## AFFIDAVIT OF MARK M. WHITNEY

MARK M. WHITNEY, being duly sworn deposes and says:

1.      I am an attorney licensed to practice law in the Commonwealth of Massachusetts and in this Court. I am counsel for defendants, Wolverine, Proctor & Schwartz, Inc. ("WPS"), Steven F. Chilinski ("Chilinski") and Deepak S. Kulkarni ("Kulkarni") (collectively referred to herein as "defendants"), in the above-captioned matter. As counsel to the defendants, I am fully aware of the facts and circumstances underlying this matter. I submit this Affidavit in support of Defendants' Motion for Summary Judgment.

2.      Plaintiff *pro se* Peter A. Crawford ("Crawford") filed his Complaint in this action on January 12, 2005. A true copy of Plaintiff's Complaint in this matter is attached hereto as Exhibit "1".

3.      Annexed hereto as Exhibit "2" are true and correct copies of relevant excerpts of the transcripts from the first day of the deposition of the plaintiff, Peter A. Crawford, which was held on February 1, 2006.

4.    Annexed hereto as Exhibit "3" are true and correct copies of relevant excerpts of the transcripts from the second day of the deposition of the plaintiff, Peter A. Crawford, which was held on February 6, 2006.

5.    Annexed hereto as Exhibit "4" are true and correct copies of relevant excerpts of the transcripts from the deposition of defendant Steven Chilinski, which was held on November 14, 2005.

6.    Annexed hereto as Exhibit "5" are true and correct copies of relevant excerpts of the transcripts from the deposition of Richard Cummings, which was held on November 29, 2005.

Signed under the penalties and pains of perjury this 17th day of March 2006.


/s/ Mark M. Whitney_____
MARK M. WHITNEY

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on April 8, 2005, I filed the foregoing document with the

Clerk of the Court by using the ECF system. I further certify that I mailed the foregoing

document and the notice of electronic filing to the pro se plaintiff, Peter A. Crawford, 23

Newcastle Drive, #11, Nashua, NH 03060, by U.S. mail, on April 8, 2005.

___/s/ Mark M. Whitney___
Mark M. Whitney, Esq.

# EXHIBIT 1
## WHITNEY

UNITED STATES DISTRICT COURT
District of Massachusetts

Civil Action
No.  05-10078-DPW

—————————————————————————   )
                                                                         )
PETER A. CRAWFORD, Plaintiff                           )
                                                                         )
             v.                                                         )         AMENDED
                                                                         )         COMPLAINT
WOLVERINE, PROCTOR & SCHWARTZ, INC.,       )         (Jury Trial
       Steven F. Chilinski, Deepak S. Kulkarni,           )          Demanded)
                                                                         )
             Defendants                                               )
—————————————————————————   )

## INTRODUCTION

This is a diversity action for, inter alia, breach of a written contract to pay nearly

$600,000 in bonus wages due to the plaintiff as a result of his service as Chief Operating

Officer of Wolverine, Proctor & Schwartz, Inc., a corporation headquartered in

Merrimac, Massachusetts.  The plaintiff successfully turned around that company.

## JURISDICTION

1.       Plaintiff Peter A. Crawford is a citizen of the State of New Hampshire.

2.       Defendant Wolverine, Proctor & Schwartz, Inc. ("Wolverine Inc.") is

incorporated in the State of Delaware and has its principal place of business at Merrimac,

Massachusetts.

3.       Defendant Deepak S. Kulkarni is the former Chairman and Chief

Executive Officer of Wolverine, Inc., resides in Boston, Massachusetts and is a citizen of

the Commonwealth of Massachusetts.

1

4.      Defendant Steven F. Chilinski is the current President and Chief Executive Officer of Wolverine Inc., and assumed that position sometime between January 15, 2002 and January 31, 2002. He performs his duties relating to that position at the Wolverine Inc. headquarters in Merrimac, Massachusetts. His domicile is unknown.

5.      This complaint seeks in excess of $1,792,710 in damages, which amount is in controversy.

6.      Plaintiff invokes this Court's jurisdiction pursuant to its diversity jurisdiction under 28 U.S.C. §1332(a)(1) and its supplemental jurisdiction under 28 U.S.C. §1367(a).

<u>ALLEGATIONS COMMON TO ALL CAUSES OF ACTION</u>

7.      The allegations of paragraphs 1-6 above are incorporated herein by reference.

8.      Wolverine Inc. is primarily engaged in the business of producing large machines for the heating, cooking or drying of food and other products in continuous processes. During 2000 and 2001, it had major operations in Massachusetts, North Carolina, and the U.K. Portions of the company had been in existence since the mid-1800s.

9.      Mr. Crawford became employed by Wolverine Inc. as its Chief Operating Officer ("COO") on December 30, 1999. A written contract (the "Employment Contract") governing the terms of his employment was executed by him and Deepak Kulkarni, on behalf of Wolverine Inc., on January 4, 2000 within the Commonwealth of Massachusetts. Said Employment Contract provided for wages, including a base salary of $150,000 annually, a bonus (the "Bonus"), and stock options in Wolverine Inc.

2

10.     At the time that Mr. Crawford joined Wolverine Inc., Deepak Kulkarni was Chairman and Chief Executive Officer of Wolverine Inc. and had been so since prior to 1994. During Mr. Kulkarni's tenure, Wolverine Inc.'s fortunes had declined, culminating in an EBITDA (earnings before interest, taxes, depreciation and amortization) loss of $4.700 million during calendar 1999. After Mr. Crawford joined and assumed day-to-day operating responsibility for the Wolverine Inc. operations, Wolverine Inc.'s profits improved dramatically. Wolverine Inc.'s EBITDA for the 12 months commencing ending September 30, 2001 was $4.028 million on revenues of $39.615 million.

11.     Nevertheless, Wolverine Inc. continued to be severely cash constrained during 2000 and 2001 due to heavy bank debt and the continued withdrawal by Mr. Kulkarni of approximately $2 million annually from Wolverine Inc. to finance a lavish lifestyle and the renovation of a multi-million dollar townhouse in Boston's exclusive Back Bay neighborhood. Distrustful of Mr. Kulkarni, becoming increasingly aware of the magnitude of Mr. Kulkarni's cash withdrawals, and growing weary of his frequent harangues and bombastic negotiating style, the company's lender forced the sale of Wolverine Inc. in late 2001.

12.     But for the leadership exercised by Mr. Crawford, Wolverine Inc. would not have survived in its current form, and its shares would have become worthless.

13.     At the time the Employment Contract was entered into, Mr. Crawford knew that Wolverine Inc. was cash-constrained, but agreed to accept the position anticipating that his primary financial reward would come from the Bonus and stock options once the turnaround was complete. However, he never received any Bonus, and

his stock options have been converted into an unmarketable equity interest in Wolverine
Inc.'s current parent company, although Mr. Crawford received a $150,000 "equity
advance."

14.    Under the terms of the Employment Contract, Mr. Crawford was to
receive an annual Bonus equal to 5 percent of Wolverine's adjusted profits for any
calendar year in which he was an employee. The adjusted profit for purposes of the
bonus calculation is equal to EBITDA less capital expenditures, interest, and taxes.

15.    From prior to 1994 through late December, 2001, Mr. Kulkarni was the
sole shareholder of Wolverine Inc. His duties while Mr. Crawford was COO were
largely limited to general oversight of Wolverine and its subsidiaries and affiliates, while
Mr. Crawford managed and operated Wolverine Inc.

16.    In late 2001, an agreement was reached with a Boston-based investment
firm, Parthenon Capital, and related entities, including Parthenon Investors II, L.P., PCIP
Investors and J&R Founders' Fund, L.P. (collectively "Parthenon"). Mr. Kulkarni was
previously acquainted with certain principals of that firm. Under the agreement, Mr.
Kulkarni's shares in Wolverine Inc. and a related entity were transferred to a new entity,
Wolverine, Proctor & Schwartz, LLC ("Wolverine LLC"), and Parthenon lent funds to
Wolverine Inc. sufficient to retire all of its bank debt. This transaction was closed
between December 28, 2001 and December 31, 2001. Following the transaction,
Parthenon controlled a majority of the Board of Directors of Wolverine LLC, which in
turn owned all of the shares of Wolverine Inc.

17.    In connection with this transaction, Mr. Kulkarni ceased to be CEO of
Wolverine Inc. but became a consultant to Wolverine Inc. and continued as a member of

the Wolverine LLC Board of Directors.  The successful turnaround and sale being completed, Mr. Crawford expressed little interest in remaining with Wolverine Inc., other than as CEO, but agreed to remain for a transition period.  Parthenon made the securing of the services of Mr. Crawford after the sale a condition of closing the transaction.

18.    In connection with this transaction, Mr. Crawford on December 28, 2001 executed a Transition Agreement that specifically preserved his rights to the Bonus, and continued his base salary at the prior rate.  The Transition Agreement was executed within the Commonwealth of Massachusetts.

19.    The Wolverine Inc. consolidated financial statements for 2001, audited by Arthur Anderson LLP, set forth EBITDA for 2001 of $9,683,723.  Subtracting capital expenditures, interest, and taxes set forth in these financial statements of $2,526,598 leaves $7,157,125 as a base for the bonus calculation, of which Mr. Crawford is entitled to five percent, or $357,856.25, under the written Employment Contract.

20.    Under the terms of the Transition Agreement, Mr. Crawford committed to not knowingly taking any action contrary to the best interests of Wolverine Inc.

21.    During early 2001, prior to January 14, Mr. Crawford met with Erik Scott, an employee of Parthenon and one of its representatives on the Board of Directors of Wolverine LLC.  Mr. Scott informed Mr. Crawford that he had been doing a fantastic job holding Wolverine Inc. together and suggested that Mr. Crawford should remain with Wolverine Inc. until Mr. Crawford and Parthenon were both comfortable that the transition was complete.  The two also discussed the large sums that Mr. Kulkarni had extracted from Wolverine Inc. prior to its sale, and Mr. Scott assured Mr. Crawford that

he could call Mr. Scott directly at any time, particularly regarding any issue of payments to Mr. Kulkarni.

22.    During the afternoon of January 14, 2002, Mr. Kulkarni summoned Mr. Crawford to a meeting to discuss the payment of $135,000 to Mr. Kulkarni, which he alleged was due him as fringe benefit compensation above and beyond his normal salary for the month of December, 2001.  Mr. Kulkarni stated that the Wolverine Inc. Chief Financial Officer ("CFO") had declined to make such payment in accordance with Mr. Crawford's instructions.  Inasmuch as such payment request was wholly without any credible rationale whatsoever, such that payment would constitute embezzlement under Massachusetts law (M.G.L. c. 266 §30), Mr. Crawford suggested that representatives of Parthenon be contacted for approval.  To this, Mr. Kulkarni angrily replied that he alone would deal with Parthenon, that henceforth the CFO and his U.K. counterpart alone would deal with any cash disbursement decisions, and that Mr. Crawford remained employed by Wolverine Inc. only because of his actions.

23.    Mr. Crawford attempted unsuccessfully to contact Mr. Scott, and later on January 14, 2002, Mr. Crawford was informed that the Board of Directors had voted to terminate his employment immediately.  A letter dated January 18, 2002 from the Wolverine Inc. Human Resources Manager confirmed this action, however, no written notice of termination from Wolverine's Chief Executive Officer was ever received.

AS AND FOR A FIRST CAUSE OF ACTION
(Breach of the written contract to pay Bonus)

24.    The allegations of paragraphs 1-23 above are incorporated herein by reference.

25.    The Employment Contract is valid, binding and enforceable.

6

26.    The Employment Contract makes the Bonus due upon "completion of the audit of each year's results," or April 15, if no audit is performed.  The audit report of the Wolverine 2001 consolidated financials prepared by Arthur Anderson LLP is dated March 26, 2002.  The 2001 bonus was thus due no later than March 26, 2002.

27.    In a letter to Steven F. Chilinski, Chief Executive Officer of Wolverine, Inc., dated December 2, 2004, Mr. Crawford detailed the calculations, derived directly from the Employment Contract and the audited 2001 financial statements of Wolverine, leading to a bonus payment for 2001 of $357,856.25 (rounded off in the letter).  The only reply Mr. Crawford received to that letter was a letter dated December 22, 2004 from Daniel Blake of Epstein Becker & Green, counsel for Wolverine Inc., to which was attached a letter dated December 8, 2004 which merely states that "[t]he Company does not believe that it owes you a bonus for 2001 and disagrees with the various calculations set forth in your letter," but provides no support for its belief.  The letter indicates that the matter is being forwarded to Mr. Kulkarni's accountants for "clarification."

28.    Mr. Crawford's December 2, 2004 letter states that if no payment is received by December 17, 2004, further action may be taken without further notice or demand.

29.    No payment of the Bonus for 2001 has been received by Mr. Crawford, nor has there been any explanation as to the reason, beyond that noted above.

30.    Defendant Wolverine Inc. has therefore breached the Employment Agreement, plaintiff has been damaged by that breach, and plaintiff is entitled to recover the amount of $357,856.25 in damages.

AS AND FOR A SECOND CAUSE OF ACTION<br>(Violation of Massachusetts Payment of Wages Statute)

31.     The allegations of paragraphs 1-30 above are incorporated herein by reference.

32.     Defendant Chilinski is a an "officer[] or agent[] having the management of" Wolverine Inc. within the meaning of Massachusetts General Laws ("M.G.L.") c. 149 §148.

33.     Defendant Chilinski took actions within the Commonwealth of Massachusetts that caused the Bonus and other wages not to be paid to Mr. Crawford.

34.     The Bonus wages were earned in connection with Mr. Crawford's employment within the Commonwealth of Massachusetts and are thus subject to the provisions of M.G.L. c. 149 §§148 and 150 (the "Massachusetts Payment of Wages Statute").

35.     The office of the Attorney General of Massachusetts has assented in writing to the filing of this suit.  The plaintiff is therefore authorized to bring this action pursuant to M.G.L. c. 149 §150.

36.     The Bonus has remained due for more than six days of the "termination of the pay period when earned" and has not been paid.  Defendants Wolverine and Chilinski are therefore jointly and severally liable to the plaintiff under the Massachusetts Payment of Wages Statute for damages of treble the amount in the First Cause of Action, $1,073,568.75, an additional $715,712.50 in the case of defendant Wolverine Inc. Defendants Wolverine Inc. and Chilinski are furthermore liable for costs and attorney fees pursuant to M.G.L. c. 149 §150.

<u>AS AND FOR A THIRD CAUSE OF ACTION</u>
(Breach of the oral contract to pay additional Bonus)

8

37.    The allegations of paragraphs 1-36 above are incorporated herein by reference.

38.    During February 2001, Mr. Crawford and Mr. Kulkarni, in his capacity as Chairman and Chief Executive Officer of Wolverine Inc., reached an oral agreement to increase the bonus percentage for calculation, pursuant to the formula in the Employment Contract, from five percent to eight percent. This agreement was reached within the Commonwealth of Massachusetts.

39.    As consideration for this increase, Mr. Crawford continued to perform his duties as Chief Operating Officer of Wolverine Inc.

40.    The oral agreement reached was capable of being fully executed within one year of the date made, inasmuch as the underlying Employment Agreement makes the Bonus due upon completion of the audit, which completion, in the case of the 2001 Bonus, could have occurred any time after December 31, 2001.

41.    Wolverine Inc. has failed to pay the additional Bonus resulting from the above-detailed oral agreement when due.

42.    Defendant Wolverine Inc. has therefore breached the Employment Contract, as orally modified, plaintiff has been damaged by that breach, and plaintiff is entitled to recover an additional amount of $214,713.75 in damages from defendant Wolverine Inc., said amount representing the increase in the bonus due as a result of the oral contract.

### AS AND FOR A FOURTH CAUSE OF ACTION
(Violation of Massachusetts Payment of Wages Statute on additional Bonus)

43.    The allegations of paragraphs 1-42 above are incorporated herein by reference.

9

44.     The additional bonus amount set forth in the Third Cause of Action has remained unpaid for more than six days after the termination of the pay period when earned.  Defendants Wolverine Inc. and Chilinski are therefore jointly and severally liable to the plaintiff under the Massachusetts Payment of Wages Statute for damages of treble the amount in the Third Cause of Action, $644,141.25, an additional $429,427.50 in the case of defendant Wolverine Inc.

45.     Defendants Wolverine and Chilinski are furthermore liable for costs and attorney fees pursuant to M.G.L. c. 149 §150.

### AS AND FOR A FIFTH CAUSE OF ACTION
(Breach of Transition Agreement)

46.     The allegations of paragraphs 1-45 above are incorporated herein by reference.

47.     The Transition Agreement provides for employment of the plaintiff until March 31, 2002 unless terminated earlier by virtue of either the consummation of a working capital facility or written notice of termination by the Chief Executive Officer of Wolverine Inc.

