UNITED STATES DISTRICT COURT
District of Massachusetts

FILED
IN CLERKS OFFICE
2006 MAR 17 P 3: 17
Civil Action
No. 05-10078-DPW
U.S. DISTRICT COURT
DIST. OF MASS.

)
PETER A. CRAWFORD, Plaintiff        )
                                    )
v.                                  )
                                    )
WOLVERINE, PROCTOR & SCHWARTZ, INC., )
Steven F. Chilinski, Deepak S. Kulkarni, )
                                    )
        Defendants                  )
                                    )

## PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

### REQUEST FOR ORAL ARGUMENT

Plaintiff hereby requests, pursuant to Local Rule 7.1(d), that oral argument on this motion be permitted.

### MOTION

Now comes the plaintiff in the above-captioned action and moves that this honorable Court:

(1) Grant Summary Judgment, pursuant to Fed. R. Civ. P. 56(a) on Count I of his Complaint.

(2) Direct that the method for calculation of the plaintiff's BONUS be as indicated in the accompanying memorandum, and enter an order, pursuant to Fed. R. Civ. P. 56(d), that further proceedings on Counts II, III and IV of the Complaint take that methodology as established.

1

In support of this motion, plaintiff submits herewith Plaintiff's Affidavit in Support of his

Motion for Partial Summary Judgment and Plaintiff's Memorandum in Support of his

Motion for Partial Summary Judgment.

## CERTIFICATE OF CONFERRAL

Plaintiff hereby certifies that he conferred in good faith with Jeffrey Kuhn of

Morgan, Brown & Joy, counsel for all defendants, and defendants were not willing to

assent to this motion.

Peter A. Crawford, pro se
23 Newcastle Dr. #11
Nashua, NH 03060
(603)888-4574

Date: March 17, 2006

## Affidavit of Service

FILED
IN CLERKS OFFICE

I, Peter A. Crawford, plaintiff, hereby say and depose, under pains and penalties

of perjury, that I this day served the within papers upon defendants' attorney by causing

copies thereof to be mailed, first class postage prepaid, to Mark Whitney, Morgan Brown

& Joy, 200 State St., Boston, MA  02109.

*[signature: Peter A. Crawford]*

Date: *March 17, 2006*

FILED
IN CLERKS OFFICE

2006 MAR 17 P 3: 16

U.S. DISTRICT COURT
DISTRICT OF MASS.

UNITED STATES DISTRICT COURT
District of Massachusetts

Civil Action
No. 05-10078-DPW

PETER A. CRAWFORD, Plaintiff )
)
)
v. )
)
WOLVERINE, PROCTOR & SCHWARTZ, INC., )
Steven F. Chilinski, Deepak S. Kulkarni, )
)
Defendants )

## PLAINTIFF'S AFFIDAVIT IN SUPPORT OF HIS
## MOTION FOR PARTIAL SUMMARY JUDGMENT

I, Peter A. Crawford, do hereby say and depose that:

1.      I am the plaintiff in the above captioned action. I joined the defendant

Wolverine, Proctor & Schwartz, Inc. ("WPS, Inc.") as Chief Operating Officer ("COO")

on or about December 30, 1999, and served in that capacity until January 14, 2002. In

that capacity I was responsible for the day-to-day operations of WPS, Inc., while Mr.

Kulkarni, Chief Executive Officer during 2000 and 2001, was largely focused on external

matters involving negotiations with potential investors and with the company's lender,

and occasionally customer or strategic issues. Every organization chart for WPS, Inc.

that I ever saw showed all WPS, Inc. employees, except Mr. Kulkarni and his secretary

(and possibly his driver, his mother and his cook who did little or no work for the

company but were on the WPS, Inc. payroll), reporting directly or indirectly to me. I

1

make the statements in this affidavit based upon personal knowledge, unless otherwise indicated.

