FILED
IN CLERKS OFFICE
2006 MAR 17 P 3: 17
U.S. DISTRICT COURT
DISTRICT OF MASS.

UNITED STATES DISTRICT COURT
District of Massachusetts

Civil Action
No. 05-10078-DPW

PETER A. CRAWFORD, Plaintiff

v.

WOLVERINE, PROCTOR & SCHWARTZ, INC.,
Steven F. Chilinski, Deepak S. Kulkarni,

Defendants

PLAINTIFF'S MEMORANDUM IN SUPPORT OF HIS
MOTION FOR PARTIAL SUMMARY JUDGMENT

I. STATEMENT OF UNDISPUTED MATERIAL FACTS

Plaintiff, pursuant to Local Rule 56.1, asserts that the following material facts are undisputed.

1. Plaintiff joined defendant Wolverine, Proctor & Schwartz, Inc. (hereinafter "WPS, Inc.") as Chief Operating Officer ("COO") on or about December 30, 1999. Plaintiff's Affidavit in Support of His Motion for Partial Summary Judgment (hereinafter "Plaintiff's Affidavit") ¶1.

2. On or about January 4, 2000, within the Commonwealth of Massachusetts, plaintiff and defendant Kulkarni executed a letter agreement of the same date (the "Employment Agreement"), setting forth the terms of plaintiff employment with WPS, Inc., including the computation of his bonus based upon the audited financial results of WPS, Inc. Plaintiff's Affidavit ¶16, Exhibit O (hereinafter "Kulkarni Deposition") at 7-

8, Plaintiff's Affidavit ¶2, Exhibit A (hereinafter "Exhibit A")[1]. At the time that the Employment Agreement was executed, defendant Kulkarni had the buy back of the WPS, Inc. debt from its lender, Citizens Bank of Massachusetts (hereinafter "Citizens"), as a distant option in his mind. Kulkarni Deposition at 202.

3. During the plaintiff's tenure, the profitability of WPS, Inc. improved dramatically. According to internal company reports and the audited financial statements, the earnings before interest, taxes, depreciation and amortization (including an extraordinary loss of $1,282,000 in 1999, with all amounts rounded to nearest $1000, and with losses indicated by parentheses) was as follows:

| | |
|---|---|
| Total 1999 | ($5,982,000) |
| | |
| First quarter 2000 | ($1,564,000) |
| Second quarter 2000 | $105,000 |
| Third quarter 2000 | $602,000 |
| Fourth quarter 2000 | $1,211,000 |
| Total 2000 | $354,000 |
| | |
| First quarter 2001 | $1,119,000 |
| Second quarter 2001 | $1,220,000 |
| Third quarter 2001 | $ 478,000 |

Plaintiff's Affidavit ¶7, Exhibit F. According to Mark Brown, Chief Financial Officer ("CFO") of WPS, Inc. from September 11, 2000 through September 25, 2003, the company was quite profitable for the period from the fourth quarter of 2000 through the third quarter of 2001. Plaintiff's Affidavit ¶17, Exhibit P (hereinafter "Brown Deposition") at 6-7, 34.

[1] References of the form "Exhibit n" hereinafter refer to the Exhibits attached to Plaintiff's Affidavit.

4. Throughout most of 2000 and 2001, Mr. Kulkarni was supportive of the plaintiff, believed that he was doing the best that he could for the company, and was satisfied with the financial results. Brown Deposition at 182.

5. Commencing as early as March, 2001, Citizens became increasingly aggressive and concerned regarding the level of compensation being paid to Mr. Kulkarni, which was purported to be $900,000 in base salary, plus fringe benefits, annually. In fact, Mr. Kulkarni's W-2 for 2001 reported $1,578,924.33 in U.S. income. Plaintiff's Affidavit ¶12, Exhibit K. Additional income in the U.K. brought Mr. Kulkarni's total 2001 compensation to approximately $2 million. Plaintiff's Affidavit ¶22. Kulkarni Deposition at 2-22[2].

6. Citizens insisted that a principal payment of $500,000 be made on June 1, 2001, whereas principal repayments in 2000 and earlier in 2001 had been waived. All of the bank debt was due on September 30, 2001, but was not paid, putting WPS, Inc. in default. A combination of the principal payment, continuing disbursements to Mr. Kulkarni, and payments to attorneys preparing for a bankruptcy filing and other options, led to a severe shortage of capital and a reduced ability of the company to meet shipments in the second half of 2001. Plaintiff's Affidavit ¶¶23-25. Plaintiff's Affidavit ¶20, Exhibit S (hereinafter "Bartlett Deposition") at 30. However, customer orders continued to be strong, leaving the company with a good backlog at the end of 2001. Bartlett Deposition at 62. Mr. Bartlett is employed by Parthenon Capital and was involved in the due diligence relating to the transaction between Parthenon and WPS, Inc., particularly in

---

[2] References of the form "2-n" refer to the second Kulkarni deposition, and the pages in Exhibit O are labeled that way.

sales and marketing areas, and subsequently served on the board of WP LLC. Bartlett Deposition at 6-8.

7. Offers to purchase WPS, Inc. for as much as $45 million beginning in early 2001 were withdrawn, and Riverside Capital withdrew an offer to purchase the company virtually immediately after a discussion focused primarily on Mr. Kulkarni's recent high compensation and worsening overdue amounts owed by WPS, Inc. to its vendors. Plaintiff's Affidavit ¶¶6, 26. In late 2001, Mr. Kulkarni planned to permit the company to be driven into receivership, and then reacquire it inexpensively. Plaintiff's Affidavit ¶27.

8. On or about December 5, 2001, just prior to a scheduled hearing in which a receiver was to be appointed for WPS, Inc., representatives from Parthenon Capital and Citizens reached an agreement whereby the bank debt of WPS, Inc. would be purchased at a discount. Plaintiff's Affidavit ¶28. Kulkarni deposition at 23-24.

9. On December 28, 2001 and December 31, 2001, a transaction was completed whereby Parthenon Capital and related investors (collectively "Parthenon") provided $14 million in funds to retire the debt of WPS, Inc. and provide funds for working capital. On December 31, 2001, the related notes were assigned to a newly created entity, Wolverine Proctor LLC (hereinafter "WP LLC") in exchange for 1000 Class B member units. Plaintiff's Affidavit ¶4, Exhibit C at PAC0033. Plaintiff's Affidavit ¶18, Exhibit Q (hereinafter "Cummings Deposition") at 32-33.

10. Prior to December 28, 2001, defendant Kulkarni had been the sole shareholder of WPS, Inc. On December 31, 2001, defendant Kulkarni contributed his

shares in WPS, Inc. and related entities to WP LLC in exchange for 1000 Class A member units and ceased to be a shareholder of WPS, Inc. Exhibit C at PAC0033 ¶2.

11. Commencing on or about December 28, 2001, WP LLC held substantially all of securities of Wolverine Proctor, Inc., which in turn owned substantially all of the securities of WPS, Inc. Exhibit C at PAC0033 ¶1, Cummings Deposition at 36.

12. The plaintiff and Mr. Kulkarni met on or about December 28, 2001 and discussed the issue of the plaintiff's bonus and the impact of the forgiveness of indebtedness income on plaintiff's bonus. Mr. Kulkarni's position was that no bonus was owed with respect to the forgiveness of indebtedness income. However, he does not assert that plaintiff agreed with his position. Rather, he believes that the plaintiff carved out the bonus in order to set WPS, Inc. up for litigation regarding the bonus calculation. Kulkarni Deposition at 2-12 to 2-15. Plaintiff's Affidavit ¶3.

13. Following these discussions, on or about December 28, 2001, plaintiff and Mr. Kulkarni each signed the Transition Agreement whereby the plaintiff retained the right to payment of the Bonus provided under the Employment Agreement. Plaintiff's Affidavit ¶3, Exhibit B at PAC0044 ¶5.1.

14. At the time that the bank debt of WPS, Inc. was retired on December 28, 2001, its outstanding balance was $20,967,514 plus accrued interest of $702,325. All amounts due the bank were settled for the payment of $11,500,000 as part of the recapitalization in December, 2001, which resulted in an extraordinary gain (also referred to as "forgiveness of indebtedness income") of $10,169,839. Exhibit C at PAC0038 ¶9.

15. The extraordinary gain was reflected on the audited financial statements of WP LLC as part of its net income for 2001 of $4,695,837. Exhibit C at PAC0030.

