**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**
_____

PETER A. CRAWFORD,

       Plaintiff,

                                Civil Action No.
v.                               05-cv-10078 (DPW)

WOLVERINE, PROCTOR & SCHWARTZ, INC.,         **Oral Argument Requested**
STEVEN F. CHILINSKI, and
DEEPAK S. KULKARNI,

       Defendants.
_____

## MEMORANDUM IN OPPOSITION TO PLAINTIFF'S
## MOTION FOR SUMMARY JUDGMENT

Mark M. Whitney (BBO # 637054)
Jeffrey D. Kuhn (BBO # 662326)
MORGAN, BROWN & JOY, LLP
_Attorneys for the Defendants_
200 State Street – 11th Floor
Boston, Massachusetts  02109
(617) 523-6666

## PRELIMINARY STATEMENT

Defendants Wolverine, Proctor & Schwartz, Inc. ("WPS"),[1] Steven F. Chilinski ("Chilinski") and Deepak S. Kulkarni ("Kulkarni") (collectively "defendants") hereby submit the following memorandum in opposition to plaintiff *pro se* Peter A. Crawford's Motion for Partial Summary Judgment.

Plaintiff *pro se*, Peter A. Crawford ("Crawford"), commenced the instant suit on January 12, 2005. Crawford's Amended Complaint, which seeks $1,792,710 in damages, asserts nine causes of action sounding in breach of contract, violations of the Massachusetts Payment of Wages Act, tortious interference with a contractual relationship and fraud. Crawford, the former Chief Operating Officer ("COO") of Wolverine, alleges that he is owed a bonus and certain unpaid wages arising out of his employment with Wolverine from December 1999 through January 2002.

Crawford's instant motion seeks summary judgment on just one count of his Amended Complaint: for breach of his Employment Agreement by failing to pay him a Bonus for fiscal year 2001 (Count 1). Crawford's motion for partial summary judgment should be denied for the following reasons:

1. Genuine issues as to *the central* material facts in this case - the meaning of the term "EBITDA" and, more specifically, the meaning of the "E" (*i.e.,* earnings) in "EBITDA" - exists which precludes entry of summary judgment in favor of Crawford.

2. Crawford drafted the bonus provision in his Employment Contract. Because that bonus provision is inherently ambiguous, it must be construed against Crawford and in favor of defendants under well-settled law governing interpretation of contracts.

3. Defendants' proffered interpretation of the term "EBITDA" is the more reasonable interpretation because it is entirely consistent with: (a) the widely held

---

[1] For purposes of consistency, defendants utilizes herein the same capitalized and abbreviated terms as it used in its own summary judgment papers.

view in the industry of the meaning of EBITDA; (b) the academic definition of EBITDA as a term of art; (c) the judgment of WPS's independent auditors; (d) WPS's historical treatment and definition of EBITDA in its financial statements; and (e) the intention of the parties as reflected in the express language of Crawford's employment contract.

4.   Finally, because the evidence proffered by the defendants regarding the parties' intended meaning of the term EBITDA is so one-sided that no reasonable person could decide to the contrary, this Court should exercise its discretion and enter summary judgment in favor of defendants as to Counts 1 through 4 of the Amended Complaint.

## MATERIAL FACTS THAT ARE IN DISPUTE

Pursuant to Local Rule 56, defendants set forth the following counter-statement of material facts in response to the Statement of Undisputed Material Facts ("Crawford's SOF") contained in Crawford's memorandum of law. The following numbered paragraphs correspond to the numbered paragraphs contained in Crawford's SOF.

As an initial matter, defendants note that paragraph 24 of Crawford's SOF expressly acknowledges that the proper contractual definition and value of EBITDA is a disputed material fact in this case. This admission, in and of itself, should preclude summary judgment in Crawford's favor.

3.     WPS's profits did not "improve dramatically" during plaintiff's tenure as the company's Chief Operating Officer. Crawford began serving as WPS's COO on or about December 30, 1999. [Crawford's SOF, ¶ 1]. Crawford's employment was terminated on January 14, 2002. [Amended Complaint, ¶¶ 22-23]. For 1999, WPS's EBITDA ("earnings before interest, taxes, depreciation and amortization") was a loss of $4,700,073. [Accompanying Affidavit of Deepak S. Kulkarni, exh. 2, pg. 3; Amended Complaint, ¶ 10]. For 2000, WPS's EBITDA was a modest gain of $354,045. [Kulkarni Aff., exh. 2, pg. 3]. For 2001, Crawford's last year as WPS's COO, WPS's EBITDA was a loss of $486,116. [Accompanying Affidavit of Richard Cummings, ¶ 6, exh. A, pg. 3].

2

WPS's EBITDA for 1999 was not a loss of $5,982,000, but was, rather a loss of $4,700,073. [Amended Complaint, ¶ 10; Kulkarni Aff., exh. 2, pg. 3].

Although Mark Brown, WPS's former Chief Financial Officer, testified that WPS operated at a profit for the isolated period from fourth quarter of 2000 through the third quarter of 2001, Mr. Brown also testified immediately thereafter that the overall financial performance of WPS during Crawford's tenure was "fairly poor." [Deposition transcript of Mark Brown, attached as exh. P to Crawford's Affidavit].

5.    Crawford has offered no documentation, deposition testimony or affidavits in support of his assertion that "Commencing as early as March, 2001, [Citizen's Bank] became increasingly aggressive and concerned regarding the level of compensation being paid to Mr. Kulkarni."

7.    The statement that Deepak Kulkarni "planned to permit [WPS] to be driven into receivership, and the reacquire it inexpensively," is false. [Kulkarni Aff., ¶ 8].

