**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**
_____

PETER A. CRAWFORD,

        Plaintiff,

                                           Civil Action No.
v.                                         05-cv-10078 (DPW)

WOLVERINE, PROCTOR & SCHWARTZ, INC.,
STEVEN F. CHILINSKI, and
DEEPAK S. KULKARNI,

        Defendants.

_____

## AFFIDAVIT OF DEEPAK S. KULKARNI

        DEEPAK S. KULKARNI, being duly sworn deposes and says:

        1.      I was the sole stockholder, Chief Executive Officer ("CEO") and Chairman of the Board of defendant Wolverine, Proctor & Schwartz, Inc. ("WPS") throughout 1999, 2000 and most of 2001.  I submit this Affidavit in opposition to plaintiff Peter A. Crawford's Motion for Summary Judgment.

        2.      In or about December 1999, I asked plaintiff *pro se* Peter A. Crawford to join WPS as the company's Chief Operating Officer ("COO").  Soon thereafter, I entered into employment contract negotiations with Crawford.

        3.      On January 4, 2000, Crawford and I signed Crawford's Employment Contract (the "Employment Contract"), which provided the terms of Crawford's employment with WPS. A copy of Crawford's January 4, 2000 Employment Contract is attached hereto as <u>Exhibit 1</u>.

        4.      Crawford's Employment Contract provided for an annual base salary of $150,000, stock options and an annual bonus (the "Bonus").

5.     Provision 4 of Crawford's Employment Contract, which was drafted completely by Crawford, contained the following formula by which any potential Bonus due Crawford was to be calculated:

$$BONUS = (EBITDA - CAPX - INT - TAXES) \times .05$$

6.     Attached hereto as <u>Exhibit 2</u> is a true copy of the WPS Consolidated Financial Statements as of December 31, 2000 and January 1, 2000. This documents was prepared by WPS's auditors, Arthur Andersen LLP.

7.     I have reviewed the Affidavit and Memorandum of Law submitted by Crawford in support of his current motion for summary judgment. Crawford's Affidavit contains a number of statements regarding things I am alleged to have done and said. Not only are most of these accusations patently false, but they also appear to have little or no bearing on this case.

8.     For instance, in paragraph 27 of his Affidavit and in paragraph 7 of this Statement of Undisputed Material Facts, Crawford alleges that in late 2001 I "planned to permit the company to be driven into receivership, and then reacquire it inexpensively." This statement is false. Whether or not to have a receiver appointed was the decision of Citizen's Bank as WPS's lender. The allegation that I wanted I ever wanted or desired a receiver be appointed for WPS is absurd and has no basis in reality.

9.     Annexed hereto as <u>Exhibit 3</u> are true and correct copies of relevant excerpts of the transcripts from the second day of deposition testimony which I gave on December 7, 2005.


Signed under the penalties and pains of perjury this 7th day of April 2006.


/s/ Deepak S. Kulkarni_____
DEEPAK S. KULKARNI

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that on April 7, 2006, I filed the foregoing document with the Clerk of the Court by using the ECF system. I further certify that I mailed the foregoing document and the notice of electronic filing to the pro se plaintiff, Peter A. Crawford, 23 Newcastle Dive, #11, Nashua, NH 03060, by U.S. mail, on April 7, 2006.

<u>/s/ Jeffrey D. Kuhn</u>
Jeffrey D. Kuhn

# KULKARNI Exhibit 1

# April 7, 2006





January 4, 2000


Mr. Peter A. Crawford
23 New Castle Drive, Apt. 11
Nashua, NH 03060

Dear Peter:

We are pleased to offer you the position of Chief Operating Officer for Wolverine, Proctor & Schwartz, Inc. (the "Company"). The following will be the terms of your employment.

1.  You will report to the Company's Chief Executive Officer and be based at the Company's Merrimac, Massachusetts headquarters.

2.  Your employment will commence on December 30, 1999.  You will be an employee at will.

3.  You will be paid a base salary of $150,000 per year, to be paid ratably on each of the Company's regular paydays.

4.  You will receive a bonus for each year, commencing 2000, which will calculated as follows:

$$BONUS = (EBITDA - CAPX - INT - TAXES) \times .05$$

For purposes of this calculation, the above terms will be calculated based upon the annual consolidated financial results of the Company, in accordance with generally accepted accounting principles, and have the following meanings:

EBITDA means the earnings before any interest, taxes or deductions for depreciation or amortization.  Excluded from EBITDA will be any non-operating adjustments to reserves, to the extent that those adjustments affect EBITDA, or any operating expenses charged against reserves.

CAPX means capital expenditures, except that portion which the Company has expensed in arriving at EBITDA.

‡



Wolverine Proctor & Schwartz, Inc.

INT means interest expense, whether or not paid, net of interest income.    TAXES means imputed taxes on the income of the Company, computed as follows:

(EBITDA + BOOKDIF  - DEPR - INT) x TAXRATE

If the calculation of TAXES yields a negative number, TAXES will be deemed to be zero. No amounts will be carried backward or forward for TAXES.

BOOKDIF means those adjustments, positive or negative, to make EBITDA equal to those earnings before interest, taxes, depreciation and amortization, which are taxable.

DEPR means depreciation, amortization and capital expenditures which are deductible for tax purposes and which have not previously been deducted in arriving at EBITDA.

TAXRATE means (for the year for which the computation is being performed) the maximum U.S. federal income tax rate  applicable to individuals with respect to income attributable to Sub-chapter S of the Internal Revenue Code, plus the maximum Massachusetts tax rate on such income net of the federal tax benefit received, if any, with respect to such Massachusetts tax rate (currently, 1 minus the above-mentioned federal tax rate), plus that portion of federal FICA tax which applies on a marginal basis at all income levels (i.e. Medicare tax or other similar FICA taxes not subject to an annual cap) plus any other taxes on income applicable on a marginal basis to all income levels, which may be later introduced or may apply from time to time.  If the calculation of TAXRATE requires clarification, Arthur Andersen & Company or such other accounting firm nominated to prepare the individual tax returns of the sole shareholder of the Company shall be the binding arbiter of the TAXRATE.

The BONUS calculation will be performed annually, based upon the consolidated audited financial results of the Company.  The bonus will be due upon completion of the audit of each year's results, or if no such audit is performed, by April 15.  In the event that you leave the Company involuntarily, other than for cause (defined as including only dishonesty, disloyalty, conviction for a felony, misappropriation of funds, habitual insobriety, substance abuse, willful misconduct or gross negligence in the performance of your duties), prior to the end of any calendar year, the bonus will be prorated for that fiscal year based upon the number of months, or portions of months, during which you were employed, divided by 12, and the result multiplied by the calculated BONUS for that year.  For any year in which you were employed by the Company on December 31 you will receive the full bonus without proration.  In the event that you leave the company for cause, as defined above, no BONUS will be paid for that year.  In the event that any bonus calculation yields a negative number, no amount will be due back from you, and no negative calculation can be carried forward or backward from one year to another.   If the calculation of BONUS requires clarification, Arthur Andersen & Company or such other accounting firm nominated to prepare the individual tax returns of the sole shareholder of the Company shall be the binding arbiter of the BONUS.

