

FILED
UNITED STATES DISTRICT COURT
District of Massachusetts
2006 APR -b  P 4: 01

U.S. DISTRICT COURT    Civil Action
DISTRICT OF MASS.    No. 05-10078-DPW

PETER A. CRAWFORD, Plaintiff )
)
v. )
)
WOLVERINE, PROCTOR & SCHWARTZ, INC., )
Steven F. Chilinski, Deepak S. Kulkarni, )
)
Defendants )

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

### REQUEST FOR ORAL ARGUMENT

Plaintiff hereby requests oral argument pursuant to Local Rule 7.1(d).

### I. INTRODUCTION

In Defendants' Local Rule 56.1 Statement of Undisputed Material Facts in Support of Defendants' Motion for Partial Summary Judgment (hereinafter "SOF"), defendants have repeatedly mischaracterized the plaintiff's deposition testimony and other evidence. Plaintiff submits herewith his own Plaintiff's Local Rule 56.1 Counter Statement of Disputed Material Facts in Support of Plaintiff's Opposition to Defendants' Motion for Partial Summary Judgment (hereinafter "CSOF") and Plaintiff's Affidavit in Support of his Opposition to Defendants' Motion for Partial Summary Judgment (hereinafter "Plaintiff's Opposition Affidavit"). Plaintiff will not restate the facts here, which are adequately stated in Plaintiff's Memorandum in Support of His Motion for Summary Judgment (hereinafter "Plaintiff's Support Memorandum") and in his CSOF.

1

Many of defendants' arguments are largely a rehash of the positions advanced in their Motion to Dismiss, which was denied in its entirety. With respect to the plaintiff's breach of contract claim for the bonus wages, defendants no longer assert, as they did during the conference on June 14, 2005, that no bonus is owed due to the WPS, Inc. EBITDA being negative. Rather, they claim mistake as a defense, and claim that both "EBITDA" and "earnings" are not defined terms under generally accepted accounting principles ("GAAP"), apparently thereby maintaining that the bonus portion of plaintiff's employment contract is void. But "earnings" has a very specific meaning under GAAP, and that meaning includes the extraordinary gain.

## II. EARNINGS IS A GAAP DEFINED TERM AND THE EMPLOYMENT AGREEMENT CANNOT BE VOIDED BASED ON MISTAKE

Defendants' argument is essentially that the plaintiff is not entitled to any bonus because defendant Kulkarni alleges that he mistakenly believed that the bonus calculation would exclude any extraordinary gain (also called forgiveness of indebtedness income). They thus seek to penalize the plaintiff for defendant Kularni's lack of diligence in researching the issue during the eight days that passed between the draft Employment Agreement of December 27, 1999 and the signing of the final Employment Agreement on January 4, 2000. Kulkarni Aff. Exhibits 1, 2. Defendants' predicament was summarized in Kulkarni's deposition testimony:

Q. You did not ask him to do that?
A. I did not ask him to do that. Once again, I want to clear (sic), it's not until -- if you go to my last deposition, you will see this in sworn testimony. It wasn't until this lawsuit was launched, okay, that I knew that earnings was not a GAP (sic) defined term that excluded extraordinary items. That is what I thought...

Plaintiff's Opposition Affidavit, Exhibit E, (hereinafter "Kulkarni Deposition") at 2-39 to 2-40.

While defendants structure their defense as an absence of a "meeting of the minds," in reality it is one of mistake. They attempt to structure it as a mutual, rather than unilateral, mistake by falsely alleging that "earnings" is not a GAAP defined term, and that both defendant Kulkarni and the plaintiff mistakenly believed that it was.

The law relating to mutual and unilateral mistake is set forth in Restatement (Second) of Contracts §§151-154. See Navisite v. Cloonan, 2005 WL 1528903 *7 (Mass. Super. May 11, 2005) (sections 153 and 154 represent the law in Massachusetts). In the case of mutual mistake, a contract is voidable if the mistake is on a basic assumption which has a "material effect on the agreed exchange of performances" and the adversely affected party has not borne the risk of the mistake. Restatement (Second) of Contracts §152. Section 154 of the Restatement states that a party "bears the risk of a mistake when… (b) he is aware, at the time the contract is made, that he has only limited knowledge with respect to the facts to which the mistake relates but treats his limited knowledge as sufficient…" That is certainly the case here, where, defendant Kulkarni, despite ample time to do research, and even though he had the possibility of a buy back of the Citizens debt as an option in his mind, believed that he had sufficient knowledge to sign the Employment Agreement. Plaintiff's Affidavit in Support of his Motion for Partial Summary Judgment (hereinafter "Plaintiff's Support Affidavit"), Exhibit O at 202.

Nevertheless, because "earnings" is a GAAP defined term, any mistake was unilateral, not mutual. The criteria applicable to unilateral mistakes is even more stringent. The mistake must again be one on a basic assumption and have a material effect on the exchange, but "(a) the effect of the mistake [must be] such that enforcement of the contract would be unconscionable, or (b) the other party had reason to know of the

3

mistake or his fault caused the mistake." See Restatement (Second) of Contracts §153. The same criteria as to bearing the risk applies as in the case of a unilateral mistake.

Defendants do not argue, nor could they, that enforcement of the bonus provision would be unconscionable. The payment of a bonus of $572,570 to the plaintiff for leading the successful turnaround of WPS, Inc., which resulted in a $14 million investment, is not compensation that no rational businessperson would be willing to pay. Nor did the plaintiff have any reason to know of Kulkarni's alleged assumption as to the inclusion of the forgiveness of indebtedness income in earnings. See CSOF ¶10.

Most importantly, defendants' contention that "earnings" is not a GAAP defined term is without merit. Richard Cummings, the Arthur Andersen partner responsible for the WPS, Inc. 2001 audit, admits that it is "described."[1] Statement of Financial Accounting Concepts No. 5 (hereinafter "CON 5") provides the requisite definition[2]. See Plaintiff's Support Affidavit ¶14, Exhibit M.

A review of CON 5 reveals that "earnings" has a specific meaning under GAAP, and that reporting of "earnings" is one of the main purposes of financial statements prepared in accordance with GAAP. "A full set of financial statements for a period should show… [e]arnings for the period…" CON 5 at 4. An entire section of CON 5 is devoted to describing how "earnings" are calculated in accordance with GAAP. See CON 5 at 18-20. "Present practice accepts a variety of terms for net income, and the

---

[1] He admits that the term "earnings" was described in Statement of Financial Accounting Standards No. 130. See Plaintiff's Support Affidavit ¶13, Exhibit L (hereinafter "FAS 130") at 16 ¶37. Cummings also admits that "earnings" is a widely used term. Plaintiff's Support Affidavit, Exhibit Q at 64-65, 70.

[2] CON 5 was introduced during Mr. Cummings' deposition as Cummings 6 and would be included in the accounting literature that Mr. Cummings would review to determine whether earnings and net income are identical for WP LLC for 2001. See Plaintiff's Support Affidavit ¶18, Exhibit Q at 90.

Board anticipates that net income, profit, net loss, and other equivalent terms will continue to be used in financial statements as names for earnings." CON 5 at 18 ¶33. Other than the cumulative effect of accounting changes of earlier periods, there is no difference between earnings and net income pursuant to GAAP. When asked to describe the difference between net income and earnings, Mr. Cummings[3] referred back to FAS 130 at 26 ¶81[4] which states that "[e]arnings, so defined, excludes cumulative effects of changes in accounting principle… As a result, earnings is similar to, but not necessarily the same as, net income in current practice." (emphasis supplied). That sentence demonstrates conclusively that earnings are defined by GAAP. Furthermore, the GAAP literature sets forth a very specific meaning for "earnings" and that meaning includes extraordinary gains and losses. See Plaintiff's Support Memorandum at 14-17.

Statement of Financial Accounting Concepts No. 6 (hereinafter "CON 6"), Elements of Financial Statements[5], sets forth the meaning of a number of terms in accordance with GAAP. Although it does not itself define earnings, it states that:

> "[e]arnings is not defined in this Statement. FASB Concepts Statement 5 has now described earnings for a period as excluding certain cumulative accounting adjustments and other nonowner changes in equity that are included in comprehensive income for a period.

Defendants contend that the parties disagreed as to the meaning of the "EBITDA component of the Bonus calculation," maintaining that Kulkarni intended that it be approximated by cash flow, while the plaintiff intended that it be approximated by net income. However, the plaintiff's deposition testimony refers not to an "EBITDA component" but rather the entire bonus calculation. See CSOF ¶13. The formula is:

---

[3] Plaintiff's Support Affidavit Exhibit Q at 65-66.
[4] Plaintiff's Support Affidavit, Exhibit L.
[5] Plaintiff's Opposition Affidavit ¶4, Exhibit B

5

$$BONUS = (EBITDA - CAPX - INT - TAXES) \times .05$$

However, "EBITDA" is defined as "the earnings before[6] any interest, taxes or deductions for depreciation or amortization." Thus:

$$EBITDA = earnings + interest + taxes + depreciation + amortization$$

But INT=interest; TAXES=taxes[7]; and DEPR=depreciation + amortization. See Employment Agreement at PAC0001 to PAC0002. Simple algebra yields:

$$BONUS = (earnings + DEPR - CAPX) \times .05$$

Thus, the BONUS calculation contains no "EBITDA component." Any disagreement as to the meaning or the intent of the parties with respect to the "EBITDA component" is irrelevant because the bonus is based upon earnings, not EBITDA.

The 2002 passage of Sarbanes-Oxley further supports plaintiff's position. See Public Law 107-204. Sarbanes-Oxley tightened requirements for the disclosure of "pro forma" financial information, referred to as "non-GAAP financial measures" in the implementing regulations. During testimony before a Senate committee considering Sarbanes-Oxley, the President and CEO of the Association for Investment Management and Research testified that:

> "we believe that earnings data based on Generally Accepted Accounting Principles (GAAP) are still the most useful starting point for analysis of a company's performance. Analysts and other investors at least know how GAAP earnings are computed and, hence, there is some comparability across companies. (emphasis supplied)[8]

The report went on to recommend that the SEC promulgate rules requiring simultaneous disclosure of pro forma data and "financial disclosures (e.g., earnings) calculated

---

[6] See Plaintiff's Support Affidavit ¶30, Exhibit Q at 121-122 (use of the word "before" means that the terms following are excluded from the calculation and must be added back).

[7] Taxes are minimal for 2001 due to BOOKDIF and loss carryforwards. See Plaintiff's Support Memorandum at 19.

[8] See S. Rep. No. 205, 107th Cong., 2d Sess. at 28. Plaintiff's Opposition Affidavit ¶4, Exhibit H.

according to GAAP…" Exhibit H at 29. See also 15 C.F.R. §229.10(e)(4), 15 C.F.R. §244.101(a)(1) (specifically excluding from the definition of "non-GAAP financial measures" measures required to be disclosed by GAAP and combinations of measures that are not themselves non-GAAP). Thus, any mistake was unilateral, as the plaintiff correctly believed that "earnings" was a GAAP defined term.

In their memorandum, defendants refer to an absence of a "meeting of the minds," and cite Walsh v. Telesector Resources Group, Inc., 40 Mass. App. Ct. 227, 233 (1996). However, that case is not even remotely on point as it involved judicial modification of a settlement agreement. In this case, there is a written contract signed by Kulkarni. Restatement (Second) of Contracts §17 requires only mutual assent and consideration, elements that are undeniably present here. Defendants cite Nadherny v. Roseland Property Company, 390 F.3d 44 (1st Cir. 2004). However, the First Circuit did not void that contract due to an unexpressed intention, but merely reversed summary judgment granted in the plaintiff's favor, finding the contract ambiguous. Lonnqvist v. Lammi, 240 Mass. 371 (1922) involved an oral, not written, contract and the parties had different recollections as to what was agreed. The court thus voided the contract, but permitted the plaintiff to recover on a quantum meruit theory. I & R Mechanical, Inc. v. Hazelton Manufacturing Co., 62 Mass. App. Ct. 452, 455 (2004) involved an erroneous price quotation that was merely an invitation to negotiate under Massachusetts law. Similarly Kyle v. Kavanagh, 103 Mass. 356 (1869) was a classic case of mistake, where the parties had different understandings as to which Prospect St. the contract referenced.

Nissan Automobiles of Marlborough, Inc. v. Glick, 62 Mass. App. Ct. 302 (2004) underscores the high hurdle that must be overcome for a party to overcome a unilateral

mistake. In <u>Nissan</u>, the parties had orally negotiated a 20 year lease, with a purchase

option during the <u>second</u> ten years. The lessor's attorney changed some language,

inadvertently providing a purchase option during the <u>first</u> ten years. Nevertheless, the

contract was enforced as written; even though the judge found proof of a mistake after

examining earlier drafts. The Appeals Court held that "[a] party seeking recovery for a

unilateral mistake must present full, clear, and decisive proof that a mistake occurred."

