**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**
_____

PETER A. CRAWFORD,

        Plaintiff,

                                                      Civil Action No.

v.                                                05-cv-10078 (DPW)

WOLVERINE, PROCTOR & SCHWARTZ, INC.,
STEVEN F. CHILINSKI, and
DEEPAK S. KULKARNI,

        Defendants.

_____

## <u>AFFIDAVIT OF DEEPAK S. KULKARNI</u>

DEEPAK S. KULKARNI, being duly sworn deposes and says:

1.      I was the sole stockholder, Chief Executive Officer ("CEO") and Chairman of the Board of defendant Wolverine, Proctor & Schwartz, Inc. ("WPS") throughout 1999, 2000 and most of 2001. I submit this Affidavit in support of my Motion for Summary Judgment to dismiss plaintiff _pro se_ Peter A. Crawford's ("Crawford") fraud claim against me.

2.      In or about December 1999, I asked Crawford to join WPS as the company's Chief Operating Officer ("COO"). On January 4, 2000, Crawford signed an Employment Contract and began his employment as WPS's COO.

3.      Crawford served as WPS's COO from approximately December 30, 1999 until January 14, 2002.

4.      As WPS's COO, Crawford was in charge of the entire day-to-day operations of the company. There was no single individual at WPS, myself included, who knew more about the company's cash flow and financial condition, including, but not limited to, all monies

coming in and going out, and all funds collectible and payable. When I initially hired Crawford as WPS's COO, he also served as the company's acting Chief Financial Officer ("CFO") until such time as a new CFO could be hired. Crawford was ultimately responsible for hiring WPS's new CFO (who joined the company in September 2000) and Crawford was the CFO's direct supervisor. Crawford also closely supervised individual staff accountants at WPS.

5.      I have reviewed the substance of Crawford's Amended Complaint, including Crawford's allegation that I fraudulently induced him into signing his Settlement Agreement on or about December 28, 2001.

6.      In his Amended Complaint, Crawford falsely states that, prior to executing his Settlement Agreement, I failed to disclose to him the fact that WPS owed me approximately $624,263 in accrued dividends and expenses. In paragraph 82 of his Amended Complaint, Crawford goes so far as to state that I had "exclusive knowledge" of the fact that I was owed $624,263 in accrued dividends and expenses. This statement is false, absurd and perjurious.

7.      On June 29, 2001 (one and a half years into Crawford's tenure as COO and a full six months prior to Crawford's execution of his Settlement Agreement), Arthur Andersen LLP issued WPS's Consolidated Financial Statements and Auditors' Report as of December 31, 2000 and January 1, 2000 (the, "2000 Financial Statements," attached hereto as Exhibit 1). As the COO and executive in charge of WPS's day-to-day operations at that time, Crawford had intimate knowledge of WPS's 2000 Financial Statements and the litany of WPS financial documents (including trial balances) used to generate it. On page 16 of the 2000 Financial Statements, under the emboldened heading "RELATED PARTY TRANSACTIONS" and the emboldened subheading "Accrued Expenses," is the following text:

> Included in the accrued expenses at December 31, 2000 and January 1, 2000 is approximately $694,000 and $1,374,000, respectively, payable to the sole stockholder of the Company.

The term "sole stockholder of the company" is a reference to me.

8.     As of December 27, 2001, page 27 of WPS's General Ledger and Trial Balance (the "Trial Balance") reflected an accrued dividend owing to me of $624,263.00.  This Trial Balance was incorporated into Parthenon's acquisition of WPS in late December 2001.  A portion of the Trial Balance (the entire document is 121 pages) which includes the line-item for the $624,263 in accrued dividends owing to me as of December 27, 2001 is attached hereto as Exhibit 2.

9.     As WPS's COO, Crawford had immediate and unfettered access to WPS's Trial Balance at any time, up to and including December 28, 2001, the day on which he executed his Settlement Agreement.  As the supervisor of the accounting department, Crawford had a regular weekly meeting on Friday afternoons with WPS's CFO and a staff accountant to go over each week's trial balance.  The line-item for my accrued dividends/expenses appeared on substantially all of the weekly trial balances for the past several years (up to an including the specific Trial Balance attached to this Affidavit), sometimes as different numbers because the amount fluctuated over time.

10.     All of the various Trial Balances and the 2000 Financial Statements were available for either Parthenon or Crawford to examine at their leisure.  Thus, Crawford's repeated allegation that I either had "exclusive knowledge" or took steps to hide the existence of the accrued dividend/expenses owing to me prior to December 28, 2001 is simply untrue.

11.     In paragraph 85 of his Amended Complaint, Crawford alleges that I "failed fully and completely to disclose the existence of [my] alleged rights to these payments [the accrued

dividends/expenses] to representatives of Parthenon." This statement is false. As I stated above, the existence of the accrued dividend/expenses was incorporated – in writing – into the documents which governed Parthenon's acquisition of WPS in late December 2001. No one at Parthenon has ever brought suit against me and Parthenon has since acknowledged the propriety of my contractual entitlement to the accrued dividend/expenses.

12.    On Friday, January 20, 2006, Crawford took the deposition of Marshall Bartlett, a Parthenon representative who was heavily involved in the management of WPS. I have read the transcript of Mr. Bartlett's deposition, relevant portions of which are attached hereto as Exhibit 3. When questioned by Crawford regarding Parthenon's payment of monies to me, including the accrued expenses/dividends at issue here, Mr. Bartlett testified as follows:

> Q.    Were people at Parthenon frustrated that he continued to ask for his money while Parthenon was forgiving or deferring the money it was owed?
>
> A.    … We felt we were doing the right thing. He was contractually within his rights to get those payments, and we looked at it hard, but on both sides, but he was within his rights.
>
> Q.    You said you looked at it hard. What do you mean by that?
>
> A.    We looked at the agreement to ensure that he was really due those payments, and he was.

[Exh. 3, pgs. 38-39].

13.    Attached hereto as Exhibit 4 is a true copy of the Wolverine Proctor, LLC Limited Liability Company Agreement ("LLC Agreement"), which was executed on December 28, 2001.

14.    Attached hereto as Exhibit 5 is a true copy of Crawford's December 28, 2001 Settlement Agreement.

Signed under the penalties and pains of perjury this 5th day of May 2006.

/s/ Deepak S. Kulkarni_____ _____
DEEPAK S. KULKARNI

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on May 5, 2006, I filed the foregoing document with the Clerk of the Court using the ECF system. I further certify that I mailed the foregoing document and the notice of electronic filing to the pro se plaintiff, Peter A. Crawford, 23 Newcastle Drive, #11, Nashua, NH 03060, by U.S. mail, on the same date. I further certify that I sent a courtesy copy of this filing and its ECF confirmation to plaintiff at his email address petercra@ix.netcom.com on the same date.

/s/ Jeffrey D. Kuhn_____
Jeffrey D. Kuhn, Esq.

# Exhibit 1

# Kulkarni Affidavit – May 5, 2006



**WOLVERINE PROCTOR & SCHWARTZ, INC.**

Consolidated Financial Statements
as of December 31, 2000 and January 1, 2000
Together with Auditors' Report

PAC 0081



**Report of Independent Public Accountants**

To the Board of Directors of
Wolverine Proctor & Schwartz, Inc.:

We have audited the accompanying consolidated balance sheets of Wolverine Proctor & Schwartz, Inc. (a Delaware corporation) and subsidiaries as of December 31, 2000 and January 1, 2000, and the related consolidated statements of operations and comprehensive loss, stockholder deficit and cash flows for the years then ended. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with auditing standards generally accepted in the United States. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Wolverine Proctor & Schwartz, Inc. and subsidiaries as of December 31, 2000 and January 1, 2000, and the results of their operations and their cash flows for the years then ended, in conformity with accounting principles generally accepted in the United States.

The accompanying financial statements have been prepared assuming that the Company will continue as a going concern. As discussed in Note 1 to the financial statements, the Company has incurred losses from operations during 1999 primarily in connection with a restructuring of its business. These matters raise substantial doubt about its ability to continue as a going concern. Management's plans in regard to these matters are also described in Note 1. The accompanying financial statements do not include any adjustments that might result from the outcome of this uncertainty.

*Arthur Andersen LLP*

Boston, Massachusetts
June 29, 2001

**PAC** 0082

**WOLVERINE PROCTOR & SCHWARTZ, INC.**

Consolidated Balance Sheets
December 31, 2000 and January 1, 2000

| ASSETS | 2000 | 1999 |
|---|---|---|
| **Current Assets:** | | |
| Cash and cash equivalents | $      254,331 | $      770,235 |
| Restricted cash | - | 1,200,000 |
| Accounts receivable, net of allowance for doubtful accounts of $1,070,803 and $1,051,401, respectively | 5,414,775 | 8,976,305 |
| Costs and estimated earnings in excess of billings on uncompleted contracts | 2,915,989 | 2,352,396 |
| Inventories | 3,377,333 | 4,399,757 |
| Prepaid expenses and other | 1,316,383 | 1,208,770 |
| Total current assets | 13,278,811 | 18,907,463 |
| Property and Equipment, at cost, less accumulated depreciation | 6,510,812 | 7,909,605 |
| Goodwill | 11,632,662 | 12,925,626 |
| Other Assets | 202,042 | 434,021 |
| | $  31,624,327 | $  40,176,715 |
| **LIABILITIES AND STOCKHOLDER DEFICIT** | | |
| **Current Liabilities:** | | |
| Revolving loan payable | $    4,816,200 | $    5,009,805 |
| Current portion of long-term obligations | 14,500,000 | 2,000,000 |
| Due to affiliate | 1,000,000 | - |
| Accounts payable | 7,273,794 | 9,318,238 |
| Billings in excess of costs and estimated earnings on uncompleted contracts | 2,048,846 | 121,458 |
| Accrued expenses and other | 6,177,640 | 10,198,248 |
| Customer deposits | 3,411,649 | 2,778,590 |
| Total current liabilities | 39,228,129 | 29,426,339 |
| Commitments and Contingencies (Note 11) | | |
| Long-term Obligations, less current portion | - | 12,500,000 |
| Other Long-term Liabilities | 4,697,634 | 5,631,415 |
| Minority Interest | 158,509 | 66,096 |
| **Stockholder Deficit:** | | |
| Common stock, $0.01 par value— | | |
| Authorized—150,000 shares | | |
| Issued and outstanding—655 shares in 2000 and 1999 | 7 | 7 |
| Additional paid-in capital | 1,493 | 1,493 |
| Put warrants | 183,195 | 183,195 |
| Retained deficit | (12,864,872) | (7,814,304) |
| Accumulated other comprehensive income | 220,232 | 182,474 |
| Total stockholder deficit | (12,459,945) | (7,447,135) |
| | $  31,624,327 | $  40,176,715 |

*The accompanying notes are an integral part of these consolidated financial statements.*

**PAC 0083**

18321.doc

**WOLVERINE PROCTOR & SCHWARTZ, INC.**

Consolidated Statements of Operations and Comprehensive Loss
for the Years Ended December 31, 2000 and January 1, 2000

| | 2000 | 1999 |
|---|---|---|
| Sales | $ 43,866,391 | $ 64,028,783 |
| Cost of Sales | 31,980,286 | 52,431,132 |
| Gross profit, excluding depreciation expense | 11,886,105 | 11,597,651 |
| Selling, General and Administrative Expense | 11,662,740 | 15,208,871 |
| Restructuring Expense | - | 1,589,039 |
| Interest and Other Income | (130,680) | (500,186) |
| Earnings (loss) before interest expense, taxes, depreciation and amortization and extraordinary loss | 354,045 | (4,700,073) |
| Other Expenses: | | |
| Interest expense | 1,889,576 | 1,726,265 |
| Depreciation | 1,817,432 | 2,133,092 |
| Amortization | 1,519,624 | 1,373,205 |
| Minority interest expense | 92,413 | 164,490 |
| Loss before provision for income taxes and extraordinary loss | (4,965,000) | (10,097,125) |
| Provision for Income Taxes | 45,568 | 376,750 |
| Net loss before extraordinary loss | (5,010,568) | (10,473,875) |
| Extraordinary loss | - | 1,282,006 |
| Net loss | (5,010,568) | (11,755,881) |
| Other Comprehensive Income, net of tax: | | |
| Foreign currency translation adjustments | 37,758 | 27,213 |
| Comprehensive loss | $ (4,972810) | $ (11,728,668) |

*The accompanying notes are an integral part of these consolidated financial statements.*

PAC 0084

**WOLVERINE PROCTOR & SCHWARTZ, INC.**

Consolidated Statements of Stockholder Deficit
for the Years Ended December 31, 2000 and January 1, 2000

| | Common Stock | | Additional Paid-in Capital | Put Warrants | Retained Earnings (Deficit) | Accumulated Other Comprehensive Income | Total |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | Number of Shares | Par Value | | | | | |
| Balance, December 26, 1998 | 655 | $ 7 | $ 1,493 | $ 4,665,000 | $ 106,622 | $ 155,261 | $ 4,928,383 |
| Net loss | - | - | - | - | (11,755,881) | - | (11,755,881) |
| Decrease in warrant estimated value | - | - | - | (4,481,805) | 4,481,805 | - | - |
| Distributions accrued and paid | - | - | - | - | (646,850) | - | (646,850) |
| Effect of cumulative translation adjustment | - | - | - | - | - | 27,213 | 27,213 |
| Balance, January 1, 2000 | 655 | 7 | 1,493 | 183,195 | (7,814,304) | 182,474 | (7,447,135) |
| Net loss | - | - | - | - | (5,010,568) | - | (5,010,568) |
| Distributions accrued and paid | - | - | - | - | (40,000) | - | (40,000) |
| Effect of cumulative translation adjustment | - | - | - | - | - | 37,758 | 37,758 |
| Balance, December 31, 2000 | 655 | $ 7 | $ 1,493 | $ 183,195 | $ (12,864,872) | $ 220,232 | $ (12,459,945) |

*The accompanying notes are an integral part of these consolidated financial statements.*

4

18321.doc

PAC 0085

**WOLVERINE PROCTOR & SCHWARTZ, INC.**

Consolidated Statements of Cash Flows
for the Years Ended December 31, 2000 and January 1, 2000

|  | 2000 | 1999 |
|---|---|---|
| **Cash Flows from Operating Activities:** | | |
| Net loss | $ (5,010,568) | $ (11,755,881) |
| Adjustments to reconcile net loss to net cash (used in) provided by operating activities, net of acquisitions– | | |
| Depreciation, amortization and accretion | 3,337,056 | 3,681,277 |
| Loss on disposal of assets | - | 104,454 |
| Provision for bad debts | 62,546 | 587,930 |
| Minority interest | 92,413 | 164,490 |
| Restructuring | - | 1,589,039 |
| Changes in assets and liabilities, net of acquisition and disposition– | | |
| Accounts receivable | 3,498,984 | 2,792,386 |
| Costs and estimated earnings in excess of billings on uncompleted contracts | (563,593) | 189,791 |
| Inventories | 824,872 | 2,143,721 |
| Prepaid expenses and other | (109,079) | (413,635) |
| Accounts payable | (2,044,444) | 865,788 |
| Billings in excess of costs and estimated earnings on uncompleted contracts | 1,927,388 | (202,433) |
| Accrued expenses and other liabilities | (4,314,389) | 1,470,117 |
| Customer deposits | 633,059 | (586,046) |
| Net cash (used in) provided by operating activities | (1,665,755) | 630,998 |
| **Cash Flows from Investing Activities:** | | |
| Purchase of property and equipment | (214,302) | (916,510) |
| Proceeds from sale of fixed assets | - | 31,485 |
| Net cash used in investing activities | (214,302) | (885,025) |
| **Cash Flows from Financing Activities:** | | |
| Proceeds from long-term borrowings | - | 4,659,805 |
| Proceeds from affiliate | 1,000,000 | - |
| Payments of long-term obligations and notes payable | (193,605) | (2,650,000) |
| Dividends paid for taxes | (680,000) | (646,850) |
| Net cash provided by financing activities | 126,395 | 1,362,955 |
| Effect of Exchange Rates on Cash and Cash Equivalents | 37,758 | 27,035 |
| Net (Decrease) Increase in Cash and Cash Equivalents | (1,715,904) | 1,135,963 |
| Cash and Cash Equivalents, beginning of year | 1,970,235 | 834,272 |
| Cash and Cash Equivalents, end of year | $ 254,331 | $ 1,970,235 |
| **Supplemental Disclosure of Cash Flow Information:** | | |
| Cash paid during the period for– | | |
| Interest | $ 1,801,092 | $ 1,725,116 |
| Income taxes | $ 688,234 | $ 354,849 |

*The accompanying notes are an integral part of these consolidated financial statements.*

5

18321.doc

PAC 0086

**WOLVERINE PROCTOR & SCHWARTZ, INC.**

Notes to Consolidated Financial Statements
December 31, 2000

(1)    **THE COMPANY**

Wolverine Proctor & Schwartz, Inc. (the Company) designs, manufactures and sells commercial ovens, web-handling and associated equipment used in the food processing, coating, laminating, chemical, waste management and plastic industries.  The Company manufactures these products under contracts with its customers.  The Company's divisions include Wolverine, located in Merrimac, Massachusetts; Proctor & Schwartz (P&S), located in Lexington, North Carolina, and Horsham, Pennsylvania and Wolverine Proctor & Schwartz (WP&S), located in Glasgow, Scotland.  P&S and WP&S were acquired by the Company in 1994.

Through its American Tool and Machine Company (ATM) division, the Company also engages in the manufacturing and repair of certain components, primarily for its paper industry customers.

The Company also owns a 49% interest in Friel Engineering Limited (Friel), a U.K. manufacturer of industrial drying machinery.  The remaining 51% of Friel is owned by the president and sole stockholder of the Company.  Accordingly, the operations of Friel are included in the accompanying consolidated financial statements.  During 1999, the Company sold the assets of its pollution control line of business for approximately $1.9 million.  The sale resulted in a gain of approximately $490,000, which is included in other income.

The Company entered into a Loan Amendment and Funding Agreement dated September 29, 2000 with Citizen's Bank of Massachusetts (Citizen's).  The Company has incurred a significant loss in 1999, primarily in connection with a restructuring of its business.  The Company has made required principal and interest payments to date; however, the agreement expires on September 30, 2001, on which date all outstanding debt is due.  As a result, all outstanding debt has been classified as current in the consolidated balance sheet as of December 31, 2000.  The Company does not have the ability to repay all of the outstanding debt without obtaining additional financing. Management is currently seeking additional financing. In the absence of such financing, there is substantial doubt concerning the Company's ability to continue as a going concern.  The accompanying consolidated financial statements do not include any adjustments that might result if the Company is unable to continue as a going concern.

(2)    **SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES**

The accompanying consolidated financial statements include the accounts of the Company and its divisions and the accounts of Friel.  The net assets of Friel not owned by the Company are presented as minority interest.  All material intercompany transactions have been eliminated in consolidation.

(a)    **Use of Estimates**

The preparation of financial statements requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities as of the date of the financial statements and the reported amounts of revenues and expenses during the reporting periods.  Actual results could differ from those estimates.

6

18321.doc

PAC 0087

**WOLVERINE PROCTOR & SCHWARTZ, INC.**

Notes to Consolidated Financial Statements
December 31, 2000

(b)    **Reclassifications**

Certain amounts in 1999 have been reclassified to conform to the
presentation in the 2000 financial statements.

(c)    **Cash and Cash Equivalents**

Cash and cash equivalents primarily consists of overnight cash investments
in Nassau securities, which are swept daily by the Company's bank. The
Company values these temporary cash investments at cost, which
approximates market. Included in cash and cash equivalents at January 1,
2000 is $1.2 million, which had been restricted by the bank. The restricted
cash represented a portion of the proceeds associated with the sale of the
Pollution Control division in 1999. In September 2000, the $1.2 million was
released by the Company's bank and applied against the outstanding balance
of the Company's Revolving Credit Agreement (Revolver) (see Note 6).

(d)    **Inventories**

Inventories at December 31, 2000 and January 1, 2000 consisted of the
following:

|  | 2000 | 1999 |
|---|---|---|
| Raw materials | $    1,175,130 | $    1,261,795 |
| Work-in-process | 2,186,688 | 2,747,421 |
| Finished goods | 15,515 | 390,541 |
|  | $    3,377,333 | $    4,399,757 |

Inventories are stated at the lower of cost (first-in, first-out method) or market.
Raw materials inventory consists of sheet steel, piping, wire, fasteners and
other items used in the manufacturing process. Work-in-process inventory
represents materials released into production and labor and overhead applied
on a job-order cost basis. Finished goods inventory includes goods awaiting
shipment to fulfill open sales orders and component parts available for sale to
customers for repairs or modifications to existing equipment.

(e)    **Property and Equipment**

Property and equipment are recorded at cost. Additions and improvements
are capitalized, and ordinary repairs and maintenance are charged to
expense as incurred.

The Company provides for depreciation on property and equipment on the
straight-line basis over their estimated useful lives, ranging from three to 50
years. During 1999, the Company accelerated depreciation (amounting to
approximately $350,000) of certain assets at one of its manufacturing plants
due to a change in the estimated useful lives of those assets (see Note 8).
The Company recorded depreciation expense of approximately $1,817,000
and $2,133,000 in 2000 and 1999 respectively. Depreciation expense

7

18321.doc

**PAC 0088**

WOLVERINE PROCTOR & SCHWARTZ, INC.

Notes to Consolidated Financial Statements
December 31, 2000

associated with costs of sales was $1,273, 000 and $1,494,000 in 2000 and 1999. Depreciation expense associated with selling, general and administrative expenses was $544,000 and $639,000 in 2000 and 1999, respectively.

**(f)    Goodwill**

The unallocated excess of purchase cost over net assets acquired in acquisitions has been amortized on the straight-line basis over 40 years. Effective January 2, 2000, the Company revised its estimate of the remaining useful life of goodwill to 10 years resulting in an increase on amortization approximately $921,000 from 1999 to 2000. The total goodwill amortization was approximately $1,293,000 and $372,000 in 2000 and 1999 respectively. The Company regularly assesses the realizability of goodwill in accordance with Statement of Financial Accounting Standards (SFAS) No. 121, *Accounting for the Impairment of Long-Lived Assets and for Long-Lived Assets To Be Disposed Of*, and has concluded that no impairment has occurred.

**(g)    Other Assets**

Included in other assets at December 31, 2000 and January 1, 2000, are the following:

|  | 2000 | 1999 |
|---|---|---|
| Deferred financing costs | $ 396,036 | $ 439,241 |
| Other | 32,666 | 37,984 |
|  | 428,702 | 477,225 |
| Less—Accumulated amortization charged in the accompanying consolidated statements of income and comprehensive income | 226,660 | 43,204 |
|  | $ 202,042 | $ 434,021 |

Deferred financing costs represent costs associated with the Company's debt obligations, which are being amortized on the straight-line basis over the life of the respective agreements. Unamortized finance costs of approximately $157,000 were written-off during 1999 as a result of the refinancing (see Note 6).

**(h)    Income Taxes**

The Company has elected to be treated as a small business corporation (a Subchapter S corporation) under the Internal Revenue Code and state tax law. Accordingly, no provision for federal income taxes is reflected in the Company's accompanying consolidated financial statements, since the stockholder, not the Company, is liable for federal income taxes on corporate

8

18321.doc

PAC 0089

**WOLVERINE PROCTOR & SCHWARTZ, INC.**

Notes to Consolidated Financial Statements
December 31, 2000

income.  The Company's WP&S branch is subject to corporate income taxes
in the United Kingdom.

The Company records certain state and foreign income taxes in accordance
with SFAS No. 109, *Accounting for Income Taxes*.  Under SFAS No. 109,
deferred tax assets and liabilities are recognized for the expected future tax
consequences of events that have been included in the consolidated financial
statements or tax returns.  The amount of deferred tax assets and liabilities is
based on the differences between the financial statement and tax bases of
assets and liabilities using currently enacted tax rates.  Valuation allowances
are established when necessary to reduce deferred tax assets to the amount
that is realizable based upon the realization criteria defined in SFAS 109.

**(i)**   **Revenue Recognition**

Revenue from sales contracts for machinery is recognized under the
percentage-of-completion method, measured by the percentage ratio of either
costs incurred to date to the estimated total costs of the contract or labor
hours incurred to date to the estimated total labor hours of the contract.
When an ultimate loss is indicated on a contract, the entire estimated loss is
recorded.  Revenue from sales of machine parts and repair services is
recognized when the parts are shipped or the services are rendered.  The
Company provides for a reserve for its estimate of warranty costs at the time
of shipment.

**(j)**   **Comprehensive Income**

In 1998, the Company adopted SFAS No. 130, *Reporting Comprehensive
Income*, which establishes standards for the reporting and display of
comprehensive income and other comprehensive income items.  In general,
comprehensive income combines net income and other changes in equity
from nonowner sources during the year.  At year-end 2000 and 1999, the
balance of accumulated other comprehensive loss represents the Company's
cumulative translation adjustment.

**(3)**   **CONTRACTS**

Costs, estimated earnings and related billings on uncompleted contracts, net, at
December 31, 2000 and January 1, 2000, are as follows:

|  | 2000 | 1999 |
|---|---|---|
| Cost incurred to date | $   7,900,815 | $   8,728,276 |
| Estimated earnings | 2,771,737 | 3,353,109 |
|  | 10,672,552 | 12,081,385 |
| Less—Billings to date | 9,805,409 | 9,850,447 |
|  | $      867,143 | $   2,230,938 |

18321.doc

PAC 0090

**WOLVERINE PROCTOR & SCHWARTZ, INC.**

Notes to Consolidated Financial Statements
December 31, 2000

Included in the accompanying consolidated balance sheets at December 31, 2000 and January 1, 2000 are the following:

|  | 2000 | 1999 |
|---|---|---|
| Costs and estimated earnings in excess of billings on uncompleted contracts | $   2,915,989 | $   2,352,396 |
| Billings in excess of costs and estimated earnings on uncompleted contracts | (2,048,846) | (121,458) |
|  | $     867,143 | $   2,230,938 |

**(4)    INCOME TAXES**

The Company's state income tax provision consists of corporate-level state income taxes that are levied against the Company as a Subchapter S corporation. Payments to the sole stockholder to fund the personal tax liabilities as a result of the Company's taxable income are recorded as distributions in the accompanying consolidated statements of stockholder's equity.

In 2000 and 1999, the Company's effective state tax rate differs from the statutory rate of 30% primarily because of state tax apportionment relief, goodwill related to the purchase of P&S in 1994 and the corporate taxes owed in the United Kingdom.

A valuation allowance has been established to fully reserve against the tax benefits associated with certain temporary differences and operating loss carry forwards as it cannot be determined that it is more likely than not that these deferred tax assets will be realized.

PAC 0091

**WOLVERINE PROCTOR & SCHWARTZ, INC.**

Notes to Consolidated Financial Statements
December 31, 2000

(5)    PROPERTY AND EQUIPMENT

Property and equipment at December 31, 2000 and January 1, 2000 consists of the following:

|  | Useful Life | 2000 | 1999 |
|---|---|---|---|
| Buildings and improvements | 31–50 years | $  3,894,108 | $  3,825,108 |
| Office equipment and motor vehicles | 3–10 years | 2,321,733 | 2,324,627 |
| Machinery and equipment | 7–10 years | 6,562,056 | 6,340,605 |
| Laboratory and computer equipment | 7–10 years | 2,684,953 | 2,560,659 |
| Leasehold interest | Life of lease | 1,437,282 | 1,437,282 |
|  |  | 16,900,132 | 16,488,281 |
| Less—Accumulated depreciation |  | 11,746,167 | 9,935,523 |
|  |  | 5,153,965 | 6,552,758 |
| Land |  | 1,356,847 | 1,356,847 |
|  |  | $   6,510,812 | $   7,909,605 |

(6)    LONG-TERM OBLIGATIONS

Long-term obligations at December 31, 2000 and January 1, 2000 consists of the following:

|  | 2000 | 1999 |
|---|---|---|
| Revolving loan payable | $   4,816,200 | $   5,009,805 |
| Due to affiliate | 1,000,000 | - |
| Senior notes payable | 14,500,000 | 14,500,000 |
|  | 20,316,200 | 19,509,805 |
| Less—Current portion | 20,316,200 | 7,009,805 |
|  | $            - | $  12,500,000 |

In February 1999, the Company entered into a Loan and Security agreement with Citizen's for the purpose of refinancing the terms of its existing credit arrangements and to provide for working capital needs of the Company.  Under the agreement, the Company entered into two term loans for $10,000,000 (Term A) and $6,000,000 (Term B), respectively.  Both were originally payable in quarterly installments, maturing on February 28, 2004.  Interest for the Term A loan was due quarterly at the greater of 7.5% or the aggregate of the Five-Year U.S. Treasury Yield plus 350 basis points.  The interest rate for the Term B loan was due quarterly at 10%.

18321.doc

PAC 0092

**WOLVERINE PROCTOR & SCHWARTZ, INC.**

Notes to Consolidated Financial Statements
December 31, 2000

Additionally, with the agreement, the Company entered into the Revolver. The Company could borrow up to $8,000,000. The borrowing base under the Revolver was reduced by the total amount outstanding of all letters of credit. The amount of letters of credit was limited to $4,000,000. Outstanding letters of credit at December 31, 2000 and January 1, 2000 were $1,547,750 and $2,053,892, respectively.

The proceeds from the refinancing were used to pay off all existing debt. The refinancing resulted in an extraordinary loss of $1,282,006 in 1999 primarily due to the write-off of unamortized debt discount and deferred financing fees.

In September 2000, the Company and Citizen's entered into a Loan Amendment and Funding Agreement (Amendment) that amended the terms of the Loan and Security Agreement dated February 24, 1999 and provided additional funding to the Company. The Amendment provided for the release of $1,200,000 of restricted cash from the sale of the Pollution Control division, held by Citizens, and a capital contribution, by the sole shareholder or affiliate of the shareholder, of $1,000,000 to be applied against the outstanding principal balance of the Revolver. The funds may be reborrowed by the Company immediately and until the occurrence of a termination event, as defined.

The Amendment waived all existing events of default at December 31, 1999 under the Loan and Security Agreement that existed and confirmed the revolving credit default and term loan default interest fees totaling $300,700, a waiver fee minimum of $200,000 and legal fees of $55,000, for various defaults under the loan agreements. Principal payments towards the Term Loans of not less than $500,000 are required on June 1, 2001 and September 1, 2001. The Amendment also revised the revolving credit and term loan maturity dates to September 30, 2001, amended the borrowing base availability calculation and reduced the limit on letters of credit to $2,000,000 (excluding the Cardwell Letter of Credit).

