UNITED STATES DISTRICT COURT
District of Massachusetts

$D \cup \_ \_ \_ \bar{1} \bar{E} D$   Civil Action
No. 05-10078-DPW

)
PETER A. CRAWFORD, Plaintiff )
)
v. )
)
WOLVERINE, PROCTOR & SCHWARTZ, INC., )
Steven F. Chilinski, Deepak S. Kulkarni, )
)
Defendants )
)

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF HIS FURTHER MOTION
FOR PARTIAL SUMMARY JUDGMENT

### I. STATEMENT OF UNDISPUTED MATERIAL FACTS

Plaintiff, pursuant to Local Rule 56.1, incorporates herein by reference, ¶¶1-38 of

his Statement of Undisputed Material Facts, enumerated in Plaintiff's Memorandum in

Support of his Motion for Partial Summary Judgment. In support of Plaintiff's Further

Motion for Partial Summary Judgment, plaintiff asserts that the following additional

material facts are undisputed.

39. After defendant Chilinski received the letter dated December 2, 2004 from the

plaintiff to him requesting the payment of a bonus, he contacted defendant

Kulkarni who requested that a copy of the letter be sent to him. Defendant

Kulkarni informed defendant Chlinski that he would then take care of the next

steps. The matter was left in Mr. Kulkarni's hands. Plaintiff's Affidavit in

Support of his Further Motion for Partial Summary Judgment (hereinafter

1

/06

"Plaintiff's Affidavit") ¶3, Exhibit A (hereinafter "Chilinski Deposition") at
17-20, Plaintiff's Affidavit ¶4, Exhibit B.

40. At the time of the discussion between defendants Chiliniski and Kulkarni,
defendant Chilinski was CEO of WPS, Inc. Chilinski Deposition at 19-20.
Plaintiff's Affidavit in Support of his Partial Motion for Summary Judgment
(hereinafter "Plaintiff Prior Affidavit") ¶21, Exhibit T at 5. Defendant
Chilinski left WPS, Inc. at the end of January, 2005, after this case had been
filed on January 12, 2005. Docket in this case, Chilinski Deposition at 23-25.
Defendant Chilinski became CEO of WPS, Inc. on February 28, 2002.
Plaintiff's Prior Affidavit ¶21, Exhibit T at 5.

41. At the time that defendant Chilinski contacted Mr. Kulkarni with respect to
the matter of the plaintiff's bonus, defendant Kulkarni was Chairman of the
Board of Wolverine, Proctor & Schwartz, Inc. (hereinafter "WPS, Inc.").
Chilinski Deposition at 19-20.

42. Sometime in 2004, defendant Chilinski, who had been defendant Kulkarni's
nominee on the board of directors of WPS, Inc. was removed from the board
of directors of WPS, Inc. by defendant Kulkarni and replaced by Philip
Constable. Chilinski Deposition at 90-92.

43. After defendant Chilinski caused a copy of the letter dated December 2, 2004
(Exhibit B to Plaintiff's Affidavit) to be forwarded to defendant Kulkarni,
defendant Kulkarni had a conversation with Marshall Bartlett of Parthenon.
Plaintiff's Affidavit ¶5, Exhibit C (hereinafter "Kulkarni Deposition") at 158-
164. Mr. Bartlett was the key representative from Parthenon on the Board of

2

Directors of Wolverine after Erik Scott left Parthenon. Plaintiff's Affidavit ¶6, Exhibit D (hereinafter "Bartlett Deposition") at 48. Erik Scott was a member of the Board of Directors of WPS, Inc. or its successor from January 2002 through January 2004. Affidavit of Erik Scott ¶2 (submitted by defendants in support of their Motion for Summary Judgment)

44. During the conversation with Marshall Bartlett of Parthenon, Mr. Bartlett was informed by defendant Kulkarni that he would be informing counsel of the plaintiff's bonus matter, with which Mr. Bartlett agreed. Defendant Kulkarni cannot recall any further conversations with Mr. Bartlett concerning the matter. Kulkarni Deposition at 162-163.

45. Mr. Bartlett recalls the issue of the plaintiff's bonus arising, but that Parthenon was focused on the 2005 recapitalization and left the matter of the plaintiff's bonus in the company's hands. Bartlett Deposition at 43-50.

46. Defendant Kulkarni recalls that he most likely consulted with Daniel Blake before the letter dated December 8, 2004 was sent to the plaintiff indicating that the company believed that no bonus was owed him. Plaintiff's Affidavit ¶7, Exhibit E. Kulkarni Deposition at 217-220.

47. On or about February 11, 2005, Wolverine Proctor LLC was recapitalized. Plaintiff's Affidavit ¶8, Exhibit F. In preparation for that recapitalization, on December 2, 2004, Wolverine Proctor & Schwartz, LLC (hereinafter "WPS, LLC") was organized, with defendant Kulkarni as Manager. Plaintiff's Affidavit ¶9, Exhibit G. Defendant Kulkarni was Managing Member and 100% shareholder of WPS, LLC as of the bankruptcy filing of WPS, LLC on

3

April 1, 2006. Plaintiff's Affidavit ¶10, Exhibit H. WPS, LLC was successor

in interest to all of the operating assets, rights, properties and substantially all

of the liabilities and obligations of WPS, Inc. Plaintiff's Affidavit ¶11,

Exhibit I.

48. WPS, LLC continued to occupy the same facilities that WPS, Inc. had

occupied when the plaintiff was COO of WPS, Inc. Plaintiff's Affidavit ¶12,

Exhibits H and J.

49. Following the February 11, 2005 recapitalization, defendant Kulkarni became

the sole common shareholder of WPS, LLC while Parthenon and related

investors became the sole preferred shareholders of WPS, LLC. Plaintiff's

Affidavit ¶10, Exhibit H at 9. Plaintiff's Affidavit ¶8, Exhibit F.

50. During February, 2005, WPS, Inc. was dissolved. Docket entry made by

defendants in this case, April 11, 2006.

51. The management of WPS, LLC was largely unchanged from what it had been

in December 2001 when the plaintiff was Chief Operating Officer of WPS,

Inc. Plaintiff's Affidavit ¶13. Plaintiff's Prior Affidavit ¶21, Exhibit T at 5-6.

## II. THE WAGE ACT IMPOSES MANDATORY LIABILITY ON MANAGEMENT

Plaintiff's Further Motion for Partial Summary Judgment, which is

supported by this memorandum, adds requests that this Court allow summary

judgment against defendants Kulkarni and Chilinski with respect to single

damages under M.G.L. c. 149 §§148 and 150 (hereinafter the "Wage Act"). Filed

with this motion is Plaintiff's Second Motion for Leave to Amend his Complaint,

which seeks to add, inter alia, an eleventh cause of action against defendant
Kulkarni under the Wage Act.

Plaintiff filed his original Motion for Partial Summary Judgment in this
matter on March 17, 2006, two weeks before WPS, LLC filed for bankruptcy. In
the memorandum supporting that motion, Plaintiff's Memorandum in Support of
his Motion for Partial Summary Judgment (hereinafter "Plaintiff's Original
Memorandum"), the plaintiff noted that pursuant to the recent decision of
Wiedmann v. The Bradford Group, Inc., et al., 444 Mass. 698 (2005), resolution
of his Wage Act claims "would appear to be subject to the discretion of the Court
and necessarily based upon subjective determinations of motive, intent and good
faith that must be made at trial." Plaintiff's Original Memorandum at 11.
However, a closer examination of Wiedmann, prompted by the April 1, 2006
bankruptcy filing of WPS, LLC, indicates that the discretion which the SJC read
into the Wage Act related to treble damages, not the applicability of the Wage Act
to particular claims. See Wiedmann at 710.

Prior to the bankruptcy filing, the distinction had little practical difference,
as the plaintiff assumed that summary judgment in his favor as to Count I would
result in a judgment against WPS, Inc. that would be paid by WPS, LLC as its
successor. As he would not be entitled to a double recovery, he would not be able
to recover single damages from defendant Chilinski after recovering from WPS,
Inc. or WPS, LLC, therefore there was no need to move for summary judgment
against defendant Chilinski under the Wage Act. The bankruptcy filing has
caused plaintiff to rethink his prior motion, and to seek summary judgment

against those defendants who appear able to pay a judgment, namely Chilinski and Kulkarni.

Review of the Wage Act indicates that it has two effects. The first is that the "president and treasurer of a corporation and any officers or agents having the management of such corporation shall be deemed to be the employers…" See M.G.L. c. 149 §148 ¶5. This makes the officers, agents and managers of the corporation equally liable along with the corporation itself. The second is to permit plaintiffs to recover treble damages from both the corporation and the officers. See M.G.L. c. 149 §150. The Wage Act, by using the word "shall," provides for no discretion in making officers personally liable. By its plain language, once the corporation itself is liable under the Wage Act, the officers are as well. Furthermore, nothing in Wiedmann provides for discretion in determining whether or not the Wage Act applies to a particular situation, the discretion provided relates only to whether or not the damages are to be trebled. Wiedmann at 710.

There is no dispute that defendant Chilinski was CEO of WPS, Inc. at the time that the issue of the plaintiff's bonus arose in December 2004 and at the time this suit was filed on January 12, 2005. See the above Statement of Undisputed Material Facts (hereinafter "SOF") ¶40. It is also undisputed that defendant Chilinski is subject to the Wage Act as CEO of WPS, Inc. at the time that the Bonus came due, upon the completion of the audit of the 2001 financial statements on March 26, 2002. He became CEO of WPS, Inc. on February 28, 2002. SOF ¶40. See Plaintiff's Prior Affidavit ¶2, Exhibit A at PAC0002 (bonus

is due "upon completion of the audit of each year's results…"), Plaintiff's Prior Affidavit ¶4, Exhibit C at PAC0028 (audit of 2001 results is dated March 26, 2002). Defendant Chilinski remained CEO during the determination, in December 2004 and January 2005, of whether or not the Bonus would be paid to the plaintiff, and was CEO until after this suit was filed on January 12, 2005. SOF ¶40.

The situation with defendant Kulkarni is somewhat different. He was Chairman of the Board of WPS, Inc. at the time that defendant Chilinski received the plaintiff's December 2, 2004 demand letter, when the decision was made as to whether or not the Bonus would be paid to the plaintiff. SOF ¶41. However, defendant Kulkarni, as Chairman, was exercising effective control of WPS, Inc. He had already removed defendant Chilinski from the WPS, Inc. Board of Directors. SOF ¶42. While Parthenon, prior to the February 11, 2005 recapitalization still controlled WPS, Inc., the key Parthenon representative on the WPS, Inc. board, Marshall Bartlett, deferred to defendant Kulkarni and the company regarding the decisions relating to the plaintiff's bonus, the 2005 recapitalization being imminent. SOF ¶44-45. As a result of the 2005 recapitalization, defendant Kulkarni became Manager, or Managing Member (effectively CEO) of WPS, Inc.'s successor, WPS, LLC. SOF ¶47.

The Wiedmann decision also addressed the circumstances under which an individual can be liable under the Wage Act. The key phrase, according to the SJC, is "had the 'management of such corporation.'" Wiedmann at 711. The SJC construed that to mean "someone who controls, directs, and participates to a

7

substantial degree in formulating and determining policy of a corporation."

Wiedmann at 711. There is no doubt that defendant Kulkarni, virtually alone, formulated the policy of WPS, Inc. with respect to whether it would pay a bonus to the plaintiff. In Wiedmann, Mr. Higgenbotham was a manager, however, the SJC held that there "was insufficient evidence to determine that Higginbotham directed and participated to a substantial degree in formulating the corporation's policy," and suggested that he did not have "the 'management' of the 'corporation' as a whole." Wiedmann at 712. Exactly what the SJC meant by a "substantial degree" is uncertain, but its crystal clear that, in December 2004 and January 2005, defendant Kulkarni was the sole member of the WPS, Inc. Board of Directors involved in establishing the policy of WPS, Inc. with respect to payment of the plaintiff's bonus. Furthermore, as Chairman, unlike Mr. Higgenbotham who was a middle manager, defendant Kulkarni's role related to the "corporation as a whole." Whether the SJC was referring to a policy relating to payment of wages, or policies in general is uncertain, but it is also clear that, even though Parthenon still controlled the WPS, Inc. Board of Directors through February 11, 2005, in December 2004 and January 2005, it was focused on the imminent recapitalization and had left the matter of the plaintiff's bonus in the hands of the company and defendant Kulkarni. SOF ¶45.

Regardless of whether or not defendant Kulkarni "participated to a substantial degree in formulating and determining" the policy of WPS, Inc., there can be no doubt that he had the management of WPS, LLC as a whole. SOF ¶47. In fact, his title as Managing Member or Manager is the equivalent of CEO. See

8

Del. Code Ann. tit. 6 §18-402 (defining role of LLC managers under Delaware law). There can also be no doubt that WPS, LLC, which had assumed the liability for the plaintiff's bonus, also refused to pay it. While the Wage Act by its terms does not make successor corporations or their officers liable for the debts of their predecessors, M.G.L. c. 156B §80(b) specifically provides that, in the case of a merger, "[t]he rights of creditors of any constituent corporation shall not in any manner be impaired…[and] [t]he stockholders, directors, and officers of the constituent corporations shall continue to be subject to all the liabilities, claims and demands existing against them as such at or before the consolidation or merger." While, WPS, LLC did not apparently succeed to the interests of WPS, Inc. by a merger, denominated as such, according to a filing in an unrelated case in this district, it is "successor in interest to all of the operating assets, rights, properties, and substantially all of the liabilities and obligations of WPS, Inc." See SOF ¶47, Plaintiff's Affidavit, Exhibit I. Under Cargill, Incorporated v. Beaver Coal & Oil Co., Inc., 424 Mass. 356, 360 (1997), the transaction was clearly a de facto merger between WPS, Inc. and WPS, LLC, making general principles applicable to mergers under Massachusetts law applicable, including M.G.L. c. 156B §80(b). All of the factors giving rise to a de facto merger under Massachusetts law are present. See Cargill at 360. There is a continuity of physical locations. SOF ¶48. There was a continuity of management, with defendant Kulkarni being Chairman of WPS, Inc. and Managing Member of WPS, LLC and most of the other key managers of WPS, Inc. when plaintiff was COO continuing in their positions. SOF ¶¶41, 47, 51. Defendant Kulkarni and

9

Parthenon continued as shareholders, although with somewhat different positions. SOF ¶47. WPS, Inc. dissolved and ceased its business operations. SOF ¶50. WPS, LLC assumed those obligations ordinarily necessary for the uninterrupted continuation of normal business operations of WPS, Inc. SOF ¶47.

