UNITED STATES DISTRICT COURT
District of Massachusetts

FILED
IN CLERKS OFFICE

2006 MAY -8  P 1: 58

U.S. DISTRICT COURT

Civil Action
No. 05-10078-DPW

_____
                                                    )
PETER A. CRAWFORD, Plaintiff        )
                                                    )       DOCKETED
        v.                                          )
                                                    )
WOLVERINE, PROCTOR & SCHWARTZ, INC.,   )
Steven F. Chilinski, Deepak S. Kulkarni,        )
                                                    )
        Defendants                             )
_____)

## PLAINTIFF'S SECOND MOTION FOR LEAVE TO AMEND HIS COMPLAINT

### REQUEST FOR ORAL ARGUMENT

### MOTION

Now comes the plaintiff in the above captioned action, and moves, pursuant to

Fed. R. Civ. P. 15(a) that this Honorable Court grant him leave to amend his Complaint.

A copy of the proposed Second Amended Complaint is attached hereto, and plaintiff

submits herewith Plaintiff's Memorandum in Support of his Second Motion for Leave to

Amend his Complaint.

### CERTIFICATE OF CONFERRAL

Plaintiff hereby certifies that he has complied with the provisions of Local Rule

7.1(a)(2) and defendants have refused to assent to this amendment.

Respectfully submitted,

_Peter A. Crawford_

1

Peter A. Crawford, pro se
23 Newcastle Dr. #11
Nashua, NH 03060
(603)888-4574

Date: 5 May 2006

UNITED STATES DISTRICT COURT
District of Massachusetts

FILED
IN CLERKS OFFICE
2006 MAY -8  P  1: 56

U.S. DISTRICT COURT
DISTRICT OF MASS.

Civil Action
No. 05-10078-DPW

PETER A. CRAWFORD, Plaintiff )

v. )

WOLVERINE, PROCTOR & SCHWARTZ, INC., )
Steven F. Chilinski, Deepak S. Kulkarni, )

Defendants )

SECOND
AMENDED
COMPLAINT
(Jury Trial
Demanded)

## INTRODUCTION

This is a diversity action for, inter alia, breach of a written contract to pay nearly

$600,000 in bonus wages due to the plaintiff as a result of his service as Chief Operating

Officer of Wolverine, Proctor & Schwartz, Inc., a corporation headquartered in

Merrimac, Massachusetts. The plaintiff successfully turned around that company.

## JURISDICTION

1.      Plaintiff Peter A. Crawford is a citizen of the State of New Hampshire.

2.      Defendant Wolverine, Proctor & Schwartz, Inc. ("WPS, Inc.") is

incorporated in the State of Delaware and has its principal place of business at Merrimac,

Massachusetts.

3.      Defendant Deepak S. Kulkarni is the former Chairman and Chief

Executive Officer of WPS, Inc., resides in Boston, Massachusetts and is a citizen of the

Commonwealth of Massachusetts.

1

4.      Defendant Steven F. Chilinski was the President and Chief Executive

Officer of WPS, Inc. from sometime between January 15, 2002 and January 31, 2002

through late January, 2005, after the original Complaint in this action was filed. He

performed his duties relating to that position at the WPS, Inc. headquarters in Merrimac,

Massachusetts. He is domiciled in Massachusetts.

5.      This complaint seeks in excess of $1,792,710 in damages, which amount

is in controversy.

6.      Plaintiff invokes this Court's jurisdiction pursuant to its diversity

jurisdiction under 28 U.S.C. §1332(a)(1) and its supplemental jurisdiction under 28

U.S.C. §1367(a).

### ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

7.      The allegations of paragraphs 1-6 above are incorporated herein by

reference.

8.      WPS, Inc. is primarily engaged in the business of producing large

machines for the heating, cooking or drying of food and other products in continuous

processes. During 2000 and 2001, it had major operations in Massachusetts, North

Carolina, and the U.K. Portions of the company had been in existence since the mid-

1800s.

9.      Mr. Crawford became employed by WPS, Inc. as its Chief Operating

Officer ("COO") on December 30, 1999. A written contract (the "Employment Contract"

or "Employment Agreement") governing the terms of his employment was executed by

him and Deepak Kulkarni, on behalf of WPS, Inc., on January 4, 2000 within the

Commonwealth of Massachusetts. Said Employment Contract provided for wages,

2

including a base salary of $150,000 annually, a bonus (the "Bonus"), and stock options in WPS, Inc.

10.    At the time that Mr. Crawford joined WPS, Inc., Deepak Kulkarni was Chairman and Chief Executive Officer of WPS, Inc. and had been so since prior to 1994. During Mr. Kulkarni's tenure, WPS, Inc.'s fortunes had declined, culminating in an EBITDA before extraordinary loss (earnings before interest, taxes, depreciation, amortization and extraordinary loss) loss of $4.700 million during calendar 1999. After Mr. Crawford joined and assumed day-to-day operating responsibility for the WPS, Inc. operations, WPS, Inc.'s profits improved dramatically. WPS, Inc.'s EBITDA for the 12 months commencing ending September 30, 2001 was $4.028 million on revenues of $39.615 million.

11.    Nevertheless, WPS, Inc. continued to be severely cash constrained during 2000 and 2001 due to heavy bank debt and the continued withdrawal by Mr. Kulkarni of approximately $2 million annually from WPS, Inc. to finance a lavish lifestyle and the renovation of a multi-million dollar townhouse in Boston's exclusive Back Bay neighborhood. Distrustful of Mr. Kulkarni, becoming increasingly aware of the magnitude of Mr. Kulkarni's cash withdrawals, and growing weary of his frequent harangues and bombastic negotiating style, the company's lender forced the sale of WPS, Inc. in late 2001.

12.    But for the leadership exercised by Mr. Crawford, WPS, Inc. would not have survived in its current form, and its shares would have become worthless.

13.    At the time the Employment Contract was entered into, Mr. Crawford knew that WPS, Inc. was cash-constrained, but agreed to accept the position anticipating

3

that his primary financial reward would come from the Bonus and stock options once the turnaround was complete. However, he never received any Bonus, and his stock options have been converted into an unmarketable equity interest in WPS, Inc.'s current parent company, although Mr. Crawford received a $150,000 "equity advance."

