FILED
UNITED STATES DISTRICT COURT IN CLERKS OFFICE
District of Massachusetts

2006 MAY 26  P 3: 35

Civil Action
No. 05-10078-DPW

---

```
                                          )
PETER A. CRAWFORD, Plaintiff              )
                                          )
        v.                                )
                                          )
WOLVERINE, PROCTOR & SCHWARTZ, INC.,      )
    Steven F. Chilinski, Deepak S. Kulkarni, )
                                          )
        Defendants                        )
                                          )
```

## PLAINTIFF'S OPPOSITION TO DEFENDANT DEEPAK S. KULKARNI'S MOTION FOR PARTIAL SUMMARY JUDGMENT

### REQUEST FOR HEARING

All pending motions are scheduled for hearing on June 28, 2006 at 3:30 p.m.

Plaintiff requests that this motion be heard at that time.

### I. INTRODUCTION

Defendant Kulkarni attempts to recast payment of the fraudulently hidden accrued dividend and other amounts allegedly due him as discretionary interest payments, the possible payment of which was disclosed. However, $226,000 of the amount paid to defendant Kulkarni under the Omnibus Agreement is not even arguably discretionary interest and the plaintiff was directly damaged when he exchanged valuable stock options for an equity interest in a company that retained hidden liabilities. At the very minimum, a significant portion of the Omnibus payments were direct payments of amounts allegedly owing to Kulkarni that he had specifically denied he would retain the right to

1

payment of after December 28, 2001. Furthermore, even the portion called 2002 Interest was in reality payment of the hidden accrued dividend.

## II. PLAINTIFF'S LOCAL RULE 56.1 COUNTER STATEMENT OF FACTS

Pursuant to Local Rule 56.1, plaintiff disputes the facts set forth in the Memorandum in Support of Defendant Deepak S. Kulkarni's Motion for Partial Summary Judgment (hereinafter "Kulkarni Memorandum")[1].

1. Admit.

2. Admit

3. Admit.

4. Admit.

5. Admit, except Kulkarni ceased to be sole shareholder as a result.

6. Admit, except that plaintiff denies the implication that the options would have expired worthless in the absence of the Settlement Agreement. See Plaintiff's Affidavit in Support of his Motion for Partial Summary Judgment ¶2, Exhibit A at PAC0003 ¶5(a) (change of control would have caused options to vest in any event).

7. Admit, except that the plaintiff denies any implication that the options would have expired worthless for the reason stated above.

8. Admit.

9. Plaintiff admits that he determined that a possibility existed that Kulkarni would be entitled to distributions under either §5.2 or §5.3 of the LLC Agreement after

---

[1] The paragraphs set forth herein are intended to correspond with the numbered paragraphs in the Local Rule 56.1 Statement of that document. By stating that he admits certain facts, plaintiff does not hereby waive any right to contest defendants' alleged facts should additional contradictory facts be discovered at a later date, but merely that he presently has no basis to contest them.

reading that agreement. He denies that defendant Kulkarni so informed him. Plaintiff's Affidavit in Support of his Opposition to Defendant Kulkarni's Motion for Partial Summary Judgment (hereinafter "Plaintiff's Affidavit") ¶4.

    10. Admit.

    11. Admit.

    12. Plaintiff denies that Kulkarni so represented to him. Plaintiff states that defendant Kulkarni represented to him that the Special Distributions under §5.2 of the LLC Agreement were likely to be deferred or forgiven. The conclusion that unshared payments would be limited in scope was arrived at considering other factors as well. Plaintiff's Affidavit ¶5. In fact, Parthenon declined to accept Special Distributions for itself. Plaintiff's Opposition Affidavit ¶6, Exhibit A (hereinafter "Bartlett Deposition") at 35-37. Plaintiff's Opposition Affidavit ¶7, Exhibit B (hereinafter "Chilinski Deposition") at 47-49.

    13. Plaintiff denies that the entire $765,980 was pursuant to §5.2 of the LLC Agreement, and denies that Kulkarni, Parthenon and Wolverine Proctor LLC were the only parties, as Wolverine, Proctor & Schwartz, Inc. (hereinafter "WPS, Inc.") was also a party. See Plaintiff's Affidavit ¶9, Exhibit D (hereinafter "Omnibus Agreement") at W0975-W0977. The payments specified by that Omnibus Agreement were as follows:

| In respect of certain state tax liabilities | $56,000 |
| Deferred compensation | $170,000 |
| Interest purportedly pursuant to §5.2 | $539,980 |
| Total | $765,980 |

Furthermore, the actual payments made to defendant Kulkarni that defendants have documented were made against the following general ledger liability accounts:

                                    Wire transfer  Wire transfer  Check

3

|                             | 11/19/02  | 12/20/02  | 4/16/03   |
|-----------------------------|-----------|-----------|-----------|
| Accrued dividends           |           | $224,869  |           |
| Accrued payroll             | $ 74,985  | $   4,131 |           |
| Accrued state tax           | $ 56,000  |           |           |
| Distribution to shareholder |           |           | $135,500  |
| Total                       | $130,985  | $229,000  | $135,500  |

Plaintiff's Affidavit ¶10, Exhibit E.

14. Admit, except that plaintiff denies that the word "unassailable" was used. Plaintiff denies any implication that the validity of his own case for fraud is somehow diminished by Parthenon's choices, as plaintiff, unlike Parthenon, was not provided a copy of the Termination and Release Agreement. Plaintiff's Affidavit ¶13.

15. Plaintiff denies that he was the senior WPS executive in charge of finance and accounting. Plaintiff's Affidavit ¶11.

16. Plaintiff denies that he had access to the trial balance on December 28, 2001. Plaintiff's Affidavit ¶12. Plaintiff further states that his reference in the Complaint to defendant Kulkarni not disclosing that he retained an alleged right to the accrued dividend referred primarily to the lack of disclosure regarding the Termination and Release Agreement which purported to preserve amounts allegedly owing to defendant Kulkarni that were listed on the trial balance. Plaintiff's Affidavit ¶13. Other information provided to the plaintiff during December 2001 led him to believe that defendant Kulkarni would forgive any remaining amounts (if any) owed to him on the balance sheet as part of the transaction. Plaintiff's Affidavit ¶14, Exhibit F. Plaintiff denies that he directly supervised the WPS accounting department or that he had regular meetings to go over each week's trial balance. Plaintiff's Affidavit ¶¶11, 15.