48.     No working capital facility was consummated by Wolverine Inc. prior to March 31, 2002.

49.     No written notice of termination by the Chief Executive Officer of Wolverine Inc. was received by the plaintiff.

50.     Defendant Wolverine Inc. was notified of its breach of the Transition Agreement by way of the letter to Mr. Chilinski of December 2, 2004.  Defendant Wolverine Inc. responded to that letter by way of the December 8, 2004 letter from Daniel Blake, which merely alleges that no compensation was due because the plaintiff

10

"did not perform services for the Company during that time" and "[y]ou were given effective notice." Such interpretation of the Transition Agreement is wholly unreasonable as it would render void and superfluous the provision requiring written notice of termination by the Chief Executive Officer of Wolverine.

51.     The December 2, 2004 letter from the plaintiff constituted a final notice and demand.

52.     As a result of its breach of the Transition Agreement, the plaintiff received no wages from Wolverine Inc. for the period from February 1, 2002 through March 31, 2002.

53.     Defendant Wolverine Inc. therefore breached the Transition Agreement and is liable to the plaintiff in the amount of $25,000, the amount of unpaid wages for February and March 2002.

AS AND FOR A SIXTH CAUSE OF ACTION
(Violation of Massachusetts Payment of Wages Statute on Transition Payments)

54.     The allegations of paragraphs 1-53 above are incorporated herein by reference.

55.     The payments set forth in the Fifth Cause of Action has remained unpaid for more than six days after the termination of the pay period when earned. Defendants Wolverine Inc. and Chilinski are therefore jointly and severally liable to the plaintiff under the Massachusetts Payment of Wages Statute for damages of treble the amount in the Third Cause of Action, $75,000.00, an additional $50,000.00 in the case of defendant Wolverine Inc.

56.     Defendants Wolverine Inc. and Chilinski are furthermore liable for costs and attorney fees pursuant to M.G.L. c. 149 §150.

11

## AS AND FOR A SEVENTH CAUSE OF ACTION
(Tortious interference with contractual and business relations)

57.     The allegations of paragraphs 1-56 above are incorporated herein by reference.

58.     Defendant Kulkarni knew that the $135,000 that he sought to have paid to him by Wolverine Inc. was not owed to him and that the receipt thereof would have constituted a fraudulent misappropriation of Wolverine Inc. funds.  The terms of his relationship to Wolverine Inc., as consultant to, and former CEO of, the company enabled him to attempt to receive disbursement of these funds.

59.     Following the plaintiff's refusal to permit defendant Kulkarni to embezzle and unlawfully convert $135,000 from Wolverine Inc., defendant Kulkarni took actions to persuade, cause and induce the Board of Directors of Wolverine to terminate the plaintiff's employment.

60.     Fraudulent and criminal intent by Mr. Kulkarni to convert the $135,000 to his own use was demonstrated by his vehement unwillingness to have the plaintiff disclose the attempt to representatives of Parthenon, and by his actions resulting in the termination of the plaintiff's employment to cover up his fraudulent and criminal attempt.

61.     But for the plaintiff's refusal to permit embezzlement and conversion of $135,000 from Wolverine Inc., the plaintiff's employment would not have been terminated.

62.     Plaintiff Crawford was ready, willing and able to perform his duties under the Transition Agreement.  But for defendant Kulkarni's actions, Mr. Crawford would have remained employed with Wolverine Inc. through March 31, 2002 or later.

63.    Defendant Kulkarni took such actions to terminate the plaintiff's employment knowing that the plaintiff would be economically damaged thereby, and with malice, fraud and misrepresentation wrongfully attempted to intimidate the plaintiff into permitting the embezzlement and unlawful conversion of funds by Mr. Kulkarni.

64.    Defendant Kulkarni was aware of the Transition Agreement as he signed it on December 28, 2001 in his then-current capacity as CEO of Wolverine Inc.

65.    As of a date prior to January 14, 2002, Mr. Kulkarni had ceased to be Chairman or CEO of Wolverine Inc., and was neither an officer nor an employee of that corporation.

66.    The actions taken by Mr. Kulkarni to terminate the plaintiff's employment were beyond the scope of his authority as a consultant to Wolverine Inc., not related to a legitimate business purpose of Wolverine Inc., and in furtherance of his own greed and his personal objective of extracting funds from Wolverine Inc.

67.    The actions of Mr. Kulkarni to terminate the plaintiff's employment were taken with actual malice and in retaliation for Mr. Crawford's refusal to permit disbursement of Wolverine Inc. funds to Mr. Kulkarni.

68.    The actions taken by Mr. Kulkarni to terminate the plaintiff's employment took place within the Commonwealth of Massachusetts.

69.    If plaintiff had permitted the payment of $135,000 to Mr. Kulkarni, the plaintiff would have both have violated the Transition Agreement that prohibited actions adverse to those of Wolverine Inc., would have breached his fiduciary duties to Wolverine Inc., and would have committed an unlawful and criminal act as well.

70.    Plaintiff Crawford had a legally protected interest in the Transition Agreement and in other prospective business relations.

71.    Defendant Kulkarni interfered these those interests without justifiable cause and for the unlawful purpose of permitting him to convert and embezzle funds from Wolverine Inc.

72.    Plaintiff Crawford was damaged by defendant Kulkarni's actions in that he did not receive the full benefits of the Transition Agreement, his reputation was damaged, any prospect of his being selected as CEO of Wolverine Inc. was eliminated, and other prospective business relations were interfered with.

73.    Defendant Kulkarni therefore did tortiously interfere with the Transition Agreement between the plaintiff and Wolverine Inc., and with other prospective business relationships, the plaintiff was damaged thereby, and Mr. Kulkarni is liable to the plaintiff for damages.

<u>AS AND FOR AN EIGHTH CAUSE OF ACTION</u>
(Fraud)

74.    The allegations of paragraphs 1-73 above are incorporated herein by reference.

75.    On December 28, 2001, plaintiff met with defendant Kulkarni prior to signing the Transition Agreement and a separate Settlement Agreement, both executed later that day.

76.    At that meeting, defendant Kulkarni represented to the plaintiff that defendant Kulkarni had no right to any distributions or other monies from Wolverine Inc. or Wolverine Proctor, LLC, other than a $1 million per year Consulting Agreement, and under sections 5.2 and 5.3 of the LLC Agreement (governing the respective rights of

14

Kulkarni and Parthenon in Wolverine Proctor, LLC), both being executed on December 28, 2001. Defendant Kulkarni further represented to the plaintiff that the optional Special Distributions allowed pursuant to section 5.2 of the LLC Agreement were likely to be deferred or forgiven.

77.    Under the terms of the LLC Agreement, the Special Distributions were, except as to the portion necessary to meet tax liabilities, optional and subject to the sole discretion of the Board of Managers of Wolverine Proctor, LLC, a majority of which was controlled by Parthenon.

78.    Under the terms of the Settlement Agreement, plaintiff exchanged his right to options in Wolverine Inc. under the Employment Contract for a right to 4-8 percent of the distributions to Kulkarni under section 5.3, but not section 5.2, of the LLC Agreement.

79.    The Settlement Agreement created a resulting trust whereby plaintiff's right to share in distributions under that agreement were nominally held in defendant Kulkarni's name for the benefit of the plaintiff. Kulkarni therefore had a fiduciary obligation to the plaintiff arising out of that trust.

80.    Plaintiff was concerned that defendant Kulkarni would be able to receive payments from Wolverine Inc. or Wolverine Proctor, LLC in which plaintiff would not be entitled to share under the Settlement Agreement, and which would reduce the value of distributions in which he was entitled to share. Defendant Kulkarni's representations assured him that unshared payments would be limited in scope. Plaintiff relied upon these representations in entering into the Settlement Agreement and the Transition Agreement.

15

81.    Contrary to his assertion on December 28, 2001, defendant Kulkarni retained an alleged right to $624,263 in accrued dividends and certain other payments from Wolverine Inc., neither of which was under the Consulting or LLC Agreement.

82.    Defendant Kulkarni had exclusive knowledge of the fact that he retained an alleged right to the accrued dividend and certain other payments and information by which plaintiff might have discovered that right was not available to him.

83.    Defendant Kulkarni actively concealed the existence of his alleged right to the accrued dividend from the plaintiff.

84.    Defendant Kulkarni had a duty to the plaintiff to disclose the existence of his alleged right to the accrued dividend, but failed to disclose it.

85.    Defendant Kulkarni failed fully and completely to disclose the existence of his alleged rights to these payments to representatives of Parthenon.

86.    Parthenon entered into the transaction that closed between December 28, 2001 and December 31, 2001 without knowing that defendant Kulkarni could and would later allege that he was entitled to the accrued dividend and other payments.

87.    On November 13, 2002, defendant Kulkarni, Parthenon and Wolverine Proctor, LLC entered into an Omnibus Agreement whereby Kulkarni's alleged right to the accrued dividend and certain other payments was extinguished, in exchange for $765,980 in payments, largely as Special Distributions for 2002 pursuant to section 5.2 of the LLC Agreement.  The Omnibus Agreement further made the Special Distributions mandatory as to defendant Kulkarni for 2003 and subsequent years, removed the discretion of the Board of Managers as to the Special Distributions, and permitted Special

Distributions to be made only to defendant Kulkarni rather than requiring that Special Distributions be made 61.43% to Parthenon and 38.57% to Kulkarni.

88.    But for Kulkarni's alleged right to the accrued dividend, Parthenon would not have entered into the Omnibus Agreement and the funds paid out thereunder would have been retained for the benefit of Wolverine Proctor, LLC and Wolverine Inc., immediately or subsequently increasing the value of General Distributions under section 5.3 of the LLC Agreement, and benefiting the plaintiff through his share of such distributions under the Settlement Agreement.

89.    Plaintiff relied upon the representations made by defendant Kulkarni on December 28, 2001, such representations were false, plaintiff relied upon such representations and was damaged, and thereby defrauded.

90.    Defendant Kulkarni fraudulently concealed from the plaintiff the fact that defendant Kulkarni utilized his alleged right to the accrued dividend to obtain payments in which plaintiff was not entitled to share until defendants produced the Omnibus Agreement during discovery in this case on November 9, 2005. Any statute of limitations applying to this cause of action was therefore tolled until such date.

91.    On February 11, 2005, approximately one month after the filing of this suit, the assets of Wolverine LLC were transferred to a new entity, owned and controlled by defendant Kulkarni, which fact was actively hidden by defendants and was not disclosed to the plaintiff until defendants produced documents in this case on September 28, 2005. Defendants have steadfastly refused to reveal the details of such recapitalization.

92.    Plaintiff believes that the February 11, 2005 recapitalization may further have defrauded him of the benefits to which he is entitled under the Settlement Agreement, or may have constituted a breach of fiduciary duty by Kulkarni to the plaintiff, or both.

93.    Because of defendant Kulkarni's fraud, plaintiff may elect between the remedy of rescission of the Settlement Agreement and/or the Transition Agreement, or the remedy of damages, but has insufficient information at this time to make such election and does hereby expressly choose to pursue both remedies until he makes such election.

94.    Defendant Kulkarni is liable to the plaintiff for damages for fraud arising out of the facts stated in this cause of action.

95.    In the event that plaintiff elects to rescind the Settlement Agreement, defendant Wolverine Inc. is subject to equitable relief in the nature of an order returning to the plaintiff options on eight percent of the shares of Wolverine Inc., to be exercised, or not, by the plaintiff, as of any date between December 28, 2001 and the date upon which such order granting him such equitable relief issues.

## AS AND FOR AN NINTH CAUSE OF ACTION
(Accounting)

96.    The allegations of paragraphs 1-95 above are incorporated herein by reference.

97.    The amounts due to the plaintiff resulting from defendant Kulkarni's fraud and/or breach of fiduciary duty arising out of the 2005 recapitalization are not readily ascertainable.

98.    Adequate relief may not be obtained at law.

18

99.    Plaintiff is entitled to an election of remedies for defendant Kulkarni's fraud, but has insufficient information to make such election without the accounting requested in this cause of action.

100.    Defendant Kulkarni, as a result of the fiduciary relationship between him and the plaintiff arising out of the Settlement Agreement, and also because of the fraudulent actions taken by defendant Kulkarni, has a duty to the plaintiff to render to him an account as to (a) all distributions by Wolverine LLC or any related entity, of cash, assets in kind, securities, contract rights or other assets of any nature or type whatsoever made to himself, his family or entities that he controls, or to Parthenon or related entities, (b) copies of any and all agreements, contracts, undertakings, understanding or other documents which amend, purport to amend, rescind, replace, supercede, or otherwise modify, expand, reduce or alter in any way the LLC Agreement, or any of the exhibits thereto, and (c) copies of all financial statements of Wolverine LLC and any subsidiaries thereof through the present.

WHEREFORE, Plaintiff seeks damages for breach of contract from defendant Wolverine Inc. in the total amount of $597,570.

WHEREFORE, Plaintiff seeks treble damages for violation of the Massachusetts Payment of Wages Statute in the amount of $1,792,710 from defendants Wolverine Inc. and Chilinski, of which $597,570 of these damages are duplicative of those in the above paragraph with respect to defendant Wolverine Inc. only.

WHEREFORE, Plaintiff seeks damages from Mr. Kulkarni for tortious interference with contractual relations.

WHEREFORE, Plaintiff seeks attorney fees and costs.

19

WHEREFORE, Plaintiff seeks interest of 18 percent per annum, commencing from the date of breach, pursuant to M.G.L. c. 231 §§6C and 6F.

WHEREFORE, Plaintiff seeks an accounting of the financial results of Wolverine Inc. for 2001.

WHEREFORE, Plaintiff seeks a declaratory judgment that Mr. Kulkarni tortiously interfered with his contractual and business relations.

WHEREFORE, Plaintiff seeks damages from defendants Kulkarni and Wolverine Inc. for fraud.

WHEREFORE, Plaintiff seeks equitable relief in the nature of an order reforming, rescinding, or otherwise modifying the Settlement Agreement and the Transition Agreement, and/or distributing options in Wolverine Inc. to him, the exact nature, and the necessity, of such relief to be determined at plaintiff's option following discovery in this matter.

WHEREFORE, Plaintiff seeks equitable relief in the nature of an accounting from defendants Kulkarni and Wolverine Inc.

WHEREFORE, Plaintiff seeks such other relief as the Court finds just and meet.


Respectfully submitted,


_____
Peter A. Crawford, pro se
23 Newcastle Dr. #11
Nashua, NH  03060
(603)888-4574


Date: _____

**EXHIBIT 2**
**WHITNEY**

1                 UNITED STATES DISTRICT COURT

2                   DISTRICT OF MASSACHUSETTS

3

4

5    *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

     PETER A. CRAWFORD,                      *

6            Plaintiff                       *

                                             *

7    VS.                                     *    CIVIL ACTION NO.

                                             *    05-cv-10078(DPW)

8    WOLVERINE, PROCTOR & SCHWARTZ,          *

     INC.; STEVEN F. CHILINSKI and           *

9    DEEPAK S. KULKARNI,                     *

             Defendants                      *

10   *  *  *  *  *  *  *  *  *  *  *  *  *  *     *

11

12

13

14           DEPOSITION OF PETER A. CRAWFORD, called by the

15   Defendants, pursuant to the applicable provisions of the

16   Federal Rules of Civil Procedure, before Ruth E. Hulke,

17   Certified Shorthand Reporter No. 114893 and Notary Public

18   for the Commonwealth of Massachusetts, at Morgan, Brown &

19   Joy, LLP, 200 State Street, Boston, Massachusetts, on

20   Wednesday, February 1, 2006, commencing at 10:07 a.m.

21

22

23

Page 2

```
 1   APPEARANCES:

 2

         PETER A. CRAWFORD, 23 Newcastle Drive, Number 11,

 3   Nashua, New Hampshire, 03060, pro se.

 4     MARK WHITNEY and JEFFREY D. KUHN, ESQS., of Morgan,

     Brown & Joy, LLP, 200 State Street, Boston,

 5   Massachusetts, 02109-2605, on behalf of the Defendants.

 6

 7   ALSO PRESENT:    Mark Brown

                      Deepak Kulkarni

 8                    Heidi Wise

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23
```

Page 3

```
 1                         I N D E X

 2     WITNESS          DIRECT    CROSS     REDIRECT      RECROSS

 3     Peter A. Crawford   4

 4

 5

 6                         E X H I B I T S

 7     NUMBER                                          PAGE

 8       1     Employment agreement                    77

 9       2     Documents PAC 0006 through 0021         77

10       3     Document PAC 0057                      109

11       4     2001 Financial Statements              117

12       5     Document PAC 0023                      119

13       6     Answers to Interrogatories             124

14       7     FAS No. 130                            126

15       8     Financial Accounting Concepts No. 5    136

16       9     APB 20                                 143

17      10     APB 9                                  145

18      11     APB 30                                 148

19      12     FAS No. 4                              150

20      13     FAS No. 145                            153

21      14     Complaint                              157

22      15     Amended complaint                      157

23
```

1               P R O C E E D I N G S

2                  (Witness sworn)

3          MR. WHITNEY:  Good morning, Mr. Crawford.

4          MR. CRAWFORD:  Good morning.

5          MR. WHITNEY:  Shall we assume the same

6    stipulations are in effect that have been in effect in

7    all of the depositions in this case?

8          MR. CRAWFORD:  Right.  I will read and sign.

9    Objections, except as to form, will be preserved until

10   trial.