2.      On or about January 4, 2000, I executed, within the Commonwealth of Massachusetts, a letter agreement dated January 4, 2000 (the "Employment Agreement"). I attach a true copy of that agreement hereto as Exhibit A, pages PAC0001 to PAC0005. In the negotiations leading up to the execution of that agreement, Mr. Kulkarni and I discussed the fact that the earnings of WPS, Inc. had been increased in prior years due to reserve adjustments. Mr. Kulkarni and I specifically discussed the pension reserve at that time, and we may also have discussed the warranty reserve. Based upon these discussions, we agreed to a clause in the Employment Agreement providing that "[e]xcluded from EBITDA will be any non-operating adjustments to reserves, to the extent that those adjustments affect EBITDA..." My intention in agreeing to include this clause was to provide for a situation where a reserve, such as the pension or warranty reserve, went up or down due to a management decision. If the earnings and EBITDA were affected by those changes, the changes would be excluded from the earnings and EBITDA calculations. I did not intend that this clause apply to any other situation beyond that just described, nor did I, prior to 2005, have any reason to believe that Mr. Kulkarni intended it to apply to any other such situation. The Employment Agreement at PAC0002 includes two sentences relating to the clarification of calculations by an accounting firm. These sentences were added at the sole request of Mr. Kulkarni.

3.      On December 28, 2001, I met with Deepak Kulkarni and gave him the a choice between acknowledging an earlier oral agreement to increase my equity stake in WPS, Inc. to 8%, and in carving my bonus for 2001 out of a release he had demanded

2

that I would execute that same day. Mr. Kulkarni and I had previously discussed, most

likely during the summer of 2001, the possibility that Citizens Bank of Massachusetts,

the lender to WPS, Inc., might take less than the full value of the Citizens debt in

payment, and that WPS, Inc. in such an event might record the forgiveness of

indebtedness income as an increase to earnings. Mr. Kulkarni stated during that

conversation that the Employment Agreement could be construed to provide for the

payment of a bonus on those earnings. Based upon that earlier conversation, and the fact

that the WPS, Inc. earnings through November 2001 were insufficient to result in a bonus

being owed, I had no doubt that Mr. Kulkarni understood, on December 28, 2001, that if

he selected the option of carving out the bonus that I was likely to seek payment of a

bonus on the forgiveness of indebtedness income.  At no time on December 28, 2001, or

at any other time, did I misrepresent to anyone my intention with regard to the bonus. At

no time on December 28, 2001, or at any other time, did I ever state to anyone that no

bonus would be owed to me, or mislead anyone into so believing.  My contacts with

representatives of Parthenon were limited to WPS, Inc. issues and did not include any

personal issues, such as the Employment Agreement, my bonus or options.  I dealt

exclusively with Mr. Kulkarni on those issues.  Later on December 28, 2001, both Mr.

Kulkarni and I executed the document entitled "Transition Agreement."  I attach a true

copy of the Transition Agreement hereto as Exhibit B, pages PAC0043 to PAC0047.

     4.     I attach hereto a true copy of the Wolverine Proctor LLC 2001 financial

statements as Exhibit C, pages PAC0027 to PAC0042. This document was introduced at

the deposition of Richard Cummings on November 29, 2005 as Cummings 5. See

Exhibit Q at 32-33.

5.      I attach hereto as Exhibit D true copies of selected pages from the WPS, Inc. 2000 financial statements. These financial statements were prepared while I was COO of WPS, Inc. It was the regular practice of WPS, Inc. to compile and report this information annually based upon compilations and other regularly recorded records of the financial effect of acts and events made at or near the time the records were made. While I was not at WPS, Inc. for the final steps in the compilation of the Wolverine Proctor LLC 2001 statements, I believe that the regular practices were followed.

6.      I attach hereto a copy of an e-mail and letter that I received, in my capacity as Chief Operating Officer of Wolverine, Proctor & Schwarz, Inc. on or about March 8, 2001 as Exhibit E, pages PAC0226 to PAC0229. I have omitted a Due Diligence Checklist and Information Request List that was attached to the letter. E-mails such as these were regularly retained in the ordinary course of business. The offer made in this document was subsequently withdrawn.

7.      I attach hereto as Exhibit F, pages PAC0100 and PAC0101 two documents that I received from Bill Crotty on December 21, 2001. Mr Crotty was a senior member of the accounting staff of WPS, Inc. and he prepared these and similar documents monthly in the ordinary course of his duties. I was Chief Operating Officer of WPS, Inc. during the entire time period reflected on these documents and state that, through the end of November 2001, the figures present the financial results reported both internally and externally by WPS, Inc. It was the regular practice of WPS, Inc. to compile and report this information monthly based upon compilations and other regularly recorded records of the financial effect of acts and events made at or near the time the records were made.