Cummings Deposition at 54-55. The same page showed a 2001 "loss before interest expense, taxes, depreciation and amortization and extraordinary gain" of ($486,116) (emphasis supplied).

16. In this context, the loss is negative earnings. Cummings Deposition at 84. The WPS, Inc. 2000 financial statements used the term "loss" to reflect negative earnings. Plaintiff's Affidavit ¶5, 29, Exhibit D at PAC0084.

17. No financial statements were prepared for Wolverine, Proctor & Schwartz, Inc. for 2001, and none exist. However, there would be no difference between the income statement of WPS, Inc. compared to that for WP LLC for 2001 (Exhibit C at PAC0030), according to the WPS, Inc. CFO at the time. Brown deposition at 135-137.

18. The Employment Agreement provides for a bonus to the plaintiff based upon the formula: BONUS = (EBITDA – CAPX – INT – TAXES) x .05, to be "calculated based upon the annual consolidated financial results of [WPS, Inc.] in accordance with generally accepted accounting principles ["GAAP"]…" Exhibit A at PAC0001.

19. The Employment Agreement defines EBITDA as "the earnings before any interest, taxes or deductions for depreciation or amortization." Exhibit A at PAC0001.

20. The use of the word "before" by accountants generally means that the terms that come after are excluded from the calculation. Plaintiff's Affidavit ¶30, Cummings Deposition at 121-122.

21. Defendant WPS, Inc. admits that the CAPX of WPS, Inc. for 2001 was $411,750. Plaintiff's Affidavit ¶21, Exhibit T (hereinafter "First Interrogatory Answers"), ¶2(b), page 10.

22. Defendant WPS, Inc. admits that the INT of WPS, Inc. for 2001 was $2,070,954. First Interrogatory Answers ¶2(c), page 10.

23. Defendant WPS, Inc. admits that the TAXES of WPS, Inc. for 2001 were $43,894. First Interrogatory Answers ¶2(d), page 10; Brown Deposition at 51. Plaintiff's Affidavit ¶8, Exhibit G.

24. Only the EBITDA is in dispute. Brown Deposition at 48-52.

25. The Employment Agreement provides that "[e]xcluded from EBITDA will be any non-operating adjustments to reserves, to the extent that those adjustments affect EBITDA..." Exhibit A at PAC0001.

26. The parties both construed the above phrase to mean that, if WPS, Inc. decided that a reserve, such as the warranty reserve, was too high or too low, and the company decided to change the reserve such that there was a positive or negative effect on EBITDA, that such change would be excluded from the calculation of BONUS as the change would have no cash impact. Kulkarni Deposition at 203-204. Plaintiff's Affidavit ¶2.

27. For purposes of the calculation of the plaintiff's bonus, WPS, Inc. agrees that there are no non-operating adjustments to reserves that should be excluded. Brown Deposition at 141. Plaintiff's Affidavit ¶¶2, 15, Exhibit N.

28. The Employment Agreement provides that "[i]f the calculation of BONUS requires clarification, Arthur Andersen & Company or such other accounting firm nominated to prepare the <u>individual</u> tax returns of the sole shareholder of [WPS, Inc.] shall be the binding arbiter of the BONUS" (emphasis supplied). Exhibit A at PAC0002

29. Arthur Andersen & Company audited the 2001 financial statements of WP LLC and Richard Cummings was the partner at Arthur Andersen & Company responsible for the audit, and was still at Andersen on March 26, 2002, the date on which Andersen presented its opinion that the WPS LLC 2001 financial statements complied with GAAP. Cummings Deposition at 33-34. Exhibit C at PAC0028.

30. Mr. Cummings has been a Certified Public Accountant (CPA) for at least 20 years. He left Arthur Andersen after the audit of the 2001 results of WP LLC had been completed in connection with Arthur Andersen ceasing to exist during the summer of 2002. Cummings Deposition at 5, 123-124.

31. Wolverine Proctor, Inc. is a Delaware corporation. Exhibit C at PAC0033. It owns substantially all of the shares of WPS, Inc. Cummings Deposition at 35-36. On December 31, 2001, Wolverine Proctor, Inc. was the sole shareholder of WPS, Inc. Kulkarni Deposition at 211. However, corporate entities do not file individual tax returns. Brown Deposition at 137-138.

32. After leaving Arthur Andersen in 2002, Mr. Cummings joined the firm of Vitale Caturano & Company Ltd. Cummings Deposition at 5-6. By way of a letter dated February 22, 2006 to Mr. Cummings, Mark Whitney of Morgan, Brown & Joy, LLP, counsel for all defendants in this matter, requested that Vitale Caturano clarify the plaintiff's 2001 bonus pursuant to the clause in the Employment Agreement. However, through counsel, both Mr. Cummings and Vitale Caturano declined the request. Plaintiff's Affidavit ¶10, Exhibit I.

33. The WPS, Inc. financial statements for 2001 state that "the company follows SFAS No. 130, [hereinafter "FAS 130"] Reporting Comprehensive Income." Exhibit C

at PAC0035 ¶3(h). Mr. Cummings identified a copy of FAS 130 during his deposition and indicated that that was the statement referred to in the 2001 financial statements. Cummings Deposition at 48-49. Plaintiff's Affidavit ¶13, Exhibit L.

34. The rules and standards published by the Financial Accounting Standards Board and its affiliates comprise generally accepted accounting principles ("GAAP"). The concepts of net income are encompassed in GAAP. Cummings Deposition at 44-46. The WP LLC financial statements for 2001 include the extraordinary gain in net income. Cummings Deposition at 54-55.

35. FAS 130 ¶37 (Exhibit L, page 16) states that "[e]arnings was described [in Concepts Statement 5] as being similar to net income in current practice, except for cumulative effects of changes in accounting principles, which are included in present net income but are excluded from earnings." Mr. Cummings specifically referred to FAS 130 in answering a question as to the difference between earnings and net income. Cummings Deposition at 64-70, 87-91. Concept Statement 5 (hereinafter "CON 5") was introduced during the Cummings deposition as Cummings 6. See Cummings Deposition at 46-48, Plaintiff's Affidavit ¶14, Exhibit M. FAS 130 and CON 5 would be included in the accounting literature that Mr. Cummings would review to determine whether earnings and net income are identical for WP LLC for 2001. Cummings Deposition at 90.

36. There were no changes in accounting principle for WP LLC in 2001. See Exhibit C. Cummings Deposition at 66.

37. FAS No. 130 Footnote 4 (Exhibit L, page 49) states that "[t]his Statement uses the term <u>net income</u> to describe a measure of financial performance resulting from the aggregation of revenues, expenses, gains, and losses that are not items of other

comprehensive income as identified in this Statement. A variety of other terms such as net earnings or earnings may be used to describe that measure." (emphasis in original). See also Exhibit M at 19.

38. The items of "other comprehensive income" aggregated on the WP LLC 2001 financial statements do not include the extraordinary gain. See Exhibit C, PAC0030; Cummings Deposition at 55-56.

## II. ARGUMENT

With respect to Count One of the Amended Complaint (breach of written contract to pay Bonus), the plaintiff is entitled to summary judgment as there are no genuine issues of material fact. Rather, that count is based upon an unambiguous contract, the audited financial statements of Wolverine Proctor LLC, and the application of simple, readily ascertainable generally accepted accounting principles. Coll v. PB Diagnostic Systems, Inc., 50 F.3d 1115, 1121 (1st Cir. 1995) (summary judgment is appropriate when documents show the absence of a fact that might affect the outcome of the suit under the governing law).

The Employment Agreement was signed within the Commonwealth of Massachusetts (Plaintiff's Affidavit ¶2) and provided that the plaintiff was to serve as Chief Operating Officer for WPS, Inc. and "be based at the [WPS, Inc.] Merrimac, Massachusetts headquarters." The contract was both entered into and was to be performed largely within Massachusetts, and Massachusetts law governs under the most significant relationship test. New England Telephone & Telegraph v. Gourdeau Construction Co., Inc., 419 Mass. 658, 661 (1995).

While plaintiff is entitled to summary judgment on that portion of his bonus that arises out of the written Employment Agreement, he recognizes that factual disputes remain with respect to the oral agreement increasing his bonus percentage to 8% (Count III) and on his related Wage Act claims (Counts II, IV and VI), which, after Wiedmann v. The Bradford Group, Inc., et al., 444 Mass. 698 (2005) would appear to be subject to the discretion of the Court and necessarily based upon subjective determinations of motive, intent and good faith that must be made at trial. There are either factual disputes on the other claims or they are not ripe for summary judgment at this time[3].