12.    With respect to a conversation which took place between Crawford and Kulkarni on December 28, 2001, Crawford's SOF mischaracterizes Kulkarni's testimony. Crawford's SOF asserts that:

> Mr. Kulkarni's position was that no bonus was owed with respect to the forgiveness of indebtedness income. However, he does not assert that plaintiff agreed with his position.

This is an inaccurate summary of Kulkarni's deposition testimony, which actually reads as follows:

> Q.    So do you recall a conversation between the two of us regarding the bonus and the EBITDA that occurred on or about December 28, 2001?

> A.    About your bonus?
>
> Q.    Right.
>
> A.    Any conversation about your bonus?
>
> Q.    Correct.
>
> A.    I do recall a conversation about the bonus.
>
> Q.    What was that conversation?
>
> A.    That you weren't entitled to any because the Company had made a loss.
>
> Q.    Was that what you said or what I said?
>
> A.    That's what we, I thought, mutually agreed at the time…

[Kulkarni Aff., exh. 3, pg. 27].

14.    Richard Cummings did not testify, as Crawford implies, that "the loss is negative earnings" in any technical accounting sense.  [Crawford Aff., exh. Q, pg. 84].  It appears that Crawford is mischaracterizing this confusing exchange from the Cummings deposition:

> Q.    Do you disagree that negative earnings is a loss?
>
>        [Mr. Kuhn: Objection]
>
> A.    I'm not sure I disagree with that – I guess I don't have a – In a general commons sense way I guess I don't disagree with that.

[Crawford Aff., exh. Q, pg. 84].

WPS's 2000 financial statements use the phrase "Earnings (loss)" to reflect negative earnings.  [Kulkarni Aff., exh. 2, pg. 3]

19.    Crawford's asserted definition of EBITDA is incomplete.    Besides defining EBITDA as WPS's "earnings before any interest, taxes or deductions for

depreciation or amortization," the Employment Contract also excludes from EBITDA "any non-operating adjustments to reserves." [Kulkarni Aff., exh. 1].

23.    Defendants have never admitted that the TAXES (as that term is defined in Crawford's Employment Contract) of WPS for 2001 were $43,894. [Crawford Aff., exh. T, pg. 10; Affidavit of Deepak S. Kulkarni submitted in support of defendant's Motion for Summary Judgment (Docket # 69), exh. 10, pg. PAC 0025]. WPS's TAXES for 2001 were $2,147,000. [Previous Kulkarni Aff. (Docket # 69), exh. 10, pg. PAC 0025].

Moreover, Crawford admitted in his initial demand letter that calculating the Bonus according to the terms of Employment Contract would yield a substantially lower Bonus figure of approximately $253,000. [Id.]

26.    Crawford's offers a misleading and incomplete statement regarding how "both parties construed" the phrase "excluded from EBITDA will be any non-operating adjustments to reserves, to the extent that those adjustments affect EBITDA." Kulkarni testified in unambiguous terms that he construed that phrase as excluding any "extraordinary gains or losses" from EBITDA. [Kulkarni Aff., exh. 3, pgs. 203-204].

35.    Crawford's assertion that "Mr. Cummings specifically referred to FAS 130 in answering a question as to the difference between earnings and net income" is extremely misleading. It was Crawford, in questioning Mr. Cummings, who introduced FAS 130 as a deposition exhibit and subsequently instructed Mr. Cummings to base his answer on his interpretation of the language in FAS 130. [Crawford Aff., exh. Q, pgs. 64-65].

**ARGUMENT**

5

The crux of Crawford's argument in support of his motion for partial summary judgment is that the "E" in "EBITDA" *(i.e.*, the term "earnings") is synonymous with the accounting term "net income."  He asserts that, under GAAP, "net income" includes extraordinary gains and he is therefore entitled to payment of a sizeable bonus.  In making his argument, however, Crawford relies on a hefty quantity of extrinsic evidence to support his proposition, including but not limited to various FASB statements, accounting treatises, testimony, documents, and other authority.  By straying well beyond the four corners of his Employment Contract, Crawford concedes that the Bonus provision at issue is inherently ambiguous and requires additional evidence to establish its true meaning and the intent of the parties.

It is undisputed that Crawford was the sole drafter of the relevant bonus provision.  As such, the ambiguities in his Bonus provision must be construed *against* Crawford as a matter of law.  Under the summary judgment rubric, factual inferences should also be construed in defendants' favor as opponents to Crawford's instant motion.  Against that backdrop, the defendants' proffered interpretation of the term "EBITDA" is the more reasonable interpretation because it is entirely consistent with:  (1) the widely held view in the industry of the meaning of EBITDA; (2) the academic definition of EBITDA as a term of art; (3) the judgment of WPS's independent auditors; (4) WPS's historical treatment and definition of EBITDA in its financial statements; (5) the intention of the parties as reflected in the express language of Crawford's Employment Contract.  In light of these legal principles and factual inferences, Crawford's instant motion cannot succeed.

Finally, this Court has the discretion to award summary judgment to a nonmovant. Bank v. Int'l Business Machines Corp., 145 F.3d 420, 431 (1st Cir. 1998). The defendants respectfully submit that it would be a proper exercise of this Court's discretion if it entered summary judgment in favor of defendants on Counts 1 through 4 of the Amended Complaint, in light of the clear and inherently reasonable positions defendants have posted in response to Crawford's instant motion.