PAC 0002

5.  You will receive non qualified stock options representing 5 percent of the fully diluted number of common shares (after issuance of your options) of the Company as of January 1, 2000 (the "Option"). The terms of the Option will be as follows:

    a.  The Option will fully vest upon the completion of your 24th month of employment with the Company, or upon a change in control, as defined below, whichever occurs first.

    b.  The amount per share which you would have to pay upon exercising the Option (the "Strike Price") will be the fair market value per share of the underlying stock as of January 1, 2000 as determined by an appraisal conducted by the Company prior to June 30, 2000, or as otherwise agreed.

    c.  Once vested, the Option shall remain in effect regardless of whether or not you remain employed by the Company. However, the Company shall have the right to call your Option by informing you in writing of its intent to exercise the call within ten days after your separation from the Company for any reason or under circumstances qualifying as a Change in Control (defined under d. below). This call shall be exercised by paying you (for each share underlying your Option), the difference, if any, between the value, as of the end of the fiscal quarter immediately prior to the separation date, of the underlying stock represented by your Option, less the Strike Price, computed in accordance with generally accepted principles of valuation (without considering any discount for the minority nature of the stock underlying the Option) (the "Call Payment"), using the procedure detailed in 6. below.

    d.  The Option may be exercised only upon or after a change in control of the Company, defined as any event which causes Deepak Kulkarni voluntarily to control less than 50 percent of the then-existing common shares of the Company (other than for estate planning purposes and other than in circumstances involving a restructuring of the Company's indebtedness), or an event whereby the Company sells substantially all of its assets other than cash and marketable securities (a "Change in Control"). The Company agrees to give you ten days prior written notice of any Change in Control so as to enable you to decide whether or not to exercise your Option and for you individually to secure financing to do so, if needed. Notwithstanding the foregoing, the Option may not be exercised under circumstances which could cause the Company to lose its status as a Sub-Chapter S corporation.

    e.  The Strike Price and the number of shares on which you have the Option will be subject to the customary proportional adjustments in the event of a stock split or stock dividend (defined as an event which causes additional shares to be issued, without new investment and without affecting the percentage ownership of any shareholder). No adjustment will be made for dividends

PAC 0003

Wolverine Proctor & Schwartz, Inc.

paid in cash. The Option will be subject to dilution with respect to any shares, options, warrants or other similar instruments granted to other employees of the Company or to sources of capital in exchange for valuable consideration received.

   f.   You will enter into a Stockholder Agreement (in the form attached) ceding control of the shares, other than after a public offering of the Company's shares, or other than in circumstances qualifying as a Change in Control.

6.  The following procedure will be utilized in the event your Option is called pursuant to 5c. above, and you and the Company are unable to agree on the fair market value of the underlying shares:

   a.   Based upon the average of appraisals conducted by two independent appraisers qualified in business valuations; one appointed and paid for by the Company, and the other appointed and paid for by you. However, in the event that the ratio of the greater of the appraisals to the lesser exceeds 1.05, the two appraisers shall jointly appoint a third appraiser, the reasonable cost of whom will be equally borne by you and the Company. The valuation arrived at by the third appraiser shall be binding unless the ratio of the third appraisal to the average of the first two is greater than 1.15 or less than .87. Under such circumstances, the highest and lowest value shall be discarded, and the remaining value shall be deemed to be the appraised value.

   b.   In the event that an appraisal is required, the Company shall provide such financial statements, financial projections, and other information as any appraiser may reasonably require in order to complete his appraisal; and any statements, projections or other information provided to one appraiser shall be provided to all. The Company may elect to require all appraisers appointed to sign a customary confidentiality agreement.

7.  In the event that the Company elects to call your Option, it may choose either to make the Call Payment in a lump sum, or to immediately issue you an unsecured promissory note. In such event, the promissory note shall provide for five equal principal repayments, paid annually over five years, commencing upon the first anniversary of its issuance. In addition, simple interest of 8 percent per annum of the average principal balance outstanding during the prior year shall be paid annually commencing upon the first anniversary of the note's issuance. Payments of interest or principal under such a note, and all of its terms, will be subordinated, in all respects, to the Company's then outstanding indebtedness, plus any refinancings thereof in any amounts, on terms acceptable to the Company and its then lenders or sources of capital. The Company may cancel and reissue its promissory note to you to comply with any restrictions or subordination arrangements during the life of the promissory note, and you agree to execute an intercreditor agreement so providing, or if you fail to do so within ten business

PAC 0004

Wolverine Proctor & Schwartz, Inc.

days of written request, the Company may execute such an agreement on your behalf.    In the event that the Company becomes insolvent or is the debtor in a bankruptcy case which is not dismissed, the remaining principal balance shall become immediately due and payable.

8. In addition to the above-mentioned compensation, you will be eligible for the normal fringe benefits of the Company, including but not limited to medical benefits, 401(k), vacation, and similar benefits.    You will also receive reimbursement of business and travel  expenses incurred in connection with your employment in accordance with normal policies and procedures of the Company.

9. You may elect to join the Company's Board of Directors at any time while you are employed by the Company.  If you do so, the Company will indemnify you in connection with your duties as a director and officer of the Company, on terms at least as favorable to you as the most favorable ones enjoyed by any other director or officer.

To indicate your acceptance of these terms, please countersign below.

Sincerely,

Deepak S. Kulkarni
President and CEO

Accepted by:

_____
Peter A. Crawford

_____
Date                January 4, 2000

PAC 0005

# KULKARNI Exhibit 2

# April 7, 2006

$2^{000}$



WOLVERINE PROCTOR & SCHWARTZ, INC.

Consolidated Financial Statements
as of December 31, 2000 and January 1, 2000
Together with Auditors' Report

**ARTHUR ANDERSEN**

**Report of Independent Public Accountants**

To the Board of Directors of
Wolverine Proctor & Schwartz, Inc.:

We have audited the accompanying consolidated balance sheets of Wolverine Proctor & Schwartz, Inc. (a Delaware corporation) and subsidiaries as of December 31, 2000 and January 1, 2000, and the related consolidated statements of operations and comprehensive loss, stockholder deficit and cash flows for the years then ended. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with auditing standards generally accepted in the United States. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Wolverine Proctor & Schwartz, Inc. and subsidiaries as of December 31, 2000 and January 1, 2000, and the results of their operations and their cash flows for the years then ended, in conformity with accounting principles generally accepted in the United States.

The accompanying financial statements have been prepared assuming that the Company will continue as a going concern. As discussed in Note 1 to the financial statements, the Company has incurred losses from operations during 1999 primarily in connection with a restructuring of its business. These matters raise substantial doubt about its ability to continue as a going concern. Management's plans in regard to these matters are also described in Note 1. The accompanying financial statements do not include any adjustments that might result from the outcome of this uncertainty.

*Arthur Andersen LLP*

Boston, Massachusetts
June 29, 2001

1
16321.doc

**WOLVERINE PROCTOR & SCHWARTZ, INC.**

Consolidated Balance Sheets
December 31, 2000 and January 1, 2000

| ASSETS | 2000 | 1999 |
|---|---:|---:|
| **Current Assets:** | | |
| Cash and cash equivalents | $     254,331 | $     770,235 |
| Restricted cash | - | 1,200,000 |
| Accounts receivable, net of allowance for doubtful accounts of $1,070,803 and $1,051,401, respectively | 5,414,775 | 8,976,305 |
| Costs and estimated earnings in excess of billings on uncompleted contracts | 2,915,989 | 2,352,396 |
| Inventories | 3,377,333 | 4,399,757 |
| Prepaid expenses and other | 1,316,383 | 1,206,770 |
| Total current assets | 13,278,811 | 18,907,463 |
| Property and Equipment, at cost, less accumulated depreciation | 6,510,812 | 7,909,605 |
| Goodwill | 11,632,662 | 12,925,626 |
| Other Assets | 202,042 | 434,021 |
| | $  31,624,327 | $  40,176,715 |
| **LIABILITIES AND STOCKHOLDER DEFICIT** | | |
| **Current Liabilities:** | | |
| Revolving loan payable | $    4,816,200 | $    5,009,805 |
| Current portion of long-term obligations | 14,500,000 | 2,000,000 |
| Due to affiliate | 1,000,000 | - |
| Accounts payable | 7,273,784 | 9,318,238 |
| Billings in excess of costs and estimated earnings on uncompleted contracts | 2,048,846 | 121,458 |
| Accrued expenses and other | 6,177,640 | 10,198,248 |
| Customer deposits | 3,411,649 | 2,778,590 |
| Total current liabilities | 39,228,129 | 29,426,339 |
| Commitments and Contingencies (Note 11) | | |
| Long-term Obligations, less current portion | - | 12,500,000 |
| Other Long-term Liabilities | 4,697,634 | 5,631,415 |
| Minority Interest | 158,509 | 66,096 |
| **Stockholder Deficit:** | | |
| Common stock, $0.01 par value— Authorized—150,000 shares Issued and outstanding—655 shares in 2000 and 1999 | 7 | 7 |
| Additional paid-in capital | 1,493 | 1,493 |
| Put warrants | 183,195 | 183,195 |
| Retained deficit | (12,864,872) | (7,814,304) |
| Accumulated other comprehensive income | 220,232 | 182,474 |
| Total stockholder deficit | (12,459,945) | (7,447,135) |
| | $  31,624,327 | $  40,176,715 |

*The accompanying notes are an integral part of these consolidated financial statements.*

2

18321.doc

WOLVERINE PROCTOR & SCHWARTZ, INC.