<u>Nissan</u> at 306. Nissan further cited Restatement (Second) of Contracts §153 in holding

that it must be demonstrated either that the enforcement of the contract would be

unconscionable, or that the other party had reason to know of the mistake. <u>Nissan</u> at 306.

Despite the lessee's notes showing a different agreement, those were held not to be

sufficient to inform the lessee of the mistake. The instant case is even more compelling,

where the plaintiff had no reason to know of defendant Kulkarni's alleged mistake. See

CSOF ¶15.

### III. EQUITABLE ESTOPPEL DOES NOT BAR THE PLAINTIFF'S RECOVERY

Defendants' second argument is that the plaintiff is equitably estopped from

recovering for defendants' breach of his bonus contract. They maintain that the plaintiff,

by allegedly failing to inform <u>Parthenon</u> that he might be entitled to a bonus, is barred

from collecting a bonus from <u>WPS, Inc</u>. But, defendants' argument fails for three

separate reasons. First, Parthenon was not a party to the Employment Agreement and is

not a party to this case. Second, both Parthenon and Kulkarni were aware of the

Employment Agreement and its terms, and knew of the extraordinary gain prior to any

transaction. Third, Kulkarni knew before the December 2001 transaction that the

plaintiff was likely to request a bonus on the forgiveness of indebtedness income.

8

Defendants confuse the issues by alternatively arguing that the plaintiff failed to notify both WPS, Inc. and Parthenon about the possibility of a bonus being owed to him, and attributing a loss to both from such action. But the positions of Parthenon and WPS, Inc. are very different, and the estoppel claim must be analyzed separately with respect to each. As defendants correctly indicate, under Massachusetts law "[t]he essential factors giving rise to an estoppel are…

> (1.) A representation or conduct amounting to a representation intended to induce a course of conduct on the part of the person to whom the representation is made. (2.) An act or omission resulting from the representation, whether actual or by conduct, by the person to whom the representation is made. (3.) Detriment to such person as a consequence of the act or omission." Turnpike Motors, Inc. v. Newbury Group, Inc., 413 Mass. 119, 123 (1992).

Here, the plaintiff is not seeking a bonus from Parthenon, which is not a party to this action, thus any detriment to Parthenon is immaterial. Furthermore, they submit no evidence of such detriment. An estoppel defense based on representations to Parthenon necessarily fails as Turnpike Motors requires that representation, act and detriment all involve the same person.

With respect to WPS, Inc., defendant Kulkarni admits that WPS, Inc. "was on the brink of either bankruptcy or receivership" in December, 2001. Kulkarni Aff. ¶19. Parthenon invested $14 million in WPS, Inc. in December, 2001. But, he alleges that if the plaintiff had "disclosed his alleged Bonus entitlement to either WPS or Parthenon during December 2001, that fact would have very likely derailed Parthenon's acquisition of WPS…" Kulkarni Aff. ¶20. Independent of the factual disputes that plaintiff will raise shortly, it is obvious that WPS, Inc., suffered no detriment as a result of plaintiff's alleged failure to disclose his bonus entitlement. See Harrington v. Fall River Housing

Authority, 27 Mass. App. Ct. 301, 308 (1989) (denying the estoppel defense to a party not establishing all of the elements).

In any case, plaintiff disputes that Kulkarni, and thus WPS, Inc., were unaware of the likelihood that the plaintiff would request a bonus. The parties discussed the bonus as it related to forgiveness of indebtedness income in the summer of 2001. See Plaintiff's Support Affidavit ¶3[9]. Furthermore, Kulkarni's deposition testimony on this issue indicates that he knew, on December 28, 2001 that plaintiff was likely to request a bonus. Plaintiff's Support Affidavit, Exhibit O at 2-14 to 2-15. All of the plaintiff's dealings relating to his relationship with WPS, Inc., including the Employment Agreement, the bonus and options, were with Kulkarni, not Parthenon. See Plaintiff's Support Affidavit ¶3. If anyone misled Parthenon, it was Kulkarni, not the plaintiff.

Finally, both WPS, Inc. and Parthenon were well aware of the plaintiff's Employment Agreement and its bonus provisions long before any transaction. See Kulkarni aff. Exh. 3 at W01114 (discussing the terms of plaintiff's option, as set forth in the Employment Agreement), CSOF ¶39. See Harrington at 310 (denying estoppel when the leases signed provided actual notice of provisions contrary to defendant's oral representations based on which estoppel was sought).

Defendants allege that plaintiff took a number of wrongful actions in providing financial information to Parthenon. Ignoring the lack of any demonstrated detriment to WPS, Inc., from these alleged actions, defendants' assertions are disputed. The data that plaintiff personally provided was largely limited to data on booking, backlog, prospects, revenues and cost of goods sold, and in all likelihood did not extend to any EBITDA or

_____

[9] Kulkarni's affidavit refers only to December, 2001 and fails to preclude an earlier bonus discussion. Although the parties offer somewhat different versions of events it is undisputed that Mr. Kulkarni knew, on December 28, 2001, of the likelihood that plaintiff would request a bonus.

liability information that defendants allege should have included an accrual for plaintiff's bonus. CSOF ¶31. Furthermore, Brown often dealt directly with defendant Kulkarni on accounting issues, and in providing data to Parthenon, and defendant Kulkarni was himself sophisticated at these issues and had once published an accounting book. CSOF ¶32.

More importantly, defendants are incorrect when they suggest that any of the financial statements should have included an accrual for the plaintiff's bonus. First of all, the statements (PAC0100 and PAC0101 attached as exh. 2 to Brown aff.) reflect actual results as of the end of November, 2001 and only projected results for December, 2001. Yet, the agreement between Citizens and Parthenon leading to forgiveness of indebtedness income did not occur until on or about December 5, 2001. Plaintiff's Support Affidavit ¶28. As of the end of November, 2001, there was no probability that a liability had been incurred that would permit it to be recorded under GAAP. See Plaintiff's Support Affidavit, Exhibit N at 5-6 ¶8. See also CON 6 at 62 ¶206 (only present obligations are liabilities under GAAP). While PAC0100 includes projections for December, 2001[10], it would have been incorrect to reflect an accrual for the plaintiff's bonus without also including the approximately $10 million in forgiveness of indebtedness income, as the two are inextricably linked. Under GAAP, it is normally improper to accrue for gains. See Plaintiff's Support Affidavit, Exhibit N at 7-8 ¶17. Furthermore, under the matching principle, accruing for the bonus but not the gain on which it depended would be improper. See CON 6 at 47 ¶145. The trial balance that defendants allege should include the plaintiff's bonus was prepared as of November 30, 2001, thus, for the reasons previously stated, it would have been premature to accrue any

---

[10] Page PAC0101 contains #REF's indicating an error in the data for the fourth quarter of 2001.

11

bonus on that document. SOF ¶38, CSOF ¶38. Finally, it was obvious to anyone who might have reviewed the documents that they did not include any effects of the scheduled Parthenon transaction, as no $10 million gain was obviously included in the projections.

Thus, neither WPS, Inc. nor Parthenon could have been misled by these documents, even if they were provided to Parthenon, which defendants nowhere allege. Defendants' estoppel argument must therefore fail. Cleaveland v Malden Savings Bank, 291 Mass. 295, 297 (1935) (estoppel requires inducement, change in position, and resulting harm).

Defendants cite Turnpike Motors to support their position. However, in that case, all three of the factors required for estoppel were present, a representation by the auto dealership as to the structure of the transaction, the failure of the broker to obtain a real estate broker's license in time, and resulting detriment. The instant case may readily be distinguished from Turnpike Motors in that there is at best a factual dispute as to whether the plaintiff ever engaged in "a representation or conduct amounting to a representation," that induced anyone to engage in any act or omission to their detriment. Furthermore, any reliance must have been reasonable. Turnpike Motors at 125. Both Parthenon and WPS, Inc. had full access to the Employment Agreement and knowledge of the upcoming gain. Any reliance upon any purported representation of the plaintiff was therefore unreasonable, as they could have, and should have, ascertained the facts of their own accord. See Harrington at 310.

Defendants also cite Moran v. Gala, 13 LCR 7, No. 266795, 2005 WL 22859 (Mass. Land Ct. Jan. 6, 2005), arguing that the "circumstances [are] similar to the ones in the instant case." Defendants' Memorandum at 36. But the facts are anything but

12

similar. Moran had actually signed, under power of attorney, the certificate denying that there were other parties in possession of any of the land that he later claimed under adverse possession. In the instant case, defendants produce no evidence of misrepresentations by the plaintiff, and unlike the case in Moran, both Parthenon and WPS, Inc. could readily have ascertained the facts. Defendants argue that it was Parthenon "that reasonably relied upon the representations," but WPS, Inc. that "faces the detriment of defending itself against this lawsuit." Defendants Memorandum at 37. Yet Turnpike Motors at 123 specifically requires that the detriment be to the same party to whom the misrepresentation was made and who relied on it. Most importantly, the instant case is different from Moran in that the Galas in that case spent money to purchase the house based upon Moran's misrepresentation, whereas in the instant case WPS, Inc. received money from Parthenon, and, could only have benefited from any alleged misrepresentation[11].

"A party relying on an estoppel theory has a heavy burden to prove that all the elements are present." Harrington at 308-309. Finally, the doctrine of estoppel can only be applied when to refuse it would be inequitable. Cleaveland at 297. In this case the equities are in favor of the plaintiff, not defendants, and he must prevail. See Plaintiff's Support Memorandum at 37-40.

## IV. THE MASSACHUSETTS PAYMENT OF WAGES STATUTE IS CLEARLY APPLICABLE TO THE PLAINTIFF'S BONUS WAGES

---

[11] FN2 of the Moran case indicates that it was immaterial that the certificate was actually furnished to the title company, not the Galas, because the Galas were effectively relying on the title company to ensure a conveyable title and the deal would have collapsed without the certificate. In effect the title company was an agent for the Galas. That is unlike the instant case where Parthenon was not an agent for WPS, Inc., ensuring the adequacy of paperwork, but was an investor with interests adverse to WPS, Inc.

13

Defendants' arguments relating to M.G.L. c. 149 §148 (the "Wage Act") are largely a rehash of the previously unsuccessful arguments advanced in their Motion to Dismiss. While defendants cite a few new cases, they fail to address at all Wiedmann v. The Bradford Group, Inc., 444 Mass. 698 (2005) decided on July 21, 2005, after this Court denied defendants' Motion to Dismiss.

Defendants make four basic arguments based on words that do not appear in the Wage Act and are not referenced with approval by any SJC decisions relating to it. They maintain that the Wage Act does not protect wages that are "contingent" or "episodic," that the Wage Act does not apply to "professionals enforcing their asserted contract rights," and that it applies only to "ordinary wages and wage equivalents." But, by its express terms, the Wage Act applies to wages that increase or decrease, to all employees, specifically including executives and professionals, and to remuneration on an annual basis. While a number of the lower court cases cited by defendants make use of the terms "contingent," "episodic," "contractual rights" and "ordinary," a close reading of most of these cases reveals that, where the payments were not deemed to be subject to the statute, it was because the compensation had not been "earned," by an "employee" both of which are specifically required by the statute.

Wiedmann rejects the contention in Commonwealth v. Savage, 31 Mass. App. Ct. 714, 716 (1991) that the purpose of the Wage Act is "to assist employees who would ordinarily be paid on a weekly basis, such as retail salespeople, and for whom commissions constitute a significant part of weekly income." Wiedmann notes instead that the Wage Act "sets out different payment deadlines for different types of employees." Wiedmann at 704. Wiedmann goes on to cite, with approval, Barthel v.

14

One Community, Inc., 233 F.Supp.2d 125, 126-127 (D. Mass. 2002) which rejected the argument that the Wage Act applied only to weekly commissions. Barthel also stands for the proposition "that all commissions are contingent to some extent, but [] once they are due and payable the commissions are covered by the [Wage] Act." Barthel at 126. Wiedmann refuses to follow the logic of Savage, focusing instead on the text of the Wage Act, that requires that commissions be "definitely determined." While Wiedmann cites Cumpata v. Blue Cross Blue Shield of Mass., Inc., 113 F.Supp.2d 164 (D. Mass 2000), in upholding the commission due to Wiedmann, it implicitly rejects many of the arguments in Cumpata and other cases cited by defendants that were decided before Wiedmann. Furthermore, it explicitly rejects the premise in Cumpata that the Wage Act "deals with the weekly payment of wages." Cumpata at 167.

Wiedmann does not cite Prozinski v. Northeast Real Estate Services, LLC, 59 Mass. App. Ct. 599 (2003) at all. Prozinski, like Cumpata, cited Savage and its reference to payment of wages on a weekly basis to support its holding. Prozinski at 603. The approval with which the SJC cites Barthel, combined with its disapproval of Savage, and implicitly Cumpata and Prozinski, casts considerable doubt on whether these cases, and many of the other pre-Wiedmann cases cited by defendants were correctly decided.