In September 2000, the Company borrowed $1,000,000 from MAWLAW 492 Ltd. (MAWLAW 492), an entity owned by the sole shareholder of the Company, in return for a promissory note. The note bears interest at 15% per annum and is payable on demand if an "event of default" occurs, as defined. The note is subordinate to all indebtedness owed to Citizens and may be prepaid at any time, and from time to time, in whole or in part, without penalty or premium.

Simultaneously with the issuance of the promissory note, the Company issued MAWLAW 492 a warrant to purchase the number of fully paid and nonassessable shares of the Company's common stock equivalent to 34% of (i) the number of shares of common stock outstanding at the time of such exercise (not including shares owned or held by or for the account of the Company) plus (ii) the number of shares of common stock to which all Convertible Securities, as defined, of the Company then outstanding would then be convertible plus (iii) the number of shares of common stock which would then be issuable upon exercise of all Stock Purchase Rights, as defined, then outstanding. The warrant was issued for no additional consideration. The Company has not assigned any portion of the debt proceeds to the warrant as the amount would be immaterial.

Certain of the Company's financing arrangements contain restrictions, which, among other things, require maintenance of certain financial ratios. Among the

**12**

18321.doc

PAC 0093

**WOLVERINE PROCTOR & SCHWARTZ, INC.**

Notes to Consolidated Financial Statements
December 31, 2000

Company's financial ratio tests is a ratio based upon earnings before interest, taxes, depreciation and amortization (EBITDA). The Company has defined EBITDA to be the sum of its income, including interest income and other income, before interest expenses, minority interest and taxes plus depreciation and amortization. Compliance with each of the aforementioned covenants shall be calculated on a six-month rolling average basis, commencing with the six months ending March 31, 2001. The Company is in compliance with the terms of the amendment.

(7)   **EMPLOYEE BENEFIT PLANS**

The Wolverine and the P&S divisions have 401(k) contribution plans, covering substantially all of their employees, in which participants may invest up to 6% of their gross compensation. Under the terms of the plans, the Company provides a 60% matching contribution and pays all fees and expenses related to the plans. During 2000 and 1999, contributions to the plans, including fees and expenses, totaled $24,919 and $31,446, respectively, for Wolverine, and $164,222 and $392,061, respectively, for P&S.

ATM has a noncontributory, collectively bargained, multiemployer defined benefit pension plan covering substantially all nonmanagement employees. The Company contributed $37,097 and $51,016 in 2000 and 1999, respectively. The pension fund has advised the Company that there were no unfunded vested benefits for withdrawal liability purposes during the plan years ended December 31, 2000 and January 1, 2000.

P&S maintains a noncontributory defined benefit pension plan covering substantially all of its full-time salaried employees (the Salaried Plan) and a noncontributory defined benefit pension plan covering substantially all of its full-time hourly employees (the Hourly Plan). These plans merged during 1999 to form the Proctor & Schwartz Salaried Employees' Retirement Plan (the Plan). P&S's policy is to fund amounts as are necessary, on the actuarial basis, to provide assets sufficient to meet the benefits to be paid to plan members in accordance with the requirements of the Employee Retirement Income Security Act of 1974.

Pension (income) expense was $(286,655) in 2000, and $210,675 in 1999.

Unrecognized prior-service costs are being amortized over 15 years.

PAC 0094

**WOLVERINE PROCTOR & SCHWARTZ, INC.**

Notes to Consolidated Financial Statements
December 31, 2000

The following table sets forth the reconciliation of the Plan's funded status as of December 31, 2000.

|  | Pension | Life and Medical |
|---|---|---|
| Benefit cost | $ (75,422) | $ (204,645) |
| Employer contribution | – | 173,726 |
| Benefits paid | (1,273,011) | (173,726) |
| Benefit obligation at December 31 | 14,491,267 | (1,413,162) |
| Fair value of plan assets at December 31 | 15,608,508 | – |
| Funded status | 1,117,241 | (1,413,162) |
| Accrued benefit cost recognized in the statement of financial position | (285,723) | (4,563,591) |
| Weighted average assumptions as of December 31, 2000– | | |
| Discount rate | 7.50% | 7.50% |
| Expected return on plan assets | 9.00% | N/A |
| Rate of compensation increase | N/A | N/A |

The following table sets forth the reconciliation of the Plans' funded status as of January 1, 2000.

|  | Pension | Life and Medical |
|---|---|---|
| Benefit cost | $ 19,317 | $ (169,933) |
| Employer contribution | – | 172,172 |
| Benefits paid | (1,203,170) | (172,172) |
| Benefit obligation at January 1 | 14,342,427 | (1,663,416) |
| Fair value of plan assets at January 1 | 16,727,305 | – |
| Funded status | 2,384,878 | (1,663,416) |
| Accrued benefit cost recognized in the statement of financial position | (361,145) | (4,941,962) |
| Weighted average assumptions as of January 1, 2000– | | |
| Discount rate | 7.75% | 7.00% |
| Expected return on plan assets | 9.00% | N/A |
| Rate of compensation increase | N/A | N/A |

All benefit costs above are shown net of any plan participant contributions.

**14**

18321.doc

PAC 0095

**WOLVERINE PROCTER & SCHWARTZ, INC.**

Notes to Consolidated Financial Statements
December 31, 2000

During 1998, the Company changed the method of coverage from self-insured to managed care programs for the majority of their retirees. This change results in a reduction of the plan's liabilities of approximately $898,000 that is currently being amortized over 12 years.

P&S's postretirement health care plans currently are not funded. Under the terms of the plan, retirees will pay 50% of the premiums, but all currently employed personnel will pay 100% of their premiums upon retirement. The income included in the consolidated statements of operations and comprehensive income relating to the postretirement plan amounted to $377,785 and $169,933 in 2000 and 1999, respectively.

The assumed health care cost trend rates used in measuring the accumulated postretirement benefit obligations as of December 31, 2000 were 9.5% for pre-65 coverage and 7.5% for post-65 coverage, decreasing linearly each successive year until it reaches 5.0% in the year 2009, after which it remains constant. A 1% increase or decrease in the assumed health care cost trend rate for each year would change the accumulated postretirement benefit obligations as of December 31, 2000 by approximately $93,551 and $(84,790), respectively. The assumed discount rate used in determining the accumulated postretirement benefit obligation was 7.50%.

(8)    **RESTRUCTURING**

During 1999, the Company recorded restructuring and related costs of approximately $1.6 million. The restructuring mainly affected the Company's P&S operations. The Company recorded an adjustment for severance as well as employee benefits. The Company has terminated 108 employees as a part of the restructuring. The Company also included lease abandonment costs for manufacturing facilities in Lexington, North Carolina, for lease obligations through March 2001. The Company paid out substantially all of the accrued restructuring during 2000.

(9)    **RELATED PARTY TRANSACTIONS**

(a)    **Management Agreement**

The Company has a management agreement (the Agreement) with DSK Management Corporation (the Management Company), a company owned by the sole stockholder of the Company. The Agreement includes a five-year initial term and an additional five-year renewal option (exercisable at the option of the Management Company). Under the Agreement, the Company pays to the Management Company a fee calculated at an annual rate of $200,000 for the period ending December 31, 1991, increasing thereafter at an annual rate of $50,000 per year (subject to the availability of funds after consideration of certain loan agreement compliance limitations as discussed in Note 6). The Management Company has forgiven the amount owed each year under the Agreement for all periods through December 31, 2000. Accordingly, no amounts have been reflected by the Company in the accompanying consolidated financial statements.

PAC 0096

**WOLVERINE PROCTER & SCHWARTZ, INC.**

Notes to Consolidated Financial Statements
December 31, 2000

**(b)    Executive Bonus**

During 1999 and 2000, the Company paid approximately $75,000 and $450,000, respectively, to a retired executive as a bonus and/or severance. A balance of $53,000 remains in accrued expenses at December 31, 2000 in the accompanying consolidated balance sheets.

**(c)    Accounts Receivable**

The Company was owed approximately $211,000 from The Cardwell Machine Company (Cardwell), an affiliate of the Company as of December 31, 2000. This amount has been fully reserved for as management believes the amount is uncollectible. Also included in prepaid expenses and other at December 31, 2000 is approximately $1,155,400 advanced by Friel to an affiliate owned by the sole shareholder of the Company on account of future dividends from Friel.

**(d)    Accrued Expenses**

Included in accrued expenses at December 31, 2000 and January 1, 2000 is approximately $11,000 and $35,000, respectively, as amounts payable to the sole stockholder of the Company.

Included in the accrued expenses at December 31, 2000 and January 1, 2000 is approximately $694,000 and $1,374,000, respectively, payable to the sole stockholder of the Company.

**(10)    PUT WARRANTS**

In connection with a prior revolving credit agreement, the Company issued a warrant to Merita Bank (replacing a previous warrant) to purchase 75 shares of common stock representing, in the aggregate, 7.5% of the outstanding common stock of the Company as of the effective date. This warrant is exercisable at any time after September 23, 1994 for an aggregate exercise price of $1,000 subject to various terms.

Also, in connection with the acquisition of P&S (see Note 1) as of September 23, 1994, the Company additionally issued warrants to purchase shares of the Company's common stock to Equitable and EDFFII and Hanseatic Corporation.

The Equitable and EDFFII agreement represents an option to purchase an aggregate of 150 warrants (or 15% of the outstanding common stock of the Company as of the effective date) of the Company, each warrant representing the right to purchase, upon certain terms and conditions, one share of common stock. The initial purchase price is the amount of $1,000 divided by the original number of shares of common stock purchasable upon exercise of all of the warrants, or $6.67 per share. The expiration date is the later of the 10th anniversary of the closing date (September 22, 1994) or the date upon which any holder owns any Bundled Securities, as defined.

**PAC 0097**

WOLVERINE PROCTOR & SCHWARTZ, INC.

Notes to Consolidated Financial Statements
December 31, 2000

Originally, the proceeds from the financing were allocated between the debt instruments and the warrants respectively based upon the relative fair value.

Both of these warrants are governed by a Stockholder's Agreement dated September 23, 1994. The Company has recognized changes in the estimated redemption price of the warrants by periodic charges (credits) to retained earnings. During 1999 and 2000, the put warrants were purchased by the sole stockholder of the Company. The warrant value was decreased in 1999 based on the buyouts of the warrants in 2000 by the Stockholder.

(11)    **COMMITMENTS AND CONTINGENCIES**

(a)    **Lease Commitments**

The Company leases office space and equipment under noncancelable operating leases. The following is a schedule, by year, of minimum future lease commitments under such leases as of December 31, 2000:

| | |
|---|---:|
| 2001 | $    315,250 |
| 2002 | 228,000 |
| 2003 | 234,000 |
| 2004 | 240,000 |
| 2005 | 246,000 |
| Thereafter | 252,000 |
| Total future minimum rentals | $    1,515,250 |

Rent expense incurred under operating leases was approximately $289,548 in 2000 and $365,763 in 1999. Renewal options ranging from one to 10 years exist for several of these leases.

(b)    **Other Contingencies**

At December 31, 2000, there were lawsuits pending that arose in the ordinary course of business. Management has reviewed these actions with legal counsel and has taken into consideration the view of counsel concerning the outcome of the litigation. In the opinion of management, final disposition of these lawsuits is not expected to have a material adverse effect on the Company's financial position or results of operations. In addition, the Company has been indemnified against unfavorable outcomes in certain legal matters of P&S assumed as part of the acquisition of P&S.

The Company has issued an irrevocable standby letter of credit of $1,500,000 to support certain obligations of Cardwell, a wholly owned company of the sole stockholder. The Company pays on behalf of Cardwell all fees plus 1% of the stated amount of the letter of credit to Citizens per annum.

PAC 0098

**WOLVERINE PROCTOR & SCHWARTZ, INC.**

Notes to Consolidated Financial Statements
December 31, 2000

(12)  DISCLOSURES ABOUT THE FAIR VALUE OF FINANCIAL INSTRUMENTS

The following methods and assumptions were used to estimate the fair value of
each class of financial instrument for which it is practicable to estimate that value.
The carrying amount the cash and cash equivalents, accounts receivable and
accounts payable on the Company's consolidated balance sheets approximates their
fair value because of the short maturity of these instruments.

PAC0099

# Exhibit 2

# Kulkarni Affidavit – May 5, 2006

Dec 27, 2001 - 8:29am

WOLVERINE (MASSACHUSETTS) CORP.
GENERAL LEDGER TRIAL BALANCE

Ranges: Period 11/01/2001 To 11/30/2001
       All Accounts Selected
       Without Detail
       Active And Non-Active Accounts
       All Profit Centers
       Alternate Account No. Order

| Account-No<br>Trx Date | Description<br>Source    Reference | Beg Bal | Debits | Credits | Net Change | Ending Bal |
|---|---|---|---|---|---|---|
| 10200-100-00 | CASH PAYROLL-BROWN BROTHERS | | | | | |
| | Account Total: | .00 | .00 | .00 | .00 | .00 |
| 10200-400-00 | CASH OPERATING-CLYDESDALE TELE | | | | | |
| | Monthly Total: | | 3,095.00 | 91.00 | | |
| | Account Total: | 8,316.93 | 3,095.00 | 91.00 | 3,004.00 | 11,320.93 |
| | Account 10200-  Totals: | 8,316.93 | 3,095.00 | 91.00 | 3,004.00 | 11,320.93 |
| 10201-100-00 | CASH PAYROLL-CITIZENS | | | | | |
| | Monthly Total: | | 753,725.00 | 765,964.00 | | |
| | Account Total: | 148,605.69 | 753,725.00 | 765,964.00 | 12,239.00CR | 136,366.69 |
| | Account 10201-  Totals: | 148,605.69 | 753,725.00 | 765,964.00 | 12,239.00CR | 136,366.69 |
| 10202-100-00 | CASH BROWN BROS ORDINARY ACCT | | | | | |
| | Monthly Total: | | 101,924.47 | 50,000.00 | | |
| | Account Total: | 102,203.25 | 101,924.47 | 50,000.00 | 51,924.47 | 154,127.72 |
| 10202-400-00 | CASH-CLYDESDALE-DOLLAR ACCOUNT | | | | | |
| | Monthly Total: | | .00 | 2,581.00 | | |
| | Account Total: | 6,024.08 | .00 | 2,581.00 | 2,581.00CR | 3,443.08 |
| | Account 10202-  Totals: | 108,227.33 | 101,924.47 | 52,581.00 | 49,343.47 | 157,570.80 |
| 10204-100-00 | CASH CITIZENS/DISBURSEMENTS | | | | | |
| | Monthly Total: | | 278,893.33 | 246,931.24 | | |
| | Account Total: | 92,140.65CR | 278,893.33 | 246,931.24 | 31,962.09 | 60,178.56CR |
| | Account 10204-  Totals: | 92,140.65CR | 278,893.33 | 246,931.24 | 31,962.09 | 60,178.56CR |
| 10205-100-00 | CASH FLEET/DISBURSEMENTS | | | | | |

==================================================================================================

|  |  | ----------------- ----------------- |  |  |
|---|---|---|---|---|
| Account Total: | .00 | .00 | .00 | .00 | .00 |

**10205-400-00   CASH OPERATING-CLYDESDALE PLC**

|  |  | ----------------- ----------------- |  |  |
|---|---|---|---|---|
| Monthly Total: |  | 91,946.00 | .00 |  |  |
| Account Total: | 131,199.22CR | 91,946.00 | .00 | 91,946.00 | 39,253.22CR |

|  |  | ----------------- ----------------- ----------------- | ----------------- |
|---|---|---|---|
| Account 10205-   Totals: | 131,199.22CR | 91,946.00 | .00 | 91,946.00 | 39,253.22CR |

**10206-100-00   CASH-FLEET INVESTMENT ACCT.**

|  |  | ----------------- ----------------- |  |  |
|---|---|---|---|---|
| Account Total: | .00 | .00 | .00 | .00 | .00 |

**10206-400-00   CASH-EURO DOLLAR**

|  |  | ----------------- ----------------- |  |  |
|---|---|---|---|---|
| Monthly Total: |  | 139,959.00 | .00 |  |  |
| Account Total: | 17,006.40CR | 139,959.00 | .00 | 139,959.00 | 122,952.60 |

|  |  | ----------------- ----------------- ----------------- | ----------------- |
|---|---|---|---|
| Account 10206-   Totals: | 17,006.40CR | 139,959.00 | .00 | 139,959.00 | 122,952.60 |

**10207-100-00   CASH FUNDING DEPOSIT**

|  |  | ----------------- ----------------- |  |  |
|---|---|---|---|---|
| Account Total: | .00 | .00 | .00 | .00 | .00 |

**10207-400-00   CASH FUNDING DEPOSIT**

|  |  | ----------------- ----------------- |  |  |
|---|---|---|---|---|
| Monthly Total: |  | .00 | 55.00 |  |  |
| Account Total: | 4,993.19 | .00 | 55.00 | 55.00CR | 4,938.19 |

|  |  | ----------------- ----------------- ----------------- | ----------------- |
|---|---|---|---|
| Account 10207-   Totals: | 4,993.19 | .00 | 55.00 | 55.00CR | 4,938.19 |

**10208-100-00   CASH - ASSOCIATED BANK - PC**

|  |  |  |  |  |
|---|---|---|---|---|
| Account Total: | .00 | .00 | .00 | .00 | .00 |

|  |  | ----------------- ----------------- ----------------- | ----------------- |
|---|---|---|---|
| Account 10208-   Totals: | .00 | .00 | .00 | .00 | .00 |

**10209-100-00   CASH-PETTY-PC**

|  |  | ----------------- ----------------- |  |  |
|---|---|---|---|---|
| Account Total: | .00 | .00 | .00 | .00 | .00 |

|  |  | ----------------- ----------------- ----------------- | ----------------- |
|---|---|---|---|
| Account 10209-   Totals: | .00 | .00 | .00 | .00 | .00 |

**10210-100-00   CASH-PETTY**

----------------- -----------------

Dec 27, 2001 - 8:29am

WOLVERINE (MASSACHUSETTS) CORP.
GENERAL LEDGER TRIAL BALANCE

| | | | | | |
|---|---|---|---|---|---|
| Account Total: | 1,700.00 | .00 | .00 | .00 | 1,700.00 |

**10210-200-00    CASH-PETTY-ATM**

| | | | | | |
|---|---|---|---|---|---|
| Account Total: | .00 | .00 | .00 | .00 | .00 |

**10210-400-00    CASH-PETTY-INT'L**

| | | | | | |
|---|---|---|---|---|---|
| Monthly Total: | | 589.00 | 39.00 | | |
| Account Total: | 3,599.71 | 589.00 | 39.00 | 550.00 | 4,149.71 |
| Account 10210-    Totals: | 5,299.71 | 589.00 | 39.00 | 550.00 | 5,849.71 |

**10211-400-00    CASH INTEREST INCOME**

| | | | | | |
|---|---|---|---|---|---|
| Account Total: | .00 | .00 | .00 | .00 | .00 |
| Account 10211-    Totals: | .00 | .00 | .00 | .00 | .00 |

**10212-100-00    CASH-PETTY-DK**

| | | | | | |
|---|---|---|---|---|---|
| Account Total: | 300.00 | .00 | .00 | .00 | 300.00 |
| Account 10212-    Totals: | 300.00 | .00 | .00 | .00 | 300.00 |

**10220-100-00    CASH-SAVINGS (FREIGHT PLAN)**

| | | | | | |
|---|---|---|---|---|---|
| Monthly Total: | | .00 | 18,465.42 | | |
| Account Total: | 19,179.32 | .00 | 18,465.42 | 18,465.42CR | 713.90 |
| Account 10220-    Totals: | 19,179.32 | .00 | 18,465.42 | 18,465.42CR | 713.90 |

**10230-100-00    CASH FLEET CHECKING**

| | | | | | |
|---|---|---|---|---|---|
| Monthly Total: | | .00 | 100,946.36 | | |
| Account Total: | 101,224.13 | .00 | 100,946.36 | 100,946.36CR | 277.77 |
| Account 10230-    Totals: | 101,224.13 | .00 | 100,946.36 | 100,946.36CR | 277.77 |

**10231-100-00    CASH CITIZENS CHECKING**

| | | | | | |
|---|---|---|---|---|---|
| Monthly Total: | | 525,898.16 | 633,113.75 | | |
| Account Total: | 177,719.65 | 525,898.16 | 633,113.75 | 107,215.59CR | 70,504.06 |
| Account 10231-    Totals: | 177,719.65 | 525,898.16 | 633,113.75 | 107,215.59CR | 70,504.06 |

========================================================================================================

```
10232-100-00    CASH CITIZENS INVESTMENT

        Account Total:          .00              .00           .00              .00               .00

                        ------------------  ------------------ ------------------  ------------------   ------------------
    Account 10232-  Totals:     .00              .00           .00              .00               .00

10233-100-00    CASH-RESTRICTED

                        ------------------ ------------------
        Account Total:          .00              .00           .00              .00               .00

                        ------------------ ------------------ ------------------  ------------------   ------------------
    Account 10233-  Totals:     .00              .00           .00              .00               .00

10240-100-00    PAYROLL-BAY BANK

                        ------------------ ------------------
        Account Total:          .00              .00           .00              .00               .00

10240-200-00    PAYROLL-BAY BANK-ATM

                        ------------------ ------------------
        Account Total:          .00              .00           .00              .00               .00

                        ------------------ ------------------ ------------------  ------------------   ------------------
    Account 10240-  Totals:     .00              .00           .00              .00               .00

10300-100-00    A/R TRADE

                        ------------------ ------------------
        Monthly Total:                      912,115.84    372,302.15
        Account Total:     1,343,323.71     912,115.84    372,302.15    539,813.69      1,883,137.40

10300-400-00    A/R TRADE-INT'L

                        ------------------ ------------------
        Monthly Total:                         .00       794,212.00
        Account Total:     2,727,515.17        .00       794,212.00    794,212.00CR    1,933,303.17

                        ------------------ ------------------ ------------------  ------------------   ------------------
    Account 10300-  Totals:  4,070,838.88   912,115.84   1,166,514.15   254,398.31CR   3,816,440.57

10305-100-00    A/R PROCTOR & SCHWARTZ-INTERCO

        Account Total:          .00              .00           .00              .00               .00

                        ------------------ ------------------ ------------------  ------------------   ------------------
    Account 10305-  Totals:     .00              .00           .00              .00               .00

10306-100-00    A/R FRIEL

                        ------------------ ------------------
        Account Total:      290,997.00          .00           .00              .00         290,997.00

10306-400-00    A/R - FRIEL
```

```
=================================================================================================================================

                                                    ------------------ ------------------
                    Monthly Total:                       812,129.00          .00
                    Account Total:      555,531.97CR      812,129.00          .00            812,129.00          256,597.03

                                       ------------------ ------------------ ------------------ ------------------ ------------------
        Account 10306-  Totals:         264,534.97CR      812,129.00          .00            812,129.00          547,594.03

10310-100-00     A/R STRAYFIELD

                                                    ------------------ ------------------
                    Account Total:             .00             .00             .00                   .00                 .00

                                       ------------------ ------------------ ------------------ ------------------ ------------------
        Account 10310-  Totals:                .00             .00             .00                   .00                 .00

10315-100-00     A/R INTERNATIONAL - INTERCO.

                                                    ------------------ ------------------
                    Monthly Total:                       115,588.04      115,588.04
                    Account Total:             .00       115,588.04      115,588.04                  .00                 .00

                                       ------------------ ------------------ ------------------ ------------------ ------------------
        Account 10315-  Totals:                .00       115,588.04      115,588.04                  .00                 .00

10320-100-00     A/R MISCELLANEOUS

                                                    ------------------ ------------------
                    Monthly Total:                     8,180,672.24    8,297,207.02
                    Account Total:        6,395.02     8,180,672.24    8,297,207.02          116,534.78CR         110,139.76CR

10320-400-00     A/R MISCELLANEOUS-INT'L

                                                    ------------------ ------------------
                    Account Total:             .00             .00             .00                   .00                 .00

                                       ------------------ ------------------ ------------------ ------------------ ------------------
        Account 10320-  Totals:           6,395.02     8,180,672.24    8,297,207.02          116,534.78CR         110,139.76CR

10321-100-00     A/R CARDWELL

                                                    ------------------ ------------------
                    Account Total:     1,500,000.00            .00             .00                   .00           1,500,000.00

                                       ------------------ ------------------ ------------------ ------------------ ------------------
        Account 10321-  Totals:        1,500,000.00            .00             .00                   .00           1,500,000.00

10324-100-00     A/R EMPLOYEE TRANSPORTAION ADV

                                                    ------------------ ------------------
                    Account Total:             .00             .00             .00                   .00                 .00

                                       ------------------ ------------------ ------------------ ------------------ ------------------
        Account 10324-  Totals:                .00             .00             .00                   .00                 .00

10325-100-00     A/R EMPLOYEE ADVANCES

                                                    ------------------ ------------------
                    Monthly Total:                          150.00          165.33
                    Account Total:        5,515.33          150.00          165.33               15.33CR           5,500.00
```

GENERAL LEDGER TRIAL BALANCE

=================================================================================

10325-400-00    A/R EMPLOYEE ADVANCES-INT'L

|  |  | 1,609.00 | 11.00 |  |  |
|---|---|---|---|---|---|
| Monthly Total: |  | 1,609.00 | 11.00 |  |  |
| Account Total: | 1,011.03 | 1,609.00 | 11.00 | 1,598.00 | 2,609.03 |

| Account 10325- Totals: | 6,526.36 | 1,759.00 | 176.33 | 1,582.67 | 8,109.03 |

10326-100-00    A/R-P

| Account Total: | .00 | .00 | .00 | .00 | .00 |
|---|---|---|---|---|---|

| Account 10326- Totals: | .00 | .00 | .00 | .00 | .00 |

10327-100-00    A/R-WP

|  |  | 4,166.66 | 4,166.66 |  |  |
|---|---|---|---|---|---|
| Monthly Total: |  | 4,166.66 | 4,166.66 |  |  |
| Account Total: | .00 | 4,166.66 | 4,166.66 | .00 | .00 |

| Account 10327- Totals: | .00 | 4,166.66 | 4,166.66 | .00 | .00 |

10330-100-00    A/R ROYALTIES

| Account Total: | .00 | .00 | .00 | .00 | .00 |
|---|---|---|---|---|---|

| Account 10330- Totals: | .00 | .00 | .00 | .00 | .00 |

10340-100-00    ALLOW FOR DOUBTFUL ACCTS-WOL

|  |  | .00 | 48,797.66 |  |  |
|---|---|---|---|---|---|
| Monthly Total: |  | .00 | 48,797.66 |  |  |
| Account Total: | 280,920.55CR | .00 | 48,797.66 | 48,797.66CR | 329,718.21CR |

10340-200-00    ALLOW FOR DOUBTFUL ACCTS-A T M

|  |  | 43,797.66 | .00 |  |  |
|---|---|---|---|---|---|
| Monthly Total: |  | 43,797.66 | .00 |  |  |
| Account Total: | 82,826.02CR | 43,797.66 | .00 | 43,797.66 | 39,028.36CR |

10340-400-00    ALLOW FOR DOUBTFUL ACCTS-INTL

| Account Total: | .00 | .00 | .00 | .00 | .00 |
|---|---|---|---|---|---|

| Account 10340- Totals: | 363,746.57CR | 43,797.66 | 48,797.66 | 5,000.00CR | 368,746.57CR |

10350-100-00    A/R ELIMINATIONS

| Account Total: | .00 | .00 | .00 | .00 | .00 |
|---|---|---|---|---|---|

Dec 27, 2001 - Case 1:05-cv-10078-DPW WOLVERINE (MASSACHUSETTS) CORP. Document 90-3 Filed 05/03/2006 Page 8 of 28 Page 7

GENERAL LEDGER TRIAL BALANCE

==============================================================================

| Account 10350- | Totals: | .00 | .00 | .00 | .00 | .00 |
|---|---|---|---|---|---|---|

10360-100-00    A/R MASS TAX

| | Account Total: | .00 | .00 | .00 | .00 | .00 |
|---|---|---|---|---|---|---|
| Account 10360- | Totals: | .00 | .00 | .00 | .00 | .00 |

10370-100-00    A/R FEDERAL TAX

| | Account Total: | .00 | .00 | .00 | .00 | .00 |
|---|---|---|---|---|---|---|
| Account 10370- | Totals: | .00 | .00 | .00 | .00 | .00 |

10380-100-00    A/R ATM COMPANY - INTERCO.

| | Account Total: | .00 | .00 | .00 | .00 | .00 |
|---|---|---|---|---|---|---|
| Account 10380- | Totals: | .00 | .00 | .00 | .00 | .00 |

10390-200-00    A/R WOLVERINE - INTERCO.

| | Account Total: | .00 | .00 | .00 | .00 | .00 |
|---|---|---|---|---|---|---|
| Account 10390- | Totals: | .00 | .00 | .00 | .00 | .00 |

10400-100-00    REVENUE IN EXCESS OF INVOICING

| | Monthly Total: | | 1,071,541.50 | 725,104.50 | | |
|---|---|---|---|---|---|---|
| | Account Total: | 725,104.50 | 1,071,541.50 | 725,104.50 | 346,437.00 | 1,071,541.50 |

10400-400-00    COST/EARNING IN EXCESS OF BILL

| | Monthly Total: | | .00 | 643,568.00 | | |
|---|---|---|---|---|---|---|
| | Account Total: | 2,238,720.19 | .00 | 643,568.00 | 643,568.00CR | 1,595,152.19 |
| Account 10400- | Totals: | 2,963,824.69 | 1,071,541.50 | 1,368,672.50 | 297,131.00CR | 2,666,693.69 |

10500-100-00    WIP MATERIAL-WOL

| | Monthly Total: | | 2,167,889.77 | 2,207,331.60 | | |
|---|---|---|---|---|---|---|
| | Account Total: | 59,969.30 | 2,167,889.77 | 2,207,331.60 | 39,441.83CR | 20,527.47 |

10500-200-00    WIP MATERIAL-ATM

====================================================================================================

|  | | 26,803.25 | 20,799.02 | | |
|---|---|---|---|---|---|
| Monthly Total: | | 26,803.25 | 20,799.02 | | |
| Account Total: | 2,156.24 | 26,803.25 | 20,799.02 | 6,004.23 | 8,160.47 |

10500-400-00   WIP MATERIAL-INTL

|  | | 3,948,081.00 | 3,981,800.00 | | |
|---|---|---|---|---|---|
| Monthly Total: | | 3,948,081.00 | 3,981,800.00 | | |
| Account Total: | 224,111.45 | 3,948,081.00 | 3,981,800.00 | 33,719.00CR | 190,392.45 |
| Account 10500- Totals: | 286,236.99 | 6,142,774.02 | 6,209,930.62 | 67,156.60CR | 219,080.39 |