Under Cargill and M.G.L. c. 156B §80(b), WPS, Inc. and WPS, LLC are one and the same for purposes of the liability of their officers under the Wage Act. Thus, although the plaintiff was never actually employed by WPS, LLC, WPS, LLC is effectively deemed to have been his employer as it assumed the liability for his bonus wages. Thus, defendant Kulkarni, as Managing Member of WPS, LLC, is liable to the plaintiff under the Wage Act, as construed together with the de facto merger doctrine and M.G.L. c. 156B §80(b).

This result is in keeping with the intent of the Wage Act. "The purpose of the weekly wage law is clear: to prevent the unreasonable detention of wages." Boston Police Patrolmen's Association, Inc. v. City of Boston, 435 Mass. 718, 720 (2002). The clear intent of the Wage Act would be thwarted if successor corporations and their officers could escape liability for the unreasonable actions of a predecessor corporation, particularly where the officers and managers of the successor are the same as those of the predecessor. The purpose and intent of the Wage Act is therefore served by making defendant Kulkarni liable to the plaintiff under the Wage Act.

Obviously, the liability of defendants Kulkarni and Chilinski under the Wage Act, at least as to Count II, depends upon the liability of WPS, Inc. for the bonus pursuant to Count I. Plaintiff has already moved for summary judgment on

10

that issue, and incorporates herein by reference the arguments made in Plaintiff's
Memorandum in Support of his Motion for Partial Summary Judgment.

## III. APPLICABILITY OF WAGE ACT

Plaintiff anticipates that defendants will raise the same arguments with
respect to this motion that they raised in their Motion for Summary Judgment and
in their unsuccessful Motion to Dismiss, namely that the Wage Act is not
applicable to the plaintiff's Bonus Wages. The plaintiff recognizes that the same
arguments that are made with respect to defendant WPS, Inc. are applicable to
defendants Chilinski and Kulkarni. Rather than repeat those arguments here,
plaintiff incorporates herein by reference Plaintiff's Memorandum in Opposition
to Defendants' Motion for Partial Summary Judgment, in particular pages 13-28
thereof.

## IV. CONCLUSION

Inasmuch as discovery in this case revealed that defendant Kulkarni was
the key individual responsible for denying the payment of the Bonus to the
plaintiff, and because defendants Chilinski and Kulkarni failed to exercise their
responsibilities as CEO and Chairman of WPS, Inc., respectively, to ensure that
plaintiff's bonus request was properly evaluated, it is just and equitable that they
should be held liable to the plaintiff for single damages, with the issue of treble
damages to be decided at trial.

Respectfully submitted,

Peter A. Crawford, pro se
23 Newcastle Dr. #11

11

Nashua, NH  03060
(603)888-4574

Date: _5 May 2006_

UNITED STATES DISTRICT COURT
District of Massachusetts

FILED
IN CLERKS OFFICE

2006 MAY -8  P 1: 58

Civil Action DISTRICT COURT
No. 05-10078-DPW MASS

)
PETER A. CRAWFORD, Plaintiff          )
                                      )
        v.                            )
                                      )
WOLVERINE, PROCTOR & SCHWARTZ, INC.,  )
    Steven F. Chilinski, Deepak S. Kulkarni,  )
                                      )
        Defendants                    )
_____)

## PLAINTIFF'S AFFIDAVIT IN SUPPORT OF HIS
## FURTHER MOTION FOR PARTIAL SUMMARY JUDGMENT

I, Peter A. Crawford, do hereby say and depose that:

1.      I am the plaintiff in the above-captioned action. I was employed by the

defendant Wolverine, Proctor & Schwartz, Inc. ("WPS, Inc.") as Chief Operating Officer

("COO") on or about December 30, 1999, and served in that capacity until January 14,

2002.

2.      I make the statements herein based upon personal knowledge, unless

otherwise indicated.

3.      I attach hereto as Exhibit A, true copies of selected pages from the

deposition of Steven Chilinski in this matter, taken November 14, 2005, together with the

errata sheets relating thereto.

4.      I attach hereto as Exhibit B, pages PAC0023 to PAC0026, a true copy of a

letter that I sent to defendant Steven Chilinski on December 2, 2004. True copies of that

1

same letter were introduced during the deposition of Steven Chilinski on November 14,
2005 as Exhibit 3, during the deposition of Deepak Kulkarni on December 7, 2005 as
Kulkarni Exhibit 12, and during the deposition of Marshall Bartlett on January 20, 2006
as Bartlett Exhibit 7.

5.      I attach hereto as Exhibit C, true copies of selected pages from the
deposition of Deepak Kulkarni in this matter, taken December 7, 2005. I never received
any errata sheets or other corrections pursuant to Fed. R. Civ. P. 30(e) for this deposition.

6.      I attach hereto as Exhibit D, true copies of selected pages of the deposition
of Marshall Bartlett in this matter, taken January 20, 2006, together with the errata sheets
I received relating to that deposition.

7.      I attach hereto as Exhibit E, pages PAC055 and PAC0056, a true copy of a
letter that I received from Daniel Blake dated December 8, 2004. I did not receive this
letter until sometime on or after December 22, 2004 when it was sent first to me by e-
mail, together with a letter dated December 22, 2004 from Mr. Blake claiming that the
December 8 letter had been sent earlier. True copies of this letter were introduced during
the deposition of Deepak Kulkarni on December 7, 2005 as Kulkarni 14, and during the
deposition of Marshall Bartlett on January 20, 2006 as Exhibit 8.

8.      I attach hereto as Exhibit F, selected pages from the 2004 consolidated
financial statements of Wolverine Proctor LLC that were produced by defendants during
discovery in this matter. I was Chief Operating Officer of WPS, Inc. on December 28,
2001 and am very familiar with the recapitalization plan of December 28, 2001 referred
to in ¶2 of page W0367. I am personally aware that the person referred to as the
"previous sole shareholder" and the "Class A member" is Deepak Kulkarni, a defendant

2

in this case. I am also personally aware that the entities referred to as the "Class B member" is Parthenon Capital and its related entities Parthenon Investors II, L.P., PCIP Investors and J&R Founders Fund, L.P. I refer to those entities collectively hereinafter as "Parthenon."

9.  I attach hereto as Exhibit G a true copy of a document that I downloaded on January 5, 2006 from the web site of the Massachusetts Secretary of State, corp.sec.state.ma.us, indicating that Deepak Kulkarni is Manager of Wolverine Proctor & Schwartz, LLC.

10.  I attach hereto as Exhibit H a true copy of a document that I downloaded during April 2006 from the Pacer web site of the United States Bankruptcy Court in Boston in case 06-10815-JNF, the Chapter 7 bankruptcy case of Wolverine, Proctor & Schwartz, LLC. According to Pacer, this document was filed on or about the date of the commencement of the case on April 1, 2006.

11.  I attach hereto as Exhibit I a true copy of a document that I downloaded during January 2006 from this court's Pacer web site. This document was filed in the case of Wolverine, Proctor & Schwartz, Inc. v. Aeroglide Corporation, Case 1:03-cv-11372-NG.

12.  When I was COO of WPS, Inc. in 2001, the company owned facilities at 51 E. Main St., Merrimac, MA and 121 Proctor Ln., Lexington, NC and Fitchburg, MA, and leased a facility in Horsham, PA. I have reviewed the document attached hereto as Exhibit H at page 9. It indicates that a Mr. Hines, based at 121 Proctor Ln., Lexington, NC and a Mr. Crotty, based at 51 E. Main St., Merrimac, MA have possession of the inventory records of the debtor, WPS, LLC. I know both individuals, and each was based

3

at the same respective addresses when I was COO of WPS, Inc. Based upon this information I have concluded that the debtor, WPS, LLC is occupying the same facilities that WPS, Inc. occupied in 2001. During 2001 and early 2002, I was personally negotiating the sale of the WPS, Inc. facility in Fitchburg, MA and I believe that such sale was completed during 2002. The facility in Horsham, PA that WPS, Inc. occupied in 2001 when I was COO was a sales and support office, smaller in size, and leased from Liberty Property. I also attach hereto as Exhibit J a copy of page 82 of the debtor WPS, LLC's Form 6 attachment, filed on or about April 1, 2006 in the bankruptcy case of WPS, LLC and downloaded from Pacer during April, 2006. That schedule refers to a lease with Liberty Property Limited Partnership for a facility in Horsham, PA. Although no address for the property is given, this indicates that it is likely that WPS, LLC, on April 1, 2006, was occupying the same facility in Horsham, PA that WPS, Inc. occupied when I was COO.

13.     I have reviewed defendants' responses to my interrogatories that are attached to Plaintiff's Affidavit in Support of His Motion for Partial Summary Judgment as Exhibit T, specifically pages 5-6 thereof. When I was COO of WPS, Inc., the senior management team consisted of me, Deepak Kulkarni, Mark Brown, Mike Royea, Brian D'Arcangelo, Rick Diefes, Iain Gillies, Victor Garvie, Paul Smith and Terry Midden. Exhibit T lists Mike Royea, Brian D'Arcangelo, Iain Gillies, and Victor Garvie in the same positions with "WPS," as they held when I was COO in 2001. Mark Brown was CFO when I was COO in 2001, but is listed as President of "WPS" in Exhibit T. Rick Diefes was General Manager of Small Orders when I was COO in 2001, but is listed as Director of Manufacturing Operations in Exhibit T. I did not request information

4

regarding Paul Smith and Terry Midden, who were co-heads of sales when I was COO in

2001.

Signed under pains and penalties of perjury this the 5th day of May, 2006

Peter A. Crawford, pro se
23 Newcastle Dr. #11
Nashua, NH  03060
(603)888-4574

# EXHIBIT A

1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS


\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

PETER A. CRAWFORD,                          \*
      Plaintiff                        \*
                                      \*

VS.                                         \*    CIVIL ACTION NO.
                                        \*    05-ev-10078(DPW)

WOLVERINE, PROCTOR & SCHWARTZ,              \*
INC.; STEVEN F. CHILINSKI and               \*
DEEPAK S. KULKARNI,                         \*
      Defendants                       \*
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*        \*


          **DEPOSITION OF STEVEN CHILINSKI**, called by the
Plaintiff, pursuant to the applicable provisions of the
Federal Rules of Civil Procedure, before Ruth E. Hulke,
Certified Shorthand Reporter No. 114893 and Notary Public
for the Commonwealth of Massachusetts, at Morgan, Brown &
Joy, LLP, 200 State Street, Boston, Massachusetts, on
Monday, November 14, 2005, commencing at 12:55 p.m.


APPEARANCES:

    PETER A. CRAWFORD, 23 Newcastle Drive, Number 11,
Nashua, New Hampshire, 03060, pro se.

    MARK WHITNEY, ESQ., of Morgan, Brown & Joy, LLP, 200
State Street, Boston, Massachusetts, 02109, on behalf of
the Defendants.


*Leavitt Reporting, Inc.*

*1207 Commercial Street, Rear*
*Weymouth, MA 02189*

*Tel. 781-335-6791*
*Fax: 781-335-7911*
*leavittreporting@att.net*

*Hearings ◆ Conferences ◆ Legal Proceedings*

1                          I N D E X

2    WITNESS          DIRECT   CROSS    REDIRECT    RECROSS

3    Steven Chilinski   3

4

5

6                       E X H I B I T S

7    NUMBER                                           PAGE

8     1     Employment Agreement                      8
      2     Minutes of Board Meeting, 2-28-02        10
9     3     12-2-04 letter to Chilinski from
            Crawford                                 17
10    4     12-8-04 letter to Crawford from Blake    21
      5     3-26-02 Arthur Andersen report           28
11    6     Mission and Investment Profile           37
      7     Consolidated Financial Statements
12          Years Ended 12-31-02 and 2001           40
      8     Omnibus Agreement                        44
13    9     General Ledger Trial Blance              51
      10    Chilinski resume                         57
14    11    Consolidated Financial Statements
            Years Ended 12-31-03 and 2002           60
15    12    Consolidated Financial Statements
            Years Ended 12-31-04 and 2003           60
16    13    12-21-04 letter to Chilinski from
            Crawford                                 66
17    14    Press release                            74
      15    Income Statement Data - Wolverine        75
18    16    Article 5, Distributions and
            Allocations of Profit and Loss           86
19

20

21

22

23

```
 1                   P R O C E E D I N G S

 2                     (Witness sworn)

 3              MR. CRAWFORD:  This is a deposition called by

 4   the Plaintiff in the case of Crawford v. Wolverine,

 5   Proctor & Schwartz, Inc.  It's the deposition of Steve

 6   Chilinski.  The parties have agreed that reading and

 7   signing will not be waived, the witness will read and

 8   sign the deposition, and, also, any objections, except as

 9   to form, need not be made in the deposition, but will be

10   preserved to be made at trial.

11              Are those agreed to, Mr. Whitney?

12              MR. WHITNEY:  Yes.

13              STEVEN CHILINSKI, having been satisfactorily

14   identified and duly sworn, testified as follows in answer

15   to direct interrogatories by Mr. Crawford:

16         Q.   Mr. Chilinski, I wonder if you could tell me

17   about your background, the position that you held before

18   Wolverine, Proctor & Schwartz, and about your education

19   and accounting experience.

20         A.   Well, I graduated from Syracuse University with

21   a degree in finance, worked at Pricewaterhouse for, I

22   believe, around seven years, and subsequent to that was a

23   CFO of two companies, and then ultimately became a CEO of
```

```
 1                    THE WITNESS:  My apologies.
 2              MR. WHITNEY:  I'll point that out if you do it
 3   again.  It's natural and hard in a conversation to stray
 4   from what you're used to doing when you communicate.
 5         Q.   Did there come a time when you were aware of an
 6   issue of a bonus payable to me?
 7         A.   Did there come a time?  Yeah.
 8         Q.   Can you tell me when that occurred and the
 9   circumstances?
10         A.   I think what I am -- When I opened up the
11   letter that you had sent to me, I believe it was
12   November, December of two thousand -- What year was that?
13              MR. WHITNEY:  Off the record?
14              MR. CRAWFORD:  Yes.  Off the record.
15              (Discussion off the record.)
16              MR. CRAWFORD:  Back on the record.
17         Q.   I show you this document and ask it be marked
18   Plaintiff's Exhibit 3.  This is pages PAC 0023 through
19   0026.
20              (Document marked Exhibit No. 3 for Id.)
21         Q.   I ask you whether you have seen this document
22   before.
23         A.   Yes, I have.
```

1      Q.    Is this the letter that you were referring to a
2    minute ago?
3          A.    Yes, it is.
4          Q.    When you received that letter, was that the
5    first that you had ever heard about a bonus possibly
6    being due to me?
7          A.    Yes.
8          Q.    So you had never before this discussed this
9    issue with anyone from Arthur Andersen or Vitale
10   Caturano?
11         A.    No.
12         Q.    To your knowledge, before you received this
13   letter, had anyone at the company discussed the issue of
14   the bonus with anyone from Arthur Andersen or Vitale
15   Caturano?
16         A.    No.
17         Q.    Could you tell me what you did after you
18   received this letter?
19         A.    I read it and I believe called up Deepak
20   Kulkarni and I would think Marshall Bartlett at Parthenon
21   Capital to tell them I had received this.
22         Q.    What did you say to Mr. Kulkarni and what did
23   he say?