14.     Under the terms of the Employment Contract, Mr. Crawford was to receive an annual Bonus equal to 5 percent of WPS Inc.'s adjusted profits for any calendar year in which he was an employee. The adjusted profit for purposes of the bonus calculation is equal to EBITDA less capital expenditures, interest, and taxes.

15.     From prior to 1994 through late December, 2001, Mr. Kulkarni was the sole shareholder of WPS, Inc. His duties while Mr. Crawford was COO were largely limited to general oversight of WPS, Inc. and its subsidiaries and affiliates, while Mr. Crawford managed and operated WPS, Inc.

16.     In late 2001, an agreement was reached with a Boston-based investment firm, Parthenon Capital, and related entities, including Parthenon Investors II, L.P., PCIP Investors and J&R Founders' Fund, L.P. (collectively "Parthenon"). Mr. Kulkarni was previously acquainted with certain principals of that firm. Under the agreement, Mr. Kulkarni's shares in WPS, Inc. and a related entity were transferred to a new entity, Wolverine Proctor LLC ("WP LLC"), and Parthenon lent funds to WPS, Inc. sufficient to retire all of its bank debt. That loan was effectively converted to equity as part of the transaction. This transaction was closed between December 28, 2001 and December 31, 2001. Following the transaction, Parthenon controlled a majority of the Board of Directors of WP LLC, which in turn owned substantially all of the shares of WPS, Inc. through an intermediate entity Wolverine Proctor, Inc.

4

17.     In connection with this transaction, Mr. Kulkarni ceased to be CEO of WPS, Inc. but became a consultant to WPS, Inc. and continued as a member of the WP LLC Board of Directors. The successful turnaround and sale being completed, Mr. Crawford expressed little interest in remaining with WPS, Inc., other than as CEO, but agreed to remain for a transition period. Parthenon made the securing of the services of Mr. Crawford after the sale a condition of closing the transaction.

18.     In connection with this transaction, Mr. Crawford on December 28, 2001 executed a Transition Agreement that specifically preserved his rights to the Bonus, and continued his base salary at the prior rate. The Transition Agreement was executed within the Commonwealth of Massachusetts.

19.     The WPS, Inc. consolidated financial statements for 2001, audited by Arthur Anderson LLP, set forth EBITDA for 2001 of $9,683,723. Subtracting capital expenditures, interest, and taxes set forth in these financial statements of $2,526,598 leaves $7,157,125 as a base for the bonus calculation, of which Mr. Crawford is entitled to five percent, or $357,856.25, under the written Employment Contract.

20.     Under the terms of the Transition Agreement, Mr. Crawford committed to not knowingly taking any action contrary to the best interests of WPS, Inc.

21.     During early 2002, prior to January 14, Mr. Crawford met with Erik Scott, an employee of Parthenon and one of its representatives on the Board of Directors of WP LLC. Mr. Scott informed Mr. Crawford that he had been doing a fantastic job holding WPS, Inc. together and suggested that Mr. Crawford should remain with WPS, Inc. until Mr. Crawford and Parthenon were both comfortable that the transition was complete. The two also discussed the large sums that Mr. Kulkarni had extracted from WPS, Inc.

prior to its sale, and Mr. Scott assured Mr. Crawford that he could call Mr. Scott directly at any time, particularly regarding any issue of payments to Mr. Kulkarni.

22.    During the afternoon of January 14, 2002, Mr. Kulkarni summoned Mr. Crawford to a meeting to discuss the payment of $135,000 to Mr. Kulkarni, which he alleged was due him as fringe benefit compensation above and beyond his normal salary for the month of December, 2001. Mr. Kulkarni stated that the WPS, Inc. Chief Financial Officer ("CFO") had declined to make such payment in accordance with Mr. Crawford's instructions. Inasmuch as such payment request was wholly without any credible rationale whatsoever, such that payment would constitute embezzlement under Massachusetts law (M.G.L. c. 266 §30), Mr. Crawford suggested that representatives of Parthenon be contacted for approval. To this, Mr. Kulkarni angrily replied that he alone would deal with Parthenon, that henceforth the CFO and his U.K. counterpart alone would deal with any cash disbursement decisions, and that Mr. Crawford remained employed by WPS, Inc. only because of his actions.

23.    Mr. Crawford attempted unsuccessfully to contact Mr. Scott, and later on January 14, 2002, Mr. Crawford was informed that the Board of Directors had voted to terminate his employment immediately. A letter dated January 18, 2002 from the WPS, Inc. Human Resources Manager confirmed this action, however, no written notice of termination from WPS, Inc.'s Chief Executive Officer was ever received.

AS AND FOR A FIRST CAUSE OF ACTION
(Breach of the written contract to pay Bonus)

24.    The allegations of paragraphs 1-23 above are incorporated herein by reference.

25.    The Employment Contract is valid, binding and enforceable.

6

26.    The Employment Contract makes the Bonus due upon "completion of the audit of each year's results," or April 15, if no audit is performed. The audit report of the WP LLC 2001 consolidated financials prepared by Arthur Anderson LLP is dated March 26, 2002. The 2001 bonus was thus due no later than March 26, 2002. No separate financial statements were prepared for WPS, Inc. for 2001, but if they had been the items used to calculate the Bonus owing to the plaintiff would have been no different.

27.    In a letter to Steven F. Chilinski, Chief Executive Officer of WPS, Inc., dated December 2, 2004, Mr. Crawford detailed the calculations, derived directly from the Employment Contract and the audited 2001 financial statements of WP LLC, leading to a bonus payment for 2001 of $357,856.25 (rounded off in the letter). The only reply Mr. Crawford received to that letter was a letter dated December 22, 2004 from Daniel Blake of Epstein Becker & Green, counsel for WPS, Inc., to which was attached a letter dated December 8, 2004 which merely states that "[t]he Company does not believe that it owes you a bonus for 2001 and disagrees with the various calculations set forth in your letter," but provides no support for its belief. The letter indicates that the matter is being forwarded to Mr. Kulkarni's accountants for "clarification."

28.    Mr. Crawford's December 2, 2004 letter states that if no payment is received by December 17, 2004, further action may be taken without further notice or demand.

29.    No payment of the Bonus for 2001 has been received by Mr. Crawford, nor had there been any explanation as to the reason, at the time the original Complaint in this action was filed, beyond that noted above.