17. Plaintiff admits that at some point in mid-2001 he reviewed the 2000 Financial Statements, but states that he does not recall when. Plaintiff's Affidavit ¶16.

4

Plaintiff further states that in June 2001, Mark Brown, CFO, was much more involved than he was in balance sheet and audited financial statement issues, other than accounts payable and accounts receivable which could have an immediate cash impact. In that time frame, plaintiff's financial focus was largely upon the WPS cash flow and gross margin profitability. Plaintiff's Affidavit ¶11, 22. Finally, plaintiff states that the 1999 financial statements are inconsistent with those for 2000 and do not reflect a large liability to defendant Kulkarni. Plaintiff's Affidavit ¶¶16, 17, Exhibits H and I.

## III. DEFENDANT KULKARNI'S ATTEMPT TO TRANSFORM THE OMNIBUS PAYMENTS INTO DISCRETIONARY SECTION 5.2 PAYMENTS IS ILLOGICAL AND CONTRADICTED BY THE FACTS

Defendant Kulkarni argues that he "eventually received $765,980 in §5.2 special distributions pursuant to an Omnibus Agreement Kulkarni entered into with Parthenon on November 13, 2002." Kulkarni Memorandum at 9. However, he submits no evidence to so indicate, and does not attach a copy of the Omnibus Agreement to the Affidavit of Deepak S. Kulkarni dated May 5, 2006 (hereinafter "Kulkarni Affidavit") which supports his Motion for Partial Summary Judgment.

The documents directly contradict the position taken by defendant Kulkarni. See Plaintiff's Affidavit ¶9, Exhibit D at W0975-W0977, particularly ¶¶2(a) and 4 thereof. Rather than being an agreement solely with Parthenon, as defendant Kulkarni suggests, the Omnibus Agreement was entered into between Wolverine Proctor, LLC ("WP LLC")[2], WPS, Inc., Kulkarni and Parthenon. Contrary to defendant Kulkarni's suggestion, it was WPS, Inc., not Parthenon, that was to pay the $56,000 for state taxes and the $170,000 for deferred compensation. See Omnibus Agreement ¶2(a), Plaintiff's

---

[2] WP LLC was a holding company that indirectly owned substantially all of the shares of the operating entities WPS, Inc. and Friel Engineering Limited, the U.K. manufacturing arm. MawLaw 492 was another holding company. Plaintiff's Affidavit ¶21, Exhibit L at W0418 ¶1.

Affidavit ¶8, Exhibit C (hereinafter "Kulkarni Deposition") at 273-274. Only the $539,980 in 2002 Interest[3] was arguably to be paid pursuant to §5.2 of the LLC Agreement, and that, by WP LLC, not by Parthenon. In fact, the Omnibus Agreement does not even label the 2002 Interest a §5.2 distribution, stating only that distributions starting in 2003 are to be paid "in accordance with percentages set forth in Section 5.2…" Omnibus Agreement ¶4.

Furthermore, examination of the actual payment records produced by the defendants indicates that, during 2002, two Omnibus payments totaling $359,985[4] were made. See Counter Statement of Facts (hereinafter "CSOF") above ¶13. According to the accounting notations made on the documents, $56,000 of these two payments was allocated to the "Accrued State tax" general ledger account, $79,116 to the "Accrued payroll" account, and $224,869 to the "Accrued dividends" account. See CSOF ¶13, Plaintiff's Affidavit ¶10, Exhibit E. None of the 2002 payments was initially allocated as interest or distributions to shareholders[5]. Furthermore, the WP LLC 2002 financial statements show a member distribution of $133,985. Plaintiff's Affidavit ¶21, Exhibit L at W0415. Thus, it appears that the final accounting for the $359,985 in 2002 Omnibus Agreement payments to defendant Kulkarni was that $226,000 was applied to the state

---

[3] The payment to defendant Kulkarni for 2002 Interest was the full amount of his share of the interest on the WP&S notes, not just the tax portion. He was entitled to 38.57% of the §5.2 Special Distributions. With $14 million in WP&S Notes at 10% interest, his full share was .3857 x .1 x $14 million = $539,980.

[4] Some of the documents indicate a payment of $130,967 rather than $130,985. Apparently the $18 difference is due to a wire transfer fee.

[5] Certain documents produced by defendants indicate that the entries on the books and records of WPS, Inc. and WP LLC were later "reclassed" to affect different general ledger accounts. However, even after the reclasses the final audited 2002 financial statements show only $133,985 in member distributions, $226,000 less than the total paid to defendant Kulkarni in 2002, indicating that $226,000 had nothing to do with §5.2 distributions.

6

tax and accrued payroll obligations under the Omnibus Agreement, and the remaining $133,985 accounted for as a member distribution.

Clearly, the $226,000 had nothing to do with distributions under §5.2 of the LLC Agreement. It was neither so denoted in the Omnibus Agreement, nor was it accounted for in that manner. Furthermore, at least the $56,000 state tax and $79,116 accrued payroll liabilities paid later in 2002 were the same ones that existed in late 2001 and were hidden from the plaintiff[6].

Even the remaining $539,980, termed "interest" in the Omnibus Agreement, clearly would not have been paid to defendant Kulkarni had it not been for the accrued dividend and other payments allegedly due to defendant Kulkarni. In his deposition, Marshall Bartlett of Parthenon testified that "Mr. Kulkarni was positioned to be paid an accrued dividend, and that negotiation resulted in an omnibus agreement between Parthenon and Mr. Kulkarni." Bartlett Deposition at 27. The Omnibus Agreement is in accord. Paragraph 2(b) (Omnibus Agreement at W0976) specifically required defendant Kulkarni to waive his right to the accrued dividend in return for the other payments. Calling the $539,980 in "2002 Interest" under the Omnibus Agreement a discretionary payment within the sole control of the WP LLC Board of Managers defies credibility. See Kulkarni Memorandum at 12. Taken in a light most favorable to the plaintiff, as this Court must on a motion for summary judgment, the evidence shows that defendant Kulkarni effectively extorted payment of the accrued dividend from WP LLC and claims part of it is a distribution under §5.2 of the LLC Agreement.

---

[6] See Kulkarni Affidavit, Exhibit 2 at 26 (accrued state tax, account 22310-100-00 had a balance of $87,799.59 as of 11/30/01), Plaintiff's Affidavit ¶¶18, 20 (accrued payroll payable to Kulkarni, account 22450-100-00, had a balance of $79,116.00 as of the end of 2001).