11         MR. WHITNEY:  Okay.

12         PETER A. CRAWFORD, having been satisfactorily

13   identified and duly sworn, testified as follows in answer

14   to direct interrogatories by Mr. Whitney:

15   Q.    Would you identify yourself for the record?

16   A.    Peter A. Crawford.

17   Q.    Your address?

18   A.    23 Newcastle Drive, Number 11, Nashua, New

19   Hampshire.

20   Q.    We have already had a number of depositions in

21   this case, but it doesn't hurt to emphasize the ground

22   rules, that it makes sense to get a clean record.  If you

23   will allow me to finish my questions, and I will do the

Case 1:05-cv-10078-DPW    Document 70-3    Filed 03/17/2006    Page 6 of 23

Page 101

1    you?  Makes it less ambiguous?

2         A.   Certainly makes it less ambiguous.

3         Q.   Now, do you recall why there was no arbiter

4    provision in this last draft that was exchanged on

5    December 30th of 1999 in the bonus provision?

6         A.   I don't believe the issue had come up with

7    respect to the bonus at that point.

8         Q.   Now, in the first draft that you provided, who

9    wrote the EBITDA provision?  When you wrote the first

10   draft, did it have an EBITDA provision?

11        A.   Are you talking about PAC 0006?

12        Q.   Let's talk about that.  Who wrote the EBITDA

13   provision in this draft agreement?

14        A.   What do you mean EBITDA provision?

15        Q.   Well, there's a paragraph in Paragraph 4 that

16   defines how the bonus is calculated, right?  Let me ask

17   it a different way.

18        In providing your first draft to the agreement did

19   you take the first stab at drafting Provision 4?

20        A.   There was a paragraph numbered 4 in my first

21   draft, yes.

22        Q.   You're referring to what page?

23        A.   PAC 0342.

1      Q.    Did your Provision 4 -- Let me ask it a

2    different way.  Did the first four paragraphs of

3    Provision 4 in your first draft change?

4      A.    What do you mean by paragraph?

5      Q.    Line of text and then -- There's distinct

6    paragraphs.  The first paragraph is, "You will receive a

7    bonus for each year, commencing 2000, which will be

8    calculated as follows," and then there's a hard return,

9    then there's the definition of bonus.

10     A.    Are you counting that as a separate paragraph?

11     Q.    Yes.  For clarity sake, yes.  Any time there's

12   a hard return.

13     A.    When you say the fourth paragraph --

14     Q.    Well, the fourth provision, the first four

15   paragraphs of the fourth provision, did those change from

16   your initial draft to the draft that's reflected on PAC

17   0006?

18     A.    Just for clarification, when you mean the

19   fourth paragraph of Provision 4, do you mean the text

20   that starts "EBITDA means the earnings"?

21     Q.    That would be the last of the four paragraphs

22   that I'm referring to.

23     A.    Okay.  Your asking me to compare my initial

Page 103

1  draft with what?

2        Q.    With PAC 0006.  With the language that appears

3  on PAC 0006.

4        A.    Actually, there is a change.

5        Q.    What's the change?

6        A.    The second, what you would call the second

7  paragraph which is capitalized text, BONUS =, the term

8  DEPR is removed between PAC 0342 and PAC 0006.

9        Q.    Are there any other changes from the first four

10  paragraphs of Provision 4 in your initial draft to PAC

11  0006?

12        A.    That appears to be the only one, having read it

13  quickly.

14        Q.    Do you remember who or how that change of

15  removing the DEPR from the second paragraph of the first

16  four paragraphs of Provision 4 occurred?

17        A.    I think I just drafted it incorrectly.

18        Q.    So did you remove it?

19        A.    I probably did.  It didn't make any sense the

20  way the first draft was done.

21        Q.    So the first four paragraphs of Provision 4 as

22  reflected on PAC 0006 were your drafting except for the

23  -- Well, all of it was your drafting, correct?

Page 122

1        A.    Well, that's a completely different question.

2        Q.    That's why I asked a different question.

3        A.    Well, at the point where we came to the draft

4   of the agreement I think I understood that my bonus was

5   to be based on the earnings of the company with some

6   adjustments, earnings being basically net income.

7        Q.    And is that the understanding you had when you

8   drafted the first four paragraphs of Provision 4 of your

9   employment contract?

10       A.    Yeah.  I mean, the discussions had evolved over

11  time, but basically at the point when it came time to

12  draft the agreement, essentially the definition that we

13  had worked out was based on earnings or net income of the

14  company with some adjustments.

15       Q.    Now, the definition in your contract doesn't

16  mention net income, does it?

17       A.    Says earnings.

18       Q.    So is the answer no?

19       A.    You're asking me if it mentions net income?

20       Q.    In the first four paragraphs of Provision 4 of

21  your contract -- Do you have a copy of it still over

22  there?

23       A.    Um-hmm.

Page 123

1       Q.    Doesn't mention anything about net income, does

2   it?

3       A.    No.  But it does mention earnings.

4       Q.    So is it your position that earnings is the

5   same thing as net income?

6       A.    Yes.  Substantially, and for this company in

7   2001 that certainly appears to be the case.

8       Q.    Now, your first four paragraphs of Provision 4

9   of your contract mentions that, and I'm paraphrasing from

10  the -- I'm reading from the third paragraph, the above

11  terms, meaning the bonus calculation terms, will be

12  calculated based upon the annual consolidated financial

13  results of the company, in accordance with the generally

14  accepted accounting principles.  Right?

15      A.    Right.  I see that.

16      Q.    Are you aware that EBITDA is not a term that's

17  defined under GAAP?

18      A.    That issue has been discussed in a number of

19  depositions in this case.

20      Q.    That's not what I asked you, though.  Are you

21  aware that EBITDA is not defined in GAAP?

22      A.    I have not found a place where it's defined in

23  GAAP.

Page 124

1        Q.    When you drafted the first four paragraphs of

2    Provision 4 of your contract, were you aware that EBITDA

3    was not defined in GAAP?

4        A.    I don't believe so.

5        Q.    You were unaware at the time you drafted the

6    contract?

7        A.    You're talking specifically about EBITDA, not

8    earnings?

9        Q.    Right.  EBITDA.

10       A.    Right.  I don't believe I was aware one way or

11   the other at that point.

12       Q.    Do you recall a time when you became aware that

13   EBITDA was not defined in GAAP?

14       A.    I think in connection with this case that issue

15   was mentioned.

16       Q.    So that was the first time you became aware at

17   some point in this case?

18       A.    I don't recall exactly.

19       Q.    Was it before this case that you became aware

20   that EBITDA was not defined in GAAP?

21       A.    I can't recall exactly.

22            (Document marked Exhibit No. 6 for Id.)

23            MR. WHITNEY:  Let the record reflect I have

Page 160

1        A.    I have the --

2        Q.    Mr. Crawford, again I'm going to insist on you

3    not looking at documents.  I'm entitled to permit an

4    inquiry into your independent -- Mr. Crawford, I'm trying

5    to be nice about this, all right.  I'm entitled to

6    inquire about your independent recollection before you go

7    filtering through documents.  I'm going to stop this

8    deposition if you keep doing this.  You are not entitled

9    to go flipping -- I'm entitled to ask you what your

10   recollection is before I decide whether I want to refresh

11   it or not.  It's my deposition.

12       A.    Would you point to the place in the rules that

13   says that?

14       Q.    I'm not going to point to a place in the rules.

15   But if you persist in flipping through documents every

16   time I ask you a question, I'm going to suspend this

17   deposition and we'll go before the court.  You do not

18   have the right to grab through the volumes of documents

19   that you have appeared with here today and read from them

20   and reference them to answer questions.  I'm entitled to

21   have you testify from your knowledge and in your head.  I

22   can decide if I want to then refresh your recollection by

23   showing you a document.  If you can't recall without the

Page 161

1    document, then that's fine.  But I'm entitled to test

2    your independent recollection.  It's my deposition.  I'm

3    entitled to decide how I ask the questions.

4         A.   I'm the deponent.  I'll feel free to flip

5    through documents if I --

6         Q.   If you keep doing that, I'm going to suspend

7    the deposition, haul you back here, and seek costs

8    because you are not entitled to do it that way.

9         A.   Cite one case or part of the federal rules that

10   says that.

11        Q.   I have made my point.

12        A.   There is none.  What's your question?

13             MR. WHITNEY:  Read the question back.

14             (Question on Page 159, Line 21 read by the

15   Stenographer.)

16        A.   My recollection is that it was in a similar

17   manner to the way the 2001 statements were done.

18        Q.   Do you have any recollection of whether the

19   company defined EBITDA in the past prior to the 2001

20   financial statements?

21        A.   I believe there are comments in the 1999 and

22   2000 financial statements that refer to a definition of

23   EBITDA, yes.

1       Q.    Do you recall what line item the company's

2   definition of EBITDA corresponded with in the financial

3   statements prior to 2001?

4       A.    I would have to look at the documents.  I don't

5   believe it referred to a specific line item.

6       Q.    So if it did, if the company's definition of

7   EBITDA that preceded the 2001 financial statements did

8   refer to a specific line item, that would surprise you?

9       A.    I just don't have a good recollection.

10      Q.    But, nevertheless, you had access to review the

11  company's financial statements while you were employed

12  there, right?

13      A.    While I was employed there.  Not when I

14  negotiated the agreement.

15      Q.    While you were employed there, though, you did

16  have access to the company's financial statements?

17      A.    Yes.

18      Q.    Now, can you point to your employment contract

19  or a section in your employment contract where the term

20  earnings is defined?

21      A.    Right on the first page.  PAC 0001.  For

22  purposes of this calculation, the above terms will be

23  calculated based upon the annual consolidated financial

Page 163

```
 1   results of the company in accordance with generally

 2   accepted accounting principles and have the following

 3   meanings.

 4        Q.   Where is earnings defined in that paragraph?

 5        A.   What it's saying, it's defined in accordance

 6   with generally accepted accounting principles.

 7        Q.   Is earnings a GAAP defined term?

 8        A.   My belief is that it is.

 9        Q.   But is there a definition of earnings in your

10   employment contract?

11        A.   I just answered that.

12        Q.   That's it?  That's the only one that you

13   considered to be a definition of earnings, that third

14   paragraph of Provision 4?

15        A.   The one that begins "For purposes of this

16   calculation."

17        Q.   Okay.  But you'll agree with me, won't you, the

18   word earnings isn't mentioned anywhere in that paragraph?

19        A.   Well, implicitly it is.

20        Q.   It's not what I asked.  Explicitly is the word

21   earnings mentioned in that paragraph?

22        A.   Not explicitly, but it refers to the above

23   terms.  One of the above terms is EBITDA.  Then below
```

Page 164

1    where it says EBITDA means the earnings.  So implicitly

2    it's in that paragraph.

3         Q.   Now, when you negotiated your employment

4    contract with Mr. Kulkarni, did you discuss with him at

5    any time what your intention was with respect to the

6    meaning of EBITDA?

7         A.   I don't recall a discussion on that, no.

8         Q.   Do you remember Mr. Kulkarni speaking with you

9    at all and communicating with you what his understanding

10   was of the term EBITDA?

11        A.   No.  Other than, obviously, we arrive at the

12   definition of earnings before any interest, taxes or

13   deductions for depreciation or amortization.  So,

14   obviously, there was some sort of discussion that went

15   into that sentence appearing in the contract.

16        Q.   Was there a general discussion between you and

17   Mr. Kulkarni that talked about the purpose of the bonus,

18   why were you given the opportunity to have a bonus?

19        A.   Well, it was to incent me in terms of making

20   sure that the company was profitable, and he specifically

21   said he wanted to get the profitability back to where it

22   was.

23        Q.   Now, you no doubt remember Mr. Kulkarni's

1    answers in your deposition of him as to his intent as to

2    the meaning of EBITDA.  Do you remember his answers?

3         A.    Yeah.  Somewhat.

4         Q.    And he testified that his intention was to get

5    to the cash flow of the company?

6         A.    I remember him saying that.

7         Q.    Do you disagree with his testimony?

8         A.    I disagree with the timing of what he's saying.

9    I think that he's correct on the earlier discussions, but

10   I think the discussion ultimately led to what we ended up

11   with which is a bonus based more on the profitability or

12   the earnings or the net income of the company as opposed

13   to the cash flow.

14        Q.    At the time that you drafted Provision 4 of the

15   employment contract, did you have any understanding that

16   there could be or there was anticipated to be an unusual

17   event like a loan forgiveness?

18        A.    No.  We didn't discuss that at all.

19        Q.    Did you, aside from not discussing it, did you

20   have your own independent understanding that there was a

21   chance down the road that there could be a large loan

22   forgiveness?

23        A.    No.  My understanding at the time I negotiated

Page 166

1    the agreement was that a lot of costs were being taken

2    out of North Carolina and the company was going to be

3    quite profitable in fairly short order.

4        Q.   Okay.  So it's fair to say then that neither

5    you nor Mr. Kulkarni -- Strike that.  You already said

6    that.

7        Do you remember Mr. Kulkarni's testimony where he

8    indicated and explained his understanding that the bonus

9    was designed to compensate you for achieving a positive

10   cash flow?

11       A.   I remember that testimony.

12       Q.   He testified that when you take an EBITDA

13   number and you run it through the calculation, you know,

14   subtracting CAPX, the INT figure, and taxes, times .05,

15   that that actually gets you to cash flow itself by

16   subtracting those items.  Do you disagree with that?

17       A.   I do.

18       Q.   Why?

19       A.   I think if you look at the formula, it's

20   EBITDA, it's left parentheses, EBITDA, minus CAPX, minus

21   interest, minus taxes, right parentheses, times .05.

22   Well, that base for the bonus calculation which is the

23   EBITDA minus the CAPX, minus the interest, minus the

Page 167

1    taxes, is basically the net income of the company with

2    one exception.  That is, that you take capital

3    expenditures rather than depreciation when you calculate

4    it.  So, in other words, earnings before interest, taxes,

5    depreciation and amortization, if you subtract out

6    interest and taxes, is earnings before depreciation and

7    amortization.  So if you look at this algebraically, in

8    essence, what this is is earnings before depreciation and

9    amortization minus capital expenditures.

10         So to the extent that capital expenditures is less

11    than depreciation and amortization, then the base for the

12    bonus calculation would be (inaudible) --

13              THE REPORTER:  The base for the bonus

14    calculation would be?

15              THE WITNESS:  Would be more.

16         Let me start over because I want to make sure you

17    got it right.

18         To the extent the capital expenditures is more than

19    the depreciation plus the amortization, then the base for

20    the bonus calculation would be less than the net income

21    of the company.  To the extent that the capital

22    expenditures was more than the depreciation and

23    amortization of the company, then the base for the bonus

Page 168

1    calculation would be less than the net income.

2         So, in essence, this is a bonus based on net income

3    with one adjustment.  Call it two if you say that there's

4    a synthetic calculation of the taxes that appears on the

5    next page.  But that's similar to the corporate rate.

6         Q.   So was it your intent when you drafted this

7    paragraph to have EBITDA reflect the net income of the

8    company as opposed to cash flow?

9         A.   I don't think you quite understood what I was

10   saying.

11        Q.   It's a different question, though.  You talked

12   a lot about net income in the last hour.

13        A.   Let me see if I can answer your question this

14   way.  The reason EBITDA appears in this document is it's

15   part of the taxes calculation that appears on PAC 0002

16   and it's part of the bonus calculation, and it appears

17   here because it's a synthetic way of coming up with the

18   taxes.  The reason is that depreciation and amortization

19   are deductible for tax purposes.

20        Q.   Let me ask this a different way.  Was it your

21   intent when you wrote the bonus Provision 4 to have your

22   bonus reflect the net income of Wolverine as opposed to

23   just it's cash flow from operations?

Page 169

1      A.    I think my thinking in drafting this was, yes,

2   it was more, what we ended up with was a bonus that was

3   substantially based on net income.

4      Q.    So with twenty/twenty hindsight, now that you

5   have heard what Mr. Kulkarni has to say about his

6   understanding, it's fair to say, isn't it, you were

7   thinking something different than he was based on each of

8   your own testimony?

9      A.    No.  I think what he's describing was an

10  accurate discussion of our early discussions.  Where, you

11  know, he's quite correct we did discuss changes in

12  working capital and we came to the conclusion that we

13  would not include that in the calculation.  And what we

14  ended up with was a calculation that really reflects the

15  net income of the company as opposed to the cash flow.

16  If you just look at the document, you're forced to come

17  to that conclusion.  The only real difference is the

18  difference between capital expenditures and depreciation

19  and amortization and the fact that the taxes are computed

20  synthetically.

21      Q.    Except for the fact that the way you have

22  testified about this and the way Mr. Kulkarni has

23  testified about his understanding of the bonus, you'll

Page 170

1    agree that you two apparently didn't agree as to what the

2    intent was?  He, obviously, had a different intent as to

3    what the bonus was for than you do, than what you're

4    saying today?

5         A.   Are you talking about my knowledge of his

6    intent now or back in 2001?

7         Q.   No.  You have heard what Mr. Kulkarni testified

8    his intent was with regard to the bonus.  It's,

9    obviously, not the same as what you're saying today your

10   intent was, right?

11        A.   I think that his deposition testimony, yes, is

12   different from what I'm testifying today.  I think that's

13   accurate.