4

8.      I attach hereto as Exhibit G, true copies of pages W0448, W0450 and
W0455 produced by defendants during discovery in this matter.

9.      I attach hereto as Exhibit H, a true copy of a letter that I sent by priority
mail to Bob Berluti, counsel for Richard Cummings, on December 19, 2005, as well as
the delivery confirmation receipt that I obtained at the time of mailing and the results of
an inquiry that I performed on January 31, 2006 from the U.S. Postal Service web site,
indicating that the letter was delivered on December 21, 2005. Enclosed with the letter
were copies of Mr. Cummings' November 29, 2005 deposition transcript and copies of
all exhibits introduced during that deposition.

10.     I attach hereto as Exhibit I a true copy of a letter dated February 22, 2006,
a copy of which I received shortly after February 22, 2006, a true copy of a letter I sent
on February 27, 2006 to Messrs. Cummings, Whitney and Berluti, and a true copy of a
letter dated March 1, 2006 that I received shortly after March 1, 2006. I have omitted the
exhibits that were attached to the February 22, 2006 letter.

11.     I attach hereto as Exhibit J a true copy of Defendants' Supplemental
Response to Plaintiff's First Request for the Production of Documents, that I received
shortly after January 17, 2006. I have followed up with Jeffrey Kuhn of Morgan, Brown
& Joy, counsel for all defendants, by telephone and by e-mail on this issue a number of
times. He has steadfastly denied that his clients or his firm have any responsive
documents in their possession. At one point, however, he alleged that he had just
obtained a copy from Mr. Berluti of the Richard Cummings affidavit purportedly signed
on April 8, 2005 and forwarded a copy to me. That was before Mr. Berluti provided a

5

copy to me. Subsequently, Mr. Kuhn admitted to me that his firm retained e-mails for a year.

12.    I attach hereto as Exhibit K, page W0021, a true copy of the 2001 W-2 of Deepak Kulkarni that was produced by defendants during discovery in this matter.

13.    I attach hereto as Exhibit L, a true copy of Statement of Financial Accounting Standards No. 130 that I downloaded from the www.fasb.org web site during late 2005. This document was introduced during the deposition of Richard Cummings in this matter on November 29, 2005 as Cummings 7. See Exhibit Q at 48-49.

14.    I attach hereto as Exhibit M, a true copy of Statement of Financial Accounting Concepts No. 5 that I downloaded from the www.fasb.org web site during late 2005. This document was introduced during the deposition of Richard Cummings in this matter on November 29, 2005 as Cummings 6. See Exhibit Q at 46-47.

15.    I attach hereto as Exhibit N a true copy of selected pages from Statement of Financial Accounting Standards No. 5 that I downloaded from the www.fasb.org web site during late 2005.

16.    I attach hereto as Exhibit O a true copy of selected pages from the depositions of Deepak Kulkarni in this matter. Those depositions were taken on December 7, 2005 and February 8, 2006. The page numbers from the February 8, 2006 deposition are preceded by the prefix "2-". I never received any errata sheets or corrections pursuant to Fed. R. Civ. P. 30(e) for either deposition.

17.    I attach hereto as Exhibit P a true copy of selected pages from the deposition of Mark Brown, taken in this matter on November 3, 2005, together with a true copy of the errata sheet that I received relating to that deposition.

18.    I attach hereto as Exhibit Q a true copy of selected pages from the deposition of Richard Cummings, taken in this matter on November 29, 2005.  The errata sheet that I received after expiration of the requisite 30 day period is attached hereto as part of Exhibit R.

19.    I attach hereto as Exhibit R, a true copy of a letter that I received from Bob Berlutti, counsel for Richard Cummings, shortly after January 25, 2006, as well as true copies of some of the documents that were enclosed therewith.

20.    I attach hereto as Exhibit S, a true copy of selected pages from the deposition of Marshall Bartlett, taken in this matter on January 20, 2006, together with a true copy of the errata sheet that I received relating to that deposition.

21.    I attach hereto as Exhibit T, a true copy of Defendant Wolverine Proctor & Schwartz, Inc.'s Response to Plaintiff's First Set of Interrogatories, that I received shortly after August 5, 2005.