While Counts II, III and IV are not suitable for summary judgment, plaintiff's motion seeks, pursuant to Fed. R. Civ. P. 56(d) an order specifying that the methodology proposed herein for computing the BONUS be adopted for purposes of these other counts. That will greatly simplify the trial of these counts as it will limit testimony to the existence or nonexistence of an oral agreement to increase the bonus percentage, and the issues of motive, intent and good faith of the defendants in denying the plaintiff's bonus claim.

While the undisputed material facts summarized above inevitably lead to the conclusion that plaintiff is entitled to the indicated BONUS as a matter of law, they also support reasons why it is fair that he should receive the BONUS. Plaintiff successfully turned around WPS, Inc. and offers to buy the company for as much as $45 million were received, which would have resulted in his equity being worth at least $1.2 million. Instead of demonstrating faith in the company's future prospects to investors and Citizens

---

[3] There are no material factual disputes relating to his claim for breach of the Transition Agreement (Count V), but discovery relating to Counts VIII and IX (added in the Amended Complaint) remains pending and plaintiff is concerned that he may be estopped from voiding the Transition and Settlement Agreements, as Count VIII potentially seeks to do, if he asserts Count V at this time. There are factual disputes relating to Count VII (tortuous interference).

by limiting his cash withdrawals, Mr. Kulkarni appeared intent upon destroying WPS, Inc. by draining it of cash, so that he could repurchase it at a deeply discounted price.

## A. THE CONTRACT UNAMBIGUOUSLY BASES THE BONUS ON EARNINGS, WHICH IS PRECISELY DEFINED BY GAAP

"Under Massachusetts law, interpretation of a contract is ordinarily a question of law for the court." Coll at 1122. "Only if the contract is ambiguous is there an issue of fact for the jury… Moreover, where the contract is unambiguous it is to be enforced according to its terms." See also Freelander v. G. & K. Realty Corp., 357 Mass. 512, 516, 258 N.E.2d 786, 788 (1970).

In this case, the Employment Agreement provides a bonus formula based upon the EBITDA of WPS, Inc., less reductions for capital expenditures, interest and taxes. It is based upon the simple formula:

BONUS = (EBITDA – CAPX – INT – TAXES) x .05

See Exhibit A at PAC0001. Each of the capitalized terms is defined in the agreement. The parties are in agreement as to the value of the CAPX, INT and TAXES. Only the EBITDA is in dispute. See Exhibit T No. 2, Brown Deposition at 48-52.

The Employment Agreement specifically defines EBITDA to mean "the earnings before any interest, taxes or deductions for depreciation or amortization." Thus, the specific meaning attached by either party to the term "EBITDA" is irrelevant, as the term is itself defined in the agreement. Furthermore, the use of the article "the" and the inclusion of the words "any" and "deductions for" indicates that the parties intended not merely to recite the words from which the acronym EBITDA is derived, but rather to define a specific calculation leading to EBITDA as defined in the Employment Agreement. The starting point is "the earnings." Those earnings are adjusted for any

interest or taxes that were added or subtracted in calculating "the earnings." Finally, any deductions for depreciation or amortization that went into the calculation of "the earnings" are added back. The use of the article "the" indicates that the parties determined that there could only be a single earnings figure that would form the basis for this calculation, and that that figure would necessarily be derived using GAAP principles.

While using the earnings as a starting point is the correct analysis, a simpler calculation starting with EBITDA yields virtually the same result. Defendants argue that the EBITDA for WPS, Inc. was a negative $486,116, and point to that figure on the WP LLC financial statements (Exhibit C, page PAC0030). However, the description adjacent to that figure is not EBITDA, or "earnings before interest, taxes, depreciation and amortization," but rather "loss before interest expense, taxes, depreciation and amortization and extraordinary gain." (emphasis supplied). In this context, negative earnings is a loss, as can be seen from the WPS Inc. 2000 financial statements. Cummings Deposition at 84, Plaintiff's Affidavit ¶¶5, 29, Exhibit D at PAC0084.

Even if one starts with EBITDA, as opposed to earnings, the words used in the WP LLC financial statements are clearly against the defendants. Why would the financial statements use a description that specifically excludes the extraordinary gain if the commonly accepted meaning of EBITDA already excluded any extraordinary gain? Clearly, the company, in preparing these statements, and Arthur Andersen & Co., LLC, in auditing them, considered EBITDA to include any extraordinary gain. That was the reason that the description needed specifically to exclude the extraordinary gain. Manifestly, the difference between "earnings [or loss] before interest expense, taxes, depreciation and amortization and extraordinary gain" and "earnings before interest

expense, taxes, depreciation and amortization" is the extraordinary gain[4]. EBITDA for WP LLC for 2001 is therefore the negative $486,116 plus the extraordinary gain of $10,169,839 that appears on the same page, or $9,683,723. Subtracting the agreed CAPX of $411,750, the agreed INT of $2,070,954 and the agreed TAXES of $43,894 yields a base for the bonus calculation of $7,157,125. The BONUS due under the written Employment Agreement based upon this calculation is therefore $357,856.25.

Nevertheless, while the above methodology is simple and persuasive, there is an even more compelling calculation that, with one or two minor exceptions, leads to the same result, and avoids any argument as to the meaning of the term "EBITDA." The Employment Agreement itself defines EBITDA, eliminating any need to resolve any conflicting definitions of that term that the parties might attach to it. It defines EBITDA as "the earnings before any interest, taxes or deductions for depreciation or amortization." In this context, the use of the word "before" means that the terms coming after are excluded from the calculation. In other words, if "earnings" includes any "interest, taxes or deductions for depreciation or amortization" then these items would need to be added back to arrive at EBITDA as defined by the Employment Agreement. Plaintiff's Affidavit ¶30, Cummings Deposition at 121.

The Employment Agreement specifically provides that the "terms will be calculated based upon the annual consolidated financial results of [WPS, Inc.], in accordance with generally accepted accounting principles, and have the following meanings..." See Exhibit A at PAC0001. The Employment Agreement then goes on explicitly to define each term. In the case of EBITDA, that definition uses the words "the earnings." Given

---

[4] Incredibly, after testifying in his deposition that he could not express an opinion as to which figure on the 2001 financial statements was EBITDA, Richard Cummings submitted an untimely errata sheet and an affidavit stating otherwise. This issue is addressed below in Section F.

the reference to "generally accepted accounting principles" the parties clearly intended that GAAP govern the construction of any of the financial words of art used in the Employment Agreement. Restatement (Second) of Contracts §§202(3)(a) and 202(3)(b) provides that "[u]nless a different intention is manifested (a) where language has a generally prevailing meaning, it is interpreted in accordance with that meaning; [and] (b) technical terms and words of art are given their technical meaning when used in a transaction within their technical field." See also Lodge Corporation v. Assurance Company of America, 56 Mass. App. Ct. 195, 198 (2002) (citing the Restatement with approval and indicating that the common meaning prevails).

In this case, the word "earnings" has a very specific meaning according to GAAP. Richard Cummings is a Certified Public Accountant ("CPA") with over 20 years experience, who was also the partner in charge of the WP LLC 2001 audit while at Arthur Andersen. The WP LLC 2001 financial statements specifically state that "[t]he Company follows SFAS No. 130, Reporting Comprehensive Income, which established standards for the reporting and display of comprehensive income and other comprehensive income items. In general, comprehensive income combines net income and other changes in equity from nonowner sources during the year." During his deposition, Mr. Cummings identified the copy of FAS 130 that is Exhibit L and specifically referred to it as a source of GAAP principles to be used in determining any difference between earnings and net income. Mr. Cummings also agreed that the statements published by the Financial Accounting Standards Board, including FAS 130, comprise GAAP.

WPS, Inc. did not prepare financial statements for 2001. However, WP LLC did, and those statements are attached to Plaintiff's Affidavit as Exhibit C. However, for 2001 there would be no difference between the income statements of WPS, Inc. and WP LLC. Brown Deposition at 135-137. Furthermore, WP LLC (and by implication WPS, Inc.) had net income for 2001 of $4,695,837. As Exhibit C at PAC0030 clearly indicates, and Mr. Cummings agreed, the extraordinary gain was included in the figure of net income. See Cummings Deposition at 54-55. He also agreed that net income is one of the concepts that is encompassed in GAAP. Cummings Deposition at 46.