## I.     SUMMARY JUDGMENT STANDARD

Summary judgment "purports 'to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" Podiatrist Ass'n, Inc. v. La Cruz Azul De Puerto Rico, Inc., 332 F.3d 6, 12 (1st Cir. 2003). The Court may grant a motion for summary judgment only if the record "construed in the light most favorable to the party opposing summary judgment," reveals no dispute as to any genuine issues of material facts. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 261 (1986).

When considering "whether to grant summary judgment, the Court must determine whether the pleadings, depositions, answers to interrogatories, and admission on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "In making this assessment, the Court must 'scrutinize the record in the light most flattering to the party opposing the motion, indulging all reasonable inferences in that party's favor.'" Mulvihill v. Top-Flite Golf Co., 335 F.3d 15, 19 (1st Cir. 2003).

In deciding whether a factual dispute is "genuine," the Court must determine whether the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson, 477 U.S. at 248.

## II.    FRAMEWORK FOR ANALYSIS - APPLICABLE CONTRACT INTERPRETATION PRINCIPLES

At the center of this dispute is Crawford's contention that WPS breached Crawford's January 4, 2000 Employment Contract (the "Employment Contract") by failing to pay Crawford a Bonus for 2001.    [Kulkarni Aff., exh. 1].    Under the Employment Contract, Crawford's entitlement to a Bonus was defined by the following formula:

$$BONUS = (EBITDA - CAPX - INT - TAXES) \times .05$$

The figures used in the calculation were to be derived from WPS's "annual financial results [] in accordance with generally accepted accounting principles ["GAAP"]…"  The starting point for this Bonus calculation is "EBITDA," a popularly used financial acronym which is defined in the Employment Contract as WPS's "earnings before interest, taxes or deductions for depreciation or amortization."

WPS has consistently maintained that Crawford is not entitled to any Bonus for 2001 because the company's EBITDA for that year was expressly defined in the 2001 financial statement as a *loss* of $486,116.  [Cummings Aff., ¶ 6, exh. A].  Crawford's entire claim (and the instant motion) is predicated on Crawford's contention that $10,169,839 in debt forgiveness granted to WPS from Citizen's Bank – recorded on the 2001 financial statements as an "extraordinary gain" – should be included in EBITDA for the purposes of Crawford's Bonus calculation.

Thus, Crawford's entitlement to a Bonus of $357,856.25[2] turns squarely on the question of whether the extraordinary gain of $10,169,839 in debt forgiveness that WPS

---

[2]    The correct bonus figure is actually $253,000.  Crawford has arrived at the larger figure he now seeks by venturing outside the Employment Contract's definition of TAXES and, instead, unilaterally selecting a tax figure from the company's financial statements.

realized in 2001 should be incorporated into EBITDA. [Crawford's SOF, ¶ 24]. For his part, Crawford takes the position that EBITDA is essentially synonymous with the GAAP-defined concept of "net income" and, as a result, EBITDA is an extremely broad concept that includes all extraordinary gains – including debt forgiveness. Defendants, on the other hand, interpret EBITDA in conformity with the parties' contractual intent *and* the substantially universal manner in which the term is defined in the financial and business communities, all of which leads inexorably to the same conclusion: EBITDA <u>does not</u> include debt forgiveness and it was never the parties' intention in entering the Employment Contract to depart from this general rule.

\*        \*        \*

"Under Massachusetts law, interpretation of a contract is ordinarily a question of law for the court." <u>Fairfield 274-278 Clarendon Trust v. Dweks</u>, 970 F.2d 990, 993 (1st Cir. 1992). The threshold question of whether a contract is ambiguous is a matter of law for the Court to resolve. <u>Tropeano v. Dorman</u>, No. 05-1435, 2006 WL 744557, \*5 (1st Cir. Mar. 24, 2006); <u>see</u>, <u>Allstate Ins. Co. v. Bearce</u>, 412 Mass. 442, 446-447 (1992). Where a contract is ambiguous, however, "there is an issue of fact for the jury" to resolve. <u>Coll v. PB Diagnostics Sys., Inc.</u>, 50 F.3d 1115, 1122 (1st Cir. 1995).

Moreover, "ambiguous language in an agreement is to be construed against the drafter of the agreement." <u>Demoulas v. Demoulas Super Markets, Inc.</u>, 424 Mass. 501, 570 (1997); <u>see also</u>, <u>Interpay, Inc. v. Bigham</u>, No. 01-10779, 2002 WL 1998249, \*3 (D. Mass. Aug. 15, 2002) (Woodlock, J.) ("Where a contract is ambiguous, ambiguities are typically resolved against the drafter of the document.") Thus, because it was Crawford who drafted the Bonus/EBITDA provision of the Employment Contract, any doubts

regarding the ambiguity or meaning of EBITDA must be resolved in the defendants' favor.  [Defendants' SOF ¶¶ 3, 5].[3]

A contractual term is ambiguous "if it is susceptible of more than one meaning and reasonably intelligent persons would differ as to which meaning is the proper one." Diamond Crystal Brands, Inc. v. Backleaf, LLC, 60 Mass. App. Ct. 502, 505 (2004) (quoting, Citation Ins. Co. v. Gomez, 426 Mass. 379, 381 (1998)); see, Rey v. G.D. Lafferty, 990 F.2d 1379, 1384-1385 (1st Cir. 1993) ("Contract language is usually considered ambiguous where an agreement's … phraseology can support reasonable difference of opinion as to the meaning of the words employed and obligations undertaken."); National Fire Protection Association v. Int'l Code Council, Inc., No. 03-10848, 2006 WL 839501, *19 (D. Mass. Mar. 29, 2006) (Woodlock, J.) (contractual language is ambiguous when "reasonably prone to different interpretations" or "susceptible to differing, but nonetheless plausible constructions.")