Consolidated Statements of Operations and Comprehensive Loss
for the Years Ended December 31, 2000 and January 1, 2000

| | 2000 | 1999 |
|---|---|---|
| Sales | $ 43,866,391 | $ 64,028,783 |
| Cost of Sales | 31,980,286 | 52,431,132 |
| Gross profit, excluding depreciation expense | 11,886,105 | 11,597,651 |
| Selling, General and Administrative Expense | 11,662,740 | 15,208,871 |
| Restructuring Expense | - | 1,589,039 |
| Interest and Other Income | (130,580) | (500,186) |
| Earnings (loss) before interest expense, taxes, depreciation and amortization and extraordinary loss | 354,045 | (4,700,073) |
| Other Expenses: | | |
| Interest expense | 1,889,576 | 1,726,265 |
| Depreciation | 1,817,432 | 2,133,092 |
| Amortization | 1,519,624 | 1,373,205 |
| Minority interest expense | 92,413 | 164,490 |
| Loss before provision for income taxes and extraordinary loss | (4,965,000) | (10,097,125) |
| Provision for Income Taxes | 45,568 | 376,750 |
| Net loss before extraordinary loss | (5,010,568) | (10,473,875) |
| Extraordinary loss | - | 1,282,006 |
| Net loss | (5,010,568) | (11,755,881) |
| Other Comprehensive Income, net of tax | | |
| Foreign currency translation adjustments | 37,758 | 27,213 |
| Comprehensive loss | $ (4,972,810) | $ (11,728,668) |

*The accompanying notes are an integral part of these consolidated financial statements.*

**WOLVERINE PROCTOR & SCHWARTZ, INC.**

Consolidated Statements of Stockholder Deficit
for the Years Ended December 31, 2000 and January 1, 2000

| | Common Stock | | Additional Paid-In Capital | Put Warrants | Retained Earnings (Deficit) | Accumulated Other Comprehensive Income | Total |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | Number of Shares | Par Value | | | | | |
| Balance, December 26, 1998 | 655 | $ 7 | $ 1,493 | $ 4,665,000 | 106,622 | $ 155,231 | $ 4,928,383 |
| Net loss | - | - | - | - | (11,765,881) | - | (11,765,881) |
| Decrease in warrant estimated value | - | - | - | (4,481,805) | 4,481,805 | - | - |
| Distributions accrued and paid | - | - | - | - | (646,550) | - | (646,850) |
| Effect of cumulative translation adjustment | - | - | - | - | - | 27,213 | 27,213 |
| Balance, January 1, 2000 | 655 | 7 | 1,493 | 183,195 | (7,814,304) | 182,474 | (7,447,135) |
| Net loss | - | - | - | - | (5,010,568) | - | (5,010,568) |
| Distributions accrued and paid | - | - | - | - | (40,000) | - | (40,000) |
| Effect of cumulative translation adjustment | - | - | - | - | - | 37,758 | 37,758 |
| Balance, December 31, 2000 | 655 | $ 7 | $ 1,493 | $ 183,195 | $ (12,864,872) | $ 220,232 | $ (12,459,945) |

*The accompanying notes are an integral part of these consolidated financial statements.*

WOLVERINE PROCTOR & SCHWARTZ, INC.

Consolidated Statements of Cash Flows
for the Years Ended December 31, 2000 and January 1, 2000

| | 2000 | 1999 |
|---|---:|---:|
| **Cash Flows from Operating Activities:** | | |
| Net loss | $ (5,010,568) | $ (11,755,881) |
| Adjustments to reconcile net loss to net cash (used in) provided by operating activities, net of acquisitions-- | | |
| Depreciation, amortization and accretion | 3,337,056 | 3,681,277 |
| Loss on disposal of assets | - | 104,454 |
| Provision for bad debts | 62,546 | 587,930 |
| Minority interest | 92,413 | 164,490 |
| Restructuring | - | 1,589,039 |
| Changes in assets and liabilities, net of acquisition and disposition-- | | |
| Accounts receivable | 3,498,984 | 2,792,385 |
| Costs and estimated earnings in excess of billings on uncompleted contracts | (563,593) | 189,791 |
| Inventories | 824,872 | 2,143,721 |
| Prepaid expenses and other | (109,079) | (413,635) |
| Accounts payable | (2,044,444) | 865,788 |
| Billings in excess of costs and estimated earnings on uncompleted contracts | 1,927,388 | (202,433) |
| Accrued expenses and other liabilities | (4,314,389) | 1,470,117 |
| Customer deposits | 633,059 | (586,046) |
| Net cash (used in) provided by operating activities | (1,665,755) | 630,998 |
| **Cash Flows from Investing Activities:** | | |
| Purchase of property and equipment | (214,302) | (916,510) |
| Proceeds from sale of fixed assets | - | 31,485 |
| Net cash used in investing activities | (214,302) | (885,025) |
| **Cash Flows from Financing Activities:** | | |
| Proceeds from long-term borrowings | - | 4,659,805 |
| Proceeds from affiliate | 1,000,000 | - |
| Payments of long-term obligations and notes payable | (193,605) | (2,650,000) |
| Dividends paid for taxes | (680,000) | (646,850) |
| Net cash provided by financing activities | 126,395 | 1,362,955 |
| Effect of Exchange Rates on Cash and Cash Equivalents | 37,758 | 27,035 |
| Net (Decrease) Increase in Cash and Cash Equivalents | (1,715,904) | 1,135,963 |
| Cash and Cash Equivalents, beginning of year | 1,970,235 | 834,272 |
| Cash and Cash Equivalents, end of year | $ 254,331 | $ 1,970,235 |
| **Supplemental Disclosure of Cash Flow Information:** | | |
| Cash paid during the period for-- | | |
| Interest | $ 1,801,092 | $ 1,725,116 |
| Income taxes | $ 588,234 | $ 354,849 |

*The accompanying notes are an integral part of these consolidated financial statements.*

5

18321.doc

WOLVERINE PROCTOR & SCHWARTZ, INC.

Notes to Consolidated Financial Statements
December 31, 2000

**(1)    THE COMPANY**

Wolverine Proctor & Schwartz, Inc. (the Company) designs, manufactures and sells commercial ovens, web-handling and associated equipment used in the food processing, coating, laminating, chemical, waste management and plastic industries. The Company manufactures these products under contracts with its customers. The Company's divisions include Wolverine, located in Merrimac, Massachusetts; Proctor & Schwartz (P&S), located in Lexington, North Carolina, and Horsham, Pennsylvania and Wolverine Proctor & Schwartz (WP&S), located in Glasgow, Scotland. P&S and WP&S were acquired by the Company in 1994.

Through its American Tool and Machine Company (ATM) division, the Company also engages in the manufacturing and repair of certain components, primarily for its paper industry customers.

The Company also owns a 49% interest in Friel Engineering Limited (Friel), a U.K. manufacturer of industrial drying machinery. The remaining 51% of Friel is owned by the president and sole stockholder of the Company. Accordingly, the operations of Friel are included in the accompanying consolidated financial statements. During 1999, the Company sold the assets of its pollution control line of business for approximately $1.9 million. The sale resulted in a gain of approximately $490,000, which is included in other income.

The Company entered into a Loan Amendment and Funding Agreement dated September 29, 2000 with Citizen's Bank of Massachusetts (Citizen's). The Company has incurred a significant loss in 1999, primarily in connection with a restructuring of its business. The Company has made required principal and interest payments to date; however, the agreement expires on September 30, 2001, on which date all outstanding debt is due. As a result, all outstanding debt has been classified as current in the consolidated balance sheet as of December 31, 2000. The Company does not have the ability to repay all of the outstanding debt without obtaining additional financing. Management is currently seeking additional financing. In the absence of such financing, there is substantial doubt concerning the Company's ability to continue as a going concern. The accompanying consolidated financial statements do not include any adjustments that might result if the Company is unable to continue as a going concern.

**(2)    SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES**

The accompanying consolidated financial statements include the accounts of the Company and its divisions and the accounts of Friel. The net assets of Friel not owned by the Company are presented as minority interest. All material intercompany transactions have been eliminated in consolidation.