Defendants place much reliance upon Navisite, supra, decided before Wiedmann. However, Navisite relies exclusively upon Prozinski and Cumpata and is therefore suspect. Specifically, the court cited Cumpata's holding that "the [Wage] Act did not apply to quarterly payments due a sales executive under an incentive compensation plan." Navisite at *13. However, Wiedmann specifically upheld a Wage Act claim for a

salesperson entitled to monthly payments under an incentive compensation plan, putting the holding in Navisite in serious doubt.

Similarly, defendants cite Sterling Research, Inc. v. Pietrobono, No. 02-40150, 2005 WL 3116758 (D. Mass. Nov. 21, 2005) (Saylor, J.). While Sterling was decided after Wiedmann, it cites it only in a footnote supporting the proposition that one of the defendants was potentially liable as president and treasurer. Sterling at *10 FN25. While Sterling indicates that "[g]enerally, bonuses are not 'wages earned' within the meaning of [the Wage Act]," it cites the pre-Wiedmann case of Navisite for support, then analyzes the compensation sought as a commission, not a bonus, finding that the commissions were not "definitely determined" and "due and payable." Sterling at *12-13.

This Court's recent decision in Scalli v. Citizens Financial Group, Inc., No. 03-12413-DPW, slip op. Memorandum and Order, Feb. 28, 2006 rejected Mrs. Scalli's Wage Act claim for the "equivalent to the commissions she would have received for the loans in her pipeline when she was terminated" because commissions were only "definitely determined" and "due and payable" after the loans closed. Scalli, slip op. at 39. The reference to "compensation 'triggered by contingencies', such as a trip to Aruba" appears to refer to Mrs. Scalli's alleged entitlement to the monetary value of such a trip after she failed to take it in the year it was offered, an issue that was conceded by Mrs. Scalli on summary judgment. Scalli slip op. at 38, 26 FN13.

## A. The text of the Wage Act and SJC decisions support the plaintiff's position

None of the cases cited by defendants relate specifically to the type of bonus wages in this case. Under the Employment Agreement, the bonus was "due upon completion of the audit of each year's results" and, in the event the plaintiff was

16

terminated involuntarily (other than for cause), would be prorated based on the number of months worked during the year (Employment Contract at PAC0002, last paragraph). Thus, the bonus wages were earned regularly each month, and became due and payable on a regular basis as part of each year's wages.

Furthermore, there are no decisions of the SJC that are even remotely on point, and the two Massachusetts Appeals Court decisions that defendants cite relate to unearned severance pay and a commission payable to a non-employee. Defendants largely rely upon Massachusetts Superior Court opinions and decisions of this court, which, while instructive, are not binding. King v. Order of United Commercial Travelers, 333 U.S. 153, 160-161 (1948). "It would be incongruous indeed to hold [a] federal court bound by a decision which would not be binding on any state court." Similarly "a federal court adjudicating a matter of state law in a diversity suit is 'in effect, only another court of the State.'" King at 161. Furthermore, none of these cases specifically relate to the regularly earned bonus wages to which the plaintiff is entitled.

As only the Wage Act itself and SJC decisions on it are binding upon this Court, we start with these authorities. While initially the purpose of the Wage Act, enacted in the late 1800s, may have been to ensure weekly payment of wages, numerous amendments have expanded its purpose. In 1960 the first paragraph was completely rewritten by 1960 Mass. Acts c. 416 to permit "bona fide executive, administrative or professional" persons to be paid "bi-weekly or semi-monthly," or, if they "elect[] at [their] own option to be paid monthly..." This clause was cited by Wiedmann at 704 n. 9, in noting that the Wage Act applies to other than weekly wage payments.

The 1960 amendment clearly puts salaries and wages on an equal footing, and brings executives and professionals within its protections. Furthermore, the 1960 act defines "salaried employee" to mean "any employee whose remuneration is on a weekly, bi-weekly, semi-monthly, monthly or annual basis, even though deductions or increases may be made in a particular pay period." (emphasis supplied) This text, unchanged in the current Wage Act, clearly contemplates a variable component, such as bonuses or commissions. Furthermore, the statute provides for the calculation of remuneration on an annual basis, and makes such remuneration subject to its provisions. Both the plaintiff's base salary and his bonus are calculated on an annual basis under the Employment Agreement. Furthermore, the Wage Act must be construed in light of M.G.L. c. 149 §148B which defines "employee," for purposes of the Wage Act, very broadly.

Defendants cite American Mutual Liability Ins. Co. v. Commissioner of Labor & Industries, 340 Mass. 144 (1959), in arguing that the statute was primarily intended to apply to "wage earners." But, American Mutual was decided five months before the Wage Act was amended with language referring to executives and professionals. Now, the "clear purpose of the [Wage Act] is to prevent unreasonable detention of wages." Wiedmann at 703. See also Boston Police Patrolmen's Association, Inc. v. City of Boston, 435 Mass. 718, 720 (2002).

B. The SJC has broadly construed the term "wages"

The statute provides that "[e]very person having employees in his service shall pay weekly or bi-weekly each such employee the wages earned by him…" Thus, in order for the Wage Act to apply, only three conditions must be met. First, the compensation must have been "earned." Second, the person entitled to compensation must be an

18

"employee." Third, the compensation must constitute "wages." Unfortunately, neither "wages" nor "earned" is defined in M.G.L. c. 149 §1 or elsewhere in that chapter. Employee is effectively defined, for purposes of §148, by M.G.L. c. 149 §148B.

The only SJC case found which addresses the definition of "wages" in the context of the Wage Act is Boston. It held that deferred compensation contributions were not "wages" because the whole purpose of the scheme was that "funds are intended to be held, out of the employee's possession, for an extended period," and the purpose of the statute was "to prevent the unreasonable detention of wages." Boston at 720. That is not applicable here, where the Employment Agreement specifically requires payment of bonus wages immediately after completion of the annual audit. Unlike the plaintiffs in Boston who had contractually agreed to defer part of their compensation, the plaintiff never so agreed and at all times after completion of the audit had a right to immediate payment. Any delay by the plaintiff in asserting his rights did not constitute consent to defer such compensation.

Furthermore, in Boston, the SJC indicated the way in which the word "wages" was to be construed.

"As always, we interpret the statutory language 'according to the intent of the Legislature ascertained from all its words construed by the ordinary and approved usage of the language, considered in connection with the cause of its enactment, the mischief or imperfection to be remedied and the main object to be accomplished, to the end that the purpose of its framers may be effectuated." Boston at 719-720.

See also Wiedmann at 709. Just such a method of construction was applied in Jancey v. School Committee of Everett, 421 Mass. 482, 490 (1995), where the SJC construed the meaning of "wages," for purposes of another section of M.G.L. c. 149 (the same chapter in which Wage Act appears, causing it to share with the Wage Act the

19

definitions of M.G.L. c. 149 §1). The court went on to embrace the definition in Black's Law Dictionary (6th ed. 1990) which defines wages as "[e]very form of remuneration payable for a given period to an individual for personal services, including salaries ...bonuses... and any other similar advantage received from the individual's employer or directly with respect to work for him... Term should be broadly defined and includes not only periodic monetary earnings but all compensation for services rendered without regard to manner in which such compensation is computed." Jancey at 490-491 (emphasis supplied).[12] The plaintiff's bonus is remuneration payable for a given period, is for personal services and is an advantage received with respect to his work for his employer. Clearly, the plaintiff's bonus falls within the Black's definition.

Furthermore, prior SJC decisions and other statutes that are part of the same subchapter as the Wage Act, clearly indicate that wages may be computed on a basis other than time worked. In Gallagher v. Hathaway Manuf. Corp., 172 Mass. 230 (1898), the Wage Act's applicability to piece work was not questioned, only whether the practice of deducting for second quality work violated it. In that case, woven cloth of second quality was to be paid for at only half of the rate of that for first quality cloth. Although denominated as a fine, in effect the employees received a bonus of 100% for first quality cloth. See also M.G.L. c. 149 §153 (referring to grading of work affecting the "wages" of the weavers), and M.G.L. c. 149 §155 (requiring written documentation of piece rate "wages" in cotton factories). Both of these sections are part of the "Weekly Payment of Wages" subchapter of M.G.L. c. 149 in which the Wage Act appears, thus the term "wages" applies equally to compensation calculated on a basis other than time worked.

---

[12] The court further cited the text of M.G.L. c. 151A §1(s)(A) which mirrors the Black's definition.

20

The difference between the bonus wages due to the plaintiff, which is a function of the quality and efficacy of his services as COO of WPS, Inc., and the wages due a weaver or employee of a cotton factory based on the quality and quantity of production is one of degree only. Furthermore, making distinctions based upon how compensation is computed, or whether it is denominated a "base salary," "bonus," "commission," "incentive payment," or some other term would elevate form over substance, and provide an incentive for employers to avoid the Wage Act merely by referring to the wages by some other word. The plaintiff's bonus wages and the weavers' incentive payments are both wages under both the Black's definition and the Wage Act.

A broad definition of "wages" was adopted by Justice Souter in Ives v. Manchester Subaru, Inc., 498 A.2d 297 (N.H. 1985). The plaintiff in Ives had been general manager of a car dealership and was entitled to a bonus of 15% of pre-tax profits. Justice Souter held that "[i]t is obvious that the parties' agreement for a share of profits was intended to provide compensation for the plaintiff's labor and services, and it clearly may fall within the statute's reference to compensation calculated on some 'other basis'" Ives at 300. Even though the New Hampshire statute defines "wages," that definition, like the Massachusetts Wage Act, does not specifically refer to bonuses. Nevertheless, Ives held that bonuses constitute "wages."[13] Other out of state authorities overwhelmingly consider bonuses to be "wages"[14].

---

[13] Although the New Hampshire statute refers to determination of compensation on a "time, task, piece, commission or other basis of calculation," factors not specifically enumerated in the Massachusetts statute, it is clear from the Massachusetts statutes and case law that, in Massachusetts, the determination of whether the compensation is "wages" does not hinge on the method of calculation.

[14] See also Ware v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 100 Cal. Rptr. 791, 797 (Cal. App. 1972), 24 Cal.App.3d 35, affirmed 414 U.S. 117 (1973) (applying a broad construction of the term "wages" under the section of the California Labor Code providing for collection of due

## C. Two Massachusetts Appeals Court decisions are not on point and are in doubt post-Wiedmann

While decisions of the SJC as to Massachusetts law are binding on this court,

decisions of the Massachusetts Appeals Court are entitled to less deference. It is the duty

of federal courts "to ascertain from all the available data what the state law is and apply it

rather than to prescribe a different rule…" In so doing, intermediate appellate state court

decisions are "dat[a] for ascertaining state law which [are] not to be disregarded by a

federal court unless it is convinced by other persuasive data that the highest court of the

state would decide otherwise." West v. American Telephone & Telegraph Co., 311 U.S.

223, 237 (1940). However, an analogous or related decision of the highest court controls

over a lower court decision which is more on point. Strubbe v. Sonnenschein, 299 F. 2d

185, 188-189 (2nd cir. 1962). See also 32 Am. Jur. 2d Federal Courts, §§465-468.

Neither Savage and Prozinski relates to bonuses. Thus, the analogous decision of

the SJC in Jancey, which clearly construes the term "wages" to include bonuses, is

persuasive data that the SJC would apply this same meaning in the Wage Act context. As

previously discussed, Savage, at least insofar as it refers to "assisting "employees who

would ordinarily be paid on a weekly basis" has been overruled by Wiedmann. The

---

and unpaid wages); Suess v. Lee Sapp Leasing, Inc., 428 N.W.2d 899 (Neb. 1988), 229 Neb. 755
(manager entitled to 10 percent of profits as a bonus under Nebraska Wage Payment and
Collection Act); Rohr v. Ted Neiters Motor Co., 758 P.2d 186, 188 (Colo.App. 1988) (bonus
constituted "wages"). See also Validity, Construction and Effect of State Laws Requiring
Payment of Wages on Discharge of Employee Immediately or Within Specified Period, 18
A.L.R. 5th 577 §25 (1994) (bonuses are wages under California, Colorado, Delaware, Idaho,
South Carolina, but not Louisiana law), Validity, Construction, and Effect of State Laws
Requiring Payment of Wages on Resignation of Employee Immediately or Within Specified
Period, 11 A.L.R. 5th 715 §21 (1993) (bonuses are wages under Colorado and Nebraska, but not
Louisiana, law).

rejection of <u>Savage</u>[15] casts doubt on the continuing validity of the implication in <u>Savage</u> that "transactions [that] are not regular, but episodic…" are excluded from the purview of the Wage Act. <u>Savage</u> at 716.