10510-100-00   WIP LABOR-WOL

|  | | 437,908.88 | 412,347.03 | | |
|---|---|---|---|---|---|
| Monthly Total: | | 437,908.88 | 412,347.03 | | |
| Account Total: | 54,284.58 | 437,908.88 | 412,347.03 | 25,561.85 | 79,846.43 |

10510-200-00   WIP LABOR-ATM

|  | | 12,646.67 | 10,972.25 | | |
|---|---|---|---|---|---|
| Monthly Total: | | 12,646.67 | 10,972.25 | | |
| Account Total: | 4,452.29 | 12,646.67 | 10,972.25 | 1,674.42 | 6,126.71 |

10510-400-00   WIP LABOR-INTL

|  | | .00 | 46,228.00 | | |
|---|---|---|---|---|---|
| Monthly Total: | | .00 | 46,228.00 | | |
| Account Total: | 229,049.68 | .00 | 46,228.00 | 46,228.00CR | 182,821.68 |
| Account 10510- Totals: | 287,786.55 | 450,555.55 | 469,547.28 | 18,991.73CR | 268,794.82 |

10520-100-00   WIP OVERHEAD-WOL

|  | | 1,050,982.90 | 989,634.06 | | |
|---|---|---|---|---|---|
| Monthly Total: | | 1,050,982.90 | 989,634.06 | | |
| Account Total: | 130,284.19 | 1,050,982.90 | 989,634.06 | 61,348.84 | 191,633.03 |

10520-200-00   WIP OVERHEAD-ATM

|  | | 37,940.01 | 32,916.75 | | |
|---|---|---|---|---|---|
| Monthly Total: | | 37,940.01 | 32,916.75 | | |
| Account Total: | 13,356.87 | 37,940.01 | 32,916.75 | 5,023.26 | 18,380.13 |

10520-400-00   WIP OVERHEAD-INT'L

|  | | .00 | .00 | | |
|---|---|---|---|---|---|
| Account Total: | .00 | .00 | .00 | .00 | .00 |
| Account 10520- Totals: | 143,641.06 | 1,088,922.91 | 1,022,550.81 | 66,372.10 | 210,013.16 |

10540-100-00   INVENTORY FINISHED GOODS-WOL

|  | | .00 | .00 | | |
|---|---|---|---|---|---|
| Account Total: | .00 | .00 | .00 | .00 | .00 |

MARINE (MASSACHUSETTS) CORP.
GENERAL LEDGER TRIAL BALANCE

====================================================================================================================

10540-200-00      INVENTORY FINISHED GOODS-ATM

          Account Total:          11,780.69            .00            .00            .00         11,780.69

10540-400-00      INVENTORY FINISHED GOODS-INTL

          Account Total:                .00            .00            .00            .00               .00

     Account 10540-   Totals:        11,780.69            .00            .00            .00         11,780.69

10550-100-00      INVENTORY RAW MATERIALS-WOL

          Monthly Total:                        5,357.27       3,419.91
          Account Total:          69,413.20       5,357.27       3,419.91       1,937.36         71,350.56

10550-200-00      INVENTORY RAW MATERIALS-ATM

          Monthly Total:                          587.50       8,639.33
          Account Total:          43,727.90         587.50       8,639.33       8,051.83CR       35,676.07

10550-400-00      INVENTORY RAW MATERIALS-INTL

          Account Total:                .00            .00            .00            .00               .00

     Account 10550-   Totals:       113,141.10       5,944.77      12,059.24       6,114.47CR      107,026.63

10560-100-00      BOOK TO PHYSICAL INVENTORY-WOL

          Account Total:                .00            .00            .00            .00               .00

10560-200-00      BOOK TO PHYSICAL INVENTORY-ATM

          Account Total:                .00            .00            .00            .00               .00

     Account 10560-   Totals:              .00            .00            .00            .00               .00

10570-200-00      FUEL OIL

          Account Total:                .00            .00            .00            .00               .00

     Account 10570-   Totals:              .00            .00            .00            .00               .00

10580-100-00      PURCHASE PRICE VARIANCE

          Account Total:                .00            .00            .00            .00               .00

================================================================================

| | | | | |
|---|---|---|---|---|
| Account 10580-  Totals: | .00 | .00 | .00 | .00 | .00 |

**10590-100-00    INVENTORY TRANSACTIONS**

| | | | | |
|---|---|---|---|---|
| Account Total: | .00 | .00 | .00 | .00 | .00 |
| Account 10590-  Totals: | .00 | .00 | .00 | .00 | .00 |

**10600-100-00    PREPAID INSURANCE**

| | | | | |
|---|---|---|---|---|
| Monthly Total: | | .00 | 39,472.84 | | |
| Account Total: | 432,951.15 | .00 | 39,472.84 | 39,472.84CR | 393,478.31 |

**10600-200-00    PREPAID INSURANCE-ATM**

| | | | | |
|---|---|---|---|---|
| Account Total: | .00 | .00 | .00 | .00 | .00 |

**10600-400-00    PREPAID INSURANCE-INT'L**

| | | | | |
|---|---|---|---|---|
| Monthly Total: | | .00 | 6,299.00 | | |
| Account Total: | 12,071.88 | .00 | 6,299.00 | 6,299.00CR | 5,772.88 |
| Account 10600-  Totals: | 445,023.03 | .00 | 45,771.84 | 45,771.84CR | 399,251.19 |

**10610-100-00    PREPAID INTEREST**

| | | | | |
|---|---|---|---|---|
| Account Total: | .00 | .00 | .00 | .00 | .00 |
| Account 10610-  Totals: | .00 | .00 | .00 | .00 | .00 |

**10620-100-00    PREPAID FREIGHT**

| | | | | |
|---|---|---|---|---|
| Account Total: | .00 | .00 | .00 | .00 | .00 |
| Account 10620-  Totals: | .00 | .00 | .00 | .00 | .00 |

**10630-100-00    PREPAID MANAGEMENT FEES**

| | | | | |
|---|---|---|---|---|
| Account Total: | .00 | .00 | .00 | .00 | .00 |
| Account 10630-  Totals: | .00 | .00 | .00 | .00 | .00 |

**10640-100-00    PREPAID EXPENSES-OTHER**

| | | | | |
|---|---|---|---|---|
| Account Total: | .00 | .00 | .00 | .00 | .00 |

==================================================================================================

| 10640-200-00 | PREPAID EXPENSES-OTHER-ATM | | | | | |
|---|---|---|---|---|---|---|
| | Account Total: | .00 | .00 | .00 | .00 | .00 |

| 10640-400-00 | PREPAID EXPENSES | | | | | |
|---|---|---|---|---|---|---|
| | Monthly Total: | | .00 | 461.00 | | |
| | Account Total: | 1,066.26 | .00 | 461.00 | 461.00CR | 605.26 |
| | Account 10640-  Totals: | 1,066.26 | .00 | 461.00 | 461.00CR | 605.26 |

| 10650-400-00 | PREPAID RENT | | | | | |
|---|---|---|---|---|---|---|
| | Monthly Total: | | 14,631.00 | 82.00 | | |
| | Account Total: | 7,397.27 | 14,631.00 | 82.00 | 14,549.00 | 21,946.27 |
| | Account 10650-  Totals: | 7,397.27 | 14,631.00 | 82.00 | 14,549.00 | 21,946.27 |

| 10700-100-00 | DEPOSITS | | | | | |
|---|---|---|---|---|---|---|
| | Monthly Total: | | 209,415.50 | 95,866.50 | | |
| | Account Total: | 211,704.89 | 209,415.50 | 95,866.50 | 113,549.00 | 325,253.89 |

| 10700-200-00 | DEPOSITS-ATM | | | | | |
|---|---|---|---|---|---|---|
| | Account Total: | 975.00 | .00 | .00 | .00 | 975.00 |
| | Account 10700-  Totals: | 212,679.89 | 209,415.50 | 95,866.50 | 113,549.00 | 326,228.89 |

| 10701-100-00 | DEPOSITS-RX CLAIMS-EBA | | | | | |
|---|---|---|---|---|---|---|
| | Account Total: | .00 | .00 | .00 | .00 | .00 |
| | Account 10701-  Totals: | .00 | .00 | .00 | .00 | .00 |

| 10710-100-00 | INTERCOMPANY PURCHASE ACCTG | | | | | |
|---|---|---|---|---|---|---|
| | Account Total: | 15,500,253.11CR | .00 | .00 | .00 | 15,500,253.11CR |
| | Account 10710-  Totals: | 15,500,253.11CR | .00 | .00 | .00 | 15,500,253.11CR |

| 10800-100-00 | LAND-WOL | | | | | |
|---|---|---|---|---|---|---|
| | Account Total: | 892,344.00 | .00 | .00 | .00 | 892,344.00 |

```
===============================================================================================================

10800-200-00      LAND-ATM

                Account Total:       176,013.00          .00          .00          .00         176,013.00

                                  ------------------  ------------------
    Account 10800-   Totals:        1,068,357.00          .00          .00          .00       1,068,357.00

10810-100-00      BUILDING-WOL

                Account Total:      1,731,755.99          .00          .00          .00       1,731,755.99

10810-200-00      BUILDING-ATM

                Account Total:        605,299.00          .00          .00          .00         605,299.00

                                  ------------------  ------------------
    Account 10810-   Totals:        2,337,054.99          .00          .00          .00       2,337,054.99

10820-100-00      BUILDING IMPROVEMENTS

                Account Total:        133,176.56          .00          .00          .00         133,176.56

10820-200-00      BUILDING IMPROVEMENTS-ATM

                Account Total:         97,343.75          .00          .00          .00          97,343.75

                                  ------------------  ------------------
    Account 10820-   Totals:          230,520.31          .00          .00          .00         230,520.31

10830-100-00      MOTOR VEHICLE-WOL

                Account Total:         20,153.89          .00          .00          .00          20,153.89

10830-200-00      MOTOR VEHICLE-ATM

                Account Total:         69,440.50          .00          .00          .00          69,440.50

10830-400-00      MOTOR VEHICLE-INTL

                Account Total:        137,595.69          .00          .00          .00         137,595.69

                                  ------------------  ------------------
    Account 10830-   Totals:          227,190.08          .00          .00          .00         227,190.08

10840-100-00      OFFICE EQUIPMENT-WOL

                Account Total:        148,228.38          .00          .00          .00         148,228.38

10840-200-00      OFFICE EQUIPMENT-ATM
```

=============================================================================================================

```
              Account Total:        23,916.29              .00           .00              .00        23,916.29

10840-400-00     OFFICE EQUIPMENT-INTL

              Account Total:       178,829.00              .00           .00              .00       178,829.00
                                -----------------   ----------------  ----------------  ----------------   -----------------
   Account 10840-   Totals:       350,973.67              .00           .00              .00       350,973.67

10845-100-00     OFFICE EQUIPMENT-PROCTOR

              Account Total:       404,589.00              .00           .00              .00       404,589.00
                                -----------------   ----------------  ----------------  ----------------   -----------------
   Account 10845-   Totals:       404,589.00              .00           .00              .00       404,589.00

10850-100-00     LABORATORY EQUIPMENT-WOL

              Account Total:       664,045.19              .00           .00              .00       664,045.19

10850-200-00     LABORATORY EQUIPMENT-ATM

              Account Total:             .00              .00           .00              .00              .00
                                -----------------   ----------------  ----------------  ----------------   -----------------
   Account 10850-   Totals:       664,045.19              .00           .00              .00       664,045.19

10855-100-00     LABORATORY EQUIPMENT-PROCTOR

              Account Total:       279,770.00              .00           .00              .00       279,770.00
                                -----------------   ----------------  ----------------  ----------------   -----------------
   Account 10855-   Totals:       279,770.00              .00           .00              .00       279,770.00

10860-100-00     SOFTWARE-WOL

              Account Total:       776,149.79              .00           .00              .00       776,149.79

10860-200-00     SOFTWARE-ATM

              Account Total:         8,081.25              .00           .00              .00         8,081.25

10860-400-00     SOFTWARE-INTL

              Monthly Total:                       13,760.00           .00
              Account Total:       468,177.00      13,760.00           .00        13,760.00       481,937.00
                                -----------------   ----------------  ----------------  ----------------   -----------------
```

WOLVERINE (MASSACHUSETTS) CORP.
GENERAL LEDGER TRIAL BALANCE

====================================================================================================

| Account 10860- Totals: | 1,252,408.04 | 13,760.00 | .00 | 13,760.00 | 1,266,168.04 |

**10870-100-00    COMPUTER HARDWARE-WOL**

| Account Total: | 422,059.50 | .00 | .00 | .00 | 422,059.50 |

**10870-200-00    COMPUTER HARDWARE-ATM**

| Account Total: | 29,812.90 | .00 | .00 | .00 | 29,812.90 |

**10870-400-00    COMPUTER HARDWARE-INTL**

| Monthly Total: | | 96.00 | .00 | | |
| Account Total: | 333,199.00 | 96.00 | .00 | 96.00 | 333,295.00 |

| Account 10870- Totals: | 785,071.40 | 96.00 | .00 | 96.00 | 785,167.40 |

**10880-100-00    MACHINERY & EQUIPMENT-WOL**

| Account Total: | 1,095,507.71 | .00 | .00 | .00 | 1,095,507.71 |

**10880-200-00    MACHINERY & EQUIPMENT-ATM**

| Account Total: | 1,003,920.18 | .00 | .00 | .00 | 1,003,920.18 |

**10880-400-00    MACHINERY & EQUIPMENT-INTL**

| Account Total: | 147,240.00 | .00 | .00 | .00 | 147,240.00 |

| Account 10880- Totals: | 2,246,667.89 | .00 | .00 | .00 | 2,246,667.89 |

**10890-100-00    MACHINERY & EQUIP RENTAL-WOL**

| Account Total: | .00 | .00 | .00 | .00 | .00 |

| Account 10890- Totals: | .00 | .00 | .00 | .00 | .00 |

**10891-100-00    CRANES-WOL**

| Account Total: | 120,894.75 | .00 | .00 | .00 | 120,894.75 |

**10891-200-00    CRANES-ATM**

| Account Total: | 50,597.00 | .00 | .00 | .00 | 50,597.00 |

```
============================================================================================================================
     Account 10891-   Totals:       171,491.75              .00             .00              .00        171,491.75

10895-100-00     LEASEHOLD IMPROVEMENTS-PROCTOR

                                    ------------------ ------------------
        Account Total:              170,300.00              .00             .00              .00        170,300.00

10895-400-00     LEASEHOLD IMPROVEMENTS

                                    ------------------ ------------------
        Account Total:               39,769.00              .00             .00              .00         39,769.00

                                    ------------------ ------------------ ------------------- ------------------- ------------------
     Account 10895-   Totals:       210,069.00              .00             .00              .00        210,069.00

10896-100-00     PROJECTS IN PROGESS

                                    ------------------ ------------------
        Account Total:                     .00              .00             .00              .00               .00

                                    ------------------ ------------------ ------------------- ------------------- ------------------
     Account 10896-   Totals:              .00              .00             .00              .00               .00

10905-100-00     ACC DEPRECIATION LEASEHOLD IMP

                                    ------------------ ------------------
        Monthly Total:                                     .00        1,172.15
        Account Total:               99,628.49CR            .00        1,172.15       1,172.15CR        100,800.64CR

10905-400-00     ACC DEPRECIATION LEASEHOLD IMP

                                    ------------------ ------------------
        Account Total:               44,391.29CR            .00             .00              .00         44,391.29CR

                                    ------------------ ------------------ ------------------- ------------------- ------------------
     Account 10905-   Totals:       144,019.78CR            .00        1,172.15       1,172.15CR        145,191.93CR

10910-100-00     ACC DEPRECIATION BUILDING-WOL

                                    ------------------ ------------------
        Monthly Total:                                     .00        4,581.94
        Account Total:              590,797.40CR            .00        4,581.94       4,581.94CR        595,379.34CR

10910-200-00     ACC DEPRECIATION BUILDING-ATM

                                    ------------------ ------------------
        Monthly Total:                                     .00        1,601.50
        Account Total:              206,230.00CR            .00        1,601.50       1,601.50CR        207,831.50CR

                                    ------------------ ------------------ ------------------- ------------------- ------------------
     Account 10910-   Totals:       797,027.40CR            .00        6,183.44       6,183.44CR        803,210.84CR

10920-100-00     ACC DEPRECIATION BLDG IMPR-WOL

                                    ------------------ ------------------
        Monthly Total:                                     .00          353.00
        Account Total:               19,032.61CR            .00          353.00         353.00CR         19,385.61CR
```

WOLVERINE (MASSACHUSETTS) CORP.
GENERAL LEDGER TRIAL BALANCE

================================================================================

10920-200-00     ACC DEPRECIATION BLDG IMPR-ATM

```
                                        ------------------ ------------------
              Monthly Total:                       .00            257.56
              Account Total:       7,739.07CR       .00            257.56       257.56CR      7,996.63CR

                                   ------------------ ------------------ ------------------ ------------------ ------------------
     Account 10920-  Totals:      26,771.68CR       .00            610.56       610.56CR     27,382.24CR
```

10930-100-00     ACC DEPRECIATION MOTOR VEH-WOL

```
                                        ------------------ ------------------
              Monthly Total:                       .00                .16
              Account Total:      20,153.73CR       .00                .16           .16CR     20,153.89CR
```

10930-200-00     ACC DEPRECIATION MOTOR VEH-ATM

```
                                        ------------------ ------------------
              Account Total:      69,440.50CR       .00                .00           .00       69,440.50CR
```

10930-400-00     ACC DEPRECIATION MOTOR VEH-INT

```
                                        ------------------ ------------------
              Monthly Total:                       .00            205.00
              Account Total:     140,787.93CR       .00            205.00        205.00CR    140,992.93CR

                                   ------------------ ------------------ ------------------ ------------------ ------------------
     Account 10930-  Totals:     230,382.16CR       .00            205.16        205.16CR    230,587.32CR
```

10940-100-00     ACC DEPRECIATION OFFICE EQ-WOL

```
                                        ------------------ ------------------
              Monthly Total:                       .00          1,433.23
              Account Total:     120,123.70CR       .00          1,433.23      1,433.23CR    121,556.93CR
```

10940-200-00     ACC DEPRECIATION OFFICE EQ-ATM

```
                                        ------------------ ------------------
              Monthly Total:                       .00            172.70
              Account Total:      17,266.82CR       .00            172.70        172.70CR     17,439.52CR
```

10940-400-00     ACC DEPRECIATION OFFICE EQ-INT

```
                                        ------------------ ------------------
              Monthly Total:                       .00          1,974.00
              Account Total:     128,177.58CR       .00          1,974.00      1,974.00CR    130,151.58CR

                                   ------------------ ------------------ ------------------ ------------------ ------------------
     Account 10940-  Totals:     265,568.10CR       .00          3,579.93      3,579.93CR    269,148.03CR
```

10945-100-00     ACC DEPRECIATION OFFICE EQ-PRO

```
                                        ------------------ ------------------
              Account Total:     404,589.00CR       .00                .00           .00      404,589.00CR

                                   ------------------ ------------------ ------------------ ------------------ ------------------
     Account 10945-  Totals:     404,589.00CR       .00                .00           .00      404,589.00CR
```

WOLVERINE (MASSACHUSETTS) CORP.
GENERAL LEDGER TRIAL BALANCE

=================================================================================================

10950-100-00     ACC DEPRECIATION LAB EQUIP-WOL

```
                                              ------------------  ------------------
           Monthly Total:                                  .00         4,792.12
           Account Total:         481,597.10CR             .00         4,792.12          4,792.12CR       486,389.22CR
```

10950-200-00     ACC DEPRECIATION LAB EQUIP-ATM

```
           Account Total:                 .00             .00              .00               .00                .00
                                  ------------------  ------------------  ------------------  ------------------  ------------------
   Account 10950-    Totals:        481,597.10CR             .00         4,792.12          4,792.12CR       486,389.22CR
```

10955-100-00     ACC DEPRECIATION LAB EQUIP-PRO

```
                                              ------------------  ------------------
           Monthly Total:                                  .00              .02
           Account Total:         279,769.98CR             .00              .02               .02CR       279,770.00CR
                                  ------------------  ------------------  ------------------  ------------------  ------------------
   Account 10955-    Totals:        279,769.98CR             .00              .02               .02CR       279,770.00CR
```

10960-100-00     ACC DEPRECIATION SOFTWARE-WOL

```
                                              ------------------  ------------------
           Monthly Total:                                  .00        12,909.82
           Account Total:         677,603.26CR             .00        12,909.82         12,909.82CR       690,513.08CR
```

10960-200-00     ACC DEPRECIATION SOFTWARE-ATM

```
                                              ------------------  ------------------
           Monthly Total:                                  .00            91.13
           Account Total:           7,352.13CR             .00            91.13             91.13CR         7,443.26CR
```

10960-400-00     ACC DEPRECIATION SOFTWARE-INTL

```
                                              ------------------  ------------------
           Monthly Total:                                  .00        10,716.00
           Account Total:         279,592.68CR             .00        10,716.00         10,716.00CR       290,308.68CR
                                  ------------------  ------------------  ------------------  ------------------  ------------------
   Account 10960-    Totals:        964,548.07CR             .00        23,716.95         23,716.95CR       988,265.02CR
```

10970-100-00     ACC DEPRECIATION HARDWARE-WOL

```
                                              ------------------  ------------------
           Monthly Total:                                  .00         3,859.89
           Account Total:         396,890.50CR             .00         3,859.89          3,859.89CR       400,750.39CR
```

10970-200-00     ACC DEPRECIATION HARDWARE-ATM

```
                                              ------------------  ------------------
           Monthly Total:                                  .00           141.57
           Account Total:          29,179.62CR             .00           141.57            141.57CR        29,321.19CR
```

10970-400-00     ACC DEPRECIATION HARDWARE-INTL

========================================================================================================================================

```
                                    ------------------- -------------------
            Monthly Total:                        .00          4,796.00
            Account Total:          301,773.31CR          .00          4,796.00          4,796.00CR          306,569.31CR


    Account 10970-   Totals:        727,843.43CR          .00          8,797.46          8,797.46CR          736,640.89CR

10980-100-00    ACC DEPRECIATION MACH/EQUP-WOL

                                    ------------------- -------------------
            Monthly Total:                        .00          5,841.85
            Account Total:          963,420.11CR          .00          5,841.85          5,841.85CR          969,261.96CR

10980-200-00    ACC DEPRECIATION MACH/EQUP-ATM

                                    ------------------- -------------------
            Monthly Total:                        .00          5,329.26
            Account Total:          906,973.97CR          .00          5,329.26          5,329.26CR          912,303.23CR

10980-400-00    ACC DEPRECIATION MACH/EQUP-INT

                                    ------------------- -------------------
            Monthly Total:                        .00          1,055.00
            Account Total:           57,658.83CR          .00          1,055.00          1,055.00CR           58,713.83CR


    Account 10980-   Totals:      1,928,052.91CR          .00         12,226.11         12,226.11CR        1,940,279.02CR

10990-100-00    ACC DEPR MACH/EQUP RENTAL-WOL

                                    ------------------- -------------------
            Account Total:                 .00          .00               .00               .00                 .00

10990-200-00    ACC DEPR MACH/EQUP RENTAL-ATM

                                    ------------------- -------------------
            Account Total:                 .00          .00               .00               .00                 .00


    Account 10990-   Totals:              .00          .00               .00               .00                 .00

10995-100-00    ACC DEPRECIATION CRANES-WOL

                                    ------------------- -------------------
            Monthly Total:                        .00            437.37
            Account Total:          106,417.92CR          .00            437.37            437.37CR          106,855.29CR

10995-200-00    ACC DEPRECIATION CRANES-ATM

                                    ------------------- -------------------
            Monthly Total:                        .00            212.50
            Account Total:           48,902.00CR          .00            212.50            212.50CR           49,114.50CR


    Account 10995-   Totals:        155,319.92CR          .00            649.87            649.87CR          155,969.79CR

11000-100-00    A/R LONG TERM
```

```
==================================================================================================================================
                                                    ------------------- -------------------
            Account Total:                  .00                 .00                 .00                 .00                 .00

                                            ------------------- ------------------- ------------------- ------------------- -------------------
        Account 11000-   Totals:            .00                 .00                 .00                 .00                 .00

11009-100-00    INVESTMENT

            Account Total:                  .00                 .00                 .00                 .00                 .00

                                            ------------------- ------------------- ------------------- ------------------- -------------------
        Account 11009-   Totals:            .00                 .00                 .00                 .00                 .00

11010-100-00    DEFERRED ACQUISITION COSTS-P&S
                                                    ------------------- -------------------
            Account Total:                  .00                 .00                 .00                 .00                 .00

                                            ------------------- ------------------- ------------------- ------------------- -------------------
        Account 11010-   Totals:            .00                 .00                 .00                 .00                 .00

11011-100-00    DEFERRED ACQUISITION - FRIEL
                                                    ------------------- -------------------
            Account Total:                  .00                 .00                 .00                 .00                 .00

                                            ------------------- ------------------- ------------------- ------------------- -------------------
        Account 11011-   Totals:            .00                 .00                 .00                 .00                 .00

11012-100-00    DEFERRED ACQUISITION- CARDWELL
                                                    ------------------- -------------------
            Account Total:                  .00                 .00                 .00                 .00                 .00

                                            ------------------- ------------------- ------------------- ------------------- -------------------
        Account 11012-   Totals:            .00                 .00                 .00                 .00                 .00

11013-100-00    DEFERRED ACQ/SALE - CE DIV
                                                    ------------------- -------------------
            Account Total:                  .00                 .00                 .00                 .00                 .00

                                            ------------------- ------------------- ------------------- ------------------- -------------------
        Account 11013-   Totals:            .00                 .00                 .00                 .00                 .00

11020-100-00    DEFERRED FINANCING COSTS

            Account Total:                  .00                 .00                 .00                 .00                 .00

                                            ------------------- ------------------- ------------------- ------------------- -------------------
        Account 11020-   Totals:            .00                 .00                 .00                 .00                 .00

11030-100-00    DEFERRED ORGANIZATIONAL COSTS
                                                    ------------------- -------------------
            Account Total:                  .00                 .00                 .00                 .00                 .00

                                            ------------------- ------------------- ------------------- ------------------- -------------------
```

```
==============================================================================================================
  Account 11030-   Totals:            .00           .00            .00             .00                 .00

11040-100-00    GOODWILL

                                                 ------------------  ------------------
                Monthly Total:                              .00       107,713.58
                Account Total:      10,555,526.16           .00       107,713.58     107,713.58CR       10,447,812.58

                                    ------------------  ------------------  ------------------  ------------------  ------------------
  Account 11040-   Totals:          10,555,526.16           .00       107,713.58     107,713.58CR       10,447,812.58

11050-100-00    NON COMPETITION AGREEMENT

                                                 ------------------  ------------------
                Account Total:             .00           .00            .00             .00                 .00

                                    ------------------  ------------------  ------------------  ------------------  ------------------
  Account 11050-   Totals:             .00           .00            .00             .00                 .00

11060-100-00    OTHER ASSETS

                                                 ------------------  ------------------
                Account Total:             .00           .00            .00             .00                 .00

                                    ------------------  ------------------  ------------------  ------------------  ------------------
  Account 11060-   Totals:             .00           .00            .00             .00                 .00

11070-100-00    PATENT DRAWINGS

                                                 ------------------  ------------------
                Account Total:             .00           .00            .00             .00                 .00

                                    ------------------  ------------------  ------------------  ------------------  ------------------
  Account 11070-   Totals:             .00           .00            .00             .00                 .00

11080-100-00    PREPAID ORGANIZATION FEES

                                                 ------------------  ------------------
                Account Total:             .00           .00            .00             .00                 .00

                                    ------------------  ------------------  ------------------  ------------------  ------------------
  Account 11080-   Totals:             .00           .00            .00             .00                 .00

11090-100-00    PROCTOR/SCHWARTZ RETAINED EARN

                                                 ------------------  ------------------
                Account Total:             .00           .00            .00             .00                 .00

                                    ------------------  ------------------  ------------------  ------------------  ------------------
  Account 11090-   Totals:             .00           .00            .00             .00                 .00

11091-100-00    PROTECTED INTEREST RATE AGREE

                                                 ------------------  ------------------
                Account Total:             .00           .00            .00             .00                 .00

                                    ------------------  ------------------  ------------------  ------------------  ------------------
  Account 11091-   Totals:             .00           .00            .00             .00                 .00
```

===========================================================================

11092-100-00      SURPLUS DEPOSITS W/C PROPAC

    Account Total:        8,163.16              .00           .00              .00           8,163.16

11092-200-00      SURPLUS DEPOSITS W/C PROPAC

    Account Total:             .00              .00           .00              .00                .00

  Account 11092-   Totals:        8,163.16              .00           .00              .00           8,163.16

11093-100-00      UNAMORTIZED FINANCE COSTS

    Account Total:             .00              .00           .00              .00                .00

  Account 11093-   Totals:             .00              .00           .00              .00                .00

11094-200-00      DUE FROM WOLVERINE - INTERCO.