LEAVITT REPORTING, INC.

```
 1        A.    I briefly, you know, gave him the gist of the
 2   letter, I believe.  He asked that I fax it to him as soon
 3   as I could.  And I believe I faxed it to him within a
 4   couple of days of receiving it.
 5        Q.    In that first conversation did you have any
 6   discussion about the letter?
 7        A.    I think generally the summary was, you know,
 8   Deepak said fax it to me and I'll take care of next
 9   steps.
10        Q.    Okay.  And did you subsequently talk to Mr.
11   Kulkarni about --
12        A.    About this letter?
13        Q.    -- about this letter?
14        A.    I might have, I might have talked to him to
15   make sure that some action was being taken, and I believe
16   he said yes.
17        Q.    But you pretty much left it in his hands.  Is
18   that correct?
19        A.    Correct.
20        Q.    At that time what was Mr. Kulkarni's position
21   with the company, if any?
22        A.    At that time, he was chairman of the board.
23        Q.    Okay.  But you were CEO.  Is that correct?
```

LEAVITT REPORTING, INC.

1          A.    Correct.

2          Q.    So you reported to the board?

3          A.    Correct.

4          Q.    And was Mr. Kulkarni also a consultant to the

5     company?

6          A.    I believe he has a consulting agreement with

7     the company.

8          Q.    But at that time was he a consultant to the

9     company?

10         A.    I would have to look at his agreement, but I

11    think so.

12         Q.    How often, if at all, did you see him at the

13    company?

14         A.    For our quarterly or regular board meetings.

15         Q.    Other than that, was he ever there?

16         A.    If it was, it was rarely.  Most of the board

17    meetings.

18         Q.    You say you also called Mr. Bartlett at

19    Parthenon Capital.  What did you say and what did he say?

20         A.    I'm not sure of this, but I would assume that I

21    kind of gave him the gist of the letter and also faxed

22    him a copy.

23         Q.    Did he say anything other than requesting a

```
 1        Q.   Did you tell him you had turned it over to Mr.
 2   Kulkarni and Mr. Bartlett?
 3        A.   I would assume I did, but I don't know.
 4        Q.   And did he do anything with regard to the
 5   letter that you know of?
 6        A.   I don't know.
 7        Q.   Did there come a time when you left Wolverine,
 8   Proctor & Schwartz, Inc.?
 9        A.   I'm sorry.  Did there come a time --
10        Q.   You're no longer with Wolverine.  Correct?
11        A.   Correct.
12        Q.   When did you leave?
13        A.   I believe my official last day was the end of
14   January.  I'm not sure exactly what the date.
15        Q.   I believe the suit --
16        A.   2005.
17        Q.   So were you aware prior to the time that you
18   left that this suit in this matter had been filed?
19        A.   I must have because I was a named defendant.
20        Q.   Okay.  When you became aware of that, what did
21   you do?
22        A.   I believe I had a conversation with my personal
23   attorney, and I believe I had a conversation with counsel
```

LEAVITT REPORTING, INC.

```
 1   who was representing the company regarding it.
 2        Q.   I won't ask you about those.
 3        A.   Thank you.
 4        Q.   But other than that, did you do anything?
 5        A.   Read your suit.
 6        Q.   Okay.  What did you think when you read it?
 7        A.   I wasn't happy.
 8        Q.   At that point had you had any further
 9   discussion with Mr. Kulkarni or Mr. Bartlett about the
10   bonus?
11        A.   It was around that time I was leaving the
12   company.
13        Q.   Right.  At what point did you decide or was it
14   determined that you would leave the company?
15        A.   It was told to me by Mr. Bartlett that the
16   board had voted to, you know, terminate my employment,
17   and gave me a letter saying that.
18        Q.   Okay.  What time frame was that?
19        A.   I believe it was in January sometime.  Probably
20   right around, you know, my last day.
21        Q.   Were you escorted out the door?
22        A.   No.  I was asked -- I met with Mr. Bartlett at
23   Parthenon Capital.
```

```
 1        Q.   So this would have been after you received my
 2  December letter.  Is that correct?
 3        A.   Yes.
 4        Q.   And was it before or after you became aware of
 5  the lawsuit?
 6             MR. WHITNEY:  Objection.
 7        A.   I would have to see the date of the lawsuit.
 8        Q.   I think it was filed sometime around
 9  January 11th, but I don't know when it was served.
10        A.   Well, how I would answer it, I believe I might
11  have -- I saw it before my termination, but I don't know.
12        Q.   When you met with Mr. Bartlett regarding your
13  termination, did the issue of my bonus or the lawsuit
14  come up at all?
15        A.   Yes, in terms of, you know, in my
16  indemnification of my liabilities.
17        Q.   So they said they would indemnify you?
18        A.   Yeah.  There was an understanding that there
19  was indemnification.
20        Q.   Okay.  In December of 2004, who was responsible
21  for making decisions with respect to disbursements of
22  Wolverine, Proctor & Schwartz, Inc.?
23        A.   Disbursements?  On a weekly basis, our
```

LEAVITT REPORTING, INC.

1      Q.  Right.  But that was the entity that prepared

2  the financial statements.  Correct?

3      A.  Correct.

4      Q.  Did Wolverine, Proctor, Inc., prepare financial

5  statements?

6      A.  No.  But as an officer, I can only make

7  representations of what I'm an officer of, right?  So.

8           MR. WHITNEY:  Ask him what he knows.

9      A.  What are we getting at?

10     Q.  Well, I'm trying --

11          MR. WHITNEY:  That's what he's here for, to

12  tell you what he knows.

13     Q.  I'm trying to get the distributions under

14  Paragraphs 5.2 and 5.3.

15     A.  Okay.

16     Q.  My question is, other than what's provided

17  under the omnibus agreement, do you know of any other

18  distributions under those, under either of those two

19  paragraphs?

20     A.  Said that way, I don't know of any other

21  distributions.

22     Q.  Okay.  And I ask you to turn also to WO581, and

23  you see where it talks about the Kulkarni nominees,

```
 1   Paragraph 7.3.
 2        A.    Yep.
 3        Q.    Do you see that?
 4        A.    Yes.
 5        Q.    And were you, in fact, Mr. Kulkarni's nominee
 6   on the board of directors of Wolverine, Proctor &
 7   Schwartz, Inc.?
 8        A.    Inc., yes.
 9        Q.    And throughout the time that you were with
10   Wolverine, Proctor & Schwartz, Inc., were you his nominee
11   on the board of directors?
12        A.    I believe sometime in 2004 I was taken off as a
13   nominee.
14        Q.    I see.  Were you then no longer on the board?
15        A.    I wasn't on the board, but I was still CEO.
16        Q.    So you were removed from the board sometime in
17   2004?
18        A.    Correct.
19        Q.    Who was put on the board at that time, if
20   anybody?
21        A.    I believe it was Phillip Constable.
22        Q.    Do you know why that was done?
23        A.    Mr. Kulkarni didn't give me a reason.
```

```
 1        Q.    Did the Parthenon representatives on the board
 2   remain the same?
 3        A.    From when to when?
 4        Q.    From 2002 through 2005, when you left.
 5        A.    Well, after I became a board member or didn't
 6   stop being a board member, I don't know what happened
 7   after that.  From 2002, when I was taken off as a board
 8   member, there was just one change in 2002 where Gideon
 9   Argov left the board and Marshall Bartlett came on as a
10   board member.
11        Q.    How about Erik Scott?
12        A.    He was a board member the whole time.
13        Q.    He was?
14        A.    That I was there.  No, I'm sorry.  Yeah,
15   because he left Parthenon sometime during that time, and
16   David Ament, I believe, was.
17        Q.    How do you spell that?
18        A.    A M E N T.
19        Q.    Was he with Parthenon?
20        A.    Yes.
21        Q.    In fact, they're in this building, are they
22   not?
23        A.    They used to be.
```

1 | COMMONWEALTH OF MASSACHUSETTS
PLYMOUTH, SS.

2

3 |    I, Ruth E. Hulke, a Notary Public in and for the
Commonwealth of Massachusetts, do hereby certify there
came before me on the 14th of November, 2005, the person

4 | hereinbefore named and that he was duly sworn to testify
to his knowledge concerning the matters in controversy in

5 | this cause; that he was thereupon examined under oath,
and that the foregoing transcript is a true record of the

6 | testimony given by the witness.

7 |    I further certify that I am neither attorney nor
counsel for, nor related to or employed by any of the

8 | parties to the action in which this deposition was taken;
and, further, that I am not a relative or employee of any

9 | attorney or counsel employed in this case, nor am I
financially interested in this action.

10

   IN WITNESS THEREOF, I have hereunto set my hand and

11 | affixed my seal this 25th day of November ,
2005.

12

13 | RUTH E. HULKE, NOTARY PUBLIC
Certified Shorthand Reporter No. 114893

14 | My Commission Expires: November 1, 2007

15

16

PLEASE NOTE:

17 |   THE FOREGOING CERTIFICATION OF THIS TRANSCRIPT DOES
NOT APPLY TO ANY REPRODUCTION OF THE SAME BY ANY MEANS

18 | UNLESS UNDER THE DIRECT CONTROL AND/OR DIRECTION OF THE
CERTIFYING REPORTER.

19

20

21

22

23

112

1   I, _Steven Chilinski_ , do hereby certify that I have

2   read the foregoing transcript of my testimony, and

3   further certify that said transcript is a true and

4   accurate record of said testimony.

5

6

7                    DEPONENT

8

9   COMMONWEALTH OF MASSACHUSETTS)

10  COUNTY OF _Norfolk_          )

11      I, _PAULA L. CURTIS_          , a Notary Public

12  within and for the Commonwealth of Massachusetts, do

13  hereby certify that on the _30_ day of _January_ ,

14  2006, there personally appeared before me the within

15  named deponent who read and subscribed the foregoing

16  deposition and made such corrections, if any, recorded

17  herein before me.

18                                          **Paula L. Curtis**
                                            **Notary Public**
19           NOTARY PUBLIC                  My Commission Expires
                                            May 28, 2010
20  My Commission Expires: _5/28/10_

21

22

23

**Crawford v. Wolverine, Proctor & Schwartz, Inc., et al.**

**ERRATA SHEET – STEVEN CHILINSKI**

| Page | Line | Change |
|------|------|--------|
| 4 | 17 | Delete the second to last word -- "I" |
| 5 | 9 | Delete the word "was" |
| 5 | 10 | Delete the first use of the word "company" |
| 6 | 18 | Delete the word "a" before CEO |
| 7 | 1 | Delete the words "I mean, probably" |
| 7 | 2 | Delete the first occurrence of the words "when I" |
| 10 | 2 | Delete the word "is" |
| 13 | 12-13 | Delete "I think that's" |
| 16 | 8 | Change the word "Yes" to "No" |
| 20 | 16 | Change "Most of" to "Most for" |
| 20 | 21 | Delete "kind of" |
| 23 | 14 | Change "what" to "of" |
| 25 | 11 | Change "—I saw" to "seen" |
| 30 | 10 | Change "was" to "were" |
| 32 | 2-3 | Delete the words "it was" |
| 34 | 9 | Delete the words "the, of their" |
| 34 | 10 | Delete the word "is" |
| 39 | 17 | Change "I'll just call them record." To "Just for the record." |
| 42 | 14 | Delete the words "I believe" |
| 42 | 20 | Delete the first occurrence of the words "in the" |

Handwritten annotation near page 5, line 9: "Second use of the/of"

| Page | Line | Change |
|------|------|--------|
| 43 | 13 | Delete the words "It was a –" |
| 47 | 22 | Delete the words "The named." |
| 48 | 22 | Change the word "the" to "this" |
| 48 | 23 | Delete the word "not" and add the word "there" after the word "knowledge" |
| 49 | 19 | Delete the word "so" |
| 50 | 13 | Delete the words "in that" |
| 50 | 20 | Delete the word "if" |
| 53 | 10-11 | Delete the words "that there was, not surprise, but a – I think" |
| 53 | 18-19 | *Second use of the /th*  Delete the words "It was," and "they were just" |
| 54 | 20 | Delete the words "it was" and add the word "in" before "2001" |
| 54 | 21 | Change the word "a" to "or one" |
| 56 | 12 | Delete the punctuation and word ", if" |
| 61 | 3 | Change "from an" to "for an"; also change "basis" to "comparison" |
| 61 | 4 | Change "and probably" to "but" |
| 63 | 15 | Delete the words "I'm trying to – payments –" |
| 74 | 3 | Delete the word "That" |
| 74 | 7 | Change the word "in" to "and" |
| 76 | 21 | Change the word "No" to "I don't recall" |
| 77 | 10 | Change the word "do" to "did" |
| 81 | 6 | Add the word "the" in-between the words "in numbers" |

| **Page** | **Line** | **Change** |
|------|------|--------|
| 83 | 17-18 | Delete the words "so you're asking me questions." |
| 83 | 16 | Change the words "So you" to "You" |
| 84 | 13 | Change both occurrences of the word "purpose" to "perspective" |
| 88 | 17 | Change the word "transactions" to "transaction" |
| 91 | 2 | Change "Yep" to "Yes" |
| 92 | 5-7 | Delete the entire first sentence of the answer; insert the word "~~from~~" after "2002," ⌐to" /⅄ |
| 92 | 14 | Delete "That I was there." |
| 101 | 22 | Delete the word "it" and change the word "again" to add open and closed quotes around the word "again" |
| 102 | 10 | Delete the word "don't" |
| 102 | 14 | Delete the word "Because" |
| 103 | 7 | Delete the words "in that" |
| 106 | 21 | Delete the words "But it was," |
| 106 | 22 | Delete the word "but" |
| 108 | 10-11 | Delete the words "kind of" |
| 108 | 19-20 | Change the answer to "I think it became a non-event." |
| 108 | 7 | Delete the words "the first" |

**B**

# EXHIBIT B

**PETER A. CRAWFORD**
**23 Newcastle Dr. #11**
**Nashua, NH 03060**
**(603) 888-4574**
**petercra@ix.netcom.com**

December 2, 2004

Mr. Steven F. Chilinski
Chief Executive Officer
Wolverine, Proctor & Schwartz, Inc.
51 East Main St.
Merrimac, MA  01860

By certified mail, return receipt requested

Dear Mr. Chilinski:

I am writing to you regarding the bonus payment which is due to me under the terms of
the letter agreement dated January 4, 2000 (the "Agreement"), pursuant to which I served
as Chief Operating Officer of Wolverine, Proctor & Schwartz, Inc. (the "Company")
between December 30, 1999 and January 14, 2002. Inasmuch as the Company's capital
had been seriously eroded by actions occurring prior to my tenure, and I continue to hold
a financial interest in the Company, I benefited from rebuilding of the Company's
working capital and thus have deferred my request for payment. However, certain
deadlines are now approaching which require me to pursue this payment, or potentially
waive certain rights to it. I hope that my forbearance has benefited the company and that
it is now in a position to pay these funds to me.