30.     Defendant WPS, Inc. has therefore breached the Employment Agreement,
plaintiff has been damaged by that breach, and plaintiff is entitled to recover the amount
of $357,856.25 in damages.

## AS AND FOR A SECOND CAUSE OF ACTION
(Violation of Massachusetts Payment of Wages Statute)

31.     The allegations of paragraphs 1-30 above are incorporated herein by
reference.

32.     Defendant Chilinski is a an "officer[] or agent[] having the management
of" WPS, Inc. within the meaning of Massachusetts General Laws ("M.G.L.") c. 149
§148.

33.     Defendant Chilinski took actions within the Commonwealth of
Massachusetts that caused the Bonus and other wages not to be paid to Mr. Crawford.

34.     The Bonus wages were earned in connection with Mr. Crawford's
employment within the Commonwealth of Massachusetts and are thus subject to the
provisions of M.G.L. c. 149 §§148 and 150 (the "Massachusetts Payment of Wages
Statute").

35.     The office of the Attorney General of Massachusetts has assented in
writing to the filing of this suit. The plaintiff is therefore authorized to bring this action
pursuant to M.G.L. c. 149 §150.

36.     The Bonus has remained due for more than six days after the "termination
of the pay period when earned" and has not been paid. Defendants WPS, Inc. and
Chilinski are therefore jointly and severally liable to the plaintiff under the Massachusetts
Payment of Wages Statute for damages of treble the amount in the First Cause of Action,
$1,073,568.75, an additional $715,712.50 in the case of defendant WPS, Inc. Defendants

8

WPS, Inc. and Chilinski are furthermore liable for costs and attorney fees pursuant to M.G.L. c. 149 §150.

## AS AND FOR A THIRD CAUSE OF ACTION
(Breach of the oral contract to pay additional Bonus)

37.     The allegations of paragraphs 1-36 above are incorporated herein by reference.

38.     During February 2001, Mr. Crawford and Mr. Kulkarni, in his capacity as Chairman and Chief Executive Officer of WPS, Inc., reached an oral agreement to increase the bonus percentage for calculation, pursuant to the formula in the Employment Contract, from five percent to eight percent. This agreement was reached within the Commonwealth of Massachusetts.

39.     As consideration for this increase, Mr. Crawford continued to perform his duties as Chief Operating Officer of WPS, Inc.

40.     The oral agreement reached was capable of being fully performed within one year of the date made, inasmuch as the underlying Employment Agreement makes the Bonus due upon completion of the audit, which completion, in the case of the 2001 Bonus, could have occurred any time after December 31, 2001.

41.     WPS, Inc. has failed to pay the additional Bonus resulting from the above-detailed oral agreement when due.

42.     Defendant WPS, Inc. has therefore breached the Employment Contract, as orally modified, plaintiff has been damaged by that breach, and plaintiff is entitled to recover an additional amount of $214,713.75 in damages from defendant WPS, Inc., said amount representing the increase in the bonus due as a result of the oral contract.

## AS AND FOR A FOURTH CAUSE OF ACTION

(Violation of Massachusetts Payment of Wages Statute on additional Bonus)

43.    The allegations of paragraphs 1-42 above are incorporated herein by reference.

44.    The additional bonus amount set forth in the Third Cause of Action has remained unpaid for more than six days after the termination of the pay period when earned. Defendants WPS, Inc. and Chilinski are therefore jointly and severally liable to the plaintiff under the Massachusetts Payment of Wages Statute for damages of treble the amount in the Third Cause of Action, $644,141.25, an additional $429,427.50 in the case of defendant WPS, Inc.

45.    Defendants WPS, Inc. and Chilinski are furthermore liable for costs and attorney fees pursuant to M.G.L. c. 149 §150.

### AS AND FOR A FIFTH CAUSE OF ACTION
(Breach of Transition Agreement)

46.    The allegations of paragraphs 1-45 above are incorporated herein by reference.

47.    The Transition Agreement provides for employment of the plaintiff until March 31, 2002 unless terminated earlier by virtue of either the consummation of a working capital facility or written notice of termination by the Chief Executive Officer of WPS, Inc.

48.    No working capital facility was consummated by WPS, Inc. prior to March 31, 2002.

49.    No written notice of termination by the Chief Executive Officer of WPS, Inc. was received by the plaintiff.

10

50.     Defendant WPS, Inc. was notified of its breach of the Transition

Agreement by way of the letter to Mr. Chilinski of December 2, 2004. Defendant WPS,

Inc. responded to that letter by way of the December 8, 2004 letter from Daniel Blake,

which merely alleges that no compensation was due because the plaintiff "did not

perform services for the Company during that time" and "[y]ou were given effective

notice." Such interpretation of the Transition Agreement is wholly unreasonable as it

would render void and superfluous the provision requiring written notice of termination

by the Chief Executive Officer of WPS, Inc.

51.     The December 2, 2004 letter from the plaintiff constituted a final notice

and demand.

52.     As a result of its breach of the Transition Agreement, the plaintiff received

no wages from WPS, Inc. for the period from February 1, 2002 through March 31, 2002.

53.     Defendant WPS, Inc. therefore breached the Transition Agreement and is

liable to the plaintiff in the amount of $25,000, the amount of unpaid wages for February

and March 2002.

AS AND FOR A SIXTH CAUSE OF ACTION
(Violation of Massachusetts Payment of Wages Statute on Transition Payments)

54.     The allegations of paragraphs 1-53 above are incorporated herein by

reference.

55.     The payments set forth in the Fifth Cause of Action have remained unpaid

for more than six days after the termination of the pay period when earned. Defendants

WPS, Inc. and Chilinski are therefore jointly and severally liable to the plaintiff under the

Massachusetts Payment of Wages Statute for damages of treble the amount in the Third

11

Cause of Action, $75,000.00, an additional $50,000.00 in the case of defendant WPS, Inc.

56.     Defendants WPS, Inc. and Chilinski are furthermore liable for costs and attorney fees pursuant to M.G.L. c. 149 §150.

### AS AND FOR A SEVENTH CAUSE OF ACTION
(Tortious interference with contractual and business relations)

57.     The allegations of paragraphs 1-56 above are incorporated herein by reference.

58.     Defendant Kulkarni knew that the $135,000 that he sought to have paid to him by WPS, Inc. was not owed to him and that the receipt thereof would have constituted a fraudulent misappropriation of WPS, Inc. funds. The terms of his relationship to WPS, Inc., as consultant to, and former CEO of, the company enabled him to attempt to receive disbursement of these funds.