In any event, even if the \$539,980 were discretionary interest under §5.2 of the LLC Agreement and therefore somehow not fraudulent, that would reduce, but not eliminate, the damages for fraud because some payments were clearly completely unrelated to §5.2 of the LLC Agreement, and the fact that the plaintiff was on notice as to the possibility of discretionary §5.2 payments is not a factor with respect to those payments.

## IV. PLAINTIFF HAS CLEARLY SHOWN BOTH DETRIMENTAL RELIANCE AND CAUSATION UNDER MASSACHUSETTS LAW

Defendant Kulkarni contends that plaintiff's argument that amounts not paid to him would have become General Distributions under §5.3 of the LLC Agreement is "pure speculation… at odds with the language of the LLC Agreement itself." Kulkarni Memorandum at 16. He thereby suggests that these distributions are a sort of gift that the Board of Managers can elect to bestow, or not, as it chooses. However, general principles of corporate law, Delaware law relating to LLCs[7], and the LLC Agreement itself are to the contrary. As with any corporation, all residual rights, after the payment of debts to creditors, rest with the stockholders, or "Members" as they are known under Delaware LLC law. That means that upon the winding up or dissolution of a corporation or LLC, after the creditors have been paid in full, any remaining funds are paid to the stockholders or members. See Del. Code Ann. tit. 6 §18-804. Furthermore, the LLC Agreement, §5.1 (see Kulkarni Affidavit, Exhibit 4 at W0574) provides that "in the event of a Recapitalization or a Sale, the proceeds of such Recapitalization or Sale, as the case may be, after deducting reasonable expenses incurred by the Company in connection therewith, shall be distributed, as soon as reasonably practicable…"

---

[7] Wolverine Proctor LLC is a Delaware Limited Liability Company. See Omnibus Agreement at W0975, first paragraph.

8

WP LLC was recapitalized on February 11, 2005, triggering this provision, but no funds were paid to the plaintiff. Plaintiff's Affidavit ¶19, Exhibit M ¶2. Upon a recapitalization, distributions become mandatory, not discretionary, under the LLC Agreement. Furthermore, even if the payments to Kulkarni were discretionary interest payments, that would not affect the fact that the value of WP LLC upon dissolution or winding up was reduced by at least the amounts paid to defendant Kulkarni under the Omnibus Agreement. That is necessarily so as the cash to pay defendant Kulkarni either had to be borrowed by WP LLC or its subsidiaries, or the money had to be withdrawn from its bank account. Upon recapitalization, any funds previously borrowed had to be either repaid or refinanced, (becoming liabilities of some new entity), and any cash remaining was available for distributions. In any case, the value of the cash and assets (less transferred liabilities) available for distribution after recapitalization were necessarily reduced by the amount of the payments to defendant Kulkarni, plus interest that either had to be paid while the increased loan was outstanding, or that was foregone due to a lower bank account balance. It would be completely illogical to assume that WP LLC or its subsidiaries could distribute an unanticipated $765,980 to Kulkarni without reducing the value of the members' units, which value is reflected in the required distributions at recapitalization or winding up. In addition, the business of WP LLC (and the value of the members' units) was likely further adversely affected by the lack of available cash, resulting from the Omnibus payments. That explains why Parthenon, although entitled to share in distributions to defendant Kulkarni pursuant to the LLC Agreement and the Omnibus Agreement, chose instead to keep the funds within the company. See Bartlett Deposition at 34-38, Chilinski Deposition at 46-49.

Defendant Kulkarni's next argument is that since there was a $150,000 "Equity

Advance," and the plaintiff was only entitled to distributions once his share exceeded this

amount, the plaintiff could not have been damaged. He argues that the plaintiff's

argument is "intrinsically flawed" because the $624,263 in accrued dividends was less

than the $3,750,000 (i.e. $150,000 divided by the plaintiff's 4% share) of distributions

"needed to activate Crawford's dormant rights." Kulkarni Memorandum at 17. But, he

submits no evidence as to the amount of distributions, in cash or in property, made as part

of the February 11, 2005 recapitalization. It is thus impossible to determine whether

those distributions themselves were $3,750,000 or more in value[8]. If they were, all of the

---

[8] It appears likely that the value of assets distributed as part of the February 11, 2005
recapitalization to defendant Kulkarni and Parthenon together was substantially more than the
$7.5 million threshold at which the plaintiff's $150,000 Equity Advance would be satisfied. The
Settlement Agreement (Kulkarni Affidavit Exhibit 5) at PAC0048, ¶1(a), provides that the
plaintiff is to receive 4% of the distributions to the holder of the Class A Units (i.e. defendant
Kulkarni). The LLC Agreement (Kulkarni Affidavit Exhibit 4) at W0574, §5.3.1 provides that
the first $10 million in distributions under §5.3 be divided 50/50 between the "Class A" and
"Class B" Units , providing $3.75 million to Kulkarni and $150,000 to the plaintiff at the $7.5
million value. When it made its investment in 2001, Parthenon paid $14 million for less than all
of the equity of WP LLC. While the division of distributions between Parthenon and Kulkarni
varied by tier in accordance with §5.3 of the LLC Agreement, effectively Parthenon obtained a
60.9% percent stake, making the total value of WP LLC at that point $23 million.

    To demonstrate that the $23 million is correct, one must consider the economics of the
transaction. Defendant Kulkarni was entitled to a $1 million/year consulting fee for 3 years
essentially regardless of what transpired. If he died or there was a change in control of WP LLC,
any amount remaining payable on the three year contract became due. Furthermore, he was
entitled to 50% of the first $10 million, and 10% of the next $37,778,000 of distributions under
§5.3 of the LLC Agreement. If WP LLC were sold for $23 million the day after the December
2001 transaction, Kulkarni would receive the first $3 million and there would be $20 million left
to pay the unit holders. Of that, 50% of $10 million ($5 million) plus 10% of $10 million ($1
million) would be paid to defendant Kulkarni. The remaining $14 million would be paid to
Parthenon (and related investors), returning their investment and demonstrating that $23 million
is the correct value. The 60.9% is also very close to the 61.43%/38.57% split of Special
Distributions under §5.2.