14        Q.   His deposition testimony reflects that his

15   intent for the bonus was apparently different than what

16   your intent for the bonus was, based on the testimony,

17   wouldn't you agree?

18        A.   I can't testify to what his intent was back in

19   2000.  In 1999 at 2000.  I probably misspoke.  I think I

20   said 2001.

21        Q.   I'm not asking you that.

22        A.   I was talking about 1999 and 2000.  When it was

23   negotiated.

1      Q.    Are you done?

2      A.    Yeah.

3      Q.    Based on the testimony that we now know with

4    twenty/twenty hindsight, it appears, does it not, you and

5    Mr. Kulkarni had different intents about the same

6    paragraph?

7      A.    I can't testify as to what Mr. Kulkarni's

8    intent was.

9      Q.    But he can, right, and he did?

10     A.    Fine.

11     Q.    And his testimony reflects an intent that is

12   different from the intent that you're testifying about

13   today, is it not?

14     A.    He, obviously, testified differently from what

15   I'm testifying to today.  I'm not required to testify

16   about his testimony, that's all on the record.

17     Q.    But you'll agree his testimony is different

18   than yours substantially about the intent behind the

19   bonus provision from his perspective versus your

20   perspective?

21     A.    Seems to be, yes.

22     Q.    What impact did the debt forgiveness have on

23   Wolverine's cash flow in 2001?

# EXHIBIT 3
# WHITNEY

1                UNITED STATES DISTRICT COURT

2                  DISTRICT OF MASSACHUSETTS

3

4

5    * * * * * * * * * * * * * * * * * *

     PETER A. CRAWFORD,                    *

6            Plaintiff                     *

                                           *

7    VS.                                   *   CIVIL ACTION NO.

                                           *   05-cv-10078(DPW)

8    WOLVERINE, PROCTOR & SCHWARTZ,        *

     INC.; STEVEN F. CHILINSKI and         *

9    DEEPAK S. KULKARNI,                   *

             Defendants                    *

10   * * * * * * * * * * * * * *           *

11

12

13

14            VOLUME 2 OF THE DEPOSITION OF PETER A. CRAWFORD,

15   called by the Defendants, pursuant to the applicable

16   provisions of the Federal Rules of Civil Procedure,

17   before Ruth E. Hulke, Certified Shorthand Reporter No.

18   114893 and Notary Public for the Commonwealth of

19   Massachusetts, at Morgan, Brown & Joy, LLP, 200 State

20   Street, Boston, Massachusetts, on Monday, February 6,

21   2006, commencing at 10:07 a.m.

22

23

1    APPEARANCES:

2

    PETER A. CRAWFORD, 23 Newcastle Drive, Number 11,

3    Nashua, New Hampshire, 03060, pro se.

4    MARK WHITNEY and JEFFREY D. KUHN, ESQS., of Morgan,

    Brown & Joy, LLP, 200 State Street, Boston,

5    Massachusetts, 02109-2605, on behalf of the Defendants.

6

7    ALSO PRESENT:    Deepak Kulkarni

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

Page 3

```
 1                    I N D E X

 2   WITNESS         DIRECT   CROSS    REDIRECT      RECROSS

 3   Peter Crawford    4

 4

 5

 6                    E X H I B I T S

 7   NUMBER                                       PAGE

 8    16        Document PAC 412                   5

 9    17        Documents PAC 342 - 343            7

10    18        Documents PAC 363 - 370            9

11    19        Documents PAC 264 - 265           112

12    20        Documents PAC 426 - 429           115

13    21        Document PAC 423                  119

14    22        Documents PAC 110 - 101           196

15    23        12-27-01 trial balance            199

16

17

18

19

20

21

22

23
```

1              P R O C E E D I N G S

2          MR. CRAWFORD:  Before we start, could I just

3    say a couple of things for the record.

4      First of all, Mr. Kulkarni is here with his laptop,

5    and I have again requested that if there are any

6    documents that are responsive to my prior request for

7    production or interrogatories, that I would like to see

8    them.  He responded that I would not be allowed to see

9    them and indicated that he intended to use what is on his

10   laptop as the basis for certain questions in the

11   deposition.

12     Number two, Mr. Kulkarni is wearing a tee shirt that

13   says along the top Best Wishes, has a hand with a finger

14   pointed upward, which I suppose he has a right to do

15   under the First Amendment.  But I would just like to note

16   that I believe it's unprofessional.

17                 PETER A. CRAWFORD, Sworn

18                 DIRECT EXAMINATION, Continued

19        Q.   (by Mr. Whitney) Mr. Crawford, since we are

20   resuming your deposition today, you understand you are

21   still under oath?

22        A.   I do.

23                 MR. WHITNEY:  Mark this as an exhibit.

1          (Document marked Exhibit No. 16 for Id.)

2          MR. WHITNEY:   Let the record reflect I have

3     marked as Exhibit Number 16 a document that has numbers

4     PAC 412, and show it to Mr. Crawford and ask if he

5     recognizes this document.

6          A.   Yes.  I believe I produced that earlier in this

7     case.

8          Q.   Can you tell me what it is?

9          A.   These are notes from discussions with Mr.

10    Kulkarni in December of 1999.

11         Q.   They're your notes.  Is that correct?

12         A.   Yes.

13         Q.   When would you take these notes?  Would it be

14    while you were talking to Mr. Kulkarni or at some other

15    time?

16         A.   I can't remember at this point.

17         Q.   At the bottom of the exhibit there's a note

18    that appears to say, "You will be an employee at will."

19    Do you see that?

20         A.   Yes.

21         Q.   Can you tell me why that's written there and

22    why you wrote it?

23         A.   To the best of my recollection, I wrote it

Page 6

1    because Mr. Kulkarni had asked me to add that to the

2    agreement.

3        Q.    Did you understand that you were an employee at

4    will under your agreement when you worked at Wolverine,

5    Proctor and Schwartz, Inc.?

6        A.    Well, I believe that's in the employment

7    agreement, the letter dated January 4th, 2000.

8        Q.    So is that a yes?

9        A.    Well, I believe that agreement governs the

10   relationship, and it does include the sentence "You will

11   be an employee at will."

12       Q.    At the time in December, '99, did you have an

13   understanding of what employee at will meant?

14       A.    General understanding, yes.

15       Q.    Do you recall what that understanding was in

16   December, '99?

17       A.    In general, that either party could terminate

18   the agreement without incurring liabilities.

19       Q.    Or without cause?  Is that correct?

20       A.    Well, certain causes would be permissible

21   reasons.  Others would not be.

22       Q.    What reasons under your contract would be

23   impermissible reasons to terminate you?

1        A.    Well, I think anything that would be against

2   public policy.

3        Q.    Such as what?  Can you give an example?

4        A.    For example, if I had been called for jury duty

5   and was unable to go into work, I don't believe I could

6   be terminated on that basis.

7        Q.    Okay.  How about for dissatisfaction with your

8   performance?  Could you have been terminated for that

9   under your contract as an at-will employee?

10       A.    Under the January 4th, 2000 contract, probably,

11   yes.

12             (Document marked Exhibit No. 17 for Id.)

13             MR. WHITNEY:  Let the record reflect that we

14   have marked as Exhibit 17 documents that are Bates

15   labeled PAC 342 and 43.

16      I ask you, Mr. Crawford, if you recognize those

17   pages.

18       A.    I do.

19       Q.    What are they?

20       A.    This is an e-mail that I produced earlier in

21   this case.

22       Q.    Who wrote the e-mail?  Is this your typing?

23       A.    As I recall, yes.

Page 8

1        Q.    Is this the initial draft of what became your

2    employment contract?

3        A.    As far as I can tell, this is the earliest

4    draft of which I'm aware.

5        Q.    This is the version of the contract that you, I

6    believe, had testified on Wednesday which contained the

7    Provision 4 that you had drafted, the initial Provision 4

8    that contained a reference to depreciation in the bonus

9    calculation.  Correct?

10       A.    This contains a Provision 4 that I believe I

11   drafted, yes.

12       Q.    Then you testified that you had later realized

13   that having depreciation in the calculation didn't make

14   sense and ultimately you took it out?

15       A.    I believe that's correct, yes.

16       Q.    Now, down at the bottom of this page there

17   appears to be a date and a time stamp, do you see that,

18   12-12-2005 at 4:46 p.m.?

19       A.    That's correct.

20       Q.    Did you print this out on that date at that

21   time?

22       A.    I would say yes.  Probably approximately around

23   that time.

Page 9

1      Q.    What caused you to print it out on that date?

2      A.    I believe I was responding to a request for

3  production of documents that you had sent to me.

4            (Document marked Exhibit No. 18 for Id.)

5            MR. WHITNEY:   Let the record reflect I have

6  marked as Exhibit 18 documents that are labeled PAC 363

7  through 70.

8            I ask Mr. Crawford if he recognizes this.

9      A.    I do.

10     Q.    Can you explain what it is?

11     A.    These are documents that I produced in this

12  case.

13     Q.    Do you know in any more detail what they are?

14     A.    Well, this appears to be an e-mail that I

15  received from Mr. Kulkarni on the 3rd of January, 2000.

16     Q.    Do you recall receiving this e-mail?

17     A.    Vaguely.

18     Q.    And the e-mail from Mr. Kulkarni indicates that

19  Gabor has got back to me, and he made minor

20  clarifications which are incorporated, and please call

21  me, I'm paraphrasing, at 6:45 p.m.  Do you remember

22  receiving a draft back from Mr. Kulkarni indicating that

23  an attorney had reviewed it?

1      A.   Vaguely, yes.

2      Q.   Do you remember having a discussion with Mr.

3   Kulkarni this evening of January 3rd at or around 6:45

4   p.m. to discuss your agreement?

5      A.   I can recall the discussion, but I can't recall

6   what time it took place.

7      Q.   What do you recall about the discussion?

8      A.   Well, in reviewing the documents that I

9   produced, I believe I found another copy of this document

10   with some handwritten notations on it.

11      Q.   Well, I would like to ask you what your

12   independent recollection is of your conversation.  We can

13   talk about documents later.  But what do you recall about

14   having a discussion with Mr. Kulkarni on the night of

15   January 3rd, 2000, to discuss a draft contract?

16      A.   You know, all I can recall off the top of my

17   head is that there were some minor changes that we made

18   at that point in time.

19      Q.   Now, this version, if you look at Page 366,

20   this version contains a binding arbiter provision in the

21   bonus definition.  Is that correct?

22      A.   I see that, yes.

23      Q.   Do you know who inserted that?  Do you remember

Page 11

1    we had discussed on Wednesday some of the initial drafts

2    didn't have this provision and then later it appeared in

3    the tax rate provision?  Do you remember that?

4        A.    Well, I have very little independent

5    recollection of this, but in reviewing all of the various

6    drafts it appears that that provision was added just

7    before the agreement was sent to Gabor Garai.

8        Q.    Do you know who added it?

9        A.    Yeah.  I believe I testified earlier about

10   that.  I'm quite sure that Mr. Kulkarni added it.

11       Q.    Do you remember when you -- Did you recall

12   noticing it was added?

13       A.    I can't specifically recall noticing that it

14   was added.

15       Q.    Do you recall any discussions with Mr. Kulkarni

16   or anybody concerning the insertion of the binding

17   arbiter sentence at the end of the bonus provision?

18       A.    No.  I can't recall any discussions regarding

19   that.

20       Q.    So you don't remember questioning it, what it

21   meant or somebody telling you why it was there or

22   anything like that?

23       A.    No.  I believe I already testified to that on

Page 12

1    Wednesday.

2         Q.    And you'll agree, won't you, that this binding

3    arbiter sentence language that's on Page 366 ultimately

4    made its way into the final draft or the final contract

5    that you signed on January 4th, right?

6         A.    Yes.

7         Q.    And do you recall objecting to that language

8    being inserted?

9         A.    I just can't recall any discussion on that

10   particular sentence at all.

11        Q.    Is it possible there was none?  There was no

12   discussion about it?

13        A.    Yeah.

14        Q.    Is it fair to say that the provision in the

15   bonus provision for binding arbiter was not one of large

16   controversy in the drafting of your complaint?

17        A.    In the drafting of my complaint?

18        Q.    Right.  Is it fair to say the insertion of that

19   provision was not a controversial one in terms of the

20   negotiations, if you don't remember even talking about --

21        A.    I'm sorry.  I'm confused as to your question.

22   You talked about the drafting of the complaint?  Was that

23   what you meant to say?

1    have had a better understanding of some of those issues

2    than I did.

3           Q.    But Mark Brown reported to you, right?

4           A.    Yes.

5           Q.    When you say revenues and costs, does that

6    include foreseeable costs like accounts payable type

7    costs or was it only sort of currently --

8           A.    Are you talking about the rev flow now?

9           Q.    Right.  You separated that out and said you had

10   a particularly good understanding of that.

11          A.    Well, for the large order jobs that were being

12   done in the U.S. we generally had a weekly review of all

13   of the jobs, and we would look at the hours that had been

14   spent so far and the hours that would be required to be

15   spent to complete the job, and we looked at the material

16   that had been received so far and the additional material

17   that would be required to be received to complete the

18   job.  And that information also went into the rev flow.

19   So I would say, yeah, I had a pretty good handle on all

20   of those costs for the large order jobs.

21          Q.    Was there anyone else with respect to the U.S.

22   operations of Wolverine who had a better understanding of

23   the financial details of the company than you?

Page 99

1      A.    It would depend on what you mean by financial

2    details.

3      Q.    Well, the overall financial picture of the

4    company.

5      A.    Well, in terms of cash flow and gross margin

6    profitability, I probably had the best understanding.  If

7    you're talking about the application of accounting

8    principles, you know, Mark Brown as a CPA certainly had a

9    better understanding than I did in terms of what the

10    requirements would be at the end of the year to have a

11    set of financial statements that the auditors would sign

12    off on.

13      Q.    Did you work with Mark Brown or anyone else to

14    provide information to auditors in connection with

15    preparation of year end financials?

16      A.    Usually he dealt directly with the auditors,

17    and I would occasionally answer questions for the

18    auditors or provide information, but most of that was

19    done directly with Mark Brown.

20      Q.    Did you ever review anything that Mark was

21    going to provide to the auditors before he provided it to

22    the auditors?

23      A.    I may well have.  I just can't remember.

1      Q.    Why not just send the demand letter at any

2   point in time to advise the company that you believed you

3   were owed that money?

4      A.    Well, I'm not -- I don't know why I didn't.  My

5   thoughts were elsewhere.

6      Q.    Did you call anybody from the almost three-year

7   period from your termination until when you brought the

8   suit and said, hey, is the company back on its feet, can

9   you pay me now?

10     A.    No.  I tried to call Mark Brown, but his

11  extension was not active, and I assumed that he had left

12  the company which, in fact, at that point I believe he

13  was not with the company.

14     Q.    Back to this exhibit which I think is 21.  In

15  Paragraph 5 you mention what appears to say, "I'm still

16  concerned about language which would allow receiver to

17  fire me, terminating my options, then settle company or

18  assets."  Is that accurate, that it says that?

19     A.    That's not quite verbatim.

20     Q.    Were you in March of 2001 concerned that a

21  receiver could be appointed or take over the company?

22     A.    Well, I remember that there had been

23  discussions about a receiver even back in 2000.  Because

1    that was one of the things that got added to the LAF

2    agreement that was negotiated with the bank and signed in

3    September of 2000.

4         Q.   What is it that you're writing about here in

5    Number 5 in your notes?  Can you explain to me what that

6    means?

7         A.   I can't remember exactly, but there was a

8    change of control provision in the January 4th, 2000

9    letter, and exactly how that provision would be triggered

10   was somewhat unclear.  I think I was concerned that a

11   receiver could come in, terminate me, but not trigger the

12   change of control provision, and I would lose my options.

13        Q.   Why were you discussing this with Mr. Kulkarni

14   in March of '01?

15        A.   Because I think we both knew that the bank had

16   a right to appoint a receiver under the September, 2000

17   LAF agreement, and I was concerned about that issue.

18        Q.   Did there come a point in time in, well, at any

19   point in time that you came to realize that there was a

20   chance that Citizens may be willing to accept less than

21   the face value of its debt?

22        A.   Yes.

23        Q.   Do you remember any specific point in time that

Page 130

1    you came to the realization that may be the case?

2          A.    I think it was probably sometime around the

3    summer of 2001.

4          Q.    Do you remember the circumstances of your

5    understanding that for the first time?

6          A.    Not exactly.  I know at one point Riverside was

7    contemplating a transaction, and one of the requirements

8    for that was that the bank accept 18 million for the debt

9    which I think was worth closer to 20 to 21 million.  I

10    believe that was sometime in the September or October

11    time frame of 2001.  And I believe that Mr. Kulkarni had

12    also mentioned that possibility to me sometime around the

13    summer of 2001.

14          Q.    What was the first time that you realized that

15    there might be a possibility that Citizens might take

16    less than the face value of its debt?

17          A.    I'm not sure I remember the very first time,

18    but my recollection is Mr. Kulkarni raised the issue

19    before Riverside had actually put on the table sort of a

20    contingent offer to buy the company provided the bank

21    would take 18 million dollars for the debt.