22.    As Chief Operating Officer of Wolverine, Proctor & Schwartz, Inc., I had personal knowledge of the approximate level of compensation being paid to Deepak Kulkarni.  I was aware that, during 2001, he obtained additional compensation, beyond that reported on the W-2 attached hereto as Exhibit K, from the Wolverine, Proctor & Schwartz, Inc. branch office in the United Kingdom and/or from Friel Engineering Limited, a 49% owned subsidiary of WPS, Inc. for most of 2001.  Substantially all of the revenues of Friel Engineering Limited came from WPS, Inc. which subcontracted U.K. manufacturing to it.  Furthermore, I am personally aware that during 2001, potential investors in WPS, Inc. were informed that Mr. Kulkarni's compensation was approximately $2 million annually.  However, I understood that Citizens Bank of

7

Massachusetts (hereinafter "Citizens"), the company's lender, believed that Mr. Kulkarni's compensation was limited to $900,000 plus fringe benefits, annually.

23.     Starting during the first part of 2001, Citizens became increasingly aggressive regarding its loan to WPS, Inc. and retained the consulting firm of Trimmingham Americas Inc. (hereinafter "Trimmingham") to conduct an on-site review at the WPS, Inc. offices in Merrimac, Massachusetts. I am personally aware of this as I participated in several meetings and phone calls with Mr. Kulkarni and representatives of Citizens. Most of the interactions between the consultants of Trimmingham and the employees of WPS, Inc. were with members of the accounting department of WPS, Inc., managed by Mark Brown, Chief Financial Officer, however, I had limited interactions with the people from Trimmingham. I learned from Mark Brown that Trimmingham was focused largely on payments being made to Mr. Kulkarni.

24.     Around the time that Trimmingham was conducting its review, Citizens was aggressively insisting that repayments commence on the loans that had been made to WPS, Inc. Specifically, principal repayments of $500,000 per quarter were due under the terms of the original agreement between WPS, Inc. and Citizens, however, these repayments had been waived during 2000 and early 2001. Under the terms of an amended agreement, the principal payments were to commence again on June 1, 2001. Around that time, I received a phone call from Patrick Joyce of Citizens to discuss the June 1, 2001 principal payment. Mr. Joyce was the principal contact point between WPS, Inc. and Citizens at that time. I informed Mr. Joyce that, while WPS, Inc. had set aside the money for the principal repayment, cash flow remained constrained and draining that amount of cash from the company was likely to lead to an inability to make shipments in

8

the future. I knew, however, from conversations that I had had, and meetings that I attended, with Mr. Joyce and other representatives of Citizens, that they were very concerned with the amount of cash being withdrawn by from WPS, Inc. by Mr. Kulkarni. I was unable to persuade Mr. Joyce to continue to waive the principal repayment and WPS, Inc. made a $500,000 payment to Citizens in early June, 2001. My prediction proved correct, and WPS, Inc. became increasingly unable to pay its vendors and make shipments commencing within a month or two after this payment.

25.     Under the terms of the loan agreement between WPS, Inc. and Citizens, all of the outstanding balance of the debt from WPS, Inc. to Citizens became due on September 30, 2001. The outstanding debt was not paid at that time and WPS, Inc. was in default on September 30, 2001, if not earlier. Under the terms of its agreement with WPS, Inc., Citizens had the right to appoint a receiver in the event of default. During the second half of 2001, WPS, Inc. paid several hundred thousand dollars to Hale & Dorr and Cohen & Kelakos as attorneys representing WPS, Inc. and Mr. Kulkarni respectively. These payments were in preparation for a Chapter 11 bankruptcy filing (in the event Citizens decided to exercise its contractual rights) and to explore various options for Mr. Kulkarni under receivership or bankruptcy scenarios. The June 1, 2001 principal repayment, the disbursements to attorneys, and a continuing high level of overdue amounts owed by WPS, Inc. to its vendors led to an increasing difficulty by WPS, Inc. in obtaining material from its vendors to ship the substantial backlog of orders that it had.