While the WP LLC 2001 financial statements report net income, they do not report earnings per se. However, in this case, there is no difference. FAS 130, Footnote 4 (Exhibit L, page 49) states that

> "[t]his Statement uses the term net income to describe a measure of financial performance resulting from the aggregation of revenues, expenses, gains, and losses that are not items of other comprehensive income as identified in this Statement. A variety of other terms such as net earnings or earnings may be used to describe that measure." (emphasis in original).

Elsewhere, FAS 130 ¶37 states that "earnings was described [in Concepts Statement 5] as being similar to net income in current practice, except for cumulative effects of changes in accounting principles, which are included in present net income but are excluded from earnings." A review of the WP LLC 2001 financial statements reveals that there were no changes in accounting principle in 2001. Mr. Cummings also did not believe that there were any, and admitted that any material such changes would have to have been disclosed in the audited financial statements. Cummings Deposition at 66. Thus, for the WP LLC 2001 financial statements, the terms "net income" and "earnings" are synonymous. While Mr. Cummings was not willing completely to concede this point, he

admitted that FAS 130 and CON 5, would be included in the accounting literature that he would review to determine whether earnings and net income are identical for WP LLC for 2001. Cummings Deposition at 90. See Plaintiff's Affidavit ¶14, Exhibit M.

Once a determination has been made that earnings and net income are identical, a determination that is inevitable based upon a review of the applicable GAAP standards, (most importantly FAS 130 and CON 5), the calculation of the BONUS becomes a simple exercise. As may be clearly seen from the WP LLC 2001 income statement for 2001 Exhibit C at PAC0030, the lines labeled "interest expense," "depreciation," "amortization," and "provision for income taxes" on page PAC0030 were all deducted in arriving at the net income (or earnings). They must, therefore be added back to arrive at a figure for EBITDA, defined by the Employment Agreement as "the earnings before any interest, taxes or deductions for depreciation or amortization." Using the figures from page PAC0030, the calculation yields the following:

| | |
|---|---|
| The Earnings (i.e.. net income) | $4,695,837 |
| Add back: interest expense | $2,152,470[5] |
| Add back: provision for income taxes | $ 43,894 |
| Add back: depreciation | $1,267,769 |
| Add back: amortization | $1,461,939 |
| EBITDA per Employment Agreement | $9,621,909 |

Applying the formula in the Employment Agreement, and utilizing the figures that defendants do not dispute for CAPX, INT and TAXES:

BONUS = (EBITDA – CAPX – INT – TAXES) x .05

| | |
|---|---|
| EBITDA | $ 9,621,909 |
| Less: CAPX | ($ 411,750) |

5 Arguably, interest income of $81,516 should be netted against the interest expense as the expression "the earnings before any interest…" could be construed to exclude both interest expense and income. However, defendants have waived this point as they asserted in their First Interrogatory Response ¶2(a) that EBITDA was a loss of $486,116. That figure is before interest expense, but after interest income.

| | |
|---|---|
| Less: INT | ($2,070,954) |
| Less: TAXES | ($ 43,894) |
| Equals: subtotal | $ 7,095,311 |
| Add back: Minority interest (waived) | $ 61,814 |
| Base for bonus calculation | $ 7,157,125 |
| Times .05 equals BONUS | $ 357,856.25 |

The figure of $7,095,311 differs from the $7,157,125 previously computed by the $61,814 minority interest expense appearing on PAC0030. Inasmuch as defendants have waived this issue, the minority interest expense should be added back to the base for the bonus calculation, yielding an identical calculation to that outlined previously[6].

Defendants may argue that the parties intended the BONUS to be based upon cash flow, not earnings, and that EBITDA is similar to cash flow. However, as the above calculations make clear, it is earnings, not EBITDA that drives the BONUS calculation as interest and taxes are added back, only to be subtracted again in the next step[7]. In any event, such a contention, even if true, would prove little, as the recapitalization generated an actual cash savings.

While defendants have admitted to the figure for TAXES (see Brown Deposition at 51), independent evidence also supports that admission. WPS, Inc., as a Subchapter S corporation through December, 2001, filed a 2001 tax return showing no taxes due, and

---

[6] The minority interest expense is apparently Mr. Kulkarni's share of the net incomes of Friel and Mawlaw for most of 2001. Friel was 49%, and Mawlaw 0%, owned by WPS, Inc. prior to the December 2001 transaction, but both were 100% owned by WP LLC after it. See Exhibit C, PAC0033 notes 1 and 2. Arguably, the minority interest expense should be deducted for purposes of the bonus calculation, however, defendants have waived this issue by failing to assert it in their response to the First Interrogatories, Interrogatory 2.

[7] One could also use algebra to derive the even simpler formula of BONUS = (earnings + depreciation + amortization – CAPX) x .05 = (net income + DEPR – CAPX) x .05. That calculation would yield a base for the bonus calculation of $7,013,795 which differs from this subtotal only by the $81,516 in interest income. See Exhibit T ¶2(f) (defendants admit DEPR is $2,729,708).

negative ordinary income of $5,265,833. Plaintiff's Affidavit ¶8, Exhibit G at W0450. The $10,169,839 in discharged indebtedness was excluded from taxable income due to net operating losses in prior years being carried forward. See Exhibit G, W0455. The Employment Agreement defines "BOOKDIF" as "those adjustments, positive or negative, to make EBITDA equal to those earnings before interest, taxes, depreciation and amortization, which are taxable." Clearly, the intent of the parties was to exclude from the calculation of TAXES any accounting differences that caused the EBITDA for tax purposes to be lower or higher than that for book purposes. Since the EBITDA for tax purposes excludes the income from the discharged indebtedness and is negative, there is a large difference between the EBITDA for tax purposes and that for financial reporting purposes. The difference is due to BOOKDIF, resulting in TAXES of a nominal amount.

B. MASSACHUSETTS LAW ON PROFIT-BASED BONUSES IS CONSISTENT WITH GAAP

Independent of GAAP, Massachusetts law supports the inclusion of gains from debt forgiveness in the calculation of a bonus. In Daly v. Chapman Manufacturing Co., 246 Mass. 118 (1923), a former general manager sought a bonus based upon a contract to pay 5% of the "net profits"[8] of his employer. A large customer canceled an order, but settled the breach of contract claim in a subsequent year. While the term "net profits" was not defined in the letter agreement, the SJC determined that "the method of 'ascertaining the net profits' for a given period under a contract such as this has been clearly defined with reference to the beginning and end of the period as involving 'a comparison between the

[8] Net profits is similar to net income or earnings. See Black's Law Dictionary (8th ed) which defines "net profit" as "[t]otal sales less the cost of the goods sold and all additional expenses – also termed net revenue. Cf. gross profit. "

assets of the defendant on these dates…'" Daly at 125, citing Stein v. Strathmore Worsted Mills, 221 Mass. 86 (1915). In Daly, the SJC ruled that it was necessary to record as an asset the estimated value of the breach of contract claim on the canceled order.

Most importantly, an examination of the opinion in Stein indicates that the reference to "assets" in Daly means net assets, i.e. after deducting liabilities, also known as equity. "'In other words, they [net profits] would be what should remain as the clear gain of the venture, after deducting from the net value of all assets on hand the capital invested in the business and all outstanding liabilities.'" Stein at 89, citing Thurston v. Hamblin, 199 Mass. 151 (1908) (emphasis supplied).

Based upon this definition, which is in fact very similar to the current GAAP definition of income or earnings[9], either an increase in assets or a decrease in liabilities would lead to net profits, since Stein mandates that "all outstanding liabilities" be deducted from assets in determining the net assets at the beginning and end of the period. A reduction in a liability inevitably increases net profits for purposes of a bonus calculation under Massachusetts law by causing the net assets to increase during the period for which the profits are measured. Since the Citizens Bank debt was a liability that was reduced to zero in 2001, independent of GAAP principles, Daly and Stein mandate the payment of a bonus to the plaintiff on the forgiveness of indebtedness income.

Finally, definitions in Black's Law Dictionary (7th ed) are in accord with GAAP principles. Black's defines "net income" as "[t]otal income from all sources minus deductions, exemptions and other tax reductions. Income tax is computed on net income.

---

[9] See FAS 130 ¶2, Exhibit L at 4-5.