Where a determination is made that some aspect of a contract is ambiguous, "uncertain or equivocal in meaning," then "all the circumstances of the parties leading to [contract] execution may be shown for the purpose of elucidating, but not contradicting or changing [the contractual] terms." Nadherny v. Roseland Property, Co., Inc., No. 02-11317, 2004 WL 540281, *1 (D. Mass. Mar. 18, 2004).  "Although not admissible either to contradict or alter express terms, extrinsic evidence is admissible to assist the factfinder in ascertaining the intent of the parties as imperfectly expressed in ambiguous contract language." Den Norske Bank AS v. First National Bank of Boston, 75 F.3d 49, 52-53 (1st Cir. 1996).  Such extrinsic evidence may include: (1) details of the parties'

---

[3]    Reference to "Defendants' SOF" herein is to the defendants' Statement of Undisputed Material Facts filed in support of their motion for summary judgment.  [Docket # 66].

negotiations; (2) the course of performance; (3) the parties' prior course of dealing; and (4) trade usage in relevant industry.  Id.  The purpose of such an inquiry is to establish the "intent of the contracting parties," which is "'generally deemed a material issue of fact' precluding summary [judgment]."[4]  Tropeano, 2006 WL 744557, *12 (citing, Boston Five Cents Sav. Bank v. Dept. of HUD, 768 F.2d 5, 8 (1st Cir. 1985)).

Thus, where a court determines that some provision of a contract satisfies the legal definition of ambiguity, "[o]nly in limited circumstances is it appropriate for a court to choose one meaning of a disputed agreement over another."  Tropeano, 2006 WL 744557, *12.  "Such limited circumstances occur only where 'no reasonable person' could differ about what the contract means, either because the language is unambiguous or the supporting evidence is sufficiently one-sided."  Id.; see also, Affiliated FM Ins. Co. v. Constitution Reinsurance Corp., 416 Mass. 839, 845-846 (1994) (summary judgment inappropriate where contract language was ambiguous and interpretation was aided by trade usage); Boston Five Cents Sav. Bank, 768 F.2d at 8 (A judge may properly construe an ambiguous contract only where "the evidence presented about the parties' intended meaning [is] so one-sided that no reasonable person could decide the contrary."); Teragram Corp. v. Marketwatch.com, Inc., No. 02-11138, 2004 WL 3086883, *4 (D. Mass. Dec. 29, 2004) (Woodlock, J.) ("Where a contract has terms that are 'ambiguous, uncertain, or equivocal in meaning, the intent of the parties is question of fact to be

---

[4]    Crawford miscalculates the alleged bonus he is entitled to receive by selectively meandering outside the express terms of his Employment Contract when it suits his position as to the proper definition of EBITDA.  Although defendants obviously reject Crawford's logic, it is worth noting that Crawford's arguments are predicated, not on the four-corners of his Employment Contract, but on his personal interpretations of FASB statements, accounting treatises, etc.  Crawford also recognized in his deposition that his Bonus calculation was based on information that was outside the express terms of his Employment Contract.  [Crawford deposition transcript, pgs. 154-155, attached as exh. 1 to the accompanying Affidavit of Mark M. Whitney].  Thus, by resorting to extrinsic evidence to bolster his proffered interpretation of EBITDA, Crawford seemingly acknowledges the term's ambiguity.

determined at trial' [] and 'summary judgment is appropriate only if the extrinsic evidence presented about the parties' intended meaning is so one-sided that no reasonable person could decide to the contrary.'"); Singer Co. v. E.I. du Pont de Nemours & Co., 579 F.2d 433, 439-440 (8th Cir. 1978) ("The better rule, when there remains an issue of contractual intent, is to submit the issue to the jury unless the evidence is so clear that no reasonable person would determine the issue but one way.")

Said differently, where parties to a contract advance differing interpretations of an ambiguous contractual term, summary judgment is appropriate only where one of the competing interpretations is so inherently irrational that no reasonable person could subscribe to the proffered construction. Id.

Here, given that the crux of this dispute are the parties' competing interpretations of the meaning of the term EBITDA (specifically, the exclusion of debt forgiveness income from EBITDA), Crawford may prevail on summary judgment only if this Court determines as a matter of law that the defendants' interpretation of EBITDA is so utterly irrational that no reasonable person could agree with the defendants' position.[5]  Because the defendants' interpretation of EBITDA is not only reasonable, however, but also in conformity with both the parties' contractual intent *and* the objective meaning of the term, Crawford's instant motion for summary judgment should be denied.

---

[5]  In his memorandum of law, Crawford concedes that if this Court determines that the EBITDA provision of the Employment Contract is susceptible to more than one reasonable meaning, an unresolved "issue of fact for the jury" would preclude summary judgment.  See, Crawford's Memo, pg. 12 (citing, Coll v. PB Diagnostics Sys., Inc., 50 F.3d 1115, 1122 (1st Cir. 1995)).