**(a)    Use of Estimates**

The preparation of financial statements requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities as of the date of the financial statements and the reported amounts of revenues and expenses during the reporting periods. Actual results could differ from those estimates.

6

18321.doc

WOLVERINE PROCTOR & SCHWARTZ, INC.

Notes to Consolidated Financial Statements
December 31, 2000

(b) Reclassifications

Certain amounts in 1999 have been reclassified to conform to the
presentation in the 2000 financial statements.

(c) Cash and Cash Equivalents

Cash and cash equivalents primarily consists of overnight cash investments
in Nassau securities, which are swept daily by the Company's bank. The
Company values these temporary cash investments at cost, which
approximates market. Included in cash and cash equivalents at January 1,
2000 is $1.2 million, which had been restricted by the bank. The restricted
cash represented a portion of the proceeds associated with the sale of the
Pollution Control division in 1999. In September 2000, the $1.2 million was
released by the Company's bank and applied against the outstanding balance
of the Company's Revolving Credit Agreement (Revolver) (see Note 6).

(d) Inventories

Inventories at December 31, 2000 and January 1, 2000 consisted of the
following:

|  | 2000 | 1999 |
|---|---|---|
| Raw materials | $ 1,175,130 | $ 1,261,795 |
| Work-in-process | 2,186,688 | 2,747,421 |
| Finished goods | 15,515 | 390,541 |
|  | $ 3,377,333 | $ 4,399,757 |

Inventories are stated at the lower of cost (first-in, first-out method) or market.
Raw materials inventory consists of sheet steel, piping, wire, fasteners and
other items used in the manufacturing process. Work-in-process inventory
represents materials released into production and labor and overhead applied
on a job-order cost basis. Finished goods inventory includes goods awaiting
shipment to fulfill open sales orders and component parts available for sale to
customers for repairs or modifications to existing equipment.

(e) Property and Equipment

Property and equipment are recorded at cost. Additions and improvements
are capitalized, and ordinary repairs and maintenance are charged to
expense as incurred.

The Company provides for depreciation on property and equipment on the
straight-line basis over their estimated useful lives, ranging from three to 50
years. During 1999, the Company accelerated depreciation (amounting to
approximately $350,000) of certain assets at one of its manufacturing plants
due to a change in the estimated useful lives of those assets (see Note 8).
The Company recorded depreciation expense of approximately $1,817,000
and $2,133,000 in 2000 and 1999 respectively. Depreciation expense

WOLVERINE PROCTOR & SCHWARTZ, INC.

Notes to Consolidated Financial Statements
December 31, 2000

associated with costs of sales was $1,273, 000 and $1,494,000 in 2000 and 1999. Depreciation expense associated with selling, general and administrative expenses was $544,000 and $639,000 in 2000 and 1999, respectively.

(f) Goodwill

The unallocated excess of purchase cost over net assets acquired in acquisitions has been amortized on the straight-line basis over 40 years. Effective January 2, 2000, the Company revised its estimate of the remaining useful life of goodwill to 10 years resulting in an increase on amortization of approximately $921,000 from 1999 to 2000. The total goodwill amortization was approximately $1,293,000 and $372,000 in 2000 and 1999 respectively. The Company regularly assesses the realizability of goodwill in accordance with Statement of Financial Accounting Standards (SFAS) No. 121, *Accounting for the Impairment of Long-Lived Assets and for Long-Lived Assets To Be Disposed Of*, and has concluded that no impairment has occurred.

(g) Other Assets

Included in other assets at December 31, 2000 and January 1, 2000, are the following:

|  | 2000 | 1999 |
|---|---|---|
| Deferred financing costs | $    396,036 | $    439,241 |
| Other | 32,666 | 37,984 |
|  | 428,702 | 477,225 |
| Less—Accumulated amortization charged in the accompanying consolidated statements of income and comprehensive income | 226,660 | 43,204 |
|  | $    202,042 | $    434,021 |

Deferred financing costs represent costs associated with the Company's debt obligations, which are being amortized on the straight-line basis over the life of the respective agreements. Unamortized finance costs of approximately $157,000 were written-off during 1999 as a result of the refinancing (see Note 6).

(h) Income Taxes

The Company has elected to be treated as a small business corporation (a Subchapter S corporation) under the Internal Revenue Code and state tax law. Accordingly, no provision for federal income taxes is reflected in the Company's accompanying consolidated financial statements, since the stockholder, not the Company, is liable for federal income taxes on corporate

8

18321.doc

WOLVERINE PROCTOR & SCHWARTZ, INC.

Notes to Consolidated Financial Statements
December 31, 2000

income. The Company's WP&S branch is subject to corporate income taxes in the United Kingdom.

The Company records certain state and foreign income taxes in accordance with SFAS No. 109, *Accounting for Income Taxes*. Under SFAS No. 109, deferred tax assets and liabilities are recognized for the expected future tax consequences of events that have been included in the consolidated financial statements or tax returns. The amount of deferred tax assets and liabilities is based on the differences between the financial statement and tax bases of assets and liabilities using currently enacted tax rates. Valuation allowances are established when necessary to reduce deferred tax assets to the amount that is realizable based upon the realization criteria defined in SFAS 109.

(i)    Revenue Recognition

Revenue from sales contracts for machinery is recognized under the percentage-of-completion method, measured by the percentage ratio of either costs incurred to date to the estimated total costs of the contract or labor hours incurred to date to the estimated total labor hours of the contract. When an ultimate loss is indicated on a contract, the entire estimated loss is recorded. Revenue from sales of machine parts and repair services is recognized when the parts are shipped or the services are rendered. The Company provides for a reserve for its estimate of warranty costs at the time of shipment.

(j)    Comprehensive Income

In 1998, the Company adopted SFAS No. 130, *Reporting Comprehensive Income*, which establishes standards for the reporting and display of comprehensive income and other comprehensive income items. In general, comprehensive income combines net income and other changes in equity from nonowner sources during the year. At year-end 2000 and 1999, the balance of accumulated other comprehensive loss represents the Company's cumulative translation adjustment.

(3)    CONTRACTS

Costs, estimated earnings and related billings on uncompleted contracts, net, at December 31, 2000 and January 1, 2000, are as follows:

|  | 2000 | 1999 |
|---|---|---|
| Cost incurred to date | $  7,900,815 | $   8,728,276 |
| Estimated earnings | 2,771,737 | 3,353,109 |
|  | 10,672,552 | 12,081,385 |
| Less—Billings to date | 9,805,409 | 9,850,447 |
|  | $     867,143 | $   2,230,938 |

9.
18321.doc

**WOLVERINE PROCTOR & SCHWARTZ, INC.**

Notes to Consolidated Financial Statements
December 31, 2000

Included in the accompanying consolidated balance sheets at December 31, 2000 and January 1, 2000 are the following:

|  | 2000 | 1999 |
|---|---|---|
| Costs and estimated earnings in excess of billings on uncompleted contracts | $ 2,815,989 | $ 2,352,396 |
| Billings in excess of costs and estimated earnings on uncompleted contracts | (2,048,846) | (121,458) |
|  | $ 867,143 | $ 2,230,938 |

### (4) INCOME TAXES

The Company's state income tax provision consists of corporate-level state income taxes that are levied against the Company as a Subchapter S corporation. Payments to the sole stockholder to fund the personal tax liabilities as a result of the Company's taxable income are recorded as distributions in the accompanying consolidated statements of stockholder's equity.

In 2000 and 1999, the Company's effective state tax rate differs from the statutory rate of 30% primarily because of state tax apportionment relief, goodwill related to the purchase of P&S in 1994 and the corporate taxes owed in the United Kingdom.

A valuation allowance has been established to fully reserve against the tax benefits associated with certain temporary differences and operating loss carry forwards as it cannot be determined that it is more likely than not that these deferred tax assets will be realized.

WOLVERINE PROCTOR & SCHWARTZ, INC.