In <u>Prozinski</u>, the Massachusetts Appeals Court construed the Wage Act not to apply to severance payments. In so doing, it concluded that the "severance pay was not earned but contingent upon severance." <u>Prozinski</u> at 603. By using "contingent" in this context, the court appeared to equate "contingent" with "unearned." <u>Prozinski</u> is inapplicable to the plaintiff's bonus wages as they were clearly earned. Unearned compensation is contingent because it becomes due only after a contingency beyond the control of the employee, in this case termination, occurs. See <u>Kittredge v. McNerney</u>, 17 Mass. L. Rptr. 652 (May 11, 2004), 2004 Mass. Super LEXIS 185 (severance not subject to Wage Act as it is unearned).

However, the <u>Prozinski</u> court goes on to state, in dicta, that the Black's definition of "wages" should not apply. As a rationale for this, the court appears to conclude that the Wage Act itself defines the term "wages," and that "[t]here is, therefore, no need to resort to the popular meaning of the term 'wages' …" <u>Prozinski</u> at 604. This assertion is directly contrary to the ruling of the SJC in <u>Boston</u>. In that case, the SJC held that the word "wages" must be "construed by the ordinary and approved usage of the language…" See also <u>Wiedmann</u> at 709. This statement indicates that the SJC has concluded that "wages" are <u>not</u> defined in the Wage Act itself. The dicta in <u>Prozinski</u> must therefore be ignored as it directly contradicts an SJC holding on the same issue.

---

[15] This rejection was predicted in <u>Lohnes v. Darwin Partners</u>, 15 Mass. L. Rptr. 157, 159 n. 1 (July 22, 2002).

Furthermore, if the Wage Act itself defined "wages," it would have had no applicability whatsoever prior to 1943. Before then, no categories of wages were enumerated in the statute, and by the logic of Prozinski, no compensation could be considered wages[16]. To the contrary, any reasonable reading of the statute indicates that "wages" includes, but is not limited to holiday and vacation pay, and definitely determined commissions. What other compensation is included rests, as the Supreme Judicial Court indicated in Boston, on the meaning of the word "wages."

Casting further doubt on Prozinski is the language in M.G.L. c. 149 §150 that refers to instituting a civil action for "any damages incurred, including treble damages for any loss of wages and other benefits." (emphasis supplied). That language appears to broaden the sweep of the Wage Act. Furthermore, other cases have referred to "sick leave" as being recoverable under the Wage Act, even though such wages are not specifically enumerated. See Cumpata at 167, Baptista v. Abbey Healthcare Group, Inc. 1996 WL 33340740 *4 (D. Mass. 1996) (both referring to sick leave as an ordinary wage or wage equivalent).

## D. Contingent compensation is not subject to the Wage Act only when it has not been earned

The focus on the word "contingent" appears to have entered the case law with Massachusetts v. Morash, 490 U.S. 107 (1989). That case did not construe the Wage Act itself, but merely held that "[b]ecause ordinary vacation payments are typically fixed, due

---

[16] 1943 Mass. Acts c. 467 added language relating to commissions. 1966 Mass Acts c. 319, entitled "[a]n act clarifying the word 'wages' as used in the weekly payment of wages law" added a sentence relating to holiday and vacation payments. The word "clarify," according to Webster's New Collegiate Dictionary (1977), means "to free of confusion," indicating that the Legislature felt that the Wage Act already applied to these payments, but amended the statute to eliminate any confusion on the issue

24

at known times, and do not depend on contingencies outside the employee's control" they are not subject to ERISA. Morash at 115 (emphasis supplied). ERISA was held to apply to benefits accumulating over time and payable upon the occurrence of contingencies outside of the employee's control, such as medical, accident or unemployment benefits. Morash at 113, 116.

A few years later in Baptista, the court relied in part upon Morash in deciding that stock options were not subject to the Wage Act. However, the opinion erroneously stated that the holding in Morash "is limited to the payment of ordinary wages and wage equivalents…" Baptista at *4. In fact, the U.S. Supreme Court never construed the Wage Act[17]; its reference in Morash to "ordinary vacation pay" was in the context of ERISA preemption, not in construing the statute, which was for the SJC, not itself. The errors in Baptisa in misconstruing Morash have caused other courts to misconstrue the Wage Act to exclude from its purview wages "triggered by contingencies" and wages other than "ordinary wages and wage equivalents" phrases that originally came from Baptista's clearly erroneous interpretation of Morash. While other courts have continued in that error, the SJC has never endorsed that mistake.

Furthermore, cases citing Baptista fail to acknowledge that the Supreme Court referred to contingencies outside of the control of the employee, such as termination or sickness, not those within the control of the employee. This distinction is similar to that of whether the compensation is earned or not. In Baptista, the issue was the vesting of options on termination, thus the contingency was arguably outside of the employee's control. While Baptista refers to "bonuses," the surrounding words indicate that the court

---

[17] This error was noted in Cumpata at 167 n. 5.

was using the term to refer to the stock options[18]. The decision in Sword v. Biofertec, 15 Mass. L. Rptr. 489 (December 2, 2002) is in accord with the principle that the Wage Act applies to earned compensation, even when it is contingent. In that case, compensation which was earned, but contingent upon sufficient funds being available, was nevertheless subject to the Wage Act, there being no exception for highly paid individuals in the Wage Act. Sword at 490.

In Cumpata, the applicability of the Wage Act was considered. While the court considered applying the statutory requirement that commissions be "definitively determined" to support its decision, it was reluctant to do so, as it feared that employers seeking to avoid the Wage Act might raise "contractual question[s] to remove themselves from [the] sweep" of the statute. Cumpata at 168. Thus, it relied upon the erroneous "triggered by contingencies" and "ordinary wages and wage equivalents" criteria espoused by Baptista. Cumpata at 167. Wiedmann took the opposite approach, relying upon the phrase "definitively determined," and appears to reject Cumpata. Wiedmann at 708-709.

The exclusion of contingent compensation under the Wage Act was rejected in Barthel at 126-127 and in Lohnes v. Darwin Partners, 15 Mass. L. Rptr. 157 (July 22, 2002), that court concluding that "[i]f commissions were not protected by G.L. c. 149, §148 because they became payable only when something happened, then the Legislature would be engaged in a sham to have amended the statute to include commissions,

---

[18] Baptista found no reason to apply the Wage Act to "bonuses potentially owing to highly paid executives, who were confident enough to resign their employment if their demands for accelerated (and contingent) stock options were not met." Baptista at *4. This text is clearly referring to Baptista himself, who had threatened to resign and had negotiated accelerated vesting in the event of termination. Baptista at *2. Of course, there is a big difference between a stock option, which is simply a contractual right to purchase a security, and a bonus, which is generally paid in cash.

because all (or virtually all) commissions would fall outside the protection of the statute."

Lohnes at 159. Thus, any argument that plaintiff's bonus wages are not subject to the

Wage Act because they are contingent fails. The fact that the Wage Act mentions

commissions, but not bonuses is irrelevant, because the plaintiff's bonus wages were

earned. Commissions under the Wage Act need not be earned, but need only be "due and

payable." Thus the legislature provided protection in the typical situation, where

salespersons are entitled to commissions for sales in their territory independent of effort

expended.[19]

Defendants cite a number of other Superior Court decisions, none of which

specifically relate to the issue of bonuses and are in any case not binding on this court[20].

_____

[19] This policy avoids disputes, simplifies bookkeeping and provides an incentive for salespersons to call on accounts that place small orders directly with the home office.

[20] In Ockerman v. VA Software, 16 Mass. L. Rptr. 513 (July 9, 2003), 2003 WL 21960599, the plaintiff sued for unpaid commissions, but summary judgment (or judgment on the pleadings) was granted on both the breach of contract claim and the related Wage Act claim. Locke v. Sales Consultants of Boston, 13 Mass. L. Rptr. 164 (April 13, 2001), 2001 WL 716911, also related to commissions (for an employment recruiter), but these were deemed contingent in part because they were subject to disgorgement in the event a recruited employee did not remain with the client. Furthermore, it relies upon Cumpata, supra, and is in doubt after Wiedmann. In Huebsch v. Katahdin Industries, 13 Mass. L. Rptr. 180 (April 24, 2001), 2001 WL 716884, the importance of wages being "earned" was underscored. The employee in that case did not work the required 100 days during the first year which were required for payment of a contingent salary of a matching amount, and he was terminated before the end of the first year. While his contract provided for payment of both the first and second year's non-contingent salary despite the termination, "Huebsch did not work during the second year and therefore did not earn any part of the second-year salary. Any right Huebsch had to the guaranteed second year salary is based on contract." Huebsch at 182. In Dennis v. Jager, Smith & Stetler, P.C., 11 Mass. L. Rptr. 567 (April 10, 2000), 2000 WL 782946, a contract attorney sued for compensation, yet it was unclear from the opinion exactly how that compensation was computed, thus this opinion is of little assistance. In Wilkie v. Nets, Inc., 20 Mass. L. Rptr. No. 8, 176, No. 023840, 2005 WL 3105692 (Mass. Super. Ct. Oct. 16, 2005), there is a reference to erratic payments, such as a yearly bonus, not constituting a commission. Nevertheless, the court found that Wilkie's commissions were covered by the Wage Act. Furthermore, while decided after Wiedmann, that case was cited only in reference to the availability of treble damages. Wilkie at 179. In supporting its dicta relating to the Wage Act, Wilkie starts by citing the discredited Savage with its reference to payment of "wages on a weekly basis." Wilkie at 177. Boston Police Patrolmen's Ass'n v. City of Boston, 11 Mass. L. Rptr. 11, 1999 WL 1260164 (Mass. Super. Ct. 1999) was affirmed, see 435 Mass.

Some of these cases are apparently misguided attempts to avoid mandatory trebling under of the Wage Act. However, Wiedmann makes such trebling discretionary. Many of these cases would likely have been decided differently post-Wiedmann.

In an attempt to overcome the argument that plaintiff's bonus wages were earned, defendants argue that the plaintiff had no control over the earnings that led to the bonus being owed. But as argued in Plantiff's Support Memorandum at 2, 29-30, plaintiff was directly responsible for turning around WPS, Inc. Without such a turnaround having been accomplished, Parthenon would not have been willing to invest \$14 million in the company and there would have been no forgiveness of indebtedness income. The converse argument, that there could have been extraordinary losses is hypothetical.

## V. A GENUINE ISSUE OF MATERIAL FACT EXISTS AS TO WHETHER OR NOT DEFENDANT KULKARNI WAS CEO OF WPS, INC ON JANUARY 14, 2002

Defendants claim that defendant Kulkarni was Chief Executive Officer (CEO) of WPS, Inc. on January 14, 2002. But, Kulkarni signed a Consulting Agreement on December 28, 2001. SOF ¶48, Kulkarni Aff., Exhibit 5. That agreement specifies that he had "no right, power or authority in any way to bind the Company to the fulfillment of any condition, contract or obligation or to create any liability binding on the Company." Kulkarni Aff., Exhibit 5 at W0739 ¶3(b). They allege that he was reappointed CEO on December 31, 2001. SOF ¶50. However the unanimous consent is dated "as of" that date, and the dates on all five copies appear in the same handwriting. Although the Kulkarni Aff. ¶22 alleges (without stating that he has personal knowledge) that all five board members signed on that date, a Monday and New Year's Eve, the Scott Aff. ¶5

---

718 (2002), but the SJC declined to adopt the more expansive language of the Superior Court in construing the definition of "wages."

does not allege that he, or any of the other board members, signed it on any particular day. Nor has any evidence been submitted alleging that the document was "filed with the minutes of proceedings of the Board or committee" as required by §2.13 of the WPS, Inc. bylaws[21], and Delaware Law in order for a unanimous consent to be effective[22]. See Del. Code Ann. tit. 8, §141(f).

Furthermore, a review of the WPS, Inc. bylaws §3.8 reveals that the President, not the CEO, shall "have general charge and supervision of the business of the corporation." Although the bylaws permit the board to appoint the President, Chairman or another officer as CEO, the unanimous consent removed all of the officers of WPS, Inc. and appointed Kulkarni only CEO, not Chairman or President. But the bylaws prohibit the appointment of a non-officer as CEO. Even if the unanimous consent were effective and construed to make Kulkarni CEO, amending the Consulting Agreement, its specific provisions would override the generality of the appointment and defendant Kulkarni had no power.

Finally, documents signed by defendant Kulkarni during this time period casts doubt as to whether he actually was CEO. The Transition Agreement is signed by him as "Chairman," not CEO or President, and lists a separate notification address for him. See Kulkarni aff., Exhibit 4 at PAC0045, PAC0047. An affidavit filed in this court by defendant Kulkarni in an unrelated case alleges that he was President, not CEO, of WPS, Inc. from 1991 to early in 2002. See Plaintiff's Opposition Affidavit ¶26, Exhibit I.

---

[21] See Plaintiff's Opposition Affidavit ¶17, Exhibit D.