    Account Total:             .00              .00           .00              .00                .00

  Account 11094-   Totals:             .00              .00           .00              .00                .00

21000-100-00      ACCOUNTS PAYABLE-TRADE

    Monthly Total:                        317,454.93    384,182.79
    Account Total:    2,426,696.25CR   317,454.93    384,182.79    66,727.86CR   2,493,424.11CR

21000-400-00      ACCOUNTS PAYABLE-TRADE-INT'L

    Monthly Total:                         84,735.00           .00
    Account Total:    1,928,997.07CR    84,735.00           .00    84,735.00    1,844,262.07CR

  Account 21000-   Totals:    4,355,693.32CR   402,189.93    384,182.79    18,007.14    4,337,686.18CR

21010-100-00      RESERVE FOR A T M

    Account Total:             .00              .00           .00              .00                .00

  Account 21010-   Totals:             .00              .00           .00              .00                .00

21020-100-00      A/P-INTERCOMPANY-PROCTOR

    Monthly Total:                          2,597.27      2,597.27
    Account Total:             .00        2,597.27      2,597.27           .00                .00

================================================================================

| | | | | | |
|---|---|---|---|---|---|
| Account 21020-  Totals: | .00 | 2,597.27 | 2,597.27 | .00 | .00 |

**21100-200-00    ACCOUNTS PAYABLE-TO WOLVERINE**

| | | | | | |
|---|---|---|---|---|---|
| Account Total: | .00 | .00 | .00 | .00 | .00 |
| Account 21100-  Totals: | .00 | .00 | .00 | .00 | .00 |

**22010-100-00    ACCRUED ACCOUNTS PAYABLE**

| | | | | | |
|---|---|---|---|---|---|
| Monthly Total: | | 292,096.58 | 335,974.17 | | |
| Account Total: | 497,107.87CR | 292,096.58 | 335,974.17 | 43,877.59CR | 540,985.46CR |

**22010-400-00    ACCRUED ACCOUNTS PAYABLE-INT'L**

| | | | | | |
|---|---|---|---|---|---|
| Monthly Total: | | 397,648.00 | .00 | | |
| Account Total: | 2,180,008.43CR | 397,648.00 | .00 | 397,648.00 | 1,782,360.43CR |
| Account 22010-  Totals: | 2,677,116.30CR | 689,744.58 | 335,974.17 | 353,770.41 | 2,323,345.89CR |

**22011-100-00    ACCRUED DSK1**

| | | | | | |
|---|---|---|---|---|---|
| Account Total: | .00 | .00 | .00 | .00 | .00 |
| Account 22011-  Totals: | .00 | .00 | .00 | .00 | .00 |

**22012-100-00    ACCRUED DSK2**

| | | | | | |
|---|---|---|---|---|---|
| Account Total: | .00 | .00 | .00 | .00 | .00 |
| Account 22012-  Totals: | .00 | .00 | .00 | .00 | .00 |

**22013-100-00    ACCRUED JOB COSTS**

| | | | | | |
|---|---|---|---|---|---|
| Monthly Total: | | 625,601.14 | 729,136.00 | | |
| Account Total: | 275,906.01CR | 625,601.14 | 729,136.00 | 103,534.86CR | 379,440.87CR |
| Account 22013-  Totals: | 275,906.01CR | 625,601.14 | 729,136.00 | 103,534.86CR | 379,440.87CR |

**22014-100-00    ACCRUED PC SALE**

| | | | | | |
|---|---|---|---|---|---|
| Account Total: | .00 | .00 | .00 | .00 | .00 |
| Account 22014-  Totals: | .00 | .00 | .00 | .00 | .00 |

22020-100-00     INVOICING IN EXCESS OF REVENUE

|  |  |  |  |  |  |
|---|---|---|---|---|---|
| Monthly Total: |  | 15,796.00 | 19,250.00 |  |  |
| Account Total: | 15,796.00CR | 15,796.00 | 19,250.00 | 3,454.00CR | 19,250.00CR |

22020-400-00     BILLINGS IN EXCESS OF COSTS-IN

|  |  |  |  |  |  |
|---|---|---|---|---|---|
| Monthly Total: |  | 73,420.00 | .00 |  |  |
| Account Total: | 110,049.96CR | 73,420.00 | .00 | 73,420.00 | 36,629.96CR |

| Account 22020-   Totals: | 125,845.96CR | 89,216.00 | 19,250.00 | 69,966.00 | 55,879.96CR |

22030-100-00     ACCRUED EXPENSES-OTHER

|  |  |  |  |  |  |
|---|---|---|---|---|---|
| Account Total: | .00 | .00 | .00 | .00 | .00 |

| Account 22030-   Totals: | .00 | .00 | .00 | .00 | .00 |

22040-100-00     DO NOT USE - ACCRUED PAYROLL

|  |  |  |  |  |  |
|---|---|---|---|---|---|
| Account Total: | .00 | .00 | .00 | .00 | .00 |

22040-400-00     ACCRUED PAYROLL-INT'L

|  |  |  |  |  |  |
|---|---|---|---|---|---|
| Account Total: | .00 | .00 | .00 | .00 | .00 |

| Account 22040-   Totals: | .00 | .00 | .00 | .00 | .00 |

22050-100-00     ACCRUED 401K

|  |  |  |  |  |  |
|---|---|---|---|---|---|
| Monthly Total: |  | 47,150.17 | 41,869.63 |  |  |
| Account Total: | 54,743.12CR | 47,150.17 | 41,869.63 | 5,280.54 | 49,462.58CR |

| Account 22050-   Totals: | 54,743.12CR | 47,150.17 | 41,869.63 | 5,280.54 | 49,462.58CR |

22060-100-00     ACCRUED LEGAL & ACCOUNTING

|  |  |  |  |  |  |
|---|---|---|---|---|---|
| Monthly Total: |  | 183,648.59 | 393,412.48 |  |  |
| Account Total: | 68,574.22CR | 183,648.59 | 393,412.48 | 209,763.89CR | 278,338.11CR |

22060-200-00     ACCRUED LEGAL & ACCOUNTING-ATM

|  |  |  |  |  |  |
|---|---|---|---|---|---|
| Account Total: | .00 | .00 | .00 | .00 | .00 |

| Account 22060-   Totals: | 68,574.22CR | 183,648.59 | 393,412.48 | 209,763.89CR | 278,338.11CR |

Case 1:05-cv-10078-DPW   Document 104-3   Filed 05/05/2006   Page 25 of 28

===================================================================================================================

22070-100-00    ACCRUED INCENTIVE COMPENSATION

                                    ------------------ ------------------
            Account Total:          .00              .00              .00              .00              .00

                              ------------------ ------------------ ------------------ ------------------ ------------------
      Account 22070-  Totals:       .00              .00              .00              .00              .00

22080-100-00    ACCRUED AGENTS COMMISSIONS

                                    ------------------ ------------------
            Monthly Total:                          .00       360,704.20
            Account Total:          .00              .00       360,704.20     360,704.20CR     360,704.20CR

22080-200-00    ACCRUED AGENTS COMMISSIONS-ATM

                                    ------------------ ------------------
            Monthly Total:                     7,337.40         8,959.10
            Account Total:    14,763.94CR      7,337.40         8,959.10       1,621.70CR      16,385.64CR

22080-400-00    ACCRUED AGENTS COMMISSIONS

                                    ------------------ ------------------
            Account Total:          .00              .00              .00              .00              .00

                              ------------------ ------------------ ------------------ ------------------ ------------------
      Account 22080-  Totals:  14,763.94CR      7,337.40       369,663.30     362,325.90CR     377,089.84CR

22090-100-00    ACCRUED SALESMAN COMMISSIONS

                                    ------------------ ------------------
            Monthly Total:                    32,917.02       105,000.00
            Account Total:    34,472.59CR     32,917.02       105,000.00      72,082.98CR     106,555.57CR

                              ------------------ ------------------ ------------------ ------------------ ------------------
      Account 22090-  Totals:  34,472.59CR     32,917.02       105,000.00      72,082.98CR     106,555.57CR

22100-100-00    ACCRUED WARRANTY

                                    ------------------ ------------------
            Monthly Total:                    17,882.35        24,488.25
            Account Total:   475,764.34CR     17,882.35        24,488.25       6,605.90CR     482,370.24CR

22100-200-00    ACCRUED WARRANTY-ATM

                                    ------------------ ------------------
            Monthly Total:                       929.76         2,500.00
            Account Total:    44,413.65CR        929.76         2,500.00       1,570.24CR      45,983.89CR

22100-400-00    ACCRUED WARRANTY-INT'L

                                    ------------------ ------------------
            Monthly Total:                    13,447.00              .00
            Account Total:    44,426.25CR     13,447.00              .00      13,447.00        30,979.25CR

                              ------------------ ------------------ ------------------ ------------------ ------------------
      Account 22100-  Totals: 564,604.24CR     32,259.11        26,988.25       5,270.86       559,333.38CR

=====================================================================================================================

22120-100-00    ACCRUED INTEREST

```
                                    ------------------  ------------------
                 Monthly Total:            77,900.62        257,435.55
                 Account Total:   653,338.62CR   77,900.62        257,435.55       179,534.93CR      832,873.55CR
```

22120-200-00    ACCRUED INTEREST-ATM

```
                                    ------------------  ------------------
                 Account Total:          .00              .00              .00              .00              .00
```

```
                                ------------------  ------------------  ------------------  ------------------  ------------------
     Account 22120-   Totals:   653,338.62CR   77,900.62        257,435.55       179,534.93CR      832,873.55CR
```

22130-100-00    ACCRUED GROUP MEDICAL INS.

```
                                    ------------------  ------------------
                 Monthly Total:            50,000.00             .00
                 Account Total:   150,000.00CR   50,000.00             .00          50,000.00        100,000.00CR
```

```
                                ------------------  ------------------  ------------------  ------------------  ------------------
     Account 22130-   Totals:   150,000.00CR   50,000.00             .00          50,000.00        100,000.00CR
```

22140-100-00    ACCRUED VACATION & HOLIDAY

```
                                    ------------------  ------------------
                 Monthly Total:               .00         68,112.06
                 Account Total:    81,151.24CR        .00         68,112.06         68,112.06CR      149,263.30CR
```

22140-200-00    ACCRUED VACATION & HOLIDAY-ATM

```
                                    ------------------  ------------------
                 Account Total:          .00              .00              .00              .00              .00
```

```
                                ------------------  ------------------  ------------------  ------------------  ------------------
     Account 22140-   Totals:    81,151.24CR        .00         68,112.06         68,112.06CR      149,263.30CR
```

22150-100-00    ACCRUED INTEREST-N/P MINORITY

```
                                    ------------------  ------------------
                 Account Total:          .00              .00              .00              .00              .00
```

```
                                ------------------  ------------------  ------------------  ------------------  ------------------
     Account 22150-   Totals:          .00              .00              .00              .00              .00
```

22160-100-00    ACCRUED MNGMT FEES/BONUS

```
                                    ------------------  ------------------
                 Account Total:          .00              .00              .00              .00              .00
```

```
                                ------------------  ------------------  ------------------  ------------------  ------------------
     Account 22160-   Totals:          .00              .00              .00              .00              .00
```

22165-200-00    ACCRUED PENSION

```
                                    ------------------  ------------------
                 Account Total:          .00              .00              .00              .00              .00
```

================================================================================

| Account 22165- Totals: | .00 | .00 | .00 | .00 | .00 |
|---|---|---|---|---|---|

22170-100-00    CUSTOMER DEPOSITS

| | | ------------------ ------------------ | | | |
| Monthly Total: | | 3,245,148.50 | 3,741,949.69 | | |
| Account Total: | 2,362,058.00CR | 3,245,148.50 | 3,741,949.69 | 496,801.19CR | 2,858,859.19CR |

22170-400-00    CUSTOMER DEPOSITS-INT'L

| | | ------------------ ------------------ | | | |
| Monthly Total: | | 31,271.00 | .00 | | |
| Account Total: | 53,536.66CR | 31,271.00 | .00 | 31,271.00 | 22,265.66CR |

| Account 22170- Totals: | 2,415,594.66CR | 3,276,419.50 | 3,741,949.69 | 465,530.19CR | 2,881,124.85CR |
|---|---|---|---|---|---|

22300-100-00    ACCRUED INCOME TAXES

| | | ------------------ ------------------ | | | |
| Monthly Total: | | 61,257.00 | .00 | | |
| Account Total: | 61,257.00CR | 61,257.00 | .00 | 61,257.00 | .00 |

22300-200-00    ACCRUED INCOME TAXES-ATM

| Account Total: | .00 | .00 | .00 | .00 | .00 |
|---|---|---|---|---|---|

| Account 22300- Totals: | 61,257.00CR | 61,257.00 | .00 | 61,257.00 | .00 |
|---|---|---|---|---|---|

22301-100-00    ACCRUED INCOME TAXES DUE DK

| | | ------------------ ------------------ | | | |
| Monthly Total: | | .00 | 128,247.00 | | |
| Account Total: | .00 | .00 | 128,247.00 | 128,247.00CR | 128,247.00CR |

| Account 22301- Totals: | .00 | .00 | 128,247.00 | 128,247.00CR | 128,247.00CR |
|---|---|---|---|---|---|

22310-100-00    ACCRUED STATE TAX

| | | ------------------ ------------------ | | | |
| Monthly Total: | | 66,990.00 | .00 | | |
| Account Total: | 154,789.59CR | 66,990.00 | .00 | 66,990.00 | 87,799.59CR |

22310-200-00    ACCRUED STATE TAX-ATM

| Account Total: | .00 | .00 | .00 | .00 | .00 |
|---|---|---|---|---|---|

| Account 22310- Totals: | 154,789.59CR | 66,990.00 | .00 | 66,990.00 | 87,799.59CR |
|---|---|---|---|---|---|

22320-100-00    ACCRUED SALES TAX

------------------ ------------------

===============================================================================================

|  |  |  |  |  |  |
|---|---|---|---|---|---|
| | Monthly Total: | | 168.54 | 8,999.62 | |
| | Account Total: | 168.52CR | 168.54 | 8,999.62 | 8,831.08CR | 8,999.60CR |

22320-200-00     ACCRUED SALES TAX-ATM

| | Account Total: | .00 | .00 | .00 | .00 | .00 |

Account 22320-   Totals:        168.52CR        168.54        8,999.62        8,831.08CR        8,999.60CR

22330-100-00     ACCRUED REAL ESTATE TAX

| | Monthly Total: | | .00 | 4,576.85 | |
| | Account Total: | 9,153.69 | .00 | 4,576.85 | 4,576.85CR | 4,576.84 |

22330-200-00     ACCRUED REAL ESTATE TAX-ATM

| | Account Total: | .00 | .00 | .00 | .00 | .00 |

Account 22330-   Totals:        9,153.69        .00        4,576.85        4,576.85CR        4,576.84

22340-100-00     ACCRUED VALUE ADDED TAX

| | Account Total: | .00 | .00 | .00 | .00 | .00 |

22340-400-00     ACCRUED VALUE ADDED TAX

| | Monthly Total: | | 287,688.00 | 217,330.00 | |
| | Account Total: | 122,039.77 | 287,688.00 | 217,330.00 | 70,358.00 | 192,397.77 |

Account 22340-   Totals:        122,039.77        287,688.00        217,330.00        70,358.00        192,397.77

22341-100-00     ACCRUED PURCHASE ACCOUNTING

| | Account Total: | .00 | .00 | .00 | .00 | .00 |

Account 22341-   Totals:        .00        .00        .00        .00        .00

22342-100-00     ACCRUED DIVIDENDS

| | Account Total: | 624,263.00CR | .00 | .00 | .00 | 624,263.00CR |

Account 22342-   Totals:        624,263.00CR        .00        .00        .00        624,263.00CR

22350-100-00     OTHER TAXES PAYABLE

| | Account Total: | .00 | .00 | .00 | .00 | .00 |

# Exhibit 3

# Kulkarni Affidavit – May 5, 2006

1                    UNITED STATES DISTRICT COURT

2                     DISTRICT OF MASSACHUSETTS

3

4

5    * * * * * * * * * * * * * * * * *

     PETER A. CRAWFORD,                    *

6              Plaintiff                   *

                                           *

7    VS.                                   *   CIVIL ACTION NO.

                                           *   05-ev-10078(DPW)

8    WOLVERINE, PROCTOR & SCHWARTZ,        *

     INC.; STEVEN F. CHILINSKI and         *

9    DEEPAK S. KULKARNI,                   *

               Defendants                  *

10   * * * * * * * * * * * * * * *         *

11

12

13

14              DEPOSITION OF MARSHALL A. BARTLETT, called by

15   the Plaintiff, pursuant to the applicable provisions of

16   the Federal Rules of Civil Procedure, before Ruth E.

17   Hulke, Certified Shorthand Reporter No. 114893 and Notary

18   Public for the Commonwealth of Massachusetts, at Morgan,

19   Brown & Joy, LLP, 200 State Street, Boston,

20   Massachusetts, on Friday, January 20, 2006, commencing at

21   10:05 a.m.

22

23

Page 2

1    APPEARANCES:

2

      PETER A. CRAWFORD, 23 Newcastle Drive, Number 11,

3    Nashua, New Hampshire, 03060, pro se.

4      JEFFREY D. KUHN, ESQ., of Morgan, Brown & Joy, LLP,

      200 State Street, Boston, Massachusetts, 02109-2605, on

5    behalf of the Defendants.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

```
1                          I N D E X

2    WITNESS          DIRECT    CROSS     REDIRECT      RECROSS

3    Marshall Bartlett  4         87

4

5

6                      E X H I B I T S

7    NUMBER                                          PAGE

8     1     Documents W0026 through W0027            8

9     2     Documents PAC0043 through PAC0047        22

10    3     Documents W0975 through W0988            27

11    4     Documents PAC0027 through PAC0042        31

12    5     Documents W0409 through W0432            32

13    6     Documents PAC0049 through PAC0051        40

14    7     Documents PAC0023 through PAC0026        43

15    8     Documents PAC0055 through PAC0056        47

16    9     Documents W0384 through W0408            58

17    10    Documents W0357 through W0382            58

18    11    Documents PAC0100 through PAC0101        59

19

20

21

22

23
```

1                    P R O C E E D I N G S

2                    (Witness sworn)

3          MARSHALL A. BARTLETT, having been

4    satisfactorily identified and duly sworn, testified as

5    follows in answer to direct interrogatories by Mr.

6    Crawford:

7          Q.    Are you taking any medication or is there any

8    reason --

9          A.    No.

10          Q.    -- why you can't testify truthfully today?

11          A.    No.

12          Q.    Would you state your name and address?

13          A.    Marshal Bartlett.  Would you like my work

14    address or home address?

15          Q.    Both.

16          A.    Work address is 75 State Street, Boston, and my

17    home address is 70 Glezen Lane in Wayland, Massachusetts.

18          Q.    Just to read the stipulation into the record, I

19    believe you would like to read and sign the deposition?

20          A.    I would.

21          MR. CRAWFORD:  We will use the standard

22    stipulations.  Mr. Kuhn and I have agreed that

23    objections, except as to form, will be preserved until

Page 5

1    trial.   Is that correct?

2              MR. KUHN:   That is correct.

3              MR. CRAWFORD:   I guess that's it in terms of

4    the stipulations.

5              MR. KUHN:   Right.   Just to make it clear on the

6    record, I am not acting as Mr. Bartlett's attorney in any

7    capacity here today.

8              MR. CRAWFORD:   Okay.

9         Q.   I wonder if you could describe your background,

10   your education, when you joined Parthenon --

11        A.   Sure.

12        Q.   -- for me briefly.

13        A.   I have an undergraduate degree from Yale.   I

14   have an MBA from Tuck School at Dartmouth.   I graduated

15   from Yale in 1992.   I graduated from Tuck in 1998.

16   Between undergrad and business school I worked at two

17   different private equity firms.   One is the 1818 Funds at

18   Brown Brothers Harriman in New York.   The other was a

19   firm called Saugatuck Capital in Stanford, Connecticut,

20   both of which are still in operation.   I joined the

21   Parthenon Group, the consulting firm a couple of floors

22   up, out of business school.   I worked there for about

23   three years.   Then I joined Parthenon Capital in May of

Page 37

1    were, we were not paid in a timely way for those amounts.

2    We did receive some cash out of the recapitalization in

3    2005.  Whether that could be construed as payment for

4    those past fees or not, I don't know.  I don't think so.

5        Q.    To your knowledge, through the end of 2002 did

6    Mr. Kulkarni receive everything he was due under his

7    consulting agreement?

8        A.    I believe so.

9        Q.    Was that paid on time to him?

10       A.    I believe so.

11       Q.    Did that seem unfair to anyone at Parthenon?

12       A.    Contractually, he was owed it.  So there was

13   nothing wrong contractually with him being paid.  I think

14   there was frustration that there was not enough free cash

15   out of the business to make sure we got paid.  But he was

16   within his rights to be paid that.

17       Q.    Mr. Kulkarni owned approximately 40 percent of

18   Wolverine, Proctor, LLC?

19       A.    It was a very complicated structure.  Frankly,

20   I have forgotten most of it.  But there were unit

21   ownerships.  What that actual breakdown was, I can't

22   recall.  I do know that Parthenon had a majority of a

23   unit ownership in the LLC.  Then that LLC agreement

Page 38

1   governed how proceeds out of any funds coming to the LLC

2   would get distributed between the two parties.

3        Q.   But it was a significant stake, was it not?

4        A.   He did have a -- I think the challenge with an

5   LLC agreement is that you can't specifically say what his

6   ownership was.  The proceeds that he would get out of any

7   -- the portion of proceeds he would ultimately get if you

8   thought about that as ownership was governed depending on

9   the amount of those proceeds.  So at one level his

10  percentage ownership or stake in the proceeds would be

11  very low and at another level it would be higher.

12       Q.   Okay.  But suffice it to say he had a

13  significant stake?

14       A.   I would say he had a stake in the business.

15       Q.   Were people at Parthenon frustrated that he

16  continued to ask for his money while Parthenon was

17  forgiving or deferring the money it was owed?

18       A.   It's hard for me to speak globally about

19  Parthenon.  So it's hard for me to talk globally about

20  how other people at Parthenon felt about it.  We felt we

21  were doing the right thing.  He was contractually within1

22  his rights to get those payments, and we looked at it

23  hard, but on both sides, but he was within his rights.

Page 39

1      Q.    You said you looked at it hard.  What do you

2   mean by that?

3      A.    We looked at the agreement to ensure that he

4   was really due those payments, and he was.

5      Q.    So you looked at it hard to see if there was a

6   way to avoid making the payments?

7      A.    No, no.  Just to make sure that any cash

8   leaving the business was really due to all parties, and

9   it absolutely was for him.

10      Q.    What was his involvement in the business after

11   Mr. Chilinski joined?

12      A.    As I stated at the start, chairman.  He

13   continued to advise Steve as, you know, based on his

14   knowledge, and be helpful with customer relationships

15   where he could.

16      Q.    How many days a week did he spend on the

17   business?

18      A.    That's hard for me to say.  He was not on site

19   very much, but how much time he actually spent working on

20   matters for the company it's hard for me to say.  We

21   would hold board meetings once a quarter, issues would

22   come up here and there, as they do with companies, and

23   require us all to spend more time or less time.  But how

# Exhibit 4 (part 1)

# Kulkarni Affidavit – May 5, 2006

(E)

WOLVERINE PROCTOR, LLC

LIMITED LIABILITY COMPANY AGREEMENT

Dated as of December 28, 2001

W0565

# TABLE OF CONTENTS

Page

ARTICLE 1  DEFINITIONS.................................................................................................1
ARTICLE 2  FORMATION AND PURPOSE....................................................................1
    2.1.  Formation...................................................................................................1
    2.2.  Name.........................................................................................................1
    2.3.  Registered Office/Agent ..........................................................................2
    2.4.  Term..........................................................................................................2
    2.5.  Purpose.....................................................................................................2
    2.6.  Specific Powers........................................................................................2
    2.7.  Certificate.................................................................................................3
    2.8.  Principal Office.........................................................................................3
ARTICLE 3  MEMBERSHIP, CAPITAL CONTRIBUTIONS AND UNITS ..................3
    3.1.  Members ...................................................................................................3
    3.2.  Member Interests and Units......................................................................4
    3.3.  In-Kind Capital Contributions .................................................................4
    3.4.  Default.......................................................................................................4
ARTICLE 4  CAPITAL ACCOUNTS.................................................................................4
    4.1.  Allocations................................................................................................4
    4.2.  Capital Accounts......................................................................................4
    4.3.  Revaluations of Assets and Capital Account Adjustments.......................5
    4.4.  Additional Capital Account Adjustments.................................................5
    4.5.  Additional Capital Account Provisions ...................................................5
ARTICLE 5  DISTRIBUTIONS AND ALLOCATIONS OF PROFIT AND LOSS ...................6
    5.1.  Board of Managers Determination............................................................6
    5.2.  Special Distributions................................................................................6
    5.3.  General Distributions................................................................................6
    5.4.  No Violation..............................................................................................7
    5.5.  Withholdings.............................................................................................7
    5.6.  Property Distributions and Installment Sales...........................................7
    5.7.  Net Profit or Net Loss..............................................................................7
    5.8.  Tax Allocations: Code Section 704(c) and Unrealized Appreciation or Depreciation8
ARTICLE 6  STATUS, RIGHTS AND POWERS OF MEMBERS..................................9
    6.1.  Limited Liability.......................................................................................9
    6.2.  Return of Distributions of Capital............................................................9
    6.3.  No Management or Control .....................................................................10
    6.4.  Specific Limitations................................................................................10
    6.5.  Certain Member Voting Rights...............................................................10
    6.6.  Put 11
    6.7.  Forced Sale.............................................................................................12
    6.8.  Management Incentive Plan.....................................................................12
    6.9.  Pre-Emptive Right ..................................................................................12
ARTICLE 7  BOARD OF MANAGERS ..........................................................................12
    7.1.  Board of Managers..................................................................................12

7.2. Authority of Board of Managers ..................................................................13
7.3. Kulkarni Nominees ...................................................................................13
7.4. Reliance by Third Parties ..........................................................................14
ARTICLE 8  OFFICERS ..............................................................................................14
8.1. Officers; Agents .......................................................................................14
ARTICLE 9  BOOKS, RECORDS, ACCOUNTING AND REPORTS .........................14
9.1. Books and Records ...................................................................................14
9.2. Delivery to Member; Inspection; etc ..........................................................15
9.3. Fiscal Year; Financial Statements ..............................................................15
9.4. Filings ....................................................................................................15
9.5. Kulkarni Access Rights .............................................................................16
9.6. Kulkarni Audit Rights ...............................................................................16
9.7. Contributed Companies Tax Information ....................................................16
9.8. Non-Disclosure .......................................................................................16
ARTICLE 10  TAX MATTERS MEMBER .....................................................................16
10.1. Tax Matters Member ................................................................................17
10.2. Indemnity of Tax Matters Member .............................................................17
10.3. Tax Returns ............................................................................................17
ARTICLE 11  TRANSFER OF INTERESTS ..................................................................17
11.1. Restricted Transfer ..................................................................................17
11.2. Permitted Transferees ..............................................................................17
11.3. Transfer Requirements .............................................................................17
11.4. Consent ..................................................................................................18
11.5. Withdrawal of Member; No Dissolution .....................................................18
11.6. Noncomplying Transfers Void ...................................................................18
11.7. Amendment of Exhibit 3.1 ........................................................................18
ARTICLE 12  DISSOLUTION OF COMPANY .............................................................19
12.1. Termination of Membership ......................................................................19
12.2. Events of Dissolution ...............................................................................19
12.3. Liquidation .............................................................................................19
12.4. No Action for Dissolution .........................................................................19
12.5. No Further Claim .....................................................................................19
ARTICLE 13  INDEMNIFICATION ............................................................................19
13.1. General ..................................................................................................19
13.2. Exculpation ............................................................................................20
13.3. Persons Entitled to Indemnity ...................................................................20
13.4. Procedure Agreements .............................................................................20
13.5. Fiduciary and Other Duties .......................................................................20
ARTICLE 14  AMENDMENTS TO AGREEMENT ........................................................21
14.1. Amendments ..........................................................................................21
14.2. Corresponding Amendment of Certificate ...................................................21
14.3. Binding Effect .........................................................................................21
ARTICLE 15  GENERAL ...........................................................................................21
15.1. Successors; Delaware Law; Etc ..................................................................21
15.2. Notices, Etc ............................................................................................22
15.3. Execution of Documents ...........................................................................23

8686361.11

W0567

15.4. Consent to Jurisdiction..................................................................................24
15.5. Waiver of Jury Trial.......................................................................................24
15.6. Severability ..................................................................................................25
15.7. Table of Contents; Headings........................................................................25
15.8. No Third Party Rights...................................................................................25
    [The remainder of this page is intentionally blank.] .........................................25

W0568

## WOLVERINE PROCTOR, LLC
## LIMITED LIABILITY COMPANY AGREEMENT

This Limited Liability Company Agreement of Wolverine Proctor, LLC is dated as of December 28, 2001, among Parthenon Investors II, L.P., PCIP Investors, J&R Founders' Fund, L.P., Deepak Kulkarni and certain other Persons who may become party hereto from time to time (collectively, the "Members").

WHEREAS, the limited liability company has been formed in accordance with the Delaware Limited Liability Company Act in order to conduct the businesses described herein; and

WHEREAS, the Members are entering into this Agreement to provide for, among other things, the management of the business and affairs of the Company, the allocation of profits and losses among the Members, the respective rights and obligations of the Members to each other and to the Company, and certain other matters;

NOW, THEREFORE, the Members agree as follows:

## ARTICLE 1

## DEFINITIONS

For purposes of this Agreement (a) certain capitalized terms have specifically defined meanings which are either set forth or referred to in Exhibit 1 which is attached hereto and incorporated by reference, (b) references to "Articles", "Exhibits" and "Sections" are to Articles, Exhibits and Sections of this Agreement unless explicitly indicated otherwise, (c) references to statutes include all rules and regulations thereunder, and all amendments and successors thereto from time to time and (d) the word "including" shall be construed as "including without limitation".

## ARTICLE 2

## FORMATION AND PURPOSE

2.1.    <u>Formation</u>.  The Company was formed as a limited liability company in accordance with the Act by the filing of the Certificate with the Delaware Secretary of State. The rights and liabilities of the Members shall be determined pursuant to the Act and this Agreement.  To the extent that the rights or obligations of any Member are different by reason of any provision of this Agreement than they would be in the absence of such provision, this Agreement shall, to the extent permitted by the Act, control.

2.2.    <u>Name</u>.  The name of the Company is "Wolverine Proctor, LLC".  The business of the Company may be conducted under that name or, upon compliance with applicable laws, any other name that the Board of Managers deems appropriate.  The Board of Managers shall file, or shall cause to be filed, any fictitious name certificates and similar filings, and any amendments thereto, that the Board of Managers considers appropriate.

2.3.    Registered Office/Agent. The registered office required to be maintained by the Company in the State of Delaware pursuant to the Act shall initially be c/o Corporation Trust Center, 1209 Orange Street, Wilmington, New Castle County, Delaware 19801. The name and address of the registered agent of the Company pursuant to the Act shall initially be Corporation Trust Center, 1209 Orange Street, Wilmington, New Castle County, Delaware 19801. The Company may, upon compliance with the applicable provisions of the Act, change its registered office or registered agent from time to time in the discretion of the Board of Managers.

2.4.    Term. The term of the Company shall continue indefinitely unless sooner terminated as provided herein. If the filing of a certificate of cancellation is required by the Act, the existence of the Company as a separate legal entity shall continue until the filing of such certificate in the manner required by the Act.

2.5.    Purpose. The Company is formed for the purpose of, and the nature of the business to be conducted by the Company is, engaging in any lawful act or activity for which limited liability companies may be formed under the Act and engaging in any activities necessary, convenient or incidental thereto. Such purpose shall include, without limitation, holding and investing in securities of Wolverine Proctor Holdings, Inc., a Delaware Corporation ("Holdings") and its Subsidiaries.