While the fact of a bonus being due is a matter governed by the Agreement, it was also
well earned. From the fourth quarter of 2000 through the third quarter of 2001, the
Company's EBITDA was approximately $4 million, to which approximately $2 million
in shareholder payments should be added to reflect operating results over which I had
control. This represents strong operating performance for a company with approximately
$40 million in annual revenues, and should be compared to a loss, from an operating
EBITDA standpoint, of approximately $1.5 million (before subtracting shareholder
payments) in 1999, the year before I joined. Reserve adjustments for 1999 made the
results even worse: an EBITDA loss of $4.7 million. The dramatic turnaround was
accomplished in the face of a severe working capital shortage and, as accepted by most
employees, could not have been accomplished without my leadership, the shareholder
being largely absent and not involved in day-to-day operations, particularly during the
critical summer of 2000. Without this leadership, the company would likely not have
survived, destroying the approximately $20 million in value ultimately demonstrated by
the 2001 recapitalization.

PAC 0023

The results for the calendar year 2001 (before the extraordinary gain) would have reflected this improved operating performance, were it not for the shutdown of Cardwell, an operation with which I had substantially no involvement. This resulted in the drawing down of a $1.5 million letter of credit (issued by the Company) guaranteeing the Cardwell debt, and the writeoff of this and other Cardwell receivables by the Company. This was partially responsible for poor performance during the fourth quarter of 2001 which reduced full year results. In addition, the relationship between the shareholder and the Company's lender deteriorated, in part as it was forced to pay $1.5 million against the Cardwell LC, leading to a working capital squeeze and inability to make shipments in the fourth quarter of 2001. Furthermore, no bonus was paid for 2000, as it took one or two quarters after I joined to turn the results around, and these early quarters detracted from the results for the entire year.

According to the Agreement, a copy of which is attached hereto, I was to receive the full bonus for any year in which I was employed by the Company on December 31, which was in fact the case for 2001. This bonus is to be calculated as follows:

$$BONUS = (EBITDA - CAPX - INT - TAXES) \times .05$$

$$Where\ TAXES = (EBITDA + BOOKDIF - DEPR - INT) \times TAXRATE$$

The capitalized terms are further defined in the Agreement. While certain amounts, such as adjustments to reserves and the BOOKDIF adjustment to the taxes calculation are not calculable with precision from the audited financial statements, the following summarizes my calculation of the BONUS in accordance with the terms of the Agreement. All terms in which every letter is capitalized have the same meaning as in the Agreement and the page numbers refer to the audited financial statements.

(Figures in $000s for 2001)

| | |
|---|---:|
| Loss before interest, taxes, depreciation, amortization and extraordinary gain (p. 3) | (486) |
| Plus: Extraordinary gain (p. 3) | <u>10,170</u> |
| EBITDA | 9,684 |
| Less: CAPX (p. 5) | (412) |
| Less: INT (net of income of 82) (p. 3) | (2,070) |
| Less: TAXES | <u>(44)</u> |
| Equals: base for bonus calculation | 7,158 |
| Times .05 equals BONUS due under written agreement | 358 |

PAC 0024

I reserve the right to amend this calculation to reflect a higher or lower base amount for the bonus calculation in the event that I receive subsequent information that reflects a different amount. I have used the amount stated in the audited financial statements for TAXES, rather than the formula in the Agreement, as the difference is due to BOOKDIF. However, even if one were to assume that BOOKDIF is zero, the TAXES would be calculated as follows:

(Figures in $000s for 2001)

| | |
|---|---|
| Maximum federal personal tax rate for 2001 | 39.10% |
| Maximum Massachusetts tax rate for 2001 | 5.60% |
| Federal benefit on Massachusetts taxes | (2.19%) |
| FICA Medicare portion (applicable at all income levels) | 1.45% |
| TAXRATE | 43.96% |
| EBITDA (from prior page) | 9,684 |
| Less: INT | (2,070) |
| Less: Depreciation (DEPR together with line below) (p. 3) | (1,268) |
| Less: Amortization (p. 3) | (1,462) |
| Taxable income for calculation | 4,884 |
| Times .4396 equals TAXES | 2,147 |

Even if one were to apply the above calculation of TAXES the base for the bonus calculation would be $7,158 - (2,147 - 44) = 5,055$, and the BONUS $253,000. However, I believe that utilizing the actual TAXES figure for 2001 is correct, and the BONUS due under the written agreement is thus approximately $358,000. Furthermore, Mr. Kulkarni and I entered into an oral agreement, by which the bonus amount was increased to 8%, making the bonus due approximately $573,000.

I entered into a Transition Agreement and Settlement Agreement dated December 28, 2001. Under the terms of the Settlement Agreement, paragraph 5.2, the Bonus Payment was specifically excluded from the amounts due to me that were being settled by that Agreement. Mr. Kulkarni and I had specifically discussed the fact that the Company's 2001 EBITDA would be increased by the transaction of December, 2001, and it is in light of that understanding and knowledge that we entered into the Transition and Settlement Agreements. I would not have accepted a substitute financial interest in the Company of less than that which I was entitled to under the Option provided in the Agreement, as

PAC 0025

amended, while also agreeing to forego the BONUS. Furthermore, the extraordinary gain is due to the Company's lender accepting less than book value for the repayment of the Company's debt and is neither a non-operating adjustment to reserves, interest, taxes, or capital expenditures, which would cause the amount to be excluded from the calculation of BONUS under the terms of the Agreement. The BONUS is thus due.

In addition, reviewing the Transition Agreement, paragraph 2, I note that that Agreement was to remain in force until March 31, 2002, and I was to be paid through that date unless two weeks written notice of termination by the Chief Executive Officer was provided. No such written notice by the Chief Executive Officer was provided; I am thus due wages for February and March 2002, an additional amount of approximately $25,000.

If you would like to discuss this matter further, please call me at (603)888-4574. While I hope that we may proceed in the spirit of cooperation, certain deadlines are fast approaching and I unfortunately feel compelled to mention that, in the absence of a positive response from you by December 9, 2004, I shall be forced to commence the statutory notification process with the Massachusetts Attorney General under M.G.L. c. 149 §150, and, if the BONUS and other wages of $598,000 are not paid by December 17, 2004, I may proceed on my own behalf without further notice or demand. I make these statements with some reluctance, as I know that you personally may not have been aware of the terms of the agreements entered into prior to your tenure, and I certainly hope that we are able to proceed in a professional and non-adversarial manner.

I look forward to talking with you.

Sincerely,

Peter A. Crawford

Enclosures: January 4, 2000 Agreement
            December 28, 2001 Transition and Settlement Agreements
            Pages 3 and 5 of Wolverine, Proctor & Schwartz, Inc. consolidated audited
            financial statements for 2001

C

# EXHIBIT C

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
                                               \*

PETER A. CRAWFORD,             \*
              Plaintiff      \*
                              \*  CIVIL ACTION
             VS                  \*  NO. 05-10078-DPW
                              \*
WOLVERINE PROCTOR &       \*
SCHWARTZ, INC., STEVEN F.   \*
CHILINSKI, DEEPAK S.      \*
KULKARNI,                    \*
              Defendants     \*
                              \*

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

                    DEPOSITION OF DEEPAK KULKARNI, taken on behalf
of the plaintiff pursuant to the Massachusetts Rules of Civil
Procedure before Kathleen M. Benoit, CSR # 1368F94, Shorthand
Reporter and Notary Public in and for the Commonwealth of
Massachusetts at the offices of Morgan, Brown & Joy, 200
State Street, Boston, Massachusetts, on Wednesday, December
7, 2005, commencing at 11:10 a.m.

APPEARANCES:

PETER A. CRAWFORD, 23 Newcastle Drive, #11, Nashua, NH 03060,
Pro Se

MARK WHITNEY, ESQ., and JEFFREY KUHN, ESQ., Morgan, Brown &
Joy, LLP, 200 State Street, Boston, MA 02109, For the
defendant

ALSO PRESENT:

Mark A. Brown

*Leavitt Reporting, Inc.*

*1207 Commercial Street, Rear*                              *Tel. 781-335-6791*
*Weymouth, MA 02189*                                       *Fax: 781-335-7911*
                                                        *leavittreporting@att.net*

*Hearings ◆ Conferences ◆ Legal Proceedings*

2

```
                          INDEX
WITNESS              DIRECT CROSS REDIRECT RECROSS

Deepak Kulkarni
  by Mr. Crawford    5

                        EXHIBITS
No. Description                              Page

1   Letter 1/4/00, Kulkarni to
    Crawford Re: Employment Contract          7

2   Employment Contract - Draft              10

3   2001 Tax Return Form 982                 34

4   Transition Agreement                     48

5   Settlement Agreement                     48

6   Letter 3/1/01 Kulkarni to
    Crawford                                 68

7   Letter 2/26/01 Wolverine to
    Crawford                                 69

8   Income Statement Data                    79

9   Handwritten Document "Original
    655" top heading                         89

10  Telephone Bill                          109

11  Omnibus Agreement 11/13/02              127

12  Letter 12/2/04 Crawford to
    Chilinski                               158

13  Consolidated Financial Statements
    with Auditor's Report                   206

14  Letter 12/8/04 Daniel Blake to
    Crawford                                217
```

3

1
**INDEX**
WITNESS                  DIRECT CROSS REDIRECT RECROSS

2
**EXHIBITS**

3
No. Description                          Page

4
15  Letter 12/17/01 Kulkarni to

5
    Bernie Ward                        226

6
16  Letter 12/27/01 Kulkarni to
    Bernie Ward                        226

7
17  Journal Entries                    229

8
18  Handwritten Document "Discussions

9
    with Deepak 12/28/01" top heading  247

10

11

12

13

14

15

16

17

18

19

20

21

22

23

4

1           P R O C E E D I N G S

2              MR. CRAWFORD:  The standard stipulations?

3              MR. WHITNEY:  Yes, that have been in effect

4    for all the depositions.

5              MR. CRAWFORD:  Right.

6              DEEPAK KULKARNI, SWORN

7              MR. CRAWFORD:  Okay, I'd like to first go

8    over the stipulations.  The witness will read and sign the

9    deposition and objections will be preserved until trial,

10   the standard stipulations that we used the last time.

11             MR. WHITNEY:  Yes, except for the form of the

12   question.

13             MR. CRAWFORD:  Except for the form of the

14   question.  And with respect to the ground rules for this

15   deposition, Mr. Whitney and I have agreed to abide by the

16   court's order in the Cummings deposition for this

17   deposition as well.  What that means is that any questions

18   relative to the 2005 recapitalization or the 2005 Financial

19   Statements or any payments to Mr. Kulkarni after December

20   31, 2002, are off limits; however, counsel has agreed that

21   Mr. Kulkarni will return to the extent that I prevail on

22   the motions, the protective order motions, is that correct?

23             MR. WHITNEY:  The only difference is that, to

158

1              MR. WHITNEY:  Objection.

2      A.  No.

3      Q.  Was it during 2002?

4      A.  I can't remember.

5      Q.  Okay, let's shift to another topic.

6              MR. CRAWFORD:  I would ask that this be

7  marked Kulkarni Exhibit 12, and this is pages PAC 0023

8  through 026.

9              (Exhibit No. 12 marked.)

10     Q.  And I ask you if you've ever seen this document

11 before?

12     A.  I'm going to have to read this.

13     Q.  Well, familiarize yourself with it.

14     A.  This is like ground hog day, okay?  I can't speed

15 read these things.

16             MR. WHITNEY:  Take as much time as you need

17 to understand it.

18             (Document Perusal.)

19     A.  You aren't arguing about taxes, right, so I'm going

20 to skip this portion in the interest of time.

21     Q.  Okay.

22     A.  Are you going to refrain from asking me questions

23 about taxes?

159

1    Q.   For now.

2    A.   Then I'm going to keep reading this.   What would

3    you like me to do?

4    Q.   Let's skip it in the interest of time.

5              MR. WHITNEY:   That's on page PAC 0025?

6              THE WITNESS:   That's right.

7              (Document Perusal.)

8    A.   Okay.

9    Q.   Have you seen this document before?

10   A.   I have.

11   Q.   And under what circumstances?

12   A.   It was sent to me.

13   Q.   And by whom?

14   A.   By the Company, by Wolverine.

15   Q.   Do you recall who at Wolverine sent it to you?

16   A.   It might have been Mark Brown.   I'm not sure.

17   Q.   And do you recall that it was --

18   A.   No, I don't think Mark was actually at the Company.

19   Let me rephrase that.   December 2nd, it would have been

20   somebody, it would have been Steve or one of his people.

21   Q.   Steve Chilinski?

22   A.   Or one of his people, yea.

23   Q.   And was it faxed to you?

160

1      A.   He was one of those people who were never in the
2   office.
3      Q.   Okay, so you received it sometime around January 2,
4   2004, do you believe?
5      A.   Do you mean January 2, 2004?
6      Q.   No, did I say January?
7      A.   Could you read back --
8      Q.   It doesn't matter.  I meant December 2, 2004.
9      A.   I was just checking.
10      Q.   Did you receive it sometime around December 2,
11   2004?
12      A.   Well, it certainly couldn't have been before so it
13   would have been sometime after.
14      Q.   But sometime in December of 2004?
15      A.   I couldn't tell you if it was in December of 2004
16   or not, but I would say sometime around that period.  It
17   may have been in January for all I know.  I mean I just
18   don't know.
19      Q.   And did you have a conversation with Steve
20   Chilinski or anybody from Wolverine, Proctor & Schwartz,
21   Inc., with regard to this letter?
22      A.   I think I had a conversation.  I'm not sure whether
23   I had a conversation with Steve but I had a conversation I

161

1    think with Marshall Bartlett.

2        Q.   And Marshall Bartlett was with Parthenon?

3        A.   Yes.

4        Q.   And I guess still is --

5        A.   Yes.

6        Q.   -- is that correct?

7        A.   As far as I know.  He might have left last week.  I

8    don't call him any more.

9        Q.   And so you recall a conversation with Marshall

10   Bartlett regarding this letter, is that correct?

11       A.   I recall having a conversation.  I mean I can give

12   you the content of the conversation to the best of my

13   memory.