59.     Following the plaintiff's refusal to permit defendant Kulkarni to embezzle and unlawfully convert $135,000 from WPS, Inc., defendant Kulkarni took actions to persuade, cause and induce the Board of Directors of WPS, Inc. to terminate the plaintiff's employment.

60.     Fraudulent and criminal intent by Mr. Kulkarni to convert the $135,000 to his own use was demonstrated by his vehement unwillingness to have the plaintiff disclose the attempt to representatives of Parthenon, and by his actions resulting in the termination of the plaintiff's employment to cover up his fraudulent and criminal attempt.

61.     But for the plaintiff's refusal to permit embezzlement and conversion of $135,000 from WPS, Inc., the plaintiff's employment would not have been terminated.

62. Plaintiff Crawford was ready, willing and able to perform his duties under the Transition Agreement. But for defendant Kulkarni's actions, Mr. Crawford would have remained employed with WPS, Inc. through March 31, 2002 or later.

63. Defendant Kulkarni took such actions to terminate the plaintiff's employment knowing that the plaintiff would be economically damaged thereby, and with malice, fraud and misrepresentation wrongfully attempted to intimidate the plaintiff into permitting the embezzlement and unlawful conversion of funds by Mr. Kulkarni.

64. Defendant Kulkarni was aware of the Transition Agreement as he signed it on December 28, 2001 in his then-current capacity as CEO of WPS, Inc.

65. As of a date prior to January 14, 2002, Mr. Kulkarni had ceased to be Chairman or CEO of WPS, Inc., and was neither an officer nor an employee of that corporation.

66. The actions taken by Mr. Kulkarni to terminate the plaintiff's employment were beyond the scope of his authority as a consultant to WPS, Inc., not related to a legitimate business purpose of WPS, Inc., and in furtherance of his own greed and his personal objective of extracting funds from WPS, Inc.

67. The actions of Mr. Kulkarni to terminate the plaintiff's employment were taken with actual malice and in retaliation for Mr. Crawford's refusal to permit disbursement of WPS, Inc. funds to Mr. Kulkarni.

68. The actions taken by Mr. Kulkarni to terminate the plaintiff's employment took place within the Commonwealth of Massachusetts.

69. If plaintiff had permitted the payment of $135,000 to Mr. Kulkarni, the plaintiff would have both have violated the Transition Agreement that prohibited actions

13

adverse to those of WPS, Inc., would have breached his fiduciary duties to WPS, Inc.,
and would have committed an unlawful and criminal act as well.

70.    Plaintiff Crawford had a legally protected interest in the Transition
Agreement and in other prospective business relations.

71.    Defendant Kulkarni interfered these those interests without justifiable
cause and for the unlawful purpose of permitting him to convert and embezzle funds from
WPS, Inc.

72.    Plaintiff Crawford was damaged by defendant Kulkarni's actions in that
he did not receive the full benefits of the Transition Agreement, his reputation was
damaged, any prospect of his being selected as CEO of WPS, Inc. was eliminated, and
other prospective business relations were interfered with.

73.    Defendant Kulkarni therefore did tortiously interfere with the Transition
Agreement between the plaintiff and WPS, Inc., and with other prospective business
relationships, the plaintiff was damaged thereby, and Mr. Kulkarni is liable to the
plaintiff for damages.

### AS AND FOR AN EIGHTH CAUSE OF ACTION
(Fraud)

74.    The allegations of paragraphs 1-73 above are incorporated herein by
reference.

75.    On December 28, 2001, plaintiff met with defendant Kulkarni prior to
signing the Transition Agreement and a separate Settlement Agreement, both executed
later that day.

76.    At that meeting, defendant Kulkarni represented to the plaintiff that
defendant Kulkarni had no right to any distributions or other monies from WPS, Inc. or

14

WP LLC, other than a $1 million per year Consulting Agreement, and under sections 5.2 and 5.3 of the LLC Agreement (governing the respective rights of Kulkarni and Parthenon in WP LLC), both being executed on December 28, 2001. Defendant Kulkarni further represented to the plaintiff that the optional Special Distributions allowed pursuant to section 5.2 of the LLC Agreement were likely to be deferred or forgiven.

77.     Under the terms of the LLC Agreement, the Special Distributions were, except as to the portion necessary to meet tax liabilities, optional and subject to the sole discretion of the Board of Managers of WP LLC, a majority of which was controlled by Parthenon.

78.     Under the terms of the Settlement Agreement, plaintiff exchanged his right to options in WPS, Inc. under the Employment Contract for a right to 4-8 percent of the distributions to Kulkarni under section 5.3, but not section 5.2, of the LLC Agreement.

79.     The Settlement Agreement created a resulting trust whereby plaintiff's right to share in distributions under that agreement were nominally held in defendant Kulkarni's name for the benefit of the plaintiff. Kulkarni therefore had a fiduciary obligation to the plaintiff arising out of that trust.

80.     Plaintiff was concerned that defendant Kulkarni would be able to receive payments from WPS, Inc. or WP LLC in which plaintiff would not be entitled to share under the Settlement Agreement, and which would reduce the value of distributions in which he was entitled to share. Defendant Kulkarni's representations assured him that unshared payments would be limited in scope. Plaintiff relied upon these representations in entering into the Settlement Agreement and the Transition Agreement.

15

81.    Contrary to his assertion on December 28, 2001, defendant Kulkarni retained an alleged right to $624,263 in accrued dividends and certain other payments from WPS, Inc., neither of which was under the Consulting or LLC Agreement.

82.    Defendant Kulkarni had exclusive knowledge of the fact that he retained an alleged right to the accrued dividend and certain other payments and information by which plaintiff might have discovered that right was not available to him.

83.    Defendant Kulkarni actively concealed the existence of his alleged right to the accrued dividend from the plaintiff.

84.    Defendant Kulkarni had a duty to the plaintiff to disclose the existence of his alleged right to the accrued dividend, but failed to disclose it.

85.    Defendant Kulkarni failed fully and completely to disclose the existence of his alleged rights to these payments to representatives of Parthenon.

86.    Parthenon entered into the transaction that closed between December 28, 2001 and December 31, 2001 without knowing that defendant Kulkarni could and would later allege that he was entitled to the accrued dividend and other payments.