    For WP LLC to be worth less than $7.5 million at the 2005 recapitalization would have
required a precipitous decline in its value, unsupported by the audited financial statements. While
WP LLC in 2004 had an EBITDA before extraordinary items of negative $25,554, the
comparable figure for 2001 was a negative $486,116. Revenues for 2004 were $37.6 million,
compared to $34.4 million in 2001. Thus, the financial performance actually improved somewhat
between 2001 and 2004. Although there was $3.5 million in debt on the WP LLC balance sheet

$624,263 of fraudulently concealed dividends directly reduced plaintiff's share of the mandatory distribution following the February 11, 2005 recapitalization.

Defendant Kulkarni's argument illogically presupposes that there were no other distributions that were, or should have been, made pursuant to §5.3. He provides no factual support for that implicit allegation. In fact, defendants have steadfastly refused to provide any information or documents relating to distributions to defendant Kulkarni after April 2003, going so far as obtaining protective orders prohibiting the plaintiff from inquiring into the 2005 recapitalization or payments to defendant Kulkarni after 2002. Now, they in effect ask this Court to assume, without providing any documents or affidavits whatsoever, that the distributions to Kulkarni as part of the 2005 recapitalization were less than $3,750,000. Clearly, this Court cannot so assume, as summary judgment based on any such assumed fact would clearly run afoul of Fed. R. Civ. P. 56(f) and 56(e).

Furthermore, the standards for demonstrating causation under Massachusetts law are very liberal when what is sought is damages for fraud or deception relating to an investment in a business. All that need be demonstrated is a false representation, intended to induce action, reliance thereon by the plaintiff, and damages that "naturally flow from the fraud." David v. Belmont, 291 Mass. 450, 453 (1935); Reisman v. KPMG Peat Marwick LLP, 57 Mass. App. Ct. 100, 108-109 (2003). In David, shares of stock already owned were held, rather than sold, and more purchased in reliance upon false advertisements and representations. The stock subsequently declined in value. The Supreme Judicial Court held that the measure of damages was the decline in value

at the end of 2004 that wasn't there at the end of 2001, the accounts payable had been reduced from $5.5 million at the end of 2001 to $3.9 million at the end of 2004.

between the time the stock was purchased and the time the fraud was discovered. David at 454. Under that ruling, even if the value of WP LLC at the time of the 2005 recapitalization was less than $7.5 million, plaintiff would still recover, as the defendant is liable for all declines in value, independent of the cause, and WP LLC was undeniably worth more than $7.5 million on December 28, 2001, as Parthenon paid $14 million.

Similarly, in Fottler v. Moseley, 185 Mass. 563 (1904), in an analogous case to the instant one, a director and officer of a company had embezzled nearly $100,000. Following the discovery of that fact, the stock immediately fell to approximately 10% of its value two months earlier. Fottler at 564. The Supreme Judicial Court rejected the argument that the broker was not liable for the decline in value, despite the lack of connection between the false representations and the embezzlement. It rejected the argument that "the embezzlement of an officer of a corporation, being an unlawful act of a third person, should be treated as a new and independent cause of the loss, not contemplated by the defendant, for which he is not liable." Fottler at 565. Instead, it the SJC held that "[t]he risk of a fall [in the value of the stock], from whatever cause, is presumed to have been contemplated by the defendant when he falsely and fraudulently induced the plaintiff to retain his stock." Fottler at 566. See also Stolzoff v. Waste Systems International, Inc., 58 Mass. App. Ct. 747, 753, 763-764 (2003) (half truths hiding misappropriation of funds by company president was potentially actionable fraud).

While, plaintiff's interest in WPS, Inc. through the Settlement Agreement was not denominated as shares of stock, in effect that is exactly what it was. There were 1000 Class A Units. See Kulkarni Affidavit Exhibit 4 at W0599. Plaintiff shared in 4% of the

distributions and 4% of the indemnity obligations[9] of Kulkarni. Kulkarni Affidavit Exhibit 5 at PAC0049 ¶2. Plaintiff effectively owned 40 Class A Units that he purchased in exchange for the extinguishment of his options under the Employment Contract, except that he did not share in §5.2 distributions. While the Class A Units did not trade on a stock exchange, nothing in the logic of Fottler or David so requires. The Units were not marketable at all times, rather the mandatory §5.1 distributions provided liquidity.

Defendant Kulkarni argues that "Kulkarni's alleged misrepresentations regarding his entitlement to $624,263 in accrued dividend/expenses could never have resulted in actual damages to Crawford."[10] Kulkarni Memorandum at 16. Fottler presents a strikingly similar set of facts where an unanticipated payment to a corporate officer resulted in the decline of the value of an equity holder's position. Yet, Fottler stands in stark contrast to defendant Kulkarni's argument which is clearly contrary to binding precedent. Indeed, the circumstances of the instant case are even more compelling. In Fottler, the misrepresentation was by a broker who presumably lacked any knowledge of the embezzlement. In the instant case, it was defendant Kulkarni who fraudulently induced the plaintiff to sign the Settlement Agreement, benefited from the extinguishment of the plaintiff's options (which was a prerequisite to the closing of the Parthenon transaction)[11], and who knew the true facts regarding the accrued dividend.

The holdings in Fottler and David were reaffirmed in Reisman. In that case, as in the instant one, one set of equity rights was exchanged for another. Reisman at 107. In that case, as in the instant one, defendant argued a lack of causation. Reisman at 111. In

_____

[9] These percentages were both increased to 8% after distributions exceeded $47,778,000 (i.e. §5.3.3 of the LLC Agreement applied). Settlement Agreement ¶¶1(c) and 1(d).
[10] Either WP LLC was worth less than $7.5 million at the 2005 recapitalization, proving damages from the decline in value, or plaintiff was fraudulently not paid his share of the distributions.
[11] See Plaintiff's Affidavit ¶13, Exhibit N at PAC0465-PAC0466 §6.1(i)

Reisman, the disclosure of accounting irregularities came after the plaintiff had sold his shares at a major loss and the defendant argued a lack of causation. Reisman at 107. Citing David and Fottler, the Massachusetts Appeals Court refused to adopt into Massachusetts law principles of loss causation that have arisen in the context of SEC Rule 10b-5. Reisman at 116-117. In rejecting defendant's arguments, the court held that it was not necessary to prove that the "misrepresentation caused the price of Marcam stock to decline after the transaction." Reisman at 117. It held that "the Reismans are not required under Massachusetts law (nor would they be under the Restatement [Second] of Torts) to establish this as an element of their fraud claim." Reisman at 117.