22          Q.    Do you know who came up with the idea of paying

23    less than the face value?  Was it Riverside or someone

1   else?

2        A.   I don't know.  I wasn't involved in many of the

3   discussions with Riverside.

4        Q.   Do you recall specifically being involved in

5   any discussions with any buyers?

6        A.   Yes.

7        Q.   Which buyers?

8        A.   I attended numerous meetings and participated

9   in numerous calls with Riverside.  I attended some

10  meetings with people from Parthenon.  I attended some

11  meetings, I have forgotten even the name of the firm, but

12  David Malm had a firm that he was associated with, and

13  one or two of his associates came to visit the company.

14  I remember participating in those meetings.

15       I remember meetings with Carlisle Companies that had

16  made an offer for the company.  I remember meeting with

17  ACS in the presentation in New York.  I can't

18  specifically recall if they ever visited the company or

19  not.  And I remember conversations with Joan McCabe.

20       Q.   I'm confused.  In a prior answer you said you

21  didn't have involvement in Riverside.  Then you

22  subsequently said that you remembered meeting with

23  Riverside.  So I want to make sure I understand the

Page 132

1    apparent inconsistency.

2         A.   I think what I was testifying to earlier was

3    whether I had negotiated the terms of an agreement with

4    Riverside.  I think your question just now was with

5    respect to meetings with Riverside and participation in

6    conversations.

7         Q.   So that's the difference?

8         A.   I believe so, yeah.  I would have to go back

9    and review.

10        Q.   Did you negotiate the terms with any buyers?

11        A.   I think I testified that I remembered after

12   Joan McCabe had decided not do the deal with Wolverine,

13   having talked with her on the sorts of terms that a

14   private equity firm would offer, but at that point I

15   think she decided not to participate and not to do the

16   deal.

17        Q.   That's the only potential buyer that you

18   believe you discussed any terms of purchase and sale

19   with?

20        A.   It's hard to say because Mr. Kulkarni would

21   frequently fill me in on the details of his conversations

22   with investors.  So I would hear from him what those

23   terms were, and I was involved in some phone discussions.

Page 133

1    I can remember one with Bob Fitzsimmons of Riverside

2    where various things were discussed, you know, might have

3    been that some terms and conditions were discussed

4    between him and Mr. Kulkarni in that conversation.  But I

5    would not have independently negotiated terms and

6    conditions.  Mr. Kulkarni felt he owned the company, and

7    I wouldn't want to have been doing that.

8         Q.    Well, he did own the company, right?

9         A.    Well, he owned the equity.

10        Q.    What's the difference?

11        A.    The bank was owed a significant amount of

12   money.

13        Q.    Aside from that.  He felt right?  He owned the

14   equity in the company, right, a hundred percent of it?

15        A.    Well, I had options.

16        Q.    Which had not vested, right?

17        A.    Depending on what time frame you're talking

18   about.

19        Q.    Well, they did never vest, right?

20        A.    Well, we had a settlement agreement that

21   covered that issue.

22        Q.    We'll get to that.  Now, did you have any

23   involvement in discussing with Citizens what debt they

1   might be willing to forgive?

2       A.   I can remember multiple meetings with Citizens,

3   but generally Mr. Kulkarni was in those meetings.

4   Whether he discussed in those meetings with Citizens

5   forgiveness of the debt or not, you know, I'm not sure I

6   can remember that.  He may well have.

7       Q.   Was there a time when you came to believe or

8   think that debt forgiveness could impact your bonus?

9       A.   Yes.

10      Q.   When was that?

11      A.   I remember Mr. Kulkarni coming to me, probably

12  sometime around the summer of 2001, and making a

13  statement to the effect of, you know, your agreement with

14  the company could be construed to require the payment of

15  a bonus on the forgiveness of debt income.

16      Q.   When was this conversation?

17      A.   Sometime around the summer of 2001.

18      Q.   Do you remember if you said anything in this

19  conversation?

20      A.   Only vaguely.

21      Q.   What do you vaguely remember?

22      A.   I vaguely remember -- Well, I remember Mr.

23  Kulkarni making the assertion that, in essence, I would

Page 135

1    be being paid double.  And based on that, I probably made

2    some sort of comment that I wasn't expecting a double

3    payment, or something to that effect.

4        Q.   Do you know why this came up in your

5    conversation that you're describing?

6        A.   I believe around that time that there was an

7    increasing belief that it might be necessary for the bank

8    to take a reduction in its debt, in the value of its

9    debt.

10       Q.   Did you agree with Mr. Kulkarni, did you agree

11   that loan forgiveness would possibly impact your bonus?

12       A.   No.  I don't think we agreed one way or the

13   other.  He just made the statement.

14       Q.   Did you do anything in reaction to him making

15   that statement?

16       A.   No.  I don't recall having done anything.

17       Q.   I mean besides this lawsuit.  Did you review

18   your contract?

19       A.   I can't remember doing that.

20       Q.   Did you take notices of this conversation?

21       A.   Not that I can recall or have found.

22       Q.   Why not?

23       A.   I don't know.

1      Q.    So you took notes of some -- Strike that.   What

2   did you use for a determinant to figure out whether you

3   would go home and take notes or go back to your office

4   and take notes of a conversation or not?  How did you

5   determine which conversation was worthy of preserving and

6   those which weren't?

7      A.    I didn't have a formal procedure by which I

8   determine whether or not I would take notes of a

9   particular conversation.

10     Q.    If it involved money or ownership percentages,

11  did you take notes?

12     A.    Not necessarily.

13     Q.    Are you aware of any writings or any documents

14  at all that indicate that Mr. Kulkarni said to you

15  something along the lines of debt forgiveness could

16  increase your bonus?

17     A.    Am I aware of any documents?

18     Q.    Any documents, any writings, anything.

19     A.    Well, other than the transition and settlement

20  agreements.  What I have written in this case, no.   Not

21  that I can think of right now.

22     Q.    I mean e-mails or notes or letters or anything

23  like that.

Page 137

```
1        A.    No.  I'm not aware of that.

2        Q.    Did anyone participate in the conversation with

3   the two of you?

4        A.    Not that I remember.

5        Q.    So is it fair to say that by at least the

6   summer of 2001 the thought had crossed your mind that

7   loan forgiveness could positively impact your bonus

8   amount?

9        A.    Yes.

10            MR. WHITNEY:  Can we take a quick break?

11            MR. CRAWFORD:  Yeah.  I don't want to go too

12   late tonight.  The last three-minute break that I called

13   lasted twenty minutes.

14            MR. WHITNEY:  I disagree with that.  Go off the

15   record.

16            (Recess from 3:04 p.m. to 3:10 p.m.)

17        Q.    When did Parthenon enter the picture?

18        A.    That I can't remember exactly.  Sometime

19   between January of 2001 and June of 2001, I think.

20        Q.    Do you know how they entered the picture?

21        A.    I believe that Mr. Kulkarni had contacts with

22   them.

23        Q.    And was debt forgiveness a component of a
```

Page 138

1    contemplated transaction with Parthenon in, say, by the

2    summer of 2001?

3        A.    I believe that it was, yes.

4        Q.    Now, you mentioned the Riverside potential

5    terms which involved roughly a two million dollar loan

6    forgiveness, it sounds like, right?

7        A.    Two or three.

8        Q.    Two or three, right, because it was 18 million

9    they would potentially pay on, was it a 20 or 21 million

10   dollar --

11       A.    Something like that, yeah.

12       Q.    Was there a point in time when you ever

13   understood the scope of the potential loan forgiveness

14   for the Parthenon transaction?

15       A.    Yeah.  I believe, I believe I have somewhere

16   something around the June, 2001 time frame, a document

17   that reflects the potential agreement at that point in

18   time.  I can't remember if that has something about debt

19   forgiveness or not.

20       Q.    Do you recall whether the initial debt

21   forgiveness amount contemplated changed by the time of

22   the deal consummation?

23       A.    Yes.  Obviously, it increased substantially.

Page 139

1          Q.    Well, that's what I wanted to know.  How is it

2    obvious?  You said obviously it changed substantially.

3    Changed from what?  We know the final number, but when

4    did you first know the initial number?

5          A.    Which initial number?

6          Q.    The initial number.

7          A.    I don't know that there was, quote unquote, the

8    initial number.

9          Q.    Well, there had to be some starting point,

10   right, to discuss loan forgiveness with Parthenon?

11         A.    There were discussions with Parthenon relating

12   to a deal, and there were discussions with Riverside

13   relating to a deal, and I believe both of those involved

14   some element of debt forgiveness at some point in time.

15         Q.    We know the ultimate level of debt forgiveness

16   was approximately ten million dollars?

17         A.    Right.

18         Q.    When did you first recall becoming aware of the

19   range of debt forgiveness and it being near ten million

20   dollars?

21         A.    Oh, I think sometime around late November/

22   early December of 2001, at the time when Parthenon

23   negotiated with the banks, quote unquote, on the

Page 140

1    courthouse steps that the number was arrived at.  I think

2    both Mr. Kulkarni and I at that point were surprised at

3    how large the debt forgiveness was.

4        Q.   Do you remember a meeting on December 6th of

5    2001 with the parties, including Citizens and Parthenon,

6    and members from Wolverine that you attended?

7        A.   December 6th?

8        Q.   Of 2001.  Your independent recollection.

9        A.   I can't remember a meeting around that date.

10       Q.   Do you remember attending a meeting in

11   November/December 2001 time frame where the final number

12   of loan forgiveness amount was agreed upon?

13       A.   No.  My recollection with regard to the final

14   amount was it was decided on the courthouse steps between

15   Parthenon and the bank and then disclosed to us fairly

16   shortly thereafter by way of a phone call to Mr.

17   Kulkarni.

18       Q.   So were you involved in the courthouse steps

19   negotiations, as you have characterized them?

20       A.   No.

21       Q.   Were you involved in any of the negotiations

22   relating to the amount of loan forgiveness that Citizens

23   would be prepared to live with?

1        A.    Not that I recall.

2        Q.    Who was on behalf of Wolverine involved in

3    negotiations concerning loan forgiveness to the extent

4    you know?

5        A.    My understanding was it was Mr. Kulkarni.

6        Q.    So, in any event, you recall learning the

7    amount at some point in either late November or early

8    December of 2001.  Is that accurate?

9        A.    Yes.

10        Q.    Now the Parthenon transaction occurred on what

11    date?

12        A.    Well, it was a two-phase transaction.  My

13    understanding was the first step was December 28th of

14    2001.  The second step was December 31st of 2001.

15        Q.    Okay.  Now, prior to that closing or those

16    closings, did Parthenon conduct due diligence into the

17    viability of entering into a transaction with Wolverine

18    and Citizens?

19        A.    My understanding was they did.

20        Q.    When did they conduct due diligence?

21        A.    I don't remember exactly when they started, but

22    I recall meetings certainly during the summer of 2001.

23        Q.    What sort of meetings do you recall?

Page 142

1      A.    Meetings where members of their team would come

2  to Wolverine and talk with people from Wolverine.

3      Q.    Were there people from Pricewaterhouse?

4      A.    In those meetings with Parthenon?

5      Q.    You had mentioned that -- Okay.  When you say

6  their people, what do you mean?  You said their people

7  would attend meetings and talk about --

8      A.    I'm talking about people from Parthenon.

9      Q.    Who came from Parthenon in connection with due

10  diligence?

11      A.    I remember meeting Gideon Argov and Erik Scott,

12  and there's a woman whose name I don't recall, but I

13  believe Mr. Bartlett spoke about a Kate who was I think a

14  summer student from Harvard Business School, and I do

15  remember somebody like that.  Whether it was Kate or not,

16  I don't recall.

17      Q.    Now, did Parthenon engage any agents to assist

18  them in their due diligence?

19      A.    My understanding was they engaged

20  Pricewaterhouse.

21      Q.    Do you remember the names of the

22  Pricewaterhouse representatives?

23      A.    I don't.

Page 143

```
1        Q.    Did you ever meet with any of the

2    representatives from Pricewaterhouse in connection with

3    Parthenon's due diligence?

4        A.    I believe that I did.  And I reviewed the

5    report that was given to me last week and indicates that

6    they interviewed me, so I believe that I must have, yes.

7        Q.    Do you recall providing Pricewaterhouse with

8    any information in connection with due diligence?

9        A.    What do you mean when you say information?

10       Q.    Do you understand what information is?

11       A.    Well, documents or --

12       Q.    Information in any shape, size, form, state.

13       A.    Well, if I spoke with them, I must have

14   provided information.

15       Q.    Orally, right?

16       A.    Yes.

17       Q.    And you saw the report that we provided which

18   was a due diligence report prepared by Pricewaterhouse,

19   right?

20       A.    Right.

21       Q.    And you recall you're listed as one of just a

22   few people who they name as providing information?

23       A.    Right.
```

Page 144

1      Q.    You and, I think, two other people?

2      A.    No.  I think there were more than that.

3      Q.    Whatever it says.  There's a small universe of

4   people, right?

5      A.    They had some phone conversations I think, too.

6      Q.    Did you provide Pricewaterhouse or assist

7   anyone at Wolverine in providing information to

8   Pricewaterhouse other than orally, such as spreadsheets

9   or documents or data files or anything, compilations?

10     A.    I may well have, but I can't specifically

11   recall having provided data other than in oral form to

12   Pricewaterhouse.

13     Q.    Do you recall reviewing any data that was

14   provided by someone else to Pricewaterhouse?

15     A.    I can't recall that.

16     Q.    Do you know who at Wolverine was involved in

17   providing information to Pricewaterhouse?

18     A.    It would have been Mark Brown and people from

19   the accounting department.

20     Q.    Who did the accounting department report to at

21   that time?

22     A.    I believe they reported to me through Mark

23   Brown.

Page 145

1      Q.    So you don't, as you sit here today, have a

2  recollection of providing any specific information other

3  than oral statements to Pricewaterhouse?

4      A.    Yeah, I may well have provided documents to

5  them.  I just can't remember at this point.

6      Q.    You just don't recall today?

7      A.    Right.

8      Q.    So if people in the accounting department

9  recall giving information to you, you would defer to

10  their recollections?

11      A.    It would depend on what they say.  You said

12  giving information to me?

13      Q.    For the purpose of providing to

14  Pricewaterhouse.

15      A.    I don't know.  I'm not agreeing to defer to

16  anyone's recollection right now.

17      Q.    If people from Pricewaterhouse were to testify

18  that you gave them documents and spreadsheets and other

19  compilations, you would not dispute that?

20      A.    You're asking me a hypothetical.  I can't, I

21  can't answer that question.  It would depend on what it

22  was.

23      Q.    You could answer the question?

Page 146

1    A.    No.  You would have to refresh my recollection

2    with a specific document, and then I could answer that

3    question more definitively.  But I can't answer it the

4    way it's asked.

5        Q.    As of, say, September, 2001, was there any

6    emphasis on any particular suitor as the one that was

7    appearing to go forward at that time?

8        A.    I think at that point the emphasis was more on

9    Riverside.

10       Q.    Did there come a time when the emphasis was

11   placed on Parthenon and the related entities that engaged

12   with Parthenon?

13       A.    Yeah.  At some point Riverside backed out of

14   the deal.

15       Q.    Do you remember when Riverside backed out?

16       A.    I think it was October or November of 2001.

17       Q.    Okay.  So as of October and November of 2001

18   had any litigation commenced by the bank?

19       A.    My recollection is a bit hazy, but I think they

20   waited until Riverside backed out of the deal before they

21   commenced litigation and that would be logically how it

22   made sense that it would occur.  I think the bank was

23   hoping that the Riverside deal would be completed and

Page 147

1    they wouldn't have to litigate.

2        Q.    Did the bank, to your knowledge, did the bank

3    know that Parthenon was out there as well during the

4    summer and fall of 2001?

5        A.    That I just can't remember one way or the

6    other.

7        Q.    After Riverside dropped out, were there any

8    other potential suitors out there besides Parthenon?

9        A.    Well, Mr. Kulkarni had his friend, I'm trying

10   to remember the guy's name, who was going to give him

11   some money to buy the company out of receivership or keep

12   it operating in the U.K. or something like that.

13       Q.    Well, out of receivership means it would have

14   had to go into receivership, right?

15       A.    Yes.

16       Q.    So that would happen after only Citizens took

17   some legal action under their loan agreements, right?

18       A.    Well, there were various negotiations with his

19   friend and various scenarios.  It was almost a daily

20   occurrence when Mr. Kulkarni would call me up and tell

21   me, you know, the latest kind of deal that he was trying

22   to negotiate or was thinking about proposing or this,

23   that or the other.  They took various forms.  You know, I

1    can't recall all of the various forms that those deals

2    took.

3        Q.    Was there ever a time when you understood that

4    Parthenon was the primary suitor?

5        A.    Yeah, I think I probably had that understanding

6    after Riverside backed out.

7        Q.    So prior to the resolution on the courthouse

8    steps, you understood that Parthenon was the primary

9    suitor at that point?

10       A.    Primary suitor for the company.  There was this

11   other deal with Dave Callan, I think was his name, that

12   Mr. Kulkarni was negotiating, but that was a deal of a

13   somewhat different form.