26.     During October or November, 2001, I participated in a three-way telephone conversation with Mr. Kulkarni and Bob Fitzsimmons of the Riverside Company ("Riverside"). Mr. Fitzsimmons was the senior executive of Riverside

9

considering an investment in WPS, Inc., and Riverside had conducted extensive due diligence of WPS, Inc. including many days of on site work by Riverside employees and on-site investigations by independent accountants retained by it. I recall that Riverside was considering a transaction whereby WPS, Inc. would be recapitalized for a total value, after the Citizens loans had been paid off, of approximately \$27.5 million. The discussion focused largely upon the amount of compensation recently paid to Mr. Kulkarni, the level of overdue accounts payable owed by WPS, Inc. to its vendors, and the company's inability to make shipments. Mr. Kulkarni or I disclosed that the unpaid invoices over 60 days old had increased by \$500,000. Virtually immediately after this telephone conversation, I learned from Mr. Kulkarni that Riverside had withdrawn its interest in investing in WPS, Inc., I believe because Mr. Kulkarni's cash withdrawals in the face of increasing overdue accounts payable and an inability to make shipments demonstrated a lack of faith by Mr. Kulkarni in the future of WPS, Inc.

27.    From discussions with Mr. Kulkarni, I learned that he had arranged financing from David Callan, a friend of his, and that their preferred option was to permit Citizens to appoint a receiver for WPS, Inc. Mr. Kulkarni would then use his control of Friel Engineering Limited (Mr. Kulkarni owned 51% of Friel and its assets were not pledged to Citizens) to set up a business competitive with WPS, Inc. in the U.K. Friel at that time did the majority of the manufacturing for WPS, Inc. shipments to the European market. Mr. Kulkarni stated that he intended to wait for WPS, Inc. to run out of cash while it was in receivership, at which point he would repurchase WPS, Inc. at a deep discount.

28.     On or about December 5, 2001, I was attending a meeting at the WPS, Inc.
offices in Merrimac, Massachusetts with Mr. Kulkarni and representatives of General
Mills, including Jim Getchell a vice president of General Mills. General Mills was at that
time the largest and best customer of WPS, Inc., had just placed a number of substantial
equipment orders with WPS, Inc., and was very concerned about the company's financial
situation. During that meeting, Mr. Kulkarni, while still CEO of WPS, Inc., stated that he
expected a receiver to be appointed for WPS, Inc. that same day, and he outlined his
plans to set up a competing operation from Friel and appeared to solicit the business of
General Mills on behalf of Friel. While this meeting was ongoing, Mr. Kulkarni's cell
phone rang, and following a conversation, he announced to the meeting that Citizens and
Parthenon Capital (which had been considering a transaction recapitalizing WPS, Inc.)
had reached an agreement whereby the bank debt would be forgiven in return for a
payment of $11.5 million, and the bank's receivership motion withdrawn. I understood
that the negotiations leading to this agreement had occurred at the courthouse just before
the motion was to be heard.

29.     I have an MBA from Harvard University and extensive experience in
reviewing financial statements and with accounting matters. In my experience, when the
when the expenses exceed the revenues, the calculated earnings are a negative number.
That is termed a "loss." When the expenses are less than the revenues the earnings are a
positive number and are denoted as "earnings."

30.     In my experience the use of the word "before" in financial statements
means that the terms following the word "before" are excluded from the calculation.
Thus, for example, the phrase "profit before taxes" indicates that the profit so calculated

11

should not include the addition or subtraction of any taxes. Any profit figure that had taxes added or subtracted would therefore need to have taxes added back to yield a figure for "profit before taxes."

31.     During the time that I was Chief Operating Officer of WPS, Inc. the company on one or more occasions wrote off uncollectible accounts receivable. Typically these transactions did not affect earnings or EBITDA as the company had already provided sufficient reserves for these bad debts. The transaction was accounted for as a credit to accounts receivable and a debit to the bad debt reserve.

32.     During the afternoon or evening of December 27, 2001, the day before the first closing of the December 2001 recapitalization, Mr. Kulkarni presented to me a Consulting Agreement that I would be expected to sign the next day. That agreement provided for a maximum of three months of consulting services before I would be terminated, and required that I release all claims against WPS, Inc. The fact that I might be asked to sign such an agreement, or that I might be asked to become a consultant, had not been previously discussed with me. In addition, Mr. Kulkarni had before then steadfastly refused to acknowledge an oral agreement that we had made increasing my equity stake to 8 percent. When I refused to sign the Consulting Agreement, Mr. Kulkarni used profanity directed at me, and the next day, when we were meeting at the offices of Ropes & Gray in Boston, threatened to terminate my employment immediately. Prior to December 27, 2001, I had intended to forgive the bonus.

Signed under pains and penalties of perjury this the 17th day of March, 2006

12