– Also termed net earnings." Its definition of "net earnings" is "see net income under INCOME." (emphasis in original). Gross earnings is defined as being synonymous with gross income, which is turn defined as "[t]otal income from all sources before deductions, exemptions, or other tax reductions." Clearly, the term "earnings," unless the context indicates otherwise, indicates "net earnings" which is synonymous with "net income" according to Black's.

C. NO RESERVE ADJUSTMENTS AFFECT THE BONUS CALCULATION

The Employment Agreement provides that "any non-operating adjustments to reserves, to the extent that those adjustments affect EBITDA" will be excluded from EBITDA. Mark Brown, former CFO of WPS, Inc. and current President of Wolverine, Proctor & Schwartz, LLC (successor in interest to WPS, Inc.) admitted during his deposition that that there were no reserve adjustments affecting plaintiff's bonus calculation. Brown Deposition at 141. However, in his deposition, defendant Kulkarni appeared to assert that the parties' intent in negotiating this clause was to exclude extraordinary gains.

> Q. Wasn't that what the phrase "Excluded from EBITDA will be any non-operating adjustments to reserves," isn't that what that means?
> A. No, hang on. The meaning, there are two different things going on in this, in this EBITDA calculation, okay? No. 1, if there are any changes to reserves, okay, they should be excluded from EBITDA to the extent they affect EBITDA. Do you understand what I'm saying? That's all this agreement is saying.
> Q. It's worded somewhat differently.
> A. It is worded somewhat differently, okay, I read it carefully, okay? What we meant was if there are changes to the reserves that have a positive or negative effect on the EBITDA, they should be excluded. That's category No. 1. Category No. 2, in other words, if the warranty reserve goes up and down and we simply create profits and losses as a result of changes in reserves, it's affecting the EBITDA, but it's probably (sic) the cash flow, no more than depreciation is affecting the cash flow, and just like we're adding back depreciation, okay, we're

> adding back changes to reserves that affect EBITDA. That is category No. 1. Category No. 2 is if we have any extraordinary gains or losses they will be excluded...

Kulkarni Deposition at 203-204. While the plaintiff agrees completely with Mr. Kulkarni's Category No. 1 as it relates to the intent of the parties, he disagrees with his Category No. 2. Plaintiff's Affidavit ¶2. Mr. Kulkarni's expression of the intent of the parties in Category No. 1 is a complete and accurate description of the logical meaning of, and the intent of the parties with regard to, the phrase "[e]xcluded from EBITDA will be any non-operating adjustments to reserves, to the extent that those adjustments affect EBITDA..."[10] WPS, Inc., like substantially all corporations, uses double entry bookkeeping. Thus, an adjustment to a reserve would necessarily involve a second entry elsewhere, that often would affect the earnings, and therefore the EBITDA, of the company. For example, a reduction in the warranty reserve would result in a debit to that reserve, the corresponding credit of an equal amount would be to earnings. However, it would also be possible that an adjustment to a reserve might not affect EBITDA. For example, during plaintiff's tenure, WPS, Inc. reduced its reserve for bad debts by writing off accounts receivable against a reserve. That transaction was a credit to accounts receivable and a debit of an equal amount to the bad debt reserve, and had no impact on either earnings or EBITDA. The former transaction would be excluded from EBITDA, but the latter would not be, as it never affected earnings or EBITDA in the first place. Plaintiff's Affidavit ¶31.

As Mr. Kulkarni appears to acknowledge, the debt owed to Citizens Bank was in no sense a reserve. The term "accrual" has largely replaced the term "reserve" in the

[10] The rest of the sentence refers to "any operating expenses charged against reserves." That clause does not appear to be at issue in this case, so it need not be construed. The forgiveness of indebtedness income, which increases net income, is not even arguably an operating expense.

GAAP literature. However, the WP LLC 2001 financial statements refer to a "reserve for [the] estimate of warranty costs." See Exhibit C at PAC0035 ¶3(g). Statement of Financial Accounting Standards No. 5 (hereinafter "FAS 5")[11], Accounting For Contingencies, indicates at Page 5, ¶7 that "[t]his Statement supersedes both ARB No. 50 and Chapter 6, 'Contingency Reserves,' of ARB No. 43." Plaintiff's Affidavit ¶15, Exhibit N. It goes on (Exhibit N at 4 ¶1) to define a contingency

> "as an existing condition, situation, or set of circumstances involving uncertainty as to possible gain (hereinafter a "gain contingency") or loss (hereinafter "loss contingency") to an enterprise that will ultimately be resolved when one or more future events occur or fail to occur.

At ¶4 it provides examples of such contingencies as including receivables collectibility, warranty obligations, and various other risks of loss. It then, at ¶61, page 17, discusses accruals:

> "Accrual of a loss related to a contingency does not create or set aside funds to lessen the possible financial impact of a loss, although some respondents to the Discussion Memorandum and the Exposure Draft argued to the contrary. The Board believes that confusion exists between accounting accruals (sometimes referred to as "<u>accounting reserves</u>") and the reserving or setting aside of specific assets to be used for a particular purpose or contingency. Accounting accruals are <u>simply a method of allocating costs among accounting periods</u> and have <u>no effect on an enterprise's cash flow</u>..." (emphasis supplied)

Finally, FAS 5 provides at ¶8 (Exhibit N at 5), that:

> "[a]n estimated loss from a loss contingency (as defined in paragraph 1) shall be accrued by a charge to income if <u>both</u> of the following conditions are met: (a) Information available prior to issuance of the financial statements indicates that it is probable that an asset had been impaired or a liability had been incurred at the date of the financial statements. It is implicit in this condition that it must be probable that one or more future events will occur confirming the fact of the loss. (b) The amount of loss can be reasonably ascertained." (emphasis in original).

---

[11] Not to be confused with Concept Statement 5 (CON 5), previously referred to.

A.P.N. Holdings Corp. v. Hart, 615 F.Supp. 1465 (S.D.N.Y. 1985) includes an extensive discussion of reserves, and the adjustment of reserves under GAAP. It cites the same text (although from a different source) as that in (a) above. See A.P.N. at 1471. The reserves discussed in A.P.N. at 1469-1471, are all for loss contingencies, such as losses on insurance claims or bad debts. Ultimately the court sided with the former CEO of the company in question, and determined that he was correct when he "saw no reason to believe that a reserve adjustment was necessary." A.P.N. at 1470. A.P.N. provides a good understanding of the common meaning of the words "reserve adjustment."

Black's Law Dictionary (7th ed) defines a "reserve" as "[s]omething retained or stored for future use; esp., a fund of money set aside by a bank or insurance company to cover future liabilities." (emphasis supplied). GAAP requires that accruals (i.e. reserves) be made for these contingencies when it is probable that a condition will occur. However, when new information is received, these reserves are subject to adjustment based upon the new information. It was these adjustments that the parties intended to exclude from the EBITDA calculation. See Plaintiff's Affidavit ¶2.

As FAS 5, A.P.N. and the Black's definition all make clear, a reserve is an accrual for a contingency. Contingencies, by definition, involve an element of uncertainty. The forgiveness of indebtedness income was by no means an "adjustment to reserves." The bank debt was a liability on the books of WPS, Inc. because there was a legal obligation for the full amount of that debt up until the closing of the December 2001 recapitalization. After that, the liability was zero. That is very different from a warranty reserve or a pension reserve that is based upon estimates of product failure rates or retirement ages and life expectancies. The warranty and pension reserves are subject to

adjustment based upon new information. As FAS 5 ¶61 states, the accruals are "simply a method of allocating costs among accounting periods."

The carrying value of the Citizens debt was an entirely different matter. It was not subject to probabilities or estimation. It allocated no costs among accounting periods. It did not vary based upon the company's shipments, or the additional retirement benefits earned by workers. It was based entirely upon how much money had been lent to the company, and the interest thereon. The value of the bank debt on the books of WPS, Inc. went from $20,967,514 (plus $702,325 in accrued interest) to zero all at once. The word "adjustment" implies something of lesser magnitude than a total elimination. The forgiveness of indebtedness income manifestly did not result from either a change to a reserve, or an adjustment.

Furthermore, unlike an adjustment to a reserve, which has "no effect on an enterprise's cash flow" (Exhibit N, FAS 5 at 17 ¶61), the $10,169,839 extraordinary gain represented actual cash savings. WPS, Inc. paid $11,500,000 in actual cash for the debt, $10,169,839 less than it otherwise would have needed to. Mr. Kulkarni acknowledged, in the deposition testimony reproduced above, that there was no cash impact to adjusting a reserve.