III.  **APPLYING THE FRAMEWORK SET FORTH ABOVE, PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT SHOULD BE DENIED FOR ANY ONE OF SEVERAL INDEPENDENT REASONS**

A.  **The Defendants' Interpretation of EBITDA is Consistent with the Objective Industry and Academic Definition of EBITDA as a Word of Art**

In his memorandum of law, Crawford points out the Restatement (Second) of Contracts §§ 202(3)(a) and 202(3)(b) provides that "unless a different intention is manifested (a) where language has a generally prevailing meaning, it is interpreted in accordance with that meaning; and (b) technical terms and words of art are given their technical meaning when used in a transaction within their technical field." [See, Crawford Memo, pg. 15]. Thus, Crawford's argument concedes that the parties' intent in incorporating EBITDA into the Bonus calculation was that the term would be interpreted in accordance with its "generally prevailing meaning." See also, Affiliated FM Ins. Co., 416 Mass. at 845 (Where "contract language is ambiguous, evidence of trade usage is admissible to determine the meaning of the agreement .… Valid usages [] respecting the subject matter of an agreement, are by implication incorporated therein [] and are admissible to aid in its interpretation."); Fanelli Amusement Co., Inc. v. Sartori Import-Export Co., No. 940472, 1995 WL 808605, *2 (Mass. Super. Jan. 27, 1995) ("Ambiguous contract language is interpreted in accordance with the established business usage of the terms employed.") (citing, Keating v. Stadium Management Corp., 24 Mass. App. Ct. 246, 249 (1987)).

Under EBITDA's "generally prevailing meaning," debt forgiveness would never be incorporated into the term.

13

Notwithstanding that the Employment Contract provides that the particular components of the Bonus formula, including EBITDA, were to be "calculated based upon the annual consolidated financial results of [WPS], in accordance with [GAAP]," neither EBITDA nor "earnings" (*i.e.,* the "E" in "EBITDA") are GAAP-defined terms. [Defendant's SOF, ¶¶ 8-9]. Because GAAP takes an "all-inclusive" approach to net income, EBITDA was developed as an alternative concept to measure a company's performance from normal operations. [Georgiou Aff., exh. 1, pg. 3].

Although not defined by GAAP, EBITDA is defined in financial textbooks as beginning with "operating income" or "operating earnings." [Id.] Other industry publications define EBITDA as a measurement of a company's "operating profitability before non-operating expenses." [Georgiou Aff., exh. 1, pgs. 3-4]. Indeed, that EBITDA excludes the effects of any transactions outside a company's normal operations business (*i.e.,* extraordinary gains, such as debt forgiveness) is a key functional difference between EBITDA and the much broader GAAP-defined concept of "net income." [Id.]

Here, because WPS's 2001 financial statements were prepared using the "generally prevailing meaning" of EBITDA outlined above, the $10,169,839 in debt forgiveness WPS realized as an extraordinary gain in 2001 was not incorporated into the $486,116 EBITDA loss which appears on page 3 of the company's 2001 financial statements. [Cummings Aff., exh. 1, ¶ 6]. Because WPS's gain on its debt forgiveness resulted from a "non-core" transaction unrelated to WPS's operations (WPS is in the business of making ovens, not procuring debt forgiveness), the non-operating debt forgiveness income was properly excluded from EBITDA. [Georgiou Aff., exh. 1, pg. 4].

That WPS's exclusion of the Citizen's Bank debt forgiveness from EBITDA is consistent with "generally prevailing meaning" of the term is conclusively demonstrated by a review of the 2001 financial statements of public companies in the same position. Of the ten public companies which reported EBITDA and realized an extraordinary gain from the early extinguishment of debt in 2001, 100% of those companies excluded their debt forgiveness from the calculation of EBITDA. [Georgiou Aff., exh. 1, pg. 4].

Based on the foregoing, in concluding that WPS's 2001 debt forgiveness was properly excluded from the EBITDA component of Crawford's Bonus formula, the defendants interpreted EBITDA in a manner entirely consistent with the "generally prevailing meaning" of the term utilized by both the academic and corporate financial communities. Thus, the defendants' interpretation of EBITDA could never be characterized as unreasonable or irrational and, as a result, Crawford's motion for summary judgment should be denied. See, Boston Five Cents Sav. Bank, 768 F.2d at 8; Singer, 579 F.2d at 439-440; Tropeano, 2006 WL 744557, *12; Nadherny, 2004 WL 540281, *1.

Crawford attempts to contradict the well-established definition of EBITDA as excluding non-operating or extraordinary items by parsing language from the WPS's 2001 Financial Statements. Crawford's memorandum argues that because the EBITDA line item from WPS's 2001 Financial Statements reads "loss before interest expense, taxes, depreciation and amortization and extraordinary gain," any extraordinary gains must have originally been included in EBITDA. Crawford's memorandum poses the rhetorical question "Why would the financial statements use a description that specifically excludes the extraordinary gain if the commonly accepted meaning of

15

EBITDA already <u>excluded</u> any extraordinary gain?" [See, Crawford's Memo, pg. 13]. The answer to this question is quite simple: both Accounting Principles Board Opinion 30 and Rule 5-03 of the Securities and Exchange Commission Regulation S-X require the following line items on an income statement when a company reports an extraordinary item:

- Income or loss before extraordinary items

- Extraordinary items

- Net income or loss

[Georgiou Aff., ¶ 7]. Thus, it is a general practice for companies to specify what items have been incorporated into summary-type lines on income statements. [<u>Id.</u>] Without this guideline, the reader could be confused as to what particular items (including extraordinary items) were included into summary-type line items.

### B.    <u>The Defendants' Interpretation of EBITDA is Consistent with the Judgment of WPS's Independent Auditors</u>

EBITDA is the starting point in the Bonus calculation formula incorporated into provision 4 of Crawford's January 4, 2000 Employment Contract. [Kulkarni Aff., exh. 1]. After defining the Bonus formula, the Employment Contract states that "for purposes of this calculation, the above terms [including EBITDA] will be calculated based upon the annual consolidated financial results of the Company, in accordance with generally accepted accounting principles."