Notes to Consolidated Financial Statements
December 31, 2000

(5)    PROPERTY AND EQUIPMENT

Property and equipment at December 31, 2000 and January 1, 2000 consists of the following:

| | Useful Life | 2000 | 1999 |
|---|---|---|---|
| Buildings and improvements | 31–50 years | $ 3,884,108 | $ 3,825,108 |
| Office equipment and motor vehicles | 3–10 years | 2,321,733 | 2,324,627 |
| Machinery and equipment | 7–10 years | 6,552,056 | 6,340,605 |
| Laboratory and computer equipment | 7–10 years | 2,684,953 | 2,560,659 |
| Leasehold interest | Life of lease | 1,437,282 | 1,437,282 |
| | | 16,900,132 | 16,488,281 |
| Less—Accumulated depreciation | | 11,746,167 | 9,935,523 |
| | | 5,153,965 | 6,552,758 |
| Land | | 1,356,847 | 1,356,847 |
| | | $ 6,510,812 | $ 7,909,605 |

(6)    LONG-TERM OBLIGATIONS

Long-term obligations at December 31, 2000 and January 1, 2000 consists of the following:

| | 2000 | 1999 |
|---|---|---|
| Revolving loan payable | $ 4,816,200 | $ 5,009,805 |
| Due to affiliate | 1,000,000 | - |
| Senior notes payable | 14,500,000 | 14,500,000 |
| | 20,316,200 | 19,509,805 |
| Less—Current portion | 20,316,200 | 7,009,805 |
| | $        - | $ 12,500,000 |

In February 1999, the Company entered into a Loan and Security agreement with Citizen's for the purpose of refinancing the terms of its existing credit arrangements and to provide for working capital needs of the Company. Under the agreement, the Company entered into two term loans for $10,000,000 (Term A) and $6,000,000 (Term B), respectively. Both were originally payable in quarterly installments, maturing on February 28, 2004. Interest for the Term A loan was due quarterly at the greater of 7.5% or the aggregate of the Five-Year U.S. Treasury Yield plus 350 basis points. The interest rate for the Term B loan was due quarterly at 10%.

11 -

18321.doc

WOLVERINE PROCTOR & SCHWARTZ, INC.

Notes to Consolidated Financial Statements
December 31, 2000

Additionally, with the agreement, the Company entered into the Revolver. The Company could borrow up to $8,000,000. The borrowing base under the Revolver was reduced by the total amount outstanding of all letters of credit. The amount of letters of credit was limited to $4,000,000. Outstanding letters of credit at December 31, 2000 and January 1, 2000 were $1,547,750 and $2,053,892, respectively.

The proceeds from the refinancing were used to pay off all existing debt. The refinancing resulted in an extraordinary loss of $1,282,006 in 1999 primarily due to the write-off of unamortized debt discount and deferred financing fees.

In September 2000, the Company and Citizen's entered into a Loan Amendment and Funding Agreement (Amendment) that amended the terms of the Loan and Security Agreement dated February 24, 1999 and provided additional funding to the Company. The Amendment provided for the release of $1,200,000 of restricted cash from the sale of the Pollution Control division, held by Citizens, and a capital contribution, by the sole shareholder or affiliate of the shareholder, of $1,000,000 to be applied against the outstanding principal balance of the Revolver. The funds may be reborrowed by the Company immediately and until the occurrence of a termination event, as defined.

The Amendment waived all existing events of default at December 31, 1999 under the Loan and Security Agreement that existed and confirmed the revolving credit default and term loan default interest fees totaling $300,700, a waiver fee minimum of $200,000 and legal fees of $55,000, for various defaults under the loan agreements. Principal payments towards the Term Loans of not less than $500,000 are required on June 1, 2001 and September 1, 2001. The Amendment also revised the revolving credit and term loan maturity dates to September 30, 2001, amended the borrowing base availability calculation and reduced the limit on letters of credit to $2,000,000 (excluding the Cardwell Letter of Credit).

In September 2000, the Company borrowed $1,000,000 from MAWLAW 492 Ltd. (MAWLAW 492), an entity owned by the sole shareholder of the Company, in return for a promissory note. The note bears interest at 15% per annum and is payable on demand if an "event of default" occurs, as defined. The note is subordinate to all indebtedness owed to Citizens and may be prepaid at any time, and from time to time, in whole or in part, without penalty or premium.

Simultaneously with the issuance of the promissory note, the Company issued MAWLAW 492 a warrant to purchase the number of fully paid and nonassessable shares of the Company's common stock equivalent to 34% of (i) the number of shares of common stock outstanding at the time of such exercise (not including shares owned or held by or for the account of the Company) plus (ii) the number of shares of common stock to which all Convertible Securities, as defined, of the Company then outstanding would then be convertible plus (iii) the number of shares of common stock which would then be issuable upon exercise of all Stock Purchase Rights, as defined, then outstanding. The warrant was issued for no additional consideration. The Company has not assigned any portion of the debt proceeds to the warrant as the amount would be immaterial.

Certain of the Company's financing arrangements contain restrictions, which, among other things, require maintenance of certain financial ratios. Among the

12

**WOLVERINE PROCTOR & SCHWARTZ, INC.**

Notes to Consolidated Financial Statements
December 31, 2000

Company's financial ratio tests is a ratio based upon earnings before interest, taxes, depreciation and amortization (EBITDA). The Company has defined EBITDA to be the sum of its income, including interest income and other income, before interest expenses, minority interest and taxes plus depreciation and amortization. Compliance with each of the aforementioned covenants shall be calculated on a six-month rolling average basis, commencing with the six months ending March 31, 2001. The Company is in compliance with the terms of the amendment.

(7)  **EMPLOYEE BENEFIT PLANS**

The Wolverine and the P&S divisions have 401(k) contribution plans, covering substantially all of their employees, in which participants may invest up to 6% of their gross compensation. Under the terms of the plans, the Company provides a 60% matching contribution and pays all fees and expenses related to the plans. During 2000 and 1999, contributions to the plans, including fees and expenses, totaled $24,919 and $31,446, respectively, for Wolverine, and $164,222 and $392,061, respectively, for P&S.

ATM has a noncontributory, collectively bargained, multiemployer defined benefit pension plan covering substantially all nonmanagement employees. The Company contributed $37,097 and $51,016 in 2000 and 1999, respectively. The pension fund has advised the Company that there were no unfunded vested benefits for withdrawal liability purposes during the plan years ended December 31, 2000 and January 1, 2000.

P&S maintains a noncontributory defined benefit pension plan covering substantially all of its full-time salaried employees (the Salaried Plan) and a noncontributory defined benefit pension plan covering substantially all of its full-time hourly employees (the Hourly Plan). These plans merged during 1998 to form the Proctor & Schwartz Salaried Employees' Retirement Plan (the Plan). P&S's policy is to fund amounts as are necessary, on the actuarial basis, to provide assets sufficient to meet the benefits to be paid to plan members in accordance with the requirements of the Employee Retirement Income Security Act of 1974.

Pension (income) expense was $(285,655) in 2000, and $210,675 in 1999.

Unrecognized prior-service costs are being amortized over 15 years.

13
15321.doc

WOLVERINE PROCTOR & SCHWARTZ, INC.

Notes to Consolidated Financial Statements
December 31, 2000

The following table sets forth the reconciliation of the Plan's funded status as of
December 31, 2000.

| | Pension | Life and Medical |
|---|---|---|
| Benefit cost | $    (75,422) | $    (204,645) |
| Employer contribution | - | 173,726 |
| Benefits paid | (1,273,011) | (173,726) |
| Benefit obligation at December 31 | 14,491,267 | (1,413,162) |
| Fair value of plan assets at December 31 | 15,608,508 | - |
| Funded status | 1,117,241 | (1,413,162) |
| Accrued benefit cost recognized in the statement of financial position | (285,723) | (4,563,591) |
| Weighted average assumptions as of December 31, 2000– | | |
| Discount rate | 7.50% | 7.50% |
| Expected return on plan assets | 9.00% | N/A |
| Rate of compensation increase | N/A | N/A |

The following table sets forth the reconciliation of the Plans' funded status as of
January 1, 2000.

| | Pension | Life and Medical |
|---|---|---|
| Benefit cost | $    19,317 | $    (169,933) |
| Employer contribution | - | 172,172 |
| Benefits paid | (1,203,170) | (172,172) |
| Benefit obligation at January 1 | 14,342,427 | (1,663,416) |
| Fair value of plan assets at January 1 | 16,727,305 | - |
| Funded status | 2,384,878 | (1,663,416) |
| Accrued benefit cost recognized in the statement of financial position | (381,145) | (4,941,962) |
| Weighted average assumptions as of January 1, 2000– | | |
| Discount rate | 7.75% | 7.00% |
| Expected return on plan assets | 9.00% | N/A |
| Rate of compensation increase | N/A | N/A |

All benefit costs above are shown net of any plan participant contributions.