[22] As further evidence of irregularities in the board actions of WPS, Inc., the January 10, 2002 meeting was conducted without Messrs. Brown, Jacquet and Rutherford, and thus lacked a quorum. See Kulkarni aff. Exhibit 7. The February 28, 2002 meeting was conducted without Messrs. Scott, Jacquet and Rutherford, and also lacked a quorum. See Kulkarni aff. Exhibit 9. Furthermore, neither set of minutes is attested to or signed.

29

Furthermore, that affidavit directly contradicts his affidavit in this case and the unanimous consent. Defendants maintain that defendant Chilinski was hired as CEO on January 29, 2002, but the board action making him CEO did not occur until February 28, 2002, even though Mr. Chilinski understood he was CEO from the first day. Whitney aff., Exh. 4 at 9-10.

Finally, contrary to the Scott Affidavit ¶6, Kulkarni was not actively involved with WPS, Inc. between the time that the December 2001 transaction closed and January 14, 2002, other than to interfere with the plaintiff's contract of employment. See SOF ¶55, CSOF ¶55. Taken in a light most favorable to the plaintiff, Kulkarni was not CEO on January 14, 2002, or at most CEO in name only, with no authority or duties.

## VI. COUNT SEVEN CANNOT BE DISMISSED AS KULKARNI WAS NOT PRIVILEGED TO INTERFERE WITH PLAINTIFF'S CONTRACT AND WAS NOT THE ALTER EGO OF WPS, INC.

Defendants arguments on the interference claim (Count VII) are largely a rehash of those advanced in their unsuccessful Motion to Dismiss, except that they now submit evidence that Kulkarni was CEO of WPS, Inc. at the time that the plaintiff was terminated on January 14, 2002. Defendants have abandoned the argument, however, that Kulkarni was "'the highest ranking corporate official' and the sole shareholder" of [WPS, Inc.] at the time he executed Crawford's Transition Agreement."[23]

While the plaintiff has adequately demonstrated factual disputes as to whether defendant Kulkarni was CEO of WPS, Inc. on January 14, 2002, that issue is immaterial because the plaintiff has submitted evidence that defendant Kulkarni's interference was

---

[23] Memorandum in Support of Defendants' Motion for Partial Dismissal of Plaintiff's Complaint at 11. By the time Kulkarni signed the Transition Agreement he had already contributed his shares in WPS, Inc. to Wolverine Proctor LLC and was no longer sole shareholder. See Plaintiff's Opposition Affidavit ¶22, Exhibit F at W0634.

wrongful, spiteful, and for a malignant purpose unrelated to the legitimate corporate purpose of WPS, Inc. Specifically, the plaintiff's affidavit demonstrates that defendant Kulkarni summoned the plaintiff to a meeting on January 14, 2002 to discuss $135,000 in extracontractual compensation that Kulkarni alleged was due to him, and that the WPS, Inc. CFO, Mark Brown, had declined to pay in accordance with the plaintiff's instructions. After the plaintiff suggested that representatives of Parthenon be contacted for approval, defendant Kulkarni angrily replied that he alone would deal with Parthenon, purported to remove any authority for cash disbursement decisions from the plaintiff and stated that the plaintiff remained employed only because of Mr. Kulkarni's actions. Plaintiff's Opposition Affidavit ¶27. Later that day, Kulkarni telephoned Erik Scott, then of Parthenon, and a member of the WPS, Inc. board, and told him that the plaintiff "had outlived his usefulness." Kulkarni Deposition at 148-149. Mr. Scott related the conversation using the words "[i]t was explained to me that the primary reason for terminating Mr. Crawford's employment was that he was not well-regarded or respected by WPS's senior management," indicating that this was new information to Scott. Scott later authorized the plaintiff's immediate termination. Scott Aff. ¶8. Marshall Bartlett of Parthenon, based on discussions with Mr. Scott and another person at Parthenon, had expected the plaintiff to remain until a new CEO was on board and that a decision would then be made regarding the plaintiff's future. Bartlett Deposition at 16-18

Given these facts, which must be taken as true at this stage, there can be no question but that a reasonable jury could find that the plaintiff was terminated on January 14, 2002 as a direct result of actions taken by defendant Kulkarni, and that those actions were for the spiteful and malignant purpose of retaliating against the plaintiff for

blocking the $135,000 payment, and for the improper purpose of enabling payment of that money. Furthermore, it is obvious that such purpose was unrelated to any legitimate corporate purpose of WPS, Inc., in fact the purpose was contrary to its corporate interest.

Defendants argue that the tortious interference claim must fail because the Transition Agreement was not breached and an essential element of the interference claim is absent. While Count V alleges a breach, defendants' contention must in any case fail because in the employment context, even an employee at will may maintain an action for tortious interference under Massachusetts as the "agreement at will is 'valid and subsisting,' until terminated, and 'defendant may not improperly interfere with it.'" Harrison v. NetCentric Corporation, 433 Mass. 465, 477 (2001), citing Restatement (Second) of Torts §766 cmt. g. at 10-11 (1979). See also Owen v. Williams, 322 Mass. 356, 361-362 (1948) (only probable future business relationship, not binding contract, necessary to maintain an action for interference); Rogers v. NSTAR Elec., 389 F.Supp.2d 100, 109-110 (D.Mass. 2005) (validity of interference claim depends not on employer's right to discharge the plaintiff, but on the conduct of the co-employee procuring the discharge).

Defendants next argue that Kulkarni cannot be liable for interfering with his own contract. But WPS, Inc and Kulkarni are two separate and distinct legal persons. A review of the Transition Agreement reveals that Kulkarni signed it on behalf of WPS, Inc., not himself[24]. See Kulkarni aff., Exhibit 4 at PAC0047. In fact, it was the conflict

---

[24] The signing occurred at the offices of Ropes & Gray, attorneys for Parthenon Capital, in Boston, on a day when large numbers of documents were being signed and exchanged in connection with the closing of the transaction referred to in ¶16 of the Amended Complaint. Mr. Crawford was informed that it had been reviewed by Parthenon's attorneys. Mr. Kulkarni signed the agreement as representatives of Parthenon had already left for the day. See Plaintiff's Opposition Affidavit ¶24.

32

between Kulkarni's interest and that of WPS, Inc. that led to Kulkarni's interference.

While it is true that a corporate decision maker advancing the corporation's legitimate purposes is privileged to terminate an employee, defendants present no evidence of that. See Owen at 360 (burden is on the defendant to establish privilege defense). Rather, the plaintiff's evidence, which must be accepted as true at this point, demonstrates the opposite, that Kulkarni's purpose of extracting unowed funds from WPS, Inc. was contrary to any legitimate purpose.

In G.S. Enterprises, Inc. v. Falmouth Marine, Inc., 410 Mass. 262, 272 (1991) the SJC set forth the four elements of a tortious interference claim under Massachusetts law, requiring proof by a plaintiff that "(1) he had a contract with a third party; (2) the defendant knowingly induced the third party to break that contract; (3) the defendant's interference, in addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed by the defendant's actions." The plaintiff has submitted evidence to prove each of these four elements[25]. In United Truck Leasing Corp. v. Geltman, 406 Mass. 811, 816 (1990), the SJC defined "improper" to mean interference "wrongful by some measure beyond the fact of the interference itself."

While plaintiff disputes that defendant Kulkarni was CEO or his supervisor on January 14, 2002, in the case of an employee's supervisor, it is also be necessary to show a "spiteful, malignant purpose, unrelated to the legitimate corporate interest." See Shea v. Emmanuel College, 425 Mass. 761, 764 (1997), Zimmerman v. Direct Federal Credit

---

[25] The Transition Agreement is evidence of the contract. and defendant Kulkarni's knowledge of it. Defendant Kulkarni, by telephoning Mr. Scott, knowingly induced the plaintiff's termination, breaking the contract. The interference was improper in both motive and means in the interference by defendant Kulkarni was in retaliation for plaintiff's objection, earlier that day, to the $135,000 payment and defendant Kulkarni used improper means by misleading Mr. Scott as to the real reason why he was recommending the plaintiff's termination.

Union, 262 F.3d 70. 76 (1st Cir. 2001) (summarizing Massachusetts law on interference by a supervisor), Wright v. Shriners Hospital for Crippled Children, 412 Mass. 469, 476 (1992). However, there is no practical difference between "'actual malice' and improper motives and means for purposes of" the tort of intentional interference. Harrison at 479. n. 16. (emphasis in original). Thus, "proven retaliation may serve as a proxy for actual malice." Zimmerman at 77, citing Harrison n. 16. As plaintiff has amply demonstrated retaliation and a spiteful, malignant purpose, Kulkarni's position is immaterial.

In Falcon v. Leger, 62 Mass. App, Ct. 352 (2004), the Appeals Court upheld a jury verdict for interference against Mr. Leger, the general manager of a corporation, after Mr. Falcon was terminated shortly after refusing to lie to a UL inspector. Holding that "Leger's actions did not comport with any legitimate corporate interest, Falcon succeeded in establishing that Leger abused his privilege to fire Falcon." Falcon at 353.

In Cariglia v. Hertz Equipment Rental Corp., 363 F.3d 77 (1st Cir. 2004), a supervisor failed to inform the president of certain exculpatory facts when recommending termination of a plaintiff. Even though the actions of the president were not wrongful and advanced a legitimate corporate purpose, the First Circuit permitted the interference claim against the supervisor to proceed. Cariglia at 88. On remand, the district court awarded over $827,000 in damages on interference and other theories. Cariglia v. Hertz Equipment Rental Corp., 343 F.Supp.2d 50, 57 (D.Mass. 2004). Similarly, the First Circuit upheld a jury verdict for interference in Zimmerman at 77-78 (interference verdict supported by actual malice finding based on retaliation evidence).

Defendants cite Harrison at 478 in support of their assertion that "courts frown upon 'tortious interference claims against an individual decision maker who is

34

indistinguishable from the corporation itself.'" However, in Harrison, even though

O'Sullivan was a founder, chairman, CEO, and a large shareholder of a closely held

corporation, there was insufficient evidence to determine, as a matter of law, that

O'Sullivan controlled the "corporation to the degree that he should be viewed as its alter

ego," which the court established as the standard for a corporate officer to avoid liability

for interference. Harrison at 478. On January 14, 2002, Mr. Kulkarni was far from being

the alter ego of Wolverine. Even on defendants' facts, he was only a 40% shareholder

and interim CEO, and whether or not defendant Kulkarni was actually CEO, and whether

he had any actual authority, is disputed by the plaintiff. Furthermore, the First Circuit has

referred to the contention in Harrison, and the comment in Schinkel v. Maxi-Holding,

Inc., 30 Mass. App. Ct. 41, as mere dicta. Zimmerman at 76 n. 4.

Defendants cite Schutz v. Go Ahead Vacations, Inc., 10 Mass. L. Rptr 573 (Sept.

1, 1999), 1999 WL 959681. In that case, however, the CEO was "not someone who

maliciously set out to influence some other decision-maker to fire plaintiff. He was the

decision-maker acting on behalf of the corporation." Schutz at 575. Similarly, in

Restuccia v. Burk Technology, Inc., 5 Mass. L. Rptr. 712 (August 13, 1996), 1996 WL

1329386, Burk apparently owned 100% of the company, it bore his name and he was its

president. The court apparently found it to be his alter ego, insulating him from liability.

Defendants further cite Gram v. Liberty Mutual Ins. Co., 384 Mass. 659 (1981) in

support of the proposition that employees may not be liable for tortious interference when

acting within the scope of their employment responsibilities. However, Gram recognizes

that the privilege is unavailable to those acting with malevolence or outside the scope of

their authority. Gram at 663. Other cases cited by defendants are not on point. In

Platten v HG Bermuda Exempted Ltd., 437 F.3d 118, 130 (1st Cir. 2006), by alleging that a number of entities acted as a group, the plaintiffs were effectively alleging that the defendants interfered with their own contract. In Powderly v. Metrabyte Corp., 866 F.Supp. 39, 43 (D. Mass. 1994), interference claims arising after a merger were barred as the contracting party and the interfering party became one and the same, however, interference claims prior to the merger could proceed. Finally, Appley v. Locke, 396 Mass. 540, 543 (1986) acknowledges that a manager is liable for interference if he lacked the authority to fire the plaintiff.

## VII.  COUNTS FIVE AND SIX RELATING TO BREACH OF THE TRANSITION AGREEMENT CANNOT BE DISMISSED AS MASSACHUSETTS LAW REQUIRES CONTRACT NOTICE PROVISIONS TO BE STRICTLY OBSERVED

Defendants' final argument is that Counts V and VI must fail as the January 18, 2002 letter (the "O'Donohue letter") from WPS, Inc.'s Human Resources Manager constituted sufficient notice. See Brown aff., Exh. 1. That is despite the fact that the Transition Agreement itself specifically provides that "the Chief Executive Officer [must] provide[] written notice of termination."<sup>26</sup> While the O'Donohue letter obviously fails to meet the requirements of the Transition Agreement, there is also a factual dispute as to whether Kulkarni was even CEO of WPS, Inc. on January 18, 2002, the date of the letter.