2.6.    Specific Powers. Without limiting the generality of Section 2.5, the Company shall have the power and authority to take any actions necessary, convenient or incidental to or for the furtherance of the purposes set forth in Section 2.5, including the power:

2.6.1. To conduct its business, carry on its operations and exercise the powers granted to a limited liability company by the Act in any country, state, territory, district or other jurisdiction, whether domestic or foreign;

2.6.2. To acquire by purchase, lease, contribution of property or otherwise, own, hold, operate, maintain, finance, improve, lease, sell, convey, mortgage, transfer, demolish or dispose of any real or personal property;

2.6.3. To negotiate, enter into, renegotiate, extend, renew, terminate, modify, amend, waive, execute, perform and carry out and take any other action with respect to licenses, leases, contracts or agreements of any kind, including without limitation, guarantees and other contracts for the benefit of or with any Member or any Affiliate thereof, in each case without regard to whether such contracts may be deemed necessary, convenient or incidental to the accomplishment of the purpose of the Company;

2.6.4. To purchase, take, receive, subscribe for or otherwise acquire, own, hold, vote, use, employ, sell, mortgage, lend, pledge or otherwise dispose of, and otherwise use and deal in and with, shares or other interests in or obligations of domestic or foreign corporations, associations, general or limited partnerships, trusts, limited liability companies, individuals or other Persons, or direct or indirect obligations of the United States or any government, state, territory, governmental district or municipality or any instrumentality of any of them;

8686361.11

W0570

2.6.5.  To lend money, to invest and reinvest its funds, and to accept real and personal property for the payment of funds so loaned or invested;

2.6.6.  To borrow money and issue evidence of indebtedness, and to secure the same by a mortgage, pledge, security interest or other lien on the assets of the Company;

2.6.7.  To pay, collect, compromise, litigate, arbitrate or otherwise adjust or settle any other claims or demands of or against the Company or to hold such proceeds against the payment of contingent liabilities;

2.6.8.  To sue and be sued, defend and participate in administrative or other proceedings in its name;

2.6.9.  To appoint employees, officers, agents and representatives of the Company, and define their duties and fix their compensation;

2.6.10.  To indemnify any Person in accordance with the Act and this Agreement;

2.6.11.  To cease its activities and cancel its Certificate; and

2.6.12.  To make, execute, acknowledge and file any documents or instruments necessary, convenient or incidental to the accomplishment of the purpose of the Company.

2.7.  <u>Certificate</u>.  Philip J. Smith, Christopher C. Henry and Debra K. Lussier are hereby designated as authorized persons within the meaning of the Act to execute, deliver and file the Certificate, and such Persons and such other Persons as may be designated from time to time by the Board of Managers are hereby designated as authorized persons, within the meaning of the Act, to execute, deliver and file all certificates and any amendments or restatements thereof required or permitted to be filed in the office of the Secretary of State of Delaware, including any certificate of cancellation of the Certificate.

2.8.  <u>Principal Office</u>.  The principal executive office of the Company shall be located at such place as the Board of Managers shall establish, and the Board of Managers may from time to time change the location of the principal executive office of the Company to any other place within or without the State of Delaware.  The Board of Managers may establish and maintain such additional offices and places of business of the Company, either within or without the State of Delaware, as it deems appropriate.

ARTICLE 3

<u>MEMBERSHIP, CAPITAL CONTRIBUTIONS AND UNITS</u>

3.1.  <u>Members</u>.  The Members of the Company shall be listed on Exhibit 3.1, as from time to time amended and supplemented in accordance with this Agreement.  Each Member shall contribute to the Company on the Initial Contribution Date the assets set forth opposite such Member's name on Exhibit 3.1 as being contributed on the Initial Contribution Date, and in addition each Member shall contribute to the Company on the Business Day immediately after

8686361.11

-3-

W0571

the Initial Contribution Date, the assets set forth opposite such Member's name on Exhibit 3.1 as being contributed on the Business Day after the Initial Contribution Date. Each Member shall receive on the Initial Contribution Date or the day after the Initial Contribution Date, as the case may be, the number and class of Units set forth beside such Member's name on Exhibit 3.1 for the Capital Contributions described in the immediately preceding sentences. Exhibit 3.1 shall be amended from time to time so that it sets forth, the then current list of members and the number and class of Units held by such member.

3.2.    Member Interests and Units.  The Interests of the members of the Company shall be divided into Units.  There shall be only two classes of Units:  Class A Units and Class B Units.  Each Unit shall entitle the Member holding such Unit to the Distributions provided for by Sections 5.2, 5.3 and 12.3.

3.3.    In-Kind Capital Contributions.  In-kind Capital Contributions shall be effected by a written assignments or such other documents as the Board of Managers shall direct. Any Member making an in-kind Capital Contribution agrees from time to time to do such further acts and execute such further documents as the Board of Managers may direct to perfect the Company's interest in such in-kind Capital Contribution.

3.4.    Default.  If any Member shall fail to contribute the assets required by Section 3.1 to be contributed as a Capital Contribution by such Member on the Business Day after the Initial Contribution Date, the other Members shall, at their option, be relieved of their obligations to make the Capital Contributions to be made on such Business Day, the Member so failing shall automatically forfeit the Units previously issued to such Member and shall cease to have any further rights as a Member hereunder and, in such event, all assets of the Company shall be distributed to the non-defaulting Members.

ARTICLE 4

CAPITAL ACCOUNTS

4.1.    Allocations.  The Net Profits and Net Loss of the Company in any fiscal period shall be allocated among the Members as provided in Article 5.

4.2.    Capital Accounts.  A separate account (each a "Capital Account") shall be established and maintained for each Member which:

      (a)    shall be increased by (i) the amount of cash and the fair market value of any other property contributed by such Member to the Company as a Capital Contribution (net of liabilities secured by such property or that the Company assumes or takes the property subject to) and (ii) such Member's share of the Net Profit of the Company, and

      (b)    shall be reduced by (i) the amount of cash and the fair market value of any other property distributed to such Member (net of liabilities secured by such property or that the Member assumes or takes the

W0572

property subject to) and (ii) such Member's share of the Net Loss of the Company.

It is the intention of the Members that the Capital Accounts of the Company be maintained in accordance with the provisions of section 704(b) of the Code and the Regulations thereunder and that this Agreement be interpreted consistently therewith.

4.3.    Revaluations of Assets and Capital Account Adjustments.  Unless otherwise determined by the Board of Managers, immediately preceding the issuance of additional Units in exchange for cash, property or services to a new or existing Member and upon the redemption of the Interest of a Member, the then prevailing Asset Values of the Company shall be adjusted to equal their respective gross fair market values, as determined in good faith by the Board of Managers, and any increase in the net equity value of the Company (Asset Values less liabilities) shall be credited to the Capital Accounts of the Members in the same manner as Net Profits are credited under Section 5.7 (or any decrease in the net equity value of the Company shall be charged in the same manner as Net Losses are charged under Section 5.7).  Accordingly, as of the date of issuance of additional Units or the redemption of all or a portion of a Member's Interest in the Company, the Capital Accounts of Members will reflect both realized and unrealized gains and losses through such date and the net fair market value of the equity of the Company as of such date.

4.4.    Additional Capital Account Adjustments.  Any income of the Company that is exempt from federal income tax shall be credited to the Capital Accounts of the Members in the same manner as Net Profits are credited under Section 5.7 when such income is realized.  Any expenses or expenditures of the Company which may neither be deducted nor capitalized for tax purposes (or are so treated for tax purposes) shall be charged to the Capital Accounts of the Members in the same manner as Net Losses are charged under Section 5.7.  If the Company makes an election under section 754 of the Code to provide a special basis adjustment upon the transfer of an Interest in the Company or the distribution of property by the Company, Capital Accounts shall be adjusted to the limited extent required by the Regulations under section 704 of the Code following such transfer or distribution.

4.5.    Additional Capital Account Provisions.  No Member shall have the right to demand a return of all or any part of such Member's Capital Contributions.  Any return of the Capital Contributions of any Member shall be made solely from the assets of the Company and only in accordance with the terms of this Agreement.  No interest shall be paid to any Member with respect to such Member's Capital Contributions or Capital Account.  In the event that all or a portion of the Units of a Member are transferred in accordance with this Agreement, the transferee of such Units shall also succeed to all or the relevant portion of the Capital Account of the transferor.  Units held by a Member may not be transferred independently of the Interest to which the Units relate.

ARTICLE 5

DISTRIBUTIONS AND ALLOCATIONS OF PROFIT AND LOSS

5.1.    Board of Managers Determination.  The Board of Managers shall determine in its sole discretion the timing and the aggregate amount of any Distributions to Members;  provided, however, (i) that in the event of a Recapitalization or a Sale, the proceeds of such Recapitalization or Sale, as the case may be, after deducting reasonable expenses incurred by the Company in connection therewith, shall be distributed, as soon as reasonably practicable and (ii) in the event the Company receives income taxable to its Members, the Board of Managers shall make Distributions to all Members under Sections 5.2 or 5.3 as applicable in amounts calculated to be sufficient to enable the Members in the highest marginal tax bracket to pay income tax on such income at a combined federal and state tax rate determined in good faith by the Board of Managers, unless the Board of Managers determines in good faith that the making of such Distribution would be against the best interests of the Company.  Distributions shall be charged to the Capital Accounts of the Members and made in the order set forth in Sections 5.2 and 5.3, as applicable (including Distributions described in clause (ii) of the immediately preceding sentence).  Distributions made to a particular class of Units shall be made to the holders of such class of Units pro rata in accordance with the number of Units of such class held by the holder in question.  Distributions to holders of Class A Units are subject to offset as provided in the Kulkarni Subscription Agreement.

5.2.    Special Distributions.  After deducting any amounts of interest on the WP&S Notes which are used to pay expenses of the Company, amounts equal to interest on the WP&S Notes shall be distributed 38.57% to the holders of Class A Units and 61.43% to the holders of Class B Units.

5.3.    General Distributions.  Except for amounts distributed pursuant to Section 5.2:

5.3.1.  First, 50% of any Distributions shall be made to the holders of the Class A Units and 50% of such Distributions shall be made to the holders of Class B Units until the aggregate amount of Distributions made pursuant to this Section 5.3.1 equals $10,000,000;

5.3.2.  Second, after the aggregate amount of Distributions made pursuant to Section 5.3.1 equals $10,000,000, 10% of any Distributions shall be made to the holders of the Class A Units and 90% of any Distributions shall be made to the holders of the Class B Units until the aggregate amount of Distributions made pursuant to this Section 5.3.2 equals $37,778,000;

5.3.3.  Third, after the aggregate amount of Distributions made pursuant to Section 5.3.2 equals $37,778,000, 90% of any Distributions shall be made to the holders of Class A Units and 10% of any Distributions shall be made to the holders of Class B Units until the aggregate amount of Distributions made pursuant to this Section 5.3.3 equals $20,665,000;

W0574

5.3.4. Thereafter, 40% of any Distributions shall be made to the holders of Class A Units and 60% of any Distributions shall be made to the holders of Class B Units.

5.3.5. Notwithstanding the foregoing, the proceeds distributed after the occurrence of a Liquidation Event shall be distributed solely to the holders of Class B Units until the holders of Class B Units have received $14,000,000 in the aggregate pursuant to this Section 5.3.5 and the other provisions of this Section 5.3 including all Distributions to holders of Class B Units made prior to the occurrence of Liquidation Event (it being understood and agreed that (i) any Distributions made after a Liquidation Event shall in no way require any repayment of any Distributions made prior to such Liquidation Event and (ii) Distributions pursuant to this Section 5.3.5 shall be credited against amounts payable to the holders of Class B Units pursuant to Section 5.3.1, 5.3.2, 5.3.3 and 5.3.4).

5.4.   No Violation.  Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not make a Distribution to any Member on account of such Member's Interest in the Company if such Distribution would violate section 18-607 of the Act or other applicable law.

5.5.   Withholdings.  All amounts withheld pursuant to the Code or any federal, state, local or foreign tax law with respect to any payment, distribution or allocation to the Company shall be treated as amounts paid to the Company. The Board of Managers is authorized to withhold from Distributions, or with respect to allocations, to the Members and to pay over to the appropriate federal, state, local or foreign government any amounts required to be so withheld. The Board of Managers shall allocate any such amounts to the Members in respect of whose Distribution or allocation the tax was withheld and shall treat such amounts as actually distributed to such Members.

5.6.   Property Distributions and Installment Sales.  If any assets of the Company shall be distributed in kind pursuant to this Article 5, such assets shall be distributed to the Members entitled thereto in the same proportions as the Members would have been entitled to cash Distributions. The amount by which the fair market value of any property to be distributed in kind to the Members exceeds or is less than the then prevailing Asset Value of such property shall, to the extent not otherwise recognized by the Company, be taken into account in determining Net Profit and Net Loss and determining the Capital Accounts of the Members as if such property had been sold at its fair market value immediately prior to such Distribution. If any assets are sold in transactions in which, by reason of section 453 of the Code, gain is realized but not recognized, such gain shall be taken into account when realized in computing gain or loss of the Company for purposes of allocation of Net Profit and Net Loss under this Article 5 and, if such sales shall involve substantially all the assets of the Company, the Company shall be deemed to have been dissolved and terminated notwithstanding any election by the Members to continue the Company for purposes of collecting the proceeds of such sales.

5.7.   Net Profit or Net Loss.  The "Net Profit" or "Net Loss" of the Company for each Fiscal Year or relevant part thereof shall mean the Company's taxable income or loss for federal income tax purposes for such period (including all items of income, gain, loss or deduction

required to be stated separately pursuant to section 703(a)(1) of the Code) with the following adjustments:

(a)    Gain or loss attributable to the disposition of property of the Company with an Asset Value different than the adjusted basis of such property for federal income tax purposes shall be computed with respect to the Asset Value of such property, and any tax gain or loss not included in Net Profit or Net Loss shall be taken into account and allocated for federal income tax purposes among the Members pursuant to Section 5.8.

(b)    Depreciation, amortization or cost recovery deductions with respect to any property with an Asset Value that differs from its adjusted basis for federal income tax purposes shall be computed in accordance with Asset Value, and any depreciation allowable for federal income tax purposes shall be allocated in accordance with Section 5.8.

Items of income attributable to interest on the WP&S Notes and expenses paid out of cash received as interest on the WP&S Notes shall be allocated to the Capital Accounts of the Members in the same manner as cash attributable to such interest income is distributed under Section 5.2. Net Profits and Net Losses (excluding items of income attributable to interest on the WP&S Note and expenses paid out of cash received as interest on the WP&S Notes) for a fiscal period shall be allocated to the Capital Accounts of the Members so as to ensure, to the extent possible, that the Capital Accounts of the Members as of the end of such fiscal period (after taking into account Distributions made during the fiscal period) are equal to the aggregate Distributions that the Members would receive if all of the assets of the Company were sold for their Asset Values and the proceeds were distributed as of the end of such accounting period in accordance with Sections 5.3.1 through 5.3.5. Notwithstanding the foregoing, the Board of Managers shall be entitled to modify these allocations if it determines in its reasonable discretion that such modification is necessary to appropriately reflect the Distributions that have been and are expected to be made to the Members.

5.8.    Tax Allocations: Code Section 704(c) and Unrealized Appreciation or Depreciation.

5.8.1. Contributed Assets. In accordance with section 704(c) of the Code, income, gain, loss and deduction with respect to any property contributed to the Company with an adjusted basis for federal income tax purposes different from the initial Asset Value at which such property was accepted by the Company shall, solely for tax purposes, be allocated among the Members so as to take into account such difference in the manner required by section 704(c) and the applicable Regulations.

5.8.2. Revalued Assets. If upon the acquisition of additional Units in the Company by a new or existing Member the Asset Value of any the assets of the Company are adjusted pursuant to Section 4.3, subsequent allocations of income, gain, loss and deduction with respect to such assets shall, solely for tax purposes, be allocated among the Members so as to take into account such adjustment in the same manner as under section 704(c) of the Code and the applicable Regulations.

5.8.3. <u>Elections and Limitations</u>. The allocations required by this Section 5.9 are solely for purposes of federal, state and local income taxes and shall not affect the allocation of Net Profits or Net Losses as between Members or any Member's Capital Account. All tax allocations required by this Section 5.9 shall be made using the so-called "traditional method" described in Regulation 1.704-3(b); <u>provided</u>, <u>however</u>, that the Board of Managers, with the advice of the Company's auditors or tax counsel, may elect to use the so-called "traditional method with curative allocations" described in Regulation 1.704-3(c).

5.8.4. <u>Allocations</u>. Except as noted above, all items of income, deduction and loss shall be allocated for federal, state and local income tax purposes in the same manner as Net Profits, Net Losses and items of income and expense are allocated under Section 5.7.

## ARTICLE 6

## <u>STATUS, RIGHTS AND POWERS OF MEMBERS</u>

6.1.    <u>Limited Liability</u>. Except as otherwise provided by the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, expenses, obligations and liabilities of the Company, and no member or Indemnified Person shall be obligated personally for any such debt, expense, obligation or liability of the Company solely by reason of being a member or Indemnified Person. All Persons dealing with the Company shall have recourse solely to the assets of the Company for the payment of the debts, obligations or liabilities of the Company. In no event shall any Member be required to make up any deficit balance in such Member's Capital Account upon the liquidation of such Member's Interest or otherwise.

6.2.    <u>Return of Distributions of Capital</u>. Except as otherwise expressly required by law, a Member, in such capacity, shall have no liability for obligations or liabilities of the Company in excess of (a) the amount of such Member's Capital Contributions, (b) such Member's share of any assets and undistributed profits of the Company, and (c) to the extent required by law, the amount of any Distributions wrongfully distributed to such Member. Except as required by law, no Member shall be obligated by this Agreement to return any Distribution to the Company or pay the amount of any Distribution for the account of the Company or to any creditor of the Company; <u>provided</u>, <u>however</u>, that if any court of competent jurisdiction holds that, notwithstanding this Agreement, any Member is obligated to return or pay any part of any Distribution, such obligation shall bind such Member alone and not any other Member; <u>provided</u>; <u>further</u>, <u>however</u>, that if any Member is required to return all or any portion of any Distribution under circumstances that are not unique to such Member but that would have been applicable to all Members if such Members had been named in the lawsuit against the Member in question (such as where a Distribution was made pro rata to all Members and rendered the Company insolvent, but only one Member was sued for the return of such Distribution), the Member that was required to return or repay the Distribution (or any portion thereof) shall be entitled to reimbursement from the other Members that were not required to return the Distributions made to them pro rata based on each such Member's share of the Distribution in question. The provisions of the immediately preceding sentence are solely for the benefit of the Members and

shall not be construed as benefiting any third party. The amount of any Distribution returned to the Company by a Member or paid by a Member for the account of the Company or to a creditor of the Company shall be added to the account or accounts from which it was subtracted when it was distributed to such Member. The provisions of this Section 6.2 shall not be construed as relieving Kulkarni of his indemnity obligations under the Kulkarni Subscription Agreement.

6.3.    No Management or Control. Except as expressly provided in this Agreement, no Member shall take part in or interfere in any manner with the management of the business and affairs of the Company or have any right or authority to act for or bind the Company.

6.4.    Specific Limitations. No Member shall have the right or power to: (a) withdraw or reduce such Member's Capital Contribution except as a result of the dissolution of the Company or as otherwise provided by law or in this Agreement, (b) make voluntary Capital Contributions or to contribute any property to the Company other than cash, (c) bring an action for partition against the Company or any Company assets, (d) cause the termination and dissolution of the Company, except as set forth in this Agreement, or (e) upon the Distribution of its Capital Contribution require that property other than cash be distributed in return for its Capital Contribution. Each Member hereby irrevocably waives any rights that such Member may have to maintain an action for partition of any of the Company's property. Except as otherwise set forth in this Agreement, no Member shall have priority over any other Member either as to the return of such Member's Capital Contribution or as to Net Profit, Net Loss or Distributions. Other than upon the termination and dissolution of the Company as provided by this Agreement, no time has been agreed upon when the Capital Contribution of any Member will be returned.

6.5.    Certain Member Voting Rights. Except with the prior written consent of Kulkarni, the Board of Managers shall not;

6.5.1. prior to January 1, 2004, (i) permit the Company to sell or otherwise transfer all or substantially all the stock of Holdings or (ii) permit Holdings and/or its Subsidiaries to sell or otherwise transfer all or substantially all the stock of its Subsidiaries or (iii) permit Holdings and/or its Subsidiaries to sell, lease or otherwise transfer all or substantially all of their consolidated assets in a single transaction or series of related transactions; or

6.5.2. prior to January 1, 2004, (i) permit the Company to merge, consolidate or effect any other similar corporate transaction with any other Person or (ii) permit Holdings or its Subsidiaries to merge, consolidate or effect any similar corporate transaction with any other Person (other than Holdings or another Subsidiary of Holdings) unless Holdings or the Subsidiary in question is the surviving entity in such transaction; or

6.5.3. permit the Company or any of its Subsidiaries to enter into a transaction or agreement with an Affiliate other than the Kulkarni Consulting Agreement, the Kulkarni Subscription Agreement, or the Parthenon Advisory Agreement; provided, however, that the consent of Kulkarni shall be required for the payment of any fee pursuant to Sections 2(f) and 2(g) of the Parthenon Advisory Agreement; or

6.5.4. permit the Company, Holdings or any of its Subsidiaries to issue equity at less than Fair Market Value as determined in the case of the Company by the Board of Managers in good faith and in the case of Holdings and its Subsidiaries, the Board of Directors of Holdings, provided, however, the foregoing shall not apply to issuance of equity awards pursuant to the Management Incentive Plan; or

6.5.5. enter into any transaction of the type described in Sections 6.5.1 or 6.5.2 if at least 80% of the consideration therefor does not consist of cash or registered or otherwise freely tradable securities; or

6.5.6. permit Holdings or any of its Subsidiaries to incur indebtedness to fund a Recapitalization, which consent shall not be unreasonably withheld.

Notwithstanding the foregoing:

(a)    if the Board of Managers shall in good faith determine that the Board of Managers and Kulkarni disagree about the strategic direction of Holdings and its Subsidiaries, then the Board of Managers may permit the transactions described in Sections 6.5.1 or 6.5.2 to occur without the consent of Kulkarni and upon the consummation of any such transaction, unless Kulkarni shall have consented to such transaction, such transaction shall be deemed to be a Change of Control under the Kulkarni Consulting Agreement and as a result Kulkarni shall be entitled to receive the payments provided for in Section 5(c) of the Kulkarni Consulting Agreement in addition to the Distributions to which Kulkarni is entitled pursuant to Article 5 hereof; and

(b)    after the death of Kulkarni, the rights of Kulkarni may be exercised by the holders of a majority of the Class A Units except that no consent shall be required for transactions described in Sections 6.5.1 or 6.5.2 and the percentage "80%" in Section 6.5.5 shall be changed to "60%". After the death of Kulkarni, if the Board of Managers shall vote to undertake any transaction that requires the consent of the holders of a majority of the Class A Units and a representative on the Board of Managers elected by the holders of the majority of Class A Units votes in favor of such transaction, such vote shall be considered the consent of the holders of a majority of the Class A Units for purposes of this Section 6.5. In addition, if the consent of the holders of a majority of the Class A Units is required pursuant to this Section 6.5 and such consent is requested by notice given as provided hereunder and the holders of a majority of the Class A Units have not either given or denied consent within fifteen (15) Business Days after such notice is given, then the holders of a majority of Class A Units shall be deemed to have consented to such transaction

6.6.    Put. The Board of Managers agrees that any time after December 31, 2006, if requested by Kulkarni the Board of Managers will cause the Company to purchase the Class A Units at the Fair Market Value thereof, determined with no discount for the fact that such Class A Units may represent a minority interest or that the Class B Units may represent a controlling interest. The purchase of the Class A Units pursuant hereto shall take place as promptly as possible after the Fair Market Value thereof is determined but in no event later than ten (10) calendar days after such determination. All payments for the purchase of the Class A Units shall

be made by cashier's or certified check or by wire transfer of immediately available fund to an account designated by Kulkarni.

6.7.    Forced Sale. The Board of Manager agrees that any time after December 31, 2006, if requested by Kulkarni the Board of Managers will cause the Company to enter into an agreement with a third party that is not an Affiliate of Kulkarni, pursuant to which a transaction contemplated by Section 6.5.1 or 6.5.2 is to be consummated provided that at least 80% of the consideration for such sale consists of cash or registered or otherwise freely tradable securities.

6.8.    Management Incentive Plan. The Board of Managers shall as soon as practicable after the date hereof cause Holdings to establish an equity incentive plan pursuant to which equity representing approximately five percent (5%) of the fully-diluted equity of Holdings shall be reserved for equity grants to the management of Holdings and its Subsidiaries (the "Management Incentive Plan"). The Management Incentive Plan shall be administered by the Board of Directors of Holdings.

6.9.    Pre-Emptive Right. If the Company, Holdings or its Subsidiaries propose to issue any equity securities other than in connection with an acquisition, to lenders of other sources of debt financing or to employees, the holders of the Class A Units shall have the right to purchase up to 40% of the equity securities so being issued on the terms set forth in this Section 6.9. The Company shall give the holders of the Class A Units not less than 15 Business Days notice of any such proposed issuance and the holders of the Class A Units shall have 10 Business Days to notify the Company that they wish to exercise their rights under this Section 6.9. The notice from the Company shall state the price at which the proposed issuance is to take place, the name of the purchaser if the purchaser is Parthenon or its Affiliates, the name of any other known purchasers and any other material facts with respect to the transaction. If the Company has not received notice from the holders of Class A Units within said 10 Business Day period to the effect that such holders wish to exercise their rights under this Section 6.9 and specifying the amount of equity securities which such holders wish to purchase, the Company may proceed to issue equity securities in the proposed transaction free of the right of the holders of the Class A Units to purchase such equity securities pursuant to this Section 6.9. The holders of the Class A Units purchasing equity securities pursuant to this Section 6.9 shall enter into such agreements as the other purchasers of equity securities are entering into in connection with such purchase and shall fund their purchase of such equity securities at the same time and on the same terms as such other purchasers it being understood that without the consent of the holders of a majority of the Class A Units, no agreement with respect to such purchase shall require the holders of the Class A Units to modify or surrender their rights under this Agreement. If the proposed issuance is to Parthenon or its Affiliates, the time of the closing shall be extended for such time as is needed in order to permit a determination of Fair Market Value pursuant to Section 6.5.4.

ARTICLE 7

BOARD OF MANAGERS

7.1.    Board of Managers. The business of the Company shall be managed by the Board of Managers, and the Persons constituting the Board of Managers shall be the "managers" of the

W0580

Company for all purposes under the Act. The Board of Managers shall initially be the individuals set forth in Exhibit 7.1. Thereafter, the individuals constituting the Board of Managers shall be determined in accordance with the provisions of Exhibit 7.1. Exhibit 7.1 sets forth the procedures for the conduct of the affairs of the Board of Managers and decisions of the Board of Managers shall be set forth in a resolution adopted in accordance with the procedures set forth in Exhibit 7.1. Such decisions shall be decisions of the Company's "manager" for all purposes of the Act and shall be carried out by officers or agents of the Company designated by the Board of Managers in the resolution in question or in one or more standing resolutions or with the power and authority to do so under Article 8. A decision of the Board of Managers may be amended, modified or repealed in the same manner in which it was adopted or in accordance with the procedures set forth in Exhibit 7.1 as then in effect, but no such amendment, modification or repeal shall affect any Person who has been furnished a copy of the original resolution, certified by a duly authorized officer of the Company, until such Person has been notified in writing of such amendment, modification or repeal.

7.2.   Authority of Board of Managers. Subject to the provisions of this Agreement that require the consent or approval of one or more Members, the Board of Managers shall have the exclusive power and authority to manage the business and affairs of the Company and to make all decisions with respect thereto. Except as otherwise expressly provided in this Agreement, the Board of Managers or Persons designated by the Board of Managers, including officers and agents appointed by the Board of Managers, shall be the only Persons authorized to execute documents which shall be binding on the Company. To the fullest extent permitted by Delaware law, but subject to any specific provisions hereof granting rights to Members, the Board of Managers shall have the power to perform any acts, statutory or otherwise, with respect to the Company or this Agreement, which would otherwise be possessed by the Members under Delaware law, and the Members shall have no power whatsoever with respect to the management of the business and affairs of the Company. The power and authority granted to the Board of Managers hereunder shall include all those necessary, convenient or incidental for the accomplishment of the purposes of the Company and shall include the power to make all decisions with regard to management, operations, assets, financing and capitalization of the Company, provided, however that without the required consent pursuant to Section 6.5, the Board of Managers shall not take any of the actions described in Section 6.5 except as provided therein.

7.3.   Kulkarni Nominees. Notwithstanding the grant of powers to the Board of Managers contained in Section 7.1, the Board of Managers agrees to cause the Company to vote the stock of Holdings so that the Board of Directors of Holdings shall consist of five members, two of whom shall be Persons designated by the holders of a majority of the Class A Units and three of whom shall be Persons designated by the holders of a majority of the Class B Units, it being understood that the holders of a majority of the Class A Units shall initially designate the new Chief Executive Officer of Holdings as one of their initial nominees but are under no obligation to continue to nominate the Chief Executive Officer of Holdings as one of their nominees. Persons who are elected as directors of Holdings pursuant to the provisions of this Section 7.3 may be removed only by the holders of the class of Units who nominated such director. Such removal shall be effected by giving notice to the Board of Managers in which case the Board of Managers shall vote the stock of Holdings to remove such Person as director. Notwithstanding the foregoing if the new Chief Executive Officer of Holdings has not been

appointed prior to the date on which the directors of Holdings are first elected or the Board of Managers hereunder is first elected, promptly after a new Chief Executive Officer is appointed, the holders of the Class A Units shall take such steps as are necessary to substitute the new Chief Executive Officer as a director of Holdings and as a member of the Board of Managers of the Company for one of the nominees of the holders of the Class A Units, on the understanding that the holders of the Class A Units shall have no obligation to continue to nominate the Chief Executive Officer of Holdings to either board after the new Chief Executive Officer is initially elected to said boards.

7.4.    Reliance by Third Parties.  Any person or entity dealing with the Company or the Member may rely upon a certificate signed by the Board of Managers as to: (a) the identity of the Board of Managers; (b) the existence or non-existence of any fact or facts which constitute a condition precedent to acts by the Board of Managers or are in any other manner germane to the affairs of the Company; (c) the Persons which are authorized to execute and deliver any instrument or document of or on behalf of the Company; (d) the authorization of any action by or on behalf of the Company by the Board of Managers or any officer or agent acting on behalf of the Company; or (e) any act or failure to act by the Company or as to any other matter whatsoever involving the Company or the Board of Managers.