14       Q.   Why don't you do that?

15       A.   The content?

16       Q.   Yes.

17       A.   Marshall said we have this demand from Peter, you

18   know.  I said well, you know, it has no merit in my

19   opinion.

20       Q.   Was your understanding during that conversation

21   that he had a copy of the letter?

22       A.   That he had a copy of the letter?

23       Q.   Yes.

162

1       A.   I don't know if he had a copy of the letter in
2   front of him.  I wasn't on his side of the table.  He was
3   at the end.
4       Q.   But you had a copy of the letter, is that correct?
5       A.   Yea, I read the letter.  I can't say that I had it
6   open on my screen or anything like that but I read the
7   letter.
8       Q.   All right, so go on about the conversation, you
9   said it had no merit?
10      A.   He asked me what I thought of it and I said, The
11  case has no merit.
12      Q.   And what did he say?
13      A.   He said, Well, what should we do?
14      Q.   And what did you say?
15      A.   So I said, Well, I think we should refer this to
16  Vitale Caturano as provided for in the agreement, that's
17  what we should do.
18      Q.   And what did he say?
19      A.   And I'm also going to consult counsel, I said.
20      Q.   And what did he say?
21      A.   He said fine.
22      Q.   Did you have any subsequent conversations with
23  Marshall Bartlett --

163

1     A.   No.

2     Q.   -- concerning this matter?

3     A.   I don't think so.  I mean I may have summarized two

4   conversations.  I mean I can't tell you if this entire

5   thing took place in one conversation or two but we didn't

6   have an ongoing conversation about this topic.

7     Q.   And after the conversation with Marshall Bartlett,

8   did you talk with anyone at Wolverine, Proctor & Schwartz,

9   Inc.?

10    A.   I think I might have had a conversation with, a

11  brief conversation with Steve; I may have.

12    Q.   Steve Chilinski?

13    A.   Yea, I don't have a perfect memory of that

14  conversation because I didn't see him as being particularly

15  useful.

16    Q.   And do you remember what you said and what he said?

17    A.   No, as I said, I just informed him that I'd be

18  dealing with it.

19    Q.   Did Marshall Bartlett ask you why you thought it

20  didn't have any merit?

21    A.   No.  I mean, you know, I gave him my own opinion.

22  I said I don't believe this gain that's here should be part

23  of EBITDA, but I said, There's a dispute mechanism

164

1    provision here that we should pursue.  It is not what I
2    think is important; it's what the arbiter thinks.
3        Q.   And what was the next thing that you did?
4        A.   I gave the letter to counsel.
5        Q.   And counsel was who?
6        A.   Epstein, Becker & Greene at the time.
7        Q.   And who at Epstein, Becker & Greene?
8        A.   He is no longer there but his name is Daniel Blake.
9    He actually left because he didn't have enough employee
10   litigation.  Now, if this happened in a more timely fashion
11   he might have stuck around.
12       Q.   Okay.  And Epstein, Becker & Greene at the time was
13   counsel to Wolverine, Proctor & Schwartz, Inc., is that
14   correct?
15       A.   Well, one of the companies, yes.
16       Q.   Did you do anything else other than send the letter
17   to counsel?
18       A.   I subsequently followed the advice of counsel.
19       Q.   And what did you do?
20       A.   They asked me to limit my interactions with Rich
21   Cummings, okay?
22       Q.   Okay.
23       A.   And I said, Well, I need to call him at least once

217

1      Q.   Okay, let's move on.

2                   MR. CRAWFORD:   And I would ask that you mark

3      this Exhibit 14.   This is pages PAC 0055 through 0056.

4                   THE WITNESS:   I'm just noting here that the

5      court reporter has asked me to slow down, and therefore, I

6      am going to reserve the right to carefully review my

7      testimony to make sure that it's accurate.

8                   MR. WHITNEY:   You will have that right.

9                   THE WITNESS:   Okay, thank you.

10                  MR. WHITNEY:   That's what the reading and

11     signing is; you will have a chance to read it.

12                  THE WITNESS:   I mean even small differences

13     could be missed and could radically change the...so I

14     reserve that right.

15                  MR. WHITNEY:   Okay.

16                  MR. CRAWFORD:   I would ask that you mark that

17     Kulkarni 14.

18                  (Exhibit No. 14 marked.)

19     Q.   I ask you if you've seen this letter before?

20     A.   I am going to have to read this.

21                  (Document Perusal.)

22     A.   Yes.

23     Q.   Under what circumstances?

218

1      A.   This is the attorney for the Company at the time.
2   I mean so I saw copies of this letter as part of privileged
3   conversations that I don't want to get into with you.

4      Q.   Did you do anything after seeing this letter as a
5   result of having seen it?

6      A.   Yea, I already answered this question.  I told you
7   that we would contact Arthur Andersen which I did and I
8   told him that we'd send him a package which did not take
9   place not because I didn't want to, that instruction fell
10  through the cracks.  If you go back and reread, do you want
11  the reporter to reread my previous testimony where I said I
12  was confused as to whether I had that conversation with
13  Steve Chilinski or Dan Blake, do you want her to go back
14  and read that?

15     Q.   No, I remember that.  Okay, so did you answer the
16  question?  I think my question was after seeing this letter
17  did you do anything as a result of having seen it, and the
18  answer to that was?

19     A.   Which part of my last answer didn't you understand?

20     Q.   I don't think I asked that question before.

21     A.   Yes, you did.

22     Q.   This is a different question.

23     A.   I had a conversation with Rich Cummings which was

219

1  described to you in a previous answer, correct?

2      Q.  Okay.

3      A.  Okay, and then on the advice of counsel I didn't

4  contact him because I was not supposed to.

5      Q.  All right, let me ask you this question then:  Was

6  your conversation with Rich Cummings before or after having

7  seen this letter?

8      A.  I can't be sure of that.  I can't be sure of that.

9      Q.  Do you have a sense as to whether it was before or

10  after?

11               MR. WHITNEY:  Objection.

12      A.  I mean they're all so close.  I am now realizing

13  that this is dated December the 8th right?  And your demand

14  letter is dated December the 2nd, right?

15      Q.  Yes.

16      A.  So we have some new information now.  Remember in

17  the beginning I said I couldn't exactly remember when I saw

18  the letter?  Now we know it has to be between the 2nd and

19  the 8th, right?

20      Q.  Well, you're saying that.

21      A.  Well, I mean I'm assuming that because he wouldn't

22  have written this letter without consulting me.

23               MR. WHITNEY:  No. 14.

LEAVITT REPORTING, INC.

220

1  Q. All right.

2  A. So now we know through a process of triangulation

3 because I actually don't keep as detailed a log as you do

4 about these matters because I'm not anticipating

5 litigation, okay?

6  Q. All right.  So did there come a time when you

7 became aware of this lawsuit?

8  A. Yea, I think a constable showed up at my door.

9  Q. And what did you do?

10 A. I tried to pacify my kid who was scared because a

11 policeman was at the door.

12 Q. Didn't it come by mail?

13 A. No, I think a cop dropped it off, I think; I'm not

14 sure.

15 Q. And then what did you do?

16 A. Well, I signed it, isn't that what I was supposed

17 to do?  A number of things, what, from that point on to

18 date?  Pete, let me ask you a question, what have you done

19 since January the 2nd, 2000?  Oh, dear.

20 Q. So did you ever tell anyone at Wolverine, Proctor &

21 Schwartz, Inc., either to pay me a bonus or not to pay me a

22 bonus in 2004 or 2005?

23 A. I mean in 2004, you know, I was a consultant to the

LEAVITT REPORTING, INC.

284

1                    COMMONWEALTH OF MASSACHUSETTS

2        I, Kathleen Benoit, a Notary Public in and for the
     Commonwealth of Massachusetts, do hereby certify there came
3    before me on Wednesday, December 7, 2005, the person
     hereinbefore named was duly sworn to testify to his
4    knowledge concerning the matters in controversy in this
     cause; that he was thereupon examined upon oath, and that
5    the deposition is a true record of the testimony given by
     the witness.
6        I further certify that I am neither attorney nor
     counsel for, nor related to or employed by any of the
7    parties to the action in which this deposition was taken;
     and further, that I am not a relative or employee of any
8    attorney or counsel employed in this case, nor am I
     financially interested in this action.
9
         IN WITNESS WHEREOF, I have hereunto set my hand and
10   affixed my seal December 28, 2005.

11

12

13

14                          Kathleen M. Benoit
15                          Notary Public

16                          My commission expires
                            May 25, 2012
17

18   PLEASE NOTE:

19       THE FOREGOING CERTIFICATION OF THIS TRANSCRIPT DOES NOT
     APPLY TO ANY REPRODUCTION OF THE SAME BY ANY MEANS UNLESS
20   UNDER THE DIRECT CONTROL AND/OR DIRECTION OF THE CERTIFYING
     REPORTER.
21

22

23

**D**

# EXHIBIT D

1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS


```
* * * * * * * * * * * * * * * * * *
PETER A. CRAWFORD,                *
        Plaintiff                 *
                                  *
VS.                               *  CIVIL ACTION NO.
                                  *  05-ev-10078(DPW)
WOLVERINE, PROCTOR & SCHWARTZ,    *
INC.; STEVEN F. CHILINSKI and     *
DEEPAK S. KULKARNI,               *
        Defendants                *
* * * * * * * * * * * * * * * * *  *
```


**DEPOSITION OF MARSHALL A. BARTLETT**, called by

the Plaintiff, pursuant to the applicable provisions of

the Federal Rules of Civil Procedure, before Ruth E.

Hulke, Certified Shorthand Reporter No. 114893 and Notary

Public for the Commonwealth of Massachusetts, at Morgan,

Brown & Joy, LLP, 200 State Street, Boston,

Massachusetts, on Friday, January 20, 2006, commencing at

10:05 a.m.

## *Leavitt Reporting, Inc.*

*1207 Commercial Street, Rear*   *Tel. 781-335-6791*
*Weymouth, MA 02189*   *Fax: 781-335-7911*
*leavittreporting@att.net*

*Hearings ◆ Conferences ◆ Legal Proceedings*

```
 1   APPEARANCES:

 2

 3      PETER A. CRAWFORD, 23 Newcastle Drive, Number 11,
     Nashua, New Hampshire, 03060, pro se.

 4      JEFFREY D. KUHN, ESQ., of Morgan, Brown & Joy, LLP,
     200 State Street, Boston, Massachusetts, 02109-2605, on
 5   behalf of the Defendants.

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23
```

3

1                          I N D E X

2    WITNESS          DIRECT    CROSS      REDIRECT      RECROSS

3    Marshall Bartlett 4        87

4

5

6                          E X H I B I T S

7    NUMBER                                              PAGE

8      1      Documents W0026 through W0027        8

9      2      Documents PAC0043 through PAC0047    22

10     3      Documents W0975 through W0988        27

11     4      Documents PAC0027 through PAC0042    31

12     5      Documents W0409 through W0432        32

13     6      Documents PAC0049 through PAC0051    40

14     7      Documents PAC0023 through PAC0026    43

15     8      Documents PAC0055 through PAC0056    47

16     9      Documents W0384 through W0408        58

17     10     Documents W0357 through W0382        58

18     11     Documents PAC0100 through PAC0101    59

19

20

21

22

23

1                    P R O C E E D I N G S

2                         (Witness sworn)

3                    MARSHALL A. BARTLETT, having been

4     satisfactorily identified and duly sworn, testified as

5     follows in answer to direct interrogatories by Mr.

6     Crawford:

7          Q.    Are you taking any medication or is there any

8     reason --

9          A.    No.

10         Q.    -- why you can't testify truthfully today?

11         A.    No.

12         Q.    Would you state your name and address?

13         A.    Marshal Bartlett.  Would you like my work

14    address or home address?

15         Q.    Both.

16         A.    Work address is 75 State Street, Boston, and my

17    home address is 70 Glezen Lane in Wayland, Massachusetts.

18         Q.    Just to read the stipulation into the record, I

19    believe you would like to read and sign the deposition?

20         A.    I would.

21              MR. CRAWFORD:  We will use the standard

22    stipulations.  Mr. Kuhn and I have agreed that

23    objections, except as to form, will be preserved until

```
 1        A.    I remember seeing your filing earlier this year

 2   when you first submitted it, and it was right before the

 3   recapitalization.  So we were still involved with the

 4   company, and I do remember seeing it then.

 5        Q.    When you say filing?

 6        A.    Whatever the lawsuit is.

 7        Q.    So the complaint?

 8        A.    The complaint.

 9        Q.    This action?

10        A.    Yes, this action.

11        Q.    Where did you obtain that from?

12        A.    The company.  I was on the board at the time.

13        Q.    But prior to that had you heard from Mr.

14   Chilinski or Mr. Kulkarni or anyone else that I was

15   seeking a bonus?

16        A.    I don't think so.

17        Q.    I show you a document, and I'll ask this be

18   marked Bartlett Exhibit 7.

19              (Document marked Exhibit No. 7 for Id.)

20        Q.    I ask you if you have -- This is Pages PAC0023

21   through PAC0026.  I ask you if you have seen this

22   document before.

23        A.    I don't believe so.
```

44

1       Q.    I ask you if you would just familiarize
2    yourself with it briefly.
3       A.    Okay.
4       Q.    After having seen it, does that refresh your
5    recollection at all or you don't recall seeing this?
6       A.    No, I don't recall seeing it.
7       Q.    Do you recall anyone having ever related to you
8    the contents of this letter?
9       A.    I don't.
10      Q.    Okay.  Is it your recollection then when you
11   saw the complaint in this action that that was the first
12   you had ever heard?
13      A.    I believe it was the first time I had heard it.
14      Q.    So you never heard from Steve Chilinski that he
15   received a letter?
16      A.    I don't, I don't recall him telling me.  He
17   might have, but.
18      Q.    You never heard it from Mr. Kulkarni?
19      A.    Not that I remember.
20      Q.    So when you saw the complaint, what did you do,
21   what did you think?
22      A.    It was just one other topic, you know, among
23   the board talking.  We were very close to the

```
 1   recapitalization at that point, so that was really the
 2   primary focus.  So it was not something that at least
 3   Parthenon was highly engaged in in talking about and
 4   figuring out.
 5        Q.   Who was on the board of directors at that point
 6   in time?
 7        A.   It was myself, David Ament, and Jack Cooney who
 8   was an independent director sitting in our seats, Mr.
 9   Kulkarni, and --
10        Q.   Philip Constable?
11        A.   Yes.  I think that was his name.  His colleague
12   at Remedial Capital.
13        Q.   Was Philip formerly COO of Wolverine?
14        A.   I can't confirm that.  There was some prior
15   working relationship.
16        Q.   Did the topic come up at the board meeting?
17        A.   I do remember it coming up.
18        Q.   What was said?
19        A.   It was forwarded -- Well, not necessarily at a
20   board meeting, but just in discussions among the board
21   members.  Your document was forwarded to me so I could
22   look at it, and I don't recall what, if any, kind of
23   decision came out of those discussions.  Again, it's
```

1   close to the time when we did our recapitalization, so
2   Parthenon was more focused on that at the time.