87.    On November 13, 2002, defendant Kulkarni, Parthenon and WP LLC entered into an Omnibus Agreement whereby Kulkarni's alleged right to the accrued dividend and certain other payments was extinguished, in exchange for $765,980 in payments, largely as Special Distributions for 2002 pursuant to section 5.2 of the LLC Agreement. The Omnibus Agreement further made the Special Distributions mandatory as to defendant Kulkarni for 2003 and subsequent years, removed the discretion of the Board of Managers as to the Special Distributions, and permitted Special Distributions to

16

be made only to defendant Kulkarni rather than requiring that Special Distributions be made 61.43% to Parthenon and 38.57% to Kulkarni.

88.    But for Kulkarni's alleged right to the accrued dividend, Parthenon would not have entered into the Omnibus Agreement and the funds paid out thereunder would have been retained for the benefit of WP LLC and WPS, Inc., immediately or subsequently increasing the value of General Distributions under section 5.3 of the LLC Agreement, and benefiting the plaintiff through his share of such distributions under the Settlement Agreement.

89.    Plaintiff relied upon the representations made by defendant Kulkarni on December 28, 2001, such representations were false, plaintiff relied upon such representations and was damaged, and thereby defrauded.

90.    Defendant Kulkarni fraudulently concealed from the plaintiff the fact that defendant Kulkarni utilized his alleged right to the accrued dividend to obtain payments in which plaintiff was not entitled to share until defendants produced the Omnibus Agreement during discovery in this case on November 9, 2005. Any statute of limitations applying to this cause of action was therefore tolled until such date.

91.    On February 11, 2005, approximately one month after the filing of this suit, the assets of WP LLC were transferred to new entities, owned and controlled by defendant Kulkarni, which fact was actively hidden by defendants and was not disclosed to the plaintiff until defendants produced documents in this case on September 28, 2005. Defendants have steadfastly refused to reveal the details of such recapitalization.

92.    Plaintiff believes that the February 11, 2005 recapitalization may further have defrauded him of the benefits to which he is entitled under the Settlement

Agreement, or may have constituted a breach of fiduciary duty by Kulkarni to the plaintiff, or both.

93.     Because of defendant Kulkarni's fraud, plaintiff may elect between the remedy of rescission of the Settlement Agreement and/or the Transition Agreement, or the remedy of damages, but has insufficient information at this time to make such election and does hereby expressly choose to pursue both remedies until he makes such election.

94.     Defendant Kulkarni is liable to the plaintiff for damages for fraud arising out of the facts stated in this cause of action.

95.     In the event that plaintiff elects to rescind the Settlement Agreement, defendant WPS, Inc. is subject to equitable relief in the nature of an order returning to the plaintiff options on eight percent of the shares of WPS, Inc., to be exercised, or not, by the plaintiff, as of any date between December 28, 2001 and the date upon which such order granting him such equitable relief issues.

## AS AND FOR AN NINTH CAUSE OF ACTION
(Accounting)

96.     The allegations of paragraphs 1-95 above are incorporated herein by reference.

97.     The amounts due to the plaintiff resulting from defendant Kulkarni's fraud and/or breach of fiduciary duty arising out of the 2005 recapitalization are not readily ascertainable.

98.     Adequate relief may not be obtained at law.

18

99.     Plaintiff is entitled to an election of remedies for defendant Kulkarni's fraud, but has insufficient information to make such election without the accounting requested in this cause of action.

100.    Defendant Kulkarni, as a result of the fiduciary relationship between him and the plaintiff arising out of the Settlement Agreement, and also because of the fraudulent actions taken by defendant Kulkarni, has a duty to the plaintiff to render to him an account as to (a) all distributions by WP LLC or any related entity, of cash, assets in kind, securities, contract rights or other assets of any nature or type whatsoever made to himself, his family or entities that he controls, or to Parthenon or related entities, (b) copies of any and all agreements, contracts, undertakings, understandings or other documents which amend, purport to amend, rescind, replace, supercede, or otherwise modify, expand, reduce or alter in any way the LLC Agreement, or any of the exhibits thereto, and (c) copies of all financial statements of WP LLC and any subsidiaries thereof through the present.

## AS AND FOR A TENTH CAUSE OF ACTION
(Breach of implied warranty of non-interference with assignment)

101.    The allegations of paragraphs 1-100 above are incorporated herein by reference.

102.    The Settlement Agreement is, by its express terms, an irrevocable assignment of a portion of defendant Kulkarni's rights under the LLC Agreement.

103.    Plaintiff contributed value in entering into the Settlement Agreement in that the options granted to him under the Employment Contract were extinguished.

104.    By assigning, or purporting to assign, a portion of his rights under the LLC Agreement, defendant Kulkarni implicitly warranted that he would do nothing to

defeat or impair the value of that assignment, and that he has no knowledge of any fact which would do so, pursuant to Restatement (Second) of Contracts §333(1)(a).

105.    By entering into the Omnibus Agreement, and through other actions, including but not limited to the February 11, 2005 recapitalization, defendant Kulkarni impaired, and defeated a portion of, the value of the assignment to the plaintiff under the Settlement Agreement.

106.    Plaintiff has been damaged thereby, and defendant Kulkarni is liable for the loss suffered by the plaintiff arising out of defendant Kulkarni's breach of his implied warranty of non-interference with the assignment represented by the Settlement Agreement.

## AS AND FOR AN ELEVENTH CAUSE OF ACTION
(Violation of Massachusetts Payment of Wages Statute by Kulkarni)

107.    The allegations of paragraphs 1-106 above are incorporated herein by reference.

108.    After defendant Chilinski received the letter dated December 2, 2004 demanding payment of a bonus for 2001 to the plaintiff, he turned the matter completely over to defendant Kulkarni, Defendant Kulkarni was solely responsible for the December 8, 2004 letter from Daniel Blake of Epstein Becker & Green which denied that any bonus was owed. Defendant Kulkarni failed adequately to investigate the bonus claim set forth in the December 2, 2004 letter, summarily decided that the claim had no merit, and caused a letter indicating that WPS, Inc. believed that no Bonus was owed to be sent to the plaintiff. Such conduct was in reckless indifference to the rights of the plaintiff and outrageous because of the evil motive of defendant Kulkarni in preserving

20

the amount of the Bonus for his own benefit as the soon to be sole common shareholder of WPS, LLC, the successor in interest to WPS, Inc.