## V. PLAINTIFF IS NOT ATTEMPTING TO RECOVER FOR A MISREPRESENTATION OR LOSS TO PARTHENON

Defendant Kulkarni argues that "it is Crawford's apparent contention that he was indirectly damaged when the Board of Managers of Wolverine Proctor, LLC failed to declare a section 5.3 distribution partially as a result of Kulkarni's misrepresentations. The law is clear, however, that a viable cause of action for fraud cannot be sustained where it was a third-party, and not the plaintiff, who relied on the purported misrepresentations." Kulkarni Memorandum at 16. Defendant Kulkarni's statement mischaracterizes the Amended Complaint. Plaintiff alleges that both he and Parthenon were misled[12], that both relied upon the misrepresentation, and both were thereby

---

[12] Unlike the plaintiff case, in Parthenon's case it appears that they were provided the lengthy printout (part of which is attached to the Kulkarni Affidavit as Exhibit 2) on December 27, 2001, one day before the initial closing of the transaction. In his affidavit ¶8, Kulkarni admits that the complete document is 121 pages, but he attaches only 27 pages. In fact, the 121 page document was the trial balance for only one division of WPS, Inc. There were at least another 30 pages (even more densely printed than those he attached) relating to other divisions of WPS, Inc. and related entities,that were made part of the Termination and Release Agreement. Given the vast quantities of documents reviewed and signed on December 28, 2001, it is not surprising that Parthenon missed the accrued dividend. Unlike Parthenon, plaintiff was not provided with the

damaged. Amended Complaint ¶¶76, 85. The fact that Parthenon was misled at the same time in no way invalidates plaintiff's claim.

Clearly, both he and Parthenon were damaged when WPS, Inc. was forced to pay the fraudulently hidden accrued state tax and accrued payroll amounts (denominated as such), and WP LLC was forced to pay the fraudulently hidden accrued dividend (disguised as interest, arguably under §5.2). Just as the value of the stock in Fottler declined after the embezzlement by a director and officer, so the value of the Class A and Class B units of WP LLC declined when defendant Kulkarni was paid for liabilities that he had hidden from the plaintiff and from Parthenon. Unlike the situation in Fottler, however, there was no public market for the WP LLC units. The major return to be received from the investment was clearly contemplated to be following a Recapitalization or Sale, with the payoff coming from the resulting mandatory distribution under §5.1 of the LLC Agreement, rather than from the sale of a publicly traded security. This distinction is of little importance as the effect is the same: the investor receives a return (positive or negative) when the investment is liquidated.

Nowhere does the Amended Complaint allege that defendant Kulkarni's misrepresentations induced the Board of Managers not to pay a §5.3 distribution. Rather, plaintiff argues that Parthenon was forced to enter into the Omnibus Agreement because of the hidden amounts allegedly due to Kulkarni, and that the need for WPS, Inc. to pay funds thereunder diminished the funds available to be paid as distributions under §5.3 to

---

Termination and Release Agreement prior to signing the Transition Agreement and the Settlement Agreement. Plaintiff's Affidavit ¶13. The fact that Parthenon was provided documentation may have been the reason why they did not sue defendant Kulkarni for fraud or simply refuse to allow WPS, Inc. to pay him, but that fact doesn't detract from the plaintiff's case, which is based on more compelling facts. See Kulkarni Memorandum at 5 ¶14 (suggesting that since Parthenon never alleged fraud that plaintiff doesn't have a case for fraud)

15

all of the unit holders. A reasonable jury could certainly find that Parthenon, which controlled the WP LLC Board of Managers, would never have allowed a distribution that it did not share in absent the hidden accrued dividend. Indeed, unless forced, agreeing to an optional Special Distribution for Kulkarni, but not itself, would imply that it acted purely for altruistic reasons and in a way that also damaged its interest in the business of WP LLC, given the latter's lack of free cash flow. See Bartlett Deposition at 36. Parthenon quite simply made a judgment that, absent the Omnibus Agreement, WPS, Inc. would have to either pay the accrued dividend or engage in litigation with Kulkarni, and that, given the Termination and Release Agreement that both it and WPS, Inc. signed, it might well lose. The Omnibus Agreement merely changed the label that was attached to $539,980 of the $765,980 in Omnibus payments, calling it 2002 Interest rather than payment of the accrued dividend.

## VI. DEFENDANT KULKARNI'S CONTENTION THAT PLAINTIFF IS SEEKING TO RECOVER FOR STATEMENTS OF OPINION IS MISPLACED

While ¶76 of the Amended Complaint alleges that defendant Kulkarni stated that the Special Distributions were "likely to be deferred or forgiven," a review of the remaining paragraphs of Count 8 reveals that the action for fraud does not depend upon this allegation[13]. See Amended Complaint ¶¶80-84, 88. The false statement as to

---

[13] In the Kulkarni Memorandum at 8, FN5, defendant Kulkarni argues that ¶¶76 and 80 of the Amended Complaint are inconsistent. They are not. Plaintiff himself determined that the unshared payments would be limited in scope after reviewing the LLC Agreement and its §5.1 tax provision. Assuming a combined federal and state tax rate of 42.5%, that would have meant a distribution to defendant Kulkarni of $14 million x .10 (interest rate) x .3857 (Kulkarni share) x .425 (tax rate), or $229,492 annually, of which plaintiff would have been entitled to 4%, or $9180, had it been under §5.3 rather than §5.2. Plaintiff viewed this amount as being limited in scope, particularly relative to what he would be entitled to if WP LLC were to be sold for $45 million, as an offer (later withdrawn), earlier in 2001 had provided. Plaintiff's Affidavit ¶5.

Kulkarni's retained right to the accrued dividend sufficiently establishes a cause of action for fraud.

Moreover, contrary to defendant Kulkarni's argument, opinions can be actionable under Massachusetts law. "[A] statement of opinion may be actionable where the speaker possesses superior knowledge concerning the subject matter to which the misrepresentations relate… or where the opinion is 'reasonably interpreted by the recipient to imply that the speaker knows facts that justify the opinion.'" Stolzoff at 760. Such is the case here, where defendant Kulkarni was responsible for all of the negotiations with Parthenon leading up to the December 2001 transaction, and plaintiff relied upon that statement as to the likelihood of the Special Distributions as reflecting an informal understanding between him and Parthenon. See Plaintiff's Affidavit ¶5. In retrospect, it appears that this statement correctly reflected Parthenon's intention as it was not itself paid more than a single quarter's worth of Special Distributions. Kulkarni Deposition at 274-275.