14       Q.    But at some point in time did you come to

15   understand that Parthenon was the only suitor for

16   Wolverine?

17       A.    Well, I guess it would depend on what you mean

18   by only suitor.

19       Q.    Well, you certainly as of December 28th knew

20   that, right, that Parthenon was the only suitor?

21       A.    By that point there was an agreed deal.

22       Q.    Right.  So going back from that, did there come

23   a point in time when you realized that the deal was going

Page 149

1    to be Parthenon or not?

2         A.    Well, I think Parthenon reached the agreement

3    with the bank sometime in late November and early

4    December, so I think my assumption was at that point that

5    that was the deal.   That they had an agreement with

6    Citizens and Wolverine had an agreement with them, you

7    know, that was at least oral, if not a term sheet.

8         Q.    Did you see any of the term sheets or any of

9    the proposed drafts of agreement between Parthenon and

10   Wolverine and Citizens?

11        A.    Yeah, I think that Mr. Kulkarni provided some

12   of those to me.

13        Q.    Now, were you involved subsequent to Riverside

14   backing out, were you involved at all in consummating the

15   Parthenon transaction?

16        A.    Yes.

17        Q.    How were you involved?

18        A.    Well, I can remember, you know, long schedules

19   of documents, litigation, all kinds of things, that our

20   attorneys at Epstein, Becker & Green were preparing.

21        Q.    Did you assist in preparing any of those

22   documents?

23        A.    Yeah, I believe I did at least the litigation

Page 150

1    portion of it and may have done some other parts as well

2    or sent requests off to Victor Garvie in the U.K. to fill

3    in specific parts.

4         Q.    Do you recall any other types of documents that

5    you assisted with in connection with consummating the

6    Parthenon transaction?

7         A.    Participated in drafting or providing

8    information for?

9         Q.    In any capacity.  Drafting, providing

10   information for, commenting on or something else.

11        A.    Well, I remember the LLC agreement, and I think

12   there was an indemnity and subscription agreement which I

13   believe I saw some earlier drafts of and may well have

14   commented on them.

15        Q.    What about numbers, did you assist in pulling

16   together any numbers or estimates or reports or anything

17   like that in connection with consummating the Parthenon

18   transaction?

19        A.    In what time frame?

20        Q.    Say, from the time Riverside backed out to the

21   end.  So really just slightly more than a month.

22        A.    I can remember sending copies of the rev flow

23   over to Parthenon and maybe other data associated with

1    bookings and backlog.

2              MR. WHITNEY:  Take a quick break.

3              (Recess from 3:38 p.m. too 3:42 p.m.)

4         Q.   Now, you had mentioned that you sent copies of

5    rev flow documents or spreadsheets to Parthenon?

6         A.   Yeah.

7         Q.   Then you say, I think, other data associated

8    with backlogs and bookings.  Is that accurate?

9         A.   Possibly.  There was another spreadsheet that I

10   forgot to mention which was the yearly bookings

11   spreadsheet that was prepared by someone in accounting.

12        Q.   Did you assist in providing any other sorts of

13   documents to Parthenon during the Riverside pullout to

14   the end of the transaction period?

15        A.   You know, I may well have.  I just can't

16   remember, and I remember supplying the rev flow to them

17   on a couple of occasions.  But beyond that I just can't

18   remember specific documents.

19        Q.   Again, can you remind me, the rev flow shows

20   what?

21        A.   It showed actual and projected revenues and

22   costs for the large order business, it showed bookings

23   and backlog also for the large order business, and some

1    calculations that might have been based on those.

2        Q.    What would you use the rev flow estimates for?

3        A.    For gaining an understanding as to how the

4    company was going to be doing financially over the next

5    few months based on the revenues and costs of the larger

6    odd jobs that were in the backlog at that point.

7        Q.    So did it provide a short-term picture of the

8    revenues of the company?

9        A.    A few months out, yeah.  It would have a

10   reasonably good prediction of the revenues.

11       Q.    Do you recall how many months out?

12       A.    Well, it would vary.  Often the job would take

13   five or six months to complete, and we would start

14   recognizing revenue two or three months, just roughly

15   speaking in general terms, into the job.  So three, four,

16   five, six months out, you know, we would have some

17   visibility as to revenues in particular and somewhat less

18   visibility as to cost.

19       Q.    So it's fair to say as of the time frame we're

20   talking about that that rev flow spreadsheet should have

21   provided to the people at Parthenon a rough estimation of

22   revenues beyond the closing date and into 2002?

23       A.    Depending on when it was provided, yeah.

Page 153

1      Q.    Well, assuming it was provided December 1st of

2    2001, is it fair to say that spreadsheet would have

3    provided information at least into February and March and

4    maybe April of 2002?

5      A.    For the large order business.

6      Q.    Did it show any information for other

7    businesses or other sales?

8      A.    That I can't remember for sure.  We certainly

9    had projections for the small order business.  But

10   whether those were on the rev flow or not, you know, I

11   can't remember at this point.

12     Q.    Now, because it's a short-term picture of

13   revenue, would the rev flow spreadsheet be a useful tool

14   to understand the company's EBITDA for a particular month

15   or particular quarter?

16     A.    Well, it would allow us to project the gross

17   margin, but there are many other things that go into

18   EBITDA beyond the gross margin.

19     Q.    I'm not sure you answered my question.  Would

20   that be information that one would need to help determine

21   what the company's EBITDA would be for a month or a

22   period of a quarter, for example, because it's a

23   short-term projection of revenues?

1    A.    Yeah, it would be important information for

2    projecting the EBITDA for the next several months, but by

3    no means the exclusive information for projecting that.

4    Q.    So it would have been logical or reasonable to

5    understand that Parthenon could have been using those

6    documents to project EBITDA beyond the closing date?

7    A.    I can't comment about how they projected

8    EBITDA.

9    Q.    Why not?

10    A.    I just don't know how they would do that.

11    Q.    I didn't ask you that.  I asked if it was

12    reasonable, would it have been reasonable for Parthenon

13    to rely on the rev flow estimates to help them understand

14    what the company's EBITDA would be for a particular

15    period the sheet covered?

16    A.    I would think it reasonable for them to do that

17    as one source of information, yes.

18    Q.    Now, in this, again, this same time frame, the

19    Riverside pullout to the consummation of the Parthenon

20    deal, so really it's December of '01 and possibly

21    sometime in November of '01, right?

22    A.    Yeah, I think I testified I thought Riverside

23    had pulled out sometime around October or November of

Page 155

1    2001.

2        Q.    So maybe a two-month period.  Maybe more than a

3    two-month period.

4        A.    Could have been, yeah.

5        Q.    So sometime in the last quarter of 2001 is what

6    I'm talking about?

7        A.    Most likely in the last quarter.

8        Q.    During this period of the last quarter leading

9    up to the Parthenon closing do you have a recollection of

10   people who were underneath you at the Wolverine

11   organization working to prepare numbers and provide

12   accounting and financial information to Parthenon?

13       A.    Yeah.  I recall that the people were doing

14   that.

15       Q.    Do you have any specific recollection of which

16   people were doing that or was it a lot of people?

17       A.    Probably all of the senior people in the

18   accounting department had some sort of role.

19       Q.    Do you remember what involvement, if any, you

20   had in dealing with those people as they were pulling

21   together numbers for the Parthenon transaction?

22       A.    I may have had some role, but I can't recall

23   specifically.  I think that Mr. Kulkarni dealt directly

1    with Mr. Brown on a lot of those issues.

2         Q.    Why do you think that?

3         A.    Well, I would see people in accounting

4    gathering information or auditors sitting in the

5    conference room, and I knew that this was not something

6    that had been coordinated by me, so my sense was perhaps

7    Mr. Kulkarni had arranged this directly with Mr. Brown,

8    or it might have been, there might have been a meeting

9    with Mr. Brown, Mr. Kulkarni and me where a list of due

10   diligence items was discussed and assignments made to

11   various people.

12        Q.    Now, help me out here.  There weren't any

13   auditors working at Wolverine in the weeks leading up to

14   the transaction, were there?  The due diligence occurred

15   in the summer, right?  Are you confusing time frames,

16   perhaps?

17        A.    I don't remember.  We had so many auditors in

18   and out of that organization, I don't know if they came

19   back in just prior to the transaction or not.  It would

20   have been logical that they would have come back in to

21   confirm a few things, yes.

22        Q.    Do you know specifically whether

23   Pricewaterhouse did come back in to confirm?

Page 157

1      A.    No, I don't know that at all.

2      Q.    And you did see the due diligence report that

3  was dated in July of 2001, right?

4      A.    Right.  It's labeled a draft.  So I suspect

5  there may be a later version.  Maybe you could tell me.

6      Q.    As far as Mr. Brown communicating with Mr.

7  Kulkarni and auditors, are you speculating or do you have

8  specific knowledge that Brown and Kulkarni made

9  arrangements with the auditors to come in that you don't

10  know about?

11      A.    Well, I think I would have known at the time

12  had the auditors been there because I would have seen

13  them.

14      Q.    Was Mark Brown involved in gathering

15  information and putting together data for Parthenon?

16      A.    Yes.

17      Q.    Again, this is during the last quarter of '01?

18      A.    Various times.  I'm sure that Parthenon wanted

19  updated information, and I know that I didn't provide all

20  the information that Parthenon got, so I'm sure he must

21  have been involved.

22      Q.    What about Marian Lord, was she during the last

23  quarter of 2001 putting together numbers for Parthenon to

1    review?

2         A.    I can't specifically recall, but that would

3    have been typically part of her function.

4         Q.    How about Bill Crotty, would Bill Crotty have

5    been involved in pulling together numbers for Parthenon

6    to review?

7         A.    Yeah, him as well.

8         Q.    Do you have any specific recollection of having

9    any interaction with Bill Crotty or Marian Lord during

10   the last quarter of '01 for the purpose of reviewing

11   information for Parthenon and providing information to

12   Parthenon?

13        A.    I can remember meetings in Bill Crotty's office

14   with Mr. Kulkarni and Mr. Brown and Mr. Crotty being

15   there, of course, as well where Mr. Kulkarni would tell

16   Mr. Crotty to, quote unquote, goose up the numbers in the

17   rev flow to show somewhat better numbers for Parthenon.

18        Q.    Do you want to answer the question after you're

19   done with your hypothesis here?

20        A.    No.   I was in those meetings, so I do remember

21   that.

22             MR. WHITNEY:   Would you read back the question?

23             (Question read by the Stenographer.)

Page 159

1      A.    I thought I answered it.

2      Q.    You talked about goosing up numbers.  Is that

3   the only meeting you recall with Bill Crotty or Marian

4   Lord concerning reviewing information for Parthenon or

5   providing information to Parthenon in the last quarter of

6   2001?

7      A.    I don't know.  You know, it's been over

8   five years.  I can't remember all the various meetings

9   that took place.

10      Q.    Here's the question then.  How do you think Mr.

11   Crotty would describe your level of involvement in the

12   last quarter of 2001 in connection with gathering numbers

13   for Parthenon and providing numbers to Parthenon before

14   the closing?

15      A.    I think he would say that I was involved.  I

16   don't know what adjective he would select.

17      Q.    What do you think Marian Lord would say about

18   your involvement in gathering numbers and providing

19   numbers to Parthenon in the last quarter of 2001?

20      A.    I don't know what adjectives she would use.

21      Q.    Do you think she would be of the opinion that

22   you were involved in gathering and providing numbers?

23      A.    Oh, I'm sure she would be.

1      Q.    Would she be accurate?

2      A.    Because I believe I was involved.  I have

3 already testified to that.

4      Q.    With some level of vagueness, I'm trying to

5 find out how you were involved and what you did.  So how

6 would Mark Brown characterize your involvement in

7 gathering numbers and reviewing numbers to provide them

8 to Parthenon in the last quarter of 2001?

9      A.    I don't know what adjective he would use.  I'm

10 sure they would all say I was involved.

11      Q.    How about Sheila, is it Gagnon?

12      A.    Grenon.

13      Q.    How would Sheila Grenon describe your

14 involvement in preparing numbers for Parthenon to review

15 in the last quarter of 2001?

16      A.    I don't know.  Now with respect to Sheila

17 Grenon, I'm not sure she was involved with Parthenon at

18 all other than maybe providing a bookings spreadsheet

19 that she might have provided to me that I might have

20 provided to Parthenon.

21      Q.    What adjective would you use to describe your

22 level of involvement in gathering numbers and providing

23 numbers to Parthenon prior to the close of the

1   transaction in the last quarter of 2001?

2        A.   I would say that I had some involvement, but

3   that most of the numbers were provided by Mark Brown or

4   the accounting organization directly.

5        Q.   So is it your testimony that most of the

6   numbers, using your words, were not shown to you before

7   being provided to Parthenon?

8        A.   It would depend on which numbers you're talking

9   about.

10       Q.   I'm using your words.  Which numbers do you

11  think were not shown to you, if you recall?

12       A.   Well, I don't know all of the numbers that were

13  provided to Parthenon.  I think I testified that I

14  probably provided the rev flow to them.  I may well have

15  provided the bookings information.  I believe that Mr.

16  Kulkarni caused Mr. Crotty to update the rev flow in

17  particular fashion before we provided it to Parthenon.  I

18  do recall some goosing up of the numbers.  There were

19  monthly financial statements that were provided to me and

20  to Mr. Kulkarni by people like Bill Crotty that I

21  probably saw around the same time as they were provided

22  to Parthenon.  That's what I can remember.

23       Q.   What sort of information was contained on the

1    monthly financial statements?  What would those

2    statements help the reader understand about Wolverine?

3         A.   Well, it would have the revenues and the gross

4    margin and the EBITDA, and there were a few other line

5    items on there as well.

6         Q.   Such as what?

7         A.   Well, I don't remember.  I have to look for my

8    copy, but it's that spreadsheet that I think says from

9    Crotty that I introduced.  That's what I'm talking about.

10        Q.   So that -- I remember that.  Okay.  Now, so you

11   saw monthly financial statements that Bill Crotty

12   prepared during this time frame of the last quarter of

13   2001?

14        A.   Yeah.  I would see the statements that Bill

15   Crotty prepared.

16        Q.   Did you provide any --

17        A.   As they were prepared.

18        Q.   I missed the last part of your answer.

19        A.   I said as they were prepared.

20        Q.   What would happen to them after they were

21   prepared during this time frame?  Would they be provided

22   to Parthenon?

23        A.   They would well have been.

1        Q.    Did you provide any to Parthenon?

2        A.    That I can't remember.  I may have.

3        Q.    Were these monthly financial statements created

4   and used prior to the potential sale of the company?

5        A.    Yeah.  We had done these for the whole time I

6   was there.  Well, let's put it this way.  Early in 2000

7   the accounting organization was way behind in the

8   numbers, so I think, for example, they did the first six

9   months of 2000 as one lump sum and then we proceeded from

10  there.

11       Q.    So were the monthly financial statements

12  something that you as the new COO pushed to be used more

13  regularly and accurately as part of your job duties?

14       A.    Yes.

15       Q.    Do the monthly financial statements reflect any

16  costs?  Do you remember?

17       A.    Of course.  Every financial statement has

18  revenue and costs.  Those are the two most important

19  parts.

20       Q.    Did the monthly financial statements show --

21  You mentioned revenues.  You mentioned they showed

22  EBITDA.  Is that correct?

23       A.    Yes.

1    Q.    And did you know how Bill Crotty calculated

2    EBITDA to arrive at EBITDA numbers?

3    A.    I had a general understanding, yes.

4    Q.    How did he calculate EBITDA for the monthly

5    financial statements?

6    A.    I think he would take the earnings and add back

7    the interest, taxes, depreciation and amortization.

8    Q.    Was there ever a time when you reviewed

9    Crotty's EBITDA calculations and asked him to recalculate

10   them or noticed an error in them?

11   A.    I'm sure that happened.

12   Q.    Do you recall whether you noticed any errors in

13   the EBITDA numbers that were in the monthly financial

14   statements during the last quarter of 2001?

15   A.    There may have been.

16   Q.    Do you remember as you sit here today whether

17   there were any errors or mistakes on any of the monthly

18   financial statements for the last quarter of 2001?

19   A.    For the actual or the projected?

20   Q.    For any of them that you saw in that period.

21   A.    Well, if you're talking about the projected

22   2001 number, I think Mr. Kulkarni pointed out at his

23   deposition that there was no projected extraordinary gain

Page 165

1    on that.  So if you want to call that an error, I would

2    say, yeah.

3         Q.   As a practice in receiving these monthly

4    financial statements from Mr. Crotty did you look to see

5    if there were any errors?

6         A.   Yes.

7         Q.   As you testified, if you saw them, you would

8    bring them to his attention to fix them?

9         A.   Well, one cannot always tell just by looking at

10   the numbers that there was an error.  But at times it

11   would appear that the numbers were not as expected, and I

12   would then ask him to do some additional analysis or

13   demonstrate why the numbers were right, or maybe I tried

14   to do some analysis of my own.

15        Q.   Now, there was an appointment or a move to

16   appoint a receiver in November/December of 2001 by

17   Citizens, right?

18        A.   Yes.  November -- October/November, yeah,

19   December.

20        Q.   Did you have an understanding of what the

21   receiver would do with the company if he or she was

22   appointed at that time?