By arguing that "if we have any extraordinary gains or losses they will be excluded…," Mr. Kulkarni goes beyond the text of this clause, and expresses wishful thinking that the clause had so stated. But it does not.

> "Contract language is ambiguous where 'an agreement's terms are inconsistent on their face or where the phraseology can support reasonable difference (sic) of opinion as to the meaning of the words employed and the obligations undertaken… However, an 'ambiguity is not created simply because a controversy exists between parties, each favoring an interpretation contrary to the other's'" Suffolk Construction Company,

Inc. v. Lanco Scaffolding Co., Inc., 47 Mass. App. Ct. 726, 729 (1999) (citations omitted).

The clause in question is clear and unambiguous, and the intent of both parties is in accordance with that meaning. Restatement (Second) of Contracts §201(1) states that "[w]here the parties have attached the same meaning to a promise or agreement or a term thereof, it is interpreted in accordance with that meaning." The meaning expressed by Mr. Kulkarni as Category No. 2 finds absolutely no support in the text of the clause, which expresses no more and no less than Category No. 1. There are no additional words, ambiguous or not, that would support Category No. 2. "[P]arol evidence may not be used to 'create ambiguity where none otherwise exists…' '[P]arties are bound by the plain terms of their contract'… and their subjective contemplations are immaterial where the agreement is unambiguous." Coll at 1122.

D. THE EMPLOYMENT AGREEMENT DOES NOT BY ITS TERMS EXCLUDE NONOPERATING ITEMS OR ITEMS UNRELATED TO THE PLAINTIFF'S EFFORTS AND MASSACHUSETTS LAW PERMITS NONE TO BE IMPLIED

Defendants are likely to argue further that the extraordinary gain was non-operating in nature and the parties never intended for a bonus to be paid on EBITDA that arose out of non-operating causes. However, there is no support in the Employment Agreement for such a contention, other than that non-operating adjustments to reserves are excluded from EBITDA. As argued above, that clause applies only to reserve adjustments, not at issue here.

Were it the case that EBITDA, either by definition, or by the parties' purported intent, excluded non-operating items, then the clause just discussed would be surplusage. Non-operating items, whether adjustments to reserves or otherwise, would already have been excluded from EBITDA and there would be no need for that clause. Under

Massachusettts law "[a] contract must... be interpreted as a whole and effect must be given to all of its provisions in order to effectuate its overall purpose... a contract must not, whenever possible, be construed so as to render any of its terms meaningless." Baybank Middlesex v. 1200 Beacon Properties, Inc., 760 F.Supp. 957, 963 (D. Mass. 1991), citing Shea v. Bay State Gas Co., 383 Mass. 218, 225, 418 N.E.2d 597 (1981). Restatement (Second) of Contracts §203(a) is in accord. "[A]n interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect." See also Starr v. Fordham, 420 Mass. 178, 190 (1995) (no part of a contract may be disregarded). "A contract is to be construed to give reasonable effect to each of its provisions...'[E]very phrase and clause must be presumed to have been designedly employed, and must be given meaning and effect, whenever practicable..." J. A. Sullivan Corp. v. Commonwealth, 397 Mass. 789, 795 (1986).

A similar issue to that in the instant case arose in the case of Siteman v. Marine Petroleum Co., 511 S.W.2d 436 (1974). In that case a former president sought payment of his salary pursuant to a contract providing that he be paid "an amount equal to ten percent (10%) of the net profits of the Company before taxes..." Siteman at 437. The question was "whether the term 'net profits' was limited to Marine's operating profits or also included a large gain Marine made on the sale of its original terminal." Siteman at 438. In that case, there was no provision referencing GAAP that might have provided a definition of "net profits." Nevertheless, the court found in favor of the former president, finding that "the parties evidenced no intention to limit 'net profits' to operating profits." Siteman at 440. The court further noted that the president had "participated in the

corporate business leading up to the profitable sale," and that in previous years depreciation had been "treated as a corporate expense in computing net profits," implying that the parties "intended plaintiff's income would be increased by appreciation when realized." Siteman at 440 (emphasis in original).

Similarly, the SJC has similarly recognized that an executive's bonus must be interpreted according to the plain language of the agreement, and cannot be varied based upon an argument that the earnings upon which the bonus was based arose out of fortuitous circumstances.

> "'The natural inference from the contract is that the plaintiff as selling agent would find his good judgment and skill in this department reflected in the profits... But it is also true that the result of a business year may turn upon some commercial contingency which the plaintiff's skill and diligence could neither cause nor prevent. Both are contemplated by the contract." Daly, 246 Mass. at 125.

A review of the contract in Daly, however, reveals that no mention of the applicability of the bonus to net profits arising out of commercial contingencies, as opposed to the plaintiff's skill, was made. Daly at 120-121. The SJC necessarily ruled that the letter agreement, by failing to make any distinction as to how the net profits could be generated, necessarily made the bonus applicable to net profits, regardless of how they were generated. The same is true of the letter agreement in the instant case.

Similarly, in Hoffman v. Dann, 205 A.2d 343 (Del. 1964), the issue arose as to whether Chrysler executives were entitled to a bonus on sources not connected with the automobile business in which the executives worked, or on nonoperating income. However, the court held that

> "[t]he Resolution of the Stockholders of 1956 does not exclude in terms so-called nonoperating income, but refers generally to 'consolidated net earnings...' If the stockholders intended to exclude income from sources

> other than the manufacture and sale of automobiles from the Incentive Compensation Plan, that should have been made specific in the Resolution authorizing such payments. This follows from the provision of the Resolution that incentive compensation was to be based on the Annual Report to stockholders, which included earnings from all sources as consolidated earnings." Hoffman at 346.

Such is also the case here, where the Employment Agreement does not by its terms exclude any earnings, unless derived from "non-operating adjustments to reserves" and is based "upon the consolidated audited financial results of [WPS, Inc.]" See Exhibit A at PAC0002. By using the word "consolidated," it is clear that the parties intended, as in Hoffman, that the earnings be from WPS, Inc. or any of its subsidiaries.

Other out of state cases that might stand for the proposition that unrelated earnings ought not be included may easily be distinguished by factors not present in the instant case. In Heller v. Boylan, 29 N.Y.S.2d 653, aff'd 32 N.Y.S.2d 131, app. den., 32 N.Y.S.2d 1011 (1941), the corporate bylaw establishing the bonus had referred to "net profits" as the "net earnings made by the company in its business as a manufacturer and seller of tobacco and its products." In Winkelman v. General Motors Corp., 44 F.Supp. 960, settlement approved as modified, 48 F.Supp. 500 (S.D.N.Y. 1942), the profits used for the bonus calculation included profits on the difference between the proceeds from the sale of treasury stock, over the cost of acquiring it. Profits on trading in treasury stock were not properly includable in earnings under GAAP.

Furthermore, it cannot be argued that plaintiff had little to do with the extraordinary gain. The plaintiff was responsible for the operations of WPS, Inc. leading up to the 2001 recapitalization, and participated significantly in marketing the company to investors. The recapitalization, and thus the forgiveness of indebtedness, was made possible only because the profitability that had been demonstrated under plaintiff's

leadership had resulted in Parthenon investing $14 million in WPS, Inc. Were it not for such profitability, no entity would have been interested in investing in WPS, Inc. at any fraction of the debt acceptable to Citizens, and no transaction would have occurred.

Furthermore, the Employment Agreement provides that interest be deducted from EBITDA when calculating the BONUS. Yet, interest is manifestly a non-operating item. It would be illogical to include interest on debt as a deduction from EBITDA in calculating the bonus, but exclude forgiveness of indebtedness income on that same debt from that calculation. In fact, the irrationality of defendants' position is underscored in their answers to the First Interrogatories, where they include the full INT of $2,070,954, even though $702,325 of that was accrued interest that was never paid[12]. See Exhibit C at PAC0038 ¶9. That accrued interest was part of the outstanding debt, part of which was forgiven.