The Employment Contract goes on to state:

If the calculation of BONUS requires clarification, Arthur Andersen & Company or such other accounting firm nominated to prepare the individual tax returns of the sole shareholder of the Company shall be the binding arbiter of the BONUS.

16

WPS's 2001 annual consolidated financial results are identical with and incorporated into the 2001 Consolidated Financial Statements of Wolverine Proctor LLC (the "2001 Financial Statements"). [Crawford's SOF, ¶ 17]. The 2001 Financial Statements were prepared by Arthur Andersen & Company ("Arthur Andersen"). [Cummings Aff., ¶¶ 4-6]. Richard Cummings, a certified public accountant with over 29 years of experience, was the Arthur Andersen partner in charge of preparing the 2001 Financial Statements. [Cummings Aff., ¶ 6].

According to paragraph 6 of Mr. Cummings's April 8, 2005 Affidavit, in the 2001 Financial Statements, WPS's "EBITDA is represented by the page 3 line 'Loss before interest expense, taxes, depreciation and amortization and extraordinary gain.'" Mr. Cummings's Affidavit goes on to state that "as presented in their 2001 Audited Financial Statements, [WPS'] EBITDA for fiscal year 2001 was an aggregate loss of $486,116." [Cummings Aff., ¶ 6].

On November 29, 2005, Crawford took the deposition of Mr. Cummings as a third-party witness. [Crawford Aff., ¶ 18]. In an apparent effort to avoid the expense of procuring an expert witness on the subject, Crawford attempted to use the Mr. Cummings's deposition to procure opinions from Cummings as to several very detailed and complex accounting concepts related to EBITDA. Crawford also asked several "yes-or-no" type questions regarding complex topics relating to esoteric accounting principles, EBITDA and WPS's 2001 Financial Statements. Following his deposition, Mr. Cummings signed an errata sheet on January 24, 2006 which contained the following statement:

> A:    Solely within the context of these financial statements, I believe
>        the line item entitled "Loss before interest expense, taxes,

> depreciation and amortization and extraordinary gain", corresponds to EBITDA. As I mentioned, however, EBITDA is a widely used financial term often specifically defined by parties preparing or using the financial information.

Based on the foregoing, it is clear that both the defendants' general interpretation of EBITDA and their specific conclusion that WPS's EBITDA for 2001 was a loss of $486,116 is consistent with the judgment of Mr. Cummings and Arthur Andersen – the entity empowered under Crawford's Employment Contract as the "binding arbiter" of the Bonus. [Kulkarni Aff., exh. 1]. Thus, Crawford's instant motion for summary judgment cannot be granted unless this Court determines that both the defendants' and Mr. Cummings's interpretation of the proper value of EBITDA is unreasonable as a matter of law. See, Boston Five Cents Sav. Bank, 768 F.2d at 8; Singer, 579 F.2d at 439-440; Tropeano, 2006 WL 744557, *12; Nadherny, 2004 WL 540281, *1. Because such a conclusion is unwarranted, Crawford's motion to summary judgment should be denied.

1.  This Court Should Disregard Crawford's Unfounded Attempts to Discredit Mr. Cummings and Defense Counsel

Notwithstanding that Crawford's own motion papers credit Cummings's expertise in the subject matter of accounting and finance,[6] Crawford recognizes that Mr. Cummings's Affidavit and the testimony contained in the Cummings errata sheet cannot be reconciled with the interpretation of EBITDA advanced by Crawford in this litigation. As a result, Crawford's advances a series of meritless arguments in an attempt to persuade this Court to ignore portions of Mr. Cummings's testimony inconvenient to Crawford's position.

---

[6]    "Richard Cummings is a Certified Public Accountant ("CPA") with over 20 years experience, who was also a partner in charge of the WP LLC 2001 audit which at Arthur Andersen." [Crawford's Memo, pg. 15].

First, Crawford argues that Mr. Cummings's April 8, 2005 Affidavit should be ignored under the so-called sham affidavit rule. Under the sham affidavit rule, "a party cannot create an issue of fact by an affidavit contradicting his *prior* deposition testimony." Hambleton Bros. Lumber Co. v. Balkin Enterprises, Inc., 397 F.3d 1217, 1225 (9th Cir. 2005) (emphasis supplied). As an initial matter, the sham affidavit rule is inapplicable because Mr. Cummings signed his Affidavit on April 8, 2005, several months prior to Crawford even noticing Mr. Cummings's November 29, 2005 deposition.[7] More importantly, however, the sham affidavit rule is inapplicable because nothing in Mr. Cummings's Affidavit directly contradicts Mr. Cummings's deposition testimony or accompanying errata sheet

Crawford also argues that the post-deposition errata sheet signed by Mr. Cummings on January 24, 2006 should be ignored because it was not signed until 34 days after Mr. Cummings's apparent receipt of his deposition transcript. Crawford argues that since Federal Rule 30(e) provides that errata sheets should be signed within 30 days of receipt of deposition transcripts, Mr. Cummings's errata sheet "should be stricken and not considered" because it was signed four days too late. Besides holding a non-party witness to an extraordinarily hyper-technical standard, Crawford offers no case law or statutory language in support of his argument. Neither Federal Rule 30(e) nor any case interpreting that Rule mandate striking an errata sheet submitted four days late.

---

[7]    In order to prop up this fatally flawed argument, Crawford has chosen to incorporate into his motion papers a series of scurrilous and unsupportable accusations against defense counsel concerning the alleged back-dating of the Cummings affidavit – ostensibly to circumvent the sham affidavit rule. [See, Crawford Memo, pgs. 34-36]. Crawford's own arguments, however, demonstrate the speciousness of his accusations. In footnote 13 to his memorandum (pg. 35) Crawford acknowledges that the final draft of the Cummings Affidavit was included in an April 7, 2005 email. Crawford's insinuation that the defendants conspired to convince Mr. Cummings to refrain from signing an affidavit (which was finalized in early April 2005) until after his November 29, 2005 deposition defies all logic.