18321.doc

WOLVERINE PROCTOR & SCHWARTZ, INC.

Notes to Consolidated Financial Statements
December 31, 2000

During 1998, the Company changed the method of coverage from self-insured to
managed care programs for the majority of their retirees. This change results in a
reduction of the plan's liabilities of approximately $898,000 that is currently being
amortized over 12 years.

P&S's postretirement health care plans currently are not funded. Under the terms of
the plan, retirees will pay 50% of the premiums, but all currently employed personnel
will pay 100% of their premiums upon retirement. The income included in the
consolidated statements of operations and comprehensive income relating to the
postretirement plan amounted to $377,765 and $169,933 in 2000 and 1999,
respectively.

The assumed health care cost trend rates used in measuring the accumulated
postretirement benefit obligations as of December 31, 2000 were 9.5% for pre-65
coverage and 7.5% for post-65 coverage, decreasing linearly each successive year
until it reaches 5.0% in the year 2009, after which it remains constant. A 1%
increase or decrease in the assumed health care cost trend rate for each year would
change the accumulated postretirement benefit obligations as of December 31, 2000
by approximately $93,551 and $(84,790), respectively. The assumed discount rate
used in determining the accumulated postretirement benefit obligation was 7.50%.

(8)    RESTRUCTURING

During 1999, the Company recorded restructuring and related costs of
approximately $1.6 million. The restructuring mainly affected the Company's P&S
operations. The Company recorded an adjustment for severance as well as
employee benefits. The Company has terminated 108 employees as a part of the
restructuring. The Company also included lease abandonment costs for
manufacturing facilities in Lexington, North Carolina, for lease obligations through
March 2001. The Company paid out substantially all of the accrued restructuring
during 2000.

(9)    RELATED PARTY TRANSACTIONS

(a)    Management Agreement

The Company has a management agreement (the Agreement) with DSK
Management Corporation (the Management Company), a company owned by
the sole stockholder of the Company. The Agreement includes a five-year
initial term and an additional five-year renewal option (exercisable at the
option of the Management Company). Under the Agreement, the Company
pays to the Management Company a fee calculated at an annual rate of
$200,000 for the period ending December 31, 1991, increasing thereafter at
an annual rate of $50,000 per year (subject to the availability of funds after
consideration of certain loan agreement compliance limitations as discussed
in Note 6). The Management Company has forgiven the amount owed each
year under the Agreement for all periods through December 31, 2000.
Accordingly, no amounts have been reflected by the Company in the
accompanying consolidated financial statements.

15

WOLVERINE PROCTOR & SCHWARTZ, INC.

Notes to Consolidated Financial Statements
December 31, 2000

(b)   Executive Bonus

During 1999 and 2000, the Company paid approximately $75,000 and $450,000, respectively, to a retired executive as a bonus and/or severance. A balance of $53,000 remains in accrued expenses at December 31, 2000 in the accompanying consolidated balance sheets.

(c)   Accounts Receivable

The Company was owed approximately $211,000 from The Cardwell Machine Company (Cardwell), an affiliate of the Company as of December 31, 2000. This amount has been fully reserved for as management believes the amount is uncollectible. Also included in prepaid expenses and other at December 31, 2000 is approximately $1,155,400 advanced by Friel to an affiliate owned by the sole shareholder of the Company on account of future dividends from Friel.

(d)   Accrued Expenses

Included in accrued expenses at December 31, 2000 and January 1, 2000 is approximately $11,000 and $35,000, respectively, as amounts payable to the sole stockholder of the Company.

Included in the accrued expenses at December 31, 2000 and January 1, 2000 is approximately $694,000 and $1,374,000, respectively, payable to the sole stockholder of the Company.

(10)   PUT WARRANTS

In connection with a prior revolving credit agreement, the Company issued a warrant to Merita Bank (replacing a previous warrant) to purchase 75 shares of common stock representing, in the aggregate, 7.5% of the outstanding common stock of the Company as of the effective date. This warrant is exercisable at any time after September 23, 1994 for an aggregate exercise price of $1,000 subject to various terms.

Also, in connection with the acquisition of P&S (see Note 1) as of September 23, 1994, the Company additionally issued warrants to purchase shares of the Company's common stock to Equitable and EDFFII and Hanseatic Corporation.

The Equitable and EDFFII agreement represents an option to purchase an aggregate of 150 warrants (or 15% of the outstanding common stock of the Company as of the effective date) of the Company, each warrant representing the right to purchase, upon certain terms and conditions, one share of common stock. The initial purchase price is the amount of $1,000 divided by the original number of shares of common stock purchasable upon exercise of all of the warrants, or $6.67 per share. The expiration date is the later of the 10th anniversary of the closing date (September 22, 1994) or the date upon which any holder owns any Bundled Securities, as defined.

16
18321.doc

WOLVERINE PROCTOR & SCHWARTZ, INC.

Notes to Consolidated Financial Statements
December 31, 2000

Originally, the proceeds from the financing were allocated between the debt instruments and the warrants respectively based upon the relative fair value.

Both of these warrants are governed by a Stockholder's Agreement dated September 23, 1994. The Company has recognized changes in the estimated redemption price of the warrants by periodic charges (credits) to retained earnings. During 1999 and 2000, the put warrants were purchased by the sole stockholder of the Company. The warrant value was decreased in 1999 based on the buyouts of the warrants in 2000 by the Stockholder.

**(11)    COMMITMENTS AND CONTINGENCIES**

    **(a)    Lease Commitments**

The Company leases office space and equipment under noncancelable operating leases. The following is a schedule, by year, of minimum future lease commitments under such leases as of December 31, 2000:

| | | |
|---|---|---:|
| 2001 | $ | 315,250 |
| 2002 | | 228,000 |
| 2003 | | 234,000 |
| 2004 | | 240,000 |
| 2005 | | 246,000 |
| Thereafter | | 252,000 |
| Total future minimum rentals | $ | 1,515,250 |

Rent expense incurred under operating leases was approximately $289,548 in 2000 and $365,763 in 1999. Renewal options ranging from one to 10 years exist for several of these leases.

    **(b)    Other Contingencies**

At December 31, 2000, there were lawsuits pending that arose in the ordinary course of business. Management has reviewed these actions with legal counsel and has taken into consideration the view of counsel concerning the outcome of the litigation. In the opinion of management, final disposition of these lawsuits is not expected to have a material adverse effect on the Company's financial position or results of operations. In addition, the Company has been indemnified against unfavorable outcomes in certain legal matters of P&S assumed as part of the acquisition of P&S.

The Company has issued an irrevocable standby letter of credit of $1,500,000 to support certain obligations of Cardwell, a wholly owned company of the sole stockholder. The Company pays on behalf of Cardwell all fees plus 1% of the stated amount of the letter of credit to Citizens per annum.

WOLVERINE PROCTOR & SCHWARTZ, INC.

Notes to Consolidated Financial Statements
December 31, 2000

(12)  DISCLOSURES ABOUT THE FAIR VALUE OF FINANCIAL INSTRUMENTS

The following methods and assumptions were used to estimate the fair value of
each class of financial instrument for which it is practicable to estimate that value.
The carrying amount the cash and cash equivalents, accounts receivable and
accounts payable on the Company's consolidated balance sheets approximates their
fair value because of the short maturity of these instruments.

**KULKARNI Exhibit 3**

**April 7, 2006**

```
                    UNITED STATES DISTRICT COURT
                             FOR THE
                    DISTRICT OF MASSACHUSETTS
*********************************
                                  *
PETER A. CRAWFORD,                *
               Plaintiff          *
                                  *    CIVIL ACTION
               VS                 *    NO. 05-10078-DPW
                                  *
WOLVERINE PROCTOR &               *
SCHWARTZ, INC., STEVEN F.         *
CHILINSKI, DEEPAK S.              *
KULKARNI,                         *
               Defendants         *
                                  *
*********************************
```

DEPOSITION OF DEEPAK KULKARNI, taken on behalf of the plaintiff pursuant to the Massachusetts Rules of Civil Procedure before Kathleen M. Benoit, CSR # 1368F94, Shorthand Reporter and Notary Public in and for the Commonwealth of Massachusetts at the offices of Morgan, Brown & Joy, 200 State Street, Boston, Massachusetts, on Wednesday, December 7, 2005, commencing at 11:10 a.m.