The Transition Agreement must be read in light of the circumstances. It assumes a transition, and it requires notice of termination to be provided by the CEO, unless a working capital facility is obtained or three months pass. It provides that the plaintiff will perform services for the Board of Directors or the CEO, which suggests a period of time when WPS, Inc. is acting without a CEO. Thus, the intent is clearly that the new CEO of

---

<sup>26</sup> The dictionary definition of "provide" as "to make preparation to meet a need," cited by defendants (Defendants' Memorandum at 17), is wholly unreasonable given the context in which the word appears.

WPS, Inc. provide written notice, not the former CEO. This provided an important protection to the plaintiff, as the new CEO[27] would doubtless require the plaintiff's assistance in the "transition of the Company's management" and the benefit of his "expertise in managing and operating the Company." Kulkarni aff., Exhibit 4 at PAC0043 ¶1. Failure to follow the notice requirement was thus much more than a minute or hypertechnical failure. It abridged a fundamental protection in the agreement.

Defendants assert that the O'Donohue letter constituted the requisite notice. However, that letter contains no reference to the Transition Agreement, does not purport to provide notice pursuant to any agreement, does not refer to its having been issued at behest of any individual, and purports to effect the termination without the two weeks notice required by the Transition Agreement ¶2. Furthermore, the argument that the plaintiff received effective notice would render superfluous the requirement in the Transition Agreement that the CEO provide written notice. Contracts must be interpreted, whenever possible, to give meaning to every part. 17A Am Jur 2d Contracts §377. Restatement (Second) of Contracts §203(a).

Despite these obvious deficiencies, defendants maintain that the "manner in which Wolverine furnished Crawford with written notice of his termination conforms with the provisions of the Agreement." [28] Contrary to defendants' assertion, plaintiff does not allege that the CEO merely failed to sign the notice. Amended Complaint ¶49. Defendants maintain that "Kulkarni made arrangement for written notice to be 'provided' to Crawford," but a review of the Brown and Kulkarni affidavits reveals that only Brown alleges that he took any actions leading to the sending of the letter. Brown aff. ¶12,

---

[27] See Kulkarni aff. ¶25. The new CEO was hired on January 29, 2002, after the termination of the plaintiff.

[28] Defendants' Memorandum at 22.

Kulkarni aff. ¶29. Thus, even if Kulkarni remained CEO, a fact in dispute, the notice was not "provided" by the CEO as required by the Transition Agreement, as even by defendants' facts he did not request that it be sent. Furthermore, nothing in the O'Donohue letter indicates that it constituted notice under the Transition Agreement. Defendants' argument requires clairvoyance by the plaintiff as to happenings outside of his purview in order for him to ascertain whether or not the required notice under the Transition Agreement had been provided.

Defendants argue that any failure to follow the notice provisions is excused because such failure is an immaterial breach. However, the breach was not due to the failure to provide notice in the manner specified. Rather the notice was without force or effect as it was not provided in the matter clearly spelled out by the agreement. It was the failure to pay the amounts due under the still effective agreement that constituted the breach.

Contract notice requirements, particularly those of contract termination, must be strictly observed, and notices of termination which do not comply with the requirements of the contract are without effect. See 17A Am Jur 2d Contracts §544. In Cities Service Oil Co. v. National Shawmut Bank, 342 Mass. 108 (1961), a lessee exercised its option to purchase a property by mailing notice of such exercise on the day the option expired. Even though the notice was received the very next day, it was deemed ineffective as the contract required that notice be "given," and, even though the contract provided for notice by forwarding, notice was not effective until received. Similarly, in McCord v. Masonic Casualty Company, 201 Mass. 473 (1909), notice of an accident to an insurance company was deemed ineffective and the claim correctly denied, when notice was mailed

before a two week deadline, but not received until after it. In Old Colony Railroad v. Assessors of Quincy, 305 Mass. 509 (1940) a messenger delivering a petition of abatement found the assessor's office closed early (by the messenger's watch set to standard time) following the Governor's extension of daylight saving time after the Hurricane of 1938. Even though notice was immediately mailed, it arrived after the statutory deadline and was ruled ineffective.

Furthermore, even if the January 18, 2002 letter had been "provided" by the CEO, it did not constitute effective notice because it purported to effect termination earlier than the contract permitted, i.e. immediately, as opposed to after the requisite two weeks notice. In Nissan, supra at 310, the exercise of a purchase option was completely invalid because it purported to be effective earlier than the requisite six months in the future. See also Cadillac Automobile Co. v. Stout, 20 Mass. App. Ct. 906, 907 (1985) (person seeking to exercise option must turn his corners squarely). A contract termination option is no different than a purchase option in this regard. See Oldfield v. Chevrolet Motor Co., 199 N.W. 161 (Iowa 1924) (no contract termination at all when notice purported to cancel a contract with less notice than required).

Defendants confuse general contract principles relating to substantial performance with the more stringent requirements relating to options and, in a footnote, cite several out of state cases. These are not on point as they do not relate to options. Nor are their cases relating to contract interpretation on point. There is no allegation that the Transition Agreement is ambiguous as to the two week notice requirement, nor is there any ambiguity as to meaning of "provide[] written notice of termination" There is simply no ambiguity that would require this court to construe the agreement according to the

39

intent of the parties, as a rational business instrument, or in accordance with the substance

of the transaction. After acknowledging that contract interpretation is a question of law

for the court, they proceed to request that the court apply principles applicable to

ambiguous contracts. That this court cannot do.

## VIII.  CONCLUSION

For the above stated reasons, defendants are not entitled to summary judgment on

any of the counts in the Amended Complaint, and the plaintiff is entitled to summary

judgment on Count I of the Amended Complaint.

Respectfully submitted,

Peter A. Crawford, pro se
23 Newcastle Dr. #11
Nashua, NH  03060
(603)888-4574

Date: April 6, 2006

UNITED STATES DISTRICT COURT
District of Massachusetts

, 2006 APR -b  P 4: 07

U.S. DISTRICT COURT    Civil Action
DISTRICT OF MASS.    No. 05-10078-DPW

PETER A. CRAWFORD, Plaintiff    )
    )
    )
    v.    )
    )
WOLVERINE, PROCTOR & SCHWARTZ, INC.,    )
    Steven F. Chilinski, Deepak S. Kulkarni,    )
    )
    Defendants    )
    )

### PLAINTIFF'S LOCAL RULE 56.1 COUNTER STATEMENT OF DISPUTED MATERIAL FACTS IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Pursuant to Local Rule 56.1, plaintiff disputes the facts set forth in Defendants' Local Rule 56.1 Statement of Undisputed Material Facts in Support of Defendants' Motion for Partial Summary Judgment, dated March 17, 2006, as indicated. The paragraphs set forth herein are intended to correspond with those in defendants' statement. By stating that he admits certain facts, plaintiff does not hereby waive any right to contest defendants alleged facts should additional contradictory facts be discovered at a later date, but merely that he presently has no basis to contest them.

1. Admit.

2. Plaintiff admits, except that he does not hereby acknowledge that Mr. Kulkarni was President and CEO of Wolverine, Proctor & Schwartz, Inc. (hereinafter "WPS, Inc.") on January 4, 2000, which fact is not demonstrated by the documents or affidavits indicated.

1

3. Admit.

4. Admit, except that plaintiff denies that the bonus was annual, because the plain terms of the Employment Contract (also known as the "Employment Agreement") provided for monthly proration of the bonus in the event that plaintiff left WPS, Inc. See Kulkarni Aff., exh. 2 at PAC0002.

5. Plaintiff admits that the provision numbered 4 of the Employment Contract contained a formula for the bonus, but denies that he drafted the final version. Pages 101-103 of his deposition testimony indicate that the word "DEPR" was removed between the first and final documents. In addition, a further comparison between pages PAC0342 (see Kulkarni Aff., exh. 1) and PAC0001 (see Kulkarni Aff., exh. 2) indicates that the phrase "or any operating expenses charged against reserves" was added. Furthermore, the plaintiff's deposition testimony as to the comparability of the text refers only to the text through the paragraph commencing with "EBITDA means the earnings…" A number of changes requested by Mr. Kulkarni affected the remaining paragraphs of provision 4. See Plaintiff's Affidavit in Support of his Opposition to Defendants' Motion for Partial Summary Judgment (hereinafter "Plaintiff's Opposition Affidavit") ¶3.

6. Admit, to the extent that the words "Crawford's annual Bonus was calculated" refers to the text of the Employment Contract as opposed to any calculation ever having been performed which is not alleged in the affidavits referred to.

7. Admit, except that the referenced document includes the word "the," making the provision read "the earnings before any interest, taxes or deductions for depreciation

or amortization," indicating that there is but a single earnings figure contemplated to form the basis for the bonus calculation.

8.  Plaintiff admits only that he has not found a place where EBITDA is defined in FASB literature. Plaintiff's Deposition at 123 (Whitney Aff. Exh. 2). He maintains, however, that "earnings" is a GAAP defined term. Plaintiff's Opposition Affidavit ¶4. Plaintiff's Affidavit in Support of his Motion for Partial Summary Judgment (hereinafter "Plaintiff's Support Affidavit"), Exhibits L, M, N.

9.  Deny. Plaintiff's Opposition Affidavit ¶4. Plaintiff's Support Affidavit, Exhibits L, M, N.

10. Plaintiff denies that defendant Kulkarni ever, prior to 2005, informed him that he believed that either EBITDA or earnings were GAAP defined terms that excluded extraordinary gains. Plaintiff's Opposition Affidavit ¶20. Plaintiff also maintains that "earnings" is in fact a GAAP defined term. Plaintiff's Opposition Affidavit ¶4. Plaintiff's Support Affidavit, Exhibits L, M, N. Plaintiff's Opposition Affidavit, Exhibit B. Plaintiff's Support Affidavit ¶18, Exhibit Q at 70, 90.

11. Plaintiff admits that he was proceeding from the assumption that "earnings" is a GAAP defined term, but denies that such assumption is mistaken. Plaintiff's Opposition Affidavit ¶4.

12. Plaintiff denies that non-GAAP terms cannot be defined in accordance with GAAP. Plaintiff's Opposition Affidavit ¶5, 15 C.F.R. §229.10(e)(4), 15 C.F.R. §244.101(a)(1). Plaintiff denies that defendant Kulkarni ever indicated to him that he intended that the EBITDA component of the Bonus calculation would approximate WPS, Inc.'s annual cash flow from operations excluding changes in the company's working

capital and any extraordinary gains. Conversely, he states that the parties intended only to exclude non-operating adjustments to reserves, to the extent that those adjustments affected EBITDA. Plaintiff's Opposition Affidavit ¶6.

13. Plaintiff admits that the Employment Contract as structured provides for a bonus substantially based on net income. He denies that that has anything to do with an "EBITDA component," but rather follows inexorably from the algebra of the bonus formula. That is the conclusion reached from the deposition testimony on pages 168-171 referenced by defendants, not what is stated.

14. Plaintiff denies that he acknowledged during his deposition that his intent as to the meaning of EBITDA was different than that of defendant Kulkarni. The transcript at the pages indicated reveals that the plaintiff was referring to defendant Kulkarni's recent deposition testimony in this case, not his intent at the time the Employment Contract was negotiated. Furthermore, a review of the indicated testimony reveals that there was no mention of "EBITDA" at that point, but that the testimony related to intent as to the bonus calculation, of which EBITDA is but one component.

15. Plaintiff denies that the parties had radically different understandings and intentions with respect to the EBITDA component of the Bonus calculation. Plaintiff's Opposition Affidavit ¶7.

16. Plaintiff states that this mischaracterizes his deposition testimony at the pages indicated, which indicates that there were no discussions of the possibility that there might be "an unusual event like a loan forgiveness." The testimony indicated does not discuss the inclusion of extraordinary gains or debt forgiveness in the bonus calculation at all.

17. Admit

18. Admit, except that the controlling interest was in Wolverine Proctor LLC. Plaintiff's Support Affidavit, Exhibit C at PAC0033.

19. Admit, except that plaintiff states that the Complaint is in error when it refers to Wolverine, Proctor & Schwarz, LLC. The correct entity is Wolverine Proctor LLC ("WP LLC"). The entity Wolverine Proctor & Schwarz, LLC ("WPS, LLC") was formed in late 2004. Plaintiff's Support Affidavit ¶4, Exhibit C at PAC0033 ¶1.

20. Plaintiff states that WP LLC owned substantially all of the shares of Wolverine Proctor, Inc., which in turn owned substantially all of the shares of Wolverine, Proctor & Schwartz, Inc. Plaintiff's Support Affidavit ¶4, Exhibit C at PAC0033 ¶1.

21. Plaintiff states that this mischaracterizes his deposition testimony at the pages indicated, which did not use the word "substantial" or discusses the magnitude of the loan forgiveness in connection with the Parthenon transaction in relation to the June 2001 time frame.