ARTICLE 8

OFFICERS

8.1.    Officers; Agents.  The Board of Managers shall have the power to appoint officers and agents to act for the Company with such titles, if any, as the Board of Managers deems appropriate and to delegate to such officers or agents such of the powers as are granted to the Board of Managers hereunder, including the power to execute documents on behalf of the Company, as the Board of Managers may in its sole discretion determine; provided, however, that no such delegation by the Board of Managers shall cause the Persons constituting the Board of Managers to cease to be the "Board of Managers" of the Company within the meaning of the Act. The officers so appointed may include persons holding titles such as Chairman, Chief Executive Officer, Chief Operating Officer, President, Chief Financial Officer, Executive Vice President, Vice President, Treasurer or Controller. Unless the authority of the officer in question is limited in the document appointing such officer or is otherwise specified by the Board of Managers, any officer so appointed shall have the same authority to act for the Company as a corresponding officer of a Delaware corporation would have to act for a Delaware corporation in the absence of a specific delegation of authority; provided, however, that without the required consent pursuant to Section 6.5, no officer shall take any action described in Section 6.5 except as provided therein.

ARTICLE 9

BOOKS, RECORDS, ACCOUNTING AND REPORTS

9.1.    Books and Records.  The Company shall maintain at its principal office (in the case of the items referred to in clauses (c) and (d) and (e) until the later of (i) the expiration of the applicable statute of limitations with respect to income taxes resulting from the ownership of

8686361.11

W0582

Interests in the Company or (ii) the applicable period specified below in clauses (c), (d) or (e)) all of the following:

(a)      A current list of the full name and last known business or residential address of each Member, together with information regarding the amount of cash and a description and statement of the agreed value of any other property or services contributed by such Member and which such Member has agreed to contribute in the future, and the date on which such Member became a Member of the Company;

(b)      A copy of the Certificate and this Agreement, including any amendments to either thereof, together with executed copies of any powers of attorney pursuant to which the Certificate, this Agreement or any amendments have been executed; .

(c)      Copies of the Company's federal, state and local income tax or information returns and reports, if any, for each year;

(d)      The annual financial statements of the Company for the six most recent Fiscal Years; and

(e)      The Company's books and records for at least the current and past three Fiscal Years.

9.2.    _Delivery to Member; Inspection; etc._  Upon the request of any Member for any purpose reasonably related to such Member's Interest, the Board of Managers shall cause to be delivered to the requesting Member, at the expense of the Company, a copy of the information required to be maintained by clauses (a) through (d) of Section 9.1.

9.3.    _Fiscal Year; Financial Statements_.  Unless changed by the Board of Managers, the Fiscal Year of the Company shall end on December 31 in each year.  The Board of Managers shall cause books of account to be maintained reflecting the operations of the Company and shall cause to be prepared for the Members at least annually, at the Company's expense, financial statements of the Company prepared in accordance with generally accepted accounting principles.

9.4.    _Filings_.  At the Contributed Companies' expense, Kulkarni shall cause the income tax returns for the Contributed Companies for the tax year ended December 31, 2001 to be prepared and timely filed with appropriate authorities.  At the Company's expense the Board of Managers shall cause the income tax returns for the Company to be prepared and timely filed with the appropriate authorities and to have prepared and to furnish to each Member such information with respect to the Company (including without limitation a schedule setting forth such Member's distributive share of the Company's income, gain, loss, deduction and credit as determined for federal income tax purposes) as is necessary to enable such Member to prepare such Member's federal and state income tax returns.  The Board of Managers, at the Company's expense, shall also cause to be prepared and timely filed, with appropriate federal and state

regulatory and administrative authorities, all reports required to be filed by the Company with those entities under then current applicable laws, rules and regulations.

9.5.    Kulkarni Access Rights. The Company shall permit, and shall cause Holdings and its Subsidiaries to permit, one representative of the holders of Class A Units, for so long as at least 25% of the Class A Units originally issued hereunder remain outstanding (which representative shall be Kulkarni so long as he is living), to visit and inspect any of the properties of the Company and its Subsidiaries, examine their books and take copies and extracts therefrom, discuss the affairs, finances and accounts of the Company and its Subsidiaries with their officers and employees, consult with the management of the Company and its Subsidiaries as to the affairs, finances and accounts of the Company and its Subsidiaries, all at reasonable times and upon reasonable notice.

9.6.    Kulkarni Audit Rights. After a Distribution is made, Kulkarni may require that an audit of the amount of such Distribution be made by the independent certified public accountants then auditing the accounts of Holdings and its Subsidiaries. If such audit confirms that the Distribution in question was made correctly in accordance with the provisions of this Agreement, Kulkarni shall pay for the cost of such audit. If such audit determines that the Distribution in question was not made correctly in accordance with the provisions of this Agreement, the Company shall bear the expense of such audit.

9.7.    Contributed Companies Tax Information. So long as any tax years of any of the Contributed Companies or of Kulkarni through and including the tax year ended December 31, 2001 remain open the Company shall cause Holdings and its Subsidiaries to maintain all tax-related records with respect to such open tax years until the expiration of the applicable statute of limitations (as such statute of limitations may be extended). The foregoing obligation shall inure to the benefit of the estate of Kulkarni on his death.

9.8.    Non-Disclosure. Each Member agrees that, except as otherwise consented to by the Board of Managers, all non-public information furnished to such Member pursuant to this Agreement will be kept confidential and will not be disclosed by such Member, or by any of such Member's agents, representatives or employees, in any manner, in whole or in part, except that (a) each Member shall be permitted to disclose such information to those of such Member's agents, representatives and employees who need to be familiar with such information in connection with such Member's investment in the Company and who are charged with an obligation of confidentiality, (b) each Member shall be permitted to disclose such information to such Member's partners and equity holders so long as they agree to keep such information confidential on the terms set forth herein, (c) each Member shall be permitted to disclose information to the extent required by law, so long as such Member shall have first provided the Company a reasonable opportunity to contest the necessity of disclosing such information, and (d) each Member shall be permitted to disclose information to the extent necessary for the enforcement of any right of such Member arising under this Agreement.

## ARTICLE 10

### TAX MATTERS MEMBER

8686361.11

W0584

10.1.   Tax Matters Member.  Unless and until another Member is designated as the tax matters partner by the Board of Managers, Parthenon Investors II, L.P. shall be the tax matters partner of the Company as provided in the Regulations under Code section 6231 and any analogous provisions of state law and in such capacity is referred to as the "Tax Matters Member".

10.2.   Indemnity of Tax Matters Member.  The Company shall indemnify and reimburse the Tax Matters Member for all expenses (including legal and accounting fees) incurred as Tax Matters Member pursuant to this Article 10 in connection with any administrative or judicial proceeding with respect to the tax liability of the Members attributable to interest in the Company.

10.3.   Tax Returns.  Unless otherwise agreed by the Board of Managers, all returns of the Company shall be prepared by the Company's independent certified public accountants.

ARTICLE 11

TRANSFER OF INTERESTS

11.1.   Restricted Transfer.  Except for Transfers pursuant to Section 11.2 to a Permitted Transferee, no Member shall Transfer all or any part of the economic or other rights that comprise such Member's Interest unless such Transfer is first approved by the holders of a majority of the class of Units which are not being Transferred, which such approval shall not be unreasonably withheld.

11.2.   Permitted Transferees.  Subject to Sections 11.3 and 11.4, a Member who is an individual shall be entitled to Transfer all or any portion of such Member's Units to one or more Members of the Immediate Family of such Member, or to a trust for the benefit of such Member or one or more of the Members of the Immediate Family of such Member, so long as the Person controlling such trust is reasonably satisfactory to the Board of Managers (any such transferee herein referred to as a "Permitted Transferee").  In no event shall all or any part of an Interest be transferred to a minor or an incompetent except in trust or pursuant to the Uniform Gifts to Minors Act.

11.3.   Transfer Requirements.  No Person to whom a Member's Interest is Transferred (including a Permitted Transferee) shall be admitted to the Company as a Member unless the following conditions are satisfied or such conditions are waived by the Board of Managers:

(a)     A duly executed written instrument of Transfer is provided to the Board of Managers, specifying the Interests being transferred and setting forth the intention of the Member effecting the Transfer that the transferee succeed to a portion or all of such Member's Interest as a Member;

(b)     an opinion of responsible counsel (who may be counsel for the Company), reasonably satisfactory in form and substance to the Board of Managers to the effect that:

(i)     such Transfer would not violate the Securities Act or any state securities or blue sky laws applicable to the Company or the Interest to be transferred;

(ii)     such Transfer would not cause the Company to be considered a publicly traded partnership under section 7704(b) of the Code;

(iii)     such Transfer would not cause the Company to lose its status as a partnership for federal income tax purposes; and

(iv)     such Transfer would not cause a termination of the Company for federal income tax purposes.

(c)     The Member effecting the Transfer and the transferee execute any other instruments that the Board of Managers deems reasonably necessary or desirable for admission of the transferee, including the written acceptance by the transferee of this Agreement and execution and delivery to the Board of Managers of a special power of attorney as provided in Section 15.3; and

(d)     The Member effecting the Transfer or the transferee pays to the Company a transfer fee in an amount sufficient to cover the reasonable expenses incurred by the Company in connection with the admission of the transferee.

11.4.   Consent. Each Member hereby agrees that upon satisfaction of the terms and conditions of this Article 11 with respect to any proposed Transfer, the Person proposed to be such transferee may be admitted as a Member.

11.5.   Withdrawal of Member; No Dissolution. If a Member Transfers all of its Interest pursuant to Section 11.1 and the transferee of such interest is admitted as a Member pursuant to Section 11.3, such transferee shall be admitted to the Company as a Member effective on the effective date of the Transfer or such other date as may be specified when the transferee is admitted and, immediately following such admission, the transferor Member shall cease to be a Member of the Company. Upon the transferor Member's withdrawal from the Company, the withdrawing Member shall not be entitled to any Distributions (other than Distributions permitted by Section 18-604 of the Act) from and after the date of such withdrawal or transfer.

11.6.   Noncomplying Transfers Void. Any Transfer in contravention of this Article 11 shall be void and of no effect, and shall not bind nor be recognized by the Company.

11.7.   Amendment of Exhibit 3.1. In the event of the admission of any transferee as a Member of the Company, the Board of Managers shall promptly amend Exhibit 3.1 to reflect such Transfer or admission, as the case may be.

W0586

ARTICLE 12

DISSOLUTION OF COMPANY

12.1.    Termination of Membership. No Member shall resign or withdraw from the Company except that, subject to the restrictions set forth in Article 11, any Member may Transfer its Interest in the Company to a transferee and a transferee may become a Member in place of the Member assigning such Interest.

12.2.    Events of Dissolution. The Company shall be dissolved upon the happening of any of the following events: (a) the entry of a decree of judicial dissolution under section 18-802 of the Act, (b) the written determination of the Board of Managers or (c) the disposition of all of the Company's assets.

12.3.    Liquidation. Upon dissolution of the Company for any reason, the Company shall immediately commence to wind up its affairs. A reasonable period of time shall be allowed for the orderly termination of the Company's business, discharge of its liabilities, and distribution or liquidation of the remaining assets so as to enable the Company to minimize the normal losses attendant to the liquidation process. The Company's property and assets or the proceeds from the liquidation thereof shall be distributed so as not to contravene the Act and shall be otherwise made in accordance with Sections 5.2 and 5.3.

12.4.    No Action for Dissolution. The Members acknowledge that irreparable damage would be done to the goodwill and reputation of the Company if any Member should bring an action in court to dissolve the Company under circumstances where dissolution is not required by Section 12.2. This Agreement has been drawn carefully to provide fair treatment of all parties and equitable payment in liquidation of the Interests of all Members. Accordingly, except where the Board of Managers has failed to liquidate the Company as required by Section 12.2 and except as specifically provided in section 18-802(a) of the Act, each Member hereby waives and renounces its right to initiate legal action to seek dissolution or to seek the appointment of a receiver or trustee to liquidate the Company.

12.5.    No Further Claim. Upon dissolution, each Member shall have recourse solely to the assets of the Company for the return of such Member's capital, and if the Company's property remaining after payment or discharge of the debts and liabilities of the Company, including debts and liabilities owed to one or more of the Members, is insufficient to return the aggregate Capital Contributions of each Member, such Member shall have no recourse against the Company, the Board of Managers or any other Member.

ARTICLE 13

INDEMNIFICATION

13.1.    General. The Company shall indemnify, defend and hold harmless the Board of Managers, each Member, including the Tax Matters Member in such Member's capacity as such, each such Person's officers, directors, partners, members, shareholders, employees, accountants, counsel and agents, and the employees, officers, accountants, counsel and agents of the

8686361.11

-19-

W0587

Company (all indemnified persons being referred to as "Indemnified Persons" for purposes of this Article 13), from any liability, loss or damage incurred by the Indemnified Person by reason of any act performed or omitted to be performed by the Indemnified Person in connection with the business of the Company and from liabilities or obligations of the Company imposed on such Person by virtue of such Person's position with the Company, including reasonable attorneys' fees and costs and any amounts expended in the settlement of any such claims of liability, loss or damage; provided, however, that if the liability, loss, damage or claim arises out of any action or inaction of an Indemnified Person, indemnification under this Section 13.1 shall be available only if (a) either (i) the Indemnified Person, at the time of such action or inaction, determined in good faith that its, his or her course of conduct was in, or not opposed to, the best interests of the Company or (ii) in the case of inaction by the Indemnified Person, the Indemnified Person did not intend its, his or her inaction to be harmful or opposed to the best interests of the Company, and (b) the action or inaction did not constitute fraud, gross negligence or willful misconduct by the Indemnified Person; provided, further, however, that indemnification under this Section 13.1 shall be recoverable only from the assets of the Company and not from any assets of the Members. Unless the Board of Managers determines in good faith that the Indemnified Person is unlikely to be entitled to indemnification under this Article 13, the Company shall pay or reimburse reasonable attorneys' fees of an Indemnified Person as incurred, provided that such Indemnified Person executes an undertaking, with appropriate security if requested by the Board of Managers, to repay the amount so paid or reimbursed in the event that a final non-appealable determination by a court of competent jurisdiction that such Indemnified Person is not entitled to indemnification under this Article 13. The Company may pay for insurance covering liability of the Indemnified Persons for negligence in operation of the Company's affairs.

13.2. Exculpation. No Indemnified Person shall be liable, in damages or otherwise, to the Company or to any Member for any loss that arises out of any act performed or omitted to be performed by it, him or her pursuant to the authority granted by this Agreement if (a) either (i) the Indemnified Person, at the time of such action or inaction, determined in good faith that such Indemnified Person's course of conduct was in, or not opposed to, the best interests of the Company, or (ii) in the case of inaction by the Indemnified Person, the Indemnified Person did not intend such Indemnified Person's inaction to be harmful or opposed to the best interests of the Company, and (b) the conduct of the Indemnified Person did not constitute fraud, gross negligence or willful misconduct by such Indemnified Person.

13.3. Persons Entitled to Indemnity. Any Person who is within the definition of "Indemnified Person" at the time of any action or inaction in connection with the business of the Company shall be entitled to the benefits of this Article 13 as an "Indemnified Person" with respect thereto, regardless whether such Person continues to be within the definition of "Indemnified Person" at the time of such Indemnified Person's claim for indemnification or exculpation hereunder.

13.4. Procedure Agreements. The Company may enter into an agreement with any of its officers, employees, consultants, counsel and agents, or the Board of Managers, setting forth procedures consistent with applicable law for implementing the indemnities provided in this Article 13.

13.5. Fiduciary and Other Duties.

8686361.11

W0588

13.5.1.  An Indemnified Person acting under this Agreement shall not be liable to the Company or to any other Indemnified Person for its, his or her good faith reliance on the provisions of this Agreement.  The provisions of this Agreement, to the extent that they restrict the duties (including fiduciary duties) and liabilities of an Indemnified Person otherwise existing at law or in equity, are agreed by the parties hereto to replace such other duties and liabilities of such Indemnified Person.

13.5.2.  Whenever in this Agreement an Indemnified Person is permitted or required to make a decision (a) in its discretion or under a grant of similar authority, the Indemnified Person shall be entitled to consider only such interests and factors as such Indemnified Person desires, including its, his or her own interests, and shall have no duty or obligation to give any consideration to any interest of or factors affecting the Company or any other Person, or (b) in its, his or her good faith or under another express standard, the Indemnified Person shall act under such express standard and shall not be subject to any different standard imposed by this Agreement or other applicable law.

## ARTICLE 14

## AMENDMENTS TO AGREEMENT

14.1.  <u>Amendments</u>.  This Agreement may be modified or amended only with the prior written consent of a majority of the holders of the Class A Units and a majority of the holders of the Class B Units.

14.2.  <u>Corresponding Amendment of Certificate</u>.  The Board of Managers shall cause to be prepared and filed any amendment to the Certificate that may be required to be filed under the Act as a consequence of any amendment to this Agreement.

14.3.  <u>Binding Effect</u>.  Any modification or amendment to this Agreement pursuant to this Article 14 shall be binding on all Members.

## ARTICLE 15

## <u>GENERAL</u>

15.1.  <u>Successors; Delaware Law; Etc</u>.  This Agreement:  (a) shall be binding upon the executors, administrators, estates, heirs and legal successors of the Members; (b) shall be governed by and construed in accordance with the laws of the State of Delaware; (c) may be executed in more than one counterpart, all of which together shall constitute one agreement; and (d) together with the Kulkarni Subscription Agreement, the Kulkarni Consulting Agreement, the Parthenon Advisory Agreement, the Institutional Investor Subscription Agreement (as defined in the Kulkarni Subscription Agreement) and the Termination and Release Agreement (as defined in the Kulkarni Subscription Agreement) contains the entire contract among the Members as to the subject matter hereof.  The waiver of any of the provisions, terms or conditions contained in this Agreement shall not be considered as a waiver of any of the other provisions, terms or conditions hereof.

15.2.    Notices, Etc.  All notices, requests, demands, claims, and other communications hereunder will be in writing. Any notice, request, demand, claim, or other communication hereunder shall be deemed duly given (i) upon electronic confirmation of facsimile (provided that any notice so given is also mailed or sent as provided in clauses (ii) or (iii) below), (ii) one business day following the date sent when sent by overnight delivery and (iii) five business days following the date mailed when mailed by registered or certified mail return receipt requested and postage prepaid at the following address:

(a)    If to Mr. Kulkarni, to him at:

124 Commonwealth Avenue
Boston, MA  02116
Facsimile:  (617) 262-7963

with a copy to:

Epstein, Becker & Green, P.C.
75 State Street
Boston, MA 02109-1813
Attention:  Gabor Garai, Esq.
Facsimile:  (617) 342-4001

which address, after February 24, 2002, shall be:
111 Huntington Avenue, 26th floor
Boston, MA  02199
Attention:  Gabor Garai, Esq.
Facsimile:  (617) 342-4001

(b)    If to the Company, to it at:

51 East Main Street
Merrimac, MA 01860
Attention:  Chief Executive Officer
Facsimile:  (978) 346-4213

with a copy to:

Parthenon Capital
200 State Street
Boston, MA 02109
Attention:  Samantha Trotman Burman and Erik Scott
Facsimile:  (617) 478-7010

and to:

Ropes & Gray
One International Place

8686361.11

W0590

Boston, MA  02110
Attention:  Philip J. Smith, Esq.
Facsimile:  (617) 951-7050

(c)    If to Parthenon, to it at:

200 State Street
Boston, MA  02109
Attention:  Samantha Trotman Burman and Erik Scott
Facsimile:  (617) 478-7010

with a copy to:

Ropes & Gray
One International Place
Boston, MA  02110
Attention:  Philip J. Smith, Esq.
Facsimile:  (617) 951-7050

15.3.    Execution of Documents.  From time to time after the date of this Agreement, upon the request of the Board of Managers, each Member shall perform, or cause to be performed, all such additional acts, and shall execute and deliver, or cause to be executed and delivered, all such additional instruments and documents, as may be required to effectuate the purposes of this Agreement. Each Member, including each new and substituted Member, by the execution of this Agreement or by agreeing in writing to be bound by this Agreement, irrevocably constitutes and appoints the Board of Managers or any Person designated by the Board of Managers to act on such Member's behalf for purposes of this Section 15.3 as such Member's true and lawful attorney-in-fact with full power and authority in such Member's name and stead to execute, deliver, swear to, file and record at the appropriate public offices such documents as may be necessary or appropriate to carry out this Agreement, including:

(a)    all certificates and other instruments (specifically including counterparts of this Agreement), and any amendment thereof, that the Board of Managers deems appropriate to qualify or to continue the Company as a limited liability company in any jurisdiction in which the Company may conduct business or in which such qualification or continuation is, in the opinion of the Board of Managers, necessary to protect the limited liability of the Members;

(b)    all amendments to this Agreement adopted in accordance with the terms hereof and all instruments that the Board of Managers deems appropriate to reflect a change or modification of the Company in accordance with the terms of this Agreement; and

(c)    all conveyances and other instruments that the Board of Managers deems appropriate to reflect the dissolution of the Company.

The appointment by each Board of Managers or any Person designated by the Board of Managers to act on its behalf for purposes of this Section 15.3 as such Member's attorney-in-fact shall be deemed to be a power coupled with an interest, in recognition of the fact that each of the Members under this Agreement will be relying upon the power of the Board of Managers to act as contemplated by this Agreement in any filing and other action by him, her or it on behalf of the Company, and shall survive the bankruptcy, dissolution, death, adjudication of incompetence or insanity of any Member giving such power and the transfer or assignment of all or any part of such Member's Interests; provided, however, that in the event of a Transfer by a Member of all of its Interest, the power of attorney given by the transferor shall survive such assignment only until such time as the transferee shall have been admitted to the Company as a substituted Member and all required documents and instruments shall have been duly executed, filed, and recorded to effect such substitution.

15.4.    Consent to Jurisdiction.  Each of the parties agrees that all actions, suits or proceedings arising out of or based upon this Agreement or the subject matter hereof shall be brought and maintained exclusively in the federal courts located in The Commonwealth of Massachusetts.  Each of the parties hereby by execution hereof (i) hereby irrevocably submits to the jurisdiction of the federal courts located in The Commonwealth of Massachusetts for the purpose of any action, suit or proceeding arising out of or based upon this Agreement or the subject matter hereof and (ii) hereby waives to the extent not prohibited by applicable law, and agrees not to assert, by way of motion, as a defense or otherwise, in any such action, suit or proceeding, any claim that he or it is not subject personally to the jurisdiction of the above-named court, that he or it is immune from extraterritorial injunctive relief or other injunctive relief, that his or its property is exempt or immune from attachment or execution, that any such action, suit or proceeding may not be brought or maintained in one of the above-named court should be dismissed on the grounds of *forum non conveniens,* should be transferred to any court other than one of the above-named court, should be stayed by virtue of the pendency of any other action, suit or proceeding in any court other than one of the above-named court, or that this Agreement or the subject matter hereof may not be enforced in or by any of the above-named court.  Each of the parties hereto hereby consents to service of process in any such suit, action or proceeding in any manner permitted by the laws of The Commonwealth of Massachusetts, agrees that service of process by registered or certified mail, return receipt requested, at the address specified in or pursuant to Section 15.2 hereof is reasonably calculated to give actual notice and waives and agrees not to assert by way of motion, as a defense or otherwise, in any such action, suit or proceeding any claim that service of process made in accordance with Section 15.2 hereof does not constitute good and sufficient service of process.  The provisions of this Section 15.4 shall not restrict the ability of any party to enforce in any court any judgment obtained in the federal courts located in The Commonwealth of Massachusetts.

15.5.    Waiver of Jury Trial.  To the extent not prohibited by applicable law which cannot be waived, the Company and each Member hereby waives, and covenant that they will not assert (whether as plaintiff, defendant or otherwise), any right to trial by jury in any forum in respect of any issue, claim, demand, action or cause of action arising out of or based upon this agreement or the subject matter hereof, whether now existing or hereafter arising and whether sounding in tort or contract or otherwise.

15.6.   <u>Severability</u>.  If any provision of this Agreement is determined by a court to be invalid or unenforceable, that determination shall not affect the other provisions hereof, each of which shall be construed and enforced as if the invalid or unenforceable portion were not contained herein.  Such invalidity or unenforceability shall not affect any valid and enforceable application thereof, and each such provision shall be deemed to be effective, operative, made, entered into or taken in the manner and to the full extent permitted by law.

15.7.   <u>Table of Contents; Headings</u>.  The table of contents and headings used in this Agreement are used for administrative convenience only and do not constitute substantive matter to be considered in construing this Agreement.

15.8.   <u>No Third Party Rights</u>.  Exception for the provisions of Section 7.4, the provisions of this Agreement are for the benefit of the Company, the Board of Managers and the Members and no other Person, including creditors of the Company, shall have any right or claim against the Company, the Board of Managers or any Member by reason of this Agreement or any provision hereof or be entitled to enforce any provision of this Agreement.

[The remainder of this page is intentionally blank.]

The parties have executed this Agreement as of the date first set forth above.

PARTHENON INVESTORS II, L.P.

By:  PCap Partners II, LLC, its General Partner

By:  PCap II, LLC, its Managing Member

By:_____
Name:
Title:  Managing Member

PCIP INVESTORS
by its General Partners:

Parthenon Capital, Inc.

_____
Name:
Title:

_____
Ernest K. Jacquet

_____
John C. Rutherford

J&R FOUNDERS' FUND, L.P.

By:  J&R Advisors F.F., Inc., its General Partner

By:_____
Name:
Title:

_____
Deepak S. Kulkarni

W0594

EXHIBIT I

## DEFINED TERMS

"Act" means the Delaware Limited Liability Company Act (6 Del. C. § 18-101, et seq.).

"Affiliate" means with respect to any specified Person, any Person that directly or through one or more intermediaries controls or is controlled by or is under common control with the specified Person. As used in this definition, the term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, by contract or otherwise.

"Agreement" means this Limited Liability Company Agreement of the Company dated as of December 28, 2001, as amended from time to time.

"Asset Value" of any property of the Company means its adjusted basis for federal income tax purposes unless:

> (a)    the property was accepted by the Company as a contribution to capital at a value different from its adjusted basis, in which event the initial Asset Value for such property shall mean the gross fair market value of the property agreed to by the Company and the contributing Member; or

> (b)    as a consequence of the issuance of additional Units or the redemption of all or part of the Interest of a Member, the property of the Company is revalued in accordance with Section 4.3.

As of any date references to the "then prevailing Asset Value" of any property shall mean the Asset Value last determined for such property less the depreciation, amortization and cost recovery deductions taken into account in computing Net Profit or Net Loss in fiscal periods subsequent to such prior determination date.

"Board of Managers"  means the board of managers elected and determined as provided in Exhibit 7.1.

"Business Day" shall mean any day other than a Saturday, Sunday or a day which is a legal holiday in Massachusetts.

"Capital Account" is defined in Section 4.2.

"Capital Contribution" means with respect to any Member, the sum of (1) the amount of money plus (b) the fair market value of any other property (net of liabilities assumed or to which the property is subject) contributed to the Company with respect to the Interest held by such Member pursuant to this Agreement.

"Certificate" shall mean the Certificate of Formation of the Company and any amendments thereto and restatements thereof filed on behalf of the Company with the Delaware Secretary of State pursuant to the Act.

"Code" means the Internal Revenue Code of 1986.

"Company" means the limited liability company formed by virtue of this Agreement and the filing of the Certificate in accordance with the Act.

"Contributed Companies" means Wolverine Proctor & Schwartz, Inc., a Delaware corporation, MawLaw 492 Ltd., a company formed under the laws of the United Kingdom, Friel Engineering Ltd., a company formed under the laws of the United Kingdom.

"Distribution" shall mean cash or property (net of liabilities assumed or to which the property is subject) distributed to a Member in respect of the Member's Interest.

"Fair Market Value" means the fair market value of the Company, Holdings or any Subsidiary, as the case may be, as determined by the Applicable Board (as defined below) in good faith, provided, however, that if Kulkarni disagrees with the Applicable Board's determination of fair market value, fair market value shall mean the fair market value as shown by an appraisal performed by an independent appraiser satisfactory to Kulkarni and the Applicable Board. In the event that the Manger and Kulkarni do not agree on the selection of an independent appraiser within 20 days after the event which gives rise to the need to determine Fair Market Value, each of the Applicable Board and Kulkarni shall select an appraiser within 30 days of such event and those two appraisers shall select within 45 days of such event another independent appraiser to perform the appraisal. The three appraisers selected pursuant to the immediately preceding sentence shall then have 30 days from the date of the selection of the third appraiser to determine fair market value. If the single appraiser has been appointed, such appraiser's determination of value shall be final and binding. If three appraisers shall have been appointed as hereinabove set forth, the values determined by the three appraisers shall be averaged, the determination which shall differ most from such average shall be disregarded, the remaining two determinations shall be averaged, and such average shall be final and binding. Each party appointing its own appraiser shall each bear the expenses of such appraiser. If an independent appraiser is selected, the Applicable Board and Kulkarni shall each bear one-half of the expenses of the independent appraiser. Notwithstanding the provisions of the immediately two preceding sentences if an appraisal has been conducted in connection with an issuance of equity securities to Parthenon or its Affiliates and the result of the appraisal is that Fair Market Value was not more than 10% above the price at which the equity securities were originally proposed to be issued, Kulkarni shall bear the expense of all appraisers. "Applicable Board" shall mean: (i) in the case of the Company, the Board of Managers; and (ii) in the case of Holdings and its Subsidiaries, their respective Boards of Directors. As used herein, the term "Kulkarni" shall include Persons who are entitled to exercise the rights of Kulkarni under Section 6.5 after his death.

"Fiscal Year" means the fiscal year of the Company, which shall be the calendar year, or such other fiscal year as determined by the Board of Managers.

"Holdings" is defined in Section 2.5.

"Indemnified Persons" is defined in Section 13.1.

"Initial Contribution Date" means December 28, 2001.

"Interest" shall mean with respect to any Member as of any time, the number of Units such Member holds relative to the number of total outstanding Units and such Member's Capital Account balance relative to the aggregate balances in the Capital Accounts of all Members.

"Kulkarni" shall mean Deepak Kulkarni; an individual residing at 124 Commonwealth Avenue, Boston, MA 02116 on the Initial Contribution sale.

"Kulkarni Consulting Agreement" shall mean the Consulting Agreement dated as of December 28, 2001 between WP&S and Kulkarni.

"Kulkarni Subscription Agreement" shall mean the Deepak Kulkarni Representation and Warranty, Indemnity and Subscription Agreement dated as of December 28, 2001 between the Company and Kulkarni.

"Liabilities" shall mean all liabilities of the Company which in accordance with generally accepted accounting principles should be carried as liabilities on the balance sheet of the Company.