3        Q.   Okay.  So you never did anything that you can
4   recall with respect to the complaint.  Is that correct?

5        A.   Not that I can recall.  I believe we -- I'm
6   sure we forwarded on to the company's attorney, the
7   company's counsel, just so they were up to speed on it.
8   And, again, I think that was sort of the step we took at
9   that point to begin preparing.

10       Q.   Who was that?

11       A.   At that time we were using a firm called Gadsby
12  Hannah based here in Boston.

13       Q.   That would have been counsel for Parthenon?

14       A.   For the company.  The company.

15       Q.   The company meaning?

16       A.   Wolverine.

17       Q.   So not Epstein, Becker & Green?

18       A.   No.

19       Would you mind if I used the restroom?

20            MR. CRAWFORD:  Why don't we take a five-minute
21  break.  We're off the record at 11:10.

22            (Brief recess)

23            MR. CRAWFORD:  Back on the record at 11:13.

1        Q.    I show you this document PAC0055 and PAC0056.
2    I'll ask it be marked Exhibit 8.
3              (Document marked Exhibit No. 8 for Id.)
4        Q.    Ask you if you have seen that document before.
5        A.    So maybe it was Epstein, Becker.  I'm sorry.  I
6    guess we forwarded it to them.
7        Q.    Well, this is referring to your correspondence
8    of December 2nd, 2004?
9        A.    This letter.
10       Q.    So it's referring to the letter?
11       A.    Yeah.  So, you know, over the history of our
12   investment, the company, Wolverine, had both Epstein,
13   Becker and Gadsby Hannah work on its behalf.  So it looks
14   like in this case --
15       Q.    I think what you said earlier, you referred the
16   complaint to Gadsby Hannah?
17       A.    I don't recall.  It would have been one or the
18   other.  It's more likely it would have been, given that
19   Epstein responded to the letter, my guess is we sent them
20   the complaint as well, but I don't know.  It would be one
21   of the two firms he would have given it to.
22       Q.    So Epstein was still doing some work for
23   Wolverine?

48

```
 1        A.    Yes.
 2        Q.    Is it possible that Mr. Kulkarni sent the
 3   December 2nd, 2004, letter to Epstein without notifying
 4   you?
 5        A.    I would doubt it.
 6        Q.    But you don't specifically recall?
 7        A.    I don't.
 8        Q.    Okay.  Were you the key person from Parthenon
 9   on the board of directors of Wolverine at that point?
10        A.    After Eric's departure, yes.
11        Q.    Of the three people -- I think you referred to
12   David Ament and Jack Cooney?
13        A.    That's right.
14        Q.    Of the three, you were the key representative
15   from Parthenon?
16        A.    Yes.
17        Q.    So if Mr. Kulkarni were to have a discussion
18   with Parthenon, it would most likely be with you.  Is
19   that correct?
20        A.    It would have been likely to have been with me,
21   but he had an active discussion with the other members as
22   well.  David Ament as well.  But it would have been
23   likely at this point.
```

LEAVITT REPORTING, INC.

49

```
 1        Q.   Did you have a discussion with Steve Chilinski
 2   in January of 2005 when he was terminated from the
 3   company?
 4        A.   I did.
 5        Q.   You recall the subject of my bonus coming up at
 6   that time?
 7        A.   I don't actually.  Surrounding his termination
 8   from the company?
 9        Q.   Yes.
10        A.   I don't recall that coming up.
11        Q.   Was there a discussion about him being
12   indemnified for potential liabilities?
13        A.   I guess, yes.  He did express concern about
14   that.  He did express concern about that.
15        Q.   Was he indemnified ultimately for the
16   liability?
17        A.   I don't recall.  My guess is he was, but I
18   would have to see his agreement.
19        Q.   Okay.  Would that be by Parthenon --
20        A.   No.
21        Q.   -- or Wolverine?
22        A.   By the company.
23        Q.   Did you ever do any investigation as to whether
```

```
 1    I, Marshall Brethen , do hereby certify that I have

 2    read the foregoing transcript of my testimony, and

 3    further certify that said transcript is a true and

 4    accurate record of said testimony.

 5

 6

 7                DEPONENT

 8

 9    COMMONWEALTH OF MASSACHUSETTS)

10    COUNTY OF Suffolk              )

11        I, Cheryl Pasquarosa , a Notary Public

12    within and for the Commonwealth of Massachusetts, do

13    hereby certify that on the 13th day of February,

14    2006, there personally appeared before me the within

15    named deponent who read and subscribed the foregoing

16    deposition and made such corrections, if any, recorded

17    herein before me.

18

19                NOTARY PUBLIC

20    My Commission Expires:

21                              CHERYL PASQUAROSA
                                   Notary Public
22                          Commonwealth of Massachusetts
                            My Commission Expires Oct 2, 2009
23
```

## Errata Sheet

*Case:* Peter A. Crawford v. Waltham, Proctor & Schwartz

*Witness:* Marshall A. Bartlett   *Date taken:* January 20, 2006

| Page | Line | Change |
|------|------|--------|
| 4 | 13 | "Marshall" replaces "Marshal" |
| 5 | 19 | "Stamford" replaces "Stanford" |
| ___ | ___ | |
| ___ | ___ | |
| ___ | ___ | |
| ___ | ___ | |
| ___ | ___ | |
| ___ | ___ | |
| ___ | ___ | |
| ___ | ___ | |
| ___ | ___ | |
| ___ | ___ | |
| ___ | ___ | |
| ___ | ___ | |
| ___ | ___ | |
| ___ | ___ | |
| ___ | ___ | |

*Leavitt Reporting, Inc.*

# EXHIBIT E

# EPSTEIN BECKER & GREEN, P.C.

ATTORNEYS AT LAW

111 HUNTINGTON AVENUE
26TH FLOOR
BOSTON, MA 02199-7610
617.342.4000
FAX: 617.342.4001
EBGLAW.COM


December 8, 2004

*Via Overnight Mail*

Peter A. Crawford
23 Newcastle Drive, #11
Nashua, NH 03060

Re:    Your Correspondence of December 2, 2004

Dear Mr. Crawford:

We represent Wolverine, Procter and Schwartz, Inc. (the "Company.")  Your December 2, 2004 letter to CEO Stephen F. Chilinski has been forwarded to us for reply.

The Company does not believe that it owes you a bonus for 2001 and disagrees with the various calculations set forth in your letter.

You will recall that your January 4, 2000 agreement calls for any clarification of the bonus calculation to be submitted to Arthur Andersen, or the firm nominated to prepare the individual tax returns of Mr. Kulkarni.  As you know, such firm shall be the "binding arbiter" of the bonus.  Accordingly, we will submit a copy of your January 4, 2000 agreement and the Company's 2001 financials to the firm of Vitale Caturano & Co., Ltd.

Responding to the other assertions in your letter, the Company denies that Mr. Kulkarni made a verbal agreement to increase the bonus amount to 8%, or that he made any other representations or misrepresentations that would affect the bonus calculation.  Finally, with regard to February and March 2002, you did not perform services for the Company during that time which would entitle you to additional compensation.  You were given effective notice by the Company at the time your employment ended.

**PAC 0055**

ATLANTA • BOSTON • CHICAGO • DALLAS • HOUSTON • LOS ANGELES
NEWARK • NEW YORK • SAN FRANCISCO • STAMFORD • WASHINGTON, D.C.

EPSTEIN BECKER GREEN WICKLIFF & HALL, P.C. IN TEXAS ONLY

Peter A. Crawford
December 8, 2004
Page 2

The Company reserves all of its rights and defenses. Please direct any further communications regarding this matter to me.

Very truly yours,

Daniel J. Blake

**PAC 0056**

# EXHIBIT F



# Wolverine Proctor LLC and Subsidiaries

Consolidated Financial Statements

Years Ended December 31, 2004 and 2003

VITALE, CATURANO & COMPANY PC

W0357

### *WOLVERINE PROCTOR LLC AND SUBSIDIARIES*
Notes to Consolidated Financial Statements
Years Ended December 31, 2004 and 2003

---

### 1.    THE COMPANY

Wolverine Proctor LLC (the Company), a limited liability company, was formed on December 28, 2001 for the purpose of holding the securities of Wolverine Proctor, Inc. (WPI), a Delaware corporation, and its Subsidiaries. The purpose of WPI is to hold the securities of all of the operating entities of the Company. These operating entities include Wolverine Proctor & Schwartz, Inc. (WP&S), Wolverine Proctor & Schwartz Limited (Limited) and Mawlaw 492 Ltd. (Mawlaw).

The Company designs and manufactures thermal processing and converting equipment used for a variety of industry applications. WP&S was formed from the 1994 acquisition of Proctor & Schwartz by Wolverine (Massachusetts) Corporation and their subsequent merger. The Company has manufacturing operations located in Merrimac, Massachusetts; Lexington, North Carolina; and Deeside, Wales. The Company also maintains sales offices in Horsham, Pennsylvania and Glasgow, Scotland.

### 2.    RECAPITALIZATIONS

Pursuant to a recapitalization plan (Recapitalization), on December 28, 2001, an investor group assigned a series of promissory notes (Notes) to the Company amounting to $14 million in exchange for 1,000 Class B member units. The Notes had been issued by WP&S to the investor group to fund the retirement of WP&S bank debt on December 28, 2001 and provide funds for working capital. On or about December 31, 2001, the previous sole shareholder contributed 100% of the outstanding shares of WP&S, Mawlaw and Limited in exchange for 1,000 Class A member units.

On February 11, 2005, the Company and the Class A and B shareholders entered into a series of transactions reorganizing and continuing the Company in which the Class A member acquired new equity interests and the Class B member received approximately $2,000,000 in cash from the Company and certain preferred interests in newly-formed US and UK entities. Also as part of the transactions, the newly-formed US and UK entities acquired the operating net assets of the Company, resulting in effective liquidation and dissolution of the Company. The outstanding debt of the Company was refinanced.

### 3.    SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

Principles of Consolidation

The accompanying consolidated financial statements include the accounts of the Company and its subsidiaries. All material intercompany accounts and transactions have been eliminated in consolidation.



# EXHIBIT G

The Commonwealth of Massachusetts William Francis Galvin – Public Browse and Search                                        01/05/2006 10:15 AM



# The Commonwealth of Massachusetts
# William Francis Galvin

Secretary of the Commonwealth
One Ashburton Place, Boston, Massachusetts 02108-1512
Telephone: (617) 727-9640

---

*WOLVERINE PROCTOR & SCHWARTZ, LLC* Summary Screen

?
Help with this form

---

[ Request a Certificate ]

**The exact name of the Foreign Limited Liability Company (LLC):** <u>WOLVERINE PROCTOR & SCHWARTZ, LLC</u>

**Entity Type:** <u>Foreign Limited Liability Company (LLC)</u>

**Identification Number:** <u>000882760</u>

**Date of Registration in Massachusetts:** <u>12/13/2004</u>

**The is organized under the laws of:** State: <u>DE</u>   Country: <u>USA</u>   **on:**   <u>12/02/2004</u>

**The location of its principal office:**
No. and Street: <u>51 E. MAIN ST.</u>
City or Town: <u>MERRIMAC</u>        State: <u>MA</u>        Zip: <u>01860</u>        Country: <u>USA</u>

**The location of its Massachusetts office, if any:**
No. and Street:
City or Town:        State:        Zip:        Country:

**The name and address of the Resident Agent:**
Name: <u>C T CORPORATION SYSTEM</u>
No. and Street: <u>101 FEDERAL ST.</u>
City or Town: <u>BOSTON</u>        State: <u>MA</u>   Zip: <u>02110</u>   Country: <u>USA</u>

**The name and business address of each manager:**

| Title | Individual Name<br>First, Middle, Last, Suffix | Address (no PO Box)<br>Address, City or Town, State, Zip Code |
|---|---|---|
| MANAGER | DEEPAK KULKARNI | 111 HUNTINGTON AVE., STE. 2600<br>BOSTON, MA 02199 USA |

**The name and business address of the person in addition to the manager, who is authorized to execute documents to be filed with the Corporations Division.**

| **Title** | **Individual Name** First, Middle, Last, Suffix | **Address** (no PO Box) Address, City or Town, State, Zip Code |
|---|---|---|

Prior to August 27, 2001, Records can be obtained on Microfilm

**The name and business address of the person(s) authorized to execute, acknowledge, deliver and record any recordable instrument purporting to affect an interest in real property**

| **Title** | **Individual Name** First, Middle, Last, Suffix | **Address** (no PO Box) Address, City or Town, State, Zip Code |
|---|---|---|
| REAL PROPERTY | DEEPAK KULKARNI | 111 HUNTINGTON AVE., STE. 2600 BOSTON, MA 02199 USA |

**X** Consent  __ Manufacturer  __ Confidential Data  __ Does Not Require Annual Report

__ Partnership  __ Resident Agent  __ For Profit  __ Merger Allowed

**Select a type of filing from below to view this business entity filings:**

ALL FILINGS
Annual Report
Application For Registration
Certificate of Amendment
Certificate of Cancellation

( View Filings )   ( New Search )

**Comments**

© 2001 - 2006 Commonwealth of Massachusetts
All Rights Reserved

?
Help

# EXHIBIT H

Official Form 7
(10/05)

# UNITED STATES BANKRUPTCY COURT

**DISTRICT OF      MASSACHUSETTS**

In re: Wolverine Proctor & Schwartz, LLC,          Case No. _____
<br>             Debtor                                              (if known)

## STATEMENT OF FINANCIAL AFFAIRS

This statement is to be completed by every debtor. Spouses filing a joint petition may file a single statement on which the information for both spouses is combined. If the case is filed under chapter 12 or chapter 13, a married debtor must furnish information for both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed. An individual debtor engaged in business as a sole proprietor, partner, family farmer, or self-employed professional, should provide the information requested on this statement concerning all such activities as well as the individual's personal affairs. Do not include the name or address of a minor child in this statement. Indicate payments, transfers and the like to minor children by stating "a minor child." See 11 U.S.C. § 112; Fed. R. Bankr. P. 1007(m).

Questions 1 - 18 are to be completed by all debtors. Debtors that are or have been in business, as defined below, also must complete Questions 19 - 25. **If the answer to an applicable question is "None," mark the box labeled "None."** If additional space is needed for the answer to any question, use and attach a separate sheet properly identified with the case name, case number (if known), and the number of the question.