109.    From prior to 2003 through February 11, 2005, defendant Kulkarni was Chairman of the Board of WPS, Inc., and a member of its Board of Directors. He directed and participated to a substantial degree in formulating the policy of WPS, Inc. and as of December 8, 2004 effectively controlled the management of WPS, Inc. as a whole. By December 8, 2004, defendant Chilinski had been removed from the Board of Directors of WPS, Inc. and was replaced by a nominee of defendant Kulkarni. By December 8, 2004, because of the pending February 11, 2005 recapitalization, defendant Kulkarni's co-investor in WP LLC, the ultimate parent of WPS, Inc., had effectively ceded day-to-day control of WPS, Inc. to defendant Kulkarni.

110.    Parthenon's primary representative on the WPS, Inc. Board of Directors, Marshall Bartlett, if he was informed of plaintiff's December 2, 2004 demand letter at all, was informed by defendant Kulkarni that the bonus request had no merit, and Marshall Bartlett therefore left the matter entirely in defendant Kulkarni's hands.

111.    As of February 11, 2005, Wolverine, Proctor & Schwartz, LLC (hereinafter "WPS, LLC"), a Delaware Limited Liability Company, took ownership of substantially all of the assets of defendant WPS, Inc., except for 49 shares of the stock of Wolverine, Proctor & Schwartz, Limited (hereinafter "WPS, Ltd."), a corporation incorporated pursuant to the laws of the United Kingdom. WPS, LLC also assumed substantially all of the liabilities of defendant WPS, Inc., including its liabilities to the plaintiff in this Second Amended Complaint.

21

112.    Both before and after the February 11, 2005 recapitalization, defendant Kulkarni was the officer of both WPS, Inc. or WPS, LLC having the management of the respective companies, and the person primarily responsible, both before and after February 11, 2005, for preventing the payment of the amounts sought in the First, Third, and Fifth Causes of Action of this Second Amended Complaint.

113.    Beginning as of February 11, 2005, defendant Kulkarni was the sole Member (similar to shareholder) of WPS, LLC, and was the Managing Member (similar to Chief Executive Officer) of that company. He therefore was an officer having the management of that company within the meaning of M.G.L. c. 149 §148.

114.    WPS, LLC is the successor to defendant WPS, Inc. and continued the enterprise of WPS, Inc., with its management, personnel, physical location, assets and general business operations substantially unchanged.

115.    There is a continuity of shareholders between WPS, LLC and WPS, Inc., with defendant Kulkarni and Parthenon having held indirect equity interests in WPS, Inc. through WP LLC, and holding direct equity interests (common in the case of Kulkarni and preferred in the case of Parthenon) in WPS, LLC.

116.    Following the acquisition of the assets of WPS, Inc. by WPS, LLC, WPS, Inc. ceased ordinary business operations, liquidated and dissolved shortly thereafter.

117.    WPS, LLC assumed substantially all of the obligations of WPS, Inc. after the February 11, 2005 recapitalization, including those ordinarily necessary for the uninterrupted continuation of normal business operations previously conducted by WPS, Inc.

118.    WPS, LLC therefore is the surviving corporation of a de facto merger, and the rights of plaintiff as a creditor of WPS, Inc. may not in any way be impaired by such de facto merger, and all of plaintiff's claims both against WPS, Inc. as well as against the officers having the management of WPS, Inc., pursuant to M.G.L. c. 149 §148, continue unimpaired against WPS, LLC and against the officers having the management of WPS, LLC, including defendant Kulkarni, pursuant to M.G.L. c. 156B §80(b).

119.    This cause of action arises out of the same conduct, transaction and occurrence as that set forth in the original Complaint in this action.

120.    Defendant Kulkarni received notice of the institution of this action as he was named a defendant by the original Complaint in this action, which original Complaint was timely served upon him in accordance with Fed. R. Civ. P. 4(m). He will not be prejudiced by the addition of this cause of action.

121.    By service of the original Complaint in this action, defendant Kulkarni knew, or should have known, that but for the mistake in failing to name him as an officer having the management of both WPS, Inc. and WPS, LLC, this action would have been brought against him as well.

122.    This cause of action therefore relates back to the filing of the original Complaint in this action pursuant to Fed. R. Civ. P. 15(c) and Massachusetts law.

123.    Defendant Kulkarni is therefore liable, jointly and severally with Defendants WPS, Inc. and Chilinski, for the damages, costs and fees sought in the Second, Fourth and Sixth Causes of Action of this Second Amended Complaint.

## AS AND FOR AN TWELFTH CAUSE OF ACTION
(Piercing the corporate veil against Kulkarni)

124.    The allegations of paragraphs 1-123 above are incorporated herein by
reference.

125.    In connection with the recapitalization of February 11, 2005, WP LLC
was split into separate U.S. and U.K. entities, each owned and controlled by defendant
Kulkarni as the sole direct, or indirect, common stockholder. After February 11, 2005,
the business of the U.K. entity was conducted by WPS, Ltd.

126.    Prior to the transaction of February 11, 2005, 49 shares (representing a
49% ownership interest) of WPS, Ltd. were owned by defendant WPS, Inc. On or about
April 18, 2005, the 49 shares of WPS, Ltd. were transferred to Phoenix UK, LLC, a
Delaware Limited Liability Company that defendant Kulkarni controls, directly or
indirectly, as the sole common shareholder.

127.    On or about February 11, 2005, defendant WPS, Inc. incurred additional
debt in the form of a $1.9 million loan from Tencara, LLC, a Delaware Limited Liability
Company owned by David Callan, a long-standing personal friend of defendant Kulkarni.
The $1.9 million was paid to Parthenon in a transaction whereby Parthenon surrendered
its approximately 60 percent indirect equity interest in defendant WPS, Inc. and WPS,
Ltd. to defendant Kulkarni in exchange for $2 million and preferred stock in the separate
U.S. and U.K. entities.

128.    In addition, on or about February 11, 2005, substantially all of the assets
of WPS, Inc., other than the 49 shares of WPS, Ltd., were transferred to WPS, LLC, and
WPS, LLC assumed substantially all of the liabilities of WPS, Inc. including those arising
out of this action. From and after February 11, 2005, the business of WPS, Inc. was
continued by WPS, LLC.