## VII.  DEFENDANT KULKARNI'S ARGUMENT THAT PLAINTIFF COULD EASILY HAVE DETERMINED THE TRUTH RELATING TO THE ACCRUED DIVIDEND IS NOT SUPPORTED BY THE FACTS

Defendant Kulkarni misconstrues the Amended Complaint ¶81 which states that he "retained an alleged right to $624,263 in accrued dividends and certain other payments" as indicating that the plaintiff was not aware of amounts allegedly owing to defendant Kulkarni on the books of WPS, Inc.  While Kulkarni alleges that certain of plaintiff's allegations are not credible, the plaintiff's allegations, as supported by affidavits and deposition transcripts, must be taken as true for purposes of this motion.

Nevertheless, it appears that defendant Kulkarni has simply misconstrued the Amended Complaint.

Although plaintiff was less aware of amounts allegedly owed to Kulkarni as of November 30, 2001 than defendant Kulkarni suggests, the plaintiff's allegation is not so much that he wasn't aware of these liabilities, but rather that that he was unaware that defendant Kulkarni intended to <u>retain</u> the right to payment of the accrued dividend and other liabilities after the December 2001 transaction. A draft schedule to one of the closing documents, reviewed by plaintiff before the transaction, stated that accrued compensation due to Kulkarni had been paid. See Plaintiff's Affidavit ¶14, Exhibit F. Also, plaintiff was aware that defendant Kulkarni had extracted $347,477.37 from WPS, Inc. in the days before the transaction, while telling the plaintiff that he was doing so as his ability to receive payments post-transaction would be limited. See Plaintiff's Affidavit ¶14, Exhibit G. Based upon several factors, plaintiff concluded that the agreements that defendant Kulkarni and the WPS, Inc. attorneys were negotiating would provide for the forgiveness of all significant amounts owed by WPS, Inc. to defendant Kulkarni, if any remained. Plaintiff's Affidavit ¶14. Defendant Kulkarni statement confirmed that conclusion. Plaintiff's Affidavit ¶12, Kulkarni Deposition at 255-257.

Of the many documents and contracts that were part of the December 2001 transaction, plaintiff was provided by defendant Kulkarni and the WPS, Inc. attorneys drafts of only four. Plaintiff's Affidavit ¶13. Unbeknownst to the plaintiff in 2001, the Termination and Release Agreement between defendant Kulkarni, WPS, Inc., Parthenon and other entities provided that, while extinguishing certain contractual obligations to defendant Kulkarni, it specifically preserved others listed upon the November 30, 2001

balance sheet of WPS, Inc. (also called the trial balance). Plaintiff's Affidavit ¶20, Exhibit K. Plaintiff had no reason to request a copy of this agreement, which was only briefly referred to by title in another document that plaintiff reviewed. Because he had no inkling that it both terminated and preserved rights, plaintiff instead very reasonably relied upon defendant Kulkarni's statement that he had "no right to any distributions or other monies from WPS, Inc. or WP LLC other than the $1 million per year Consulting Agreement and §§5.2 and 5.3 of the LLC Agreement." Furthermore, even had the plaintiff been aware that the Termination and Release Agreement carved out the amounts listed on the trial balance, he had no access to that document during the negotiations on December 28, 2001, which occurred at the offices of Ropes & Gray in Boston, not at the WPS, Inc. offices in Merrimac, MA, 45 minutes drive away. Plaintiff's Affidavit ¶12. Defendant Kulkarni had threatened to terminate the plaintiff should he not sign the agreements by 7:00 p.m. that day. Kulkarni Deposition at 42-46, 255-256.

Collins v. Huculak, 57 Mass. App. Ct. 387 (2003) and Kuwaiti Danish Computer Co. v. Digital Equip. Corp., 438 Mass. 459 (2003) do not assist defendant Kulkarni. In the former case, the plaintiffs' father had demanded they sign what proved to be a deed, presented it to them folded over so that they could not see its contents, and had represented that it was just for the bank. Clearly, the plaintiffs should have insisted on seeing what they were signing. In the instant case, the plaintiff had no way of knowing that the unseen Termination and Release Agreement purported to carve out certain liabilities to defendant Kulkarni. In the Kuwaiti Danish case, a quotation provided to the plaintiff specifically included a disclaimer that the quote was subject to management

approval. Again, perusal of the provided document would have quickly cleared up the facts.

Unlike these cases, the instant case would have required that plaintiff ignore clear indications that Kulkarni was forgiving any remaining amounts owed to him. The plaintiff would have had to demand that he be provided copies of all documents associated with the December 28, 2001 transaction and spend several hours reviewing the hundreds of pages involved in order to confirm that the clear and unambiguous assertion that defendant Kulkarni had made was in fact true. That would have had to have been done in the face of a 7:00 p.m. deadline for signature, with termination of his employment hanging over his head. Clearly, plaintiff's reliance was reasonable.

VIII.  CONCLUSION

Defendant Kulkarni's motion must fail as there are genuine issues of material fact and the plaintiff has demonstrated sufficient causality and detrimental reliance under the liberal standards for proof of fraud under Massachusetts law. In the alternative, plaintiff seeks either a continuance pursuant to Fed. R. Civ. P. 56(f) in order that full discovery into the 2005 recapitalization and payments to defendant Kulkarni after 2002 may be explored and/or leave to amend his complaint pursuant to Fed. R. Civ. P. 15(a) to state the fraud claim with greater clarity.

Respectfully submitted,

Peter A. Crawford, pro se
23 Newcastle Dr. #11
Nashua, NH  03060
(603)888-4574

Date: 26 May 2006

20

## Affidavit of Service

FILED
IN CLERKS OFFICE

2006 MAY 26  P 3: 35

DISTRICT OF MASS.

I, Peter A. Crawford, plaintiff, hereby say and depose, under pains and penalties of perjury, that I this day served the within papers upon defendants' attorney by causing copies thereof to be mailed, first class postage prepaid, to Mark Whitney, Morgan Brown & Joy, 200 State St., Boston, MA  02109.

Date: 26 May 2006

UNITED STATES DISTRICT COURT
District of Massachusetts

FILED
IN CLERKS OFFICE

2006 MAY 26  P 3: 35

Civil Action
No. 05-10078-DPW
DISTRICT OF MASS.