23        A.   An understanding from whose perspective?

Page 166

1          Q.    Did anybody tell you what the receiver would do

2     if they were appointed?

3          A.    Yeah.  I think Mr. Kulkarni had his view of

4     what the receiver would do.

5          Q.    What was his view?

6          A.    I think his view was he would be the first to

7     be fired.

8          Q.    Did you have an understanding around the

9     November/December, 2001 time frame of what the receiver

10    would do if appointed?

11         A.    Well, I knew what Mr. Kulkarni's view was.  I

12    imagine I had spoken with some of the company's attorneys

13    or even Mr. Kulkarni's personal bankruptcy attorney, Dan

14    Cohen, and I had met with people from Trimingham.  But as

15    I recall, it was an individual by the name of Steve Gray

16    that was put forth as the receiver.  I had not met Steve

17    Gray or didn't even know of his reputation.  So I would

18    only be speculating if I were to speak for the

19    perspective of Mr. Gray or the perspective of Citizens

20    Bank.

21         Q.    Did you have an understanding or a belief that

22    you might be on the short list of those to be terminated

23    behind Mr. Kulkarni?

Page 167

1    A.    Are you asking about Mr. Kulkarni's opinion or

2    my belief?

3    Q.    Well, what was your understanding or belief?

4    A.    My belief was probably I would be the key guy

5    to help the receiver finish the turnaround.

6    Q.    What was Mr. Kulkarni's opinion?

7    A.    Kulkarni's opinion was that I would be the

8    first to be fired after him.

9    Q.    Did you think at the time there was a chance he

10   could be right?

11   A.    Sure.

12   Q.    Now, could you describe or characterize the

13   certainty of the Parthenon transaction during the weeks

14   leading up to the closing?

15   A.    Are you talking about December of 2001?

16   Q.    Yes.  How certain was the transaction in

17   December of 2001?

18   A.    Well, I think after Parthenon had agreed with

19   the bank on the courthouse steps that it was pretty

20   certain.

21        MR. WHITNEY:  Let's take a break so we can

22   count up he time.

23        (Recess from 4:05 p.m. to 4:08 p.m.)

Page 168

1        Q.    What would have happened to Wolverine if the

2   Parthenon deal had fallen through?

3        A.    In December of 2001?

4        Q.    Yes.  If the deal had fallen apart at the end

5   of December of 2001, what would have happened to

6   Wolverine?

7        A.    You're talking about fallen apart or delayed?

8        Q.    Tanked.  Fallen apart.

9        A.    Probably a receiver would have been appointed.

10       Q.    Was bankruptcy a real possibility?

11       A.    Well, I think at that point in time Mr.

12   Kulkarni had decided that receivership was preferable to

13   bankruptcy from his perspective.

14       Q.    If the Parthenon deal fell apart, Mr.

15   Kulkarni's preference might not have been taken into

16   account, right?  He might not have had a preference?

17       A.    I'm not sure that's accurate.

18       Q.    The bank would have been back in play in their

19   litigation, right?

20       A.    Yes.  But my understanding was the company

21   always had the option to file for bankruptcy.

22       Q.    So it could have been receivership or a

23   bankruptcy if the Parthenon deal fell apart?

1    A.    Could have been, yes.

2    Q.    So let's talk about December 28th.  What do you

3  remember about December 28th of 2001?

4    A.    I remember arriving at the Wolverine offices

5  and Mark Brown immediately coming to me and saying we've

6  got to call Deepak right away.

7    Q.    What time did you arrive at the offices?

8    A.    I don't know.  It was probably ten o'clock,

9  thereabouts.

10    Q.    A.m.?

11    A.    A.m.

12    Q.    What happened after your arrival and you saw

13  Mark Brown?

14    A.    Well, then we called Deepak.

15    Q.    And did you have a discussion with Deepak and

16  Mark?

17    A.    A brief one.

18    Q.    What was the substance of that discussion?

19    A.    Deepak said something like, "Get your ass down

20  to Ropes & Gray."

21    Q.    Were you supposed to have been somewhere else

22  that morning?

23    A.    Yeah.  I had a court date on a speeding ticket.

1   Parthenon as an investor in the company to prevent

2   improper payments.

3        Q.   So to the extent payments were improper, as you

4   have alleged, prior to 12-31 of 2001 the only person

5   subject to being hurt by that is Mr. Kulkarni, right, as

6   the sole shareholder of the company?

7        A.   Well, I wouldn't say that.  Citizens Bank, me.

8        Q.   Why didn't you talk to Citizens about the

9   improper payments that you were aware of prior to the end

10  of 2001?

11       A.   Although he doesn't believe it now, I had a lot

12  of loyalty to Mr. Kulkarni.  It was a tough issue.  On

13  many times I thought about resigning over the issue.

14       Q.   You'll agree, will you not, you have already

15  testified that the accounting department and Mr. Brown as

16  CFO reported to you --

17       A.   Yes.

18       Q.   -- during your time frame?  So would you agree

19  that as the COO the accuracy of the accounting department

20  and Mr. Brown, ultimately the responsibility for their

21  accuracy rested on your shoulders since they reported to

22  you?

23       A.   I don't believe I had complete control over the

Page 196

1   numbers that the accounting department produced.  I think

2   that Mr. Kulkarni dealt, quite frankly, with Mr. Brown.

3       Q.   They reported to you, right, Mr. Crawford?

4       A.   They did.  But if Mr. Kulkarni instructed them

5   to change a number, then I wouldn't have the ability to

6   change it back.

7            (Document marked Exhibit No. 22 for Id.)

8       Q.   Now Exhibit 22 is document number PAC 100 and

9   101.  You have already mentioned this today, Mr.

10  Crawford.  Do you recognize this?

11      A.   Yes, I do.

12      Q.   What is it?

13      A.   These are financial statements that I received

14  from Bill Crotty on or about December 21st of 2001.

15      Q.   Did you have a role in reviewing this or

16  preparing it?

17      A.   In reviewing, yes.  Not preparing them.

18      Q.   Now, did you review this document?

19      A.   I'm sure I did at some point.

20      Q.   Are those your handwritten notes in the upper

21  right hand corner saying From Crotty 12-21-01?

22      A.   Yes.

23      Q.   Do you know this was shown to Parthenon

Page 197

1    personnel prior to the closing of the Parthenon

2    transaction?

3        A.    By me?

4        Q.    By Wolverine.

5        A.    In this particular format, I don't know.    I

6    imagine that these numbers in some format probably were

7    shown to Parthenon.    I believe.

8        Q.    Wasn't this document incorporated into the

9    Parthenon transaction?

10       A.    It may have been.    I don't know.

11       Q.    Why did you obtain this from Mr. Crotty on

12   12-21 of '01?

13       A.    I got financial statements from Mr. Crotty

14   every month.    So this would have been as a matter of

15   course.

16       Q.    Now, this is, what, would you agree with me,

17   about ten days before the final closing in the Parthenon

18   transaction, right?

19       A.    Right.

20       Q.    Are you familiar with the term SG&A expenses?

21       A.    Yes.

22       Q.    What does that stand for?

23       A.    Selling general and administrative expenses.

1      Q.    So what types of expenses are included in SG&A?

2      A.    Well, everything but cost to goods sold and

3  interest, taxes, and I think in this case depreciation

4  and amortization had probably been removed from the SG&A,

5  although that I can't be sure of.

6      Q.    Is the accrual for your 2001 bonus included

7  under the SG&A expenses line of this document?

8      A.    I don't believe so.

9      Q.    Is an accrual for your 2001 bonus incorporated

10 into any of the figures on this income statement?

11     A.    No, I don't believe so.

12     Q.    Did you call that to anyone's attention on or

13 about 12-21 of 2001?

14     A.    I think on 12-21 of 2001 the exact nature of

15 the transaction may well not have been known to me, and

16 the level of which the extraordinary gain would be taken

17 probably was not known to me at that time.

18     Q.    Mr. Crawford, didn't you, in fact, testify

19 earlier today that it was known at the beginning of

20 December?

21     A.    What was known?

22     Q.    The amount of the extraordinary gain.

23     A.    I think the amount of the extraordinary gain

Page 199

1  was known as of the day that Parthenon and Citizens

2  agreed on the courthouse steps, roughly.

3       Q.   And you testified there was a meeting

4  afterwards where it was disclosed to you?

5       A.   Yes.  But what I didn't know, and I think at

6  that point I don't believe that the exact structure of

7  the transaction had been decided.

8           (Document marked Exhibit No. 23 for Id.)

9           MR. WHITNEY:  Let the record reflect as Exhibit

10  Number 23 we have marked a document which is the

11  Wolverine trial balance dated December 27th of 2001.

12       A.   Does this match the one that you produced in

13  this case that has a Bates number?

14       Q.   My understanding is that it does and this was

15  copied from the original.

16       A.   This one doesn't have Bates numbers, so.

17       Q.   Now, have you seen this document before?

18       A.   Well, if this is the one that you produced,

19  yeah, I have seen that document.  But this doesn't have

20  Bates numbers, so I can't be sure.

21       Q.   Assuming this is the trial balance that has

22  been produced to you which I'll represent that it is ,

23  did you have a role in drafting this document?

Page 200

1    A.    Drafting?

2    Q.    Or putting it together?

3    A.    This a printout from the computer.

4    Q.    Did you review it?

5    A.    No.  I don't believe so.

6    Q.    Did you review it shortly after it was printed

7  in the morning of December 27th?

8    A.    No, I don't believe that I ever reviewed this

9  document until you guys produced it in discovery.

10    Q.    This document was incorporated into the

11  Parthenon transaction, right?

12    A.    Well, there was a trial balance dated

13  December 27th that you produced in this case that

14  appeared to have been part of the documents that were

15  part of the Parthenon transaction.

16    Q.    Do you know whether your 2001 accrued bonus is

17  incorporated anywhere into this trial balance?

18    A.    That I don't know.

19    Q.    Well, if you turn to Page 30, see the item for

20  accrued payroll?

21    A.    Yes.

22    Q.    Looking at that, can you determine whether your

23  accrued bonus for 2001 is indicated anywhere in this line

Page 201

1  item for accrued payroll?

2       A.    I think that the magnitude of the bonus

3  relative to the magnitude of the accrued payroll would

4  seem to indicate it's probably not in that line item, if

5  it's here at all.

6       Q.    So because the bonus is so huge compared to the

7  numbers that appear on that line, you're concluding it's

8  not indicated on the accrued payroll line?

9       A.    Yeah.  I believe actually there's some other

10  detail with respect to that line item that you produced

11  in this case, and that detail indicates most of that

12  money is owed to Mr. Kulkarni.

13       Q.    Did you talk to Bill Crotty after reviewing the

14  12-21-01 income statement and say anything to him about

15  your accrued bonus not being included in the forecast for

16  December of '01?

17       A.    No.  I don't believe, I don't recall discussing

18  that with Mr. Crotty.

19       Q.    Why not?  Why didn't you?

20       A.    On December 21st of 2001?

21       Q.    Yes.

22       A.    I think at that point I didn't have an

23  understanding as to the exact nature of the transaction

1   and I didn't know what I might be agreeing with Mr.

2   Kulkarni in the days before the transaction.

3        Q.   Well, you knew that the bonus would be

4   sizeable, right?

5        A.   In what time frame?

6        Q.   In the week or so leading up to the closing of

7   the Parthenon transaction, you were certainly expecting

8   your bonus would be sizeable?

9        A.   I don't think I knew what the negotiations with

10  Mr. Kulkarni would lead to, number one.  And, number two,

11  I can't recall exactly at what point I became aware of

12  which entity would have the extraordinary gain.

13       Q.   But you knew leading up to the transaction that

14  your bonus was certainly at issue and it could

15  potentially be referred to in the transaction as a

16  liability that Parthenon should have been made aware of?

17       A.   I think up until the evening of December 27th I

18  believe that I was intending to forgive any amount that

19  might be owed as a bonus to me.

20       Q.   And on the 28th you specifically carved out

21  your bonus in your agreements that you signed?

22       A.   Because of Mr. Kulkarni's behavior, yes.

23       Q.   So at least as of the 28th you fully expected

1   to receive some sort of bonus after the closing of the

2   Parthenon transaction?

3       A.   I think that would be accurate.

4       Q.   Now if that deal didn't close, you likely would

5   not have had any bonus, right?

6       A.   Well, a lot of other things would have

7   happened.

8       Q.   If that deal didn't close, you likely wouldn't

9   have had any claim to a bonus?

10      A.   For 2001?

11      Q.   For the 2001 financials.

12      A.   Probably not for 2001.

13      Q.   And you needed that deal to close to enable you

14  to even claim for a bonus today, right?

15      A.   Well, you're making some assumptions here.  A

16  bonus for which year?

17      Q.   The bonus that we're talking about in this

18  lawsuit.

19      A.   I believe that the Parthenon transaction

20  closing enabled the EBITDA to be larger and for the bonus

21  to be claimed, yes.

22      Q.   If the transaction had not closed, the EBITDA

23  would have been considerably smaller, right, for 2001?

Page 204

1     A.    Yes.

2     Q.    It would have been negative for 2001?

3     A.    All other things taken equally, I don't know

4  what adjustments were made for December of 2001.

5     Q.    In all likelihood, the future of Wolverine was

6  imperiled if that Parthenon transaction didn't go

7  forward?

8     A.    I don't believe I would say that.

9     Q.    Wouldn't the company have been taken over by a

10  receiver and likely liquidated?

11     A.    No, I don't believe it would have been

12  liquidated.

13     Q.    Wouldn't it likely have gone into bankruptcy?

14     A.    I don't believe that Mr. Kulkarni wanted to

15  take the company into bankruptcy.

16     Q.    In fact, the only way you're even in a position

17  today to make the claim that you're making is because

18  that Parthenon deal closed?  Because if it hadn't, you

19  wouldn't be able to make your claims?

20     A.    Yes, but I might have been CEO in 2002 and been

21  entitled to an even bigger bonus.

22     Q.    Well, that's speculation?

23     A.    Well, so is yours.

1      Q.    I think not.  You knew if that deal didn't

2  close you wouldn't have had an opportunity to claim a

3  five hundred seventy something thousand dollar bonus in

4  April of 2002, right?

5      A.    I think I already answered that question.

6      I see that we're now up on eleven hours exactly.  If

7  you want a few more minutes, I'll give it to you, but we

8  have a reporter waiting for the next deposition.

9      Q.    Prior to December 31st of 2001 did you disclose

10  to anyone that you anticipated that you would be

11  expecting a five hundred seventy plus thousand dollar

12  bonus in April of 2002?

13      A.    No, I don't recall discussing that with anyone.

14      MR. WHITNEY:  Okay.  I realize that we're

15  nearing the end of the time that had been agreed upon,

16  and I'm just going to state on the record that I'm not

17  agreeing to conclude the deposition at this point, though

18  I appreciate any further deposition will have to occur by

19  agreement or order of the court, and I reserve all my

20  rights, especially those with regard to spoliation of

21  evidence and other disclosures that apparently have not

22  been made thus far in this case.

23      Do you want to cross-examine yourself?

**EXHIBIT 4**
**WHITNEY**

Page 1

1              UNITED STATES DISTRICT COURT
2                DISTRICT OF MASSACHUSETTS
3
4   * * * * * * * * * * * * * * * * * *
    PETER A. CRAWFORD,                    *
5           Plaintiff                     *
                                          *
6   VS.                                   *   CIVIL ACTION NO.
                                          *   05-ev-10078(DPW)
7   WOLVERINE, PROCTOR & SCHWARTZ,        *
    INC.; STEVEN F. CHILINSKI and         *
8   DEEPAK S. KULKARNI,                   *
           Defendants                     *
9   * * * * * * * * * * * * * * *         *
10
11
12          DEPOSITION OF STEVEN CHILINSKI, called by the
    Plaintiff, pursuant to the applicable provisions of the
13  Federal Rules of Civil Procedure, before Ruth E. Hulke,
    Certified Shorthand Reporter No. 114893 and Notary Public
14  for the Commonwealth of Massachusetts, at Morgan, Brown &
    Joy, LLP, 200 State Street, Boston, Massachusetts, on
15  Monday, November 14, 2005, commencing at 12:55 p.m.
16
    APPEARANCES:
17
        PETER A. CRAWFORD, 23 Newcastle Drive, Number 11,
18  Nashua, New Hampshire, 03060, pro se.
19      MARK WHITNEY, ESQ., of Morgan, Brown & Joy, LLP, 200
    State Street, Boston, Massachusetts, 02109, on behalf of
20  the Defendants.
21
22
23

Page 2

```
1                          I N D E X
2   WITNESS          DIRECT    CROSS      REDIRECT      RECROSS
3   Steven Chilinski   3
4
5
6                       E X H I B I T S
7   NUMBER                                           PAGE
8     1    Employment Agreement                        8
      2    Minutes of Board Meeting, 2-28-02          10
9     3    12-2-04 letter to Chilinski from
           Crawford                                   17
10    4    12-8-04 letter to Crawford from Blake      21
      5    3-26-02 Arthur Andersen report             28
11    6    Mission and Investment Profile             37
      7    Consolidated Financial Statements
12         Years Ended 12-31-02 and 2001             40
      8    Omnibus Agreement                         44
13    9    General Ledger Trial Blance               51
     10    Chilinski resume                          57
14   11    Consolidated Financial Statements
           Years Ended 12-31-03 and 2002             60
15   12    Consolidated Financial Statements
           Years Ended 12-31-04 and 2003             60
16   13    12-21-04 letter to Chilinski from
           Crawford                                  66
17   14    Press release                             74
     15    Income Statement Data - Wolverine         75
18   16    Article 5, Distributions and
           Allocations of Profit and Loss            86
19
20
21
22
23
```

1              P R O C E E D I N G S

2                  (Witness sworn)

3          MR. CRAWFORD:  This is a deposition called by

4     the Plaintiff in the case of Crawford v. Wolverine,

5     Proctor & Schwartz, Inc.  It's the deposition of Steve

6     Chilinski.  The parties have agreed that reading and

7     signing will not be waived, the witness will read and

8     sign the deposition, and, also, any objections, except as

9     to form, need not be made in the deposition, but will be

10    preserved to be made at trial.