In essence, therefore, defendants seek to deduct for purposes of plaintiff's bonus calculation, accrued interest that was forgiven. That is similar to charging Mr. Siteman with depreciation on the building, but not permitting him to benefit from appreciation, when the reality turned out to be that, rather than depreciating, the building had in fact appreciated. See Siteman at 440. Finally, there is little practical difference between a gain that results from the forgiveness of indebtedness and a gain that results from the appreciation of an asset securing the debt. What is important is the equity, or the difference between the value of the asset and the debt secured by it.

The fact that, under the Employment Agreement, plaintiff was entitled to both an option representing 5% of the equity of WPS, Inc. and a bonus of 5% of the profits, as adjusted per the formula, further underscores the parties' intent. That intent was that the

[12] Generally debt repayments are allocated first to interest and then to principal.

plaintiff would have a 5% stake in whatever happened with WPS, Inc. Whether the Change in Control provisions were triggered due to a sale of the company or its assets (Exhibit A at PAC0003 ¶5), or whether the company remained under Mr. Kulkarni's ownership and the plaintiff was entitled to a 5% bonus on adjusted profits, the Employment Agreement allowed the plaintiff, as the most important executive after Mr. Kulkarni, to share in a 5% stake in the enterprise, regardless of whether the economic value was added through some effort of the plaintiff or not. Clearly, the option portion of the agreement did not, and indeed could not, distinguish between sources for appreciation in the value of the WPS, Inc. stock. It would be incongruous to hold that the bonus would be payable on some types of earnings, but not others.

E. THE CLARIFICATION CLAUSE IS OF NO FORCE OR EFFECT DUE TO THE IMPOSSIBILITY OR IMPRACTICABILITY OF PERFORMANCE

The Employment Agreement provides that "[i]f the calculation of BONUS requires clarification, Arthur Andersen & Company or such other accounting firm nominated to prepare the individual tax returns of the sole shareholder of the Company shall be the binding arbiter of the BONUS." However, Arthur Andersen is defunct and has withdrawn from the business of accounting. Cummings Deposition at 5, 123-124. The question then arises as to whether the second portion of this clause might mandate that a different accounting firm clarify the BONUS calculation. However, the sole shareholder of WPS, Inc. since prior to December 31, 2001 has been Wolverine Proctor, Inc., which as a corporation files a corporate, rather than an individual tax return. Brown Deposition at 137-138. Furthermore, while it appears that Vitale Caturano prepares the

tax returns for Wolverine Proctor, Inc., Vitale specifically declined a request by defendants to clarify the bonus calculation. See Plaintiff's Affidavit ¶10, Exhibit I.

Furthermore, there does not appear to be any calculation needing clarification. A condition precedent to the use of an accounting firm to clarify the calculation of the bonus is that there first be something to clarify, as that clause of the Employment Agreement begins with the words "[i]f the calculation of BONUS requires clarification…" Webster defines "calculate" as to "determine by mathematical processes; to reckon by exercise of practical judgment: estimate" That definition indicates that the parties either must have arrived at different results by mathematically calculating the figures underlying the bonus, or, more likely, that there must be some disagreement as to the estimates used in computing the financial results. See Exhibit C at PAC0033 ¶3(a). Neither is the case here. Rather, the issue is purely legal, namely, whether the Employment Agreement by its terms excludes the extraordinary gain from earnings or not (or if the agreement is held to be ambiguous, what the intent of the parties was). Those are legal and factual issues that judges and courts decide, not accountants. The Employment Agreement contemplates a role for accountants only in matters of calculation. Even applying GAAP principles to a particular set of facts is inherently a legal process, beyond the scope of what was contemplated by the word "calculation."

A similar situation to the one in this case arose in Davis v. Dawson, Inc., 15 F.Supp.2d 64 (D.Mass. 1998). In that case, the accounting firm of Deloitte & Touche had been specified as the organization nominated to determine the net worth of a company following the closing of a sale transaction. However, Deloitte refused to actually make that determination as a matter of policy. As in Davis, the accountants'

function in this case was not a "material part of the exchange." The use of an accounting firm as arbiter is therefore excused as rescission of the entire contract is obviously not required. See Davis at 114-115 n. 158, citing Restatement (Second) of Contracts §271 (impracticality excuses the non-occurrence of a condition if the condition is not a material part of the exchange). It was at the request of Mr. Kulkarni, then CEO of WPS, Inc., that the clarification clause was inserted in the Employment Agreement. See Plaintiff's Affidavit ¶2. The fact that neither of the possible firms specified in the Employment Agreement is available to clarify the bonus calculation should therefore not work to the detriment of the plaintiff. See Davis at 114. Although the doctrine of mutual mistake, as well as impracticability, applied in Davis, and only the latter applies here (neither party could have anticipated that Arthur Andersen would go out of business), similar principles ought to apply.

F. THE CUMMINGS AFFIDAVIT AND TARDY ERRATA SHEET OUGHT TO BE IGNORED AND IN ANY EVENT DO NOT AFFECT THE OUTCOME

At his deposition, Richard Cummings testified as follows:

> Q. Looking at this page of Wolverine's 2001 financials [PAC0030], is there a line item on this page that corresponds to EBITDA?
>
> A. I don't know. Again, because of the – I know what that line says, but I also know what – I explained what the acronym means, stands for. But EBITDA is a financial term, a widely used financial term.

Cummings deposition at 171. On December 19, 2005, a copy of Mr. Cummings' deposition and all exhibits thereto was sent to his attorney by priority mail, and was delivered to him on December 21, 2005. See Plaintiff's Affidavit ¶9, Exhibit H. An errata sheet was signed by Mr. Cummings on January 24, 2006, and sent to the plaintiff by his attorney on January 25, 2006. See Plaintiff's Affidavit ¶19,

Exhibit R. Also, enclosed with that letter was the copy of an affidavit, purportedly signed on April 8, 2005. See Exhibit R. The errata sheet purported to change the above testimony to:

> A. Solely within the context of these financial statements, I believe the line item entitled "Loss before interest expense, taxes, depreciation and amortization and extraordinary gain", corresponds to EBITDA. As I mentioned, however, EBITDA is a widely used financial term often specifically defined by parties preparing or using the financial information.

However, 34 days passed between the receipt of the deposition by Mr. Cummings' attorney on December 21, 2005 and the signing of the errata sheet on January 24, 2006. Fed. R. Civ. P. 30(e) provides that the "statement reciting such changes and the reasons given by the deponent for making them" shall be provided within 30 days. Furthermore, the statement provides no reasons for the changes. Therefore, the errata sheet should be stricken and not considered.

Enclosed with the errata sheet is an affidavit that makes a similar contention as to what line of PAC0030 represents EBITDA. However, at his deposition, Mr. Cummings testified that he had drafted an affidavit, and e-mailed it to Jeff Kuhn, counsel for defendants, but didn't believe any affidavit had been signed. Cummings Deposition at 149-151. Neither of these contentions was corrected in Mr. Cummings' tardy errata sheet. However, copies of e-mails subsequently produced by Mr. Cummings' counsel show that Mr. Kuhn had in fact drafted the affidavit, which an assistant of Mr. Cummings apparently edited after speaking with defendant Kulkarni. See Exhibit R, April 7, 2005 12:03 p.m. e-mail from Jeffrey Kuhn to Richard Cummings and e-mails copied therein. Compare Exhibit R, April 1 e-mail from Jeffrey Kuhn to Richard Cummings

(attempting to have Mr. Cummings call the plaintiff's position "absurd").

Furthermore, the existence of even the draft affidavit was not revealed until Mr. Cummings' deposition on November 29, 2005, despite the fact that plaintiff's first request for production of documents, Request 7, responded to by defendants on September 28, 2005, plainly encompassed that document. In defiance of this Court's order of January 6, 2006 compelling defendants to produce any documents responsive to Request 7, defendants' counsel has denied that they possess any responsive documents and refused to produce any, even after they undeniably were provided copies by Mr. Berluti[13]. Plaintiff stated to Mr. Kuhn that he is entitled to independent production of these documents by defendants. Any contention that the documents are work product is without merit as no objection, let alone an express objection, was made. See Fed. R. Civ. P. 26(b)(5). See Plaintiff's Affidavit ¶11, Exhibit J.