C.    **The Defendants' Interpretation of EBITDA is Consistent with WPS's Historical Treatment and Definition of the Term**

As certified public accountants and experts on the topic, both Mr. Georgiou and Mr. Cummings have testified that, because EBITDA is a non-GAAP term with no compulsory accounting disclosure or calculation requirements, EBITDA is often "specifically defined by parties preparing or using [specific] financial information." [See, Cummings Errata Sheet, attached as Exhibit R to Crawford's Affidavit; Georgiou Aff., exh. 1, pg. 5]. Furthermore, in attempting to derive the definition of EBITDA intended by the parties when they executed the Employment Contract, the Court may consult extrinsic evidence so long as that evidence does not directly contradict the actual contractual language. See, Den Norske Bank AS, 75 F.3d at 52-53. Thus, in deriving the intent of Messrs. Crawford and Kulkarni in including the term "EBITDA" in Crawford's January 4, 2000 Employment Contract, the manner in which EBITDA had theretofore been defined by WPS is particularly compelling evidence of contractual intent.

WPS's Consolidated Financial Statements for the two fiscal years ending December 31, 2000 and January 1, 2000 (*i.e.*, for fiscal years 1999 and 2000; hereinafter the "1999/2000 Financial Statements) include a line item that reads "Earnings (loss) before interest expense, taxes, depreciation and amortization and extraordinary loss." [Kulkarni Aff., exh. 2, pg. 3]. This line corresponds to the definition of EBITDA in Note 6 to the 1999/2000 Financial Statements which states that WPS has defined "EBITDA to be the sum of its income, including interest income and other income, before interest expenses, minority interest and taxes plus depreciation and amortization." [Georgiou Aff., exh. 1, pg. 5; Kulkarni Aff., exh. 2, pg. 13]. This definition of EBITDA is

consistent with that which is presented in WPS's Consolidated Financial Statements for the previous three years. [Georgiou Aff., exh. 1, pgs. 5-6].

WPS recognized extraordinary losses in both 1999 and 2000, but in neither year was the extraordinary loss included in the aforementioned line item expressly defined by the company as representing EBITDA. [Georgiou Aff., exh. 1, pg. 6; Kulkarni Aff., exh. 2, pg. 3]. Simple logical consistency dictates that if WPS's extraordinary losses were not incorporated into the company's EBITDA in either 1999 or 2000, than the extraordinary gain WPS realized in 2001 (from the $10,169,839 in debt forgiveness) also cannot be incorporated into the company's definition of EBITDA.

Most compelling, however, is that Crawford's own Amended Complaint concedes the accuracy of the foregoing analysis. In paragraph 10 of his Amended Complaint (docket # 63), Crawford correctly states that WPS's EBITDA for 1999 was a "loss of $4.700 million." Thus, Crawford agrees with the defendants that for 1999, WPS's EBITDA is represented by the line item which reads "Earnings (loss) before interest expense, taxes, depreciation and amortization and extraordinary loss." But WPS suffered an extraordinary loss of $1,282,008 in 1999, and that loss is recorded on WPS 1999/2000 Financial Statements and *excluded* from EBITDA. Therefore, if one accepts the interpretation of EBITDA underpinning Crawford's entire unpaid Bonus claim – viz., that extraordinary gains and losses are properly included in EBITDA – then the 1999 extraordinary loss of $1,282,000 should have been included in WPS's 1999 EBITDA, resulting in an EBITDA loss for that year of $5,982,000, as opposed to the recorded EBITDA loss of $4,700,000. Crawford's Amended Complaint concedes, however, that WPS's 1999 EBITDA was, in fact, a loss of $4,700,000 – meaning that Crawford also

admits that WPS's extraordinary loss in 1999 <u>was properly excluded</u> from the company's EBITDA for that year.

In sum, Crawford concedes that an extraordinary loss was properly *excluded* from WPS's EBITDA in 1999, while at the same time arguing that an extraordinary gain should be *included* in WPS's EBITDA for 2001. Crawford's position is logically untenable.

The contractual interpretation of EBITDA posited by the defendants – *i.e.,* that EBITDA does not include extraordinary gains such as debt forgiveness – is completely consistent with the manner in which the company defined EBITDA prior to execution of Crawford's Employment Contract. That WPS and Deepak Kulkarni interpreted EBITDA on January 4, 2000 as being *exclusive* of extraordinary gains is demonstrated not only by the accounting treatment of the term in the company's earlier financial statements, but also by the admissions included in Crawford's Amended Complaint. Because the defendants' current interpretation of EBITDA is consistent with the definition of the term in use by the parties at the time Crawford's Employment Contract was executed, the defendants' interpretation of EBITDA cannot be characterized as unreasonable or irrational and, as a result, Crawford's motion for summary judgment should be denied. <u>See</u>, <u>Boston Five Cents Sav. Bank</u>, 768 F.2d at 8; <u>Singer</u>, 579 F.2d at 439-440; <u>Tropeano</u>, 2006 WL 744557, *12; <u>Nadherny</u>, 2004 WL 540281, *1.