APPEARANCES:

PETER A. CRAWFORD, 23 Newcastle Drive, #11, Nashua, NH 03060, Pro Se

MARK WHITNEY, ESQ., and JEFFREY KUHN, ESQ., Morgan, Brown & Joy, LLP, 200 State Street, Boston, MA 02109, For the defendant

ALSO PRESENT:

Mark A. Brown

Page 2

```
 1                          INDEX
     WITNESS              DIRECT CROSS REDIRECT RECROSS
 2
     Deepak Kulkarni
 3     by Mr. Crawford     5
 4                         EXHIBITS
     No. Description                        Page
 5
     1    Letter 1/4/00, Kulkarni to
 6        Crawford Re: Employment Contract     7
 7   2    Employment Contract - Draft         10
 8   3    2001 Tax Return Form 982            34
 9   4    Transition Agreement               48
10   5    Settlement Agreement               48
11   6    Letter 3/1/01 Kulkarni to
          Crawford                           68
12
     7    Letter 2/26/01 Wolverine to
13        Crawford                           69
14   8    Income Statement Data              79
15   9    Handwritten Document "Original
          655" top heading                   89
16
     10   Telephone Bill                    109
17
     11   Omnibus Agreement 11/13/02        127
18
     12   Letter 12/2/04 Crawford to
19        Chilinski                         158
20   13   Consolidated Financial Statements
          with Auditor's Report             206
21
     14   Letter 12/8/04 Daniel Blake to
22        Crawford                          217
23
```

1                           INDEX

    WITNESS              DIRECT CROSS REDIRECT RECROSS

2

                         EXHIBITS

3   No. Description                          Page

4

    15  Letter 12/17/01 Kulkarni to
5       Bernie Ward                          226

6   16  Letter 12/27/01 Kulkarni to
        Bernie Ward                          226

7

    17  Journal Entries                      229

8

    18  Handwritten Document "Discussions
9       with Deepak 12/28/01" top heading    247

10

11

12

13

14

15

16

17

18

19

20

21

22

23

```
1                    P R O C E E D I N G S

2              MR. CRAWFORD:  The standard stipulations?

3              MR. WHITNEY:  Yes, that have been in effect

4      for all the depositions.

5              MR. CRAWFORD:  Right.

6              DEEPAK KULKARNI, SWORN

7              MR. CRAWFORD:  Okay, I'd like to first go

8      over the stipulations.  The witness will read and sign the

9      deposition and objections will be preserved until trial,

10     the standard stipulations that we used the last time.

11             MR. WHITNEY:  Yes, except for the form of the

12     question.

13             MR. CRAWFORD:  Except for the form of the

14     question.  And with respect to the ground rules for this

15     deposition, Mr. Whitney and I have agreed to abide by the

16     court's order in the Cummings deposition for this

17     deposition as well.  What that means is that any questions

18     relative to the 2005 recapitalization or the 2005 Financial

19     Statements or any payments to Mr. Kulkarni after December

20     31, 2002, are off limits; however, counsel has agreed that

21     Mr. Kulkarni will return to the extent that I prevail on

22     the motions, the protective order motions, is that correct?

23             MR. WHITNEY:  The only difference is that, to
```

1   the extent our agreement for this deposition differs from

2   that order, is that we didn't agree to the portion of the

3   order that required that we pay the costs of the resumed

4   deposition.

5              MR. CRAWFORD:  That's correct.

6              DIRECT EXAMINATION

7      Q.  (By Mr. Crawford) Mr. Kulkarni, you understand that

8   you're sworn today as in a court of law?

9      A.  I fully understand English, Mr. Crawford.

10     Q.  But do you understand that you're sworn today --

11     A.  Yes.

12     Q.  -- as in a court of law?

13     A.  You heard me swear in just a few minutes ago.

14     Q.  Okay.  And do you understand that if at trial in

15  this matter that any of your responses are different from

16  those that you provide today that you may be asked to

17  explain those differences?

18     A.  Yes.

19     Q.  And are you under any medication or is there any

20  reason why you cannot testify truthfully today?

21     A.  No.

22     Q.  All right.

23              (Discussion held off the record.)

Page 25

1       A.  Yes, that's one of several options I discussed with

2  you including bankruptcy.

3       Q.  And did we at that time discuss the potential

4  impact on the EBITDA of the Company and/or my bonus?

5       A.  No, we did not.

6       Q.  So there was no discussion --

7       A.  Not, not in the time frame that you're describing.

8  There was a discussion about the impact of the gain on

9  your, on your bonus but not in that time frame that you're

10  referring to.

11       Q.  Okay, when was that discussion?

12       A.  Which discussion now?

13       Q.  The one that you're referring to.

14       A.  The one about the impact of the gain on your bonus

15  calculation?

16       Q.  Right.

17       A.  That was literally on the day of the closing and I

18  want to be very specific.  I'm talking about the day of the

19  first closing.

20       Q.  Would that be December 28, 2001?

21       A.  I think it was the 27th.  It might have been the

22  28th, I'm not sure.

23       Q.  But one or the other?

Page 26

1        A.   There were two dates and they were very close.   I

2    want to be clear that I'm not testifying the date was the

3    28th.   There were two closings.   One I believe was the 27th

4    and one was the 29th but there were two separate closings.

5        Q.   So it would have been the date of the first

6    closing?

7        A.   That we would have discussed it, yes.

8        Q.   And what date --

9        A.   That's simply a recollection.   It could very easily

10   have been on the date of the second also but I am not sure.

11       Q.   What did I say and what did you say?

12       A.   What did I say and what did you say.   I can't

13   recall if the conversation took place with you specifically

14   or with my counsel at the time, Jarvis Kellog.

15       Q.   So did Jarvis Kellog relate to you discussions that

16   he had had with me?

17       A.   Yes.

18                   MR. WHITNEY:   Well, I mean --

19                   MR. CRAWFORD:   I think that's not privileged.

20                   MR. WHITNEY:   Do you want to go off the

21   record for a second?

22                   MR. CRAWFORD:   Yes, off the record.

23                   (Discussion held off the record.)

Page 27

1     Q.  So do you recall a conversation between the two of

2  us regarding the bonus and the EBITDA that occurred on or

3  about December 28, 2001?

4     A.  About your bonus?

5     Q.  Right.

6     A.  Any conversation about your bonus?

7     Q.  Correct.

8     A.  I do recall a conversation about the bonus.

9     Q.  What was that conversation?

10    A.  That you weren't entitled to any because the

11  Company had made a loss.

12    Q.  Was that what you said or what I said?

13    A.  That's what we, I thought, mutually agreed at the

14  time because had there been a -- let me tell you why, okay?

15  You read this agreement carefully?

16    Q.  Yup.

17    A.  As you know, you do not vest until the 24th month,

18  correct?

19    Q.  I believe there is something in there about that.

20    A.  That's correct, the 24th month.  This document is

21  dated the 4th of January, okay?  So the closing took place

22  on the 27th of December.  That is within the 24-month

23  period, so you are not vested at this point.  Is that a

Page 28

1    fair statement?

2        Q.   Well, I think you're referring to the options, is

3    that correct?

4        A.   That's correct; that's correct.  So your ownership

5    position in this company, and I should use that word

6    sparingly, your economic interest in this company through

7    any sale would not have hardened, okay, on the 27th of

8    December, correct, it would not?

9        Q.   Well, that's what you say.

10       A.   What do you mean that's what I'm saying?  It's

11   within the 24-month period.

12       Q.   I'm not going to answer your questions here today.

13   You'll get a chance to do that later but let me ask you a

14   question.

15       A.   I'm answering your previous question so let me

16   finish.