22. Admit

23. Plaintiff admits that he recalls meetings with Parthenon during the Summer of 2001, but states that he doesn't remember exactly when the Parthenon due diligence started. Crawford deposition transcript at 141.

24. Admit.

25. Plaintiff states that this mischaracterizes this document which states only that PWC met with the plaintiff and discussed Information Systems issues. Plaintiff does not recall any meetings with PWC in which he provided information regarding WPS, Inc.'s financial status. Plaintiff's Opposition Affidavit ¶8.

5

26. Admit.

27. Admit.

28. Admit, except that plaintiff did not testify on the indicated pages as to what entity was to repay the debt.

29. Admit, except that the indicated pages do not discuss this issue.

30. Plaintiff admits that he became aware of the level of debt forgiveness on or about December 5, 2001, but denies that he was aware in late November or early December of 2001 of the structure of the transaction. Plaintiff states that his awareness of the structure of the transaction came later in December, 2001. Plaintiff's Opposition Affidavit ¶9.

31. Plaintiff states that he recalls providing sales and marketing data to Parthenon, including bookings, backlog, and prospects, as well as revenues and cost of goods sold for the large order (equipment) business. Any suggestion that he provided data regarding WPS's financial condition beyond that mischaracterizes his testimony on the pages indicated. Any information relating to EBITDA, or the assets and liabilities of WPS, Inc. was in all likelihood provided by Mr. Kulkarni, CEO, Mr. Brown, CFO. or members of the WPS, Inc. accounting department who reported to Mr. Brown. Plaintiff's Opposition Affidavit ¶10.

32. Plaintiff states that this mischaracterizes his testimony on the indicated pages. While he had the best understanding of the company's cash flow and gross margin profitability (revenues minus the cost of goods sold – the cost of producing items sold), Mark Brown, CFO had a better understanding of accounting principles, the assets and liabilities WPS, Inc., and of costs other than cost of goods sold. Plaintiff's Opposition

6

Affidavit ¶11. Plaintiff further denies that he was the senior WPS, Inc. executive in charge of corporate finance and accounting. Mr. Brown, CFO, often dealt directly with Mr. Kulkarni, CEO, on finance and accounting issues. Plaintiff's Opposition Affidavit ¶12. Mr. Kulkarni is sophisticated at accounting issues, was once a chartered accountant in the U.K. and had published a book on accounting. Plaintiff's Opposition Affidavit ¶21, Exhibit E (hereinafter "Kulkarni Deposition") at 239-240.

33. Admit, except that plaintiff denies that William Crotty or anyone in the WPS, Inc. accounting department other than Mark Brown reported directly to him after Mark Brown joined WPS, Inc. in 2000. Plaintiff's Opposition Affidavit ¶13.

34. Admit, except that plaintiff states that this format was for internal use and that he doubts that information in this format was provided to Parthenon. Plaintiff's Opposition Affidavit ¶14.

35. Admit, except that plaintiff states that it would be completely incorrect from an accounting standpoint to have included an accrual for his 2001 bonus on financial statements prepared as of November 30, 2001 as at that point it was believed that receivership was likely and Citizens did not agree to debt forgiveness until on or about December 5, 2001. Furthermore, plaintiff states that it would also have been incorrect from an accounting standpoint to include an accrual for his bonus in the December, 2001 projections without also including forgiveness of indebtedness income, and it was clear to everyone that the December 2001 projections excluded that income. Plaintiff's Opposition Affidavit ¶14.

36. Admit.

37. Plaintiff states that this mischaracterizes his testimony on the indicated pages, which is that "as of" December 28, 2001 he had that belief.

38. Admit, except that plaintiff states that no such accrual would have been proper from an accounting standpoint, as the trial balance was as of November 30, 2001. Plaintiff's Opposition Affidavit ¶14.

39. Admit, except that plaintiff states that defendant Kulkarni was fully aware of the possibility that the plaintiff might request such a bonus. Plaintiff's Support Affidavit ¶16, Exhibit O at 2-12 to 2-15. Furthermore, Parthenon was fully aware of and was provided with a copy of the Employment Agreement. Plaintiff's Opposition Affidavit ¶22, Exhibit F. That agreement disclosed the terms of the bonus and Parthenon was aware that WPS, Inc. would have an extraordinary gain. The plaintiff did not deal with Parthenon on matters relating to his bonus, his conversations relating to that were exclusively with Mr. Kulkarni and WPS, Inc. attorney Jarvis Kellogg. Plaintiff's Opposition Affidavit ¶¶23, 24.

40. Plaintiff neither admits nor denies this as it is pure speculation, and is not admissible evidence.

41. Plaintiff states that this mischaracterizes his testimony, which was that receivership or bankruptcy were likely in the event that the deal fell apart, but not if it was merely delayed. The deal could have been delayed into January 2002 without Citizens again seeking to appoint a receiver. Plaintiff's Opposition Affidavit ¶15. Furthermore, any statement as to what agreements might or might not have been signed in such an event is pure speculation not addressed in the deposition pages cited. Plaintiff admits that if the deal had not consummated in late 2001 that the extraordinary gain

8

would not have occurred in 2001, but denies that it could not have occurred at any time

prior to 2:00 p.m. January 4, 2002. Plaintiff's Opposition Affidavit ¶15, Exhibit C at

W0734 ¶2.

    42. Admit.

    43. Admit.

    44. Admit.

    45. Admit, the paragraph continues, stating that "[t]he Employee's commitment to

the Company during the Transition Period will be full-time and shall take into account

the Employee's expertise in managing and operating the Company."

    46. Admit, except that nothing in the Transition Agreement prevented the parties

from negotiating an extension, or agreeing that the plaintiff should serve permanently in

any other capacity, including CEO. Parthenon and the plaintiff both contemplated that

the plaintiff would remain at least until a new CEO was appointed and the transition was

complete. Plaintiff's Opposition Affidavit ¶16, Plaintiff's Opposition Affidavit ¶25,

Exhibit G (hereinafter "Bartlett Deposition") at 16-18.

    47. Admit.

    48. Admit.

    49. Admit.

    50. Plaintiff denies that each of the five members of the WPS, Inc. Board of

Directors executed the indicated documents on December 31, 2001. The document itself

indicates that it is "as of" December 31, 2001, which date appears to have been hand

written by the same person on each of the five copies. See Kulkarni Aff. Exh. 6.

Furthermore, Erik Scott, who signed one of the copies, does not allege that he signed on

December 31, 2001. See Scott Aff. ¶5. Finally, Mr. Bartlett of Parthenon believes that

Mr. Kulkarni was not formally appointed CEO. Bartlett Deposition at 13-14. The

plaintiff further denies that such documents had any effect pursuant to the WPS, Inc.

bylaws or Delaware Law. Plaintiff further states that defendants have submitted no

evidence that the purported unanimous consent was "filed with the minutes of

proceedings of the Board" as required by both the WPS, Inc. bylaws and Delaware law

for such a unanimous consent to be effective. Plaintiff's Opposition Affidavit ¶17,

Exhibit D at PAC0332 §2.13, Kulkarni Deposition at 2-92.

51. Admit.

52. The plaintiff admits that the document so states, but denies that the bylaws of

WPS, Inc. permitted any person not already President, Chairman or another corporate

officer of WPS, Inc. to be appointed Chief Executive Officer, and denies that the WPS,

Inc. Board of Directors took such action on December 31, 2001 for the reasons stated in

¶50 above.

53. Admit, however plaintiff denies that a quorum was present as Messrs. Brown,

Rutherford and Jacquet were absent.

54. Admit.

55. Plaintiff denies that defendant Kulkarni was lawfully serving in the capacity

of CEO of WPS, Inc., and further states that his Consulting Agreement, still in effect and

not lawfully modified, provided that defendant Kulkarni "shall have no right, power or

authority in any way to bind the Company to the fulfillment of any condition, contract or

obligation or to create any liability binding on the Company." Kulkarni Aff. Exh. 5 at

W0739 ¶3(b). Plaintiff also denies that defendant Kulkarni was coming into the office

during January, 2002 on other than an sporadic basis, or playing any significant role in managing WPS, Inc. Plaintiff's Opposition Affidavit ¶18.

56. Admit.

57. Admit, except that plaintiff denies that defendant Kulkarni was ever officially appointed Chairman of the Board of WPS, Inc., which fact is not demonstrated by any evidence presented by defendants.

58. Admit, except that plaintiff denies that a quorum was present, Messrs. Scott, Rutherford and Jacquet being absent.

59. Admit, except that plaintiff denies that such action was lawfully taken, no quorum being present. Plaintiff's Opposition Affidavit, Exhibit D §2.11.

60. Admit.

61. Plaintiff states that this mischaracterizes the affidavits which never state that the WPS, Inc. Board of Directors met telephonically as a group to take such action, as the statement of facts implies. Both the WPS, Inc. bylaws and Delaware law require that all directors be able to hear each other for a valid meeting to occur. Plaintiff's Opposition Affidavit Exhibit D §2.10. Plaintiff further states that Mr. Scott was misled as to the real reason for the plaintiff's termination, which was in retaliation for the plaintiff blocking a $135,000 payment to Mr. Kulkarni earlier that day. Plaintiff's Opposition Affidavit ¶27, Kulkarni Deposition at 148-149. Scott Aff. ¶8, Bartlett Deposition at 16-18.

62. Admit, except that plaintiff denies that the WPS, Inc. Board of Directors validly voted to terminate his employment. See ¶61 above.

63. Admit, except that the plaintiff denies that Mr. Brown provided the plaintiff any written notification.

64. Plaintiff denies that Mr. Brown escorted him out of the WPS, Inc.

headquarters. Plaintiff's Opposition Affidavit ¶19.

65. Admit.

66. Admit.

67. Admit.

68. Plaintiff states that this statement mischaracterizes his testimony at the

indicated page, and further states that defendant Kulkarni was fully aware on December

28, 2001, prior to the signing of the Transition Agreement, that the plaintiff was likely to

request a bonus based upon his 2001 employment with WPS, Inc. Plaintiff's Support

Affidavit ¶16, Exhibit O at 2-12 to 2-15.

Respectfully submitted,

Peter A. Crawford, pro se
23 Newcastle Dr. #11
Nashua, NH 03060
(603)888-4574

Date: April 6, 2006

UNITED STATES DISTRICT COURT
District of Massachusetts

Civil Action
No. 05-10078-DPW

PETER A. CRAWFORD, Plaintiff )
)
)
v. )
)
WOLVERINE, PROCTOR & SCHWARTZ, INC., )
Steven F. Chilinski, Deepak S. Kulkarni, )
)
Defendants )

## PLAINTIFF'S AFFIDAVIT IN SUPPORT OF HIS OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

I, Peter A. Crawford, do hereby say and depose that:

1. I am the plaintiff in the above-captioned action. I was employed by Wolverine, Proctor & Schwartz, Inc. (hereinafter "WPS, Inc.") as its Chief Operating Officer from on or about December 30, 1999 to January 14, 2002.

2. I make the statements herein based upon personal knowledge, unless otherwise indicated.

3. Since my deposition in this matter, I have compared more carefully the documents marked PAC0342 and PAC0001. I refer to pages PAC0001 through PAC0005 as the Employment Contract or the Employment Agreement. PAC0342 is an earlier draft of that contract. In addition to deletion of the word "DEPR," the final version of the Employment Contract has the phrase "or any operating expenses charged against reserves" added. Furthermore, there are a number of changes to provision 4 (the

1

text from the paragraph number 4 on page PAC0001 through the bottom of PAC0002) after the paragraph beginning "EBITDA means the earnings…" In particular, the formula for TAXES was modified from a flat 45% to a calculation intended to estimate Mr. Kulkarni's actual tax rate, and a BOOKDIF term was added. Other than the deletion of the term "DEPR" from the BONUS formula, which was a drafting error on my part, I recall that the rest of the changes in provision 4 were requested by Mr. Kulkarni or WPS, Inc. attorney Gabor Garai, who reviewed the document before either of us signed it. I attach hereto as PAC0363, Exhibit A, a copy of an e-mail from Mr. Kulkarni that I received on January 3, 2000, before signing the Employment Agreement, indicating that "Gabor" had gotten back to him, referring to Mr. Garai. After Mr. Kulkarni reworded the provision for proration of the bonus to provide for forfeiture of the bonus after termination for cause, I inserted a provision clarifying the meaning of cause. I did not have my attorney review the Employment Contract before signing it. Mr. Kulkarni had ample opportunity to participate in the drafting of provision 4, and indeed in the entire Employment Agreement, and made extensive changes.