"Liquidation Event" means (i) the filing by or against Holdings or a Subsidiary or Subsidiaries of Holdings which account for 25% or more of the consolidated revenues of Holdings of a petition under the federal Bankruptcy Act or any similar proceeding under state law, (ii) the receipt by Holdings or its Subsidiaries of a notice that the obligations under any senior credit facility entered into with a Person other than an Affiliate of the Company are being accelerated or declared due and payable prior to their stated maturity and the holders of a majority of the Class A Units and the holders of a majority of the Class B Units have reasonably determined that foreclosure on the assets of Holdings or a Subsidiary or Subsidiaries of Holdings which account for 25% or more of the consolidated revenues of Holdings or enforcement of the payment of one of the obligations under the senior credit facility is likely to occur or (iii) the holders of the obligations under any senior credit facility entered into with a Person other than an Affiliate of the Company commence foreclosure on the collateral therefor owned by Holdings or a Subsidiary or Subsidiaries of Holdings which account for 25% or more of the consolidated revenues of Holdings or otherwise seek to enforce the payment of the obligations thereunder.

"Members" means the Persons listed as members on Exhibit 3.1 and any other Person that both acquires an Interest in the Company and is admitted to the Company as a Member.

"Members of the Immediate Family" means, with respect to any Member who is an individual, each parent, spouse or child (including those adopted) of such individual and each custodian or guardian of any property of one or more of such Persons in the capacity as such custodian or guardian.

"Net Profit" and "Net Loss" are defined in Section 5.7.

"Parthenon" shall mean any one or more of Parthenon Investors II, L.P., PCIP Investors, J&R Founders Fund, L.P.

"Parthenon Advisory Agreement" shall mean the advisory agreement dated as of December 28, 2001 between Parthenon Capital LLC and WP&S.

"Permitted Transferee" is defined in Section 11.2.

"Person" shall mean an individual, partnership, joint venture, association, corporation, trust, estate, limited liability company, limited liability partnership, unincorporated entity of any kind, governmental entity, or any other legal entity.

"Recapitalization" means (i) the repayment of all or a portion of the WP&S Notes with the proceeds of a financing entered into by Holdings or its Subsidiaries or (ii) the distribution by Holdings or its Subsidiaries to the Company of the proceeds of any financing entered into by Holdings or its Subsidiaries.

"Regulations" shall mean the Treasury regulations, including temporary regulations, promulgated under the Code.

"Regulatory Allocations" is defined in Section 5.8.

"Sale" means any transaction of the type referred to in Sections 6.5.1 or 6.5.2.

"Subsidiary" means any Person which is controlled, either directly or indirectly, by the Company.

"Tax Matters Member" is defined in Section 10.1

"Transfer" means a sale, assignment, pledge, encumbrance, abandonment, disposition or other transfer.

"Units" are a measure of a Member's rights to share in Distributions from the Company as described in Article 5 and Section 12.3.

"WP&S Notes" shall mean the $11,229,685 note of WP&S dated December 28, 2001, the $95,227 of WP&S dated December 28, 2001, the $175,088 note of WP&S dated December 28, 2001, the $2,441,236 note of WP&S dated December 31, 2001, the $20,702 note of WP&S dated December 31, 2001 and the $38,063 note of WP&S dated December 31, 2001.

"WP&S" shall mean Wolverine, Proctor and Schwartz, a Delaware corporation.

W0598

EXHIBIT 3.1

## MEMBERS OF THE COMPANY

| Member | Initial Contribution Date | | Next Business Day Following Initial Contribution Date | |
|---|---|---|---|---|
| | Contributed Assets | Units | Contributed Assets | Units |
| Kulkarni | 100,000 Ordinary Shares of MawLaw 492 Ltd. | 500 Class A Units | 1,357 shares of Common Stock of WP&S | 500 Class A Units |
| Parthenon Investors II, L.P. | | | S11,229,685 note of WP&S dated December 28, 2001<br><br>S2,441,236 note of WP&S dated December 31, 2001 | 977 Class B Units |
| PCIP Investors | | | S95,227 of WP&S dated December 28, 2001<br><br>S20,702 note of WP&S dated December 31, 2001 | 8 Class B Units |
| J&R Founders' Fund, L.P. | | | S175,088 note of WP&S dated December 28, 2001<br><br>S38,063 note of WP&S dated December 31, 2001 | 15 Class B Units |

EXHIBIT 7.1

## BOARD OF MANAGERS

7.1.1.    Number; Appointment.  The Board of Managers initially shall consist of five Persons (each such Person, along with any other Persons appointed from time to time, the "Board Members"), two of whom shall be Persons designated by the holders of a majority of a Class A Units and three of whom shall be Persons designated by the holders of a majority of a Class B Units.  No Board Member need be a Member.

7.1.2. ·    Initial Board of Mangers.  The following individuals, as nominees of the holders of a majority of the Class A Units and the holders of a majority of the Class B Units, as indicated, will be the initial Board Members and shall serve until such time as he or she shall resign or be removed in accordance with this Exhibit 7.1:

| Board Member | Nominating Member |
|---|---|
| Deepak Kulkarni | Kulkarni, as holder of a majority of the Class A Units |
| Mark Brown | Kulkarni, as holder of a majority of the Class A Units |
| Erik Scott | Parthenon, as holder of a majority of the Class B Units |
| Ernest K. Jacquet | Parthenon, as holder of a majority of the Class B Units |
| John C. Rutherford | Parthenon, as holder of a majority of the Class B Units |

7.1.3.    Vacancies.  In the event a representative of a certain class of Units ceases to serve on the Board of Managers for any reason, the holders of a majority of such class of Units shall have the right to nominate an individual as a replacement on the Board of Managers.  The Board of Managers shall have and may exercise all their powers notwithstanding the existence of one or more vacancies in their number, subject to the requirements of this Agreement as to the number of Board Members required for a quorum.

7.1.4.    Meetings.  Meetings of the Board of Managers may be held at any time and at any place within or without the State of Delaware designated in the notice of the meeting, when called, upon notice as provided herein by the Board of Managers, the holders of a majority of the Class A Units or the holders of a majority of the Class B Units. ′

7.1.5.    Notice.  It shall be reasonable notice to a Board Member to send notice by overnight delivery at least 72 hours or by facsimile at least 48 hours before the meeting addressed to such Board Member at such Board Member's usual or last known business or residence address or to give notice to such Board Member in person or by telephone at least 48 · hours before the meeting.  Notice of a meeting need not be given to any Board Member if a written waiver of notice, executed by such Board Member before or after the meeting, is filed with the records of the meeting, or to any Board Member who attends the meeting without protesting prior thereto or at its commencement the lack of notice to such Board Member. Neither notice of a meeting nor a waiver of a notice need specify the purposes of the meeting.

7.1.6.    Quorum.  Except as may be otherwise provided by law, at any meeting of the Board of Managers, at least one representative of the holders of the Class A Units and two representatives of the Class B Units shall be necessary to constitute a quorum.

7.1.7.    Action by Vote.  When a quorum is present at any meeting the vote of a majority of the Board Members present shall be the act of the Board of Managers.

7.1.8.    Action Without a Meeting.  Any action required or permitted to be taken at any meeting of the Board of Managers may be taken without a meeting if all the Board Members consent thereto in writing and such writing or writings are filed with the records of the meetings of the Board of Managers.  Such consent shall be treated for all purposes as the act of the Board of Managers.

7.1.9.    Participation in Meetings by Conference Telephone.  Board Members may participate in a meeting of the Board of Managers by means of conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear each other or by any other means permitted by law.  Such participation shall constitute presence in person at such meeting.

7.1.10.    Resignation and Removal.  Any Board Member or officer may resign at any time by delivering such Board Member's resignation in writing to the Company.  Such resignation shall be effective upon receipt unless specified to be effective at some other time, and without in either case the necessity of its being accepted unless the resignation shall so state.  A Board Member may be removed from office with or without cause by the vote of the holders of a majority of the Units of the particular class entitled to vote in the election of such Board Member.

7.1.11.    Interested Transactions.

(a)  No contract or transaction between the Company and one or more of the Board Members or officers, or between the Company and any other entity in which one or more of the Board Members or officers are directors or officers, or have a financial interest, shall be void or voidable solely for this reason, or solely because the Board Member or officer is present at or participates in the meeting of the Board of Managers which authorizes the contract or transaction, or solely because his, her or their votes are counted for such purpose, if:

(i)  The material facts as to such Board Member's relationship or interest and as to the contract or transaction are disclosed or are known to the Board of Managers, and the Board of Managers in good faith authorizes the contract or transaction by the affirmative votes of a majority of the disinterested Board Members, even though the disinterested Board Members constitute less than a quorum; or

(ii)  The material facts as to his, her or their relationship or interest and as to the contract or transaction are disclosed or are known to the Members entitled to vote thereon, and the contract or transaction is specifically approved in good faith by vote of the Board Members; or

W0601

# Exhibit 4 (part 2)

# Kulkarni Affidavit – May 5, 2006

(iii)  The contract or transaction is fair as to the Company as of the time it is authorized, approved or ratified by the Board of Managers or the Members.

(b)  Common or interested Board Members may be counted in determining the presence of a quorum at a meeting of the Board of Managers which authorizes the contract or transaction.

The parties have executed this Agreement as of the date first set forth above.

PARTHENON INVESTORS II, L.P.

By: PCap Partners II, LLC, its General Partner

By: PCap II, LLC, its Managing Member

By: _____
Name:
Title: Managing Member


PCIP INVESTORS
by its General Partners:

Parthenon Capital, Inc.

_____
Name:
Title:

_____
Ernest K. Jacquet

_____
John C. Rutherford


J&R FOUNDERS' FUND, L.P.

By: J&R Advisors F.F., Inc., its General Partner

By: _____
Name:
Title:


_____
Deepak S. Kulkarni

The parties have executed this Agreement as of the date first set forth above.

PARTHENON INVESTORS II, L.P.

By:  PCap Partners II. LLC, its General Partner

By:  PCap II, LLC. its Managing Member

By:_____
Name:
Title:  Managing Member


PCIP INVESTORS
by its General Partners:

Parthenon Capital. Inc.

_____
Name:
Title:

_____
Ernest K. Jacquet

_____
John C. Rutherford


J&R FOUNDERS' FUND, L.P.

By:  J&R Advisors F.F., Inc., its General Partner

By:_____
Name:
Title:


_____
Deepak S. Kulkarni

The parties have executed this Agreement as of the date first set forth above.

PARTHENON INVESTORS II, L.P.

By:  PCap Partners II, LLC, its General Partner

By:  PCap II, LLC, its Managing Member

By:_____
Name:
Title:  Managing Member


PCIP INVESTORS
by its General Partners:

Parthenon Capital, Inc.

_____
Name:
Title:

_____
Ernest K. Jacquet

_____
John C. Rutherford


J&R FOUNDERS' FUND, L.P.

By:  J&R Advisors F.F., Inc., its General Partner

By:_____
Name:
Title:

_____
Deepak S. Kulkarni

## PROMISSORY NOTE

## WOLVERINE PROCTOR & SCHWARTZ, INC.

**THE SALE, ENCUMBRANCE OR OTHER DISPOSITION OF THIS NOTE IS SUBJECT TO THE PROVISIONS OF THIS NOTE.  THIS NOTE WAS ISSUED IN A PRIVATE PLACEMENT, WITHOUT REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT") AND MAY NOT BE SOLD, ASSIGNED, PLEDGED OR OTHERWISE TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT COVERING THE TRANSFER OR AN EXEMPTION FROM REGISTRATION UNDER THE ACT.**

$ [              ]                                                    Merrimac, Massachusetts
                                                                     _____ __, 200_

FOR VALUE RECEIVED, the undersigned, **Wolverine Proctor & Schwartz, Inc.**, a Delaware corporation (the "Company"), hereby promises to pay to [              ], or its registered assigns (the "Payee"), at 12:00 p.m. (Boston time) on _____ __, 200_ (the "Maturity Date") or upon earlier DEMAND (the "Demand Date") the principal sum of [($              )], or such lesser principal amount thereof as may remain outstanding, together with accrued and unpaid interest thereon, in lawful money of the United States of America in immediately available funds, and to pay interest from the date hereof and prior to the earlier of the Demand Date or Maturity Date, on the principal amount hereof from time to time outstanding, in like funds, at said office, at a rate or rates per annum and payable on such dates and in the manner as set forth herein.

1.  Definitions.

    1.1    Certain Definitions.   The following capitalized terms are used in this Note with the meanings set forth in this Section 1:

    "Affiliate" means, with respect to any specified Person, any Person that directly or through one or more intermediaries controls or is controlled by or is under common control with the specified Person.  As used in this definition, the term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, by contract or otherwise.

    "Board" means the Board of Directors of the Company.

    "Business Day" means any day excluding Saturday, Sunday and any date which is a legal holiday under the laws of The Commonwealth of Massachusetts or is a day on which banking institutions located in Boston, Massachusetts are authorized or required by law or other governmental action to close.

8698606

"Change of Control" means (i) any change in the ownership of the capital stock of the Company if, immediately after giving effect thereto, any Person (or group of Persons acting in concert) who is not a Parthenon Investor will, after giving effect to the closing of such transaction, have the direct or indirect power to elect members of the Board having a majority of the voting power of the Board or (ii) any sale or other disposition of all or substantially all of the assets of the Company (including without limitation by way of merger, consolidation or recapitalization or through the sale of all or substantially all of the capital stock of the Subsidiaries of the Company or sale of all or substantially all of the assets of the Company and its Subsidiaries, taken as a whole).

"Collateral" has the meaning set forth in Section 9.1 hereof.

"Company" has the meaning set forth in the preamble hereto.

"Demand Date" has the meaning set forth in the preamble hereof.

"Event of Default" has the meaning set forth in Section 5.1 hereof.

"Interest Payment Date" has the meaning set forth in Section 2.2 hereof.

"Kulkarni" means an Deepak Kulkarni; an individual residing at 124 Commonwealth Avenue, Boston, Massachusetts 02116 on the date hereof.

"Kulkarni Subscription Agreement" means the Deepak Kulkarni Representation and Warranty, Indemnity and Subscription Agreement dated on even date herewith between Wolverine Proctor, LLC and Kulkarni.

"Maturity Date" has the meaning set forth in the preamble hereof.

"Note" shall mean this Note and any substitute or replacement note or note issued following assignment of this Note in accordance with the terms hereof.

"Note Obligations" shall mean any and all obligations of the Company and its Subsidiaries under the Note, including, without limitation, the obligation to pay principal, interest, expenses, attorneys' fees and disbursements and other amounts payable thereunder or in connection therewith or related thereto.

"Parthenon Investor" shall mean Parthenon Investors II, L.P., PCIP Investors, J&R Founders' Fund, L.P., Parthenon Capital, LLC or any Affiliate thereof.

"Payee" has the meaning set forth in the preamble hereof.

"Person" shall mean and include any individual, partnership, joint venture, corporation, limited liability company, trust, joint-stock company, unincorporated entity, organization or other legal entity.

"Securities Act" shall mean the Securities Act of 1933, as amended.

8690870.4

-2-

"Subsidiary" means, with respect to any Person, any other Person of which such specified Person shall own directly or indirectly through a Subsidiary, a nominee arrangement or otherwise at least a majority of the outstanding capital stock (or other shares of beneficial interest) entitled to vote generally or at least a majority of the partnership, joint venture or similar interests, or in which such specified Person is a general partner or a joint venture without limited liability.

"Transfer" means any sale, pledge, assignment, hypothecation, encumbrance or other transfer or disposition of any applicable securities to any other Person, whether directly, indirectly, voluntarily, involuntarily, by operation of law, pursuant to judicial process or otherwise.

"UCC" means the Uniform Commercial Code as in effect from time to time in the Commonwealth of Massachusetts.

2.  Interest.

2.1    Interest.  This Note shall bear interest at a rate of ten percent (10%) per annum on the unpaid principal amount thereof from and including the date hereof until such principal amount shall become due and payable, provided, however, that such rate may be reduced from time to time (but not thereafter increased) at the sole discretion of the holder of the Note to a rate less than ten percent (10%) per annum but not less than the Applicable Federal Rate (as defined in Section 1274(d) of the Internal Revenue Code of 1986, as amended or replaced and as in effect from time to time), in effect as of the date hereof.  This Note shall bear interest on any overdue principal (including any overdue prepayment of principal, and any principal due upon acceleration) and on any overdue payment of interest, as provided in Section 5.1.  Interest on this Note shall be computed on the basis of a 360 day year of twelve 30-day months.  In computing such interest, the date hereof shall be included and the date of payment shall be excluded.

2.2    Interest Payments.  Interest shall be paid with respect to this Note on the last Business Day of each March, June, September and December, commencing on the last Business Day of March 2002 (each an "Interest Payment Date").  Upon any optional or mandatory prepayment of the Note described in Section 3 below (to the extent of accrued interest on the principal amount so prepaid) or upon the earlier accelerated maturity of this Note as provided in Section 5 below, the Company shall pay accrued and unpaid interest at the rate set forth in Section 2.1 on the unpaid principal amount of this Note, in each case by wire transfer or other same day funds to the respective account designated in writing by the Payee.

3.  Prepayment.

3.1    Optional Prepayment.  The Company may, at its option, prior to the Maturity Date, prepay all, or any portion, of the Note on not less than two Business Days' prior notice to the holder of the Note at a price equal to the principal amount outstanding plus accrued and unpaid interest to, but not including, the date fixed for prepayment on the principal amount of the Note.

3.2    Mandatory Prepayment.  In the event that all of the WP&S Shares (used herein as

W0608

defined in the Kulkarni Subscription Agreement) are not contributed to Wolverine Proctor, LLC at the Subsequent Closing (used herein as defined in the Kulkarni Subscription Agreement) as contemplated by section 1(b) of the Kulkarni Subscription Agreement, the Company shall immediately prepay the Note at a price equal to the principal amount outstanding plus accrued and unpaid interest to, but not including, the date of such prepayment on the principal amount of the Notes so prepaid.

4.    Restrictions on Transfer; Legends.

      4.1    No holder of this Note shall Transfer such Note to any other Person without the consent of the Board, except for Transfers by the Payee to an Affiliate of the Payee.

      4.2    The Note shall bear a legend in substantially the following form:

> "THE SALE, CONVERSION, ENCUMBRANCE OR OTHER DISPOSITION OF THIS NOTE IS SUBJECT TO THE PROVISIONS OF THIS NOTE.  THIS NOTE WAS ISSUED IN A PRIVATE PLACEMENT, WITHOUT REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT") AND MAY NOT BE SOLD, ASSIGNED, PLEDGED OR OTHERWISE TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT COVERING THE TRANSFER OR AN EXEMPTION FROM REGISTRATION UNDER THE ACT ."

      4.3    Termination of Restrictions.  The requirements of Section 4.2 hereof, with respect to legends describing restrictions on the transferability of the Note under the Securities Act, shall cease and terminate as to the Note (i) when, in the opinion of Ropes & Gray, or other counsel reasonably acceptable to the Company, such restrictions are no longer required in order to assure compliance with the Securities Act or (ii) when the Note shall have been registered under the Securities Act or the Note is transferred pursuant to Rule 144 thereunder.  Whenever such Securities Act restrictions shall cease and terminate as to the Note, the holder thereof shall be entitled to receive from the Company, without expense, a new Note not bearing the legends with respect to such Securities Act restrictions set forth in Section 4.2 hereof.

5.    Events of Default

      5.1    Defaults on Note.  If one or more of the following events shall occur and be continuing (each, an "Event of Default"):

          (a)    Payment Default.  The Company shall fail to pay (i) any principal of the Note when the same becomes due and payable, whether upon demand, maturity, prepayment, acceleration or otherwise or (ii) any interest on the Note for a period of 5 days after the same shall become due and payable;

8690870.4

W0609

(b)     <u>Acceleration of Other Indebtedness; Principal Payment Default</u>.  Any event of default shall have occurred under any loan, advance, debt, liability or obligation owing by the Company or any of its Subsidiaries in excess of $100,000 in the aggregate for the Company and its Subsidiaries, which default either (i) constitutes the failure to make any payments of principal at final maturity of such loan, advance, debt, liability or obligation, (ii) results in the acceleration of such loan, advance, debt, liability or obligation, whether by having become due and payable by its terms or by having been declared due and payable prior to its stated maturity, or (iii) results in the termination of such loan, advance, debt, liability or obligation;

(c)     <u>Judgments and Attachments</u>.  One or more judgments or decrees shall be entered against the Company or any of its Subsidiaries involving a liability (to the extent not paid or fully covered by insurance) in excess of $500,000 for all such judgments and decrees and all such judgments or decrees shall not have been vacated, discharged or stayed or bonded pending appeal within 60 days from the entry thereof;

(d)     <u>Involuntary Bankruptcy, Appointment of Receiver, etc</u>. (i) A court having jurisdiction in the premises shall enter a decree or order for relief in respect of the Company or any Subsidiary in an involuntary case under the United States Bankruptcy Code or any applicable bankruptcy, insolvency or other similar law now or hereafter in effect, which decree or order is not stayed, or any other similar relief shall be granted and remain unstayed under the applicable federal or state law; or (ii) an involuntary case is commenced against the Company or any Subsidiary under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect, or a decree or order of a court having jurisdiction in the premises for the appointment of a receiver, liquidator, sequestrator, trustee, custodian or other officer having similar powers over the Company or any of its Subsidiaries or over all or a substantial part of any of their respective properties shall have been entered, or an interim receiver, trustee or other custodian of the Company or any of its Subsidiaries for all or a substantial part of their respective properties is involuntarily appointed; or a warrant of attachment, execution or similar process is issued against any substantial part of the property of the Company or any of its Subsidiaries; and the continuance of any such events in this clause (d) for 30 days unless dismissed, bonded, stayed, vacated or discharged;

(e)     <u>Voluntary Bankruptcy, Appointment of Receiver, etc</u>.  The Company or any of its Subsidiaries shall have an order for relief entered with respect to it or commence a voluntary case under the United States Bankruptcy Code or any applicable bankruptcy, insolvency or other similar law now or hereafter in effect, or shall consent to the entry of an order for relief in an involuntary case, or to the conversion of an involuntary case to a voluntary case, under any such law, or shall consent to the appointment of or taking possession by a receiver, trustee or other custodian for all or a substantial part of its property; the making by the Company or any of its Subsidiaries of any assignment for the benefit of creditors; or the board of directors of the Company or any of its Subsidiaries (or any committee thereof) adopts any resolution or otherwise authorizes any action to approve any of the foregoing; or

8690870.4

-5-

(f)    Change of Control. A Change of Control occurs.

THEN, (a) (i) upon the occurrence of any Event of Default described in the foregoing clauses (d) or (e) with respect to the Company, the unpaid principal amount of this Note, together with accrued interest thereon, shall automatically become immediately due and payable, without presentment, demand, protest or other requirements of any kind, all of which are hereby expressly waived by the Company, and (ii) upon the occurrence of any other Event of Default, the holder of the Note may upon written notice to the Company, declare the Note to be due and payable, whereupon the principal amount of this Note, together with accrued interest thereon, shall automatically become immediately due and payable without any other notice of any kind, and without presentment, demand, protest or other requirements of any kind, all of which are hereby expressly waived by the Company and (b) the rate at which this Note shall bear interest shall increase to 13% per annum until the earlier of (i) the date on which all Note Obligations in respect of this Note, including principal and all interest accrued thereon, are paid in full and (ii) such time as (A) such Event of Default is no longer continuing or (B) such Event of Default is deemed no longer to exist pursuant to a waiver granted in accordance with Section 11 hereof.

5.2    Notice. The Company shall, so long as the Note is outstanding, deliver to the holder of the Note (i) immediately upon becoming aware of any Event of Default under the Note, a notice of such Event of Default and describing what action the Company is taking or proposes to take with respect thereto, and (ii) immediately upon receipt thereof, any notice of default received by it under any agreements relating to any indebtedness of the Company or any of its Subsidiaries.

5.3    Costs of Collection and Attorney's Fees. Following an Event of Default, the Company agrees to pay to the holder of the Note upon demand all of such holder's costs and expenses (including without limitation all attorneys' fees and costs) incurred by such holder including, without limitation in connection with (i) the administration, workout, negotiation, amendment or enforcement of this Note or (ii) any bankruptcy, reorganization, receivership or other insolvency proceeding involving the Company (including, without limitation, review of court papers, attendance and participation in hearings and litigation or negotiation in connection with any plan of reorganization of the Company).

6. Payment at Maturity. On the earlier of the Demand Date or Maturity Date, or upon any acceleration of this Note pursuant to Section 5.1 hereof, the Company shall pay all remaining principal of this Note, together with accrued and unpaid interest on the amounts so paid and together with any other Note Obligations then outstanding.

7. Manner and Time of Payment.

7.1    All payments by the Company under this Note shall be made without defense, set off or counterclaim, in same day funds and delivered to the holder of this Note not later than 12:00 noon (Boston time) on the date such payment is due, with such payment to be made in the same manner as that provided for payment of interest under Section 2; provided that funds received by such holders after 12:00 noon (Boston time) shall be deemed to have been paid by the Company on the next succeeding Business Day.

8690870.4

-6-

7.2    Whenever any payment to be made hereunder shall be stated to be due on a day which is not a Business Day, the payment shall be made on the next succeeding Business Day and such additional period shall be included in the computation of the payment of interest hereunder.

7.3    All prepayments (whether voluntary or mandatory) shall include the payment of accrued and unpaid interest to, but not including, the date of such prepayment on the principal amount of this Note.

8.  Covenants.

8.1    Access to Information.  From time to time upon request of the holder of the Note, the Company will furnish to holder, and its representatives (including without limitation its accountants and legal counsel), such information regarding the business of the Company and its subsidiaries (including materials furnished to the directors of the Company and its subsidiaries at or in connection with board meetings) as such holder may reasonably request. Each such holder, and its representatives (including without limitation its accountants and legal counsel), shall have the right during normal business hours to make an independent examination of the books and records of the Company and any of its subsidiaries, to make copies, notes and abstracts therefrom, and to discuss their business, affairs and financial condition with the officers, employees and accountants of the Company.  Each such holder shall have the right during normal business hours to consult with the directors and executive officers of the Company and its subsidiaries and to advise such directors and officers on corporate issues; provided, however, that no such holder shall thereby have any right to direct the management or policies of the Company or any of its subsidiaries.

8.2    Incurrence of Additional Indebtedness.  Without the consent of the holder of the Note, the Company shall not, and shall not permit any of its subsidiaries to, directly or indirectly, create, incur, assume or otherwise become directly or indirectly liable, with respect to any indebtedness.

9.  Security.

9.1    Grant of Collateral.  As security for the payment and performance of the Note Obligations, the Company is simultaneously herewith granting to the Payee a mortgage and mortgage covenants with respect to certain real property and hereby creates a security interest in favor of the Payee and any future holder of the Note in all of the Company's right, title and interest in and to (but none of its obligations or liabilities with respect to) the items and types of present and future property described below in this Section 9.1, whether now owned or hereafter acquired (each term used herein as defined in the UCC):

Accounts receivable, contract rights, documents, instruments, general intangibles, inventory, goods, equipment, patents, copyrights, trademarks, domain names, goodwill, investment property, stock or other evidences of ownership, indebtedness, chattel paper, instruments, leases, motor vehicles, cash, cash equivalents, deposit accounts, books, records,

8690870.4

-7-

W0612

insurance proceeds, dividends, all other property, assets and items of value
and proceeds and products of the foregoing (all of the above being
included in the term "Collateral").

9.2     Perfection of Collateral.

(a)     The Company will deliver to the holder of the Note certificates and
instruments representing any pledged stock, debt or other securities, accompanied by
transfer powers executed in blank and, if the holder of the Note so requests, with the
signature guaranteed, all in form and manner reasonably satisfactory to the holder of the
Note.

(b)     The Company agrees that from time to time and at the Company's
expense, the Company will promptly execute and deliver all further instruments and
documents and take all further action, that may be necessary or desirable, or that the
holder of the Note may request, in order to create and/or maintain the validity, perfection
or priority of and protect any security interest granted or purported to be granted hereby
or to enable the holder of the Note to exercise and enforce its rights and remedies
hereunder with respect to any Collateral.  Without limited the generality of the foregoing,
the Company shall execute and file such financing or continuation statements or
amendments thereto, and execute and deliver such other agreements, instruments,
endorsements, powers of attorney or notices including Uniform Commercial Code
financing statements, control statements, collateral assignments of copyrights,
trademarks, and patents, documents providing for direct collection of accounts
receivable, and notations on certificates of title (such terms used as defined in the UCC),
as may be necessary or desirable, or as the holder of the Note may reasonable request, in
order to perfect and preserve the security interests granted or purported to be granted
hereby.

(c)     The Company hereby authorizes the holder of the Note to file a record or
records (used as defined in the UCC), including, without limitation, financing statements
in all jurisdictions and with all filing offices as the holder of the Note may determine, in
its sole discretion, as are necessary or desirable to perfect the security interest granted in
the Collateral.  Such financing statements may describe the Collateral in the same manner
as described herein or may contain an indication or description of collateral that describes
such property in any other manner as the holder of the Note may determine, in its sole
discretion, is necessary, desirable or prudent to ensure the perfection of the security
interest in the Collateral granted to the holder of the Note herein, including, without
limitation, describing such property as "all assets" or "all personal property."

9.3     No Liens or Dispositions.  All assets of the Company, including the Collateral
shall be free and clear of any liens and restrictions on the transfer thereof, including contractual
provisions which prohibit the assignment of rights under contracts, except for nonconsensual
liens imposed by law and liens and restrictions on transfer approved by the Payee in writing.
Except with the Payee's consent, the Company will not sell, lease or otherwise dispose of any of
the Collateral or modify or terminate any contracts or contractual rights included in the

8690870.4

-8-

W0613

Collateral, except in each case in the ordinary course of business, consistent with past practice and on arm's length terms.

9.4    Remedies.  If any Event of Default shall have occurred and be continuing, the holder of the Note may exercise in respect of the Collateral, in addition to all other rights and remedies available to it at law or in equity, all the rights and remedies of a secured party on default under the UCC.

10. Representations and Warranties of the Company.

10.1    Organization, Standing, Etc. The Company is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization and has all requisite power and authority to own, lease and operate its properties, to carry on its business as now conducted, and now proposed to be conducted.

10.2    Authorization and Execution. The Company has full power and authority to execute, deliver and perform this Note and to perform its obligations hereunder.  This Note has been duly executed and delivered by, and constitutes a legal, valid and binding obligation of, the Company, enforceable against in accordance with its terms.

11.    Waiver of Notice.  The Company hereby waives diligence, presentment, demand, protest and notice of any kind whatsoever.  The nonexercise by the holder of this Note of any of its rights hereunder in any particular instance shall not constitute a waiver thereof in that or any subsequent instance.

12.    Amendments and Waivers.  This Note may not be amended or any provision modified, terminated, waived or consented to without the express written consent of the holder of the Note and the Company.  Any waiver or consent shall be effective only in the specific instance and for the specific purpose for which it was given.  No notice to or demand on the Company in any case shall entitle the Company to any further notice or demand in similar or other circumstances.  Any amendment, modification, termination, waiver or consent effected in accordance with this Section 12 shall be binding upon the Payee and each future holder of the Note.