### DEFINITIONS

*"In business. "* A debtor is "in business" for the purpose of this form if the debtor is a corporation or partnership. An individual debtor is "in business" for the purpose of this form if the debtor is or has been, within six years immediately preceding the filing of this bankruptcy case, any of the following: an officer, director, managing executive, or owner of 5 percent or more of the voting or equity securities of a corporation; a partner, other than a limited partner, of a partnership; a sole proprietor or self-employed full-time or part-time. An individual debtor also may be "in business" for the purpose of this form if the debtor engages in a trade, business, or other activity, other than as an employee, to supplement income from the debtor's primary employment.

*"Insider."* The term "insider" includes but is not limited to: relatives of the debtor; general partners of the debtor and their relatives; corporations of which the debtor is an officer, director, or person in control; officers, directors, and any owner of 5 percent or more of the voting or equity securities of a corporate debtor and their relatives; affiliates of the debtor and insiders of such affiliates; any managing agent of the debtor. 11 U.S.C. § 101.

---

**1.  Income from employment or operation of business**

None ☐        State the gross amount of income the debtor has received from employment, trade, or profession, or from operation of the debtor's business, including part-time activities either as an employee or in independent trade or business, from the beginning of this calendar year to the date this case was commenced. State also the gross amounts received during the two years immediately preceding this calendar year. (A debtor that maintains, or has maintained, financial records on the basis of a fiscal rather than a calendar year may report fiscal year income. Identify the beginning and ending dates of the debtor's fiscal year.) If a joint petition is filed, state income for each spouse separately. (Married debtors filing under chapter 12 or chapter 13 must state income of both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| AMOUNT | SOURCE |
|---|---|
| 1,402,100.00 | Sales 2006 |
| 26,611,000.00 | Sales 2005 |

American LegalNet, Inc.
www.USCourtForms.com

2

**2.  Income other than from employment or operation of business**

None
☐

State the amount of income received by the debtor other than from employment, trade, profession, operation of the debtor's business during the two years immediately preceding the commencement of this case. Give particulars. If a joint petition is filed, state income for each spouse separately. (Married debtors filing under chapter 12 or chapter 13 must state income for each spouse whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

AMOUNT                                                    SOURCE

0.00

**3.  Payments to creditors**

*Complete a. or b., as appropriate, and c.*

None
☒

a. *Individual or joint debtors) with primarily consumer debts:* List all payments on loans, installment purchases of goods or services, and other debts to any creditor made within 90 days immediately preceding the commencement of this case if the aggregate value of all property that constitutes or is affected by such transfer is not less than $600. Indicate with an asterisk (*) any payments that were made to a creditor on account of a domestic support obligation or as part of an alternative repayment schedule under a plan by an approved nonprofit budgeting and creditor counseling agency. (Married debtors filing under chapter 12 or chapter 13 must include payments by either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| NAME AND ADDRESS OF CREDITOR | DATES OF PAYMENTS | AMOUNT PAID | AMOUNT STILL OWING |
|---|---|---|---|

None
☐

b. *Debtor whose debts are not primarily consumer debts:* List each payment or other transfer to any creditor made within 90 days immediately preceding the commencement of the case if the aggregate value of all property that constitutes or is affected by such transfer is not less than $5,000. (Married debtors filing under chapter 12 or chapter 13 must include payments and other transfers by either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| NAME AND ADDRESS OF CREDITOR | DATES OF PAYMENTS/ TRANSFERS | AMOUNT PAID OR VALUE OF TRANSFERS | AMOUNT STILL OWING |
|---|---|---|---|

See attached listing

None
☐

c. *All debtors:* List all payments made within **one year** immediately preceding the commencement of this case to or for the benefit of creditors who are or were insiders. (Married debtors filing under chapter 12 or chapter 13 must include payments by either or both spouses whether or not a joint petition is filed, unless the spouses are separated and
a joint petition is not filed.)

| NAME AND ADDRESS OF CREDITOR AND RELATIONSHIP TO DEBTOR | DATES OF PAYMENTS | AMOUNT PAID | AMOUNT STILL OWING |
|---|---|---|---|

See attached listing

American LegalNet, Inc.
www.USCourtForms.com

3

**4. Suits and administrative proceedings, executions, garnishments and attachments**

None
☐

a. List all suits and administrative proceedings to which the debtor is or was a party within **one year** immediately preceding the filing of this bankruptcy case. (Married debtors filing under chapter 12 or chapter 13 must include information concerning either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| CAPTION OF SUIT AND CASE NUMBER | NATURE OF PROCEEDING | COURT OR AGENCY AND LOCATION | STATUS OR DISPOSITION |
|---|---|---|---|

See attached listing

None
☒

b. Describe all property that has been attached, garnished or seized under any legal or equitable process within **one year** immediately preceding the commencement of this case. (Married debtors filing under chapter 12 or chapter 13 must include information concerning property of either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| NAME AND ADDRESS OF PERSON FOR WHOSE BENEFIT PROPERTY WAS SEIZED | DATE OF SEIZURE | DESCRIPTION AND VALUE OF PROPERTY |
|---|---|---|

**5.  Repossessions, foreclosures and returns**

None
☒

List all property that has been repossessed by a creditor, sold at a foreclosure sale, transferred through a deed in lieu of foreclosure or returned to the seller, within one year immediately preceding the commencement of this case. (Married debtors filing under chapter 12 or chapter 13 must include information concerning property of either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| NAME AND ADDRESS OF CREDITOR OR SELLER | DATE OF REPOSSESSION, FORECLOSURE SALE, TRANSFER OR RETURN | DESCRIPTION AND VALUE OF PROPERTY |
|---|---|---|

**6.  Assignments and receiverships**

None
☒

a. Describe any assignment of property for the benefit of creditors made within **120 days** immediately preceding the commencement of this case. (Married debtors filing under chapter 12 or chapter 13 must include any assignment by either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| NAME AND ADDRESS OF ASSIGNEE | DATE OF ASSIGNMENT | TERMS OF ASSIGNMENT OR SETTLEMENT |
|---|---|---|

American LegalNet, Inc.
www.USCourtForms.com

4

None ☒ b. List all property which has been in the hands of a custodian, receiver, or court-appointed official within **one year** immediately preceding the commencement of this case. (Married debtors filing under chapter 12 or chapter 13 must include information concerning property of either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| NAME AND ADDRESS OF CUSTODIAN | NAME AND LOCATION OF COURT CASE TITLE & NUMBER | DATE OF ORDER | DESCRIPTION AND VALUE Of PROPERTY |
|---|---|---|---|

## 7. Gifts

None ☒ List all gifts or charitable contributions made within **one year** immediately preceding the commencement of this case except ordinary and usual gifts to family members aggregating less than $200 in value per individual family member and charitable contributions aggregating less than $100 per recipient. (Married debtors filing under chapter 12 or chapter 13 must include gifts or contributions by either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| NAME AND ADDRESS OF PERSON OR ORGANIZATION | RELATIONSHIP TO DEBTOR, IF ANY | DATE OF GIFT | DESCRIPTION AND VALUE OF GIFT |
|---|---|---|---|

## 8. Losses

None ☒ List all losses from fire, theft, other casualty or gambling within **one year** immediately preceding the commencement **of this case or since the commencement of this case.** (Married debtors filing under chapter 12 or chapter 13 must include losses by either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| DESCRIPTION AND VALUE OF PROPERTY | DESCRIPTION OF CIRCUMSTANCES AND, IF LOSS WAS COVERED IN WHOLE OR IN PART BY INSURANCE, GIVE PARTICULARS | DATE OF LOSS |
|---|---|---|

## 9. Payments related to debt counseling or bankruptcy

None  List all payments made or property transferred by or on behalf of the debtor to any persons, including attorneys, for consultation concerning debt consolidation, relief under the bankruptcy law or preparation of a petition in bankruptcy within one year immediately preceding the commencement of this case.

| NAME AND ADDRESS OF PAYEE | DATE OF PAYMENT, NAME OF PAYER IF OTHER THAN DEBTOR | AMOUNT OF MONEY OR DESCRIPTION AND VALUE OF PROPERTY |
|---|---|---|
| | 3/13/06 | 10,000 |
| Greenberg Traurig, LLP | 3/21/06 | 15,000 |
| 1007 North Orange Street, Ste. 1200 | 3/28/06 | 5,000 |
| Wilmington, DE 19801 | 3/30/06 | 5,000 |
| Phoenix Capital Resources | | |
| 110 Chadds Ford Commons | 3/8/06 | 5,000 |
| Chadds Ford, PA 19317 | 3/14/06 | 25,000 |

American LegalNet, Inc.
www.USCourtForms.com

5

**10.    Other transfers**

None    a.    List all other property, other than property transferred in the ordinary course of the business or financial affairs
☐           of
          the debtor, transferred either absolutely or as security within **two years** immediately preceding the
          commencement of this case. (Married debtors filing under chapter 12 or chapter 13 must include transfers by
          either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition
          is not filed.)

| NAME AND ADDRESS OF TRANSFEREE, RELATIONSHIP TO DEBTOR | DATE | DESCRIBE PROPERTY TRANSFERRED AND VALUE RECEIVED |
|---|---|---|
| Wolverine, Proctor & Schwartz, Ltd. 3 Langlands Avenue Kelvin South Business Park East Kilbride Glasgow, United Kingdom G75 0YG | 1/1/06 | Trademarks and tradenames Value received was ownership of proprietary software, copyrights, know-how and registered patents and cross-licensing |

None
☒    b. List all property transferred by the debtor within ten years immediately preceding the commencement of this
        case to a self-settled trust or similar device of which the debtor is a beneficiary.

| NAME OF TRUST OR OTHER DEVICE | DATE(S) OF TRANSFER(S) | AMOUNT OF MONEY OR DESCRIPTION AND VALUE OF PROPERTY OR DEBTOR'S INTEREST IN PROPERTY |
|---|---|---|

**11. Closed financial accounts**

None    List all financial accounts and instruments held in the name of the debtor or for the benefit of the debtor which were
☒      closed, sold, or otherwise transferred within **one year** immediately preceding the commencement of this case.
        Include checking, savings, or other financial accounts, certificates of deposit, or other instruments; shares and share
        accounts held in banks, credit unions, pension funds, cooperatives, associations, brokerage houses and other
        financial institutions. (Married debtors filing under chapter 12 or chapter 13 must include information concerning
        accounts or instruments held by or for either or both spouses whether or not a joint petition is filed, unless the
        spouses are separated and a joint petition is not filed.)

| NAME AND ADDRESS OF INSTITUTION | TYPE OF ACCOUNT, LAST FOUR DIGITS OF ACCOUNT NUMBER, AND AMOUNT OF FINAL BALANCE | AMOUNT AND DATE OF SALE OR CLOSING |
|---|---|---|

**12. Safe deposit boxes**

None    List each safe deposit or other box or depository in which the debtor has or had securities, cash, or other valuables
☒      within **one year** immediately preceding the commencement of this case. (Married debtors filing under chapter 12 or
        chapter 13 must include boxes or depositories of either or both spouses whether or not a joint petition is filed, unless
        the spouses are separated and a joint petition is not filed.)

| NAME AND ADDRESS OF BANK OR OTHER DEPOSITORY | NAMES AND ADDRESSES OF THOSE WITH ACCESS TO BOX OR DEPOSITORY | DESCRIPTION OF CONTENTS | DATE OF TRANSFER OR SURRENDER, IF ANY |
|---|---|---|---|

American LegalNet, Inc.
www.USCourtForms.com

6

13.    **Setoffs**

None

☒     List all setoffs made by any creditor, including a bank, against a debt or deposit of the debtor within **90 days** preceding
the commencement of this case. (Married debtors filing under chapter 12 or chapter 13 must include information concerning either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

|  | DATE OF | AMOUNT |
| NAME AND ADDRESS OF CREDITOR | SETOFF | OF SETOFF |

---

14.   **Property held for another person**

None
☒     List all property owned by another person that the debtor holds or controls.

| NAME AND ADDRESS | DESCRIPTION AND |  |
| OF OWNER | VALUE OF PROPERTY | LOCATION OF PROPERTY |

---

15.   **Prior address of debtor**

None

☒     If debtor has moved within **three years** immediately preceding the commencement of this case, list all premises which the debtor occupied during that period and vacated prior to the commencement of this case. If a joint petition is filed, report also any separate address of either spouse.

| ADDRESS | NAME USED | DATES OF OCCUPANCY |

---

**16. Spouses and Former Spouses**

None
☒     If the debtor resides or resided in a community property state, commonwealth, or territory (including Alaska, Arizona, California, Idaho, Louisiana, Nevada, New Mexico, Puerto Rico, Texas, Washington, or Wisconsin) within **eight years** immediately preceding the commencement of the case, identify the name of the debtor's spouse and of any former spouse who resides or resided with the debtor in the community property state.

NAME

American LegalNet, Inc.
www.USCourtForms.com

7

**17. Environmental Information.**

For the purpose of this question, the following definitions apply:

"Environmental Law" means any federal, state, or local statute or regulation regulating pollution, contamination, releases of hazardous or toxic substances, wastes or material into the air, land, soil, surface water, groundwater, or other medium, including, but not limited to, statutes or regulations regulating the cleanup of these substances, wastes, or material.

"Site" means any location, facility, or property as defined under any Environmental Law, whether or not presently or formerly owned or operated by the debtor, including, but not limited to, disposal sites.

"Hazardous Material" means anything defined as a hazardous waste, hazardous substance, toxic substance, hazardous material, pollutant, or contaminant or similar term under an Environmental Law.

None
☒

a. List the name and address of every site for which the debtor has received notice in writing by a governmental unit that it may be liable or potentially liable under or in violation of an Environmental Law. Indicate the governmental unit, the date of the notice, and, if known, the Environmental Law:

| SITE NAME AND ADDRESS | NAME AND ADDRESS OF GOVERNMENTAL UNIT | DATE OF NOTICE | ENVIRONMENTAL LAW |
|---|---|---|---|

None
☒

b. List the name and address of every site for which the debtor provided notice to a governmental unit of a release of Hazardous Material. Indicate the governmental unit to which the notice was sent and the date of the notice.

| SITE NAME AND ADDRESS | NAME AND ADDRESS OF GOVERNMENTAL UNIT | DATE OF NOTICE | ENVIRONMENTAL LAW |
|---|---|---|---|

None
☒

c. List all judicial or administrative proceedings, including settlements or orders, under any Environmental Law with respect to which the debtor is or was a party. Indicate the name and address of the governmental unit that is or was a par to the proceeding, and the docket number.

| NAME AND ADDRESS OF GOVERNMENTAL UNIT | DOCKET NUMBER | STATUS OR DISPOSITION |
|---|---|---|

**18. Nature, location and name of business**

None
☒

a. *If the debtor is an individual*, list the names, addresses, taxpayer identification numbers, nature of the businesses, and beginning and ending dates of all businesses in which the debtor was an officer, director, partner, or managing executive of a corporation, partner in a partnership, sole proprietor, or was self-employed in a trade, profession, or other activity either full- or part-time within six years immediately preceding the commencement of this case, or in which the debtor owned 5 percent or more of the voting or equity securities within six years immediately preceding the commencement of this case.