24

129.    As part of the February 11, 2005 recapitalization, WPS, LLC incurred in excess of $3.25 million in debt with CapitalSource Finance LLC (hereinafter "CapitalSource"), which debt was greater than that which had been owed by WPS, Inc. prior to that date, even before considering the $1.9 million loan from Tencara, LLC.

130.    The recapitalization of February 11, 2005 left WPS, LLC thinly capitalized and the assets and equity remaining were unreasonably small in relation to the business of WPS, LLC.

131.    During August 2005, the two largest facilities utilized by WPS, Inc., and the only facilities owned by it, were sold for approximately $3.25 million, and leased back from the purchaser. The funds obtained were used to pay down the loan from CapitalSource.

132.    On or about January 1, 2006, a Technology Transfer and License-Back Agreement was entered into between WPS, LLC and WPS, Ltd., whereby the intellectual property of WPS, LLC and the trademarks and trade names owned by WPS, LLC were transferred to WPS, Ltd. for grossly inadequate consideration, which consideration was not in cash but rather was a right by WPS, LLC to certain intellectual property of WPS, Ltd. The Technology Transfer and License-Back Agreement was purported to memorialize and formalize long-standing informal practices between the U.S. and U.K. entities and their predecessors. However, historically, almost all of the designs and other intellectual property were transferred from the U.S. to the U.K., rather than vice versa, and the U.K. designs and other intellectual property were largely derived from those originally transferred from the U.S. and have little value to WPS, LLC.

133.    In early March, 2006, approximately $900,000 remained owing to
CapitalSource, which held a security interest in substantially all of the assets of WPS,
LLC that was superior to a purported security interest held by Tencara, LLC.

134.    In early March, 2006, WPS, LLC was controlled by defendant Kulkarni.
At the time, approximately $800,000 in cash was held in bank accounts of WPS, LLC
and Capital Source had visibility of those amounts and the right to set off amounts owing
on its loan to WPS, LLC from those accounts. The $800,000 was an unusually high cash
balance for WPS, LLC to be holding. During January and February, 2006, WPS, LLC
had sales of only $1,402,100, compared to sales of $26,611,000 during 2005. Because it
had accumulated cash rather than paying vendors to obtain material shipments, WPS,
LLC had been unable to ship many orders in January and February of 2006.

135.    In early March, 2006, WPS LLC sought to negotiate with CapitalSource
regarding a filing under Chapter 11 of Title 11 of the United States Code. The large cash
balance held by WPS, LLC relative to the remaining CapitalSource loan predictably
caused Capital Source to sweep the cash from the WPS, LLC bank accounts and apply it
towards the loan, leaving a balance of approximately $100,000.

136.    On or about March 7, 2006, WPS, LLC and CapitalSource entered into an
agreement whereby the remaining balance on the CapitalSource loan was extinguished,
and any security interest in the assets of WPS, LLC terminated, in return for a payment
by WPS, LLC of $31,476.57.

137.    The effect of the August 2005 sale and lease back transaction and the
March 7, 2006 transaction was to leave Tencara, LLC as the sole purported secured
creditor of WPS, LLC. The sale and lease back transaction, and the events of March,

2006 with CapitalSource were intentionally designed to leave Tencara, LLC, controlled by a friend of defendant Kulkarni, as the sole secured lender to WPS, LLC, in order to position it to obtain the assets of WPS, LLC after a planned bankruptcy filing.

138.    In addition to being personal friends, Messrs. Kulkarni and Callan have other mutual business interests. Tencara, LLC also loaned $100,000 by WPS, Ltd., and has warrants to purchase 10 percent of the shares of that corporation. In addition, Messrs. Kulkarni and Callan share ownership interests in Longlite, LLC a company based in Portsmouth, NH. In 2005, the Longlite, LLC web site listed Mr. Callan as Chairman and Mr. Kulkarni as CEO of that company.

139.    On April 1, 2006, WPS, LLC filed for Chapter 7 Bankruptcy in the United States Bankruptcy Court in Boston, MA.

140.    On or about April 21, 2006 the Chapter 7 Trustee filed motions in the bankruptcy case of WPS, LLC seeking to sell substantially all of the assets of WPS, LLC to Tencara, LLC or its nominee for $150,000 more than the value of Tencara's $1.9 million purported loan, in accordance with a bidding procedure and notice of sale. Tenacara was to be permitted to bid in its purported secured loan amount. The associated Asset Purchase Agreement filed by the Chapter 7 Trustee sought to release Tencara, LLC from any liability to the Trustee and required, as a condition of the transaction, an order by the Bankruptcy Court that the transaction was for equivalent and fair consideration, and that Tencara, LLC or its nominee would not be deemed a successor to WPS, LLC by any theory of law or equity.

141.    During a portion of April, 2006 the uniform resource locators, www.wolverine.com and www.jetzone.com, both owned by WPS, LLC, were redirected

27

to the web site owned by WPS, Ltd., www.wolverineproctor.co.uk. That web site assured viewers that WPS, Ltd. was a separate legal entity from WPS, LLC, "unaffected by the US Company's recent filing." By this action, defendant Kulkarni sought to capture, for the benefit of WPS, Ltd., business that otherwise would have gone to WPS, LLC.

142.    On April 25, 2006 the Bankruptcy Court denied the Chapter 7 Trustee's motion for to approve bidding procedures and to approve the notice of sale. The reasons given included numerous questions raised regarding the relationships between WPS, LLC and Tencara, LLC, and between WPS, LLC and WPS, Ltd. On April 27, 2006 the Chapter 7 Trustee withdrew her motion to sell the assets of WPS, LLC to Tencara, LLC.

143.    Through his control of WPS, Ltd. and WPS, LLC and his influence on Tencara, LLC through his friend and business partner David Callan, defendant Kulkarni sought to defraud the creditors of WPS, LLC and WPS, Inc., including the plaintiff, by driving WPS, LLC out of business in order to enable Tencara, LLC to repurchase the assets for much less than their fair value, leaving little if any funds for unsecured creditors, including the plaintiff, and permitting Tencara, LLC or its nominee to restart the business with free and clear title to the assets, without the liabilities to the plaintiff and the other creditors of WPS, LLC, and operating in conjunction with WPS, Ltd.