PETER A. CRAWFORD, Plaintiff )
)
)
v. )
)
WOLVERINE, PROCTOR & SCHWARTZ, INC., )
Steven F. Chilinski, Deepak S. Kulkarni, )
)
Defendants )

## PLAINTIFF'S AFFIDAVIT IN SUPPORT OF HIS OPPOSITION TO DEFENDANT KULKARNI'S MOTION FOR PARTIAL SUMMARY JUDGMENT

I, Peter A. Crawford, do hereby say and depose that:

1.  I am the plaintiff in the above-captioned action. I was employed by

Wolverine, Proctor & Schwartz, Inc. (hereinafter "WPS, Inc.") as its Chief Operating

Officer ("COO") from on or about December 30, 1999 to January 14, 2002.

2.  I make the statements herein based upon personal knowledge, unless

otherwise indicated.

3.  I have an MBA from Harvard University and have extensive experience in

reviewing financial statements and with accounting matters. I am familiar with the

accounting systems of WPS, Inc. from my time there and am thus able to understand and

draw conclusions from the detailed accounting documents produced by defendants during

discovery in this matter.

1

4. I do not recall that Deepak Kulkarni informed me on December 28, 2001 that a possibility existed that he would be entitled to distributions under either section 5.2 or 5.3 of the LLC Agreement. I reached that conclusion independently after reading a draft of that agreement on December 28, 2001.

5. On December 28, 2001, defendant Kulkarni represented to me that the interest payments provided for in section 5.2 of the LLC Agreement were likely to be deferred or forgiven. This representation was made just before I signed the Settlement Agreement and the Transition Agreement, and was clearly intended to induce me to sign those agreements. Based upon this representation, and relying on it as well as a review of the LLC Agreement itself and its provision in section 5.1 that distributions must be made to enable Members to pay taxes (unless determined in good faith not to be in the best interests of the company), and the fact that I perceived that it would not be in Parthenon's best interest to vote for a Special Distribution, I determined independently that unshared payments were likely to be limited in scope, probably to those required for taxes. I was aware that substantially all of the negotiations relating to the December 2001 transaction between WPS, Inc., Mr. Kulkarni and Parthenon had occurred between Mr. Kulkarni (assisted by the company's attorneys) and representatives of Parthenon. I therefore believed that he had superior knowledge as to Parthenon's intentions and that he knew facts to justify his statement regarding the likelihood of section 5.2 distributions. Specifically, I believed that he and representatives of Parthenon had an informal understanding that the interest payments would be deferred or forgiven.

6. I attach hereto as Exhibit A true copies of selected pages from the deposition of Marshall Bartlett, taken in this matter on January 20, 2006, together with a true copy of the errata sheet that I received relating to that deposition.

7. I attach hereto as Exhibit B true copies of selected pages from the deposition of Steven Chilinski, taken in this matter on November 14, 2005, together with a true copy of the errata sheet that I received relating to that deposition.

8. I attach hereto as Exhibit C true copies of selected pages from the deposition of Deepak Kulkarni, taken in this matter on December 7, 2005. I never received an errata sheet relating to that deposition.

9. I attach hereto as Exhibit D a true copy of the Omnibus Agreement, produced by defendants during discovery in this matter.

10. I attach hereto as Exhibit E true copies of pages W1014, W1015, W01059, W01060, W01067 and W01069 produced by defendants during discovery in this matter.

11. Mark Brown, not I, was the senior WPS, Inc. executive in charge of corporate finance and accounting issues throughout 2001, and defendant Kulkarni was also heavily involved in these areas. Mr. Kulkarni was very sophisticated at accounting and corporate finance issues. Nobody in the WPS, Inc. accounting organization, other than Mark Brown, reported directly to me at any time after Mark Brown joined WPS, Inc. as CFO in 2000.

12. On December 28, 2001, I was present only very briefly in the offices of WPS, Inc. in Merrimac, MA before being summoned by Mr. Kulkarni to the offices of Ropes & Gray in Boston, MA where the transaction with Parthenon was being closed, and where I remained until I had signed the Transition Agreement and the Settlement

3

Agreement. Mr. Kulkarni represented to me during a meeting in a conference room in those offices that he "had no right to any distributions or other monies from WPS, Inc. or WP LLC, other than a $1 million per year Consulting Agreement, and under sections 5.2 and 5.3 of the LLC Agreement." That representation was made prior to my signing of the Transition Agreement and the Settlement Agreement, both executed later that day. I relied upon this representation in entering into the Settlement Agreement and the Transition Agreement. I was very concerned, particularly given prior withdrawals by Mr. Kulkarni that had left WPS, Inc. severely cash constrained and unable to make shipments, that Mr. Kulkarni not be able to receive payments from either entity in which I would not be entitled to share under the Settlement Agreement, or that would reduce the value of the distributions that I was entitled to share in. I was under enormous pressure on December 28, 2001 to reach an agreement as Mr. Kulkarni had earlier that day threatened to terminate my employment. I believed that copies of the WPS, Inc. trial balance were available only at the WPS, Inc. offices in Merrimac, MA, and in any case I did not consider it necessary to consult the trial balance on December 28, 2001 as I was completely unaware of the contents of the Termination and Release Agreement and its incorporation of the trial balance, prior to signing the Transition Agreement and the Settlement Agreement.

13. Prior to my signing of the Transition Agreement and the Settlement Agreement on December 28, 2001, Mr. Kulkarni and the WPS, Inc. attorneys at Epstein, Becker & Green had provided me with draft copies of only four of the agreements relating to the December 2001 transaction with Parthenon: The Transition Agreement (an earlier draft was called the Consulting Agreement), the Settlement Agreement, the

4

Wolverine Proctor, LLC Limited Liability Company Agreement ("LLC Agreement") and

the Deepak Kulkarni Representation and Warranty, Indemnity and Subscription

Agreement (the "Indemnity and Subscription Agreement"). I did not receive any of the

agreements listed as exhibits to the Indemnity and Subscription Agreement (on page

PAC0442 referenced below), but did receive drafts of schedules to it numbered 3.4 to

3.30. I had not seen any other agreements associated with the December 28, 2001

transaction before signing the Transition Agreement and the Settlement Agreement on

December 28, 2001. My attention was not specifically called to the existence of the

Termination and Release Agreement, although reviewing a draft copy of the Indemnity

and Subscription Agreement that I have indicates that it is briefly mentioned by name. I

was not aware of any of the terms of the Termination and Release Agreement at any time

prior to being provided a copy of it in 2005 during discovery in this matter. I attach

hereto true copies of pages PAC0438, PAC0442, PAC0445, PAC0465 and PAC0466 as

Exhibit N. These are pages from a draft of the Indemnity and Subscription Agreement

that I received from Deepak Kulkarni on December 27, 2001. The Termination and

Release Agreement is mentioned on pages PAC0442 and PAC0445.