11         Are those agreed to, Mr. Whitney?

12         MR. WHITNEY:  Yes.

13         STEVEN CHILINSKI, having been satisfactorily

14    identified and duly sworn, testified as follows in answer

15    to direct interrogatories by Mr. Crawford:

16    Q.   Mr. Chilinski, I wonder if you could tell me

17    about your background, the position that you held before

18    Wolverine, Proctor & Schwartz, and about your education

19    and accounting experience.

20    A.   Well, I graduated from Syracuse University with

21    a degree in finance, worked at Pricewaterhouse for, I

22    believe, around seven years, and subsequent to that was a

23    CFO of two companies, and then ultimately became a CEO of

Page 4

1    a company owned by a private equity group out of Boston,

2    and subsequent to that became CEO of Wolverine, Proctor.

3        Q.    Okay.  Are you a certified public accountant?

4        A.    I used to be.

5        Q.    What was the name of the private equity firm?

6        A.    Which one?  The first?

7        Q.    You said you were the CEO of a company owned by

8    a private equity firm?

9        A.    Bain Capital.

10       Q.    Were some of the principals with Bain Capital

11   -- Strike that.  Did some of the principals with Bain

12   Capital go over to Parthenon Capital at some point?

13       A.    I'm not sure.

14       Q.    Why don't you tell me how you first found out

15   about the Wolverine opportunity.

16       A.    I guess I had left the company that was owned

17   by Bain Capital, they had sold it, and I through

18   networking had met one of the partners at Parthenon

19   Capital.  And also, you know, through my networking I

20   think Parthenon Capital probably heard about me through

21   my acquaintances, and through that triangulation, you

22   know, I heard about the job.

23       Q.    Who is the partner at Parthenon Capital?

Page 5

1        A.    Samantha Trotman.

2        Q.    What time frame did you first hear about the

3    Wolverine opportunity?

4        A.    When did I hear about it?  Sometime in the fall

5    of 2001.

6        Q.    What did they say about the opportunity and why

7    a CEO might be needed?

8              MR. WHITNEY:   Objection.   You can answer.

9        A.    It was a transaction was being contemplated to

10   buy a company, manufacturing company, I had manufacturing

11   experience, and thought I might be a good candidate for

12   it.

13       Q.    Did they say anything about the existing

14   management?

15       A.    No.

16       Q.    Okay.  And did there come a time when you met

17   Mr. Kulkarni in connection with this opportunity?

18       A.    Sure, yeah.

19       Q.    When was that?

20       A.    Don't know exactly what the dates are.  I

21   believe it was sometime in December, and may be early

22   January.

23       Q.    That would have been December of 2001?

Page 6

1      A.    2001.   Correct.   And early January of 2002.

2      Q.    And what did Mr. Kulkarni say?

3      A.    What did he say?  Well, you know, it was your

4  typical interview process.   A lot of investigation into,

5  you know, my past experience, and, you know, in terms of

6  evaluating, you know, my ability to run the company.

7      Q.    Did he mention anything about the existing

8  chief operating officer?

9      A.    Not that I recall.

10     Q.    Did he tell you why -- Strike that.   What

11  position -- Strike that.   When you first had these

12  discussions with Mr. Kulkarni, what position was it

13  regarding?

14     A.    Chief executive officer.

15     Q.    Did he explain to you why the chief executive

16  officer position might be open?

17     A.    Well, I think that, I think generally my

18  thoughts were that he was a CEO and that as part of the

19  transaction he would, you know, his role in the company

20  would be more at a board level.   So they needed, you

21  know, somebody to take over his role as CEO.

22     Q.    Did he discuss the time frame in which that

23  might occur?

1      A.    Well, I mean, probably he hadn't offered me a

2  job yet, so it would happen when I, when I became an

3  employee.

4      Q.    Did he say anything about there being an

5  existing chief operating officer with the company?

6      A.    I don't think we really got into organization

7  structure.

8      Q.    Okay.  And so this first meeting was in

9  December of 2001 or January of 2002?

10     A.    I think it was probably in December.

11     Q.    When was the second meeting either with Mr.

12 Kulkarni or with anyone else from Wolverine, Proctor and

13 Schwartz?

14     A.    Well, I didn't say there was a second meeting.

15 But as part of the interview process I met with a number

16 of people, if that's what you're getting at, --

17     Q.    Right.

18     A.    -- in some of my interviews.

19     Q.    Yes.  After that first meeting with Mr.

20 Kulkarni, when was the next time that you met anyone from

21 Wolverine, Proctor & Schwartz?

22     A.    From Wolverine, Proctor & Schwartz?  You know,

23 I apologize.  I don't have the whole sequence of events,

Page 8

1  but, you know, at some point before I was offered the

2  job, you know, I met with some of the management team at

3  that time, and Mr. Kulkarni I think one more time.

4      Q.   But you don't remember the time frame?

5      A.   Well, it was around that time, you, know, late

6  December or early January.  You know, it was probably

7  like a three- to four-weeks time where there was an

8  interview process going on.

9      Q.   Okay.  Then you joined the company.  Is that

10  correct?

11      A.   Correct.

12      Q.   When did you join the company?

13      A.   I'm -- I believe my first day on the job was, I

14  think, February 1st maybe of 2002.

15      Q.   Okay.

16          MR. CRAWFORD:  Ask that you mark this as

17  Plaintiff's Exhibit 1.  This is pages W0051 through

18  W0070.

19          (Document marked Exhibit No. 1 for Id.)

20      Q.   I ask you if you have seen this document

21  before.

22      A.   Yes, I have seen this document.

23      Q.   Would you turn to the last page?  That is your

Page 9

1  signature on the last page?

2      A.    Um-hmm.

3      Q.    This is the employment contract between you and

4  the company?

5      A.    Correct.

6      Q.    Just to refresh your recollection, I believe

7  there's a date on the first page of January 29th, 2002?

8      A.    Correct.

9      Q.    Would that be then the date that you joined the

10  company?

11     A.    I guess, technically.  I don't remember if

12  there was a weekend or whether that was a Friday, but

13  somewhere around that date.

14     Q.    Somewhere around that date.  Okay.  And was it

15  your understanding that you were chief executive officer

16  from the time you joined?

17     A.    Yes.

18     Q.    And starting at the time you joined, did you

19  take any direction from Mr. Kulkarni?

20     A.    Well, from the board, and he was the chairman

21  of the board, so.

22     Q.    But you didn't take direction from him as chief

23  executive officer, did you?

Page 10

1                MR. WHITNEY:   Objection.

2        A.    I was -- The way this was worded is I came on

3    as the CEO of the company.

4        Q.    Right.

5        A.    First day.

6        Q.    And your understanding was that you were CEO of

7    the company from the first day.  Is that correct?

8        A.    From the first day.

9        Q.    I show you a second document.  This is W0026

10   through W0027.  Ask that be marked Plaintiff's Exhibit 2.

11           (Document marked Exhibit No. 2 for Id.)

12       Q.    I ask you whether you have seen this document

13   before.

14       A.    Can I read it?

15       Q.    Certainly.  You don't need to read the whole

16   thing.

17              (A pause)

18       Q.    You don't need to read the whole thing.  I'm

19   going to point you to specific parts of it in a minute.

20       A.    Okay.

21       Q.    Tell me when you're ready.

22       A.    You told me to stop reading, so I'll stop

23   reading.

Page 11

1    Q.    Well, you have read part of it?

2    A.    Yes, I have read part of it.

3    Q.    Have you seen this document before?

4    A.    I would assume so.  It's minutes of the board

5    meeting, that first board meeting.

6    Q.    Do you see down at the second voted where it

7    says to remove Deepak Kulkarni as chief executive

8    officer?  Do you remember that --

9    A.    Yes.

10   Q.    -- taking place?

11   A.    I think so, yeah.

12   Q.    Do you remember that occurring on

13   February 28th, 2002?

14   A.    Yep.

15   Q.    So is it a fair statement that, even though you

16   acted as chief executive officer from January 29, 2002,

17   that you weren't officially voted in as chief executive

18   officer by the board until February 28, 2002?

19   A.    All I know is that there was a board meeting on

20   February 28th making me the CEO and that I had signed an

21   employment agreement approximately a month previous

22   saying that I would become the CEO.

23   Q.    Right.  But if you look at the last page,

Page 12

1    W0070 --

2        A.    Of this?

3            MR. WHITNEY:  Exhibit 1.

4        Q.    Exhibit 1, right.  You see 3-8-02 under your

5    signature?

6        A.    Yes.

7        Q.    Does that refresh your recollection as to when

8    you signed this agreement?

9        A.    Yes.

10       Q.    So it was actually March 8th?

11       A.    That I signed this agreement, right.

12       Q.    So that would have been after the board

13   meeting?

14       A.    Right.  But -- Okay.  It was after the board

15   meeting.

16       Q.    Right.  I'm just suggesting that not only had

17   you not signed the agreement and that the board hadn't

18   acted yet -- Strike that.

19           What I'm saying, in the absence of board action and

20   in the absence of an agreement, as far as you were

21   concerned, from January 29th of 2002 through

22   February 28th of 2002 you were CEO.  Correct?

23           MR. WHITNEY:  Objection to form.

1        A.    Could you ask that again?

2        Q.    As far as you were concerned, from January 29th

3    of 2002 through February 28th of 2002 you were CEO of

4    Wolverine, Proctor & Schwartz, Inc.?

5        A.    I did believe I was the CEO of Wolverine,

6    Proctor & Schwartz.

7        Q.    Was there anything that Mr. Kulkarni or anybody

8    else said that would have indicated otherwise?

9        A.    No.  But I think it's typical in any hiring of

10   an executive is you have basically house cleaning to do

11   to make sure all the legal documents, you know, conform

12   to, you know, what the intent is.  And that's, I think

13   that's what happened here.

14       Q.    It's very understandable.  I'm making a

15   somewhat different point that will come out later, and

16   don't think that I'm challenging your integrity in any

17   way.

18       A.    Okay.  Good.

19       Q.    I'm just making a point that will become

20   apparent later in the case.

21            When you joined Wolverine, Proctor & Schwartz, Inc.

22   -- Strike that.  When did you first hear the name Peter

23   Crawford or any mention of a chief operating officer of

**EXHIBIT 5**
**WHITNEY**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

---------------------------------

PETER A. CRAWFORD,                    :
                    Plaintiff         :
                                      :  Civil Action
     VS.                              :  No. 05-10078-DPW
                                      :
WOLVERINE, PROCTOR & SCHWARTZ,        :
INC., STEVEN F. CHILINSKI,            :
DEEPAK S. KULKARNI,                   :
                    Defendants        :
---------------------------------

                    DEPOSITION OF RICHARD M. CUMMINGS,
taken on behalf of the Plaintiff, pursuant to the
applicable provisions of the Massachusetts Rules of
Civil Procedure, before Linda J. Modano, CSR No.
121093, a Registered Professional Reporter and Notary
Public in and for the Commonwealth of Massachusetts,
at the Offices of Sugarman and Sugarman, P.C., One
Beacon Street, Boston, Massachusetts, on Tuesday,
November 29, 2005, commencing at 10:02 a.m.

APPEARANCES:

PETER A. CRAWFORD, 23 Newcastle Drive,
No. 11, Nashua, New Hampshire, 03060,
pro se.

JEFFREY D. KUHN AND MARK WHITNEY, ESQS., of
Morgan Brown & Joy, LLP, 200 State Street,
Boston, Massachusetts, 02109-2605, for the
Defendants.
ROBERT R. BERLUTI, ESQ., of Berluti & McLaughlin
LLC, 44 School Street, Boston, Massachusetts,
02108-4201, for the Deponent.

                    LEAVITT REPORTING, INC.

```
1                  I N D E X

2

3    Witness              Direct  Cross  Redirect  Recross

4    Richard Cummings    3        167

5

6                  E X H I B I T S

7

8    NO.                                          ID.

9    1   3/12/02 memorandum                       9

10   2   1/4/00 letter as identified              29

11   3   12/2/04 letter as identified             30

12   4   PAC 0055-0056                             30

13   5   Copy of 2001 financial statements        32

14   6   Statement of Financial Accounting        47

15       Concepts No. 5

16   7   Statement of Financial Accounting        48

17       Concepts No. 130

18   8   99 and 2000 financial statements         75

19       of Wolverine as identified

20   9   Financial statements, PAC 0061-0080      75

21   10  W 0409 - W 0432                          112

22

23
```

Page 3

1                    P R O C E E D I N G S

2                    MR. KUHN: Can I just raise an issue?

3     Did you and Mark talk about the normal stipulations

4     before I got in?

5                    MR. CRAWFORD: We didn't, but I believe,

6     based on the discussion just now, that the witness

7     will read and sign the deposition.  The court

8     reporter has agreed to let me make a copy of my copy

9     and to provide it to Mr. Cummings.

10                   MR. KUHN: So we'll stipulate to only

11    objections as to form.  All other objections will be

12    preserved?

13                   MR. CRAWFORD: Correct.

14                   MR. KUHN: Okay.

15                   Richard M. Cummings, having been

16    satisfactorily identified and duly sworn by the

17    Notary Public, was examined and testified as follows:

18                   Direct Examination

19       Q.  (by Mr. Crawford) I want to thank you for

20    coming down, Mr. Cummings. You understand that you're

21    sworn as in a court of law today?

22       A.  Yes.

23       Q.  You understand that if at the trial of this

Page 4

1    matter any of the answers that you give to questions

2    are different from those that you give today, that

3    you may be asked to explain those differences?

4        A.  Yes.

5        Q.  And are you under any medication or is there

6    any reason why you cannot testify completely and

7    truthfully today?

8        A.  No.  I have a cold but I took a Sudafed this

9    morning.  But other than that, no.

10        Q.  If you could speak up, I'm actually having a

11    little trouble hearing both you and Mr. Kuhn and I

12    suspect the reporter may be as well.

13              Could you tell me about your background

14    starting from your college experience.  Just give me

15    a summary of where you've been and what degrees you

16    have and whether you're a CPA or not and so forth.

17              MR. BERLUTI: Objection as to form.

18    If you understand the question you can answer it,

19    Mr. Cummings.

20        A.  I graduated from college in 1976 with an AB

21    from Holy Cross College, Worcester, and worked for

22    Arthur Andersen from that time, 76, through

23    approximately 2002, and have been with the Vitale

1    paragraph.

2        Q.  So that would include the net income, is that

3    correct?

4        A.  The net income is a line item on one of the

5    financial statements, that's correct.

6        Q.  So could an auditor decide upon his own

7    definition for net income or would he need to look to

8    the standards of the Financial Accounting Standards

9    Board?

10       A.  No.  I believe the concepts of the net income

11   are encompassed in GAAP.

12       Q.  So it's fairly specifically defined, is it

13   not, by the standards of the Financial Accounting

14   Standards Board?

15                MR. BERLUTI: Objection.

16                MR. KUHN: Objection.

17       A.  I believe so.  I think that's --

18       Q.  And are you familiar with the term earnings?

19       A.  Yes.

20       Q.  And is earnings something that is defined by

21   the Financial Accounting Standards Board?

22       A.  I don't believe it is.

23                MR. CRAWFORD: I ask that this be marked

Page 103

1    -- I mean, I wouldn't begin to speculate as to what

2    the answer to it is.

3        Q.  And if you were to perform that calculation,

4    what information would you need?

5        A.  I think -- These are agreements that

6    typically need a lot of information, need agreement

7    among the parties and definitions, and so it's a lot

8    of information.

9        Q.  You see the term EBITDA appearing several

10   times in that text, do you not?

11       A.  I do.

12       Q.  In your mind would EBITDA include or exclude

13   an extraordinary gain?

14       A.  I wouldn't speculate.

15       Q.  You would have to do some more research?

16       A.  No.  I think EBITDA is a very general term

17   used by a lot of people in a lot of ways, so I

18   wouldn't begin to speculate how it was being used

19   here.

20       Q.  Is EBITDA a GAAP-defined term?

21       A.  Not to my knowledge it's not.  It's -- Again,

22   it's a general financial term that a lot of people

23   use in a lot of ways.