Meanwhile Mr. Cummings' counsel provided plaintiff with copies of e-mails from defendants' counsel that are undeniably responsive to Request 7 and that must surely be in their possession (some of these are included in Exhibit R). In fact, Mr. Kuhn admitted to the plaintiff that his firm saved e-mails for a year. Furthermore, the exchange of e-mails and testimony inconsistent with them, as well as the surreptitious behavior of defendants' counsel create a strong inference that defendant Kulkarni, his counsel and Mr. Cummings were at one point fraudulently conspiring to manufacture testimony to deprive the plaintiff of his

[13] Defendants allegedly obtained a copy of the Cummings affidavit just before it was produced by Mr. Berluti, and provided a copy of only that document, to plaintiff. At a minimum one of the draft affidavits apparently remains unproduced by either defendants' counsel or Mr. Cummings. The affidavit attached to the April 7 e-mail is identical to the signed one, indicating that the draft sent by Mr. Cummings to Mr. Kuhn 11:49 a.m. remains undisclosed.

bonus. These facts suggest that the affidavit was not signed until after Mr. Cumming's deposition, but rather was made to appear that it was drafted and signed before his deposition to get around the sham affidavit rule[14].

The errata sheet and the subsequently produced affidavit fall under the sham affidavit rule and should be excluded. See Colantuoni v. Alfred Calcagni & Sons, Inc., 44 F.3d 1, 4-5 (1st Cir 1994) (after giving clear answers to unambiguous questions, one cannot defeat summary judgment by submitting a contradictory affidavit); Hambleton Bros. Lumber Co. v. Balkin Enterprises, 397 F.3d 1217, 1225 (9th Cir. 2005) (clearly inconsistent "corrections" on deposition errata sheet excluded by sham affidavit rule); Burns v. Board of County Commissioners of Jackson Countrry, 330 F.3d 1275, 1282 (10th Cir. 2003) (without reasonable explanation for deposition testimony, sham affidavit rule applies equally to Rule 30(e) corrections).

In any case, the Cummings affidavit and the attempted revision of his deposition testimony have no impact on the outcome of this motion. First of all, in his affidavit, Mr. Cummings states that EBITDA "generally means earnings before interest, taxes, depreciation and amortization," while the Employment Agreement defines EBITDA to mean "the earnings before any interest, taxes or deductions for depreciation or amortization." As argued previously, the use of the article "the," and the use of the words "deductions for" in the latter indicate that the definition in the Employment Agreement was meant not to refer to any

---

[14] Even if the affidavit had been signed prior to Mr. Cummings' deposition, it could not have been provided to anyone involved in this case unless defendants' counsel lied, destroyed evidence, or returned the affidavit to Mr. Cummings or his counsel to prevent its disclosure. Exhibit J indicates that all responsive documents in their possession had been produced.

particular line denoted as "EBITDA" on the financial statements, but rather to define a specific process for calculating the EBITDA. Mr. Cummings' assumption as to the meaning of EBITDA uses a different set of words; his statement therefore cannot be construed to suggest any conclusion as to the calculation of the BONUS in this case. In fact, his revised testimony specifically contemplates that the parties might have adopted a different definition of EBITDA than the one he used in selecting a particular line as representing EBITDA and expresses no opinion as to whether or not the Employment Agreement did so. As the Employment Agreement defines EBITDA, the selection by Mr. Cummings of a particular line in the financial statements as being EBITDA is immaterial.

G. PLAINTIFF IS NOT ESTOPPED FROM ASSERTING HIS CLAIM FOR A BONUS BY ANY ACTIONS THAT HE TOOK

Plaintiff anticipates that defendants will argue that plaintiff is somehow estopped from seeking a bonus because of his own actions in December, 2001. But, defendant Kulkarni's testimony indicates that he believed, prior to the signing of the Transition Agreement, that the plaintiff might assert a bonus claim as he admitted he believed that the plaintiff was seeking to carve out the bonus because he intended later to assert a claim for one against WPS, Inc. Kulkarni Deposition at 2-12 to 2-15. Yet, defendant Kulkarni, the primary contact with Parthenon, did not disclose this possibility to them. Kulkarni Deposition at 2-30 to 2-37. Plaintiff's Affidavit ¶3. Furthermore, Parthenon's agents had access to the Employment Agreement and were aware of the structure of the transaction and unquestionably the existence of the extraordinary gain.

Defendant Kulkarni, as then-CEO of WPS, Inc. had full knowledge of the facts. At best, he simply made a legal misjudgment as to the inclusion of the forgiveness of indebtedness income in the plaintiff's bonus calculation. At worst, he actually knew that legally the bonus would have to be paid, but denied that to Parthenon. In any case, the plaintiff made no false statements to Parthenon or its attorneys regarding the bonus. Plaintiff's Affidavit ¶3, Kulkarni Deposition at 2-35 to 2-36. If anyone misled Parthenon it was defendant Kulkarni. In any event, Parthenon and WPS, Inc. are separate entities, plaintiff never received any money from Parthenon and any alleged misrepresentation by the plaintiff to Parthenon cannot affect any obligation by WPS, Inc. to the plaintiff.

Nor were the estimates of the WPS, Inc.'s December 2001 financial performance required to include any increase in EBITDA as a result of the forgiveness of indebtedness. See Exhibit F. FAS 5 at 7 ¶17 provides that "[c]ontingencies that might result in gains usually are not reflected in the accounts since to do so might be to recognize revenue prior to its realization." See Exhibit N. Negotiations between WPS, Inc. and Parthenon were continuing up to closing and the deal could have fallen apart at any time, thus any gain was contingent. As the bonus that might be owed the plaintiff would only reduce (by 5-8%) the amount of the gain and could not become a liability without it, it would have also been improper to accrue the bonus but not the gain upon which it depended.

Defendants' likely assertions with regard to the plaintiff's actions are made even more incredible by defendant Kulkarni's egregious behavior. After

driving away investors willing to pay as much as $45 million for the company[15] through his demonstrated lack of faith in its future evidenced by continuing cash withdrawals in the face of mounting overdue accounts payable, he planned to force the company into receivership and repurchase it at a deep discount. Plaintiff's Affidavit ¶¶25-28. His continued cash withdrawals, legal fees in support of his strategy, and the principal repayment demanded by Citizens Bank on June 1, 2001 combined to drain the company of cash and make it unable to make many shipments in the second half of 2001.

By the fourth quarter of 2001, the company had gone from being quite profitable to being on the verge of failing, and defendant Kulkarni was proceeding with plans to force it into receivership so he could buy it back at a deep discount. At the last moment, Parthenon negotiated with Citizens to recapitalize the company and repurchase the debt at a discount.

On December 27, 2001, the day before that transaction was to close, defendant Kulkarni sprung a previously unmentioned Consulting Agreement on the plaintiff whereby the plaintiff was to be terminated in three months, and was to release all claims against the company. Furthermore, defendant Kulkarni had failed to acknowledge an oral agreement with the plaintiff[16] to increase his equity stake to 8%. When plaintiff refused to sign the Consulting Agreement, defendant Kulkarni used profanity, and the next day threatened to terminate the plaintiff's employment immediately. When plaintiff gave defendant Kulkarni the option of

[15] Plaintiff's share of that would have been at least $1.2 million, calculated by deducting $21 million in bank debt, then taking 5% of that as his equity stake under the written Employment Agreement. In addition the stake had been orally increased to 8%.

[16] Drafts of written agreements memorializing the oral agreement were acknowledged by defendant Kulkarni to bear his writing. The final draft evidenced a meeting of the minds.

choosing between acknowledgment of the increased equity stake or carving the bonus out of the claims to be released, he chose the carving out of the bonus. Until December 27, 2001, plaintiff had intended to forgive the bonus. Plaintiff's Affidavit ¶¶3, 32. Any wrongful actions on December 27 and 28, 2001, were those of Mr. Kulkarni. See Kulkarni Deposition at 183-184[17].

III. CONCLUSION

For the reasons stated in this memorandum, plaintiff is entitled to summary judgment on Count I of the Amended Complaint and to an order specifying that the BONUS be calculated in accordance with the methodology described herein for purposes of Counts II, III and IV. The written contract, the written financial statements of WP LLC, and the written statements of the Financial Accounting Standards Board are clear. There is no evidence that the parties intended that any items be excluded from earnings for purposes of the BONUS calculation, other than nonoperating adjustments to reserves of which there are demonstrably none. There are no calculations that require clarification and in any case no firm extant to clarify them.

Peter A. Crawford

Peter A. Crawford, pro se
23 Newcastle Dr. #11
Nashua, NH 03060
(603)888-4574

Date: March 17, 2006

[17] The admitted facts would clearly support a claim for breach of defendant WPS, Inc.'s obligations of good faith and fair dealing.