    **D.**    <u>**The Defendants' Interpretation of EBITDA is Consistent with the Intention of the Parties as Reflected in the Express Language of Crawford's Employment Contract**</u>

Defendants have consistently maintained that when Messrs. Crawford and Kulkarni executed Crawford's Employment Contract, the parties intended that the

EBITDA component of the Bonus formula would be interpreted in conformity with the "generally prevailing meaning" of the term.  As was stated above, EBITDA is generally defined as a measurement of a company's "operating profitability before non-operating expenses."  [See, subheading A, *supra*].  The language of the Employment Contract confirms that it was the parties' intent that the effects of any non-operating transactions (such as an extraordinary gain from debt forgiveness) would be *excluded* from EBITDA. The Employment Contract expressly provides that "excluded from EBITDA will be any non-operating adjustments to reserves, to the extent that those adjustments affect EBITDA."  [Kulkarni Aff., exh. 1].

During his deposition, Kulkarni testified that his intention in agreeing to the preceding language (which Crawford drafted along with the rest of the Bonus provisions) was that "… if we have any extraordinary gains or losses they will be excluded." [Crawford's Memo, pg. 22].  Kulkarni also testified, however, that the preceding language was somewhat superfluous because – under the "generally prevailing meaning" of EBITDA – any non-operating transactions, whether adjustments to reserves or forgiveness of debt, would, by definition, never affect EBITDA:

> A.      … First of all, this, the statement "Excluded from EBITDA," which is the next statement, actually doesn't make any sense if you read it.   It says "Excluded from EBITDA would be any nonoperating adjustments to reserves."   Why would any nonoperating adjustments to reserves ever affect EBITDA in the first place?  They would affect the reserves, okay?  The intention of the parties here is excluded from EBITDA, okay, will be any nonoperating adjustments to EBITDA, okay, to the extent they were reflected in EBITDA.

[Kulkarni Aff. exh. 3, pgs. 199-200].

Kulkarni also testified that in agreeing to the Bonus formula provision of Crawford's Employment Contract, it was his "intention to have [Crawford] get 5 percent of the Company's cash flow … ignoring working capital changes … and ignoring extraordinary items." [Kulkarni Aff., exh. 3, pg. 198; Defendant's SOF ¶ 12]. By rewarding Crawford for an increase WPS's cash flow from operations, the Bonus was clearly intended to compensate Crawford for those sources of revenue under his control as WPS's Chief *Operations* Officer. [Defendant' SOF ¶ 12]. Because Kulkarni intended to base Crawford's Bonus on cash available after paying off necessary obligations, the inclusion in the Bonus calculation of an extraordinary gain from debt forgiveness, an indisputably non-cash item, would distort the value of Crawford's contribution which the Bonus formula was intended to represent. [Georgiou Aff., exh. 1, pg. 8]. Incorporating the $10,169,839 of Citizen's Bank debt forgiveness into the EBITDA component of Crawford's Bonus formula would not only run contrary to the intention of the parties and the "generally prevailing meaning" of EBITDA, but it would also create un unmerited windfall for Crawford based on a non-operating and non-cash item. See, National Fire Protection Association v. Int'l Code Council, Inc., No. 03-10848, 2006 WL 839501, *19 (D. Mass. Mar. 29, 2006) (Woodlock, J.) ("common sense is as much a part of contract interpretation as is the dictionary or the arsenal of canons.").

Accordingly, Crawford's motion for partial summary judgment should be denied for any one or more of the reasons set forth above.

## IV.  THIS COURT SHOULD EXERCISE ITS PROPER DISCRETION AND AWARD SUMMARY JUDGMENT TO THE DEFENDANTS ON COUNT I OF THE COMPLAINT

That debt forgiveness is never incorporated into EBITDA may beg the question: Why have defendants not moved for summary judgment dismissing Crawford's Bonus

claims on these grounds?  Defendants recognize, unlike Crawford apparently, that where a contractual term is susceptible to multiple reasonable interpretations (*i.e.*, an ambiguous term), a court may resolve that ambiguity on summary judgment only where one of the competing interpretations is so inherently unreasonable that no intelligent person would credit it.  Under this rigorous standard, the ultimate resolution of the parties' opposing positions on whether debt forgiveness is properly included in EBITDA should be left to the trier of fact.

However, should this Court recognize, after examining the parties' competing interpretations of EBITDA, that Crawford's definition of EBITDA (*i.e.,* as inclusive of extraordinary gains/debt forgiveness) is so at-odds with the universal definition of the term and the parties' contractual intent as to be considered unreasonable, this Court may, in its discretion, award *sua sponte* summary judgment to the defendants.  See, Bank, 145 F.3d at 431 (upholding *sua sponte* summary judgment issued by Judge Woodlock).

## **CONCLUSION**

For the foregoing reasons, plaintiff *pro se* Peter A. Crawford's Motion for Summary Judgment should be denied.

Dated: April 7, 2006

Respectfully submitted,

WOLVERINE, PROCTOR & SCHWARTZ, INC.,
STEVEN F. CHILINSKI, and
DEEPAK S. KULKARNI

By their attorneys,

/s/ Mark M. Whitney
Mark Whitney (BBO #637054)
Jeffrey D. Kuhn (BBO #662326)
MORGAN, BROWN & JOY, LLP
200 State Street
Boston, Massachusetts  02109
(617) 523-6666

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on April 7, 2006, I filed the foregoing document with the Clerk of the Court by using the ECF system and served an electronic copy upon the plaintiff. I further certify that I mailed the foregoing document and the notice of electronic filing to the pro se plaintiff, Peter A. Crawford, 23 Newcastle Drive, #11, Nashua, NH 03060, by U.S. mail, on April 7, 2006.

/s/ Jeffrey D. Kuhn_____
Jeffrey D. Kuhn, Esq.