17       Q.   All right, finish.

18       A.   So you would not have vested until the 4th of

19   January 2002, okay, and now, as you know, you're an

20   employee at will and you can be fired at any time for any

21   reason or no reason.  Okay, now, and I was on the verge of

22   firing you on that day.  You may or may not know that.  Did

23   you know that?  I was on the verge of firing you that day

Page 198

1    capital goes way up and then when you get an infusion of

2    cash out the working capital goes way down.  So what we

3    said was we're going to have, we're going to try to have a

4    facsimile of the Company's cash flow, you know, by starting

5    EBITDA, okay, we're going to exclude extraordinary items,

6    okay?

7        Q.  Where does it say that in here?

8        A.  You asked me a question about intention.  This

9    document was not drafted by an attorney.  Go back to my

10   prior testimony.  Should we go back to that?  You asked me

11   a question of whether Gabor Garai had seen the agreement.

12       Q.  Please continue.

13       A.  So these are two pseudo attorneys of which you are

14   more of an attorney than I am.  I mean I am basically a

15   consumer of legal services.  You appear to be a provider of

16   legal services mostly to yourself.  So we are two amateurs

17   drafting this agreement.  So all I can testify to is my

18   intention.  My intention was to have you get 5 percent of

19   the Company's cash flow, okay, of the Company's cash flow,

20   ignoring working capital changes, okay, and ignoring

21   extraordinary items, and then because I knew that you were

22   kind of a litigious fellow, okay, and more particularly

23   because you also happened to be a friend at the time, I

Page 199

1   said, okay, I don't want to get into court with this guy,

2   we'll find a dispute resolution mechanism on each item in

3   this agreement that has the potential for ambiguity.

4       Q.  Let's move forward -- I'm sorry, are you done?

5       A.  I've barely begun to answer this complex question

6   as to what is your intention behind this agreement.  So now

7   what I'm hearing, okay, in this lawsuit, I've learned for

8   the first time that EBITDA is not a GAAP defined term.  It

9   just goes to show the mistakes you make when you try to

10  draft agreements yourself.  Now, had I known that, there is

11  no way I wouldn't have clarified EBITDA.

12      Q.  But doesn't that sentence do it?

13      A.  No, it absolutely --

14      Q.  Where it says EBITDA means earnings --

15      A.  No.  First of all, this, the statement "Excluded

16  from EBITDA," which is the next statement, actually doesn't

17  make any sense if you read it.  It says "Excluded from

18  EBITDA would be any nonoperating adjustments to reserves."

19  Why would any nonoperating adjustments to reserves ever

20  affect EBITDA in the first place?  They would affect the

21  reserves, okay?  The intention of the parties here is

22  excluded from EBITDA, okay, will be any nonoperating

23  adjustments to EBITDA, okay, to the extent they were

Page 200

1    reflected in EBITDA.  Are you with me?

2        Q.  So you're saying the drafting was not quite

3    correct?

4        A.  The drafting I think is nonsense with respect to

5    these, to these, you know, if you were to ask me now for

6    the benefit -- when I look at this agreement again for the

7    first time, okay, I looked at this agreement twice after it

8    was executed in 2000, okay?  I looked at it, I looked at it

9    again toward the closing on the 28th, whatever it was.  I

10   probably, I looked at it probably when I was ready to fire

11   you, actually I pulled it out and said what is this guy

12   entitled to, let's figure this out, okay, and then I looked

13   at it again after I received this letter on, you know, in

14   whenever it was, shortly after, you know, December,

15   whenever it was mailed to me.  I can't tell you exactly

16   when it was mailed to me.  I would imagine it was sometime

17   in January or December, but more likely in December.

18              MR. WHITNEY:  The December '04 letter.

19       A.  The December '04 letter.  Okay, so that's when I

20   looked at it, and then when I read the letter in December

21   '04, I was genuinely horrified to read it because when I

22   read it then, okay, first of all, at that time I still did

23   not know that EBITDA was not a GAAP defined term.  I was

1   I'm in business for myself.  I don't work for anybody.

2   Okay, so there's no provision in this agreement, okay, that

3   limits my compensation in any fashion.

4           Now, for example, there's nothing to stop me

5   from simply increasing my compensation to the amount of

6   EBITDA, is there?  None, right?  So what I'm trying to say

7   to you is there were certain principles in this agreement.

8   No. 1, you would have no ability to affect my compensation;

9   No. 2, there would be a dispute resolution provision.

10       Q.  Let's get back.

11       A.  No.  No. 3, there would be, there would be no

12  impact of extraordinary items on EBITDA, and included in

13  that category, okay, at that point we weren't contemplating

14  a forgiveness of indebtedness, you know, we weren't

15  contemplating a buy-back from Citizens Bank at that time in

16  2000 when you joined, okay?  It might have been a distant

17  option in my mind but it wasn't one that we had

18  contemplated, but it was very clear to me that all

19  extraordinary type gains or losses for that matter should

20  be excluded from this calculation.  And I recall having an

21  explicit discussion with you on what we do with warranty

22  reserves.

23       Q.  What was that discussion?

1      A.   Do you remember that?

2      Q.   No, why don't you tell me about that.

3      A.   You don't remember that.  That's interesting.

4   Because we have a warranty reserve of roughly around, I'll

5   give you rough numbers, okay?  Let's call it 3 percent,

6   okay?  At that time the sales of the Company was 60

7   million.  So 3 percent of 60 million is 1.8 million.  So

8   there would be a 1.8 million reserve on average.  So for

9   any one year, for example, if we had a $500,000 warranty

10  experience, we might decide that the 1.8 is too much and we

11  might release half a million dollars in income.  I wanted

12  that to be excluded, okay, and you agreed because there was

13  no cash impact of that, right, and so --

14     Q.   Wasn't that what the phrase "Excluded from EBITDA

15  will be any non-operating adjustments to reserves," isn't

16  that what that means?

17     A.   No, hang on.  The meaning, there are two different

18  things going on in this, in this EBITDA calculation, okay?

19  No. 1, if there are any changes to reserves, okay, they

20  should be excluded from EBITDA to the extent they affect

21  EBITDA.  Do you understand what I'm saying?  That's all

22  this agreement is saying.

23     Q.   It's worded somewhat differently.

1      A.  It is worded somewhat differently, okay, I read it

2    carefully, okay?  What we meant was if there are changes to

3    the reserves that have a positive or negative effect on the

4    EBITDA, they should be excluded.  That's category No. 1.

5    Category No. 2, in other words, if the warranty reserve

6    goes up and down and we simply create profits and losses as

7    a result of changes in reserves, it's affecting the EBITDA,

8    but it's probably the cash flow, no more than depreciation

9    is affecting the cash flow, and just like we're adding back

10   depreciation, okay, we're adding back changes to reserves

11   that affect EBITDA.  That is category No. 1.  Category

12   No. 2 is if we have any extraordinary gains or losses they

13   will be excluded.  Okay, now, here is the interesting

14   thing, okay, in your demand letter which you sent on

15   January 4, 2000, what I found very curious --

16                MR. WHITNEY:  December 4, 2000.

17      A.  December 4, 2000, make the correction please.

18                MR. WHITNEY:  So there's no confusion --

19      A.  I'm sorry, it's Exhibit --

20                MR. WHITNEY:  It's 2004.

21      A.  Which is his demand letter?  These documents have a

22   habit of disappearing.  Here it is (indicating).  If you

23   look at Kulkarni No. 12 and you look at PAC 0024 in your

Page 205

1    highly complicated computerized filing system over there,

2    isn't it curious that the cognitive loss is not part of

3    this but the Citizens' gain is.

4       Q.   What do you mean by that?

5       A.   Well, first of all, the same, in the same letter on

6    the top paragraph you refer to the fact that you have

7    nothing to do with the $1.5 million loss.

8       Q.   I'll ask you a question --

9       A.   Isn't it curious that you would exclude the

10   extraordinary loss but include the extraordinary gain?  The

11   point of my story is that both should be excluded as being

12   extraordinary, and that was the intention of this entire

13   document.  I hope you're getting all this.

14            So the intention of the parties was that, it

15   was two things.  No. 1, any changes in reserves that had no

16   cash impact that affected EBITDA should be excluded.

17   That's item 1.  And item 2, any extraordinary gains or

18   extraordinary losses to the extent that they affected

19   EBITDA should be excluded.  Unfortunately, that's not what

20   this agreement says.

21            MR. CRAWFORD:  Let me follow up but first I

22   would like to introduce this as Kulkarni No. 13.  This is

23   PAC 0027 through PAC 0042.