4. I have an MBA from Harvard University and extensive experience in reviewing financial statements and with accounting matters. I have reviewed in detail the appropriate statements of the Financial Accounting Standards Board ("FASB"), and have determined that the term "earnings" is defined by, and has a very specific meaning under GAAP. In addition to FAS 130 and CON 5 and FAS 5, all or portions of which were attached to Plaintiff's Affidavit in Support of his Motion for Partial Summary Judgment, I attach hereto a true copy of selected pages of Statement of Financial Accounting Concepts No. 6 (hereinafter "CON 6") as Exhibit B. I downloaded a copy of that

document from www.fasb.org during November, 2005. In addition, I attach hereto as Exhibit H selected pages from S. Rep. No. 205, 107th Cong., 2nd Sess. (2002) that I downloaded from frwebgate.access.gpo.gov during March, 2006. I reviewed these and other materials in reaching this conclusion.

5. I disagree that it is impossible to define non-GAAP contractual terms in accordance with GAAP. Non-GAAP financial measures calculated using exclusively GAAP defined measures and/or operating measures that are not non-GAAP financial measures are definable in accordance with GAAP. Specifically, since the terms "earnings," "interest," "taxes," "depreciation," and "amortization" all have well-defined meanings under GAAP and are not themselves non-GAAP financial measures, any calculation using exclusively these measures is inherently definable in accordance with GAAP.

6. During December 1999 and January 2000 I had extensive discussions with defendant Kulkarni regarding calculation of my bonus under the Employment Contract. While initially the discussions were focused more on cash flow than earnings, the completed agreement reflects a bonus based largely upon the earnings (synonymous with net income), of WPS, Inc. Mr. Kulkarni never contended, prior to 2004, that an extraordinary gain, whether arising from the forgiveness of indebtedness or otherwise, would be excluded from the bonus calculation. However, we did discuss the exclusion of non-operating adjustments to reserves, and agreed to exclude those from the bonus calculation, to the extent that they affected EBITDA.

7. During December 1999 and January 2000, defendant Kulkarni and I reached a meeting of the minds with respect to the bonus calculation. After several discussions by

3

telephone and in person, numerous revisions of provision 4 by Mr. Kulkarni, and a review of the document by Gabor Garai, WPS, Inc.'s attorney, prior to signing, we arrived at a carefully crafted and mutually agreed definition for the calculation of my bonus. I did not fail to disclose to Mr. Kulkarni any of my intentions with regard to the bonus, and he had ample time and opportunity to disclose to me any of his intentions, and did so on numerous occasions. While the initial discussions relating to the bonus calculation were focused on cash flow, ultimately the discussions led to a bonus based on earnings (synonymous with net income).

8. I recall meeting with representatives of PriceWaterhouse Coopers ("PWC") during 2001, and I recall discussions with them relating to Information Systems. I do not recall significant discussions with PWC regarding WPS, Inc.'s financial status during any meeting with PWC representatives. I recall that most of PWC's interactions were with Mark Brown and members of the WPS, Inc. accounting department.

9. On or about December 5, 2001, I became aware that Parthenon had agreed with Citizens that the WPS, Inc. loan could be repurchased, or otherwise extinguished, for $11,500,000. I did not become aware of the structure of the transaction until later in December 2001. Prior to then, the transaction could have been structured such that Parthenon or some other newly-created entity, rather than WPS, Inc., would have repurchased the debt from Citizens. In such an event, there might not have been an extraordinary gain for WPS, Inc.

10. I recall providing only a limited amount of information to representatives of Parthenon during 2001. Primarily, that data was of a sales and marketing nature, and included bookings, backlog and prospect information, as well as past and projected

4

revenues and cost of goods sold for the WPS, Inc. large order (i.e. equipment rather than spare parts) business. I recall that information relating to the balance sheet of WPS, Inc. or the past or future EBITDA of WPS, Inc. was typically provided either by Mark Brown, CFO, or by people in the WPS, Inc. accounting organization that reported to him. During 2001, Mr. Brown frequently dealt directly with defendant Kulkarni and with Parthenon on financial issues. I typically did not review information before it was provided to Parthenon.

11. While I was heavily involved in managing the WPS, Inc. cash flow to ensure we could make shipments, and I closely monitored the WPS, Inc. gross margin (gross margin consists of the revenues minus the cost of goods sold, the cost of producing particular items that were sold), I left most of the other financial issues to Mark Brown as CFO. In particular, during 2001, I rarely reviewed the WPS, Inc. balance sheet, which included the company's assets and liabilities, other than to examine the accounts receivable for amounts that we might be able to collect from customers, or the accounts payable for amounts owing to vendors, both of which could have an immediate cash impact. While the gross margin was an element of the WPS, Inc. profits, there were also substantial selling, general and administrative costs that I left largely up to Mark Brown and the WPS, Inc. accounting department to understand and monitor.

12. Mr. Brown, not I, was the senior WPS executive in charge of corporate finance and accounting issues, and defendant Kulkarni was also heavily involved in these areas. Mr. Kulkarni was very sophisticated at accounting and corporate finance issues.

5

13. Neither William Crotty nor anyone else in the WPS, Inc. accounting organization, other than Mark Brown, reported direcly to me at any time after Mark Brown joined WPS, Inc. as CFO in 2000.

14. I never requested that Mr. Crotty provide an accrual for any bonus that might be owed to me for 2001 in any financial statements prepared as of November 30, 2001 because it would have been completely incorrect from an accounting standpoint to have done so. As of November 30, 2001, receivership was likely and Citizens did not agree to any forgiveness of debt until December 5, 2001, and even then it was not clear who would purchase or repay the debt and thus whether WPS, Inc. would have any forgiveness of indebtedness income. Furthermore, while one of the statements provided includes projections for December 2001, the other has only quarterly projections and data is missing for the fourth quarter of 2001, as indicated by the "#REF" notations on several lines. In any event, it would also have been incorrect from an accounting standpoint to have included an accrual for any bonus owed to me in any December 2001 projections without also including the effect of forgiveness of indebtedness income. Inasmuch as the amount of that income was to be approximately $10 million, it was obvious to me, and I believe to anyone who might examine these statements, that the projections did not incorporate any effect from the transaction that was to occur at the end of December, 2001. Finally, these statements were for internal use, and I doubt that they were provided in this format to anyone at Parthenon. The trial balance referred to in defendants' statement of facts ¶34 was as of November 30, 2001, and it would have been incorrect to include any accrual for my bonus as of that date for the reasons stated above.

15. Neither defendant Kulkarni nor anyone else ever suggested to me that Citizens had set a deadline of December 2001 for the closing of a transaction. Rather, Mr. Kulkarni had informed me that the reason for the closing before the end of 2001 was to ensure a tax benefit to him. I attach hereto a letter agreement from Citizens indicating that the transaction could close at any time prior to 2:00 p.m. on January 4, 2002. That letter is a true copy of documents produced by defendants during discovery in this matter, and is attached hereto as Exhibit C, pages W0733 to W0737.

16. From the terms of the Transition Agreement and from discussions with defendant Kulkarni and Erik Scott, I understood that my role during 2002 was to manage WPS, Inc. until such time as a new CEO had been appointed, and to assist in the transition to the new CEO. At the time that I signed the Transition Agreement, Mr. Kulkarni had told me about the consulting agreement that he was signing as part of the transaction that day, and I believed that he would cease to be CEO of WPS, Inc. after the transaction closed. I understood the reference to the "Chief Executive Officer" in §2 of the Transition Agreement to be to the new CEO, not Mr. Kulkarni. That understanding was reinforced by the reference to the performance of services as "requested by the Chief Executive Officer of the Company or its Board of Directors" in §1. I understood that to refer to my taking direction directly from the Board of Directors until such time as a new CEO was appointed.

17. I attach hereto as Exhibit D a true copy of the bylaws of Wolverine Acquisition Corp. and related documents demonstrating that Wolverine Acquisition Corp. was renamed Wolverine (Massachusetts) Corporation on September 3, 1991. These documents were kept by WPS, Inc. as business records in the ordinary course.

Wolverine (Massachusetts) Corporation was renamed Wolverine, Proctor & Schwartz, Inc. in 1999.

18. After the transaction closed on December 31, 2001, I recall that Mr. Kulkarni came into the WPS, Inc. offices on the next business day. I do not recall that he came into the office again, or that he was significantly involved in the management of WPS, Inc. until January 14, 2002. During that time, I recall that Erik Scott and Marshall Bartlett, as representatives of Parthenon, came to the WPS, Inc. offices to meet with me, Mark Brown and William Crotty as a group. There may have been some other persons from Parthenon or WPS, Inc. at that meeting, but Mr. Kulkarni was definitely not present. After the meeting, I spoke privately with Mr. Scott, and expressed to him my concerns regarding prior cash withdrawals by Mr. Kulkarni, and the possibility that he might attempt further unauthorized withdrawals in the future. Mr. Scott shared my concerns in that regard and assured me that I could contact him directly regarding that or any other issues.

19. Mark Brown never escorted me out of the WPS, Inc. offices on January 14, 2002 or at any other time.

20. Prior to 2005, defendant Kulkarni never informed me that he believed that either "EBITDA" or "earnings" were GAAP defined terms that excluded extraordinary gains.

21. I attach hereto as Exhibit E, true copies of selected pages from the depositions of Deepak Kulkarni in this matter, taken December 7, 2005 and February 8, 2006. I never received any errata sheets or other corrections pursuant to Fed. R. Civ. P. 30(e) for either deposition. The February 8, 2006 deposition pages are of the form "2-xx."

8

22. I attach hereto as Exhibit F, true copies of pages W0632, W0634, W0639 and W0640 produced by defendants during discovery in this matter. These are selected pages from the Institutional Investor Loan and Security and Class B Unit Subscription Agreement that I understand was executed on December 28, 2001. I understood that representatives of Parthenon were provided a copy of my Employment Agreement, referred to in this document as the Crawford Employment Letter, well before December 28, 2001.

23. During December, 2001 I had a number of discussions with Mr. Kulkarni relating to a substitute equity provision, to take effect following the closing of the anticipated transaction with Parthenon. That provision would provide a substitute for the options that were provided by my Employment Agreement. I did not deal directly with anyone else (other than Jarvis Kellogg, WPS, Inc.'s attorney), including anyone from Parthenon, on any personal issues relating to my Employment Agreement, or the options or bonus provided for in that agreement. I dealt exclusively with Mr. Kulkarni and Mr. Kellogg on those issues.

24. On December 28, 2001, I dealt exclusively with Mr. Kulkarni and Jarvis Kellogg of Epstein, Becker & Green, attorneys for WPS, Inc., on the negotiation of the Transition Agreement and the Settlement Agreement, both executed by me that day. At one point in the negotiations Mr. Kellogg informed me that he was leaving the room to obtain the approval of Parthenon, its attorneys, or both, to the language of the Transition Agreement and the Settlement Agreement. By his demeanor and actions, Mr. Kellogg made it clear that he did not want me dealing directly with either Parthenon or its attorneys. It was after 5:00 p.m. when Mr. Kulkarni signed the two agreements on behalf

9

of WPS, Inc. and he informed me that representatives of Parthenon had left for the day so
were not available to sign. I attach hereto as Exhibit J a true copy of the Settlement
Agreement that I executed on December 28, 2001. The Transition Agreement is attached
to Plaintiff's Affidavit in Support of his Motion for Partial Summary Judgment as Exhibit
B.

25. I attach hereto as Exhibit G, a true copy of selected pages from the deposition
of Marshall Bartlett, taken in this matter on January 20, 2006, together with a true copy
of the errata sheet that I received relating to that deposition.

26. I attach hereto as Exhibit I, a true copy of the Affidavit of Deepak Kulkarni
(excluding exhibits) that was filed in this court as Docket Entry 25 on June 4, 2004 in the
unrelated case of Wolverine, Proctor & Schwartz, Inc. v. Aeroglide Corporation, 1:03-cv-
11372-NG. I downloaded that document from this court's Pacer web site.

27. During the afternoon of January 14, 2002, Mr. Kulkarni summoned me to a
meeting to discuss the payment of $135,000 to him, which he alleged was due him as
fringe benefit compensation above and beyond his normal salary for the month of
December, 2001. Mr. Kulkarni stated that the WPS, Inc. Chief Financial Officer
("CFO") had declined to make such payment in accordance with my instructions.
Inasmuch as such payment request was wholly without any credible rationale whatsoever,
such that payment would constitute embezzlement under Massachusetts law (M.G.L. c.
266 §30), I suggested that representatives of Parthenon be contacted for approval. To
this, Mr. Kulkarni angrily replied that he alone would deal with Parthenon, that
henceforth the CFO and his U.K. counterpart alone would deal with any cash
disbursement decisions, and that I remained employed by WPS, Inc. only because of his

10

actions. I attempted unsuccessfully to contact Erik Scott of Parthenon, and later on

January 14, 2002, I was informed that the WPS, Inc. Board of Directors had voted to

terminate my employment immediately.

Signed under pains and penalties of perjury this the $6th$ day of April, 2006

Peter A. Crawford, pro se
23 Newcastle Dr. #11
Nashua, NH 03060
(603)888-4574

11