13.    Governing Law.  This Note shall be construed in accordance with and governed by the laws of The Commonwealth of Massachusetts without giving effect to any choice or conflict of law provision or rule that would cause the application of the domestic substantive laws of any other jurisdiction.

[THE REST OF THIS PAGE INTENTIONALLY LEFT BLANK.]

W0614

IN WITNESS WHEREOF, this Note was duly executed as of the first date written above.

**WOLVERINE PROCTOR & SCHWARTZ, INC.**

By:_____
    Name:
    Title:

Attest:_____
    Name:
    Title:

8698606

-10-

<u>Exhibit B</u>
to Institutional Investor
Subscription Agreement

<u>Form of Additional Promissory Note</u>

(Please see attached)



8691503.7

W0616

Exhibit B

## PROMISSORY NOTE

### WOLVERINE PROCTOR & SCHWARTZ, INC.

THE SALE, ENCUMBRANCE OR OTHER DISPOSITION OF THIS NOTE IS SUBJECT TO THE PROVISIONS OF THIS NOTE. THIS NOTE WAS ISSUED IN A PRIVATE PLACEMENT, WITHOUT REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT") AND MAY NOT BE SOLD, ASSIGNED, PLEDGED OR OTHERWISE TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT COVERING THE TRANSFER OR AN EXEMPTION FROM REGISTRATION UNDER THE ACT.

$[_____]                                                   Merrimac, Massachusetts
                                                                    _____ \_\_, 200\_\_

FOR VALUE RECEIVED, the undersigned, Wolverine Proctor & Schwartz, Inc., a Delaware corporation (the "Company"), hereby promises to pay to [                    ], or its registered assigns (the "Payee"), at 12:00 p.m. (Boston time) on _____ \_\_, 200\_\_ (the "Maturity Date") or upon earlier DEMAND (the "Demand Date") the principal sum of [($                )], or such lesser principal amount thereof as may remain outstanding, together with accrued and unpaid interest thereon, in lawful money of the United States of America in immediately available funds, and to pay interest from the date hereof and prior to the earlier of the Demand Date or Maturity Date, on the principal amount hereof from time to time outstanding, in like funds, at said office, at a rate or rates per annum and payable on such dates and in the manner as set forth herein.

1. Definitions.

1.1    Certain Definitions.    The following capitalized terms are used in this Note with the meanings set forth in this Section 1:

"Affiliate" means, with respect to any specified Person, any Person that directly or through one or more intermediaries controls or is controlled by or is under common control with the specified Person. As used in this definition, the term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, by contract or otherwise.

"Board" means the Board of Directors of the Company.

"Business Day" means any day excluding Saturday, Sunday and any date which is a legal holiday under the laws of The Commonwealth of Massachusetts or is a day on which banking institutions located in Boston, Massachusetts are authorized or required by law or other governmental action to close.

8698609

W0617

"Change of Control" means (i) any change in the ownership of the capital stock of the Company if, immediately after giving effect thereto, any Person (or group of Persons acting in concert) who is not a Parthenon Investor will, after giving effect to the closing of such transaction, have the direct or indirect power to elect members of the Board having a majority of the voting power of the Board or (ii) any sale or other disposition of all or substantially all of the assets of the Company (including without limitation by way of merger, consolidation or recapitalization or through the sale of all or substantially all of the capital stock of the Subsidiaries of the Company or sale of all or substantially all of the assets of the Company and its Subsidiaries, taken as a whole).

"Collateral" has the meaning set forth in Section 9.1 hereof.

"Company" has the meaning set forth in the preamble hereto. 

"Demand Date" has the meaning set forth in the preamble hereof.

"Event of Default" has the meaning set forth in Section 5.1 hereof.

"Interest Payment Date" has the meaning set forth in Section 2.2 hereof.

"Kulkarni" means an Deepak Kulkarni; an individual residing at 124 Commonwealth Avenue, Boston, Massachusetts 02116 on the date hereof.

"Kulkarni Subscription Agreement" means the Deepak Kulkarni Representation and Warranty, Indemnity and Subscription Agreement dated on even date herewith between Wolverine Proctor, LLC and Kulkarni.

"Maturity Date" has the meaning set forth in the preamble hereof.

"Note" shall mean this Note and any substitute or replacement note or note issued following assignment of this Note in accordance with the terms hereof.

"Note Obligations" shall mean any and all obligations of the Company and its Subsidiaries under the Note, including, without limitation, the obligation to pay principal, interest, expenses, attorneys' fees and disbursements and other amounts payable thereunder or in connection therewith or related thereto.

"Parthenon Investor" shall mean Parthenon Investors II, L.P., PCIP Investors, J&R Founders' Fund, L.P., Parthenon Capital, LLC or any Affiliate thereof.

"Payee" has the meaning set forth in the preamble hereof.

"Person" shall mean and include any individual, partnership, joint venture, corporation, limited liability company, trust, joint-stock company, unincorporated entity, organization or other legal entity.

8698609.4

-2-

W0618

"Securities Act" shall mean the Securities Act of 1933, as amended.

"Subsidiary" means, with respect to any Person, any other Person of which such specified Person shall own directly or indirectly through a Subsidiary, a nominee arrangement or otherwise at least a majority of the outstanding capital stock (or other shares of beneficial interest) entitled to vote generally or at least a majority of the partnership, joint venture or similar interests, or in which such specified Person is a general partner or a joint venture without limited liability.

"Transfer" means any sale, pledge, assignment, hypothecation, encumbrance or other transfer or disposition of any applicable securities to any other Person, whether directly, indirectly, voluntarily, involuntarily, by operation of law, pursuant to judicial process or otherwise.

"UCC" means the Uniform Commercial Code as in effect from time to time in the Commonwealth of Massachusetts.

2. Interest.

2.1    Interest. This Note shall bear interest at a rate of ten percent (10%) per annum on the unpaid principal amount thereof from and including the date hereof until such principal amount shall become due and payable, provided, however, that such rate may be reduced from time to time (but not thereafter increased) at the sole discretion of the holder of the Note to a rate less than ten percent (10%) per annum but not less than the Applicable Federal Rate (as defined in Section 1274(d) of the Internal Revenue Code of 1986, as amended or replaced and as in effect from time to time), in effect as of the date hereof. This Note shall bear interest on any overdue principal (including any overdue prepayment of principal, and any principal due upon acceleration) and on any overdue payment of interest, as provided in Section 5.1. Interest on this Note shall be computed on the basis of a 360 day year of twelve 30-day months. In computing such interest, the date hereof shall be included and the date of payment shall be excluded.

2.2    Interest Payments. Interest shall be paid with respect to this Note on the last Business Day of each March, June, September and December, commencing on the last Business Day of March 2002 (each an "Interest Payment Date"). Upon any optional prepayment of the Note described in Section 3 below (to the extent of accrued interest on the principal amount so prepaid) or upon the earlier accelerated maturity of this Note as provided in Section 5 below, the Company shall pay accrued and unpaid interest at the rate set forth in Section 2.1 on the unpaid principal amount of this Note, in each case by wire transfer or other same day funds to the respective account designated in writing by the Payee.

3. Optional Prepayment. The Company may, at its option, prior to the Maturity Date, prepay all, or any portion, of the Note on not less than two Business Days' prior notice to the holder of the Note at a price equal to the principal amount outstanding plus accrued and unpaid interest to, but not including, the date fixed for prepayment on the principal amount of the Note.

4. Restrictions on Transfer; Legends.

8698609.4

-3-

W0619

4.1    No holder of this Note shall Transfer such Note to any other Person without the consent of the Board, except for Transfers by the Payee to an Affiliate of the Payee.

4.2    The Note shall bear a legend in substantially the following form:

"THE SALE, CONVERSION, ENCUMBRANCE OR OTHER
DISPOSITION OF THIS NOTE IS SUBJECT TO THE
PROVISIONS OF THIS NOTE.  THIS NOTE WAS ISSUED IN
A PRIVATE PLACEMENT, WITHOUT REGISTRATION
UNDER THE SECURITIES ACT OF 1933, AS AMENDED
(THE "ACT") AND MAY NOT BE SOLD, ASSIGNED,
PLEDGED OR OTHERWISE TRANSFERRED IN THE
ABSENCE OF AN EFFECTIVE REGISTRATION
STATEMENT UNDER THE ACT COVERING THE
TRANSFER OR AN EXEMPTION FROM REGISTRATION
UNDER THE ACT ."



4.3    Termination of Restrictions.  The requirements of Section 4.2 hereof, with respect to legends describing restrictions on the transferability of the Note under the Securities Act, shall cease and terminate as to the Note (i) when, in the opinion of Ropes & Gray, or other counsel reasonably acceptable to the Company, such restrictions are no longer required in order to assure compliance with the Securities Act or (ii) when the Note shall have been registered under the Securities Act or the Note is transferred pursuant to Rule 144 thereunder.  Whenever such Securities Act restrictions shall cease and terminate as to the Note, the holder thereof shall be entitled to receive from the Company, without expense, a new Note not bearing the legends with respect to such Securities Act restrictions set forth in Section 4.2 hereof.

5.  Events of Default

5.1    Defaults on Note.  If one or more of the following events shall occur and be continuing (each, an "Event of Default"):

(a)    Payment Default.  The Company shall fail to pay (i) any principal of the Note when the same becomes due and payable, whether upon demand, maturity, prepayment, acceleration or otherwise or (ii) any interest on the Note for a period of 5 days after the same shall become due and payable;

(b)    Acceleration of Other Indebtedness; Principal Payment Default.  Any event of default shall have occurred under any loan, advance, debt, liability or obligation owing by the Company or any of its Subsidiaries in excess of $100,000 in the aggregate for the Company and its Subsidiaries, which default either (i) constitutes the failure to make any payments of principal at final maturity of such loan, advance, debt, liability or obligation, (ii) results in the acceleration of such loan, advance, debt, liability or obligation, whether by having become due and payable by its terms or by having been declared due and payable prior to its stated maturity, or (iii) results in the termination of

8698609.4

-4-

such loan, advance, debt, liability or obligation;

(c)     Judgments and Attachments.  One or more judgments or decrees shall be entered against the Company or any of its Subsidiaries involving a liability (to the extent not paid or fully covered by insurance) in excess of $500,000 for all such judgments and decrees and all such judgments or decrees shall not have been vacated, discharged or stayed or bonded pending appeal within 60 days from the entry thereof;

(d)     Involuntary Bankruptcy, Appointment of Receiver, etc. (i) A court having jurisdiction in the premises shall enter a decree or order for relief in respect of the Company or any Subsidiary in an involuntary case under the United States Bankruptcy Code or any applicable bankruptcy, insolvency or other similar law now or hereafter in effect, which decree or order is not stayed, or any other similar relief shall be granted and remain unstayed under the applicable federal or state law; or (ii) an involuntary case is commenced against the Company or any Subsidiary under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect, or a decree or order of a court having jurisdiction in the premises for the appointment of a receiver, liquidator, sequestrator, trustee, custodian or other officer having similar powers over the Company or any of its Subsidiaries or over all or a substantial part of any of their respective properties shall have been entered, or an interim receiver, trustee or other custodian of the Company or any of its Subsidiaries for all or a substantial part of their respective properties is involuntarily appointed; or a warrant of attachment, execution or similar process is issued against any substantial part of the property of the Company or any of its Subsidiaries; and the continuance of any such events in this clause (d) for 30 days unless dismissed, bonded, stayed, vacated or discharged;

(e)     Voluntary Bankruptcy, Appointment of Receiver, etc.  The Company or any of its Subsidiaries shall have an order for relief entered with respect to it or commence a voluntary case under the United States Bankruptcy Code or any applicable bankruptcy, insolvency or other similar law now or hereafter in effect, or shall consent to the entry of an order for relief in an involuntary case, or to the conversion of an involuntary case to a voluntary case, under any such law, or shall consent to the appointment of or taking possession by a receiver, trustee or other custodian for all or a substantial part of its property; the making by the Company or any of its Subsidiaries of any assignment for the benefit of creditors; or the board of directors of the Company or any of its Subsidiaries (or any committee thereof) adopts any resolution or otherwise authorizes any action to approve any of the foregoing; or

(f)     Change of Control.  A Change of Control occurs.

THEN, (a) (i) upon the occurrence of any Event of Default described in the foregoing clauses (d) or (e) with respect to the Company, the unpaid principal amount of this Note, together with accrued interest thereon, shall automatically become immediately due and payable, without presentment, demand, protest or other requirements of any kind, all of which are hereby

W0621

expressly waived by the Company, and (ii) upon the occurrence of any other Event of Default, the holder of the Note may upon written notice to the Company, declare the Note to be due and payable, whereupon the principal amount of this Note, together with accrued interest thereon, shall automatically become immediately due and payable without any other notice of any kind, and without presentment, demand, protest or other requirements of any kind, all of which are hereby expressly waived by the Company and (b) the rate at which this Note shall bear interest shall increase to 13% per annum until the earlier of (i) the date on which all Note Obligations in respect of this Note, including principal and all interest accrued thereon, are paid in full and (ii) such time as (A) such Event of Default is no longer continuing or (B) such Event of Default is deemed no longer to exist pursuant to a waiver granted in accordance with Section 11 hereof.

5.2    Notice.  The Company shall, so long as the Note is outstanding, deliver to the holder of the Note (i) immediately upon becoming aware of any Event of Default under the Note, a notice of such Event of Default and describing what action the Company is taking or proposes to take with respect thereto, and (ii) immediately upon receipt thereof, any notice of default received by it under any agreements relating to any indebtedness of the Company or any of its Subsidiaries.

5.3    Costs of Collection and Attorney's Fees.  Following an Event of Default, the Company agrees to pay to the holder of the Note upon demand all of such holder's costs and expenses (including without limitation all attorneys' fees and costs) incurred by such holder including, without limitation in connection with (i) the administration, workout, negotiation, amendment or enforcement of this Note or (ii) any bankruptcy, reorganization, receivership or other insolvency proceeding involving the Company (including, without limitation, review of court papers, attendance and participation in hearings and litigation or negotiation in connection with any plan of reorganization of the Company).

6.  Payment at Maturity.  On the earlier of the Demand Date or Maturity Date, or upon any acceleration of this Note pursuant to Section 5.1 hereof, the Company shall pay all remaining principal of this Note, together with accrued and unpaid interest on the amounts so paid and together with any other Note Obligations then outstanding.

7.  Manner and Time of Payment.

7.1    All payments by the Company under this Note shall be made without defense, set off or counterclaim, in same day funds and delivered to the holder of this Note not later than 12:00 noon (Boston time) on the date such payment is due, with such payment to be made in the same manner as that provided for payment of interest under Section 2; provided that funds received by such holders after 12:00 noon (Boston time) shall be deemed to have been paid by the Company on the next succeeding Business Day.

7.2    Whenever any payment to be made hereunder shall be stated to be due on a day which is not a Business Day, the payment shall be made on the next succeeding Business Day and such additional period shall be included in the computation of the payment of interest hereunder.

8698609.4

-6-

7.3     All prepayments shall include the payment of accrued and unpaid interest to, but not including, the date of such prepayment on the principal amount of this Note.

8.  Covenants.

8.1     Access to Information.  From time to time upon request of the holder of the Note, the Company will furnish to holder, and its representatives (including without limitation its accountants and legal counsel), such information regarding the business of the Company and its subsidiaries (including materials furnished to the directors of the Company and its subsidiaries at or in connection with board meetings) as such holder may reasonably request.  Each such holder, and its representatives (including without limitation its accountants and legal counsel), shall have the right during normal business hours to make an independent examination of the books and records of the Company and any of its subsidiaries, to make copies, notes and abstracts therefrom, and to discuss their business, affairs and financial condition with the officers, employees and accountants of the Company.  Each such holder shall have the right during normal business hours to consult with the directors and executive officers of the Company and its subsidiaries and to advise such directors and officers on corporate issues; provided, however, that no such holder shall thereby have any right to direct the management or policies of the Company or any of its subsidiaries.

8.2     Incurrence of Additional Indebtedness.  Without the consent of the holder of the Note, the Company shall not, and shall not permit any of its subsidiaries to, directly or indirectly, create, incur, assume or otherwise become directly or indirectly liable, with respect to any indebtedness.

9.  Security.

9.1     Grant of Collateral.  As security for the payment and performance of the Note Obligations, the Company is simultaneously herewith granting to the Payee a mortgage and mortgage covenants with respect to certain real property and hereby creates a security interest in favor of the Payee and any future holder of the Note in all of the Company's right, title and interest in and to (but none of its obligations or liabilities with respect to) the items and types of present and future property described below in this Section 9.1, whether now owned or hereafter acquired (each term used herein as defined in the UCC):

Accounts receivable, contract rights, documents, instruments, general intangibles, inventory, goods, equipment, patents, copyrights, trademarks, domain names, goodwill, investment property, stock or other evidences of ownership, indebtedness, chattel paper, instruments, leases, motor vehicles, cash, cash equivalents, deposit accounts, books, records, insurance proceeds, dividends, all other property, assets and items of value and proceeds and products of the foregoing (all of the above being included in the term "Collateral").

9.2     Perfection of Collateral.

8698609.4

-7-

W0623

(a)    The Company will deliver to the holder of the Note certificates and instruments representing any pledged stock, debt or other securities, accompanied by transfer powers executed in blank and, if the holder of the Note so requests, with the signature guaranteed, all in form and manner reasonably satisfactory to the holder of the Note.

(b)    The Company agrees that from time to time and at the Company's expense, the Company will promptly execute and deliver all further instruments and documents and take all further action, that may be necessary or desirable, or that the holder of the Note may request, in order to create and/or maintain the validity, perfection or priority of and protect any security interest granted or purported to be granted hereby or to enable the holder of the Note to exercise and enforce its rights and remedies hereunder with respect to any Collateral. Without limit the generality of the foregoing, the Company shall execute and file such financing or continuation statements or amendments thereto, and execute and deliver such other agreements, instruments, endorsements, powers of attorney or notices including Uniform Commercial Code financing statements, control statements, collateral assignments of copyrights, trademarks, and patents, documents providing for direct collection of accounts receivable, and notations on certificates of title (such terms used as defined in the UCC), as may be necessary or desirable, or as the holder of the Note may reasonable request, in order to perfect and preserve the security interests granted or purported to be granted hereby.

(c)    The Company hereby authorizes the holder of the Note to file a record or records (used as defined in the UCC), including, without limitation, financing statements in all jurisdictions and with all filing offices as the holder of the Note may determine, in its sole discretion, as are necessary or desirable to perfect the security interest granted in the Collateral. Such financing statements may describe the Collateral in the same manner as described herein or may contain an indication or description of collateral that describes such property in any other manner as the holder of the Note may determine, in its sole discretion, is necessary, desirable or prudent to ensure the perfection of the security interest in the Collateral granted to the holder of the Note herein, including, without limitation, describing such property as "all assets" or "all personal property."

9.3    No Liens or Dispositions. All assets of the Company, including the Collateral shall be free and clear of any liens and restrictions on the transfer thereof, including contractual provisions which prohibit the assignment of rights under contracts, except for nonconsensual liens imposed by law and liens and restrictions on transfer approved by the Payee in writing. Except with the Payee's consent, the Company will not sell, lease or otherwise dispose of any of the Collateral or modify or terminate any contracts or contractual rights included in the Collateral, except in each case in the ordinary course of business, consistent with past practice and on arm's length terms.

9.4    Remedies. If any Event of Default shall have occurred and be continuing, the

8698609.4

-8-

W0624

holder of the Note may exercise in respect of the Collateral, in addition to all other rights and remedies available to it at law or in equity, all the rights and remedies of a secured party on default under the UCC.

10. Representations and Warranties of the Company.

    10.1   Organization, Standing, Etc. The Company is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization and has all requisite power and authority to own, lease and operate its properties, to carry on its business as now conducted, and now proposed to be conducted.

    10.2   Authorization and Execution. The Company has full power and authority to execute, deliver and perform this Note and to perform its obligations hereunder. This Note has been duly executed and delivered by, and constitutes a legal, valid and binding obligation of, the Company, enforceable against in accordance with its terms.

11.   Waiver of Notice. The Company hereby waives diligence, presentment, demand, protest and notice of any kind whatsoever. The nonexercise by the holder of this Note of any of its rights hereunder in any particular instance shall not constitute a waiver thereof in that or any subsequent instance.

12.   Amendments and Waivers. This Note may not be amended or any provision modified, terminated, waived or consented to without the express written consent of the holder of the Note and the Company. Any waiver or consent shall be effective only in the specific instance and for the specific purpose for which it was given. No notice to or demand on the Company in any case shall entitle the Company to any further notice or demand in similar or other circumstances. Any amendment, modification, termination, waiver or consent effected in accordance with this Section 12 shall be binding upon the Payee and each future holder of the Note.

13.   Governing Law. This Note shall be construed in accordance with and governed by the laws of The Commonwealth of Massachusetts without giving effect to any choice or conflict of law provision or rule that would cause the application of the domestic substantive laws of any other jurisdiction.

[THE REST OF THIS PAGE INTENTIONALLY LEFT BLANK.]


8698609.4

W0625

IN WITNESS WHEREOF, this Note was duly executed as of the first date written above.

**WOLVERINE PROCTOR & SCHWARTZ, INC.**

By:_____
    Name:
    Title:

Attest:
    Name:
    Title:

8698609

-10-

W0626

*IN WITNESS WHEREOF*, the parties hereto, intending to be legally bound by the terms hereof, have executed this Institutional Investor Subscription Agreement, under seal, as of the date first above written.

*THE COMPANY:*

WOLVERINE PROCTOR, LLC

By _____
Name: Erik A. Scott
Title: Vice President

WP    WOLVERINE PROCTOR & SCHWARTZ, INC.

By _____
Name:
Title:

*THE INVESTORS:*

PARTHENON INVESTORS II, L.P.

By: PCap Partners II, LLC, its General Partner

By: PCap II, LLC, its Managing Member

By: _____
Name:
Title: Managing Member

8691503.5                                                              W0627

*IN WITNESS WHEREOF*, the parties hereto, intending to be legally bound by the terms hereof, have executed this Institutional Investor Subscription Agreement, under seal, as of the date first above written.

*THE COMPANY:*                           WOLVERINE PROCTOR, LLC


                                         By_____
                                         Name:
                                         Title:

*WP&S:*                    WOLVERINE PROCTOR & SCHWARTZ, INC.


                                         By_____
                                         Name:
                                         Title:


*THE INVESTORS:*                          PARTHENON INVESTORS II, L.P.


                                         By:  PCap Partners II, LLC, its General Partner

                                         By:  PCap II, LLC, its Managing Member


                                         By:_____
                                         Name:
                                         Title:  Managing Member

8691503.5                                                         W0628

*IN WITNESS WHEREOF*, the parties hereto, intending to be legally bound by the terms hereof, have executed this Institutional Investor Subscription Agreement, under seal, as of the date first above written.

*THE COMPANY:*                    WOLVERINE PROCTOR, LLC


By_____
Name:
Title:

*WP&S.*                    WOLVERINE PROCTOR & SCHWARTZ, INC.


By_____
Name:
Title:

*THE INVESTORS:*                    PARTHENON INVESTORS II, L.P.


By:  PCap Partners II, LLC, its General Partner

By:  PCap II, LLC, its Managing Member


By:_____
Name: Ernst K. Teichert
Title:  Managing Member

8691503.5                                                      W0629

PCIP INVESTORS
by its General Partners:

Parthenon Capital, Inc.

Name: Ernest K. Jacquet
Title:

Ernest K. Jacquet

John C. Rutherford


J&R FOUNDERS' FUND, L.P.

By:  J&R Advisors F.F., Inc., its General Partner

By:
Name: Ernest K. Jacquet
Title:

W0630

PCIP INVESTORS
by its General Partners:

Parthenon Capital, Inc.

_____
Name:
Title:

_____
Ernest K. Jacquet

_____
John C. Rutherford

J&R FOUNDERS' FUND, L.P.

By:  J&R Advisors F.F., Inc., its General Partner

By:_____
Name:
Title:

8691503.5

W0631

# Exhibit 5

# Kulkarni Affidavit – May 5, 2006

## SETTLEMENT AGREEMENT

SETTLEMENT AGREEMENT made and entered into in Boston, Massachusetts, by and among Wolverine Proctor, LLC, a Delaware limited liability company (the "Company"), Deepak Kulkarni of 124 Commonwealth Avenue, Boston, Massachusetts and Peter Crawford of 23 New Castle Drive #11, Nashua, NH 03060 ("Crawford"), as of this 28th day of December, 2001.

WHEREAS, Crawford and Wolverine Proctor & Schwartz, Inc. ("WP&S") are parties to that certain letter agreement, dated January 4, 2000, as the same may have been amended or modified (the "Crawford Employment Letter");

WHEREAS, Deepak Kulkarni ("Kulkarni"), Parthenon Investors II, L.P., PCIP Investors, J&R Founders' Fund, L.P. and Wolverine Proctor, LLC (the "LLC") have entered into the Deepak Kulkarni Representation and Warranty, Indemnity and Subscription Agreement (the "Kulkarni Subscription Agreement") and the documents contemplated thereby (the "Transaction Documents");

WHEREAS, pursuant to the Transaction Documents, among other things, WP&S will be recapitalized and refinanced;

WHEREAS, in connection with the consummation of the recapitalization and refinancing of WP&S contemplated by the Transaction Documents, it is desired that all of Crawford's rights with respect to any and all options or other rights to acquire capital stock of WP&S granted pursuant to Crawford Employment Letter or otherwise ("Crawford's Equity Rights") be purchased by the LLC or otherwise terminated and extinguished;

WHEREAS, in connection with the execution of this Agreement, Crawford and WP&S are entering into a Transition Agreement dated as of even date herewith (the "Transition Agreement");

NOW, THEREFORE, in consideration of the foregoing premises (including, without limitation, the termination of Crawford's Equity Rights, which are hereby terminated) and the mutual promises, terms, provisions and conditions set forth in this Agreement, the parties hereby agree

1.    Crawford shall be entitled to the following payments, which are to be made solely in the event that a Distribution is made to the holders of the Class A Units under the Wolverine Proctor, LLC Limited Liability Company Agreement dated as of December 28, 2001 (the "LLC Agreement"):

(a)    In the event that the holders of the Class A Units receive a Distribution pursuant to Section 5.3.1. of the LLC Agreement, Crawford shall be entitled to a payment in an amount equal to four percent (4%) of the aggregate Distributions actually received by the holders of Class A Units thereunder; provided, that Crawford shall not be entitled to any payment under this clause (a) until the foregoing amount exceeds the Equity Advance (as that term is defined in the

8698873.2



EXHIBIT
PLF'S 20
BROWN
KEN 11-3-05

PAC 0048

Transition Agreement) in which case he shall only be entitled to the amount in excess of the Equity Advance.

(b)    In the event that the holders of the Class A Units receive a Distribution pursuant to Section 5.3.2. of the LLC Agreement, Crawford shall be entitled to a payment in an amount equal to four percent (4%) of the aggregate Distributions actually received by the holders of Class A Units thereunder.

(c)    In the event that the holders of the Class A Units receive a Distribution pursuant to Section 5.3.3. of the LLC Agreement, Crawford shall be entitled to a payment in an amount equal to eight percent (8%) of the aggregate Distributions actually received by the holders of Class A Units thereunder.

(d)    In the event that the holders of the Class A Units receive a Distribution pursuant to Section 5.3.4. of the LLC Agreement, Crawford shall be entitled to a payment in an amount equal to eight percent (8%) of the aggregate Distributions actually received by the holders of Class A Units thereunder.

For the purposes hereof, the term "Distributions" shall include cash, assets in kind or other property actually distributed to the holders of the Class A Units, provided that, (i) in the case of cash Distributions, the value thereof shall be calculated prior to giving effect to any withholding pursuant to Section 5.5 of the LLC Agreement and (ii) all Distributions shall be net of any applicable withholding or similar taxes.

2.    In the event that the holders of the Class A Units are obligated to indemnify the Company, the Parthenon Investors (as defined in the Kulkarni Subscription Agreement) or any of their respective Affiliates (as defined in the Kulkarni Subscription Agreement) under the Kulkarni Subscription Agreement and such indemnity obligation is satisfied by Kulkarni (whether through the return of the proceeds of a Distribution, offset of compensation payments, direct payments or otherwise) Crawford shall pay Kulkarni in cash that percentage of such indemnity payment which is equal to the percentage of Distributions to which Crawford would be entitled under paragraph 1 hereof in each case calculated at the date of the making of such indemnity payment. By way of example only, if Kulkarni were to make an indemnity payment on a date on which Crawford was entitled to receive four percent (4%) of Distributions under paragraph 1 hereof, Crawford would be required to pay Kulkarni four percent (4%) of such indemnity payment. If Kulkarni were to make an indemnity payment on a date on which Crawford was entitled to receive eight percent (8%) of Distributions under paragraph 1 hereof, Crawford would be required to pay Kulkarni eight percent (8%) of such indemnity payment. Notwithstanding the forgoing, Crawford's percentage of indemnity payments arising under paragraphs 9.3 (d), (h) or (i) of the Kulkarni Subscription Agreement shall be fixed at four percent (4%). Any such payments due to Kulkarni shall be made within ten (10) business days of receipt by Crawford of a written notice delivered by Kulkarni to Crawford, which notice shall set forth in reasonable detail the nature of the indemnified loss and the amount of Kulkarni's indemnity obligation with respect thereto.

8698873.2

-2-

PAC 0049

3.      All payments made to Crawford pursuant to paragraph 1 above shall be made by the Company in the same form as the Distribution was paid to the holders of the Class A Units and shall be made as soon as reasonably practicable after payment of such Distribution is made to the holders of the Class A Units.

4.      Crawford acknowledges and agrees that nothing herein shall be construed as granting him (i) any rights as a member of the Company (including, without limitation, any approval or voting rights granted to any members of the Company) or (ii) any right to acquire or otherwise exercise ownership of any Units of the Company or (iii) any right of employment by the Company.

5.      This Agreement may not be amended or modified without the written consent of all parties hereto.

8698873.2

PAC 0050

IN WITNESS WHEREOF, the parties hereto, intending to be legally bound by the terms hereof, have executed this Agreement, under seal, as of the date first above written.

_____
Peter Crawford

_____
Deepak Kulkarni

Wolverine Proctor, LLC hereby joins in the foregoing Agreement solely for the purpose of agreeing to make the payments in paragraphs (a) through (d) of paragraph 1 directly to Crawford as an irrevocable assignee of that portion of Kulkarni's interest in the Class A Units. Crawford's rights to receive these assigned payments from the LLC shall be enforceable notwithstanding the provisions of Section 15.8 of the LLC Agreement.

WOLVERINE PROCTOR, LLC

By: _____
Name:
Title:

PAC 0051