*If the debtor is a partnership*, list the names, addresses, taxpayer identification numbers, nature of the businesses, and beginning and ending dates of all businesses in which the debtor was a partner or owned 5 percent or more of the voting or equity securities, within six years immediately preceding the commencement of this case.

*If the debtor is a corporation*, list the names, addresses, taxpayer identification numbers, nature of the businesses, and beginning and ending dates of all businesses in which the debtor was a partner or owned 5 percent or more of the voting or equity securities within six years immediately preceding the commencement of this case.

American LegalNet, Inc.
www.USCourtForms.com

8

| NAME | LAST FOUR DIGITS OF SOC. SEC. NO./ COMPLETE BIN OR OTHER TAXPAYER I.D. NO. | ADDRESS | NATURE OF BUSINESS | BEGINNING AND ENDING DATES |
|------|------|------|------|------|

None
☒    b. Identify any business listed in response to subdivision a., above, that is "single asset real estate" as defined in 11 U.S.C. § 101.

     NAME                           ADDRESS

The following questions are to be completed by every debtor that is a corporation or partnership and by any individual debtor who is or has been, within six years immediately preceding the commencement of this case, any of the following: an officer, director, managing executive, or owner of more than 5 percent of the voting or equity securities of a corporation; a partner, other than a limited partner, of a partnership, a sole proprietor, or self-employed in a trade, profession, or other activity, either full- or part-time.

*(An individual or joint debtor should complete this portion of the statement only if the debtor is or has been in business, as defined above, within six years immediately preceding the commencement of this case. A debtor who has not been in business within those six years should go directly to the signature page.)*

### 19. Books, records and financial statements

None
☐    a. List all bookkeepers and accountants who within two years immediately preceding the filing of this bankruptcy case kept or supervised the keeping of books of account and records of the debtor.

| NAME AND ADDRESS | DATES SERVICES RENDERED |
|------|------|
| William M. Crotty, 51 E. Main St., Merrimac, MA 01860 | 2 years |
| Marian Lord, 51 E. Main St. Merrimac, MA 01860 | 2 Years |

None
☐    b. List all firms or individuals who within two years immediately preceding the filing of this bankruptcy case have audited the books of account and records, or prepared a financial statement of the debtor.

| NAME | ADDRESS | DATES SERVICES RENDERED |
|------|------|------|
| Vitale Caturano | 80 City Sq., Boston, MA 02129 | 2 Years |

None
☐    c. List all firms or individuals who at the time of the commencement of this case were in possession of the books of account and records of the debtor. If any of the books of account and records are not available, explain.

| NAME | ADDRESS |
|------|------|
| William Crotty | 51 E. Main St., Merrimac, MA 01860 |
| Marian Lord | 51 E. Main St., Merrimac, MA 01860 |

American LegalNet, Inc.
www.USCourtForms.com

9

American LegalNet, Inc.
www.USCourtForms.com

None ☐    d. List all financial institutions, creditors and other parties, including mercantile and trade agencies, to whom a financial statement was issued by the debtor within two years immediately preceding the commencement of this case.

| NAME AND ADDRESS | DATE ISSUED |
|---|---|
| Capital Source Finance LLC, 4445 Willard Ave., Chevy Chase, MD 20815 | Monthly |

#### 20. Inventories

None ☐    a. List the dates of the last two inventories taken of your property, the name of the person who supervised the taking of each inventory, and the dollar amount and basis of each inventory.

| DATE OF INVENTORY | INVENTORY SUPERVISOR | DOLLAR AMOUNT OF INVENTORY (Specify cost, market or other basis) |
|---|---|---|
| 12/31/05 | William M. Crotty | 1,577,329 |

None ☐    b. List the name and address of the person having possession of the records of each of the inventories reported in a., above.

| DATE OF INVENTORY | NAME AND ADDRESSES OF CUSTODIAN OF INVENTORY RECORDS |
|---|---|
| 12/31/05 | John R. Hines, 121 Proctor Ln., Lexington, NC |
| 12/31/05 | William M. Crotty, 51 E. Main St., Merrimac, MA 01860 |

#### 21. Current Partners, Officers, Directors and Shareholders

None ☒    a. If the debtor is a partnership, list the nature and percentage of partnership interest of each member of the partnership.

| NAME AND ADDRESS | NATURE OF INTEREST | PERCENTAGE OF INTEREST |
|---|---|---|

None ☐    b. If the debtor is a corporation, list all officers and directors of the corporation, and each stockholder who directly or indirectly owns, controls, or holds 5 percent or more of the voting or equity securities of the corporation.

| NAME AND ADDRESS | TITLE | NATURE AND PERCENTAGE OF STOCK OWNERSHIP |
|---|---|---|
| Deepak Kulkarni, 51 E. Main St., Merrimac, MA 01860 | Managing Member, Shareholder | 100% common |
| Mark Brown, 51 E. Main St., Merrimac, MA 01860 | President | 0 |
| Parthenon Investors II, LP 200 State Street, Boston, MA 02109 | Preferred Shareholder | 100% preferred |
| PCIP Investors 200 State Street, Boston, MA 02109 | Preferred Shareholder | 100% preferred |
| J&R Founders Fund, LP 200 State Street, Boston, MA 02109 | Preferred Shareholder | 100% preferred |
| Tencara, LLC 6A Robert Avenue Portsmouth, NH 03801 | Warrant Holder | Warrants for 10% |

10

**22. Former partners, officers, directors and shareholders**

None
☒

a. If the debtor is a partnership, list each member who withdrew from the partnership within **one year** immediately preceding the commencement of this case.

NAME                    ADDRESS              DATE OF WITHDRAWAL

None
☒

b. If the debtor is a corporation, list all officers, or directors whose relationship with the corporation terminated within **one year** immediately preceding the commencement of this case.

NAME AND ADDRESS          TITLE          DATE OF TERMINATION

**23. Withdrawals from a partnership or distributions by a corporation**

None
☒

If the debtor is a partnership or corporation, list all withdrawals or distributions credited or given to an insider, including compensation in any form, bonuses, loans, stock redemptions, options exercised and any other perquisite during **one year** immediately preceding the commencement of this case.

NAME & ADDRESS                              AMOUNT OF MONEY
OF RECIPIENT,          DATE AND PURPOSE     OR DESCRIPTION
RELATIONSHIP TO DEBTOR OF WITHDRAWAL        AND VALUE OF PROPERTY

**24. Tax Consolidation Group.**

None
☒

If the debtor is a corporation, list the name and federal taxpayer identification number of the parent corporation of any consolidated group for tax purposes of which the debtor has been a member at any time within **six years** immediately preceding the commencement of the case.

NAME OF PARENT CORPORATION      TAXPAYER IDENTIFICATION NUMBER (BIN)

**25. Pension Funds.**

None
☐

If the debtor is not an individual, list the name and federal taxpayer identification number of any pension fund to which the debtor, as an employer, has been responsible for contributing at any time within **six years** immediately preceding the commencement of the case.

NAME OF PENSION FUND                    TAXPAYER IDENTIFICATION NUMBER (BIN)
Proctor & Schwartz Salaried Employees' Retirement
Plan                                    14-1918705  Plan 004

American LegalNet, Inc.
www.USCourtForms.com

11

*[If completed by an individual or individual and spouse]*

I declare under penalty of perjury that I have read the answers contained in the foregoing statement of financial affairs and any attachments thereto and that they are true and correct.

Date _____    Signature _____
                                   of Debtor

Date _____    Signature _____
                                   of Joint Debtor
                                   (if any)

---

*[If completed on behalf of a partnership or corporation]*

I declare under penalty of perjury that I have read the answers contained in the foregoing statement of financial affairs and any attachments thereto and that they are true and correct to the best of my knowledge, information and belief

Date _____    Signature _____

                                        Mark Brown, President
                                        Print Name and Title

[An individual signing on behalf of a partnership or corporation must indicate position or relationship to debtor.]

**82** continuation sheets attached

*Penalty for making a false statement. Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571*

---

**DECLARATION AND SIGNATURE OF NON-ATTORNEY BANKRUPTCY PETITION PREPARER (See 11 U.S.C. § 110)**

I declare under penalty of perjury that: (1) I am a bankruptcy petition preparer as defined in 11 U.S.C. § 110; (2) I prepared this document for compensation and have provided the debtor with a copy of this document and the notices and information required under 11 U.S.C. §§ 110(b), 110(h), and 342(b), and, (3) if rules or guidelines have been promulgated pursuant to 11 U.S.C. § 110(h) setting a maximum fee for services chargeable by bankruptcy petition preparers, I have given the debtor notice of the maximum amount before preparing any document for filing for a debtor or accepting any fee from the debtor, as required by that section.

_____    _____
Printed or Typed Name and Title, if any, of Bankruptcy Petition Preparer    Social Security No. (Required by 11 U.S.C. § 110.)

*If the bankruptcy petition preparer is not an individual, state the name, title (if any), address, and social security number of the officer, principal, responsible person, or partner who signs this document*

_____
Address

X _____    _____
Signature of Bankruptcy Petition Preparer                                    Date

Names and Social Security numbers of all other individuals who prepared or assisted in preparing this document if the bankruptcy petition preparer is not an individual.

If more than one person prepared this document, attach additional signed sheets conforming to the appropriate Official Form for each person.

*A bankruptcy petition preparer's failure to comply with the provisions of title 11 and the Federal Rules of Bankruptcy Procedure may result in fines or imprisonment or both. 18 U.S.C. § 156.*

American LegalNet, Inc.
www.USCourtForms.com

# EXHIBIT I

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

WOLVERINE PROCTOR & SCHWARTZ, LLC,

As successor in interest to all of the operating assets, rights, properties, and substantially all of the liabilities and obligations of

WOLVERINE, PROCTOR & SCHWARTZ, INC.,

Plaintiff

v.

AEROGLIDE CORPORATION,

Defendant.

Case No. 03 11372 NG

## STIPULATION OF DISMISSAL WITH PREJUDICE

Pursuant to Rule 41(a)(1)(ii) of the Federal Rules of Civil Procedure, Plaintiff Wolverine Proctor & Schwartz, LLC as successor in interest to all of the operating assets, rights, properties, and substantially all of the liabilities and obligations of Wolverine Proctor & Schwartz, Inc. and Defendant Aeroglide Corporation stipulate that this action and all claims asserted herein shall be and hereby are dismissed with prejudice, each party to bear its own attorneys' fees and costs.

WOLVERINE PROCTOR & SCHWARTZ, LLC,
As successor in interest to all of the operating assets, rights, properties, and substantially all of the liabilities and obligations of
WOLVERINE PROCTOR & SCHWARTZ, INC.

By its attorneys,

Thomas I. Elkind (BBO #153080)
Claire Bishop (BBO #660363)
FOLEY & LARDNER LLP
111 Huntington Ave.
Boston, MA 02199
(617) 342-4000

AEROGLIDE CORPORATION

By its attorneys,

John T. Williamson (N.C. State Bar No. 5895)
James E. Gates (N.C. State Bar No. 13189)
Michael C. Lord (N. C. State Bar No. 15966)
MAUPIN TAYLOR, P.A.
3200 Beechleaf Court, Suite 500
P. O. Drawer 19764
Raleigh, North Carolina  27619
(919) 981-4000
(Admitted in Accordance with LR D.Mass
83.5.3(b))

Sarah B. Herlihy, BBO #640531
MINTZ, LEVIN, COHN, FERRIS, GLOVSKY
AND POPEO, P.C.
One Financial Center
Boston, Massachusetts  02111
(617) 542-6000

Dated: January ___, 2006

2

# EXHIBIT J

Form B6G
(10/05)

In re Wolverine Proctor & Schwartz, LLC          Case No. _____
          **Debtor**                                              (if known)

## SCHEDULE G - EXECUTORY CONTRACTS AND UNEXPIRED LEASES

Describe all executory contracts of any nature and all unexpired leases of real or personal property. Include any timeshare interests. State nature of debtor's interest in contract, i.e., "Purchaser," "Agent," etc. State whether debtor is the lessor or lessee of a lease. Provide the names and complete mailing addresses of all other parties to each lease or contract described. If a minor child is a party to one of the leases or contracts, indicate that by stating "a minor child" and do not disclose the child's name. See 11 U.S.C. § 112; Fed.R. Bankr. P. 1007 (m).'

☐ Check this box if debtor has no executory contracts or unexpired leases.

| NAME AND MAILING ADDRESS, INCLUDING ZIP CODE, OF OTHER PARTIES TO LEASE OR CONTRACT | DESCRIPTION OF CONTRACT OR LEASE AND NATURE OF DEBTOR'S INTEREST. STATE WHETHER LEASE IS FOR NONRESIDENTIAL REAL PROPERTY. STATE CONTRACT NUMBER OF ANY GOVERNMENT CONTRACT. |
|---|---|
| Liberty Property Limited Partnership<br>P.O. Box 828438<br>Philadelphia, PA 19182-8438 | Lease of Horsham, PA facility |
| AIC Ventures<br>8080 N. Central Expressway<br>Suite 1080<br>Dallas, TX 75206 | Lease of Merrimac, MA and Lexington, NC facilities |
| GE Capital<br>P.O. Box 642333<br>Pittsburgh, PA 15264-2333<br>Acct Schedule #4347321-001 | Lease - Canon copier system<br>Location:<br>251 Gilbratar Road<br>Horsham, PA 19044 |
| Ascom Hasler/GE Capital Prog.<br>P.O. Box 802585<br>Chicago, IL 60680-2585<br>Acct #4133862-001 | Ascom mailing machine<br>Location: Merrimac, MA |
| Purchase Power (Pitney Bowes)<br>P.O. Box 856390<br>Louisville, KY 40285-6390<br>Acct #909-4922-86-1 | Postage meter<br>Location: Horsham, PA |
| Systel Business Equipment<br>Ref. No. 000000000190017<br>P.O. Box 41601<br>Philadelphia, PA 19101-1601 | Ricoh 450<br>Location: Lexington, NC |
| Arakawa Co., Ltd.<br>7-5, 8 Ban-cho, Atsuta-Ku<br>Nagoya, Japan | License Agreement |
| Wolverine, Proctor & Schwartz, Ltd.<br>3 Langlands Avenue<br>Kelvin South Business Park<br>East Kilbride<br>Glasgow, United Kingdom G75 0YG | Technology Transfer and License-Bank Agreement |

American LegalNet, Inc.
www.USCourtForms.com