144.    Through his actions, defendant Kulkarni sought to destroy the value of the assets of WPS, LLC to any bidders competing with Tencara, LLC, by transferring to WPS, Ltd. the ownership of the intellectual property formerly owned by WPS, LLC, and by the ownership by WPS, Ltd. of the trademarks and trade names of WPS, LLC. Such ownerships created the threat that WPS, Ltd. would compete with any buyer of the assets

of WPS, LLC using the same designs, intellectual property, trademarks and trade names that had previously been owned by WPS, LLC.

145. Defendant Kulkarni actively and directly participated in the management of both WPS, LLC and WPS, Ltd. and exercised pervasive control of the activities of each with the fraudulent and injurious consequence of hindering, delaying and defrauding the creditors of WPS, Inc. and WPS, LLC, by, inter alia, seeking to retain control and ownership of the assets and business of WPS, LLC, free of unsecured claims, through WPS, Ltd. and Tencara, LLC.

146. WPS, LLC and WPS, Ltd. were engaged in a common enterprise in that both entities sold similar equipment, using similar designs, to customers that were in many cases the same, creating serious ambiguity about the manner and capacity in which WPS, LLC and WPS, Ltd. and their representatives were acting.

147. Defendant Kulkarni caused a confused intermingling of the business activity, assets and management of WPS, LLC and WPS, Ltd. by utilizing common web site content for the two entities, suggesting to customers and creditors, prior to April 1, 2006 that the two were a single entity, intermingling the designs and other intellectual property assets of each, and serving as the equivalent of the Chief Executive Officer of both.

148. Defendant Kulkarni, by way of the February 11, 2005 recapitalization, and through other means, including but not limited to the withdrawal of excessive compensation, caused WPS, LLC to be thinly capitalized, with capital and assets unreasonably small in relation to the business of WPS, LLC.

149.    Defendant Kulkarni caused WPS, LLC to be insolvent on and after February 11, 2005, at which time the liability to the plaintiff arising out of the causes of action in this case was assumed by WPS, LLC. As a result of the February 11, 2005 recapitalization, and the April 18, 2005 transfer of the WPS, Ltd. shares, WPS, Inc. was rendered insolvent and without any assets to satisfy any judgment arising out of this action.

150.    Defendant Kulkarni, through the transfer of the shares of WPS, Ltd. to Phoenix UK, LLC for his benefit, and through other means, caused corporate assets of WPS, LLC and WPS, Inc. to be siphoned off to himself, as the dominant shareholder.

151.    Defendant Kulkarni used the corporations WPS, LLC and WPS, Ltd. for his own transactions as dominant shareholder, including, but not limited to, the transfer of the intellectual property, trademarks and trade names from WPS, LLC to WPS, Ltd. for his benefit, and with the purpose of hindering, delaying and defrauding the creditors of WPS, LLC and WPS, Inc., including the plaintiff.

152.    Defendant Kulkarni used the corporations WPS, LLC and WPS, Ltd. to promote fraud by the actions enumerated herein.

153.    Defendant Kulkarni used the corporations WPS, LLC and WPS, Ltd. as mere instrumentalities. He completely dominated both entities and utilized his control to commit fraud and legal wrongs.

154.    The joinder of this claim is permitted by Fed. R. Civ. P. 18(b).

155.    Defendant Kulkarni is therefore personally liable to the plaintiff for damages arising out of the causes of action enumerated in this Second Amended Complaint against defendant WPS, Inc. by virtue of WPS, LLC having assumed liability

for such damages, and because defendant Kulkarni has abused the corporate forms of
WPS, LLC and WPS, Ltd. to the detriment of the plaintiff, justifying piercing of the
corporate veils of WPS, LLC and WPS, Ltd. and holding their shareholder, defendant
Kulkarni, personally liable.

WHEREFORE, Plaintiff seeks damages for breach of contract from defendant
WPS, Inc. in the total amount of $597,570, and from defendant Kulkarni by virtue of
piercing of the corporate veil.

WHEREFORE, Plaintiff seeks treble damages for violation of the Massachusetts
Payment of Wages Statute in the amount of $1,792,710 from defendants WPS, Inc.,
Kulkarni and Chilinski, of which $597,570 of these damages may be duplicative of those
in the above paragraph. With respect to defendant Kulkarni, such damages are sought
both through his direct liability under the Massachusetts Payment of Wages Statute and
in the alternative through his liability resulting from piercing the corporate veil.

WHEREFORE, Plaintiff seeks damages from Mr. Kulkarni for tortious
interference with contractual relations.

WHEREFORE, Plaintiff seeks attorney fees and costs.

WHEREFORE, Plaintiff seeks interest of 18 percent per annum, commencing
from the date of breach, pursuant to M.G.L. c. 231 §§6C and 6F.

WHEREFORE, Plaintiff seeks an accounting of the financial results of WPS, Inc.
for 2001.

WHEREFORE, Plaintiff seeks a declaratory judgment that Mr. Kulkarni
tortiously interfered with his contractual and business relations.

WHEREFORE, Plaintiff seeks damages from defendants Kulkarni and WPS, Inc. for fraud.

WHEREFORE, Plaintiff seeks damages from defendant Kulkarni for breach of the implied warranty of non-interference with assignment embodied in the Settlement Agreement.

WHEREFORE, Plaintiff seeks equitable relief in the nature of an order reforming, rescinding, or otherwise modifying the Settlement Agreement and the Transition Agreement, and/or distributing options in WPS, Inc. to him, the exact nature, and the necessity, of such relief to be determined at plaintiff's option following discovery in this matter.

WHEREFORE, Plaintiff seeks equitable relief in the nature of an accounting from defendants Kulkarni and WPS, Inc.

WHEREFORE, Plaintiff seeks equitable relief in the form an order piercing the corporate veils of WPS, LLC and WPS, Ltd. and holding defendant Kulkarni personally liable for the amounts sought herein from defendant WPS, Inc. In the alternative, plaintiff seeks legal relief in the form of jury findings that the corporations WPS, LLC and WPS, Ltd. are mere instrumentalities, and holding defendant Kulkarni personally liable for the amounts sought herein from defendant WPS, Inc.

WHEREFORE, Plaintiff seeks such other relief as the Court finds just and meet.

Respectfully submitted,

Peter A. Crawford, pro se

32

23 Newcastle Dr. #11
Nashua, NH  03060
(603)888-4574

Date: _5 May 2006_