14. In preparation for the closing of the transaction with Parthenon that occurred

on December 28, 2001, I reviewed and contributed to the drafting of various schedules to

the Indemnity and Subscription Agreement. On December 19, 2001, I received from

Glenn Burlingame of Epstein, Becker and Green, a draft of schedules numbered 3.4

through 3.30. I attach hereto as Exhibit F true copies of selected pages of that document.

During December 2001, prior to December 28, 2001, Mr. Kulkarni informed me that he

was withdrawing funds from WPS, Inc. as his ability to do so after the Parthenon

transaction closed would be greatly reduced. Through Mark Brown, CFO of WPS, Inc. at the time, I learned that these withdrawals had occurred and that they had been made in settlement of alleged liabilities owed to Mr. Kulkarni. I attach hereto as Exhibit G, true copies of pages W0129, W0133 and W0134 produced by defendants during discovery in this matter. These documents reflect a payment to Mr. Kulkarni of $159,298.52 on December 17, 2001 and of $188,178.85 on December 27, 2001, the day prior to the closing of the transaction with Parthenon. These payments are consistent with my recollection of what occurred during December 2001. I was also aware that PriceWaterhouseCoopers had conducted extensive due diligence, on behalf of Parthenon, on site at the WPS, Inc. headquarters in Merrimac, MA during 2001 and believed that they must have become aware of any significant amounts that might contractually have been owed to Mr. Kulkarni. Based upon all of the information in this paragraph, I concluded that the agreements relating to the December 2001 transaction must have provided for Mr. Kulkarni to forgive all significant amounts that were owed to him by WPS, Inc. and related entities (to the extent any remained) in connection with the transaction, particularly since I believed that a rational investor in Parthenon's position would require precisely that.

15. I did not hold regular meetings, on Friday afternoon or at any other time, with anyone to go over each week's trial balance, or the WPS, Inc. balance sheet. Prior to the closing of a transaction with Citizens Bank in September 2000, I reviewed certain of the WPS, Inc. balance sheet accounts relating to revenues, accounts receivable and customer deposits, but not accrued expenses or dividends, with the WPS, Inc. accounting staff on a few occasions. One of those meeting likely occurred on a Friday afternoon as it was just

6

before one of the consulting accountants left for vacation. After the Citizens Bank
transaction closed in September 2000, and particularly after the 1999 WPS, Inc. audited
financial statements were completed on November 6, 2000, I rarely, if ever, reviewed the
WPS, Inc. balance sheet in detail, other than the accounts receivable and accounts
payable.

16. At some point in mid-2001, I reviewed the WPS, Inc. financial statements for
2000, however I do not recall when I did so. Although I have no specific recollection of
having seen it, in all likelihood I at some point during 2001 noticed the reference to
$694,000 being owed to the sole shareholder in these statements, the audit of which is
dated June 29, 2001. I attach hereto as Exhibit H, a true copy of page PAC0077 from the
WPS, Inc. 1999 financial statements (period ending January 1, 2000) which refers to only
$35,000 being owed to the sole shareholder as of January 1, 2000. That is inconsistent
with an additional $1,374,000 for that same date set forth in the WPS, Inc. 2000 financial
statements. By June, 2001, I had little involvement with the WPS, Inc. balance sheet,
other than the accounts receivable and accounts payable, and do not recall being aware, in
2001, of a large accrued dividend purportedly being owed to Mr. Kulkarni, as the
reference in the 2000 audited financial statements was to amounts owed to him in
general. Conversely, I specifically recall a large tax payment of approximately $680,000
made by WPS, Inc. on behalf or Mr. Kulkarni in late September or early October 2000
that was accounted for as a reduction to the accrued dividend account.

17. I attach hereto as Exhibit I true copies of pages W01150 and W01152
produced by defendants during discovery in this matter. I do not recall being aware, at
any time during 2000 or 2001, of the entry on page W01152 increasing the accrued

dividend balance by $640,000 as of December 31, 2000, or the fact that the accrued dividend balance remained this high after the tax payment of $680,234 charged against the accrued dividend account, set forth on page W01152.

18. I attach hereto as Exhibit J a true copy of page W01051 produced by defendants during discovery in this matter. In my opinion, and based upon my familiarity with the WPS, Inc. accounting documents gained while I was COO, this document indicates that $79,116.00 of the WPS, Inc. accrued payroll liability as of the end of 2001 was owed to Deepak Kulkarni.

19. I received no notice of the February 11, 2005 recapitalization of Wolverine Proctor LLC, no accounting for any distributions made therewith, and no payments of distributions. I was not even aware of the recapitalization until defendants produced documents in this case much later in 2005. I attach hereto as Exhibit M a true copy of page W0367 from the Wolverine Proctor LLC 2004 financial statements, produced by defendants during discovery in this matter.

20. I attach hereto as Exhibit K a true copy of pages W0756-W0762 produced by defendants during discovery in this matter. Attached as an exhibit to this document were an additional 162 pages of computer listings and spreadsheets numbered W0763-W0924. I have reviewed Exhibit 2 to the Affidavit of Deepak S. Kulkarni dated May 5, 2006, submitted in support of his Motion for Partial Summary Judgment. Pages 1-27 of that document appear to match pages W0801-W0828 produced by defendants, although portions of the pages were cut off in the copy produced by defendants, and pages W0802 and W0803 are identical and match page 2 of Exhibit 2.

8

21. Attached hereto as Exhibit L are true copies of pages W0409, W0415 and W0418, selected pages from the WP LLC 2002 financial statements, produced by defendants during discovery in this matter.

22. From prior to December 2000 through January 14, 2002, I left most issues relating to the balance sheet and the audited financial statements of WPS, Inc. in the hands of Mark Brown, CFO and the WPS, Inc. accounting department under his direction. My financial focus during that time was on cash flow, gross margin profitability and, because immediate cash flow was affected, the accounts payable and accounts receivable balance sheet accounts.

Signed under pains and penalties of perjury this the 26th day of May, 2006

Peter A. Crawford, pro se
23 Newcastle Dr. #11
Nashua, NH  03060
(603)888-4574

9